**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION, CINCINNATI**

|  |  |  |
|---|---|---|
| **EVERETT W. WHISMAN, et al.** | : | **Case No.  C01-02-406** |
|  | : |  |
| Plaintiffs, | : | **Judge Beckwith** |
|  | : | **Magistrate Sherman** |
| -vs- | : |  |
|  | : | <u>**NOTICE OF FILING OF**</u> |
| **ZF BATAVIA, LLC, et al.** | : | <u>**DEPOSITION OF LEN SENNISH**</u> |
|  | : |  |
| Defendants. | : |  |

 **NOW COMES** Defendant ZF Batavia, LLC, by and through counsel and hereby gives

notice of the filing of the deposition of Len Sennish.  Attached hereto is a true and accurate copy

of the deposition of Len Sennish.

 Respectfully submitted,

 /s/ Douglas M. Morehart
 Douglas M. Morehart (0038668)
 Haverkamp, Brinker, Rebold
 & Rhiel Co. LPA
 Trial Counsel
 5856 Glenway Avenue
 Cincinnati, OH  45238-2079
 (513) 922-3200
 (513) 922-8096 Fax
 *dmoreha@hbrr-law.com*

 /s/ John J. Hunter, Jr.
 John J. Hunter, Jr. (0034602)
 HUNTER & SCHANK CO., LPA
 Co-Counsel
 One Canton Square
 1700 Canton Avenue
 Toledo, OH  43624
 (419) 255-4300
 (419) 255-9121 Fax
 *jrhunter@hunterschank.com*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent to the individual(s) listed below by facsimile and First Class U.S. Mail, postage prepaid, on this 21st day of November, 2003.

Ellen J. Garling
Jeffrey L. Vanway
Baker & Hostetler LLP
312 Walnut Street, Suite 3200
Cincinnati, OH  45202
Facsimile No. 513-929-0303

Stephen A. Simon
David M. Cook
David M. Cook LLC
22 West Ninth Street
Cincinnati, OH  45202
Facsimile No. 513-721-1178

/s/ John J. Hunter, Jr.
John J. Hunter, Jr.

jr/whisman.depo.sennish.notice.doc

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, CINCINNATI


EVERETT W. WHISMAN, et al.,          :

        Plaintiffs                    :

        -v-                           : Case No. C-1-02-406
                                      : (Judge Beckwith)
                                      : (Magistrate Sherman)

ZF BATAVIA, LLC, et al.,             :

        Defendants                    :


                    - 0 -


        The deposition of LEONARD SENNISH, taken before
Melea E. Chaney, Court Reporter and Notary Public in
and for the State of Ohio, at the Holiday Inn Eastgate,
4501 Eastgate Boulevard, Cincinnati, Ohio, on the 25th
day of July, 2003, beginning at the hour of 7:57 a.m.
and ending at 12:12 p.m. of the same date.

                    - 0 -


                RIVERSIDE REPORTING
               Certified Court Reporters
                    P.O. Box 949
              Covington, Kentucky  41012
           KY(859)291-6110  OH(513)574-7017

                                                          2

APPEARANCES:


FOR THE PLAINTIFF:          STEPHEN A. SIMON, Esq.
                           Attorneys at Law
                           22 West Ninth Street
                           Cincinnati, Ohio 45202


FOR THE DEFENDANTS:         JOHN J. HUNTER, JR., Esq.
                           Attorney at Law
                           One Canton Square
                           1700 Canton Avenue
                           Toledo, Ohio  43264

                           JEFFREY L. VANWAY, Esq.
                           Attorney at Law
                           312 Walnut Street
                           Suite 3200
                           Cincinnati, Ohio  45202-4074


ALSO PRESENT:               MR. GARY VORIES
                           MR. E. WAYNE WHISMAN
                           MR. HERBERT HUEBNER

                           - 0 -


STIPULATIONS:

        It is stipulated by and between counsel
for the respective parties that the deposition of
LEONARD SENNISH, a witness herein, may be taken at this
time pursuant to the Federal Rules of Civil Procedure
and Notice; that the deposition may be taken via
Stenomask by the Notary Public/Court Reporter, and
transcribed by her out of the presence of witness; that
the deposition was submitted to counsel for the witness
for reading and signature.

                           - 0 -



                                                    3



                    INDEX OF EXAMINATION:

By Mr. Simon......................................4

INDEX OF EXHIBITS:

28  4/1/01 corporate policy (overtime)...........125

29  2/19/02 e-mail...............................135

30  2/19/02 e-mail...............................135

31  6/1/01 corporate policy (bereavement).......136

32  ZF Batavia salary broad bands...............144

33  9/8/01 e-mail...............................144

34  1/22/02 e-mail..............................147

35  2/8/02 e-mail...............................148

36  3/8/02 memo.................................150

37  2001 AIP Determination 3/5/02...............150

38  SHRM article................................153

39  5/5/00 transition plan......................155

40  7/31/00 e-mail..............................156

41  9/28/00 memo................................157

42  8/21/00 e-mail..............................159

43  12/15/00 e-mail.............................161

4

1    LEONARD SENNISH, called as a witness, being first duly

2    sworn, testified as follows:

3            Q       Sir, can you please state your full

4    name for the record?

```
 5              A       It's Leonard Walter Sennish,

 6       S-E-N-N-I-S-H.

 7                      MR. SIMON:  All right.  Mr. Sennish, my

 8              name is Steve Simon.  I'm one of the attorneys

 9              for the plaintiffs in this lawsuit that was

10              brought against ZF Batavia and Ford Motor

11              Company.  Two of my clients are here today,

12              Wayne Whisman and Gary Vories, but I think

13              you're aware there's a total of 15 salaried

14              employees that are in the lawsuit.  Were you

15              aware of that?

16                      THE WITNESS:  That's correct.  Yes, I

17              was.

18       BY MR. SIMON:

19              Q       Have you ever had your deposition

20       taken, Mr. Sennish?

21              A       Yes, I have.

22              Q       More than once?

23              A       More than once.

24              Q       When was the most recent?

25              A       About two or three weeks ago.
```

                                                              5

```
 1              Q       Was that in the Gene Gilliam case?

 2              A       That's correct.

 3              Q       What other times before that?
```

4          A          Approximately a year ago, Tony Clay.

5    And then it was probably five years prior to that, a

6    case with another company.  I can't remember the

7    individual's name.

8          Q          Who is Tony Clay?

9          A          Tony Clay was a former employee of ZF

10   Batavia, a salaried group leader.

11         Q          What was the nature of his lawsuit?

12         A          I believe it just centered on wrongful

13   termination and threw in, I believe, based on his race.

14         Q          Is it still pending?

15         A          No, that has been resolved.

16         Q          Was it filed here in southern Ohio?

17         A          Yes.

18         Q          Was it in federal court, do you know?

19         A          I'm not sure.  I believe it was.

20         Q          So obviously in the Tony Clay case you

21   testified in your capacity as human resources director?

22         A          That's correct.

23         Q          Is that your title?

24         A          That's correct.

25         Q          And five years ago you testified again

                                                        6

1    on behalf of another company in your capacity as a

2    human resource manager of some kind?

3          A          At that time I was director of labor

4    relations.

5              Q       What was the company?

6              A       American Axle and Manufacturing.

7                   MR. SIMON:  All right.  Well, you've

8              done this a few times so you probably know the

9              ground rules, but I'll go ahead and tell you

10             them again.  You've heard it two or three weeks

11             ago, but the ground rules of a deposition just

12             are that I'm going to ask you questions and

13             you're going to answer them under oath.  The

14             court reporter is going to take down your

15             answers.  Answer audibly where you can with a

16             yes or no so she can take down what you said as

17             opposed to making some sort of noise.  That's

18             hard to figure out what that is.

19                  The most important thing is, though, if

20             I ask a question and you don't understand it,

21             Mr. Sennish, or you just didn't hear it, please

22             ask me to rephrase or re-ask.  Otherwise

23             someone reviewing the transcript is going to

24             think that you understood my question.  Will

25             you ask me to re-ask or rephrase if you don't

7

1              understand a question?

2                   THE WITNESS:  Yes, I will.

3      MR. SIMON:  You'll do that?

4      THE WITNESS:  I absolutely will.

5      MR. SIMON:  All right.  And understand,

6    too, sir, that if you become tired or have

7    trouble concentrating, you can take a break if

8    you like.  We'll probably be here in the

9    morning, but we'll break at a good time, so

10    whenever you need a break, just tell your

11    lawyer.

12      THE WITNESS:  Great.

13 BY MR. SIMON:

14    Q  You sort of hinted at where -- I wanted

15 to ask you about your former background before you

16 started at ZF Batavia.  Did you start at ZF Batavia in

17 1999 or 2000?

18    A  September of 1999.

19    Q  Where did you work before that?

20    A  American Axle and Manufacturing in

21 Detroit.

22    Q  And how long were you there?

23    A  Exactly five years.

24    Q  Started in '94 roughly?

25    A  Correct.  September of '94.

8

1    Q  Before that?

2    A  I worked with Philip Morris USA in

```
3       Charlotte, North Carolina.

4           Q       And how long were you there?

5           A       Eighteen months.

6           Q       Say, 1992 to 1994, I guess?

7           A       Yes, more or less.

8           Q       What was your position at Philip

9       Morris?

10          A       Human resources manager.

11          Q       When you were at American Axle, were

12      you director of labor relations that whole time?

13          A       No.  That would have been the last

14      three years.  The previous two years was site personnel

15      director at the Detroit complex.

16          Q       At Philip Morris you were HR manager

17      for the 18 months?

18          A       Yes.

19          Q       Before that?

20          A       General Motors.

21          Q       How long were you there and what were

22      your jobs?

23          A       I was there 12 years.  Lastly labor

24      relations manager at the Saginaw, Michigan site.

25          Q       What was your position when you
```

9

```
1       started?
```

```
2          A       Labor relations administrator.

3                  MR. VANWAY:  Gentlemen, could I ask

4          both of you to keep your voices up?

5                  MR. SIMON:  Yes.  Sure thing.

6                  THE WITNESS:  I'm -- I'm sorry.  Did --

7          was that the -- at the Saginaw site or at

8          General Motors?

9                  MR. SIMON:  You said you were at

10         General Motors for 12 years, and I don't need

11         to know everything you did there, I just

12         wondered what you started at General Motors.

13                 THE WITNESS:  At General Motors as a

14         first line supervisor.

15  BY MR. SIMON:

16         Q       Okay.  So you worked your way up into

17  HR?

18         A       Yeah, you can put it that way.

19         Q       Well, was it a voluntarily choice to go

20  into human resources?

21         A       Quite frankly, I was recruited into HR.

22         Q       What kind of educational background do

23  you have?

24         A       A BS/BA from Ohio State.

25         Q       What year?
```

                                                                        10

```
1          A       1976.
```

2          Q        Now, what's in between Ohio State and

3    GM?

4          A        About a week.

5          Q        Let's see.  Twelve years.  According to

6    my math, I've got you starting at GM in 1980; is that

7    not right?  It must be '76.

8          A        Yeah.  I'm sorry.  Did I --

9          Q        You said you were at GM for about 12

10   years and I thought you started at Philip Morris in

11   '92.

12         A        Yeah.  I guess my math was wrong.  I --

13   '76 is when I started.

14         Q        All right.  What kind of training have

15   you received over the years in human resources?

16         A        Well, without chronicling every one, I

17   can't think of much I haven't had in terms of seminars

18   and workshops and certifications from certified quality

19   instructor from Crosby Quality College to affirmative

20   action planning certification to labor relations

21   workshops at Harvard, Michigan State and just a lot of

22   -- a lot of workshops, seminars and training.

23         Q        Do you have documentation of that

24   training in your personnel file at ZF Batavia?

25         A        No.

1          Q        Do you have documentation of any

2      training in your personnel file?

3          A        Not at ZF Batavia.  It just wasn't

4      relevant when I was hired.

5          Q        Did you leave voluntarily from Philip

6      Morris?

7          A        Yes.  I got a job offer with American

8      Axle I couldn't refuse.

9          Q        Did you leave voluntarily from American

10     Axle to go to ZF Batavia?

11         A        I was recruited to work at ZF Batavia

12     and accepted their offer.

13         Q        Have you been fired at any of your

14     positions in HR, whether it's GM, Philip Morris or

15     American Axle?

16         A        Absolutely not.

17         Q        Are there certain plants that you used

18     to work at where you've been told that you're not

19     welcome there anymore?

20         A        Never.

21         Q        Did you develop any relationships with

22     a labor union such that they've told management at

23     these former jobs that they don't want you there

24     anymore?

25         A        Well, the only way you move from one

1    company to another in a job where you're in labor

2    relations or in human resources where you have a

3    responsibility for labor relations -- the international

4    union keeps book that I'm aware of on labor relations

5    managers, directors and whatnot.  And so when a company

6    typically hires somebody at higher level, they will --

7    they will talk to the international union, their

8    contacts there and say "Hey, what do you know about

9    this guy?"  And they will get feedback which will

10   undoubtedly enter into their decision relative to

11   hiring that person.

12        Q       Well, who hired you at ZF Batavia?

13        A       My current boss, Dave Adams, was the

14   primary mover.  I also interviewed with Ford Motor

15   Company as a 49 percent partner in the joint venture

16   with a gentleman by the name of Dennis Cirbes and a

17   retired gentleman by the name of Jim Quinlan, retired

18   now.

19        Q       What was it about the job at ZF Batavia

20   that was attractive to you?

21        A       Well, I always liked being close to the

22   plants and the three years -- the last three years at

23   American Axle was a corporate job which was a fine job,

24   I just got this contact from a -- a executive recruiter

25   out of Chicago who talked to me about the position.

1      And what, number one, attracted me to it was the

2      combination of a corporate job and a plant job in one

3      job.  And that -- that was very enticing in terms of

4      the variety of activities.  And, secondly, I had lived

5      in Michigan two different times and I didn't want to

6      live in Detroit anymore and Cincinnati was an

7      acceptable alternative, secondarily.

8            Q      So when I had asked you about if you

9      were not allowed in certain plants, are you saying

10     that's not true or it is true?

11           A      I have never been barred from any

12     factory that I'm aware of.

13           Q      But it is your testimony that you think

14     the people who hired you at ZF Batavia may have talked

15     to the international union to see what your previous

16     experience was or are you saying the union, the UAW,

17     talked to the international --

18           A      Well, I know the -- I know the UAW did

19     because that feedback came back to me and I'm pretty

20     sure that my boss went through the Ford channels to

21     find out and I bet Ford did to make sure when they

22     interviewed me that there wasn't going to be a problem

23     in Batavia.

24           Q      Well, was it your understanding the UAW

25     reported negative things about you at the former jobs?

1       A     Not at all.  I doubt whether I would

2   have gotten hired if they had a negative opinion.

3       Q     All right.  I mean, you're the type of

4   HR manager that takes a pretty aggressive posture

5   towards the unions?

6       A     Well, I mean, cautiously aggressive.

7   There's --

8       Q     When you came in September '99, what

9   were you told about the transition in terms of the

10  salaried workforce?

11      A     Well, when I came to ZF in September of

12  '99, the -- the Ford HR manager was still there and so

13  when I --

14      Q     Who was?

15      A     Mike Warden, who's now in Chicago at

16  the assembly plant.  When I came in physically, Mike

17  and I pretty much divided -- put a clear line of

18  demarcation in our responsibilities in that Mike would

19  continue working in an ancillary office handling the

20  Ford business and that I would be taking over the ZF

21  business and the plant activities, et cetera, et

22  cetera.  So Mike was there until February of 2000, give

23  or take a week, where he pretty much oversaw the -- the

24  transition through that time.

25      Q     Let's go right to the documents.  The

1    documents I have in front of you, Mr. Sennish, are

2    documents we've referred to in previous depositions, so

3    if you'll just keep that stack there and at times I'll

4    tell you to grab off the stack.  So if you could grab

5    Exhibit 2 off the stack and place that in front of you.

6              Exhibit 2, we've kind of called it a

7    lot of things.  I'll try to be consistent today.  We've

8    called it a brochure, a summary.  It's a copy of a tri-

9    fold brochure.  Have you seen Exhibit 2 before?

10        A    Yes, I have.

11        Q    I don't need you to identify the exact

12   date, but when did you first see Exhibit 2?

13        A    During September of '99.

14        Q    Kind of explain for me the context that

15   you first saw this summary.

16        A    Well, having come from an outside

17   company, I read everything kind of voraciously and this

18   was one of the -- the items that I was presented with

19   as a document that was relevant to the joint venture

20   and read through it and at that time I understood it

21   pretty clearly.

22        Q    Well, what did you understand the

23   significance of this document to be?

24        A    That this was like any other benefit

25   summary.  Like the one I got when I left American Axle

16

1     to join ZF, it summarized what the -- the benefits

2     were, it summarized what the policies were and touched

3     on some procedures and it gave me a pretty good idea of

4     -- so I could compare what I was leaving at American

5     Axle and inheriting at ZF, that it was, you know, the

6     -- the general operating policies, procedures, benefits

7     of the company.

8          Q     But you didn't receive Exhibit 2, you

9     received some other summary; is that what you said?

10         A     Yes.

11         Q     Was it your understanding that Exhibit

12     2 is a summary that applies to Ford transitionals?

13         A     That was my understanding.

14         Q     Since you've been at ZF Batavia, have

15     you had occasion to look back at the benefit summary

16     you were given when you were first hired?

17         A     From time to time, yeah.

18         Q     Why do you look at it?

19         A     Usually for reference because while

20     I've think I got a pretty good memory, sometimes some

21     details get lost.

22         Q     I mean, in terms if you want to make

23     sure that the benefits that they told you about in the

24     beginning, that you're still getting them these years

25     later; is that --

17

1        A       No.

2        Q       I don't understand.  Why do you look at

3   it?

4        A       Because I just want to stay fresh with

5   what the benefits are.  I have people asking me

6   questions about benefits and I like to be able to

7   answer them.

8        Q       So you're not doing it for your own

9   purposes.  You're doing it for other people who also

10  may have been shown that benefit summary?

11       A       Yeah.

12       Q       Like it's 2003, so if they ask you

13  about their benefits, you might go back and look at the

14  benefit summary you received in '99 just to refresh

15  your memory?

16       A       Yeah, I've done that.  And it's the

17  same benefit summary pretty much since then, so, yeah I

18  refer to it once in a while.

19       Q       If a Ford transitional employee has a

20  question about their summary package, do you then refer

21  to Exhibit 2 --

22       A       I would.

23       Q       -- to refresh your recollection?

24       A       I would.  And I can't recall the last

25  time I got an inquiry about that personally.

18

1         Q         You can't remember any inquiries about

2    it?

3         A         I can't say that.  I'm sure in '99 and

4    early 2000 there were questions.  There  -- well, I can

5    say with respect to -- to transferring 401(k) assets

6    from the Ford Fidelity funds into the ZF Batavia

7    Fidelity funds there was -- there were some

8    transmission problems of the data and got a lot of

9    questions on that for a couple of days in '99, but that

10   cleared itself up and didn't hear much about that

11   subsequent to it.

12        Q         Just turning to one particular thing in

13   the brochure.  And you're familiar with it?  Do you

14   need a second to review it or are you familiar with the

15   contents?

16        A         Well, I haven't looked at it in quite

17   some time, but if there's something in particular I --

18        Q         Sure.  Did you review any documents in

19   preparation for the deposition, Mr. Sennish?

20        A         No.  I can't say that I did any special

21   preparation or I sat down and read this over, no, I

22   didn't.

23        Q         Did you review any documents?

24        A         Not in particular, no.

25        Q         Or just any documents that as you're

19

1    sitting here you know you looked at it in preparing for

2    the deposition?

3         A      Well, when we were -- the documents

4    were discovered, I went through my files and looked at

5    stuff then and looked -- read over what it was and

6    turned in what was required to be turned over, but --

7         Q      In preparation --

8         A      -- did I sit down and study this?  No.

9         Q      But in preparation for today's

10   deposition did you look over some documents to refresh

11   your recollection?

12        A      Yeah, I looked at a couple of e-mails

13   and I talked with my attorney last night, but that was

14   about it.

15        Q      Well, I don't want any e-mails between

16   you and your attorney, but are there other e-mails you

17   looked at?

18        A      I don't know.

19             MR. HUNTER:  If you remember.  I can't

20             help you with it.

21             THE WITNESS:  There was a reference to

22             -- to one that was sent to me from the

23             controller that, you know, had some reference

24             to -- I don't know, what was it, the Ford

25             transition pukes or something like that, that

20

```
1              was just such an anomaly that that was

2              referenced.  And I think that's about it.

3    BY MR. SIMON:

4              Q       Do you see where it has vacation on the

5    second page?  Second column, lower middle.

6              A       Yes.

7              Q       And it lists how many weeks the

8    employees are entitled to based on their years of

9    service; is that right?

10             A       Yes, it does.

11             Q       Now, if someone is hired -- just to use

12   the right terminology, when I say Ford transitional

13   employees, you know who I'm talking about, right?

14             A       That's true.

15             Q       And I guess there are people who are

16   from the parent company, ZF, there are ZF employees who

17   work in the facility, right?

18             A       There are some, yes.

19             Q       And then there are some who, we'll call

20   them ZF Batavia new hires, they've never worked for

21   Ford, they never worked for the parent company, they've

22   just worked for ZF Batavia; there are such salaried

23   individuals like that in the plant, right?

24             A       There's quite a few.
```

25          Q       So maybe we'll call them ZF Batavia new

                                                        21

1    hires.  Is that fair?

2          A       That's what we call them.

3          Q       All right.  So ZF Batavia new hires

4    don't necessarily have the same benefit when it comes

5    to vacation; is that right, as compared to what's

6    listed on Exhibit 2?

7          A       Well, what's listed on Exhibit 2 is

8    fairly consistent with what ZF Batavia salaried new

9    hires have in terms of the maximum number of vacation

10   weeks.

11         Q       But a ZF Batavia new hire is, depending

12   on their qualifications, in the position to possibly

13   negotiate a more favorable package for himself or

14   herself; is that right?

15         A       More favorable than the four weeks?

16         Q       Yes.

17         A       No.

18         Q       There's no ZF Batavia new hires who

19   have better than four weeks?

20         A       Not that I know of and I can't imagine

21   that there is.

22         Q       Are there any that are able to come in

23   from the get-go and they don't have 15 years with the

24   company, obviously, but they come in and they can get

25      something close to three or four weeks?

                                                22

1       A       Yeah, that's fairly typical in making

2       job offers to experienced people.

3       Q       So when we're talking about ZF Batavia

4       new hires, we don't look at the vacation benefit

5       schedule that's on Exhibit 2, right?

6       A       No, we don't.  It wouldn't apply to

7       them.

8       Q       But the vacation schedule on Exhibit 2,

9       that's the benefit summary, the benefit summary does

10      apply currently to Ford transitional employees, right?

11      A       Yes.

12      Q       Okay.  Going back to 1999, you looked

13      over some documents, you said, to try to catch up, get

14      yourself up to speed with the new company.  You looked

15      at Exhibit 2.  Did you have any conversation with Mike

16      Warden or anybody else about the circumstances of how

17      Exhibit 2 was created or if it was distributed to the

18      employees, that sort of thing?

19      A       Well, I don't recall specifically, but

20      I can say relative to the general retirement plan at

21      Ford that I'm familiar with general retirement plans,

22      but not Ford's and I think I undoubtedly clarified some

23      things with Mike just for my understanding.  The

24    medical plan, the same thing, you know, what -- some

25    incidentals of the plan just so I knew generally how it

                                                                23

1    compared to what I knew from other employment and,

2    yeah, pretty much walked through it.

3              But I can say that since Mike was there

4    for the better part of six months when I started and he

5    -- he owned this, so to speak, that I had a very -- at

6    that time I -- I knew what was in here and I was

7    comfortable that I could discuss issues with people

8    that might have issues, but Mike handled the lion's

9    share of them.

10        Q     What were you told generally about

11    efforts to have Ford salaried employees in '99 come

12    over to ZF Batavia?

13        A     Well, what I was -- what I saw was

14    about 60 people that pretty much had signed up to do

15    that and that there was a -- a negotiative process

16    prior to my arrival where every existing ZF -- or I'm

17    sorry, Ford Batavia employee was reviewed in terms of

18    their fit for employment with the JV.  And there was an

19    emphasis to place employees from Ford Batavia into the

20    joint venture if they were willing to come.

21        Q     I imagine they were looking for the

22    best of the bunch?

23        A     I would hope so.

24          Q          Well, did they get the best of the

25     bunch?


                                                             24


1          A          Not in every case.

2          Q          All right.  Now, did you have any

3     conversations with any of the Ford transitional

4     employees about their decision to come over to ZF

5     Batavia or is it by the time you were there --

6          A          Well, it was pretty much done.  I have

7     had a -- had one in my department, that's the safety

8     security manager, who transitioned and he was, for

9     example, originally scheduled to join the JV effective

10    August of '99 and -- or, no, it couldn't have been.  It

11    must have been October of '99 and he came and asked me

12    if I could shift his transition until 12/1 of '99 and I

13    did that for him.  And some other people -- I'm not

14    exactly sure anymore who it was -- did that same thing.

15    And basically there were a lot of questions about the

16    cutoff date for doing it and whatnot, but, yeah, I

17    mean, they're just incidental conversations.

18         Q          Of the 15 people in this lawsuit, did

19    you talk to any of them about their decision to come on

20    board ZF Batavia?

21         A          Not that I recall, going through those

22    names in my mind.

23        Q        Do you know all the names?

24        A        No.  I mean, if I read them, I know

25        them.  Did I hit on every -- every one of them,

25

1        probably about 12.

2        Q        That's fair.  I'll just refresh your

3        memory.  It's Wayne Whisman and Gary Vories, who are

4        here, Pam Blanco, Bill DeVito, Ted Edrington, Ron

5        Pearce, Don Williams, Jim Crump, Randy Newsome, Lee

6        Stegman, Dena Stevens, Teri Parker, Dennis Baker, Rick

7        Ervin, Michael Steward.  You know who all those people

8        are?

9        A        Yes, I know every one of them.

10        Q        Now that I've gone through the names,

11        do you specifically recall any conversations you had

12        with them prior to actually their joining ZF Batavia

13        about their decision to join the company?

14        A        No.  I think just -- just about all of

15        them were -- were already part of the JV by the time I

16        arrived.

17        Q        Do you specifically remember any of

18        those 15 that hadn't joined ZF Batavia when you joined?

19        A        No, I don't remember.

20        Q        Okay.  When I asked you about whether

21        the best of the bunch had come over, you weren't

22        responsible in any way for reviewing the performance

23      record of any of those 15 people before coming over to

24      ZF Batavia, right?

25              A       That's correct.


                                                                26


1               Q       You didn't participate in any way in

2       the decision to offer those people jobs?

3               A       I did not.

4               Q       Because you came in later?

5               A       That's -- that's the main reason.  I

6       wasn't there.

7               Q       In the last year or so has ZF Batavia

8       been changing its policies with respect to the salaried

9       people?

10              A       Well, when the company started, we

11      didn't have any policies and so we -- again, one of the

12      things we did in starting this company was create

13      policies and in the recent past we have modified some

14      of the policies, while we continue to create policies

15      as circumstances warrant.

16              Q       Let me go over this drill again.  Just

17      a second.  Let me hand you Exhibit 19, Mr. Sennish.

18      Just put Exhibit 2 just off to your left there.  We

19      might come back to that one.

20                      I'll just represent to you, sir, that

21      Deposition Exhibit 19 is an answer filed by ZF Batavia

22      in this case, specifically an answer to our third

23      amended complaint.  Have you ever seen this document

24      before?

25              A       Yeah, I reviewed this.


                                                                27


1               Q       Okay.  Turn to page five if you could.

2       See up there where it says paragraph 35?

3               A       Yes.

4               Q       Let me just read this and you tell me

5       if I've read this right.  "With respect to the

6       allegations in paragraph 35 of the third amended

7       complaint, ZFB admits that it is in the process of

8       changing policies and procedures with respect to its

9       salaried employees."  That's what it says there, right?

10              A       Yes, it does.  That's pretty clear.

11              Q       Because there's been a number of

12      amended complaints -- this document was filed in March

13      of this year.  I think that same statement I can say

14      appeared in an earlier answer that was filed.  So in

15      terms of the timing, what I'm just trying to find out

16      is:  As we look at the summer of 2002 or March 2003 and

17      go back a year or six months or however you want to

18      look at it, is it true that ZF Batavia is actually in

19      the process of changing policies and procedures with

20      respect to its salaried employees; is that a fair

21      statement?

22          A        I have to characterize the answer.  We

23     are not on a -- a mission, plan, to restructure

24     salaried policies and, therefore, we're -- we're every

25     week reviewing and updating.  We do from time to time

                                                    28

1      when the situation, circumstances, environment changes

2      in the company, we re-look at policies and we modify

3      them.  They're living documents, so to speak.

4          Q        Well, when it says that you're in the

5      process of changing policies and procedures, is there

6      any policies and procedures that you can think of?

7          A        That we're in right now the process of

8      changing?

9          Q        Or, like I said, at the time this was

10     filed in March 2003 or earlier, I believe, when this

11     was first filed in the summer of last year.

12         A        I mean, the -- the time frame is kind

13     of tough.  I mean, we've -- we've made some amendments

14     to some policies and in that time frame we may very

15     well have.

16         Q        Which ones are you thinking of when

17     you're talking about the ones that have changed?

18         A        Well, the -- the one of most

19     significance that -- that jumps out is the -- the

20     personal excused days that were once at five days per

21    year, we modified that for a one-year period to three

22    days.

23          Q      And what period was that that you made

24    that change?

25          A      It was for the year 2002, I believe it

29

1    was, that it was three days.

2          Q      All of 2002?

3          A      Eleven to 12 months of it.  I -- I

4    don't know the --

5          Q      I understand you might not specifically

6    recall.  I'm just trying to understand.  And why was

7    that change made?

8          A      To my recollection, by and large we saw

9    that a lot of employees, ZF Batavia new hires as well

10    as other employees, were scheduling those days in

11    advance as if they were vacation days.  And we looked

12    at some utilization rates and -- and how those were

13    being applied.  We looked at the state of the business

14    in terms of our performance in our existing business

15    and the -- the launch of the CVT and we had a concern

16    relative to the number of employees that were away from

17    work and that this was one of those things that, again,

18    was generated by what we considered abuse of the intent

19    of and clear wording of the policy that people were

20    just scheduling in advance like vacation days.  So we

21   -- we modified that down to three days and looked at

22   other supplier companies, that -- that was not an

23   unreasonable modification for a supplier company.

24          Q      I understand that you reversed the

25   policy back to five days?

30

1          A      Yes, we did.

2          Q      Why was that?

3          A      The -- basically the feedback from

4   employees, including managers, was that, "Hey, you

5   know, this -- we -- I think we've got it under control.

6   The people now understand that those were -- were --

7   are days that are designated fundamentally for

8   emergencies."  And there was a negative reaction

9   throughout the salaried workforce that, you know, they

10   -- that that was modified.

11                And so we looked at all the attendant

12   circumstances and collectively decided that we would

13   reinstate the other two days and that we would have

14   better controls to make sure that those days are

15   utilized for emergencies and whatnot.

16          Q      I imagine you issued some sort of memo

17   to the salaried employees letting them know that the

18   policy was back to five days?

19          A      Yes, I believe we did.

20                        MR. SIMON:  All right.  When I listed

21                  additional documents, I had asked for that one.

22                  I don't believe we have that one, Mr. Hunter.

23      BY MR. SIMON:

24          Q       Well, back when you had changed it to

25      three days, I understand there's a -- is there a policy

31

1       committee that looks at the personnel policies?

2           A       Yes, we have a policy committee.

3           Q       You're on there and Mr. Huebner, right?

4           A       That's correct.

5           Q       Mr. Kehr, Ms. Appleton maybe?

6           A       That's correct.

7           Q       Anybody else?

8           A       We have Rick Williams, our quality

9       director, Dick Newark, our plant manager was -- they --

10      they are, I would say, time to time and we typically

11      have a recording secretary in there when we have

12      meetings and we have one of our -- our expatriates,

13      Herbert Mozer, is the chief engineer.

14          Q       Do you take minutes of these meetings?

15          A       Well, we -- we have someone in there

16      who documents what actions we determine we're going to

17      take and what -- if -- if we modify a policy, it's that

18      individual who -- who handles the documents, but the

19      so-called play-by-play of the meeting, no, we don't

20      take minutes of that nature.

21          Q      But these documents that Mr. Mozer

22      takes down, I imagine you still have them?

23          A      Mr. Mozer?

24          Q      Was he the recording secretary?

25          A      No.  No.  No.  He's chief engineer.

                                                            32

1           Q      Who was the recording secretary?

2           A      That would have last been Betina Clust,

3       C-L-U-S-T.

4           Q      So she takes notes of what the

5       committee has decided with respect to certain policies?

6           A      Yes.  And she -- she handles the

7       document flow.

8           Q      And she doesn't throw those away, does

9       she, afterwards?

10          A      Not to my knowledge.  I would hope she

11      keeps them.

12          Q      So whatever policy committee meeting

13      that you had where it was ultimately decided that you

14      were going to go from five days to three days, she

15      would have some notes regarding that?

16          A      If she was in the meeting that

17      particular time, yes.

18          Q      Or whoever the recording --

19          A       Yes.

20          Q       -- secretary, right?

21          A       I -- I would expect that they wrote

22   something down.

23                   MR. SIMON:  I'm going to be asking for

24              those as well.  As things come up in

25              depositions, documents are identified that


                                                    33


1               maybe you weren't aware of, Mr. Hunter, but as

2               they come up, they seem relevant to me.  I'm

3               just going to point it out, but I'll put it in

4               a letter after the deposition.

5    BY MR. SIMON:

6          Q       Roughly do you know when this policy

7    committee -- was there a policy committee meeting where

8    you decided that you're going to move from five days to

9    three days?

10         A       Yes, to my knowledge.

11         Q       Do you remember what month that was?

12         A       I'd say it's the very end of 2001 or at

13   the very, very beginning of 2002.

14         Q       And I imagine the group discussed these

15   issues that you had testified about, that you felt the

16   policy was being abused, that sort of thing?

17         A       Yes.

18         Q       Was there any one person in the

19     committee who was urging the committee to decide to go

20     from five to three?

21             A       I'd say probably myself.

22             Q       Was there any dissent among the group?

23             A       There, to my recollection, was a lot of

24     discussion about it and I think what ultimately swayed

25     everybody were the business conditions as well as the


                                                     34


1      document -- documented scheduling of excused days as

2      vacation days.  And so that -- that precipitated an

3      agreement that we would modify it.

4              Q       Was the ultimate decision unanimous

5      among the policy committee?

6              A       To my knowledge it was, yes.

7              Q       When you had the meeting, did anyone

8      refer to Exhibit 2, which is this brochure summary that

9      we've been discussing?

10             A       Not to my recollection, no.

11             Q       Well, during the meeting you, of

12     course, were aware that Exhibit 2 existed, right?

13             A       Oh, absolutely.

14             Q       Did you explain to anyone in the group

15     that just in case they didn't know, just so you

16     understand, this is what when people came from Ford to

17     ZF Batavia they were told they were going to give five

18    personal or sick days and now we're moving it to three?

19    Did you tell anybody that?

20          A      Well, we discussed the -- the reality

21    that we are at five and everybody in -- on roll as a

22    salaried employee at that time, transition, new hire,

23    ZF person had five personal days and that we were

24    deliberately determining for everybody that it was

25    going to go to three because the policies are -- are

35

1    fluid and living and it's the discretion of the company

2    and that's a decision we made for what we felt were

3    valid reasons.

4          Q      There was no discussion that this was

5    something that we've told these Ford transitional

6    employees in writing, that they're going to get five

7    days, and now we're changing it?  Was there any sort of

8    discussion that this is something we've told them in

9    writing?

10          A      No, not that I recall.

11          Q      Is it fair to say then when we're

12    talking about ZF Batavia making change in their

13    policies with respect to the salaried workforce,

14    there's no discussion of whether the policies

15    contradict what statements are in the brochure summary

16    that is Exhibit 2?  Is that fair?

17          A      Could you please state that again?

18          Q       Yes.  When you're changing a policy

19    such as the personal sick days, from what I can tell

20    there's no discussion about Exhibit 2, which is the

21    summary package given to Ford transitionals; is that

22    right?

23          A       No.  I would answer that on a case-by-

24    case basis.  In this particular case that I -- that

25    we're discussing, it was a forgone knowledge that that


                                                           36


1     applied to all employees, whether they were transition

2     or otherwise.  It -- it just didn't -- well, let's go

3     back and make sure that we think is correct.  No, we

4     didn't do that, because like Karl Kehr, for instance,

5     was part of the transition team and he was at the

6     meeting and he knew and everybody knew that -- that

7     everybody was entitled to five personal days at that

8     point in time.

9           Q       Well, are there times that you've made

10    changes in the personnel policies with respect to the

11    salaried workforce where you have specifically

12    discussed Exhibit 2?

13          A       Not that I recall.

14          Q       So if there's a personnel policy that

15    is to be changed, it's your position that the company

16    changes them at their discretion and to be fair,

17        there's no consideration that these were promises made

18        in writing in 1999?

19                    MR. HUNTER:  Objection.  Form of the

20              question.

21                    THE WITNESS:  That would be a

22              mischaracterization.

23        BY MR. SIMON:

24            Q      You don't believe that this Exhibit 2

25        contain promises; is that correct?


                                                              37


 1            A      I just -- I've -- I've never known a

 2        company's policies and procedures to be a promise that

 3        will never, ever change.  I -- I never looked at --

 4        when I change companies, I say that's good and they're

 5        subject to change.

 6            Q      Exhibit 2, does it say anywhere that

 7        this a summary of the policies and procedures at ZF

 8        Batavia?

 9                    MR. HUNTER:  Objection.  Again, the

10              document speaks for itself.  If you want him to

11              review the document, he can look for the terms.

12              Go ahead.

13                    MR. SIMON:  Sure.

14                    MR. HUNTER:  What terms are we looking

15              for, again, Steve?

16                    MR. SIMON:  Does this document purport

17          to be a summary of the policies and procedures

18          at ZF Batavia?

19               THE WITNESS:  Plan provisions and

20          eligibility do not constitute an employment

21          contract with any individual.  That's pretty

22          standard.  But this represents policies,

23          benefit plans, but not all of them.  I think

24          that "key features" is pretty representative of

25          what this is and relative to the full scope of

38

1          policies, plans and procedures.

2     BY MR. SIMON:

3          Q     In terms of how you understand the

4     document, you're certainly not basing your

5     characterization of the document as a set of policies,

6     procedures based on anything in the document that

7     actually calls it a summary of policies and procedures,

8     right?

9          A     I don't know.  I -- the -- my comment

10     is based on what I know, what my experience has been.

11     And fundamentally what I see in here is a -- a summary

12     of key features of the Batavia, as it says, benefit

13     plans, which to me means everything that's in there.

14     And they're not all benefit plans.  There's policies in

15     there.

16          Q          But you don't see the word policy in

17     there?

18          A          No, I don't.  I mean, I'll read if you

19     want me to, but I don't -- in that -- in that section

20     there I don't, no.

21          Q          It's not in there.  I understand.

22     Salaried employees at ZF Batavia, are they entitled to

23     overtime compensation?

24          A          Yes, they are.

25          Q          And was there a period of time where

39

1     salaried employees were not receiving compensation for

2     overtime?

3          A          Not to my knowledge.

4          Q          Mr. Sennish, are you unaware of

5     problems with the overtime budget in the spring of last

6     year?

7          A          No, I'm not unaware of it.

8          Q          Was there a problem with the budget for

9     overtime last year at the plant?

10          A          There was basically a problem with

11     every department budget with salaried overtime.  And

12     our policy is fairly straightforward, as far as I'm

13     concerned, with the expectation that exempt salaried

14     employees are expected to work basically a standard

15     nine-hour day without any compensation, overtime

16      compensation, as it relates to whatever eight hours

17      means to people.

18                  And so we had a salaried budget in

19      years prior, and I use the term it blew out each year,

20      and ultimately when the fiscal constraints got tighter

21      and tighter and the -- the business was investing more

22      and more money, there was a lot more scrutiny of our

23      budgeting.  Not that there wasn't a lot of it to begin

24      with, but when we looked at that blow-out in salaried

25      overtime relative to budget, each department was

40

1       allocated -- I don't know whether it was monthly or

2       quarterly, this is -- you can't -- you can't overspend

3       by -- by quarter.  You know, it's like, yeah, I can --

4       front-load spending and then at the end of the year,

5       you know, whatever.  The idea was to month by month

6       track our overtime spending relative to our budgetary

7       limits. And I had one for HR and I tracked my spending

8       to those limits and stayed within those limits.

9                   Now, if any other department didn't

10      stay within those limits or, I don't know, stopped

11      paying overtime, it wasn't anything that I was aware

12      of.

13          Q       Are you aware of in March or April of

14      last year people in the maintenance department being

15    told that "We've just about run out on overtime budget

16    and you're going to have to work two or three weekends

17    without overtime, as well as you're going to have to

18    work overtime throughout the week and not be paid"?

19    Are you aware --

20         A     No.  No.  There's no reason HR would

21    know that.

22         Q     HR would not be aware that people were

23    being told that they're not going to be paid overtime?

24         A     I wasn't aware.  If it happened, I

25    wasn't aware.

41

1         Q     Is it your position that HR doesn't

2    have the responsibility to know something like that?

3         A     No, I didn't say that.

4         Q     Well, do they?

5         A     Yes, they -- if somebody brings it to

6    my attention that there's been a decision made in

7    whatever organization that we're not going to pay

8    people for working overtime, if -- if that's not

9    brought to my attention, I don't know it.  And in this

10    case, unless I'm having a blackout for some period in

11    my mind, I never heard of that.

12         Q     Well, would you be upset if you found

13    that the maintenance department had a meeting where

14    they were told they were going to work overtime and not

15    be paid and that HR wasn't told that this was going on?

16    Would you be upset about that?

17         A      From -- from which -- you asked me two

18    questions.  So would I --

19         Q      I just want --

20         A      -- be upset because -- upset because I

21    didn't hear about because I'm in HR or would I be upset

22    because people were working a lot of overtime?

23         Q      That's fair.  Would you be upset that

24    you didn't know about it?

25         A      I -- I would certainly question why

                                                        42

1     somebody made a decision like that and didn't bring it

2     to my attention.  If -- if not the person that made the

3     decision, the people that were impacted by it.

4          Q      It would be their responsibility?

5          A      No, I didn't say it would be their

6     responsibility.  I would be -- I would be surprised

7     what -- that that wasn't brought to our attention.

8          Q      And so it is your testimony that it was

9     never brought to your attention in the spring of last

10    year that people were told in the maintenance

11    department and perhaps other departments that because

12    of budgetary concerns they're not going to be paid

13    overtime?

14          A       No, I do not recall that at all.

15          Q       Well, let me go back to this.  You said

16      I had asked you two questions.  I'll go back to the

17      other part of it.  Do you see in Exhibit 2 where it

18      says authorized overtime will be paid, in the upper

19      left corner, under where it says salary in caps?

20          A       Yeah.

21          Q       And, as you said, that is the current

22      policy with respect to Ford transitional employees or

23      other exempt salaried employees as well?

24          A       Authorized overtime is paid.

25          Q       Well, would it concern you then that

                                                          43

1       not only didn't you hear about it, but would it concern

2       you that people were actually working overtime and not

3       being paid, seeing as in Exhibit 2 it says they're

4       supposed to be paid?

5           A       Well, you know, I have a definition and

6       I have a pretty good work history of working in

7       operations as well as in HR, and exempt employees, you

8       know, are not guaranteed overtime for working hours,

9       and authorized hours are authorized hours and hours

10      that aren't authorized aren't -- aren't paid.

11                  So, yeah, I -- I would be concerned why

12      a decision was made that was contrary to what our

13      practice was, but it -- I guess that would be tempered

14    by the fact that, you know, exempt salaried employees,

15    and my own personal experience included, don't always

16    get paid for working hours beyond eight or nine or

17    whatever the heck they feel a full day's work is.

18         Q       You work a lot of hours in your

19    department that are beyond 40 hours and you don't get

20    paid overtime, right?

21         A       Absolutely not, and we work a heck of a

22    lot of hours.

23         Q       And to be fair, your position is that

24    salaried employees shouldn't be paid overtime if it was

25    up to you?

                                                           44

1          A       My position?

2          Q       Yes.

3          A       No, I don't expect to get paid overtime

4    for working 12 hours a day.

5          Q       And if it was up to you, other salaried

6    employees wouldn't be paid overtime either?  Exempt

7    salaried employees.

8          A       No.  I think there are circumstances

9    where exempt salaried employees would be paid overtime.

10         Q       What are those circumstances?

11         A       Well, I --

12                 MR. HUNTER:  Steve, this as to his

13          personal views?

14              THE WITNESS:  Yes.

15              MR. SIMON:  Sure.

16              THE WITNESS:  Yeah.  When -- when I was

17          a maintenance manager in operations and I

18          worked overtime as a maintenance manager, I

19          didn't get paid, but the people that supervised

20          hourly employees that worked for me, I paid

21          them generally.  But I -- you know, there were

22          -- where I authorized them to work a piece or a

23          block of overtime at General Motors where I was

24          working then, I paid them.  It was my

25          authorization.  And if I didn't authorize it,

45

1           they wouldn't get paid.  But I typically

2           authorized the hours that I felt were

3           appropriate.

4               And when I was a first-line supervisor

5           at GM, by and large I got paid overtime when I

6           was managing people who were getting paid

7           overtime.  So in that circumstance I think

8           that's fair.

9               And I think in emergency circumstances

10          where, "Hey, we need you to come in on

11          Saturday, we've got to get this done, we've got

12          to, you know, crank out these numbers, this

13              data, whatever, and I need you to be here,"

14              that I would -- I would pay HR people for

15              something like that.

16                   But the general day-to-day, here's your

17              job and it takes you more than eight hours or

18              nine hours to do it, I don't know why an exempt

19              salaried employee would expect that in every

20              case they're going to get paid overtime.

21                   That's my personal opinion.

22         BY MR. SIMON:

23              Q     For the positions that my clients hold,

24         and they hold some different positions, and I can go

25         through the list, but do they hold positions where, as


46


1          you've described it, those are positions where in the

2          right circumstances it would be acceptable to you that

3          they get paid overtime?

4                   MR. HUNTER:  Objection to relevance.  I

5              don't understand how Mr. Sennish's personal

6              opinions --

7                   MR. SIMON:  He's one of the decision

8              makers at the company, so I'm entitled to ask

9              him his perspective.  Like Mr. --

10                  MR. HUNTER:  Let me have a continuing

11              objection to this series of questions.

12                    MR. SIMON:  Sure, you can have a

13           continuing objection.

14  BY MR. SIMON:

15           Q      Like Mr. Whisman, you're familiar with

16  his position?

17           A      Yeah.

18           Q      Now, is he in the type of position

19  where, as you described when you were talking about

20  your background at GM, is that the sort of position

21  where if it's authorized overtime work, that he should

22  be compensated for overtime?

23           A      If -- if that -- that work is

24  authorized by his supervisor and -- and if he's

25  supervising hourly employees, I would support that.


                                                        47


1            Q      So for front-line supervisors you think

2   that in the right circumstances overtime should be

3   compensated?

4            A      By and large, yes, I do.  That's my

5   opinion.

6                    MR. VANWAY:  I'm still confused.  Are

7            we talking about his personal opinions?  Are

8            you asking his --

9                    MR. SIMON:  Yes.

10                   MR. VANWAY:  -- personal opinions or --

11                   THE WITNESS:  I keep --

```
12                    MR. SIMON:  Yes.

13                    THE WITNESS:  -- saying it's my

14          opinion.

15                    MR. VANWAY:  -- interpreting the

16          company's policies and procedures?

17                    MR. SIMON:  He said it's his personal

18          opinion.  That's what I heard.  There's no

19          dispute.

20                    MR. VANWAY:  Okay.

21    BY MR. SIMON:

22        Q     You also said that it's ZF Batavia

23    management's right to change the policies that are in

24    place at its discretion; is it not?

25                    MR. HUNTER:  Again, is this his
```

                                                              48

```
1           personal opinion now or --

2                    MR. SIMON:  No.  No.

3                    MR. HUNTER:  -- the company's position?

4                    MR. SIMON:  All right.

5     BY MR. SIMON:

6         Q     Is that the company's position?  Do

7     they --

8         A     No.

9         Q     -- think they're entitled to change the

10    personnel policies regarding the salaried workforce as
```

11    they see fit?

12            A       As -- yeah, they -- as -- as they see

13    fit.  I would -- wouldn't characterize it that way.  I

14    would say given the -- the prevailing business

15    conditions, policies do have to be reviewed from time

16    to time and, yeah, that's our company position.

17            Q       And you're certainly one of the key

18    decision makers regarding changes in the personnel

19    policies regarding the salaried workforce; are you not?

20            A       That's correct.

21            Q       So if there's a discussion about paying

22    salaried people overtime, you're certainly going to let

23    them know your opinion, aren't you?

24            A       I always do.

25            Q       And the fact is if somebody asks for

                                                           49

1     your opinion, you're going to say that I think in most

2     instances people who are salaried exempt shouldn't be

3     paid overtime except in exceptional circumstances

4     because that's your opinion, isn't it?

5             A       I gave you my opinion.

6             Q       And did I fairly characterize it just

7     now?

8             A       In a nutshell, yes.

9             Q       Okay.  The policy regarding casual

10    time, I think you obliquely referred to it.  You said

11    that a salaried employee at ZF Batavia is expected to

12    work nine hours every day, right, and get paid for

13    eight hours?

14         A    That's -- that's our general policy.

15    Well, no, getting paid for eight hours, no, I don't

16    accept that piece of it.  I don't -- I don't know when

17    you're -- when you get a monthly salary how you break

18    it into eight hours.  I -- but we think a typical

19    standard workday for an exempt salaried employee should

20    be about nine hours.

21         Q    About nine hours or do you really

22    expect them to be there nine hours every day, to be

23    fair?

24         A    Well, ideally they'd be there nine

25    hours, but human beings being what they are and

50

1    personal business being what it is and et cetera, et

2    cetera, you know, if it averages nine hours, that --

3    that's pretty much how the real world works.

4         Q    I imagine you were told about the

5    lawsuit when it was filed last summer.

6         A    Mr. Whisman brought it up to my office

7    personally.

8         Q    That's right.  To be fair, you had

9    heard rumblings in the plant before Mr. Whisman

10      approached you with the lawsuit that there was going to

11      be a lawsuit filed?

12              A       That's correct.

13              Q       What kind of things were you hearing?

14              A       That -- and, again, this is what I was

15      hearing, that people were meeting off site of ZFB, Ford

16      transition salaried employees were -- were getting

17      together outside of work and discussing what they felt

18      were some, I don't know, injustices, erroneous

19      applications, I don't know.  But there was -- there was

20      general concern on their part about what they felt

21      their treatment was with ZF Batavia relative to what

22      they felt they should be getting.

23              Q       You said erroneous application.  I

24      didn't know what you meant by that.

25              A       Well, I -- I guess with whatever they


                                                                    51


1       were told when they joined the JV, that they must have

2       felt that we were not applying what they thought they

3       were going to get consistent with that -- that thought.

4               Q       And who told you these things?

5               A       Well, that is just absolute what was

6       going in the -- the -- the rumor mill, the discussions,

7       hey, you know, there -- there was a sense that there

8       was a group of people who were not happy with their --

9       their lot at ZF Batavia.

10          Q       Is it fair to say that had been going

11    on for maybe two or three months before the lawsuit was

12    filed?

13          A       I think that's fair.  I don't know

14    exactly.

15          Q       That's your recollection?

16          A       Yeah.  That's certainly in the ballpark

17    as I recall.

18          Q       Well, I think you had said there that

19    one of the complaints was that they were told certain

20    things in 1999 and that the company wasn't following

21    them currently, right?  That was one of the things you

22    were hearing?

23          A       That's one of the things I heard,

24    yeah.

25          Q       Well, it was true, wasn't it?

52

1          A       I don't know.  There were some policy

2    modifications.  I guess if that qualifies, then they --

3    maybe they feel that's -- that's the foundation of a

4    misapplication of what they were told.

5          Q       Well, I mean, there's really no dispute

6    that they were told in 1999 that they were going to get

7    five personal or sick days, fair?

8          A       That's what it says.

9          Q        Right.  And you obviously knew that

10    that had been changed to three days?

11          A        Just like ZF Batavia new hires were

12    told.

13          Q        And also bereavement leave had been

14    altered, right?

15          A        Yeah.  We had a -- a policy created for

16    bereavement, yes.

17          Q        Well, you see that on Exhibit 2 the

18    funeral leave says three days, right?

19          A        Up to three-day leave, yes.

20          Q        And that was changed to what, one or

21    two days?

22          A        Depending on the -- the relative.  You

23    know, immediate family member, relative and then aunts

24    and uncles and whatnot.

25          Q        But when you changed it to one day, if

                                                               53

1    it was for perhaps a more distant relative, you would

2    agree, Mr. Sennish, that was a change in the policy

3    from what's on Exhibit 2?

4          A        Well, up to three days.  I'm not

5    exactly sure that it's really a change because up to

6    three days to me contemplates that there are varying

7    degrees of -- of bereavement and applied accordingly.

8          Q        You said there "I'm not sure."  Was it

9    a change with bereavement leave or not?

10         A    No.

11         Q    The nine-hour policy that we were

12   talking about before, was that something that was

13   changed during your tenure at ZF Batavia or in your

14   mind has that been the consistent policy throughout

15   your time?

16         A    Well, I -- I have to answer that.  We,

17   number one, created our first policy in that regard,

18   that there wasn't one as a new company.  We were

19   creating policies as we evolved as a company.  So you

20   could ask -- we have 300-odd salaried employees and you

21   -- you -- you could ask any one of them and they would

22   probably have a different interpretation of what

23   exactly the practice was up to the point the policy was

24   implemented.

25              But we -- I would say that by default

54

1    we followed the prevailing practices that existed in

2    Batavia until we established our own policies.

3         Q    You had followed what Ford practices

4    had been?

5         A    Yeah.  Default more than saying "Here

6    we're going to do exactly as Ford does."  No, that was

7    not the case, nor was there any document that said

8       "Until otherwise notified, here's what we're going to

9       do."  It was just the practice in the plant that

10      typically carried over and you can only change so much

11      so fast and so there -- there was an evolutionary, you

12      know, process of creating this new company.

13             Q      Do you know if there was an expectation

14      in the plant when you first started that ZF Batavia was

15      going to follow Ford's overtime policy?

16             A      I don't know that there was that

17      expectation, but, again, my opinion was that most

18      people expected that what, you know, they experienced

19      in terms of working overtime was going to continue and

20      it by and large did or there would have been problems.

21             Q      We talked about the three days versus

22      one day.  Was that policy then changed back to

23      something else after that?

24             A      Not that I recall, no.

25             Q      I just mean as opposed to the sick

                                                              55

1       leave.  It went to three days and then later it went

2       back to five, right?

3              A      Yes.

4              Q      There's no question that the lawsuit

5       was filed and sometime after the lawsuit was filed you

6       went back to five days of personal leave, right?

7              A      If we did, it -- it was purely

8       coincidental if that was -- if that was the timing.

9               Q       Do you think that the lawsuit has any

10      effect on personnel policy with respect to the Ford

11      transitionals or even individual Ford transitional

12      employees?

13              A       No, because lawsuits are part of doing

14      business.  They -- they happen.  So if you're going to

15      run your business because of lawsuits or for fear of

16      lawsuits, you might as well close up shop.

17              Q       Did Lee Stegman or Jim Crump, to your

18      knowledge were they told they were having performance

19      problems before, let's say, this time last year?

20              A       Well, I don't know if it -- you know,

21      to say this time last year.  I know that both of those

22      gentlemen did, indeed, have performance problems to

23      whatever extent.

24              Q       And then since that time their

25      supervisors have advised both those gentlemen that

                                                                56

1       their performance has turned around?

2               A       To my knowledge, I think that's

3       correct.

4               Q       Did the fact that they were

5       participating in this lawsuit have anything to do with

6       that?

```
 7          A       I hope not.
 8          Q       Have you taken any steps to see that
 9     people in the lawsuit suffer some sort of negative
10     impact during their employment?
11          A       Absolutely not.
12          Q       When you first started in '99, was
13     there any talk between you and Mr. Warden or perhaps
14     Mr. Adams that the Ford transitional employees'
15     salaries were higher than the market would otherwise
16     bear?
17          A       The extent of that discussion was how
18     did ZF Batavia establish its salary bands.  And that
19     was done on a regional basis relative to other
20     comparable employers where we established those.  And
21     as it shook out, they were lower than the Ford
22     transition salary bands and as a result of that, don't
23     know exactly, but by and large the salaries of the Ford
24     transitional employees were higher than the new hire ZF
25     Batavia employees.
```

57

```
 1          Q       So the situation in 2000 then is that
 2     you've got Ford transitional employees, their bands --
 3     their salary bands go up much higher than your ZF
 4     Batavia new hires?  I think that's what you said.
 5          A       Yes.
 6          Q       Did that concern you that you've got
```

7    two different groups there on different bands?

8          A        The whole -- the whole JV unfortunately

9    is predicated on two different bands.

10         Q        And was it your understanding there

11   would be an effort made to have those bands ultimately

12   intersect?

13         A        No.

14         Q        You've not been told by anyone there or

15   have you yourself voiced an opinion that you think that

16   the Ford transitional salaries ultimately should come

17   down to meet the ZFB new hires or perhaps the ZFB new

18   hires come up a bit to meet the Ford transitional

19   salaries?

20         A        No, there's -- we chronicle two

21   separate salary bands and we look at Ford transition

22   under their band and ZF Batavia new hires under their

23   bands and there's no question that ZFBA employees come

24   and -- and say "Well, how come that person makes so

25   much more than me?  I should get more money," because

58

1    people talk.  But, you know, has that altered our --

2    our application of merit increases and whatnot, no.

3          Q        We had some testimony in a deposition

4    yesterday that HR may have prepared a document that it

5    gave to managers that with respect to their

6          determination of what merit increases their employees

7          should get, that there was recommendation that the Ford

8          transitional employees have a lower percent merit

9          increase than the ZF Batavia new hires.  Are you aware

10         of such a document?

11              A       No, I don't recall that.

12              Q       Are you aware of such a policy?

13              A       No.

14              Q       Are you aware of any effort from the

15         onset of ZF Batavia to lower the merit increases for

16         Ford transitional employees over the years so that

17         their salaries ultimately are more in line with the ZFB

18         new hires?

19              A       No.

20              Q       Do you think that would be unfair for

21         the company to do that?

22              A       Well, I -- I just struggle with

23         fairness, you know, in -- in something like that.  I --

24         I think that there's -- that the -- using the term, you

25         know, is it fair or not, you know, life isn't fair.

                                                                59

1          And what I -- what I would say is that the fact that we

2          have in our hourly workforce and our salaried workforce

3          we have -- we have a group of expatriates in design and

4          application engineering, we have a group of Ford

5          salaried transitional people throughout the

6     organization, we have ZF new hires, we have officers on

7     contracts, we have ZF employees working in Batavia and

8     it's a constellation.  We have Ford hourly employees

9     who have different benefits, different contracts,

10    different wages ultimately than the ZF people that work

11    right alongside of them.  It -- it's the nature of this

12    joint venture and it's one of the -- the -- the -- the

13    fundamentals that make it a unique and uniquely

14    difficult environment.

15            So I just don't recall any -- any basis

16    for any discussions that says we've got to equalize the

17    ZFB new hires with the Ford transitions and we've got

18    to -- to implement a merit and -- and incentive pays,

19    you know, to absolutely altogether in the aggregate

20    everybody's -- you've got a bell curve and everybody's

21    distributed where they ought to be and it's hunky-dory.

22    I just don't know that that ever occurred.

23        Q       Would you agree, though, if it was ZF

24    Batavia's intent to equalize the salaries, that that's

25    something that the company should have told the Ford

60

1     transitional employees before they made their decision

2     to join?

3            MR. HUNTER:  Object to the form of the

4            question.

5              THE WITNESS:  If -- if -- if there was

6          a statement to the -- you know, to the

7          contrary, I'm not aware of it.  And if there

8          was a -- a belief on the part of the Ford

9          transition folks that their bands were going to

10         stay active and that they were going to stay in

11         those bands, then to me, irrespective of what

12         the new company did with its new employees,

13         that, you know, in one respect isn't any of

14         their business and -- and vice-a-versa.  But I

15         would expect that, you know, I'm -- I'm a Ford

16         employee, I'm getting an opportunity to work at

17         this joint venture, I'm going to take it and so

18         what -- what are -- what are the -- the

19         provisions that will apply to me.

20              And if there was a -- a plan to

21         structurally over time reduce their earnings

22         down to what we consider a tier-one automotive

23         supplier level, I think that they should have

24         known that, if that was the case.  But I don't

25         know that to be the case.

61

1    BY MR. SIMON:

2         Q     All right.  Is your salary or your

3    bonuses you receive at all correlated to what someone

4    in the corresponding position at Ford gets?

5          A          They're -- they're quite a bit

6    different.  A corresponding Ford employee's band is --

7    is much higher than mine.

8          Q          Have you ever told anybody that you

9    received a certain bonus because someone in the

10   corresponding position at Ford received a similar

11   bonus?  Did you ever tell anybody anything like that?

12         A          No.  And most of the time I've been

13   with the JV my corresponding people at Ford didn't get

14   any bonus.

15         Q          Did you tell anybody anything like that

16   at all?  I might not be quoting it exactly.  That you

17   explained to somebody that your salary or your bonus

18   structure is in some way tied to what somebody in the

19   corresponding position in HR at Ford gets?

20         A          No, because that's not true.

21         Q          Have you ever told the salaried

22   workforce or individual employees that you kind of see

23   your job as you're there to kind of stir the pot?

24         A          Pardon me?

25         Q          Have you ever told people that your job

1    is to stir the pot?

2          A          I would say I sure as heck didn't use

3    those words.  But when you -- when you -- when you take

4      a -- and I -- you know, the record speaks for itself.

5      When you take a grossly under-performing plant -- when

6      I went to American Axle those were grossly under-

7      performing plants, and you get -- from my perspective,

8      this particular ZF Batavia plant got a new lease on

9      life with the joint venture because there was no

10     product plan post-2005.  The plant was going to be

11     mothballed.

12             So ZF joins with Ford, brings in their

13     technology, makes investments as a -- as a joint

14     company and you have to make change.  If we continued

15     to do everything the way we were doing it in that

16     plant, we would -- we would be failing to an extent

17     that we -- we just would have no viability.

18             And I think any of your -- the -- the

19     plaintiffs in -- in this -- this action here would tell

20     you that they know that that plant was grossly under-

21     performing and it's performing better today.  And I do

22     believe that it's performing better today because of

23     the changes that were made since the inception of the

24     JV.  So, yes, I'm -- I'm there to make change.  Call it

25     stirring the pot.  Not me.


                                                        63


1              Q      Did you ever say maybe "I'm here to

2      kind of shake things up," that sort of thing?

3              A      That would -- I'd say from -- from

 4      stirring things up to shaking things up you're now

 5      getting closer to what I might have implied to people,

 6      that, yeah, I'm -- I'm here to help make change and

 7      make this place more effective.

 8           Q      Is there a phrase that you used to

 9      people that you can think of?  You knew that stir the

10      pot was wrong.  But is there a similar phrase that

11      you've used with people?

12           A      No.  Because I -- I just -- I don't

13      imagine ever being in a position where I tell "Well, my

14      job here is to do this."  I mean, I did my job.  I do

15      my job.  And, hey, that's -- I don't -- I just don't

16      recall using a figure of speech to say I'm here to --

17      yeah, I'm here to implement change; I guarantee I said

18      that.

19           Q      With regards to any grumblings you

20      heard before this lawsuit was filed, did you ever have

21      a meeting with individuals or at a group level where

22      you told people "Hey, if you don't like it here, I've

23      got a stack of resumes, people who want to fill your

24      job, so there's the door"?

25           A      Was that a -- a sentence or two in a

                                                          64

 1      five to ten minute speech?  Yeah, that -- that was in

 2      there.

3          Q       What speech?  What meeting are you

4     talking about?

5          A       We for -- for years held weekly

6     meetings with the operations management that were

7     facilitated by human resources.  And they -- they

8     started out every Wednesday for a half an hour with the

9     day shift operations management, primarily the group

10    leaders, and then the same afternoon with the afternoon

11    shift group leaders and operations management.

12               And it was initially set up as a labor

13    relations training and simultaneous discussion of

14    issues on the floor so we could tie reality in with the

15    training.

16               And, I don't know, after we had been

17    doing those for the better part of just say two years

18    and I guess in that two-to-three-month period that you

19    referenced prior to the -- the issuance of this

20    particular suit, and myself, the -- the controller, the

21    plant manager, the labor relations manager, the

22    director of information technology and the quality

23    director all came to a -- a meeting on that -- the

24    meetings on a particular day, and we talked about, you

25    know, what was in -- in the wind with feedback that

                                                                65

1     there were a lot of disgruntled Ford transition

2     salaried employees.

3            And I gave pretty much an identical

4    speech, statement, whatever, at the two meetings that

5    day.  And the characterization that I walked in and

6    said "Go ahead and quit because I've got a stack of

7    resumes" is a pretty gross mischaracterization of that

8    talk.

9            Q        Well, what else did you say during that

10   talk?

11           A        Well, during the talk it was -- it was

12   about the state of the business, what the joint

13   venture's all about, why Ford gave the plant to ZF to

14   run and what our responsibility was to -- to improve

15   performance, to -- to change the way we do business for

16   the better and that the essence of what I said at the

17   end and the -- the better quote that I think somebody

18   should have made was that "If you dislike working here

19   that much, the real injustice you're doing is to

20   yourself.  That you have to come into work every day

21   and you're so disgruntled that the biggest injustice is

22   to yourself.  There's a lot of people that want to work

23   here.  I get -- I get resumes in the mail cold every

24   day.  We've got all kinds of people that want to work

25   here.  And if -- and if you dislike this place that

66

1    much, you're doing the biggest disservice to yourself

2          and perhaps you ought to go work somewhere else."

3                    Yeah, I made that statement, but it was

4          part of a five to ten minute speech.  And it was

5          nothing of the sort that "Why don't you just quit."

6          That was not it at all.  It's like we've got to figure

7          out how to work better together, get over all this crap

8          because it's deteriorating the business.  And that was

9          the essence of the speech.

10          Q       When you said "If you don't like it,

11          I've got a stack of resumes," that wasn't very well

12          received, was it, Mr. Sennish?

13          A       In the -- in the overall context I

14          don't know why that would have been out of context and

15          not very well received because it wasn't said like just

16          "I've got a stack of resumes.  We don't need you."

17          That's the implication, and that is not what I -- at

18          all what I said.

19          Q       Well, you were there at the meeting.

20          When you said that about the stack of resumes, what was

21          the reaction of the group either verbally or

22          nonverbally?

23          A       It's always nonverbal.  There was

24          hardly ever any -- hardly ever any spontaneous feedback

25          in those meetings.  But the point of the matter is "If

67

1          you dislike working here that much, if you really don't

2  like this place that much, there's a lot of people that

3  want to work here.  It isn't -- there's a lot of people

4  that would love to work here."  That's the point, not

5  "Get the hell out of here because I'm going to hire

6  somebody else."

7     I mean, I made the statement and the

8  reason I identified all those other people there was

9  because they observed the same thing and I would gather

10  that their assessment of that piece of it was based on

11  the fact that how can you work somewhere that you hate

12  so much.

13    Q  What was the nonverbal response?

14    A  The -- I -- I -- nondescript.

15    Q  People just nodded their heads, that

16  sort of thing?

17    A  Yeah.  Because when I talk, I -- I look

18  around and I don't -- no, I didn't -- nondescript.

19  They basically just sat there.

20    Q  Well, did you get the reaction you

21  wanted?

22    A  Well, as I said, there's hardly ever

23  any spontaneous feedback.  And my expectation going in

24  there was that I probably wasn't going to get any

25  feedback.

1            But the point was is that we -- we

2      needed to have a broader perspective of the company and

3      -- and this -- this disgruntlement, that let's put this

4      thing into perspective.  You know, we can't be what we

5      always were.  That's a recipe for failure.  That's why

6      Ford got rid of the plant.  And our job was to turn it

7      around and this kind of dissatisfaction with -- with

8      your workplace is not helping us turn the business

9      around.

10          Q     Well, weren't people upset because --

11     prior to this meeting because they were told they were

12     going to have to work overtime and not be paid?

13          A     I don't know that anybody told them

14     they wouldn't be paid.

15          Q     Were people upset about going from five

16     days to three days of sick leave?

17          A     There -- like I said, there was a lot

18     of negative feedback.

19          Q     But as you --

20          A     But there was a lot of people that

21     didn't comment either.  So --

22          Q     Going in, you understood that there

23     were people who were upset and that's why you addressed

24     your comments "Look, if you're so upset coming to your

25     job, why do this to yourself?  You ought to leave,"

1    right?

2           A       That's --

3           Q       All right.  So you understood people

4    were upset.  One of the reasons they were upset is

5    because there were things promised to them in '99 that

6    were being taken away; is that right?

7           A       I don't know.  Like I said, I told you

8    what I heard in the wind, but nobody sat there and said

9    "Well, you know, Len, you're full of crap.  I mean, I'm

10   not getting paid for overtime."  If -- and they were

11   all in there.

12          Q       Did you know why they were upset for

13   any specific reason?

14          A       Well, I -- I knew generally that there

15   was a belief that they were not getting what they felt

16   they should be getting, having transitioned from Ford

17   to the joint venture.  I knew that generally.

18          Q       And you knew it had something to do

19   with Exhibit 2, right, the benefit summary?

20          A       Well, I figured it had to because that

21   -- that is the document that they all were presented

22   with, as far as I know, when they joined the JV.  That

23   there was -- somebody had to talk to them about coming

24   to work at the joint venture, so, yes.

25          Q       And you told them at this meeting or

1    perhaps a different meeting that "If you're not getting

2    what you were promised, then sue me"?

3         A    Well, I -- again, if I made a statement

4    like that, it sure wasn't those words.  And -- and,

5    again, that's what I guess I get a little energized

6    about is that it's the -- the implication that I walk

7    in and I tell people "Sue me."  That's -- that's not it

8    at all.

9              It's like people talk about filing

10   lawsuits.  That's your prerogative.  You have a right

11   to file.  I can't stop you from filing a lawsuit.  Yep,

12   I bet I said that in a meeting.

13        Q    So when this lawsuit was filed, it was

14   certainly expected on your part?

15        A    When Mr. Whisman brought it into my

16   office, I was not surprised.

17        Q    Don't you think the better HR practice

18   would have been to try to resolve it before a lawsuit

19   was generated?

20        A    Well, I guess that was part of the

21   discussion that we -- part of the reason for having

22   that meeting where I -- I made a talk and that we'd met

23   face to face with that group every week.  I was in the

24   plant a lot.  I worked with the plant manager probably

25   more than I worked in HR and, you know, if -- there

1    were issues.  There were general issues.

2            And, you know, I was not privileged to

3    know exactly what any of the -- the individuals were

4    told when they came to the joint venture.  And as much

5    as I heard what -- you know, generally what their

6    issues were, their problems were, what they didn't like

7    in general terms, you know, I hear the other that, you

8    know, there wasn't any, you know, guarantees that A, B,

9    C and D from the people that were around then.

10           And so you got -- you know, what you

11    try to do is just balance what the environment gives

12    you and -- and all of that is on top of trying to take

13    a noncompetitive business and make it competitive,

14    which isn't -- isn't fun for most people.

15    Q     Why didn't you -- when you found out

16    people were upset about what they had been told versus

17    what was happening with the changes in policies of the

18    plant, why didn't you sit down with a group of them and

19    go through Exhibit 2 and tell them which ones they

20    could continue to get and which ones on this summary

21    that you were going to change?

22    A     I didn't do that.  I don't know why

23    during that time.  I didn't feel that it was, you know,

24    worthwhile to do that and, moreover, I didn't think

25    what we were doing in running this business was at all

 1      unreasonable, especially in light of what was going on

 2      at Ford Motor Company where they came from.  It's like

 3      wow, you know, if -- you know, Ford is basically

 4      bankrupt and nobody's getting increases, nobody's

 5      getting, you know, bonuses and whatnot, then, Christ,

 6      we're still paying them.

 7                    So I -- I guess I was tempered by the

 8      fact that our -- our circumstance was actually better

 9      than our customer's.

10           Q      But don't you think maybe the better

11      approach was to meet with these individuals who you

12      knew to be disgruntled and upset about specifically

13      what they had been told in Exhibit 2, as opposed to

14      saying in a meeting "I've got a stack of resumes" and

15      in that same meeting say "You have a right to file a

16      lawsuit"?

17                    MR. HUNTER:  Objection to the form of

18              the question and gross mischaracterization of

19              what we spent the last 15 minutes on.

20      BY MR. SIMON:

21           Q      Mr. Sennish, do you regret saying that

22      "I've got a stack of resumes" or do you regret telling

23      people "You've got a right to file a lawsuit"?

24           A      No, I don't regret that because of the

25      context in which it was said.

1          Q      Do you think that you were provoking

2     them in any sense?

3          A      No, that absolutely not -- was not to

4     provoke them.  It was to try to reason with people that

5     were running a business.

6          Q      Let me show you another exhibit here,

7     Exhibit 3.

8                 MR. HUNTER:  Are we changing format?

9          Is this a good time for a break?  It's been an

10         hour.

11                MR. SIMON:  It's a good time.

12                     (RECESS)

13    BY MR. SIMON:

14         Q      Mr. Sennish, you understand you're

15    still under oath, sir?

16         A      That's correct.

17         Q      All right.  The meetings that we were

18    talking at length about where you were talking about

19    the speech you had given to the group of salaried

20    people, are those called face-to-face meetings?

21         A      That's what they are commonly known as.

22         Q      Was there a face-to-face meeting

23    previous to the one that you describe where the

24    salaried employees said "It sounds like this meeting is

25    being recorded" and they stormed out?

74

```
1          A      I -- I simply don't remember that.  I

2    didn't go to every one of them, but I don't recall one

3    that I was at that -- that that happened.  I just don't

4    -- don't remember it.

5          Q      You're just not aware of any allegation

6    by someone in the salaried workforce that there was a

7    meeting held with HR people there and people believed

8    that the meeting was being recorded?  That doesn't ring

9    a bell?

10         A      In a face-to-face meeting?

11         Q      Well, or --

12         A      No.  I -- I'd have --

13         Q      Yes, face to face.

14         A      No.

15         Q      Any other meeting?

16         A      Where somebody felt it was being

17   recorded?

18         Q      Well, do you record meetings?

19         A      No.

20         Q      Are you aware of any time where someone

21   alleged that a group meeting was being recorded?

22         A      No.

23         Q      The meeting that you were talking about

24   the speech that you had given, you had said that you

25   didn't receive any verbal reactions from the group,
```

1    right?

2            A       Not that I recall at this point.

3            Q       Do you remember an employee named Kenny

4    Workman who used to be in the plant?

5            A       Yeah, I remember Mr. Workman.

6            Q       Did Mr. Workman tell you to shut up

7    during that meeting?

8            A       Not that I recall.

9            Q       You don't recall an exchange during

10   that meeting where he said shut up and you said a few

11   choice words to him?  Does that ring a bell?

12           A       No, I don't remember it.

13           Q       You don't recall telling him "This is

14   my meeting" and he's got not business telling you to

15   shut up?  That just doesn't ring a bell at all?

16           A       I don't know that he ever told me to

17   shut up, if he told me anything.  I -- you know,

18   there's so many of those meetings over the course of

19   three years.  I don't have any one of them -- every one

20   of them chronicled as to who said what when, but I can

21   remember having exchanges from time to time with

22   people.  But at that particular meeting did -- do I

23   recall Ken Workman telling me to shut up?  No, I don't

24   remember that.

25           Q       You don't remember any sort of exchange

76

1    with Mr. Workman at that meeting that we've been

2    talking about?

3         A    Not -- I just don't recall it, no.

4         Q    Do you recall using profanity at that

5    meeting?

6         A    What would constitute profanity?

7         Q    The word fuck.

8         A    No, I don't think I said that.

9         Q    Or shit.  Did you say that word?

10        A    Might have.  Bullshit.  That's -- you

11   know, I don't know.  I typically don't.

12        Q    But did you direct any profanity to

13   someone like Mr. Workman like "This is my fucking

14   meeting.  I don't have to take that shit."  Did Mr.

15   Workman use that language?  Does any of that sound

16   familiar?

17             MR. HUNTER:  Objection.  Asked,

18             answered about five times.

19             THE WITNESS:  No, I don't -- I

20             specifically don't recall that.

21             MR. SIMON:  Well, he's sort of hedged

22             that he's not sure and so I want to make sure

23             I'm giving him a chance to refresh his

24             recollection.

25             THE WITNESS:  Don't recall it.

77

1    BY MR. SIMON:

2         Q       If Mr. Workman or someone else in the

3    meeting says that happened, are they lying or is just

4    the recollection different?

5         A       I don't recall it.

6         Q       Are they lying?

7         A       Well, maybe he said it under his

8    breath.  I don't know.

9         Q       But if they testified that you reacted

10   to it and there was some sort of an exchange, are they

11   lying or could it have happened?

12        A       I'd have to say they'd be making that

13   up.

14        Q       Okay.  Do you use profanity at these

15   kind of meetings, Mr. Sennish?

16        A       No.

17        Q       I mean, do you take a kind of

18   aggressive posture when you're dealing with the

19   workforce in these meetings?

20        A       With the workforce?

21        Q       When you're meeting with a group of

22   employees, like salaried employees, do you take an

23   aggressive posture, let them know that you're in

24   charge, that sort of thing?  Is that sort of your

25      style?

78

1       A       It has --

2               MR. HUNTER:  Objection to the form of

3       the question.  There are three questions there

4       --

5               MR. SIMON:  All right.

6               MR. HUNTER:  -- most of which were

7       relatively vague.

8   BY MR. SIMON:

9       Q       Do you have an aggressive style in

10      terms of your dealing with the workforce?

11      A       As necessary.

12      Q       With respect to the union, did you at

13      one time call the Clermont County Sheriff and have the

14      union committee men escorted out of the building?

15      A       Well, I'd like to ask you where that

16      came from because my answer is probably going to

17      surprise you.  I was in Detroit the day that happened,

18      so, no.

19      Q       Did you instruct somebody who was at

20      the plant to see that that happened?

21      A       We had an altercation in the plant that

22      was brought to my attention when I was at a meeting in

23      Dearborn and I said if the circumstance turns physical,

24      that I would suggest that you have the sheriff on

25        notice if, in fact, you feel it's going to get

                                                              79

1         physical.  And that was the extent of it.
2                Q       Did Mr. Newark, the plant manager, at
3         some time tell the workforce that you had unfortunately
4         overreacted to that situation?
5                A       I don't know what he told the
6         workforce.  And whatever constitutes the workforce, I'm
7         not sure what you mean, but that would have been a --
8         an absolute misrepresentation.
9                Q       We're ready for Exhibit 3, sir.  I
10        think you had a chance on the break to look at that; is
11        that right?
12               A       Not on the break.  When we sat down, I
13        started to look at it.
14               Q       All right.  Take as long as you need.
15        I'm actually only going to ask you about one sentence
16        in there, but take as long as you need.
17               A       Go ahead.  No.  Go ahead.
18               Q       Have you seen this document before?
19               A       I've not seen Mr. Whisman's, but I have
20        seen this before.
21               Q       Fair to say it's a form letter that was
22        given to other --
23               A       Yes.

24          Q          -- Ford transitionals?  And you've seen

25    them before today?


                                                            80


1          A          That's correct.

2          Q          Do you see in the first paragraph where

3    it has in parentheses summary attached?

4          A          Yes.

5          Q          Is it your understanding that what was

6    Plaintiff's Exhibit 2, the summary, brochure that we

7    had talked about before, is that what was attached to

8    Mr. Whisman's letter, as far as you understand it?

9          A          I don't know, but that is what I

10    understood, yes.

11          Q          Was that based on maybe conversations

12    with Mr. Warden or do you know?

13          A          I don't remember anymore.  It just was

14    to me a matter of fact that that would have been the

15    appropriate document.

16          Q          Okay.  You have an AIP bonus for the

17    salaried workforce at the plant?

18          A          It's -- yeah, it's an annual incentive

19    plan is what it is.  Yes.

20          Q          And currently how is that calculated

21    for each employee?

22          A          Well, depending on your band,

23    administrative, general salaried, management,

24     supplemental role, there is a formula that is fairly --

25     is standard and applies to each of the bands and then

81

1     there's a percentage within each of the bands that

2     determines how much money in that band is available,

3     and it's pretty much without any intervention a

4     straightforward calculation that determines an amount

5     of money that's budgeted.

6          Q     And the amount of money that an

7     individual employee receives, is that based in any way

8     on his or her performance?

9          A     It -- it is today, yes.

10          Q     Was there a time during your tenure

11     there where performance was not a factor in determining

12     the AIP bonus for an individual employee?

13          A     Yeah, in the early years, couple years,

14     that it was pretty much just formula-based and was paid

15     out accordingly.  There may have been an exception here

16     and there, but basically it was just a formula-based

17     payout based on our performance to objectives.

18          Q     So like if we talk about the 2000 bonus

19     for AIP, we would be talking about a bonus that is

20     distributed in 2001 but reflects on the previous year

21     of 2000?

22          A     That's correct.

23          Q       Like for -- you gave out 2002 bonuses

24    this year, right?

25          A       Yeah, they were payable March 15th of

                                                            82

1     this year.

2           Q       We're looking for Exhibit 21 here, Mr.

3     Sennish.  There it is.  Pull that out of the stack.

4     This is Exhibit 21.  It says on the cover page Merit

5     Planning and AIP, ZF Batavia, LLC, February 2001.  Have

6     you seen this set of documents before, Mr. Sennish?

7     And I'm not going to ask you about every page, but feel

8     free to familiarize yourself with it so I can ask you a

9     couple questions.

10          A       Yep, I've seen those.

11          Q       And turning the page -- you'll see the

12    little Bates stamped numbers on the corner.  If you

13    could turn to 625, it says annual incentive program in

14    caps -- or, excuse me, large font.  You have the right

15    page.

16                  It says at the bottom "All eligible

17    employees will receive the AIP Award determined by the

18    formula -- no adjustments for individual performance."

19    Is that what it says there?

20          A       Yes.

21          Q       So for the AIP bonus for 2000 that was

22    given out in 2001, this was a time that you described

23 where individual performance was not a factor?

24   A  It was one of those years.

25   Q  Turn to the next page if you could,

83

1 626.  It says 2000 AIP Award at the top and then it has

2 a list of percentages broken down according to general

3 job title as well as according to Ford transitional and

4 ZF.  You see those different percentages there, sir?

5   A  Yes.

6   Q  And you would agree with me that for

7 each -- I'm calling it job title.  What do you call the

8 AC, GSR, is that job --

9   A  Those are bands.

10   Q  Bands.  Thank you.  For each job band

11 you would agree that the Ford transitional percent

12 that's listed is less than the ZF, right?

13   A  Yes.

14   Q  And so when it says ZF, it's comparing

15 what a Ford transitional employee would receive, the

16 AIP, as compared to a ZF Batavia new hire, right?

17   A  That's correct.

18   Q  Do you know why the percentages are

19 lower for each of the bands for the Ford transitional?

20   A  As -- as this -- this incentive piece

21 of compensation applies, that I was told when I first

22    joined the company that this -- this was representative

23    of a variable component of compensation to get a little

24    more parity between the Ford transitionals and the ZF

25    Batavia new hires.

84

1         Q      And so this 2000 and 2001 award was

2    just a formula that was applied to get to the bonus,

3    right?

4         A      Yes, it is or was.

5         Q      And regardless of what the individual

6    Ford employee made or the ZFB new hire made, you

7    applied these percentages to determine their AIP?

8         A      That's correct.

9         Q      And you were told, I think you said,

10    right when you started that this was the plan with the

11    AIPs, to use the AIPs to try equalize the total

12    compensation for the ZF Batavia new hires and the Ford

13    transitional?

14        A      It was a component that would -- would

15    bear that kind of influence on the compensation

16    structure.

17        Q      You can refer to Exhibit 2 if you want,

18    or if you just know, but Exhibit 2 on the second page

19    refers to the annual incentive plan.  That's in the

20    upper left column.

21        A      Yes.

22          Q        And obviously it doesn't say anything

23     in there about Ford transitionals getting a lower

24     percentage AIP award than ZF Batavia new hires.  It

25     doesn't say anything like that at all, does it, in that

                                                              85

1      sentence that you're looking at?

2          A        No.

3          Q        You agree with me?

4          A        Yeah.  It doesn't say anything about

5      compared to Ford employees either.

6          Q        Do you think that Ford transitional

7      employees should have been told before they came over

8      that the AIP award is going to be distributed

9      differently depending on whether you're a Ford

10     transitional or a ZF Batavia new hire?

11                  MR. HUNTER:  Objection.

12                  THE WITNESS:  I --

13                  MR. HUNTER:  You can answer.

14                  THE WITNESS:  I -- I don't know that

15              they weren't.  I don't know.  To -- to me it

16              was a matter of fact as to here's how it's

17              structured.  So --

18     BY MR. SIMON:

19          Q        Given that it was a matter of fact to

20     you -- and you assume it was told to the Ford

21      transitionals before they came over?

22              MR. HUNTER:  I'm sorry.  Assume what

23          was told to the Ford transitionals?

24              MR. SIMON:  What we were just talking

25          about.

86

1   BY MR. SIMON:

2       Q       Do you assume that the Ford

3   transitionals were told before they came over to ZF

4   Batavia that there would be this different structure

5   regarding the AIP for Ford transitionals versus ZF

6   Batavia?

7               MR. HUNTER:  Objection.  Asked and

8           answered.  He testified he didn't know if they

9           were told that or not.

10  BY MR. SIMON:

11      Q       Did you think they were?

12      A       I never even thought about it.  I don't

13  know what they were told.

14      Q       In fairness, Mr. Sennish, do you think

15  they should have been told?  I'm asking for your

16  opinion.

17      A       My opinion?  If there -- if there was a

18  distinction of that sort and it was relevant to

19  whatever the discussion was at the time, I think I

20  would have probably communicated that.

21        Q        I mean, if there was a discussion about

22    the Ford transitionals in '99, we've got this AIP plan,

23    if it was you who was telling them, you would have said

24    "Understand that there's going to be this different

25    structure for whether you're a Ford transitional or a

87

1    ZF Batavia new hire when we determine the percentages

2    of your compensation to get the AIP bonus," right?

3        A        Yeah.  I -- I think -- you know,

4    certainly just looking at it from the outside, well,

5    yeah, they probably would have communicated that.  But

6    I don't -- you know, when you look at the whole scope

7    of what the communication was, was that -- was that a

8    relevant piece of it?  Was there an expectation that

9    there was going to be absolute parity?

10                I -- I don't know what the

11    circumstances were, but just being reasonable, if there

12    was some distinction built in for a reason, I might

13    have communicated it.

14        Q        I appreciate that.  We're done with

15    that one.  You can turn Exhibit 21 over.  I don't think

16    I need to show you this exhibit, but do you know who

17    Julie Hallauer was?

18        A        Hallauer?  Yes.

19        Q        That's H-A-L-L-A-U-E-R, right?

20          A       That's right.

21          Q       She was a Ford transitional employee,

22     right?

23          A       As far as I know, yes.

24          Q       And she was director of CVT programs

25     while she was at the plant?

88

1          A       That was her title.

2          Q       And then in early 2001 she went back to

3     Ford at a different plant?

4          A       I don't know where she went, but she

5     went back to Ford.

6          Q       My question is:  Is that an opportunity

7     that all the Ford transitional employees have, to go

8     back to Ford, or was this a unique situation with Ms.

9     Hallauer?

10          A       I -- I can honestly report I have no

11     idea how that happened.  That was -- that was outside

12     of our sphere and it happened.

13          Q       No one ever told you what the story

14     there was?

15          A       No.

16          Q       What is your general understanding of

17     whether a Ford transitional employee who's, I guess in

18     your words, unhappy at the plant, what's the

19     opportunity to go back to Ford?

20          A       I -- my understanding is that there

21     isn't any opportunity to go back to Ford.  Now, I don't

22     know, you know, if something were to go let's just use

23     the term belly up at the JV, I don't know what kind of

24     arrangement there is between Ford and the transitions,

25     but under normal operating conditions my awareness is

                                                        89

1      that it's a one-way decision.

2          Q       Given your awareness about that, did

3      you ask anybody why it is Julie Hallauer had a

4      different arrangement?

5          A       Well, there was only speculation in --

6      within Batavia as to well, how did that happen?  No --

7      there just -- nobody was a party to it.  I don't know

8      what her transition agreement included, whether it had

9      something different or not.  I just -- she just went

10     back to Ford.

11         Q       And you didn't ask anybody?

12         A       Not that I recall.

13         Q       Staying on the AIP plan then, at some

14     point after 2001 -- when the 2000 AIP plan was

15     distributed, at some point then there was a change with

16     the AIP to consider job performance?

17         A       That's correct.

18         Q       Did that start in 2001 going forward to

19    2002, do you recall?

20         A       That seems about right.

21         Q       In 2002 were certain individuals in the

22    salaried workforce, did they have a lower AIP bonus

23    because they worked too much overtime?

24         A       Well, I think a -- a bit of background

25    will help clarify.  We -- we -- in the early stages had

90

1    a re-performance review process called the success

2    profile which was fairly -- was exclusively behavioral

3    based.  And over time we developed this performance

4    review planning and development process which was --

5    weighted behavior lighter than performance to

6    objectives.

7              And so once that was introduced, then

8    we had a -- a -- a very structured, very focused

9    performance review that measured behavior, I believe,

10    30 percent and performance to objective 70 percent and

11    then did a weighted average that we now had hard

12    criteria by which to make judgments in terms of

13    compensation and -- and incentive pay.

14              And so, yeah, there was a point where

15    once that was in play, that performance review, that we

16    began to -- to scrutinize compensation treatment

17    consistent with performance.

18         Q       And what role, if any, did overtime

19    play in the distribution of AIP 2001 bonuses?

20        A      There -- there was a collection of data

21    that represented individuals and the aggregate dollars

22    that they earned in overtime and it was compared

23    generally speaking to their performance.  And where the

24    performance was not consistent with the -- the overtime

25    worked -- and I would explain that by if -- if somebody

91

1    is working 50 percent overtime of their straight time

2    hours and their performance is rather low, there --

3    there is in a -- you know, in a readout from that that

4    would indicate that perhaps their -- their performance,

5    you know, was such that we should mitigate some of the

6    overtime that they were paid, where you're working a

7    lot of hours, yet not -- not meeting objectives to the

8    extent that we felt was appropriate.  And the

9    individual managers had a general guideline where they

10    were to factor that in.

11            Now, some people who worked a lot of

12    overtime and were assessed at a very high level of

13    performance, I believe that there wasn't any negative

14    impact on their -- their incentive pay.  So that's

15    basically what the instructions were, to do an analysis

16    to make a determination.

17        Q      When the AIP bonus are distributed,

18    does the supervisor speak to the individual and explain

19    the bonus to them?  Is that typical?

20         A    I can only say that they -- they are

21    instructed to do that and they should be doing that.

22         Q    Okay.  During those kind of meetings

23    would it be appropriate for the supervisor to say to

24    the salaried employee "You worked a lot of overtime

25    last year, so your AIP bonus has been reduced

                                                          92

 1    accordingly"?

 2         A    I would expect that anybody who was

 3    impacted positively or negatively or neutral, that

 4    there would have been an explanation associated with

 5    the payout.

 6         Q    So there are a group of salaried

 7    employees, to your understanding, who received a lower

 8    AIP bonus because they worked a lot of overtime and

 9    were not a top performer?

10         A    Yeah, that was the -- the basis.

11         Q    And for those employees it would have

12    been appropriate for their supervisor to say "This is

13    why you're getting a lower bonus"?

14         A    I would expect that, yes.

15         Q    Did you expect that anyone might have a

16    negative reaction if they're told I'm getting a lower

17    bonus because I was in the plant on the weekends too

18    much and working too much overtime?

19         A      If that was how it was explained to

20    them, I would expect there would be a negative

21    response.

22         Q      Would it be a justified negative

23    response?

24         A      In that person's mind I think they

25    would justify it, yeah.

93

1         Q      Do you think it would be justified?

2         A      Well, it depends.  I think that there

3    are a number of under-performers in our plant, so I

4    wouldn't think it's justified for an under-performer to

5    be upset about that.

6         Q      But if they were told "The reason

7    you're getting the AIP bonus is because you worked too

8    much overtime," wouldn't they be justified in your mind

9    being upset about that?

10        A      I said that -- that explanation would

11    upset me if I was that individual.

12        Q      And isn't it true that certain people

13    were told that, to your understanding?

14        A      I don't know that.  Perhaps they were.

15    I wouldn't know.

16        Q      Did anyone complain to you that "Len,

17    my supervisor said I got a lower AIP bonus because I

18    worked too much overtime"?  Did you receive any of

19    those kind of complaints?

20        A        Did I personally?  No.

21        Q        Did anyone tell you that those

22    complaints were lingering in the plant?

23        A        That there were complaints, yes, and

24    that the individual managers, the -- the same -- the

25    people that are at director level, plant manager, were

94

1    -- were handling those because the decision was made by

2    that individual based on whatever algorithm they put

3    together to -- to do that relationship.

4        Q        I just want to try to understand.  If

5    you receive a report back that supervisors are telling

6    employees that "Your AIP bonus is lower because you

7    worked too much overtime," wouldn't you have wanted to

8    try to correct the situation and let people know?

9        A        But I didn't -- I didn't hear anybody

10    say that it was just -- "They just told me I'm working

11    so much overtime I can't give you this bonus."  I

12    didn't have any one individual that I recall come up

13    and tell me that that's all they told me.  Because if

14    they had, I would have gotten personally involved and

15    found out what the real rationale was, if there was

16    some other rationale.

17          Q       On this overtime issue, were the

18     manages of those departments that had too much

19     overtime, were their AIP bonuses reduced?

20          A       I would have to go back and look.  But

21     that would have been -- the -- the application of that

22     guideline would have applied to people in management

23     role positions.  I guess we're talking about operations

24     mainly.  Yeah, that would have -- should have been the

25     case.  I just don't recall.

95

1          Q       Even if the manager was high

2     performing, if he or she's running department where

3     there's too much overtime in your judgment or the

4     judgment of the management, that person, based on the

5     guidelines, should have received a lower AIP bonus?

6          A       That was the -- the direction, that was

7     the -- the plan and there should, in my -- in my

8     recollection, have been some people at that level

9     impacted.

10          Q       What's the current policy, Mr. Sennish,

11     regarding the salaried employees' requirement to check

12     in and check out of the plant when they enter and exit?

13          A       Just exactly what I do every day.  I

14     engage a reader when I come into the building and

15     anytime I leave or re-enter, I engage a reader so my

16      presence is documented or my absence is documented.

17              Q       Was there a period in time where you

18      weren't doing that after you were hired at ZF Batavia?

19                      MR. HUNTER:  You mean Mr. Sennish

20              personally?

21                      MR. SIMON:  Yes.  Strike that.

22      BY MR. SIMON:

23              Q       Did you do that practice the whole time

24      since your start at ZF Batavia?

25              A       Personally?

96

1               Q       Yes.

2               A       No.  I think in the early months, first

3       year and a half, two years, whatever, that when I left

4       the building, I -- I didn't engage a reader unless

5       there was a door that had a reader that -- that engaged

6       it.

7               Q       Let me show you Exhibit 16, Mr.

8       Sennish.  It's got your name at the bottom.  The

9       question is:  Have you seen it before?  I'll give you

10      as long as you need to familiarize yourself with it.

11              A       Yep, this is a document that I put

12      together.

13              Q       I think we have a different copy where

14      it's the just the notice, but was this sent out to the

15      workforce through that e-mail from Glenda Flippin,

16    August 29, 2001?

17        A        That would have been one form of

18    issuance.

19        Q        But that's the date the notice was put

20    out ultimately, right, according to this document?

21        A        Yeah, it should have been.

22        Q        And is that when you started beginning

23    doing the check-in and checkout with the electronic

24    card or --

25        A        Yeah, I think the -- we had done --

                                                                    97

1    positioned readers so that virtually every entrance was

2    ingress and egress.

3        Q        So following this, the salaried

4    employees have to use the card system going in and

5    going out of the plant, right?

6        A        That's correct.

7        Q        And the hourlies only have to do it

8    going on, right?

9        A        That's correct.

10        Q        Why are the hourlies allowed to do it

11    whereas the salaried are required to check in and check

12    out?

13        A        The -- the distinction is not one of a

14    contractual nature but of a Ford policy, that Ford

15          throughout the United States employs a -- an honor

16          system where readers are not utilized in any of their

17          plants and ingress and egress is pretty much, you know,

18          as you come in and as you leave.

19                    And ZF as a company does not employ

20          that policy in its plants.  So ZF, being that the

21          management entity of the business decided that we

22          wanted, number one, to have controls of time -- for

23          timekeeping purposes for hourly employees, which we

24          still have not employed, and that when we -- we got the

25          guidelines for the benefits of designating a foreign

98

1          trade zone, the guidelines were utterly clear that any

2          individual on the premises that constituted the foreign

3          trade zone was required to have some documentation of

4          their ingress into the facility.  Egress was a -- a

5          separate, not referenced component of the foreign trade

6          zone.

7                    So insofar as the majority of our

8          hourly employees were and are Ford employees, we

9          contacted Ford relative to the foreign trade zone and

10          identified that it was our preference to have all

11          employees for security reasons, for foreign trade zone

12          reasons, for -- for getting some -- our hands around

13          timekeeping and people coming and going, that we would

14          like to do this.

15          And Ford -- the feedback from Ford

16    Motor Company was that they are on an honor system,

17    they understand the requirement for ingress but do not

18    support our request to have hourly employees that are

19    employees of Ford Motor Company engage a reader when

20    they're leaving the facility.

21          So because we have a mixed group of

22    employees in the bargaining unit, we did not require

23    then any hourly employees to hit a reader when they

24    leave the facility.  For salaried it was our -- our

25    decision that we would have all salaried employees

99

1    enter and exit and in so doing engage a reader.

2          Q      I think you said that the exiting part

3    of it or the egress part of it is not a requirement of

4    the foreign trade zone?

5          A      That's what I said.

6          Q      So why do you have the salaried people

7    hit the card on the way out?

8          A      Because the company has decided that

9    that's one of the things we wanted to do in terms of

10    security and -- and basically maintaining some control

11    over people's presence and absence in the building.

12          Q      Do you see the last paragraph of the

13    notice in front of you?  It's the last full paragraph.

14          A        Yes.

15          Q        I'll just read it.  You tell me if I've

16      read it right.  "Please be advised that salaried time

17      sheets will be audited against Honeywell system

18      readouts.  Your manager will be asked to clarify

19      notable differences between them, and pay adjustments

20      are a possibility if no justification is forthcoming."

21      I read that correct, Mr. Sennish?

22          A        Yes, I heard it correct.

23          Q        Okay.  Is it fair to say that that was

24      a reason for having the salaried people check in and

25      check out of the plant is that you wanted to check that

                                                              100

1       against their time sheets to make sure they were in the

2       building when they said they were for purpose of pay?

3           A        For purposes of pay or for purposes of

4       identifying when they were here and when they weren't.

5       I think it's more of the -- the latter.  And if I can

6       explain.

7           Q        Sure.

8           A        I -- there's probably quite a bit of

9       documentation that would indicate that we have

10      circumstances in the factory, for one, that hourly

11      employees are scheduled to work overtime on daily, for

12      example, midnight to 4:00 a.m. or whatever, and the

13      supervisor is not in the building.  And we had a bit of

14    a problem with that.

15             And so when you -- the honor system in

16    the Batavia facility was fraught with problems, and

17    that being one what we considered major example of

18    that, that there was a question of whether or not

19    people were really in the building when they were

20    indicating they -- on their time sheets that they were.

21             And so this was one of those check-and-

22    balance-type procedures that we instituted to help rein

23    in those problems and -- and -- and make salaried

24    people more accountable for their presence in the

25    building.


101


1             Q       And it indicates in the notice that if

2    you line up their time sheets with the electronic card

3    readout and there's notable differences, adjustments

4    could be made to their pay, right?

5             A       That's what it says.

6             Q       So, for example, if somebody comes in

7    to work on Monday their regular hours, according to

8    their time sheet they worked 7:00 to 5:00, but

9    according to the readout they worked 7:00 to 4:00, you

10    would expect there would be an adjustment to their pay,

11    right?

12             A       No.  We never -- we just never did it.

13          Q      Did you not do it because you kind of

14     set a deterrent here by sending this notice that we're

15     going to look?

16          A      That was pretty much what we did.

17          Q      But if somebody said they worked eight

18     hours on the time sheet for a given Monday and it turns

19     out on the electronic readout they only worked seven

20     hours, if that had happened, you would have seen that

21     there was an adjustment to their pay, right?

22          A      Well, as a -- for nonexempt salaried

23     employees, we would have made an adjustment for --

24          Q      This notice was given to exempt

25     employees, sir.

                                                        102

1           A      Well, I know.  I'm just answering the

2      question.  So for exempt employees, if it was

3      appropriate under the Fair Labor Standards Act, we

4      would have made an adjustment.

5           Q      Well, what's your understanding as we

6      sit here today?

7           A      I doubt whether we would have made an

8      adjustment in pay for a one-hour discrepancy.

9           Q      How about a two-hour discrepancy?

10          A      I don't think we would have done it

11     there either.

12          Q      What kind of discrepancy were you

13    looking for?

14            A       We weren't looking.  We've never

15    looked.

16            Q       You never looked at the time sheets and

17    the electronic card readouts after sending out this

18    notice?

19            A       Not that I recall.

20            Q       Is there an employee named Victor

21    Flanagan that used to work there?

22            A       Yeah.

23            Q       Did he get fired?

24            A       Yes, he did.

25            Q       Did he get fired because his time cards

                                                          103

1     didn't match the electronic card readout?

2             A       Ultimately,  yeah.

3             Q       And that was after this notice was

4     distributed?

5             A       It should have been, yeah.

6             Q       So somebody checked?

7             A       No.  Somebody observed and then

8     somebody checked.

9             Q       What about is there a man named Ronald

10    or Reynard South that used to work there?

11            A       Yes.

12        Q        And he doesn't work there anymore,

13    right?

14        A        I believe he voluntarily quit.

15        Q        Did you tell Chuck Hugan that -- well,

16    Chuck Hugan was his supervisor?

17        A        Chuck Hugan?

18        Q        I'm sorry.  Yes.

19        A        I -- yeah, he probably was at one time.

20        Q        Did you tell Mr. Hugan to monitor Mr.

21    South because you believed that he was putting down

22    time on his time sheet that didn't reflect the actual

23    time he was in the plant?

24        A        I seem to recall having that discussion

25    with Mr. Hugan, but it was, again, based on people's

104

1    observation that Mr. South was out of the building a

2    lot.  So I asked Mr. Hugan to watch that, as if he

3    didn't know.

4        Q        But he also didn't just have to observe

5    it; he could go and take the time cards and line them

6    up with the electronic card readout, right?

7        A        Anybody could have, yeah.  Well, I

8    mean, anybody that had access to it would have -- could

9    have done that.

10        Q        And you would have expected Mr. Hugan

11    to do that?

12          A       No.  I told him to watch Mr. South and

13    see if he is, indeed, leaving the building during

14    working hours.

15          Q       Did you look at the time cards and

16    electronic card readout for Mr. South?

17          A       On a -- in terms of the Honeywell

18    system or his time cards?

19          Q       Did you check the electronic card

20    readout or his time sheets to see that they lined up so

21    that --

22          A       No, I never compared the electronic

23    readout with his time sheet.

24          Q       Well, when it says here "Please be

25    advised that salaried time sheets will be audited

                                                          105

1     against Honeywell system readouts," were you telling

2     the truth?

3           A       Well, it depends.  We've never had any

4     plan that we were going to have a systematic audit of

5     time sheets.  Now, again, somebody may decide that I

6     got a question, so I'm going to audit.  But we never,

7     ever had any plan that, okay, let's sit down every week

8     and see who we can catch that -- because of Fair Labor

9     Standards Act just made that kind of a waste of time.

10          Q       So you didn't systematically do this

11      audit, but on various occasions individual salaried

12      employees who were exempt were audited?

13              A       May have been.

14              Q       Well, certainly Victor Flanagan is one?

15              A       After it was observed, physically

16      observed that Mr. Flanagan was out of the building and

17      every semi-monthly period was reporting that he was

18      here, I think that the individuals that were

19      incredulous about that went and looked and it was the

20      verification point confirming what they saw.

21              Q       All right.  Did anyone ever audit the

22      system readouts versus the time sheets for Dave

23      Osborne?

24              A       I don't know.  That's -- that's a

25      possibility.

106

1               Q       Is Dave Osborne exempt?

2               A       Yes, he is.  He's a maintenance group

3       leader.

4               Q       Are you aware of any concern that his

5       time sheets aren't fairly reflecting his actual time in

6       the plant?

7               A       No, I've never heard that about Mr.

8       Osborne.

9               Q       Do you know who Kevin O'Hagan is?

10              A       Yes.

11          Q        He's exempt?

12          A        Yes, he is.

13          Q        Was his pay ever docked because his

14     time sheet didn't line up with his electronic card

15     readout?

16          A        Not to my knowledge.

17          Q        But, I guess, overall after you sent

18     out this notice, it had the effect that you wanted,

19     that people were putting down the time that they were

20     actually in the plant?

21          A        I believe it did because I was just not

22     aware other than Mr. Flanagan, for example, and maybe a

23     few others that generally we felt comfortable that we

24     had better checks and balances in the process.

25          Q        And you think it helped that you sent


                                                                107


1      this notice where you told them "We may audit the

2      readouts versus the cards and if there's a notable

3      difference, adjustments might be made to your pay,"

4      right?

5          A        I don't think we would have done it for

6      any other reason than we thought it would have an

7      impact on a certain segment of the workforce.

8          Q        But you had concerns about the Fair

9      Labor Standards Act that you were so closely monitoring

10          the time sheets and exempt employees?  Did you have

11          those concerns?

12                  A       Well, that's why we didn't do them.

13                  Q       Well, you didn't do it systematically?

14                  A       Right.

15                  Q       On occasion you did look at the time

16          sheets and the readouts; there's no question about

17          that?

18                  A       I never looked at a readout, any time

19          sheet personally ever.

20                  Q       But other people did?

21                  A       May have.

22                  Q       Well, not to beat a dead horse, Mr.

23          Sennish, but we know that somebody did with Victor

24          Flanagan, right?

25                  A       Well, that's what I said, yeah.  I

                                                                108

1           mean, other people -- it's for the record that somebody

2           went back and confirmed their observation.  But there

3           was not a wholesale "Hey, give me the printout.  Give

4           me the printout.  I want to check it against this."

5           There just -- it was not like that.  It was a rare

6           exception if --

7                   Q       Do you think the Ford transitional

8           employees are treated negatively in any way as compared

9           to the ZFB new hires?

10          A       Not that I have ever noticed.

11          Q       Do you think that a disproportionate

12   amount of Ford transitional employees have been either

13   fired or forced out of the plant?

14          A       I don't believe so.

15          Q       Is there an Ann Jones that used to work

16   in the office there?

17          A       Yeah.  She worked in human resources.

18          Q       She was a Ford transitional?

19          A       No.

20          Q       She was not?

21          A       Nope.

22          Q       Well, was she a ZFB new hire?

23          A       Yep.

24          Q       You say that authoritatively.  Are you

25   sure?

109

1          A       She retired from Ford and was hired by

2    ZF.  She is not a transition.

3          Q       I understand.  She retired from Ford at

4    the time of the transition?

5          A       She must have before -- before I came.

6          Q       Well, I mean --

7          A       She retired from Ford and hired on with

8    the joint venture.

9          Q       Okay.  Well, you know who Bill DeVito

10    is, right?

11          A       Yes.

12          Q       Didn't he retire from Ford and join the

13    new venture?

14          A       I don't know.  I can't recall whether

15    he was --

16          Q       So I understand your terminology, if he

17    did, you wouldn't consider him a Ford transitional?

18          A       No, because he didn't get one of those

19    letters.

20          Q       That's your understanding?  If you

21    retired from Ford and then joined ZF Batavia, you

22    didn't get the letter that Mr. Whisman got?

23          A       Yeah.

24          Q       Well, Ms. Jones, she's still at ZF

25    Batavia?

                                                     110

1          A       No.

2          Q       Did she quit?

3          A       Yeah, she resigned.

4          Q       Was it kind of a resignation before she

5    was fired?

6          A       Before she was fired?  She was not

7    fired.

8          Q       Well, people resign sometimes in

9    anticipation of a termination.  Is that a fair

10   characterization?

11          A       No.   Her husband -- you can read it in

12   the papers -- is extraordinarily ill and she got to the

13   point where she couldn't take care of him and come to

14   work, so we gave her a separation package and it was

15   mutually satisfactory and she's very happy.

16          Q       Peggy Jameson, was she somebody that

17   worked in the office?

18          A       Yes.

19          Q       Ford transitional?

20          A       Yes.

21          Q       And she was fired?

22          A       Yeah, she was released.

23          Q       Cindy Clousson, do you know Cindy?

24          A       Yes.

25          Q       She was a Ford transitional employee?

                                                        111

1          A       Yes, she was.

2          Q       She also was involuntarily terminated?

3          A       She took a separation agreement.

4          Q       You agree with my statement?

5          A       I don't know that I necessarily

6    consider it involuntary.

7          Q       Well, did the company approach her

8          about separating her employment?

9                    A          Yeah.  She had an extended period of

10        absence at the end of which we weren't sure whether or

11        not she was going to be capable of doing her job and we

12        mutually worked out a separation.  The same with Ms.

13        Jameson.

14                    Q          In terms of your managers, is there a

15        gentleman by the name of Bob Jones there?

16                    A          Yes.

17                    Q          Ford transitional?

18                    A          As I understand, yes, he is.

19                    Q          Has he been demoted over the years?

20                    A          Not -- not in terms of his salary or

21        his status as a management role employee, no.

22                    Q          Has he been demoted then and received

23        lesser job responsibilities at some point?

24                    A          I -- I think that's a matter of an

25        individual's interpretation.  But, yeah, I -- I believe

                                                                        112

1          Bob was an area manager of -- of -- I don't remember

2          which area anymore, when the JV started.  And he

3          ultimately ended up with the same management role

4          status and -- and salary status and was converted to a

5          -- like a productivity manager for an area of the

6          plant.

7                    Q          You didn't consider that a demotion?

8          A       I -- not in what you would consider the

9     traditional hard terms, but I guess on a soft side Mr.

10    Jones might conclude that he got demoted, but I don't

11    know.

12          Q       Dave Hapner was a Ford transitional

13    employee?

14          A       I'm not sure.  I think -- I'm not sure,

15    but I think Mr. Hapner retired and joined the JV.  I'm

16    not sure though.  I'd have to go look.

17          Q       In any case, he was involuntarily

18    terminated, right?

19          A       Yes, he was.

20          Q       Gene Gilliam was a Ford transitional

21    employee?

22          A       Yes.

23          Q       He was involuntarily terminated?

24          A       Now, Gene took his Ford retirement.  So

25    I -- I'd have to go look at the record, but I know Gene


                                                           113


1     did take his retirement from Ford, which, in order to

2     do that, you have to retire from Ford, and then I

3     believe he joined the JV as what would be considered,

4     like Ms. Jones, a new hire ZF Batavia employee.

5          Q       Dan Purdy worked in purchasing?

6          A       Yes.

7        Q        He was a Ford transitional?

8        A        Yes.

9        Q        And he was involuntarily terminated?

10       A        Yes.

11       Q        And kind of considering all these

12   people and putting together some Ford transitionals and

13   people were with Ford but actually retired and joined

14   ZF Batavia new hire, do you think there's a

15   disproportionate amount of those employees that have

16   been let go since 1999?

17       A        I'd go back and do some figuring, but

18   like I told you at the beginning, there were a number

19   of people that came to the JV that were not good

20   employees and I think that's a fair reflection of them.

21   And I guess if there's 60 transition people and there's

22   300 overall employees, that if somebody sat down and

23   did the numbers, it might be a little bit skewed in

24   that direction.

25       Q        Skewed in the direction of --

                                                          114

1        A        Of -- in -- in -- I guess

2   disproportionate number of Ford transitions or Ford

3   retirees and hires.

4        Q        Do you think that might be because

5   somebody like Dave Adams kind of has a bias against

6   employees that have been in the Ford system a long

7    time?

8           A       No.

9           Q       Mr. Adams has on occasion said things

10   negative about the Ford way of doing business?

11          A       Absolutely.  We work for a different

12   company.  I mean, your own company always does things

13   right, you know, right or wrong, you know.

14          Q       But, I mean, has he said or Mr. Newark

15   said we need to get the Ford influence off the plant

16   floor?

17          A       Absolutely.  Just like American Axle,

18   got to get the GM influence out of here.  There's no

19   doubt that that -- the operating practices in that

20   plant, if everybody is honest, were -- were not very

21   good and we had to get that operating pattern out of

22   the factory, we had to go lean, we had to get out of

23   mass production, yeah, absolutely.  We were a mass

24   production plant.  Continuous improvement doesn't

25   happen there very well.

                                                         115

1           Q       Well, if you're trying to get the Ford

2    influence off the plant, I mean, it just makes logical

3    sense if you've got positions to fill, you're not going

4    to fill them with people who worked in Ford for a long

5    time; you're going to want to hire some new people off

6     the street, aren't you?

7              A        We -- most of our positions in the

8     beginning were filled by Ford employees and ultimately

9     we had openings and we hired a lot of new people.

10             Q        But if you want to get the Ford

11    influence off the floor, wouldn't you rather have a ZF

12    Batavia new hire doing that person's job as opposed to

13    a Ford transitional or a Ford retiree?

14             A        No.   One thing that I do subscribe to

15    is that the continuity of that business, as -- as bad

16    as it was, it could have got worse.   And one of the

17    reasons it didn't get worse is because we had

18    continuity from the Ford plant to the JV and that was

19    only borne out by having a considerable number of Ford

20    employees there.

21                      So they were necessary and they did

22    maintain the continuity.   And the expectation would be

23    that when they came to the JV, it ain't Ford anymore

24    and that we were going to run the business differently,

25    that the sign said ZF, not Ford, and that transitioning

116

1     out of mass to lean production was not unreasonable.

2                      And Ford did try to do that themselves

3     in the years past to no avail, and our -- our focus was

4     the same thing, that we wanted to run the plant

5     differently.   But why wouldn't the Ford person

6      accommodate himself or herself to that as opposed to an

7      outsider is a matter of personal choice.

8            Q      I think what you were saying there is

9      there was a transition period where you say roughly

10     from two to three years after the joint venture was

11     started where you needed to keep the operation running,

12     you needed to get the CD4Es out the door and in that

13     vein you did rely heavily on the Ford transitional

14     employees who had the experience?

15           A      Absolutely for the first year.

16           Q      And is there a period where maybe you

17     got beyond that transition where you could start really

18     looking forward to the CVT and beyond the transition

19     period where you're just keeping it running?  I mean,

20     how long did that transition period last that we're

21     talking about, one, two years?

22           A      I -- I mean, there's -- there's people

23     that have 25, 35 years experience that you just can't

24     dismiss that are still there that are Ford transition

25     and their experience is still beneficial, you know.


                                                            117


1                  There -- there are -- there are ways to

2      get things done that they're aware of.  They understand

3      the equipment, they've lived with it its entire life

4      and there is -- there is absolutely a benefit to it and

5      concomitant with that is the -- the transition from a

6      mass production environment where everybody has to be

7      on board.

8                      But, yeah, the design of the JV was to

9      build out the existing product and transition to CVT.

10     And as we sit here today, that's a horse of a different

11     color from that plant.

12             Q      The Ford transitionals' experience is

13     primarily doing the CD4E?

14             A      Yeah.  And before that the ATX.  But,

15     yeah, that -- the -- the equipment and product in the

16     plant was there under Ford and it's still there today,

17     virtually the same equipment, although it's been --

18     there's a different version of the -- the CD4E, but

19     fundamentally it's the same product.

20             Q      But with the CVT I guess you're in the

21     preproduction phase right now?

22             A      CVT, yes.

23             Q      And a lot of those positions are being

24     filled by ZF Batavia new hires?

25             A      Yeah.

                                                        118

1              Q      Do you know of any Ford transitional

2      employees who are in the CVT area?  And I'm including

3      Ford retirees.

4              A      Yeah, there's a department manager, Joy

5       Giddings.  I believe one of the maintenance group

6       leaders is a former Ford employee.

7           Q     Are you talking about Hassan Saleh?

8           A     No.  Ed Aris?  Well, I never thought

9       about it.  I just don't -- I -- I guess if I had the

10      roster in front of me, I could identify -- half -- half

11      of the hourly employees in there are Ford employees.

12          Q     Aren't there still a lot of salaried

13      employees who are employed by Ford?

14          A     In -- in ZF Batavia --

15          Q     Yes.

16          A     -- that are employees of Ford?

17          Q     Yes.

18          A     There is one.  Adam Vahratian is our

19      CVT programs director, who is technically the only on-

20      roll Ford salaried employee in the company.  And then

21      there are Ford resident engineers that if we were still

22      a Ford plant that would be in the building courtesy of

23      the automatic transmission organization of Ford, that

24      they -- they assigned from the -- you know, the

25      divisional office, resident engineers.  And there's

119

1       five or six of those type people still in the building,

2       but they are not on our rolls.

3           Q     Is it your understanding when people

4       joined the joint venture from Ford in 1999 that they

5       were told that ultimately you can't stay here and be a

6       Ford employee?  Is that what your understanding was?

7              A       They all --

8              Q       They're given a choice, either join ZF

9       Batavia and become a ZF Batavia employee or look

10      elsewhere for a job within Ford?

11             A       Yeah, that's what I understood and

12      that's what -- that's what certainly happened during my

13      tenure.

14             Q       We'll just go through some names here.

15      Is there a person named Penny Bradboy who works there?

16             A       Bradboy?

17             Q       Yes.

18             A       Not anymore.

19             Q       She left recently?

20             A       Every -- every -- every Ford salaried

21      employee, I believe, left the facility at the end of

22      2001.

23             Q       That would include Ms. Bradboy?

24             A       I believe.  Whatever the -- that

25      approximate timing, yes.


                                                       120


1              Q       What about John Middleton?

2              A       John Middleton?  I don't recall.  He's

3       not here today.

4          Q          Did Tom Farris retire?

5          A          Yeah, he retired the first of the year.

6          Q          Ed Zix?

7          A          Ed Zix is one of the ATL Ford

8     residents.  He's not on roll.

9          Q          Was he somebody that was there in the

10    plant in 1999 as a Ford employee?

11         A          He's been there as a long as I've been

12    there.

13         Q          You're saying that the resident

14    engineers you've --

15         A          They're Ford employees, but they've

16    never been on the Batavia plant rolls.  They're

17    assigned out of the -- the -- the divisional automatic

18    transmission office.

19         Q          Mike Conners?

20         A          Same thing as Mr. Zix.

21         Q          Mike Morfino?

22         A          Mike Morfino was in a group of Ford

23    employees that were called 30 and three.  And what that

24    meant is that Mr. Morfino was going to be eligible to

25    retire within the window that was established for all

                                                            121

1     Ford salaried employees to either join the JV or leave.

2     But if you were eligible to retire by that window

3      closing, you could stay a Ford employee up to that

4      point, then you had to retire and had to join the JV.

5      And if you didn't retire, then you would have gone back

6      to Ford; you would not have stayed at the JV.

7              Q       So what did he choose?

8              A       He -- well, he chose to retire from

9      Ford and join the JV.

10             Q       So he's an employee of ZF Batavia?

11             A       Yes, he is.  Morfino is.

12             Q       And different than some of the other

13     Ford transitionals, he became a ZF Batavia employee

14     sometime after 1999?

15             A       Yeah.  There were a pre-designated

16     group that fell into that eligible-to-retire window and

17     they were at the onset identified as 30 and threes.

18     You get 30 years in this window and then you commit to

19     stay with the JV for at least three years thereafter.

20             Q       Okay.  Mike Kelly?

21             A       Mike Kelly, I believe, was in that

22     group and he retired and he did not stay with the JV.

23     He may -- he -- he was ill and I believe he retired and

24     just retired.

25             Q       Jim Bellman?

                                                        122

1              A       I'm not sure what Jim's -- I'd have to

2      look.  I don't -- I think Jim is one of the -- the ATL,

3      but I'd have to double-check.  I'm not sure.

4            Q       John Middleton, is he still in the

5      plant?

6            A       I don't know John.

7            Q       You just don't --

8            A       I'm drawing a blank on him.

9            Q       Okay.  There's a lot of employees

10     there, Mr. Sennish, that's understandable.  Jim Grimme?

11           A       I know Jim.

12           Q       Is he still in the plant?

13           A       No, Jim is gone.

14           Q       Is he one of the Ford salaried

15     employees that left before the end of 2001?

16           A       I believe so.  It's Grimme I think.

17           Q       I'm sorry?

18           A       Grimme is his name.

19           Q       Grimme?

20           A       Yeah.

21           Q       G-R-I-M-M-E?

22           A       Yeah.

23                   MR. SIMON:  I've got some spellings

24             here I can give the court reporter afterwards,

25             but I can't verify their accuracy.


                                                              123


1      BY MR. SIMON:

2          Q        Rob Krutz?

3          A        Rob Krutz is like Ed Zix and Mike

4     Conners.  He's an ATL resident.

5          Q        George Barry?

6          A        George Barry is an ATL resident.

7          Q        And we talked about Ken Workman I

8     guess.  Is he the one who left at the end of 2001?

9          A        Yeah.  He, I believe, went to

10    Sharonville.

11         Q        Bernie Blankenship?

12         A        Bernie -- Bernie left in that window.

13    I'm not what -- where he went or he retired.  I'm not

14    sure.

15         Q        All right.  So other than Adam

16    Vahratian -- is that his name?

17         A        Vahratian, yes.

18         Q        Other than him, to your knowledge, the

19    only Ford salaried employees that are still in the

20    building are these engineers?

21         A        Right.

22         Q        I'm still not clear.  But for whatever

23    reason they've got a separate arrangement than the

24    other Ford transitional employees were given in 1999?

25         A        They're not employees of the JV, never


                                                    124


1     were.

2          Q      Do you know or has anyone told you why

3     they were apparently given a different option than the

4     other Ford transitional employees in '99?

5          A      Because our customer wants their

6     employees to be in our plant as resident engineers.

7     Like I say, you'll go into the Sharonville plant and

8     you'll find resident engineers that are not on

9     Sharonville's rolls but are working every day in that

10    plant.

11         Q      Ford apparently told ZF Batavia you can

12    keep the engineers, but they're going to be Ford

13    employees?

14         A      Yeah.  And Ford will decide that --

15    when they're leaving.  And we -- they will just go.

16                MR. HUNTER:  Do you want to take a

17           break?  It's been almost another hour and a

18           half.

19                MR. SIMON:  Sure.

20                THE WITNESS:  I'll be quick.

21                MR. SIMON:  Yes.  Yes.  Sure.

22                     (RECESS)

23                MR. SIMON:  Mr. Sennish, we took

24           another brief break.  You understand you're

25           still under oath, sir?

1                    THE WITNESS: I understand.

2                    Mr. SIMON:  We're going to look through

3            a series of documents, sir.  When I show you a

4            document, take as long as you need to review

5            the document, to familiarize yourself with it.

6            Some of the documents I'll be asking just

7            questions about one particular line, other

8            documents I might be asking you for comments on

9            the entire document.  I'll let you know.

10                   But we'll try to work as efficiently as

11           we can going through this.  But at all times

12           make sure that you look through the document

13           carefully before you start testifying.

14                   THE WITNESS:  Understood.

15   BY MR. SIMON:

16           Q        Continuing the series, this is Exhibit

17   28.  While you're looking at it, I'm just going to

18   identify it.  It says at the top Corporate Policy,

19   there's a date of January 1st, 2001 at the very top,

20   and under title it says Overtime (Exempt Employees).

21   It says it's three pages, but there's actually four

22   pages, which is an attachment.

23                   I'm not going to ask you about every

24   word here, Mr. Sennish, and I assume you've seen this

25   document before, but take a look at it as long as you

1    need.

2           A       No.  Go ahead, please.

3           Q       All right.  The author is Len Sennish,

4    which is you, right?

5           A       Yes.

6           Q       The date is November 15th, 2000 next to

7    your title; do you see that?

8           A       Yes.

9           Q       I assume that's when this policy was

10   issued.

11          A       Thereabout.

12          Q       And, I guess, when you were talking

13   about the new policies that were created at the company

14   after you joined, this would be an example of one?

15          A       This would be an example.

16          Q       And this is the overtime policy for

17   exempt employees at the plant?

18          A       Correct.

19          Q       Let's turn to -- well, look at 5.3,

20   which is part of the definitions.  It's on the second

21   page.  5.3 says overtime compensation (payable in

22   hourly increments only).  Do you see that?

23          A       Yes.

24          Q       Is that the policy regarding exempt

25   salaried overtime, is that you pay in hourly increments

1    only?

2         A    Yeah.  There's the factor of taking the

3    -- the base salary and -- I think on the last page and

4    where it's at and that it's fundamentally broken down

5    into an hourly rate, which is consistent with what Ford

6    does.

7         Q    And when you created the policy in

8    November of 2000, it was your intent at that time to

9    make it consistent with Ford's overtime policy for

10   exempt employees?

11        A    It mirrored it, but it wasn't an exact

12   duplicate of it.  We had, you know, our own pieces to

13   it.

14        Q    That attachment that you referenced on

15   the final page, it explains that the "overtime rate" is

16   for an exempt employee?

17        A    Yes.

18        Q    If you make more than approximately

19   $4300 a month, your flat rate is $37.83 for Monday

20   through Saturday, right?

21        A    Yep.

22        Q    And that rate goes up to $50.44 for

23   Sundays and holidays?

24        A    Yep.

25        Q    And you've adjusted this rate upward on

1    occasion in the last several years?

2         A      Yeah.  We -- we review it every --

3    every year for inflation and whatnot.

4         Q      Would you know the rates off the top of

5    your head if I went through them?

6         A      No.

7         Q      Okay.  I won't bother.  Did it go up

8    this year again?

9         A      I believe we did adjust it.

10        Q      Was it from 2001 to 2003?  Did you skip

11   a year in adjusting the overtime rate, do you recall?

12        A      I -- I don't recall.  I know you

13   analyze it every year and I know we've made at least

14   two adjustments in the last few years, but don't know

15   -- can't recall whether we skipped a year.

16        Q      Do you know if this overtime rate is

17   consistent with Ford's overtime rate for their salaried

18   exempt employees?

19        A      No.  But the -- the process --

20        Q      The process is the same?

21        A      -- is -- is fundamentally what most

22   companies do, including Ford.

23        Q      The figures that I had you read off on

24   the attachment, $37.83 for Monday through Saturday,

25   $50.44 on Sundays and holidays, do you recall if that

1    was the rate that Ford had given its salaried

2    employees?

3        A        I have no idea what Ford's rates are.

4        Q        Do you know how that rate was

5    determined, $37.83 and $50.44?

6        A        Well, the algorithm yes, but, you know,

7    in terms of was it based on what Ford's numbers were, I

8    don't believe we used Ford in the -- the factoring of

9    that.

10       Q        Do you recall if the $37.83 was a new

11   rate in November 2000 or were you just confirming what

12   the rate already was through 2000?

13       A        I believe that was a confirmation.  It

14   may very well have been a carryover from Ford.

15       Q        Okay.  Looking under paragraph seven,

16   policy, which is the second page -- and just for the

17   record, Exhibit 28 is Bates stamped 000214 through

18   000217.  I think those are documents we produced to

19   you.

20                I think I've got it on the record, but

21   this, in fact, the current overtime policy for exempt

22   employees at ZF Batavia, other than the perhaps

23   difference in the current rate for the exempts?

24       A        Yes, I believe that's the case.

25       Q        All right.  Paragraph 7.1 under policy,

1     it says that "Eligible ZF Batavia employees will

2     receive overtime compensation for hours worked in

3     excess of nine hours in a 24-hour time period Monday

4     through Friday.  Overtime compensation is not

5     applicable if less than ten hours are worked daily

6     except for Saturday, Sunday and holidays."  I read that

7     correctly?

8          A     Yes.

9          Q     We'll talk about casual time in a

10    second.  But let's say from the moment they walked in

11    the door till the moment they left they were there nine

12    and a half hours, all right?

13         A     Mm-hmm.

14         Q     So they were there one and a half hours

15    beyond their eight-hour shift.  Would they receive any

16    overtime compensation?

17         A     Not automatically, no.  It would have

18    to be approved in advance, and a 30-minute increment

19    wouldn't be approved in advance.

20         Q     I understand when we're talking about

21    overtime, you would always want to say that it has to

22    be approved, right?

23         A     Well, that's the procedure.

24         Q     Assuming it's approved that the person

25    worked the extra hour and a half, the fact that it's

131

1    less than ten hours would mean that the person wouldn't

2    receive any overtime compensation?

3          A        Per this policy.

4          Q        And is it your testimony that that's

5    consistent with Ford's policy?

6          A        No.

7          Q        Is it consistent with Ford's policy?

8          A        I'm not sure.

9          Q        Ultimately I thought you said that when

10    you created this policy, the process was basically

11    consistent with Ford's policy or other companies that

12    --

13          A        No.  No.  I was talking about the

14    attachment.

15          Q        Just the attachment?

16          A        That -- that piece, as we were

17    referring to it, at that point is what Ford does.  The

18    numbers may be different, but that's what Ford --

19          Q        So you don't know if at Ford if you

20    worked nine hours, once you worked that extra hour, you

21    got paid that hour?  Are you aware of that?

22          A        I -- I don't know for sure.

23          Q        We've talked about there's an employee

24    named Bernie Blankenship there at the plant.

25          A        Was.  Was, yes.

1          Q       And he was never a ZF Batavia employee;

2     he was always a Ford employee, right?

3          A       Yes.

4          Q       Was there a time where he put down that

5     he worked nine hours on his time sheet and he was told

6     "You're not getting paid for that hour" and he

7     complained to Ford and he was paid?

8          A       I recall that.

9          Q       I described it accurately?

10          A       I don't know what exactly he was paid,

11     but I do know that he did get some relief from Ford

12     relative to their policy compared to ours.

13          Q       Do you recall if the issue was that he

14     had worked nine hours?  Do you remember if that was the

15     specific issue?

16          A       I'm pretty sure that was his issue.

17          Q       Okay.  And you, implementing the policy

18     here on 7.1, as you've described it, he doesn't get

19     paid that hour, right --

20          A       All -- all --

21          Q       -- if he's a ZF Batavia employee?

22          A       Right.  That's correct.

23          Q       But apparently, based on your

24     conversations with Ford or -- did you talk to Ford

25     directly during that dispute with Bernie?

1          A        I did not personally.  Other people in

2     our organization did.

3          Q        But it was reported to you that a Ford

4     employee, if they work nine hours, they get paid the

5     full one-hour overtime?

6          A        My understanding is that they have it

7     approved in advanced and that they do, I guess, from

8     time to time pay people from the eighth hour.

9          Q        So based on what you know, your

10    experience with Bernie Blankenship, you're the one who

11    created this overtime policy, it's fair to say that

12    this overtime policy that you issued November 15th,

13    2000, was a departure from Ford's overtime policy that

14    the Ford transitional employees had otherwise acted

15    under as you understood it?

16         A        It certainly turned out to be

17    different.

18         Q        And did anyone ever complain to you

19    that they had to work this extra free hour for ZF

20    Batavia that they hadn't had to work for Ford?

21         A        Oh, yeah, I've heard that complaint.

22         Q        The free hour, you've heard that a lot?

23         A        Well, yeah.  Yeah, I've heard various

24    terms.

25         Q        That kind of gets under your skin,

134

1    doesn't it?

2          A        I'd said I don't fully comprehend why

3    that's a problem.

4          Q        You think if they're a salaried person,

5    they're well compensated.  If they work nine and a half

6    hours, including an hour and half of casual time, you

7    think that's a fair expectation that that's not paid?

8          A        In my 20-plus years that's all I've

9    ever known.

10          Q        Has anyone in management at ZF Batavia

11    told you that "Len, hey, that might be your attitude

12    and perspective on this overtime policy, but this is

13    wrong.  We want our ZF Batavia employees to get paid

14    the additional hour they work after the eight-hour

15    shift"?

16          A        Not that I recall, certainly in that

17    tone.  There are a lot of opinions expressed, but

18    nobody came up with "I think it's wrong".

19          Q        Well, I understand.  Has there been any

20    discussion since you issued this November 15th, 2000

21    policy that we ought to -- have there ever been any

22    discussions about possibly changing the policy

23    regarding the nine hour and the ten hour rule?

24          A        There's been discussion about the

25          issues surrounding it and our reaffirmation that that

                                                                    135

1          is our policy and that's what we're going to do.

2               Q      Is it fair to say that you've had

3          complaints from the people who are affected by this

4          rule, but ultimately the people in upper management

5          have decided this is our rule and we're sticking with

6          it; is that a fair summary of it?

7               A      Well, that's our rule and sticking with

8          it is one characterization.  It's the policy of the

9          company and until it's otherwise modified, that's what

10         it is and we all live by it.

11              Q      We're done with this one.  You can flip

12         that over.  You probably want to add that to your pile.

13         We'll be going through a lot of documents here.

14                     This is Exhibit 29.  Take a look at

15         that, Mr. Sennish.  Really my question to you basically

16         is just:  Did you send out this document to the

17         salaried employees?

18              A      Yes.  Mm-hmm.

19              Q      Was this sent by e-mail I take it?

20              A      That -- that is always the one forum

21         that we use and then sometime -- like in a policy like

22         this, it wouldn't be posted.  Sometimes we mail, but

23         there generally is a confidential e-mail sent to all

24         salaried employees is one mode.

25          Q       All right.  Turn that one over.  This

                                                              136


1       is Exhibit 30.  Take a look at it.  I'll just describe

2       it for the record.  Exhibit 30 is Bates stamped 000206.

3       It's an e-mail from Herb Huebner to Joe Phelps on

4       February 19th, 2002, which is the same date of the memo

5       we just looked at which was Exhibit 29.

6                    My question to you is just:  Does Mr.

7       Huebner in his e-mail to Mr. Phelps -- does he fairly

8       describe the reason that the change was made to the

9       sick and personal days?

10          A       Yeah.  I think Herb expressed a bit of

11      his opinion in here, but the facts, I believe, support

12      it.

13          Q       Is there some opinion he expressed

14      there that you disagree with?

15          A       No.  No.  I just said it wasn't --

16      again, it was -- a lot of it is him giving the so-

17      called rationale as he understood it for the changes.

18          Q       But he stated the rationale accurately?

19          A       I don't disagree with how he stated it.

20          Q       Okay.  Put that one aside.  This is

21      Exhibit 31.  Exhibit 31 is a similar document in form

22      to the overtime policy memo we looked at.  This one

23      says Corporate Policy at the top.  The title here is

24     bereavement.  The author here is Ann Appleton and Mr.

25     Sennish's name is on it and the date is June 1st, 2000.


                                                                137


1     Mr. Sennish, does this reflect the current policy at ZF

2     Batavia regarding bereavement leave?

3              A       I believe so.

4              Q       And this policy apparently was issued

5     to the personnel on June 1st, 2000 or thereabout?

6              A       Yes.

7              Q       Prior to this being issued, had it been

8     the case that employees could get three days of

9     bereavement leave for a death of a relative regardless

10    of whether the relative is an immediate family member?

11             A       Please, again.

12             Q       Do you see on page two of this document

13    procedure 7.1?

14             A       Yes.

15             Q       It explains you get up to three days

16    leave for an immediate family member?

17             A       Yes.

18             Q       And then below it says "Employees may

19    be granted one day absence with pay due to the death of

20    other family members"?

21             A       Yes.

22             Q       Do you see that?

23             A       Mm-hmm.

24          Q        Did that reflect a change in policy at

25     this point in 2000 or was this just confirming what had

138

1      been the policy all along?

2          A        This is, my recollection, a

3      confirmation of what we were doing and I don't believe

4      we -- we changed anything that -- in terms of what --

5      what practice was in place.

6          Q        Did anyone complain about this after it

7      was issued?

8          A        I -- I don't recall specifically, but I

9      do believe that there -- again, you know, there was

10     discussion about -- about this and some people

11     evidently had some concerns with it.  But, again, did

12     something bubble into my office where there's a huge

13     problem with this?  I don't -- that didn't happen.

14         Q        Do you remember if Hassan Saleh raised

15     a concern about this policy?

16         A        He may have, but I don't recall it.

17         Q        Do you remember anyone having any

18     concern that if their spouse's parents should die, that

19     they would want more than a day for bereavement leave,

20     and that person is out of town?

21         A        I -- I could understand somebody

22     raising that issue, but I don't recall hearing it.

23          Q       There were some concerns, I guess, but

24    ultimately the policy stayed in place as it's reflected

25    here, right?

139

1          A       Yes.

2                  MR. SIMON:  Do you have Exhibit 10?

3          Did we use Exhibit 10 yesterday?  Do you have

4              them over there?

5                  MR. HUNTER:  What do you need?

6                  MR. SIMON:  I've only got one copy.

7          I'm just wondering if you have it.

8    BY MR. SIMON:

9          Q       Go ahead and review Exhibit 10, Mr.

10    Sennish.  That was a document made an exhibit at an

11    earlier deposition.

12                  MR. HUNTER:  Is that it?

13                  MR. SIMON:  Off the record for a

14              second.

15                  (OFF THE RECORD)

16    BY MR. SIMON:

17          Q       You've had a chance to look at that?

18          A       Yes.

19          Q       Exhibit 10 is apparently a memo that

20    you sent out on March 28th, 2002?

21          A       Yes.

22          Q       You sent it to all the exempt salaried

23    employees, right?

24        A        Yes.

25        Q        What was the impetus for sending out

140

1    this memo?

2        A        Well, it was our -- our lack of budget

3    compliance and the state of the business, our

4    continuing under-performance and basically the

5    expectation of the parent companies that we improve,

6    and this was one -- one piece of an overall plan to

7    right the business.

8        Q        And your concern here was too much

9    overtime, right?

10       A        Yeah, that the practice apparently when

11   we wrote this letter was such that it wasn't very well

12   controlled and it was inconsistent and no -- no real

13   adherence to the budget.

14       Q        Obviously here you reiterated what the

15   overtime policy is that we previously discussed, that

16   you have to work in excess of nine hours, essentially

17   you have to work ten hours before you receive overtime

18   compensation?

19       A        That's the policy.

20       Q        And you were concerned that wasn't

21   being followed?

22          A       That and many other things.

23          Q       This is March 20th, 2002 on your memo.

24     Is it still your testimony that you don't recall in the

25     same time period that certain departments were told

141

1      that you are going to work overtime during the week and

2      on weekends and not be paid?

3          A       No.  I -- that -- the -- it -- it would

4      be like my department, if -- if I was scheduling -- and

5      I have a lot of nonexempt employees in medical and

6      security -- that I would be scheduling people and I

7      would exceed my budget.  The financial department would

8      tell me what my circumstance had to be in order to

9      comply with the budget.  It was a dollars thing that

10     was impacted by the policy and we wanted people to

11     apply the policy.  But, again, the -- the budgeting and

12     compliance with the budget was not driven by HR.  It

13     was driven by finance.  So I was under the same

14     scrutiny as anybody else was by finance, the

15     controller.

16          Q       When you wrote at the bottom there, the

17     second to last sentence, "The ZF Batavia executive team

18     understands that many salaried employees will perceive

19     this operating pattern as affecting a reduction in

20     their total compensation package," what did you mean

21     there?

22          A        That at this stage of the JV it was

23      abundantly clear that a lot of people in the workforce,

24      salaried and hourly, were pretty much adverse to change

25      and that there -- again, the -- the conditions of the

                                                          142

1       business were such that the operating environment was

2       such we made the change and there was no question that

3       the -- the -- the workforce, the salaried exempt

4       workforce, would see this as "They're taking something

5       away from us."  You know, I mean, that's their

6       perception and, you know, we expected that there would

7       be a number of people that would see it that way.

8          Q        What would they specifically think was

9       being taken away from them?

10         A        I don't know.  I just said it would --

11      that the perception out there is that there is

12      something going on, that we're going to get less

13      overtime, you know.  When you spend less money on

14      overtime, there's going to be an impact on people's

15      paychecks.

16         Q        Did you think people were concerned

17      that they weren't going to have the opportunities to

18      work more overtime and be compensated or did you

19      perceive their concern that people are going to work

20      overtime and not be paid for it?

21          A        That they were going to work less

22    overtime.  There's a reference to the -- the level of

23    overtime being worked in the hourly workforce which is

24    driving a lot of the salaried overtime and so part of

25    this just being a piece of our overall initiatives that

143

1    we were going to reduce the amount of hourly overtime,

2    which we have done, which would commensurately reduce

3    the salaried overtime.

4          Q        You didn't understand that this nine

5    hour rule that you set forth in here would be

6    interpreted as reducing people's compensation?

7          A        Well, that rule was about two years old

8    by then.

9          Q        Although apparently inconsistently

10    applied?

11          A        Inconsistently applied?  Maybe applied

12    too liberally.

13          Q        Okay.  We're done with that one.  Thank

14    you.

15                   MR. HUNTER:  Does that need to go back

16          in the stack?

17                   MR. SIMON:  No.  I'll take it.  I'll

18          take it.

19    BY MR. SIMON:

20          Q        This is Exhibit 32.  I'm going to hand

21    you some more exhibits at once, Mr. Sennish, so we can

22    do this efficiently.  Exhibit 34.

23              Mr. Sennish, I've handed you a group of

24    documents that are Exhibit 32, 33, 34 and 35.

25    Basically my point is just to try to understand a

144

1    little bit about the AIP bonus and how it's calculated.

2    We'll take them individually actually.  I know you've

3    got a lot of paper in front of you, but that's just to

4    be efficient about this.

5              Exhibit 32, which is this document,

6    says at the top ZF Batavia Salary Broad Bands 2000.  It

7    also has a date of 2/9/01 at the bottom.  What does

8    this document reflect?

9         A     This is the salaried range for that

10   period of time and represents each of our -- our broad

11   bands in -- in ZF Batavia and identifies the -- the

12   Ford transition ranges in our structure with the ZF

13   Batavia new hire.  And that gets reviewed every --

14   every year and updated as necessary.

15        Q     When you were talking earlier that the

16   Ford transition employees, that their maximum on their

17   -- for each band is higher than the corresponding ones

18   for ZF Batavia, does this document reflect that?

19        A     Yes, it does.

20          Q          Okay.  Exhibit 33 is the document Bates

21     stamped 003445.  It's a Herb Huebner e-mail dated

22     September 8, 2001.  Actually it's from you to Mr.

23     Huebner.  Below your e-mail is an e-mail from Mr.

24     Huebner from to you on September 5th, 2001 and it talks

25     about an employee named Jeff Busam.

145

1          A          Yes.

2          Q          Does this e-mail reflect your

3     recollection about -- was there some certain issue with

4     Mr. Busam?

5          A          I recall this generally.

6          Q          What was this about?

7          A          Well, there was, I believe, Mr. Busam

8     was considered for a lean processing manager position

9     and at the time he was a general salaried role

10     employee, or GSR as you would see it on that previous

11     sheet, and the LPM position was an MR position as

12     reflected on that previous sheet, and MRs generally --

13     generally are not compensated for overtime anywhere

14     near the extent that the GSR in operations is.

15               So Mr. Busam apparently worked almost

16     as much overtime as he did straight time as a GSR and

17     when considering the -- the LPM position, and evidently

18     in his case money was the motivating factor, I think he

19     kind of nixed it.  "I can make more money getting paid

20      for overtime."

21          Q      Mr. Huebner has a little chart there

22      with different names like Dennis Baker and then it has

23      average monthly year to date plus overtime, year to

24      date overtime as a percentage of base.  Do you see

25      that?

146

1          A      Yes.

2          Q      Does that in your mind reflect pretty

3      high percentages for overtime as a percentage of base

4      for those individuals?

5          A      Yeah.  I mean, the 92 percent would

6      shock any reasonable person.  But I think the 20 to 30

7      percent range for the Batavia plant is -- is a -- a

8      norm.

9          Q      As we were talking about the AIP bonus

10      before, if somebody had worked -- the percentage of

11      their total compensation for overtime was, as you said,

12      say, 30 percent, is that somebody who you would have

13      expected to have their AIP bonus reduced, assuming they

14      weren't a top performer?

15          A      No, I don't think it was that simple.

16          Q      Is there a percentage you might say

17      that would indicate too much overtime for a person such

18      that their AIP bonus would have been reduced in 2002?

19          A       No.  I think it was clearly the

20    relationship between their performance and the amount

21    of time they were putting in and getting paid and

22    factoring all those -- those components into what you

23    felt was an appropriate award.

24          Q       But overtime was one of the factors.

25    If there's too much overtime, that was a factor in


                                                      147


1     determining the AIP bonus?

2           A       Yeah.  It would -- it was a -- a -- a

3     driver in terms of looking at those individuals, say,

4     if there's a 92 percent person in your category, that

5     would have jumped right out and that would have been

6     one of the first ones you looked at and say "Okay.

7     Well, where's his performance equate with that?  He's

8     spending all these hours in here.  What am I getting

9     out of it?"

10          Q       I'm just trying to understand.  What

11    kind of percentage would jump out at you?

12          A       To -- to me any -- anything over

13    basically 25 percent.

14          Q       So Mr. Ervin who has 27 percent and Mr.

15    Baker who has 42 percent, depending on their

16    performance, you may have expected their AIP bonus to

17    be reduced for 2002, right?

18          A       In my opinion, that's how I would have

19    looked at it.

20        Q     Fair enough.  You can turn that exhibit

21    over.  We'll look at Exhibit 34, which is an e-mail

22    from Mr. Huebner to you, Mr. Sennish, on January 22nd,

23    2002.  Does Mr. Huebner's e-mail kind of reflect these

24    same things we're talking about regarding overtime and

25    AIP?  I'll just direct you to his subparagraph B in the

148

1    middle of the page "Taking "excessive" overtime into

2    account.  Did the manager fail to manage?  Did the

3    employee who worked a lot of overtime fail to manage

4    his work or was he being a good guy and taking more

5    overtime than other people?"  Are these the kind of

6    considerations that Mr. Huebner has there -- is that

7    what kind of went into the discussion of how to award

8    the AIP bonus for 2002?

9        A     Yeah, and it was kind of -- wasn't my

10    comment, it wasn't that simple?  There were several

11    factors that were to be considered.

12        Q     So if you worked a lot of overtime, you

13    weren't necessarily supposed to automatically have your

14    AIP bonus reduced?

15        A     That's correct.

16        Q     Okay.  You can turn that one over.

17    This next one is Exhibit 35, Bates stamped 003251 to

18      003252.  It's an e-mail from Mr. Huebner on February

19      8th to you, Mr. Sennish, as well as some other people.

20      And then when this was produced, there was what I

21      assume to be the attachment from Mr. Huebner, a memo,

22      on the second page.  It says AIP process review at the

23      top.

24                  Just try to help me out here, Mr.

25      Sennish.  Does this e-mail and some of the notes we

149

1       have and the memo that's attached -- does this kind of

2       reflect some conversations that you and Mr. Huebner and

3       Mr. Kehr and perhaps Mr. Adams were having about the

4       AIP bonus for that year?

5           A       Yes, it does.

6           Q       All right.  See on the second page

7       where we have the memo with all the bullet points, in

8       the middle it says "Bonus reduction departments were

9       determined by those groups with unusually heavy amounts

10      of overtime (more than 75 percent over budget)"?  Do

11      you see that there?

12          A       Yes.

13          Q       Was that how it was ultimately

14      determined?  Does his statement reflect the kind of

15      determination that was made regarding the AIP bonus

16      with respect to overtime in those departments?

17          A       I -- did I know that was a -- a

18    discussion point?  I'd have to defer to me looking at

19    the records whether or not that bullet was actually

20    implemented.

21         Q    I guess there was some discussion in

22    the middle there where it says "Group one bonus is

23    reduced by 25 percent.  Group two bonus is reduced by

24    15 percent."  Do you know if that was implemented?

25         A    I'd have to go back and look.  I just

150

1    -- there was so much discussion about that.  I --

2         Q    Was there a directive from Mr. Adams

3    that he did want the operational people to receive less

4    of a bonus because of the excessive overtime?

5         A    Where warranted.

6         Q    Did he want the operational people to

7    feel some pain?  Have you ever heard that phrase?

8         A    Well, I've heard it probably 10,000

9    times, but it may very well have been said during this

10    process.

11         Q    Okay.  You can turn that one over.

12    This is Exhibit 36, Mr. Sennish.  Take as long as you

13    need to look.  My question is:  Is this a memo that you

14    sent out to the TNTs on March 8th, 2002?

15         A    That it is.

16         Q    Who are the TNTs?

17          A       Those are the individuals that report

18    directly to the president.  It's the transmission

19    management team.

20          Q       And does this memo fairly reflect the

21    company's explanation for the AIP payout for 2001?

22          A       Yes.

23          Q       When I say 2001, that was 2001 bonus

24    that was handed out in 2002, right?

25          A       Right.


                                                      151


1          Q       Turn that one over.  This is Exhibit

2    37.  We're not going to go through every page.  Pardon

3    me.  I think I gave you too much.  This is Exhibit 37.

4    Again, you don't have to look at every page of this,

5    Mr. Sennish.

6                   This is Bates stamped number 003356

7    through 003394.  It says Confidential ZF Batavia 2001

8    AIP Determination 3/5/02.  Do these documents reflect

9    what the final payout was for AIP for 2001 for the

10   various individuals listed in here?

11                  MR. HUNTER:  Go through the whole

12          thing.

13                  MR. SIMON:  I'll represent to you, sir,

14          when you turn the page, it says 3/5/02 on the

15          second page and then 3/4/02.  The dates kind of

16          change.

17                    THE WITNESS:  Yeah, when all the

18              information was received and finalized I

19              presume.

20    BY MR. SIMON:

21         Q      I'm just trying to understand.  Is this

22    a document that would ultimately reflect the final

23    decision on the AIP bonuses?

24         A      Yeah, it would be in this format.  So

25    far it appears to be consistent.


                                                      152


1          Q      Turning to, let's say, the second page

2    where it says office of the president --

3          A      Yes.

4          Q      -- it says Cynthia Clousson is the

5    first name listed there.  It has Cynthia's base pay and

6    then it has her AIP percent payout, right?

7          A      (Nods head)

8          Q      Based on this chart, would it reflect

9    that her AIP bonus was $835?

10         A      Yes.

11         Q      So the column that says available for

12   payout 2001, as you flip through the pages here, it's

13   your understanding that those reflect the actual AIP

14   bonuses that these individuals received?

15         A      No.  The last column, I believe, is

16          reflective of what was actually --

17              Q      Actual.  I'm sorry.  Right.  The very

18      last column.  Staying with Ms. Clousson for a second,

19      why would her available for payout be $835 and her

20      actual be zero?  Would that be based on performance?

21              A      Yes.

22              Q      I see like Carmen Pinheiro, the second

23      name there, that the actual payout is slightly higher

24      than the available payout column.

25              A      Yes.


                                                        153


1               Q      Do you know why that would be the case?

2               A      It was a decision to reward her for her

3       exemplary performance.

4               Q      Would the same thing be true for Mr.

5       Feldkamp?

6               A      Yes.  And there's a footnote on Mr.

7       Feldkamp for a specific project that he worked on that

8       had exceptional success.

9               Q      Would the HR department create a

10      similar report and retain that document for each of the

11      years that an AIP bonus was distributed since 1999?

12              A      For 1999, beginning in 2000, yes.

13              MR. SIMON:  Well, we may be asking for

14          that document, Mr. Hunter, so we can understand

15          how this AIP bonus was calculated.  We're going

16              to need to know all the numbers.

17              Okay.  You can turn over that bulky

18              document, sir.  Off the record.

19                  (OFF THE RECORD)

20    BY MR. SIMON:

21        Q      There you go, Mr. Sennish.  Exhibit 38

22    is a multi-page affair.  My question to you is -- and

23    take as long as you need to, to familiarize yourself

24    with it.  This was a document that was produced by ZF

25    Batavia in this case.  I'm just wondering, do you have

154

1     any idea where this document came from, whether you've

2     seen it before?

3         A      Well, I would guess that Mr. Huebner

4     probably printed this out since he's a SHRM member.

5     I've read so much stuff in this respect, I probably

6     read this or at least gleaned it.

7              MR. SIMON:  That's it.  Off the record

8              for a second.

9                  (OFF THE RECORD)

10    BY MR. SIMON:

11        Q      This is Exhibit 39.  I don't have the

12    whole thing here.  I don't have the whole thing.

13    Actually strike that.  We're not going to mark Exhibit

14    39, but you can go ahead and review the document

15     anyhow.

16                         MR. HUNTER:  We are or we aren't using

17             this?

18                         THE WITNESS:  We're going to use it,

19             but not call it Exhibit 39.

20     BY MR. SIMON:

21             Q       My question to you as you look at this,

22     Mr. Sennish, is:  Were you aware of this inquiry into

23     whether Rick Ervin could retire from Ford and continue

24     to work for ZF Batavia?

25             A       Yeah.  He came to me and talked about

155

1      it.

2              Q       And did you initially tell him that you

3      thought that he could do that?

4              A       I told him that I felt there was a

5      possibility and that I would follow it up and see what

6      the position of Ford was.

7              Q       And apparently the position of Ford was

8      that he couldn't retire from Ford if he was going to --

9              A       Immediately assume the same desk.

10             Q       Yes.  Now, we've talked about some of

11     these other Ford employees who you said retired in 1999

12     before they joined the joint venture, right?

13             A       Mm-hmm.

14             Q       Has anyone ever told you why Ford in

15          consultation with ZF Batavia wouldn't allow a current

16          ZF Batavia employee to do the same thing that the Ford

17          employees had done in 1999, specifically allow them to

18          retire and then continue to work with ZF Batavia?

19              A      Other than a document like this, no.

20          This just wasn't the -- the transition from Ford to the

21          JV was such that there were time lines and

22          opportunities and the window was closed and this one

23          was a unique circumstance.  It was outside the

24          arrangements that were made at the inception.

25              Q      And there haven't been any further

156

1          discussions between ZF Batavia and Ford about this

2          issue?

3              A      No.  I think this, as I recall, was the

4          closure.

5              Q      Okay.  We'll call this one Exhibit 39.

6          This is a document that says Transition Plan at the

7          top.  It's dated 5/5, 2000.  It says Ford Salaried

8          Employees at ZF Batavia.  Did you create this document,

9          Mr. Sennish, do you know?

10              A      Yeah, or at least participated in it.

11              Q      Is that a true statement where it says

12          "At the onset, an agreement was made to transition out

13          the Ford salaried workforce over a period of two to

14    three years, with year-end 2002 as the target date for

15    completion"?

16         A    That's pretty much the line that we --

17    the actual outcome, yes.

18         Q    And where it says Placement Status, I

19    take it you or the HR department was keeping track of

20    which Ford salaried employees were still in the plant

21    at that time?

22         A    Yes, we were.

23         Q    Okay.  You can turn that one over.

24    This is Exhibit 40.  This is a series of e-mails

25    beginning with Karen Horan to Marty Mulloy sent on July

157

1    31st, 2000 and there's another e-mail below it.

2              Mr. Sennish, I'm not sure your name is

3    on it, but I was wondering if you could help explain.

4    In the middle of the e-mail it says "We obviously have

5    a less than desirable situation in Batavia -- let's

6    come up with a plan that appropriately address their

7    concerns."  That's said in an e-mail on July 31st,

8    2000.  The subject is Ford salaried employees.

9              Have you ever seen this e-mail before

10    or does it refresh your recollection about what Marty

11    Mulloy may have been talking about?

12         A    Well, I have never seen this part of

13    the e-mail, but I have seen Ms. Malone's summary of the

14    meeting.  And Mr. Mulloy, I believe, ultimately came to

15    Batavia and had -- had Ford-employee-only meetings with

16    the remaining Ford salaried people in the building, as

17    well as some that had transitioned.

18          Q      Do you know what this is referring to,

19    a less than desirable situation?

20          A      That there were some issues that the

21    employees had with Ford Motor Company.

22          Q      And you're not aware what those

23    concerns were?

24          A      That was a closed meeting, and Ms.

25    Malone sat in because she was a Ford employee at the

158

1    time and all ZF employees were excluded from it.  It

2    was an internal Ford meeting.

3          Q      You can turn that one over, sir.  This

4    is Exhibit 41.  This is a handwritten note that says

5    Ford/ZF Salaried at the top.  It's dated 9/28/00.  It

6    lists some people who were in attendance at perhaps a

7    meeting and your, Mr. Sennish's, name is one of them.

8    Is this your note, Mr. Sennish?

9          A      No, this is not my note.

10         Q      Do you recognize that handwriting?

11         A      No.

12         Q      There's a line at the end that says "ZF

13        will honor commitment made to people who want to stay

14        until 12/31/02."  Do you know what that's referring to?

15            A      Well, originally it was not 12/31/02.

16        I believe it was 12/31/01 was the original commitment

17        of the window to either make a decision or leave.  And

18        whether it was an internal Ford thing or a board thing,

19        that ultimately extended that window another year.  But

20        I think this is a confirmation that somewhere a

21        commitment was made and we're going to live up to it.

22            Q      Okay.  You can turn that one over.

23        This is Exhibit 42.  This is an e-mail from Carolyn

24        Malone to Marty Mulloy, among others, dated August

25        21st, 2000.  This exhibit also -- it's a three-page

159

1        exhibit, Ford Bates stamp 0542 through 0544.

2                Were you aware -- there are some

3        concerns raised in Ms. Malone's e-mail?  Were you aware

4        of these concerns?

5            A      Yeah.

6            Q      Fill us in.  What was this about?

7            A      Well, apparently during the Ford-

8        employee-only meeting that was chaired by Mr. Mulloy,

9        he evidently threw out the concept of, you know, the

10        special package or some kind of buyout, as referenced

11        in here, which was outside of any other discussions

12        with transition employees and he -- he just like added

13      to the pile of "Well, if we do this, will it help

14      whatever is -- concerns you?"

15                      And so, as it turned out, there -- the

16      -- you know, the initial population of Ford employees,

17      a lot of them were mobile and as you got down over time

18      there were people that were less mobile, that didn't

19      want to leave Cincinnati and basically felt that if

20      they -- the longer they hung around, the better

21      prospect there might be for some change that would

22      allow them to stay a Ford employee in Batavia.

23                      So all those things considered, there

24      were a lot of individual issues and people felt --

25      there were some people that simply weren't happy with

                                                160

1       the creation of the JV and the resultant effect on

2       them.

3               Q       Do you see at the bottom where she

4       writes "This does not lend much credence to confidence

5       in 'DOING THE RIGHT THING'"?  Do you know what she's

6       referring to there?

7               A       No.  And, I mean, looking up at the top

8       paragraph with the word "punitive word being 'if,'" you

9       know, I -- sometimes the choice of words is more of a

10      -- you know, a -- just a -- a phrase as opposed to

11      something having real direct meaning.

12          I -- I don't -- I wasn't in the

13     meeting.  She sat in the meeting.  She was a Ford

14     employee.  I see these bullets and I've got to believe

15     that people that have specific personal issues,

16     apparently in her mind we ought to try to do the right

17     thing.  I don't know.

18          Q     Okay.  I appreciate that.  You can turn

19     that one over.  Was it your understanding in 1999 that

20     at some point there was a freeze on Ford employees

21     going over to the Sharonville plant?

22          A     There -- there was a -- I don't know

23     whether it was '99 or 2000 and it just wasn't

24     Sharonville.  Sharonville took a position that they

25     weren't going to wholesale take people from Batavia


                                                       161


1     that they didn't need, i.e. they didn't have any

2     openings, when other Ford facilities throughout the

3     United States may have had openings, and, in other

4     words, don't -- don't give us all these people because

5     we don't need them.

6          Q     This is Exhibit 43.  This is an e-mail

7     from you, Mr. Sennish, to a gentleman at Ford, dated

8     December 15th, 2000.  The Bates stamp, it's Ford's

9     document 0625.  After you've had a moment to review

10     that, Mr. Sennish, if you could just explain if, in

11     fact, you wrote this e-mail.

12          A        Yeah, I -- this is my e-mail.

13          Q        The question is just going to be to

14     you:  What was the impetus for sending this e-mail to

15     Ford?

16          A        Well, one of my contacts at Ford was

17     Mr. Kleinsmith and -- I haven't finished reading it.

18     This has been a little while.  Yeah, I think that we --

19     we had an understanding of how this transition process

20     was supposed to work and we were the organization, you

21     know, holding the bag.  And when things -- selections

22     were made or transfers were made that weren't purely

23     consistent with what we felt was supposed to happen,

24     that it caused issues with people.

25               And as you can see in my -- my summary

162

1      here, we had people, based on one of the earlier

2      attachments, when they were available to Ford in terms

3      of us having continuity in our business, and so some of

4      these selections were inconsistent with that.  And, you

5      know, a couple of people had indicated -- well, like

6      Mr. Kelly, "I'm going to retire, so I'll just stay here

7      and retire" and somebody must have told him that's okay

8      from Ford, because they were the moving party in all

9      these.

10              And so I think what I was communicating

11     to Mr. Kleinsmith, you know, help us a little bit here

12     and let's -- let's have more advance notice and let's

13     make sure we're being consistent with the commitments

14     that were made to the employees.

15          Q     Who's SHV?  I'm sorry.

16          A     Sharonville.  An abbreviation.

17          Q     Has that kind of continued to be an

18     issue in the plant, that certain people were

19     essentially allowed to go to Sharonville and stay with

20     Ford and others haven't been given that opportunity?

21          A     That's been an issue because it hasn't

22     happened.

23          Q     Because no one else has gone to

24     Sharonville?

25          A     Well, people have gone to Sharonville,

                                                    163

1      but on a scheduled basis, based upon Sharonville's

2      openings.  And the predominate sentiment of a lot of

3      people was "I want to stay in Cincinnati.  Why can't I

4      go to Sharonville?"  And I think there's a -- a

5      reference to handpicking.  And Sharonville picked the

6      people that they felt best filled their openings, so

7      other people that weren't picked were not quite as

8      happy.

9          Q     You wanted to put an end to the

10     handpicking?  You wanted it to be a better process of

11    how people were eligible to leave Batavia and go to

12    Sharonville?

13         A       Yeah.  I didn't want to tell

14    Sharonville how to select their people, but ultimately

15    when they have an opening, there was a preference to ZF

16    Batavia employees who met the requirements of the job

17    before they would go and hire somebody else or take in

18    another transfer, that these were the preferential

19    places.

20         Q       When you wrote "I don't want to make a

21    mountain out of a mole hill, but here we go again,"

22    what did you mean by here we go again?

23         A       That circumstances similar to this

24    obviously happened in the recent past.

25         Q       Circumstances regarding handpicking by

                                                          164

1    Sharonville?

2         A       Could be.  Or it could be any of these

3    other things like not picking somebody and wanting them

4    ahead of their availability.  It was a mixed bag.

5         Q       Okay.  Turn that one over.  I want to

6    talk about the 401(k) for a second.  Was there a

7    matching contribution by the company?

8         A       ZF Batavia, yes.

9         Q       And the contribution is a reflection of

10          the person's total compensation?

11               A          Their base salary.  Six percent of the

12          base salary is eligible and there's a 50 cent on the

13          dollar match up to that amount.

14               Q          Does overtime factor in?

15               A          No.

16               Q          Does AIP bonus?

17               A          No.

18               Q          Do you know if AIP bonus or overtime

19          compensation affects the Ford pension plan for the Ford

20          transitional employees participating?

21               A          I believe the last five years' earnings

22          may -- may be influenced by that, but I'd have to

23          reread the Ford GRP.

24                    MR. SIMON:  Let's go off the record for

25               a second.

                                                            165

1                         (OFF THE RECORD)

2               Q          The benefit plans that the Ford

3          transitionals have include, let's see, 401(k) plan,

4          right?

5               A          Yes.

6               Q          What other benefit plans do you have

7          for the Ford transitionals?

8               A          You mean -- you know, hospital,

9          surgical, medical, dental, vision?

10          Q       Okay.  Let me write those down.

11     There's a health benefit plan?

12          A       Yes.

13          Q       Is there a separate plan for dental?

14          A       Yes.

15          Q       And there's a life?

16          A       Yes, life insurance, dependent group

17     life insurance.  And some of these have co-pays and

18     deductibles and whatnot, but, you know, they're pretty

19     much the standard, as in Exhibit 2, if that's what it

20     was.  You know, it pretty much identifies in a nutshell

21     what the benefit plans were.

22          Q       Well, now, the benefit plans, these are

23     ones that are subject to ERISA, right?

24          A       By and large, yeah.

25          Q       ERISA, it's the federal employee

166

1     retirement act.  You're familiar with it, being an HR

2     director, right?

3          A       Mm-hmm.

4          Q       That was a yes?

5          A       Yes.  I'm sorry.

6          Q       Okay.  And so subject to ERISA, these

7     benefit plans have to have a summary plan description,

8     right?

9          A        That's correct.

10         Q        So the 401(k) plan would have a summary

11    plan description?

12         A        It should.

13         Q        The health benefit plan the same?

14         A        Same.

15         Q        The dental plan should have a summary

16    plan description?

17         A        Yes.

18         Q        I don't know, the life insurance plan,

19    is there one?

20         A        There should be.  I -- I don't -- I'm

21    not sure.

22         Q        Are there any other benefit plans that

23    have a summary plan description that you're aware of?

24         A        No.  I think that would be it.

25         Q        I mean, you don't have a summary plan

                                                        167

1     description plan for overtime, do you?

2          A        No.

3          Q        You don't have one for the AIP, do you?

4          A        No.

5          Q        You don't have a summary plan

6     description for merit increases, do you?

7          A        No, we don't.

8          Q        Just because you may be familiar with

9    ERISA, just as an HR director, with these benefit plans

10   like the 401(k), do they typically have some language

11   in their summary plan descriptions where they have some

12   sort of reservation of rights clause?  Are you familiar

13   with that?

14        A     Yes.

15        Q     Meaning that it says in the 401(k)

16   "This is the plan, these are the terms, but we reserve

17   the right to change them as we see fit," right?

18        A     That is typical.

19        Q     You mentioned Exhibit 2 and you were

20   nice enough to keep that one on top.  Exhibit 2 is the

21   summary that was given to the Ford transitional

22   employees.  Do you see in the far right-hand column,

23   the lower right, where it says "This brochure includes

24   only the key features of the ZF Batavia benefits

25   plans"?

168

1        A     Yes.

2        Q     When it's referring to benefits plans

3    there, as you understand the document, it's referring

4    to the 401(k) plan, the health benefit plan, the dental

5    plan, et cetera?

6        A     I would consider those our plans.

7        Q     It's referring to those plans that have

8       a summary plan description, right?

9              A       Well, I don't know if that was the

10      intended use of the word plans by the -- the author of

11      this, but I think it says the brochure in its totality

12      includes key features and if they considered everything

13      in here a plan, I guess that's what they meant.

14             Q       Well, this is a document you've seen.

15      When you saw it referring to plans, did you understand

16      it to be referring to these plans that have summary

17      plan descriptions?  Is that how you understood the word

18      plans?

19             A       No.  I -- I took it as everything that

20      was in the document.

21             Q       I asked you about the reservations of

22      rights clause.  This language in that far right column,

23      does this look like your typical reservation of rights

24      column you might find in a summary plan description?

25             A       I think that it's pretty darn close to

169

1       the standard clauses.

2              Q       I mean, you've had opportunity to see

3       these reservation of rights clauses because, as an HR

4       director, you've had to review summary plan

5       descriptions routinely, right?

6              A       Yes, I have done that.

7              Q       And part of your training -- I'm sure

8       you've had ERISA training over the years, right?

9               A       Yes.

10              Q       And through that training you've

11      learned about these reservations of rights clauses and

12      you've reviewed them many times?

13              A       Absolutely.

14              Q       Do you think that the -- staying on

15      Exhibit 2, where it has salary, annual incentive plan,

16      merit increase program, do you think those refer to the

17      pay policies of ZF Batavia?

18              A       Yes.

19              Q       I guess as opposed to -- the 401(k)

20      savings plan, that's referring to a benefit that ZF

21      Batavia affords its salaried workforce, right?

22              A       Well, it, yeah, is a -- it is our --

23      our equivalent of a retirement program for ZF Batavia

24      new hires and -- and it's a -- and it's also a -- a

25      benefit of sorts, policy, plan to people that

170

1       transition into Batavia.

2               Q       I think we're done with that document.

3       I wanted to go back to another subject of inquiry just

4       to get something right.  We had talked about a comment

5       attributed to you, that you like to stir the pot, and I

6       think you said that that didn't sound like you.  Have

7       you ever said to people, I'm here to stir the pot or

8       piss people off?

9             A       No.  I just -- I -- it -- it just -- it

10      doesn't even fit, that I would -- I come in as an HR

11      director and I'm telling people I'm here to piss people

12      off.

13            Q       I mean, that wouldn't be appropriate

14      obviously?

15            A       And I didn't do it.

16            Q       And you agree with me?

17            A       Agree with you on what?

18            Q       It wouldn't be appropriate for an HR

19      director to come in and tell people "I'm here to piss

20      people off"?

21            A       No, that would not be appropriate.

22            Q       Have you ever used maybe that kind of

23      language when you were dealing with the union?

24            A       No.  And if -- if somebody extrapolated

25      that out of a statement that I made, that's the best

                                                           171

1       credence I could give it.

2                    MR. SIMON:  Let's take a brief break.

3                         (RECESS)

4       BY MR. SIMON:

5             Q       Mr. Sennish, we were talking about the

6       AIP bonus and we were talking about someone who worked

7    too much overtime, that their bonus might be reduced if

8    they were a poor performer, but if they were a good

9    performer, the overtime wouldn't be an issue for their

10   AIP bonus.  Does that fairly describe the overtime

11   issue for the AIP 2001 bonus?

12        A    I believe that was fundamentally the

13   guideline.

14        Q    Now, when we're talking about

15   performance, who's reviewing the performance, the

16   person's supervisor?

17        A    Yeah.  The manager, supervisor,

18   whatever you want to call it.

19        Q    Is it the supervisor or manager's

20   performance review that would dictate then whether this

21   person was a good performer to get an AIP bonus or was

22   conversely a bad performer and wouldn't get the AIP

23   bonus?  I mean, ultimately was it the supervisor's

24   review that would dictate that?

25        A    Yes.

172

1        Q    Was there any review up above in HR

2    that would supercede what the supervisor's review was?

3        A    No.  If we got a review back that we

4    had questions on, we would bring that respective

5    manager up and ask them, you know, "Here's what an

6    observation is.  Why did you do this?" and have them

7    justify it.

8         Q     And if they justified it, then the

9    review would stay the same and that's the review that

10   would be given to the employee, right?

11        A     Yeah.  I -- I don't recall where we

12   would ever override somebody's assessment of one of

13   their employees.

14        Q     So if a person was told in 2002 that

15   you're not getting a 2001 bonus because you worked too

16   much overtime and your performance isn't up to par and,

17   in fact, that person had what he considered to be a

18   good performance review by the supervisor, that

19   wouldn't make any sense, would it?

20        A     It would be difficult to explain.

21        Q     And if the supervisor told that person

22   "Well, I'm not talking about my performance review.

23   I'm talking about 50,000 feet up reviewed your

24   performance and determined it was bad," I mean, would

25   that be appropriate at all?  Would that be a fair

173

1    reflection of what happens?

2         A     I think it would be totally

3    inappropriate and a totally unfair representation

4    because nobody up there, whatever that means -- I

5    presume I know what it means -- would look at an

6      individual performance review and say "I'm changing

7      that."

8                  And, again, we have discussions with

9      people about questionable circumstances, but we don't

10     just arbitrarily, unilaterally overrule.

11                 MR. SIMON:  I have no more questions.

12          We're done.

- O -

(AND FURTHER THE DEPONENT SAITH NAUGHT)

- O -

_____

Leonard Sennish

174

C-E-R-T-I-F-I-C-A-T-I-O-N

STATE OF OHIO,

COUNTY OF WARREN, To-wit;

           I, Melea E. Chaney, Court Reporter and
Notary Public in and for the State of Ohio, do hereby
certify;

           That on the 25th day of July, 2003,
there appeared before me pursuant to Notice and
agreement of counsel, LEONARD SENNISH, as a witness in
the previously entitled cause;

           That the said witness was sworn by me
and examined to tell the truth, the whole truth, and
nothing but the truth in said cause;

           That the deposition was taken by me via
Stenomask and electronic recording and the foregoing
173 pages contain a true, full and correct

transcription of all the testimony of said witness;

        That the deposition was submitted to counsel for the witness for reading and signature;

        That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

        IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of August, 2003.

_____
Melea E. Chaney
My commission expires:
July 3, 2006