# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **EVERETT W. WHISMAN, et al.** | **:** | **Case No. C-1-02-406** |
| | **:** | **Judge Beckwith** |
| **Plaintiff,** | | |
| | **:** | |
| **v.** | **:** | |
| **FORD MOTOR COMPANY et al.** | **:** | |
| **Defendant.** | **:** | |

## DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT

Now comes Defendant, Ford Motor Company ("Defendant" or "Ford"), and moves this Court for summary judgment in its favor as to Plaintiff's claim because there is no genuine issue of material fact and Ford is entitled to summary as a matter of law.

The bases for this Motion are set forth in the attached Memorandum in Support.

Respectfully submitted,

/s/ Jeffery L. VanWay
Ellen J. Garling, Trial Attorney (0043554)
BAKER & HOSTETLER LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
(614) 228-1541
and

Jeffery L. VanWay (0069175)
BAKER & HOSTETLER, LLP
312 Walnut Street, Suite 3200
Cincinnati, Ohio 45202
(513) 929-3400
(513) 929-0303 – Fax
jvanway@bakerlaw.com

Attorneys for Defendant
Ford Motor Company

## MEMORANDUM IN SUPPORT

## SUMMARY OF POINTS RAISED AND AUTHORITIES RELIED UPON

|  |  | Page |
|---|---|---|
| **I.** | **INTRODUCTION** | 1 |
| **II.** | **FACTUAL BACKGROUND** | 1 |
|  | Formation of ZF Batavia LLC | 1 |
|  | Plaintiffs Resign their At-Will Employment with Ford and are Hired by ZFB as At-Will Employees | 3 |
|  | ZFB Develops and Implements its Own Policies and Procedures Without any Input from Ford. | 6 |
| **III.** | **SUMMARY JUDGMENT STANDARD.** | 10 |
|  | Celotex v. Catrett, 477 U.S. 317, 322, 327 (1986). | 10 |
| **IV.** | **Plaintiffs' Claims Against Ford Must Be Dismissed Because Plaintiffs Have Failed To Demonstrate That Ford Is The Alter-Ego Of ZF Batavia LLC.** | 11 |
|  | Ohio Revised Code § 1705.48 (a) – (b) | 11 |
|  | Belvedere Condominium Unit Owner's Ass'n. v. R.E. Roark Companies, Inc., 617 N.E. 2d 1075 (Ohio 1993). | 12 |
| **A.** | **ZFB Has A Mind, Will, And Existence Separate From Ford.** | 12 |
|  | Barents Navigation Ltd. v. Western Overseas, Inc.,1999 U.S. Dist. LEXIS   21211 (N.D. Ohio 1999). | 13 |
| **B.** | **Ford Has Not Exercised Control Over ZFB In Such A Manner As To Commit A Fraud Against Plaintiffs.** | 14 |
| **C.** | **No Harm, Injustice, Or Fundamental Unfairness Will Occur If The Court Enforces The LLC Statute And Holds That Ford Cannot Be Individually Liable For ZFB's Actions.** | 14 |
|  | P.K. Lumber Co. v. Robbins, 1991 Ohio App. LEXIS 519 (Montgomery Cty. Feb. 7, 1991). | 15 |

Page

V.    **Plaintiffs' Breach Of Contract Claims Against Ford Must Be Dismissed Because (A) Plaintiffs Were At-Will Employees Whose Terms And Conditions Of Employment Could Be Changed At Any Time, (B) The Parties Did Not Mutually Assent To A Change In The At-Will Nature Of Plaintiffs' Employment, (C) There Is No Evidence Of A Breach Of Contract, And (D) It Is Undisputed That Ford Was Not Involved In The Alleged Breach.** .......... 16

    A.    **Plaintiffs Were At-Will Employees Whose Terms And Conditions Of Employment Could Be Changed At Any Time.** .......... 16

        Johnson v. Norman Malone & Associates, Inc., 1989 Ohio App. LEXIS 4798 (Summit Cty. Dec. 20, 1989). .......... 16

        Copeco, Inc. v. Caley, 632 N.E. 2d 1299, 1301 (Ohio Ct. App. 1992). .......... 17

        Andres v. Drug Emporium, 2001 Ohio App. LEXIS 3861 (Franklin Cty. Aug. 30, 2001). .......... 18

        Nichols v. Waterfield Financial Corp., 577 N.E. 2d 422 (Ohio Ct. App. 1989). .......... 18

    B.    **The Parties Did Not Mutually Assent To A Change In The At-Will Nature Of Plaintiffs' Employment.** .......... 19

        Reasoner v. Bill Woeste Chevrolet, Inc., 730 N.E. 2d 992 (Ohio Ct. App. 1999). .......... 19

        Nichols v. Waterfield Financial Corp., 577 N.E. 2d 422 (Ohio Ct. App. 1989). .......... 22

        Shepard v. Griffin Servs., Inc., 2002 Ohio App. LEXIS 2298 (Montgomery Cty. May 10, 2002). .......... 22

        Tuhline v. Central Trust Co., 549 N.E. 2d 1223 (Ohio Ct. App. 1988). .......... 22

        Ed Schory & Sons, Inc. v. Francis, 662 N.E.2d 1074 (Ohio 1996). .......... 24

        Leonard v. TWI Networks, Inc., 1999 Ohio App. LEXIS 1651 (Montgomery Cty. March 26, 1999). .......... 24

Page

C.      **Summary Judgment Is Appropriate Because Plaintiffs Have Not Introduced Evidence Of Breach.**      25

D.      **Ford Cannot Be Liable For Breach Of Contract Because It Was Not Involved In, And Did Not Approve Of, Any Alleged Breach By ZFB.**      28

VI.     **Ford Is Entitled To Summary Judgment On Plaintiffs' Fraud Claims Because (A) There Is No Evidence That Ford Knew That ZFB Intended To Make Future Changes To Plaintiffs' Compensation And Benefits, And (B) Plaintiffs' Belief That ZFB Would Not Make Changes In Their Compensation And Benefits Was Not Reasonable.**      29

Cohen v. Lamko, Inc., 462 N.E.2d 407 (Ohio 1984).      29

A.      **Plaintiffs Cannot Establish Fraudulent Intent By Ford Because There Is No Evidence That Ford Knew That ZFB Intended To Make Future Changes To Plaintiffs' Compensation And Benefits.**      30

Tibbs v. National Homes Constr. Corp., 369 N.E.2d 1218 (Ohio Ct. App. 1977).      30

B.      **Plaintiffs' Belief That ZFB Would Not Make Changes In Their Compensation And Benefits Was Not Reasonable.**      30

Yaroma v. Griffiths, 662 N.E.2d 867 (Ohio Ct. App. 1995).      33

VII.    **Ford Is Entitled To Summary Judgment On Plaintiffs' Promissory Estoppel Claims Because (A) Plaintiffs Were At-Will Employees Who Were Not Made Any Clear And Unambiguous Promises Of A Definite Term Of Employment, (B) Plaintiffs Could Not Reasonably Have Believed That ZFB Would Not Make Changes To Their At-Will Employment, (C) Ford Is Not Responsible For ZFB's Alleged Failure To Honor The Alleged Promises, and (D) Plaintiffs Have Not Been Injured As A Result Of ZFB's Changes.**      37

Reasoner v. Bill Woeste Chevrolet, 730 N.E.2d 992 (Ohio Ct. App. 1999).      37

Andres v. Drug Emporium, 2001 Ohio App. LEXIS 3861(Franklin Cty. Aug. 30, 2001).      37

Page

**A.**    **Plaintiffs Were At-Will Employees Who Were Not Made Any Clear And Unambiguous Promises Of A Definite Term Of Employment.**    37

Reasoner v. Bill Woeste Chevrolet, 730 N.E.2d 992 (Ohio Ct. App. 1999).    37

Henning v. Marriott Hotel and Resorts, Inc., 1995 Ohio App. LEXIS 2119 (Montgomery Cty. May 24, 1995).    38

Johnson v. Norman Malone & Associates, Inc., 1989 Ohio App. LEXIS 4798 (Summit Cty. Dec. 20, 1989).    38

**B.**    **Plaintiffs Could Not Reasonably Have Believed That ZFB Would Not Make Changes To Their At-Will Employment.**    38

**C.**    **Ford Is Not Responsible For ZFB's Alleged Failure To Honor The Alleged Promises.**    39

**D.**    **Plaintiffs Have Not Been Injured By ZFB's Changes.**    39

**VIII.**    **CONCLUSION.**    39

## I.     <u>Introduction</u>

While this case involves fifteen plaintiffs and two separate corporate defendants, the issues are straightforward and are as follows:

(1)     Is Ford, a minority member of a limited liability company ("LLC") individually liable for the actions of the LLC?

(2)     Does a current employer (ZFB) have the ability to make changes to the terms and conditions of employment of its salaried, at-will employees?

(3)     Is a former employer (Ford) liable for changes made by the current employer, where the former employer no longer employs the employees and does not have any involvement in the changes?

As explained in more detail below, resolution of each of these issues leads to the inescapable conclusion that Ford cannot be held liable to Plaintiffs for breach of contract, fraud, or promissory estoppel. Because there are no material issues of fact with respect to any of these claims, and because Plaintiffs have failed to establish their burden with respect to Ford, Ford is entitled to summary judgment as a matter of law.

## II.     <u>Factual Background</u>.

Formation of ZF Batavia LLC

Ford Motor Company previously operated a transmission plant in Batavia, Ohio ("the Batavia plant"). This plant historically had underperformed, and was in danger of being closed. (Kehr dep., p. 114-15).[1] As an alternative to closing the plant, Ford and ZF Friedrichshafen AG ("ZF") entered into a joint venture whereby a new entity, known as ZF Batavia LLC ("ZFB"),

---

[1]   Due to the number of Plaintiffs in this case, the record is voluminous. In support of its Memorandum, Ford is filing the depositions of all fifteen Plaintiffs, ZFB officers Dave Adams and Karl Kehr, and Ford employee Mike Warden. Ford also relies on the Affidavits of Dave Adams and Lee Mezza, which are tabs 1 and 2 respectively, of Ford's Appendix, Plaintiffs' at-will employment agreements (Tab 3 of Appendix), Plaintiffs' Ford applications (Tab 4 of Appendix), and deposition exhibits 2, 3, 4, and 89, which are included as tab 5 of Ford's Appendix. Ford also relies on the Affidavit of Herbert Huebner and Plaintiffs' Answers and Objections to ZF Batavia's First Set of Requests for Admission. These documents have been filed as part of ZF Batavia's Motion for Summary Judgment. Ford will, of course, file any additional portions of the record that the Court requests.

was formed.  (Id. at 134-35).  ZF and Ford entered into a joint venture agreement which addressed the responsibilities of ZF and Ford in the formation of ZFB, and ZFB was formed in accordance with the provisions of Delaware's limited liability statute.  (Adams Affidavit, ¶¶ 3-4).  Under the joint venture agreement, ZF is the majority member of the LLC, holding 51% of the shares, and Ford is the minority member with 49% of the shares.  (Id.) While both Ford and ZF have representatives on the Board of Directors, ZFB has its own management which is responsible for operation of the LLC.  (Id. at ¶ 5).  ZFB's managers are not employed by Ford and do not take direction from Ford.  (Id.) ZFB maintains separate bank accounts from Ford and has at all times maintained the corporate formalities that are required of an LLC under applicable law.  (Id. at ¶¶ 3-4).

Prior to the formation of ZFB, Ford had historically produced a transmission known as the CD4E transmission at the Batavia Plant.  (Adams dep., p. 22).  Production of the transmission was scheduled to end in the mid-2000's.  (Id.)  Because the plant was the least productive of Ford's transmission plants, no new products were scheduled for the plant and the Batavia plant was to be shut down in approximately 2004 or 2005.  (Kehr dep., pp. 114-18).  ZF had experience with a new technology for producing a transmission known as the CVT transmission.  (Id. at 134-35).  The joint venture came about because ZF and Ford desired to utilize ZF's CVT technology and Ford's experience mass producing transmissions to form a joint venture which would mass produce the CVT transmission.  The long range plan was for ZFB to phase out production of the CD4E and to begin production of the CVT.  (Adams dep., p. 22).  Although this plan has been delayed, it continues today, and ZFB has just recently began production of one model of the  CVT transmission.

2

<u>Plaintiffs Resign their At-Will Employment with Ford
and are Hired by ZFB as At-Will Employees</u>

As a part of the transition of the operations and ownership of the Batavia plant from Ford to ZFB, Ford and ZF participated in a process to identify which of the salaried employees who had worked at Batavia under Ford's ownership would be offered positions by ZFB. (Warden dep., pp. 35-36). Those employees who were selected for employment with ZFB were given the option of accepting employment with ZFB as ZFB employees, or remaining employees of Ford and transferring to a different Ford location. (Third Amended Complaint, ¶ 26). A smaller class of salaried employees who were going to be eligible for retirement from Ford within three years of the joint venture were allowed to remain Ford employees and to work at ZFB until their retirement. (Warden dep., pp. 137-38).

Plaintiffs are a group of fifteen former salaried employees of Ford who were selected for, and accepted, employment with ZFB in 1999[2]. (Third Amended Complaint, ¶ 30). While Plaintiffs were employed by Ford, they signed documents acknowledging that they were employed at-will, and that their terms and conditions of employment were subject to change. (<u>See</u> Ford Employment Agreements, Appendix Tab 3; Ford Employment Applications, Appendix Tab 4).[3] Consistent with their at-will status, Plaintiffs' compensation, benefits, and other terms and conditions of employment changed frequently while they were employed at

---

[2]   Former Ford salaried employees, such as Plaintiffs, who accepted employment with ZFB are referred to as "transition employees."

[3]   The Ford at-will "Employment Agreements" signed by Plaintiffs consist of deposition exhibits 56, 57, 64, 88, 97, 101, 102, 106, 110, 113, 121, 125, 128, and 133. The exhibits were authenticated by Plaintiffs during their depositions and are included as Tab 3 of Ford's Appendix. The Ford Employment Applications signed by Plaintiffs consist of deposition exhibits 55, 63, 98, 107, 114, and 132. These applications were authenticated by Plaintiffs in their depositions and are included as Tab 4 of Ford's Appendix.

Ford.  (Plaintiffs' Responses to ZF Batavia's Request to Admit, No. 21).[4]  These changes were made at Ford's sole discretion.

Prior to the time that Plaintiffs accepted employment with ZFB, a few employee meetings were held in order to discuss the joint venture and to provide information regarding ZFB's benefits and compensation plans.  In particular, a meeting for all salaried employees was held on May 27, 1999.  (Kehr dep., pp. 66-68, 83-84).

This meeting, which was attended by most of the Plaintiffs, was held in the employee cafeteria at the Batavia Plant.[5]  During the meeting, representatives from Ford, ZF, and ZFB discussed various topics.  Ford officials primarily discussed the Ford retirement plan and the effect that the joint venture would have on the future retirement eligibility of the transition employees. (Kehr dep., pp. 52-53).  ZFB's president, Dave Adams, gave an overview of ZF and discussed the CVT technology.  ZFB's benefits manager, Tony DeShaw, and ZFB's Chief Financial Officer, Karl Kehr, discussed various compensation and benefit plans, such as vacation, 401(k), ZFB's Annual Incentive Plan ("AIP") or bonus, and ZFB's compensation bands.  (Dep. Ex. 4, Appendix Tab 5).  At various times prior to and after these meetings, Plaintiffs also discussed their decision to join ZFB with their co-workers and managers, many of whom were also trying to decide whether to join ZFB.

At no time during any employee meeting or conversation with a Ford, ZF, or ZFB representative, did anyone promise Plaintiffs that their benefit and compensation plans at ZFB

---

[4]  While each Plaintiff responded separately to ZFB's Requests to Admit, the Responses cited herein by Ford are identical for each Plaintiff.  For clarity purposes, Ford will cite to those Responses collectively as "Plaintiff's Responses to Requests to Admit, No. __," rather than by individual Plaintiff name.  ZFB has filled these Responses as support for its Motion for Summary Judgment.

[5]  Plaintiff Devito did not attend the May 27, 1999 meeting, and Plaintiff Whisman did not attend any employee meetings.  (Devito dep., p. 9; Whisman dep., p. 38).  Plaintiff Crump attended but had already accepted employment with ZFB prior to the May 27 meeting.  (Crump dep., p. 31).

were "guaranteed" or would "never change".  (See, e.g., Blanco dep., pp. 46-47, Ervin dep., p. 108, Newsome dep., p. 68).  Rather, Plaintiffs claim that they were told that benefits at ZFB would be "comparable" to what their benefits had been at Ford.  (See, e.g., Stegmann dep., p. 92).

Within weeks after the May 27, 1999 meeting, Plaintiffs were made written offers of employment to join ZFB.  These written offers ("offer letters") were virtually identical except for salary, job title, and the amount of signing bonuses and transition bonuses. (Third Amended Complaint, ¶ 31).  Included with the offer letters was a brochure which purported to describe the "key features of the ZF Batavia Benefits plans as applicable to active Ford employees leaving Ford employment to become a ZF Batavia employee."  (Dep. Ex. 2, Appendix Tab 5).  Shortly after receiving these documents, Plaintiffs each signed their offer letters and accepted employment with ZFB.[6]

As part of their offer to join ZFB, Plaintiffs received signing bonuses and "transition bonuses."  The transition bonus was "designed to address any monetary differences between Ford benefits and ZF Batavia's new plan."  (Dep. Ex. 3, Appendix Tab 5).  While the amount of the transition bonuses varied, most Plaintiffs received $25,000.

It is undisputed that the offer letters and benefits brochure do not contain any language stating that Plaintiffs' benefits are "guaranteed" or will never change.  (Dep. Exs. 2, 3, Appendix 5).  Indeed, the brochure contains a disclaimer which states just the opposite.  This disclaimer which is set forth in the same size type as the description of the various benefits, states:

> This brochure includes only the "key features" of the ZF Batavia Benefits plans as applicable to active Ford employees leaving Ford employment to become a ZF Batavia employee.  If any conflict arises between the information in this brochure

---

[6] Plaintiffs Blanco, Devito, Parker, Pearce, and Whisman all declined ZFB's initial offer.  (Blanco dep., pp. 10-15; Devito dep., pp. 15, 25; Parker dep., pp. 19-20, 29-33, 98-99; Pearce dep., pp. 32-35; 80; Whisman dep., pp. 23-24, 37-38).

> and the terms of the actual plan documents, Summary Plan Descriptions (SPDs) or other applicable documents will govern in all case. Plans described here are subject to change. Plan provisions and eligibility do not constitute an employment contract with any individual.

(Dep. Ex. 2, Appendix 5).

As part of the process of going to work for ZFB, Plaintiffs completed ZFB applications for employment. (Huebner Affidavit, ¶ 8). These applications contained an acknowledgment that Plaintiffs were employed with ZFB on an at-will basis. (Id.)

### ZFB Develops and Implements its Own Policies and Procedures Without any Input from Ford

Once Plaintiffs accepted employment with ZFB in 1999, Plaintiffs began receiving their compensation and benefits from ZFB, and ZFB began operating the plant. (Pearce dep., pp. 98-99; Steward dep., pp. 85-86). Several years later, ZFB made changes to various benefit plans and/or policies. (Steward dep., pp. 118-19, 126). These changes affected the benefits of all ZFB salaried employees, not just the transition employees. For example, in 2002, ZFB changed the number of sick and personal days that salaried employees were eligible to receive from five to three. (Parker dep., pp. 48, 114-15).[7] ZFB made this change because its management determined that employees were abusing the days. (Kehr dep., pp. 177-79). This decision was made entirely by ZFB's management; neither Ford nor the ZFB Board of Directors were involved in this decision. (Id. at 180-82; Adams Affidavit, ¶ 5). ZFB also implemented its own overtime policy in 2001. This policy requires salaried exempt employees to work "casual time," which is defined as that amount of time above and beyond the normal shift that is required for employees to do their jobs. (Kehr dep., pp. 124-26, 130-31, 133). With respect to manufacturing, casual time primarily means that salaried exempt supervisors and managers are

---

[7]   At Ford, Plaintiffs had been eligible for twenty-one personal and sick days. (Id. at 48). Plaintiffs knew when they accepted employment that their personal and sick days would be different at ZFB, but claim that ZFB did not have the right to change its own policy.

required to arrive at work before the start of their shift, and to remain at work after the end of their shift.  Overtime is not paid for casual time at ZFB.

Plaintiffs contend that this is a change from the way in which Ford paid overtime to salaried exempt employees when it operated the Batavia Plant.  While Plaintiffs contradicted themselves in their depositions, their basic claim is that at Ford they were paid overtime beginning with the ninth hour of work per day, and at ZFB they are not paid overtime until they work ten hours per day.  (Newsome dep., pp. 14-15, 37-40). It is undisputed that Ford was not involved in the implementation of ZFB's overtime policy.  (Adams Affidavit, ¶ 5; Blanco dep., p. 82).

Plaintiffs also have asserted a claim in this case with respect to the amount of the AIP bonus that they receive from ZFB.  ZFB management determined that AIP bonuses should reflect an individual employee's performance and contribution to the ZFB operation.  (Adams dep., p. 60).  ZFB management also was frustrated with the excessive amounts of overtime that were being worked in the plant.  (Id. at 38-43).  According to ZFB president Dave Adams, this excessive overtime reflected negatively on an employee's performance, as it meant that the employee was not getting his job done efficiently.  (Id.) In the case of salaried production supervisors and managers, the amount of salaried overtime was linked to the amount of hourly overtime paid, as salaried supervisors were required to be at work anytime they scheduled their hourly employees to work overtime.  (Id.)  Mr. Adams felt that this created an incentive for salaried production supervisors and managers to be less efficient during regular work hours and to schedule more overtime.  As a result, Mr. Adams and his ZFB management team decided that the amount of overtime that had been paid to a salaried supervisor would be considered when determining whether, and how much, AIP bonus a salaried supervisor would receive. (Id)

Plaintiffs concede that that they did not receive AIP bonuses at Ford. Rather, they received profit sharing. Plaintiffs further admit that the amount of their profit sharing at Ford varied from year to year, that at times they did not receive profit sharing, and that it was up to Ford's sole discretion as to whether they received profit sharing at all. (See, e.g., Baker dep., pp. 112-14; Blanco dep., pp. 77-78). Plaintiffs also concede that Ford had no involvement in ZFB's decision to factor individual performance into the AIP formula. (See, e.g., Blanco dep., p. 82).

Plaintiffs also contend that ZFB changed its bereavement policy in 2002 to limit the amount of paid days available for leave due to the death of certain family members. (Newsome dep., pp. 20-21). Only four Plaintiffs have had need for bereavement leave and have actually been impacted by the change. (Edrington dep., p. 48; Crump dep., pp. 62-63; Pearce dep., p. 53; Whisman dep., pp. 102-03). Plaintiffs concede that they knew prior to accepting employment with ZFB that ZFB's bereavement leave policy was less generous than Ford's policy and that the benefits brochure did not contain a minimum number of days allowed, but rather stated that "up to a three day leave" was allowed. (Crump dep. pp. 20-21; Dep. Ex. 2, Appendix 5). However, Plaintiffs claim that ZFB had no discretion to allow less than a three day leave. (Whisman dep., pp. 102-03).

Plaintiffs also claim that they have been denied future job opportunities in CVT production. Plaintiffs allege that in 1999 Ford and ZFB officials told them they would have an opportunity to "get in on the ground floor" of CVT. They admit that they were never promised a specific job in CVT, nor were they given a date certain as to when they would begin working on the CVT process. (Baker dep., pp. 143-44; 165-66). Rather, they concede that CVT was a future opportunity that has not yet materialized for them. (Stegmann dep., p. 107). They also concede that some transitional employees, including Plaintiff Newsome, are working in CVT. (Blanco dep., p. 63; Edrington dep., p. 59; Newsome dep. pp. 11-12, 76).

In addition, Plaintiffs claim that the merit increases they have received from ZFB are less than the merit increases ZFB has paid to non-transitional employees (new hires). Plaintiffs concede that they have always received merit increases, that they were never promised a specific minimum percentage increase, and that they were never promised that they would receive merit increases equal to or greater than non-transitional employees. (D. Williams dep., pp. 85, 126-27; Baker dep., pp. 57-58, 137-38, 148-51). Nevertheless, Plaintiffs contend that the implementation of ZFB's merit increase program is unlawful.

Finally, Plaintiff Ervin claims that he has wrongfully been denied the opportunity to retire from ZFB, begin drawing his Ford retirement, and then immediately be rehired by ZFB. In other words, Plaintiff Ervin wishes to "double dip" and draw his Ford retirement at the same time he is drawing his ZFB salary. (Dep. Ex. 89, Appendix 5). As mentioned above, at the time the joint venture was formed, employees who were within three years of retirement eligibility were allowed to continue working at Batavia as Ford employees until retirement and then begin working at ZFB. (Warden dep. pp. 137-38). Plaintiff Ervin was not within this class of employees because he was more than three years away from retirement at the time of the joint venture. (Ervin dep., pp. 127-28, 146-48).

Under ERISA, there is a provision known as the "same desk rule," which prohibits employees from retiring from their job in order to begin drawing a pension and to then immediately begin working the same job again on the next day. (Dep. Ex. 89). ERISA requires that there be at least a six month break in service between the date of retirement and the date of reemployment. (Id.) Plaintiff Ervin admits that he was never told that he could retire and then immediately be rehired, and admits that no such representation is contained in the benefits brochure. (Ervin dep., pp. 66-67, 127-28). Plaintiff Ervin further admits that he would have

9

accepted employment with ZFB even if he had known that he could not later begin drawing his Ford retirement while he worked at ZFB.  (Id. at 116-17).

Despite the fact that Plaintiffs were at-will employees at Ford, remained at-will employees when they were hired by ZFB, and were provided notice that their benefits were "subject to change," Plaintiffs have brought the instant lawsuit against their former employer, Ford and their current employer, ZFB, alleging breach of contract, fraud, and promissory estoppel.  Plaintiffs have also brought an overtime claim under the Fair Labor Standards Act ("FLSA") against ZFB.  They have not brought any claims against ZF, the majority member of the LLC.

## III.    Summary Judgment Standard.

Summary judgment is proper pursuant to Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Summary judgment is an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action," and summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex v. Catrett, 477 U.S. 317, 322, 327 (1986).  Here, there is no genuine issue of any material fact and Ford is entitled to summary judgment as a matter of law on all of Plaintiffs' claims.

## IV.    Plaintiffs' Claims Against Ford Must Be Dismissed Because Plaintiffs Have Failed To Demonstrate That Ford Is The Alter-Ego Of ZF Batavia LLC.

It is undisputed that Plaintiffs are employees of ZFB, a limited liability company, and not employees of Ford.  Further, it is undisputed that Ford is a minority member of the LLC and that

the controlling member is ZF.  (Third Amended Complaint, ¶ 20; Adams Affidavit, ¶ 4).

Plaintiffs have filed this action against both ZFB and Ford.  Curiously, Plaintiffs have not filed

suit against ZF, the controlling member of the LLC.

One of the purposes of an LLC is to provide limited liability for the members of the LLC.

This limited liability has been codified in Ohio Revised Code § 1705.48 which reads as follows:

> (A)  The debts, obligations, and liabilities of a limited liability company, whether
> arising in contract, tort, or otherwise, <u>are solely the debts, obligations, and
> liabilities of the limited liability company</u>.
>
> (B)      <u>Neither the members of the limited liability company</u> nor any managers of
> the limited liability company <u>are personally liable to satisfy any judgment</u>, decree,
> <u>or order of a court</u> for, or are personally liable to satisfy in any other manner, a
> debt, obligation, or liability of the company <u>solely by reason of being a member
> or manager of a limited liability company</u>.

O.R.C.§ 1705.48 (a) – (b) (emphasis added).[8]

In Ford's Motion to Dismiss, Ford raised the limited liability statute as a defense to

liability for Plaintiffs' breach of contract claim.  While this rationale continues to apply to the

contract claim, it is also clear from the statute that the protections of the LLC prohibit Ford from

being held liable for <u>any</u> of Plaintiffs' claims, whether in tort or in contract.  <u>See</u> R.C. § 1705.48

(A)("debts, obligations, and liabilities of a limited liability company, <u>whether arising in contract,

tort, or otherwise</u> …") (emphasis added).  The Court considered this argument in light of

Plaintiffs' breach of contract claims and allowed these claims to continue "solely" in order to

allow Plaintiffs to conduct discovery on their alter ego theory.  (<u>See</u> Order Denying Motion to

Dismiss, Sept. 27, 2002).  Plaintiffs have now had an opportunity to conduct full discovery in

this case.  This discovery has included depositions of over twenty-five individuals and the

---

[8]    While ZFB was formed under the Delaware LLC statute, because of the similarity of the Delaware and Ohio
statutes, there does not appear to be a conflict between Delaware and Ohio law and it is not necessary for the Court
to determine which state's law applies to Plaintiffs' alter ego theory.  <u>See</u> Delaware Limited Liability Company Act,
6 Del. Code § 18-101, et. seq.

production of over ten thousand pages of documents.  As explained in more detail below, despite all of this discovery, Plaintiffs have failed to establish that Ford is the alter ego of ZFB. Accordingly, Ford is entitled to summary judgment as to all of Plaintiffs' claims.

Where, as here, Plaintiffs are pursuing an alter ego theory, the burden is on the Plaintiffs to establish the alter ego relationship.  Under Ohio law, in order to prevail on their "alter ego" theory of piercing the corporate veil, Plaintiffs must show the following:

> (1)  The corporation [ZFB] is so dominated by the shareholder [Ford] that the corporation has no separate mind, will, or existence of its own;
>
> (2)  The control over the corporation was used to commit fraud or an illegal act against the person seeking to ignore the corporate entity; and
>
> (3)  Injury or unjust loss resulted to the plaintiff from such control and wrong.

(Order Denying Motion to Dismiss, p. 8 (citing Belvedere Condominium Unit Owner's Ass'n. v. R.E. Roark Companies, Inc., 617 N.E. 2d 1075, 1077 Syl. 3 (Ohio 1993)).  Plaintiffs are required to establish each and every one of these elements.  Here, Plaintiffs have failed to establish any of these elements.

### A.      ZFB Has A Mind, Will, And Existence Separate From Ford.

With regard to the first element, whether Ford exercised control over ZFB such that ZFB has no separate mind, will or existence of its own, Ohio courts have considered whether:

> (1)  The corporation is adequately capitalized;
>
> (2)  The corporation has observed corporate formalities;
>
> (3)  The corporation is insolvent;
>
> (4)  The alleged alter ego has held itself out as personally liable for the corporation's debts/obligations;
>
> (5)  The corporation and the alleged alter ego have co-mingled funds;
>
> (6)  The corporation has diverted corporate funds or property to the alleged alter ego;

(7)  The corporation and the alleged alter ego have maintained separate finances and record keeping; and

(8)  The corporation is a mere façade for the operations of the alter ego.

Barents Navigation Ltd. v. Western Overseas, Inc., 1999 U.S. Dist. LEXIS 21211, *13-14 (N.D. Ohio 1999)(Appendix Tab 6).   Application of these factors reveals that Ford and ZFB are entirely separate entities and that Ford does not exercise control over ZFB such that ZFB "has no separate mind, will, or existence of its own."

There is no evidence in the record that reflects that ZFB is not adequately capitalized or is insolvent and ZFB has observed the corporate formalities required under the LLC statute. (Adams Affidavit, ¶ 3).   ZFB has a board of directors which is responsible for management of the LLC.  The board meets regularly, and its minutes are kept in accordance with applicable law. (Id.)  ZFB's management team, and not Ford, runs the day-to-day operations at the Batavia Plant. (Id. at ¶ 5).

ZFB and Ford maintain separate finances and recordkeeping.  (Id. at ¶ 4).  There is no evidence that ZFB is a façade for the operations of Ford.  Ford is a billion dollar enterprise that operates worldwide.  Ford is incorporated separate and apart from ZFB, and maintains separate directors from those of ZFB.  Based upon the record as set forth above, it is clear that Plaintiffs have failed to establish that Ford has exercised control of ZFB such that ZFB has "no separate mind, will, or existence of its own."[9]  Accordingly, Ford is entitled to summary judgment as a matter of law on all of Plaintiffs' claims.

---

[9]  Plaintiffs have acknowledged that ZFB has a separate mind and will by bringing internal complaints about ZFB's policies to ZFB, and not Ford.  (Vories dep., p. 116).  Moreover, Plaintiffs have brought their statutory FLSA claim only against ZFB, and not against Ford, because Plaintiffs are employed by ZFB, not Ford.

**B.    Ford Has Not Exercised Control Over ZFB In Such A Manner As To Commit A Fraud Against Plaintiffs.**

Plaintiffs also have failed to establish the second element of the alter ego doctrine, which requires Plaintiffs to show that Ford exercised control over ZFB in such a manner as to commit fraud or an illegal act against Plaintiffs.  While Plaintiffs have alleged a fraud claim, in order to pierce the LLC veil they must do more than allege that a fraud occurred.  Rather, they must show that Ford <u>exercised control over ZFB</u> in such a manner as to commit fraud.  Not only is there no evidence that Ford defrauded Plaintiffs, there is also no evidence that Ford exercised control over ZFB in such a manner as to commit fraud.  There is absolutely no evidence that Ford knew, at the time of the alleged representations, that ZFB was going to later make the policy changes which Plaintiffs complain of today.  (<u>See</u>, <u>e.g.</u>, Whisman dep., pp. 158-60; D. Williams dep., pp. 120-22).  Further, the evidence shows clearly the alleged changes at issue in this case were made by ZFB and not Ford.  (Adams Affidavit, ¶ 5; Whisman dep., pp. 153-57, 191).  In fact, Plaintiffs concede that they brought suit against Ford only because Ford is the minority shareholder of the LLC.  (Stevens dep., pp. 62-63).  Thus, it cannot be said that Ford exercised control over ZFB and forced ZFB to make the policy and benefits changes.  Therefore, because Plaintiffs have failed to establish this second element of the alter ego doctrine, Ford is entitled to summary judgment as a matter of law as to all of Plaintiffs' claims.

**C.    No Harm, Injustice, Or Fundamental Unfairness Will Occur If The Court Enforces The LLC Statute And  Holds That Ford Cannot Be Individually Liable For ZFB's Actions.**

Finally, Plaintiffs have also failed to establish the third element of the alter ego doctrine, that being that injury or unjust loss resulted to the Plaintiff from such alleged control and wrong.  Ohio law indicates more than a mere allegation of damages is required for satisfaction of this element.  Rather, the damages must result from the exercise of control.  In other words, <u>Plaintiffs</u>

must show that they suffered damages because Ford exercised control over ZFB.  As explained in more detail above, there is no evidence that Ford has exercised control over ZFB.  If Plaintiffs have suffered any damages, it is solely because of the actions of ZFB, and not Ford.  Thus, Plaintiffs cannot establish this third element.

Moreover, Plaintiffs must also show that "harm, injustice, or fundamental unfairness" will occur absent a piercing of the corporate veil.  P.K. Lumber Co. v. Robbins, 1991 Ohio App. LEXIS 519 (Montgomery Cty. Feb. 7, 1991).  (Appendix Tab 7).  The instant case is unlike the typical case in which the alter ego doctrine is applied.  This is not a case where a shell corporation has been set up to protect the assets of an individual who controls the corporation and hides behind the corporate form.  Rather, the evidence shows that ZFB and Ford are separate entities, and that Ford does not exercise control over ZFB.  In this case, Plaintiffs are specifically trying to hold Ford liable for alleged changes in their terms and conditions of employment that were made only by ZFB.  Upholding the corporate formalities will not result in any injustice or fundamental unfairness to Plaintiffs because ZFB is a Defendant in the case and there is no evidence of any insolvency on ZFB's behalf. Thus, if Plaintiffs are able to establish that ZFB wrongfully changed their terms and condition of employment, then Plaintiffs can be made whole by ZFB.  A piercing of the corporate veil under these facts would only work an injustice and fundamental unfairness to Ford, not Plaintiffs.  The very reason that companies, such as Ford, enter into an LLC is  to avoid being held personally liable for the actions of the LLC.  Ford traded the ability to manage and direct the day-to-day operations of the LLC for this limited liability.  Since there is no justification here to set aside the protections offered through the LLC form, Plaintiffs' remedy, if any, should come from the LLC and not from the minority shareholder.

Therefore, because Plaintiffs have failed to establish each and every element of the alter ego doctrine, Ford is entitled to summary judgment as a matter of law on all of Plaintiffs' claims.

**V.** **Plaintiffs' Breach Of Contract Claims Against Ford Must Be Dismissed Because (A) Plaintiffs Were At-Will Employees Whose Terms And Conditions Of Employment Could Be Changed At Any Time, (B) The Parties Did Not Mutually Assent To A Change In The At-Will Nature Of Plaintiffs' Employment, (C) There Is No Evidence Of A Breach Of Contract, And (D) It Is Undisputed That Ford Was Not Involved In The Alleged Breach.[10]**

Plaintiffs allege that their offer letters and the benefits brochure (deposition exhibit 2) together constitute a written employment contract with ZFB which prohibited ZFB from making changes to Plaintiffs' terms and conditions of employment. As explained below, this allegation is incorrect as a matter of law and Ford is entitled to summary judgment on Plaintiffs' breach of contract claims.[11]

**A.** **Plaintiffs Were At-Will Employees Whose Terms And Conditions Of Employment Could Be Changed At Any Time.**

It is undisputed that Plaintiffs are not employed by ZFB for any definite term. (Plaintiffs' Responses to Requests to Admit, No. 9). "In the absence of facts and circumstances indicating that an employment agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but does not reference duration, is not a contract for term, but is terminable at will by either Party." Johnson v. Norman Malone & Associates, Inc., 1989 Ohio App. LEXIS 4798, *5 (9th App. Dist. Dec. 20, 1989) Appendix Tab 8)(citing Henkel v. Educational Research Council, 45 Ohio St.2d 249, syl. (1976)). Thus, Plaintiffs were employed

---

[10]   Because Plaintiffs have failed to pierce the corporate veil, Ford is entitled to summary judgment to all of Plaintiffs' claims. However, in the event the Court finds that Plaintiffs have carried their heavy burden of piercing the veil, Ford is also entitled to summary judgment for the additional reasons set froth in Sections V-VII.

[11]   Furthermore, and most significantly, as explained in Ford's Motion to Dismiss, Ford is not a party to a contract with Plaintiffs and there is no privity of contract between Plaintiffs and Ford.

at-will, and their "terms and conditions of employment . . . [could be] prospectively altered without consideration." Id.

The issue in the instant case is the same as that reviewed by the Ohio Court of Appeals in Johnson. In Johnson, the employee received an offer letter from her employer and accepted employment via a return letter. Sometime after she accepted employment, her employer changed her terms and conditions of employment. These changes included changes in her job and her benefits. In affirming summary judgment for the employer on the employee's breach of contract and promissory estoppel claims, the court held that because the employee's offer letter did not specify the duration of her employment, her employment was at-will and the terms and conditions of her employment could be changed prospectively by the employer. The court further held that the employee had assented to these changes by continuing her employment with the employer. Id. at *6.

Here, as in Johnson, Plaintiffs were not employed for a specific duration. This undisputed fact is evidenced not only by the fact that neither the offer letter nor the brochure specified any duration of employment, but also by the fact that the Plaintiffs signed at-will disclaimers when they were employed by Ford and again when they were hired by ZFB. (Appendix Tabs 3,4; Huebner Affidavit, ¶ 8). Plaintiffs also have admitted this fact in response to ZFB's Requests for Admissions. (Plaintiffs' Responses to Requests to Admit, Nos. 4, 9). Because Plaintiffs were employed at-will, their terms and conditions of employment, including their compensation and benefits, could be changed at any time by ZFB. See Copeco, Inc. v. Caley, 632 N.E. 2d 1299, 1301 (Ohio Ct. App. 1992) ("every day is a new day for both employer and employee in an at-will relationship").

While no consideration was necessary for ZFB to make changes to Plaintiffs' compensation and benefits, even if consideration were required, Plaintiffs' continued

17

employment constitutes sufficient consideration for the alleged changes, and Plaintiffs assented to these changes by continuing to work for ZFB. See Andres v. Drug Emporium, 2001 Ohio App. LEXIS 3861 (Franklin Cty. Aug. 30, 2001)(Appendix Tab 9); Nichols v. Waterfield Financial Corp., 577 N.E. 2d 422 (Ohio Ct. App. 1989).

In Andres, the employee relocated from Texas to Ohio after the employer offered him the opportunity to exclusively manage the employer's diversion program. Pursuant to his agreement with the employer, the employee was to receive a one-half percent commission on all merchandise sold under the diversion program. After the employee relocated, the employer told him that he would not be the exclusive manager of the division program. The effect of this change was a reduction in the employee's compensation (commissions). After working under this arrangement for a little over one week, the employee quit his job and filed suit for breach of contract and promissory estoppel. In affirming summary judgment for the employer on both claims, the court held that the employee had no definite term of employment and was employed at-will. Id. at *9. As a result, the court held that the employer "could change the terms of the employment relationship so that [the employee] did not have sole control over the program." Id.

Similarly, in Nichols, the employee was hired pursuant to an oral agreement as to his compensation. After working a few months, the employee signed a letter agreeing to a reduction in his compensation (commissions). After the employee was later terminated he brought suit for breach of contract seeking payment for unpaid commissions. The Court of Appeals held that because the employee was employed at-will "the terms and conditions of [his] at-will contract [could] be prospectively changed without consideration." Id. at 423. The court further found that "even if consideration were required to modify the at-will employment contract, [the employee's] continued employment was sufficient consideration to modify the contract." Id.

18

Here, as in <u>Johnson</u>, <u>Andres</u>, and <u>Nichols</u>, Plaintiffs were employed at-will, and were thus subject to having their compensation and benefits changed at any time.  Moreover, Plaintiffs assented to the changes made by ZFB by continuing to work for ZFB.  Therefore, because ZFB had the legal right to make changes to Plaintiffs' compensation and benefits, the exercise of this legal right cannot lead to liability – especially for Ford, which had no involvement in the changes.  (<u>See</u> Section V.D., <u>infra</u>).  Accordingly, Ford is entitled to summary judgment as a matter of law on Plaintiffs' breach of contract claims.

### B.    The Parties Did Not Mutually Assent To A Change In The At-Will Nature Of Plaintiffs' Employment

"Employment at-will is a bedrock of Ohio law.  The presumption is that all employment is at-will."  <u>Reasoner v. Bill Woeste Chevrolet, Inc.</u>, 730 N.E. 2d 992, 993 (Ohio Ct. App. 1999).  In order to overcome this bedrock principle, "[t]here must be specific evidence to show that the parties mutually assented to something other than employment at-will."  <u>Id.</u> at 995.  Here, there is no such evidence of mutual assent, and Ford is entitled to summary judgment.

During the many years that the Plaintiffs were employed as salaried employees by Ford, their employment was always at-will.  Upon their hire by Ford as salaried employees, Plaintiffs signed a document entitled "Employment Agreement" which specifically stated that the terms and conditions of their employment were subject to change at Ford's discretion.  The relevant language of the "Employment Agreement" stated as follows:

> I understand that my employment is not for any definite term, and may be terminated at any time, without advance notice, with or without cause, by either myself or my employer; that my employment is subject to such rules, regulations, and personnel practices and policies, and changes therein, as my employer may from time to time adopt, and that my employment shall be subject to such layoffs, and my compensation to such adjustments, as my employer may from time to time determine.

(Appendix Tab 3).

19

Plaintiffs also signed employment applications which again set forth the at-will nature of their employment with Ford.  The at-will disclaimers in the Ford applications read as follows:

> I understand that my employment is not to be for any definite term and it may be terminated at any time by either myself or my employer, regardless of any personnel policies or practices adopted by the Company, and the only way that any differing commitment regarding my employment may be made is by a written agreement, signed by the vice president of the Company in charge of employee relations.

(Appendix Tab 4).

Plaintiffs understood that the terms and conditions of their employment with Ford were subject to change, and have conceded that during their employment with Ford their compensation and benefits changed frequently, and at Ford's sole discretion.   (Plaintiffs' Responses to Requests to Admit, No. 21; Baker dep. pp. 109-12, 119-20).   For example, Ford made changes to its overtime policies, to healthcare benefits, and to the profit-sharing plan. (Baker dep., pp. 112-14; Devito dep., pp. 74-75).   At least some of these changes negatively affected Plaintiffs and caused a reduction in their compensation and benefits.  (Id.)

When Plaintiffs were hired by ZFB, they continued to be at-will and signed statements on their ZFB employment applications specifically acknowledging their at-will status.   These at-will disclaimers stated as follows:

> I understand that my employment is not to be for any definite term and it may be terminated at any time by either myself or my employer, regardless of any personnel policies or practices adopted by the Company, and the only way any differing commitment regarding my employment may be made is by a written agreement, signed by the Director, Human Resources, of the Company.

(Huebner Affidavit, ¶ 8; Plaintiffs' Responses to Request to Admit, No. 4)[12]

---

[12]   Plaintiffs admit that they did not have written agreements signed by ZFB's Director of Human Resources. (Plaintiffs' Responses to Requests to Admit, No. 3).

The disclaimers that Plaintiffs signed with Ford and ZFB make it clear that their employment was at-will, and that neither Ford nor ZFB assented to enter into an employment contract with Plaintiffs.  This lack of mutual assent is also found in the very documents which Plaintiffs claim constitute a written employment contract.  The language of the brochure clearly states, in the same size type as the rest of the brochure, that "[p]lans described here are subject to change.  Plan provisions and eligibility <u>do not constitute an employment contract</u> with any individual."  (Dep. Ex. 2, Appendix Tab 5)(emphasis added).  This language, which specifically states that it is not an employment contract, is yet another clear indication that neither Ford nor ZFB mutually assented to alter the at-will nature of Plaintiffs' employment or to enter into an employment contract with Plaintiffs.

While some of the Plaintiffs will argue that the disclaimer language in the brochure applies only to ERISA type plans, such as the retirement plan, the plain language of the brochure and the disclaimer do not support such a narrow interpretation.[13]  The brochure specifically states that it is a description of the "'key features'" of the ZF Batavia Benefits plans."  This language is all encompassing – it does not state that the brochure describes only ERISA-type benefits.  And, in fact, the brochure is not limited to a description of only ERISA-type benefits. Rather, the brochure describes all of ZFB's benefit plans – including each component of the benefit plans that are in dispute in this case – such as overtime, vacation, personal or sick days, and the bonus plan (Annual Incentive Plan), a benefit plan which in its very title uses the term "plan."  This same word, "plan," is also used to describe the benefits included in the brochure ("ZF Batavia Benefits plans") and is again used in the disclaimer ("Plans described here are subject to change.

---

[13]  This is a new interpretation for many of the Plaintiffs, as at least six Plaintiffs admit they did not bother to read the disclaimer prior to accepting their offer.  (Plaintiffs' Responses to Requests to Admit, Nos. 11, 13) (Plaintiffs Ervin, Baker, Stevens, Stegmann, Parker, Newsome).

Plan provisions and eligibility do not constitute an employment contract with any individual"). At least one Plaintiff, Plaintiff Crump, agrees with this interpretation and testified that AIP was a "plan" that was subject to change. (Crump dep., p. 86).

This disclaimer, combined with the historical at-will nature of the Plaintiffs' employment, makes it clear that there was no mutual assent to enter into an employment contract which would contradict this at-will nature and limit the rights of ZFB to change the terms and conditions of Plaintiffs' employment. Without some evidence that the parties mutually assented to a contract for a definite term, the employment relationship was at-will, and the terms and conditions of the Plaintiffs' employment could be changed at any time. Nichols, 577 N.E. 2d at 423.

Ohio courts have consistently reviewed similar disclaimers and held that "disclaimers negate any inference of contractual obligations between the parties." Shepard v. Griffin Servs., Inc., 2002 Ohio App. LEXIS 2298, 37 (Montgomery Cty. May 10, 2002)(Appendix Tab 10). The effect of the disclaimer is that the document becomes "merely a unilateral statement of rules and policy which create no obligations and rights." Tuhline v. Central Trust Co., 549 N.E. 2d 1223, 1227 (Ohio Ct. App. 1988).

While Plaintiffs claim that Ford and ZFB officials made representations prior to the date that Plaintiffs signed their offer letters and accepted employment with ZFB, these alleged representations do not support Plaintiffs' breach of contract claims because (1) Plaintiffs do not claim that anything was said pertaining to either a term of employment, or a guarantee that their terms and conditions of employment were not subject to change, and (2) to the extent Plaintiffs allege that these representations contradict the express disclaimer in the brochure, such statements are inadmissible under the parol evidence rule.

22

According to Plaintiffs, the alleged representations were made during all employee meetings in the plant cafeteria, as well as various one-on-one or small group meetings between Plaintiffs and certain Ford and/or ZFB managers. Plaintiffs claim that, through these conversations, they were led to believe that "things at ZFB would be like they had been at Ford." Plaintiffs admit, however, that at no time did any Ford or ZFB official tell them that their benefits were "guaranteed" or would never change. (Blanco dep., pp. 46-47; Ervin dep., p. 108; Newsome dep., p. 68).

These alleged promises are insufficient to alter the at-will nature of Plaintiffs' employment. At most, these alleged promises only indicate that the nature of their employment would be as it had been at Ford. At Ford, they had been at-will, and the terms and conditions of their employment, including their compensation and benefits, were subject to change at Ford's sole discretion. Thus, the alleged promises constitute nothing more than a commitment that the at-will nature of their employment would continue. Plaintiffs were never told they had a definite term of employment, and admit that their employment with ZFB is of an indefinite duration. This was reemphasized when the Plaintiffs signed a specific statement in their ZFB application acknowledging the at-will nature of their employment. A promise that an employee will continue to be at-will hardly gives rise to a contractual obligation not to change the employee's terms and conditions of employment. Therefore, the alleged promises do not support Plaintiffs' breach of contract claims.

Furthermore, to the extent that Plaintiffs are claiming that they were promised that their benefits would never change (a claim not supported by the record in this case), such alleged promises are inadmissible because the parol evidence rule prohibits Plaintiffs from introducing evidence of contradictory promises made prior to the execution of the alleged written contract (offer letter and brochure).

23

The Ohio Supreme Court has set forth the black letter law and corresponding rationale of the parol evidence rule, stating:

> The parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements.  When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings will not be admitted for the purpose of varying or contradicting the writing.

Ed Schory & Sons, Inc. v. Francis, 662 N.E. 2D 1074, 75 Ohio St.3d 433, 440 (1996) (internal citations omitted).

Plaintiffs can point to no statement in these written documents that indicates that their compensation and benefits were "guaranteed."  In fact, the language of the brochure specifically states that the benefits were not guaranteed, but rather were "subject to change," and that the brochure itself does not constitute a contract.  (Dep. Ex. 2, Appendix Tab 5).  By seeking to introduce allegedly contradictory oral representations, Plaintiffs are attempting to contradict the written language of the brochure and the offer letter.  While Ford denies that the offer letter and brochure constitute a contract, assuming that they do, then the parol evidence rule prohibits Plaintiffs from introducing evidence that contradicts the terms of the writings.  See Leonard v. TWI Networks, Inc., 1999 Ohio App. LEXIS 1651 (Montgomery Cty. March 26, 1999)(holding that parol evidence rule prohibited employee from contradicting the terms of her employment agreement with evidence of oral promises of compensation and benefits)(Appendix Tab 11).

Here, as in Leonard, Plaintiffs are prohibited from introducing evidence of contradictory promises allegedly made prior to the time they signed their offer letters.  If, as Plaintiffs contend, the offer letters and brochure are contracts, then Plaintiffs are bound by all of the terms therein – including the language that specifically states that the benefits are subject to change.

24

**C.    Summary Judgment Is Appropriate Because Plaintiffs Have Not Introduced Evidence Of Breach.**

Ford is also entitled to summary judgment on Plaintiffs' breach of contract claims because there is no evidence of breach.  Again, Plaintiffs claim that they were promised that "things would be the same as at Ford," and that they understood this to mean that ZFB could only make those changes in benefits or policies that Ford also made for its employees.  (Devito dep., pp. 76-77; Steward dep., pp. 109-12).

In support of their breach of contract claim, Plaintiffs claim that ZFB made changes in various benefits and policies, such as personal and sick days, overtime, and AIP.[14]  However, Plaintiffs have not introduced any evidence as to Ford's benefits and policies from the time of the alleged breaches forward.  Because Plaintiffs allege that ZFB's ability to change benefits and policies is conditioned upon Ford's changes to benefits and policies, Plaintiffs must do more than simply demonstrate that ZFB made the alleged changes.  They must also demonstrate that Ford did not make these same changes in its policies or benefits.  Not only have Plaintiffs failed to introduce evidence on this critical point, in fact, the evidence in the record shows that Ford has made reductions in benefits that ZFB has not made.  For example, in 1999 Ford changed from a profit-sharing to an individual bonus program that paid bonuses based on the performance of the individual and the company.  (Mezza Affidavit, ¶ 8, Appendix Tab 2).  This change, combined with the poor economy and lagging auto sales, has resulted in an overall reduction in bonuses.  (Id. at ¶ 9).  Moreover, in 2001 Ford stopped making matching contributions to its salaried employees' 401(k) accounts.  (Id. at ¶ 10).  Plaintiffs, however, enjoyed a 60% 401(k) match from ZFB over this same time period.  (Whisman dep., p. 138).  Ford also recently implemented

a 10% reduction in salaried costs, including salaried overtime.   ZFB has not made such reductions (Baker dep., p. 123).

Although Plaintiffs claim that their benefits were subject to change when Ford's changed, they do not believe they should suffer the negative effects of Ford's changes because that would not be "fair."   (Steward dep., pp. 109-12, 143-44).

Plaintiffs have also failed to show that ZFB made changes to AIP, overtime, and merit increases that were different than what is stated in Deposition Exhibit 2.  With respect to AIP, the brochure did not guarantee that AIP bonuses would be paid, or that if paid, a guaranteed amount would be paid. (D. Williams dep., pp. 106-07).   Likewise, with respect to overtime, the brochure merely stated that "authorized overtime" would be paid.  Here, ZFB has not authorized the payment of overtime for casual time.   Thus, because Plaintiffs' casual time was not authorized for payment by ZFB, they are not entitled to receive payment for such hours.

Similarly, Plaintiffs were never told that they would receive a minimum merit increase. The brochure merely states that a "merit program is established."  (Dep. Ex. 2; D. Williams dep., pp. 85, 126-27).   Plaintiffs' complaint here is that certain ZFB new hires allegedly received larger percentage increases than certain Plaintiffs.  However, Plaintiffs concede that their base salaries are higher than those of new hires who work in comparable jobs, and that they were never promised that their percentage increases would be larger than the increases paid to new hires.  (Id.)  And, most significantly, Plaintiffs admit that they have received merit increases every year at ZFB.  (See, e.g., Whisman dep. p. 47; D. Williams dep., pp. 68-69).  Thus, even assuming that ZFB was contractually obligated to establish a merit increase program and to pay

---

[14]   Plaintiffs claims regarding bereavement leave and personal days automatically fail because Plaintiffs knew at the time they accepted employment with ZFB that ZFB's bereavement and personal days policies differed from Ford's policies.  (Crump dep., pp. 20-21).  Thus, Plaintiffs certainly had no expectation that future changes to these policies would track changes made by Ford.

annual merit increases to each Plaintiff, ZFB has fulfilled its obligation and cannot be found to be in breach.

Plaintiffs also claim that ZFB unlawfully changed its vacation policy in 2002. According to Plaintiffs, the effect of the policy change is that employees who have accumulated five weeks of vacation time are not permitted to purchase a sixth week of vacation. (Newsome dep., pp. 18, 56-57). Plaintiffs concede that Deposition Exhibit 2 does not state that employees can accumulate six weeks of vacation, and that they were never told they could buy a sixth week. (Dep. Ex. 2; Newsome dep., pp. 64-65). Plaintiffs also understood when they accepted employment at ZFB that ZFB's policy was different than Ford's. (Baker dep., p. 98).

Finally, with respect to Plaintiff Ervin and his claim that he has been denied the right to "double dip" and to simultaneously receive his pension and his ZFB salary, there is no evidence that Ford or ZFB has breached any obligation to Plaintiff Ervin. On this point, the brochure states that only those employees who are "Immediately Eligible to Retire" may "elect to begin [Ford retirement] benefit payments and also accept employment with ZF Batavia." (Dep. Ex. 2). Employees, such as Plaintiff Ervin, who were not immediately eligible to retire "may not in the future begin benefit payments from the [Ford retirement plan] until they have separated employment from ZF Batavia." (Id.). The brochure does not address reemployment after separation from ZFB, and Plaintiff Ervin admits that no one from Ford or ZFB represented to him that he could immediately be rehired after only a one day separation. (Ervin dep., p. 128). The reason that Plaintiff Ervin has been told that he must have at least a six month period of separation is that the retirement plan documents do not allow for an exception to the ERISA same desk rule for employees, like Plaintiff Ervin, who were not immediately eligible to retire at the time of the joint venture. (Dep. Ex. 89, Appendix Tab 5). As even Plaintiffs concede, the disclaimer in the brochure applies to the retirement plan, an ERISA-type benefit. Thus, by virtue

27

of the disclaimer, the brochure did not represent a contract with regard to Plaintiff Ervin's ability to retire and be rehired, and the plan document controls this issue.

Therefore, because there is no evidence of breach, Ford is entitled to summary judgment as a matter of law.

### D.    Ford Cannot Be Liable For Breach Of Contract Because It Was Not Involved In, And Did Not Approve Of, Any Alleged Breach By ZFB.

Finally, Ford is entitled to summary judgment because there is no evidence that it was involved in, or approved of, ZFB's decisions to make the changes at issue in this case.  This Court, in its Order Denying Motion to Dismiss, has already reviewed this issue and has held that "mere 'approval' of another's breach of contract . . . is not a recognized cause of action in Ohio." (Order, p. 8).  In their depositions, each Plaintiff testified that the alleged changes had been made by ZFB, and that they had no evidence that Ford was involved in or approved of these changes. (Baker dep., pp. 152, 156; Blanco dep. p. 82; Crump dep. pp. 82, 99-100; Devito dep., pp. 60-61, 65, 68-70; Edrington dep., pp. 89-90, 92-95, 97-98; Ervin dep., pp. 121-22; Newsome dep., pp. 56-58; Parker dep., pp. 102-03; 113-15; Pearce dep., pp. 82-85, 89-94; Stegmann dep., pp. 108-09; Stevens dep., pp. 52-54; Steward dep., pp. 118-19, 126; Vories dep., pp. 122-23; Whisman dep., pp. 153-67, 191).  Indeed, the only connection to Ford that Plaintiffs even alleged was that these decisions "must have" or "should have" been approved by the ZFB board of directors, and that there are Ford employees on the ZFB board.  (Id.)  As explained above, in Section IV, the fact that Ford, pursuant to the joint venture agreement and the LLC statute, has representatives on the ZFB board does not establish that Ford Motor Company approved of  ZFB's policy and

benefit changes.[15] Nor does it establish that Ford is the alter ego of ZFB. Rather, it merely establishes that the ZFB LLC is acting in accordance with the provisions of the Limited Liability Company statute, and that only the LLC (ZFB), and not an individual member such as Ford, can be held liable for the actions of the LLC.

Accordingly, because Ford did not breach the alleged contract, and because Ford did not approve of the alleged breach, Ford is entitled to summary judgment as a matter of law.[16]

**VI.    Ford Is Entitled To Summary Judgment On Plaintiffs' Fraud Claims Because (A) There Is No Evidence That Ford Knew That ZFB Intended To Make Future Changes To Plaintiffs' Compensation And Benefits, And (B) Plaintiffs' Belief That ZFB Would Not Make Changes In Their Compensation And Benefits Was Not Reasonable.**

In order to state a claim for fraud, Plaintiffs must satisfy the following elements:

(1) a representation or, where there is a duty to disclose, concealment of a fact,
(2) which is material to the transaction at hand,
(3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
(4) with the intent of misleading another into relying upon it,
(5) justifiable reliance upon the representation or concealment, and
(6) a resulting injury proximately caused by the reliance.

(Order, p.4, citing Cohen v. Lamko, Inc., 462 N.E.2d 407 (Ohio 1984)). As explained below, Plaintiffs cannot establish the third, fourth, fifth and sixth elements of their fraud claim.

---

[15] Moreover, Mr. Adams and Mr. Kehr testified that the policy decisions at issue were not reviewed by the Board of Directors, but were made by ZFB's management team and policy committee – groups that do not include Ford representatives. (Adams dep., p. 93; Kehr dep., pp. 180-82, 237). Plaintiffs have no evidence to dispute this testimony. (See, e.g., Blanco dep., pp 85-87)(testifying that she has reviewed the minutes of the Board of Directors' meetings and has found no evidence changes at issue were discussed with Board).

[16] Summary judgment is also appropriate because Plaintiffs have not been harmed by the alleged breaches. Rather, Plaintiffs' incomes at ZFB have been higher than they were at Ford, and Plaintiffs have not been subject to the cost-cutting measures that Ford has implemented at its U.S. plants. (See Section VII. D., infra.)

A.  **Plaintiffs Cannot Establish Fraudulent Intent By Ford Because There Is No Evidence That Ford Knew That ZFB Intended To Make Future Changes To Plaintiffs' Compensation And Benefits.**

Plaintiffs claim that Ford and ZFB misrepresented to Plaintiffs that their future terms and conditions of employment at ZFB would be the same as if they had remained at Ford.  In its Motion to Dismiss, Ford pointed out that "fraud cannot be predicated upon promises or representations relating to future actions or conduct."  (Motion to Dismiss, p. 4 (quoting Tibbs v. National Homes Const. Corp., 369 N.E.2d 1218, 1223 (Ohio Ct. App. 1977)).  This Court agreed with this general principle, but stated that an action for fraud can exist under the limited circumstances where "actual intent to deceive and induce action on the part of another accompanies a statement about future events."  (Order, p. 4).  This Court then went on to hold that Plaintiffs should be given an opportunity through discovery to prove that, at the time of the alleged promises, Ford had no intention of keeping its alleged promises.  Plaintiffs have had this opportunity, and have failed to carry their burden of proof.

In order to prevail on their fraud claim against Ford, Plaintiffs must not only produce evidence that Ford made future representations about what the Plaintiffs' terms and conditions of employment would be at ZFB, but that at the time it made these alleged representations in 1999 Ford knew that ZFB would not follow through and would make changes to Plaintiffs' terms and conditions of employment years down the road, after Ford was out of the picture.[17]  This is not as simple as showing that Ford made promises that Ford did not intend to keep, but rather requires Plaintiffs to show that Ford made promises that Ford knew ZFB did not intend to keep.

---

[17] Under Plaintiffs' theory that ZFB could only make changes that were the same as Ford's changes, Plaintiffs must show that Ford also knew that ZFB would make changes that were different than those Ford might make.  This is an impossibility.  There is no evidence that Ford even knew what changes Ford would make in compensation and benefits in future years.  Ford certainly could not have predicted the downturn in the economy that occurred after the 9/11 tragedy and could not have anticipated the reductions and policy changes that occurred as a result of economic pressures.  Since Ford did not even know how its business would change in the future, it certainly could not have known what future changes ZFB would make.

Plaintiffs' task here is monumental, as they must produce evidence that in 1999 Ford knew what changes ZFB was going to make to overtime in 2002, AIP in 2001, bereavement leave in 2002, personal and sick days in 2002, and job assignments at some uncertain future date.  No such evidence exists.[18]

Discovery in this case has been comprehensive.  Over 25 depositions have been taken, and over 10,000 documents have been produced.  Each Plaintiff was specifically questioned in deposition about their fraud claim.  And each stated that they had no knowledge or evidence to support their claim that the Ford representatives knew that, years down the road, ZFB would make changes to their terms and conditions of employment.  (See, e.g., Baker dep., pp. 158-59; Devito dep., pp. 96-97; Edrington dep., pp. 99-100; Ervin dep., pp. 118-19, 125-26, 139-40; Newsome dep., pp. 73-74; Parker dep., p. 112; Pearce dep., pp. 102-03; Stevens dep., p. 61; Steward dep., pp. 132-33; Vories dep., pp. 124-25; Whisman dep., pp. 158-60; D. Williams dep., pp. 120-22).  The lone Ford representative deposed in this case, Mike Warden, testified that he gave truthful and accurate information to the employees who were considering joining ZFB, and Plaintiffs have not contradicted this with any evidence that Mr. Warden knew that the information he provided was false.  Therefore, because there is no evidence that Ford made future representations that it knew were false, Plaintiffs fraud claims against Ford must be dismissed.  See Cousins Waste Control Corp. v. City of Wellston, 1995 Ohio App. LEXIS 2315, *19 (Jackson Cty. May 26, 1995) (affirming summary judgment on fraud claim where "the appellant can offer no proof of such lack of [present] intent [to perform the future

---

[18] In its Order, the Court noted that "[i]t may seem far-fetched to believe that Ford intentionally misled the Plaintiffs as part of a greater scheme to, for instance, reduce its possible expenditure from its own corporate retirement plan and lower salaries."  Ford agrees that this is far-fetched indeed, and that there is no evidence of any such intent on Ford's part.  Indeed, with respect to Plaintiffs' salaries, the evidence shows that Plaintiffs' income has been significantly higher at ZFB than it was at Ford.  This higher income would result in an increase in Ford's future pension expenditures, not a decrease.

31

representations], except for the fact that these promises were not performed, which by itself is not sufficient") (Appendix Tab 12); Wiltberger v. Davis, 1994 Ohio App. LEXIS 3012, *12 (Franklin Cty June 30, 1994) (holding that summary judgment was appropriate where plaintiff failed to present evidence that defendant did not intend to perform at the time it entered into the contract)(Appendix Tab 13).

**B.    Plaintiffs' Belief That ZFB Would Not Make Future Changes In Their Compensation And Benefits Was Not Reasonable.**

In order to prevail on their fraud claim, Plaintiffs must also demonstrate that Ford made representations that ZFB would not change the terms and conditions of their employment, and that they reasonably relied on such alleged representations.  As has been demonstrated in great detail above, Plaintiffs were at-will employees both at Ford and then at ZFB.  An essential component of the at-will nature of their employment was that their employer had the right to make changes in the terms and conditions of their employment.  This had always been the case when they were employed at Ford, and they signed agreements with Ford evidencing this right.

It was not reasonable for Plaintiffs to expect that, upon accepting employment with ZFB, the at-will nature of their employment would suddenly change.  Indeed, Plaintiffs only expected that things would remain as they had been at Ford.  Thus, the only reasonable expectation Plaintiffs' could have had was that they would continue to be at-will, just as at Ford, and that their new employer could make changes in their compensations and benefits, just as Ford had always done.

The unreasonableness of any contrary expectation is also evidenced by the disclaimer in the brochure – a document which Plaintiffs claim constitutes a written employment contract - and by the disclaimer in the ZFB application.  The brochure disclaimer specifically stated that the benefit plans described in the brochure were "subject to change."  (Dep. Ex. 2).  As discussed

32

above with regard to Plaintiffs' breach of contract claims, the parol evidence rule prohibits Plaintiffs from introducing any prior conversations or representations which contradict the "subject to change' language of the brochure. <u>Yaroma v. Griffiths</u>, 662 N.E. 2d 867 (Ohio Ct. App. 1995)(holding that evidence of oral promises related to the plaintiff's compensation were not admissible to prove fraud where the promises contradicted the written agreement). This same analysis applies to Plaintiffs' fraud claims.

Simply put, it was not reasonable for Plaintiffs to believe that their employment at ZFB was anything more than the at-will employment they had at Ford. At Ford they had no term of employment, had acknowledged in writing that their benefits and compensation were subject to change at Ford's discretion, and had witnessed first-hand numerous changes and reductions in their compensation and benefits. (<u>See</u> Plaintiffs' Responses to Requests for Admissions, No. 21; Ford at-will employment agreements, Appendix Tab 3; Ford Applications, Appendix Tab 4). Similarly, when they went to ZFB, they had no term of employment, were told in writing that they did not have a contract with ZFB and that benefits were subject to change, and signed an acknowledgment of their at-will status. (<u>See</u> Plaintiffs' Responses to Requests for Admissions, Nos. 3, 4, 9; Huebner Affidavit, ¶ 8; Dep. Ex. 2). Moreover, as demonstrated below, several Plaintiffs, **have conceded that it was not realistic to expect that things would not have changed at ZFB**.

> Q. Now, did anyone communicate to you that your benefits would never change at any time during your employment with ZF Batavia?
>
> A. No.
>
> **Q. In fact, that would have been an unrealistic expectation, wouldn't it?**
>
> **A. Yes.**
>
> Q. Because certainly at Ford your benefits were subject to change –

A.    Yes.

(Newsome dep., p. 68).

\* \* \* \*

Q.    Okay.  Any you also recognized, didn't you, that, down the road, as the Company grew, there might be other changes in benefits?

A.    Sure.

Q.    In other words, what – the benefits you had on day one might not be the same as the benefits you had on year five, for example?

A.    Right.  That's the case.  Insurance changes, we pay more out of pocket now than we used to, co-pays, things like that.

Q.    Places you worked before, that's generally the way it operated?

A.    That happens.  That's the business world.

Q.    Benefits change.  And no one ever told you, in fact, that your benefits would never change?

A.    No, nobody said that.

Q.    And that - -

A.    That - -

Q.    That would have struck you as odd?

A.    That's - - **yeah, not realistic**.

(Edrington dep., pp. 82-83) (emphasis added).

\* \* \* \*

Q.    . . . When you made the transition, your understanding was it would be exactly the same as it was when you left Ford, correct?

A.    Yes.

Q.    Okay.  Did you have an understanding, then, as to what it would be like three years down the road?

A.    No.

\* \* \*

34

Q.     . . . Is there something in Exhibit 2 that you read that caused you to believe that all those other things could not change?

Mr. Simon:  Objection.  The document speaks for itself.  You can answer.

A.     I want to say no, but there's a caveat that goes with that.  This was presented to me with the written offer to me.  Those are two - - one and the same documents.  This was a - - to me, was a – to me, my perception, this was a contract . . .

\* \* \*

Q.     . . . Was there anything in Exhibit 126 [offer letter] that you read that caused you to believe things could not change, again, other than the medical or the holidays?

A.     No.

(Stegmann dep., pp. 104-05, 106-07).

\* \* \* \*

Q.     And did you have the same expectation that at ZF, things might change for the worst as well?

A.     With health insurance and things?

Q.     With any - - with any benefits.  Things might change for the worse.

A.     Yes.

(Ervin dep., p. 109).

\* \* \* \*

Q.     . . . But you knew it wasn't going to be what it was at Ford.   We just talked about that.  It couldn't have been what it was at Ford because Ford [vacation] wasn't capped at four weeks?

A.     I knew everything would not be the same as it was at Ford - -

Q     Okay.

A.      - - but some things would be the same.

Q.     Okay.

A.     Specifically, I didn't know what those things would be.

35

(Baker dep., p. 99).

Plaintiffs were also told in their offer letter that there were differences between ZFB's benefits and Ford's benefits, and were given substantial transition bonuses (in amounts averaging $25,000) to offset these differences. (See Dep. Ex. 3, Appendix Tab 5). Thus, Plaintiffs knew from the beginning that benefits at ZFB were different than at Ford.[19]

Plaintiffs Edrington, Ervin, Newsome, Stegmann, and Baker are absolutely correct that it was unrealistic to expect that ZFB would not make changes in compensation or benefits. ZFB was a brand new company trying to compete in a competitive industry. ZFB's future was uncertain, and was dependent upon its ability to mass produce the new CVT transmission – something that had not been done before. The prospect that compensation and benefits are subject to change is not a novel concept amongst today's workforce. Indeed, it is a rare company today that does not continually reevaluate its compensation and benefits costs, and make adjustments on at least an annual basis. This certainly was the experience of Plaintiffs – many of whom had known no other employer but Ford for many years, and who had become accustomed to having changes made to their compensation, benefits, and other terms and conditions of employment.

Given all of these circumstances, and the "subject to change" and at-will disclaimers that Plaintiffs were provided, it was unreasonable for Plaintiffs to expect that their compensation and benefits would no longer be subject to change.

Therefore, because it was not reasonable for Plaintiffs to believe that their benefits at ZFB were not subject to change, and because there is no evidence that Ford knew ZFB would

---

[19] Indeed, one of Plaintiffs' primary disputes in this case is with respect to the AIP, a bonus plan that Ford did not offer, and that was substantially different than Ford's profit-sharing plan.

make the alleged changes, Ford is entitled to summary judgment as a matter of law on Plaintiffs' fraud claims.[20]

**VII.  Ford Is Entitled To Summary Judgment On Plaintiffs' Promissory Estoppel Claims Because (A) Plaintiffs Were At-Will Employees Who Were Not Made Any Clear And Unambiguous Promises Of A Definite Term Of Employment, (B) Plaintiffs' Could Not Reasonably Have Believed That ZFB Would Not Make Changes To Their At-Will Employment, (C) Ford Is Not Responsible For ZFB's Alleged Failure To Honor The Alleged Promises, and (D) Plaintiffs Have Not Been Injured As A Result Of ZFB's Changes.**

In order to prevail on their promissory estoppel claims, Plaintiffs must demonstrate that (1) they were made clear and unambiguous promises of employment for a definite term, (2) they relied upon the alleged promises, (3) their reliance was reasonable, and (4) they were actually injured by their reliance.  Reasoner v. Bill Woeste Chevrolet, 730 N.E.2d 992, 996 (Ohio Ct. App. 1999); Andres v. Drug Emporium, 2001 Ohio App. LEXIS 3861, *12 (Franklin Cty. Aug. 30, 2001).  Here, Plaintiffs cannot satisfy the first, third, or fourth elements of their claim.  Accordingly, Ford is entitled to summary judgment as a matter of law.

**A.    Plaintiffs Were At-Will Employees Who Were Not Made Any Clear And Unambiguous Promises Of A Definite Term Of Employment.**

As discussed above with regard to Plaintiffs' breach of contract claims, Plaintiffs were at-will employees both when they were employed at Ford and when they were hired by ZFB. Plaintiffs admit that their employment with ZFB is not for a definite term, and have signed at-will disclaimers evidencing this same fact.  The same analysis discussed above with respect to Plaintiffs' breach of contract claims applies to Plaintiffs' promissory estoppel claims.  See Reasoner, 730 N.E.2d at 996  (a promise of future benefits and opportunities, without a promise of a continued employment, does not support a promissory estoppel claim); Andres, 2001 Ohio App. LEXIS 3861 at *13-14 (affirming summary judgment for the employer where there was no

---

[20]  Ford is also entitled to summary judgment because Plaintiffs were not harmed by the alleged changes.  (See

evidence of a clear and unambiguous representation of continued employment); <u>Henning v. Marriott Hotel and Resorts, Inc.</u>, 1995 Ohio App. LEXIS 2119 (Montgomery Cty. May 24, 1995) (granting summary judgment for the employer where the offer letter "did not guarantee employment for any specific period of time") (Appendix Tab 14).

In addition, Plaintiffs' promissory estoppel claims also fail because Plaintiffs continued to work for ZFB after they learned of ZFB's changes and therefore assented to these changes. <u>See Johnson v. Norman Malone & Assoc., Inc.</u>, 1989 Ohio App. LEXIS 4798, **7-8 (affirming summary judgment for employer where employee continued to work for employer once she became aware that she would not receive the bonus, stock options, raise, or position that she allegedly had been promised).

Therefore, because Plaintiffs were not employed for a definite term, and were not made any clear and unambiguous promises of employment for a specific period of time, and because Plaintiffs continued to work for ZFB after learning of the changes to their terms and conditions of employment, Ford is entitled to summary judgment as a matter of law on Plaintiffs' promissory estoppel claims.[21]

**B.    <u>Plaintiffs Could Not Reasonably Have Believed That ZFB Would Not Make Changes To Their At-Will Employment,</u>**

As explained above in Section VI.B., Plaintiffs' at-will status, previous experiences at Ford, and the language contained in the at-will disclaimers and the brochure, made it unreasonable for Plaintiffs to expect that their benefits were not subject to change at ZFB. Ford will not restate these arguments here, but rather incorporates the arguments into this section.

---

Section VII. D., <u>infra</u>).

[21] Plaintiffs also have not produced any evidence that clear and unambiguous promises were made by Ford that ZFB would not make future benefits changes. Instead, Plaintiffs have merely asserted that "things would continue to be like they were at Ford," and have acknowledged that things at Ford were subject to change.

Therefore, for this additional reason, Ford is entitled to summary judgment as a matter of law on Plaintiffs' promissory estoppel claims.

### C.    Ford Is Not Responsible For ZFB's Alleged Failure To Honor The Alleged Promises.

In Section IV. and V.D., above, Ford set forth in detail the reasons that it cannot be held liable for ZFB's actions. Ford is only a minority member of the LLC, and was not involved in the changes at issue in this case. Therefore, for these additional reasons, Ford is entitled to summary judgment as a matter of law.

### D.    Plaintiffs Have Not Been Injured By ZFB's Changes.

It is undisputed that Plaintiffs' salaries and incomes are greater now than they were at Ford. (Plaintiffs' Responses to Requests to Admit, Nos. 6, 15, 16). In addition, Plaintiffs have not been subject to the cost-cutting measures that have affected Ford employees. For example, Plaintiffs receive a 60% 401(k) match; Ford salaried employees do not receive a 401(k) match. (Baker dep., pp. 121-22; Mezza Affidavit, ¶ 10). Plaintiffs received AIP bonuses. Ford employees have received minimal bonuses. (Mezza Affidavit, ¶ 9). Ford is cutting salaried costs, including overtime, by ten percent. (Warden dep., p. 52). ZFB has not engaged in such cuts. (Baker dep., p. 123). These facts make it clear that, despite the changes made by ZFB, Plaintiffs are better off than they would have been had they remained employed by Ford. Thus, Plaintiffs cannot establish that they suffered any harm as a result of their unreasonable expectation that ZFB would not make benefit changes, and Ford is entitled to summary judgment as a matter of law.

## VIII.   CONCLUSION

Despite the voluminous record in this case, the facts and issues are not complex. Plaintiffs were at-will employees of ZFB. As a result, ZFB had the legal right to make changes

to Plaintiffs' terms and conditions of employment.  Moreover, even if ZFB is legally responsible

for making these changes, Ford, as the former employer and minority member of the LLC, is not

liable for ZFB's actions.   Accordingly, Ford is entitled to summary judgment as a matter of law

as to all of the Plaintiffs' claims.

> Respectfully submitted,
>
>
> s/ Jeffery L. VanWay
> Ellen J. Garling, Trial Attorney (0043554)
> BAKER & HOSTETLER LLP
> 65 East State Street, Suite 2100
> Columbus, Ohio 43215
> (614) 228-1541
>
>   and
>
> Jeffery L. VanWay (0069175)
> BAKER & HOSTETLER, LLP
> 312 Walnut Street, Suite 3200
> Cincinnati, Ohio  45202
> (513) 929-3400
> (513) 929-0303 – Fax
> jvanway@bakerlaw.com
>
> Attorneys for Defendant
> Ford Motor Company

## CERTIFICATE OF SERVICE

This shall certify that a true copy of the foregoing Motion for Summary Judgment was filed electronically with the CM/ECT system and duly served upon Stephen A. Simon, attorney for Plaintiffs, 22 West Ninth Street, Cincinnati, Ohio 45202, and John Hunter, Jr., attorney for ZF Batavia, Hunter & Schank Co., L.P.A., One Canton Square, 1700 Canton Avenue, Toledo, Ohio 43624-1378, by regular U.S. mail, postage prepaid on this 21st day of November, 2003.


/s/ Jeffery L. VanWay
Jeffery L. VanWay