WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 1

WESTERN STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, CINCINNATI

EVERETT W. WHISMAN, et al.,          :
          Plaintiffs                 :
          -v-                        :Case No. C-1-02-406
                                     :(Judge Beckwith)
                                     :(Magistrate Sherman)
ZF BATAVIA, LLC, et al.,             :
          Defendants                 :

- 0 -

The deposition of DAVE ADAMS, taken before
Susan K. Lee, CVR-CM, Court Reporter and Notary Public
in and for the State of Ohio, at the Holiday Inn
Eastgate, 4501 Eastgate Boulevard, Cincinnati, Ohio,
on the 15th day of October, 2003, beginning at the hour
of 11:35 a.m. and ending at 2:22 p.m. of the same date.

- 0 -

RIVERSIDE REPORTING
Certified Court Reporters
P.O. Box 949
Covington, Kentucky  41012
KY(859)291-6110   OH(513)574-7017

**COPY**

RIVERSIDE REPORTING
(859)291-6110(KY) -- (513)574-7017(OH)

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

---

**PAGE 2**

2

APPEARANCES:

FOR THE PLAINTIFF:    STEPHEN A. SIMON, Esq.
Attorney at Law
22 West Ninth Street
Cincinnati, Ohio 45202

FOR THE DEFENDANT:    JOHN J. HUNTER, JR., Esq.
Attorney at Law
One Canton Square
1700 Canton Avenue
Toledo, Ohio 43264


JEFFERY L. VANWAY, Esq.
Attorney at Law
312 Walnut Street
Suite 3200
Cincinnati, Ohio 45202-4074

ALSO PRESENT:    MR. EVERETT W. WHISMAN
MR. HERBERT HUEBNER
- 0 -

STIPULATIONS:

It is stipulated by and between counsel for the respective parties that the deposition of DAVE ADAMS, a witness herein, may be taken at this time pursuant to the Federal Rules of Civil Procedure and Notice; that the deposition may be taken via Stenomask by the Notary Public/Court Reporter, and transcribed by her out of the presence of witness; that the deposition was submitted to counsel for the witness for reading and signature.

- 0 -

---

**PAGE 3**

3

INDEX OF EXAMINATION:

By Mr. Simon......................................4

INDEX OF EXHIBITS:

144  salaried employee information meeting,
     March 5, 1999...............................33
145  accelerated design workshop report,
     February 22, 1999...........................70
146  board meeting agenda........................94
147  board meeting agenda, May 6, 1999...........97
148  board meeting agenda, September 22, 1999...100
149  board meeting agenda, May 23, 2000.........101
150  board meeting agenda, September 14, 2000...108
151  board meeting document, March 7, 2001......109
152  board meeting agenda, November 9, 2001.....112
153  board meeting agenda, November 7, 2002.....121

---

**PAGE 4**

4

1   DAVE ADAMS, called as a witness, being first duly
2   sworn, testified as follows:
3            MR. SIMON:  Mr. Adams, my name is Steve
4       Simon.  I'm one of the attorneys representing
5       Mr. Whisman, who is here, and the other 14
6       plaintiffs in the lawsuit.  This is a lawsuit
7       against ZF Batavia and Ford Motor Company.
8            THE WITNESS:  Mm-hmm.
9   BY MR. SIMON:
10      Q    Sir, have you ever had your deposition
11  taken before?
12      A    Do you mean in this suit?
13      Q    No.  Any suit.
14      A    Oh, I've done a deposition, yes.
15      Q    When was the last time you did a
16  deposition?
17      A    Oh, I don't know.  It was about a month
18  or two ago.
19      Q    Was it in the Gene Gilliam lawsuit?
20      A    Right.
21      Q    Had you ever had your deposition taken
22  before that?
23      A    No.
24      Q    Including for personal reasons?
25      A    No.

---

**PAGE 5**

5

1       Q    What is your current title, sir?
2       A    President and CEO.
3       Q    And you've held that position since the
4   joint venture was formed in 1999?
5       A    Well, at first they called me COO and
6   then they changed it to CEO, but basically it's the
7   same job.
8       Q    And the COO now is Mr. Reckmann; is
9   that right?
10      A    Yeah.
11      Q    When did he become the COO?
12      A    It would be March of last year, 2002.
13      Q    It's my understanding that before you
14  started with ZF Batavia, you had worked for ZF of North
15  America; is that right?
16      A    ZF Industries, North America, yeah.  I
17  ran the business for their transmissions down in
18  Gainesville, Georgia.
19      Q    When you say ran, were you the manager
20  of the plant?
21      A    Well, I was more than plant manager.
22  General manager title basically.  Vice-president,
23  general manager.
24      Q    Who did you report to when you worked
25  down there?

---

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 3 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 6

6

1    A    I reported to the president of ZF North
2  America and that was at the time, Jim Orchard. He has
3  subsequently gone to Visteon. Ford was our primary
4  customer. We had John Deere and -- but basically it
5  was Ford.
6    Q    How long had you worked in Gainesville?
7    A    Five years.
8    Q    How long have you worked in the
9  automotive industry?
10    A    Since I was 21 years old, 20 years old.
11    Q    Okay.
12    A    So that would be 34 years now.
13    Q    Where did you work when you were 20
14  years old?
15    A    Chrysler.
16    Q    How long did you work for Chrysler?
17    A    Ten years.
18    Q    When did you get into management?
19    A    At Chrysler.
20    Q    At Chrysler?
21    A    Yeah.
22    Q    What was the entry level position
23  there?
24    A    Entry level? You mean for management
25  or --

PAGE 7

7

1    Q    When you started at Chrysler, what was
2  your position?
3    A    They had a training program for masters
4  degree in manufacturing -- or, excuse me, in mechanical
5  engineering. It was called the Chrysler Institute. It
6  subsequently doesn't exist anymore. You went to U of M
7  and you got your masters degree and you worked there.
8  So it was a training program and you get your masters
9  degree for over a couple -- two and a half, three year
10  period.
11    Q    U of M in Ann Arbor?
12    A    No, Dearborn.
13    Q    Dearborn. Okay.
14    A    And then after that I got an MBA
15  through a similar program, but it was at Michigan
16  State.
17    Q    Okay. Where did you go from Chrysler?
18    A    From Chrysler I went to Rockwell.
19    Q    And where is Rockwell located?
20    A    Troy, Michigan. It's now called
21  ArvinMeritor. You know, the guys trying to take over
22  Dana.
23    Q    Okay. What positions did you hold at
24  Rockwell?
25    A    At Rockwell I was director of product

PAGE 8

8

1  planning. I worked at Rockwell two times, as director
2  of product planning basically, and did a joint venture
3  discussion with ZF Transmissions, interestingly enough.
4  And then, and then -- do you want to know my whole
5  career?
6    Q    Well, I want to just get some
7  highlights. Just hit some highlights.
8    A    All right.
9    Q    You held different positions while you
10  were a Rockwell besides director of product planning?
11    A    Well, that was the primary position.
12    Q    And then you left Rockwell and came
13  back; is that what I understood?
14    A    Yeah.
15    Q    Where'd you go?
16    A    To Sheller Globe.
17    Q    Sheller Globe?
18    A    Yeah. I was director of research and
19  development at Sheller Globe. And then Rockwell
20  invited me back and I became director of product
21  engineering.
22    Q    Well, let's pick up a year then. What
23  year was it that you went back to Rockwell?
24    A    Well, now you're stretching. I went
25  back -- I left Chrysler in '79. I finished at Rockwell

PAGE 9

9

1  the first time in '83 roughly. And then I went to
2  Sheller Globe for a couple of years, '85. Went back to
3  Rockwell until about '88.
4    Q    Maybe 1985 to 1988?
5    A    Yeah, right.
6    Q    We might as well cover the intervening
7  years between '88 and --
8    A    Yeah. Then I --
9    Q    -- and before Gainesville.
10    A    Then I worked for an engineering
11  company in Detroit and designed a car for Kia Motors,
12  you know, this little Sportage running around, you've
13  seen it. We designed that in Detroit for Kia. And
14  then after that, that project was done and I had to get
15  a real life and went and became a director of
16  engineering for Volvo construction equipment in North
17  America. Went to Europe for a couple of years, lived
18  in Brussels, and then decided I would come back to the
19  States and ZF offered me a job to run the Gainesville
20  facility.
21    Q    All right. Who told you about the
22  opportunity to start at ZF Batavia?
23    A    Well, I was asked to run Batavia by the
24  chairman of ZF via Mr. Nasser.
25    Q    Is that Jim Orchard or is that somebody

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 10

10

1  different?
2      A    No, no, no. It's Klaus Bleyer. Klaus
3  has subsequently retired. He runs all of ZF.
4      Q    Okay. Let's get Klaus. What's Klaus'
5  last name?
6      A    Bleyer. B-L-E-Y-E-R. And he -- we had
7  done a good job in Gainesville, excellent quality,
8  launched new products successfully and so he basically
9  asked me to come up here and run Batavia.
10      Q    Was there an interview process?
11      A    Well, yeah, five years of doing the job
12  in Gainesville right, getting a good result in the
13  business.
14      Q    When Mr. Bleyer first told you about
15  it, did you have to go and meet, for instance, some
16  people at Ford Motor Company?
17      A    No. The way we did this whole project
18  was we had a team that met. Dr. Bleyer and Mr. Nasser
19  wanted to do something together. Ford needed new
20  transmission technology and so they said, okay, let's
21  go look at this CVT opportunity. Ford had tried CVTs
22  in the past and they didn't work. They had back in the
23  early '90s a CTX in Europe and it was a disaster, and
24  so ZF had been working on the technology for a decade.
25  They said, okay, let's see if -- let's put a team

PAGE 11

11

1  together and see if there's something we can do.
2      So we had a team of Ford and ZF people
3  met for two weeks in a place in Germany and from that
4  we made a recommendation to the managements of doing
5  this joint venture. So that was in June of 1998 that
6  we did that. And as the preparation for this -- it was
7  approved by the boards of the two companies, I think,
8  roughly in October. And then as they went forward,
9  then both parties decided to contribute management
10  members to the joint venture. Ford being the minority
11  share, though, wanted to contribute the financial
12  individuals and ZF wanted to contribute the technical
13  and operational individuals.
14      So my background being engineering, I
15  was asked to be president. At the same time, Karl had
16  a good reputation -- Karl Kehr, who I think you've
17  deposed before, he was asked to be the CFO. So that
18  was the balance that was brought between the parents to
19  create the joint venture.
20      Q    Did they present -- excuse me, Dr.
21  Bleyer; is that right?
22      A    Dr. Bleyer.
23      Q    Did Dr. Bleyer at some point present
24  you with an employment agreement?
25      A    Yeah. I have a contract for employment

PAGE 12

12

1  because of the fiduciary responsibilities of the
2  company, you know, and I think you well understand,
3  being a lawyer, all of the issues that are necessary
4  for the officers of companies. So I have an employment
5  agreement, Karl has one, and it's a standard employment
6  agreement.
7      Q    Do you know if Mr. Whisman to my left
8  here has an employment agreement with ZF Batavia?
9      A    No, I don't think he does in terms of
10  the actual type of -- it's not American practice to do
11  that. We do have that for our expatriates from
12  Germany, though, because it's standard practice for
13  German citizens -- for German people to have employment
14  contracts. So what we try to do is do what -- what is
15  typical in the country, you know, where someone is
16  working.
17      Q    So as you understand it, the German
18  citizens that work for ZF Batavia in Batavia, they have
19  employment agreements?
20      A    That's correct. That's the only way
21  you'd get them to come over here to work in the United
22  States. What we've done, though, is if someone wants
23  to stay long term, you know, if they say, okay, I've
24  got my -- we encourage people, if they want to, to get
25  a green card and then we tell them, okay, if -- now

PAGE 13

13

1  you've got your green card, then you've got to stay
2  under American terms and those people then don't have
3  employment contracts.
4      So it's a -- you know, it's something you do --
5  I mean, when I went to Europe, I don't know if you've
6  worked overseas for your firm or not but, typically
7  when you go overseas you get a -- even American
8  practice is to give a contract.
9      Q    Were you present during this video
10  conference with Jack Nasser in 1998, when it was
11  publically announced that the joint venture would be
12  started?
13      A    No, interestingly enough, I was not.
14  No, I was not.
15      Q    Where were you and why weren't you
16  there?
17      A    Well, I didn't know it was occurring.
18  Okay? And I think I was down in Gainesville, but I
19  can't tell you exactly where I was.
20      Q    Any reason why -- how you've described
21  it, by the way, the formation of ZF Batavia, you were
22  definitely in on the ground floor on this, right?
23      A    That's correct.
24      Q    And how is it then when this was
25  formally announced, you weren't aware of it?

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 14

14

1  A    Because when Mr. Nasser would hold a
2  video conference, I wouldn't necessarily be aware of
3  the details of his schedule and what he was going to
4  say. Jim Orchard, I think, went and participated in
5  that, to be honest with you, because he was the senior
6  guy in North America. Jim was also party to the joint
7  venture coming together. He was the lead ZF guy at the
8  time. Okay? So Jim -- Jim went and participated in it
9  and then I heard about it after the fact.
10      Q    Well, what did you hear after the fact?
11      A    What did I hear after the fact? Well,
12 I heard that there was an issue raised about whether
13 people would be guaranteed their employment or not, on
14 the hourly side. Okay? And it was guaranteed to the
15 UAW that employees who were union people would get to
16 stay as union -- as Ford employees. And that's
17 basically the major issue that -- that came out of the
18 press conference, as I understood it, because I'm
19 reminded of that off and on by the hourly people.
20      Q    There was a guarantee that they could
21 stay Ford employees and stay in the plant?
22      A    Yes, if they wanted. If they wanted.
23      Q    And wasn't it true that initially the
24 salaried employees were told the same thing?
25      MR. HUNTER: Objection. Lack of

PAGE 15

15

1  foundation. Mr. Adams already testified that
2  he was not at the press conference, he's never
3  heard the press conference. How can he
4  possibly answer that question?
5      MR. SIMON: I'll rephrase. I'll
6  rephrase.
7  BY MR. SIMON:
8      Q    Did anyone tell you after the
9  announcement that the salaried employees had been told
10 at that meeting that they --
11      A    No. That would be entirely wrong
12 because in the process of negotiation that went on
13 months before, we were talking about how we were going
14 to transition the employees from -- the salaried
15 employees. Okay?
16      Q    So before the announcement was made, as
17 far as you know, the plan was to have the Ford salaried
18 employees to be --
19      A    Transitioned.
20      Q    -- to be transitioned to ZF Batavia
21 employment?
22      A    That's right.
23      Q    So if somebody had told the salaried
24 employees at that meeting in 1998 that they would have
25 the opportunity to stay in Batavia and remain Ford

PAGE 16

16

1  employees, that would have been factually wrong?
2      A    No, not necessarily, because they could
3  stay Ford employees for a period of time while they
4  made the decision to decide whether they wanted to stay
5  in Batavia or go elsewhere. And as it turns out -- I
6  can't remember the details -- we allowed one year and
7  then we extended it because we thought it was
8  appropriate so --
9      Q    Let me ask that again then. If
10 salaried employees were told at the 1998 announcement
11 that after the joint venture started that they could
12 remain Ford employees indefinitely, that there was no
13 one- or two-year period where they had to then
14 ultimately leave the plant, that they were -- so
15 basically if the salaried employees were told, look,
16 just like the hourlies, you can stay Ford employees and
17 stay in the plant -- if they were told that -- I
18 understand you weren't there, but if they were told
19 that, that was factually wrong, as far as you knew,
20 right?
21      MR. HUNTER: Objection. Too many --
22      THE WITNESS: Well, I don't understand
23 --
24      MR. HUNTER: Assumes facts not in
25 evidence and compound question, to the extent

PAGE 17

17

1  that he cannot answer that.
2      MR. SIMON: Let me re-ask it.
3  BY MR. SIMON:
4      Q    If salaried employees were told in 1998
5  at that announcement that they could stay Ford
6  employees as long as they liked and remain at the
7  Batavia plant, as far as you knew, that would have been
8  factually wrong, correct?
9      A    To my knowledge, they were not told
10 that.
11      Q    If they had been told that, would that
12 be factually incorrect?
13      A    Well, that's conjecture. I don't know
14 what somebody would have said or didn't say, so I don't
15 know how to answer your question.
16      Q    I'll just say it this way: As far as
17 you knew in October 1998, salaried employees were going
18 to have to make a choice, either stay in the plant as
19 Ford for a short time or leave the plant and continue
20 to be Ford employees or stay in the plant and become ZF
21 Batavia employees; is that what your understanding was
22 in October 1998?
23      A    Yeah, that would be my understanding
24 because that's what we had been negotiating for in the
25 agreements. But I guess I don't know -- I don't know

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 18
18

1   if I can ask -- can I ask a question?
2                   MR. HUNTER:  No.
3                   MR. SIMON:  Well, what is --
4                   THE WITNESS:  That's all right.
5   BY MR. SIMON:
6       Q       What are you thinking about?  Was there
7   confusion about something?
8       A       Yeah.  There's confusion because who
9   asked the question, you know?  Well, let's just go on.
10      Q       I don't understand what you're saying.
11  You have some confusion.  I understand you weren't
12  there at the October 1998 meeting, but what's your
13  confusion?
14      A       As if someone reported to the employees
15  that they were going to be able to stay Ford employees;
16  that's the question.
17      Q       Right.  And in your understanding if
18  they did, that would have been wrong information,
19  correct?
20      A       Yes, absolutely.
21      Q       All right.  Now, at some point then,
22  Mr. Adams --
23      A       I would be shocked that anybody in
24  management would say that.  That's my point.
25      Q       Okay.  Do you remember when you first

PAGE 19
19

1   visited the Batavia plant?
2       A       I visited Batavia I think it was in the
3   -- it was after we had the discussions in June, so I
4   think it would have been the summer of '98.  I can't
5   remember exactly, though, in July or August, something
6   like that.
7       Q       July and August, that's obviously
8   before the announcement was made, correct?
9       A       Sure.
10      Q       So you weren't introducing yourself to
11  people and explaining who you were; that was a secret
12  at that point?
13      A       Well, no.  I mean, there were certain
14  people that knew.  The plant manager knew what we were
15  doing.  But when I went out on the floor, I mean,
16  nobody knew who I was or what was going on and all
17  that.
18      Q       When did you first introduce yourself
19  in a group setting to the Batavia employees?
20      A       Well, we had a union trip to
21  Saarbrucken with the committee in, I think, November of
22  '98, so that would have been the first formal, okay, hi
23  guys, you know, we're here, ZF, et cetera.
24      Q       You met with the UAW officials; is that
25  what you said?

PAGE 20
20

1       A       Yeah.  The local UAW officials because
2   we wanted them to understand ZF and we took them to
3   Europe so they could understand that.
4                   MR. SIMON:  And let me just -- you said
5   you had a deposition before and you probably
6   heard this, but I just want to reiterate some
7   ground rules of the deposition.
8                   THE WITNESS:  Mm-hmm.
9                   MR. SIMON:  Whenever you can, if you
10  can give an audible answer, either a yes or a
11  no, because if you just say uh-huh the court
12  reporter can't take that down.
13                  THE WITNESS:  Fine.
14                  MR. SIMON:  So if you could do that,
15  I'd appreciate it.
16                  THE WITNESS:  Sure.
17                  MR. SIMON:  Also, wait for me to finish
18  my question before you answer and I'll do the
19  same so we're not talking over each other.
20                  THE WITNESS:  Okay.
21                  MR. SIMON:  And the final thing, Mr.
22  Adams, this is very important, if you don't
23  understand my question -- and I think you've
24  already said this at least once so far.  If you
25  don't understand my question, please ask me to

PAGE 21
21

1   rephrase, re-ask the question because if you
2   don't the transcript is going to come out with
3   a question and answer and someone reviewing the
4   transcript is going to assume that you
5   understood the question.  So if you don't
6   understand the question, you'll tell me, right?
7                   THE WITNESS:  Yeah.
8                   MR. SIMON:  All right.
9   BY MR. SIMON:
10      Q       When did you first -- you've mentioned
11  talking to hourly employees.  When did you first talk
12  to the salaried employees?
13      A       Well, there were salaried employees on
14  that trip.
15      Q       Who was on that trip?
16      A       I think Mike Warden, the labor
17  relations manager, was on that trip.  And I had talked
18  to Alain Claus, the plant manager of Batavia, before.
19  But in terms of an actual group setting when you
20  address all the salaried employees, that would have
21  been sometime in January, I think.  January or
22  February, and I can't remember exactly the date.
23      Q       Do you recall -- even though you can't
24  recall the date, do you remember a specific time where
25  you addressed the salaried employees?

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 22

22

1    A    No, to be honest with you, I can't. We
2  had a number of meetings where we talked to people.
3    Q    Just generally, what were you trying to
4  let the salaried employees know?
5    A    What I was trying to let the salaried
6  employees know was that we were going to be a stand-
7  alone company, that we were going to introduce new
8  technology, and that we were going to work together to
9  make a successful company.
10    I think -- I think another important
11  background issue is that Batavia was slated to not have
12  any products -- this is critical for Batavia. Batavia
13  was not slated to have any products after the CD4E, and
14  the CD4E was due to run out, at the time, in, I don't
15  know, the mid 2000's, here we are now. And Batavia had
16  a history of not being a very productive plant and so
17  we had a challenge to not only launch CVT, but we had a
18  challenge to -- to improve the performance of Batavia
19  as a factory.
20    MR. SIMON: You brought the today, Mr.
21    Hunter?
22    MR. HUNTER: Mm-hmm.
23    MR. SIMON: Let me refer you to Exhibit
24    74.
25  BY MR. SIMON:

PAGE 23

23

1    Q    Exhibit 74, Mr. Adams, was an exhibit
2  at a previous deposition in this case. It's an e-mail.
3  If you could just read the e-mail and I'll have some
4  questions for you.
5    A    Okay.
6    Q    I'll show you some notes from that
7  meeting. This e-mail references an upcoming meeting.
8  Do you remember meeting with the salaried employees in
9  March to discuss the issues that Mr. Warden references?
10    A    I can't -- I can't remember the
11  specific meeting, but I know there was a series of
12  meetings around this time.
13    Q    Okay. And --
14    A    We wanted the questions, as Mike has
15  indicated, ahead of time so we could think about them
16  and give, you know, answers. And we didn't -- as you
17  see, that by this time this e-mail was sent, we didn't
18  get any questions.
19    Q    What Mr. Warden relays here about
20  uncertainty, fear among the salaried work force, did he
21  report that to you as far as you recall?
22    A    Oh, sure. Yeah. There has -- there
23  had been an issue amongst the hourly, the salaried,
24  everybody because of the nature of the transition of
25  this facility. Everybody was fearful.

PAGE 24

24

1    Q    And when he writes there at the end
2  where it says We'll have a difficult time convincing
3  our salaried employees that joining the JV is positive
4  for them, did you agree with that sentiment?
5    A    No, not necessarily because he's
6  representing his experience with Ford employees. Would
7  it be difficult? I don't know. But I wouldn't -- I
8  wouldn't have agreed that it's that strong a statement.
9  Okay?
10    Q    Do you have any --
11    A    I would say that we had to work to
12  convince them to join.
13    Q    Okay. How did you work to convince
14  them?
15    A    Well, I started with a group of key
16  people that I had observed and had talked to the
17  current management at the time, Alain Claus and his
18  team, that were very capable, competent individuals and
19  went to those six guys, had a dinner with them, and we
20  had five or six guys and we had a discussion about what
21  we wanted to try to do in the JV and they would go out
22  and talk to the rest of the workforce and talk about
23  the future and what we could do with not only the CVT
24  but, you know, trying to turn the current business
25  around.

PAGE 25

25

1    Q    And the five or six people you
2  referenced, those were Ford employees, right?
3    A    Yeah, right.
4    Q    Did that include Alain Claus?
5    A    No. Alain -- Alain had already planned
6  to go back to Europe. He was French and his plan was
7  to go back to Europe. No. This -- this is Rick
8  Williams, Hassan Saleh, let's see, Greg Exner. Let me
9  think. I can't remember if Ron Clark was in that
10  group. I'd have to ask these guys who -- we went over
11  to dinner in the Italian restaurant over in Beechmont
12  and talked about what we wanted to try to do.
13    Q    Would Gerry Priest have been one?
14    A    Gerry could have been, but I -- to be
15  honest with you, I can't remember. I definitely
16  remember Hassan, Rick and Greg.
17    Q    Mr. Williams, Mr. Exner and Mr. Saleh?
18    A    Yeah, right.
19    Q    And one of the things you discussed --
20    A    I think Mike Warden could have come
21  with us then, too, yeah.
22    Q    And Mike Warden, of course, also was
23  with Ford and still is with Ford?
24    A    Right, right.
25    Q    And I suppose you were relying on these

RIVERSIDE REPORTING
(859)291-6110(KY) -- (513)574-7017(OH)

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 26

26
```
 1   managers to help you identify who you should give
 2   offers to?
 3        A     Yeah, in that it was -- well, no. We
 4   had -- I think we had a different process about who we
 5   should give offers to. Okay? We asked the Ford
 6   management team that ran the factory roughly through
 7   August, when Alain left, to identify the people -- that
 8   management team to identify the people we should give
 9   offers to.
10        Q     And that's a different group of people
11   than --
12        A     Well, obviously, there can be some
13   overlap because Rick and Hassan and Greg were not at
14   the level of the management team of the factory but
15   below it, so there could have been some dialogue
16   between, you know, those groups. But basically the
17   previous Ford management team was asked to comment who
18   should be -- because we didn't know, you know, we're
19   new there, and who should get offers and who shouldn't
20   get offers.
21        Q     So part of that group of Ford
22   management team that would help you identify which
23   salaried people to give offers to, that would have
24   included probably Mr. Marinetti?
25        A     It could have, yeah. It could -- yeah,
```

PAGE 27

27
```
 1   Glen was the production manager at the time, sure.
 2        Q     And that would have included Mr. Claus?
 3        A     Yeah, Alain Claus, correct.
 4        Q     Getting back to that group that you
 5   went to the restaurant with then, I guess then what
 6   your discussion with them was that here's our ideas on
 7   the joint venture, here are the possibilities, you
 8   talked about the CVT I'm sure, right?
 9        A     Sure.
10        Q     And then what you wanted that group of
11   people to do is fan out to the plant and talk about the
12   opportunities at the JV with the lower-level salaried
13   people; is that fair?
14        A     Yeah, yeah. These guys were leaders.
15   I had seen how they had demonstrated their leadership
16   capabilities and they were influential people in the
17   organization and they could go and talk to other
18   colleagues about joining the joint venture. That was
19   the idea.
20        Q     I mean, these individuals obviously
21   weren't supposed to go out and bad-mouth ZF Batavia;
22   they were supposed to talk about the opportunities and
23   --
24        A     Well, they could obviously express any
25   opinion they wanted. They had at that time indicated
```

PAGE 28

28
```
 1   they wanted to join, so one would assume that they
 2   would go and not bad-mouth but encourage people to
 3   join.
 4        Q     So if other salaried employees, lower-
 5   level salaried employees, testified in this case that
 6   in 1999 people like Rick Williams, Gerry Priest, Hassan
 7   Saleh came up to them and told them about the positive
 8   opportunities at ZF Batavia and why they should join,
 9   that wouldn't come as a surprise to you?
10        A     Say -- state that again, please.
11        Q     If somebody in this case testified that
12   in 1999, before this person joined ZF Batavia, that
13   Rick Williams came up to them and said _ZF Batavia will
14   be great opportunities. We've got the new CVT
15   technology,_ and talked up the opportunities at ZF
16   Batavia, that wouldn't come as a surprise to you?
17        A     No, it wouldn't.
18        Q     It would be consistent with the kind of
19   things you talked about at the restaurant with this
20   group of people?
21        A     Yeah, I think so. Mm-hmm.
22        Q     And to be fair, there was concerns
23   among the group how ZF Batavia employment would be
24   different than Ford employment?
25             MR. HUNTER: Is that a question?
```

PAGE 29

29
```
 1             MR. SIMON: Yeah.
 2             THE WITNESS: It sounded like a
 3        statement. Please make a question.
 4             MR. SIMON: And just for the record,
 5        Mr. Whisman, who was here earlier, had to leave
 6        and I may have been distracted as I asked that
 7        question.
 8             THE WITNESS: Okay.
 9   BY MR. SIMON:
10        Q     As you understood it, the salaried
11   workforce, there were concerns about if they joined ZF
12   Batavia, how that would be different than their then
13   current employment at Ford Motor Company?
14        A     Oh, yeah, that was a question in their
15   minds at the time. They had questions, yeah, what's
16   life going to be for me under ZF Batavia versus Ford,
17   sure.
18        Q     And is that something that you talked
19   about with this group, Rick Williams, Greg Exner, et
20   cetera?
21        A     To be honest with you, I can't remember
22   specifically if we got into that type of discussion.
23   What we did talk about was the potential with the CVT
24   and, you know, what the future would hold for -- for
25   people.
```

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 30

30

1    That -- that subject obviously came up
2  over time in terms of questions, anybody asking me
3  well, what's it going to be like here, what's it going
4  to be like there? Okay? But I can't tell you
5  specifically at any one conversation, at any one time,
6  who asked what question when. Okay?
7    Q    Do you know if it was conveyed
8  generally to the salaried employees that for the most
9  part the terms of their employment, in terms of
10  compensation and their pay, that would be the same as
11  it was at Ford?
12    A    Obviously, if we're going to get people
13  to join us, you have to pay them the same amount of
14  money, right? If you don't pay them the same amount of
15  money they got paid at Ford, if you paid them less,
16  they weren't going to join you. So the concept was,
17  yeah, pay them roughly, you know, the same amount of
18  money for the Ford transition employees. And we had to
19  make up for benefit losses, so we paid them an
20  increment above because the benefits in Batavia are
21  less than Ford would give, right? So we gave them a
22  one-time shot of money that made up for those benefit
23  differences.
24    So when they accepted that money, they
25  knew they were going to have less of a benefit program

PAGE 31

31

1  than they had under Ford so -- okay? Because the
2  benefit program had to be the same for all salaried
3  employees, so there would be a kind of take-away
4  scenario on benefits and then we'd would hold their --
5  obviously their salary.
6    Q    And when you're talking about --
7    A    So -- so I think that's a very
8  important point. When people joined Batavia, they knew
9  that there was going to be a take-away. Okay?
10    Q    The --
11    A    And they accepted the money, the one-
12  time cash settlement, to make up for that difference.
13    Q    The one-time cash settlement, are you
14  referring to the transition bonus?
15    A    Yeah, right.
16    Q    Even though you're calling it one-time,
17  it was actually paid out over a period of years?
18    A    Yeah, yeah. That's because someone
19  could take it all at once and then leave, so you paid
20  it over time so that they stayed and, you know,
21  justified that they should receive it.
22    Q    And the benefits that were going to be
23  different at ZF Batavia --
24    A    Yeah.
25    Q    -- would include there was going to be

PAGE 32

32

1  a 401(k) plan instead of the pension plan that they had
2  at Ford, correct?
3    A    Right.
4    Q    There was going to be different health
5  care benefits?
6    A    Right. And I can't really tell you the
7  specific details, but there was a calculation that was
8  done for every employee based on their seniority and
9  what their benefit package was at Ford and then a
10  calculation was made. I think even leases cars were
11  factored into it to some degree and -- and here's the
12  amount of money that is, you know, your due if you
13  transition, to make up for the loss of benefits in the
14  future.
15    Q    The loss of benefits that the
16  transition bonus was for would include 401(k) instead
17  of pension, correct?
18    A    Yeah.
19    Q    A difference in health care benefits,
20  correct?
21    A    Right.
22    Q    And then a difference in -- they lost
23  the A plan, this leased car benefit, correct?
24    A    Right, right.
25    Q    Is there any other benefit that they

PAGE 33

33

1  lost, to your knowledge, that the transition bonus paid
2  for?
3    A    To be honest with you, not -- not that
4  I'm aware of, but there could be. I mean, there could
5  be some details because I'm not a benefits expert.
6    Q    But as you sit here, you thought those
7  were the ones?
8    A    Yeah. The primary ones, yeah.
9  Retirement was a big issue obviously.
10    Q    Let's --
11    A    So, I mean, in summary to your
12  question, all I want to say is when people thought
13  conditions were going to be the same, I guess you could
14  say yes and no. I mean, they knew that we were going
15  to try and maintain their salary, you know, we weren't
16  going to pay people less, but when it came to benefits,
17  there was a different circumstance. And anybody that
18  accepted that payment would have accepted the idea
19  there were differences, right?
20    Q    I'm going to hand you a document --
21    A    So conditions -- so conditions couldn't
22  be exactly the same; I guess that's what I'm trying to
23  say.
24    MR. SIMON: This is a document we'll
25  mark as Exhibit 144. You can keep that and

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 34

34

1      this is for your attorney.  And, again, the
2      number is going to be 144.
3   BY MR. SIMON:
4      Q      Take as long as you need to familiarize
5   yourself with this exhibit, Mr. Adams.  It's six pages
6   long.  It was -- it looks like it was produced by Ford
7   in this litigation.
8      A      This was made by -- this was made by
9   Ford in the -- I mean --
10      Q      The number there at the bottom, where
11   it says EUWW1 --
12      A      Yeah.
13      Q      -- that indicates to me that Ford Motor
14   Company produced this document to us in the case.
15      A      Okay.
16      Q      I'm not suggesting that Ford Motor
17   Company prepared the document.  I was just giving you
18   extra information there.
19      A      Yeah.  I remember we had a meeting with
20   these fellows.
21      Q      Okay.  Does this help refresh your
22   memory about the meeting, to flip through the --
23      A      Yeah.  Let me -- let me read it.
24      Q      Oh, I thought --
25      A      Let me read it.  I'm not done yet.  I

PAGE 35

35

1   just -- when you said it was produced by Ford, I just
2   wanted to try to understand what you meant by that.
3          There's an error here in this.  I never
4   said the plant manager for ZF Batavia would be a
5   female.  What I said is the plant manager for
6   Gainesville who was replacing -- when I left, you know,
7   would be a female, so this is an error.  Okay?
8      Q      You've had an opportunity to read every
9   page of that?
10      A      Yeah, right.
11      Q      And you pointed out what you believe to
12   be an error in that last sentence on the final page?
13      A      Yeah.
14      Q      Any other errors that jumped out at
15   you?
16      A      No, not really.
17      Q      Did you ask Mr. Warden or anybody else
18   to take minutes of this meeting or create this
19   document?
20      A      No.
21      Q      Have you ever seen this document
22   before?
23      A      To be honest with you, I can't tell you
24   that I saw it or didn't see it.
25      Q      You just don't remember?

PAGE 36

36

1      A      I just don't remember, no.
2      Q      Did you --
3      A      I -- let me put it -- if I would have
4   seen it, this comment would have jumped out and I would
5   have had it corrected, so I believe maybe I haven't
6   seen it because I did not say and would not say that
7   the plant manager for ZF Batavia would be female
8   because that -- that's not correct.  The plant manager,
9   you know, is a male.  And the female is Elizabeth
10   Umberson (phonetic), who became plant manager in
11   Gainesville.
12      Q      Just so I understand, why would you
13   have told people about that?
14      A      Because they asked about diversity and
15   ZF, you know, a German company and all that.  There is
16   some fear, you know.  We tried to take over Allison
17   Transmission a number of years ago and there was a big
18   brouhaha about this German company taking over an
19   American, you know, company, et cetera, et cetera.  And
20   so I -- what I wanted to have people understand was
21   that diversity is an American issue.  It's not maybe so
22   much sensitive in Germany as it is in the United
23   States, but we would be sensitive to this issue.
24      Q      And when you said the plant manager was
25   going to be female, did you know about this specific

PAGE 37

37

1   woman or was that just a plan in Gainesville to have a
2   female replace you?
3      A      No, no, no.  The woman I had
4   recommended was -- and Elizabeth runs the factory
5   today.  She's an American-Asian woman.  She's very
6   good.  And she was the purchasing manager and she ran
7   -- she runs the factory today.  She was promoted into
8   that position after I left.
9      Q      Did you review any documents in
10   preparation for this deposition today?
11      A      Yeah.  I had a couple of documents that
12   John showed me before we came in.
13      Q      Which documents were those?
14      A      It wasn't this one.  It wasn't this
15   one.  Let's see.  It was one that was a document that
16   had a series of exchange of e-mails.
17      Q      What were the e-mails about?
18      THE WITNESS:  Do I answer this?
19      MR. HUNTER:  You can tell him what you
20   reviewed, yes.
21      THE WITNESS:  Oh, okay.  It had to do
22   -- let me think.  It had to do with the issue
23   on a discussion I had with Mark Bugjaski, about
24   AIP, et cetera, yeah.
25   BY MR. SIMON:

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 38
38
```
1       Q       Is this the e-mail where Mark Bugjaski
2    -- he used the phrase manufacturing pukes?
3       A       Yeah, right.  Which, when I saw the e-
4    mail today for the first time, I said that's totally
5    inappropriate.
6       Q       Had you used the phrase manufacturing
7    pukes?
8       A       Never, never, never.
9       Q       Had you said that you wanted the
10   salaried employees that worked in production to feel
11   some pain in terms of --
12      A       Sure.
13      Q       -- the AIP?
14      A       Sure.  Because the problem that we've
15   got is I've got a full company in which I've got
16   product engineers, I have finance people, and basically
17   our -- all our incomes, including mine, is dependent
18   upon the performance of the factory floor.  Okay?  We
19   don't get paid based on did we do a good job with
20   respect to, you know, customer relations and marketing
21   or did we get this prototype built in time.  But those
22   people put in hours, right, they're important to the
23   success of the company.  So when manufacturing
24   underperforms, all functions suffer.  Okay?  And
25   manufacturing, during this period of time when we got
```

PAGE 39
39
```
1    going, was underperforming significantly and so I
2    wanted manufacturing to understand that there was going
3    to be financial pain as a result of their lack of
4    performance and I wanted people to delineate between
5    who was performing and who was not performing.
6       Q       And the period of time we're talking
7    about is 2002, in calculating the AIP bonus for 2001;
8    is that right?
9       A       Yeah,  in that time frame.  Yeah.
10   Because we had very, very serious productivity issues.
11      Q       And so for those individual salaried
12   employees that you thought were underperforming, you
13   wanted them to either have no AIP bonus or a lower AIP
14   bonus as a result of that individual performance?
15      A       No, no.  What I was most frustrated
16   about, quite frankly, was that when I observed the
17   incomes of certain manufacturing supervisors, primarily
18   those people running production operations, had doubled
19   their income, okay, and they had a huge conflict of
20   interest because when they paid money to the hourly
21   employees to work overtime, they would obviously
22   collect money for themselves.  And there were
23   individuals that when it came to my attention were
24   earning double their income as a result of -- as a
25   result of their lack of performance, I felt that that
```

PAGE 40
40
```
1    was a strong indication if they had to work so many
2    hours overtime, that they weren't performing properly.
3    And they had taken their money away from the company
4    two ways:  by giving it to hourly employees to work,
5    and secondly, scheduling themselves for inordinate
6    overtime.  And as a result of that, in terms of
7    incentive compensation, weren't justified incentive
8    compensation to the degree that other people were in
9    terms of the engineers that were working the hours in
10   the CVT lab planning for the future.  Okay?
11      Q       So if a group leader in 2001 had
12   worked, in your mind, excessive overtime --
13      A       Doubled their income.
14      Q       -- you wanted their AIP bonus either to
15   be reduced or eliminated entirely as a result of that?
16      A       It was a judgement made by the, you
17   know, manufacturing operations management.
18      Q       I mean, that was your recommendation?
19      A       Yeah, right.
20      Q       So that's what -- when we're talking
21   about you wanted them to feel some pain, that's what
22   we're talking about?
23      A       Yeah.
24      Q       That's it?
25      A       Yeah.  Because they had taken so much
```

PAGE 41
41
```
1    money away from the company by their overtime
2    scheduling and their lack of performance in making
3    transmissions during the week.
4       Q       Did the managers of their departments
5    receive less AIP bonus as a result of that?
6       A       You mean the -- the director of
7    operations at the time, did he receive less?
8       Q       Yeah.
9       A       No.
10      Q       What about, let's say, the director of
11   the maintenance department?
12      A       Well, you should understand, they
13   received less because of a lack of performance.  You
14   understand how it works?
15      Q       You're saying that because --
16      A       There's a formula that says, okay,
17   we're all going to get paid so much money.  So when --
18   when the operation underperforms, everybody in the
19   facility gets paid less money, right?  So by that, I
20   got paid less, the director of operations got paid
21   less, correct?
22              Now, when you get down into operations,
23   what we need to understand is there were people that
24   were doubling their income, right?  Doubled their
25   income through overtime.  When I saw that, I said this
```

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 42

42

1  was not fair. If these people had doubled their
2  income, why should they be paid incentive compensation,
3  AIP bonus, on top of that when they've already taken
4  more than they could ever -- I mean, if we compare AIP
5  to the amount of money that they took away working
6  overtime, okay, AIP is a relatively small piece
7  compared to the significant amount of money they took
8  from the overtime. And it's a conflict of interest
9  because they schedule their own overtime to some
10 degree. You know, they have to have the approval, but
11 if they don't make the parts, they've got to work the
12 overtime, right? So then the hourly people also get
13 the overtime.
14             So we were pouring money out of
15 Batavia, and this was the history of Batavia in terms
16 of lack of productivity. Okay? Batavia had achieved
17 some cost reduction, but it was basically outside
18 efforts in material and what have you that had taken
19 the costs down.
20             So, yeah, I felt very, very strongly
21 that, you know, if we were going to be successful, we
22 couldn't have the circumstance where we were having
23 people double their incomes based on overtime.
24       Q       Do you know how many of those people
25 that had significant amounts of overtime were working

PAGE 43

43

1  overtime because their supervisor required them to?
2       A       No, I don't.
3       Q       Would that have made a difference in
4  your judgement about whether they should receive an AIP
5  bonus?
6       A       Yeah, in certain instances it could be.
7  Yeah.
8       Q       Do you know if that kind of analysis of
9  whether the employee who had a lot of overtime was
10 required to work -- do you know if that analysis was
11 ever utilized in figuring out their AIP bonus?
12      A       Well -- well, I think then you've got
13 two issues, right. AIP is not only were these people
14 working a lot of overtime. Okay? AIP is also related
15 to what their performance is. Okay?
16             So my frustration was that people were
17 taking significant amounts of money away from the
18 company through scheduling themselves in overtime and
19 at the same time there is this issue of what is their
20 performance in that context.
21      Q       How did you know -- you obviously
22 reviewed some numbers in 2002 and saw that there were
23 --
24      A       I reviewed some numbers, and I can't
25 tell you specifics of people --

PAGE 44

44

1       Q       Sure.
2       A       -- but I said conceptually, guys, we
3  have a problem. And so I gave direction to go do an
4  analysis and look at performance and look at overtime,
5  okay, and -- and rectify this issue so that people
6  would find in the future that AIP was going to be paid
7  for performance and that we were going to make
8  production during the week, make schedules during the
9  week, as we do today. Okay?
10            I mean, I think what's significant is
11 -- is Batavia has turned around. Okay? We have taken
12 over a hundred dollars out of the cost of a
13 transmission and we've taken -- in terms of labor
14 hours, we have taken out on the order of 1.3 hours on
15 average since Ford ran the factory. And so what had to
16 happen was operations had to understand, quite frankly,
17 that the business was going to die if we didn't rectify
18 this overtime issue.
19      Q       Didn't your cost per transmission,
20 hours per transmission actually improve in 2001?
21      A       Over time it's improved. I can't give
22 you the specific -- no, no, no. We had a -- we had a
23 blow-out and I can't tell you exactly. Our costs
24 actually went up and then they went down. When we --
25 when we were doing the -- in 2000 they had gone up, and

PAGE 45

45

1  I can't give you the details. 2001 then they went down
2  after that. But you must understand, the improvement
3  in overall cost has primarily been driven by reductions
4  in material and other costs. Okay? We've got
5  improvements in labor, okay, but labor, as I reviewed
6  just yesterday, is still an unfavorable variance in
7  terms of our business plan. We're still struggling
8  with the productivity issue because we're -- our
9  standard labor hours per transmission are supposed to
10 be on the order of 4.7 to 4.9 and we're still running
11 on the order of -- average of around six this year, but
12 we did get down to 5.5 in recent months. Okay?
13            So, I mean -- but basically the history
14 of Batavia is Batavia was seen at Ford as a very, very
15 unproductive factory where the standard labor hours
16 have never been achieved. And we still, even in the
17 joint venture, haven't achieved it, but we're
18 gradually, you know, after four years getting down
19 there where we are viable. And the work -- and the
20 work practices in Batavia have been pathetic in terms
21 of historically trying to achieve those numbers.
22      Q       When did you first during -- actually
23 we'll start in 1998, moving to 1999.
24      A       Mm-hmm.
25      Q       When did you become advised of what the

RIVERSIDE REPORTING
(859)291-6110(KY) -- (513)574-7017(OH)

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 13 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 46
```
46
1   work practices --
2       A     Well, I --
3       Q     Hold on.  Let me just finish my
4   question.
5       A     Sure.
6       Q     In 1998, 1999, when did you first
7   become aware of the work practices and, if you will,
8   underperformance of the Batavia plant?
9       A     I think it was told to me in general
10  when we were doing the planning for the joint venture,
11  but there were no specifics really given from Ford.
12  Okay?  Then we got there and then during the -- during
13  the first six months in which I was in Batavia and
14  worked with the Ford team, I began to become aware of
15  the serious productivity issue in terms of labor hours.
16          And then -- and then we launched the
17  Escape transmission, which is a version of the CD4E and
18  it became very, very apparent during this launch phase,
19  for a number of reasons both planned and unplanned,
20  that we had a serious productivity issue.
21      Q     We have moved away from Exhibit 144.
22      A     Sure.
23      Q     I'm going to try and direct your
24  attention back to that.
25      A     Right.
```

PAGE 47
```
47
1       Q     I guess you told the people -- and this
2   meeting, as far as you recall, was attended by a large
3   number of salaried personnel?
4       A     Yeah.  I think this -- I can't remember
5   for sure whether it was in the special events room or
6   cafeteria, but it was one of those two locations.
7       Q     And let me finish my questions, Mr.
8   Adams.  It's fine that -- in a normal conversation that
9   would be fine, but I want to finish my questions --
10      A     Sure.
11      Q     -- so the court reporter has them down.
12      A     Okay.
13      Q     You spoke of -- it says in the notes
14  here that you spoke of a three-legged stool.  You made
15  an analogy to that in the meeting.
16      A     Mm-hmm.
17      Q     And I've heard that in other
18  depositions.
19      A     Sure.
20      Q     What was the three-legged stool analogy
21  that you made, if you remember?
22      A     Well, it's these -- it's these three
23  items, okay, business structure -- I mean, we have to
24  have a viable structure for the company.  Are we going
25  to have the financial support, et cetera.
```

PAGE 48
```
48
1   Advanced technology, that's the CVT because the -- as
2   the industry goes forward, there's considerable change
3   in transmission technology occurring, and Batavia would
4   be able to participate in that change in technology,
5   which would help create job security for the future.
6   And then commitment of the employees to the launch of
7   the CVT, as well as the current product, CD4E, improve
8   that.
9       Q     All right.  If you turn to the third
10  page of the document where it says in the middle,
11  category four, what about our pension plan, do you see
12  that?
13      A     Yeah.
14      Q     It says Dave Adams made the statement
15  there will be a pension plan.
16      A     Right.
17      Q     Do you recall telling salaried
18  employees that, look, there's going to be a pension
19  plan?
20      A     Well, here, specifically what does
21  pension plan mean?  I mean, basically people were
22  concerned about what happens to my Ford pension.  Okay?
23  What I was trying to say to them, don't worry, we are
24  going to recognize that you have a Ford pension so that
25  you will not lose any benefit as a result of that and
```

PAGE 49
```
49
1   we're going to try and figure out how we're going to
2   make a go-forward, make-sense program for you.  Okay?
3   And subsequently we've done that.  And there were many
4   people that understood that after we put those details in
5   place and signed up because the plan makes sense to
6   them.
7       Q     And turning to another statement here
8   on page four --
9       A     Yeah.
10      Q     -- which is actually, it says category
11  five.
12          MR. HUNTER:  On what page?
13          MR. SIMON:  Page four, category four at
14      the top, line three.
15  BY MR. SIMON:
16      Q     Do you see where it says Dave Adams
17  expressed, quote, unquote, _Employees do not need to be
18  afraid that they will be harmed financially_?  Do you
19  see that?
20      A     Right.
21      Q     Do you recall making that comment?
22      A     Yeah, I could have said that because
23  what I was trying to convince people was that we had a
24  program here.  Your salary is going to be the same.
25  We're not going to take salary away from you.  You have
```

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 50

50

1  a change in benefits, like we talked about earlier in
2  this deposition, right, and we're going to make you
3  whole on that. So basically, if you join the joint
4  venture, you're not going to be harmed financially in
5  terms of the going-in position of what your
6  expectations should be.
7          Q     And I guess when you said these things
8  about the pension plan and _Employees do not need to be
9  afraid they'll be afraid financially,_ I mean, your
10  word was good, right?
11          A     Sure.
12          Q     And you expected the employees to rely
13  on what you were saying, correct?
14          A     Sure. And -- and --
15          Q     I think we --
16          A     Well, just a minute. May I add to
17  that?
18          Q     Sure.
19          A     They also had an opportunity, as these
20  plans were identified, to study those plans and ask
21  questions and then make a judgement based on the
22  specifics after their study of whether they wanted to
23  do it or not. Okay? And from that study each
24  individual could make a decision whether they wanted to
25  join the company or not.

PAGE 51

51

1          Q     I think that's a good segue. If we
2  could look at Exhibit 2 and 4 jointly. Exhibit 4 is
3  the May 27th materials. Take as long as you need to
4  familiarize yourself with these documents. Exhibit 4
5  is a little bit longer, Mr. Adams, but take as long as
6  you need.
7          MR. HUNTER: You want him to go through
8  both of them now, Steve?
9          MR. SIMON: He can.
10  BY MR. SIMON:
11          Q     And for Exhibit 4, I'm not going to ask
12  you is everything accurate there. I just want to see
13  if it jogs your memory about the meeting. That's all
14  I'm looking for. But take as long as you like.
15          A     Well, to be honest with you, I can't
16  remember that I was in this meeting. I might have been
17  in Europe at the time. So -- but I do know this
18  meeting was held, obviously.
19          Q     Let me try to take this in order. Have
20  you looked at Exhibit 4 and Exhibit 2 in preparation
21  for your deposition?
22          A     No.
23          Q     You mentioned an e-mail that got us off
24  on a tangent that you reviewed before your deposition.
25  Any other documents that you recall you reviewed in

PAGE 52

52

1  preparation for your deposition today?
2          A     No.
3          Q     Are there any other meetings at all
4  that you remember talking -- where you talked to the
5  salaried personnel who were considering joining ZF
6  Batavia? I've shown you Exhibit 144 --
7          A     There are elements of this document
8  that I've seen before. You know, it's not that I've
9  not seen this document before.
10          Q     Okay. But you didn't -- you mean
11  Exhibit 4?
12          A     I mean, no, I didn't go through and
13  study either of these exhibits, you know, trying to
14  say, okay, I remember this detail, that detail, et
15  cetera.
16          Q     I mean, did you even look at Exhibit 2
17  in preparation for your deposition?
18          A     This one?
19          Q     Yes.
20          A     No.
21          Q     And Exhibit 4 you don't recall looking
22  at either?
23          A     I've seen elements of this document
24  that I think maybe John showed me, but I can't say this
25  document I saw and reviewed.

PAGE 53

53

1          Q     Okay.
2          A     Would it help if I described how we're
3  organized in terms of preparation?
4          MR. HUNTER: Well, no.
5          THE WITNESS: Okay. All right.
6          MR. HUNTER: We aren't going to waive
7  privilege on that one.
8  BY MR. SIMON:
9          Q     I just want to know about every
10  document that you looked at when you were preparing for
11  the deposition.
12          A     No, no. I mean, fundamentally no.
13  Okay?
14          MR. SIMON: Did he look at any
15  documents, Mr. Hunter, that have not been
16  produced in the case?
17          MR. HUNTER: Oh, no.
18          MR. SIMON: Do such documents exist?
19          MR. HUNTER: You've got 5500 pages.
20  Okay?
21          MR. SIMON: All right.
22  BY MR. SIMON:
23          Q     When did you first see Exhibit 2?
24          A     Exhibit 2?
25          Q     That's the tri-fold brochure.

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 15 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 54

54

1    A      Yeah.  I -- I saw this exhibit some
2  time during the spring of 1999.  It was prepared by the
3  benefits people.  And obviously I reviewed it, didn't
4  really think that much about it because it didn't
5  impact what I was trying to do.  We had -- we had --
6  we've got an organization of benefits people, and Karl
7  Kehr, who is transitioning and very sensitive to the
8  transition employees, was the primary creator of these
9  documents because he was the person that knew what it
10  was like to go from a Ford circumstance to a ZF
11  circumstance.  I'm ZF, right?  So there was no need for
12  me, other than making sure that Karl was confident that
13  these things are fair and equitable, to get involved in
14  much detail.
15    Q      And Karl told you that they were fair
16  and equitable?
17    A      Yeah.  Yeah, I think so.
18    Q      Let's stay with Exhibit 2.  I'm not
19  trying to flood you with documents, but --
20    A      Mm-hmm.
21    Q      -- I'm just trying to see what meetings
22  you were at.
23    A      Okay.
24    Q      And some of Exhibit 4 covers the same
25  ground as Exhibit 2, so that's why we've been looking

PAGE 55

55

1  at them jointly.  But Exhibit 2, like I said, was a
2  tri-fold brochure, even though we printed it off as two
3  documents.
4    A      Sure.  I remember there was a document
5  that was prepared for the Ford employees like this,
6  yeah.
7    Q      And turning to the second page then --
8    A      Okay.
9    Q      I assume Mr. Kehr then, at some point,
10  went over this brochure with you, as you've described
11  it?
12    A      Mr. Kehr gave me this brochure for my
13  study.  I looked at the brochure, read it at the time,
14  and he asked me if, you know, are there any questions.
15  And I really had no questions because, again, I wasn't
16  -- I mean, keep in mind, I was not transitioning from
17  Ford to ZF, so in my gut I wouldn't know what's
18  important other than, yeah, roughly want to make the
19  same money, is my pension going to be taken care of,
20  and, and, and -- but, you know, so --
21    Q      As you review Exhibit 2, that second
22  page, you see 401(k) savings plan, right?
23    A      Yeah.
24    Q      And you knew that that was something
25  new to the Ford employees that they didn't have at ZF

PAGE 56

56

1  Batavia -- at Ford, right?
2    A      No.  To be honest with you, I didn't
3  realize Ford employees, until around this time, didn't
4  have 401(k) plans.  I just thought everybody had 401(k)
5  plans because that's all I've ever had.
6    Q      Okay.  Let's look at the upper left
7  part of that second page where it says competitive
8  compensation; do you see that?
9    A      Yeah.
10    Q      And it has a heading that says salary.
11    A      Mm-hmm.  Right.
12    Q      And it says "Base salary starting at
13  your current Ford salary."
14    A      Yeah.
15    Q      Now, you knew that to be correct?
16    A      Yeah, right.
17    Q      "Broad banding replaces salary grades."
18    A      Yeah.
19    Q      As you understood it, Ford had salary
20  grades and at ZF Batavia these employees would be under
21  a broad banding system?
22    A      Yeah.  Right.
23    Q      Do you see where it says _Authorized
24  overtime will be paid_?
25    A      Right.

PAGE 57

57

1    Q      And you understood that at Ford these
2  salaried employees had been paid authorized overtime?
3    A      Sure.
4    Q      And that policy was going to stay the
5  same?
6    A      Well, that's the same in ZF.  Any
7  company, authorized overtime, you pay it, right.
8    Q      All right.  Do you know if Mr. Kehr or
9  anybody else, to your knowledge, communicated to the
10  salaried employees that look, overtime policy at ZF
11  Batavia is going to be the same as it was at Ford?
12    A      At what time?  Because Ford's overtime
13  policy is constantly changing, so --
14    Q      Well, then let's start with 1999.
15    A      Okay.  Could you ask your question
16  again, please?
17    Q      Sure.  In 1999, to your knowledge, were
18  salaried employees told that the overtime policy at ZF
19  Batavia is going to be the same as it was at Ford?
20    A      No.  I didn't -- I didn't know whether
21  they were told that or not.
22    Q      Did you ever tell anybody that?
23    A      Because I didn't know the Ford policy.
24  Okay?  And Ford -- Ford has also somewhat different
25  rules in different plants, too.  So for me to say

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 58
```
                                                      58
1    categorically I knew that to be said, no, I can't say
2    that I would.
3         Q      But, to your knowledge, would it have
4    been accurate information?
5         A      Well, generally -- I mean, we're trying
6    to convince people to come and join the company, so
7    we're basically trying to say to them you're roughly
8    going to be compensated like you were before.  All
9    right?  That's the idea.  That's the concept.
10        Now, if we get into the details, I'm
11   not going to be, you know, capable of answering any
12   specific question with regard to that.  Okay?
13        Q      All right.  But generally what you were
14   trying to communicate to the salaried employees was
15   your terms of your compensation and benefits are going
16   to be the same as it was at Ford, except
17   for certain examples like 401(k), health benefits, loss
18   of the A plan; is that fair?
19        MR. HUNTER:  Object to the
20   characterization.  That is not Mr. Adams'
21   testimony.
22        MR. SIMON:  I think that's coaching the
23   witness.  I think he can answer the question.
24   It was just a question.
25        THE WITNESS:  Okay.  In general, what
```

PAGE 59
```
                                                      59
1    we were trying to tell people is that we were
2    going to have fair and equitable policies.
3    Okay?  And that your income is going to be
4    derived in similar circumstance as it was at
5    Ford.  Okay?
6         However -- however, I think it's also
7    important to point out here that there's an
8    annual incentive plan and the reward program
9    will be based on your success determined by
10   product quality, timing, delivery, existing
11   products and profitability.  Okay?  And we were
12   going to stress AIP in Batavia as a motivator
13   for performance to a higher degree than
14   historically had been done by Ford.
15   BY MR. SIMON:
16        Q      So it was your understanding of the AIP
17   that whether someone gets the AIP bonus in any given
18   year at ZF Batavia will be based in part on their
19   individual job performance?
20        A      It has to be based on -- on
21   performance.  As we -- as we got in -- no.  As we got
22   into the circumstance, we would have greater and
23   greater emphasis on AIP because the first years were
24   defined to some degree.  The first year of operation
25   was managed by a Ford management team.  And as we got
```

PAGE 60
```
                                                      60
1    into the circumstances over time, we'd know better how
2    people were going to be compensated, based on their
3    performance.
4         Q      It was your understanding in 1999 that
5    the AIP bonus would be awarded going forward -- at
6    least one or two years out going forward would be tied
7    to individual performance?
8         A      Yeah.  Right.  Correct.
9         Q      You see where it says annual incentive
10   plan on the brochure, correct?
11        A      Right.
12        Q      Does it say there that the bonus is
13   going to be tied to individual performance?
14        A      Well, it's tied to profitability, which
15   is tied to the overall result of the company.  Okay?
16        Q      Has anyone told you that at Ford they
17   had a bonus that was based on the plant performance?
18        A      No.
19        Q      Do you have any idea how the bonus was
20   awarded at Ford?
21        A      No.  I can tell you how we did it in
22   ZF.  It was based on individual performance.  Okay?
23        Q      Did you verbally tell anybody, that you
24   recall as you sit here, that the AIP would be based on
25   individual performance?
```

PAGE 61
```
                                                      61
1         A      Amongst the management team.  I didn't
2    necessarily maybe -- I can't remember whether I
3    announced that to, you know, these big salaried
4    meetings, group meetings.  But clearly in the context
5    of the discussion with the -- with the management team
6    we were talking, we were evolving to individual
7    performance measures.  Absolutely.
8         Q      So as you sit here today, you're sure
9    that in 1999 you told the top managers that AIP would
10   be based on individual job performance?
11        A      I can't -- I can't say categorically
12   that I told specifically someone that in those words,
13   no.
14        Q      Or anything --
15        A      But the concept was that we would
16   evolve to something where people would be paid on the
17   basis of their individual performance.
18        Q      But as you sit here, you can't
19   specifically recall telling anybody that?
20        A      Correct.  In those words.
21        Q      Or anything close to those words?
22        A      Well, I can't remember the details of
23   conversations that occurred in 1999.  I can tell you
24   conceptually what we were attempting to do.  Okay?
25        Q      All right.  The May 27th meeting.
```

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 62

62

1    A    Sure.
2    Q    As we've been talking about, the
3  meetings and so forth -- you've had an opportunity to
4  look at Exhibit 4. As you sit here today, you just
5  don't recall being at those meetings?
6    A    No, I -- we could go back and check my
7  schedule, but I think I was in Europe at the time this
8  -- this meeting was held or -- or I wasn't present, to
9  my knowledge. But I have seen these documents before.
10  Okay? So it's not that I haven't seen these pages,
11  because I have seen them.
12    Q    Did you attend any meeting that was
13  held in the cafeteria where there was a meeting in the
14  morning and then a meeting in the afternoon?
15    A    Not that I can remember. These --
16  these meetings that we looked at, Exhibit 144, when we
17  were trying to give people a picture of the overall
18  company, where we were going conceptually, you know,
19  strategically, it was important that I attend those
20  meetings because I was coming from ZF.
21         When it came time to talk to Ford
22  employees about their transition, I just wasn't engaged
23  in the details of their -- their compensation,
24  benefits, et cetera because my background was such that
25  it -- and my position in the company was -- it wasn't

PAGE 63

63

1  appropriate for me to do that because I really couldn't
2  answer any questions anyway.
3    Q    Just to kind of wrap this part up, do
4  you recall any conversations with lower-level salaried
5  employees who were considering joining ZF Batavia in
6  1999?
7    A    Well, I had the dinner. I told you
8  about the dinner with those guys. And off and on there
9  were conversations with various people, but I can't
10  remember specifically you talked to this person, you
11  told them such and such, no.
12    Q    But you talked to people at the level
13  of Rick Williams, Hassan Saleh and that type of thing?
14    A    Yeah. Right, right.
15    Q    Like Mr. Whisman, who was here, you
16  never talked to Mr. Whisman?
17    A    No.
18    Q    You wouldn't have talked to group
19  leaders?
20    A    I could have, I mean, depending on
21  questions that might have been asked to me. But, you
22  know, I can't tell you -- like I said, I can't tell you
23  on this day I spoke to this person and told them such
24  and such.
25    Q    You're aware of who the 15 people are

PAGE 64

64

1  in this lawsuit?
2    A    No, not all 15. Some of them, but not
3  all of them.
4    Q    All right.
5    A    No one has -- I haven't sat down and
6  reviewed there's this person, this person, this person,
7  this person. I do know, I think, Don Williams because
8  there was a question that was raised earlier. I've
9  heard of Mr. Whisman being in it because this lawsuit
10  is named after him. And let's see.
11    Q    It's not named after him. He's just
12  the first one on there, so --
13    A    Well, I'm an engineer. It's named
14  after him. It's the Whisman suit. Okay? And then,
15  let's see, I think -- I know that Dennis Baker is part
16  of it. But to be honest with you -- and there's a
17  lady, Pat. Okay? But --
18    Q    Do you mean Pam?
19    A    Pam, excuse me. Pam. But other than
20  that, no. I basically have a company to run and I have
21  not concerned myself with the details of this lawsuit.
22    Q    Any of those individuals that you
23  named, do you recall talking to them in 1999 about
24  their joining ZF Batavia?
25    A    I talked to in 1999 those people, I

PAGE 65

65

1  think, after they made their -- some of them, after
2  their decisions: Don Williams, Pam, you know. I had
3  dinner over at Hassan's house with Pam. She was there
4  one night, so -- but I can't recall talking to any one
5  of those people that I'm aware of in this suit,
6  convincing them to try to join Batavia. Okay?
7    Q    When was this dinner with Hassan that
8  Pam attended?
9    A    Oh, good question. I can't remember.
10  It was somewhere during 1999. But I think -- I think
11  she was already -- she had already joined by then, but
12  I can't be sure.
13    Q    Do you remember who else was there?
14    A    Yeah. My former wife and Hassan's wife
15  and his son.
16    Q    Anybody else?
17    A    Not to my -- not that I can remember.
18         MR. SIMON: Off the record.
19             (OFF THE RECORD)
20         MR. SIMON: Back on the record.
21  BY MR. SIMON:
22    Q    Turning to Exhibit 2, Mr. Adams, where
23  it says overtime compensation will be paid, is it your
24  understanding that that's currently the policy of ZF
25  Batavia?

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 18 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 66

66

1    A    Yeah. We -- we do pay overtime. And
2  Ford is -- we're talking to Ford about their change in
3  policies and does it have an influence on us, et
4  cetera, et cetera, because our pricing of our products
5  is tied to, you know, compensation of our people and
6  stuff like that. So we're -- the whole overtime thing
7  is being -- you know, we're thinking about what we have
8  to do to
9    Q    I mean, do you have current plans to
10  change the overtime policy with respect to salaried
11  employees?
12    A    To be honest with you, I don't know
13  whether we're going to change it or not. There's --
14  there's discussion about it, but it hasn't been
15  significant discussion yet. Ford is becoming much more
16  restrictive in overtime. And when you work in the
17  industry and there's so much competitive pressure, then
18  they are an owner of us and they could get involved and
19  start asking us why aren't your policies, you know,
20  synonymous with ours. So I don't know, because they're
21  -- they're -- they have access to our books and they
22  can see, well, you're paying for this, paying for that,
23  and no, we don't want to pay for that anymore.
24    Q    If a salaried employee, say a group
25  leader, is told that he is going to have to work

PAGE 67

67

1  several weekends because of needs of the department and
2  it's required that he work those weekends, but he won't
3  be paid overtime -- do you follow me?
4    A    Yeah, I hear -- I understand what
5  you're saying.
6    Q    Okay. Is that scenario consistent with
7  ZF Batavia's policy on overtime?
8    A    No, it wouldn't be.
9    Q    Have you ever heard of an instance in
10  the last year where maintenance employees were told
11  that they have to work weekends and not get paid
12  overtime?
13    A    No. In preparation for this deposition
14  I was told there were maintenance people that were told
15  to work overtime that maybe have complaints against the
16  company.
17    Q    Well, if a --
18    A    But I -- I am not aware of anybody
19  being told you must work overtime and then not
20  compensating them for working the overtime.
21    Q    Are you at all then aware, and as a
22  result of this lawsuit, that a group of maintenance
23  employees in April and May of 2002 were told to work
24  overtime on the weekend and did not get paid? Are you
25  aware of that?

PAGE 68

68

1    A    No.
2    Q    If you became aware of that, what would
3  you do?
4    A    Well, I'd investigate it and ask people
5  what happened here.
6    Q    If a maintenance manager ordered
7  maintenance employees to work weekends without
8  overtime, would you expect that that person would
9  report that to human resources?
10    A    Could you say that again, please?
11    Q    If employees were forced to work
12  overtime on weekends and not be paid, would you expect
13  that that information would be ultimately reported to
14  human resources?
15    A    I would think so, yeah.
16    Q    And given your testimony about that
17  phenomenon with respect to the overtime policy, would
18  you want human resources to communicate that to you?
19    A    Well, usually these types of issues are
20  dealt with by human resources, but if there was a gross
21  violation of policy, yeah, I would expect that it would
22  be reported to me. That's what I'm interested in.
23    Q    Well, I mean, there's been testimony in
24  the case that people worked weekends without being paid
25  overtime last year, and, I mean, do you have an

PAGE 69

69

1  explanation for it?
2    A    No.
3    Q    Because in your mind they should be
4  paid for it?
5    A    If someone is asked to work overtime
6  and it's the right category -- I mean, we've got to be
7  -- we've got to be careful what category employee we're
8  talking about.
9    Q    We're talking about a group leader.
10    A    Yeah, if he's got direct people
11  reporting to him, sure. Yeah.
12    Q    If -- are there certain salaried
13  employees who don't get paid overtime?
14    A    Yeah, higher-level people don't get
15  paid overtime.
16    Q    Do people get --
17    A    Managerial -- you know, managerial-
18  level people don't get paid overtime. Engineers are
19  expected to work an extra hour a day, you know, nine
20  hours. They're salaried people, get the job done. So
21  depending on the type of job and circumstance, yeah,
22  some people don't get paid overtime depending on how
23  much overtime they work, you know. But if someone is
24  going to go in and spend a whole weekend fixing
25  machines and supervising activities, my expectation is

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 19 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 70

70
1    they would be paid overtime, assuming it was approved.
2    You know, it was prior approved.
3        Q    Just to save you the trouble of having
4    your attorney fish out this exhibit, this is Exhibit 65
5    and I'll just represent that it says design team
6    members on the top and it lists you as one of the
7    design team members.  And my question to you is just:
8    Are you aware of being a design team member in 1999?
9        A    Yeah, I was appointed to sit in this
10   but I -- I didn't spend -- I didn't have time to spend
11   time in this activity with regard to working with Ernst
12   and Young on the compensation and all that stuff.  I
13   was in one meeting and then that's all I had time to
14   do.
15       Q    Well, let me see if I can figure out
16   what one meeting that was.
17       A    Yeah, that would be interesting for me,
18   too.  If it was Ernst and Young, I can -- I can give
19   you some idea it was on compensation to some degree,
20   but I can't say for sure.  But I think that's what it
21   was, if that helps you.
22       MR. SIMON:  This is -- we'll call this
23   Exhibit 145.
24       THE WITNESS:  Okay.
25       MR. SIMON:  I don't have additional

PAGE 71

71
1    copies, but just for the record, let me explain
2    that deposition Exhibit 79 is the second page
3    of what I'm marking as Exhibit 145.  I just
4    noticed that deposition Exhibit 79 is missing
5    this cover page.  So deposition Exhibit 145,
6    which is in front of Mr. Adams, is identical to
7    deposition Exhibit 79 except for the cover page
8    was missing on deposition Exhibit 79.
9        THE WITNESS:  What?  I'm sorry.
10       MR. SIMON:  You don't have to worry
11   about any of that.
12       THE WITNESS:  Give these other ones
13   back?  And this one?
14       MR. SIMON:  Yeah.
15       THE WITNESS:  Okay.
16   BY MR. SIMON:
17       Q    Exhibit 145 says "Accelerated Design
18   Workshop Report, February 22nd, 1999."
19       A    Mm-hmm.
20       Q    As you flip through this -- and you
21   don't need to read every word, but do you have any idea
22   whether you attended this meeting?
23       A    I have no idea whether I attended this
24   specific meeting.  I can tell you what I do remember is
25   I was at an opening meeting, okay, where we talked

PAGE 72

72
1    about what we wanted to do with Ernst and Young.
2        Q    And so Ernst and Young employees would
3    have been there?
4        A    Sure.  Yeah.  I specifically remember
5    being in the special events room with one meeting with
6    Ernst and Young people, talking about designing our,
7    you know, salaried compensation package, how we wanted
8    to go forward.  But for the most part I left that
9    responsibility to Karl, as the administrative head.
10       Q    Mr. Kehr, would be the person most
11   familiar with what went on at the design workshops,
12   right?
13       A    That's correct.
14       Q    You can turn over Exhibit 145, sir.
15   I'll hand you that one.
16       MR. HUNTER:  Steve, how am I going to
17   get a copy of that?
18       MR. SIMON:  I gave --
19       MR. HUNTER:  You've got one here, and
20   that's the official one.
21       MR. SIMON:  Well, we'll make it
22   afterwards then.
23       MR. HUNTER:  All right.
24       THE WITNESS:  You want it back?
25       MR. HUNTER:  No.  The court reporter is

PAGE 73

73
1    going to need that.
2        MR. SIMON:  Do you have the other
3    exhibit we used?
4        REPORTER:  Just 144 is all I need.
5    Thank you.
6        MR. HUNTER:  I wondered what you guys
7    do because this is his papers and --
8        MR. HUNTER:  That was my mistake.  I
9    shouldn't have put that one in.  The others are
10   mine.
11       MR. SIMON:  I'm sorry.  I turned to
12   Exhibit -- you do have this one, Mr. Hunter,
13   Exhibit 82.
14       MR. HUNTER:  Steve, you know what?  I
15   may not have 82 with me, either that or I've
16   got it out of order.
17       MR. SIMON:  Yeah, 79 is what I said
18   before
19       MR. HUNTER:  I think I've got 81 and 82
20   out somewhere.
21       MR. SIMON:  Let's go off the record for
22   a second.
23           (OFF THE RECORD)
24   BY MR. SIMON:
25       Q    Mr. Adams, this is Exhibit 82.  It's a

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 20 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 74

74

1  document that's marked on the cover page, Incentive
2  Plan Talking Points, March 16th, 1999.
3        A     Yeah.
4        Q     Now, based on your testimony, I'm
5  assuming that you don't recall any sort of March 16th,
6  1999 meeting.
7        A     Remember when I told you that I
8  participated in an opening discussion on this subject?
9        Q     Yes.
10       A     Okay.  I can't tell you which day that
11 occurred.  So if you put this document in front of me,
12 I can't remember on March 16th.  Okay?
13       Q     If I told you that there were meetings
14 that took place in February, one can assume the first
15 meetings -- you attended the first --
16       A     I think they -- they might have been in
17 February.
18       Q     Okay.
19       A     What happened was -- I mean, my role as
20 president, you should understand, I've got to go
21 overseas a lot, okay, so I left these issues up to
22 Karl.
23       Q     All right.  Ultimately, though, Mr.
24 Kehr communicated back to you and said this is what
25 we're doing with the incentive plan?

PAGE 75

75

1        A     Yeah.  Yeah, conceptually this is what
2  we're doing.  Karl is a real sharp guy and I kind of
3  left it up to him and if I had some questions where I
4  think there would be a problem, I would, you know, ask
5  him.  Do you want me specifically --
6        Q     Yeah, I'm going to focus you on
7  specific things.
8        A     Okay.
9        Q     My question is about where it says
10 transition plan.  If you could just read that two
11 sentences under where it says transition plan.
12       A     Sure.
13       Q     And I'll just read it into the record.
14 It says _ZF Batavia is willing to pay Ford employees at
15 comparable to current levels throughout the
16 transition._
17       A     Yeah.
18       Q     _It is okay if a two tier base pay
19 structure is in place in the short term, next three
20 years._
21       A     Yeah.
22       Q     And my question is:  Did you understand
23 that the Ford transitional employees, first of all,
24 they made more money then your typical market salary
25 for that work?

PAGE 76

76

1        A     Sure, sure.  Right.
2        Q     And --
3        A     I understood this, you know, that the
4  salaries of the Ford employees are above the typical
5  Cincinnati area employee.
6        Q     And was it your understanding, though,
7  that what the design team did is create a plan where
8  throughout the transition period the Ford transitional
9  employees would continue to make the money they did,
10 but ultimately, after the period of three years, the
11 Ford transitional employees and the ZF new hires, that
12 their salaries would converge?
13       A     No, that wasn't my -- necessarily my
14 understanding, that there would be convergence.  This
15 two tier, as I read it now and think back, is that
16 there would still be this differential with Ford
17 employees and Batavia employees or there could be.
18 There could be depending on performance, merit, et
19 cetera.
20       Q     And where it says ZF Batavia is willing
21 to pay Ford employees at comparable to levels
22 throughout the transition, was the transition a period
23 of two or three years, I take it?
24       A     Yeah, two to three years.
25       Q     And, I guess, just reading this, did

PAGE 77

77

1  you understand that after the expiration of two or
2  three years that ZF Batavia would change their policy
3  with respect to Ford transitional employees?
4             MR. VANWAY:  Objection.  Foundation.
5     No testimony that he read this document.
6             MR. SIMON:  You can answer.
7             THE WITNESS:  Well, I mean,
8        conceptually we understood that longer term
9        there could still be differences.  Okay?
10 BY MR. SIMON:
11       Q     There could be differences, but as you
12 understood how the plan developed -- this is what you
13 understood in 1999, but ultimately, after the
14 transition period of two or three years, the Ford
15 transitional employees' levels of salary would be more
16 in line with ZF Batavia new hire employees; is that
17 right?
18       A     No.
19             MR. HUNTER:  Objection.  Asked and
20        answered.
21             THE WITNESS:  Yeah.  Ask me a specific
22        question.  I'll try and answer it for you.
23 BY MR. SIMON:
24       Q     Based on the sentence _ZF Batavia is
25 willing to pay Ford employees at comparable to current

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 21 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 78

78

1    levels throughout the transition, --
2         A    Yeah.
3         Q    -- did you understand at some point
4    that ZF Batavia was not willing to pay Ford employees
5    after the transition ended?
6         A    No.  That was never an intention.
7         Q    Do you have any other explanation for
8    that sentence?
9         A    "It is okay if a two tier base pay is
10   in place in the short term," sure.  There would still
11   be differences during this period of time.  What can
12   happen long term, I don't know, but we're not
13   intentionally taking money away from the Ford
14   employees.  That's not intended whatsoever.
15        Q    But just so I understand, though, in
16   1999 it was understood in the short term there could be
17   a two tier base pay structure, but as you understood
18   it, after that three years there would be a different
19   system?
20        A    No.
21             MR. HUNTER:  Objection.  Asked and
22        answered.  This is the third time, Steve.
23             MR. SIMON:  You can answer.
24             MR. HUNTER:  At this point, that's the
25        last time you're going to ask it because if you

PAGE 79

79

1         ask it again, I'm going to instruct him not to
2         answer it.  He's already answered.  His answer
3         was no.  The court reporter can read it back if
4         you want.
5              MR. SIMON:  I didn't understand your
6         answer.  You said no.
7              THE WITNESS:  No.
8    BY MR. SIMON:
9         Q    I was just trying to understand -- I'm
10   just trying to understand when it says short term, did
11   you understand there would be a long term plan?
12        A    No.
13        Q    Was there any long term plan at all
14   with regard to the salaried employees?
15        A    At that time?
16        Q    In '99, yes.
17        A    No.  I mean, you -- how can I say out
18   four or five years that we're going to know exactly
19   what we're going to do for the salaried perspective?
20   No, can't say that I did.
21             What we were trying to do here is
22   saying that early on there's a difference between the
23   two.  Okay?  Now, what develops over the long term, I
24   can't tell you.  I didn't know what was going to happen
25   then.

PAGE 80

80

1         Q    Well, now that we're four years after
2    the fact, is there a plan to have the Ford employees'
3    -- Ford transitional employees' salaries more in line
4    with ZF Batavia new hires?
5         A    No.
6         Q    Do you see where it says new hire plan,
7    Mr. Adams?
8         A    Mm-hmm.
9         Q    Was it ever communicated to you that
10   there was a need to get the base pay to a more
11   competitive level that is benchmarked every few years
12   to maintain its competitiveness, regarding new hires?
13        A    All companies do salary studies all the
14   time.  So with respect to new hires, we have to be
15   competitive.  You can't pay too much because then
16   you're paying -- that creates higher costs for your
17   products, that's uncompetitive.  You pay too little,
18   then you won't get good people.  So you've got to pay
19   what the market is.  That's the plan.
20        Q    On the top of the page it says average
21   salary is about 20 percent above the competitive 50th
22   percentile of the market in the local area for like
23   companies.
24        A    Right.
25        Q    You see that?

PAGE 81

81

1         A    Right.
2         Q    So, I mean, as I read this -- you tell
3    me if I'm wrong -- you understood that their salaries
4    were 20 percent above the 50th percentile and the new
5    hire plan was to get them closer to the 50th
6    percentile.
7         A    Well, here, I'm not capable of getting
8    into a detailed discussion on this document when you've
9    just put it in front of me.  Basically what we
10   recognize we have to do is we have to maintain some
11   fairness with regard to the Ford employees and at the
12   same time we have to be -- when we hire new people, we
13   have to be competitive and do it at market.  And that's
14   basically what we're doing.  That's -- that's been the
15   vision all along.
16        Q    We're done with that exhibit.  Did you
17   have any concerns when you started at ZF Batavia that
18   the Ford employees' salaries were at the levels that
19   they were, in terms of your ability to make this a
20   profitable plant?
21        A    No.
22        Q    Why not?
23        A    Because salaried wage rates aren't
24   going to make or break a business.  What makes or
25   breaks a business is whether you've got good people.

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

---

PAGE 82

82

1  Q    Does overtime compensation make or
2  break a company?
3  A    Overtime, yeah, because what -- yes, it
4  can, because then you've got the hourly workforce
5  involved and then you've got huge leverage implications
6  there. Because what happens is, quite frankly, people
7  realize that if they don't make the parts during the
8  week, then they can work the weekend and get paid the
9  overtime. And so what you get into is not only an
10 issue of cost, you get into the issue of scheduling and
11 it can have serious implications depending on how --
12 how overtime is dealt with. And that's been the
13 historical problem in Batavia, too much overtime.
14     MR. SIMON: See if you've got Exhibit
15     78, Mr. Hunter.
16 BY MR. SIMON:
17 Q    These exhibits that we're looking at
18 from 1999 regarding the design team, it's your
19 understanding that Mr. Kehr would be knowledgeable
20 about these documents?
21 A    Yeah, right.
22 Q    Just a second here. Have you ever seen
23 this document before, sir? It says at the top, April
24 9th, 1999, ZF Batavia Rewards Philosophy and New
25 Rewards Programs.

---

PAGE 83

83

1  A    I can't say that I've seen specifically
2  this document. I've seen these words, okay, possibly
3  in another form. Okay?
4  Q    Okay. Let me just direct you to the
5  third page --
6  A    Yeah.
7  Q    -- which says ZF Batavia Rewards
8  Philosophy and it had base pay and others. You've got
9  the right page?
10 A    Yeah. Mm-hmm.
11 Q    And as you've testified, where it says
12 base pay, it says "ZF Batavia will offer to pay
13 transition Ford employees base salary consistent with
14 their current Ford salary," and that statement was
15 correct?
16 A    Yeah, right. If you didn't do that,
17 they wouldn't join us, right?
18 Q    And you see where it says annual
19 incentive plan?
20 A    Yeah.
21 Q    And it says in the second -- excuse me,
22 it's in the third sentence -- _The annual incentive
23 will be based on (1) product quality, (2) timing and
24 delivery of both new and existing products and (3) the
25 profitability of the company." Did I read that

---

PAGE 84

84

1  correctly?
2  A    I mean, this is kind of a repeat of the
3  other document that you saw earlier.
4  Q    It's the same statements in the
5  brochure?
6  A    Right.
7  Q    And this statement is basically what
8  was communicated to salaried employees --
9  A    Right.
10 Q    -- as far as you knew?
11 A    Right.
12 Q    Where it says merit increase program,
13 do you see that?
14 A    Mm-hmm.
15 Q    I'll read this into the record. It
16 says _Merit increases will be continued, but each year
17 the amount will decrease by a fixed amount. Over time
18 merit increases for transitional employees will align
19 with those of new hires and be at a level in line with
20 the annual inflation rate._ Has that been the policy
21 at ZF Batavia?
22 A    To some degree, yeah, but we basically
23 -- I guess I'd have to go back and -- inflation has
24 actually possibly been less then merit increases, so
25 actually maybe people have gotten more. Okay?

---

PAGE 85

85

1  Q    And where it says _Over time merit
2  increases for transitional employees will align with
3  those of new hires,_ do you see that part of it? I'm
4  just rereading it.
5  A    I'm sorry?
6  Q    It's the second sentence under the
7  merit increase.
8  A    Yeah. "Over time merit increases for
9  transitional employees will align with those of new
10 hires..." --
11 Q    And, again --
12 A    "...and be at a level in line with
13 annual inflation rate." Right.
14 Q    I mean, I realize that these documents
15 -- that you haven't seen this one before and you
16 apparently weren't at every meeting of the design team.
17 But as you understand it today, the idea in 1999 was
18 that through merit increases the Ford transitional
19 employees' salaries would come down to where ZF Batavia
20 new hires; is that fair?
21 A    No. Their salaries wouldn't come down
22 to new hire levels because they historically have much
23 more money. Okay? So to -- you can't -- there was two
24 separate issues: What is their base salary and where
25 are they today, and what are you going to do with merit

---

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 86

86

```
 1   over time with them?  Okay?
 2            I mean, a new hire, you know, is --
 3   because of their experience and years in the workforce,
 4   has a base salary significantly less than a person
 5   who's worked in the industry for a long time.  So to
 6   say you're going to converge the actual income of these
 7   two people is never intended.  It's impossible.  You
 8   could never -- everybody would leave.  I mean, it just
 9   -- it's not possible to put those two thoughts
10   together.  Okay?
11        Q    Let me just ask that a different way.
12   Instead of having the Ford transitional employees'
13   actual salaries go down, but by having their merit
14   increases aligned with those of new hires, you'd have
15   the new hire employees ultimately catch up to the Ford
16   transitionals, so you'd have a one tier system.
17        A    Well, I can't tell you whether that's
18   going to happen or not.  Okay?  But the -- I mean, the
19   Ford employee is always going to be paid more than the
20   -- than the new hire.  That's just the way it's going
21   to happen because of the gross difference in -- in
22   income.
23        Q    What did you understand the basis --
24   you said --
25        A    The idea was that we would rely less on
```

PAGE 87

87

```
 1   merit and more on AIP.  That's the -- that's the
 2   concept.  Okay?
 3        Q    When you say rely less on, do you mean
 4   in terms of a salaried employee's compensation, if they
 5   do well on their individual performance, they'll see it
 6   in AIP bonus, not merit increase?
 7        A    Yeah, right.  Not so much -- not so
 8   much relying on merit, but more relying on AIP in terms
 9   of what happened that year in terms of profitability
10   and performance in the business.
11        Q    Do you specifically recall telling
12   anybody that sentiment in 1999?
13        A    No.  That was -- that was told to me by
14   Karl and the team, that that's what they wanted to do.
15   And I said, okay, that makes sense, that's reasonably
16   consistent.
17            Again, my background is engineering and
18   manufacturing and international business and not --
19   not, you know, with respect to salaried compensation.
20        Q    Do you still have Exhibit 2 hanging
21   around somewhere?
22        A    The brochure?
23            MR. HUNTER:  I've shuffled these
24   things.
25   BY MR. SIMON:
```

PAGE 88

88

```
 1        Q    As you're looking for that, Mr. Adams,
 2   you're aware that salaried personnel that transitioned
 3   from Ford to ZF Batavia were given offer letters?
 4        A    Excuse me?
 5        Q    That they were given offer letters.
 6        A    Sure.
 7        Q    And are you aware that those offer
 8   letters referenced Exhibit 2?
 9        A    They could -- I mean, I'm not aware of
10   it, but it would have made sense, right?  Okay?
11        Q    So if there is testimony in this case
12   that people were given offer letters and they were also
13   given Exhibit 2, so that Exhibit 2 explains the terms
14   of their compensation and benefits at ZF Batavia?
15        A    Sure, this brochure should describe
16   fundamentally what that expectation should be.
17        Q    And so it was you're understanding that
18   people -- because you had talked about you had made
19   some general statements in March of 1999 like there
20   will be a pension plan or you won't be financially
21   harmed.
22        A    Mm-hmm.
23        Q    And I think you said that then specific
24   details were laid out for the employees subsequent to
25   that.
```

PAGE 89

89

```
 1        A    Right.  And then they -- and then they
 2   could make a judgement based on talking to people and
 3   studying their offer, whether they wanted to join or
 4   not.
 5        Q    So it was your understanding that
 6   certainly salaried employees who were transitioning to
 7   ZF Batavia would -- upon receiving their offer letter,
 8   would read the brochure that was attached, Exhibit 2,
 9   right?
10        A    Mm-hmm.
11        Q    And based on what they read, they would
12   make a decision about whether to join Ford -- join ZF
13   Batavia?
14            MR. HUNTER:  Objection.  Lack of
15   foundation.  You can answer, if you know.
16            THE WITNESS:  Well, it's not just the
17   offer letter.  I mean, it's the whole
18   environment in which they see the
19   opportunities.  There was a major issue, quite
20   frankly, in my judgement about whether people
21   want to live and move, okay, because that was a
22   concern that was discussed.  So where they want
23   to live, what they want to do, so it's not just
24   this circumstance.  Okay?
25            MR. SIMON:  Right.
```

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 90

90

1          THE WITNESS:  To say that the offer is
2     dependent or the offer letter is the decision
3     criteria, okay, because quite frankly, I had
4     people approach me that said that they didn't
5     care that much about the money, as long as the
6     thing was halfway reasonable, they wanted to
7     stay on the east side of Cincinnati.
8 BY MR. SIMON:
9          Q     Who told you that?
10         A     Oh, I can't remember, but that was
11    important to some people.  Okay?  That's an issue.  "I
12    want to stay here.  I live here," you know, it's
13    important.
14         Q     Right.  But you wanted the salaried
15    employees to make an informed judgement about what
16    their employment would be at ZF Batavia?
17         A     Sure.
18         Q     And certainly if they reviewed the
19    brochure which is Exhibit 2, that would be the proper
20    thing for them to do to understand the details of their
21    --
22         A     Why not?  Certainly.
23         Q     So you would certainly expect that
24    someone, in deciding whether to join ZF Batavia, would
25    have reviewed Exhibit 2 and made their decision

PAGE 91

91

1     accordingly?
2          A     They would review this document, and
3     the degree with which this document would influence
4     their decision is beyond me.  I can't say that their
5     review of this document was going to make or break the
6     decision because there are so many other issues to
7     consider.  Okay?
8          Q     And --
9          A     Would they have long term -- I mean,
10    long term job security is a critical issue to people.
11    What happens if the joint venture fails, right?
12         Q     We talked about agreements at the
13    beginning of the deposition.  But as you understood it,
14    if a salaried employee signed the offer letter which
15    had Exhibit 2 attached, didn't you understand that they
16    were entering into an agreement with ZF Batavia?
17         A     I guess in a legal sense maybe you
18    could claim they would.
19         Q     I mean, it had certain statements on
20    Exhibit 2.
21         A     This -- this is not an employment
22    contract, though.  Okay?  This is a statement of what
23    we're trying to do for these people.  It's not an
24    employment contract.
25         Q     But, I mean, they could rely on these

PAGE 92

92

1     statements that are in Exhibit 2 in making their
2     decision on whether to join ZF Batavia?
3          A     To some degree, yeah, I would think so.
4          Q     I mean, if it says, for instance,
5     authorized overtime will be paid, it was a fair
6     expectation on their part that authorized overtime
7     would be paid?
8          A     Sure.
9          Q     Just as in your employment contract it
10    must have certain promises that you expected ZF Batavia
11    to live up to?
12         A     Absolutely.
13         Q     And the same would be true for these
14    salaried employees?
15         A     Well, as we said earlier, if someone
16    was forced to work overtime and they weren't paid, then
17    I'd want to know about it, right, because it would be a
18    violation of policy.
19         Q     And if somebody had --
20         A     Assuming it was preauthorized.  Okay?
21    We had -- we've had a problem with people just working
22    overtime and not having authorization to work overtime.
23    Okay?
24         Q     All right.  Switching gears, Mr. Adams,
25    you can put that to the side, but we may come back to

PAGE 93

93

1     it.
2          A     All right.
3          Q     It's kind of an important document in
4     the case.  Do you keep a -- you attend board meetings,
5     correct?
6          A     Yeah.
7          Q     And you generally keep the two parents,
8     Ford Motor Company and ZF, apprised of what's going on
9     in the plant?
10         A     Yeah, for critical issues, absolutely.
11         Q     And you certainly report to Ford Motor
12    Company and ZF about issues with respect to salaried
13    employees?
14         A     No.
15         Q     Well, you report to them any changes in
16    salaried employee policy?
17         A     No.  There's not a need to.  There are
18    too many other major, pressing business issues.  We
19    don't have any obligation to report our company
20    policies to the board of directors.  There's just no --
21    no requirement or no need to do that.  There's
22    discussions, but --
23              MR. HUNTER:  If those are board
24         minutes, those were given confidentially.  We
25         got rid of the attorneys eyes only, but the

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 94

94

1    agreement was those would not be published.
2    Maybe we need to go off the record, but --
3            MR. SIMON:  Well, let's go off the
4    record.
5            {OFF THE RECORD}
6            MR. SIMON:  Going on the record, we're
7    going to be talking about matters concerning
8    board meetings of ZF Batavia.  And in
9    conversations with counsel, as well as previous
10   understandings between counsel, we are going to
11   go under seal for this portion of the
12   deposition, and I will advise the court
13   reporter when we will get into matters that can
14   be outside these matters.  And so all these
15   exhibits, starting with Exhibit 146, which are
16   board minutes will be under seal.
17   BY MR. SIMON:
18       Q    You were saying, Mr. Adams?
19       A    Okay.  What I'm trying to say is when
20   we were starting the joint venture, we went to the
21   board to tell what our progress was regarding getting
22   people on board.  Okay?  Because they wanted to know
23   are you going to have a salaried work force to be able
24   to maintain and manage this factory, obviously.
                **********

PAGE 95

95

PER AGREEMENT OF COUNSEL, THE FOLLOWING TESTIMONY
IS SEALED IN THE ORIGINAL TRANSCRIPT

PAGE 96

96

1        Q    And the document I've handed you,
2    Exhibit 146, a three-page document, has an agenda for a
3    board meeting.  And it doesn't have a year on it, but
4    if you look at the third page, Mr. Adams, --
5        A    Well, wait a minute.  You've got to be
6    careful.  Is this -- is this the board agenda or is
7    this the preparation for the board?  Because -- because
8    -- yeah, but we've got to be careful here because I
9    can't remember Mark coming to a board meeting.  Okay?
10   All right?  So this was our first board meeting.  So we
11   had these other guys there.  Okay, fine.
12       Q    This is in early 1999, perhaps March
13   1999?
14       A    This would have been our first board
15   meeting.
16       Q    First quarter 1999?
17       A    Yeah.  This is probably our first
18   formal board meeting, yeah.
19       Q    All right.  On that third page -- and
20   ZF Batavia produced a number of documents connected
21   with board meetings.  I've just attached to the agenda
22   one particular document that I believe was discussed at
23   this meeting.  It says Ford Salaried Employee Proposal,
24   it's Bates stamped 2297.  Take a moment to read that.
25       A    Mm-hmm.  Yeah.

PAGE 97

97

1        Q    You would have discussed the matters
2    that are reflected on that page at the board meeting?
3        A    Right.
4        Q    And that had to do with salaried
5    employees?
6        A    That -- that had -- that had to do with
7    transitioning the employees, yes.  That was a board
8    issue at the time.  But it's not policy or anything
9    like that, you know what I mean?  I want to delineate
10   between the two.  It was a board issue to become --
11   what are we doing with these Ford employees and are
12   they going to join the company or not join the company?
13       Q    You can turn that one over, sir.
14       A    Okay.
15       Q    The next one is Exhibit 147.  And 147
16   says board meeting May 6, 1999 --
17       A    Yeah.
18       Q    -- and attached to that are several
19   documents that indicate that those subjects were
20   discussed at the May 6th meeting.  I just really want
21   to direct your attention to certain things, so we'll --
22       A    Okay.
23       Q    You obviously attended the board
24   meeting May 6th, 1999?
25       A    Sure.  I'm at all board meetings.

RIVERSIDE REPORTING
(859)291-6110(KY) -- (513)574-7017(OH)

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 26 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 98

98

1      Q      And by the way there, so I understand
2   the process, I mean, there's various documents that, I
3   guess, you produce in advance to discuss at the board
4   meetings.
5      A      Correct.
6      Q      And then, I guess, are there minutes?
7      A      The board -- sure, there are board
8   meeting minutes.
9             MR. SIMON:  Have I received minutes,
10  Mr. Hunter?
11            MR. HUNTER:  Why don't you go and get
12  the list?
13            MR. SIMON:  All right.
14  BY MR. SIMON:
15     Q      Certainly there's things you might
16  discuss at the board meeting that might not be reduced
17  to minutes?
18     A      Oh, absolutely.
19     Q      And there are certain things that you
20  might discuss that might not precisely track the items
21  that are listed on the agenda?
22     A      That's correct, too.  We have a
23  standard format and then we fit certain things
24  underneath it where it's most appropriate.
25     Q      But as we look on the first page then,

PAGE 99

99

1   it says, number six, report on important human
2   resources issues, and it lists salaried employees.
3      A      Right.
4      Q      And you apparently were the one who was
5   going to tackle that subject?
6      A      Right.  And this is a summary of where
7   we were at at the time.
8      Q      All right.  If you turn to, I think,
9   it's the third page, marked -- it says 5.10, that's the
10  summary that you explained to the board?
11     A      Correct.
12     Q      And the board, by the way, is that
13  three members from ZF, three members from Ford?
14     A      Yes, at the time it was.
15     Q      And is it still?
16     A      No.  It's four and four.
17     Q      When did it become four and four?
18     A      Good question.  A year ago
19  approximately.
20     Q      All right.  As you turn to 6.1, were
21  those issues discussed with the board?
22     A      If there's a slide, then we quickly
23  reviewed these issues, yes.
24     Q      So these documents that we're reviewing
25  were more than likely slides that were presented to the

PAGE 100

100

1   board?
2      A      Correct.  That's the way it is, yeah.
3      Q      Turning back to 4.2, does that fairly
4   describe what the relationships and roles were between
5   ZF Batavia and the parents in 1999?
6      A      Yeah.  This was -- what we were trying
7   to do was get a -- get a description of what should be
8   the working patterns between the different entities,
9   the board, the different departments in Batavia, how
10  Batavia would relate certain issues back to the
11  parents, et cetera.
12     Q      All right.  We're done with that one,
13  Mr. Adams.  You can turn that one over.
14            MR. HUNTER:  Those exhibits should go
15  to the court reporter.
16            MR. SIMON:  Okay.  This is Exhibit 148.
17            THE WITNESS:  Yeah, this was a meeting
18  in German.
19  BY MR. SIMON:
20     Q      And, again, I've attached a document
21  that says 3.D on the top.
22     A      I might mention there's an important
23  point here.  Over time the level of board members from
24  the Ford perspective has changed.  Okay?  There were --
25  it's very important to understand in these early

PAGE 101

101

1   meetings there were middle-management, lower-level
2   people and then subsequently, because we had to get
3   higher engagement, there were more senior people that
4   came to the board.
5      Q      Mr. Kehr testified about that, but I
6   appreciate it.
7      A      Okay.
8      Q      3.D, which is Bates stamped 2301, I
9   mean, to your knowledge, were the matters that are
10  reflected on Bates stamp 2301, was that covered at the
11  September 22nd, 1999 meeting?
12     A      Yeah.  Mm-hmm.  Again, if it was a
13  slide, it was in the book and it -- I can't remember
14  the details of the discussion, but yeah, this is the
15  status of the transition program.
16     Q      And, again, this was with respect to
17  salaried employees?
18     A      Yeah.  It says 163 salaried employees.
19  That's what we started out, yeah.
20     Q      This is 149.  And my question is --
21  again, attached to this agenda there's two pages Bates
22  stamped 2304 and 2305.  Again, my question is just:
23  Were these issues with respect to the salaried
24  employees, to your recollection, covered at the May
25  23rd, 2000 board meeting?

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 102

102

1         A     Well, to be honest with you, I don't
2    think that the details of this document was -- how
3    should I suggest -- presented at the board for reading
4    and approval. This whole agreement stuff took place
5    ahead of time. Okay? The joint venture negotiation
6    would have been a legal matter that wouldn't have
7    gotten much press at the board, okay, much time at the
8    board, so --
9         Q     But what about the second one that says
10   Administrative issues for ZF Batavia members  on the
11   following page there? That document seems to
12   specifically reference the ZF Batavia board members,
13   and I'm wondering if that subject that is reflected in
14   this document was covered at the May 23rd meeting.
15        A     Well, it could have been. I can't
16   remember the details. When we speak of members, I
17   mean the -- it's not the board members. It's the
18   members, the companies themselves. Okay?
19        Q     As we sit here, you're not sure if at
20   the May 23rd, 2000 meeting these salaried -- these
21   issues with respect to the salaried employees were
22   discussed?
23        A     Well, you've put in front of me some
24   documents, but I'd have to go back and look at my
25   materials to understand how they fit into the context

PAGE 103

103

1    of the whole meeting. Okay? I have -- I have no idea
2    or can remember exactly what has occurred as a result
3    of this.
4              There was a point where we were
5    attempting to try and be more lenient and allow people
6    a longer period of time to decide whether they wanted
7    to join the joint venture or not. Originally it was a
8    year and then we extended it to two years, okay, so
9    that people could have more time and understand what
10   was going on.
11        Q     All right.
12        A     In fact, it took much longer than we
13   had originally envisioned.
14        Q     Why is that, do you think?
15        A     I think to give people a chance to
16   decide what they want to do.
17        Q     So another -- so if I understand you
18   correctly, in 1999 people were told --
19        A     Well, it was a year and I can't -- we'd
20   have to go back to the joint venture documentation to
21   pull out all of the details and see, but the concept
22   was to allow people more time to understand what was
23   going to happen. They were given a choice to join the
24   company in a given period of time, but there were
25   people that were retiring people. It was a -- we got

PAGE 104

104

1    into a more lengthy, complex discussion, so --
2         Q     Was it your understanding in 1999
3    people were -- salaried people were told at Ford that
4    you have until the end of 1999 to make a decision about
5    whether you're joining?
6         A     Right.
7         Q     And then what you're saying is 2000
8    came along and --
9         A     Well, we had some retiree issues that,
10   you know, you can't deal with every specific issue, so
11   --
12        Q     Do you know who Julie Hallauer is?
13        A     Yeah.
14        Q     Was she someone who was Ford and in the
15   plant in 1999?
16        A     Julie Hallauer became a ZF Batavia
17   employee. She subsequently worked for the joint
18   venture and decided that she wanted to go back and work
19   at Ford.
20        Q     And she was given an opportunity to do
21   that?
22        A     Under the normal rehire process of
23   Ford. She had to go reapply, and all the rules and
24   regulations regarding rehire she had to go through.
25        Q     Did you ever tell any Ford transitional

PAGE 105

105

1    employees after 1999 or during 1999 that if they found
2    -- if they discovered that they had made a mistake,
3    they didn't want to be at ZF Batavia, that they could
4    return to Ford?
5         A     Well, there was nothing restricting
6    them, just like Julie, going back and reapplying at
7    Ford. It's -- it's like going to any company if you
8    want to go back and go work for a company, like I did
9    with Rockwell. I mean, you can go into the market and
10   say, hey, I'd like to go back and reapply and work for
11   a company. And that's basically what Julie did.
12        Q     Well, is it a little different here,
13   that it's a joint venture and that someone in your
14   position or other people at ZF Batavia could actually
15   help somebody get a position back at Ford?
16        A     I didn't help do anything of any
17   special nature to get Julie back to Ford.
18        Q     Did you have -- did you ever have any
19   conversation with people at ZF Batavia where you told
20   them that, look, you can go back to Ford if you want?
21        A     No. No, I didn't do that.
22        Q     Do you specifically remember a
23   conversation with Don Williams?
24        A     No. No, not Don, that I can remember.
25   I had specific conversations with Don, but I can't

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 28 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 106

106

1  remember specifically telling Don that he could go back
2  to Ford. Obviously anybody can go apply for a job in
3  Ford Motor Company, right? There's no restriction.
4       Q       Did you tell Don that?
5       A       I can't remember what I told Don.
6       Q       Did you tell Don Williams or anybody
7  else that, look, we can't have all of the ZF Batavia
8  salaried people go back to Ford because that's going to
9  sink the operation?
10      A       No, I can't remember telling anybody
11 that. It's obvious, though. I mean, it's obvious that
12 we need to encourage people to come and work for -- for
13 Batavia. Don, there was a time -- there was a period
14 of time where Don wanted to retire or go someplace
15 else, and I encouraged him to try to continue to work
16 for the company because Don is a good guy. And we gave
17 him a special assignment to try and go see if that
18 would make him happy.
19      Q       When were these conversations? I guess
20 a couple of years ago?
21      A       Oh, yeah. It would have been, I don't
22 know, two or three years ago. I don't think it was
23 1999. It must have been 2000.
24      Q       I'm sorry. I didn't quite hear what
25 you said. You said you put -- you discussed putting

PAGE 107

107

1  sort of a package together for him?
2       A       No. No, no package.
3       Q       You said he had thoughts of retiring or
4  going somewhere else, and then it's your understanding
5  --
6       A       Oh, we gave him an assignment. I mean,
7  he has good supervisory skills so I asked him to go --
8  we put Lorelei and Don together to go work out in the
9  factory to coach other group leaders about how they can
10 do a better job. So we tried that for a while with
11 those two.
12      Q       Was this the days when you had
13 champions?
14      A       Champions? We've had champions
15 forever. Champions to do what?
16      Q       Oh, well, it's my understanding the
17 position of group leader has kind of gone through some
18 different permutations in time.
19      A       No. A group leader has been a group
20 leader. I mean, there could be other names for them
21 that people want to use, but group leaders are group
22 leaders. They're supervisors.
23      Q       This assignment that you gave Don was
24 to what area? Training, you said?
25      A       Oh, I don't know if you can call it

PAGE 108

108

1  training. I mean, basically, the job was to go work
2  with Lorelei, go out in the factory and develop a
3  document that will help the group leaders in the
4  factory do a better job. So we tried that for a while.
5       Q       All right. We went off on a tangent
6  there. Let's look at Exhibit 150.
7       A       I can't make anything out of this.
8       Q       Yeah. It's not a very good copy, but
9  this is a board meeting for September 14th, 2000. But
10 if you look beyond the black smudge in the middle --
11 and this is the copy we received -- do you see where it
12 says at the top _Original population is 160. Returned
13 to Ford operations equals 67._ Can you read where it
14 says "Transitioned to ZF Batavia equals 61"?
15      A       Yeah.
16      Q       And then below that it says _Plan to
17 retire from Ford and join ZF Batavia equals four._ Do
18 you see all that?
19      A       Yeah.
20      Q       Even though we're missing a part of
21 that, would you agree that this document which is
22 marked 7.C for the September 14th, 2000 meeting is a
23 document that reflects the status of Ford transitional
24 employees at the plant?
25      A       I guess I'd like to have the middle.

PAGE 109

109

1       Q       Yes.
2              MR. SIMON: And, Mr. Hunter, if you
3  have a better copy -- I don't know that you do,
4  but --
5              MR. HUNTER: I don't know. I mean, I
6  didn't bring that with me.
7              MR. SIMON: I understand, but if I can
8  just make a request.
9              THE WITNESS: Well, if you're asking
10 was it a report to the board on this issue, I
11 guess I can say that. Any other specifics it's
12 difficult for me to say
13             MR. SIMON: All right.
14 BY MR. SIMON:
15      Q       As far as you recall then, or your
16 understanding, September 14th, 2000 there was -- the
17 subject of the salaried work force was discussed at the
18 board meeting?
19      A       Right.
20      Q       This is Exhibit 151. I'll explain this
21 one. I don't have an agenda for this meeting to go
22 with it, but it says at the bottom for the board
23 meeting March 7th, 2001 and it's marked 6.e.1. Take a
24 moment to look at that. But my question is just: Did
25 you have some sort of discussion about the AIP program

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 29 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 110

110

1  during this 2001 meeting?
2        A      Yeah, yeah, mm-hmm.
3        Q      You agree, right?
4        A      Mm-hmm.  AIP has to be approved by the
5  board, you understand?
6        Q      Okay.
7        A      The -- the AIP compensation the board
8  has to give its approval to.
9        Q      So each of the last four years ZF
10  Batavia has presented to the board of directors what
11  the AIP compensation program --
12        A      The objectives.  What we do is we
13  present the objectives and then the board gives us an
14  opinion about whether those objectives, in terms of
15  quality, delivery, safety, are sufficiently aggressive
16  or not and they agree on the objectives.  And then the
17  specific compensation for the people, for myself and
18  the people that report directly to me, need to be
19  approved by the board.
20        Q      Staying with Exhibit 151 then for a
21  second, where it says approach number four, "Define
22  relationship between AIP objectives/awards and
23  Management Theme Objectives:  Points awarded based on
24  Green, Yellow, red Accomplishment.
25        A      Right.

PAGE 111

111

1        Q      What that reflects is that the AIP for
2  2001 would link individual performance to AIP bonus?
3        A      Well, it would clearly link the
4  department objectives to AIP.  The individual stuff is
5  still a decision on the basis of the department
6  manager.
7        Q      Did you communicate to the board in
8  2001 that you wanted the AIP bonus amount to be related
9  to the individual salaried employee's performance?
10        A      No, no.  We want it to relate to the
11  department.  Okay?  All right!  Share Theme Objectives
12  across departments, okay, map objectives for quarter,
13  so we wanted to do it on a quarterly basis, okay, and
14  then see where are we in terms of red, yellow, green,
15  on this accomplishment.  And then -- and then by
16  department have a scheme by which whether they'd meet
17  their objectives or not would be -- times their AIP
18  award would be their overall award for each department.
19  So as you can see, it's by department.  Okay?  That's
20  what it says, each department, right?  It was not
21  individual.  It's by department.  We were taking it
22  down to the department level.
23        Q      Well, I thought in 2001 the company
24  definitely made a decision that AIP bonuses that would
25  be awarded in 2002 for individuals would be based on

PAGE 112

112

1  that individual's job performance?
2        A      On the -- on the basis of what we were
3  attempting to do within the company.  But you're asking
4  what did we discuss at the board, and I'm trying to
5  describe to you that we discussed at the board level by
6  department.  Okay?
7        Q      You can put that one aside.  This is
8  152.  Again, this is a board meeting agenda for
9  November 9th, 2001.
10        A      Yeah.
11        Q      And I've attached two documents there,
12  one that says 7.a.2 in the lower right.  The other says
13  7.b.  And these two documents concern the AIP again for
14  2001, correct?
15        A      Exactly.  Yeah, this is -- this is the
16  formula that I discussed earlier.  Those are the
17  objectives, right?
18        Q      Mm-hmm.
19        A      Okay.  This is what we have to do
20  across the company.  And these objectives are made up
21  obviously to the performance of different departments.
22  So you cascade this result down into different
23  departments and pull it all together.
24        Q      Now, you certainly wanted to
25  communicate to the board that there was this problem

PAGE 113

113

1  with certain employees had overtime compensation that
2  was double their regular?
3        A      No.
4        Q      Why didn't you --
5        A      That was never communicated.  It's a --
6  it's a matter that doesn't need to be addressed at the
7  board.  The board is concerned about the fundamental
8  strategic running of the business.  Okay?  The board is
9  concerned about the objectives, overall business, but
10  under no circumstances was this point ever discussed
11  with the board.
12        Q      Are there -- this past week were there
13  two auditors from Ford visiting the plant?
14        A      They just visited us today and we had
15  an open discussion on a Ford audit that's going to take
16  place.
17        Q      I guess there's -- is there some
18  concern on Ford's part that if there's -- the price of
19  the transmission is going up even though ZF Batavia is
20  reporting that overall savings are --
21        A      There's no concern on Ford's part,
22  other than they're just going to do their standard
23  audit.
24        Q      Do they do this every year?
25        A      They -- they do -- well, we have

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 114

114

1    discussions every week on the price of the
2    transmission. Okay? With respect to general -- you
3    know, the GAO office audit, that's going to be a more
4    in-depth audit that's going to be done now. They've
5    waited several years, haven't done it, and it was
6    scheduled and now they have time to do it, so they're
7    in auditing.
8        Q    This is the first audit of that type
9    that they've done since 1999?
10       A    Yeah, mm-hmm. Of this in-depth, yeah.
11       Q    Why are they doing it now?
12       MR. HUNTER: Objection. I mean, it's
13    irrelevant.
14       THE WITNESS: Yeah, it's irrelevant. I
15    agree. It makes no sense. They're doing it
16    now because it's on their schedule.
17   BY MR. SIMON:
18       Q    It has nothing to do with their concern
19    about whether they're getting accurate information from
20    ZF Batavia --
21       A    No.
22       Q    -- about the cost of the transmission?
23       A    No, no. It's a standard audit. We
24    have gotten -- we've gone through the Ernst and Young
25    audits for the last four years and passed with flying

PAGE 115

115

1    colors, so there is no -- there is no issue about
2    accurate information. There's always a negotiation
3    going on between a supplier and a customer about, okay,
4    what are we doing here with respect to the price of
5    this product. Okay? So to characterize it as anything
6    other than standard business would be inappropriate
7    because that's not the case.
8        Q    But you certainly communicated with
9    Ford and ZF generally about the performance of the
10    plant; in fact, you do that regularly?
11       A    We have to. We're a joint venture.
12    They're our -- they're our -- the data is there. It's
13    available to them.
14       Q    And even if you haven't communicated
15    certain things at the board meeting, you certainly
16    communicated to various officials at Ford that you've
17    had this problem in 2001 that --
18       A    No.
19       Q    -- salaried employees --
20       A    No.
21       Q    Let me finish my question. You've
22    reported to upper management at Ford that you had
23    problems in 2001 with salaried employees having
24    excessive overtime compensation?
25       A    No.

PAGE 116

116

1        Q    Why not?
2        A    It's -- it's not an issue with regard
3    to -- that deserves a discussion at the board level.
4        Q    I'm not talking about at the board
5    level. I just mean that you've had any conversations
6    with people up the chain at Ford about this problem.
7        A    We've had discussions with Ford about
8    overtime in general, but it's mostly with respect to
9    hourly because that's where the bulk of the money is
10    spent. There has been no discussions that I have
11    participated in, in terms of this issue, this lawsuit,
12    or anything as it related to it because it doesn't
13    deserve the discussion at the board level. We've got
14    too many other major issues.
15       Q    I'm not asking board level. I mean, I
16    assume you communicate with people at Ford in between
17    the board meetings.
18       A    Yeah, but not on this subject.
19       Q    So your testimony is that you've never
20    communicated to anyone at Ford about problems with
21    salaried employees making too much overtime?
22       A    That's correct. I don't worry about
23    that. We have had lots of discussions about hourly
24    people, okay, hourly overtime.
25       Q    Well, I thought that the salaried

PAGE 117

117

1    overtime issue kind of impacts the hourly overtime
2    issue.
3        A    Well, of course it does, but it's not a
4    point of discussion with Ford. It's how we run the
5    company.
6        Q    So when you've talk to Ford, you've
7    limited it in the area of overtime to just hourly
8    employees?
9        A    Yeah. Well, no, generally you talk
10    about overtime and you look at -- the key measure, if
11    you look at this data, is the hour -- hours per unit,
12    and salaried hours are not factored into those
13    measures. Okay? So do you want to look at that?
14       Q    I thought you said that salaried
15    overtime hours are not factored into that measurable.
16       A    No, no.
17       Q    So I thought -- now we're talking about
18    department managers. Their AIP is based on
19    measurables, correct?
20       A    Sure.
21       Q    So department managers' AIP bonuses
22    wouldn't be affected by salaried overtime because
23    that's not part of the measurable, correct?
24       A    That's correct.
25       Q    All right. So you have employees in

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 31 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 118

118

1    the maintenance department, for instance, in 2001
2    working a lot of overtime?
3        A    Mm-hmm.
4        Q    And the fact that people worked a lot
5    overtime caused you to recommend that their AIP bonuses
6    be cut or reduced, correct?
7        A    Because -- because they influence the
8    hourly people. All right? That's where the cost is.
9    Do you understand?
10       Q    I understand. But the fact that the
11   salaried employees worked that extra overtime or
12   excessive overtime, as you have characterized it, had
13   no impact whatsoever on the AIP bonuses of the
14   directors of the departments, correct?
15       A    It had --
16       Q    Is that correct, Mr. Adams?
17       A    Time out. That's incorrect.
18       Q    Why is that?
19       A    Because when they work the overtime,
20   they have hourly employees that -- they don't go in and
21   just work for nothing. Okay? They have hourly
22   employees that work, and it's those hourly employees,
23   those hours that then get put against this measure.
24   Okay? So when -- when -- there's an indirect effect.
25   So when there's more hours per unit, okay, of, of --

PAGE 119

119

1    because we've got 1000, you know, 1100 hourly
2    employees, those hours per unit then get factored into
3    the AIP measure because we -- we measure direct
4    standard and indirect standard labor hours per unit.
5        Q    Do you know if a salaried employee
6    works overtime, if his hour of overtime is hour to hour
7    what an hourly employee is working?
8        A    It depends on department. In a
9    production department the salaried employee, the
10   supervisor, is supposed to be there in most cases to
11   oversee the hourly workers. And that's not always the
12   case, but for the most part we tell people you should
13   be there. If you're -- if you're going to schedule
14   your hourly people on the weekend or whenever, then you
15   should be there to supervise that practice.
16           Now, the conflict of interest comes in,
17   and particularly in 1999, is if they schedule the
18   overtime for those people and don't make the parts
19   during the week, obviously they get the personal
20   benefit of having worked the overtime. And that's been
21   the problem in Batavia.
22       Q    Certainly it's possible for a salaried
23   employee, for instance, to work on the weekend and that
24   he's not working alongside of the hourly employees?
25       A    Well, ask the question again.

PAGE 120

120

1        Q    A salaried employee could work in a
2    given month overtime and during that time a
3    corresponding hourly employee is not working; that's
4    possible?
5        A    Depending on the department, sure.
6        Q    That could happen in maintenance?
7        A    That could happen in maintenance, sure.
8        Q    That's --
9        A    It's unlikely that it would happen in
10   maintenance, but it could happen.
11       Q    Could it happen in production?
12       A    No. In production there's no
13   justification.
14       Q    Could it happen in quality?
15       A    Quality? It's a whole different
16   circumstance because some of their people that have to
17   work are hourly people and then there are salaried
18   people. So you have to go through -- if you want to
19   ask that question, we're going to have to sit down and
20   go through department by department what the
21   circumstances are.
22       Q    All right. Certainly someone who works
23   in human resources that's not a supervisor and works
24   that kind of overtime, they're not doing it in
25   connection with an hourly employee working that same

PAGE 121

121

1    amount overtime?
2        A    Well, it depends on if it's a union
3    issue or not, so, I mean, there's all -- to make
4    general characterizations, as you're attempting to do,
5    is not possible. You have to understand the specific
6    details of the circumstances.
7        Q    To understand if when a salaried works
8    overtime if an hourly person is also working overtime,
9    you can't make any general, sweeping statements?
10       A    No, you can't. But you can look in the
11   given departments and you can find out what's going on.
12       Q    All right. This is Exhibit 153. You
13   see this is a November 7th, 2002 board meeting agenda,
14   right, Mr. Adams?
15       A    Yeah.
16       Q    And do you see where it has AIP
17   measures?
18       A    Right.
19       Q    And, again, this is where you discussed
20   the AIP with the board, I take it?
21       A    Yeah. They have to approve the AIP
22   result.
23       Q    And, actually, at the bottom where it
24   says miscellaneous items, it reflects that 2002 AIP
25   results and 2003 AIP objectives were all discussed,

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 122

122

1   correct?
2        A       They have to look at the -- they have
3   to look at last year's results and agree, okay, go
4   ahead and pay the AIP and then they look at next year's
5   objectives and see if those are acceptable.
6        Q       You can put that document aside.
7   BY MR. SIMON:
8        Q       When you've talked about AIP with the
9   board, have you explained to the board that this is the
10  percentage we're going to give for GSRs, for instance?
11       A       No.
12       Q       You've never communicated -- do you
13  communicate what the actual --
14       A       We don't -- we don't have any
15  obligation to get into the details at different levels.
16  All we do is we say here are the objectives for safety,
17  quality, delivery and cost, and here is the formula
18  that we use to calculate the pot of money available
19  that then gets distributed.  Okay?
20               So the board has nothing to do with
21  this circumstance other than the very highest level,
22  there's the amount of money, here's the objectives,
23  that that money is consistent with those objectives.
24  There's no discussion, in-depth evaluation or whatever
25  beyond that.

PAGE 123

123

1        Q       You had testified earlier about Ford
2   changing their overtime policy with respect to salaried
3   employees, correct?
4        A       (Nods head)
5        Q       Have you had -- I take it then you've
6   had some understanding since 1999 of what Ford's
7   overtime policy was?
8        A       Well, what -- what Ford -- yeah.  What
9   Ford is attempting to do now, as I understand it -- and
10  I haven't read anything that says this is the policy --
11  they are permitting overtime only in their factories
12  for people who directly supervise hourly employees.
13  All other activities are supposed to be done as a
14  result of overall job responsibility.
15       Q       Ford continually has paid group leaders
16  overtime where it's authorized overtime?
17               MR. VANWAY:  Objection.  Foundation.
18               THE WITNESS:  Yeah, I mean, I -- that's
19               -- that would be an assumption, but I haven't
20               read the Ford -- I don't know the details of
21               the Ford --
22  BY MR. SIMON:
23       Q       Has the Ford overtime policy changed at
24  any other time in the last four years, other than this
25  recent change?

PAGE 124

124

1               MR. VANWAY:  Objection.
2               THE WITNESS:  I can't even tell you if
3       there's a change.
4   BY MR. SIMON:
5        Q       Has anyone told you that there has been
6   a change other than this one?
7        A       Other than this one thing I've heard,
8   no.
9        Q       To your understanding, besides this
10  change, has ZF Batavia's overtime policy for salaried
11  employees been the same as Ford's?
12               MR. VANWAY:  Objection.  Foundation.
13  No testimony he knows what Ford's policy is.
14               THE WITNESS:  Yeah, right.  I don't
15  know.
16  BY MR. SIMON:
17       Q       Has anyone told you?
18       A       No.
19       Q       Have you asked anybody?
20       A       No.
21       Q       Didn't employees -- it's your
22  understanding when salaried employees came from ZF
23  Batavia -- excuse me, from Ford to ZF Batavia, they
24  understood that they would be paid overtime as they had
25  at Ford, right?

PAGE 125

125

1        A       Not necessarily.
2        Q       Who told you differently?
3        A       Overtime was not an issue of great
4   discussion in this whole transition program.
5        Q       You mean you didn't discuss it with
6   anybody?
7        A       No.
8        Q       But you didn't attend certain meetings
9   either, right?
10       A       That's right.
11       Q       But you knew that overtime would be
12  paid was one of the statements made in the brochure,
13  correct?
14       A       Sure.
15       Q       All right.  And are you saying -- did
16  you have any understanding whether the salaried
17  employees were told that the overtime policy would be
18  the same as Ford's?
19       A       I -- I had no understanding of whether
20  specifically people were told here's this overtime
21  policy and here's our overtime policy and let's compare
22  the two.  That was not done.
23       Q       What --
24       A       And -- and I haven't participated in
25  any process of comparing those two.  All I can tell you

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 126

126

1  in detail is what my overtime policy was in
2  Gainesville.
3        Q      Is that where ZF Batavia came up with
4  their overtime policy for ZF Batavia?
5        A      No.
6        Q      Did you have any input into what the ZF
7  Batavia overtime policy would be?
8        A      I had some.
9        Q      What was your input?
10       A      My input was that we ought to
11 compensate people fairly when we ask them to work.
12       Q      And have you done that?
13       A      I think so, for the most part, yes.
14       Q      Have you ever heard of anyone referring
15 to overtime time policy as the free hour rule?
16       A      No.
17       Q      If an employee works nine hours on a
18 regular work day --
19       A      Oh, yeah, there's an expectation --
20 excuse me.  I hadn't heard that term, but there is an
21 expectation that somebody would work an extra hour as
22 part of their -- not -- through the ninth hour as part
23 of their normal supervisory or general salaried
24 responsibilities.
25       Q      So it's your understanding -- well,

PAGE 127

127

1  what if they work ten hours, what do they get paid,
2  assuming they're at a level where it's authorized and
3  assuming they were authorized to work that amount of
4  time?
5        A      Well, depending on the circumstance,
6  they would get paid for either one or two hours, and I
7  can't tell you, depending on the circumstance.
8        Q      Why would they ever be paid for two
9  hours?
10       A      Because if it was scheduled regularly,
11 consistently, yeah.
12       Q      All right.
13       A      It depends on whether it's scheduled or
14 not.  It depends on, again, the specific circumstance.
15       Q      But it's your understanding of the
16 overtime policy at ZF Batavia that if you work two
17 hours of overtime on a regular day and that two hours
18 --
19       A      No.  Regularly.  Regularly.  I mean, if
20 there's a job to be done or if someone has got to work
21 three hours or whatever.  Okay?  If they are regularly
22 working through a special requirement.  Okay?  And it's
23 up to the management to decide.
24       Q      If that person is regularly working two
25 hours, then that salaried employee should receive, in

PAGE 128

128

1  your understanding, two hours overtime compensation?
2        A      Could, if it was approved.  That's
3  correct.
4        Q      And do you have any idea whether that
5  corresponds with Ford's overtime policy?
6        A      I have no idea.
7        Q      In 1999 was it your intention that ZF
8  Batavia's overtime policy would track the same as
9  Ford's?
10       A      No.  I had no opinion either way.
11       Q      Well, did you have an opinion that ZF
12 Batavia should create overtime policy as they see fit?
13       A      Yeah, right.
14       Q      And in 1999 you believed that ZF
15 Batavia should create overtime policy regardless of
16 what Ford's overtime policy was?
17       A      Well, every company needs an overtime
18 policy, right?
19       Q      But you thought that ZF Batavia's
20 overtime policy should be created without regard to
21 Ford's overtime policy; is that fair?
22       A      No.  You can't just neglect Ford's -- I
23 mean, you have to look at both parents, what are the
24 circumstances, what are we trying to do here and what
25 makes sense.

PAGE 129

129

1        Q      So in 1999 did you then look at Ford's
2  overtime policy and ZF Batavia's overtime policy?
3        A      No, no.  I left that to the
4  responsibility of other people.
5        Q      Do you know when ZF Batavia's overtime
6  policy was created, whether anyone took stock of what
7  Ford's overtime policy is?
8        A      I believe, yeah, people did understand
9  what was going on at Ford.
10       Q      And did they try to create an overtime
11 policy that tracked Ford's?
12       A      No.  I think that's an influence, but
13 you don't necessarily say Ford is doing this,
14 therefore, I have to do it.
15       Q      Internally you -- did you recommend one
16 way or the other what to do?
17       A      No.  The important thing is to have a
18 policy.
19       Q      All right.  But it was --
20       A      And have it understood and fairly
21 administered.  That's the important thing.
22       Q      Right.  But the policy that was created
23 in 2000, it certainly wasn't surprising to you if it
24 didn't track Ford's overtime policy?
25       A      Yeah, correct.

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 130

130

1    Q    Because it was never your intent to
2  have ZF Batavia's overtime policy with respect to
3  salaried employees track Ford's overtime policy, right?
4  That wasn't your intent?
5    A    Not necessarily.
6    Q    I don't know what you mean.
7    A    Well, you have to look at the business
8  circumstances that you find yourself in.  We talked
9  earlier about a discussion with people looking at where
10  you're spending money at.  Okay?  And so you have a
11  discussion about, okay, what's fair and what's not
12  fair, and that changes over time.  What are the
13  circumstances in the business?  Everybody -- everybody
14  has to look at, in this automobile industry, look at
15  are their costs, what are they -- what are they getting
16  from their employees, what do the employees have to
17  contribute, what -- what's the performance that's
18  required, and, and, and.  Okay?  So it can change
19  continually.
20    Q    Understood.  If someone had asked you
21  in 1999 is the overtime policy at ZF Batavia going to
22  track as it was at Ford, you would have honestly
23  answered I don't know?
24    A    I would say so, yeah.
25         MR. SIMON:  Off the record.

PAGE 131

131

1                (OFF THE RECORD)
                 *********
           END OF SEALED TESTIMONY

PAGE 132

132

1         MR. SIMON:  Back on the record then.
2         Exhibits 146 to 153 were under seal and we are
3         no longer under seal.
4  BY MR. SIMON:
5    Q    If you could turn to Exhibit 16.
6    A    To a point you made earlier, I was
7  shown this this morning.  Okay?
8    Q    Okay.  You were shown Exhibit 16.  As
9  we sit here today, are there any other documents that
10  we've gone over, any other documents that --
11    A    No.  I'll tell you if you show me
12  something that we talked about that I can remember.
13  But this one, we did discuss this morning.  Okay?
14    Q    All right.  And Exhibit 16 is a notice
15  that ZF Batavia put out regarding -- it was put out to
16  all salaried employees, correct?
17    A    Yeah, right.
18    Q    So that's --
19    A    We had -- we had similar documentation
20  for hourly employees.
21    Q    Where it says under notice, it says
22  _All ZF Batavia salaried employees._  That's all
23  salaried employees that are employed by ZF Batavia,
24  correct?
25    A    Mm-hmm.

PAGE 133

133

1    Q    That's a yes?
2    A    Yeah.
3    Q    And where it says Ford salaried, that's
4  all the salaried people that are still employed by
5  Ford?
6    A    Correct.
7    Q    And, again, how many of those people do
8  you have roughly?
9    A    Well, there's still some people in the
10  factory as engineers.  And that's a good question.  I
11  would guess we have about five still, but they're --
12  they're on loan.  They're not -- okay, they're on loan.
13    Q    And also, the notice was distributed to
14  contract employees with salaried responsibilities,
15  correct?
16    A    Right.  We have contract, approximately
17  20 percent.
18    Q    Twenty percent?
19    A    Contract employees, through an agency.
20  You know, you hire people and they come and do jobs
21  through an agency.  So that's who those contract people
22  are.
23    Q    What agencies?
24    A    Oh, good question.  You would have to
25  ask somebody else.  I can't tell you.

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 134

134

1    Q    Is it more than one?
2    A    Probably, yeah.
3    Q    I guess -- I mean, Gerry Priest, I
4  guess, is a contract employee currently, right?
5    A    No, no.  When we -- when we talk about
6  contract employee, we mean somebody that's a temporary.
7  You know, you need an engineer to work for 12 months,
8  you go out and say, okay, XYZ agency, I need an
9  engineer to come in and help me do the processing on
10  this part.  Okay?  All right?
11    Q    I know you don't deal with the details
12  of this, but the contract employees, ZF Batavia pays
13  them and then gets reimbursed by the agency?
14    A    Right.  We pay the agency and then the
15  agency pays the person.
16    Q    Okay.
17    A    It's the opposite of what you said.
18    Q    All right.  What about the Ford
19  salaried employees?
20    A    The Ford salaried employees, we get an
21  invoice from Ford.
22    Q    You pay the Ford employees and get
23  reimbursed by Ford?
24    A    No, no.  We don't pay the Ford
25  employees.  Ford pays them.  It's like the -- it's like

PAGE 135

135

1  the hourly people, all the -- you've got roughly 700
2  hourly people.  They get paid by Ford, Ford gives us an
3  invoice and we give Ford the money back.
4    Q    Well, let's say the Ford salaried
5  person works two hours of overtime.
6    A    Oh, I -- I can't even go there.  I
7  don't understand how Ford would deal with that.
8    Q    Well, maybe you can help -- we'll see
9  how far we can go with this.
10    A    And, to be honest with you, I don't
11  even know if we really pay Ford back for their time of
12  these engineers working in our factory, to be honest
13  with you, because there is so few of them.  I don't
14  know if there is an invoice or not.  I really don't
15  know.
16    Q    Well, I mean, if somebody at Ford who
17  is salaried works overtime and that person's supervisor
18  says well, you weren't supposed to get paid that
19  overtime --
20    A    I -- I have no idea about that
21  circumstance whatsoever.  I can't tell you what's going
22  on there in specifics.
23    Q    All right.  But in any case, you were
24  aware that this notice had been distributed a couple
25  years ago?

PAGE 136

136

1    A    Oh, yeah.  It's an important notice
2  because of the foreign trade zone.  We -- we need to
3  comply with federal government regulation or we'll get
4  fined by the Treasury Department.
5    Q    Mm-hmm.  Where it says, third
6  paragraph, _Please be advised that salaried time sheets
7  will be audited against Honeywell system readouts,_ do
8  you see that?
9    A    Mm-hmm.
10    Q    And do you see where it goes on to say
11  that if there is notable differences between them, pay
12  adjustments are a possibility if no justification is
13  forthcoming?
14    A    Mm-hmm.
15    Q    Has ZF Batavia ever made any such pay
16  adjustments, to your knowledge?
17    A    To my knowledge, no.
18    Q    And do you know why not?
19    A    Well, after I read this and this thing
20  was distributed, I was concerned about it because
21  hourly -- or salaried people are salaried people.  So
22  the -- the issue here, this was actually done more for
23  the union than it was for the salaried employees.
24  Okay?
25    Q    How so?

PAGE 137

137

1    A    Well, we don't have timekeeping in our
2  factory today and so we needed to get the union people
3  understanding in the federal trade zone we've got to
4  keep track of them and we wanted to know when they're
5  coming and going.  So the idea is we want to make sure
6  that everybody is doing this on the salaried side as
7  well as the hourly side.
8    Q    So you wanted to do it with the
9  salaried first so that you could create a precedent to
10  do it with the union?
11    A    Yeah, right.  That's right.
12    Q    Do you know if anybody -- well, do you
13  know why it said pay adjustments are a possibility if
14  you never did it?
15    A    No, I never did.  I don't know why Len
16  put that in there, to be honest with you.
17    Q    But you said --
18    A    I think it relates to what message
19  you're trying to send to the hourly people in the
20  union.  There's no time clocks in our facility, okay,
21  so --
22    Q    Well, Mr. Adams, this notice was sent
23  to salaried employees, right?
24    A    I understand that.
25    Q    So the message --

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 36 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 138

138

1    A    And read by all of the hourly employees
2  also.  You just don't send a piece of paper like this
3  that's read only by the salaried employees.
4    Q    But with respect to the comment about
5  pay adjustments are a possibility, that was a message
6  that was directed toward the salaried workforce?
7    A    That's correct.
8    Q    And did you ever tell Mr. Sennish that
9  you had concerns that we can't adjust the base pay for
10  a salaried employee?
11    A    No, I didn't tell him that, but he
12  never brought a case to me, so I think it was something
13  that just died a natural death.
14    Q    But just so I understand, when you
15  learned that this notice said pay adjustments are a
16  possibility, you had a concern that, hey, wait a
17  minute, we can't deduct base pay for salaried
18  employees?
19    A    Yeah.  I read it and I thought, oh,
20  God, okay.
21    Q    Oh, God, we don't want to violate the
22  Fair Labor Standards Act, right?
23    A    Exactly, yeah.
24    Q    Do you have a bias against Ford
25  employees, Mr. Adams?

PAGE 139

139

1    A    No, not at all.  They own half of me.
2  Ford Motor Company owns 49 percent of me.
3    Q    Have you ever talked about getting the
4  Ford influence off the floor or that certain employees
5  have the Ford taint?
6    A    No, no, not Ford.  It's called -- one
7  of my concerns is the historical perspective of
8  Batavia.  Okay?  It's Batavia.
9    Q    Did you ever suggest that you thought
10  there might be some sort of -- that the Appalachian
11  area that the Batavia plant is at, that that somehow
12  has impacted the plant's poor performance?
13    A    No.  Let me suggest this has been a big
14  brouhaha.  I was -- we had retained consultants to talk
15  about why do we have this serious problem with
16  attendance historically, okay, why do we have this
17  productivity problem and, and, and.  And in a
18  conference one day there was a union representative and
19  a management team and I asked is this at all related to
20  that Batavia is the last in the -- if you look at the
21  federal government's categorization of counties,
22  Clermont County is on the border of Appalachia.  So I
23  asked is there in anybody's belief, in the consultant's
24  belief, an idea that Appalachian culture has
25  difficultly in terms of some of these circumstances

PAGE 140

140

1  that we're facing here today.
2    Q    Who did you --
3    A    And that became a big brouhaha after
4  that.  There was only that one comment.
5    Q    You said that to a group of people?
6    A    Yeah.  It was -- I asked a consultant a
7  question in a -- in a conference room where there was
8  one union representative and then it became common
9  knowledge in the plant the next day that I was accusing
10  everybody of being from Appalachia, blah, blah, blah,
11  so --
12    Q    Have you made other comments with
13  respect to Ford that gave people the impression that
14  you had a negative opinion of an employee that had
15  worked in the Ford system a long time?
16    A    People can interpret how they choose,
17  right?
18    Q    I mean, people have told you that they
19  had that perception of you?
20    A    Yeah.  People -- Karl mentioned it to
21  me.  Okay?  Because I had expressed some concerns about
22  where Ford was going.  Yeah.
23    Q    I mean he -- Karl expressed --
24    A    Not about the employee.  Let's not talk
25  -- let's not talk about specific employees.  Let's talk

PAGE 141

141

1  about Ford in general, okay, what Ford is attempting to
2  do and where it's going and some of the rules and
3  policies that we had encountered and how the factory
4  operated and what we believed we had to do to change
5  that mind set in Batavia.  Okay?
6    Q    If someone testified in this case that
7  Dave Adams has said things about Ford transitional
8  employees that were perceived as Dave Adams doesn't
9  like Ford employees, that wouldn't be true?
10    A    No.  People -- I can't -- I can't say
11  how people will perceive what I say.  They can perceive
12  anything.  We live in the world we perceive.  So
13  perceive, they can perceive anything.
14    Q    You never -- in your mind, you never
15  said anything like that?
16    A    No, I have not said that I don't like
17  Ford transitional employees, if that's what you're
18  getting at.
19    Q    Have you said anything that would
20  reflect that you think that a Ford transitional
21  employee has to unlearn the Ford system to be
22  successful at the plant?
23    A    Clearly, Batavia, to survive has got,
24  and has had, to change its ways.  There are -- it has
25  nothing to do with Ford, this issue.  People would like

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 142

142

1  to mix the two. This issue has nothing to do with
2  Ford. This is -- this is Batavia as an entity has been
3  very unproductive, has been uncompetitive and so we
4  have had to change historical practices both among
5  salaried and hourly people to be able to become more
6  competitive. And as a result of that, we have reduced
7  the costs considerably and made Batavia more
8  competitive.
9         Q       In 1999 --
10        A       And it's a painful change. It's a very
11  painful change.
12        Q       In 1999 you knew that those kind of
13  painful changes would have to occur at the plant?
14        A       Sure. Right.
15        Q       You knew that these employees that had
16  been at the system a long time in the Batavia plant had
17  to change their way of thinking?
18        A       We had to -- we had to get them --
19  well, not all employees, because some employees
20  complained to me about what changes really were
21  necessary and participated in the process of making
22  those changes. Rick Williams, Hassan Saleh, you know,
23  these guys that -- that were the people that we talked
24  about earlier that joined the company to try and make
25  it better.

PAGE 143

143

1         Q       Did you ever attend a board meeting up
2  in the Detroit area where the union officials like Mike
3  Warren were --
4         A       Yeah -- I'm sorry, finish your
5  question.
6         Q       There was a -- you attended such a
7  board meeting?
8         A       Yeah. We invited them to come to the
9  board meeting.
10        Q       Was a gentleman by the name of Mr.
11  McDonald at that meeting from Ford?
12        A       No.
13        Q       Do you remember a conversation during
14  the board meeting where someone suggested that it's a
15  mystery why this plant isn't performing?
16        A       Yes.
17        Q       Do you remembering somebody at the
18  meeting saying, well -- somebody from Ford saying that
19  it may be a mystery, but if this mystery is never
20  solved, we'll put a padlock on the door?
21        A       Words to that effect were exchanged,
22  yeah.
23        Q       And that was said by somebody at Ford?
24        A       That was said by -- well, to be honest
25  with you, I can't remember exactly, but most likely it

PAGE 144

144

1  was said by someone at Ford. But I can't remember
2  exactly who said it. But it was a discussion with the
3  committee, right.
4         Q       The people who were there with Ford
5  were higher upper management, right?
6         A       Mm-hmm.
7         Q       That's a yes?
8         A       Yes. Sorry.
9         Q       So it's your recollection that somebody
10  in Ford's upper management made the comment during that
11  meeting if the plant mystery isn't solved, Ford is
12  going to put a padlock on the door?
13        A       Yes.
14        MR. SIMON: Off the record.
15        (OFF THE RECORD)
16  BY MR. SIMON:
17        Q       Mr. Adams, did you have a conversation
18  with Rick Ervin or Rick Williams about Rick Ervin's
19  retirement situation?
20        A       Mm-hmm.
21        Q       Did you ever tell Mr. Williams that if
22  Rick Ervin wanted to stay in the plant and begin to
23  draw his pension from Ford, that you wanted to see that
24  happen?
25        A       No. I think I don't want to violate

PAGE 145

145

1  law and I don't understand all the details of
2  retirement law, but you can't draw, you know, two
3  retirements.
4         Q       But, I mean, what did you -- what was
5  your conversation with Mr. Williams then, about Mr.
6  Ervin?
7         A       Well, this is a year or so ago, maybe
8  it's eight or nine months ago. The conversation had to
9  do about what was Rick going to do, was he going to
10  retire or not retire. And then there was a complex
11  issue that arose during -- about his retirement and, to
12  be honest with you, I can't remember the details of
13  that right now.
14        Q       Do you recall if maybe somebody told
15  Rick that, yes, you can retire and stay at ZF Batavia
16  and then ultimately that opinion was reversed?
17        A       No, I don't think that that was -- that
18  was -- I can't tell you what somebody told Rick. I can
19  tell you that he was requesting something about
20  retirement that was not possible by law. Okay? That's
21  all I can tell you.
22        Q       You didn't recommend to Mr. Williams
23  that do what you can within the bounds of the law to
24  see that Rick Ervin is able to do this?
25        A       No, no.

Case 1:02-cv-00406-SSB-TSB    Document 44    Filed 11/21/2003    Page 38 of 39
WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 146

146

1    Q    You didn't express an opinion on it one
2  way or the other?
3    A    No.  I just wanted Rick to be satisfied
4  within reason, Rick Ervin, what he was doing.  Because
5  I thought Rick was a -- you know, Rick is a fairly
6  solid guy, been around a long time.
7    Q    As this might be my last deposition
8  before trial, is there any development in the plant in
9  the near future that will impact the terms of
10 employment of the salaried workforce at ZF Batavia?
11   A    Is there any plans?  What about?
12   Q    Let me be more specific.  Let me be
13 more specific.  People believe that there's going to be
14 a big change at the plant soon with respect to the
15 ownership of the plant.  Is there such a plan in the
16 works?
17        MR. HUNTER:  Objection to that
18 question.  It's not relevant to the facts of
19 the case at bar.
20        MR. SIMON:  I mean, like I said, this
21 is the last time I may have a deposition before
22 trial and if there's something that's about to
23 happen that's going to impact the very nature
24 of their employment with ZF Batavia, I need to
25 know about it.

PAGE 147

147

1        MR. HUNTER:  I haven't instructed the
2  witness not to answer yet, but quite frankly,
3  Mr. Simon, again, I guess I don't understand at
4  all how whatever is going on at the plant is
5  relevant to a claim for breach of past promise
6  and a Fair Labor Standards claim.
7        MR. SIMON:  Well, as you know, the
8  overtime issues, the losses are ongoing because
9  of the continuing implementation of the policy,
10 so what happens today and what happens tomorrow
11 will impact my claims.  But if you're not
12 instructing him not to answer, we don't need to
13 argue about this.  But that's my question.
14       THE WITNESS:  Well, I can't tell you
15 anything that's going to happen specifically in
16 the future that could impact that because I
17 don't know.  All right?
18 BY MR. SIMON:
19   Q    Are there plans?
20   A    I beg your pardon?
21   Q    Are there plans?
22   A    No, not -- there are no plans today
23 that I can say concretely this is going to happen, this
24 is going to happen or that.  Okay?  The parents are
25 always in discussion about where they want to take the

PAGE 148

148

1  joint venture.  Okay?  But I cannot tell you that I
2  know of anything that's going to have any impact.
3  Okay?  There's nothing specific.
4    Q    Well, as we sit here today, are there
5  heightened discussions about changing the nature of the
6  ownership and the operation of the plant?
7    A    Well, I'd have to -- I'd have to defer
8  to John to --
9        MR. HUNTER:  I am going to object and
10 instruct the witness not to answer that
11 question because it's just not relevant.  It's
12 highly proprietary.  And to the extent that Mr.
13 Adams knows anything about any discussions,
14 it's just simply not relevant.
15       MR. SIMON:  We'll have to bring that
16 one to the judge.  Again, my position is if the
17 joint venture is going to change significantly
18 tomorrow or next week in terms of who my
19 clients' employer is and what the policies are
20 there, this is my last chance to know about it
21 since we're at the end of discovery.  But
22 you're instructing him not to answer?
23       MR. HUNTER:  Again, you need to ask a
24 specific question.  If you're question is, is
25 something going to happen tomorrow or next

PAGE 149

149

1  week, I think he's answered that.  I'm happy
2  enough to let him answer it again.
3        MR. SIMON:  Well, okay.  He answered
4  that question.  Then I said:  Are there
5  heightened discussions to change the nature of
6  the ownership and operation of the plant?
7        MR. HUNTER:  And, again, the objection
8  is it's irrelevant.
9        MR. SIMON:  Okay.
10       MR. HUNTER:  To the extent that there
11 would be any such discussions, such discussions
12 would be highly proprietary.  All right?  And,
13 again, I'm going to instruct the witness not to
14 answer such a question.
15 BY MR. SIMON:
16   Q    Can you -- without revealing any
17 proprietary discussions, can you testify whether you
18 think it's likely that there is going to be a change in
19 the nature and the ownership and operation of the
20 plant, ZF Batavia, in the next six months?
21   A    Is it likely?  It's all conjecture.  Do
22 you want my conjecture?
23   Q    Well, is it more likely today than it
24 was, say, a year ago?
25   A    It's conjecture.  I mean, I -- I can't

WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
DAVE ADAMS
10/15/03

PAGE 150
150

1  project what's going to happen in the future.
2      Q      But, I mean, it sounds like there's a
3  potential plan there, so I want: What is it? Is it --
4      A      You should understand, if the parents'
5  members have a discussion, I am not party to those
6  discussions. Okay?
7      Q      As you sit here today, are you aware of
8  discussions regarding a specific company that is going
9  to take over the plant? Are you aware of discussions
10 that Ford is going to take over the plant as 100
11 percent owner? Are you aware of any such discussion?
12 Are you aware that any of those possibilities are a
13 likelihood in the next six months?
14      MR. HUNTER: Objection. Instruct the
15      witness we're just not going to go down this
16      path, Steve. I've tried to give a little
17      latitude because I don't want to give somebody
18      the wrong impression, but you've -- at this
19      point, time is up on the deposition and we're
20      just not going to answer that question or any
21      more questions.
22      MR. SIMON: All right. And, like I
23      said, for the record, I think that if there's
24      heightened discussions or plans to change the
25      very nature of the ownership and operation of

PAGE 151
151

1  the plant, I'm entitled to know them. You've
2  instructed him not to answer, and we'll add
3  that to our list of things to bring to the
4  court. We're done. Thank you.
         - 0 -
   (AND FURTHER THE DEPONENT SAITH NAUGHT)
         - 0 -

   _____
        Dave Adams

PAGE 152
152

C-E-R-T-I-F-I-C-A-T-I-O-N
STATE OF OHIO,
COUNTY OF HAMILTON, To-wit;
        I, Susan K. Lee, CVR-CM, Court Reporter
and Notary Public in and for the State of Ohio, do
hereby certify;
        That on the 15th day of October, 2003,
there appeared before me pursuant to Notice and
agreement of counsel, DAVE ADAMS, as a witness in the
previously entitled cause;
        That the said witness was sworn by me
and examined to tell the truth, the whole truth, and
nothing but the truth in said cause;
        That the deposition was taken by me via
Stenomask and electronic recording and the foregoing
151 pages contain a true, full and correct
transcription of all the testimony of said witness;
        That the deposition was submitted to
counsel for the witness for reading and signature;
        That I am not related to or in any way
associated with any of the parties to said cause of
action, or their counsel, and that I am not interested
in the event thereof.
        IN WITNESS WHEREOF, I have hereunto set
my hand this 30th day of October, 2003.

        _____
        Susan K. Lee, CVR-CM
        My commission expires:
        August 30, 2004