1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF OHIO

 3                WESTERN DIVISION, CINCINNATI

 4   EVERETT W. WHISMAN, et al.: Case No. C-1-02-406

 5        Plaintiffs,         : Judge Beckwith

 6   V.                       : Magistrate Sherman

 7   ZF BATAVIA, LLC, et al., :

 8        Defendants.         :

 9   _____

10        Deposition of DENNIS R. BAKER, taken on

11   Monday, August 4, 2003, commencing at 2:11 p.m., at

12   the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20
                GIGLIO REPORTING SERVICES
21                 3 CYPRESS GARDEN
                CINCINNATI, OHIO 45220
22                   513-861-2200

23

24
```

2

```
1    APPEARANCES:

2    On behalf of Plaintiffs:

3      Stephen A. Simon, Esq.
       22 West Ninth Street
4      Cincinnati, Ohio 45202

5    Also present:

6      Pam Blanco

7    On behalf of Defendant ZF Batavia, LLC:

8      John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
9      1700 Canton Ave.
       Toledo, Ohio 43624
10
       Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16   Also present:

17     Michael Warden

18   Cross-Examination

19     by Mr. Hunter                    4, 172

20     by Mr. VanWay                    107, 182

21

22

23

24
```

3

| 1 | BAKER DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 2 | 2 | 38 |
| 3 | | |
| 4 | 4 | 94 |
| 5 | | |
| 6 | 60 | 32 |
| 7 | 61 | 39 |
| 8 | 62 | 116 |
| 9 | 63 | 116 |
| 10 | 64 | 118 |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

1                          DENNIS BAKER

2     being first duly sworn, testified as follows:

3                          CROSS-EXAMINATION

4     BY MR. HUNTER:

5          Q.    Sir, will you please state your name

6     for the record?

7          A.    Dennis Ray Baker.

8          Q.    And, sir, your current address?

9          A.    3720 Quadrant Drive, Q-U-A-D-R-A-N-T,

10    North Bend, Ohio 45052.

11         Q.    Mr. Baker, my name is John Hunter.  I

12    represent the company in this matter.  I'm going to

13    ask you a series of questions today.

14         A.    Which company?

15         Q.    ZF Batavia, okay?  Your employer, ZF

16    Batavia.  I notice you haven't sat through any of

17    the other depositions.  Have you ever been deposed

18    before?

19         A.    No, sir.

20         Q.    Okay.  Then let me try and explain to

21    you a little bit, in terms of what's going to

22    happen.  A series of questions, if at any point in

23    time you don't hear me, you can't understand me, I

24    tend to speak very, very quickly as the court

1    reporter would acknowledge.  Every once in awhile I

2    mumble.  I have a whole array of bad habits.  If

3    you don't hear the question, don't understand it,

4    just stop me and let me know.

5            One of the things you have to do as

6    well --

7        A.    Yes I will.

8        Q.    -- you got to tell me, okay?  If you

9    shake your head, that's going to --

10        A.    No, I won't do that.

11        Q.    All right.  Is there anything today,

12    in terms of a health issue or personal issue that

13    would prevent you from going forward with your

14    deposition?

15        A.    No, there isn't.

16        Q.    Okay.  I think you told me you have

17    never been deposed before, correct?

18        A.    Correct.

19        Q.    All right.  What's your current

20    position with ZF Batavia?

21        A.    Current position as of today?

22        Q.    Sure.

23        A.    Shift operations manager, as of last

24    Friday.

1          Q.     Okay.  Is that a -- a recent

2     promotion?

3          A.     As of last Friday.  I haven't signed

4     any documentation yet to finalize that officially,

5     but that was what was offered to me Friday.

6          Q.     Am I putting you too much on the spot

7     if I ask if you've taken that promotion or not?

8          A.     Yes, I have, as long as what they get

9     me to sign is what we agreed upon.

10          Q.     Okay.  Are you working, then, in CD4E

11     or is that a CVT position?

12          A.     CD4E --

13          Q.     Okay.

14          A.     -- third shift.

15          Q.     And third shift is 3:30 to 11:30

16     approximately?

17          A.     The area I'm over, they usually start

18     around 4:00.

19          Q.     Okay.

20          A.     Assembly starts at four, the

21     production areas that support assembly will start a

22     half hour earlier at 3:30.

23          Q.     Okay.  And so I gather from that

24     statement you are in assembly?

7

 1          A.     I'm over the east side, which is all

 2     of assembly, final assembly, button up, pump, diff,

 3     main control and I also have clutch.

 4          Q.     Okay.  Prior to last Friday, what was

 5     your position with the company?

 6          A.     Lean manufacturing manager.  Lean,

 7     L-E-A-N.  It will be referred to in other documents

 8     as an LPM.

 9          Q.     LPM?

10          A.     Yeah.

11          Q.     Okay.  And is that what you hired on

12     as?

13          A.     No, sir.

14          Q.     Okay.

15          A.     MPS, Manufacturing Production

16     Specialist.

17          Q.     Would it be fair to say you've, then,

18     received a couple promotions since you've been to

19     Batavia?  You went from MPS to LPM?

20          A.     Since I hired in with Batavia?

21          Q.     Yes.

22          A.     I went from Ford to ZF as an MPS.

23     That was a promotion --

24          Q.     Okay.

8

1          A.     -- compared to what I was at Ford.

2          Q.     Sure.

3          A.     It was a job offer.   It was an MPS.

4          Q.     Okay.

5          A.     And then -- then promoted to LPM --

6          Q.     Okay.

7          A.     -- 'cause that amounted to more money.

8    And then this one right here, which until I sign is

9    official.

10         Q.     Sure.   All right.   How was it that you

11   came to hear about the opportunities at Batavia?

12         A.     I was working for General Electric at

13   the time and they had ads -- two ads in the paper,

14   one for a maintenance supervisor and one for a

15   production supervisor.

16         Q.     Okay.   And that was back when it was

17   Ford, correct?

18         A.     Yes.   That was in about September

19   1991.

20         Q.     Is that when you joined Ford?

21         A.     December 16th, 1991.

22         Q.     And what did you hire in as at that

23   time?

24         A.     Group leader, supervisor.   I think it

9

1   was called supervisor at that time and then they

2   kind of rolled it over to group leader.

3          Q.    When did you first get a promotion,

4   then, from Ford?

5          A.    When we -- when I hired in, we were in

6   the ATX area, and if I'm correct, my recollection,

7   we were level six.  And then we went to CD4E, they

8   moved everybody that went into that to a level

9   seven.

10         Q.    Okay.

11         A.    And the explanation was that you would

12  be doing some work that was traditionally a general

13  foreman or at a level above, some work.  So they

14  wanted to encompass that.

15         Q.    Okay.  And when you talk about a level

16  six to a level seven, that's like a pay grade?

17         A.    Yeah, in the Ford system.

18         Q.    And that's what we're talking about is

19  sometime after 1991, but before your joining the

20  JV, joint venture in 1999?

21         A.    Everybody that went to CD4E got --

22  went to a level six to my knowledge.

23         Q.    Okay.

24         A.    Or level seven, excuse me.

10

```
1          Q.    From six to seven?

2          A.    Six to seven, yeah.

3          Q.    Did you receive any other promotions

4    or changes with respect to your responsibilities at

5    Ford?

6          A.    No, not that I recall at this time.

7          Q.    Now, when you were at Ford, did you

8    receive other benefits other than your salary?

9          A.    Yes.

10         Q.    Okay.  What benefits would that have

11   been?

12         A.    There would be profit sharing payments

13   once a year.

14         Q.    But you didn't always get a profit

15   sharing payment every year, did you?

16         A.    I think while at Ford, yes, I did.

17         Q.    Okay.  What else?

18         A.    Stock purchase program was a

19   benefit --

20         Q.    Okay.

21         A.    -- where you buy stock and they would

22   contribute so much to it to buy Ford stock.

23         Q.    Was it a match by the company or

24   something like that?
```

```
 1          A.    Yeah.

 2          Q.    How much was that match?

 3          A.    It was either 50 or 60 cents on the

 4     dollar.

 5          Q.    Was there a cap?

 6          A.    I think 10 percent is what you can

 7     contribute.

 8          Q.    10 percent of your base?

 9          A.    Yeah.

10          Q.    What other benefits?

11          A.    Personal time, vacation time, medical

12     benefits.

13          Q.    Okay.

14          A.    Retirement.

15          Q.    Okay.

16          A.    Merit increases.

17          Q.    Okay.

18          A.    Bereavement.

19          Q.    Is that different than personal time?

20          A.    Yes.

21          Q.    Okay.

22          A.    We went through a few.

23          Q.    I can tell you, you told me personal,

24     vacation, medical, retirement, merit increases,
```

1    bereavement.  I'm not trying to --

2          A.    College tuition.

3          Q.    -- trick you.

4          A.    That's where Ford would pay up to a

5    thousand a year per student for their college

6    tuition.

7          Q.    Okay.

8          A.    Vehicle purchase, could buy cars under

9    A Plan.

10         Q.    Okay.

11         A.    And at this time, that's all I can

12   recall.

13         Q.    All right.  If you think of something,

14   just let me know.

15         A.    Okay.  Leave room.

16         Q.    All right.  The -- all of these

17   benefits were not static.  They didn't always stay

18   the same, did they?

19         A.    For the most part they did, but

20   your -- like the merit increases, they were all

21   based upon what the company did, how much profit

22   they made.  Profit sharing was based upon how

23   much -- how well the company did.  They could be

24   higher or lower, depending on what Ford Motor

1   Company did --

2           Q.      Okay.

3           A.      -- in the marketplace.

4           Q.      Now, in your complaint, I believe that

5   there are -- the allegation is that you were told

6   certain things that you don't feel that have been

7   followed through on --

8           A.      That's correct.

9           Q.      -- is that fair?  Can you tell me what

10  things you were told in terms of --

11          A.      Yeah.

12          Q.      -- the benefits or otherwise that

13  we've just gone through, what items do you feel

14  were told to you and then not followed through on?

15          A.      One thing to start with would be that

16  we were told in the meetings -- I think they were

17  in the cafeteria -- that it would be the same with

18  ZF as it was with Ford.

19              One of those I understood to be that

20  after 10 years of seniority, I'd pick up a fourth

21  week vacation.  But per the gray brochure for Ford

22  transitional, it says the most vacation you can get

23  is three years -- three weeks up till 15 years,

24  then it can go to four.

14

```
1        Q.    Okay.

2        A.    And I'm currently working on the 13th

3    year with Ford/ZF combined.

4        Q.    Okay.

5        A.    I thought that the personal days would

6    stay the same.  As of last year, they took two days

7    away.

8        Q.    Okay.

9        A.    I understood that bereavement would be

10   the same, although I haven't had to use it while

11   I've been with ZF.

12       Q.    Well, what's the change in the

13   bereavement as you understand it or perceive it?

14       A.    I have only heard -- I can't recall

15   from looking at written text that it's changed, but

16   I recall and have heard from a few other people in

17   there that the days you're supposed to get aren't

18   the same.

19           With Ford, it was take whatever you

20   needed.  If it was your mother, your father or your

21   kid, whatever you need, take.  Then it's went down

22   to three days.  It went from five days to three

23   days.  It's changed.  It's also changed for the

24   hourly.
```

1      Q.    Yeah, let's stop for a second.  When

2  you say the bereavement has changed, changed when

3  you were at Ford or changed after you came to

4  Batavia?

5      A.    After I came to Batavia.

6      Q.    Okay.

7            MR. SIMON:  He said "Batavia."  In

8  that context, you mean --

9            MR. HUNTER:  ZF Batavia.

10           THE WITNESS:  ZF Batavia.

11           MR. HUNTER:  Sure.  And I'll try and

12  use the term ZF to mean Batavia, ZF Batavia.

13  BY MR. HUNTER:

14     Q.    Do you know today what the current ZF

15  Batavia policy is for bereavement?

16     A.    Not specifically, but I would think

17  it's three days for a immediate family member --

18     Q.    Okay.

19     A.    -- but I'm not positive.  I'd -- I'd

20  have to look at the policy to make sure.

21     Q.    And your perception was that when you

22  were at Ford, it was take as much as you needed?

23     A.    Up to five days, but if you needed

24  more, management would work with us.

1          Q.     And so subject to management working

2     with you, it could have been 10 days and the extra

3     five days would have been compensated as well?

4          A.     I didn't understand that they would be

5     compensated.

6          Q.     Okay.  So you could take time --

7          A.     It wouldn't be held against you is the

8     way I'm --

9          Q.     Okay.

10          A.     That if I had to take more days to put

11     affairs in order for whatever problem there was, it

12     wouldn't be held against me.  Whether I got

13     compensated, I can't say that.

14          Q.     Okay.  And we got off a little bit

15     there.  What else was told to you that you feel

16     hasn't been followed through on?

17          A.     That we would be in on the ground

18     floor of CVT.

19          Q.     Okay.

20          A.     That would be -- at that time, when

21     the meetings were held in the cafeteria, that was

22     the new venture.  That was going to be the

23     extension of ZF Batavia's life 'cause I think, at

24     that time, CD4E was going to end in 2005.  Then it

1    went to 2007.  Now it's about 2010.

2              So after that, that was one of my

3    decisions I made based -- I used that to base a

4    decision on joining ZF Batavia on.  That was one of

5    the items.

6         Q.    Did you have any idea what the cycle

7    life was going to be for CVT at that time?

8         A.    For CVT?

9         Q.    Mm-hmm.

10        A.    No.  I had no idea what the cycle life

11   would be for CVT.  I knew it wouldn't just start

12   and end in a year.

13        Q.    Okay.

14        A.    I -- I don't want to say I knew.  I

15   had a good idea it would not.

16        Q.    Certainly didn't know if it was going

17   to 2010 or something less than that?

18        A.    Right, I did not.

19        Q.    Okay.

20        A.    But I did know it would go farther

21   than CD4E.

22        Q.    You feel you reasonably believe

23   that --

24        A.    Yes.

1         Q.      -- but certainly you hadn't seen any

2    business plans, had no idea --

3         A.      I saw no business plans, but going on

4    what was told to us, that CVT was the newest

5    technology out, that that's what the Europeans

6    want, the transmission you never feel shift.  And

7    that's the way the market was going --

8         Q.     Okay.

9         A.      -- for transmission in automobiles.

10        Q.     Okay.

11        A.      And we were told that ZF -- ZF had

12   some of the best technology there was, so they

13   wanted to combine ZF's technology with Ford's

14   ability to make a lot of the technology.

15        Q.     Okay.  What else was told to you that

16   wasn't followed through on?

17        A.      Let me think.  The ground floor was

18   the one.  I know I've already said that one.

19             MR. SIMON:  Do you want to read back

20   what he told you?

21             MR. HUNTER:  Sure.

22             THE WITNESS:  Yeah, if you don't mind.

23             MR. HUNTER:  We talked about vacation,

24   personal days, bereavement, CVT.

```
 1          A.     That there'd be AIP bonuses or -- and

 2     merits.

 3          Q.     Merit increases, you mean?

 4          A.     Merit increases.

 5          Q.     Okay.  Anything else?

 6          A.     And that Ford would be -- there'd be a

 7     group of people -- Ford, like a council to watch

 8     over if we had any concerns, any issues with the

 9     company, with the way it was being --

10          Q.     Okay.

11          A.     -- governed or whatever.  I understood

12     that when I -- when I listened to the talk in the

13     cafeteria, the way I took it was that Ford wanted

14     people to stay here at ZF, specific people to stay

15     here.  They had certain ones that they knew could

16     lend their experience, expertise and knowledge to

17     help make this go.

18               So I thought at that time I was doing

19     something also for Ford, who I had been with for, I

20     think, seven and a half years.  So this -- I didn't

21     view it as I was leaving Ford, even though this was

22     a stand-alone company, ZF Batavia LLC.  I knew Ford

23     had 49 percent, so I figured they still had a share

24     in it.
```

20

1      Q.    Okay.

2      A.    So I thought I was still just doing

3   something as an extension.

4      Q.    Okay.  Anything else, in terms of what

5   you were told that was not followed through on?

6      A.    At this time, I can't recollect

7   anything.

8      Q.    Not to give you too many hints, any

9   issues about overtime or anything like that?

10     A.    That they would be the same, that the

11  overtime policy would be the same.

12     Q.    What does that mean, I guess in terms

13  of it would be the same?

14     A.    That the way overtime was -- the way

15  overtime was done with Ford would be the same way

16  it's done with ZF.  I guess we're leading into

17  where ZF required one hour before you get -- you

18  have to do 10 hours to get a ninth back -- to get a

19  hour.  Ford was never that way.

20     Q.    Okay.

21     A.    Ford was if you worked up till 59

22  minutes, you didn't get the hour.  Once you did the

23  60th minute, you now have an hour of overtime.

24     Q.    Okay.  I don't want to get too far

1    into that, but if you worked an hour and 15

2    minutes, what's your testimony as to how that would

3    have been paid, then, at Ford?

4         A.    One hour.  The 15 minutes wouldn't be.

5         Q.    Okay.  We were talking about, again,

6    anything you were told that wasn't followed through

7    on.  I gave you a little hint there on the overtime

8    thing.  Anything else as we sit here that you can

9    think of?

10        A.    Not that I can think of at this time.

11        Q.    All right.  And let's talk about it

12   with respect to the vacation time.  Well, generally

13   overall, you referenced the meeting in the

14   cafeteria?

15        A.    Mm-hmm.

16        Q.    I believe it was May of 1999?

17        A.    Yes.

18        Q.    Sound about right?

19        A.    There a document that says when the

20   meeting was held.

21        Q.    And you were at that meeting?

22        A.    Yes.

23        Q.    Were you there for the entire meeting,

24   part of the meeting?

1          A.    I was there for the entire meeting.

2          Q.    Okay.  Prior to that meeting, did

3     you -- had you talked about your employment with ZF

4     Batavia with anybody else?

5          A.    Prior to that meeting, I was not

6     employed by ZF Batavia.

7          Q.    Understood.

8          A.    I was still employed by Ford.  Do you

9     mean, did I talk about perspective employment with

10    ZF Batavia?

11         Q.    Sure.

12         A.    Yes.

13         Q.    Okay.  Who was that?

14         A.    Jerry Priest, Rick Williams.

15         Q.    Okay.  And why did you talk with those

16    gentlemen?

17         A.    At the time, Rick Williams was the

18    superintendent of the area I was in or production

19    manager over that area.  Superintendent.  He was

20    the superintendent at that time.

21         Q.    And this was prior to May of '99?

22         A.    Yes.

23         Q.    He would have been a Ford employee at

24    that time?

1          A.    Yes, as was Glenn Marinetti, who was

2    his superior and he and I had some conversation,

3    but not quite as much as I had with the other two.

4    I worked with those guys every day directly.

5          Q.    And Jerry, again, in May of '99 would

6    have been a Ford employee as well?

7          A.    Yes.

8          Q.    And I kind of interrupted you there.

9    You spoke with Glenn Marinetti, Jerry Priest, Rick

10   Williams.  Anybody else?

11         A.    Not that I can think of at this time.

12         Q.    Okay.  Do you remember the nature of

13   your discussions with Jerry?

14         A.    Yes.

15         Q.    What were the discussions generally?

16         A.    To the -- the benefits of going to ZF

17   versus trying to stay with Ford.  If Ford could

18   relocate us somewhere else, what would I get?  And

19   that's when it was alluded to that I would probably

20   get an offer as an MPS.  At the -- at the time we

21   had the discussions, I was a group leader --

22         Q.    Okay.

23         A.    -- which is a level lower.  There was

24   no promises I would get that --

24

1          Q.     Okay.

2          A.     -- but I was told I would probably get

3     an offer as an MPS if I decide to stay because they

4     wanted me.  They knew I knew everything about

5     assembly because I had spent so much time in

6     assembly.

7          Q.     Okay.  And I want to be -- trying to

8     be real clear here.  So you're talking sometime

9     prior to May '99 with Jerry about, gee, I don't

10    know whether to go, whether to stay -- -

11         A.     Yes.

12         Q.     -- correct?

13         A.     Correct.

14         Q.     Did Jerry talk to you about the offer

15    that would be made to you to come to Batavia?

16         A.     I don't think -- Jerry didn't see an

17    offer.  I don't think Jerry formulated the offer.

18    So I don't think --

19         Q.     Okay.

20         A.     -- Jerry talked about an offer --

21         Q.     Okay.

22         A.     -- 'cause there had been none given

23    yet.

24         Q.     And I wouldn't think Jerry's --

1    wouldn't have the authority to give you an offer,

2    would he?

3        A.    Jerry didn't have the authority, but

4    he had the ability to put something -- his two

5    cents into --

6        Q.    Oh, sure.

7        A.    -- the offer --

8        Q.    Okay.

9        A.    -- of what it would take to get Dennis

10   to join ZF Batavia LLC.

11       Q.    All right.  And is that because you

12   had discussed what it would take with Jerry to get

13   you over?

14       A.    At this time, I don't know that he and

15   I discussed about that.

16       Q.    Okay.

17       A.    And I don't know how the MPS position

18   came up with Jerry and I.  They knew -- Jerry knew

19   that I was trying to get an MPS job with Ford and I

20   was in Ford's system of promotable people --

21       Q.    Okay.

22       A.    -- because Glenn Marinetti had came to

23   me prior to that about a position at Lima engine

24   plant, would I be interested in going.  I told him,

1    Yes, I would, but the interview never occurred, but

2    I was up for it.

3         Q.    Okay.  What else did you talk about

4    with Mr. Priest or Jerry?

5         A.    I'm kind of repeating, but it's mostly

6    what we're -- just about the offer, what we thought

7    the future would hold for ZF.  He was excited about

8    the CVT also and he more or less said guys like you

9    that don't have a lot of time in versus somebody

10   with 25, 26 years, this would be good for you

11   because you have an opportunity to grow with this

12   plant.  You guys are getting in on the ground

13   floor.  We're the core people --

14        Q.    Okay.

15        A.    -- like the charter members.

16        Q.    Anything else that you can think of

17   that you discussed with Jerry?

18        A.    Not with Jerry.

19        Q.    Okay.  Let's talk about Rick, then,

20   Rick Williams.

21        A.    Rick and I, he and I talked about some

22   of the financial aspects --

23        Q.    Okay.

24        A.    -- like the 401K because I think some

1    of that had been formulated how it would work with

2    the mutual funds and that.  And Rick's brother is

3    into banking and I knew Rick understood it real

4    well and he and I would talk a lot.

5         Q.    Okay.  And I --

6         A.    He didn't get down to the money.

7         Q.    Okay.  When you say "we," you spoke

8    with Rick a lot and I want to try and keep things

9    as best you can delineate prior to your signing on

10    with ZF Batavia, okay?

11         A.    Okay.

12         Q.    So, with that in mind, what did you

13    discuss with respect to the 401K?

14         A.    How it would work.  If it would be

15    comparable to the Ford stock purchase program, and

16    his understanding at that time, yes, it would.

17         Q.    Comparable in terms of what?

18         A.    How much you're going to make.  Is it

19    financially better to be in a 401K versus owning

20    Ford stock, which they both could fluctuate either

21    way.  Ford stock could go down, which it did and

22    401Ks can do down, which they did.

23         Q.    Okay.

24         A.    So they're a little riskier than the

1    stock and I understood that.

2        Q.    Okay.  What other discussions did you

3    have with Rick?

4        A.    I don't remember the specific details

5    or actual words that were used in our discussions,

6    but a lot of it entailed around that I would

7    probably get an offer as an MPS --

8        Q.    Okay.

9        A.    -- 'cause they knew there would be

10   limited people working there that knew anything

11   about it and I was one of the few that did know the

12   entire --

13       Q.    Sure.

14       A.    -- 'cause I'd ran just about all the

15   areas over there.

16       Q.    Okay.

17           MR. SIMON:  Sorry to interject.  Are

18   you asking for verbatim conversation or just

19   whatever he can remember generally?

20           MR. HUNTER:  Just what he can recall.

21           MR. SIMON:  Okay.

22           THE WITNESS:  That's all I can recall

23   at this time.

24   BY MR. HUNTER:

1         Q.     Okay.  Now, how about Mr. Marinetti?

2    And this is, again, prior to May of '99.

3         A.     Right.  I don't recall a lot of

4    conversation with Glenn Marinetti.  He and I did

5    have some discussions, but I can't remember what

6    the discussions were.  We had a good working

7    relationship.  All three of those guys I get along

8    with real well.

9         Q.     Okay.  And, in fact, you still do work

10   with Jerry and Rick, do you not?

11        A.     Rick is the director of quality.  I

12   don't see him too much, once in awhile walking

13   around.  Jerry has now moved over as a contract

14   individual with CVT and I've replaced Jerry.

15        Q.     Jerry's been with CVT, though, within

16   30, 45 days, something like that?

17        A.     Middle of June.  That's when I took

18   over his job.

19        Q.     And then other than what we've talked

20   about and these three individuals, you don't recall

21   any other conversations regarding what you thought

22   you were going to be getting by coming over to ZF

23   Batavia?

24        A.     That's correct --

```
 1          Q.    Okay.

 2          A.    -- not at this time.

 3          Q.    Now, with respect to the decision to

 4   move to ZF Batavia, is there anything else that you

 5   relied on, in terms of your understanding as to

 6   your compensation and benefits, should you move?

 7          A.    Yes.

 8          Q.    What?

 9          A.    I knew that when I was leaving Ford

10   that I would lose the tuition assistance that Ford

11   gave.  And I had two kids getting ready to go to

12   college at that time.

13          Q.    Okay.

14          A.    Well, one was already in 'cause I had

15   already gotten 1,000 for one of them.  And I

16   thought, well, if I stay with Ford, I'll still get

17   that.  I'll still get the -- I was weighing out the

18   benefits of going with one versus the other.

19          Q.    Sure.

20          A.    I sat and listed those down.

21          Q.    Okay.

22          A.    And at the point of time when the

23   CVT -- when I was told that we would be in on the

24   ground floor of CVT, I was not convinced to go with
```

1    ZF Batavia.

2            When that came up, that was a decision

3    that my wife and I talked about versus having to

4    pick up and leave and go to somewhere else with

5    Ford.  We also asked could we go to Sharonville --

6          Q.    Okay.

7          A.    -- in this meeting.  And I think it

8    was Karl Kehr who said, Over the next two years

9    there could only be 20 openings and we can't

10   guarantee those would be production.  They could be

11   in engineering, finance, sales, anywhere.  So he

12   led us to believe that there wouldn't be any

13   openings, when, in fact, there ended up being a lot

14   of openings.

15         Q.    Do you think he knew one way or the

16   other or was that just his best guess?

17         A.    Yes, I think he knew one way or the

18   other.

19         Q.    Why do you think that?

20         A.    'Cause I -- 'cause the amount of

21   people that went and the expediency at which they

22   left the plant and went to Sharonville.  The

23   majority went to Sharonville.  There was a few that

24   went to other Ford facilities, but Sharonville was

1   the biggest one.

2        Q.   Okay.

3             THE WITNESS:  Can I get this out of

4   the way so I don't confuse them with any of mine --

5             MR. HUNTER:  That's an extra.

6             THE WITNESS:  -- with any of those

7   that you're handing me?

8   BY MR. HUNTER:

9        Q.   Mr. Baker, I've handed you what we've

10  marked as Exhibit 60.  Can you take a second and

11  review that?

12       A.   Yes, I've reviewed it.

13       Q.   Okay.  Have you ever seen that

14  document before?

15       A.   Yes, I have.

16       Q.   Can you tell me what that is?

17       A.   This is the offer from ZF Batavia, LLC

18  to me for employment with ZF from Ford.

19       Q.   And I see a date on Exhibit 60 of May

20  17th, 1999.  That date seem reasonably close as to

21  when you would have received that document?

22       A.   I received the document.  Well, I

23  signed it down there on 6/9, so I would have

24  received it about the time that I signed it.

```
1          Q.     Okay.  So you didn't --

2          A.     It's more like the fifth month.

3          Q.     Okay.  So, well, let's talk about how

4     you received it.  Who gave you that letter, if you

5     remember?

6          A.     I don't remember who handed me this

7     letter.  It might have been Glenn Marinetti since

8     he signed it.  It could have been Rick Williams --

9          Q.     Okay.

10         A.     -- 'cause he was my immediate

11    supervisor.

12         Q.     Okay.  The date you signed this was

13    after the May meeting in the cafeteria that we've

14    talked about a little bit, right?

15         A.     What was the date of the May meeting?

16         Q.     Well, let me ask this.  If the letter

17    was signed in June and the meeting was in May --

18         A.     Yes.

19         Q.     -- it was after the May meeting?

20         A.     Yes, it was, yes.

21         Q.     All right.  You got me with a trick

22    question there.

23         A.     Try to make sure we're correct.

24         Q.     And that you would acknowledge is your
```

1    signature on there and certainly --

2          A.    Yes --

3          Q.    -- it appears it's signed?

4          A.    Yes, it's my signature and my

5    initials.

6          Q.    Did you read this thing?

7          A.    Yes, I did.

8          Q.    Do you remember, was there an

9    attachment to this letter?

10         A.    No, there was not.

11         Q.    Okay.  Do you see where it says

12   there's an attachment to the letter?

13         A.    Yes.

14         Q.    Let me hand you real quick -- and I

15   don't think we'll even mark it just yet.  Any

16   chance that that might have been an attachment to

17   the letter?

18              MR. SIMON:  Just object to the form of

19   the question, given his testimony.  He said there

20   was no attachment.

21         A.    I don't recall that at this time --

22         Q.    Okay.

23         A.    -- if this was attached or not.

24         Q.    Okay.  To your best recollection,

1    though, there wasn't anything attached to that?

2        A.    To the best of my recollection right

3    now --

4        Q.    Okay.

5        A.    -- I don't recall anything else but

6    this.

7        Q.    Sure.  And what about -- you know, the

8    gray brochure?

9        A.    That was not attached at this time.

10        Q.    Was it handed to you with it or

11    anything like that?

12        A.    No, it wasn't handed to me with it and

13    I don't recall when it was given to me.  And I

14    think Ann Jones would have been the person that

15    gave it to me up in personnel --

16        Q.    Okay.

17        A.    -- but I don't remember when that date

18    is or was at this point in time.

19        Q.    Would that have been after you

20    accepted your offer of employment?

21        A.    Yes, it was after.

22        Q.    Okay.  It appears you got your offer

23    as an MPS, correct?

24        A.    Correct.

```
 1          Q.      Accepted that employment?

 2          A.      Correct.

 3          Q.      When you signed this letter, if you

 4   recall, did you meet or discuss anything with Glenn

 5   Marinetti at that time?

 6          A.      I don't recall at this time.

 7          Q.      Have you reviewed or were you familiar

 8   with the gray brochure prior to the time you

 9   executed document number 60?

10          A.      Not that I recall.

11          Q.      Okay.  Do you remember at the meeting

12   copies of the gray brochure being handed out?

13          A.      At the meeting in the cafeteria?

14          Q.      Yes, sir.

15          A.      No, I do not remember that it was

16   handed out.

17          Q.      Okay.  Prior to signing this document

18   on June 9th of '99, had you reviewed any written

19   materials regarding the terms and conditions of

20   your employment with ZF Batavia?

21          A.      Restate the question.

22          Q.      Sure.  You signed Exhibit 60 on June

23   9th of 1999?

24          A.      Correct.
```

1       Q.     Did you review any written materials

2   prior to June 9th of 1999 that you believe set

3   forth the terms and conditions of your employment

4   with ZF Batavia?

5       A.     I don't recall if -- if the cafeteria

6   meeting, if there was a document handed out at that

7   time which stated a lot of the benefits or

8   advantages --

9       Q.     Okay.

10      A.     -- would be.  That would be Exhibit 4.

11      Q.     You don't recall if there was one or

12  you don't recall if you had one or did you review

13  one?

14      A.     I don't recall whether I got to review

15  that or not right now.  It could have been.

16      Q.     Okay.  Would it be safe to sum this up

17  to say basically you made the decision to jump to

18  Batavia, based on what you heard?

19           MR. SIMON:  Objection to the form of

20  the question.  I don't know what "heard" means.  Go

21  ahead and answer.

22      A.     I made the decision to jump to

23  Batavia, ZF Batavia based on what I'd heard by my

24  immediate supervisor, other people that I worked

1    around, based on information that Ford gave us in

2    the cafeteria --

3        Q.    Okay.

4        A.    -- that was given to me by Ford

5    employees at that time.  So I took it that they

6    were representing Ford Motor Company based on

7    information about ZF, the other partner in the

8    joint venture.

9        Q.    Okay.

10        A.    Those were things that played in my

11    decision to stay with -- at Batavia, ZF versus

12    casting my chances of being placed by Ford at some

13    other facility, which I would have preferred to

14    have been Sharonville, but there was no guarantee

15    we would go to Sharonville or there would be an

16    opening.

17            MR. HUNTER:  Steve, do you have --

18            MR. SIMON:  I should.

19            MR. HUNTER:  It's number two.

20            MR. SIMON:  I should.

21    BY MR. HUNTER:

22        Q.    Mr. Baker, we've handed you Exhibit

23    Number 2, what I would understand to be the gray

24    brochure or a photocopy of it.

1          A.     Looks to be the same.

2          Q.     Okay.  Trying to understand from your

3    testimony, prior to June of '99, I think you told

4    me you didn't get a copy of this, correct?

5          A.     I don't recall getting a copy of this

6    prior to June '99.

7          Q.     So you couldn't have relied on this,

8    then, obviously prior to accepting your offer of

9    employment, correct?

10         A.     Not that I recall at this time.

11         Q.     Okay.  Sometime after June of 1999,

12   did you read this thing, Exhibit 2?

13         A.     I'm not -- after June of 1999?

14         Q.     Mm-hmm.

15         A.     I would think I would have read this.

16         Q.     Okay.

17         A.     When I got it, I read it.  I can't

18   recall what date it was I got it.

19         Q.     Okay.  61.  Mr. Baker, handed you

20   Exhibit 61.  If you could, please, take a minute

21   and review that.

22         A.     Go ahead.

23         Q.     Do you recognize Exhibit 61,

24   Mr. Baker?

40

1          A.    Yes, I do.

2          Q.    And on the second page of Exhibit 61,

3     is that your signature that appears there three

4     times?

5          A.    Yes, it is.

6          Q.    Did you read this document before you

7     signed it three times?

8          A.    Yes, I read the document.

9          Q.    Okay.  Did you feel you understood the

10    document when you read it?

11         A.    I won't say I thought I understood it,

12    but I signed it.  It's a --

13         Q.    Okay.

14         A.    -- lot of small print.

15         Q.    Okay.  But you did take the time to

16    read it?

17         A.    Yes, I did.

18         Q.    Okay.  I'm done with that one.  In

19    your current position -- and let's assume for a

20    minute that that -- you've taken the promotion,

21    okay?

22         A.    Okay.

23         Q.    Would you be currently eligible for

24    overtime, paid overtime?

41

```
 1        A.    Yes.

 2        Q.    Okay.  Under what circumstances?

 3        A.    The plant, my direct supervisor, which

 4   is Dick Newark, the plant manager, if he okay's it,

 5   I get paid for it.

 6        Q.    And under what circumstances would

 7   that be okayed?

 8        A.    If I have to cover a group leader or

 9   if I'm there on the weekends, Saturday, Sundays.

10        Q.    With respect to your new position,

11   isn't that a -- kind of a 24-7 job?

12        A.    This new position that I've been given

13   is an MR role and I'm not sure if that's a 24-7

14   position or not.

15        Q.    Okay.  Well, let's back up.  Your

16   prior to position, prior to last -- I think you

17   said Friday --

18        A.    Yes.

19        Q.    -- was what?

20        A.    LPM.

21        Q.    Okay.  Was LPM MR role?

22        A.    Yes.

23        Q.    Okay.  Did you receive overtime for

24   that?
```

42

```
 1          A.    Yes.

 2          Q.    Now, I understand if you cover for a

 3   group leader because you're basically doing them --

 4   a group leader job, that you would be paid

 5   overtime, correct?

 6          A.    Correct.

 7          Q.    Okay.  If you were performing your LPM

 8   function, would you be paid overtime?

 9          A.    We're not supposed to be, no.

10          Q.    Okay.  Now, when you say you're not

11   supposed to be --

12          A.    Let me back up.

13          Q.    Okay.

14          A.    We were paid overtime whether we

15   covered a group leader or not.  That was under --

16   that was the pretenses that Dick, the plant

17   manager, wants to say how he's paying us the

18   overtime.  He's not -- he does not really ask any

19   questions.  Long as you're there, if you're

20   working, he'll pay you the overtime if you have to

21   be there.

22          Q.    Okay.  You're going to have to help me

23   here a little bit.

24          A.    Go ahead.
```

1          Q.    We're talking LPM position?

2          A.    Yes.

3          Q.    What you're saying is you understand

4     you would not generally be, as a management role

5     employee, entitled to overtime, correct?

6          A.    MR roles unless approved ahead of

7     time.

8          Q.    And, again, that would be kind of an

9     extraordinary thing?

10          A.    Not with ZF Batavia, it's not

11     extraordinary.

12          Q.    Okay.  Well, help me with your comment

13     about Dick Newark and what I understand in a sense

14     to be a subterfuge, in terms of he treats you as a

15     group leader and pays overtime when you might not

16     otherwise be paid.

17          A.    As an LPM, the LPM role was created to

18     act more on day shift -- on the day shift.  On

19     night shift, a person in that position, whoever it

20     may be, acted more as -- even though they were the

21     same level, they were more as a manager.

22          Q.    Okay.

23          A.    And in that position, you would cover

24     group leaders occasionally.  You could at any point

1    in any time, any day, you were covering a group

2    leader for --

3         Q.    Sure.

4         A.    -- hour, two hours.  If they have to

5    go to a meeting, if they're not there, if they're

6    absent, it's their -- their job, the MPS or the LPM

7    to cover that group leader in their area.

8         Q.    Okay.

9         A.    We have some group leaders who have 40

10   hour restrictions, can't work past 12:30 at night

11   or 12.  They leave, I have to stay --

12        Q.    Okay.

13        A.    -- and fill their position.

14        Q.    And, again, at that point, you're kind

15   of -- you're working as a group leader more perhaps

16   than an LPM?

17        A.    You're expected to do all.

18        Q.    Oh, okay.  Now, I'm still trying to

19   understand the distinction that you made with

20   respect to Mr. Newark, in terms of that Dick will

21   take care of you, Dick will -- whatever your

22   comment was there.

23        A.    Dick Newark, to get the -- to get his

24   managers or the MR roles paid overtime is pretty

1    much doing that under the pretense that they're

2    covering group leaders.

3         Q.    All right.  Now, if you were doing

4    your LPM job, not today's job, but your LPM job at

5    Ford, to your understanding, if you have one, would

6    you have been paid overtime?

7         A.    Yes.

8         Q.    Okay.  For every instance of overtime?

9    Would it be any different at Ford from your point

10    of view than it is at Batavia --

11         A.    Yes --

12         Q.    -- or was at Batavia?

13         A.    -- it would be different.  We would

14    have been paid for all overtime, hour, 60 minutes

15    of overtime, anything beyond that.

16         Q.    Okay.  That's the only difference

17    though?

18         A.    Restate what you're trying to ask.

19         Q.    I'm trying to understand back to the

20    LPM position, in terms of overtime paid at Batavia

21    versus overtime paid had you stayed at Ford, to

22    your understanding, what differences would there

23    have been?

24         A.    If I would have had still -- if I

46

1    would have had this position or an LPM position

2    with Ford, which they didn't have at that time that

3    I know of, if I worked overtime up to at least an

4    hour, I would have been paid the overtime.  It had

5    no bearing whether I covered a group leader or not.

6    If I worked the overtime, if I had to be there and

7    worked anything over the eight hours, I got paid

8    for that overtime.

9        Q.    Okay.  There was no concept of casual

10    time at Ford?

11        A.    There was the concept of a half hour

12    before and a half hour after, something like that.

13        Q.    Okay.

14        A.    Once you got beyond the hour or the 60

15    minutes, then you got paid for that.

16        Q.    Did you have a paid lunch at Ford?

17        A.    No.

18        Q.    Okay.  So how long was lunch when you

19    were at Ford?

20        A.    It depends.  Where I was at, it was 30

21    minutes --

22        Q.    Okay.

23        A.    -- if you got one.

24        Q.    So Ford, then, from what you're

1    telling me with the casual time and the lunch,

2    could have been up to an hour and a half that would

3    not have been paid?

4            A.    Up to 89 minutes.

5            Q.    And it --

6            A.    59 minutes and 30 minutes for lunch.

7    Once you got to the 90, you got paid for the hour.

8            Q.    Understood.  Okay.  All right.  Let's,

9    I guess since we're there, let's talk a little bit

10   about your timecard.  You report your time on a

11   sheet to the company, correct?

12           A.    Yes, I do.

13           Q.    Okay.  What does that timecard

14   reflect?

15           A.    How many hours you work in the day --

16           Q.    Okay.

17           A.    -- for a two-week period --

18           Q.    Okay.

19           A.    -- 15th and the 30th.

20           Q.    All right.  And when you come into the

21   plant, nowadays you have to use the card swipe,

22   correct?

23           A.    That's correct.

24           Q.    Do you generally use the card swipe?

48

1        A.    Not generally.  I use it all the time.

2        Q.    Okay.  For entry and exit?

3        A.    Yes.

4        Q.    Your shift starts -- I think you told

5    me at four?

6        A.    Now that I'm the -- I have areas that

7    start at 3:30, so I have to be there no later than

8    3:30.

9        Q.    Okay.

10       A.    Sometimes I'm there prior to that.

11       Q.    Okay.

12       A.    The majority of times, 3:15 --

13       Q.    Okay.

14       A.    -- 3:10, something like that.

15       Q.    Do you have a scheduled shift at this

16   point?

17       A.    Yes, the third shift.

18       Q.    Okay.  And the official scheduled time

19   for that shift is --

20       A.    In assembly is four to 12:30.  In

21   production areas, it's 3:30 till 12 midnight.

22       Q.    Okay.  And you generally arrive by

23   3:15 --

24       A.    Or sooner.

1          Q.      -- I think you -- or sooner?  What

2     time generally are you out of the plant?

3          A.      Late.

4          Q.      Okay.

5          A.      Recently anywhere from 1:00 in the

6     morning till 3:00 in the morning --

7          Q.      Okay.

8          A.      -- up to 3:30 in the morning.

9          Q.      If you arrived at the plant at 3:15,

10    what time would you put on your timecard?

11         A.      3:15.

12         Q.      Okay.

13         A.      15:30 -- or 15:15.

14         Q.      Sure.  And then when you're leaving

15    the plant, what time is reflected on the timecard

16    or time sheet?

17         A.      The time I -- whatever time I walk out

18    of the plant.

19         Q.      Okay.

20         A.      As I swipe my badge, I look at my

21    watch.

22         Q.      Okay.  Does your time sheet reflect

23    any deductions for casual time or lunch?

24         A.      Yes.  There's 30 minutes taken out for

1    lunch on every one of them.

2         Q.    Okay.  What about casual time?

3         A.    Yeah, they should reflect that, too.

4         Q.    Okay.

5         A.    I may have an hour overtime.  I could

6    work 10 hours and 25, 35 minutes and it would only

7    reflect one hour of overtime, although I've put 35

8    extra minutes in.

9         Q.    Okay.

10        A.    You can find that anywhere.

11        Q.    Do you deduct a standard amount for

12   lunch every day or --

13        A.    30 minutes.

14        Q.    Is that consistently what you've done

15   since you've started with ZF Batavia?

16        A.    Yes, I have.

17        Q.    Okay.

18        A.    That's consistently what I've done

19   since I've been at Batavia.

20        Q.    Okay.  Let's go back and talk a little

21   bit about your AIP bonus, okay?

22        A.    Okay.

23        Q.    What was your understanding from the

24   May meeting or otherwise -- and let me know if it's

1    otherwise -- about what the AIP bonus would be?

2         A.    It was my understanding that we would

3    be entitled to an AIP bonus, Annual Incentive Plan,

4    which I -- I didn't understand -- didn't -- wasn't

5    told that I recollect the specifics of it, but I

6    likened it to Ford's profit sharing.  And that's

7    what I was told.  When I asked what an AIP was, I

8    was told it's like Ford's profit sharing plan.

9         Q.    Okay.

10        A.    But I found out there was differences.

11        Q.    And who told you it was like the Ford

12   profit sharing?

13        A.    I thought Rick Williams or Jerry

14   Priest said that when I had conversations with

15   them.

16        Q.    Okay.  Was it discussed at the May

17   meeting?

18        A.    I don't remember at this time if it

19   was.

20        Q.    So you had some discussions with Jerry

21   or Rick, but that's about it with respect to AIP?

22        A.    That I remember at this time.

23        Q.    Oh, sure.  What about merit increases,

24   what's your recollection of the discussions in

1    meetings on merit increases?

2         A.    That they would be the same as Ford

3    Motor Company, once a year, based on your

4    performance, the plant's performance.

5         Q.    Now, when you say they're the same as

6    Ford, what does that mean?

7         A.    They have a set of goals, if you want

8    to call it, that you have to attain or where you

9    need to be or your merit went by that.

10        Q.    Okay.

11        A.    Were you excellent?  Were you

12   satisfactory?  Were you satisfactory plus?  Now,

13   that's Ford's way of doing it.  I think that's

14   pretty much how they went.

15            They had a range and it was based on

16   how well you did in each category, whether it be

17   production, schedule, safety, costs.

18        Q.    Okay.  And so those were measurables

19   as measured by plant performance, as opposed to

20   individual measurables based on a personal review?

21        A.    The merit was more on individual.

22   Although I said plant before, it's more on

23   individual --

24        Q.    Okay.

```
 1        A.    -- 'cause it's how well you merit

 2   getting more money from the company.

 3        Q.    All right.  And when you say it was

 4   going to be the same as Ford, meaning the

 5   measurables would be the same as Ford or that the

 6   bonus would be the same as you got at Ford -- or

 7   I'm sorry.  The merit would be the same as you got

 8   at Ford?  I don't understand.  What would be the

 9   same?

10        A.    That it would be handled the same

11   way --

12        Q.    Okay.

13        A.    -- specifically the money, all that,

14   no, I'm not saying that.

15        Q.    The process?

16        A.    The process.

17        Q.    Okay.

18        A.    Thank you.  Good word.

19        Q.    All right.  And is it your perception

20   as we sit here today that the process does not look

21   at -- well, does not match what was done with you

22   at Ford?

23        A.    No, it does not.

24        Q.    Okay.  In what ways does it not mirror
```

1 the Ford process?

2   A. Transitional employees, specific one

3 myself, are given one to one and a half percent

4 less because we're transitional employees with ZF

5 Batavia.  That didn't occur with Ford.  There was

6 no deduction for any reason that I recall.  This

7 was a set, one and a half to one percent lower.  My

8 understanding is, trying to get the pays in line.

9 I don't know with who or in line with what.

10   Q. Okay.  And that one and one half

11 percent is as to your annual merit increases?

12   A. I think it's that and -- and AIP.

13   Q. Okay.

14   A. Both are affected by that.

15   Q. Okay.

16   A. And I was not told that any time

17 before I signed my agreement to come to the

18 company.

19   Q. Well, you didn't tell me you were told

20 anything other than that the process would be the

21 same though, correct?

22   A. That's correct.

23   Q. Okay.  And as I understand it, you

24 started at 72,000 a year on about July 19th of '99,

1    correct?

2         A.    Restate what you just said.

3         Q.    Your starting salary was about 72,000

4    a year with ZF Batavia?

5         A.    Whatever this, the amount on my offer

6    adds up to with your math.

7         Q.    If you have that --

8         A.    I don't think it was 72.

9         Q.    I think it was 6,000 a month.  If my

10   math is any good, I think that's 72.

11        A.    72.

12        Q.    Okay.

13        A.    Okay.

14        Q.    In year 2000 -- I'm sorry.  Your first

15   pay bump, yeah, which would have been the year

16   2000, you moved up to 74,880.  Does that sound

17   about right?

18        A.    Sounds about right.

19        Q.    Is your perception that that's less

20   than it should have been?

21        A.    I can't answer whether it is.  I don't

22   know if it was or not.

23        Q.    Okay.  Well, I'm just trying to

24   understand if that's part of your claim here, in

```
 1    terms of the merit increase, okay?  Are you telling

 2    me that the first jump --

 3         A.    Yes --

 4         Q.    -- that you got --

 5         A.    -- it is less than I thought I should

 6    get --

 7         Q.    Okay.

 8         A.    -- 'cause I didn't know at that time

 9    that one to one and a half percent was being

10    deducted -- was being knocked off ours.

11         Q.    Well, do you know for a fact that that

12    happened in March 2000?

13         A.    I don't know that to be a fact.

14         Q.    Okay.  And, in fact, you then moved up

15    after that to a new salary of 80,870 and 40 cents.

16    I think that's when you moved up to LPM; is that

17    right?

18         A.    Yes.  Let me go back.

19         Q.    Okay.

20         A.    Yes, I know that to be a fact from

21    documentation that was given to me and the managers

22    pertaining to how much compensation people were to

23    get every year.  Then I saw in there one to one and

24    a half percent for Ford transitional.  I really
```

1    didn't even understand what it was I was looking

2    at.

3          Q.    Sure.  And the document, referring to

4    the -- was a recommendation, was it not?

5          A.    No.

6          Q.    Okay.  You think it was a flat out --

7          A.    That was flat.

8          Q.    Okay.

9          A.    That was not a recommendation, not

10   that I recall.

11         Q.    Do you have any document that shows

12   that, in fact, was carried out across the board?

13         A.    I have no documentation myself to show

14   that it was being done that way.  I have a document

15   that was given to us managers that said this is how

16   salaried payrolls and merit and AIP will be

17   handled.

18         Q.    Okay.

19         A.    Those were handed out to all the

20   managers that had supervisors working for them.

21         Q.    Okay.  You have received every year

22   you've been with Batavia either a merit increase

23   and/or a promotion, correct?

24         A.    A merit increase or a promotion?

58

```
 1          Q.    Or both?

 2          A.    Yes.

 3          Q.    And, again -- strike that.  Doesn't

 4    matter.

 5                Do you remember the amount of your AIP

 6    bonus for year 2000?

 7          A.    For the year 2000, no, sir, I don't.

 8                MR. SIMON:  Just interject an

 9    objection.  We had asked for the bonuses since '99

10    for all of our clients and those weren't produced.

11    And as I said in my letter, some of my clients

12    might recall what they received, some didn't.  So I

13    object to your asking about them when you have the

14    documents that would reflect it.

15          A.    I don't recall at this time what it

16    was.

17          Q.    Okay.  How about for 1999?

18          A.    I do not recall what that bonus would

19    have been.

20          Q.    Okay.  What I gather from your

21    testimony, you think that that bonus was reduced by

22    a point and a half?

23          A.    By one point or a point -- up to a

24    point and a half.
```

59

1          Q.    Yeah.

2          A.    Yes, I believe it was.

3          Q.    To your knowledge, has your AIP bonus

4    ever been modified due to overtime --

5          A.    Yes, it has.

6          Q.    -- considerations?  What year was that

7    for?

8          A.    Last year, 2002.

9          Q.    Well, payable 2002 for 2001?

10         A.    Yes.

11         Q.    Okay.  And how much was your bonus

12   reduced for that consideration?

13         A.    Last year I was working for Chuck

14   Hugan and he told me that he had put me in for so

15   much of a bonus.  When he went to hand it to me, he

16   said, Here's your bonus.  I said, I thought it was

17   going to be 4,000.  He said, You work too much

18   overtime.  You're only getting 2,000.

19         Q.    Okay.

20         A.    I then went to Dick Newark and asked

21   him about the bonus and I asked him who took half

22   of my bonus.

23         Q.    Okay.

24         A.    And he couldn't give me an answer.

1    And I said, I'm aware that I was -- 4,000 was

2    allocated to me, but somewhere between the

3    allocation and me, someone took my 2,000 and I

4    wanted to know where my money had went.

5         Q.    Okay.

6         A.    And he could not give me an answer.

7    Said, You can't look at it that way.  I said,

8    That's the only way I can look at it.  I don't have

9    2,000 that I should have had.

10        Q.    What did you do after you spoke with

11    Mr. Newark?

12        A.    That's pretty much the end of it.  I

13    didn't know who else I could go to.

14        Q.    Why not go to Sennish?

15        A.    I didn't know the role Len had in it

16    at that time.  I know he's the HR guy, but --

17        Q.    Okay.  How about Karl Kehr or Dave

18    or --

19        A.    I never talk to them about any of

20    those things.

21        Q.    Okay.

22        A.    I try to do my boss, then his boss.

23    And I pretty much figured it wasn't going anywhere

24    after that.  And he had already zeroed out 32 hours

1    of overtime I had back in April.

2        Q.    We'll come back to that point, all

3    right?  What about Jerry or Rick?

4        A.    Rick -- what about Jerry or Rick?

5    What are you asking?

6        Q.    I'm sorry.  Why not go talk to them?

7        A.    'Cause they weren't my supervisor at

8    that time.

9        Q.    Did feel that they didn't have the

10    authority to --

11        A.    I felt they didn't have the authority

12    to change it and I didn't work for either of those

13    gentlemen at the time.

14        Q.    Okay.

15        A.    I think Rick had already moved on into

16    the quality organization.  He had left where I'm

17    at.  I have very little to do with Rick Williams at

18    this time.

19        Q.    Okay.

20        A.    And Jerry was the third shift guy at

21    that time and I was working day shift at the time.

22    Chuck Hugan was my immediate.

23        Q.    On your hire letter, one of the things

24    that's included in there is a transition bonus.  Do

62

1    you remember that?

2          A.    Yes, I do.

3          Q.    Did you receive all of that payment?

4          A.    Yes, I have.

5          Q.    What was your understanding as to what

6    that was for?

7          A.    To address any monetary differences

8    between Ford benefits and ZF Batavia.  What

9    specific monetary, I couldn't say.

10         Q.    Okay.

11         A.    And I asked that question --

12         Q.    Okay.

13         A.    -- what those monetary differences

14   were and no one, including Jerry or Rick, could

15   give me a specific --

16         Q.    Okay.

17         A.    -- where -- I'm like, What am I going

18   to lose?  And no one could specifically say this,

19   this or this.

20         Q.    Safe to say you knew you were going to

21   lose something because --

22         A.    But I didn't know --

23         Q.    -- you got $25,000 back?

24         A.    -- what that something would be.

1      Q.      Sure.

2      A.      I asked how that was calculated and I

3    was told that the 25,000 was the max that anybody

4    would get and it was based upon how much seniority

5    you had at Ford.  That's what had to do with how

6    much you got.  Someone had been there a long time

7    wouldn't have got as much.

8      Q.      So the guys that had been there a long

9    time got less than 25,000 you think?

10     A.      I know they did.

11     Q.      Okay.

12     A.      So I took it to believe that that was

13   trying to make up for some -- I don't know, I guess

14   retirement.  I don't know where that would have

15   been.

16     Q.      You don't know.  Did you think it was

17   important to maybe ask somebody what you're going

18   to -- I understand 25 grand is nice to have.  But

19   obviously, again, you've testified they were going

20   to take something, but I didn't know what it was.

21   You didn't feel it was necessary to follow-up

22   further on what that might have been?

23     A.      I went to two people that I thought

24   knew what that --

64

1          Q.    Okay.

2          A.    -- might have been.  After those two

3    people, I didn't think I was going to get much more

4    of an answer than I already received.

5          Q.    And their answer really was along the

6    lines of we really don't know for sure?

7          A.    Kind of the way you're acting right

8    now.

9          Q.    Okay.  All right.  And I didn't tell

10   you, if you need a break at any point, I'll --

11   otherwise I'll ramble on till it gets dark out, at

12   least.

13         A.    Keep going.

14         Q.    If you need a break, let me know.

15               With respect to other things that you

16   have not gotten that you believe you're entitled to

17   from Batavia, we've talked a little bit about a

18   couple of issues, the merit increases, the AIP.

19   What else do you believe that you thought you were

20   going to get from Batavia that you have not

21   received?

22         A.    The chance to go to CVT, chance for

23   promotions that came along in the time frame I

24   joined till now that I didn't get considered for.

1    To my knowledge, I wasn't considered for.

2            In respect to the chance to go to CVT,

3    after Rick Williams had left, the next supervisor,

4    if I recall right, was Ray Pablice and I asked him,

5    How do I get to go to CVT?  He said, You have to

6    give a resume.  I said, I gave you a resume in '91.

7    He said, you have to give another resume.  I said,

8    To who?  He said, Myself and Dick Newark.

9            I made a copy of two resumes.  I

10   handed one to each and said, Have I completed all

11   that I need to be considered for CVT?  They said,

12   yes, you have.  I have not heard anything since --

13        Q.    Okay.

14        A.    -- and that was in about 2001.

15        Q.    But, suffice to say, you certainly

16   have been promoted within the company?

17        A.    Yes, I have.

18        Q.    I mean, if I'm not misunderstanding

19   things, in your entire tenure at Ford, you were

20   pretty much a group leader?

21        A.    That's correct.

22        Q.    And you have now been promoted

23   multiple times since joining ZF Batavia about four

24   years ago?

66

1          A.    That's correct.

2          Q.    But your issue is that you feel you

3     should be over in CVT?

4          A.    No.  I feel that I should have an

5     opportunity to go to CVT because once CD4E leaves,

6     and I don't have a job in CVT, we don't have

7     anything for you.  And I don't want to be left

8     holding the bag.

9               And I also believe that there was

10    promotional opportunities in CD4E that I was

11    bypassed on several times.  So who knows how far I

12    could have gone.

13         Q.    Well, given the current promotion, you

14    are pretty high up on the food chain, in terms of

15    the production facility, aren't you, at this point?

16         A.    At this point, yes.  But it's how that

17    occurred.

18         Q.    Okay.  What do you mean?

19         A.    Through attrition --

20         Q.    Okay.

21         A.    -- Jerry Priest leaving, the needs of

22    CVT.  As they started picking them off and those

23    people started leaving or quitting or moving on or

24    retiring or ZF Batavia not letting certain contract

1   people stay on, I've gradually moved up, not

2   through people looking up and saying, let's grab

3   Dennis Baker, move him all the way up to the top.

4              I think this position is a necessity,

5   as per Dick Newark's conversation last Friday when

6   he and I and Len talked about this job.  He told

7   Len, I have to have Dennis Baker do this job.  And

8   he said, I have a half a mind of making him do it

9   without any compensation 'cause we weren't agreeing

10  on money at the time.

11       Q.   Okay.  If you had your choice

12  currently and given the delay, let's call it with

13  the CFT26, still your desire to go over to CVT?

14       A.   Yes.

15       Q.   Okay.

16       A.   I believe I have a lot to give them.

17  Ford told us in the meeting that they wanted our

18  expertise and experience to further advance and

19  they would need it for CVT.  They've yet to tap on

20  my resources, experience or knowledge for that.

21       Q.   You understand the CD4E is currently

22  the only money-making project in the facility,

23  correct?

24       A.   I understand that.

1          Q.    But you don't feel that you have been

2     utilized in the current CD4E production, the only

3     money-making prospect currently at the plant?

4          A.    I believe I've been utilized, not to

5     the extent that it could have been in the time

6     frames it could have been done.

7          Q.    Okay.

8          A.    I saw two or three -- two people come

9     in that I believe I should have had the positions

10    they had.  Both of those people are now moved out

11    of their positions 'cause they found out they

12    didn't have the people they thought.  And I

13    basically did the whole job for them while they

14    attended meetings.

15         Q.    Okay.

16         A.    That's fact.

17         Q.    Okay.  When you say "they attended

18    meetings," the guys that have now come and gone?

19         A.    Jim Whittenberger, Chuck Hugan.

20         Q.    Okay.  All right.  What other things

21    do you feel haven't been given to you that

22    were represented to you as being available?

23              MR. SIMON:  Object.  I don't know if

24    you're asking for him to repeat what he said before

1     or if you're looking for additional stuff.

2              MR. HUNTER:  Additional stuff, what

3     other things, meaning what other than we've already

4     discussed.

5         A.    At this point in time, I can't recall

6     any other things, not that there may not be.

7         Q.    Okay.  We talked a little bit about

8     overtime, in terms of what ZF Batavia is not doing

9     with respect to overtime or the complaint or issue

10    is the timekeeping for everything over nine hours

11    or incremental hours over nine hours?

12        A.    What are you asking?

13        Q.    What's the issue?  I just want to go

14    back and make sure I understand the issue on

15    overtime.  What are you not getting that you were

16    supposed to be receiving from ZF Batavia with

17    respect to overtime?

18        A.    Any time, at least an hour worked over

19    eight hours.  I worked nine.

20        Q.    Well, you worked nine.

21        A.    One hour.

22        Q.    Is that what you had at Ford?

23        A.    Yes.  That's what I -- we went over

24    that Ford --

1          Q.    Well, that's what I thought.  And I

2     thought --

3          A.    If you work 60 minutes, you get an

4     hour overtime.

5          Q.    Oh, that's right.  It's the 59 and a

6     half minute thing?

7          A.    Yeah.

8          Q.    Okay.  59 and a half, you're casual?

9          A.    59, I won't split the minute.

10          Q.    Okay.  All right.  And I think you

11     told me before, an hour and a quarter, you get the

12     hour?

13          A.    Yes.

14          Q.    At least that was your perception?

15          A.    Hour and 45 minutes, you get an hour.

16          Q.    Okay.  That's the only issue that you

17     have with overtime?

18          A.    I would say at this time, that's the

19     issue that I have.

20          Q.    Okay.  Well, I understand there may be

21     others with a different perspective out there, but

22     for Dennis Baker, the only issue with overtime is

23     the incremental time up to the hour?

24                MR. SIMON:  Sorry to interpose an

1    objection.  He had referred to Dick Newark's

2    zeroing him for 32 hours.  You said you were going

3    to come back to it.  I don't know.

4         A.    That would be -- that was one main

5    one.

6         Q.    Okay.  Well, what other main ones

7    in --

8         A.    After he put a letter out stating that

9    I would be paid and it had Dennis Baker's name on

10   it, any overtime to be worked while covering a

11   group leader on weekends or daily overtime, he put

12   the letter out prior to me not getting the 32.

13         I handed him my time sheet.  He said

14   to me, Oh, by the way, I zeroed out your time

15   sheet.  I said, Why?  He said, You're MR role.  You

16   don't get overtime.  I said, You put a letter out

17   that said I get overtime.  He said, Well, you're

18   not.

19         Q.    Okay.  You've got to give me a little

20   more detail here.  All right.  You had 32 hours of

21   overtime that apparently you haven't been paid?

22         A.    That was a -- that was one instance

23   last year, April.

24         Q.    Okay.

```
 1          A.    Good Friday, somewhere in that time

 2    frame.

 3          Q.    So April of 2002, you put in 32 hours

 4    of overtime?

 5          A.    Correct.

 6          Q.    At Dick's request?

 7          A.    I was expected to be there.  I won't

 8    say it was at Dick's request, but I was expected to

 9    be there.  I was needed to be there.  The plant was

10    in trouble at that time.

11          Q.    Okay.

12          A.    We were told we had to be there --

13          Q.    Okay.

14          A.    -- to support operations.

15          Q.    Okay.  And so then Dick sent a letter

16    out that said you weren't going to get paid, or

17    that's where you lost me.

18          A.    Dick had put a letter out concerning

19    overtime.

20          Q.    Okay.

21          A.    The plant was starting to tighten up

22    on how much overtime they wanted to pay.

23          Q.    Okay.

24          A.    This one -- this is about the time
```

1    talk came out about not paying certain individuals

2    overtime.  And in that letter that I saw, the

3    letter was not sent to me, but someone else.  And

4    it had listed -- I think on that letter is all the

5    people that are MR role that could or could not be

6    paid overtime.

7         Q.    Okay.

8         A.    My name specifically said I'd be paid

9    overtime daily and weekend --

10         Q.    Okay.  You said --

11         A.    -- while backfilling a group leader.

12         Q.    That was a e-mail?

13         A.    E-mail to --

14         Q.    Okay.

15         A.    -- Jim Whittenberger.

16         Q.    I think that was recently provided to

17    your attorney?  I think that was one of the recent

18    documents?

19              MR. SIMON:  We produced them all,

20    yeah.

21         Q.    All right.  There was a list of names.

22    It said overtime, no overtime?

23         A.    Right.

24         Q.    Okay.  And you didn't get paid those

74

1    32 hours, even though you had a e-mail that said

2    you should have?

3        A.    Yes.

4        Q.    Okay.  And you were covering a group

5    leader position for those 32 hours?

6        A.    Yes.

7        Q.    Okay.  I thought you told me before

8    that you had been paid your overtime when covering

9    a group leader position, okay?  Yes?

10        A.    Yes.

11        Q.    Okay.  In this instance, is this the

12    only instance where you didn't get paid for group

13    leader overtime?

14        A.    That I know specifically.  I didn't

15    get paid the hour.  I could be in covering a group

16    leader in the morning.  I used to be on days.  I

17    was on days for over 10 years.

18        Q.    Okay.

19        A.    I would come in in the morning.  Some

20    group leaders didn't get there till 6:30, 7:00.  I

21    generally got to the plant at 5:00, 5:30.  I would

22    go -- and they had employees that worked for them,

23    subordinates that would come in early.

24            I would go make sure those employees

1    got what they needed so they could start work on

2    time so the group leader didn't have to be there.

3         Q.    Okay.

4         A.    So there was times I was covering two

5    and three group leaders trying to make sure it got

6    done.

7         Q.    Okay.  Were you paid for that time or

8    not?

9         A.    Yes.

10         Q.    I don't think I understand the point.

11         A.    Yes.

12         Q.    All right.

13         A.    But the hour -- I was paid for one

14    hour out of 10 overtime.  If I put nine hours in

15    and I was down there covering one, I didn't get

16    paid that one hour.

17         Q.    Did you report that hour on your

18    timecard?

19         A.    My timecard always reflects what time

20    I was in the building and when I went out.

21         Q.    Okay.  We had some talk and you sat

22    through most of Mr. Whisman's deposition.  Are you

23    one of the employees that for a period of time last

24    year worked scheduled overtime and didn't get paid?

1        A.      Only during the April time frame where

2    I didn't get the 32 hours.

3        Q.      Okay.

4        A.      That -- there was something else going

5    on with maintenance.  I heard a lot about that,

6    that they weren't going to get paid.  And there was

7    talk going around that overtime would eventually

8    die up.

9                Each area had -- and I -- there was an

10   e-mail somewhere that Dick put out, Dick Newark

11   explaining that once each department's overtime

12   budget had been depleted, they couldn't pay any

13   more overtime.  But they did expect the people to

14   be there, whether they got it or not.

15       Q.      Okay.  But, in fact, aside from what

16   Mr. Whisman has told us this morning, you -- you

17   got paid.  He got paid.  Was there anything else

18   that didn't get paid for actual overtime work,

19   scheduled overtime work?

20       A.      I can't really state a lot about Wayne

21   Whisman and his situation or the maintenance people

22   'cause that was a different area or department.  I

23   know, according to Rick Ervin, he didn't get paid

24   overtime that he worked.

1        Q.    Okay.

2        A.    And I'm sure there's a few others.  I

3   can't think of the names at this time.

4        Q.    Is there anybody that you have that

5   reports to you that works scheduled overtime that

6   didn't get paid?

7        A.    The -- everybody that works for me

8   before and now had to put in the hour extra

9   overtime before they --

10       Q.    Okay.

11       A.    There was a meeting that came out

12  that -- trying to think of when it was.  I think it

13  was two years ago that addressed the hour overtime.

14  There was expectation -- it was in the executive

15  conference room.

16            I know myself and Rick were there and

17  Karl Kehr was there.  And I had conversation with

18  Karl about the expectations of ZF Batavia, that the

19  salaried people give an hour or casual or free time

20  every day.

21       Q.    Every day?  But that's no -- aside

22  from the half minute distinction we've made, from

23  my understanding, that's no different than what it

24  was at Ford?

```
 1          A.    Well, yeah it was.  I could go on

 2     to -- I could put in an hour and a half, an hour

 3     and 45 minutes, an hour and 50 minutes.  I've now

 4     gave you almost two hours of overtime and I've only

 5     got compensation for eight hours worth of work.

 6     That happens quite a lot.  I mean, are you going to

 7     sit at the door and wait for 15 minutes to go by so

 8     you can pick up that extra hour?  I didn't do that.

 9          Q.    Okay.

10          A.    When I went out, I went out.  And if

11     it wasn't two hours, then I didn't put that hour

12     down, that I recollect.

13               MR. HUNTER:  Did anybody ever --

14     strike that.  Let's take a quick break.

15          (Off the record:  3:27 p.m. - 3:40 p.m.)

16          Q.    All right.  Mr. Baker, do you remember

17     responding to certain interrogatories sent to you

18     on behalf -- sent to your attorney on behalf of

19     Ford?

20          A.    Yes, I do.

21          Q.    Okay.  And did you assist in preparing

22     those answers?

23          A.    Yes.

24          Q.    Okay.  And you had indicated that you
```

1    were owed or had a loss of $23,650.

2         A.    Can I look at a copy of what you're

3    looking at, if that's what you're talking about?

4         Q.    Let me make sure I haven't written on

5    this.

6         A.    What page you on?

7         Q.    I'm looking at page number six.

8         A.    All right.  I'm with you.

9         Q.    And, again, I don't necessarily really

10   want you to read from that, okay?

11        A.    Well, I won't.  I just --

12        Q.    Okay.  But you indicated a --

13   plaintiff estimates a loss of $23,650.

14        A.    An estimate.

15        Q.    Oh, okay.

16        A.    That's an estimate, yes.

17        Q.    I'm just trying to understand,

18   though -- the question is -- or how do you get

19   there?  What's that number comprised of?

20        A.    That number is comprised of overtime

21   pay that wasn't paid over the time that I've been

22   with ZF Batavia.  Well, that's actually three

23   years.  2000 -- part of this year, 2003, 2002,

24   2001.

 1          Q.     What about 2000?

 2                 MR. SIMON:  Well --

 3          A.     I don't remember how --

 4                 MR. SIMON:  Sitting here, obviously

 5   Mr. Baker gave his attorneys information.

 6                 MR. HUNTER:  Steve, is this an

 7   objection or -- I don't want you to answer the

 8   question.  If you've got an objection --

 9                 MR. SIMON:  Well, you're asking him

10   about an estimate that obviously he said he -- the

11   objection is you said he gave it -- you asked him,

12   he gave information to me.  I guess you haven't

13   asked him what role I played.  So it might be

14   difficult for him to answer your question.  Go

15   ahead.

16   BY MR. HUNTER:

17          Q.     Okay.  Mr. Baker, what I thought I

18   asked was, is -- what is the 23,650 comprised of?

19   You indicated unpaid overtime for 2003, 2002 and

20   2001.

21          A.     Right.  And it could have been 2002.

22   I'm not positive.  I mean 2000.

23          Q.     Okay.  Is that a number -- is 23,650 a

24   number you gave to your attorney or did your

1    attorney --

2            A.    That's a number I gave.

3            Q.    -- create that?

4            A.    That's a number I calculated.

5            Q.    Okay.  You just don't remember if you

6    included 2000 in there or not, then?

7            A.    I think I did at this time.

8            Q.    From what records did you derive those

9    numbers?

10           A.    From all my pay sheets that I made

11   copies of, all but two --

12           Q.    Okay.

13           A.    -- over that time frame.

14           Q.    And you gave your attorney all of

15   those pay sheets?

16           A.    I gave him all the copies I had of my

17   pay sheets.

18           Q.    Okay.  We've talked about 32 hours

19   that didn't get paid.  With respect to the balance

20   of that number, would that be the incremental hour

21   that hasn't been paid?  Is that what we're talking

22   about, then?

23           A.    That would be some more of it, yes --

24           Q.    Okay.  What else --

82

1          A.      -- added on to the 32.

2          Q.      Okay.  Those two components?

3          A.      Right.

4          Q.      Any other components of that number?

5          A.      That should be all the hours that I

6     can recall at this time.

7          Q.      Okay.  Does that number include your

8     issue with respect to the AIP payments?

9          A.      I don't think it does.  I'm not sure

10    if last year's, the 2000 or that amount we spoke

11    before, I'm not sure if that's included in that or

12    not.

13         Q.      Okay.  But the AIP difference would be

14    $2,000 and for only the one year?

15         A.      Right, roughly.  I'm not sure if 2,000

16    is the exact figure, but we're in the ballpark.

17         Q.      Okay.  Does that number, the 23,650,

18    include the merit increased difference that we

19    spoke about earlier, the point to point and a half?

20         A.      To my knowledge, no, it does not.

21         Q.      Okay.  Does that number include

22    anything that we haven't talked about so far, then?

23         A.      To my knowledge, no, it doesn't.  That

24    should be what it says right there.

1          Q.     Would it be safe to say that your

2    concerns over your placement or nonplacement in

3    CVT, there's no number or value that you could

4    attribute to that?

5          A.     It's safe to say that.

6          Q.     Okay.

7          A.     I don't know how to put a monetary

8    figure on not getting a promotion, not going to

9    CVT.  I don't know how to do that at this time.

10         Q.     Do people that work on CVT get paid

11   more than those that are working on CD4E, if you

12   know?

13         A.     I really don't know.

14         Q.     Given your current status, would you

15   still move over to CVT at this point if it was

16   offered to you?

17         A.     Depending on what the offer is over

18   there --

19         Q.     Okay.

20         A.     -- I would consider it at this time.

21         Q.     Okay.  Obviously there's no production

22   or certainly assembly over at CVT --

23         A.     Yes, there is.

24         Q.     -- of any significance at this point?

```
1        A.    They're getting -- ramping up real

2    quick.

3        Q.    Okay.

4        A.    They're going to put on a third shift,

5    I think, on the case line at this time.  So, yes,

6    there's -- it's significantly going up.  And then

7    in the next few months, going to get real busy.

8        Q.    Sure.  Does your number have any --

9    23,650 have any consideration in it for vacation

10   changes?

11       A.    No, it doesn't.

12       Q.    The sick, personal days?

13       A.    I don't think it does --

14       Q.    All right.

15       A.    -- although we lost two personal days

16   last year.  I don't think that number reflected

17   that.

18       Q.    Did you take all three of your

19   personal days last year?

20       A.    Yes, I did.

21       Q.    Okay.  Did you need the additional two

22   personal days last year?

23       A.    Yes, I would have because towards the

24   end of the year, I had to have a test -- medical
```

1    test ran and I actually used three and a half days.

2    And I was told by Teri Parker in timekeeping that

3    if I didn't take the four hours -- those four hours

4    as vacation, I would be docked the four hours

5    because I had exceeded the amount of personal time

6    I had.

7            So I didn't want to get docked any

8    pay, so I took it as vacation.  I had two days

9    left.  That put me down to a day and a half

10   vacation, which I think I used the last week.

11       Q.    Now, Miss Parker is a Ford

12   transitional employee, isn't she?

13       A.    Yes, she is.

14       Q.    Okay.

15       A.    At that time, she was in payroll.  She

16   handled all the time sheets.

17       Q.    You're aware of the Honeywell reader

18   system?

19       A.    Yes, I am.

20       Q.    Okay.  With respect to your use of the

21   system, I think you told me you check in every day

22   and check out every day on the system, correct?

23       A.    I ring in and I ring out with my

24   badge.

86

1       Q.    Nobody has ever come to you and said,

2  jeez, Dennis, your time sheets don't match with the

3  reader, have they?

4       A.    Not to me.

5       Q.    Okay.  And certainly you've never had

6  your salary or overtime or anything else adjusted

7  based upon having the reader in place --

8       A.    Not to --

9       Q.    -- correct?

10      A.    -- my knowledge.

11      Q.    You've never seen a paycheck that you

12  felt shorted on because of that?

13      A.    Right, not to my knowledge.

14      Q.    To your knowledge, has anyone ever had

15  their timecard reduced, based upon the Honeywell

16  reader system?

17      A.    To my knowledge, Kevin O'Hagan had his

18  reduced.

19      Q.    Okay.

20      A.    And there was a issue with a group

21  leader in our area, Renard South, R-E-N-A-R-D --

22      Q.    Okay.

23      A.    -- who worked for -- he was a group

24  leader working for Chuck Hugan and he would --

1          Q.    Okay.

2          A.    He'd be under my direction if Chuck

3     wasn't around.  I bet -- that's LPM or MPS takes

4     over for the superintendent if they're not there.

5     And there was a -- there was a e-mail sent to Chuck

6     Hugan from Len Sennish having concerns about Renard

7     South's ring ins, that they were -- and it was a

8     long list, that they weren't accurate.  He would

9     put down that he was there at a certain time when,

10    in fact, he didn't get there 15, 20, 30 minutes

11    later than he actually did.  And it was a long

12    list.

13             And if I'm not mistaken, Len's comment

14    was something to the effect of if he's -- if this

15    employee is doing this kind of recording with his

16    time, I have concerns about how he's handling

17    business on the floor.  And so I don't know if

18    Chuck had any conversation with him.  I think he

19    did.

20         Q.    Okay.  Do you know --

21         A.    But I did see the e-mail.

22         Q.    Do you know, were there any

23    adjustments to Mr. South's paycheck or salary or

24    anything?

88

```
 1          A.    I have no clue.

 2          Q.    Okay.

 3          A.    He no longer works there.

 4          Q.    Was that Bernard South or Victor

 5   Flannigan?

 6          A.    Renard --

 7          Q.    Renard?

 8          A.    R-E-N-A-R-D, Renard South.

 9          Q.    All right.

10          A.    Not Victor.

11          Q.    All right.  What about Mr. O'Hagan,

12   what's your understanding as to his circumstances?

13          A.    That there was a time he was so many

14   minutes late and was docked that time reporting to

15   work.  And my understanding, it was an issue -- he

16   tried to go in one gate.  The gate was closed.  By

17   the time he drove around to the other side of the

18   building, whichever side that was to ring in, it

19   now made him late and they docked him the time for

20   being late.

21                And it was something unusual.  That's

22   why it was talked about a lot because people

23   couldn't believe that they were doing that because

24   Ford would not have done that to us.
```

89

```
 1        Q.    Well, and it hadn't happened at

 2   Batavia, either?

 3        A.    I can't say that to have -- to be the

 4   truth.  I don't know if it had or hadn't -- not.

 5        Q.    Well, you'd never heard it before?

 6        A.    I had not ever heard of it before.

 7        Q.    And haven't heard of it since?

 8        A.    Right.  But I can't say that it never

 9   happened to Batavia, nor you.

10        Q.    Okay.  And I think we said before

11   certainly it has never happened to you?

12        A.    No, it had not happened to me that I

13   know of.

14        Q.    Okay.

15        A.    I didn't scrutinize every one of my

16   pay sheets to make sure that the -- I did look at

17   whatever time I was paid versus whatever I put on

18   my time sheet and I tried to make sure it was

19   pretty close.

20        Q.    Okay.  Do you remember at the meeting

21   in May what was said about vacation time?

22        A.    The cafeteria meeting?

23        Q.    Mm-hmm.

24        A.    No, I do not.
```

90

1      Q.    Okay.  So your only recollection about

2   your vacation weeks relates to the conversations

3   with Jerry Priest ant Rick Williams?

4      A.    Yes, specifically that.  The meetings,

5   although vague around it, your benefits, it will be

6   the same with ZF as it was with Ford.  I

7   specifically asked them about the college tuition

8   refund and got an answer to that during that

9   meeting.

10      Q.    And what was the answer?

11      A.    That, no, there would not be the

12   college tuition refund if you go to ZF.

13      Q.    And so that was different than what it

14   was at Ford?

15      A.    Yes.

16      Q.    And certainly you didn't have the A

17   Plan?

18      A.    That's correct.  You had the A Plan up

19   till the -- 2000, December 2000.  And if you didn't

20   have it approved by December of 2000, you got A

21   Plan no more.  And I think you're entitled to A

22   Plan, once you retire with both Ford seniority and

23   ZF combined, then the A Plan kicks back in as a

24   retiree.

1          Q.     Okay.  But that's part of your GRP,

2     not --

3          A.     Right, that would be --

4          Q.     -- anything to do with --

5          A.     -- part of that.

6          Q.     -- ZF Batavia?

7          A.     Right.

8          Q.     Okay.

9          A.     What we have with ZF is the X Plan.

10         Q.     Which is a supplier plan, isn't it?

11         A.     Two percent over invoice.

12         Q.     Okay.  But that's, again, when I say a

13    supplier plan, that's what's given to a supplier

14    plant of Ford?

15         A.     That's correct.

16         Q.     Okay.  Which --

17         A.     That I know of.

18         Q.     Okay.  There was an issue -- maybe

19    still an issue with respect to your vacation time

20    at ZF Batavia, in terms of your number of weeks?

21         A.     Yes.

22         Q.     Okay.  Can you tell me about that, in

23    terms of what your understanding of the issue is?

24         A.     My understanding of the issue is that

```
 1    I have -- as I say, I'm working on my 13th year.

 2         Q.    Okay.

 3         A.    I understood that I would get a fourth

 4    week of vacation once I get 10 years of service in.

 5    Now, although the gray brochure says three weeks up

 6    till 15 years, my understanding, since I was a Ford

 7    transitional and what was told in the cafeteria,

 8    that with my time, that I had over 10 years, I

 9    could get a fourth week of vacation and I've been

10    told, no, I can't.

11         Q.    Okay.

12         A.    And I questioned, Well, how do you

13    bring people in off the street and hand them a

14    fourth week vacation?  Dick Newark, he told me that

15    he negotiated that fourth week.  I said, Well, I

16    don't understand how you can negotiate it, but

17    someone that Ford and ZF has asked to come help

18    them, we won't give them the fourth week -- well,

19    they would have had if they stayed with Ford.

20         Q.    Would you agree that, had you reviewed

21    the gray brochure at the May meeting, though, that

22    certainly the gray brochure was very clear on what

23    the vacation being offered at that time was?

24         A.    I would have questioned that.
```

1          Q.    But you just didn't review the gray

2    brochure at that time?

3          A.    At that time of the meeting, I didn't.

4          Q.    Okay.

5          A.    I didn't have that gray brochure to my

6    knowledge at the meeting in the cafeteria --

7          Q.    Okay.

8          A.    -- in May.

9          Q.    Has the issue with your vacation to

10   your understanding been closed at this point?

11         A.    Yeah.  I was told I'm not getting a

12   fourth week --

13         Q.    Okay.

14         A.    -- vacation as of Friday when it was

15   brought up again.

16         Q.    In your negotiation for the new

17   position?

18         A.    Yes --

19         Q.    Okay.

20         A.    -- by Len Sennish, who said, as a

21   transitional, you will not get it.

22         Q.    Okay.  I don't think we've marked this

23   and I don't have it in front of me, which

24   exhibit --

1              MR. VANWAY:  It's Exhibit 4.

2              MR. SIMON:  I do have it marked.

3              MR. HUNTER:  Pardon me?

4              MR. SIMON:  I do have it marked.

5              MR. HUNTER:  Yeah, I know we have it

6       marked.  You're just going to need it.

7              MR. SIMON:  Yeah, we've got all of

8       them.

9       BY MR. HUNTER:

10         Q.   Mr. Baker, can you take a quick look

11      at Exhibit 4 there for me?  Just take a minute to

12      review that.

13             MR. SIMON:  Take all you need.  You've

14      got to --

15             MR. HUNTER:  Yeah, not literally a

16      minute, Mr. Baker.

17         A.   I'm familiar with the document.  I

18      don't -- I haven't memorized every page, but I'm

19      familiar with the document.

20         Q.   Okay.  And in fact, do you recall was

21      some of the information contained in Exhibit 4

22      placed on like an overhead screen there at the

23      meeting?  Do you remember that or not?

24         A.   I think it was, but I don't recall

1    specifically seeing it on the screen and I do know

2    that there was some stuff shown on the screen.

3              MR. SIMON:   Dennis, go ahead and look

4    at every page before you answer questions about it,

5    thanks.

6         A.    I've reviewed it.

7         Q.    Okay.  And I think you told me before

8    some of this may or may not have been put on an

9    overhead and shown to the employees at the time.

10   You'll see in there, for example, that there was to

11   be some discussion regarding vacation.

12             Do you remember specifically who spoke

13   about the vacation issues?  Was there anything like

14   that at that meeting?

15        A.    No, I don't recall.  The people I

16   recall was Karl Kehr talking and Mike Warden.   I

17   don't recall anyone else, although there were

18   others.

19        Q.    Do you know who Tony DeShaw is?

20        A.    Tony DeShaw also talked.  Yes, I

21   recall him.

22        Q.    Okay.  Do you remember anything that

23   Tony talked about with respect to vacation?

24        A.    No, I don't.  Not at this time.

96

1          Q.     Do you remember anybody mentioning

2     there was a cap of a maximum of four weeks on

3     vacation at Batavia, ZF Batavia?

4          A.     I don't remember anyone saying that.

5     This brochure says you can get up to four weeks

6     with your Ford service at Batavia and that's one of

7     the reasons I thought I could get a fourth week.

8          Q.     Okay.

9          A.     It doesn't say I won't.

10         Q.     Understood.

11         A.     It says you can get up to, so --

12         Q.     Okay.  But you can't get any more than

13    four weeks, correct?

14         A.     According to the gray brochure, I

15    don't think you can get any more than four.

16         Q.     But at Ford --

17         A.     You could walk into the plant with

18    five.

19         Q.     Understood.  But at Ford, could you

20    have gotten more than four weeks vacation?

21         A.     Yes.

22         Q.     Okay.  So you knew immediately it

23    wasn't going to be the same as it was at Ford?

24         A.     No, I didn't know that.

97

```
 1          Q.     Well --
 2          A.     I thought it would be the same way as
 3     at Ford --
 4          Q.     But you just acknowledged --
 5          A.     -- that I could get a fourth week.
 6          Q.     Okay.  But you just told me you knew
 7     you could get five weeks at Ford?
 8          A.     Right.
 9          Q.     And you just told me you acknowledged
10     that it was capped at four weeks at Batavia?
11          A.     Per the brochure.
12          Q.     Well, you have the other exhibit in
13     front of you and it says, For the maximum of four
14     weeks ZF Batavia.
15          A.     I didn't have that gray brochure.  I
16     had this right here.
17          Q.     Oh, understood.  And we're talking
18     about Exhibit 4 when we're talking about "this"?
19          A.     Yes, Exhibit 4.
20          Q.     Okay.
21          A.     I did not have the gray brochure while
22     I was looking at Exhibit 4.
23          Q.     Okay.  But if you take a look to Bates
24     stamp page 12, which is where I think you're at --
```

98

1          A.    Yes.

2          Q.    -- okay?  See where it says at the

3     second bullet point, not apparently the little

4     finger, but the bullet point down there?

5          A.    I see it.  A maximum of four weeks.

6          Q.    Four weeks.

7          A.    I see that.

8          Q.    Which was different than what it was

9     at Ford?

10         A.    That's true.

11         Q.    Okay.  So it wasn't going to be the

12    same as it was at Ford?

13         A.    That's true.

14         Q.    And nobody didn't disclose that to

15    you?

16         A.    Say that again.

17         Q.    You understood that at the meeting,

18    that this was one of the differences of coming over

19    to Batavia?

20         A.    That's true.

21         Q.    Okay.

22         A.    I wasn't trying to get a fifth week.

23    I was trying to get my fourth week.

24         Q.    Okay.  But you told me before that

99

1    your perception was, Well, it was going to be what

2    it was at Ford, correct?

3         A.    Correct.

4         Q.    That's what you told me.

5         A.    That's correct.

6         Q.    Okay.  But you knew it wasn't going to

7    be what it was at Ford.  We just talked about that.

8    It couldn't have been what it was at Ford because

9    Ford wasn't capped at four weeks?

10        A.    I knew everything would not be the

11    same as it was at Ford --

12        Q.    Okay.

13        A.    -- but some things would be the same.

14        Q.    Okay.

15        A.    Specifically, I didn't know what those

16    things would be.

17        Q.    Okay.  And that's all I'm asking for.

18        A.    Okay.

19        Q.    I'm not trying to be difficult.

20        A.    Oh, I know.  There you go.

21        Q.    All right.  And you really didn't know

22    what was going to be the same or different.  Some

23    things you may have expected; some things you just

24    didn't know?

1          A.     That's correct.  I did expect that

2     myself, along with others, that transition over

3     would be more -- if you would call it

4     preferential --

5          Q.     Okay.

6          A.     -- because we were coming to ZF in

7     part to do what Ford wants done.  Ford needed us to

8     launch this joint venture, that if they didn't use

9     our knowledge, experience or expertise, it

10     wouldn't -- it wouldn't go right.

11          And I know that a select group of --

12     there were certain people who were picked out that

13     they needed and they really pushed on to try to get

14     them to join and I was one of those.

15          Q.     Okay.  Well, when you say, for

16     example, that you were one of the ones picked on,

17     that's based upon your conversations with Dick --

18     I'm sorry.  -- with Jerry and Rick Williams because

19     if I understand what you've told me --

20          A.     And Marinetti.

21          Q.     And Marinetti, those are the only

22     three individuals that you really talked to about

23     making this transition?

24          A.     That I recall talking to.

1        Q.    Okay.

2        A.    I won't say it's the only ones, but at

3    this time, that's the only ones I recall talking to

4    about making a transition.  I'm sure there was

5    other people I did talk to.  There was a lot of

6    conversation in the plant among us people that were

7    still Ford whether we should go or not.  Jerry and

8    Rick jumped early.  So did Hassan.

9        Q.    Okay.

10        A.    And I may have talked to Hassan.  I

11    just don't remember.  Him and I weren't really

12    working together like I was with Jerry and Rick

13    Williams.

14        Q.    Okay.  Do you believe that Batavia has

15    a policy about -- strike that.

16              To your knowledge, Kevin O'Hagan is

17    the only one -- and it's not personal knowledge,

18    but to your understanding is the only one who has

19    ever had a time sheet deducted because of a time

20    discrepancy, correct?

21        A.    Correct, to my knowledge.

22        Q.    Never happened to anybody else as far

23    as you know?

24        A.    As far as I know, it has not.

```
 1        Q.    In the complaint that was filed in

 2   this matter, there is an allegation that ZF Batavia

 3   has begun targeting Ford transitional employees for

 4   termination.  Are you familiar with that

 5   allegation?

 6        A.    I'm not familiar with that one.

 7        Q.    Okay.  Well, let me ask it this way.

 8   Do you believe that ZF Batavia has been targeting

 9   Ford transitionals for termination?

10        A.    I won't say I believe that they've

11   been targeting people.  I believe there's been Ford

12   transitional people that were terminated or were

13   let go for whatever reason.

14        Q.    Certainly people get fired from time

15   to time?

16        A.    There was some people that were let

17   go.  Now, I don't know if you want to call it

18   fired, but their position was supposedly no longer

19   needed as Dave Hapner --

20        Q.    Okay.

21        A.    -- and he's no longer there.  Dan

22   Purty.

23        Q.    Okay.

24        A.    And there's a few more.
```

1          Q.     Do you remember their names?

2          A.     I think Cindy Clossen had been there.

3     I don't know why she had left.  Gene Gilliam.

4          Q.     Okay.

5          A.     At this time, that's all I can think

6     of.

7          Q.     Okay.  Certainly you haven't suffered

8     as a result of being a Ford transitional from the

9     standpoint of being either retaliated against or

10    treated differently?

11         A.     I -- I wouldn't say that.

12         Q.     Okay.

13         A.     I think I have.

14         Q.     Okay.  How so?

15         A.     I think that there was a -- an effort

16    to get any Ford -- people that were related to

17    Ford, had been Ford, wore the blue Ford oval, I

18    think there was an effort to get them out of a

19    managerial position 'cause I was in a meeting where

20    Dick -- or Dave Adams, the president, was talking

21    over a conference call to Dick Newark and made the

22    conference -- or the comment, Now that you've got

23    all the Ford people out of the management roles,

24    now what -- what are you going to do?  What's going

1    to be your excuse for not making scheduled costs?

2              And there was other people in there,

3    too.  I can't recall who all was in there, but I --

4    I was there.  These were like cost meetings.

5         Q.    Sure.

6         A.    I think Rick Ervin was the last one to

7    leave a management role.

8         Q.    Okay.  But wait a minute.  Aren't you

9    management role?

10        A.    Now I am, but at that time -- you

11   asked if I believed I suffered any.

12        Q.    Okay.

13        A.    Yes, I do.  I saw two other people

14   get -- I saw two other people come in,

15   Whittenberger and Hugan.  I saw Keith Holmes, a guy

16   who came in same level as me, get promoted.

17             First, he was offered the job of Jerry

18   Priest on nights, which is a promotion.  Now, Jerry

19   was FCR role.  I'm filling Jerry's job and I'm not

20   offered an FCR role job.  I'm getting this job as

21   still an MR, which is a step below.

22             So how much of a promotion have I

23   really got, I can't say.  Compared to what he was

24   getting, it's a lot less than the same guy did the

1    job before.

2         Q.    Okay.  But --

3         A.    So Keith Holmes was offered his job.

4    I asked Dick Newark, Why didn't I -- why didn't you

5    ask me to go fill Jerry's job on nights?  I --

6    Yeah, I've already shown I can do it.  I didn't

7    think you wanted to go to night shift.  I'm on

8    night shift now since January.  So then Keith was

9    brought back to days to take over for Chuck Hugan.

10        Q.    Okay.

11        A.    I asked, Why wasn't I considered for

12   Chuck Hugan's job?  And Dick wouldn't say yea or

13   nay why, so --

14        Q.    But Jerry was a Ford transition guy,

15   right?

16        A.    Yes.

17        Q.    Rick Williams is a Ford transition

18   guy?

19        A.    That's true.

20        Q.    Okay.  So they're not -- I don't

21   understand the comment that all of the Ford

22   transitionals are out of the -- you know, out of

23   the management responsibility.  I don't --

24        A.    I didn't make that comment.  Dave

1    Adams made that comment.

2         Q.    Okay.  Well, do you believe --

3         A.    I'm telling you what he said.

4         Q.    Do you believe that comment to be true

5    or accurate?  I mean, that doesn't sound accurate.

6         A.    I believed it to be true and accurate,

7    particularly what he was talking about.  He was

8    talking about the business managers.  They have

9    business operations managers that run each area of

10   the plant.  They have four.  And right now none of

11   those four are Ford transitional people --

12        Q.    Okay.

13        A.    -- except Rob Kurtz, who is a resident

14   engineer acting as a manager.

15        Q.    He's really a Ford guy?

16        A.    He's really a Ford guy.

17        Q.    Okay.

18        A.    But he's not, to my understanding, on

19   ZF's payroll.  And his -- his job will last one

20   year till next June, I think it is, and he's done.

21        Q.    Okay.

22        A.    And he has to leave or whatever they

23   have to do with him.  I know they're working to try

24   to get to only three business managers.  But as of

1    now, none of them, with the exception of Rob Kurtz,

2    is Ford related.

3        Q.    Okay.  Can you quantify in dollars for

4    me what you think you've lost as a result of that?

5        A.    No, I can't.

6        Q.    Okay.

7        MR. SIMON:  Just add an objection.

8    You've asked that before obviously.  He depends on

9    his lawyers to understand the law and be able to

10   calculate certain damages.

11       MR. HUNTER:  All right.  I've rattled

12   on here for awhile.  I'll let Mr. VanWay have an

13   opportunity.  I'm not concluding mine, but it is

14   4:15 and I don't know how late we're going today.

15       MR. VANWAY:  Everybody good to go or

16   need a break?

17       MR. SIMON:  Ready.

18       THE WITNESS:  Have a seat.

19       MR. VANWAY:  All right.

20       MR. HUNTER:  Off the record.

21       (Off the record:  4:13 p.m. - 4:14 p.m.)

22                            EXAMINATION

23   BY MR. VANWAY:

24       Q.    Mr. Baker, good afternoon.  I'm not

1    sure if we've formally met.  I'm Jeff VanWay.

2          A.    I remember.

3          Q.    I represent Ford in this case.

4          A.    Pleased to meet you.

5          Q.    Thank you, sir.  I have some questions

6    for you.  I hope to not take as much time as

7    Mr. Hunter did.  He has more questions than I do

8    and I'll try not to repeat his questions, but if I

9    do, bear with me.  It's not intentional.

10          Mr. Baker, when you were employed at

11    Ford, there were basically two groups of employees

12    there, right?  Hourly and salaried employees; is

13    that correct?

14          A.    That's correct.

15          Q.    Hourly employees are represented by

16    the UAW?

17          A.    That's correct.

18          Q.    They had a labor contract that set

19    forth terms and conditions of their employment and

20    their compensation and benefits?

21          A.    That's correct.

22          Q.    Salaried employees, on the other hand,

23    didn't have a contract, did they?

24          A.    They had a employment agreement.

```
 1          Q.    Okay.  Had an employment agreement.
 2   Have you seen that employment agreement?  Did you
 3   specifically have one?  Let me ask that -- did you
 4   specifically have one?
 5          A.    I can't recall if I did.  I thought I
 6   did.
 7          Q.    And what was in that employment
 8   agreement, do you recall?
 9          A.    I do not recall at this time.
10          Q.    Did it specifically say what your
11   compensation was going to be?
12          A.    I don't remember --
13          Q.    Okay.
14          A.    -- whether it did or not.
15          Q.    Did it say what your benefits would
16   be?
17          A.    I don't recall whether it did or not.
18   We're going back real far here.
19          Q.    Sure.  No, I understand.  Was it your
20   understanding that your compensation and benefits
21   were as determined by the company?
22          A.    Yes.
23          Q.    In other words, you didn't go in with
24   the company and negotiate --
```

1          A.    No, I did not.

2          Q.    -- every year or every three years,

3     right?

4          A.    No.

5          Q.    Okay.  So company set those and

6     changed them at their discretion, didn't they?

7          A.    Yes.

8          Q.    And I assume the company didn't need

9     your approval to change your compensation or your

10    benefits?

11         A.    That's correct.

12         Q.    Okay.  And would I also be correct

13    that while you were employed at Ford, the company

14    could terminate you for -- for any reason?  Is that

15    your understanding?

16         A.    I thought that it had to be specific

17    reasons.  I don't want to say just any reason.

18         Q.    Okay.

19         A.    Color of my hair or eyes, I don't

20    think --

21         Q.    Fair enough.  Was it your

22    understanding that you had a specific term of

23    employment with Ford?  In other words, that it was

24    employment for a year, for three years, for life,

111

1    anything like that?

2         A.    I thought as long as I did a good job

3    and done what was expected of me, I had a job with

4    Ford Motor Company.

5         Q.    For how long?

6         A.    Unknown.  Long as I wanted to work

7    there and as long as they needed my services.

8         Q.    For life?

9         A.    I would -- that's what I thought.

10         Q.    Okay.  Do you recall ever receiving

11    anything in writing from Ford that said just that,

12    that you had a job for life there if you did a good

13    job?

14         A.    I don't recall --

15         Q.    Okay.

16         A.    -- not seeing anything like that.

17         Q.    Do you recall anyone from Ford

18    communicating that to you, that as long as you do a

19    good job, you've got a job for life?

20         A.    No, I don't recall anyone saying that

21    to me.

22         Q.    Okay.  Now, while you were employed

23    with Ford, your compensation and benefits, they

24    changed from time to time, didn't they?

1          A.    Yes, they did.

2          Q.    Okay.  You received merit increases?

3          A.    Yes.

4          Q.    And the amount of those increases

5     varied from year to year, didn't they?

6          A.    That's correct.

7          Q.    Based on things such as your

8     performance?

9          A.    Yes.

10         Q.    Based on company performance?

11         A.    That would be the -- like profit

12    sharing.

13         Q.    If the company wasn't doing well, your

14    merit increase might be smaller?

15         A.    If the company wasn't doing well, your

16    profit sharing might be smaller.  Merit usually --

17    I didn't think merit had a lot -- merit was usually

18    based on you, what you did.

19         Q.    Okay.

20         A.    The rest of the company, if I did a

21    good job, I was taken care of on my merit.  It was

22    based on me, not the rest of the company.

23         Q.    Okay.  But it was your understanding

24    that the profit sharing would vary, based on the

1    performance of the company?

2        A.    Yes, that was my understanding.

3        Q.    Weren't there, in fact, years when you

4    didn't receive any profit sharing at all from the

5    company?

6        A.    I don't recall there was.  I thought

7    almost every year we did get a profit that I was

8    there with Ford Motor Company.

9        Q.    Okay.  Now, you just said "almost

10   every year," which implies that there might have

11   been some years that you didn't.  Do you remember

12   whether there were years --

13       A.    No, I do not remember that.

14       Q.    Okay.  Have you still got Exhibit 4 in

15   front of you?

16       A.    Mm-hmm.

17             MR. SIMON:  I've got it.

18       Q.    If you could flip to page -- I believe

19   it's Bates stamped page 18.

20       A.    I see it.

21       Q.    If you look at that chart, which I --

22   it looks like it shows the historical profit

23   sharing for Ford.  Do you agree with me that that's

24   what that chart shows?

1        A.    Yes.

2        Q.    And it looks like for 1991 through

3    '93, it shows a zero percent profit sharing.  Does

4    that -- reviewing that document cause you to change

5    your testimony as to whether there were years that

6    you did not receive a profit sharing at Ford?

7        A.    According to this one I'm seeing, yes,

8    there were years I didn't receive profit sharing

9    from Ford.

10        Q.    Okay.  And you understood that there

11    was no guarantee that you'd receive profit sharing

12    while you were at Ford, correct?

13        A.    I understand that.

14        Q.    Okay.  And at some point while you

15    were still at Ford, didn't Ford change from profit

16    sharing to performance bonuses?

17        A.    That, I don't recall.

18        Q.    Okay.  Could have happened, you're

19    just not -- you just don't --

20        A.    Right, it --

21        Q.    -- recall?

22        A.    -- could have happened.  I don't

23    recall that.

24        Q.    When the company didn't give profit

1    sharing in those years indicated on the chart, did

2    anyone from the company come to you and seek your

3    approval for that?

4         A.    No, sir.

5         Q.    While you were with the company, with

6    Ford, your health insurance changed from time to

7    time, didn't it?

8         A.    I think it did.

9         Q.    Your premiums that you paid out of

10   pocket changed?

11        A.    I think they did.

12        Q.    Company changed carriers at least

13   once, didn't they?

14        A.    I think one time they did.

15        Q.    Changed the amount of your co-pays?

16        A.    I don't know that specifically.

17        Q.    Okay.  The changing of the amount that

18   you paid out of pocket for the premiums, they

19   increased your premiums, right?

20        A.    I would think they did.  I don't

21   recall those figures at this time.

22        Q.    Did they also make changes as to what

23   was covered under the health insurance plan?  Do

24   you recall that?

 1          A.    I don't recall that.

 2          Q.    Okay.  With respect to any of the

 3    changes on the health insurance that you do recall,

 4    did the company ask for your approval before making

 5    those changes?

 6          A.    No, they did not.

 7          Q.    It was your understanding that the

 8    company could make those changes.  It was within

 9    their discretion, correct?

10          A.    That's correct.

11          Q.    Okay.  Mr. Baker, you've been handed

12    what the court reporter has marked as Exhibit 62,

13    which appears to be the offer letter that was given

14    to you at the time you were offered employment with

15    Ford.  Am I correct, is that what Exhibit 62 is?

16          A.    Yes.

17          Q.    And you accepted employment based on

18    this offer letter; is that correct?

19          A.    Yes.

20          Q.    Mr. Baker, Exhibit 63 appears to be an

21    application for salaried employment that you

22    completed when you applied for employment with

23    Ford.  Do you agree with me that that's what

24    Exhibit 63 is?

1          A.    I agree.

2          Q.    And is that your handwriting on

3    Exhibit 63?

4          A.    Yes, it is.

5          Q.    And on the second page, is that your

6    signature that appears there?

7          A.    That's it.

8          Q.    If you turn to the second page,

9    Mr. Baker, and the first paragraph there -- and I

10   believe you may have been here when I went over

11   this similar document with Mr. Whisman this

12   morning.

13          About in the middle of that first

14   paragraph is language to the effect that -- it says

15   that your employment was not for a definite term.

16   Could be terminated at any time and that the only

17   way any differing commitment regarding your

18   employment would be made is by written agreement

19   signed by the vice president of the company in

20   charge of employee relations.  Do you see that

21   section I'm referring to?

22          A.    Yes.

23          Q.    Did you ever have an agreement, a

24   written agreement that was signed by the vice

1    president of Ford's employee relations department?

2         A.    No.

3         Q.    Now, Mr. Baker, Exhibit 64 is a

4    document that Ford produced in this case entitled

5    "Employment Agreement."  Appears to have your

6    signature on it.  Do you agree with me that that is

7    your signature on this document?

8         A.    I agree.

9         Q.    Earlier you testified that you

10   believed you had something called an employment

11   agreement with Ford.  Is this the document you were

12   referring to?

13        A.    I think it is.

14        Q.    Okay.

15        A.    I don't see Ford's name on it

16   anywhere, but I see the words employee agreement

17   and my signature.

18        Q.    Okay.  And I'll submit to you, Mr.

19   Baker, that this was produced by Ford as a part of

20   your personnel file --

21        A.    Okay.

22        Q.    -- in this case.  And it looks like --

23   and you tell me if I'm wrong, but it looks like the

24   signature of the company representative is Ann

1    Jones?

2         A.    Yes.

3         Q.    She was, back at the time you hired in

4    with Ford, in Ford's HR department?

5         A.    Yes.

6         Q.    And as you look, Mr. Baker, at the

7    third paragraph of this document here -- and I'm

8    not going to read that out loud.  I'd just ask if

9    you'd take a moment and read that paragraph.

10        A.    It's hard to read.

11        Q.    No, I understand.

12              MR. SIMON:  Maybe you're --

13              MR. VANWAY:  No, I'd be glad to read

14   it out loud as I did earlier, but I think we'll

15   save time if Mr. Baker reads it to himself.

16              MR. SIMON:  That's fine.  I didn't

17   know you read it for Mr. Whisman.

18              MR. VANWAY:  His was much harder to

19   read.

20        A.    I've read it.

21        Q.    Okay.  And as I read this paragraph,

22   Mr. Baker, among other things, it appears to say

23   that your pay and benefits were subject to such

24   adjustments as Ford may from time to time

1   determine.  And that's consistent with your

2   understanding of how things were when you were at

3   Ford, correct?

4          A.     That's correct.

5          Q.     Okay.  Now, since the time that you

6   left Ford and went to work for ZF Batavia, are you

7   aware of any changes that Ford has made with

8   respect to the compensation and benefits of people

9   that it continues to employ?

10         A.     Yes.

11         Q.     What changes are you aware that Ford

12  has made?

13         A.     Overtime pay is increased.

14         Q.     Okay.  Do you know what the increase

15  is?

16         A.     The first time, I think it went to --

17  for like Sunday or holiday work went to $50 an

18  hour.  And then it jumped again to 53.

19         Q.     Do you know what the current -- when

20  you say "53," that's the Sunday rate as well?

21         A.     Yeah --

22         Q.     Okay.

23         A.     -- Sunday or holiday rate.

24         Q.     Do you know what the Sunday or holiday

```
 1    rate is at ZF Batavia?

 2         A.    53.

 3         Q.    Same as what it was before?

 4         A.    They just brought there's up.

 5         Q.    Okay.  When Ford went to $50 an hour

 6    for Sunday or holiday, did ZF Batavia do the same?

 7         A.    No, they did not.

 8         Q.    What did they do?

 9         A.    I think they stayed the same at 47, if

10    my recollection is right.

11         Q.    So now -- they're the same now, but at

12    some point they weren't?

13         A.    Right.

14         Q.    Okay.  Any other changes that Ford has

15    made with respect to its employees that you're

16    aware of, other than overtime pay?

17         A.    At this time, that's all I can recall.

18         Q.    Are you aware that Ford no longer does

19    a 401K match for its employees?

20         A.    I'm not aware of that, no.

21         Q.    Do you currently receive 401K matches

22    at ZF Batavia?

23         A.    Yes.

24         Q.    How much is the match?
```

```
 1        A.    I thought it was 60 cents to the

 2   dollar --

 3        Q.    Okay.

 4        A.    -- up to 10 percent.

 5        Q.    Up to 10 percent?

 6        A.    I think it might go higher to 15,

 7   but --

 8        Q.    Are you aware that Ford has stopped

 9   paying performance bonuses to its salaried

10   employees?

11        A.    Not before today.

12        MR. SIMON:  Let me just interpose an

13   objection, then.  If Ford had its documents to

14   support that these are the changes that you're

15   describing in these questions, I would have

16   expected to receive those documents as part of your

17   Rule 26 disclosures.

18        MR. VANWAY:  If there are any

19   documents that are responsive to your discovery

20   request or to the Rule 26 disclosures, they'll be

21   produced.

22        MR. SIMON:  I'm just -- you can go

23   ahead and ask him, but I'm just saying that if

24   you've got documents showing that Ford's policies
```

1    have changed the way you've described, then I

2    should have gotten documents, but --

3                   MR. VANWAY:  Well, you can save that

4    one for another day.

5    BY MR. VANWAY:

6         Q.    Mr. Baker, do you currently receive an

7    AIP bonus at ZF Batavia, correct?

8         A.    Yes, I do.

9         Q.    Okay.  Are you aware that Ford

10   recently announced it would be cutting salary-

11   related costs by up to 10 percent?

12        A.    Yes.

13        Q.    And how are you aware of that?

14        A.    Read it.

15        Q.    Okay.  As --

16        A.    E-mail and newspaper articles.

17        Q.    Okay.  Here recently --

18        A.    Yeah.

19        Q.    -- you heard that?  Has ZF Batavia

20   announced a similar 10 percent cut?

21        A.    I've not heard that.

22        Q.    Are you aware that one of the ways

23   Ford has said it may achieve this 10 percent cut is

24   through overtime cuts?

1         A.     No, I'm not aware of that one.

2         Q.     Now, you testified earlier about

3    certain promises or commitments that were made to

4    you prior to the time you accepted employment with

5    ZF.  And I believe you said that with respect Mr.

6    Priest, one of the things he told you was that you

7    would probably get an MPS job if you went to ZF?

8         A.     That's correct.

9         Q.     If you hadn't -- if your offer from ZF

10   had not included an MPS job, would you have

11   accepted the offer?

12        A.     There's a chance that I would have

13   not -- would not have and -- because I believe I

14   could have stayed with Ford and had an opportunity

15   to advance with Ford.

16        Q.     If it were just a lateral move over

17   to --

18        A.     That would have had a bearing on my

19   decision.

20        Q.     Okay.  Do you know who from Ford, if

21   anyone, was responsible for putting together the

22   offers that you received?

23        A.     I thought it was Karl Kehr, Jerry

24   Priest.  All those people were Ford employees at

1    the time.

2        Q.    Mr. Kehr was a Ford employee at the

3    time, is that your understanding?

4        A.    At the time of the cafeteria meetings,

5    to my understanding, he was still a Ford employee.

6    There was no ZF Batavia salary at the time.

7        Q.    If you flip back to Exhibit 4 again,

8    which is -- I think we looked at earlier, the big

9    thick one there.

10        A.    Okay.

11        Q.    And if you look on the first page

12    where it lists the presenters and it lists Mr. Kehr

13    as being with ZF Batavia.

14        A.    I see that.

15        Q.    Does that cause you to change your

16    testimony as to whether Mr. Kehr was with Ford or

17    ZF Batavia at the time of the May 1999 meeting?

18        A.    I see that he is not now.  At the

19    time, I thought he was.

20        Q.    Okay.  Fair enough.

21        A.    Glenn Marinetti was still with Ford.

22        Q.    Right.  And I believe that what you

23    testified with regard to Mr. Marinetti is that you

24    really didn't have many discussions with him about

1     what things would be like if you accepted the ZF

2     Batavia offer?

3          A.     I had discussions, not a whole lot.

4          Q.     Specifically what were the discussions

5     with Mr. Marinetti?

6          A.     I don't recall those at this time.

7          Q.     Do you remember having any specific

8     discussion with Mr. Marinetti about what your

9     benefits would be?

10         A.     I don't recall that at this time.

11         Q.     Do you know who was it at Ford that

12    had responsibility for benefits, compensation?

13         A.     While we -- before we transitioned

14    over?

15         Q.     Before you accepted employment with ZF

16    Batavia, who at Ford had responsibility for that

17    area?

18         A.     I thought it was Mike Warden.

19         Q.     It wasn't -- I mean, it was someone in

20    HR?

21         A.     Right, Mike Warden.

22         Q.     And it wasn't Mr. Marinetti?

23         A.     No, it was not Mr. Marinetti.

24         Q.     And it wasn't Mr. Priest?

1          A.     Right.

2          Q.     And it wasn't Rick Williams?

3          A.     Correct.

4          Q.     Okay.  Now, if you still have Exhibit

5     4, why don't we turn to it.  There were two

6     meetings, as I understand it, an a.m. and a p.m.

7     meeting; is that correct, on May 27th?

8          A.     I don't know for sure.  I went to one.

9          Q.     Okay.  Do you know which one you went

10    to?  Was it in the morning or the afternoon?

11         A.     I thought it was the -- I think it was

12    the afternoon meeting.

13         Q.     Okay.  So if you would, flip to page

14    Bates stamped page 2, which is actually the third

15    page in of -- of Exhibit 4.

16         A.     Okay.

17         Q.     And it appears there was an agenda

18    there for what was going to be discussed or what

19    was discussed at the afternoon meeting.  And by

20    each topic, it appears that there are the names of

21    the persons who would talk about that?

22         A.     Mm-hmm.

23         Q.     As you look through that agenda, is

24    that consistent with your recollection as to what

1   individuals presented which topic at the meeting?

2       A.    I don't recall who spoke about what

3   topics --

4       Q.    Okay.

5       A.    -- at this time.  I know Karl Kehr

6   talked; Tony DeShaw talked.  I -- I don't know who

7   spoke about what topics.

8       Q.    Okay.  Do you have any reason to

9   believe the persons listed as presenters for

10  specific topics are not the persons who actually

11  presented for that topic?

12      A.    I have no reason to disbelieve that.

13      Q.    Okay.  And I believe it was your

14  testimony that you didn't receive this, this

15  handout, this Exhibit 4 at the meeting, did you?

16      A.    I don't think I did.  I don't recall

17  that I did get it at that time.

18      Q.    Were there any handouts given out at

19  the meeting that you recall?

20      A.    I do not recall whether there was or

21  not.  I've tried to remember that and I -- it's

22  been a few years back.

23      Q.    Okay.  Now, you testified earlier

24  about certain promises or commitments that you

1    believe were made about benefits.  And am I

2    understanding you correctly that those promises

3    that you testified about regarding those benefits

4    were made in this May '99 meeting?

5         A.    Be more specific.

6         Q.    Okay.

7         A.    I don't know which ones you're talking

8    about.

9         Q.    Sure.  You testified that you were

10   told in meetings that you'd be -- things would be

11   the same as they were at Ford, that personal days

12   would be the same, bereavement would be the same.

13   You'd get in on the ground floor of the CVT, get

14   AIP bonuses.  You would receive merit increases,

15   that Ford would watch over you, that the overtime

16   policy would be the same.  I believe that's

17   everything you testified about about the promises

18   or commitments that were made to you?

19        A.    I don't know if all those specifically

20   were said in this cafeteria meeting --

21        Q.    Okay.

22        A.    -- but the majority of what you just

23   said was said in that meeting.

24        Q.    Okay.  Well, tell me which ones you --

1    well, let's go through this.

2           First, you would agree that there was

3    nothing in the meeting, the May 1999 meeting where

4    you were told that you would get a fourth week of

5    vacation right away?

6           A.    There was nothing specifically saying

7    that I would get a fourth week vacation.

8           Q.    Okay.

9           A.    I agree with that.

10          Q.    Okay.  And I may have gotten lost

11   along the way, but you are eligible after 15 years

12   at ZF for a fourth week; is that right?

13          A.    Per the gray brochure.

14          Q.    Okay.

15          A.    After 15 years, you can get a fourth

16   week.

17          Q.    Do you have any reason to believe as

18   you sit here today that once you hit 15 years, you

19   won't receive a fourth week?

20          A.    Do I have reason to believe that?

21          Q.    Yes, sir.

22          A.    Yeah, I have doubt that what we're

23   doing with the gray brochure is being followed to

24   the letter.

1      Q.    Okay.  But no one has told you that

2  you won't receive that fourth week after --

3      A.    No, they haven't, but by looking at

4  AIP, it said you will receive AIP and it didn't say

5  it had anything to do with how much overtime I

6  work.  And that's the first part.  So if we're

7  going to bend that, I don't know if I'm going to

8  get a fourth week vacation after 15 years.

9      Q.    Okay.  I understand your testimony.

10  Personal days, do you recall anything being said in

11  the May 1999 meeting about personal days?

12      A.    I don't recall.

13      Q.    Bereavement policy, do you recall

14  anything being said in the May '99 meeting about

15  bereavement?

16      A.    No, I don't recall it.

17      Q.    Now, you understood, didn't you, that

18  the bereavement policy was going to change when you

19  went to ZF Batavia?

20      A.    No, I didn't understand that.

21      Q.    Okay.  Now, when you were with Ford, I

22  believe you testified that you could take whatever

23  you need up to five days paid?

24      A.    Yes.

1          Q.     Okay.

2          A.     It's not written that way, but your

3     superiors usually would say they worked with you,

4     they knew you and if you had -- someone died or a

5     death in your family, depending on who it was, if

6     you needed more time, you would let them take more

7     time.

8          Q.     Okay.  And weren't you aware, though,

9     at the time of this May '99 meeting that ZF was

10    only going to give three days for bereavement?

11         A.     I don't recall whether they said that

12    or not.  I -- I didn't even think about it 'cause I

13    don't plan a death in my family.

14         Q.     So that wasn't something that

15    influenced your decision as to whether or not you

16    were going to --

17         A.     No, it was not.

18         Q.     -- accept employment with ZF?

19    Personal days --

20         A.     That I got a bereavement was something

21    that would influence me.

22         Q.     But how long it was going to be --

23         A.     No, I didn't --

24         Q.     What about the number of personal days

1    that you were going to receive?  Did that influence

2    your decision as to whether or not to accept

3    employment with ZF Batavia?

4         A.    Yeah, I thought I would have five

5    personal days.

6         Q.    Okay.  If someone had told you it was

7    only going to be three, would you still have

8    accepted employment with ZF Batavia?

9         A.    I can't say that I would have.  I

10   think it would have swayed my decision what to do.

11        Q.    Do you have Exhibit 2 in front of you,

12   which is the gray brochure?

13        A.    I did at one time.

14        Q.    If you were to flip to the second page

15   of that document, the -- I guess the center column

16   under "Leaves" there at the very bottom --

17        A.    Yes.

18        Q.    -- where it says funeral up to a

19   three-day leave.  Do you see where I'm at?

20        A.    Yes.

21        Q.    Is that different than what your

22   understanding was when you accepted employment with

23   ZF Batavia as to what their funeral leave policy

24   was going to be?

134

1          A.     It's not different from the time that

2     I received this and saw it.

3          Q.     Okay.  At the time that you accepted

4     employment, did you have any understanding one way

5     or the other as to what ZF's bereavement leave

6     policy was going to be?

7          A.     At the time I accepted employment, I

8     don't recall what their -- but I didn't think it

9     would be drastically changed.

10         Q.     Okay.  At the time you accepted

11    employment, did you have any idea what ZF Batavia's

12    personal day policy was going to be?

13         A.     My understanding was it would be five

14    days.

15         Q.     And who communicated that to you?

16         A.     The same as it was with Ford Motor

17    Company.

18         Q.     Well, were you present for Mr.

19    Whisman's deposition earlier today?

20         A.     Yes, I was.

21         Q.     And I thought that you may have missed

22    part of it and that's why I asked.  I believe in

23    his deposition earlier this morning, he testified

24    that at Ford he got 30 days personal days.  When

1    you were with Ford, did you get 30 personal days?

2          A.    Not that I recall.

3          Q.    Okay.  Five is what you got?

4          A.    That I knew about.  I don't know how

5    many personal days I had available.

6          Q.    Okay.  Who, if anyone, prior to the

7    time you accepted employment with ZF Batavia

8    communicated to you how many personal days you

9    would get at ZF Batavia?

10          A.    I don't recall who would have said

11    that to me.

12          Q.    Do you recall if anyone at all did?

13          A.    No, sir.

14          Q.    Do you recall whether you had any

15    understanding at all regarding what the personal

16    day allotment would be at ZF Batavia?

17          A.    From this right here.

18          Q.    But you hadn't received --

19          A.    Right, but --

20          Q.    -- Exhibit 2 yet.

21          A.    -- before that, I thought it would be

22    the same as what I had with Ford Motor Company.

23          Q.    Okay.  Even though no one had told you

24    that?

1          A.     Right.

2          Q.     Okay.

3          A.     I knew we had days at Ford Motor

4    Company and I don't think I took any --

5          Q.     Okay.

6          A.     -- the whole time I was with them --

7          Q.     And you --

8          A.     -- because those were counted against

9    you as days off, even though you took them.  And

10   I've tried to maintain perfect attendance since --

11   just about the time I been there.

12         Q.     Okay.  Now, while you worked at Ford

13   for the -- I guess about eight --

14         A.     Seven and a half.

15         Q.     -- seven and a half years you were

16   there, your work assignment changed from time to

17   time, didn't it?

18         A.     Two, about two times.

19         Q.     Okay.  Was it your understanding that

20   the company had the ability to change your work

21   assignment as it saw fit?

22         A.     I understood that.

23         Q.     Okay.  AIP bonuses, was there anything

24   at the May 1999 meeting discussed regarding AIP

1    bonuses that you recall?

2        A.    Yes.

3        Q.    What was discussed at the meeting that

4    you recall?

5        A.    I don't recall what was discussed, but

6    I know AIP was talked about.

7        Q.    Okay.  Do you recall anyone during

8    those -- that meeting in May 1999 telling you that

9    you were guaranteed to receive an AIP bonus while

10    you were at ZF Batavia?

11        A.    No.

12        Q.    Did -- outside of that meeting, up to

13    and including the date that you accepted employment

14    with ZF Batavia, did anyone communicate to you that

15    you were guaranteed to receive an AIP bonus at ZF

16    Batavia?

17        A.    No one said I was guaranteed a bonus.

18        Q.    Okay.  Merit increases, was there any

19    discussion at the May 1999 meeting of merit

20    increases?

21        A.    I don't recall if there was or not.

22        Q.    Okay.  Setting aside the meeting, up

23    to and including the date that you accepted

24    employment with ZF Batavia, did anyone guarantee

138

1   you that you would receive merit increases if you

2   accepted employment with ZF Batavia?

3       A.   I don't know if the word "guaranteed"

4   was used, but I was told there would be merit

5   increases.

6       Q.   Okay.

7       A.   That was some of the things just like

8   Ford had.

9       Q.   And did anyone commit to you how much

10   your merit increase would be?

11       A.   No, they did not.  Be based upon how

12   well my job -- what I did.

13       Q.   Okay.  Now, you testified earlier

14   today that it was your understanding that Ford

15   would watch over you after you went to ZF Batavia,

16   words to that effect?

17       A.   Those words weren't specifically

18   spoken to me, but it was that understanding --

19       Q.   Okay.

20       A.   -- that Ford had a vested interest in

21   this company and that Ford would watch to make

22   sure.  And I did hear -- and I don't recall where

23   it was from -- that there would be a committee of

24   people with Ford on that committee, in case we had

139

1    any problems.

2         Q.    And was it your understanding that

3    committee was going to deal with employee issues or

4    that that committee was going to deal with making

5    sure the plant made money?

6         A.    Employee issues.

7         Q.    Okay.  And who told you that there was

8    going to be a committee that Ford would be a part

9    of that would deal with employee issues?

10        A.    I don't recall who said that.

11        Q.    Was it discussed at this May 1999

12   meeting?

13        A.    I don't remember if it was or not.  To

14   my knowledge, I didn't hear that at that meeting.

15        Q.    Okay.  Did Mr. Marinetti discuss that

16   with you?

17        A.    No, he did not.

18        Q.    Mr. Williams?

19        A.    No.

20        Q.    Mr. Priest?

21        A.    No, sir.

22        Q.    Well, who, if you can recall, because

23   it's my understanding that those are the only three

24   individuals that you had conversations with about

1    what things would be like at ZF Batavia?

2          A.    There -- there was conversations about

3    what things would be like at Batavia with a lot of

4    people in that plant --

5          Q.    Other co-workers?

6          A.    -- before I made my decision.

7    Co-workers, other people, other management people.

8    Specifically the ones I talked to departed about

9    specific subjects were the people I named.  Now,

10   those three, I think you said Jerry, Marinetti and

11   Rick?

12         Q.    Yes.

13         A.    They didn't say anything about

14   guarantees or about a committee being formed that I

15   recall.

16         Q.    Okay.  Was that just a rumor in the

17   plant that there might be a committee that had --

18         A.    If you want to call it a rumor.

19         Q.    Okay.  You don't recall anyone in Ford

20   managers saying that would be the case?

21         A.    I don't recall that.

22         Q.    Okay.  Now, overtime policies, do you

23   recall in this May 1999 meeting, was there any

24   discussion about the overtime policy that was going

1    to be in effect at ZF Batavia?

2         A.    There was discussion about overtime,

3    but I -- specifically a policy, I didn't remember

4    hearing anything about a policy at that meeting at

5    this time.

6         Q.    Okay.  Did anyone at that meeting say

7    that overtime will be exactly like it was at Ford?

8         A.    There was conversation -- no.

9         Q.    Okay.  Did any of the three

10   individuals that you've testified you spoke with,

11   Mr. Marinetti, Mr. Priest or Mr. Williams, tell you

12   that overtime would be exactly as it was like at

13   Ford?

14        A.    They led me to believe overtime would

15   be paid just like it was at Ford.

16        Q.    Okay.  And what did they do that led

17   you to believe that?

18        A.    When I asked if we would get paid

19   overtime, they said, yes, you'll get overtime just

20   like you were doing at Ford.

21        Q.    Okay.  Did they say just like you were

22   doing at Ford or did they say, yes, you'll be paid

23   overtime?

24        A.    I don't know exactly how they termed

1    the words that I'd get paid overtime, but there was

2    conversation held and that's what was implied to

3    me, that I would get paid overtime.

4         Q.    Okay.  And did they tell you that ZF

5    Batavia would never change its overtime policy?

6         A.    They didn't tell me never.

7         Q.    Okay.  And it's your understanding,

8    certainly when you were with Ford, was that Ford

9    had the ability to change its policies without your

10   approval, correct?

11        A.    Yes, that's correct.

12        Q.    Is it your understanding that ZF

13   Batavia has that same ability?

14        A.    Yes.

15        Q.    Okay.  So if ZF Batavia wants to

16   change its overtime policy, they have that right to

17   do so?

18        A.    Yes.

19        Q.    Okay.  Do you recall how many

20   conversations you had with Mr. Priest about what

21   things would be like at ZF Batavia?

22        A.    I have no -- I worked with Jerry every

23   day.  Conversations were held every day because

24   this was a major career decision and I was trying

1   to make up my mind whether to try to stay with Ford

2   or stay with this company.  I put a lot of time in

3   with Ford.

4        Q.    Now, your job that you initially

5   accepted with ZF Batavia was an MPS job?

6        A.    Yes, sir.

7        Q.    And that was an MPS job working on

8   CD4E?

9        A.    On CD4E, east side.

10       Q.    Okay.  And did you know that going in?

11   In other words, at the time you accepted that job,

12   did you know you were going to be MPS working on

13   CD4E?

14       A.    Yes.

15       Q.    Okay.  You understood that you

16   weren't, at that time at least, going to be working

17   on CVT?

18       A.    I understood that, yes.

19       Q.    Okay.

20       A.    I understood that I was going to work

21   for CD4E.

22       Q.    Okay.  And you were okay with that?

23       A.    I was okay that I was working with --

24   on CD4E at that time.

1          Q.    Okay.

2          A.    There was nothing saying I would never

3    go to CVT.

4          Q.    Right.  And was -- do you recall

5    anyone saying, committing to you that you were

6    guaranteed to go work on CVT?

7          A.    No one said the word "guarantee."

8          Q.    Okay.  Do you still have Exhibit 61 in

9    front of you, which I believe is your ZF Batavia

10   application for employment?

11         A.    Do now.

12         Q.    Okay.  If you would, just turn to the

13   second page of that document.  And you see where

14   your signature appears three different times?

15         A.    Yes, I do.

16         Q.    Okay.  The first time that it appears,

17   there are three paragraphs before that.  And then

18   there's a middle paragraph that contains language

19   similar to what was contained in your Ford

20   application.

21              And I don't want to read the whole

22   paragraph to you, but there's a section there that

23   says that your employment could be terminated at

24   any time and that the only way any differing

1  commitment regarding your employment could be made

2  is by a written agreement signed by the director of

3  human resources of the company.  Do you see where

4  I'm at there, in the middle paragraph there?

5       A.    Yes, I see that.

6       Q.    Do you have any such written agreement

7  signed by the director of human resources at ZF

8  Batavia?

9       A.    No, sir.

10      Q.    Now, you understood that when you

11 accepted the offer from ZF Batavia, that you were

12 going to be working for ZF Batavia and not Ford?

13      A.    I understood that I'd be working for

14 ZF Batavia LLC --

15      Q.    Right.

16      A.    -- that Ford had an interest in.

17      Q.    A minority interest?

18      A.    49 percent interest.

19      Q.    Right.  And it was your understanding

20 that ZF was the majority --

21      A.    51 percent, yes.

22      Q.    And was it also your understanding

23 that ZF or ZF Batavia would be responsible for your

24 wages and benefits once you became a ZF Batavia

1    employee?

2         A.    Yes.

3         Q.    It wouldn't be Ford that would be

4    responsible for your wages and benefits, correct?

5         A.    Correct.

6         Q.    And you understood, though, as a ZF

7    Batavia employee, you would be subject to ZF

8    Batavia's policies and procedures?

9         A.    That's correct.

10        Q.    Not Ford's policies and procedures,

11   correct?

12        A.    Say it again.

13        Q.    Sure.  Your understanding was that ZF

14   put out a policy and procedure, that that was

15   something you had to follow because you were

16   working for ZF --

17        A.    I understand --

18        Q.    -- correct?

19        A.    -- that.

20        Q.    You didn't understand, though, that if

21   Ford put out a policy and procedure, that you

22   necessarily had to follow that once you became a ZF

23   employee?

24        A.    I agree with that.

```
 1          Q.    Okay.  Now, you testified earlier, Mr.

 2   Baker, about changes that ZF Batavia has made to

 3   certain policies that are at issue in this lawsuit.

 4   And if I captured everything -- and you tell me if

 5   I didn't -- but I heard you say changes to merit

 6   increases, changes to AIP, changes to CVT

 7   promotions and changes in overtime.

 8                Are there any other changes that

 9   affected you that are at issue in this lawsuit?

10          A.    I would have to see what you have

11   listed there.

12          Q.    Okay.  Well, I can read them again.

13          A.    Read them again.

14          Q.    What I've got in my notes from your

15   testimony, merit increases, AIP, CVT promotions and

16   overtime.

17                I understand there may be other things

18   that affect other plaintiffs in this lawsuit, but I

19   want to focus specifically on changes that affected

20   you.

21          A.    Those affect me and the retirement

22   policy could affect me.

23          Q.    What retirement policy?

24          A.    Where in -- where you can retire with
```

1    the combined years of Ford and ZF, and then hire

2    back in.

3         Q.    And has there been a change in that

4    policy?

5         A.    Yes.

6         Q.    What's the change?

7         A.    Some people were allowed to do that.

8    And now here in the last year, they've put a stop

9    to that.  My understanding was Len Sennish said, I

10   can't do that anymore.  If we do, we're opening up

11   flood gates for all transitional employees to hire

12   back in.

13        Q.    What was communicated to you, if

14   anything, up to and including the time that you

15   accepted employment with ZF Batavia on that issue?

16        A.    I don't remember any specific talk

17   about that issue.

18        Q.    Okay.  So would it be fair to say that

19   there haven't been any changes made to what was

20   communicated to you about retirement?

21        A.    Yes.

22        Q.    Okay.  Now, with regard to merit

23   increases, I believe your testimony was that your

24   merit increase is one to one and a half percent

149

1   less?

2       A.    Yes.

3       Q.    Less than what?

4       A.    Percentage-wise, less than a person

5   hired in straight off the street from ZF.  Less

6   than a nontransitional.

7       Q.    Okay.  New hires?

8       A.    New hires.

9       Q.    Okay.  Was there any commitment made

10  to you as to whether you would receive merit

11  increases the same or larger than those received by

12  new hires?

13      A.    No commitments were made to that.  My

14  understanding was they would be the same.  I had no

15  reason to believe they would be smaller.

16      Q.    What did you base that understanding

17  on?

18      A.    That no one said you will have one to

19  one and a half percent less every time there's a

20  merit or AIP.  No one told us that.  So then it's

21  assumed that yours is going to stay the same as

22  everyone else's.

23      Q.    Okay.  But at the time you accepted

24  employment, there wasn't anyone else, right?  There

1    weren't any ZF new hires?

2          A.    But we knew there would be.

3          Q.    No, I understand.  But there weren't

4    any at that time?

5          A.    At that time, right.

6          Q.    And so you didn't have an

7    understanding as to what new hires' merit increases

8    were going to be, did you?

9          A.    I'm trying to think if there was any

10   new hires.  Some -- there was some people hired in

11   at -- right about that time.

12         Q.    Off the street?

13         A.    Yes.

14         Q.    Okay.  Did you have any understanding

15   as to what their merit increases were going to be?

16         A.    I didn't have any understanding what

17   they specifically would be, amounts, percentages or

18   anything like that.

19         Q.    Okay.  I don't mean to repeat my

20   question, but just to make sure I understand --

21         A.    That's all right.

22         Q.    Fair to say, then, that no one from

23   Ford or ZF Batavia prior to the time you accepted

24   your offer communicated anything to you about your

1    merit increase, as compared to merit increases of

2    new hires?

3            A.    That's correct.

4            Q.    And you also did never receive

5    anything in writing about merit increases, did you?

6            A.    Yes, I did.

7            Q.    What did you receive in writing about

8    merit increases?

9            A.    As a manager of areas, I was given

10   packets of how to do merit increases, how they were

11   going to be formulated, what percentages would be

12   given.

13           Q.    Okay.

14           A.    And in that --

15           Q.    I don't mean to interrupt you, but I

16   asked a very poor question.  What I meant to ask

17   was, up to and including the time that you accepted

18   the offer with ZF Batavia, had anything been

19   communicated to you in writing about merit

20   increases?

21           A.    No.

22           Q.    Okay.  I didn't mean to cut you off.

23   And if you want to --

24           A.    I'm fine.

 1          Q.     -- continue on your answer, you can,

 2     but --

 3          A.     Nope.

 4          Q.     -- thought I'd short circuit it there.

 5     Who, if you know, made the -- what you've testified

 6     as a change with regard to merit increases, do you

 7     know who made that decision?

 8          A.     Specifically I do not know.

 9          Q.     Okay.  Do you know if anyone from Ford

10     was involved in that decision?

11          A.     I don't know that.

12          Q.     Do you have any knowledge that anyone

13     from Ford approved of that decision?

14          A.     I have no knowledge of that.

15          Q.     Okay.  Next you testified about AIP

16     and I believe specifically the changes.  There's

17     one year you didn't receive an AIP bonus; is that

18     right?

19          A.     I didn't say that.

20          Q.     Oh, I'm sorry.  Well, what is --

21     what's the issue with the AIP bonus?

22          A.     I didn't get the full amount I was

23     supposed to get.

24          Q.     Okay.  You got one, but you didn't get

```
 1    as much as --

 2           A.    I only got half --

 3           Q.    Okay.

 4           A.    -- and it was -- that AIP, the amount

 5    I got, the formula that was calculated was

 6    influenced by how much overtime I worked.  That's

 7    what I was told.

 8           Q.    Okay.  And prior to and including the

 9    time that you accepted employment with ZF Batavia,

10    did anyone communicate anything to you about what

11    your AIP bonus would be?

12           A.    Not what it would be.

13           Q.    Just that you would get one?

14           A.    That we would get one.

15           Q.    Okay.  And you did get one?

16           A.    Yeah.

17           Q.    Now, do you know who made the decision

18    that your AIP bonus would be smaller than what you

19    believed it should be?

20           A.    My understanding was Dick Newark.

21           Q.    Okay.  And he is the --

22           A.    Plant manager.

23           Q.    -- plant manager of ZF Batavia?

24           A.    I think he's the plant manager.  Right
```

1    now, he's considered plant manager of CD4E.

2          Q.    Okay.  At ZF Batavia?

3          A.    At ZF Batavia.

4          Q.    He's a ZF Batavia --

5          A.    Yes.

6          Q.    -- employee?

7          A.    Yes, he is.

8          Q.    Okay.  And, in fact, I don't think

9    he's ever been a Ford employee, has he?

10         A.    Couldn't tell you that.

11         Q.    Okay.  Are you aware of Ford having

12   any involvement in the decision to give you a

13   smaller AIP bonus?

14         A.    I'm not aware of that at all.

15         Q.    And this was in the year 2002,

16   correct?

17         A.    That's correct.

18         Q.    So over two years after you accepted

19   employment with ZF Batavia?

20         A.    Roughly.

21         Q.    Are you aware of anyone from Ford

22   approving the decision to give you a smaller AIP

23   bonus?

24         A.    I'm not aware of that at all.

1          Q.    Okay.  Now, with regard to -- well,

2     you testified also about vacation today.  And I

3     believe your testimony was that some employees,

4     like Dick Newark, were able to come in and

5     negotiate a fourth week.  You did not negotiate a

6     fourth week with ZF Batavia, did you?

7          A.    I didn't have any clue I can negotiate

8     anything.  I was given a piece of paper with an

9     offer and it had nothing about that on there.

10         Q.    Okay.  You thought it was a take-it or

11    leave-it proposition?

12         A.    That's pretty -- yes.

13         Q.    Okay.  CVT promotions --

14               MR. SIMON:  Can we take a --

15               MR. VANWAY:  Yeah, sure.  Let's go off

16    the record for just a minute.

17         (Off the record:  4:55 p.m. - 5:11 p.m.)

18               MR. VANWAY:  Back on the record.

19    BY MR. VANWAY:

20         Q.    Mr. Baker, before we broke, we were

21    talking about changes in -- in policies by ZF

22    Batavia.  I don't think we had discussed the

23    overtime policy yet.  My understanding is that your

24    claim in this case is basically two changes.  One

1   is the casual time change and the other is the 32

2   hours that you weren't paid for.  Am I correct?  Is

3   that the entirety of your overtime claim against

4   Ford?

5          A.    Yes --

6          Q.    Okay.

7          A.    -- to my knowledge.

8          Q.    To the best of your knowledge with

9   respect to the change in the casual time policy,

10  was anyone from Ford involved in that decision?

11         A.    To my knowledge, they were not.

12         Q.    Okay.  To the best of your knowledge,

13  did anyone from Ford approve that policy change?

14         A.    The changes that ZF did?

15         Q.    Yes.

16         A.    Not to my knowledge.

17         Q.    Okay.  And the 32 hour issue, my

18  understanding from your testimony is that sometime

19  after you had been hired by ZF Batavia, Dick Newark

20  committed to you that you'd get paid for some 32

21  hours that you were going to be working?

22         A.    He put a letter out with my name on it

23  stating that I would get paid for overtime during

24  that time period.

1          Q.     Okay.  And then later after that, Mr.

2     Newark took some action that was inconsistent with

3     the letter that he put out?

4          A.     That's correct.  I gave him the sheet

5     for him to sign and he, without telling me, zeroed

6     it.  And then told me after the fact that he zeroed

7     out all those hours and I, in fact, would get no

8     hours overtime.

9          Q.     Okay.  Did anyone from Ford tell you

10     that you would be paid for working those 32 hours?

11          A.     No, sir.

12          Q.     Did anyone from Ford instruct you to

13     work those 32 hours?

14          A.     No.

15          Q.     Okay.  To the best of your knowledge,

16     was anyone from Ford involved in the decision not

17     to pay you for those 32 hours?

18          A.     To the best of my knowledge, I can't

19     say they were.

20          Q.     Okay.  And to the best of your

21     knowledge, are you aware of whether anyone from

22     Ford approved ZF or Mr. Newark's decision not to

23     pay you for those 32 hours?

24          A.     To the best of my knowledge, I can't

1    say they were.

2        Q.    Okay.  Now, with respect to -- well,

3    let's start with Mr. Marinetti.  Do you have any

4    reason to believe that at the time Mr. Marinetti

5    discussed with you what things would be like at ZF

6    Batavia, that he wasn't being honest with you?

7        A.    I have no reason to believe that.

8        Q.    Do you have any reason to believe that

9    at the time of those discussions, Mr. Marinetti

10    knew that ZF Batavia down the road was going to

11    change its policies?

12        A.    I don't think he did.

13        Q.    With respect to Mr. Williams, do you

14    have any reason to believe that Mr. Williams was

15    being untruthful with you when he had those

16    discussions?

17        A.    I thought he was being truthful with

18    me and that he had no idea that things would

19    change.

20        Q.    Okay.  Mr. Priest, did you also

21    believe he was being truthful with you?

22        A.    Yes, I did.

23        Q.    And that you didn't believe that he

24    knew that things were going to change down the

1    road?

2         A.    To -- from my conversations with him,

3    I thought that he -- he implied to me that things

4    would be the same.

5         Q.    Okay.

6         A.    That's what I understood.

7         Q.    Okay.  As far as you knew, he didn't

8    have knowledge at the time he made those

9    statements --

10         A.    That's correct.

11         Q.    -- that things were going to change

12    down the road?

13         A.    That's correct.

14         Q.    Okay.  With respect to any of the

15    changes that ZF Batavia has made in this case -- or

16    that ZF Batavia has made that are at issue in this

17    case, have you ever complained to anyone at Ford

18    about those changes?

19         A.    No, I have not.

20         Q.    Why not?

21         A.    I had -- didn't have anybody at Ford

22    to complain to about these changes --

23         Q.    Okay.

24         A.    -- that I knew.

1          Q.     Fair enough.  Now, your reporting

2     relationship, has it changed with this new

3     promotion you just got?

4          A.     What do you mean?

5          Q.     The person you report to, did that

6     just change?

7          A.     Yeah.  I'm now directly reporting to

8     Dick Newark.

9          Q.     Okay.  Who did you report to prior to

10     that?

11          A.     Right prior to that was Jerry Priest.

12          Q.     Okay.  And at the time you reported to

13     Mr. Priest he was a ZF Batavia employee?

14          A.     He was a contract employee.

15          Q.     Okay.

16          A.     He had been retired and he contracted

17     back with ZF to do that job.

18          Q.     Okay.  Prior to Mr. Priest, did you

19     have any other supervisors at ZF Batavia?

20          A.     Chuck Hugan.

21          Q.     Okay.  And at the time you reported to

22     Mr. Hugan, was he a ZF Batavia employee?

23          A.     Yes, he was.

24          Q.     Okay.  Any other supervisors at ZF

1    Batavia other than those --

2          A.    Jim Whittenberger --

3          Q.    Okay.

4          A.    -- prior to -- Hugan took

5    Whittenberger's place.

6          Q.    And was Mr. Whittenberger, whose name

7    I just butchered, was he a ZF Batavia employee at

8    the time you reported to him?

9          A.    Yes, he was.

10          Q.    Any other supervisors?

11          A.    Yes.

12          Q.    Okay.  Why don't you --

13          A.    Hassan --

14          Q.    -- just name all the supervisors

15    while --

16          A.    You're really doing good, though.

17    You're helping me recall them all.  Hassan Saleh --

18          Q.    Okay.

19          A.    -- and Ray Pablice.

20          Q.    Okay.

21          A.    In order, Ray Pablice, Hassan Saleh as

22    we go back.

23          Q.    Okay.  At the time you reported to

24    each of those individuals at ZF Batavia, were they

1    ZF Batavia employees?

2            A.    Yes, they were.

3            Q.    Now, since you left Ford and went to

4    ZF Batavia, your annual wages have been higher than

5    what they were when you were at Ford, correct?

6            A.    That's correct.

7            Q.    If my numbers are correct, your last

8    salary at Ford was around 65,000.  Does that sound

9    about right?

10           A.    That sounds about right.

11           Q.    And your current salary, not including

12   whatever may come with the promotion you just got

13   is 88,000.  Does that sound right?

14           A.    88,700.

15           Q.    Okay.  Your AIP that you received from

16   ZF Batavia in 2000 was approximately $7,700.  Does

17   that sound right?

18           A.    In 2000?

19           Q.    Yes, sir.

20           A.    I can't remember if that's true or

21   not.

22           Q.    Okay.  Let me -- we don't necessarily

23   intend -- need to mark this, but that's a document

24   which I will submit to you came from ZF Batavia.

1    And it appears to indicate that your performance

2    bonus for 2000 was $7,700.  Any reason to dispute

3    that figure?

4         A.    No.

5         Q.    Okay.  And performance bonus, that's

6    the same as AIP?

7         A.    I -- I don't know if we're calling a

8    merit a performance bonus or AIP.

9         Q.    Well, merit is an increase to your

10   salary, correct?

11        A.    Right.

12        Q.    Okay.

13        A.    Yes, you're right.

14        Q.    So AIP --

15        A.    Performance would be AIP, yes.

16        Q.    Okay.

17        A.    It's how well the plant performed in

18   your specific area.

19        Q.    Okay.  Now, also I believe that the --

20   you produced some documents in this case regarding

21   your W-2s for the time you were at Ford and also

22   for the time you were at ZF Batavia.

23             And I don't intend to mark those, but

24   just to the extent you recall, according to the

 1   document, it looks like the last full year you were

 2   with Ford, which was 1998, your W-2 wages were

 3   approximately $95,800.

 4        A.    That's correct.

 5        Q.    Does that sound about right?

 6        A.    That's about right.

 7        Q.    And I believe the documents show that,

 8   for example, in 2001, when you were entirely

 9   employed by ZF Batavia, your W-2 wages were

10   approximately $131,600?

11        A.    That's correct.

12        Q.    Okay.  And in 2002, approximately

13   $117,900?

14        A.    That's correct.

15        Q.    Okay.

16        A.    Those are influenced by the $8,333 --

17        Q.    The transition --

18        A.    -- the three-year transition bonus

19   also influenced by raises and overtime pay.

20        Q.    That you received at ZF Batavia?

21        A.    Rate of pay for overtime, yes, that we

22   received at ZF Batavia.

23        Q.    I mean, the only --

24        A.    They went up somewhere in like 2001, I

1    think.

2         Q.    Okay.  The only payment that is in

3    some way related to your time with Ford is that

4    transition bonus, right?

5         A.    To the best of my knowledge, yes.

6         Q.    Okay.  Now, at the time that you had

7    discussions with individuals about the CVT, was it

8    your understanding that you'd be considered for

9    promotions that involved the CVT process?

10        A.    Yes.  I understood that I'd be

11   considered for a position in CVT.

12        Q.    Okay.  You didn't understand that you

13   would definitely be given a position in CVT, did

14   you?

15        A.    I didn't understand that I would

16   definitely -- there was no words of definite or

17   guarantee.

18        Q.    Okay.

19        A.    But I was told that I'd be considered

20   for it, that they needed our talents, that they

21   would definitely need people of experience to help

22   start this, for when, in fact, they've taken people

23   with no experience.

24        Q.    And as you sit here today, do you know

1   for certain that you have not been considered by ZF

2   Batavia for CVT positions?

3         A.    As I sit here today, I -- I do not

4   know whether I have or have not been considered.  I

5   gave them my resume to two people and asked for

6   consideration.

7         Q.    CVT is still sort of an experimental

8   technology?

9         A.    No, it's not experimental.  This is

10  being launched.

11        Q.    Okay.  It hasn't been launched yet,

12  though?

13        A.    It's pretty close.  No, it's not been

14  launched to where they're making money off of

15  product they're selling.

16        Q.    There's no track record for CVT like

17  there is --

18        A.    No, there's not.

19        Q.    -- for CD4E?

20        A.    Right.  They're not in cars that I

21  know of yet for sale.

22        Q.    You testified earlier with regard to

23  the May '99 meeting, that you believe Mike Warden

24  may have had some discussions with employees at

1     that meeting?

2          A.     I thought Mike Warden was at that

3     meeting.

4          Q.     Okay.  Do you recall -- well, Exhibit

5     4, which, feel free to review if you'd like to.

6     But I will submit to you Exhibit 4 does not list

7     Mr. Warden as a presenter, either on the front page

8     or on either of the agendas.  Do you know whether

9     Mr. Warden made a presentation at that May 27

10    meeting?

11         A.     I don't know if he made a presentation

12    there or not, but I thought Mr. Warden was at that

13    meeting.

14         Q.     Okay.  Do you recall if he had any

15    discussions with the group --

16         A.     I don't recall that.

17         Q.     You also testified that your

18    expectation was that at ZF Batavia, you would get

19    preferential treatment.  Preferential treatment as

20    compared to whom, the new hires again?

21         A.     Yes --

22         Q.     Okay.

23         A.     -- as compared to new hires, new

24    salary hired people.

```
 1          Q.    Did anyone -- let's start with Ford

 2    first.  Did anyone from Ford tell you that you

 3    would get preferential treatment over ZF new hires?

 4          A.    Let's put it preferential

 5    consideration, not preferential treatment.

 6          Q.    Okay.  What do you mean by

 7    "preferential consideration"?

 8          A.    That if a new opportunity came up,

 9    like specifically CVT, that we would be looked

10    at -- us -- when I say "we," the transitional

11    people before anybody from off the street was

12    looked at.

13          Q.    Who from Ford communicated that to

14    you?

15          A.    No one from Ford communicated that to

16    me.  Well, Jerry Priest and I when we talked -- and

17    Rick Williams, those discussions were held,

18    specific conversations.  I, at this time, can't

19    tell you exact words that were used.

20          Q.    But they told you that was their

21    understanding of how things were going to work at

22    ZF Batavia?

23          A.    That they would need us and our

24    knowledge and experience and abilities to help
```

1   launch a product like CVT.

2        Q.    You testified earlier in response to

3   some questions by Mr. Hunter about potential

4   retaliation against you at ZF Batavia because you

5   were a transitional employee or that you believe

6   you may have possibly been retaliated against

7   because you were a transitional employee.  Do you

8   recall that testimony?

9        A.    Yes.

10       Q.    Okay.  Is it your belief that Ford has

11  retaliated against you in some way because you were

12  a transitional employee?

13       A.    No.

14       Q.    Transitional bonus, you testified

15  earlier that no one told you what the monetary

16  difference between the benefits was?

17       A.    That is correct.

18       Q.    Did you ask anyone in Ford's human

19  resources department as to what the transitional

20  bonus was designed to cover?

21       A.    I don't recall asking anybody what the

22  specific monies that they speak of in that covered,

23  but I do recall that other people spoke and said

24  that that also covered not having the A Plan.

1          Q.     And who -- you heard that from

2     co-workers?

3          A.     Yes.

4          Q.     Okay.  And my question was whether you

5     had talked to anybody in Ford's HR.  Let me ask it

6     broader.  And I think you may have already answered

7     this.

8               Did you discuss with anybody from Ford

9     as to what that transitional bonus was to cover,

10    other than perhaps co-workers?

11         A.     I spoke to Jerry and -- Jerry Priest

12    and Rick Williams about it, but they couldn't give

13    me a specific answer.  It was just considered

14    monetary.

15         Q.     Okay.

16         A.     They didn't break down what monetary.

17         Q.     Fair to say that no one from Ford in a

18    managerial or HR capacity told you what the

19    transitional bonus was designed to cover?

20         A.     That's fair to say.

21         Q.     Okay.  Mr. Baker, you've given quite a

22    bit of testimony today.  As you sit here today, are

23    you aware of any other facts that support any of

24    your claims in this case against Ford, other than

1    what you've testified about today?

2        A.    I don't know of any other facts to

3    support, except saying that -- you asked me if they

4    had a right to -- if Ford or ZF had a right to

5    change --

6        Q.    Yes.

7        A.    -- any of the benefits.  I thought

8    this tri-fold or gray brochure was an employee

9    agreement -- was an agreement between myself and ZF

10   Batavia --

11       Q.    Okay.

12       A.    -- and I didn't have any reason to

13   believe they would change it.

14       Q.    Okay.  And I'm pretty sure this is

15   clear, but just -- your question makes me want to

16   clarify.

17             At the time you accepted employment

18   with ZF Batavia, you hadn't seen the gray brochure

19   yet, correct?

20       A.    That's correct.

21             MR. VANWAY:  Mr. Baker, I don't

22   believe I have any further questions, but I'd like

23   to take just a minute to confer with my client

24   representative just to make sure, okay?

172

```
 1              THE WITNESS:  Yes.

 2              MR. VANWAY:  And I don't know if

 3    Mr. Hunter might have some questions or not.

 4              MR. HUNTER:  I have a couple.

 5              MR. VANWAY:  Well, do you want to go

 6    ahead with yours, John, and then --

 7              MR. HUNTER:  Sure.

 8              MR. VANWAY:  -- we'll confer after

 9    you're finished?

10                        (5:25 p.m.)

11                        EXAMINATION

12    BY MR. HUNTER:

13         Q.    Mr. Baker, will you take a look at

14    Exhibit 20?

15         A.    If I can find it.  Not from there, I

16    can't.  I actually see better farther away than up

17    close.  Now I got it.

18         Q.    Okay.  We spoke earlier about a e-mail

19    from Dick Newark and the 32 hours of overtime?

20         A.    Yes.

21         Q.    Would that be Exhibit 20?  Is that the

22    proper reference for that?

23         A.    That is.

24         Q.    And the overtime -- if I take a look
```

1    at this -- goes to the issue of the fact that you

2    were basically working at that time period as a

3    group leader, correct?

4         A.    I was -- I was functioning as a group

5    leader during that time period, yes.

6         Q.    All right.  And this was a time period

7    of -- apparently this e-mail is dated March 11th,

8    2002?

9         A.    That's when this letter came out.  I

10   was functioning during that time and further on

11   down.

12        Q.    Well, that's what I was going to ask

13   you is, the 32 hours, is that before March 11th,

14   after March 11th?

15        A.    After March 11th.

16        Q.    And so your testimony would be that,

17   based upon this e-mail, that you worked 32 hours

18   after March 11th --

19        A.    Yeah.

20        Q.    -- with the anticipation that that

21   would be paid as group leader time?

22        A.    That's correct.

23        Q.    Okay.

24        A.    April 1st through the 15th, I think

1    was the time period involved and I -- I even know

2    the specific departments I covered.

3        Q.    Okay.  And you were -- when you talk

4    about 32 hours of overtime, that would have been

5    overtime in addition to your regular 40 or 45-hour

6    week, depending upon your view of the world?

7        A.    That would have been overtime -- in

8    addition to that, that would have been overtime and

9    included Good Friday and Good Monday.  At ZF, they

10    have what they call "Good Monday."

11        Q.    Okay.

12        A.    They get paid -- the salary gets

13    paid -- at that time, was getting $50 an hour.  I

14    know I had 10 hours worked that day, received no

15    compensation for that --

16        Q.    Okay.

17        A.    -- not even the straight time.

18        Q.    Is -- is -- "Good Monday" is a new

19    term to me.

20        A.    I figured it was.  That's why I tried

21    to quantify what it was.

22        Q.    I presume that would be the Sunday --

23    or sorry.  The Monday after Easter Sunday?

24        A.    Yes.

175

1          Q.     Okay.  Are you aware of any written

2     policy at ZF Batavia that provides for holiday pay

3     for Good Monday?

4          A.     I'm not aware of any written document

5     that says that.

6          Q.     Are you aware of any such document at

7     Ford Motor Company for Good Monday?

8          A.     For the salary group?

9          Q.     Mm-hmm.

10          A.     I'm not aware of that.

11          Q.     You talked about AIP and the fact that

12     your AIP was affected by the amount of overtime you

13     worked, correct?

14          A.     That's what I was told.

15          Q.     You understand that AIP could be based

16     on whatever measurables ZF Batavia chose to use to

17     set AIP, correct?

18          A.     No, that's not correct.

19          Q.     Okay.

20          A.     Per this right here --

21          Q.     Well --

22               MR. SIMON:  Mr. Hunter, let him finish

23     this answer.

24          Q.     "This right here" is the gray

1    brochure.  That's the reference you're going to

2    make?

3          A.    Yes, sir.

4          Q.    Okay.

5          A.    And I think there's a page missing.

6    It says second one down, Annual incentive plan.

7    Reward program based on ZF Batavia's success as

8    determined by product quality, time and delivery of

9    new and existing products and profitability.

10         Q.    Okay.

11         A.    Doesn't say anything about overtime.

12         Q.    Okay.  But I think we've well

13   established you didn't look at the gray brochure

14   before accepting employment with ZF Batavia,

15   correct?

16         A.    That's correct.

17         Q.    And beyond that, certainly overtime --

18   the amount of overtime that is paid by the company

19   affects the company's profitability, doesn't it?

20         A.    Overtime has bearing on how much

21   profit is made.

22         Q.    And so it would again be safe to say

23   that, even if you look at the gray brochure, the

24   company is entitled to take overtime into

1  consideration in paying its AIP payments, correct?

2      A.    That's -- I'll -- I'll agree that's

3  correct, but I don't agree in the way they did it.

4      Q.    Mr. VanWay made -- summed up some of

5  your testimony regarding retaliation.  I guess I

6  just want to clarify.

7           My perception wasn't that you had said

8  you were retaliated against by ZF Batavia, but that

9  you felt you were treated differently.  Can you

10  clarify what your answer was?

11      A.    Right.  Both of you used the word

12  "retaliate."  And that's all -- the definition of

13  retaliation, like you're trying to hurt or go

14  against, I don't think the word "retaliate" applied

15  in that.

16           I think that it had bearing that I was

17  a transitional Ford employee.  It had bearing on

18  whether I was considered for any of these

19  positions.  I had shown that I had the ability, the

20  skills, the track record, the performance.  I

21  haven't missed a day's work in almost 12 years, not

22  one.

23           I've done everything asked, went

24  everywhere I was supposed to go and I couldn't

1   understand why I wasn't considered for these

2   positions.  And in every occasion, I asked, Why was

3   I not considered?  And I never at any time got a

4   good reason why.

5        Q.    All right.  So certainly, again, it's

6   not your testimony that anybody, ZF Batavia or

7   Ford, has ever retaliated against you?

8             MR. SIMON:  Objection to the form.

9   "Retaliation" has a legal connotation.  This

10  witness isn't a lawyer.  Go ahead and answer.

11       A.    True.  I'm not sure if I was

12  retaliated against --

13       Q.    Okay.

14       A.    -- or not.  But I believe as being a

15  Ford transitional or a former Ford employee, that

16  it has bearing on whether I've gotten certain jobs

17  or been considered for certain jobs --

18       Q.    Okay.

19       A.    -- especially CVT.

20       Q.    Okay.  Has your position as a Ford

21  transitional had any other negative consequences as

22  far as you can tell?

23       A.    Other than having an effect on where I

24  go, consideration for jobs --

1          Q.    I understood that one.

2          A.    -- and positions, I don't think it

3     has.  Not that I know of at this time.

4          Q.    Okay.  In your answers to

5     interrogatories -- and I don't know if Steve has a

6     copy handy there.

7          A.    He had one.

8          Q.    And if you would, take a look at page

9     4.

10         A.    Okay.

11         Q.    It indicates in the second full

12    paragraph, third paragraph down, starts with,

13    Various discussions in 1999.  Do you see that?

14         A.    Yes.

15         Q.    It says that on numerous occasions,

16    Rick Williams, Jerry Priest and Hassan Saleh met

17    with plaintiff privately.  What I gathered from

18    today's conversation, that that's not entirely

19    accurate, that the conversations were with Rick

20    Williams, Jerry Priest and Mr. Marinetti, and not

21    Mr. Saleh?

22         A.    Mr. Saleh also had conversations with

23    me.  The majority of the conversations were with

24    Rick and Jerry.

```
 1        Q.    Okay.

 2        A.    As I said, Hassan Saleh, at that time

 3   I think was the maintenance guy, so -- or the head

 4   of the maintenance.  So him and I didn't interact a

 5   whole lot unless it had something to do with

 6   maintenance or he happened to just walk up, by.

 7              And a lot of the conversations where

 8   it says private, were with just us.  I met with

 9   just Jerry.  Not with Jerry and Rick combined or

10   all three of those individuals.

11        Q.    Okay.

12        A.    And there was times that Hassan and I

13   did talk, but what our conversations were, I don't

14   recollect that.

15        Q.    Did you rely on whatever Hassan said

16   at any of these meetings to make your decision to

17   leave Ford to come to ZF Batavia?

18        A.    As part of my decision to come to ZF

19   Batavia, I relied on what Rick, Jerry, Hassan, and

20   to some extent, on what Glenn Marinetti said in

21   basing my decision.

22              I believe those three guys knew --

23   they had been in management a long time.  They had

24   been with Ford a long time.  I believe they had
```

1    looked into the future what they thought the future

2    for Batavia would be with ZF.

3           And I believe that they made their

4    decision based on some information maybe I didn't

5    know.  So, yeah, I was weighing this.  There was a

6    lot of decisions at this time whether to go.  We

7    tried calling Sharonville.  They were not allowed

8    to talk to us.

9        Q.    I think you -- what you just said was

10   in part, you based your decision in part because

11   Jerry and Rick had made the same decision?

12       A.     Jerry and Rick had made the decision.

13   I don't know which one came first -- and Hassan.  I

14   don't know which one of those decided.  And once

15   they made the decision, that swayed me somewhat.  I

16   thought, well, they've thought it out also.  And --

17       Q.    Okay.

18       A.    -- they've been with Ford a long time.

19   All these guys that we're talking about here is got

20   almost 20 -- had about 20-some years with Ford

21   Motor Company before I got there.  I had only been

22   there seven and a half.

23       Q.    Okay.

24            MR. HUNTER:  I don't think I have

1   anything further.

2           MR. VANWAY:  Can you give us two

3   minutes?  We'll walk out.

4           (Off the record:  5:35 p.m. - 5:38 p.m.)

5                       EXAMINATION

6   BY MR. VANWAY:

7       Q.    Mr. Baker, I'm not going to mark these

8   as an exhibit, but I'll hand them across the table

9   to you.  These are documents I received from your

10  lawyer late last week, Bates stamped P01011 through

11  P01015.

12          And I just ask if you'd take a moment,

13  review those documents and tell me first if you've

14  ever seen them before.

15      A.    All of these documents --

16      Q.    If you would.

17      A.    -- in this form?

18      Q.    Yeah, I mean, the first -- the first

19  couple --

20      A.    First one, I haven't.

21      Q.    -- are a cover sheet and a letter from

22  Mr. Simon.

23          MR. SIMON:  Where it starts here.

24          THE WITNESS:  Oh, okay.  I'm sorry.

1           MR. SIMON:  His question is just if

2    you've seen the document.

3           Q.    I just want to know if you've ever

4    seen those before today.

5           A.    I've seen the first one.  I've seen

6    11, 12.  I don't recall 13 or 14 or 15.

7           Q.    Okay.  And 11 is a nondisclosure

8    agreement that's signed by J.D. Phelps; is that

9    right?

10          A.    I don't know if that's his name.  I

11   see a signature, but I can't fill out -- or --

12   yeah, I know.  I can't tell.  I don't know how he

13   signs his name.

14          Q.    You've seen that particular document

15   or you've just seen --

16          A.    I've seen a document, a blank one --

17          Q.    Okay.

18          A.    -- not with any names on here.

19          Q.    And then 12 is an acknowledgment form

20   for policies, correct?

21          A.    Yes.

22          Q.    Did you ever sign one of those that

23   you're aware of?

24          A.    I don't recall signing them.  I had

1    two group leaders sign them for me that worked for

2    me at the time.

3          Q.    Do you know when that was?

4          A.    I don't remember when it was.

5          Q.    Was it this year, do you know, 2003?

6          A.    No, it wasn't this year.

7          Q.    Was it sometime after you were hired

8    by ZF Batavia?

9          A.    Yes.

10          Q.    Do you know, as you sit here today,

11    Mr. Baker, what significance, if any, those two

12    documents are to the claims that you've brought in

13    this case?

14          A.    As I sit here, I don't know the

15    significance.

16                MR. VANWAY:  Okay.  Thank you.  I

17    don't have any further questions for Mr. Baker.

18                MR. SIMON:  I have no questions.  We

19    will not waive signature.

20                (Deposition concluded at 5:41 p.m.)

21

22

23                _____
                            Dennis R. Baker

24

```
 1                 C E R T I F I C A T E

 2

 3     STATE OF OHIO          :

 4                            :   SS

 5     COUNTY OF HAMILTON     :

 6

 7            I, Susan M. Barhorst, a Notary Public in

 8     and for the State of Ohio, duly commissioned and

 9     qualified, do hereby certify that prior to the

10     giving of this deposition the within-named

11     DENNIS R. BAKER was by me first duly sworn to

12     testify the truth, the whole truth, and nothing but

13     the truth; that the foregoing pages constitute a

14     true, correct, and complete transcript of the

15     testimony of said deponent, which was recorded in

16     stenotypy by me, and on the        day of October

17     2003 was submitted to counsel for deponent's

18     signature.

19            I further certify the within deposition was

20     duly taken before me at the time and place stated,

21     pursuant to the Federal Rules of Civil Procedure;

22     that I am not counsel, attorney, relative or

23     employee of any of the parties hereto, or their

24     counsel, or financially or in any way interested in
```

186

1    the within action, and that I was at the time of

2    taking said deposition a Notary Public in and for

3    the State of Ohio.

4              IN WITNESS WHEREOF, I have hereunto set my

5    hand and notarial seal at Cincinnati, Ohio, this

6    day of October 2003.

7

8

9                    Susan M. Barhorst, Notary Public
                     in and for the State of Ohio.
10                   My commission expires
                     February 18, 2004
11

12

13

14

15

16

17

18

19

20

21

22

23

24