1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF OHIO

 3                  WESTERN DIVISION, CINCINNATI

 4
     EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
 5
            Plaintiffs,        : Judge Beckwith
 6
     V.                        : Magistrate Sherman
 7
     ZF BATAVIA, LLC, et al.,  :
 8
            Defendants.        :
 9   _____

10          Deposition of PAMELA J. BLANCO, taken on

11   Friday, August 22, 2003, commencing at 11:09 a.m.,

12   at the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17                  VOLUME I, PAGES 1-107

18

19

20

21
                    GIGLIO REPORTING SERVICES
22                    3 CYPRESS GARDEN
                    CINCINNATI, OHIO 45220
23                      513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     Dena Stevens

 7   On behalf of Defendant ZF Batavia, LLC:

 8     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 9     1700 Canton Ave.
       Toledo, Ohio 43624
10
     Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16
     Cross-Examination
17
       by Mr. Hunter                    4
18
       by Mr. VanWay                   68
19

20

21

22

23

24
```

3

| 1 | BLANCO DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 2 | 2 | 30 |
| 3 | | |
| 4 | 4 | 18 |
| 5 | | |
| 6 | 129 | 33 |
| 7 | 130 | 54 |
| 8 | 131 | 71 |
| 9 | 132 | 75 |
| 10 | 133 | 76 |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    PAMELA J. BLANCO
 2    being first duly sworn, testified as follows:
 3                    CROSS-EXAMINATION
 4    BY MR. HUNTER:
 5         Q.    Ma'am, will you please state your name
 6    for the record?
 7         A.    Pamela J. Blanco.
 8         Q.    And your current residence address?
 9         A.    1170 Elm Ridge Drive, Amelia, 45102.
10         Q.    Ms. Blanco, I believe we've met before
11    out at the plant on a couple of occasions that I
12    can think of.  My name is John Hunter.  I represent
13    ZF Batavia in the proceedings today.
14              I also recall you sat through
15    depositions a couple weeks ago, so you're at least
16    somewhat familiar with the process?
17         A.    Yes, sir.
18         Q.    Have you ever had your deposition
19    taken before?
20         A.    In what -- in what kind of --
21         Q.    Ever, in any regard.
22         A.    Any?  Yes.
23         Q.    Okay.  And in what regard was your
24    deposition taken?
```

5

```
 1          A.      In Gene Gilliam's -- you were there.

 2          Q.      Okay.  And with respect to any other

 3   matters?

 4          A.      Gosh, I can't think of any right now.

 5          Q.      Okay.  All right.  The format today is

 6   basically the same.  I have a number of questions

 7   that I have with respect to the claims that you

 8   have brought against the company and will do my

 9   best to ask those in a clear, concise and loud

10   enough manner that you can hear me.

11               But if at any point in time you can't

12   hear me, you don't understand the question, or for

13   whatever reason you don't feel that you can fairly

14   answer the question, I want you to stop me and let

15   me knew and I'll try and fix whatever that

16   shortcoming is, okay?

17          A.      Yes.

18          Q.      Is there anything today that would

19   prevent you from being able to go forward with

20   today's deposition, in terms of a medical or a

21   personal issue?

22          A.      No --

23          Q.      Okay.

24          A.      -- not that I'm aware of.  Some people
```

6

```
 1    may think that way, but --
 2         Q.    If I use the term "Ford transitional,"
 3    what do you understand that -- what would you
 4    understand that to mean?
 5         A.    Can you be a little more specific?  Do
 6    you mean in what -- how the plant perceives us or
 7    what I --
 8         Q.    Okay.  And that's what I want is a
 9    common understanding.  If I use the term, "Ford
10    transitional," what I'm speaking about is an
11    employee -- a former employee of Ford Motor Company
12    that back in 1999 agreed to join ZF Batavia -- I
13    may refer to that sometimes as the joint venture --
14    and became an employee with ZF Batavia and
15    either -- and terminated their employment with Ford
16    Motor Company, all right?
17         A.    That's okay.
18         Q.    And you understand that?
19         A.    Yes.
20         Q.    Okay.  Are you a Ford transitional?
21         A.    Yes, I am.
22         Q.    All right.  And prior to becoming an
23    employee with ZF Batavia, how long had you worked
24    for Ford?
```

1          A.     I started in Ford in August of '93, be

2     six years.  A little over six years, like that.

3          Q.     What was your first position there at

4     Ford?

5          A.     I was a salaried supervisor in ATX and

6     then I worked there when I started.

7          Q.     And you say "a salaried supervisor,"

8     is that like a floor supervisor, group leader or

9     what?

10          A.     Right.  Well, okay.  When ATX, that

11     was a grade six in Ford's standards.  I was in --

12     had graduated from Purdue --

13          Q.     Okay.

14          A.     -- and they started engineers out on

15     the floor at that time.

16          Q.     Okay.  And how many people were you

17     supervising at that time?

18          A.     Back then, I think there was like

19     probably 16.  It was not a team concept as we --

20     Batavia knows it as today.

21          Q.     Okay.

22          A.     I'm just guessing on that.

23          Q.     That's okay.

24          A.     It was not a -- ATX, you did not have

8

1    a lot of employees under the hourly because there

2    weren't, like I said, a team concept.  So you

3    dictated more what they did, instead of the team

4    coming together and working together.

5         Q.    Okay.  Did your position change while

6    you were at Ford?

7         A.    I went into engineering.

8         Q.    Okay.

9         A.    I -- let's see.  I went to AT -- let's

10   see.  I went to CD4E, yes.

11        Q.    CD4E over at Batavia?

12        A.    Right --

13        Q.    Okay.

14        A.    -- as group leader.  Went into

15   engineering and I went back on the floor as a group

16   leader.  It's kind of like a temporary assignment

17   and it developed into a, again, a full-time

18   position.

19        Q.    And this was during your tenure with

20   Ford Motor Company?

21        A.    Well, since '93 until ZF took over and

22   then I went in -- I was in center shop, supervisor.

23        Q.    But while you were at Ford?

24        A.    Right.

1        Q.    Okay.  All right.

2        A.    I think I got all those right, all

3    those departments.

4        Q.    What position did you hold immediately

5    prior to joining the joint venture?

6        A.    Supervisor in maintenance.  I think

7    center shop, sanitation type departments.

8        Q.    My understanding is that there were a

9    number of meetings that were held with the salaried

10    Ford employees regarding coming over to the joint

11    venture.  Do you recall that?

12        A.    Yes.

13        Q.    Did you attend any of those meetings?

14        A.    Yes.

15        Q.    Do you remember specifically which

16    meetings you might have attended?

17        A.    The one in the cafeteria where they

18    displayed -- example, our salary.  The people they

19    introduced, they talked about CVT, the positive,

20    all the good stuff.

21        Q.    Did they talk about the bad stuff?

22        A.    Just all the positive stuff.

23        Q.    All right.  Let's try and nail down

24    some details here.  Would this be the May 27th,

1   1999, one of those meetings that was held that

2   you're referring to?

3          A.     Yes.

4          Q.     All right.  And if I am not mistaken,

5   I think there were two meetings held on the 27th,

6   one in the morning, one in the afternoon?

7          A.     Yes.

8          Q.     Do you remember which meeting you went

9   to?

10         A.     I believe it was the afternoon.

11         Q.     Now, was this the first formal meeting

12  that you went to regarding your transitioning over

13  to the joint venture?

14         A.     Yes.  Well, with the exception of when

15  they announced it, Jacques Nasser, the video.

16         Q.     Okay.  Was that a meeting or was it

17  more like a press conference?

18         A.     Town hall, right.

19         Q.     When you made your decision to

20  transfer over to Batavia, did you consider at all

21  the little press conference with Mr. Nasser?

22         A.     When I transferred to Batavia?

23         Q.     I'm sorry.  To ZF Batavia.

24         A.     Okay.  Did I -- well that was one of

1    the reasons I declined first.

2           Q.    Okay.

3           A.    I'll be honest -- you know, because

4    Jacques Nasser got up there and said we could be a

5    Ford employee, then they retracted that.  They also

6    said -- he also -- I think it was him on the --

7    what a fantastic workforce we had.  And that kind

8    of bothered me to publish that and everyone knew

9    that Batavia was -- had some issues, labor issues.

10          Q.    Okay.  Well, let's talk, I guess, a

11   little bit more about the Nasser press conference.

12   I think that was approximately October of 1998?

13          A.    Mm-hmm.

14          Q.    There was a video screen kind of

15   outside the hospital area out there in the plant?

16          A.    Yes, sir.

17          Q.    And I gather from what you said, you

18   didn't necessarily believe what Mr. Nasser was

19   saying at that time?

20          A.    No, I did -- well, I did believe that

21   we could stay Ford.

22          Q.    Okay.

23          A.    I did believe that.

24          Q.    But you made a comment, something

1    about that you acknowledged or understood it wasn't

2    necessarily the best workforce or something like

3    that.

4          A.    I mean, he was really putting -- I

5    don't think any workforce the way he was

6    demonstrating on that TV that we had -- there is no

7    workforce, whether it's McDonald's or whether it's

8    Ford or Chrysler or anyone that can be that

9    domineering and the most wonderful.  I mean, he

10   really built everyone up so much that no one

11   could --

12         Q.    Nobody would have reasonably believed

13   him?

14         A.    Right.

15         Q.    All right.

16         A.    I mean, you can't be that fantastic.

17   No workforce -- you do have your problems.

18         Q.    All right.  And I think you said you

19   took away from that press conference kind of the

20   concept that you would be able to stay a Ford

21   employee?

22         A.    Yes, yes.

23         Q.    Okay.

24         A.    I didn't take away.  That's what he

1    said.

2        Q.    All right.  When was the next meeting

3    or discussion that you had relative to your

4    transitioning over to ZF Batavia?

5        A.    You know, there was so much discussion

6    throughout the salary ranks, the hourly ranks,

7    everyone -- it was kind of -- I can't even give you

8    a time frame.

9        Q.    Okay.  Well, let's talk about the next

10    formal meeting.  Would that be the May 27th

11    meeting?

12        A.    Yes.

13        Q.    Okay.  We talked about --

14        A.    As far as I can remember exactly --

15    you know, like I said, we had -- there was a lot of

16    discussion with everyone.  It was a continual,

17    on-your-mind discussion.  You know, they did come

18    out and retracted it that we couldn't.  I don't

19    remember what date, what month.

20        Q.    Okay.  At the May 27th meeting, do you

21    remember who was there?

22        A.    I know there was salary people there.

23        Q.    Okay.

24        A.    I mean, who was giving the

14

1    presentation?

2        Q.    Whatever you remember, attendees or

3    presenters or otherwise.

4        A.    Norm Kauffee was there.  I think Jerry

5    Priest.  There was just a lot of people was already

6    gone, all the engineers.  I remember Dave Adams.

7        Q.    Okay.

8        A.    Karl Kehr.  That's -- I can't think of

9    anybody.  I mean, there was just a lot of people.

10       Q.    Okay.  Do you remember in particular

11   anything Dave Adams said?

12       A.    Dave Adams was very positive about ZF.

13       Q.    Okay.  Did Dave say anything about

14   compensation or anything like that?

15       A.    No.  He just -- he just said that it

16   was going to be like -- and I don't know who -- we

17   did not, if I'm remembering right, Dave Adams got

18   up there because I -- his name stuck with me,

19   probably 'cause he was just so energetic about the

20   ZF joint venture.  And we did not -- I don't

21   remember getting these.  They did not have these

22   handouts.

23       Q.    Okay.

24       A.    They had them on the screen.  He made

1   a comment.  He said, Well, let's -- do we have any

2   handouts to give these people -- you know, so they

3   can observe and look over?  And they gave it to us

4   later.

5          Now, I could be -- it could be another

6   documentation, but I'm really believing this.  And

7   because I couldn't keep up with all -- everybody

8   was introducing themself and there was no list to

9   go by that you could kind of jot down.  It had

10  blue -- to kind of see who was here and who was

11  there.

12         And for some reason, I thought like

13  Karl and -- except Dave Adams.  All the other

14  people involved in the presentation were all Ford

15  Motor Company people.  Dave Adams strictly -- he

16  came up under the ZF employee -- really energetic

17  about it.  And everyone else was really excited,

18  too.  But I -- I don't know why, I got the

19  impression everyone else was Ford.

20     Q.    Do you remember, was Mr. Kehr there?

21  I think you told me that he was.

22     A.    Yeah, I think he was.  Yes, because he

23  got up there and he was talking about it's going to

24  be like -- there was somebody up there talking

16

1      about it was going to be like Ford.

2              Like I said, you had a cafeteria full

3      of people on both sides.  I mean, it was just -- it

4      was packed.

5          Q.    Do you remember specifically anything

6      that Mr. Kehr might have said?

7          A.    Specifically?  No, I can't say, okay,

8      you said this and you said that.  I do remember

9      this is a joint venture opportunity.  You'll be on

10     the ground floor.  You have seniority.  There's

11     promotional opportunities.  It's going to be like

12     Ford.  Your overtime will stay the same.

13         Q.    But you can't --

14         A.    Salary.

15         Q.    -- attribute those to anybody?

16         A.    No.  One -- one thing, Dave Adams did

17     say that we would make more money than -- see, I do

18     remember this.  Dave Adams did -- it was Dave

19     Adams.  He said we will make more money than the

20     Ford employees -- I mean the ZF employees that came

21     in because we were a joint venture and our salaries

22     were higher than the people at Ford -- or I mean at

23     ZF.  Does that make sense?

24         Q.    Mm-hmm.

17

1          A.     Are you following me?

2          Q.     I guess -- what does that mean, in

3     terms of that you would make money, that your

4     salary --

5          A.     Okay.

6          Q.     -- would be higher or --

7          A.     Our base salary starting out is higher

8     than a ZF employee coming in.

9          Q.     Other than that your base salary was

10    higher, did that mean anything else to you?

11         A.     Did that mean -- no.  I mean, it meant

12    that we were going to be a joint venture.  We had

13    to get lean and mean and -- you know, but Ford

14    understood that they weren't going to come in here

15    and take our salary away and things were going to

16    stay the same.

17              Maybe not the same -- you know, we

18    were going to have a CVT.  We're going to have new

19    technology, which that's what you want.  It was a

20    great experience.

21         Q.     Based on the meeting on the 27th, at

22    the end of that meeting, did you still have

23    questions about what you thought you were going to

24    receive or otherwise?

```
 1          A.    It was pretty well laid out.

 2          Q.    Okay.

 3          A.    They said they would get -- you know,

 4   we got other documentation later on.

 5          Q.    Do you recall, you made the comment

 6   you received or that Exhibit 4 was given to you,

 7   but not at the meeting.

 8          A.    I don't think it was because --

 9          Q.    All right.  At no point it was given

10   to you?

11          A.    Oh, yeah.  Later on they gave it to

12   us.

13          Q.    That's what I --

14          A.    We got it.

15          Q.    Okay.

16          A.    Yeah, later on, we got it.

17          Q.    Do you remember when?

18          A.    If they ran out -- no.  If they ran

19   out, we didn't -- I didn't have it 'cause like I

20   said --

21                MR. SIMON:  He just had asked you when

22   you received it.  Go ahead.

23                THE WITNESS:  Okay.

24                MR. SIMON:  That's all he asked.
```

```
 1          Q.    All right.  But you don't remember
 2    when you received that?
 3          A.    No.
 4          Q.    Okay.  Did you go to any meetings
 5    after the May 27th meeting?
 6          A.    No, not that I can remember at the --
 7          Q.    As of May 27th, I think it's safe to
 8    say you had decided not to join ZF Batavia?
 9          A.    No, that's not necessarily true, no.
10          Q.    Well, had you made up your mind?
11          A.    There was still questions.  You had
12    to --
13          Q.    Okay.  What questions did you still
14    have?
15          A.    I wanted to see it in write -- they
16    gave us a written document.  They were going to --
17    okay.  In '93, I graduated from Purdue.  I've had a
18    lot of jobs.  I went to Chrysler, looked at their
19    scenario.  Went to Ford Motor Company, looked at
20    theirs.  Went to a Japanese firm.  You decided you
21    want to go -- Ford was rated very high in '93.
22    Their quality was excellent.
23              You need this as a very -- I don't
24    have 30 years there.  This is a very big deal.  You
```

```
 1    know, when you start out, this is joint venture.

 2    When I got the documentations to make my full

 3    analogy in discussion with my -- with Hassan Saleh,

 4    who was my boss and a personal friend at that time,

 5    you can make your decisions.

 6              You don't go in, walk in, and say,

 7    this, you're going to do that and this, you're

 8    going to do this.  No, I hadn't made up my mind

 9    when I walked out of this meeting.

10         Q.    Okay.  And I think you said you still

11    had questions?

12         A.    Yes.

13         Q.    Okay.  What were the open issues for

14    you?

15         A.    What were the open issues?

16         Q.    And I'm talking just right after the

17    May 27th meeting.

18         A.    There was -- you know, there was just

19    a lot of questions in your mind, what -- period.  I

20    mean, you just had a lot of questions.  You just

21    don't decide.  I can't tell you exactly what was in

22    my mind at that -- when I walked out.  It was still

23    a complete shock that we were going into a joint

24    venture.  They talked about the CVT.  There was a
```

1    lot of things you talk about.  You can't just say,

2    well, what -- at that time.

3         Q.    Well, were you concerned, for example,

4    about what your salary was going to be?

5         A.    No.  They stated that my salary was

6    going to stay the same.

7         Q.    Okay.

8         A.    They weren't going to mess with my

9    salary.

10        Q.    Did they say that Pam Blanco's salary

11   would be the same or --

12        A.    That -- I'm talking about -- I'm

13   talking about me.  I'm talking about the whole

14   Ford --

15        Q.    Okay.

16        A.    -- transition.  When I talk about me,

17   this is what I understood.  They're not going to

18   single me out even though I'm a woman.  I mean,

19   they're not going to say, Pam, you're going to do

20   this.

21        Q.    Right.

22        A.    They said Ford transition people, they

23   would not mess with their salary, they would not

24   mess with their overtime.  We would have benefits.

1    They had the benefits person there.

2              You know, your vacation.  I'm not

3    going to get, what, five weeks?  I know that.  I

4    mean, they said -- we talked about our vacation.

5    They talked about personal time, how many days we

6    get.

7              I mean, there was a basic format.

8    There's still -- you have to examine the whole

9    scenario of what you're going to.

10         Q.    Okay.

11         A.    You can't make a decision the minute

12   you go in if it's good or bad.  And I had no -- it

13   was going to be like Ford.

14         Q.    So if you knew it was going to be like

15   Ford, then you knew what the entire compensation

16   package was going to be because you worked at Ford

17   for six-plus years?

18         A.    That's correct.

19         Q.    So I'm just trying to understand.  If

20   it was going to be the same as you're telling me,

21   then what was left to question?

22              MR. SIMON:  Objection, asked and

23   answered.  You can answer.

24         A.    Well, when you have Jacques Nasser say

1    that you can stay as a Ford Motor Company personnel

2    and then he retracts it, that -- I mean, he's

3    like -- he was like God up there and then you

4    retract it?  I had a -- I was upset about that.  I

5    mean, not that I didn't care.  It don't matter what

6    shirt I put on, I'm going to do my job.

7         Q.    You've made reference to Hassan Saleh

8    and I think you've made a comment about a

9    discussion that you may have had with Hassan?

10        A.    Yes.

11        Q.    Did you have discussions with Hassan

12   regarding your transitioning?

13        A.    Yes.

14        Q.    Okay.  Were those discussions after

15   the May 27th meeting?

16        A.    Like I said previously, everyone,

17   salary and hourly, were discussing this joint

18   venture.

19        Q.    Okay.  So the discussions with Hassan

20   were no different than the discussion you had

21   with --

22        A.    That's not true.  I didn't say that,

23   either.  I didn't know if after the 20th or the

24   27th -- he said after.  I said when they announced

24

```
 1    the joint venture, everyone talked.  So I did

 2    discuss with Hassan.  I did discuss after.  You

 3    said for.

 4         Q.    All right.  Well, did the -- you had

 5    discussions with Hassan before the 27th, correct?

 6         A.    That's correct.

 7         Q.    And you had discussions with Hassan

 8    after the 27th?

 9         A.    That's correct.

10         Q.    And you had discussions with other

11    co-workers both before and after?

12         A.    That's correct.

13         Q.    Is there some difference between the

14    discussions, then, with Hassan, who's a co-worker,

15    and the other co-workers?

16         A.    Yes.

17         Q.    What would that difference be?

18         A.    For one thing, he was my -- the boss.

19         Q.    Okay.

20         A.    He was a personal friend at that time.

21    We discussed it a lot.

22         Q.    Are you telling me that the

23    discussions with Hassan had an impact on whether or

24    not to join the joint venture?
```

1          A.    Yes.

2          Q.    Okay.  Did the discussions with the

3    other co-workers that you had have an impact on

4    your decision to join the joint venture?

5          A.    No.

6          Q.    Then why have discussions with him?

7          A.    With --

8          Q.    The -- with the other co-workers.

9          A.    You know how you just discuss this --

10   you know, I mean, you just discuss it.  I had my

11   own mind -- Hassan, he was -- like I said, we just

12   discussed it.

13         Q.    Okay.  Well, let's talk about those

14   discussions.

15         A.    Okay.

16         Q.    Let's right now focus on after the

17   27th.  Do you remember how soon after the 27th you

18   had one of these discussions with Hassan?

19         A.    Like I said, we were personal friends,

20   too, so we had discussions.

21         Q.    Do you remember any specifics from

22   those discussions as they relate to the joint

23   venture?  I'm not into your personal matters, but

24   as they related to the joint venture.

1          A.     I asked him specifically, are you sure

2     they are not going to take away our -- mess with

3     our overtime, nor our salary?

4          Q.     Okay.

5          A.     And I was concerned that the CVT still

6     has major glitches in it.  And everyone knew that

7     CD4E was going to go -- be gone.

8          Q.     And, in fact, the Batavia facility did

9     not have a replacement product scheduled?

10         A.     That's correct.

11         Q.     And I think CD4E was at that time

12     scheduled out at 2004?

13         A.     Pretty close.  I can't remember the

14     exact date, but I looked at all the technical

15     aspects of CVT.  We talked in -- we talked about

16     that.  Like I said, I've only been here in '93.  I

17     don't have 20-some years to see different programs

18     and the problems you encounter.  So it was a lot of

19     technical things, too.

20         Q.     And when you asked Mr. Saleh about the

21     salary and overtime, what did he tell you?

22         A.     He said they would not mess with it.

23     Mike Warden said -- told him personally that they

24     would not mess with our overtime, our salary.

1          Q.     And when you say "mess with it," what

2     does that mean?

3          A.     Take it away, change it.  He said, Do

4     you think I would join if I felt they were going to

5     do -- to renege on their promises?

6          Q.     Well, if the company had already told

7     you at this May 27th meeting that your salary

8     wasn't going to change or it would be the same, I

9     think, as you said it was at Ford, why would you

10     ask Mr. Saleh the same question?

11          A.     Because I respected him.  When you

12     find out that these were ZF -- Ford people -- Ford,

13     you just -- you trusted.  Ford you trusted.  I

14     didn't know those people from a load of hay.

15          Q.     You told me you trusted Ford, but five

16     minutes ago, you told me you didn't believe the

17     very first thing that you heard from Nasser about

18     this.

19          A.     But the people you work with, you

20     believe them.

21          Q.     So it's not the Ford people?

22          A.     Yes, it is.

23          Q.     Well --

24          A.     At Ford -- there was only Ford there.

28

1    What are you -- how can you say there's ZF people?

2    I trust at work, would do a job.  We're talking

3    Ford.  We were Ford.

4         Q.    All right.  There were Ford presenters

5    at the May 27th meeting, correct?

6         A.    Correct.

7         Q.    Did you trust those people that

8    presented at that meeting?

9         A.    I didn't know them.  I never worked

10   with them.

11        Q.    All right.  So you didn't trust them?

12        A.    I don't want to use the word "trust."

13   I mean, they were just trying to sell a product.  I

14   don't know if you'd say trust, not trust.  At our

15   plant, you -- it's a family.  When you work seven

16   days a work week, 12 hours a day, it's a family.

17   And your co-workers, we just worked together.

18        Q.    Based upon your discussions with

19   Mr. Saleh, is that when you decided to join the

20   joint venture?

21        A.    Yes.

22        Q.    All right.  But at some point in time,

23   you declined an offer from the joint venture,

24   didn't you?

1          A.     That's correct.

2          Q.     Why did you decline the offer?

3          A.     That -- just what I stated.  And then

4     it was after I declined, then when I talked to

5     Hassan, he said what -- he kept -- what are you

6     doing?  This is a perfect opportunity.

7          Q.     And you declined the offer, I guess

8     from what you're telling me, that you simply didn't

9     believe what had been told to you?

10         A.     Well, wait a minute.  When you have a

11    product that they don't have designed yet, that is

12    a very -- concern.  What are they going to do with

13    all -- quote, "all of us" there when they didn't

14    have a design complete?

15              And like he -- and like Mr. -- Hassan

16    said, you're always going to have glitches.  I had

17    lack of knowledge in programs that were going to be

18    launched.  That's what I would -- had discussed

19    about that.

20         Q.     I guess -- but, again, what I think I

21    asked you was, at the time that you declined the

22    offer -- first offer from ZF Batavia --

23         A.     Right.

24         Q.     -- is it because you simply didn't

1    believe what you had been told as of that date?

2          A.    Like I said, what I was declined is

3    because we did not have another program.  What were

4    they going to do with all the people if CVT didn't

5    start?  I was concerned with the technical aspects

6    and the job availability at ZF.

7          Q.    So that --

8          A.    And there was other questions, sure.

9    You just -- it's a change.  You want to make sure.

10          Q.    You want to make sure of --

11          A.    For your own -- whatever your -- if

12    they're going to say we're going to be like Ford,

13    you're going to believe it.  You get this.  I have

14    like two of them at home.  You look at it, you read

15    it.  This is what they said they're going to give

16    us.  It's on paper and so I signed it.

17          Q.    Okay.  Well, let's talk about it for a

18    second.  You made a reference to "this."  And

19    "this" would be the gray brochure, Exhibit Number

20    2, correct?

21          A.    Yeah, I guess.  I don't know.  Okay

22    two, yes.

23          Q.    Okay.  And what you've told me is

24    that -- you know, that was in writing and you

```
 1   believed it?

 2          A.    Yes.

 3          Q.    And you obtained the gray brochure

 4   when you received your first offer letter, didn't

 5   you?

 6          A.    Yes.

 7          Q.    And you rejected the first offer

 8   letter, didn't you?

 9          A.    Yes.

10          Q.    And so I still come back to, if you

11   believed that, okay, then why did you reject the

12   first offer letter?

13          A.    Let me see.  They do not state in

14   there CVT is going to run.  We are going to sell

15   millions of transmissions.  That is not located in

16   this.

17          Q.    Okay.

18          A.    That is a technical -- again, a

19   technical aspect of not knowing about launching a,

20   quote, "new program."  That was very concerning to

21   me, that they did not have a design that was

22   approved.

23              And as you know now, we still don't

24   have -- we still are doing a lot of changes.  And
```

1    the 26th been put on hold for a couple of years.

2    But that was -- that was very, very important to

3    me.

4         Q.    Then why not go back to the company,

5    to Dave or Karl or somebody else that presented on

6    May 27th and say, Hey, guys, you know, I got a bad

7    feeling about CVT and design issues?

8         A.    Why would -- why would you go to --

9    okay.  At Ford, he is my boss.  You didn't go and

10   jump up and go see a plant manager.  There was -- I

11   don't call the President of the United States when

12   I say there's something I want to say.  There's

13   steps you take.  And I respected Hassan's opinion

14   and knowledge that he had being a Ford employee for

15   years.

16        Q.    But he clearly wasn't a ZF employee

17   for years, was he?

18        A.    No.

19        Q.    And you were moving to ZF?

20        A.    But Ford had 49 percent invested in

21   it.

22        Q.    All right.  I think we've kind of beat

23   that issue to death.  Let's talk a little bit more

24   about -- what is it, then, that finally caused you

1    to accept employment with ZF?

2         A.    It was a good opportunity.  We're

3    going to be on the ground floor.  And I was looking

4    for new knowledge, new technology.

5         Q.    Ms. Blanco, you've been handed

6    document numbered Exhibit 129.  If you could, take

7    a moment to review that for me.  Have you had a

8    chance to review Exhibit 129?

9         A.    Yes.

10         Q.    Have you -- have you seen that

11    document before?

12         A.    Yes.

13         Q.    In fact, that's -- well, that's the

14    offer that you both declined and accepted, I

15    believe?

16         A.    Yes, sir.

17         Q.    Okay.  Is that your signature down

18    there at the very bottom left and at the top left?

19         A.    Yes.

20         Q.    All right.  And I think we discussed

21    before that at the time you were given this offer,

22    you also received Exhibit Number 2?

23         A.    Yes.

24         Q.    At the time -- about June 21st of

1    1999, did you receive a second copy of this

2    offer -- or I'm sorry.  -- of Exhibit 2?

3        A.    Now, what now?

4        Q.    Well, you made a comment before that

5    you had a couple copies of Exhibit 2.

6        A.    Yes.

7        Q.    Were you given that document, Exhibit

8    2, a second time that you received the offer?

9        A.    Yes.

10        Q.    Okay.  Did you read the entire Exhibit

11    2?

12        A.    I read the entire Exhibit 2.

13        Q.    All right.  Did you read the entire

14    Exhibit 2 prior to signing the acceptance of

15    Exhibit 129?

16        A.    Yes, sir.

17        Q.    At the time that you read all of

18    Exhibit 2, did you have any questions or concerns

19    about any of the language in Exhibit 2?

20        A.    No, sir.

21        Q.    Did you feel that Exhibit 2 was

22    consistent with your understanding from the May

23    27th meeting?

24        A.    Yes, sir, there was, yeah.

```
 1          Q.    You would agree with me that in

 2    Exhibit 2, that nowhere in there does it say that

 3    your terms or conditions of employment would be the

 4    same as they were at Ford --

 5               MR. SIMON:  Objection.

 6          Q.    -- does it?

 7               MR. SIMON:  Objection.  The document

 8    speaks for itself.  You can answer.

 9          A.    It doesn't state anywhere that we

10    would have an annual incentive plan, the AIP -- you

11    know, everything.  That we would have accident

12    insurance.

13               MR. SIMON:  His question was -- did

14    you hear his question?

15               THE WITNESS:  If I --

16               MR. VANWAY:  Can you read it back so

17    the question is clear?

18               (The following question was read into

19    the record by the Reporter:

20          Q.    You would agree with me that in

21    Exhibit 2, that no where in there does it say that

22    your terms or conditions of employment would be the

23    same as they were at Ford?)

24          A.    Our salary, I would agree.  Now, go
```

1    into that more in detail, please.  What are you

2    really --

3              MR. SIMON:  He'll ask you questions.

4    You'll get a chance to answer, Pam.

5              THE WITNESS:  What are you --

6              MR. SIMON:  He's very thorough.  He'll

7    get to all the questions.

8              THE WITNESS:  What are really asking

9    me?

10   BY MR. HUNTER:

11        Q.    Okay.  Well, I just want to understand

12   what you understood at the time you signed your

13   offer.

14        A.    Okay.

15        Q.    You would agree with me on page 2

16   where it talks about salary, that all it says is

17   your base salary, starting at your current Ford

18   salary, correct?

19        A.    Where are you?

20        Q.    I'm sorry.  Upper left-hand corner.

21              MR. SIMON:  I didn't hear where you

22   were at.  Second page?

23              MR. HUNTER:  I'm sorry.  Yes, second

24   page --

1         A.     That's correct.

2                MR. HUNTER:  -- upper left hand.

3         Q.     All right.  It also -- all it says

4    about overtime is that authorized overtime will be

5    paid, correct?

6         A.     Right.

7                MR. SIMON:  Objection.  Document

8    speaks for itself.

9         Q.     That statement that authorized

10   overtime will be paid, is that consistent with your

11   understanding from the May 27th meeting?

12        A.     Yes.

13        Q.     Okay.

14        A.     That's how Ford is.  Okay.  Go on.

15        Q.     Well, let's talk about that.  When you

16   say that you thought it was going to be the same as

17   it was at Ford, are -- I think what you're telling

18   me is that as of 1999 when you hired on, it would

19   be the same as it was there in 1999 when you hired

20   on to Ford?

21        A.     Now say what?  I hired in in '93.

22        Q.     When you hired on with ZF Batavia --

23        A.     Okay.

24        Q.     -- in 1999 --

38

1        A.    Okay.

2        Q.    Let me ask you it again.  At the time

3    in 1999 that you joined the joint venture, was it

4    your understanding that overtime would be paid as

5    it was then paid in 1999?

6        A.    Yes.

7        Q.    Did you have any understanding

8    whatsoever as to what the future was to hold with

9    respect to overtime?

10        A.    Sir, this says in here overtime, we

11    would get it.

12        Q.    Okay.  Does it say how much overtime?

13        A.    Authorized overtime will be paid.

14        Q.    Does it say how much overtime?

15            MR. SIMON:  Objection.  The document

16    speaks for itself.

17        A.    It says, again, authorized overtime

18    will be paid.

19        Q.    Okay.

20        A.    They stated it would be like how we

21    get overtime at Ford Motor Company.

22        Q.    As of 1999?

23        A.    That's correct.

24        Q.    Not into the future?

```
 1        A.    But they didn't put that in.  I don't
 2   see that in there, as in the future, things could
 3   change.  I took this --
 4        Q.    Okay.
 5        A.    -- as a living document.
 6        Q.    And what does that mean?
 7        A.    This is "our contract," quote, I guess
 8   you want to say.  This is what we got when we
 9   joined the joint venture.
10        Q.    Okay.  At that point in time?
11        A.    But it didn't state on there.
12        Q.    Okay.  So what did you understand
13   would happen, for example, in 2003 with respect to
14   overtime?
15        A.    Authorized overtime will be paid the
16   same as when I signed over.
17        Q.    Okay.  So you would get the same
18   hourly rate as you got in 1999?
19        A.    Same hourly -- for overtime?
20        Q.    Mm-hmm.
21        A.    If -- so be it.  They did increase it
22   as you know, yes.
23        Q.    But it could have stayed the same as
24   it was in 1999?
```

```
 1          A.    It could.

 2          Q.    Would it have -- with whatever Ford

 3    did with overtime have any bearing on what you were

 4    to be paid?

 5          A.    Now what are you talking about, Ford

 6    overtime?

 7          Q.    Well, you said it was going to be the

 8    same as it was at Ford, okay?

 9          A.    Okay.

10          Q.    I'm trying to understand, was it going

11    to be the same as it was at Ford in 1999 or in 2003

12    or 2010?

13          A.    In '99.

14          Q.    All right.

15          A.    Sir, we are in -- I work for ZF.

16          Q.    All right.  So that ZF could today pay

17    you the same overtime rate as it paid you in 1999?

18          A.    That's correct.

19          Q.    All right.  Can ZF ever pay you

20    anything less than that?

21          A.    No.

22          Q.    What if --

23          A.    Authorized overtime will be paid.

24          Q.    Okay.  But it doesn't say at what
```

```
 1   rate.  I'm going to the rate, Ms. Blanco.

 2        A.    Okay.

 3        Q.    What rate?  There's no representation

 4   in there as to rate, is there?

 5              MR. SIMON:  Objection.  Document

 6   speaks for itself.

 7        A.    No, there's no rate.

 8        Q.    With respect to litigation that you

 9   have brought here, I understand there are a number

10   of issues that Ford transitionals -- I believe that

11   ZF did not follow through on.  Can you kind of give

12   me a laundry list of what those might be?

13        A.    Well, overtime.

14        Q.    Okay.

15        A.    Bereavement, they changed that.

16        Q.    Okay.

17        A.    The personal days, AIP.

18        Q.    Anything else?

19        A.    See, AIP -- we had overtime.  That was

20   a personal day.  The bereavement, I didn't -- that

21   hasn't affected me at the present.

22        Q.    Okay.  And if you think of something

23   else, just let me know.  What was your

24   understanding with respect to personal days?
```

42

```
1           A.     You would be given five.

2           Q.     How many personal days did you have at

3    Ford just prior to the transition?

4           A.     Sir, I have no idea.

5           Q.     Do you know if five was the same,

6    then, as what you had at Ford?

7           A.     Again, I have -- I have no idea.  I

8    didn't -- I didn't take a personal day, so that

9    they -- unless you were sick or -- you know, I had

10   knee surgery.  I -- I don't have a clue.

11          Q.     Okay.

12          A.     That never was a issue.  So, I mean,

13   but if you were sick, you got paid.

14          Q.     Okay.  AIP, what are the issues with

15   respect to AIP?

16          A.     We were to get AIP.  It did not state

17   in there that we were going to have a different

18   percentage than the ZF people.

19          Q.     It doesn't state in there that you

20   would have the same percentage, does it?

21                 MR. SIMON:  Objection.

22          A.     They said it would be like Ford.

23          Q.     Ford doesn't have AIP, does it?

24          A.     They have profit sharing.
```

43

```
 1          Q.    Okay.
 2          A.    Just because you have blue eyes
 3    doesn't mean you treat that other person
 4    differently.
 5          Q.    You would agree with me that document
 6    number two makes no reference with respect to --
 7    that the AIP would be like it was at Ford, in terms
 8    of the profit sharing?
 9          A.    Do you want to repeat that again?  I'm
10    sorry.
11          Q.    Sure.  You see the language on Exhibit
12    2 that says, Annual incentive plan?
13          A.    Mm-hmm.
14          Q.    And nowhere in the language regarding
15    annual incentive plan does it say it would be like
16    it was at Ford, does it?
17          A.    No, that's correct.
18          Q.    And, in fact, if you take a look at
19    the bottom right-hand side of page 2, do you see
20    the two black lines?
21          A.    Two black -- yes.
22          Q.    Okay.  And see down, oh,
23    second-to-the-last sentence, it says specifically
24    that the plans described here are subject to
```

44

1    change, doesn't it?

2         A.    That's plan, that yeah --

3         Q.    Okay.  And the annual incentive plan

4    would then be subject to change, wouldn't it?

5              MR. SIMON:  Objection.  Document

6    speaks for itself.

7         A.    We have a dental plan.  When you talk

8    about plans, you're talking about their dental,

9    also the 401K can have some kind of change and --

10   changes.  But it's this type of thing, the plan,

11   that's when -- those are just actual -- that

12   doesn't -- that doesn't -- the plan is the benefits

13   from the dental and the medical and things that can

14   change like that and the 401K, period.  That's what

15   a plan is, my dental, medical.

16        Q.    So an annual incentive plan isn't a

17   plan?

18        A.    That's a reward.

19             MR. SIMON:  Objection.

20        A.    That's a reward program.

21        Q.    So is salary a plan?

22        A.    No.

23        Q.    Okay.

24        A.    Again, the dental, medical.

```
 1          Q.     Are holidays a plan?  Ms. Blanco, I'm
 2     not trying to be difficult.  I'm just trying to
 3     understand the distinction here.
 4          A.     No.
 5          Q.     Paid leaves?
 6          A.     No.
 7          Q.     Beneath the language that says, Plans
 8     here -- Plans described here are subject to change,
 9     it also says that plan provisions and eligibility
10     do not constitute an employment contract with any
11     individual, correct?
12          A.     That's correct.
13          Q.     You used the term that you looked at
14     this as a contract, in terms of Exhibit 2, correct?
15          A.     Yes.
16          Q.     And you understand that in the face of
17     the document, it says that it's not an employment
18     contract, correct?
19          A.     Correct.
20          Q.     How do you reconcile that?
21          A.     But it is a contract when I do my job.
22          Q.     Okay.
23          A.     This is what it is.  This is what they
24     guaranteed.
```

```
 1          Q.    Well, did anybody ever say this is

 2   guaranteed?

 3          A.    Yes, sir.

 4          Q.    All right.  Who said that?

 5          A.    The -- it's written.

 6          Q.    Show me anywhere on Exhibit 2 that it

 7   says this is guaranteed.

 8                MR. SIMON:  Objection.  Document

 9   speaks for itself.

10          Q.    Can you show me that on Exhibit 2?

11                MR. SIMON:  Objection.

12          A.    It's written.  It's a -- it's written.

13          Q.    Okay.  Can you show me anywhere on

14   Exhibit 129 where it says it was guaranteed?

15          A.    When you do your job, it's guaranteed.

16          Q.    And I think you would -- you've

17   indicated that your guarantee language didn't

18   come -- there's no one you can attribute the true

19   guarantee to that you spoke with regarding your

20   transition to ZF Batavia?

21                I said that very, very poorly.  Nobody

22   ever told you verbally, Pam, this is guaranteed, in

23   terms of Exhibit 2?

24          A.    I don't know if you'd use the word
```

1   "guarantee."  They weren't going to -- like I

2   stated before, Hassan Saleh, we discussed that at

3   the beginning.  He stated they were -- every --

4   things were going to be the same.  They weren't

5   going to mess with our overtime.

6            Why would people join a joint venture

7   when you have the opportunity to go back to Ford,

8   if they were going to come in and change the

9   overtime policy?  I'm talking about currently, all

10  right?  Why would you even make that decision?

11       Q.    All right.

12       A.    When they have it written, this is

13  what you're going to get.

14       Q.    And you thought that's what you were

15  going to get forever?

16       A.    Yes, sir.

17       Q.    Let's talk about the issues with

18  overtime.  What are your -- what do you believe was

19  represented to you that ZF Batavia has not followed

20  through on with respect to overtime?

21       A.    Well, you have to give an hour casual

22  time.

23       Q.    Okay.

24       A.    And like they have hour increments,

48

1    you know.

2         Q.    Okay.  Anything else with respect to

3    overtime?

4         A.    Not at this time.  I can't think of

5    anything.

6         Q.    If you do, just --

7         A.    I will.

8         Q.    -- let me know.  Did Ford have a

9    concept or notion, whatever you want to call it, of

10   casual overtime or casual time?

11        A.    It was never stated when I hired in at

12   '93.  No one said anything about overtime, casual.

13   Said try to get there a half an hour before, which

14   I did because it makes life easier when you start

15   your line.

16        Q.    Okay.  Is that the hand-off concept, I

17   think is what I've heard, in terms of transitioning

18   between shift and shift?

19        A.    Well, I guess, but if you don't work

20   12 hours, you don't have that.  But if you work

21   12 hours when -- two hours at Ford, you did not put

22   any casual time in whatsoever.

23        Q.    I have had others tell me that there

24   was this concept 15 to 30 minutes at the beginning

49

1     of the shift, 15 to 30 minutes at the end of the

2     shift, in terms of casual time.  And, again, it was

3     to ease the transition in and out of that shift?

4          A.    That was not a law or you had to get

5     that.

6          Q.    In your --

7          A.    Pardon me?

8          Q.    In your experience at Ford, did you

9     ever work under that working pattern?

10         A.    Oh, I came in -- you know, early if

11    you needed to stay.  But if you were there, you got

12    paid.

13         Q.    For every minute that you were there?

14         A.    Oh, no, not every minute.  I mean, you

15    didn't put down -- you didn't put down 4:02 or two

16    or three.  You know, I mean --

17         Q.    Okay.

18         A.    -- you didn't do that.

19         Q.    Okay.  With respect to your time,

20    salaried time statements that you fill out for

21    Batavia, what time does that reflect, in terms of a

22    start time?  Is that the moment that you walk

23    through the door at the plant or is that sometime

24    after that or how do you report for your salaried

1    time statements now?

2         A.    Well, I don't put it -- I just come in

3    at seven.  You know, if I come in at 10 till seven,

4    I put seven.

5         Q.    Okay.

6         A.    Now, if I work overtime, I still kind

7    of just -- I come in at five, quarter after five, I

8    put 5:30 or -- I don't know.  You can -- I'm sure

9    you have them.  I don't think I put them --

10        Q.    Okay.  I'm just trying to understand

11   if there's any casual time reflected in your salary

12   time statements?

13        A.    No, I never -- well, if I work

14   overtime I show it, yes, sir.

15        Q.    Okay.  Is there any deduction on your

16   salary time statements for lunch?

17        A.    Yes.

18        Q.    So I'll show like a start time, sort

19   of a stop time before lunch and a start time after

20   lunch?

21        A.    No, no.  You just start time, finish

22   time, subtract lunchtime or --

23        Q.    Okay.  There's a column, as I recall,

24   for compensable overtime.  And so do you kind of,

1    in a sense in your head, make the deduction, in

2    terms of not claiming that time on your overtime

3    schedule?

4        A.    I try to do that, yes.  And somebody

5    else might -- supervisors -- you know, you do make

6    mistakes, so --

7        Q.    Okay.  And I'm not concerned about

8    mistakes.  I'm just trying to, again, understand if

9    I looked at Pam Blanco's timecard, what would that

10    tell me about your workday?

11        A.    I try to subtract -- I do subtract, as

12    far as I know.  I'm not -- like I said, I could

13    have made an error, but I try to subtract the hour

14    or hour and a half, hour and 45 minutes.

15        Q.    Okay.  What time do you normally

16    start?  I think you told me.  I apologize.  I just

17    don't remember what you said.

18        A.    It just varies.

19        Q.    Give me an approximate.

20        A.    Quarter till -- sometimes -- quarter

21    till seven.  Sometimes I'll come in at 6:30.

22    Sometimes -- I mean, if you look -- I don't know.

23    I don't write down.  I -- I start at seven, even

24    though I'm there, I start.  It doesn't matter.

1    I'll start printing the DROTS.

2          Q.    Okay.

3          A.    I don't put down 6:42 or 5:32 or

4    what -- I don't -- I don't know.  I mean, I come in

5    there before time starts and I'll stay sometimes

6    till 4:00.  Sometimes I won't.  You know, depends.

7          Q.    Okay.  Well, if your shift -- it

8    sounds like the schedule normally begins at seven?

9          A.    I have people come in early.  They'll

10   start at 3:00, but I start at seven to 3:30, eight

11   hours, the majority of the time --

12         Q.    Okay.

13         A.    -- unless I'm prescheduled.

14         Q.    All right.  And so if you were

15   scheduled for seven to 3:30 and that was reflected

16   on your time statement, that -- under the current

17   situation at Batavia, you would not be entitled to

18   overtime pay, correct?

19         A.    Well, if I work seven to 3:30, I

20   would -- I got eight hours, you wouldn't be able

21   to.

22         Q.    Just -- I'm trying to draw a common

23   understanding here.  I think you'll see where I'm

24   going here in a minute.

53

```
 1              Now, if you worked seven to 4:30 under

 2    the current scheme at Batavia, would you be paid

 3    any overtime?

 4         A.    No.

 5         Q.    All right.  Do you believe that if you

 6    worked at Ford and put a seven to 4:30 time

 7    statement in, that you would be paid anything?

 8         A.    Yeah.

 9         Q.    Okay.  How much would you be paid?

10         A.    An hour.

11         Q.    An hour of overtime?

12         A.    (Witness nodded.)

13         Q.    All right.  And then there was a point

14    in time where ZF Batavia made the announcement

15    about the one hour of overtime.  I'm sorry, casual

16    time.

17         A.    Yes.

18         Q.    Okay.  Prior to that announcement,

19    were you paid for that one hour we've been talking

20    about?

21         A.    Probably sometimes -- you know, if you

22    work through lunch, I didn't put that down.  If I

23    came in at a quarter till, if it was a 45-minute

24    span, you didn't put it on -- I mean, you didn't
```

54

1   put it on.

2        Q.    Okay.  All right.  Any other issues

3   with respect to overtime?

4        A.    I can't think of anything right now.

5        Q.    Can't think of any right now?

6        A.    (Witness nodded.)

7             MR. HUNTER:  Will you mark that,

8   please?  Steve, I did not pull extra copies.  These

9   are Ms. Blanco's answers to interrogatories, which

10  I think you have.

11       Q.    Ms. Blanco, if you could take a minute

12  to look through 130, document 130, I would

13  appreciate that.

14       A.    Okay.

15       Q.    Okay.  You've had a chance to review

16  document number 130?

17       A.    Mm-hmm.

18       Q.    And I believe those are your answers

19  and objections to the interrogatories of Ford Motor

20  Company?

21       A.    Yes.

22       Q.    And with respect to those answers, is

23  the information contained within Exhibit 130

24  information that you supplied to your attorney?

```
 1          A.    Yes, sir.

 2          Q.    And as we sit here today, to the best

 3    of your information and belief, is the information

 4    contained in Exhibit 130 true and accurate?

 5          A.    Yes, sir.

 6          Q.    Are there any changes that you feel

 7    need to be made to that document at this point in

 8    time?

 9          A.    They're just talking about the

10    overtime, correct?

11          Q.    No, ma'am.  I'm talking with respect

12    to the entire document, is it true and accurate as

13    we sit here today?

14          A.    Yes, as far as I know.

15          Q.    Okay.  And in that document, I see

16    that it's indicated that there's a loss that you

17    have attributed to ZF in the amount of $6,130?

18          A.    Mm-hmm, yes, sir.

19          Q.    Can you tell me what that number

20    represents?

21          A.    That's some casual time that would

22    have been -- it's not -- like I said, it's not ring

23    to ring.  It's --

24          Q.    Is it that one hour we've been talking
```

56

1    about?

2        A.    Yes, sir.

3        Q.    Okay.  Is there any -- aside from the

4    one hour, is there any scheduled or authorized

5    overtime that you have worked for which you have

6    not been paid?

7        A.    Besides that?

8        Q.    Besides the one hour.

9        A.    Not that I can think of at this time.

10       Q.    Okay.  I've heard about some employees

11   in -- I believe it was maintenance and materials

12   control that may have worked some shifts, that they

13   weren't paid for those shifts.  That apparently

14   does not apply to you?

15       A.    No, sir.

16       Q.    Okay.  You had mentioned before that

17   you felt that ZF Batavia would be entitled to pay

18   you the 1999 rates for overtime.

19       A.    If -- that they deemed fit, I mean.  I

20   did not -- I'm going to be honest here.  They told

21   me overtime.  What if they -- with cost of

22   living -- I'll tell you one thing.  I'm going to

23   throw this out.  One thing with Ford when you

24   supervise people, whether you were hourly, salary,

```
1   you made more than the person below you.  That's

2   just business, business.

3           But overtime, like I said, I'm not

4   going to be disgruntled, like if Ford raised this

5   or they -- this is our contract that I feel that we

6   got.

7       Q.    I guess I'm trying to understand

8   whether or not it's your testimony that that rate

9   was supposed to change when Ford's changed?

10      A.    I think I stated I didn't -- it was

11  not written that it had to -- they had to follow

12  Ford, no, sir.  I mean, no.

13      Q.    Can you take a look on page 6 of

14  Exhibit Number 130?

15      A.    Six, 130.

16            MR. SIMON:  That's the one he's got.

17            THE WITNESS:  Okay.

18      Q.    And in the third paragraph, which is

19  indented --

20      A.    Right here.

21      Q.    Okay.  Your answer that you've given

22  to Ford was that your loss of 6,130 does not

23  include the loss of any pay attributable to ZF --

24      A.    Right.
```

```
 1          Q.     -- Batavia's failure to pay overtime

 2    rates to salaried employees consistent with Ford's

 3    rates as such rates have increased, contrary to the

 4    promises made to the plaintiffs in 1999.  Do you

 5    see that statement?

 6          A.     I do.

 7          Q.     Is that --

 8          A.     I read that.

 9          Q.     -- statement inaccurate?

10          A.     Okay.  They said we were going to be

11    like Ford Motor Company.  I know I work for ZF.

12    Ford is 49 percent; ZF is 51 percent.  If you want

13    to be -- you know, if you hear what people verbally

14    said and you believe and you're supposed to take

15    people's words, people go to court -- like, you

16    know, when they have a oral -- well, what do you

17    call it?  I just felt that we were like Ford.

18    That's what they said.

19          Q.     All right.  Personal days, you'd

20    mentioned you were given five --

21          A.     Took two back.

22          Q.     -- at Ford?

23                 MR. SIMON:  Are you done with this?

24                 MR. HUNTER:  Yes.
```

1          Q.     Did you have a need for the five --

2    for five personal days after the policy had been

3    changed to two?

4          A.     Yes, sir.

5          Q.     Okay.  So in addition to the $6,130

6    you're claiming for overtime, we would need to add

7    two days' pay to your damage claim?

8          A.     Yes, sir.

9          Q.     Okay.  What about the bereavement

10   days, I don't -- I think you told me that had no

11   affect on you?

12         A.     No, sir.

13         Q.     AIP, is there a loss that you can

14   identify for me with respect to AIP?

15         A.     There is a loss.

16         Q.     But you -- can you -- dollar amount,

17   percentage amount?  I don't know, something.

18         A.     I can't at this present time.

19         Q.     Okay.  As we've discussed these

20   issues, is there anything else that you feel ZF

21   Batavia has failed to follow through on with

22   respect to the representations that you believe

23   were made to you at the time of the transition?

24         A.     I -- I think I'd like to talk to Steve

1    for a minute, take a break for a minute.

2            MR. SIMON:  He's got a question.

3    Unless there's a pending question, you can answer.

4    If you don't, just testify to what you -- answer

5    the question.

6        A.    Okay.  There's other issues because I

7    can't give you a definite for the AIP, there's

8    other issues that I feel that have been unresolved.

9        Q.    Okay.  Well, what would those be?

10       A.    Okay.  Back in, what, 2000, I was

11   offered a manager's job.  No one stated that it was

12   a temporary position.  I did my job.  I never got

13   promoted.  Never got a raise or never got any of

14   the salary increases for the manager position.

15   Again, let me state, I did my job.  I don't know if

16   it --

17       Q.    Okay.  You confused me.  You said it

18   was temporary or --

19       A.    I said they never stated it was

20   temporary, nothing.  It was here -- you know, we

21   want you to be -- this position is available.  Go

22   down there and be a manager.

23       Q.    And what position did you move to?

24       A.    Let's see.  It was -- they call them

```
 1    the BOMs.  I mean, it's all that --

 2          Q.    The business operations manager?

 3          A.    Yes, whatever.  Back then it was --

 4    Ford, it's a superintendent.

 5          Q.    All right.

 6          A.    They've changed them.

 7          Q.    All right.  So you moved up to a BOM

 8    position, but apparently that was temporary?

 9          A.    Nobody stated it was temporary.

10    That's what I'm saying.  No one stated it was

11    temporary.  I'm just throwing that out, stating,

12    Pam Blanco, you're going to do this for 90 days

13    because (A) you're a woman and you can do it or

14    you're a transition, you can do it.  I mean, it was

15    here.  Would you like to do that?  Yes, I would do

16    that, thinking -- never mind.

17          Q.    Just trying to understand, Ms. Blanco.

18    It turned out to be temporary and you thought --

19          A.    No.

20          Q.    -- it was permanent?

21          A.    It -- well, no, no, no.  I'm just

22    state -- let me say it again.  When Ford Motor

23    Company, when you go out -- like I said, I was in

24    engineering.  They said we need for you to go to
```

1    the floor.  This is a temporary position.  Then I

2    would go back to engineering, okay?

3            They never stated that, Pam -- they

4    moved me from my -- my job in center shop to the

5    BOM or whatever.  You know, all these names they

6    call it into there.  I'm just stating that was my

7    permanent job.

8        Q.    Okay.

9        A.    Does that make sense?  That was a

10    permanent job I did for almost a year.

11        Q.    And the negative to that is --

12        A.    I never got paid for that position.

13        Q.    Okay.  All right.

14        A.    It was not -- I never got paid.  I

15    never was promoted.

16        Q.    Would it be safe to say that that

17    issue is not related to the transition, in terms

18    of -- it certainly wasn't discussed on the 27th or

19    anything like that?

20        A.    What do you mean "the 27th"?

21        Q.    The May 27th meeting.  I'm sorry.

22        A.    Well, you asked me if there was any --

23    you just asked me if there was any other issues, so

24    I'm letting you know.

1          Q.    Oh, absolutely.  I'm just trying to

2     understand.  That issue didn't exist at the time of

3     your transition?

4          A.    Well, I was in -- I don't understand

5     the question.  Excuse me.  I don't understand the

6     question.

7          Q.    All right.  Let's do this.  What other

8     issues might be out there, in terms of

9     representations that you feel were made to you and

10    not followed through on by ZF Batavia?

11         A.    Well, I just stated that.

12         Q.    I know.  Are there any others?

13         A.    Well, they promised that we'd go to --

14    on the monetary type --

15         Q.    Anything, just anything.

16         A.    Well, we were supposed to go to CVT,

17    ground floor.  We need your expertise.

18         Q.    And there are Ford transitionals in

19    CVT, aren't there?

20         A.    Couple, mean one.

21         Q.    What date did you think you would be

22    in CVT by?

23         A.    They said they were ground floor.

24    I -- they -- I did not have an idea what date --

64

1    I'm not going to get into that petty stuff.  They

2    said ground floor, you'll have promotional

3    opportunities.  ZF has been there what, four years?

4            Q.    All right.

5            A.    We'll conclude to that, have the

6    conclusion with that.

7            Q.    Any other issues?

8            A.    I can't think of any right now.

9            Q.    All right.  If you do, please let me

10   know.

11           A.    I do know -- you know, like the

12   difference percentages in AIP.

13           Q.    Okay.  And I think we talked about

14   that.

15           A.    I just wanted to throw that back in.

16           Q.    All right.  During the time that

17   you've been employed by ZF Batavia, have you always

18   received your full base salary?

19           A.    Have I always -- my full base salary?

20   No.

21           Q.    Okay.  When have you received less

22   than your full base salary?

23           A.    When I took more -- when I used my

24   personal, those three days up.

65

1          Q.     Well, you were paid for those three

2    personal days, weren't you?

3          A.     Yeah, but if I took two more or -- you

4    know, if I had to take personal days, it was

5    unpaid.

6          Q.     And did you take unpaid personal days?

7          A.     Yes, sir.

8          Q.     Okay.  And then other than that, have

9    you always received your full base salary?

10          A.     Well, when I was on medical, I haven't

11    received my -- whatever, the one day.  I'll have to

12    talk to -- they haven't sent it to me in the mail.

13    I had to have surgery.  But as far as I know, yes.

14          Q.     All right.  Certainly you've never

15    been approached by anyone that said, Hey, jeez,

16    Pam, we've took a look at your timecards and they

17    don't quite jibe and we're going to dock you or

18    anything like that?

19          A.     No.

20          Q.     Okay.  Are you aware that that type of

21    issue has arisen with any other salaried employees?

22          A.     I've heard it has.

23          Q.     Okay.  And what have you heard?

24          A.     O'Hagan was docked.

66

```
 1          Q.    Now, who is O'Hagan?  Have we --

 2          A.    He's in maintenance.  This is just on

 3   the floor, hearsay.

 4          Q.    And give me a little detail on what

 5   you've heard, to the extent you know it.

 6          A.    He was docked.

 7          Q.    What was he docked for?

 8          A.    He was late.

 9          Q.    All right.  And who docked him?

10          A.    It was the manager.

11          Q.    Do you know who that would be?

12          A.    Milt Gross.

13          Q.    How late was he?

14          A.    I don't know, five minutes.  I -- five

15   to 10 minutes.

16          Q.    And how much did he get docked?

17          A.    I have no idea.

18          Q.    Date when that happened?

19          A.    No.

20          Q.    Anybody else?

21          A.    There was a gentleman at -- this is --

22   again, this is just hearsay, converters and they

23   fire because of that.

24          Q.    Would that be -- well, do you remember
```

1    who that was?

2          A.    I can't think of his name.

3          Q.    Victor Flanigan?

4          A.    That sounds familiar.  We've had quite

5    a few come and go like that.  I'm sorry, but I

6    can't remember.

7          Q.    Okay.  Anybody else other than those

8    two individuals?

9          A.    They share them.  Jim Caldwell, I'm

10   going to -- he had taken a new position and he said

11   that Milt Gross called him and he wanted him to

12   dock Dave Osborne five minutes for being late.

13         Q.    Do you have any personal knowledge

14   about that?

15         A.    Pardon me?

16         Q.    Do you have any personal knowledge as

17   to that?

18         A.    Well, Jim Caldwell, he -- he was my

19   boss and he was telling me that Milt, who was his

20   boss and it goes on, wanted him to dock him and he

21   said no.  He put in enough five minute casual

22   times.  I mean, that wasn't anything to --

23         Q.    So Mr. Osborne wasn't docked?

24         A.    No, sir.  From my knowledge, he said

1    he wasn't going to do that.

2         Q.    All right.  Anybody else?

3         A.    Not that I'm aware of.

4         Q.    We've been going at this for a little

5    while now.  As you sit there currently, is there

6    any part of your testimony that you feel that you

7    need to supplement or correct or otherwise modify?

8         A.    Right now, I can't think of anything.

9              MR. HUNTER:  Okay.  I think that I'm

10   good for right now.

11             MR. SIMON:  Off the record, take a

12   break.

13       (Off the record:  12:24 p.m. - 12:36 p.m.)

14                        EXAMINATION

15   BY MR. VANWAY:

16        Q.    Ready to go?  Ms. Blanco, I think

17   we've -- if we haven't officially met, I know we've

18   been in depositions together.  I'm Jeff VanWay.  I

19   represent Ford in this case and I have a few

20   questions for you this afternoon.

21             During the six or so years that you

22   worked with Ford, you were always a salaried

23   employee, right?

24        A.    That's correct.

69

```
1          Q.    Never were a member of the union?

2          A.    No.

3          Q.    Okay.  When you were with Ford, did

4     you have an employment contract with Ford?

5          A.    Yes.

6          Q.    And what -- was it a one document?

7     Was it several documents?  What did it consist of?

8          A.    You just -- it was just a contract.

9     You know what?  I really don't know.

10          Q.    Well, did you have a written contract

11     with them that you're aware?

12          A.    I don't know.

13          Q.    What makes you think that you may have

14     had a contract with Ford?

15          A.    Because if you do your job well, you

16     have a contract with your employee.

17          Q.    That's just your general understanding

18     of kind of how the workforce works?

19          A.    Yes.

20          Q.    Not just at Ford, but at other places

21     that you worked?

22          A.    Yes.

23          Q.    Do you remember anyone from Ford

24     signing a contract with you that specified anything
```

1    about how you were going to be paid, your benefits,

2    anything like that?

3         A.    We signed up things for benefits.

4         Q.    You signed up for benefits --

5         A.    Right.

6         Q.    -- right?  But in this case, you know,

7    you had an offer letter and you have Exhibit 2,

8    which you have referred to as a contract.

9         A.    Right.

10        Q.    Did you have similar documents that

11   you believe were a contract at Ford?

12        A.    No.

13        Q.    You received an offer letter from Ford

14   when you started working there, right?

15        A.    That's correct.

16        Q.    Did you believe that document was a

17   contract?

18        A.    I hadn't accepted it.  So, no, it

19   wasn't a contract.

20        Q.    Once you accepted, did you believe it

21   became a contract?

22        A.    If you do your job.  I'm trying to

23   think of the letter you're talking about --

24        Q.    Well, let's do this.

1        A.     -- an acceptance letter.

2        Q.     Ms. Blanco, you have in front of you

3  Exhibit 131 and that appears to be the offer letter

4  that you received when you were first hired with

5  Ford; is that correct?  Is that what that document

6  is?

7        A.     Yes, sir.

8        Q.     Was it your understanding that this

9  offer letter, this Exhibit 131 was a contract

10  between you and Ford?

11        A.     A contract, no.  I -- if I wanted to

12  have the job, they accepted my employment.

13        Q.     Okay.  But the offer letter itself

14  wasn't a contract?

15        A.     No.

16        Q.     What's different about the offer

17  letter you received from ZF Batavia, Exhibit 129,

18  and Exhibit 131?  And when I say "what's

19  different," I mean, why is it that you consider 129

20  to be a contract, but not 131?

21        A.     They gave you -- they specified -- I

22  knew this was a contract for my salary.  When I

23  came in --

24        Q.     And you're talking about 131?

72

```
 1          A.    Right.

 2          Q.    Okay.  You believed 131 was a

 3   contract --

 4          A.    Okay.

 5          Q.    -- for your salary?  Is that --

 6          A.    Ford Motor Company would not come in

 7   and say you're going to get this much salary and

 8   then my next pay period or whatever -- you know,

 9   turn around and give me a less --

10          Q.    Okay.  So your under --

11          A.    Does that make sense?

12          Q.    Your understanding based on the offer

13   letter from Ford was that your salary would never

14   be less than what it was stated in the offer

15   letter; is that right?

16          A.    Never be less?  Well, if you do your

17   job, you have a contract with the company.

18          Q.    Okay.  Did you understand that your

19   salary would always be at least what was stated in

20   the offer letter?  Is that your understanding?

21          A.    You know, I didn't.  I don't remember

22   what I thought when I --

23          Q.    Okay.

24          A.    I'll tell you what I thought.  I
```

1    thought, hot -- hot dog.  I got the company that I

2    wanted to work for.  I didn't want to work for

3    Chrysler.  I wanted to work for Ford.

4            Q.    Okay.  Fair enough.

5            A.    That's what I thought.

6            Q.    As you look at 129 and 131 kind of

7    side by side there, if you could.  Do you have 129?

8    There you go.

9            A.    Okay.

10           Q.    As you look at those two side by side,

11   and I know I asked this, but I'm not -- I'm just

12   not clear on the answer.

13               What is it -- why is it that you

14   believe Exhibit 129 is a contract, but Exhibit 131

15   is not?

16               MR. SIMON:  I think that

17   mischaracterizes her testimony about Exhibit 129.

18   You can answer.

19           A.    Now, which one is 129?

20           Q.    Let me ask this.  Do you believe that

21   Exhibit 129, the offer letter from ZF Batavia that

22   you declined, do you believe that's a contract with

23   ZF Batavia?

24           A.    No.  Right here.

```
 1          Q.    Okay.  So the only contract is Exhibit

 2    2?

 3          A.    And it states the salary.  I mean,

 4    'cause it says salary, base salary starting.

 5          Q.    Right.

 6          A.    It says current Ford salary right

 7    here.

 8          Q.    You're reading that --

 9          A.    Right there.

10          Q.    -- from Exhibit 2?  Okay.  So the only

11    contract is Exhibit 2?

12          A.    Right here.

13                MR. SIMON:  Objection,

14    mischaracterizes her testimony.  Go ahead.

15          Q.    So you have to put them together?

16    Exhibit 129 and Exhibit 2, together they're the

17    contract?

18          A.    Okay.

19          Q.    Is that your testimony?

20          A.    Yeah, right.

21          Q.    Okay.  So if with Exhibit 131 you had

22    received a document similar to Exhibit 2, then

23    would you have had a contract with Ford?

24          A.    Yes.
```

```
 1        Q.    Okay.  Now, I notice in the offer

 2   letter here from Ford, the first paragraph, it

 3   mentions an enclosed summary of salaried benefits.

 4   Do you remember receiving a summary of salaried

 5   benefits from Ford around the time you were hired?

 6        A.    No, sir.

 7        Q.    Okay.  You just don't remember?

 8        A.    Sure.  I don't remember.  Like I said,

 9   let me state again.  I read this and I just --

10   ecstatic.

11        Q.    Okay.  Fair enough.  Now, Exhibit 132

12   appears to be the application for salaried

13   employment that you filled out when you were trying

14   to get the job with Ford.  Is that -- am I correct?

15   Is that what this document is?

16        A.    Yes.

17        Q.    And it's your handwriting on this

18   document?

19        A.    Yes.

20        Q.    And on the second page, is that your

21   signature there?

22        A.    Yes.

23        Q.    Okay.  And the date looks like July

24   26th, '93.  Is that around the time you were making
```

76

1    an application with Ford?

2        A.    Yes.

3        Q.    Now, Exhibit 133 is a document that

4    was produced in this case by Ford as a part of your

5    salaried personnel file.  Let me ask you first, the

6    lower left hand, is that your signature that

7    appears there?

8        A.    Mm-hmm, yes, sir.

9        Q.    And do you agree with me that this is

10   a document you signed while you were employed by

11   Ford?

12       A.    Yes, sir.

13       Q.    Now, during the time that you worked

14   for Ford, did your compensation ever change?

15       A.    Yeah, compensation, what are you --

16       Q.    Your salary --

17       A.    Yes.

18       Q.    -- your salary ever change?  Got merit

19   increases?

20       A.    Yes, sir.

21       Q.    Did you get the same merit increase

22   every year?

23       A.    No, I don't believe so.

24       Q.    It was fluctuated, right?

1          A.      Right.

2          Q.      And that was according to the

3    company's discretion, right, in terms of it was

4    their decision as to what increase to give you?

5          A.      For merit?

6          Q.      For merit.

7          A.      Yes.

8          Q.      And you received profit sharing when

9    you were with Ford?

10         A.      Yes, sir.

11         Q.      And the percentage of profit sharing,

12   that varied from year to year, didn't it?

13         A.      Yes, sir.

14         Q.      And, again, that was subject to the

15   company's discretion, correct?

16         A.      Yes, sir.

17         Q.      I mean, you didn't have any contract

18   with them that said they had to pay --

19         A.      No.

20         Q.      -- you a certain percentage profit

21   sharing?

22         A.      No, sir.

23         Q.      And, in fact, you didn't have anything

24   that said they had to pay you any profit sharing at

1     all, did you?

2          A.     No, sir.

3          Q.     You had benefits with Ford as well,

4     things like medical, health insurance, vacation, et

5     cetera, right?

6          A.     That's correct.

7          Q.     Some of those benefits changed from

8     time to time while you were with Ford, didn't they?

9          A.     No, sir, not that I can recall.

10         Q.     Were there ever any changes in your

11    health insurance?

12         A.     No, sir.

13         Q.     Never changed carriers?

14         A.     No.  I had Blue Cross-Blue Shield the

15    whole time.

16         Q.     Never changed the amount that you paid

17    for health insurance?

18         A.     Not that I can remember, no, sir.

19         Q.     Never changed deductibles?

20         A.     No, sir.

21         Q.     Co-pays?

22         A.     No, sir.

23         Q.     Okay.

24         A.     I can't -- no, nothing changed.

```
 1          Q.     Okay.  What about dental, did your
 2    dental ever change while you were with Ford, if you
 3    can recall?
 4          A.     You know what?  I can't remember.  No,
 5    I -- no, I had Blue Cross-Blue Shield for my
 6    insurance and they never changed nothing.
 7          Q.     Okay.
 8          A.     Everything stayed the same.
 9          Q.     You understood, though, didn't you,
10    that those things were subject to change?
11                 MR. SIMON:  Objection, vague and
12    ambiguous.
13          Q.     You understood that your health
14    insurance was subject to change while you were with
15    Ford, didn't you?
16                 MR. SIMON:  Same objection.
17          A.     Yes, yes, sir.
18          Q.     Yes?
19          A.     Yes, sir.
20          Q.     Okay.
21          A.     I mean, that's -- yeah.
22          Q.     I mean, that's kind of the way of the
23    workforce, right?  Those sorts of things are
24    subject to change?
```

```
 1              MR. SIMON:  Same objection.

 2         Q.    Now, you have testified as to, I

 3    believe, four what you've called unfulfilled

 4    promises.  And I believe overtime, bereavement,

 5    personal days and AIP.

 6              Do you still have Exhibit 130 in front

 7    of you?

 8              MR. SIMON:  Here it is right here.

 9         Q.    If you would on Exhibit 130, turn,

10    please, to page -- well, starting on page 5, which

11    is the beginning of interrogatory number nine.  And

12    in interrogatory number nine, you were asked

13    essentially to summarize the changes that had been

14    made, as well as to list who had made the changes.

15    Do you see where I'm at?

16         A.    Yes.

17         Q.    Okay.  And then your response starts

18    on page 5, carries over and goes all the way to

19    page 7.  And in those pages lists various changes,

20    including those you've testified about today

21    overtime, AIP, et cetera.

22              And then on page 7, you see where

23    there are the indented paragraphs there?  There are

24    three indented or --
```

81

```
 1          A.    Vacation, sick.

 2          Q.    You're right.  And then there's a full

 3    paragraph that starts with plaintiff asserts

 4    that -- do you see where I'm at?

 5          A.    Right here?

 6          Q.    Right.  And it says, Plaintiff asserts

 7    that each of the policies described herein was

 8    authorized by ZF Batavia and Ford management.

 9                Is it your testimony that the policy

10    changes in overtime, bereavement, personal days and

11    AIP, that those changes were all authorized by Ford

12    management?

13          A.    Can you --

14          Q.    Sure.  Let's go one at a time.

15          A.    No.  Can you be more specific what

16    you're asking?  I'm --

17          Q.    Well, I'll try.  In your

18    interrogatory, you've said that the changes that

19    are made to the various benefits that are at issue

20    in this case were authorized by Ford management.

21                I'm asking you, as you sit here today,

22    do you still believe that to be true?

23          A.    Yes, sir.

24          Q.    Okay.  What Ford manager authorized
```

82

1      the overtime change?

2            A.    I just think they knew.

3            Q.    Do you have a name for me, the Ford

4      manager that authorized that?

5            A.    Of Ford, of the change?

6            Q.    Who in Ford management authorized the

7      change in overtime?

8            A.    They just knew.

9            Q.    You don't know of any specific

10     individual that authorized that change?  Do you

11     know of any specific individual that authorized

12     that change?

13           A.    At Ford, no.

14           Q.    Okay.  Bereavement, do you know of any

15     specific individual with Ford that authorized the

16     bereavement change?

17           A.    No.

18           Q.    Personal day change, do you know of

19     any specific individual with Ford that authorized

20     that change?

21           A.    No.

22           Q.    AIP, do you know of any specific

23     individual with Ford that authorized that change?

24           A.    No.

1          Q.     Now, you say "they just knew."  What

2     do you base that belief on?

3          A.     You own 49 percent of the company --

4     corporation -- company, they would know.  They

5     would know what's going on in their -- they've had

6     other joint ventures.  They would know.  They

7     should -- the board of directors.

8          Q.     Other than the fact that they own 49

9     percent of the joint venture, is there any other

10    reason that you believe Ford knew of these changes?

11         A.     Yes.

12         Q.     Okay.  And what other reason would

13    that be?

14         A.     I have someone state that they have

15    let Ford Motor Company know of different procedures

16    that were getting changed.

17         Q.     Who was that?  Who said that?

18         A.     I would rather not say.

19         Q.     I appreciate that, but I need you to

20    answer the question, please.

21              MR. SIMON:  Pam, you're going to have

22    to answer, even if it might be personal.  You have

23    to say who said that.  Is there a way -- the

24    witness is struggling over this and I'm sure we can

1    revisit this.  She'll answer that.  Maybe we can

2    return to this question after your examination.

3              MR. VANWAY:  I don't know if we need

4    another break.  Are you asking for a break or --

5              MR. SIMON:  Well, I know a question is

6    pending.  She's struggling to answer because

7    there's -- apparently there's perhaps a reason she

8    doesn't want to say the name.  I don't want to put

9    her in an awkward position.  Without taking a

10   break, I don't know.  I'm just saying that perhaps

11   we can revisit this question.

12             MR. VANWAY:  Well, either way, I'm

13   going to ask the question, so I guess I'm not

14   following you.  I mean, are you instructing the

15   witness not to answer the question?

16             MR. SIMON:  No.  I'm just asking you

17   as a courtesy, you want to come back to the

18   question.  Since we just took a break, it doesn't

19   make sense to take a break now.  But I -- yes, I'm

20   asking you to have a break at some point before she

21   answers the question because she's struggling to

22   answer and I'm not quite sure why.

23             MR. VANWAY:  Well, I'll come back to

24   it out of courtesy, but it is a question that I do

1    believe I'm entitled to get the answer to.

2                MR. SIMON:  I appreciate that.

3                THE WITNESS:  Thank you.

4    BY MR. VANWAY:

5         Q.    Ms. Blanco, you prefer not to answer

6    that question at this moment; is that --

7         A.    That's correct.

8         Q.    All right.

9                MR. SIMON:  Thanks.

10        Q.    Other than those two reasons that you

11   stated, because Ford's 49 percent shareholder in

12   the joint venture and because someone told you that

13   they let Ford know of the changes, any other

14   reasons you believe that Ford, as you said in the

15   interrogatories, authorized the changes?

16        A.    Not that I can think of at this time.

17        Q.    Okay.  And with respect to the fact

18   that Ford is a 49 percent shareholder, do you have

19   any specific knowledge that anyone on the board of

20   directors was involved in any of these changes that

21   you've testified about?

22        A.    Repeat that again.

23        Q.    Sure.  With respect to the four

24   changes you've testified about, overtime,

1    bereavement, personal and the AIP, do you have any

2    knowledge that the board of directors of ZF Batavia

3    was involved in those changes?

4         A.    No.

5         Q.    Is there more to your answer?  You

6    look like there's something else that you want to

7    say.  This is -- I mean, if there's something you

8    want to explain, that's fine.  Feel free to go

9    ahead.

10         A.    No.

11         Q.    Okay.  Do you know, in fact, whether

12    policy changes, these policy changes even went up

13    to the board of directors?

14         A.    Yes, sir.  I mean, I don't know that.

15         Q.    Okay.

16         A.    Personally, corporations they know --

17    the board of directors, they review items on the

18    table.

19         Q.    You're talking in general, based on

20    your experience in the workforce?

21         A.    Yes, sir.

22         Q.    But no specific knowledge as to what

23    the ZF Batavia board of directors does or doesn't

24    review; is that right?

```
 1          A.     Not at this time.

 2          Q.     Okay.  As we're in the deposition, if

 3    something occurs to you, will you let me know?

 4          A.     Yes.

 5          Q.     Okay.  Have you ever attended a board

 6    of directors meeting?

 7          A.     No, sir.

 8          Q.     Have you ever reviewed the minutes

 9    from the board of directors meeting?

10          A.     Yes.

11          Q.     And in any of those minutes, have you

12    ever seen anything in those minutes that reflected

13    these policy changes?

14          A.     No, sir.

15          Q.     Prior to the time that you accepted

16    employment with ZF Batavia, did anyone ever tell

17    you that you would receive a larger AIP percentage

18    than the new hires would receive?

19          A.     A larger AIP?

20          Q.     Yes.

21          A.     I don't know, sir.

22          Q.     Or that you would receive the same AIP

23    that the new hires would receive?

24          A.     That was just a given.
```

1          Q.     You thought that was a given?

2          A.     Yes, sir.

3          Q.     But nobody said it?

4          A.     No, sir.  No one stated, though, we

5     were going to get less than the ZF.

6          Q.     I understand.  Now, you testified

7     earlier in response to Mr. Hunter's questions, kind

8     of your understanding of what we've called the

9     subject to change language here in Exhibit 2.

10          A.     Okay.

11          Q.     And I believe you testified that it

12     referred to -- your understanding was it referred

13     to things like the dental plan, 401K plan.  Did

14     anyone either from Ford or from ZF tell you that

15     that's what this information, this language

16     referred to?

17          A.     Sorry.  I know that they have to have

18     a plan.

19               MR. SIMON:  He was asking -- I'm sorry

20     to interrupt, but he was asking, did anyone tell

21     you about that disclaimer?

22               THE WITNESS:  No, sir.

23          Q.     And in any of the employee meetings,

24     the disclaimer was never discussed, was it?

89

1          A.    No, sir.

2          Q.    And in your conversations with Hassan,

3    that wasn't ever discussed, was it?

4          A.    No, sir.

5          Q.    When did you first reach the

6    interpretation that you testified about today?  In

7    other words, you testified today that you believe

8    that subject to change language only meant things

9    like dental plan, 401K.  When is the first time

10   that you reached that understanding of that

11   language?

12         A.    Previous work experience and I have an

13   accounting degree.  We -- I have worked with the

14   medical and the dental -- the summary plans, that

15   type of thing.

16               So my accounting degree had a lot of

17   barrier to -- knowledge of that, plus work related,

18   being a manager in a chemical plant.

19         Q.    Okay.  So based on all that prior

20   experience, that's what went into your

21   determination that that language was limited to as

22   you've testified today?

23         A.    Yes, sir.

24         Q.    Okay.  And did you have that

1   understanding at the time you read it or did you

2   even give that language any thought at that time?

3       A.    I read -- I read -- like I stated, I

4   read this.

5       Q.    I understand.  But I guess what I'm

6   asking is, when you read it, did you consider at

7   all this language here that we've been discussing,

8   the subject to change language?  Did you give that

9   language any consideration at all?

10          MR. SIMON:  Objection to the phrase

11   "consideration."  Go ahead.

12      A.    Restate that again, please.

13      Q.    Sure.  As you read the entire Exhibit

14   2 at the time you received it, did you focus at all

15   on this disclaimer language?

16      A.    Did I focus on, no.

17      Q.    I mean, you didn't read it any more

18   carefully than you did anything else in here,

19   right?

20      A.    Well, I don't know at that present

21   time what I -- I read the -- I don't know if you

22   would say I focused on this or I focused on that.

23   I don't know at this time.

24      Q.    Well, were there some things in

91

1    Exhibit 2 that were more important to you than

2    others?

3         A.    Well, yes, sir.

4         Q.    And was the language that we've been

5    referring to, this disclaimer language, was that

6    one of those things that was more important to you

7    than some of the other things?

8         A.    That's just standard in industry to

9    state that.  You have to have that in there for the

10   medical and dental.

11        Q.    Okay.  While you were with Ford, as a

12   Ford employee, was it your understanding that Ford

13   could or could not change its overtime policy?

14        A.    They could.

15        Q.    Did they have to have your approval to

16   change that?

17        A.    No.

18        Q.    Is it your understanding that ZF

19   Batavia can or cannot change its overtime policy?

20             MR. SIMON:  Objection.  Calls for a

21   legal conclusion.

22        Q.    Just asking for your understanding,

23   ma'am.

24             MR. SIMON:  Same objection.

```
 1          A.     Not what I've been stating, that this

 2    is my contract.

 3          Q.     Well, I understand your position on

 4    Exhibit 2.  I'm not referring necessarily to

 5    Exhibit 2.  I'm just asking in general, is it your

 6    understanding that ZF Batavia can or cannot change

 7    its overtime policy?

 8          A.     No.

 9                 MR. SIMON:  Objection.

10          A.     No.

11          Q.     They cannot change it?  And the reason

12    they can't change it is because of Exhibit 2?

13          A.     Yes.

14          Q.     Okay.  You testified that while you

15    were at Ford, you were told to try to get to work

16    30 minutes before the start of the shift, and you

17    did that, right?

18          A.     Yes.

19          Q.     Were you paid for that 30 minutes?

20          A.     No, sir.

21          Q.     Was that the policy that you didn't

22    get paid for the 30 minutes that you'd show up

23    early?

24          A.     That was like -- kind of like your
```

1    comp time.  Is that what you're talking about?

2         Q.    Well, you say "comp time."  I mean,

3    did you get additional time off in lieu of pay for

4    showing up 30 minutes early?

5         A.    No, sir.

6         Q.    So that time, in essence, you showed

7    up and you kind of gave that time to the company,

8    if you will?

9         A.    Yes, sir.

10        Q.    Okay.  You testified, Ms. Blanco,

11   about the BOM job, I believe that you referred to

12   that you received in 2000.  And I just want to make

13   sure, is that strictly a ZF Batavia issue?  In

14   other words, do your concerns regarding not getting

15   paid and not keeping that promotion, does that

16   involve Ford in any way?

17        A.    Yes, sir.

18        Q.    Okay.  How does it involve Ford?

19        A.    We were supposed to have a committee

20   or that's what I stated occurred in our meetings

21   that we would have a Ford -- to oversee.

22        Q.    I guess I need a little more

23   explanation.  You were supposed to have a committee

24   to oversee what?

94

1          A.    Oversee the Ford transition people.

2          Q.    Just oversee the Ford transition

3     people or --

4          A.    And Ford.

5          Q.    -- to oversee the whole plant?

6          A.    Right.

7          Q.    The whole plant?  And that was a

8     committee that had some Ford people on it and some

9     ZF people on it; is that right?

10          A.    No.  It was just going to be Ford

11     because it -- just Ford.

12          Q.    Okay.  And who told you that there was

13     going to be such a committee?

14          A.    It was in a meeting.

15          Q.    In the May 27th meeting?

16          A.    Yes, sir.

17          Q.    Do you remember who said that in the

18     May 27th meeting?

19          A.    No, sir.

20          Q.    I've -- as I've looked through Exhibit

21     4 a number of times, I've never seen any reference

22     to the existence or the plan for such a committee.

23     Were there any slides put up about this committee?

24          A.    No, sir.  It was just verbal.

1          Q.    Was there discussion at this meeting

2    about there's going to be a board of directors at

3    ZF Batavia?  Was that discussed?

4          A.    There was going to be -- like there's

5    49 percent, they were going to have some Ford and

6    some ZF.

7          Q.    Okay.

8          A.    That was mentioned.

9          Q.    Okay.  And when you say there was

10   going to be a committee, is that what you're

11   referring to, this discussion that there was going

12   to --

13         A.    No, sir.

14         Q.    -- be some Ford and some ZF on a board

15   of directors?

16         A.    No, sir.

17         Q.    So your understanding was there would

18   be a separate committee?

19         A.    Yes, sir.

20         Q.    And who was this committee going to

21   report to, do you know?

22         A.    They never stated.

23         Q.    Who was going to be on the committee,

24   do you know?

```
 1          A.    No, sir.

 2          Q.    Was it going to be people from Batavia

 3   or from outside Batavia?

 4          A.    They didn't get into specifics.

 5          Q.    And when you say "they," is there more

 6   than one person that communicated --

 7          A.    I -- that was just a --

 8          Q.    -- this to you?

 9          A.    -- phrase.  I -- someone -- person,

10   whoever, I cannot remember who it was.

11          Q.    Okay.  Do you have Exhibit 4 in front

12   of you?  If you could get Exhibit 4 in front of

13   you.  If you would, turn to the second page of that

14   document, which is Bates stamped number one.  It

15   lists an agenda.

16                Other plaintiffs in this case have

17   told me that their understanding was that what

18   was -- who spoke on which topic pretty well

19   followed the agenda at the meeting.  Is that your

20   understanding as well?  Do you remember it that

21   way?

22          A.    Yes.

23          Q.    Okay.  As you see these names now in

24   front of you, does that refresh your recollection
```

1    at all as to who may have discussed this committee

2    concept?

3          A.    No, sir.

4          Q.    Do you know, are you able to rule any

5    of these people out and say, well, he definitely

6    didn't discuss the committee?

7          A.    No, sir --

8          Q.    Okay.

9          A.    -- I can't.

10         Q.    Are you sure it's one of these people

11   that's even listed here?

12         A.    No, sir.

13         Q.    I'm not trying to be difficult.  I'm

14   just trying -- trying to figure it out.  And what

15   was your understanding this committee was going to

16   do?

17         A.    Oversee that everything was followed.

18         Q.    That what was followed?

19         A.    Just the -- oversee of the plant.

20         Q.    The entire operations of the plant?

21         A.    No.  ZF -- Ford transition people and

22   Ford people.

23         Q.    Okay.  So they were going to -- I'm

24   just -- I'm just not following because I wasn't

1    there.  Were they going to make sure that Ford

2    people and transitional were doing their jobs or

3    what was the committee going to do?

4         A.    To make -- I'm paraphrasing.

5         Q.    Sure.

6         A.    I -- you know, I don't know the exact

7    terminology.  It was more of everyone joining

8    together and everything working out and everybody

9    being treated fairly.  That's -- I'm paraphrasing

10   and I'm making it my own --

11        Q.    Okay.  You never saw anything in

12   writing about the committee, did you?

13        A.    No, sir.

14        Q.    That must have concerned you, I would

15   assume, right?

16        A.    No, sir.

17        Q.    Well, I thought you testified earlier

18   that it was important to you to get things in

19   writing?

20        A.    It was.  This was -- this was very

21   important to get this in writing, yes.

22        Q.    But there's nothing in Exhibit 2 -- I

23   know you would agree there's nothing in Exhibit 2

24   about the committee.  So why didn't it concern you

1   that you had nothing in writing about this

2   committee?

3        A.    Because what they went through here

4   was written here.

5        Q.    Okay.  But you said they went through

6   the committee at the meeting, and yet it wasn't

7   written in Exhibit 2?

8        A.    'Cause with Ford, if you did your job

9   everything -- they took care of it.

10       Q.    Okay.  But you weren't going to be

11  with Ford anymore.

12       A.    But we were Ford transition.  We were

13  going to be treated like -- it was going to be --

14  not treated.  I don't want to use that word.  We

15  were going to have Ford benefits, Ford -- be like

16  Ford.

17       Q.    You understood clearly, though, that

18  you weren't going to be working for Ford anymore?

19       A.    That's correct.

20       Q.    Okay.  And how does the -- this

21  committee, how does that relate to the BOM job and

22  the issues with that that you testified about?

23       A.    Because they would have oversaw that

24  situation.

```
 1          Q.     Okay.  Who offered you the BOM job?

 2          A.     Hassan Saleh and Dick Newark.

 3          Q.     And at the time, both Mr. Saleh and

 4   Mr. Newark offered you that job, they were both ZF

 5   employees, correct?

 6          A.     Yes.

 7          Q.     No Ford employee offered you that job,

 8   did they?

 9          A.     No, sir.

10          Q.     Did you ever complain to anyone from

11   Ford about the issues with that job?

12          A.     No, sir.

13          Q.     Have you ever complained to anyone

14   from Ford about any of your issues in this case,

15   you personally?

16          A.     I would rather not state.  There's

17   just certain things -- I'm sorry.  But there are

18   certain things that I will not -- I cannot --

19               MR. SIMON:  Hold on one second.  I

20   think we're back to the same issue we were before.

21   I just -- all I'm asking is just a courtesy.  Once

22   you finish your questioning, we'll take a break and

23   try to address those questions.

24               MR. VANWAY:  I understand and we'll do
```

1    that.  I just want to make sure that -- my question

2    was different.  And if you still need some time

3    before you want to answer it, we can do that.

4              But my question was not the one before

5    about who complained to Ford, but it was a question

6    of whether you specifically ever complained to

7    Ford.  You understood that's the question I was

8    asking, right?

9              THE WITNESS:  Yes.

10              MR. VANWAY:  Okay.  As a matter of

11    courtesy, we'll come back to that.

12              MR. SIMON:  Thank you.

13    BY MR. VANWAY:

14         Q.    With respect to the CVT, you weren't

15    ever promised a specific job at CVT, were you?

16         A.    No, sir.

17         Q.    And no one ever said that you would

18    have a CVT job by the year 2003, did they?

19         A.    No, sir.

20         Q.    It was just your understanding that at

21    some point in the future, there'd be an opportunity

22    in CVT?

23         A.    "Be on the ground floor," quote,

24    unquote.

```
 1          Q.    And so far that hasn't happened?

 2          A.    That's correct.

 3          Q.    Okay.  I noticed as you testified

 4     today that several times you referred to

 5     conversations with Mr. Saleh.  And I think each

 6     time that you did, you referred to him as someone

 7     that had been your friend.  And maybe it was --

 8     maybe I misunderstood, but it seemed like every

 9     time you did that, it was past tense.

10          Do you no longer regard Mr. Saleh as a

11     friend?

12          A.    Oh, I've got -- no, I'm not -- I don't

13     want to.

14          MR. SIMON:  I think you've hit another

15     sensitive area.

16          THE WITNESS:  Yeah.  I want to tell

17     you something.

18          MR. SIMON:  Hold on one second.  Can

19     we take a break?  I know there's a question

20     pending.

21          MR. VANWAY:  If it will help get the

22     answers to the three questions --

23          MR. SIMON:  Yeah, I think --

24          MR. VANWAY:  -- pending now.
```

103

```
1                    MR. SIMON:  -- we need them.

2                    MR. VANWAY:  Sure.

3                    MR. SIMON:  Thank you.

4                    MR. VANWAY:  Okay.

5           (Off the record:  1:10 p.m. - 2:26 p.m.)

6           Q.    Ms. Blanco, you understand you're

7      still under oath?

8           A.    Yes.

9           Q.    Do you know an employee by the name of

10     Eddie Adams?

11          A.    Yes, sir.

12          Q.    Have you had any conversations with

13     Eddie Adams about this lawsuit?

14          A.    They knew we were on -- everybody

15     knows that -- conversation --

16                    MR. SIMON:  The question is, have you

17     talked to Eddie Adams --

18          Q.    Have you spoken to him about the

19     lawsuit?

20                    MR. SIMON:  -- about the lawsuit?

21          A.    You know, I can't remember.

22          Q.    Okay.  You know, if he's aware of it,

23     I don't care.

24          A.    I'm being -- I'll be honest.
```

1          Q.    I appreciate that.  Okay.

2          A.    I have not a clue.  People have come

3    up --

4          Q.    Sure.

5          A.    I have not a clue.

6          Q.    The reason I ask, he is listed by your

7    lawyers as a potential witness at the trial of this

8    case.  Do you have any information as to why Eddie

9    Adams might be a witness at the trial of this case?

10          A.    No, sir.

11          Q.    Are you aware --

12          A.    I mean, I have not --

13          Q.    Okay.

14          A.    -- a clue.

15          Q.    Are you aware of any knowledge that he

16    has that's relevant to the issues in this case?

17          A.    No, I have no idea at this time.  I

18    mean, I --

19          Q.    Okay.

20          A.    I don't know.

21          Q.    That's all I need on that one.  Thank

22    you.  Your wages now, your salary now is higher

23    than it was when you left Ford, isn't it?

24          A.    Yes.

```
 1        Q.     And it's -- you've gotten an increase
 2   every year since you've been with ZF Batavia?
 3        A.     Yes.
 4        Q.     With regard to the BOM job that we
 5   talked about earlier, when you were offered that
 6   job, did anyone tell you it was a permanent move?
 7        A.     They didn't say it was -- no.
 8        Q.     I understand.  They didn't say it
 9   wasn't, but they didn't say it was, either, right?
10        A.     (Witness nodded.)
11        Q.     Okay.  And I just need you to answer
12   out loud.
13        A.     Oh, yeah.
14        Q.     Okay.  When you accepted that job,
15   were you given a choice or were you just told
16   you're taking the BOM job?
17        A.     I can't remember.  If you need me to
18   train, I can train.  If you need me to do this, I
19   do that.  I'll --
20        Q.     Okay.  Did anyone at the time they
21   offered that position, did anyone tell you that you
22   would get a raise?
23        A.     I talked to Dick Newark after the
24   fact, after he saw what I had accomplished in that
```

```
1    and I said -- you know, I didn't -- our -- and I

2    talked to Dick Newark.

3         Q.    Okay.  Afterwards?

4         A.    After, yes.

5         Q.    Prior to the -- prior to or at the

6    time you accepted it, did anyone tell you that you

7    were going to get a raise for that job?

8         A.    No.

9         Q.    Okay.

10        A.    It was just a given.

11        Q.    You thought it was a given?

12        A.    Yes.

13        Q.    Okay.  Now, Ms. Blanco, there were

14   three questions from this morning's session that I

15   asked you and I know that you were reluctant to

16   answer.  We've taken a considerable break and my

17   understanding is that now you will answer those

18   questions, as long as we place that testimony under

19   seal.  Do I have that correct?

20        A.    That's correct.

21        Q.    Okay.

22        A.    I can do that.

23        Q.    Great.  The questions from this point

24   forward are going to be those that are under seal,
```

107

1    then.

2         A.    Okay.

3                              *  *  *

4      CONFIDENTIAL MATERIAL UNDER SEPARATE SEAL, PAGE

5    108.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24