1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF OHIO

 3                 WESTERN DIVISION, CINCINNATI

 4
       EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
 5
              Plaintiffs,         : Judge Beckwith
 6
       V.                         : Magistrate Sherman
 7
       ZF BATAVIA, LLC, et al.,   :
 8
              Defendants.         :
 9     _____

10         Deposition of JAMES E. CRUMP, taken on

11     Tuesday, August 12, 2003, commencing at 2:26 p.m.,

12     at the offices of Baker & Hostetler LLP, 312 Walnut

13     Street, Suite 3200, Cincinnati, Ohio, before

14     Susan M. Barhorst, Notary Public.

15

16

17

18

19

20

21
                   GIGLIO REPORTING SERVICES
22                    3 CYPRESS GARDEN
                   CINCINNATI, OHIO 45220
23                    513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3      Stephen A. Simon, Esq.
        22 West Ninth Street
 4      Cincinnati, Ohio 45202

 5   On behalf of Defendant ZF Batavia, LLC:

 6      John J. Hunter, Jr., Esq.
        Hunter & Schank Co., L.P.A.
 7      1700 Canton Ave.
        Toledo, Ohio 43624
 8
     Also present:
 9
        Herb Huebner
10
     On behalf of Defendant Ford Motor Company:
11
        Jeffrey L. VanWay, Esq.
12      Baker & Hostetler LLP
        312 Walnut Street, Suite 3200
13      Cincinnati, Ohio 45202

14
     Cross-Examination
15
        by Mr. Hunter                    4
16
        by Mr. VanWay                   65
17

18

19

20

21

22

23

24
```

3

| 1 | CRUMP DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 2 | 2 | 7 |
| 3 | | |
| 4 | 97 | 87 |
| 5 | | |
| 6 | 111 | 31 |
| 7 | 112 | 36 |
| 8 | 113 | 86 |
| 9 | 114 | 88 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    JAMES E. CRUMP

 2   being first duly sworn, testified as follows:

 3                    CROSS-EXAMINATION

 4   BY MR. HUNTER:

 5        Q.    Sir, will you please state your name

 6   for the record?

 7        A.    James E. Crump, spelled with a "C."

 8        Q.    Mr. Crump, what's your current

 9   address?

10        A.    1101 Locus Corner Road, Cincinnati,

11   Ohio 45245.

12        Q.    Mr. Crump, you came into Mr. Steward's

13   deposition, kind of in progress.  And so let me

14   explain to you a little bit about the deposition

15   process for this afternoon, okay?

16        A.    Mm-hmm.

17        Q.    Generally a question and answer

18   format.  I'm going to ask you questions.  If at any

19   time you don't hear me, you don't understand what

20   I've said or for whatever reason, you just can't

21   answer the question fairly, I want you to stop me

22   and let me know, okay?

23        A.    Okay.

24        Q.    Is there anything today that would
```

1    prevent you from being able to go forward with your

2    deposition, in terms of a personal issue, a medical

3    issue or otherwise?

4          A.    No.

5          Q.    Have you ever been deposed before?

6          A.    No.

7          Q.    Ever been involved in any litigation

8    whatsoever?

9          A.    No.

10          Q.    With respect to this litigation, if I

11    use the term "Ford transitional employee," you

12    understand that that means an employee that

13    formerly worked for Ford Motor Company that

14    transitioned or became employed by ZF Batavia?

15          A.    That's correct.

16          Q.    Okay.  Are you a transitional

17    employee?

18          A.    Yes.

19          Q.    When did you start your service with

20    Ford Motor?

21          A.    April 30th, '79, 1979.

22          Q.    And what did you hire into Ford as?

23          A.    Electrician.

24          Q.    Is that in maintenance?

6

1      A.    Yes.

2      Q.    Did you have a title back then?

3      A.    Electrician.

4      Q.    Okay.  Is that a salaried position or

5  an hourly?

6      A.    Hourly position.

7      Q.    Were you covered under the collective

8  bargaining agreement?

9      A.    Yes.

10     Q.    At some point in time, did you become

11  a salaried person at Ford Motor?

12     A.    Yes.

13     Q.    When was that?

14     A.    December 19th, 1983.

15     Q.    And what was the position you took at

16  that point?

17     A.    Maintenance supervisor.

18     Q.    And how long did you hold that

19  position at Ford?

20     A.    I'm just getting my dates clear here.

21  Give me a few seconds.  Thank you.

22     Q.    Okay.

23     A.    'Cause several things took place at

24  the time.  In '90 -- '96, I became a temporary MPS.

7

1          Q.     Okay.

2          A.     And then I went back to being a

3    maintenance supervisor.

4          Q.     And why did you become a temporary

5    MPS?

6          A.     The MPS had taken a medical leave and

7    I went in as acting MPS.

8          Q.     And was that with the maintenance

9    department?

10         A.     Yes, it was.  "MPS" stands for

11   maintenance preventive -- maintenance planning

12   specialist.

13         Q.     And was this at Sharonville or Batavia

14   or where?

15         A.     Always at Batavia.

16         Q.     Okay.  Was Batavia open in 1979?

17         A.     Yes.  I was one of the first 18.

18         Q.     I was going to say you had to be first

19   in the door then or pretty close.  How long did you

20   take or fill the MPS position?

21         A.     Six months.

22         Q.     And then you went back to maintenance

23   supervisor?

24         A.     That's correct.

8

1          Q.    And is that the position you held at

2    the time you transitioned?

3          A.    I also then became reliability

4    maintenance engineer when -- in '90 -- '97.

5          Q.    Okay.  And how long did you hold that

6    position?

7          A.    That was about six months.

8          Q.    Okay.

9          A.    Then I went back to maintenance

10   supervisor again.

11         Q.    As the reliability in maintenance

12   engineer, was that a temporary position or --

13         A.    No, that was a change.  That position

14   was done away with when our new superintendent

15   took -- took over maintenance in '97, he did away

16   with reliability maintenance engineers.

17         Q.    When you moved from maintenance

18   supervisor to maintenance engineer, did you receive

19   a pay increase?

20         A.    No.

21         Q.    Did you receive increased

22   responsibilities?

23         A.    Side move.

24         Q.    So you didn't have more to do or you

9

```
 1   did?

 2         A.    It was a different position --

 3         Q.    Okay.

 4         A.    -- which I'm not understanding your

 5   question.  I'm sorry.

 6         Q.    Did you supervise the same number of

 7   people?

 8         A.    When I was a reliability maintenance

 9   engineer, I did not supervise anybody.

10         Q.    Okay.  Did it require more hours, more

11   work or just --

12         A.    About the same amount of hours.

13         Q.    Okay.  So you moved back, then, to be

14   a maintenance supervisor?

15         A.    Mm-hmm.

16         Q.    And how long did you hold that

17   position?

18         A.    Till I became a transitional employee.

19         Q.    And when you hired on with ZF Batavia,

20   I believe you hired on as a maintenance group

21   leader?

22         A.    Maintenance supervisor, yes.

23         Q.    Is there a difference between a

24   maintenance supervisor and a maintenance group
```

1  leader?

2          A.     There is no maintenance group leaders.

3          Q.     Okay.  Did you attend any of the

4   meetings at ZF Batavia regarding the transition to

5   becoming a ZF Batavia employee?

6          A.     Yes, I did.

7          Q.     Which meetings did you attend?

8          A.     There was one the first of -- around

9   the first of May.  I cannot recall the date

10  exactly.  My memory does not recall that date.  And

11  I went into another one on May 27th.

12         Q.     Okay.  What about the -- I don't know

13  if "meeting" is the right word, but where they made

14  the public announcement about the joint venture.  I

15  believe it was fourth quarter of '98.  They put up

16  a little screen out there in the plant by the

17  hospital.  Do you remember any of that?

18         A.     I was on vacation at the time.

19         Q.     Okay.  So the first kind of organized

20  or formal meeting that you had was on -- somewhere

21  around May 1st of 1999?

22         A.     About -- somewhere in the first week

23  of May.

24         Q.     First week?

```
 1          A.     Mm-hmm.

 2          Q.     And who attended that meeting?

 3          A.     There was several -- I don't recall.

 4    My memory doesn't recall who was in that meeting at

 5    that time.

 6          Q.     Do you remember anybody?

 7          A.     No.

 8          Q.     Do you remember what was said?

 9          A.     It was basically explained to us what

10    is a transitional employee.

11          Q.     Okay.  Anything more?

12          A.     No, not that -- not that my memory

13    recalls.

14          Q.     Sure, sure.  And I understand --

15          A.     Yeah.

16          Q.     -- it was four-plus years ago.

17          A.     Yes.

18                 MR. SIMON:  I'm sorry.  Mr. Hunter,

19    are you asking for every detail or just generally

20    what he remembers?

21          Q.     I'll take just anything you remember

22    about that meeting.

23          A.     Basically it was giving us -- some of

24    the stuff that comes back to my mind in my memory
```

1    was the pros of becoming a transitional employee,

2    what would be our benefits --

3          Q.    Okay.

4          A.    -- and their need for us at the time.

5          Q.    All right.  And so what was told to

6    you, in terms of the -- and I assume when you said

7    "pros," pros in terms of pros and cons?

8          A.    Yes.

9          Q.    Okay.  And so what was explained to

10   you at that point?

11         A.    They were going over -- or explained

12   in -- in some detail that -- boy, trying to recall

13   my memory.  At the time, they were explaining

14   that -- not moving our families -- you know,

15   becoming a part of the -- the new product, becoming

16   a member of a new plant -- you know, a new company.

17         Q.    Okay.  Anything else?

18         A.    My memory is just very vague on the --

19   on the meeting.

20         Q.    Is this a 10-minute meeting, a half

21   hour meeting, an hour?

22         A.    I cannot recall.

23         Q.    Did you receive any handouts at that

24   point?

1          A.     No.

2          Q.     Slides, any of that kind of stuff?

3          A.     It was basically a -- a very -- just

4     a -- some -- group of people, salary people.  There

5     was no hourly people in this meeting.  It was a

6     group of salary people that was taken in and

7     explained -- you know, it was a general meeting,

8     just a generalized meeting.

9          Q.     Okay.  You may have told me.  Was this

10    in the cafeteria?

11         A.     I don't recall.

12         Q.     Conference room or just don't recall?

13         A.     I don't recall.

14         Q.     You had, then, attended the meeting on

15    the 27th?

16         A.     That's correct.

17         Q.     Do you remember who spoke at that

18    meeting?

19         A.     No, I do not.

20         Q.     Do you remember in detail or otherwise

21    what was said at the May 27th meeting?

22         A.     They were going over the -- our

23    letter -- you know, received our -- and the -- the

24    agreement that we would be coming under.

14

1          Q.    And when you said they were going over

2     the letter, did they have --

3          A.    I'm sorry.  Not the letter.  You asked

4     me about a letter.  No, what was attached to our

5     letter.

6          Q.    Oh, if I use the term "gray

7     brochure" --

8          A.    I understand.

9          Q.    Okay.

10          A.    I understand what you're saying.

11          Q.    Exhibit 2, that one.

12          A.    Yes.

13          Q.    Is that what you were saying, they

14     went over this?

15          A.    Yes.

16          Q.    Okay.  Did they give copies out in the

17     May 27th meeting?

18          A.    I did -- I received mine with my

19     letter.

20          Q.    Okay.  And on the May -- as to the May

21     27th meeting, I think there were two on that date,

22     like a morning one or an afternoon one?

23          A.    I don't recall.

24          Q.    Do you remember what time the meeting

1   was that you went to?

2          A.    No, I do not.

3          Q.    Okay.  In the meeting in the first

4   week of May, they didn't go over this brochure, did

5   they?

6          A.    No.

7          Q.    Okay.  They went over it on the 27th?

8          A.    That's correct, in detail.

9          Q.    Okay.  And what did they say about

10  that?  Well, who was at the meeting on the 27th?

11         A.    As best as my memory recalls that

12  meeting, it was the people who had already -- or

13  who wanted or had an interest in becoming a

14  transitional employee.

15         Q.    Okay.  Do you remember who was there

16  from either ZF Batavia, ZF or Ford?

17         A.    At the time, it was Ford, Mike Warren.

18         Q.    Okay.

19         A.    He was our labor relations.  I mean,

20  our -- he was in charge of the salary personnel.

21         Q.    Okay.

22         A.    He was -- you know, he was the one

23  that -- you know, we were mostly talking to.  And

24  there was some representatives from Ford.  I don't

1    recall the names.  I'm sorry.

2         Q.    That's okay.  Was anybody there from

3    ZF Batavia?

4         A.    There was -- they did not speak to us.

5    In general terms, Mike Warren did all the -- most

6    of the speaking to us.

7         Q.    And when you say "Mike," it's Mike

8    "Warden," not "Warren"?

9         A.    Warden, I'm sorry, yeah.

10        Q.    Okay.

11        A.    Yes.

12        Q.    Mike Warren is the UAW --

13        A.    Yeah, I'm sorry.  You're right.

14        Q.    Just make sure we're --

15        A.    That's a correction on my part.

16        Q.    That's okay.

17        A.    Been too many years.

18        Q.    All right.  Do you remember

19   specifically what -- anything as to what Mike

20   Warden said?

21        A.    Basically he was going in detail on

22   our agreement, what we would be coming -- working

23   under -- the agreement we'd be working under, going

24   over details of the agreement with us and

1    explaining to us some of the benefits that would

2    be -- and the general terms that we would be coming

3    under.

4        Q.    Okay.  Do you remember what he

5    explained about anything, in terms of whether it's

6    salary or health benefits or overtime?  I don't

7    know, whatever --

8        A.    It was basically covering the health

9    benefits.  He was covering several things, the pay,

10   things of that nature.

11       Q.    Do you remember, what did he say about

12   pay?

13       A.    Basically the one agreement that we

14   would be covered under with our salary, as at the

15   moment, would be continued and then he went -- that

16   was our base pay.

17       Q.    Okay.  Did he say anything else about

18   pay?

19       A.    The overtime would be continued as --

20   as we would -- known it, as at the moment with our

21   base pay being certain amount.  We would get a flat

22   rate and if we were under that base, we would get

23   time and a half or -- yeah, time and a half or

24   double time on Sundays or holidays.

18

1              But if we was on a certain base, then

2      we would -- basically the same thing as Ford had

3      covered or was working under Ford.

4              Q.    Do you remember, did he use any

5      overhead or slides or anything like that?

6              A.    There was some overhead slides, yes.

7              Q.    Okay.  Anything else that he said

8      regarding pay or overtime pay?

9              A.    That's all my memory can recall at

10     this time.

11             Q.    Okay.  And you used the term that the

12     salary would be the same as of the moment, I think

13     was the phrase you used?

14             A.    Yes, that's the phrase I used.

15     Basically what my salary was at Ford at that

16     moment, that that's what my salary would be at

17     ZF --

18             Q.    Okay.

19             A.    -- starting salary would be at ZF.

20             Q.    Okay.  And I think you used that same

21     phrase to describe the overtime?

22             A.    The overtime, what -- I was governed

23     by my overtime at the moment when I would become a

24     transitional employee would be the same with ZF.

1      Q.    All right.  And so that your

2   understanding was that if you made the move as a

3   transition employee, the overtime would be the same

4   rate of pay and you explained flat rate --

5      A.    Yes.

6      Q.    -- holiday --

7      A.    That's correct.

8      Q.    -- as it was at that time at Ford?

9      A.    That's correct.

10      Q.    Is that your complete understanding as

11   to what the overtime was to be?

12      A.    That's correct.

13      Q.    Okay.  Did Mr. Warden speak at all

14   about personal days, sick leave, any of that?

15      A.    They were giving -- they were

16   outlining some of our benefits and things and he

17   said we would be given five personal days --

18      Q.    Okay.

19      A.    -- to be used at our discretion.

20      Q.    Okay.  Did he say anything about

21   bereavement?

22      A.    Bereavement, I don't recall.

23      Q.    Okay.  And obviously the five

24   personnel (sic) days was not the same as it was at

1    Ford because you actually had more than that at

2    Ford --

3         A.    Yes, I did.

4         Q.    -- didn't you?  All right.  So you

5    didn't understand that that was going to stay the

6    same as Ford?

7         A.    I was understanding when -- when he

8    was speaking and he was telling us about our

9    agreement, that that's what we would be getting,

10   five days.

11        Q.    And, again, not that it was the same

12   as what it was at Ford?

13        A.    No.

14        Q.    Okay.  And with respect to

15   bereavement, I think you said that as a

16   transitional, you would receive three bereavement

17   days?

18        A.    I would receive what the agreement was

19   in the folder.  I'm sorry.  My memory is not the

20   greatest in the world.  That's what I would be

21   getting.

22        Q.    Okay.

23        A.    But that would be family members.  I

24   do remember that it would be family members.  In

```
 1    other words, it couldn't be the cat and the dog

 2    and --

 3         Q.    Sure.  Under the -- excuse me.  Under

 4    the Ford policy, would you have gotten those

 5    bereavement days for the cat and the dog?

 6         A.    No.

 7         Q.    Okay.  And I got -- I'm not making

 8    light of that, but I guess --

 9         A.    I understand.

10         Q.    Are you telling me that, in a sense --

11         A.    He was explaining to me what the

12    bereavement in the agreement was all about.

13         Q.    Okay.  And that was apparently going

14    to be, then, a little different than what it was at

15    Ford?

16         A.    Yes.

17         Q.    Okay.  And you understood that?

18         A.    I understood that.

19         Q.    Do you remember, did he discuss

20    vacation?

21         A.    My vacation would be grandfathered.

22    Whatever I had at the time, I would have at ZF.  I

23    had five weeks.

24         Q.    I was going to say, I'd have to do a
```

1    little math here, but I think you're a five-week

2    guy, aren't you?

3          A.    Yes.

4          Q.    Okay.

5          A.    I knew that was your next question.

6          Q.    Okay.  Now, when I look at the gray

7    brochure, Exhibit Number 2, I -- one second.  I

8    see, for example, in the gray brochure that it says

9    that you can accumulate up to four weeks of

10   vacation?

11         A.    That's correct.

12         Q.    Okay.  You were -- I think the term

13   you used -- grandfathered in?

14         A.    That's correct.

15         Q.    And when you say you, it's not you,

16   personally, Jim Crump, but anybody that had five

17   weeks --

18         A.    Anybody that had over 20 years of

19   service with Ford Motor Company and was receiving

20   five weeks at the time would get the five weeks.

21         Q.    Okay.

22         A.    They would not take any vacation away

23   from you.

24         Q.    Okay.  And you understood that to the

1    extent that you had -- I'm sorry.  -- that the

2    transitional had less than the 20 years' worth of

3    service, they were governed by the vacation

4    schedule set forth in the brochure?

5         A.    If -- now, one thing that they were

6    saying is I, being maxed out on vacation, I could

7    not buy a week of vacation.

8         Q.    Okay.  And that's -- and that isn't

9    set forth in the gray brochure, though, either, is

10    it?  You have it in front of you.

11         A.    Yes, I'm sorry.

12         Q.    I don't see that in there where it

13    talks about that.

14         A.    Give me a second.  Let me get my --

15    vacation was -- the transitional employees who had

16    less than four weeks, that was the max they could

17    get with this agreement and they could buy one

18    week.

19         Q.    Okay.  What you had said to me,

20    though, was I was maxed at five weeks and I

21    couldn't -- because I'm at five weeks --

22         A.    Right.

23         Q.    -- I couldn't buy a week's vacation?

24         A.    That's correct.

1          Q.     Okay.  And, again, my only question

2     was, that certainly wasn't in the gray brochure,

3     was it?

4          A.     It says here, 15 years plus.  That's

5     four weeks, plus buying five days gives you five

6     weeks.  I was already at five weeks.

7          Q.     Understood.  And maybe I'm just not --

8          A.     Maybe I'm not understanding your

9     question right now.

10          Q.     Nowhere in the gray brochure does it

11     say if you've got five weeks, you can't buy the

12     additional sixth week?

13          A.     If I read this correctly, which I

14     think that I do, I have four weeks vacation.  I can

15     buy five days of vacation.

16          Q.     Understood.  But that's all it says.

17     It doesn't say anything about somebody who already

18     has five weeks and their ability to buy or not buy

19     a week's vacation?

20          A.     In my terminology, in my best -- if I

21     would term -- if I would take this and read it the

22     way I read it, four weeks plus five days equals --

23     four weeks plus five days equals five weeks.  That

24     is the max you can have under this agreement --

1          Q.     Okay.

2          A.     -- and that's what I had already.

3          Q.     Okay.

4          A.     So that meant I could not have any

5    more than five weeks.

6          Q.     Now, I think -- now I understand where

7    you're coming from there.  All right.  Were there

8    any other discussions at that meeting -- and,

9    again, I guess we're talking about the 27th, all

10   right?  With respect to the annual incentive

11   plan --

12         A.     The -- are you talking about our

13   profit sharing?

14         Q.     Well, ZF Batavia doesn't have profit

15   sharing.

16         A.     Okay.  I'm sorry, AIP.

17         Q.     Okay.  You would acknowledge ZF

18   Batavia doesn't have a profit sharing plan?

19         A.     They have an AIP --

20         Q.     Okay.

21         A.     -- which I term as a profit sharing.

22         Q.     All right.  Was there any discussion

23   about that AIP/profit sharing at this May 27th

24   meeting?

```
 1          A.    There were certain incentives that we

 2     would, as a plant, have to come under and quality,

 3     safety and some of those other -- you know,

 4     guidelines would be given to us.  As a plant, each

 5     employee would be given a profit sharing -- or I'm

 6     sorry.  AIP bonus under these terms.

 7          Q.    If these measurables were met?

 8          A.    That's correct.

 9          Q.    And that certainly couldn't mirror

10     Ford's because, again, Ford didn't have an annual

11     incentive plan?

12          A.    Ford Motor Company -- my memory is

13     going to have to go back on this one.  Ford Motor

14     Company changed their plan, which was going to

15     reflect certain rules of about how your plant was

16     going to function and under these certain or

17     similar guidelines under -- if your plant was

18     profitable, if your plant was -- safety and all

19     those other things.  I do not recall if I ever fell

20     underneath those guidelines.  I don't recall.

21          Q.    Okay.  Did Mr. Warden or anybody else

22     discuss anything further with respect to the annual

23     incentive plan at this meeting?

24          A.    That was -- in my memory, the
```

1    guidelines that he gave us at the time was what we

2    was going to be governed under.

3         Q.    Okay.  And we've discussed those so

4    far?

5         A.    Not -- best of my memory.  I'm just --

6    I gave you a general layout, not a total.  I can't

7    recall all of them, but majority was quality,

8    safety and the -- the ability of the plant to make

9    a profit.

10        Q.    Okay.

11        A.    And if -- 'cause I'm sure my memory is

12   a little short here and there's probably some other

13   things.

14        Q.    Okay.  But those are things, basically

15   the measurables?

16        A.    All the measurables --

17        Q.    Okay.

18        A.    -- that's correct.

19        Q.    Other than the measurables, do you

20   remember anything else, in terms of the discussion

21   about the annual incentive plan?

22        A.    Not at this time, I do not recall.

23        Q.    Okay.  What about anything to do with

24   merit increase?

1          A.     Merit increase would be based upon our

2     annual -- let me get my words -- my words here

3     right -- performance review.

4          Q.     And that would be the individual

5     annual performance review?

6          A.     That's correct, and it would be

7     delivered on April the 1st.

8          Q.     And so if your performance reviews

9     were good, you would expect a good merit increase?

10         A.     That's correct.

11         Q.     And if they were bad, then you

12    shouldn't expect a good merit increase?

13         A.     That's correct.

14         Q.     And it was based on individual

15    performance?

16         A.     That's correct.

17         Q.     Do you remember anything further with

18    respect to what was represented at the meeting

19    about merit increase or otherwise?

20         A.     That's all I can recall at this time.

21         Q.     Do you remember, with respect to the

22    plaintiffs in this litigation, do you remember of

23    those plaintiffs -- and I think there's 15 people,

24    14 including yourself.  Of those 14, which of them

1   were at this meeting with you?

2        A.     I cannot recall.

3        Q.     In regard to making your decision to

4   come over to ZF Batavia, did you have any

5   conversations with other Ford or Ford transitional

6   employees?

7        A.     No.

8        Q.     Do you remember kind of at what point

9   in time that you decided, Hey, I'm going make this

10  decision to come over?

11       A.     I was given a letter --

12       Q.     Okay.

13       A.     -- with this attached to it.  I was

14  asked to go over this.  This would be the agreement

15  that we would be going under.

16       Q.     And this is Exhibit 2, for the record.

17       A.     Exhibit 2 --

18       Q.     Okay.

19       A.     -- take it home, talk to my family,

20  see what they were considering or what they thought

21  about -- you know, staying or leaving or becoming a

22  transitional employee.  Come back and make a

23  decision upon what the family and what I thought

24  was best for me.  And I had a certain amount of

1   time to do that in.

2        Q.   Do you remember who gave you the

3   letter?

4        A.   I -- in my -- trying to think who my

5   boss was back then.  At this time, I'd say, no, I

6   do not remember.  My memory does not --

7        Q.   Could it be John Zielke?

8        A.   No.  I work for maintenance.

9   Maintenance, it would have to either been Hassan --

10       Q.   Okay.

11       A.   -- Saleh, Mike Conners, who was a MPS

12  at the time.  But I cannot -- I'll be honest.  I

13  cannot recall or it could have been my manager.

14       Q.   Who would that have been?

15       A.   Production manager would have been --

16  think here for a second.  They change so often.  I

17  can't -- it's just like playing cards.  In '99, I

18  do not recall.

19       Q.   Okay.  And that's okay.  Is it

20  possible Mike Warden gave you that or no?

21       A.   No.

22       Q.   Okay.

23       A.   I was -- given to me on the floor.

24       Q.   And I think you told me that you had

1    the gray brochure prior to this May 27th meeting?

2            A.    That's correct.

3            Q.    And that's because you got your hire

4    letter prior to the May 27th meeting?

5            A.    That's correct.

6            Q.    And, in fact, I think you signed your

7    hire letter and accepted employment prior to the

8    May 27th meeting?

9            A.    That's correct.

10           Q.    Mr. Crump, we've handed you what we've

11   marked for identification purposes as Exhibit 111.

12   Would you take a moment to review that for me?

13           A.    Yes.  Okay.

14           Q.    Is that your hire letter?

15           A.    Yes, it is.

16           Q.    And that's your signature down there

17   at the bottom?

18           A.    Yes, it is.

19           Q.    And that was signed on May 25th, 1999?

20           A.    That's correct.

21           Q.    You had made the comment before that

22   there was no such thing as a maintenance group

23   leader?

24           A.    My memory -- I've always been called a

1    maintenance supervisor.

2         Q.    Okay.

3         A.    I don't recall ever being called a

4    maintenance group leader.  A group leader was

5    always in production.

6         Q.    Okay.  There was a transition bonus

7    payable to you in the amount of $19,500.

8         A.    That's correct.

9         Q.    Did you receive that transition

10   monies?

11        A.    Yes, I received three payments.

12        Q.    Okay.  And you see that in the letter

13   at bullet point two, it says that that transition

14   bonus is defined to address the monetary

15   differences between Ford benefits and ZF Batavia's

16   new plan.  To your understanding, is that sentence

17   accurate?

18        A.    The way that I read this is, yes, it

19   is correct because of the fact if -- if we go back

20   to Exhibit 2, we had to get rid of our Ford

21   stock --

22        Q.    Okay.

23        A.    -- and sell.  At the time we could not

24   hold Ford stock, so I -- with this bonus, I was

1    understanding that it was going to compensate me

2    for any loss that I would receive as becoming a

3    transitional employee.  If I would read that as

4    such, yes, that statement is true.

5         Q.    All right.  Well, let's talk about it

6    because I -- I don't see the -- I don't think I

7    understand fully the Ford stock issue because my

8    understanding is that you would have sold the Ford

9    stock, okay, but invested it basically into some

10   other Fidelity funds?

11        A.    That's correct.

12        Q.    Okay.  So I'm not sure how that would

13   be a loss.

14        A.    Because of the fact that what we

15   bought the stock for and what we would have -- we

16   had to change it over by October of '99.

17        Q.    Okay.

18        A.    And -- and at that -- if there were

19   going to be a loss at the time, which there was,

20   then we would be -- this would be part of the

21   compensation to help us -- you know, it would just

22   basically -- anything we were going to lose in

23   becoming a transitional employee, either through

24   the stock plan, through -- boy, I wish my memory

```
 1   was better than this.  And other -- you know,

 2   really basically it didn't mean that we was going

 3   to get a -- this here was just explained to us that

 4   this was a bonus to help us.  It was a sign-up

 5   bonus.

 6        Q.    Well, I see a signing bonus thing in

 7   the first bullet point for 750 bucks.

 8        A.    That's right.  That's a

 9   one-time bonus, that's correct.

10        Q.    Okay.  And I see again in the last

11   sentence, it talks about the monetary differences

12   between Ford benefits and Batavia's new plan.  And

13   so --

14        A.    Some of this was medical also --

15        Q.    Okay.

16        A.    -- and my memory cannot tell you

17   exactly what the difference in the medical plans

18   was.  First of all, I know there was no vision plan

19   at ZF --

20        Q.    Okay.

21        A.    -- or for a transitional employee.  I

22   want to use that word.  There was not going to be

23   any vision plan at the time.

24        Q.    Well, you talked before that -- and
```

1    vacation was going to be reduced, particularly in

2    terms of -- you got your five weeks, but there are

3    other transitionals that didn't.

4          A.    Mm-hmm.

5          Q.    And so was that addressed towards that

6    issue?

7          A.    I cannot answer for those people.

8          Q.    Okay.  Well, in terms of what was

9    represented to them --

10          A.    I can't answer for them.  I can only

11    answer for myself.

12          Q.    Okay.  What about the differences in

13    terms of any other benefit or compensation, do you

14    have an understanding as to whether or not it

15    addressed those issues?

16          A.    Basically the one was a medical --

17          Q.    Okay.

18          A.    -- and the vision plan was one.  That

19    was going to help, and plus the -- there was -- if

20    there was a question on changing doctors 'cause --

21    you know, we was going under a different plan and

22    also a dentist.

23          Q.    Okay.  And, again, this was your

24    understanding from this meeting on May 27th of

1   1999?

2        A.    When the benefits were totally -- in

3   the May -- the first meeting, we were told we'd

4   receive a bonus.

5        Q.    Okay.

6        A.    Not how much, nothing like that.  And

7   basically was sort of generalized it that it was

8   going to cover some of the losses that we were

9   going to receive as becoming a ZF employee.

10       Q.    And this was --

11       A.    First meeting.

12       Q.    -- the first meeting there in the

13  first part of May?

14       A.    Yeah, a general meeting.

15       Q.    Okay.  Because you -- it had become

16  pretty obvious then that things were going to be

17  different and you were going to suffer a change,

18  and perhaps a detriment, in terms of your overall

19  compensation?

20       A.    In the terms of medical, there were

21  going to be some changes, yes.

22       Q.    Okay.  Mr. Crump, we've given you

23  Exhibit Number 112 and I would ask that you take a

24  moment to review that document.

1        A.    I'm familiar with the document.

2        Q.    Okay.  And that's your -- the

3    application that you had signed and gave to ZF

4    Batavia?

5        A.    That's correct.

6        Q.    And that's your signature that appears

7    three times on the second page of Exhibit 112?

8        A.    That's correct.

9        Q.    Okay.  And you read that document

10    before you signed it?

11        A.    Yes.

12        Q.    Okay.  You think you understood that

13    document?

14        A.    Yes.

15        Q.    I've obviously at this point spoken

16    with a number of the Ford transitional employees

17    and understand that there are some issues with

18    those employees as to certain representations,

19    promises, commitments, whatever you want to call

20    them, that they feel were made to them and not

21    followed through on by ZF Batavia.

22            Do you believe that to be the case,

23    that ZF Batavia has not followed through on certain

24    commitments or promises to you?

38

```
 1          A.    I feel that the agreement that I came

 2    under as a transitional employee, some of it has

 3    not been followed through, yes.

 4          Q.    Okay.  Can you just run me through

 5    what those issues would be?

 6          A.    I can recall two; one is overtime.

 7          Q.    Okay.

 8          A.    And the other one that really stands

 9    out is the profit sharing -- or the AIP.

10          Q.    Okay.

11          A.    But they're -- and those are the two

12    that really stand out.

13          Q.    Okay.  Let's talk about overtime.

14    What's the -- what hasn't Batavia done that you

15    believe it should have with respect to overtime?

16          A.    Year 2001 -- let me get my thoughts

17    clear about it.  I don't want to get my years mixed

18    up here.  I work so much, I -- yes, year 2001.  I

19    did not -- we were told that -- gosh, there was so

20    much that happened.

21          Q.    Let me see if I can help you a little,

22    but I don't want to put words in your mouth.  But

23    are you --

24          A.    No, I appreciate the help.
```

```
 1          Q.    Are you one of the employees that

 2    worked weekends, like three weekends and didn't get

 3    paid?

 4          A.    That's correct.

 5          Q.    Okay.  Because I've asked who was

 6    involved --

 7          A.    Yes.

 8          Q.    -- in that and nobody can --

 9          A.    I was one of them.

10          Q.    If they didn't get paid, they could

11    tell me, but they can't tell me who else.  All

12    right.  So you're one of those folks?

13          A.    That's correct.

14          Q.    And, as I understand it, there were

15    three weekends, and you may have worked one or two

16    shifts on those weekends on scheduled overtime; you

17    just didn't get paid for that overtime?

18          A.    That's correct.

19          Q.    Okay.

20          A.    That was year 2002.  I'm sorry.  That

21    was last year.  Let me think.  There was two things

22    that happened.  One thing happened in 2001; one

23    happened in 2002.

24          Q.    Okay.  Because I thought that I had
```

1    been told before that was 2001, but all right.

2        A.    My mind, like I said, my memory is --

3            MR. SIMON:  I won't chime in.  Go

4    ahead.

5        A.    My memory, sometimes I get things

6    confused.

7        Q.    All right.  But let's do this.

8    There's three weekends.  Now, do you remember how

9    many shifts you worked?

10       A.    I worked Saturday and Sunday, day

11   shift.

12       Q.    So you worked six days or -- well, six

13   days, six shifts and were unpaid?

14       A.    That's correct, plus during the week.

15       Q.    So you had -- during this same time

16   period, you had weekly overtime, I guess?  I don't

17   know --

18       A.    That's correct.

19       Q.    -- what else to call it --

20       A.    Sorry.

21       Q.    -- that was unpaid?

22       A.    That's correct.

23       Q.    All right.  So there were three

24   weekend shifts and then three weeks of overtime

1   that as well was not paid?

2         A.     There was -- at that time, all

3   overtime was not being paid, whether it was weekend

4   or weekly.

5         Q.    Okay.  You supplied your attorney with

6   certain documents, time slips, things like that.

7   Are those -- are those pay periods included in

8   those documents that you gave to your attorney?

9         A.    Yes.

10              MR. HUNTER:  All right.  Well, let's

11   see.  And I -- let's go off the record for one

12   second here.

13         (Off the record:  3:05 p.m. - 3:09 p.m.)

14         Q.    We've had a short discussion off the

15   record and have discussed Bates stamped documents

16   001901, 001904 and 001903, which I believe are

17   documents supplied by plaintiffs, as they are

18   salaried time statements for Mr. Crump.

19              And as I understand it, Mr. Crump,

20   these three documents that we referenced are your

21   salaried time statements for the periods ending

22   4/15/2002, 4/30/2002 and 5/15/2002, correct?

23         A.    That's correct.

24         Q.    Okay.  And as I further understand

1    these documents, the hours reflected in there as

2    actual starting time and actually quitting time are

3    the actual hours you worked?

4         A.    Correct.

5         Q.    And if the -- if it's blank in terms

6    of the compensable overtime column, that's not

7    because you didn't work the overtime.  That's

8    because you weren't permitted to be paid for that

9    overtime?

10         A.    That's correct.

11         Q.    Okay.  And I see, for example, now in

12    document 1904 for the entry Saturday, April 13th,

13    there is compensable overtime of eight hours?

14         A.    That was our last Saturday to work --

15         Q.    Okay.

16         A.    -- and get paid for overtime.  The no

17    pay started April the 15th.

18         Q.    Okay.  And then I see, for example, in

19    document 1901 a Saturday and Sunday, May 11 and

20    12th, again, eight hours of pay in there.  So

21    apparently you were paid for that overtime there in

22    May?

23         A.    We were told that Friday, if my memory

24    recalls, that we were being given enough money in

43

1    maintenance budget to cover us to be paid on those

2    two days, yes.

3        Q.    And then after May 15th, 2002 --

4        A.    It was a weekend-to-weekend basis.  If

5    we had money in our budget, if we was going to be

6    allowed to have money in our budget, we would be

7    told to put it on our overtime on a Friday.

8        Q.    Okay.  And just so that I understand,

9    are there any other overtime, whether weekend or

10   otherwise that you have worked, but not been paid

11   for, other than what is represented in these three

12   pages?

13       A.    Yes.

14       Q.    Okay.

15       A.    When overtime was restarted, I was

16   allowed to put down eight hours for Saturday and

17   eight hours for Sunday.  Daily overtime would not

18   be paid.

19       Q.    And how long did that continue where

20   the daily overtime was not paid?

21       A.    Still continues.

22       Q.    I guess I don't -- I don't understand

23   that.  You currently receive no overtime

24   compensation, except for Saturdays and Sundays

44

1   worked?

2       A.   The only time that I would ever get

3   any overtime, if I would be -- say, have a

4   supervisor who is off on third shift and have to

5   stay four hours over for him, I would get three

6   hours of pay for that.

7       Q.   Okay.

8       A.   Not four, but three because of the --

9   the rule says I have to work at least two hours

10  before I get an hour of overtime and that my boss

11  has never come back and changed that rule.

12      Q.   Who's your boss right now?

13      A.   Milt Gross.  And he has never

14  corrected any of my time sheets or given me any

15  extra hours for my overtime.

16      Q.   You've included in your

17  interrogatories a loss estimate of about $27,000.

18      A.   That's correct.

19      Q.   Okay.  What does that loss relate to?

20      A.   Like -- like my statement says, it's

21  the loss of the overtime that I have not been paid

22  and the one AIP bonus that I did not receive.

23      Q.   Okay.  I want to come back to the AIP

24  thing in a minute.  Still want to make sure I

1    understand the overtime.

2              At some point at ZF Batavia, you were

3    being paid what I'll all daily overtime?

4         A.    That's correct.

5         Q.    Okay.  And apparently that changed in

6    April of 2002?

7         A.    That's correct.

8         Q.    Okay.  Prior to April of 2002, do you

9    believe you were paid properly for the overtime

10   that you had worked prior to that date?

11        A.    No.

12        Q.    Okay.  What was improper prior to

13   April of 2002?

14        A.    The one-hour rule that we have to work

15   one hour of overtime -- I mean -- sorry.  Two hours

16   of overtime before we can get one hour of pay.  Not

17   one hour and 59 minutes, two hours.

18        Q.    Okay.  And what was inappropriate

19   about that?

20        A.    That sometimes, especially if you had

21   to stay over for certain individual who was off at

22   the time and you have to cover him, no matter if

23   you come in at 3:00 in the morning or stay over

24   till 7:30 at night, you only get three hours' pay.

1            And he -- he working four hours for

2    this individual who's a supervisor and because I'm

3    an MPS, does not mean I don't take a supervisor's

4    place when he's off 'cause I do.  I still only get

5    three hours' pay.

6        Q.    You got to help me with that part.

7        A.    Okay.

8        Q.    So you've got -- you've explained that

9    you've got a situation where you stay over because

10   what, somebody else --

11       A.    Is absent --

12       Q.    -- is absent?

13       A.    -- on vacation or absent.

14       Q.    Okay.  And so from your normal shift,

15   you would stay over --

16       A.    Four hours to cover half of his shift.

17       Q.    To cover half of his shift and

18   apparently somebody that comes on after you would

19   cover the other half?

20       A.    That's correct.

21       Q.    They would come in early or whatever?

22       A.    That's correct.

23       Q.    All right.  And you believe that you

24   should be paid four hours of overtime for covering

47

1    his shift?

2         A.    That's correct.

3         Q.    And why do you believe that?

4         A.    He would have been paid eight hours

5    and I think the people who takes his place, not

6    necessarily me, but anybody should get the eight

7    hours.

8         Q.    Okay.  All right.  Any other issues

9    with overtime?

10        A.    I think sometimes that the one-hour

11   rule is basically not fair because you have

12   meetings, et cetera, that you have to stay over

13   for, school or some kind of a training.  And it's

14   not necessarily -- I think you're getting -- you

15   should be paid for -- for work rendered.

16        Q.    Okay.  And you just -- your opinion --

17   to paraphrase, you just think that's unfair that

18   you're not being compensated for that?

19        A.    If you're asked to stay, I think you

20   should be paid.

21        Q.    Okay.  Any other issues with respect

22   to overtime?

23        A.    No.

24        Q.    Okay.

```
 1        A.    Not at the time, I can't recall any,

 2   no.

 3        Q.    Okay.  All right.  Now, I told you I'd

 4   come back to it.  You mentioned there's an issue

 5   with your AIP bonus?

 6        A.    That's correct.

 7        Q.    Okay.  Tell me about that.

 8        A.    Okay.  For the year 2001 --

 9        Q.    Okay.

10        A.    -- we would have gotten a check in

11   2002, April somewhere.  I did not receive one.

12        Q.    And is there an understanding as to

13   why you didn't receive one?

14        A.    Yes, it is.

15        Q.    And what's your understanding?

16        A.    That I had worked too many hours

17   overtime and that, due to the fact that my overtime

18   hours' pay, overtime pay had exceeded the fair

19   amount -- that they considered a fair amount of

20   pay, that -- that that was compensation enough for

21   an AIP.

22        Q.    All right.  And who explained that to

23   you?

24        A.    Milt Gross.
```

49

1          Q.    Did anybody else --

2          A.    Nope.  He's my boss.  He's the one

3    that deals with me.

4          Q.    Did you follow-up with Mr. Gross' boss

5    about the --

6          A.    I talked --

7          Q.    -- issue?

8          A.    -- to Hassan Saleh --

9          Q.    Okay.

10         A.    -- and his statement was -- and there

11   was also a notice that -- that this was true.  This

12   was not something that was being delivered just to

13   particular individuals.  This was giving -- that if

14   your overtime was to a certain amount, you would

15   not receive a bonus.

16         Q.    Do you remember what that amount was?

17         A.    I do not.

18         Q.    Was it a dollar amount or percentage

19   amount?

20         A.    It was never given to me in any

21   amount.

22         Q.    Okay.  And you made comment that there

23   was a notice?

24         A.    There was -- again, going back over a

1    year now, but the bonuses would be based on your

2    overtime, yes.

3          Q.    Okay.  But I asked -- there was like

4    an e-mail or a posting in the plant?

5          A.    It was an e-mail.

6          Q.    Okay.  An e-mail that went to

7    everybody or --

8          A.    That, I cannot answer you that on.  I

9    do not remember.

10         Q.    How much do you think your AIP bonus

11    should have been?

12         A.    Based on the overtime that I worked,

13    I'll -- I want to put this on the record.  The

14    plant went into plant critical status in 2001.

15    What that means, that you cannot refuse any

16    overtime.  You will work Saturday and Sunday.  You

17    cannot turn down any overtime.

18            So you have no choice.  My bonus was

19    based on the fact that I worked too much overtime.

20    Sorry.  I was told to work it.

21         Q.    Understood.

22         A.    And basically at the time, I thought

23    my bonus should have been around 7,000 to $8,000 --

24         Q.    Okay.

```
 1          A.    -- based on the performance.

 2          Q.    Okay.  Is that seven to $8,000 part of

 3     the 27?  And I'm sorry.  Part of the $27,000 listed

 4     in your answers to interrogatories.

 5              MR. SIMON:  Note my objection.  The

 6     interrogatory answers explains that, but go ahead

 7     and answer, Jim.

 8          A.    I'd have to -- I can't recall.  I'm

 9     sorry.  I'd have to get my records out and look

10     because I added all this up.

11          Q.    Okay.

12          A.    And I'd have to look it up.  In my

13     clear memory, that does not include in this.

14          Q.    Okay.  So it would be appropriate for

15     me to -- your claim is 27,000, plus the seven to

16     eight?

17          A.    That's correct --

18          Q.    Okay.

19          A.    -- based on my memory.

20          Q.    Sure.

21          A.    Okay.

22          Q.    And you made a comment that you have

23     records or something you reviewed to establish

24     that --
```

```
 1          A.     That's right.

 2          Q.     -- 27,000?  Did you give copies of

 3    those records to your attorney?

 4          A.     Yes.

 5          Q.     Okay.  And is that the time sheets

 6    that we just kind of looked at before?

 7          A.     Yes, mm-hmm.

 8          Q.     All right.  Any other issues with AIP?

 9          A.     No.

10          Q.     What we were talking about, I think,

11    was commitments or whatever that ZF Batavia has not

12    followed through on.  And as I understand it, we

13    have the overtime issue and I think we talked

14    through all those issues.  We have the AIP payment.

15    Is there anything else?

16          A.     I didn't think it was fair that this

17    agreement stated -- this agreement that I decided

18    to become a Z -- or a transitional employee went

19    from five to three personal days.

20          Q.     And why did you think that was unfair?

21          A.     The agreement was five days.

22          Q.     Okay.

23          A.     This is my agreement that I became a

24    transitional employee.  I felt that I was working
```

1    under this agreement.

2         Q.    Okay.

3         A.    And they had no right to change that

4    agreement.

5         Q.    In Exhibit 2, on the second page, if

6    you look over to the right-hand column --

7         A.    Okay.

8         Q.    -- down towards the bottom --

9         A.    Mm-hmm.

10         Q.    -- okay?  You see the language in

11    there that says, Plans described here are subject

12    to change?

13         A.    That's correct.

14         Q.    You understood that the information

15    contained in Exhibit 2 was subject to change,

16    didn't you?

17         A.    That's clarified plans.  Terms of

18    employment are your salary, which there are

19    personal days, your vacation, your bonuses and your

20    raises.

21         Q.    Okay.

22         A.    Those are not plans.  Plans are your

23    benefits, your -- your 401K, your health benefits,

24    those are plans.  To me, anytime it has something

1   to do with my salary, that is terms of employment.

2        Q.    Okay.  And so you felt that they

3   couldn't change your salary?

4        A.    What I'm talking about in changing my

5   salary terms, an agreement is when I came over as a

6   transitional employee, that I would start out as my

7   base pay as the same as Ford with merit increases

8   per year.

9        Q.    Okay.

10        A.    That's a change in my salary.

11        Q.    All right.  And so they had the right

12   to change your salary?

13        A.    They have a right to give me a merit

14   increase.

15        Q.    Okay.  Do they have the right to

16   develop the annual incentive plan?

17             MR. SIMON:  Note my objection.  Both

18   you and Mr. VanWay have used the phrase, they have

19   the right to do this and right to do that.  I think

20   that calls for a legal conclusion.

21             So if I could just have a continuing

22   objection to that question, they have a right to do

23   it.  Perhaps I'll apply that objection to all the

24   depositions.  Go ahead and answer.

1          A.     Could you restate your question?  I'm

2     sorry.

3          Q.     Sure.  Do you believe that ZF Batavia

4     has the right to develop or determine its annual

5     incentive plan?

6                 MR. SIMON:  Same objection.

7          A.     Based on company-wide policy,

8     equals -- or would treat all employees the same and

9     give everybody the same, yes.

10         Q.     Okay.  When you signed on with ZF

11    Batavia, you had reviewed the gray brochure, I

12    think you told me?

13         A.     That's correct.

14         Q.     Okay.  And certainly you understood,

15    then, that from time to time, things could change,

16    in terms of whether you want to call them benefits

17    or the terms of your employment, those things would

18    change from time to time?

19         A.     Only thing I understood that could

20    change would be plans.  And, again, I state, my

21    salary is not a plan.  It's terms of employment.

22         Q.     Does the phrase "terms of employment"

23    appear anywhere in the gray brochure?

24                MR. SIMON:  Objection.  The document

1   speaks for itself.

2          A.    It says here salary.  Then it goes

3   down below that and it says benefits.  Salary is,

4   to me, when I read this, salary is terms of

5   employment.  This is what I'm -- now my benefits --

6                MR. SIMON:  His question was just

7   whether the words "terms of employment" --

8                THE WITNESS:  Okay.

9                MR. SIMON:  -- are in the agreement.

10               THE WITNESS:  Okay.

11         Q.    You can explain --

12         A.    No.

13         Q.    All right.  Then I guess -- and you

14  referred to this thing as -- Exhibit 2 as an

15  agreement or --

16         A.    Yes.

17         Q.    Okay.  When you say agreement, do you

18  mean it's an employment contract, an agreement or

19  what is it?

20         A.    The agreement cannot -- this is

21  what -- I will become a transitional employee will

22  be expecting.

23         Q.    Okay.  And it's your testimony that

24  your anticipation that salary could never change?

1          A.    My base salary would never decrease.

2          Q.    Okay.

3          A.    Only increase through merit raises --

4          Q.    Okay.

5          A.    -- or through promotion.

6          Q.    Okay.  Was it your understanding --

7    well, strike that.

8              Is there anything else that you feel

9    Batavia hasn't done, other than the overtime, the

10   personal days and the AIP payment that it was

11   supposed to do?

12         A.    At this time, this is the three things

13   that stand out in my mind.  I'm sure there's other

14   things here, but I can't -- these are the things

15   that really stick --

16         Q.    Okay.  When you report your time on

17   your salary time statements, how do you -- is that

18   the minute you walk into the plant?  Is that the

19   time the shift is scheduled or how do you report --

20         A.    It's recommended we do it every --

21   every day.

22         Q.    Okay.

23         A.    And we look at our clocks.  We have to

24   rate -- we have to clock in --

1        Q.    Okay.

2        A.    -- our badge in, I'm sorry, and badge

3  out.

4        Q.    Okay.

5        A.    So basically at that time when we do

6  that, we look at our -- basically two or three

7  minutes here and there.  We try to make sure that

8  we're within what time we clock in at.

9        Q.    All right.  So your time sheets kind

10  of reflect --

11        A.    Roughly.

12        Q.    -- roughly the time you get into the

13  plant?

14        A.    Yes.  Not in the plant, basically --

15  okay.  That's a fair statement.

16        Q.    Because I think the Honeywell readers

17  for the Ford trades are --

18        A.    That's a fair -- that's a fair

19  statement.  That's within three or four minutes,

20  yes.

21        Q.    Okay.  And I'm not looking to quibble

22  over minutes --

23        A.    Okay.

24        Q.    -- just -- and so on your time sheets,

1    how do you account for casual time?

2        A.    Casual time is -- is basically I -- I

3    think a half hour a day, 15 minutes prior to and 15

4    minutes after and that's my own general feeling,

5    should be given to get what -- to get your feet on

6    the floor and then to wrap up.

7        Q.    Okay.  And is casual time somehow

8    reflected on your time sheets?

9        A.    The times I start and the times I quit

10   is always -- always reflected on my time cards.  In

11   other words, if I get there -- if it says I get

12   there at 6:20, I get there at 6:20.  If I leave at

13   5:00 in the evening, I record that at 17:00.

14       Q.    Okay.  But I guess what I'm try to

15   understand --

16       A.    I misunderstand your question, then.

17       Q.    No, that's all right.  Let's -- as I

18   understand casual time, casual time would be

19   uncompensated for time?

20       A.    Unpaid for --

21       Q.    Sure.

22       A.    -- yes.

23       Q.    Okay.  And so how does that -- how is

24   that reflected on a James Crump time sheet because

60

1    I think what you told me was, kind of as you swipe

2    in, you look at your watch and that's the time

3    that's reported in?

4          A.    Mm-hmm.

5          Q.    And then as you go out, that's the

6    time that's reported out?

7          A.    I usually look at my watch before I --

8    when I'm changing my shoes, taking my glasses off

9    and things of that nature.

10         Q.    Okay.  So if that's the time into the

11   building and basically the time out of the

12   building, how does your time sheet account for the

13   casual time?

14         A.    I'm not following your question.

15         Q.    Just take a look at exhibit -- or

16   document 901, referred to it before.

17         A.    Okay.

18         Q.    For example, it says, start time at

19   16:40.

20         A.    06:40, yes.

21         Q.    Okay.  And that -- 06:40 or is it 16?

22   I apologize.  6:40.

23         A.    Right.

24         Q.    That's the time you walked into the

1   building, right?

2          A.    That's correct.

3          Q.    And, for example, in that same entry,

4   what time did you actually leave the building?

5          A.    16:30.

6          Q.    Okay.  So how was casual time, that --

7   how is that reflected in that document?

8          A.    It's -- I worked an hour and 15 -- an

9   hour and 20 minutes more than my eight hours.  So I

10  could not write down any time of compensatible

11  (sic) overtime because I have to work at least two

12  hours before I can write down an hour.

13         Q.    Okay.

14         A.    And I did not work the two hours.  I

15  only worked an hour and 20 minutes.

16         Q.    Okay.  And so, in one sense, would it

17  be safe to say you kind of deducted that in your

18  head because you didn't hit that two-hour threshold

19  or something?

20         A.    You got that, yes.

21         Q.    Okay.  All right.  And what about

22  lunch, is there any deduction in the time sheet for

23  that?

24         A.    Lunch is a half hour a day, whether

1    you eat or don't.

2        Q.    Okay.

3        A.    And 90 percent of the time, you don't

4    eat.

5        Q.    And, again, there's no -- you don't

6    make any deduction in the time --

7        A.    No.

8        Q.    -- sheet for that?

9        A.    No.

10        Q.    All right.  I think I asked this, but

11    I want to be clear.  Anything else, in terms of

12    issues as to items ZF Batavia has not followed

13    through on?

14        A.    I think that one thing that affected

15    me was the death benefits.

16        Q.    Okay.

17        A.    And I've always had -- you know,

18    because I'm only given one day.  In the instance

19    that I've been through, I've had to take vacation

20    or I take a personal day on -- on a bereavement.

21        Q.    How many days do you think you lost

22    because of that?

23        A.    My mother-in-law passed away this past

24    year.  I lost two days.

63

```
 1          Q.     Okay.

 2          A.     I gave -- I took one day of

 3   bereavement, which I was allowed and I ended up

 4   taking two personal days.

 5          Q.     Okay.

 6          A.     That was in this past year.

 7          Q.     With respect to the overtime

 8   compensation, I understand that -- I think I

 9   understand the issues there.  Certainly you have

10   always received your salary?

11          A.     Sure.

12          Q.     And the merit increases?

13          A.     That's correct.

14          Q.     Okay.  And so you're not asserting,

15   are you, that you've ever received less than your

16   full salary?

17          A.     On -- now, I'd have to ask you to

18   clarify that.

19          Q.     Okay.  I'm aware you had a suspension

20   or a disciplinary issue at one point.

21          A.     That's correct.

22          Q.     Okay.  And you -- your salary was

23   affected for that disciplinary --

24          A.     That's correct.
```

1          Q.    Other than that, you've not --

2          A.    No.

3          Q.    -- had any issues with salary?

4          A.    No.

5                MR. HUNTER:  All right.  At this

6    point, I'll turn it over to Mr. VanWay.

7                MR. VANWAY:  Let's take a quick five

8    minutes.

9          (Off the record:  3:34 p.m. - 3:45 p.m.)

10               MR. SIMON:  Mr. Crump just wanted to

11   clarify some testimony he gave about the May 27th

12   meeting, if he could.

13               MR. VANWAY:  Okay.  Go ahead.

14               THE WITNESS:  We were told -- Mike

15   Warden was there and did some general speaking.

16   I'm not saying he was the key speaker.  He was just

17   generalizing some of the stuff that he went -- was

18   going over.

19               MR. HUNTER:  Okay.

20               THE WITNESS:  And there was, more than

21   likely, several speakers.  I just can't recall all

22   of them.

23               MR. HUNTER:  Okay.

24               MR. SIMON:  That was it.  Thank you,

1    Mr. VanWay.

2              MR. VANWAY:  That's a good

3    clarification because I was going to have a lot of

4    questions based on that.  May not have as many on

5    that now.

6              MR. SIMON:  Glad we cleared that up.

7                        EXAMINATION

8    BY MR. VANWAY:

9         Q.    Afternoon, Mr. Crump.

10        A.    Afternoon.

11        Q.    My name is Jeff VanWay.  I represent

12   Ford in this case.  I just have a few questions for

13   you today.  I'll try not to repeat the same things

14   you've already testified about.  If I do, bear with

15   me.  It's not intentional, okay?

16              I want to make sure I understand your

17   testimony as to a few things.  First of all, other

18   than what you heard at the May 1st, '99 meeting

19   that you attended, and other than what you read in

20   the brochure, which we've marked as Exhibit 2, did

21   you rely on anything else when you made your

22   decision to accept employment with ZF Batavia?

23        A.    Decision to join or become a

24   transitional employer with Ford -- or I mean for

```
 1    ZF --
 2         Q.    Yes.
 3         A.    -- was based on a lot of things.  One
 4    was Exhibit 2; one was talking and going to the
 5    meeting, talking --
 6         Q.    The May 1st meeting?
 7         A.    May 1st meeting --
 8         Q.    Okay.
 9         A.    -- talking to my family and -- and
10    understanding that -- that I was going to be
11    employed at ZF or as a transitional employee in the
12    same maintenance and other things.  Those was most
13    of the main factors that made my mind up to become
14    ZF.
15         Q.    Okay.  And I'm just asking if there
16    were any other factors.  And if there weren't,
17    that's fine.  You said those were most of the main
18    factors.  I'm wondering if there were any others?
19         A.    I can't recall others.
20         Q.    Okay.  Now -- and I know you clarified
21    this before we got started.  With respect to the
22    May 27, '99 meeting, was Mike Warden a presenter at
23    all or did he just take questions maybe at the end?
24         A.    I -- I wish I could really answer your
```

1    question because -- but, yeah, he was there and

2    speaking.  He did answer some questions.  I -- I

3    don't recall if he started out the meeting by

4    introducing people.  I'm not really -- I can't

5    really clarify that for you.

6         Q.    Okay.  Do you know whether Mike Warden

7    was the person who spoke about overtime?

8         A.    I cannot answer that.

9         Q.    Or do you know whether Mike Warden is

10   the person that spoke on personal days?

11        A.    There was people at this meeting who

12   were specialists in that area and -- and those --

13   it was really -- you know, to recall great details

14   about the meeting, I just really cannot do that.

15        Q.    I understand.  Profit sharing, do you

16   recall whether that was Mike Warden that

17   spoke about --

18        A.    I cannot recall that.

19        Q.    Bereavement, do you recall if it was

20   Mike Warden --

21        A.    I cannot answer that.

22        Q.    -- that -- Okay.  Were there slides at

23   this meeting, do you remember?

24        A.    Yes, sir.

1          Q.    Were copies of those distributed or

2    not, to the best of your memory?

3          A.    Best of my memory, there was some

4    handouts, but I don't recall it actually being the

5    slides.

6          Q.    Okay.  At either the -- well, let me

7    ask you this.  In terms of the specific discussion

8    as to what benefits and terms and conditions are

9    going to be at ZF Batavia, the specific discussion

10   was at the May 27th meeting, as opposed to the May

11   1st meeting; is that right?

12         A.    The May 1st meeting was mostly a

13   general -- you know, giving us an overall feel of

14   what was taking place, what to expect and May 27th

15   went into more detail.

16         Q.    Okay.  Was there anything in detail

17   discussed at the May 1st meeting about overtime

18   that you can recall?

19         A.    The overtime was stated that it was --

20   that we would be treated on the same scale or the

21   same -- when we transitioned over into ZF, we would

22   receive the same base salary and also our -- our

23   overtime pay would remain the same.

24         Q.    That was discussed at the May 1st

1    meeting?

2         A.    That was just a general statement,

3    yes.

4         Q.    Was there any discussion as to what

5    your overtime would be in the future, say, a year

6    down the road after you became a ZF Batavia --

7         A.    We would go --

8         Q.    -- employee?

9         A.    Basically what we were looking at was

10    the agreement we were starting out with.

11        Q.    Yes, Exhibit 2.  Now, you didn't have

12    that as of the May 1st meeting, did you?

13        A.    No, I did not get that until I got my

14    letter.

15        Q.    Okay.  So at the May 1st meeting, was

16    there anything discussed at all about future

17    overtime?

18        A.    We were just having a general meeting

19    of -- an overall layout of what we were going to

20    expect from ZF, to get a feel to -- and to let us

21    know what was actually taking place.  Details was

22    not discussed at that meeting.

23        Q.    Okay.  What about in terms of profit

24    sharing, at this May 1st meeting, was there any

1   specific discussion as to what the profit sharing

2   formula was --

3          A.    All we were told --

4          Q.    -- going to be?

5          A.    -- and best of my memory was that

6   there was a profit sharing plan.

7          Q.    Okay.  Personal days, was there any

8   specific --

9          A.    They --

10         Q.    And I don't mean to be rude.

11         A.    No.

12         Q.    I just need to get my question out

13  before you answer so the court reporter can get it

14  all down.

15              MR. SIMON:  Jim, just wait for him --

16              THE WITNESS:  Okay.

17              MR. SIMON:  -- to finish his question

18  before you answer.

19              THE WITNESS:  Okay.

20              MR. SIMON:  Thanks.

21  BY MR. VANWAY:

22         Q.    With respect to personal days, do you

23  remember at the May 1st meeting there being any

24  discussion about personal days at all?

```
 1          A.    No.

 2          Q.    Okay.  Bereavement leave, was that

 3    discussed at all at the May 1st meeting?

 4          A.    No details.

 5          Q.    Okay.  You say "no details."  Was it

 6    even brought up?

 7          A.    Yes.  There would be bereavement;

 8    there would be personal days.  No details.

 9          Q.    No details as to how many days?

10          A.    No.

11          Q.    Okay.  At either the May 1st meeting

12    or the May 27th meeting, was there any discussion

13    as to what your salary would be in the future after

14    you accepted employment with ZF Batavia?

15          A.    Base salary, we would transition to ZF

16    Batavia under base salary, what we were at at the

17    time.

18          Q.    Your starting salary would --

19          A.    Starting salary --

20          Q.    -- be what it was at Ford?

21          A.    Yes.  And --

22          Q.    Was there any discussion as to what

23    your salary would be in later years with ZF

24    Batavia?
```

1         A.     Based on merit raises, it would go up.

2         Q.     Okay.  So whatever the merit program

3    that was going to be designed was, then that's --

4    that would affect your base salary?

5         A.     Yes.

6         Q.     Okay.  And there wasn't any specific

7    discussion at either of those meetings, was there,

8    as to what the merit program -- what the specifics

9    of the merit program were going to be?

10        A.     There was basically one statement and

11   that was that your personal performance review

12   would affect your merit raise.

13        Q.     Okay.  There wasn't any talk about it

14   will be one percent, 10 percent, somewhere --

15        A.     No specific amounts.

16        Q.     All right.  Now, I know you and

17   Mr. Hunter discussed this earlier and I'll try not

18   to go back through that testimony.  With respect to

19   vacation, you got grandfathered with the fifth

20   week, I understand?

21        A.     Yes.

22        Q.     So to get that fifth week, you don't

23   have to buy or sell any days; you just

24   automatically get it?

73

1          A.    That's correct.

2          Q.    Okay.  And that's different than

3     Exhibit 2, right?  Strike that.  The document will

4     speak for itself.

5                Now, you said -- I believe you

6     testified that while you were at Ford, they made a

7     change in the profit sharing and made the profit

8     sharing more plant specific, as opposed to

9     company-wide?

10         A.    Yeah, back in '99, '98, somewhere in

11    that -- they were speaking of making it more where

12    your plant would have more of a affect on your

13    profit sharing than it have, say, for instance, a

14    flat overall North America base.  And your plant

15    would reflect somewhat of your -- of your profit

16    sharing and that's --

17         Q.    Okay.  And I assume, then, that that,

18    depending on which plant you were at, could either

19    be a positive or a negative if you were --

20         A.    That's correct.

21         Q.    -- a high performing plant, positive;

22    low-performing plant, a negative?

23         A.    That's correct.

24         Q.    Okay.  And you don't dispute, do you,

1    that Ford had the ability to make that change to

2    the profit sharing?

3         A.    It was a -- a change -- a corporate

4    change or -- came out of Detroit.  They were going

5    to affect everybody at Ford Motor Company.

6         Q.    They didn't ask your approval to make

7    that change, did they?

8         A.    No.

9         Q.    They just made the change and told you

10   what it was?

11        A.    That's correct.

12        Q.    Okay.  And that, by the way, that's

13   how things operated at Ford when you were there,

14   right?  If they were going to make a change in

15   benefits, they would make the change and then tell

16   you what it was?

17        A.    Yes.

18        Q.    They wouldn't ask you if it were okay

19   with you or ask for your approval?

20        A.    Right.

21        Q.    Same thing with respect to your

22   compensation.  If they were going to make a change

23   to your compensation, they would do it and tell you

24   what it was?

```
 1          A.    That's correct.

 2          Q.    Okay.  And, again, they wouldn't ask

 3    your approval?

 4          A.    Yes.

 5          Q.    Now, you testified right at the tail

 6    end of Mr. Hunter's questioning about a suspension

 7    that you received at ZF Batavia?

 8          A.    That's true.

 9          Q.    And that cost you one week's pay?

10          A.    Two instances.

11          Q.    So you've been suspended twice?

12          A.    That's correct.

13          Q.    Okay.  Each time, was it for one

14    week's pay?

15          A.    One week and two weeks.

16          Q.    Okay.  So a total of three weeks --

17          A.    That's correct.

18          Q.    -- unpaid?

19          A.    That's correct.

20          Q.    And when the folks at ZF Batavia had

21    suspended you on those two occasions, they didn't

22    ask you if that was all right with you, did they?

23          A.    They asked me, but it didn't make any

24    difference.
```

1        Q.    I mean, they took pay from you without

2    regard to whether you wanted them to or not?

3        A.    One was with Ford and one was with ZF.

4        Q.    Okay.  With Ford, was it a one week or

5    a two week?

6        A.    Ford was one week.

7        Q.    Okay.  And when Ford suspended you for

8    that one week, they didn't ask you, is it okay if

9    we take a week's pay from you, did they?

10       A.    In -- no.

11       Q.    They just took it, right?

12       A.    That's correct.

13       Q.    Okay.  And a week's pay, that's a term

14   of employment, isn't it?

15            MR. SIMON:  Objection to the extent

16   the question calls for a legal conclusion.  You can

17   answer, Jim.

18       A.    Disciplinary is -- yes, disciplinary

19   is the effect -- you're supposed to be to where you

20   are disciplined.  And what that means is that is

21   taking away your money.

22       Q.    And I'm not trying to get you to -- to

23   draw any legal conclusions.  You testified

24   earlier -- you made a distinction between terms of

1    employment, I believe you called them and benefits.

2        A.    Sure.

3        Q.    And you'd agree with me that when your

4    employer takes a week's pay from you, they're

5    affecting a term of employment, as you understand

6    that term to mean?

7        A.    That's correct.

8        Q.    Okay.  Now, the date on your offer

9    letter, which is Exhibit 111, is May 17th and then

10   you signed it on May 25th.

11       A.    That's correct.

12       Q.    Do you know what date you actually

13   received the letter?

14       A.    No, I do not recall.

15       Q.    Did you sign it the same day you

16   received it?

17       A.    No.

18       Q.    Took it home and spoke to your family

19   about it?

20       A.    That's correct.

21       Q.    Did you come back, then, the next day

22   and accept?

23       A.    I don't recall.

24       Q.    Do you have any idea how much time

1    elapsed between the time you got the letter and the

2    time you accepted it?

3        A.    I only had eight days, so I had

4    exactly -- the time I -- the date of this letter

5    and the date I signed it is eight days.  So I

6    had -- apparently if I received it -- I don't know

7    what day I received this letter on, but I

8    apparently didn't receive it on the 17th.  Probably

9    was the day after.  But I -- I don't recall how

10   long it took me to make that decision.

11       Q.    But by the time you received the offer

12   letter, was your mind already made up --

13       A.    No --

14       Q.    -- that you were going to accept?

15       A.    -- because then I received this also.

16       Q.    Oh, so you didn't have --

17       A.    No.

18       Q.    -- Exhibit 2 till you got the offer?

19       A.    That's correct.

20       Q.    Okay.  I believe you testified that

21   during the May 1st meeting, you were told in sort

22   of general terms that the transition bonus would

23   cover losses and benefits that you were going to

24   suffer?

1          A.     That's correct.

2          Q.     And you never got any clarification at

3     that time, at least, as to what those losses were?

4          A.     That's correct.

5          Q.     Okay.  And by the time you accepted

6     the offer on May 25th, had you been told what the

7     losses and benefits were?

8          A.     I was understanding when I signed

9     the -- when I signed this, that this bonus was

10     explained to me that it was to compensate for some

11     of the medical benefits that was going to be

12     missing, which was, like I testified before, was

13     eyeglasses in particular.  Some of the dental plan

14     was different and some of the medical benefit was

15     going to be different.

16              And the fact is now, we were going to

17     be told what doctor we could go to.  With Ford, we

18     had -- we could go -- in our dental -- in our

19     dental and our medical benefit with Ford, we had --

20     we could go to our own doctor and our own -- the

21     plan I had -- I'm sorry.  There was several plans

22     at Ford.  I'll clarify that for the record.  But

23     the plan that I took at Ford gave me the option to

24     choose my doctor.

```
 1              The plan with ZF says no.  Here's

 2    the -- here's the plan.  You can either choose --

 3    you know, this -- this doctor, these doctors or

 4    these dentists.  And I was supposed to understand

 5    that they were going to compensate me for some of

 6    those.

 7         Q.    And did someone specifically tell you

 8    that that's what the transition bonus was for, or

 9    is that just the understanding that you reached?

10         A.    I was told that that was part of

11    the -- part of the difference.

12         Q.    Who told you that?

13         A.    I was in the meeting with -- at the

14    time and my best recollection when I signed this,

15    Mike Warden was.

16         Q.    He told you that was part of what --

17         A.    Part of it, the slim part of it.

18         Q.    Okay.  Did he explain what the greater

19    part of it was?

20         A.    I don't recollect at that meeting.

21         Q.    At any other meeting, did anyone

22    explain what the greater part was?

23         A.    No.

24         Q.    I take it you didn't go in and ask
```

1    anybody?

2        A.    (Witness nodded.)

3        Q.    I know you answered.  I just need you

4    to answer out loud so the court reporter can record

5    it.

6        A.    I'm sorry.

7        Q.    I think your answer was no?

8        A.    No.

9        Q.    Okay.  Thank you.  You testified a

10   little bit about a time where the Batavia plant was

11   in a critical status mode?

12       A.    Repeat that.  I'm sorry.

13       Q.    I think you said something about

14   Batavia plant was in a critical --

15       A.    Oh, I'm sorry, yes.

16       Q.    -- critical status?

17       A.    We had -- we were on the verge of

18   shutting down Kansas City, due to lack of

19   transmissions.  So we went into a critical status,

20   and at that time means we were working seven days a

21   week.  There was no refusal of overtime.

22       Q.    That term, "critical status mode" or

23   "critical status," had that been used at Ford when

24   you worked there?

1          A.     I never fell into that, but that

2     was -- that was with Ford.  Not necessarily under

3     those terms, but what -- Ford didn't call it a

4     plant critical status.  They called it a -- I don't

5     recall what they called it.  But if in case you

6     would get ready to shut down an assembly plant

7     with -- and you was a vendor of transmissions or

8     with engines or whatever component they need, you

9     were expected to work.

10         Q.     Did that ever happen to you when you

11    were a Ford employee, that you were told you

12    couldn't refuse overtime?

13         A.     No.

14         Q.     You testified about the change in

15    personal days.  And I wrote down that you said they

16    had no right to change the agreement.  Who is it --

17    who's the "they" who changed the agreement with

18    respect to personal days?

19         A.     ZF.

20         Q.     Now, while you were with Ford during

21    the time you were a salaried employee, was it your

22    understanding that your terms of employment were

23    subject to change?

24         A.     My terms of employment, which is my

1    salary, my raises and my bonuses were not subject

2    to change.

3        Q.    So if I understand you, then, if Ford,

4    for example, had decided that they were going to

5    cut your salary, they wouldn't have been able to do

6    that?

7        A.    No.

8        Q.    Or if they decided that they weren't

9    going to pay for overtime any more, they wouldn't

10   have been able to do that?

11       A.    They would have had to have been --

12   let me think.  In my recollection -- recalling

13   since I been salary since '83, Ford never has done

14   that.

15       Q.    No, I understand.  I'm asking, was it

16   your impression that they couldn't do that unless

17   you agreed to it?

18       A.    Under the agreement I came under with

19   Ford, yes, they could do that.

20       Q.    Did you, as a salaried employee with

21   Ford, did you have a written employment agreement?

22       A.    We had when we -- when we signed up or

23   signed our -- our -- to become salary, we were --

24   had an agreement of -- of employment.  It was in

1    the matrix -- or I call matrix of employment.  This

2    is what you will -- are expected to do with your

3    job and this is what the company is providing you

4    to be an employee of Ford Motor Company.

5         Q.    Is this a written document you're

6    referring to?

7         A.    Yes.

8         Q.    And this is something you received

9    when you were first brought on as a salaried --

10        A.    That's correct.

11        Q.    -- employee?  And it told you what

12   your salary was going to be?

13        A.    No.  Your salary was based upon

14   your -- you know, when you get hired anywhere,

15   you're given a base salary.  And that base salary

16   is based upon the position you -- you hire in on

17   and I was given a base salary upon the position

18   I --

19        Q.    Okay.

20        A.    -- accepted with Ford Motor Company.

21        Q.    And then what did this document say,

22   with respect to your terms of employment?

23        A.    You was entitled health benefits and

24   you were going to be given -- you know, certain

1    provisions -- you know, health benefits.  You're

2    going to give vision, dental.  You had a cost of

3    living or you had a -- your salary is going to be

4    every two -- twice a month.  You know, just the

5    general terms of -- not general terms, but terms of

6    employment.

7         Q.    Do you still have that document, by

8    the way?

9         A.    I don't think so.

10        Q.    Now, you testified about Exhibit 2 and

11   about your understanding that the only things that

12   were subject to change were those things that you

13   believe were benefit plans.  You remember that

14   testimony --

15        A.    Yes.

16        Q.    -- with Mr. Hunter?

17        A.    Mm-hmm, yes.

18        Q.    At the time that you first reviewed

19   Exhibit 2, you didn't have any understanding

20   whatsoever as to what the subject to change

21   language meant, did you?

22        A.    Yes, I did.  And --

23        Q.    The first time you read it?

24        A.    When I read this the first time, I

1   understood that plans described here are subject to

2   change.  "Plans," in my term, again, is -- salary

3   is not a plan.  It's terms of the agreement.  You

4   know, that's your terms of employment.  Plans, to

5   me, are your medical, savings plans and -- and

6   those terms.

7        Q.    What about AIP, is that a plan?

8        A.    AIP is a plan.

9        Q.    So that would be subject to change?

10       A.    That's correct.

11       Q.    Okay.  Now, Mr. Crump, you've been

12   handed Exhibit 113, which I will acknowledge is a

13   copy of a document that's very hard to read.

14       A.    Right.

15       Q.    At the bottom of that document, it

16   appears to have your signature on it.  Is that your

17   signature?

18       A.    Yes, it is.

19       Q.    Okay.  And I will submit to you that

20   this is a document that was produced in this case

21   by Ford as a part of your personnel file.  Do you

22   have any reason to dispute that you signed this

23   document when you worked for Ford?

24       A.    No.

1       Q.    Okay.  And I understand that you can't

2    read the copy I have now.  I assume, though, at the

3    time you signed this, you could read what it said?

4       A.    Correct.

5       Q.    You wouldn't have signed it if you

6    couldn't read it?

7       A.    That's correct.

8       Q.    Okay.  And I'm going to show you what

9    was previously marked as Exhibit 97 in Mr. Pearce's

10   deposition and that appears -- the text, at least,

11   of the part on Exhibit 113 that says "Employment

12   Agreement" appears to be the same in Exhibit 97 and

13   Exhibit 113.

14          As you look at Exhibit 97, is it your

15   understanding that that's the language that you

16   signed?

17      A.    I -- I really, be honest with you, I

18   can't say yes to that because I cannot -- I cannot

19   read this one.  And to compare the two, I can't do

20   that.

21      Q.    Okay.  Fair enough.  I'll take 97

22   back.

23      A.    Okay.

24      Q.    Thank you.  Now, Mr. Crump, Exhibit

88

1    114 appears to be the application for salaried

2    employment that you completed with Ford back in

3    1983.  Do you agree with me that's what that

4    document is?

5           A.    That's correct.

6           Q.    And on the second page of this

7    document, is that your signature that appears at

8    the bottom there?

9           A.    That's correct.

10          Q.    This one we can read, right?

11          A.    That's correct.

12          Q.    Okay.  Do you recall during the time

13   you were -- and I'm finished with that exhibit,

14   unless you need it.

15          A.    Oh, okay.

16          Q.    That was my only question.

17          A.    Okay.

18          Q.    Do you recall that during the time you

19   were employed with Ford, there being years when you

20   didn't receive profit sharing?

21          A.    I do not recall that.

22          Q.    Okay.  Is it possible that that

23   happened and you just don't recall it?

24          A.    Yes.

89

1          Q.    And you understood that while you were

2     with Ford, there was no guarantee that you'd

3     receive a profit sharing every year?

4          A.    There was no guarantee, no.

5          Q.    During the time that you were with

6     Ford, do you recall Ford ever changing the way it

7     paid overtime?

8          A.    The only time it affected me -- and,

9     again, it was still the company policy that you had

10    a base.  If you were at that certain -- at that one

11    line, you were paid time and a half.  If you

12    exceeded that base, then you would become what you

13    call -- you just get a certain amount.

14         Q.    You got a flat rate?

15         A.    Flat rate, I'm sorry.  Yes.

16         Q.    And did you exceed that rate?

17         A.    Yes.

18         Q.    Okay.  And so you got a flat rate

19    instead of time and a half?

20         A.    Yes.

21         Q.    And was the flat rate less than what

22    time and a half would have been?

23         A.    It was comparable to time -- and just

24    a touch under, not quite time and a half.

1        Q.    Okay.  And when Ford made that change,

2   they made it, then told you about the change,

3   right?

4        A.    No.  Ford Motor Company did not make

5   that change.  That was the -- that was the --

6   always the agreement with Ford Motor Company, that

7   if you had a certain base and you maintained that

8   base, you would get time and a half.  If you

9   exceeded that base -- in other words, as you --

10  your years went along and you increased your salary

11  and you went above that base, then you would get

12  just flat rate.

13       Q.    So if I understand you, then, the

14  change occurred when your salary --

15       A.    That's correct.

16       Q.    -- went up and you were above the

17  base?

18       A.    That's correct.

19       Q.    Gotcha.  Okay.  Do you recall at any

20  time while you were with Ford, Ford changing from

21  paying overtime to giving comp time?

22       A.    Not at Batavia.  No, I don't recall

23  that at all.

24       Q.    And you understand what I mean by comp

1    time and --

2          A.    Yes.

3          Q.    -- time off --

4          A.    You would get paid -- if you worked

5    Saturday, you would get a day off later on.

6          Q.    Right, okay.  Okay.  Now, as I

7    understood your testimony, there are essentially, I

8    believe, four promises or representations that you

9    made -- you believe were made to you that hadn't

10   been fulfilled.  One is the overtime; one is profit

11   sharing or AIP; one is personal days and one is

12   bereavement leave.

13          Other than those four, any other

14   representations or promises that you believe were

15   made that haven't been fulfilled?

16          A.    At this time, those are the four that

17   really stand out in my mind, and I just right now

18   cannot recall any others.

19          Q.    Okay.  As we go through the deposition

20   today, if you recall any others, will you let me or

21   Mr. Hunter know that?

22          A.    Yes, I would.

23          Q.    Okay.  With respect to each of those

24   four, then, overtime, bonus, AIP, personal days and

1    bereavement leave, are you aware of Ford being

2    involved at all in making the changes to those

3    policies?

4         A.    I feel Ford has certain control of

5    Batavia.

6         Q.    Why do you say that?

7         A.    Because of all the training, all of

8    our policies are based on Ford policies.  We're

9    under the -- the training we go through has to be

10    approved by Ford because the -- diversity training,

11    for instance, one is one, which it's a mandatory

12    training.  It's a Ford program.  Ford approved our

13    quality program and several others.  Numerous ones.

14    All the programs are Ford -- total preventive

15    maintenance is a Ford program.  This is all

16    training -- we was all trained under the Ford

17    policy.

18         Q.    Okay.  Now, with respect to these

19    programs that you said were Ford programs, I think

20    you named three, the diversity training, the

21    quality program and the total preventive

22    maintenance.  Were these programs that were Ford

23    programs before ZF Batavia existed and then ZF

24    Batavia brought those programs over, or are those

1    new programs?

2         A.    These are programs that existed before

3    ZF Batavia.  And Ford has told ZF this is the

4    program that I want you to go by.

5         Q.    Okay.  And how do you know that Ford

6    had told ZF Batavia that they --

7         A.    Because they were told to us in the

8    class when we go to take our training.

9         Q.    Again, you just need to let me -- let

10   me --

11        A.    I'm sorry.

12        Q.    -- finish -- finish my question.

13        A.    I'm sorry.

14        Q.    You were told --

15        A.    I'm excited.

16        Q.    That's okay.  You were told this in a

17   class that Ford said ZF Batavia must implement

18   these programs?

19        A.    That's correct.

20        Q.    And who told you that?

21        A.    Trainer.

22        Q.    Was that trainer someone from ZF or

23   someone from Ford?

24        A.    Let me think a second.  The last class

1    I had was is he -- was a Ford employee who was a

2    pipe fitter, who is -- who is conducting the class

3    and also a job setter.  She was a -- also a Ford

4    employee.

5         Q.    Okay.  Now --

6         A.    That was on the diversity class.

7         Q.    The diversity class, who is that class

8    being taught to, salaried employees or hourly

9    employees?

10        A.    Both.

11        Q.    Okay.  Were you there as a participant

12   or --

13        A.    I was --

14        Q.    -- as an --

15        A.    --  mandatory.  I had to go.

16        Q.    Okay.  You had to go.  And were there

17   hourly employees in the training as well?

18        A.    That's correct.

19        Q.    And who was the presenter of the

20   program?

21        A.    Presenter of the program?  You mean --

22   clarify that.

23        Q.    Who was the speaker?

24        A.    Speaker was Jerry Phillips, the pipe

1    fitter, and Donna Swope Johnson.  Donna Swope

2    Johnson.

3            Q.    Who is Donna Swope Johnson?

4            A.    She is the -- she's a machine operator

5    at Ford or ZF, sorry.

6            Q.    And these two persons, Mr. Phillips

7    and Ms. Swope Johnson were talking about diversity?

8            A.    Yes.  They were our -- yes.

9            Q.    And I'm sorry.  I know you just told

10   me this.  Ms. Swope Johnson, what's her job again?

11           A.    She's a machine operator.

12           Q.    Are both of these individuals hourly

13   employees?

14           A.    Yes.

15           Q.    Were there any other presenters or

16   those were the only two?

17           A.    Dick Newark came in and gave a small

18   speech about diversity and some of the programs,

19   which were videotapes, were done in -- and through

20   the Ford and through the UAW International

21   safety -- I mean, not safety, but out of Detroit --

22   Dearborn.

23                 And there was some union

24   representation there to understand that this was

1    going to be implemented through -- through both --

2    you know, through the union and through the

3    company.

4        Q.    Okay.  Now, the quality program that

5    you spoke of, who was the presenter for the

6    quality --

7        A.    I don't recall that.

8        Q.    Was it -- do you know, was it a Ford

9    person or a ZF person?

10       A.    I -- I -- if -- there was several

11   quality programs.  The ones that I recall was Pam

12   Blanco and she is a ZF employee.

13       Q.    Right.  And at this meeting, someone

14   said Ford wants us to put this quality program in?

15       A.    Yes.

16       Q.    And the program, I take it, has

17   something to do with the quality of the

18   transmissions --

19       A.    That's correct.

20       Q.    -- that you're producing for Ford?

21       A.    Yes.

22       Q.    Okay.  So, in this case, then, the

23   customer has said we want you to meet certain

24   quality standards on the products that you're

1    selling to us?

2         A.    That could be a true -- true

3    statement.

4         Q.    Okay.  Now, total preventative

5    maintenance, who was the presenter for that

6    program?

7         A.    That was an outside person.  I don't

8    recall the teacher's name.

9         Q.    And what, if anything, did this person

10   say in that program that led you to believe that --

11        A.    They wanted to have --

12        Q.    -- Ford was behind the program?

13        A.    Okay.  I'm sorry.  They wanted to have

14   the program under the same as Ford, Ford program.

15   They call it Ford total preventive maintenance.

16   Well, then they dropped was the "F" off of it and

17   went with it, TPM.  But they wanted to understand

18   that the policy that Ford had, Ford wanted to make

19   sure we had the same policy.

20        Q.    The presenter said that?

21        A.    Yes.

22        Q.    Okay.  And this was a guy that's not

23   affiliated with Ford or --

24        A.    He was --

```
 1          Q.     -- ZF?

 2          A.     He was an outside presenter.

 3          Q.     Okay.  Now, you also said that ZF

 4     Batavia policies are based on the Ford policies.

 5          A.     Could you clarify that?

 6          Q.     Well, sure.  You started this by

 7     saying that you believe Ford has certain control of

 8     the Batavia plant.

 9          A.     I have --

10          Q.     And I believe you said one of the ways

11     you believe that Ford controls the Batavia plant is

12     that the policies at Batavia are the same as Ford

13     policies?

14          A.     What I mean by that is that they've

15     got a lot of input.  Ford has a lot of input in

16     that plant and I was just giving you examples of

17     how I -- of things that I really know that I can

18     base stuff on, my conclusion on is that they -- the

19     quality issues and some of the other programs that

20     they -- Ford does control or dictate is a better

21     word to say.  They dictate the program, safety

22     programs, the other things that goes into that

23     plant and to -- 'cause there is Ford employees in

24     there, hourly employees in there.
```

99

1          Q.     Right.

2          A.     And so they still have a huge

3     influence in that plant and they're -- they're --

4     the board of directors from ZF and from Ford do

5     come in once in awhile --

6          Q.     Okay.

7          A.     -- to have a meeting.

8          Q.     And it's your understanding that Ford

9     exercises a great deal of control over the people

10    that it still employs that happen to be housed out

11    at Batavia, like the hourly employees?

12         A.     Yes.

13         Q.     Do you have any specific knowledge

14    regarding Ford being involved in the change in the

15    overtime policy that was made at ZF Batavia?

16         A.     No.

17         Q.     Or any specific knowledge regarding

18    Ford being involved in the AIP change that was made

19    at --

20         A.     No.

21         Q.     -- Batavia?  Any specific knowledge

22    regarding Ford being involved in the personal day

23    change?

24         A.     No.

```
 1          Q.    Or in the bereavement change?

 2          A.    No.

 3          Q.    Who do you currently report to,

 4    Mr. Crump?

 5          A.    Milt Gross, M-I-L-T.  Gross,

 6    G-R-O-S-S.

 7          Q.    He's a ZF Batavia employee?

 8          A.    That's correct.

 9          Q.    Do you know who he reports to?

10          A.    Hassan Saleh.

11          Q.    He's also a ZF Batavia employee?

12          A.    That's correct.

13          Q.    Do you know who Mr. Saleh reports to?

14          A.    Yes, Dick Newark.

15          Q.    And he's also a ZF Batavia employee,

16    correct?

17          A.    That's correct.

18          Q.    Do you know who Mr. Newark reports to?

19          A.    Yes, Dave Adams.

20          Q.    And he's the president of ZF Batavia?

21          A.    That's correct.

22          Q.    Now, since the time that you left

23    Ford, your wages have gone up every year at ZF

24    Batavia, haven't they?
```

1        A.    Correct.

2        Q.    Your base salary has gone up every

3   year, right?

4        A.    That's correct.

5        Q.    And, in fact, your gross W-2 wages

6   have increased every year as well, haven't they?

7        A.    That's correct.

8        Q.    Do you know an employee by the name of

9   Eddie Adams?

10        A.    Yes, I do.

11        Q.    Have you ever spoken to Eddie Adams

12   about any of -- well, about this lawsuit?

13        A.    No.

14        Q.    Or about any of the claims in this

15   lawsuit?

16        A.    No.

17        Q.    Have you spoken to Eddie Adams about

18   whether or not Ford, as you've testified, controls

19   the plant?

20        A.    No.

21        Q.    Eddie Adams has been listed as a

22   potential witness in this case.  Are you aware of

23   any potential knowledge that Mr. Adams has that's

24   relevant to this case?

1          A.    No.

2                MR. VANWAY:  I don't think I have

3     anything else, Mr. Crump.  Thank you.

4                MR. HUNTER:  I don't think so.

5                THE WITNESS:  Okay.

6                MR. SIMON:  Let me just leave, let me

7     talk to Mr. Crump, if that that's all right?  Off

8     the record.

9          (Off the record:  4:22 p.m. - 4:27 p.m.)

10                MR. VANWAY:  Mr. Crump, there's

11     something, I take it, you wanted to add on the

12     record?

13                MR. SIMON:  I'll just direct him --

14     there was a question about -- that Jeff had asked

15     about the AIP plan and whether it was subject to

16     change.  And I just wanted to give Mr. Crump an

17     opportunity to more fully answer that question,

18     so --

19                THE WITNESS:  When I was asked that

20     question, I said, yes, because -- you know, if

21     plant performance deteriorates or if their quality

22     is -- is a problem, it is subject to change for

23     those reasons.  That is -- that's a very true

24     statement.  Our AIP is based on certain -- meeting

1    certain things.  And if those things are not met,

2    then our performance bonus would change.

3                          EXAMINATION

4    BY MR. VANWAY:

5          Q.    Well, that leads, at least from my

6    side, Mr. Crump, to a brief follow-up.  I believe

7    that earlier as we talked about Exhibit 2, you were

8    saying that the understanding you had reached was

9    that those things which were plans were subject to

10   change.

11            And I believe I asked you was the

12   annual incentive plan, the AIP, was that a plan and

13   you said yes.  Is your testimony on that point

14   changing or are you still saying that the AIP was a

15   plan?

16            MR. SIMON:  Objection as vague and

17   ambiguous.  Are you saying that in connection to

18   the sentence there or are you talking about is it a

19   plan generally?  I think that might be some of the

20   confusion here.

21          Q.    Well, it was your earlier testimony.

22   You differentiated between what you called "plans"

23   and what you called "terms of employment."  And I'm

24   asking, then, which category does the AIP fit into?

1    Is it a plan or a term of employment?

2        A.    The AIP is a term of employment

3    because the fact is they -- it is based on my --

4    has an affect on my yearly -- you know, pay, my

5    pay.  But it -- the definition --

6        Q.    Well, I think you've answered my

7    question on that point, Mr. Crump.  Now let me

8    direct your attention to Exhibit 2, I guess the

9    second -- the second page here, left-hand side

10    where it says, Annual incentive plan.  Do you see

11    where I'm at?

12        A.    Yes, I do.

13        Q.    I mean, it specifically uses the word

14    "plan," the annual incentive plan.  Now that you

15    read that, does that cause you to change your

16    testimony at all as to whether --

17        A.    They -- they --

18        Q.    Let me, if I can --

19            MR. SIMON:  Let him finish his

20    question.

21        Q.    Does that cause you to change your

22    testimony at all as to whether the AIP was a plan,

23    given that it has the word "plan" in the title of

24    the benefit?

1          A.     The word "plan" here -- the annual

2     incentive plan is based upon certain -- reaching

3     certain criterias before you're given an AI -- a

4     bonus.  In that terms, that is a plan.  You know,

5     here's your set of conditions you have to meet in

6     order to receive an AIP bonus throughout the plant

7     for every employee.  And that would constitute

8     it -- if you wanted to say had conditions, then I

9     would say that's a plan.

10         Q.     Okay.  It's a plan.  Then you would

11    agree with me, wouldn't you, that later in Exhibit

12    2 where it says, Plans described here are subject

13    to change, that that refers to all plans that are

14    listed here in Exhibit 2, right?

15         A.     Plans, yes.

16              MR. VANWAY:  Okay.  I don't think I

17    have anything further, Mr. Crump.  Thank you.

18              MR. SIMON:  No further questions.

19    Thank you.  We're off the record.

20         (Deposition concluded at 4:31 p.m.)

21

22

23                 _____

24                      James E. Crump

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF OHIO          :

 4                            :    SS

 5     COUNTY OF HAMILTON     :

 6

 7          I, Susan M. Barhorst, a Notary Public in

 8     and for the State of Ohio, duly commissioned and

 9     qualified, do hereby certify that prior to the

10     giving of this deposition the within-named

11     JAMES E. CRUMP was by me first duly sworn to

12     testify the truth, the whole truth, and nothing but

13     the truth; that the foregoing pages constitute a

14     true, correct, and complete transcript of the

15     testimony of said deponent, which was recorded in

16     stenotypy by me, and on the 21st day of October

17     2003 was submitted to counsel for deponent's

18     signature.

19          I further certify the within deposition was

20     duly taken before me at the time and place stated,

21     pursuant to the Federal Rules of Civil Procedure;

22     that I am not counsel, attorney, relative or

23     employee of any of the parties hereto, or their

24     counsel, or financially or in any way interested in
```

107

1    the within action, and that I was at the time of

2    taking said deposition a Notary Public in and for

3    the State of Ohio.

4         IN WITNESS WHEREOF, I have hereunto set my

5    hand and notarial seal at Cincinnati, Ohio, this

6    21st day of October 2003.

7

8

9
              Susan M. Barhorst, Notary Public
10            in and for the State of Ohio.
              My commission expires
11            February 18, 2004

12

13

14

15

16

17

18

19

20

21

22

23

24