1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF OHIO

 3                WESTERN DIVISION, CINCINNATI

 4
      EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
 5
            Plaintiffs,        : Judge Beckwith
 6
      V.                       : Magistrate Sherman
 7
      ZF BATAVIA, LLC, et al.,  :
 8
            Defendants.         :
 9    _____

10         Deposition of WILLIAM DEVITO, taken on

11    Monday, August 11, 2003, commencing at 2:36 p.m.,

12    at the offices of Baker & Hostetler LLP, 312 Walnut

13    Street, Suite 3200, Cincinnati, Ohio, before

14    Susan M. Barhorst, Notary Public.

15

16

17

18

19

20

21                  GIGLIO REPORTING SERVICES
22                     3 CYPRESS GARDEN
                     CINCINNATI, OHIO 45220
23                       513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3       Stephen A. Simon, Esq.
         22 West Ninth Street
 4       Cincinnati, Ohio 45202

 5   On behalf of Defendant ZF Batavia, LLC:

 6       John J. Hunter, Jr., Esq.
         Hunter & Schank Co., L.P.A.
 7       1700 Canton Ave.
         Toledo, Ohio 43624
 8
     Also present:
 9
         Herb Huebner
10
     On behalf of Defendant Ford Motor Company:
11
         Jeffrey L. VanWay, Esq.
12       Baker & Hostetler LLP
         312 Walnut Street, Suite 3200
13       Cincinnati, Ohio 45202

14
     Cross-Examination
15
         by Mr. Hunter                4, 91
16
         by Mr. VanWay                54, 96
17

18

19

20

21

22

23

24
```

3

| | DEVITO DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 16 |
| 3 | | |
| 4 | 99 | 20 |
| 5 | 100 | 33 |
| 6 | 101 | 72 |
| 7 | 102 | 74 |
| 8 | 103 | 75 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                          WILLIAM DEVITO
 2    being first duly sworn, testified as follows:
 3                          CROSS-EXAMINATION
 4    BY MR. HUNTER:
 5         Q.    Sir, will you please state your name
 6    for the record?
 7         A.    William DeVito.
 8         Q.    And, sir, your current address?
 9         A.    1187 Yearwood Lane, Batavia, Ohio
10    45103.
11         Q.    And Mr. DeVito, have you ever had your
12    deposition taken before?
13         A.    No.
14         Q.    You just had an opportunity this
15    afternoon to sit through a -- at least a portion of
16    Mr. Pearce's deposition.  And basically it's an
17    opportunity for me to ask questions and try and
18    understand better the litigation that's currently
19    being brought.
20              I would ask that at any time, if you
21    can't hear me, you don't understand the question or
22    for whatever reason, you don't feel that you can
23    fairly answer my question, then stop me and let me
24    know that you didn't hear the question, understand
```

1    it or whatever the problem might be.  Is that fair?

2         A.    Yes.

3         Q.    Okay.  Is there anything today that

4    would prevent you from being able to go forward

5    with your deposition, in terms of a personal issue,

6    a health issue or anything like that?

7         A.    Not that I can think of.

8         Q.    Okay.  If I use the term "Ford

9    transitional," do you know what I mean by that?

10        A.    Yes.

11        Q.    Okay.  Basically a individual that

12   hired on with ZF Batavia at the time of the joint

13   venture and is now a ZFB -- ZB Batavia employee,

14   okay?

15        A.    That's the way I understand it, yes.

16        Q.    All right.  Do you recall, when did

17   you start with Ford?

18        A.    11/11/67.

19        Q.    So did you have 30 years vested

20   service in the general retirement plan at the time

21   you transferred to Batavia?

22        A.    Yes.

23        Q.    Did you retire or have you retired yet

24   from Ford Motor Company?

6

1          A.     Yes, I have.

2          Q.     And what was the effective date of

3     your retirement?

4          A.     11/30/99.

5          Q.     So if I see a start date of -- what

6     was your state date at Batavia?

7          A.     12/1/99.

8          Q.     Okay.  Immediately after your --

9          A.     Yes.

10         Q.     -- retirement from Ford?  Okay.

11    During your tenure at Ford, what various job

12    positions did you have?

13         A.     Production supervisor.  At one time,

14    there used to be various titles that went with

15    that, but they were all production supervisor, the

16    utility supervisor.  That's it, I guess.

17         Q.     Okay.  And prior to coming on with

18    Batavia, ZF Batavia, what was your position?

19         A.     I forget the exact title.  I guess the

20    last title was group leader.

21         Q.     Okay.  The hire letter that I'm aware

22    of for you, and I'll show you that in just a minute

23    here, indicates that you were hired on as a

24    manufacturing production specialist.  Would that

7

1  have been a promotion to come over to the joint

2  venture?

3        A.    Yes.

4        Q.    Okay.  All right.  Let's talk a little

5  bit about the move over to Batavia.  Did you attend

6  any of the meetings that were held regarding the

7  opportunities at Batavia?

8        A.    Yes, I did.

9        Q.    Do you remember what meetings you

10  attended?

11        A.    I don't know the exact dates.  There

12  was one in either late April or early May and

13  another one in June.

14        Q.    All right.  Well, let's talk about the

15  first one in late April or early May.  Where was

16  that meeting held?

17        A.    It was in the cafeteria.

18        Q.    Do you remember who spoke at that

19  meeting?

20        A.    I don't remember everybody.  Mike --

21  Mike Warden.  I think Dave Adams spoke a little bit

22  at that one and Karl Kehr.  There were others, but

23  I -- there was some Ford people that I've not --

24  that I never met before, so --

1          Q.     Was -- to your knowledge, was Karl

2     Kehr a Ford person or a Batavia person at that

3     time?

4          A.     He was introduced as the chief

5     financial officer, so I would assume that he was

6     already on board with them --

7          Q.     Okay.

8          A.     -- but I don't know that to be a fact.

9          Q.     Do you remember any of the

10    discussions, comments, statements from any of these

11    folks you've identified at this first meeting in

12    April, May?

13         A.     Not really.

14         Q.     Were you given any handouts or other

15    documentation?

16         A.     Not in that -- not in that first

17    meeting.

18         Q.     Okay.

19         A.     There was -- they were -- the general

20    theme was to let everybody know what was going on

21    with the -- the joint venture and the opportunity

22    was there for the Ford people --

23         Q.     Okay.

24         A.     -- and to reassure them that if they

9

1  chose to not go with the company.  That was the

2  things that I remembered from it.

3      Q.    What was your understanding as to what

4  would happen if they didn't go with the company, at

5  least as of this first meeting?

6      A.    As of this first meeting, they painted

7  a pretty rosy picture that there'd be opportunities

8  for -- for everybody, either to stay with the joint

9  venture or return to a Ford facility.

10      Q.    All right.  And then there was a

11  subsequent meeting, I think you said in perhaps

12  June?

13      A.    Yes.  Yeah, there was a meeting in

14  May, but I was on vacation when that one

15  transpired.

16      Q.    All right.  Who was at the meeting in

17  early June?

18      A.    The same -- it was the same folks that

19  I mentioned.  There was a couple different HR

20  people from -- from Ford and there was a

21  representative from Fidelity Investments.

22      Q.    Where was this meeting at?

23      A.    It was also in the cafeteria.

24      Q.    And you're sure this wasn't the May

1    27th meeting?

2         A.    Yeah.  I was on vacation that whole

3    week, so --

4         Q.    Okay.

5         A.    -- I don't know if it was a make-up

6    meeting for -- because there wasn't like the

7    general population -- salary population wasn't

8    there.  There was -- I don't know.  I wouldn't even

9    venture to guess how many.

10        Q.    Because there were a lot or because

11   there were a few or because you don't remember?

12        A.    Well, I don't really remember, but,

13   no, there wasn't as many as the first meeting.

14        Q.    Okay.  Do you remember what was said

15   at this second meeting?

16        A.    That was the one that they told

17   everybody that they would be -- Glenn Marinetti, in

18   my specific case, would be contacting me.  It was

19   the -- all the production personnel and the

20   maintenance personnel, he would contact because he

21   was their manager to either make them an offer or

22   to explain it -- give them a brief explanation of

23   why they weren't receiving one.

24        Q.    Do you remember anything else from

1  that meeting?

2      A.    There was comments that were made

3  about -- that they were going to mirror the Ford

4  benefits.

5      Q.    Okay.  Do you remember anything else?

6      A.    They went into some detail about some

7  of the things, but they -- they covered so much, I

8  don't really remember.  They did talk about -- I

9  don't remember whether they called it a pamphlet, a

10 flier or what, that would further describe the

11 benefits that would be made available to you at the

12 time of the offer.

13     Q.    Did they provide that prior, at the

14 time of this meeting?

15     A.    No.  They just -- there was a lot of

16 questions around getting more specific and they

17 still -- had commented that it was -- hadn't been

18 finalized and was still in the works.

19     Q.    Were you given any documents at this

20 meeting?

21     A.    I think that the representative from

22 Fidelity had some pamphlets that he handed out, but

23 that's all that I recall.  One other thing, I just

24 didn't remember, that was when they talked about

```
 1   the lease program being suspended and the A Plan

 2   being suspended.  You could still purchase a car on

 3   A Plan, I think, through the end of that calendar

 4   year, but that's -- that's it.

 5        Q.    Now, you -- don't you get A Plan

 6   because you're a Ford retiree?

 7        A.    I get Z Plan.

 8        Q.    Z Plan, okay.  Which is better?

 9        A.    It's the same.

10        Q.    Is it?

11        A.    It's exactly the same, just a way of

12   identifying that retirees are buying it, I guess.

13        Q.    Okay.  So you've told me that they --

14   the comment was they would try and mirror the Ford

15   benefits, the tri-fold hasn't been completed at

16   that point.  Anything else you remember that was

17   said to you at that meeting?

18        A.    No, I don't.

19        Q.    Do you remember any discussions about

20   your retirement plan?

21        A.    I can't say that I do at this time.

22        Q.    Okay.  Did you attend any other

23   meetings relative to your potential move over to ZF

24   Batavia?
```

1         A.    Well, I had meetings with Jerry

2    Priest, Rick Williams and a couple brief

3    conversations with Hassan.

4         Q.    Do you remember when you had the

5    meeting -- meetings with Jerry Priest?

6         A.    Oh, yeah.  I also had a meeting with

7    Glenn Marinetti.  His was the first one I had.

8         Q.    Do you remember when that meeting was?

9         A.    I want to say it was like the last

10   week in June, but I'm not sure which day because I

11   had to -- I had to notify them before the vacation

12   shutdown that year if I accepted or declined.

13        Q.    What was the nature of the discussion

14   with Mr. Marinetti?

15        A.    It was basically like a canned spiel

16   that he just presented to me because he was still a

17   Ford employee and it was like -- made the

18   information available and that's about it.

19        Q.    When you say "a canned spiel," I -- I

20   would give that like a negative connotation, like

21   the company line or just -- you know, I don't know.

22   It seems that's a negative to me.

23        A.    Well, he's -- I think it kind of was

24   for dealing with the man for 15 years.  He was --

1    he had very few answers to any questions that were

2    asked.  Unlike most everybody else that talked

3    about it, the other three names I gave you, they

4    had all joined the company by the time I talked to

5    them, ZF Batavia that is.

6            Glenn just went through the motions

7    and read the offer, stated that he didn't -- that

8    he had made some recommendations on who got offers

9    and who didn't, but that's about the only thing

10   that he volunteered.

11       Q.    Okay.  Did you talk to him about

12   anything else at the time of this meeting, in terms

13   of benefits, retirement, vacation, any of that?

14       A.    We had some conversation about it, but

15   I don't remember.  I think he -- I think his

16   comment was it was his understanding that the --

17   that the benefits would be identical.

18       Q.    And when we talk about benefits,

19   that's like medical and dental, things like that?

20       A.    Yeah, medical, dental, vacation,

21   personal time, medical leaves.

22       Q.    Now, you made a comment that you

23   needed to get back to him before the July shutdown

24   with respect to the offer.  I think that's what you

15

1    told me?

2         A.    Yes.

3         Q.    So obviously by that statement, you

4    were presented an offer prior to the shutdown

5    apparently?

6         A.    Yes.  It was a -- my same job, same

7    pay.

8         Q.    Okay.  And you declined that job

9    offer?

10        A.    Yes, I did.

11        Q.    How come?

12        A.    Well, it -- exactly what I told him

13   was that I saw an opportunity there for something

14   that I -- I didn't see as a Ford Motor Company

15   facility and that was opportunities for promotion

16   that hadn't existed in -- at ZF -- or I mean at

17   Ford Batavia.

18             And if all they had to offer was the

19   same job and I wasn't specifically talking about a

20   promotion, just material control, maintenance,

21   labor relations or industrial relations, that I

22   would entertain that, otherwise I would just

23   decline and go with Ford.

24        Q.    Did you have any further discussions

16

1    with him about -- well, about anything?

2        A.    Not that I recall.  I don't think I

3    even talked to him after that.

4        Q.    Okay.  Did you -- if you can pull out

5    Exhibit Number 2.  Do you remember when you first

6    saw that document?

7        A.    Yeah.  It was given to me when they

8    made the presentation.

9        Q.    Okay.  Did you read that document at

10   that time?

11       A.    Not right then.  As I remember, he

12   handed it to me as I was getting ready to leave.

13   It wasn't attached or anything.  It was folded up.

14       Q.    A little tri-fold thing --

15       A.    Yep, yep.

16       Q.    -- that's about yea wide?

17       A.    Yeah.

18       Q.    Okay.  At some point in time, did you

19   read that document?

20       A.    Yes, I did.

21       Q.    Okay.  You were subsequently given

22   another offer or made another offer, I believe?

23       A.    Yeah.

24       Q.    By Mr. Priest, I believe?

1       A.    Yeah, that was sometime in late

2   September, early October.

3       Q.    If you thought the benefits and -- and

4   items like that were going to be the same at

5   Batavia as they were at Ford, why wouldn't you just

6   come on to Batavia?

7       A.    Well, I never did quite figure out how

8   they considered that the retirement was going to be

9   the same, even though they kept saying that.  And

10  part of that, as I continue to read it and -- and

11  discuss it with my wife and other people, that was

12  a -- one consideration.

13          The other was -- the first offer that

14  Jerry Priest made me was the exact same one that

15  Marinetti had.  Then -- then they came back with --

16  with the promotional opportunity, but that was

17  strictly a verbal -- a verbal offer, I think.

18          I don't remember being -- having to

19  sign a sheet.  And I had also had an interview at

20  Sharonville, which was not supposed to have any

21  openings, we were told.  And made an offer over

22  there and I -- so they kind of put me under the gun

23  to make a decision.

24      Q.    Well, in the interim --

1              MR. SIMON:  Hold on a second.

2         A.    And part of what I was -- part of

3    their sales pitch was seeing a million

4    transmissions a year annually because we weren't

5    able to make 400,000 a year, except the one year

6    that I was there.  That was with maximum overtime

7    and minimal time out of the plant for everybody.

8    And all the great opportunities that were going to

9    be there with the CVT, that was the reason that I

10   decided --

11        Q.    To join?

12        A.    -- to join, yes.

13        Q.    After your discussion with

14   Mr. Marinetti, there weren't any more -- I'll call

15   it group meetings with transitional employees and

16   the management, were there?

17        A.    Not that I -- not that I'm aware of.

18        Q.    Okay.  And I think you told me you had

19   some discussions with some of your -- at least

20   former co-workers at that point, Mr. Priest and

21   Mr. Williams?

22        A.    Yes, they were both -- at the time

23   that they discussed it with me, they -- they had

24   both just signed on with ZF.

19

```
 1          Q.    They signed on pretty early in 1990,
 2   if memory serves me, probably second quarter?
 3          A.    For the two of them?
 4          Q.    Mm-hmm.
 5          A.    I'm not really sure --
 6          Q.    Okay.
 7          A.    -- because there -- there was rumors
 8   floating around that they had their confirmation
 9   that they signed to people was not till sometime
10   later.
11          Q.    Let's talk about the discussions with
12   Mr. Williams, for example.  What discussions did
13   you have with him?
14          A.    He basically was reiterating what the
15   opportunities were as he saw them and his reasons
16   for joining the company.  He had some of the same
17   that I did, that was seeing that many units being
18   produced at one location.  I don't think any Ford
19   facility had produced a million transmissions in a
20   year at one location before, either.  And the
21   opportunities that presented their self with the
22   new product starting up.
23          Q.    What was your understanding of the
24   opportunities with respect to the new product?
```

1          A.    Being in on the ground floor of buying

2     equipment, setting -- setting up the processes and

3     also promotional opportunities and assisting with

4     the hiring of the people that were coming on board

5     for ZF Batavia.

6          Q.    Anything else?

7          A.    No, not really.

8          Q.    Ultimately you accepted a position as

9     an MPS with Batavia, correct?

10         A.    Yes.

11         Q.    You've been handed what we've marked

12    for identification purposes as Exhibit 99.  Is that

13    the job offer that you accepted?

14         A.    Yes.

15         Q.    And I see that, again, that was as an

16    MPS.  And it has a start date of December 1, 1999.

17    Do you see that?

18         A.    Yes.

19         Q.    And I believe that was, in part, to

20    assist with your retirement from Ford so that you

21    can have your Ford GRP retirement, as well as draw

22    salary at Batavia, correct?

23         A.    Yes.

24         Q.    To your understanding, is what's

1    occurring currently with your retirement in line

2    with what's in the gray brochure marked as Exhibit

3    2?

4         A.    Could you repeat the question?

5         Q.    Sure.  Let me try and rephrase it.

6    Exhibit 2 says certain things about your Ford

7    general retirement plan, correct?

8         A.    Yes.

9         Q.    Are you receiving what you should be

10   receiving, in terms of your Ford general retirement

11   plan benefits at this time?

12        A.    Yes.

13        Q.    Okay.  We've heard a lot of discussion

14   about representations or promises, I think the term

15   has been used, that were made to Ford transitional

16   employees that have not been followed through by ZF

17   Batavia.  Are you aware or have an opinion about

18   any such promises or representations?

19        A.    Not that I can recall right at the

20   moment.

21        Q.    Do you feel that ZF Batavia or Ford

22   Motor Company has made any representations or

23   promises to you that have not been followed through

24   on since your hiring on with the company in

1    November of 1999?

2         A.    Could you repeat that?

3         Q.    Sure.  Do you believe that -- try to

4    think of a better way to say this.  Do you believe

5    that you have received everything that you are

6    entitled to as a result of your employment with ZF

7    Batavia?

8              MR. SIMON:  Rephrase the question

9    again.  I'm not sure the witness understands your

10   question.  There's a pause there, so I didn't

11   think -- but go ahead, if you understand the

12   question, Bill.

13             THE WITNESS:  No, I'm not sure that I

14   do.

15        Q.    Okay.  Let me try this way.  Do you

16   feel that in order to bring you over as an employee

17   to ZF Batavia, that certain representations or

18   promises were made to you sometime during 1999?

19        A.    Yes, I do.

20        Q.    Okay.  What promises or

21   representations were made to you?

22        A.    That opportunities that were supposed

23   to be there for job opportunities on the CVT

24   program, the promotional opportunities that were

1    supposed to be there.

2        Q.    Were those promotional opportunities

3    within CVT or do you mean in general?

4        A.    CVT.

5        Q.    Okay.  And I didn't mean to interrupt,

6    but what other promises or representations were

7    made?

8        A.    I can't think of any others right at

9    the moment.

10            MR. SIMON:  Can we just take -- I'm

11    sorry.  Can we take just a quick break?  Just take

12    five minutes.  There's no question pending.

13            MR. HUNTER:  Sure.

14        (Off the record:  3:09 p.m. - 3:19 p.m.)

15            MR. HUNTER:  We're back on the record,

16    all right.

17            MR. SIMON:  Thank you, counsel, for

18    letting us take that break.  Mr. DeVito has a

19    condition where he has to visit the rest room and

20    we appreciate that.  I think he may have been

21    confused by your last round of questioning.  I know

22    you were doing your best.  Perhaps Mr. DeVito could

23    explain, if he could.

24            MR. HUNTER:  Sure.

1            THE WITNESS:  Yeah.  I -- I took it to

2    mean that you were asking questions about the

3    conversations with Jerry Priest and -- well, all

4    the other three, not Glenn Marinetti.

5            Part of the reason that I joined the

6    company in -- was this brochure, the agreement that

7    I entered into and it looked like it was identical

8    to Ford, at least on the surface.  That's like as

9    I -- as I looked further into things, the -- the

10   retirement was -- it was implied at least in one of

11   the meetings that it would be -- I would retire

12   with the exact same benefits after 35 years with

13   Ford, that I would -- with -- or I mean, after 35

14   years of a combination with Ford and ZF, that I

15   would retire the same as if I had continued my

16   service at Ford.

17           And no one said that that would be any

18   different.  The paid days off, whether it was

19   personal leave or -- or bereavement or vacation,

20   the vacation was the only one that -- that I had

21   any questions about because it was stated one way

22   as a transitional employee and another way as a

23   retiree joining.  And they made that clear to me

24   when -- when I signed up.  Other than that, I

 1    thought everything was as this brochure says.

 2              And it sounded good.  Like I said, the

 3    opportunities with -- with the new process and

 4    everything and what's in this brochure, that's what

 5    helped me make the decision.

 6         Q.   Well, if I'm not mistaken, the first

 7    offer that you were made, you told me you had the

 8    gray brochure and you rejected the offer, right?

 9         A.   Yes.

10         Q.   And the second offer, you had the gray

11    brochure and you rejected that offer as well,

12    right?

13         A.   Yes, and it had --

14         Q.   And on the third offer, you were given

15    a promotion, in terms of responsibilities.  And

16    that offer was accepted, correct?

17         A.   Yeah, that's correct.

18         Q.   And so the offer that you accepted had

19    very little to do with the gray brochure, but

20    rather, the fact that you were given a promotion

21    that included a significant bump in pay from what

22    you had at Ford?

23         A.   That offer only came about after I was

24    made an offer from Sharonville.  And the reason I

```
 1    accepted it was because it was something different

 2    than what I had been doing.  It didn't have to be a

 3    promotion.  It could have been a lateral move.

 4              I had been stuck at Batavia in a

 5    direct supervisory role the whole time I'd been

 6    there.  I got a couple title changes and a -- and

 7    promotional increase and -- and actually a

 8    promotion to the utility supervisor.

 9              That was -- that, plus the -- this

10    brochure was why I made the decision.  The biggest

11    decision was not wanting to be a production

12    supervisor to the end of my career.  And I saw an

13    opportunity to not do that, and they're the ones

14    that came up with the -- the promotional

15    opportunity because they wanted to maintain me in

16    production.

17        Q.    So what specifically in the gray

18    brochure, then, did you rely upon?

19        A.    Well, the overtime, the paid personal

20    days being the same, the -- the vacation, at the

21    time I made the decision, was going to carry over

22    my current vacation, which was five weeks, which

23    was significant.

24        Q.    Okay.  What else?
```

1        A.     The overtime maintaining the same

2   policies that Ford had in place.

3        Q.     Okay.  What else?  And I would note

4   for the record you have the gray brochure in front

5   of you.  I mean, do you remember or if -- you want

6   to read the brochure --

7        A.     I was going to say, I need to look at

8   it as you keeping asking me more 'cause I'm

9   forgetting.  The merit increase program.

10              MR. SIMON:  Can you see without your

11  glasses, Bill?

12              THE WITNESS:  Yeah, I'm -- because of

13  my diabetes I wind up to where I -- sometimes I

14  have to have them; sometimes I don't to read, so --

15  the holidays, the bereavement was supposed to

16  mirror the package that Ford had.

17       Q.     Where does it say that in the gray

18  brochure?

19       A.     It -- it doesn't say that here.

20       Q.     Okay.

21       A.     But that was one of the things that we

22  were told in the -- in the group meetings.

23       Q.     But you testified earlier that there

24  was nothing that was represented to you by

 1    Mr. Marinetti or others that wasn't followed

 2    through on.

 3            MR. SIMON:  I don't think that's what

 4    he represented.  Go ahead and answer.

 5        A.    Well, I didn't look through for any

 6    specific item.  The three-day bereavement leave is

 7    something that just personally hit me this year.

 8    So there was a lot of things that were covered in a

 9    short period of time and bereavement is not one

10    that you really count on being there.  It's

11    something when you need it, it's there.  It's

12    not -- and when they covered it in the general

13    population meetings in the cafeteria, they just

14    touched on the highlights and made the comments

15    about mirroring or being identical to -- to the

16    Ford benefits that I'd been used to.

17        Q.    When I asked you earlier about the

18    group meetings, you told me you couldn't remember

19    any specific comments or what was said.  Are you

20    telling me now that at those general group

21    meetings, comments were made that the benefits

22    would mirror the Ford benefits?

23            MR. SIMON:  Object.  That

24    mischaracterizes what he said, but go ahead and

```
 1    answer.

 2              THE WITNESS:  What'd you say?

 3              MR. SIMON:  I just objected that that

 4    mischaracterized what you've testified to, but you

 5    can answer his question.

 6         A.   Well, as I'm reading through the

 7    brochure seeing things, like the paid holidays

 8    and -- and under leaves, it's got funeral, the paid

 9    sick days.  I remember the general comments and

10    some of the questions that were asked by people

11    after the meeting, as I read some of this.

12              And also some of the things that were

13    covered in the meeting were covered, like the 401K

14    stuff were covered in the meeting, just as a

15    general statement.  And they had the guy from

16    Fidelity there at the second meeting.

17              So there were -- there were things

18    that were asked individually by myself and other

19    people of Karl Kehr and the representative from

20    Fidelity Investments.  And I think that was the

21    meeting that they introduced -- Tony DeShaw was the

22    guy in charge of the ZF salaried benefits.  So

23    those -- those weren't covered in the general

24    meeting.  They were covered individually or with
```

1    small groups.

2         Q.    You made a comment that you asked

3    questions.  Do you remember what questions you

4    asked?

5         A.    The one that I can -- that I can say

6    for a certainty was what investments were available

7    to us under the ZF Batavia 401K?  This was -- this

8    brochure was not available at that time and they

9    were still working on what funds would be

10   available.  The only thing that they did say was

11   that Ford stock was not going to be an option.

12        Q.    You made reference to the fact that

13   you relied on the gray brochure with respect to

14   vacation.  What was your understanding as to the

15   vacation?  Mr. DeVito, if you want to use that to

16   refresh your recollection, that's great.  I mean,

17   if you can remember --

18        A.    Well, I forget how it was stated that

19   they -- as a transitional employee, I'd carry

20   forward the five weeks vacation and would retain

21   that during my employment there.  It's not in this

22   brochure, but -- because it says 15 years plus.

23        Q.    So do you receive five weeks vacation

24   currently?

1          A.    No.

2          Q.    Any idea why not?

3          A.    When they made me the promotional

4    opportunity and I declined it originally, it was --

5    I -- I noted on the bottom of the page -- as they

6    instructed me at the time, that if I wanted to

7    retire and -- that it would change the -- let me

8    see what they call it here.  The one-time signing

9    bonus, it would change that.  The others had a

10   signing bonus and -- I don't know.  I don't

11   remember what they called the other bonus, and that

12   I would be limited to three weeks vacation, but I

13   could purchase a week.

14         Q.    Specifically your hire letter, Exhibit

15   99, sets forth a special term or condition for your

16   employment, doesn't it?

17         A.    I'm not sure I understood the

18   question.

19         Q.    Exhibit 99 sets forth a -- something

20   very different, in terms of vacation than what's

21   contained in Exhibit 2 for vacation, correct?

22         A.    Yes, it does.

23         Q.    It's -- and you understood that

24   Exhibit 99, you needed to negotiate something

32

```
 1    different than what was contained in the gray

 2    brochure, correct?

 3         A.    No, I did not think it was negotiable

 4    at all.

 5         Q.    Well, is what's provided for vacation

 6    in the gray brochure, Exhibit Number 2, the same as

 7    what's provided for in your hire letter, Exhibit

 8    99?

 9         A.    I'm not sure I understand the

10    question.

11         Q.    You see the first bullet point on

12    Exhibit 99?

13         A.    Yes.

14         Q.    It talks about three weeks of vacation

15    per year parens "(pro-rated based on hire date for

16    1999)" end parens.  Do you see that term?

17         A.    Yes.

18         Q.    Does that term match what is stated as

19    to vacation with respect to Exhibit 2?

20         A.    No.

21         Q.    Is that a negotiated term between

22    yourself and ZF Batavia?

23         A.    That was part of their offer to me.

24    There was no negotiation on my part.
```

```
 1        Q.    Okay.

 2        A.    I was restricted to take it or leave

 3   it.

 4        Q.    Mr. DeVito, we've handed you what's

 5   been marked for identification purposes as Exhibit

 6   100.  I would ask that you take a couple minutes to

 7   read through that, please.

 8        A.    Okay.

 9        Q.    You've had a chance to review Exhibit

10   100?

11        A.    Yes.

12        Q.    Is that your employment application

13   for ZF Batavia?

14        A.    Yes.

15        Q.    On the second page of Exhibit 100, it

16   appears to have your signature there in three

17   different places?

18        A.    Yes.

19        Q.    Is that, in fact, your signature?

20        A.    Yes, it is.

21        Q.    And you read and understood this

22   document certainly before you signed it?

23        A.    Yes.

24        Q.    And prior to signing Exhibit 99 or
```

1    100, I think you told me you had the gray brochure,

2    correct?

3          A.    Yes.

4          Q.    And you read it and understood that

5    document?

6          A.    I understood most of the document, I

7    should say.

8          Q.    What --

9          A.    There's other questions that I -- that

10   I should have asked, I guess.

11         Q.    Okay.  Well, what parts of Exhibit 2

12   didn't you understand?

13         A.    Well, I guess I made some assumptions

14   based on what Ford had -- Ford had done over the

15   years.  Their merit increase program, their annual

16   incentive plan and the 401K because I'd never

17   participated in a 401K before.

18         Q.    Okay.  So you didn't understand the

19   provisions in the gray brochure regarding those

20   items?

21         A.    And probably some more if I reread the

22   whole thing, yeah.  That's what I could -- that's

23   what I can state, too, yes.

24         Q.    Well, let's take a minute, I guess,

1    and go through the gray brochure and tell me if

2    there's anything else in there you did not

3    understand.

4         A.    Well, I guess, based on what I -- what

5    I was told and what I read, I took it as an

6    agreement and a -- and a contract between me and

7    the company or a part of it, part thereof, with

8    this being another part of it.

9         Q.    I think the question that I had asked

10    you is, other than the AIP, the merit and the 401K

11    that you told me about before, was there anything

12    else in Exhibit 2 that you did not understand?

13         A.    Not that I can tell right offhand.

14         Q.    Okay.  In your answers to

15    interrogatories, you indicated that you believe ZF

16    Batavia owes you approximately $33,200 in --

17    somehow related to overtime.  Do you recall that

18    number?

19         A.    Yes.

20         Q.    Okay.  Can you tell me what comprises

21    that number?  What does that represent?

22         A.    That's the overtime, lost hours that I

23    was required to put in that there was no overtime

24    compensated for.

1          Q.     From what period to what period, sir?

2          A.     It was sometime starting in October of

3     2000.

4          Q.     Until roughly May when those answers

5     were supplied?

6          A.     Yes.

7          Q.     Okay.  What I gather --

8          A.     That was also AIP bonus that I did not

9     receive -- or is that what they call it?  Anyway,

10    annual incentive program.

11         Q.     Okay.  We'll come back to that in a

12    second.  But I would gather, then, that your

13    feeling is that prior to October of 2000, you were

14    paid what you thought you were going to be paid?

15         A.     Well, they changed -- they changed my

16    job responsibility sometime and included --

17    included all the MPS work that I'd been doing and

18    the -- they changed the title of the champion and

19    assigned me to -- to supervise some group leaders,

20    as well as doing departmental planning and

21    budgeting.

22              And I was told that if I couldn't fit

23    that in the regular day, I was expected to have it

24    on time, so -- and they didn't care how much casual

1    time I put in.

2         Q.    I think what I had asked you was prior

3    to October of 2000, you were paid, in terms of

4    overtime compensation, that which you felt you had

5    bargained for?  You got what you were supposed to?

6         A.    I -- I can't really answer that 'cause

7    I don't -- I don't have access to the pay records

8    and my time statements to see if I was paid every

9    minute I put down.

10        Q.    Well, what's the --

11        A.    Every hour, I should say.

12        Q.    What's the difference?  I guess, why

13   did you start in October of 2000 with that number,

14   as opposed to December 1 of 1999?

15        A.    Well, the very first package that I

16   had to present, I spent 20-some hours in the plant

17   without pay at -- let's see.  I was trying to -- I

18   think Mr. Pablice was my supervisor at the time and

19   he told me that I would get it done.  Anyway, it

20   was due for the November review -- or I mean, the

21   October review, which came up early in November.

22        Q.    You used the term "casual time."  What

23   is casual time?

24        A.    That's time required to do your job

1    that's nonpaid.

2        Q.    And certainly Ford Motor Company had

3    casual time, did it not?

4        A.    Yes.

5        Q.    And so if you thought things were

6    going to be the same at Batavia as they were at

7    Ford, then certainly you thought you would have

8    casual time at ZF Batavia, correct?

9        A.    Well, yes, I did.

10       Q.    Okay.

11       A.    And I also assumed it would be similar

12   to what Ford's was, which was no more than 45

13   minutes a day.

14       Q.    Ford had a written policy about that?

15       A.    At one time, yes, they did.

16       Q.    But certainly not in 1999, did they?

17       A.    I don't know that it had ever been

18   changed.

19       Q.    I've had testimony from other

20   plaintiffs in this litigation that told me that

21   casual time could have gone up to almost an hour.

22   Would you tell me, then, that that testimony was

23   incorrect?

24              MR. SIMON:  Just object to the extent

1    he wasn't here to hear testimony, so the record

2    speaks for itself as to what they said.  You can

3    answer.

4         A.    I would say that -- to coin a phrase

5    that Len Sennish made when he -- when he made this

6    presentation about November the 15th about overtime

7    was you had to work at least one hour of casual

8    time before you started your overtime and you could

9    work all the casual time you wanted.

10         So I would say that's up to the

11   individual whether they went over that or not.  And

12   that would go for Ford with the 45 minutes.

13         Q.    Well, certainly the company has the

14   right to tell you or give you certain assignments

15   with respect to your work, right?

16         A.    Yes.

17         Q.    And Mr. Pablice never told you that

18   you needed to stay in the plant for 20 hours to get

19   your work done, correct?

20         A.    No, he didn't -- he didn't say 20

21   hours, no.  He said I expect you to stay tonight

22   and get it done.

23         Q.    Okay.  He expected you to give --

24         A.    And that was after -- and that was

1    after a 10-hour day.

2        Q.    Okay.  And that sounds like it was one

3    occasion?

4        A.    No, there was more than one occasion.

5        Q.    What occasions were there?

6        A.    There was -- every quarterly review

7    because every other area manager that they had had

8    an MPS to do the work for them.  I do not have --

9        Q.    Okay.

10        A.    I did not have a maintenance MPS to

11    gather the data for that, so I had to do it all.

12    There was also an annual review that was due in

13    January that I had to prepare for.  I was in the --

14    I was in the facility a total of 27 hours getting

15    prepared for that.  And subsequently in February, I

16    was removed from the job and they put a maintenance

17    MPS and a production MPS and a business unit

18    manager in to replace me.

19        Q.    As I recall, I believe it was sometime

20    in 2001, you had a reduction in responsibilities in

21    the company, didn't you?

22        A.    Yes.

23        Q.    Do you have any documents or anything

24    else that helps support your claim for this

1     $33,200?

2          A.     I have -- I have some of my time

3     statements, but not all of them.

4          Q.     Okay.

5          A.     And I -- the one that I manually fill

6     out, I put in factual starting times and quitting

7     time.  Did not put any overtime charge in 'cause I

8     was instructed not to.

9          Q.     Who instructed you not to put in

10    overtime?

11         A.     Ray Pablice.

12         Q.     And is that because you were an MR

13    band employee?

14         A.     If I was, they never did change

15    anything that indicated that.  He -- he had hired

16    in after I -- after I had been on the job about two

17    years -- or no.  About a year, I guess.  Can I get

18    some water?

19              MR. HUNTER:  Sure.

20              (Off-the-record discussion.)

21         Q.     We were talking about overtime and I

22    just -- I guess I want to be clear.  You're not

23    saying you've never been paid overtime by ZF

24    Batavia, correct?

```
 1          A.    Ask that again, would you please?

 2          Q.    Are you telling me that ZF Batavia has

 3   never paid you overtime?

 4          A.    No, they've paid me overtime.

 5          Q.    Okay.  But at some point in time, you

 6   quit receiving any overtime or what happened?

 7          A.    Effective when they put me in the area

 8   managers' position, I was told that I would receive

 9   no more than what my departments were scheduled,

10   minus the hour casual time.

11          Q.    And you feel that was in -- I'm sorry.

12   Go ahead.

13          A.    And that was for five departments and

14   I was paid what the masses were scheduled.  So the

15   one that had the most people working, if I had

16   people in there 12 hours and I needed to be there,

17   I only got paid for one hour overtime.

18          Q.    Okay.  So if I understand what you're

19   telling me, if there was production scheduled and

20   you had a team in and the team was scheduled for

21   overtime, you were paid the same overtime they were

22   paid?

23          A.    Excluding the hour casual time.

24          Q.    Understood, excluding the hour of
```

43

1   casual time.  So basically you were paid for the

2   scheduled overtime that you were there?

3        A.    To the best of my knowledge, I was.

4        Q.    Okay.  You made a mention about --

5        A.    That's prior to the October date.

6        Q.    Okay.  What happened after the October

7   date?

8        A.    Well, that was when they switched my

9   position and who I was reporting to and I was

10  instructed by Mr. Pablice that I wouldn't get paid

11  and he -- he refused to sign a time statement when

12  I put it on the first one.

13       Q.    Okay.  Did you receive a promotion at

14  that point?

15       A.    No, sir.

16       Q.    Okay.  You just got changed -- your

17  supervisors changed?

18       A.    My supervisor and my job

19  responsibility changed to encompass having three

20  supervisors reporting directly to me.

21       Q.    Then why isn't that a promotion?

22       A.    Well, the explanation to me was under

23  the broad brand that ZF uses, that they could --

24  that was part of their process and the way they

44

1    handled it, it was not a promotion.  It was just

2    changing my specific assignment.

3          Q.    Did you have greater responsibilities?

4          A.    Yes.

5          Q.    You had more people reporting to you?

6    Did you receive an increase in pay?

7          A.    No, sir.

8          Q.    Just extra responsibilities and more

9    people reporting to you and a different title?

10          A.    And not all the people that --

11    everybody at the same level had to do some of the

12    paperwork and legwork.  Like I said, the MPSs

13    are -- they've changed the titles about three times

14    since Dick Newark's been the plant manager and

15    they've change the responsibility that goes with

16    it.

17          Q.    All right.  With respect to the gray

18    brochure, were your discussions with Mr. Priest,

19    Mr. Saleh, Mr. Williams or Mr. Marinetti, was there

20    ever any discussion about what your job

21    responsibilities were going to be at Batavia?

22          A.    Specifically to the gray brochure, I

23    mean -- because one of these was discussed every

24    time.  So, yes, there were some specifics, but

1    there were also some generalities, like the MPS job

2    was basically a combination utility supervisor to

3    fill in when people were off and to -- to take care

4    of the paperwork and projects, the projects that

5    they -- for the next quarter or the next year and

6    to do the monthly reports --

7         Q.    Okay.  I think --

8         A.    -- which summarize everything that is

9    under the superintendent or the area manager title.

10        Q.    I think maybe we've had a bit of a

11   disconnect.  But are you telling me that your --

12   what job you would be doing at Batavia was

13   discussed with Mr. Williams, Mr. Priest, Mr. Saleh

14   or Mr. Marinetti prior to your signing?

15        A.    Not with Mr. Marinetti.  It was

16   generalized with Mr. Priest and Mr. Saleh.  It

17   was -- yes, the specific job was discussed.

18        Q.    Okay.  But that specific job was the

19   job that you were hired on as, correct, which was

20   the MPS?

21        A.    Yes.

22        Q.    Did you ever discuss with them about

23   being an area manager at Batavia?

24        A.    No.

1          Q.    Awhile ago you mentioned something --

2          A.    First, they made the area managers'

3     job was called a champion by Mr. Newark.  Then some

4     subsequent conversations with -- that included --

5     Dave Adams didn't like the term, so they changed it

6     to area manager.  That position has changed

7     three -- actually four times since he's been the

8     plant manager.

9          Q.    Okay.

10         A.    And there's no -- no additional

11    compensation as the job changes or is added to or

12    taken away from.

13         Q.    You made a comment awhile ago about

14    AIP.  And I think you said something about that

15    being a component of the $33,200 number?

16         A.    If I did, I was -- I wasn't really

17    thinking the AIP.  I was thinking about the -- I

18    forget what they call it.  Defined contribution or

19    something like that.  I don't know if it's in here

20    or not.  Part of the 401K process is what I was

21    thinking, not the -- anyway, it's --

22              MR. SIMON:   Interrogatory answers

23    referenced 401Ks, so apparently Mr. DeVito is

24    confused.

47

```
 1          Q.     Okay.  So the AI -- do you have an

 2   issue with ZF Batavia with respect to the AIP

 3   payment?

 4          A.     Yeah, I received none for -- be 2001.

 5          Q.     Do you have any understanding as to

 6   why you received none?

 7          A.     The only -- the only explanation I had

 8   for not receiving one was that I worked excessive

 9   overtime and made too much money.

10          Q.     And who told you that?

11          A.     Chuck Hugan.  And at that time, I

12   asked for a meeting with Dick Newark, the plant

13   manager --

14          Q.     Okay.

15          A.     -- because I worked significant less

16   overtime than the top five people in the building,

17   which were the -- supposedly the only ones that the

18   rumor mill had that were not receiving an AIP and

19   they -- they all received 50 percent and I received

20   zero.

21          Q.     Who were the top five in the plant?

22          A.     They were Bob Price, John Mosely.

23   Right at the moment it alludes me on who the other

24   three are.
```

48

```
 1         Q.    When you say "the top five," in terms

 2    of top five in the amount of overtime compensation?

 3         A.    Yes.

 4         Q.    All right.  You mention that 401K is a

 5    component of your loss.  How is that?

 6         A.    Because it's based on percentage of my

 7    income.

 8         Q.    Okay.  And --

 9         A.    And shoot.  I can't think of the name

10    of the term.  Anyway, there's --

11         Q.    You mean the match?

12         A.    Yeah, the match.  There's an

13    additional match for the transitional employees, so

14    it impacts both those.

15         Q.    Okay.  And we talked before about the

16    gray brochure and you indicated that you had read

17    and understood the gray brochure.  Do you remember

18    that discussion?

19         A.    Yes.

20         Q.    And the gray brochure provides that

21    the items set forth in the gray brochure are

22    subject to change, correct?

23         A.    Yeah, I read that somewhere.

24         Q.    All right.  And so you knew when you
```

1   signed on with Batavia and, in fact, having

2   rejected two prior offers, that the terms and

3   conditions of your employment with Batavia were

4   subject to change, correct?

5        A.    I didn't think that the things in the

6   brochure were subject to change, no, I didn't.

7        Q.    Even though the brochure specifically

8   says they're subject to change?

9        A.    Yeah, I --

10            MR. SIMON:  Objection.  The document

11   speaks for itself.  Go ahead.

12        A.    That's been kind of standard verbiage

13   on any employment agreement or benefits brochure

14   that I've ever received.  And some of them are more

15   inclusive than this one, but -- because most of the

16   benefits that the salaried employees received at

17   Ford -- and RCA is another employer that I had

18   where we're impacted by contractual negotiations.

19   That's the type of changes that I have experienced

20   in my work life.  So that's what I thought that

21   referred to.

22        Q.    Okay.

23        A.    I'm talking about UAW -- or union

24   contract, not --

1          Q.     But certainly you're not covered by a

2     collective bargaining agreement here?

3          A.     No, I'm not.

4          Q.     Okay.

5          A.     But things like vacation, holidays

6     were -- we get the same thing.  So do most UAW

7     salaried supervisors usually get the same.

8          Q.     All right.  With respect to the

9     personal days and vacation days that you'd

10    mentioned before, you understood that, again, those

11    were subject to change because the gray brochure

12    says they're subject to change?

13         A.     No, I don't -- like I said, every job

14    I've ever had, the -- the vacation was pretty much

15    a policy that was set, established and there wasn't

16    any flexibility in it.

17         Q.     Okay.  You've indicated to me that you

18    believed the gray brochure because it was in

19    writing and given to you, correct?

20         A.     I believed it because of the

21    statements that were made by the people making the

22    presentation and then handing it to me in writing.

23         Q.     All right.  And it says in writing

24    that it's going to change and you just simply chose

51

1    not to believe that?

2              MR. SIMON:   Objection.

3    Mischaracterizes the record.   Document speaks for

4    itself.   You can answer.

5              A.    I wouldn't say I made a conscious

6    decision to not believe it.   I would say that in my

7    work life, that I understand certain things are

8    going to change.   For example, prescription

9    coverage, the amount that companies that I've

10   worked for has covered changes, vacations were not

11   flexible, never did change or they always -- if

12   there was a change, I should say, 'cause I only

13   worked one place where it did change and it went

14   up.  Once again, that was a negotiated UAW

15   facility.

16             Q.    With respect to the annual incentive

17   plan at Batavia and what's listed in the gray

18   brochure, Batavia has an annual incentive plan,

19   correct?

20             A.    Yes.

21             Q.    And certainly Batavia has a merit

22   increase program, correct?

23             A.    Yes.

24             Q.    And you thought that you would receive

52

1    how much annually under the annual incentive plan?

2        A.    There was not a discussion of how much

3    the program would be.  It would be how close you

4    came to making all of the objectives.

5        Q.    Okay.

6        A.    And also which of the broad bands you

7    were in.  Like if you're in the manager role or the

8    GSR role, you -- they were different.

9        Q.    Certainly that's not indicated

10   anywhere in the gray brochure?

11       A.    No.

12       Q.    You received a --

13       A.    But it was discussed in the meeting

14   subsequent to the offers.

15       Q.    Do you remember what was discussed?

16       A.    Which band you fell in, what

17   percentage, what the percentage ranges were.  I

18   don't remember what they are right offhand, up to a

19   maximum.

20       Q.    There was a maximum set?

21       A.    Yes.

22       Q.    You remember what that was?

23       A.    No, I don't really.

24       Q.    Okay.  When you say that it was -- the

1    benefits were to mirror Ford, do you know today how

2    the current benefit structure at ZF Batavia

3    compares to Ford?

4         A.    The -- the only one that I know about

5    is the -- the overtime rates.

6         Q.    Okay.  What about the overtime rate?

7         A.    Ford's are -- Ford is $6 an hour

8    higher, I think.  I can't remember the specifics,

9    but like ZF's is like $47 and some change for

10   Sunday and Ford's is $54 and some change, I think.

11        Q.    Do you know anything else about how

12   things compare with folks that are still working

13   for Ford?

14        A.    Their bereavement increased where they

15   can -- for immediate family members, they get five

16   days.

17        Q.    Okay.  Is it Ford's --

18        A.    There's -- there's nothing that -- for

19   bereavement, that is one day for Ford.  It's three

20   or five.

21        Q.    The benefit plans for Ford, in terms

22   of bereavement, apparently, then, they were subject

23   to change?

24        A.    Once again, that was negotiated during

1    the UAW contract and the salaried people got the

2    same benefits.

3         Q.    Okay.  But you understood, then, while

4    you worked at Ford, that your terms or conditions

5    of employment could change from time to time?

6         A.    Certain things have changed over the

7    years, yes.

8         Q.    But that all the things could change?

9         A.    Was I aware that all those things

10   could change, no.

11              MR. HUNTER:  Okay.  Well, it's getting

12   late.  I will allow Mr. VanWay to inquire.

13              MR. VANWAY:  Mr. DeVito, before I

14   start asking questions, do you need a break or are

15   you ready to go on?

16              THE WITNESS:  I'm all right.

17                              EXAMINATION

18   BY MR. VANWAY:

19        Q.    Mr. DeVito, my name is Jeff VanWay.  I

20   don't believe we've met before.  I represent Ford

21   in this case.

22        A.    Okay.

23        Q.    You are aware, aren't you, that you

24   filed claims in this case against both ZF Batavia

1    and Ford?

2         A.    Yes.

3         Q.    Why have you filed claims against Ford

4    in this case?

5         A.    I'm sorry.  Can you --

6         Q.    Yes, sir.  Why have you filed claims

7    against Ford?

8              MR. SIMON:  Objection, to the extent

9    that it calls for a legal conclusion.  Obviously

10   Mr. DeVito's lawyers filed the complaint on his

11   behalf.  But you can go ahead and answer the

12   question as best you can.

13        Q.    I just want your understanding, Mr.

14   DeVito, as to why you have filed this lawsuit

15   against Ford.

16        A.    Well, the --

17             MR. SIMON:  Same objection.  Go ahead.

18        A.    The first statements that were made to

19   the salaried population were made by the Ford

20   people about the joint venture and the subsequent

21   meetings were -- were conducted by Ford people and

22   most of the questions and reassurances came from

23   Ford.

24             So, therefore, it appeared that they

```
 1    had a pretty big interest in getting people to

 2    transition over and made promises that were

 3    subsequently included in what ZF does.

 4         Q.    Okay.  Any other reason, Mr. DeVito,

 5    that you've filed these claims against Ford?

 6         A.    Not that I can think of right now.

 7         Q.    Now, you testified about several

 8    different promises that you believe were made or

 9    representations that were made that haven't been

10    followed through on.  I don't want to go through

11    all of those again.  I just want to make sure I

12    understand your testimony and I haven't missed any.

13              I believe you said overtime, personal

14    days, vacation days, merit increase program,

15    bereavement leave, AIP and then CVT opportunities.

16    And I'm not trying to trick you, Mr. DeVito.

17    That's just all I had in my notes from what you had

18    said.

19              As you sit here, are you aware of any

20    other promises or representations that you believe

21    were made to you that haven't been followed through

22    with?

23         A.    Yeah.  Dave Adams one time made --

24    made a promise to anybody that felt like it was a
```

1    mistake to -- to have left Ford and joined there,

2    that he would help them return to the Ford system.

3    And that, in part, was why I declined the second

4    offer that was made to me because he rescinded that

5    statement.

6         Q.    When did Mr. Adams make that

7    statement, do you recall?

8         A.    It -- it had to be at the close of the

9    second meeting because the first one, it wasn't

10   discussed at all.

11        Q.    So this was before you made the

12   decision to come over to ZF Batavia?

13        A.    Yes.

14        Q.    And you said later he rescinded that

15   statement?

16        A.    Yes.

17        Q.    When did he rescind that statement?

18        A.    It was -- I'm not really sure.  I --

19   had to be before the end of November, but I'm not

20   sure when.

21        Q.    November of which year?

22        A.    Of '99.

23        Q.    Do you know, had you accepted

24   employment with ZF Batavia before he rescinded that

1    statement?

2             MR. SIMON:  Objection, asked and

3    answered.  I think he explained that, but go ahead.

4        A.    That, I can't really say.

5        Q.    And I'm not trying to repeat

6    questions.

7        A.    He didn't come out and rescind it --

8        Q.    I didn't get it.

9        A.    -- to everybody.  He rescinded it to a

10   couple people that went to him and approached him

11   about doing that very thing that had already

12   joined.

13       Q.    Okay.  Did he rescind it specifically

14   to you?  Did you talk to him --

15       A.    No.

16       Q.    -- about it?

17       A.    No, no, I did not.

18       Q.    Okay.  At the time you accepted

19   employment with ZF Batavia, signed your offer

20   letter, were you aware that he had rescinded his

21   statement to some other people?

22       A.    No.

23       Q.    Anything else other than those that I

24   mentioned and then this promise by Mr. Adams, any

1    other promises, representations that you believe

2    were made and not fulfilled?

3         A.    Not that I can think of.

4         Q.    Okay.  Now, would you agree with me

5    that each of these promises that you've listed,

6    including the promise by Mr. Adams, that it was ZF

7    that didn't keep those promises?

8         A.    I don't know.  I don't know that to be

9    a fact, no.

10         Q.    Okay.  Well, let's -- with respect to

11    the overtime change, do you know whether Ford made

12    that change?

13         A.    I don't know what part they played in

14    it, being the minority partner in the -- in the new

15    organization or being the only customer.  I know

16    that they put pressure on to -- to back up on a

17    cost plus agreement where they were paying for the

18    added expense of the excessive overtime.

19              So I don't know how they factored into

20    all of that, but I'm sure they played a part, if

21    not the part as the customer.

22         Q.    And when you say you're sure they

23    played the part as a customer, you mean because

24    indirectly they were saying, reduce the amount that

1    you're charging us for these transmissions that

2    you're making?

3        A.    Yeah.  When they agreed to the cost

4    plus, we were running considerably higher than what

5    was initially quoted, and they agreed to pay it

6    because we were the only supplier that they had.

7    And at some point in time, they decided that that

8    was not economically feasible for them to do after

9    they got into the -- the Firestone tire deal.

10       Q.    And then after that, it's your

11   understanding that ZF Batavia made changes in its

12   overtime policy, which resulted in you getting less

13   in overtime?

14       A.    Yes.

15       Q.    Okay.  With respect to the specific

16   changes that were made, you testified about casual

17   time, about the fact that you worked more casual

18   time at ZF Batavia than you did at Ford.  Do you

19   know whether Ford specifically was involved in that

20   decision and said to ZF Batavia, change your casual

21   time policy?

22       A.    No, I -- I don't know that.

23       Q.    Okay.  With respect to personal days,

24   you testified as to a change that was made in the

1    personal day policy.  Do you know, was Ford

2    involved in that change?

3         A.    No, I do not know.

4         Q.    Okay.  You testified about vacation.

5    Let me just make sure, first, I understood your

6    testimony on vacation.  You knew by the time you

7    accepted employment with ZF Batavia that your

8    vacation was going to be different than what was in

9    Exhibit 2, right --

10        A.    Yes.

11        Q.    -- the gray brochure?  Okay.  You knew

12   you were only going to get three weeks?

13        A.    Yes.

14        Q.    And are you saying that that hasn't

15   been fulfilled, that you didn't get the three weeks

16   that you were supposed to get?

17        A.    No, I have got the three weeks.

18        Q.    Okay.  So don't -- tell me if I'm

19   wrong.  But everything that was represented to you

20   regarding vacation, then, has been fulfilled?

21        A.    Yes.

22        Q.    Okay.  Merit increase, what has not

23   been fulfilled with regard to merit increase?

24        A.    Well, it was explained to me -- I got

```
 1    a -- I got the lowest merit increase I ever had in

 2    my whole career.  I got a .9 merit increase from ZF

 3    and the explanation that -- I forget.  I think it

 4    was Hassan, but I couldn't swear to it.  No, it was

 5    Jerry Priest.  The explanation that he gave me that

 6    part of the agreement was a transitional employee

 7    with ZF was that we would get reduced merit

 8    increases till we fell back in line with -- and/or

 9    the people that worked for ZF caught up with the

10    pay scale.

11         Q.    When was this?  Do you recall this 0.9

12    percent merit?  What year was that that you

13    received it?

14         A.    No, I don't right offhand.  It was the

15    first merit increase I received, but I don't

16    remember when that was.

17         Q.    During any of the meetings that you

18    had with individuals from Ford or ZF Batavia, prior

19    to the time that you became a ZF Batavia employee,

20    did anyone in those meetings ever tell you that

21    your merit increases would be the same as what new

22    hires received?

23         A.    I -- I don't know.  I can't recall if

24    they did or not.
```

1          Q.      Okay.   There's -- I'll submit to you

2     that there's nothing in the gray brochure that says

3     how much merit you would get or whether you would

4     get more or less than the new hires.   You just

5     don't remember whether anything like that was

6     communicated to you?

7          A.      There was a piece of paper that was

8     part of the slides they showed on the screen, but I

9     never was -- never was -- had a copy of -- that did

10    state that there would be a difference.   I don't --

11    I don't remember how it was worded.

12         Q.      And did it -- do you remember, did it

13    say what that difference was going to be that you

14    would receive more or less?

15         A.      No, just that there would be a

16    difference for the transitional employees.

17         Q.      And, in fact, it's your understanding

18    that there has been a difference, right, between

19    the transitional employees and the new hires?

20         A.      Yes.

21         Q.      When you were with Ford, your merit

22    increase, the amount of it varied from year to

23    year, didn't it?

24         A.      Yes.

64

1      Q.    Did the percentage vary as well from

2   year to year?

3      A.    Yes.

4      Q.    Ever any years you didn't receive a

5   merit increase from Ford?

6      A.    Yeah, there were years I didn't.  But

7   at the time, there was -- the salary pay increases

8   were linked to the contractual increases and

9   they -- when they switched to total merit system

10   instead of a -- roughly a three percent annual

11   increase, that's -- that's when -- there were years

12   you didn't get it.

13      Q.    Okay.  You testified earlier about

14   your belief -- and I guess you referred to the

15   subject to change language in Exhibit 2, that it

16   had been your experience that the benefits that

17   were subject to change were those that might be

18   changed also for the UAW represented employees.

19           You understood, didn't you, that ZF

20   Batavia, as a new company, was going to have to

21   enter into new agreements with the UAW?

22      A.    Yes.

23      Q.    And that Ford would have agreements

24   with the UAW that might be separate from what ZF

```
 1    Batavia going forward negotiated with the UAW?

 2         A.    Would you repeat that?

 3         Q.    Sure.  You understood obviously that

 4    Ford and ZF Batavia were different companies,

 5    right?

 6         A.    Yes.

 7         Q.    And that Ford, as a separate company

 8    from ZF Batavia, would negotiate separately with

 9    the UAW for compensation and benefits for Ford UAW

10    employees?  You understood that that would happen,

11    didn't you?

12         A.    Yes.

13         Q.    And you also understood that ZF

14    Batavia, as a separate company, would negotiate

15    separately with the UAW for compensation and

16    benefits for ZF Batavia UAW employees?

17         A.    Yeah, the ones that are not Ford

18    employees do have a different agreement.

19         Q.    Okay.  Now, with respect to the merit

20    increase and the .9 percent merit that you received

21    one year, do you know whether anyone from Ford was

22    involved in the decision to only award you a .9

23    percent merit increase?

24         A.    That, I do not know.
```

1          Q.      You testified about changes in

2     bereavement.   And I thought you also testified that

3     Ford has since made changes in their bereavement

4     leave; is that right?

5          A.      Yeah.   The last contract, they

6     increased the number of days for immediate family

7     members to five instead of three.

8          Q.      Okay.   So at the time you left Ford,

9     it was three?

10         A.      Yes.

11         Q.      Okay.   And at ZF Batavia, it's three

12    as well?

13         A.      It's one for -- for some qualified

14    family members; three for others.

15         Q.      Have you had occasion to need to use

16    the bereavement leave policy since you've been at

17    ZF Batavia?

18         A.      Yes.

19         Q.      And on the occasion that you needed to

20    use it, did you take one day or three days?

21         A.      I took three days off.

22         Q.      Your claim, then, is that you should

23    have been allowed to use five days?

24         A.      Yes.

1          Q.    Because that's what Ford's new --

2          A.    Well --

3          Q.    -- policy was sometime after you left

4    Ford?

5          A.    No.  My claim is that I should have

6    had three days for my father-in-law and I had

7    one --

8          Q.    Oh, okay.

9          A.    -- paid day.

10         Q.    Is --

11         A.    And the statement was made that I

12   could -- that's the procedure.  That's the --

13   that's the way it's established and I could take

14   all the vacation days I wanted with it, so --

15         Q.    Is that -- I just want to make sure

16   that I'm clear.  Is it just the one time that

17   you've used the bereavement leave since you've been

18   at Batavia, ZF Batavia?

19         A.    Yes.

20         Q.    And that's the instance you just

21   talked about with your father-in-law?

22         A.    Yes.

23         Q.    Okay.

24         A.    The -- the other thing I'd like to say

1    about that is it's a change that -- that normally,

2    with my experience at Ford, there would have been a

3    notice put out if they had to make a change like

4    that, so it wouldn't catch you by surprise at the

5    last minute.  And there would be some time that it

6    was cut off.  There was nothing done like that at

7    ZF.  You get there and you get a surprise.

8        Q.    Okay.  Do you have any reason to

9    believe that anyone from Ford was involved in the

10   decision that ZF Batavia made to change the number

11   of bereavement days that you were entitled to?

12       A.    I don't know that.

13       Q.    Okay.  You also testified about AIP,

14   and I believe you said that there's one year that

15   you didn't receive an AIP bonus.  While you were

16   with Ford, you received profit sharing, correct?

17       A.    That's correct.

18       Q.    And weren't there some years that you

19   were with Ford that there wasn't a profit sharing

20   pay out?

21       A.    Yes, but that was -- nobody got a

22   profit sharing or the bonus.  At ZF, it was select

23   people didn't get it.

24       Q.    Okay.

1          A.    And the criteria changes, depending on

2    who you talk to.

3          Q.    Do you have any reason to believe that

4    Ford was involved with the criteria changing as to

5    who got an AIP bonus and who didn't at ZF Batavia?

6          A.    I -- I don't know that.

7          Q.    Okay.  With respect to the CVT

8    opportunities, would you agree with me that there's

9    still an opportunity to work CVT at ZF Batavia?

10         A.    I don't know that I can answer that

11   'cause I don't -- they've changed from a policy

12   where they were out soliciting people to go, to

13   where they started posting jobs while I was off on

14   medical leave, so --

15         Q.    Have you ever posted for a job in CVT?

16         A.    Like I said, they -- they started that

17   system while I was off.  I didn't even know it was

18   in place until just recently when people were

19   complaining that they didn't get considered.

20         Q.    Do you have any reason to believe that

21   you weren't considered for CVT, other than the fact

22   that you weren't present in the plant when those

23   jobs were -- became posted?

24         A.    When I -- when I questioned Hassan

1    about it a couple years ago, he was told -- or I

2    was told by him that I'm too old and that's the

3    future.  I wouldn't be going there.

4        Q.    Okay.  Do you have any reason to

5    believe that anyone from Ford was involved in the

6    decision not to assign you to CVT?

7        A.    Once again, I don't know that.

8        Q.    Okay.  Now, you would agree with me,

9    wouldn't you, while you were employed with Ford,

10   you didn't have an employment contract?

11       A.    I'm sorry?

12       Q.    When you were with Ford, you didn't

13   have an employment contract, did you?

14       A.    You mean the personal contract between

15   me and Ford?

16       Q.    Yes.

17       A.    Just what I signed up to on the

18   application, I guess.

19       Q.    You weren't aware of any agreement

20   that you had with Ford that said Ford couldn't

21   change your compensation or your benefits?

22       A.    I would guess that I -- there's some

23   assumptions that were made based on it being tied

24   to the UAW contract, but no one ever specifically

1    told me they couldn't.

2        Q.    And your understanding was that it --

3    if Ford wanted to, they could change your

4    compensation, couldn't they?

5        A.    I guess the assumption that -- that I

6    made was, no, they couldn't, as far as decreasing

7    the compensation or taking away compensation.

8        Q.    Okay.  For example, when -- in those

9    years when you didn't receive a merit increase, did

10   anyone from Ford come to get your approval and ask

11   you, Mr. DeVito, is it okay if we don't give you a

12   merit increase this year?

13       A.    No.  It was usually determined or set

14   forth by your performance review.  So if your

15   performance review was downgraded, it was expected

16   that you wouldn't get as much or, if any, merit

17   increase.

18       Q.    And that was, as far as you knew,

19   solely within the company's discretion, right, as

20   to whether or not you were going to receive a merit

21   increase or not?  What I mean is they never asked

22   your permission, right?  They just did what they

23   believed was right?

24       A.    Yes, but there was an opportunity to

1    write a rebuttal to the review and subsequently get

2    the -- the merit increase or a merit increase, I

3    should say.

4        Q.    Okay.  In those years when there

5    wasn't any profit sharing awarded, again Ford

6    didn't ask you for your approval on that, right?

7    They just said, we're not awarding profit sharing

8    this year, correct?

9        A.    The years that I remember that there

10   wasn't one, it was -- they put out a letter to the

11   effect to the general population in the plant,

12   salary and hourly, that there wouldn't be no profit

13   sharing.

14       Q.    Okay.  The letter told you what the

15   company's decision was?

16       A.    Yes.

17       Q.    Okay.

18       A.    It also stated the reasons, like

19   lagging sales or general economy.  That's the two I

20   remember.

21       Q.    Okay.  I'll show you a few documents,

22   Mr. DeVito.  Mark this whatever -- Mr. DeVito,

23   you've been handed what's been marked as Exhibit

24   101, which I'll submit to you is a document that

```
 1    Ford produced in this case that came from your
 2    personnel file, your Ford personnel file.  And
 3    really, I only have a couple of questions.
 4              The first is, down at the bottom on
 5    the left where it says, "Employee's Signature," is
 6    that your signature there?
 7         A.    Yes.
 8         Q.    Do you agree with me that you signed
 9    this document while you were working for Ford?
10         A.    Yeah.  When was this dated?
11         Q.    It doesn't appear to be dated.
12         A.    Huh?
13         Q.    It doesn't appear to have a date.  Did
14    you work in more than one Ford facility?
15         A.    Yes.
16         Q.    You worked in Indianapolis first?
17         A.    Indianapolis and then here.
18         Q.    And then Batavia?
19         A.    Yes.
20         Q.    Are those the only two facilities?
21         A.    Yes.
22         Q.    This may clear it up.  Is it your
23    understanding that you might have signed one of
24    these at each facility?
```

1     A.     I signed more than one at Indianapolis

2     because I was laid off twice there.

3     Q.     Okay.  Well, let me show you another

4     one that we'll mark as Exhibit 102.  And this

5     document, Mr. DeVito, Exhibit 102 appears to be

6     very similar to Exhibit 101.  Again, it's a

7     document from your Ford personnel file.  And,

8     again, it appears to be your signature on this

9     document.  Do you agree with me that this is your

10    signature?

11    A.     Yes.

12    Q.     And that you signed this document

13    while you were working for Ford?

14    A.     Yes.

15    Q.     Okay.  Do you recall, Mr. DeVito, when

16    you were with the company in approximately -- with

17    Ford that is -- in approximately 1982, that Ford

18    canceled some vacation days that employees were

19    otherwise entitled to receive?

20    A.     I was not aware of it at the time they

21    did it.  I was when I was recalled to Batavia.

22    Q.     Okay.  You later learned that they had

23    canceled some vacation days?

24    A.     Yeah.

1          Q.    Okay.  Was there a period of time

2     while you were with Ford that Ford started issuing

3     comp time instead of paid overtime to certain

4     salaried employees?

5          A.    Yes, there was to the engineering

6     group; never to the production group that I'm aware

7     of.

8               MR. SIMON:  Are you done with Exhibit

9     101 and 102?

10              MR. VANWAY:  I am.

11         Q.    Do you recall, Mr. DeVito, there ever

12    being a time that Ford stopped paying time and a

13    half and just started paying straight time for

14    overtime for salaried employees?

15         A.    Not that I recall.

16         Q.    Just so the record is clear,

17    Mr. DeVito, I've got a couple of other offer

18    letters, which I believe you were presented by ZF

19    Batavia.  Just want to go ahead and mark these.

20              Okay.  Mr. DeVito, I believe you have

21    in front of you documents -- Exhibit 103 and 104.

22    103, that appears to be the first offer letter that

23    you received from ZF Batavia; is that correct?

24         A.    Yes.

```
 1          Q.     Okay.  And that -- that one, it's not
 2   very clear on the copy, but it looks like you
 3   declined that one on or about June 11th, 1999.
 4   Does that sound about right?
 5          A.     Yes.
 6          Q.     And then Exhibit 105 -- 105 -- 104,
 7   thank you.  Exhibit 104 is the second offer letter
 8   you received from ZF Batavia, correct?
 9          A.     Yes.
10          Q.     And you declined this one as well, it
11   looks like on or about October 13th of '99?
12          A.     That's correct.
13          Q.     Is it your position, Mr. DeVito, in
14   this case that ZF Batavia can't ever change your
15   benefits, or that if they do, it has to be the same
16   as any changes Ford makes down the road?
17          A.     I would say that there are some things
18   I feel that they couldn't do, couldn't change based
19   on meetings and the things, questions that were
20   asked and the answers that were given.
21          Q.     Things that they can't change,
22   regardless of what Ford might do at any time?
23          A.     No.  I would think that they were
24   linked with Ford based on who -- who said -- at the
```

1    time, the Ford HR people and Mike Warden.

2         Q.    So if we could set those aside for

3    just a minute, those changes that you believe that

4    ZF makes, they have to be the same as what Ford

5    makes.  Are there any other changes, changes that

6    you believe ZF Batavia can't make at all,

7    regardless of what Ford may or may not do?

8         A.    I don't know.  Would you re-ask that?

9         Q.    Sure.  My understanding from your

10   testimony is that there are some benefits that you

11   believe ZF Batavia could change only if Ford also

12   changed their policies or benefits with respect to

13   those types of things.  Overtime, I think is one

14   that you referenced earlier in your testimony.

15            I'm asking, are there any benefits at

16   all that you believe were represented to you that

17   you would have when you went to work at ZF Batavia

18   that you believe ZF Batavia doesn't have the

19   authority to change without regard to what Ford

20   does?

21        A.    Yes, I'd say there's some.

22        Q.    And what would those be?

23        A.    The 401K.

24        Q.    Any others other than the 401K?

```
 1        A.    Yeah.  There's probably others, but I
 2   can't think exactly what they might be right now.
 3        Q.    Okay.  If you think of any while we're
 4   still in the deposition today, would you let me
 5   know that?
 6        A.    Yes.
 7        Q.    Thank you.  Now, you received a
 8   transition bonus as part of accepting the offer
 9   with ZF Batavia, correct?
10        A.    No.  What I received was a signing
11   bonus on the final offer.
12        Q.    Okay.  And your signing bonus was
13   $10,000?
14        A.    Yes, paid in three increments.
15        Q.    Prior to that -- in your previous
16   offer letters, you've been offered transition
17   bonus, but you declined those offers.  Do you
18   remember --
19        A.    Yes.
20        Q.    Okay.  What was your understanding
21   that the signing bonus was for?
22        A.    To compensate for no A Plan.
23        Q.    Anything else that you believed it was
24   for?
```

1          A.     Yeah.   I thought part of it was for

2    the difference between Ford's SSIP and the 401K.

3          Q.     Okay.   Anything else that you

4    understood the signing bonus to be for?

5          A.     That's all I can think of right now.

6          Q.     Did someone tell you that that's what

7    the signing bonus was for?

8          A.     I -- the A Plan portion of it was

9    specifically said and I -- as part of it because

10   someone asked a question about it and they -- they

11   referred back to that -- or the transitional bonus

12   as being -- to offset that.   And I -- I think the

13   same is true for the 401K because it was -- the

14   Ford system was totally paid for and I think we --

15   we have to pay a percentage, a small percentage to

16   Fidelity for transactions and things that wasn't

17   there with Ford.

18         Q.     And you said in your answer that you

19   believed that someone was told in one of these

20   meetings that the transition bonus was for the loss

21   of the A Plan, but you didn't receive a transition

22   bonus.   So I want to focus specifically on the

23   signing bonus.   Did anyone ever specifically tell

24   you what your signing bonus was designed to cover?

1          A.     No.

2          Q.     And you said you thought maybe it was

3    to compensate for the loss of the A Plan.  I

4    believe you testified earlier, once you retired,

5    you got the Z Plan, which is basically the same as

6    the A Plan, right?

7          A.     Yes.

8          Q.     So when the A Plan went away, you

9    didn't lose anything, did you?

10         A.     No --

11         Q.     Okay.

12         A.     -- not on that.

13         Q.     Now, I just want to make sure I

14   understand your testimony.  In response to

15   interrogatories in this case, you stated in the

16   interrogatory that you attended the meeting on May

17   27th, 1999.  But I heard your testimony earlier

18   today to be a fact that you didn't attend the

19   meeting.  So I'm just trying to make sure I'm

20   clear.

21              The May 27, 1999 meeting, you were on

22   vacation and did not attend that meeting, did you?

23         A.     That's correct, I did not.

24         Q.     You said that there were rumors

1   floating around the plant about when Rick Williams,

2   Jerry Priest and Hassan Saleh joined ZF Batavia.   I

3   take it it was important to you that they join ZF

4   Batavia?

5        A.    Yeah.  It was important that there was

6   some of the upper management that trusted the

7   system and the new -- the formation of the new

8   company enough to join it.

9        Q.    But by the time you finally accepted

10   the offer and agreed to come on board, each of

11   those individuals had already accepted and come on

12   board as ZF Batavia employees, hadn't they?

13        A.    Yes.

14        Q.    All right.  Now, with regard to the

15   loss of opportunities in CVT, have you suffered any

16   economic damages as a result of not being assigned

17   to CVT?

18        A.    That, I wouldn't really know.  I have

19   a --

20        Q.    Are there any -- is there a specific

21   promotion that you can point to that you believe

22   you should have received and didn't in the CVT?

23        A.    I don't know.  Once again, I couldn't

24   really answer that because I don't know all the

1    moves that have been made over there.

2         Q.    I believe you testified earlier that

3    with regard to overtime, it was your understanding

4    that ZF Batavia was going to maintain the same

5    policies that Ford had had with regard to overtime.

6              Did someone specifically tell you

7    that, that the overtime policy at ZF Batavia will

8    be the same as it has been at Ford?

9         A.    Well, Mike Warden told the group that

10   it was going to -- he either stated identical or

11   mirror the Ford overtime policy.

12        Q.    He specifically referenced the

13   overtime policy?

14        A.    Yes.

15        Q.    With respect to the -- you testified

16   at some length about casual time.  And I believe I

17   understood your testimony to be that once you were

18   assigned to a new position that had additional

19   responsibilities, that the amount of casual time

20   that you worked increased dramatically.  Is that a

21   fair characterization?

22        A.    That's correct.

23        Q.    Okay.  At Ford, when you worked at

24   Ford, you weren't in that same position, were you?

```
 1          A.    No.

 2          Q.    And you didn't have those additional

 3    duties?

 4          A.    No.

 5          Q.    Is it fair to say that the additional

 6    casual time that you worked was directly related to

 7    the additional duties that you'd been assigned at

 8    ZF Batavia?

 9          A.    Yes.

10          Q.    And prior to the time that you

11    accepted employment with ZF Batavia, no one had

12    made any representations to you about how you would

13    be paid as an area manager, had they?

14          A.    No, they hadn't.

15          Q.    Hadn't told you whether area managers

16    would receive overtime or would not receive

17    overtime?

18          A.    No.

19          Q.    You testified about the top five, two

20    of which I think you were able to name that you

21    believe received a 50 percent AIP in the year that

22    you didn't receive an AIP?

23          A.    Would you repeat that?

24          Q.    Sure.  I think you gave some testimony
```

84

 1    earlier that in the year you didn't receive an AIP,

 2    there were the so-called top five that did receive

 3    AIPs?

 4            A.    That's correct.

 5            Q.    Okay.  And I thought that what you

 6    said was that those folks received a 50 percent

 7    AIP.  Did I get that right?

 8            A.    Yes, yes.

 9            Q.    And is that a plant rumor that they

10    received 50 percent or do you know that to be fact?

11            A.    The 50 percent is -- that they

12    received half of what they would have got, not 50

13    percent of their pay.

14            Q.    Oh, okay.  And do you know that to be

15    a fact or is that, again, the plant rumor?

16            A.    No, that's a fact.

17            Q.    And how do you know that to be a fact?

18            A.    I saw at least two of them's checks.

19            Q.    They showed them to you?

20            A.    Yeah.

21            Q.    I believe you testified that with

22    regard to the AIP, it was your understanding that

23    how much AIP you received would be based on how

24    close you came to meeting the objectives that were

1    set for the AIP?

2          A.    That's correct.

3          Q.    And you understood, didn't you, that

4    it would be management that would determine whether

5    or not you had reached the objectives or not?

6          A.    The way they -- the way they've done

7    it, there's a scorecard.  You keep your own, your

8    boss keeps one and the plant manager's office keeps

9    another one.  And based on the total scores, it

10   wasn't all decided by management.  Part of it was

11   by the individuals.

12              And at no time was there any

13   conversation with myself and Dick Newark.  And

14   Chuck Hugan was my boss at the time.  He had only

15   been in the building a few weeks at the time, so he

16   didn't even know how the system operated --

17         Q.    And --

18         A.    -- and so he referred everything back

19   to Dick Newark.

20         Q.    Okay.  And what you're describing with

21   regard to the process, that's the process that --

22   that's how it's worked at ZF Batavia since you've

23   been there --

24         A.    Yeah.

```
 1        Q.     -- these scorecards or whatever you
 2   want to call them?  Prior to the time you accepted
 3   employment with ZF Batavia, did anyone tell you
 4   that there were going to be scorecards kept and
 5   everybody would get together and that's kind of how
 6   they determined the AIP?
 7        A.     No.
 8        Q.     And so it was your understanding that
 9   with regard to whether or not you met objectives or
10   not, that would be the company's decision as to
11   whether or not you met the objectives, correct?
12        A.     Yes.
13        Q.     And I take it you understood that it
14   was possible that there might be years that you
15   might not receive an AIP at all?
16        A.     Yes, but that statement was made in
17   general terms that everybody wouldn't receive one.
18        Q.     Someone made a --
19        A.     If they didn't --
20        Q.     I'm sorry.
21        A.     If they didn't make a profit, if they
22   didn't -- if they missed all of the objectives --
23   so it wasn't just a blank -- it wasn't
24   individualized.
```

1           Q.     Who made that statement, do you

2      remember?

3           A.     No, I don't right offhand.

4           Q.     That was at one of these cafeteria

5      meetings, you think?

6           A.     I can't really recall if it was that

7      one or if it was one of the first meetings we had

8      looking at individual performance for the -- the

9      area managers.

10          Q.     One of the first meetings you had, you

11     mean after you became a ZF Batavia employee?

12          A.     No, not after I did, but when they

13     first had some of the area managers assigned, they

14     had a meeting and individuals were invited to

15     attend with their boss there.

16                 So it could have been one of those

17     meetings.  It could have been one of the general

18     plant meetings.  I really don't recall.

19          Q.     And those meetings with the area plant

20     managers, did you attend one of those meetings?

21          A.     I attended more than one.

22          Q.     If you could pull out Exhibit 2, the

23     tri-fold brochure.  I believe you testified earlier

24     that you took this document to be an employment

88

1    contract between you and ZF Batavia?

2            A.    Yes.

3            Q.    If you would, turn to the second page

4    of this document, the very bottom.  You see where

5    there's the language there in between the black

6    lines?

7            A.    Yes.

8            Q.    Last sentence of that first full

9    paragraphs says, Plan provisions and eligibility do

10   not constitute an employment contract with any

11   individual.  Do you see where I'm reading from?

12           A.    Yes.

13           Q.    Do you remember reading that at the

14   time you reviewed the gray brochure, Exhibit 2?

15           A.    I can't say that I did or that I

16   didn't.  I don't recall.

17           Q.    But you would agree with me, wouldn't

18   you, Mr. DeVito, that since you've become a ZF

19   Batavia employee, that your -- your gross annual

20   wages have been more at ZF Batavia than they were

21   when you were at Ford?

22           A.    I would say in general, yes, yeah.

23           Q.    And would you agree also that setting

24   aside the one year that you didn't receive an AIP

1    bonus, that in most years, your AIP bonus from ZF

2    Batavia is larger than the profit sharing that you

3    received while you were at Ford?

4        A.    No.

5        Q.    Do you remember what the profit

6    sharing you received in the last few years from

7    Ford was?

8        A.    No, I can't right offhand.  There was

9    one that was around 12,000.

10       Q.    Was that in one of your last years

11   with Ford or was that sometime earlier?

12       A.    That was one of the last three years

13   with Ford.

14       Q.    Do you recall --

15       A.    I think all three of them have been

16   higher than the ones I've received at --

17       Q.    Do you recall receiving a bonus from

18   ZF Batavia in the year 2000 of $11,550?

19       A.    What year?

20       Q.    2000, on or about March 10th of 2000.

21       A.    When was it received?

22       Q.    March 10, 2000.  Let me do this.  I

23   don't think we need to mark this, but this might

24   help.

1        A.    That would be based on the '99 --

2        Q.    For the record, I've put in front of

3    the witness Bates stamped document 000116, which is

4    a document produced in this case by plaintiffs.  It

5    appears to reflect that you received an $11,550

6    bonus.

7        A.    Okay.

8        Q.    You don't have any reason to dispute

9    that, do you, Mr. DeVito?

10       A.    No.

11       Q.    Okay.

12       A.    The only -- the only reason I

13   questioned it at all is because -- the time that it

14   was received because it was for the year 2000, I

15   could understand that.  If it's for -- to

16   compensate me for the one month in '99 that was

17   left that wasn't covered by Ford, then that would

18   be a different story.  That would be the one I

19   received --

20       Q.    Okay.

21       A.    -- in March of that year.

22            MR. VANWAY:  Mr. DeVito, I may have a

23   follow-up question or two when I review my notes.

24   But for right now, I think I'll see if Mr. Hunter

1    has got anything further, so we can maybe speed

2    this process up a little bit.

3                              EXAMINATION

4    BY MR. HUNTER:

5        Q.    Mr. DeVito, just a couple of follow-up

6    questions.  Mr. VanWay had indicated or asked a

7    question about some things that can't change, in

8    terms of your employment terms.  And you made a

9    comment that some of them were linked with Ford.  I

10    think it was something along those lines.  Do you

11    remember that comment?

12        A.    I don't.  I don't recall exactly what

13    it was in reference to.  I mean, if I know what the

14    question was, I might.

15        Q.    Let me try it this way.  In terms of

16    your current employment terms with Batavia, are

17    there certain things that you believed are directly

18    linked to what Ford does, in terms of compensation

19    or benefits?

20        A.    I guess based on what I was told in

21    the meetings, as well as the -- the other group

22    that was there.  I thought things like vacation,

23    the -- the bereavement, the holidays, various types

24    of leaves would be linked with what Ford did, yes.

1          Q.    So if Ford changed those policies, you

2     would expect those to automatically change, then,

3     at Batavia?

4          A.    Yes, I -- I guess I did.

5          Q.    What about your --

6          A.    The other thing is the overtime rate,

7     I -- based on the statements that were made, I

8     thought that that would keep pace with not only

9     what Ford did, but since hourly -- Ford hourly

10    employees work at our plant, I thought it would

11    keep pace.  As a supervisor, I didn't think I would

12    make less than the people working for me on

13    overtime, but I do.

14         Q.    Did you feel your salary was somehow

15    linked to Ford?

16         A.    Not my -- not my base salary, no.

17         Q.    What about the merit increases?

18         A.    Do I think they were linked to Ford?

19         Q.    Mm-hmm.

20         A.    From the standpoint of Ford being the

21    only customer and then paying everybody's wages

22    there by purchasing transmissions, yes, I did think

23    that there was.

24         Q.    What about the AIP payment?

1          A.    Well, once again, if -- if -- when

2     Ford was paying the cost plus, that was when we got

3     the -- the maximum that was ever paid on the AIP,

4     or I did, I should say.  I don't know what

5     everybody else got.

6          Q.    Well, I don't understand how -- Ford

7     doesn't have an AIP payment, do they?

8          A.    No, but they contribute to whether we

9     are successful on our goals or not.  It's like

10    reducing the schedule at their plant impacts

11    whether we made schedule or not.  They also are our

12    only customer for service components, which is

13    another measurable.

14          The ones they don't control are health

15    and safety-related issues, that we have certain

16    criteria we have to meet.  But we do compete within

17    the Ford system to be in the -- to be their

18    hierarchy system, as far as where the Ford -- where

19    the plant rates on deliverables and safety.

20          So we compete with the other

21    transmission plants.  We compete with everybody in

22    the division that we sell components from.

23          Q.    When you talk about cost plus, is it

24    your understanding that CVT is a cost plus program?

94

1          A.     If they are, I don't know about CVT.

2    It's the --

3          Q.     And you under --

4          A.     -- U204 that goes in the Escape was

5    the one that was put on cost plus.

6          Q.     Okay.  You understood CVT was the

7    future production at Batavia, correct?

8          A.     Yes.

9          Q.     And you understood even at the time of

10   the joint venture, the CD4E, U204 was scheduled to

11   go out of service in a relatively short term,

12   correct?

13         A.     2005 or six is when they -- when they

14   kept quoting back then, yes.

15         Q.     So cost plus would not have had

16   anything to do with merit or salary or anything

17   else, once the plant jumped over to CVT, correct?

18         A.     Repeat that.

19         Q.     Since CVT is not a cost plus program,

20   you understood that Batavia would essentially have

21   to stand on its own with respect to CVT and pricing

22   and the economics, correct?

23         A.     At some point in time, yes.  They're

24   not there yet, though.

1          Q.    And so the company, Batavia, would

2    have to stand on its own and that your pay would

3    not be related to Ford because of the cost plus

4    pricing?

5          A.    At some point in time when Ford's not

6    their only customer, yeah, I would think that Ford

7    wouldn't have any impact.

8          Q.    All right.  And so what happened at

9    that point in time, in terms of Batavia's ability

10   to make changes to its compensation structure?

11         A.    I didn't understand the question.

12         Q.    Once the CD4E went out of production,

13   would it be your testimony that all of these things

14   would be subject to change at that point in time?

15         A.    I don't know that.  That's a

16   prediction for the future.

17         Q.    But certainly at the time you signed

18   on, the anticipation was that CD4E would go out of

19   production and that the plant would be producing

20   only CVTs?

21         A.    At some point in time, yes, that's the

22   plan.  Who the customers might be, the only one

23   that was in line or committed to and still hasn't

24   signed on the dotted line was Ford Motor Company.

```
 1    So they -- they do play -- play an integral part in

 2    what happens there.  If you don't have a customer,

 3    you don't have to make a transmission.

 4         Q.    Doesn't -- you also sell to Mazda, do

 5    you not?

 6         A.    It's also Ford.

 7         Q.    Part of it is, correct?

 8         A.    The part we sell to is.

 9         Q.    Okay.

10         A.    It's ran by Ford managers.

11              MR. HUNTER:  I don't think I have

12    anything further.

13              MR. VANWAY:  True to my word,

14    Mr. DeVito, I do have a few more.

15              THE WITNESS:  I didn't hear what you

16    said.

17              MR. VANWAY:  I have just a few more.

18              THE WITNESS:  Oh, okay.

19              MR. VANWAY:  I'll be quick.  I'll try

20    to be quick.

21                             EXAMINATION

22    BY MR. VANWAY:

23         Q.    With respect to the different people

24    that you've testified about, Hassan and the others,
```

1    I won't name them all, but the people that you had

2    conversations with about coming over to ZF Batavia,

3    did you have any reason to believe that those folks

4    weren't telling you the truth at the time they made

5    those communications to you?

6         A.    No.

7         Q.    Did you at that time have any reason

8    to believe that -- that they knew that, down the

9    road, after ZF Batavia got up and running, after

10   you went to work there, that ZF Batavia was going

11   to make changes in its benefits or in its policies?

12        A.    I think at least part of -- parts of

13   some of the things they said they knew were going

14   to change based on comments that Hassan has made.

15        Q.    Okay.  And at the time they were

16   making it, did you believe that things were going

17   to change?

18        A.    I'm sorry?

19        Q.    At the time that they made these

20   comments to you, did you believe that things were

21   going to change?

22        A.    Yeah, I bought it hook, line and

23   sinker.

24        Q.    So you didn't believe things were

98

1     going to change?

2          A.     I -- at the time, no, I didn't.

3          Q.     Okay.  Well, what makes you think now

4     that some of these individuals knew that things

5     were going to change?

6          A.     Well, Hassan, for one, has flat out

7     said that he's been privy to information from Ford

8     people and ZF executives, that they knew it right

9     out of the gate.

10          Q.     What information is that, do you know?

11          A.     He has stated that he has documents

12     that -- from Rick Behr.  He used to be the general

13     manager of the division.

14          Q.     Have you seen these documents?

15          A.     I'm sorry?

16          Q.     Have you seen those documents --

17          A.     No, I haven't.

18          Q.     -- that Hassan --

19          A.     I just -- I was there when he was

20     talking with someone else about it.

21          Q.     Do you know what -- what changes

22     Hassan was referring to?

23          A.     No, I -- I don't know all of them.  I

24     know that the ability for people to go to the

99

1    Sharonville plant was not a true statement when

2    they made that.  It was an added inducement to get

3    people to sign on that didn't want to relocate.

4    There were -- there was some people that were told

5    that ZF wasn't interested in them and that

6    Sharonville didn't have openings and if they didn't

7    want to relocate, they would be laid off with --

8    within six months and there were at least six

9    people that were put in that category that went to

10   Sharonville.

11          Q.    Okay.  Any other changes that Hassan

12   referenced?

13          A.    That's the only ones I remember at

14   all.

15          Q.    You had an offer to go to Sharonville,

16   right?

17          A.    Yes.

18          Q.    And you declined it?

19          A.    Yes, but up till -- up till the change

20   in management happened over there, I was -- I was

21   not eligible to go there.  My opportunities were

22   going to be Detroit, Cleveland, Atlanta.

23          Q.    I think you testified that it was your

24   belief that things such as merit increases, for

1    example, are impacted by the fact that Ford is ZF

2    Batavia's customer.  Did I understand that right?

3         A.    Yeah.

4         Q.    Okay.  If, for example, Chrysler

5    started buying transmissions from ZF Batavia, then

6    I assume they would impact merit increases in the

7    same way that you believe Ford does, by virtue of

8    them being a customer?

9         A.    Yeah.

10        Q.    And the CVT opportunities, you

11   expected those to materialize in the future at some

12   point after you went to ZF Batavia, right?

13        A.    Yes.

14        Q.    And you didn't expect to walk in the

15   door on day one, be working in CVT, did you?

16        A.    No.

17        Q.    That was some future opportunity that

18   you thought would come about?

19        A.    Yes.

20        Q.    And with respect to your profit

21   sharing, I know you testified that you thought your

22   last few years at Ford were larger than at ZF

23   Batavia.  I've got documents, Mr. DeVito, that

24   appear to show that in 1996, for example, your

1    profit sharing at Ford was a little over $3,100;

2    1997, it was about $2,982; 1998, $7,700.  Do those

3    numbers sound accurate to you?

4          A.    Is that the gross on it?

5          Q.    I'm sorry?

6          A.    Is that the gross for them?

7          Q.    Right, correct, before taxes.

8          A.    I think so.

9          Q.    Okay.

10         A.    What was the first year?

11         Q.    The first year was 1996 at $3,118.

12   That sound right to you?

13         A.    I don't really recall.  I was just

14   interested in finding out what it was.

15              MR. VANWAY:  Okay.  I don't think I

16   have anything further, Mr. DeVito.  Thank you.

17              MR. HUNTER:  I think we're done.

18              MR. SIMON:  Well, just let me -- can I

19   kick you out of here real quick, and then I might

20   have a question or two?  Off the record.

21              (Deposition concluded at 5:19 p.m.)

22

23                    _____
                                William DeVito
24

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO          :

 4                           :   SS

 5    COUNTY OF HAMILTON     :

 6

 7         I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named WILLIAM

11    DEVITO was by me first duly sworn to testify the

12    truth, the whole truth, and nothing but the truth;

13    that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the        day of October 2003 was

17    submitted to counsel for deponent's signature.

18         I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

103

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3            IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    day of October 2003.

6

7

8
                    Susan M. Barhorst, Notary Public
9                   in and for the State of Ohio.
                    My commission expires
10                  February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24