1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION, CINCINNATI

4
    EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
5
            Plaintiffs,        : Judge Beckwith
6
    V.                         : Magistrate Sherman
7
    ZF BATAVIA, LLC, et al.,   :
8
            Defendants.        :
9   _____

10          Deposition of TED EDRINGTON, taken on

11   Thursday, August 21, 2003, commencing at 1:31 p.m.,

12   at the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20
                    GIGLIO REPORTING SERVICES
21                    3 CYPRESS GARDEN
                    CINCINNATI, OHIO 45220
22                     513-861-2200

23

24

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3      Stephen A. Simon, Esq.
        22 West Ninth Street
 4      Cincinnati, Ohio 45202

 5   On behalf of Defendant ZF Batavia, LLC:

 6      John J. Hunter, Jr., Esq.
        Hunter & Schank Co., L.P.A.
 7      1700 Canton Ave.
        Toledo, Ohio 43624
 8
     Also present:
 9
        Herb Huebner
10
     On behalf of Defendant Ford Motor Company:
11
        Jeffrey L. VanWay, Esq.
12      Baker & Hostetler LLP
        312 Walnut Street, Suite 3200
13      Cincinnati, Ohio 45202

14
     Cross-Examination
15
        by Mr. Hunter                    4, 107
16
        by Mr. VanWay                    66, 110
17
        by Mr. Simon                     111
18

19

20

21

22

23

24
```

3

| 1 | EDRINGTON DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 2 | 2 | 27 |
| 3 | | |
| 4 | 4 | 23 |
| 5 | | |
| 6 | 122 | 26 |
| 7 | 123 | 36 |
| 8 | 124 | 74 |
| 9 | 125 | 75 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                        TED EDRINGTON
 2  being first duly sworn, testified as follows:
 3                        CROSS-EXAMINATION
 4  BY MR. HUNTER:
 5          Q.    Sir, will you please state your name
 6  for the record?
 7          A.    Ted Edrington.
 8          Q.    And your current address,
 9  Mr. Edrington?
10          A.    504 North Cooper Avenue, Lockland,
11  Ohio.
12          Q.    Mr. Edrington, I know you joined us
13  kind of in the middle of Mr. Newsome's deposition,
14  but I want to go over a couple of ground rules and
15  how I hope this is going to work today.
16              In your deposition, I'm going to ask
17  you questions related to the litigation that you
18  have filed against the company.  Hopefully you'll
19  be able to hear me, understand me and generally
20  answer my questions.
21              If at any point in time I either speak
22  to quickly, I mumble, just -- you can't hear me or
23  for whatever reason, you can't fairly answer my
24  questions, I want you to stop me and let me know,
```

5

```
 1    okay?

 2           A.     Sure.

 3           Q.     Is there anything today that would

 4    prevent you from being able to go forward with your

 5    deposition, in terms of a personal problem or a

 6    medical issue?

 7           A.     To forward it?

 8           Q.     To go forward with the deposition --

 9           A.     Oh --

10           Q.     -- to be able to answer the

11    questions --

12           A.     -- no, nothing --

13           Q.     -- I have.

14           A.     -- I know of.

15           Q.     Okay.  If I use the term "Ford

16    transitional," what does that mean to you or do you

17    know what that means?

18           A.     I'd say in relation to us, it's people

19    that worked at Ford that transitioned to ZF

20    Batavia.

21           Q.     And would you consider yourself a Ford

22    transitional employee?

23           A.     Yes.

24           Q.     And how many years did you have in
```

1   with Ford prior to coming over to ZF Batavia?

2          A.    Nine, I believe.

3          Q.    And were all those years of service --

4   well, where were those nine years of service?

5          A.    It was all what we call the

6   maintenance supervisor at that time.

7          Q.    Physically, what plant were you at?

8          A.    Batavia.

9          Q.    Were you at Sharonville or Batavia?

10         A.    Oh, it was Batavia.

11         Q.    Okay.  And I would gather, then, you

12  were a maintenance supervisor that entire time

13  period?

14         A.    Yes, sir.

15         Q.    Okay.  Do you remember who your

16  immediate supervisor was during that tenure?

17         A.    Norm Jurnigan.

18         Q.    Prior to working at Ford Batavia,

19  where were you employed?

20         A.    Beckett Paper Company up in Hamilton.

21         Q.    How long were you with Beckett?

22         A.    Seven years.

23         Q.    And what did you do while you were at

24  Beckett?

7

1       A.    I was a maintenance supervisor the

2  last two years.  Before that, I was hourly

3  maintenance mechanic.

4       Q.    Then you were with Beckett for about

5  seven years.  Where were you before Beckett?

6       A.    Klosterman's Bakery for a year.

7       Q.    Okay.  Probably in maintenance?

8       A.    Yes, maintenance.

9       Q.    Okay.  And prior to Klosterman's?

10       A.    Well, it was Phillip Carey Company in

11  Lockland and then it changed to Panagon and then

12  Jim Walters.  But it's basically the same company,

13  went through a series of owners.

14       Q.    Okay.  And at that -- what was the

15  last entity that it was?

16       A.    Jim Wolters.

17       Q.    Jim Wolters?  At Jim Wolters or any of

18  its predecessors, what position did you hold?

19       A.    When I left, I was maintenance

20  supervisor.

21       Q.    Okay.  I'm not surprised.  All right.

22  So it sounds like you spent a fair amount of time,

23  basically your work career, doing maintenance?

24       A.    Yes, since the seventies.

8

1          Q.     All right.  And as a maintenance

2    supervisor in the various positions, were those

3    always salaried?

4          A.     Yes.

5          Q.     Were you always paid overtime?

6          A.     Not until I came to Ford.

7          Q.     Okay.  What happened, for example, at

8    Beckett, in terms of overtime compensation?

9          A.     We didn't get any.

10          Q.     Okay.  There were no circumstances

11    under which you were paid overtime compensation?

12          A.     No, we'd get days off.

13          Q.     Kind of a comp time type thing?

14          A.     Yeah, they didn't officially call it

15    that, but I -- if I could explain?

16          Q.     Sure.

17          A.     If I worked -- say if I put in a 16-

18    hour day, I said, listen, I won't -- I'm only going

19    to come in a couple hours tomorrow, get everything

20    squared away and then I'm going to go home.

21          Q.     Okay.  Maybe even flex time sounds

22    like it might be a better description.  I mean, it

23    doesn't matter.

24          A.     It really wasn't called that --

9

1          Q.     Okay.

2          A.     -- yeah.

3          Q.     And just so that I'm clear, at the

4    time that you transitioned your position to ZF

5    Batavia, your position was that of maintenance

6    supervisor, correct?

7          A.     Correct.

8          Q.     How many individuals were you

9    responsible for, in terms of direct reports?

10         A.     Initially or now?

11         Q.     At the time still while you were

12   employed by Ford Motor Company just prior to the

13   transition to ZF Batavia.

14         A.     I can give you a ballpark figure of

15   35.

16         Q.     Okay.

17         A.     That number varied with people that

18   either came in early or stayed over off a different

19   shift.

20         Q.     Oh, sure.  I think you told me you

21   were paid overtime -- started to be paid overtime

22   compensation when you came to Ford?

23         A.     That's correct.

24         Q.     How did that work when you were paid

1    at Ford, in terms of how -- what was the overtime

2    scheme?  How did you get paid for that?

3         A.    Well, if it was over 40 hours, we got

4    paid a rate.  I'm not sure exactly what it was.  I

5    think it was like $37.  That was over eight hours

6    and then Saturday was a different rate and Sunday

7    was a different rate.

8         Q.    Now, I've heard from a lot of folks,

9    something that they've referred to as casual time.

10   And we've even had some of the witnesses break it

11   down and indicate that basically anything less than

12   59 minutes that you didn't get paid for at Ford.

13   Is that not your understanding?

14        A.    Now or --

15        Q.    No, no.  When you were at Ford, in

16   terms of the way Ford paid overtime, anything 59

17   minutes or under, is that how it was for you at

18   Ford or no?

19        A.    I believe so, yeah.

20        Q.    Okay.  Because I don't understand that

21   to kind of mesh what you told me before.  You said

22   that over 40 hours, we got paid at a rate?

23        A.    Correct.

24        Q.    So that's not entirely accurate, then,

1    is it?

2         A.    Yes, that's not accurate.

3         Q.    Okay.  So Ford -- you would agree with

4    me that Ford had some -- some understanding or

5    expectation with respect to casual time?

6         A.    My immediate supervisor did.

7         Q.    Okay.  And would it be safe to say

8    that the concept of casual overtime at Ford

9    certainly could depend, in part, upon who your

10   supervisor was?

11        A.    Yes.

12        Q.    And, in fact, did you understand that

13   to some degree to be true at ZF Batavia as well?

14        A.    No.

15        Q.    Okay.  In terms of your immediate

16   supervisor at Ford, again, I guess can you clarify

17   for me how you got paid because it isn't -- I think

18   what you initially told me, in terms of everything

19   over 40 hours, when did you start to get overtime

20   compensation at Ford?  And I'm talking at the time

21   period just prior to the transition.

22        A.    Okay.  Just prior to the transition.

23   I need to go back a little bit.  Norm Jurnigan

24   wasn't my supervisor just at the transition period.

1    That was when I first started there.

2          Q.    Okay.

3          A.    During the transition period or just

4    before, I think it was Milt Gross.

5          Q.    Okay.

6          A.    But, in any case, the expectation was

7    to come in before the shift started to get a lineup

8    from the other supervisors.  And at the end of my

9    shift, I would give the day shift supervisors --

10   I'm on midnights.  I would give the day shift

11   supervisors a lineup what we had done and things

12   they needed to follow-up on.

13         Q.    Okay.

14         A.    And once that was done, I was usually

15   free to go.

16         Q.    Okay.  And, again, kind of, I think,

17   the term I've heard is hand off?

18         A.    Yeah, yeah.  That's a good term.

19         Q.    Okay.  Was that -- I've as well heard

20   that that was anywhere from 15 to 30 minutes on a

21   general -- general basis?

22         A.    The -- like the formal hand off, yes,

23   that would be fair.

24         Q.    And I guess I should have clarified

1    that.  That would be 15 to 30 minutes at the

2    beginning and at the end of the shift?

3         A.    Sometimes less; sometimes no, yeah.

4         Q.    Okay.  I think we kind of got off on a

5    tangent there.  When you came over to ZF Batavia,

6    you came over, I believe, as a maintenance

7    supervisor?

8         A.    Yes.

9         Q.    And that's, I believe, the current

10   position that you hold?

11        A.    Yes.  I think formally it's called a

12   group leader, but it's still the same function.

13        Q.    My understanding is that a lot of

14   folks have had changes, in terms of the name of the

15   position, but many times the responsibilities would

16   be substantially similar to where you started?

17        A.    It was exactly the same.

18        Q.    Okay.  With regard to the litigation

19   that has been brought, it is my understanding there

20   are a number of promises or representations that

21   plaintiffs in this case have alleged that have been

22   broken by either Ford or ZF Batavia.

23             Can you kind of give me a laundry list

24   of the issues that you have with respect to those

1    promises or representations that you feel ZF

2    Batavia has not lived up to?

3         A.    Taking away the paid personal days,

4    which we have gotten back.  But bereavement days,

5    the overtime pay.  Oh, did I mention paid personal

6    days?

7         Q.    Well, yeah.  You said taking away the

8    paid personal days, I presume that's the two-day

9    change from five to three?

10        A.    Yes, yes.

11        Q.    Okay.

12             MR. SIMON:  You might read back what

13   he just said, if you could, John.

14             MR. HUNTER:  Sure.

15             MR. SIMON:  He asked you what he said.

16        Q.    Sure.  I believe it was the -- you

17   made reference to the paid personal days, which I

18   understand the five to three change, okay?  You

19   also mentioned the bereavement change.

20        A.    Right.

21        Q.    And you mentioned overtime.

22        A.    Right.

23        Q.    Is there anything else?

24        A.    At this time, I --

1          Q.    Okay.

2          A.    -- I've kind of drawn a blank here.  I

3    work midnight shift.

4          Q.    Understood.

5          A.    And I'm sorry if I'm a little fuzzy

6    today.

7          Q.    That's all right.  If while we're

8    going through this, you think of something else,

9    just stop me and let me know.

10         A.    Okay.

11         Q.    My understanding is that there were a

12   series of meetings out at the plant with respect to

13   discussions with Ford transitional employees.  Do

14   you remember any of those meetings?

15         A.    I remember one up in the cafeteria.

16         Q.    And was that a meeting that you

17   attended?

18         A.    Yes.

19         Q.    Okay.  Did you attend any other

20   meetings?

21         A.    In regards to CVT and the joint

22   venture?

23         Q.    Well, in regards to any of the

24   meetings that helped influence your decision to

1    either come to Batavia or otherwise.

2        A.    There were a couple of meetings with

3    Hassan Saleh.

4        Q.    Okay.

5        A.    Right now that's all I can think of.

6        Q.    Well, let's talk about the meeting

7    with Hassan.  Those were not meetings like at the

8    cafeteria where, in a sense, all the Ford

9    transitionals were there, were they?

10       A.    Correct.

11       Q.    Were they more along the lines of

12   discussions between yourself and Hassan?

13       A.    Yes.

14       Q.    Was anybody else present for these

15   discussions between you and Hassan?

16       A.    No.

17       Q.    Okay.  In terms of the meeting in the

18   cafeteria that you attended, do you recall, was

19   that one of the meetings that was held on May 27th

20   of 1999?

21       A.    It was about that time of year.

22       Q.    Okay.  Was that the meeting where they

23   had the slide --

24       A.    Right.

1          Q.     -- presentation and whatnot?

2          A.     Exactly.

3          Q.     Okay.  Do you recall who was in

4     attendance at that meeting?

5          A.     Not definitely.  I cannot honestly

6     give you a definite answer.

7          Q.     Is there anybody that --

8          A.     The names, Mr. Kehr.

9          Q.     Okay.

10          A.     Dave Adams may have been there and

11     there were a couple of guys from Ford Detroit were

12     down, I believe.

13          Q.     Do you remember, did you go to the

14     morning or the afternoon session?

15          A.     I'm -- oh, I'm sure it would be in the

16     morning.

17          Q.     The morning, okay.  And I think I may

18     have interrupted you there.  Was there anybody else

19     that you recalled at the meeting?

20          A.     Not definitely that I could honestly

21     say, no, I can't.

22          Q.     Do you remember any specifics of what

23     Mr. Kehr said at this meeting?

24          A.     No.  I just vaguely remember the

18

 1    presentation with the slides.

 2         Q.    Do you remember any details whatsoever

 3    about the slides or anything that you can recall

 4    from the meeting or the slides?

 5         A.    That most of our -- had -- if we would

 6    transition to ZF Batavia, our benefits would stay

 7    about the same.  And there may have been a slide

 8    that listed some of those.  This was some time

 9    back.

10         Q.    Oh, understood.  You used the phrase

11    that if we would transition, the benefits would

12    stay about the same.  Is that something that you

13    specifically remember that Mr. Kehr said?

14         A.    I believe he did, but I won't say

15    definitely, absolutely he said that.  I can't

16    honestly say that.

17         Q.    Okay.  And I guess -- and maybe I

18    asked a poor question.  Was that, from what you can

19    remember, something that Mr. Kehr actually said or

20    was that kind of your impression of the overall --

21         A.    That was my impression of the overall

22    meeting.

23         Q.    Okay.  Do you specifically recall

24    anything that either Karl Kehr or Dave Adams might

1    have said at the meeting?

2         A.    One of them said we want to excel with

3    our new joint venture.  We want the best people and

4    to be competitive in the market, we need the best

5    people.  And, therefore, that's why we're offering

6    good salary and good benefits.

7         Q.    Okay.  Do you remember anything else

8    from that meeting?

9         A.    How -- how much of an improvement the

10   CVT would be and how much it would bring the

11   company into the new age of automotive

12   transmissions, if you will.

13        Q.    Do you remember, was there any real

14   discussion with what CVT was or could be?

15        A.    Oh, yeah.

16        Q.    Okay.

17        A.    A new type of transmission based on

18   varying pulley sizes and dimensions, ratios.  And

19   it would give it approximately 10 percent increase

20   in fuel economy, be lighter.

21        Q.    Okay.  Do you remember anything else

22   with respect to the comments about CVT?

23        A.    That we would be one of the first

24   people to actually produce this item.

1        Q.     That the plant, ZF Batavia, would be

2    the --

3        A.     Yes, okay.

4        Q.     Anything else regarding CVT?

5        A.     Not specifically that I can recall.

6        Q.     Okay.  Anything else about the meeting

7    that you can recall with any degree of specificity?

8        A.     No.

9        Q.     As of this meeting -- strike that.

10            You had mentioned discussions or

11   meetings with yourself and Mr. Saleh.  Do you

12   remember, were those discussions prior to this May

13   27th meeting?

14       A.     No.

15       Q.     Okay.  So they were after that?

16       A.     That's correct.

17       Q.     As of May 27th, had you made a

18   decision as to whether or not to join the joint

19   venture?

20       A.     Definite decision, no.

21       Q.     What issues were open in your mind as

22   of that -- the end of that meeting on May 27th?

23       A.     Well, I didn't know how -- what our

24   retirement would be, the health plan, 401K, the

1    benefit package generally.

2         Q.    Okay.  And after -- again, after the

3    meeting on the 27th, those issues were open issues

4    for you?

5         A.    Yes.

6         Q.    Okay.  In terms of the discussions

7    then with Hassan, how did that come about?

8         A.    I just asked him, how is the new

9    company going to be, as far as benefits, pay,

10   retirement and the -- just the overall employment.

11        Q.    Hassan wasn't in human resources at

12   that time, was he?

13        A.    No.

14        Q.    I guess I'm curious as to why you

15   would ask Hassan about such things, as opposed to

16   somebody in human resources or one of the

17   presenters at the meeting on May 27th?

18        A.    Well, if I'm not mistaken, he had

19   transitioned at that time.

20        Q.    Okay.

21        A.    And I dealt with him more on a daily

22   basis than the people in HR.

23        Q.    Okay.  Did you take some comfort in

24   the fact that he had joined the joint venture?

22

```
 1          A.    Oh, sure.

 2          Q.    Okay.

 3          A.    Had it not been a good thing, he

 4   probably wouldn't have joined.

 5          Q.    Okay.

 6          A.    That was my opinion, my perspective.

 7          Q.    Okay.  Let's talk, then, to the extent

 8   that you can recall, what -- how many discussions

 9   did you have with Hassan?

10          A.    I think two --

11          Q.    Two?

12          A.    -- total.

13          Q.    Can you put a date on those for me?

14          A.    No, sorry.  I'm afraid --

15          Q.    Okay.  How about any detail, in terms

16   of the discussions?

17          A.    The one thing he said was you can't

18   keep your Ford stock.  You have to put it into one

19   of the Fidelity programs.

20          Q.    Okay.

21          A.    Specifically that's --

22          Q.    You told me that as of the May 27th

23   meeting, you -- after that meeting, you had still

24   not made up your mind to transition.  Is there any
```

1    event or information that you obtained after the

2    May 27th meeting that kind of in and of itself

3    helped to help you -- helped you make that

4    decision?

5         A.    No.  I just thought it would be a good

6    move to be in on the ground floor, if you don't

7    mind my using that expression, as far as this new

8    transmission that was going to be on the cutting

9    edge of technology.  And I figured -- I wanted to

10   be proud to be one of the guys that made this

11   thing.

12        Q.    Okay.

13        A.    It was exciting.

14        Q.    Did you and Hassan discuss anything

15   with respect to CVT?

16        A.    The transmission itself?

17        Q.    Mm-hmm.  Or, well, in terms of --

18        A.    No.

19        Q.    -- your -- what the joint venture

20   might hold for you with respect to the CVT?

21        A.    Specifically, no.  I don't remember.

22             MR. HUNTER:  Okay.  Steve, do you have

23   Exhibit 2 there handy?

24        Q.    Mr. Edrington, Steve has handed you

1    Exhibit Number 2.  Can you take a moment to take a

2    look at that for me?  You've had a chance to review

3    that document?

4         A.    (Witness nodded.)

5         Q.    Exhibit Number 2, we've referred to it

6    as the gray brochure.  You've seen that document

7    before?

8         A.    Yes.

9         Q.    You did not receive a copy of Exhibit

10   2 at the May 27th meeting, did you?

11        A.    No, sir.

12        Q.    Okay.  With respect to Hassan, I think

13   you'd told me you'd had a couple discussions with

14   him.  Was he the one that made you or brought you

15   your offer letter?

16        A.    I believe that's the case, yes.

17        Q.    All right.  Do you remember, did he

18   come out on the floor and bring you the offer

19   letter?

20        A.    No.  I went up to his office.

21        Q.    Were you expecting that you were going

22   to receive an offer from ZF Batavia?

23        A.    Oh, yes.

24        Q.    Okay.  And did -- had you had

1      discussions with Batavia about specifically what

2      the compensation would be, in terms of the base

3      salary and things like that?

4           A.    In actual numbers?

5           Q.    Mm-hmm.

6           A.    No.

7           Q.    So would it be safe to say that the

8      offer letter, in terms of the dollar amount -- I

9      don't want to say it was a surprise to you, but you

10     didn't know exactly what that was going to be?

11          A.    I believe that's the case.  I don't --

12     I would have to see the letter.

13          Q.    And I'll give that to you here in one

14     second.  With respect to --

15          A.    I don't remember actually.

16          Q.    Sure.  No, understood.  With respect

17     to Hassan, he called you up into the office and

18     then he handed you the offer letter?

19          A.    Well, he talked about it and then he

20     said -- you know, we are going to offer you -- we

21     are offering you a position with the new joint

22     venture.

23          Q.    Okay.  Do you remember what else he

24     said?

1     A.     He said if you decide to go with the

2     joint venture, your benefits will stay about the

3     same as Ford or about equivalent to the benefits

4     that you would receive if you stayed with Ford.

5     Q.     And did you feel that that was

6     consistent with what you were told at the May 27th

7     meeting?

8     A.     Yeah.

9     Q.     Okay.  And was that consistent with

10     what you had discussed with Mr. Saleh in the

11     meetings we've talked about prior to the offer

12     letter?

13     A.     Yeah.

14     Q.     Okay.  Do you remember any other

15     comments that Mr. Saleh had made?  Well, made at

16     the time of giving you the offer letter?

17     A.     Not specifically, no.

18     Q.     Do you remember, did you sign the

19     offer letter right there at that time?

20     A.     I think I took it home, brought it

21     back the next day.

22     Q.     Okay.  Mr. Edrington, we've handed you

23     Exhibit 122.  If you could take a moment to review

24     that.

27

```
 1        A.    Okay.

 2        Q.    The Exhibit 122, is that the offer

 3   letter we've been discussing here?

 4        A.    That's correct.

 5        Q.    And that's your signature down there

 6   on the bottom left?

 7        A.    That's correct.

 8        Q.    And there's a June 18th, 1999 date on

 9   that letter.  If you know, is that the date you

10   received it from Hassan or would that be the date

11   you signed it or is that date one and the same

12   or --

13        A.    I believe this is the date that I --

14   well, it's the date that I signed it --

15        Q.    Okay.

16        A.    -- but I think I received it the day

17   before.

18        Q.    Okay.  Did you receive any other

19   documents with Plaintiffs' Exhibit -- or I'm

20   sorry.  -- with Exhibit 122?

21        A.    I got one of these, I believe, at the

22   same time.

23        Q.    Okay.

24              MR. SIMON:  For the record --
```

28

```
 1        Q.     And when we say --

 2               MR. SIMON:  I'm sorry.

 3        Q.     And when we say "one of these," you're

 4   talking to the --

 5        A.     Oh, I'm sorry.

 6        Q.     -- Exhibit 2, gray brochure?

 7               MR. SIMON:  Sorry.  We just needed to

 8   clarify --

 9               THE WITNESS:  I'm sorry.

10               MR. SIMON:  -- that for the record.

11               THE WITNESS:  Sorry.

12        Q.     All right.  Did you discuss Exhibit 2

13   with Hassan when he gave that to you?

14        A.     No.  I think it's pretty well self-

15   explanatory.  We may have gone over it.

16        Q.     Okay.  Well, how long do you think

17   your meeting was with Hassan, in terms of -- up in

18   his office to go over or discuss the hire letter?

19        A.     This and --

20        Q.     Mm-hmm.

21        A.     -- Exhibit 122 and Exhibit --

22        Q.     Two.

23        A.     -- 2?  Maybe a half hour.

24        Q.     Okay.  And I would gather since you
```

1    didn't sign the offer at that point in time, still

2    hadn't made up your mind to join the joint venture?

3        A.    On the initial meeting, right.

4        Q.    No, sir.  I'm talking at the time that

5    you met with Hassan and he gave you the hire

6    letter --

7        A.    Right.

8        Q.    -- you didn't sign it as you sat there

9    in that office, correct?

10        A.    That's correct.

11        Q.    And I guess I'm -- I'm presuming from

12    that -- and correct me if I'm wrong -- that because

13    you didn't sign it, that, again, as of that point,

14    you had not made up your mind?

15        A.    That's correct.

16        Q.    Okay.  After the meeting with Hassan,

17    did you have any other discussions regarding your

18    transitioning to ZF Batavia with anybody else from

19    ZF Batavia or Ford?

20        A.    I don't think so.

21        Q.    Okay.  Is there something that you

22    could point to or why is it that, then, overnight

23    you decided to accept the offer?

24        A.    Well, I read my Exhibit 2 --

```
 1          Q.    Okay.

 2          A.    -- document and considered the future

 3     of what I thought the CVT would bring to the

 4     company.

 5          Q.    Okay.

 6          A.    I mean, it's a big change --

 7          Q.    Oh, understood.

 8          A.    -- and I just wanted to think it over.

 9          Q.    Okay.  Were you aware or concerned

10     that Ford Batavia was possibly subject to closing

11     down at sometime in the foreseeable future back in

12     1999 when you were making the decision here?

13          A.    No.

14          Q.    You've made comments about CVT and

15     being the future of ZF Batavia.  To your

16     understanding, was there any program slated for

17     Ford Batavia after CD4E?

18          A.    Not that I know of.

19          Q.    Okay.  And in 1999, did you understand

20     that serial production for CD4E was scheduled to

21     close in, I believe, 2004?

22          A.    I knew it would come to an end

23     sometime --

24          Q.    Okay.
```

1        A.      -- but I was sure that we would have a

2    new product of some sort.

3        Q.      Okay.  I think you told me that you

4    took Exhibit 2 and read it at home, apparently on

5    the night, I would guess, of June 17th of 1999?

6        A.      Probably.

7        Q.      Do you remember, did you read that

8    document kind of cover to cover?

9        A.      Well, I'm sure I did.

10        Q.      Okay.  Can you take a look on Exhibit

11    2 for me on the second page?  And if you look at

12    the bottom right-hand side, see the kind of two

13    thicker lines --

14        A.      Okay.

15        Q.      -- and the language sandwiched in

16    between those lines?

17        A.      Mm-hmm.

18        Q.      In that -- I won't call it a box, but

19    between those two lines, do you see the language

20    that says, Plans described here are subject to

21    change?

22        A.      Yeah.

23        Q.      When you read that, what did that mean

24    to you?

1          MR. SIMON:  Objection.  Lack of

2     foundation.  Go ahead.

3          MR. HUNTER:  He's testified he read

4     the document cover to cover.

5          MR. SIMON:  Objection, foundation.  Go

6     ahead and answer.

7     A.    I took that to mean benefit plans.

8     Q.    Okay.  But you would agree with me the

9     document doesn't say benefit plans?

10          MR. SIMON:  Objection.  Document

11     speaks for itself.

12     A.    No, it doesn't say benefit plan.

13     Q.    Okay.  Why would you, then, assume

14     that it meant benefit plans?

15     A.    Well, summary plan description, as I

16     understand it, is like a full booklet describing

17     medical, life insurance, what I -- like what I call

18     benefits.

19     Q.    Okay.  Well, is salary a benefit?

20     A.    No.

21     Q.    Is overtime a benefit?

22     A.    No.

23     Q.    Maybe I should say, are either one of

24     those a benefit plan?

```
 1          A.    No.

 2          Q.    Okay.  Is an annual incentive plan a

 3    benefit plan?

 4          A.    I don't think so.

 5          Q.    Well -- and I guess I'm asking kind of

 6    your opinion.  I mean, in your opinion.  I'm not --

 7          A.    Okay.

 8          Q.    I don't want a legal, but just, in

 9    your opinion, is annual incentive plan a benefit

10    plan?

11                MR. SIMON:  Objection.  Calls for a

12    legal conclusion.

13          A.    I don't think it's a benefit.

14          Q.    Okay.  What about merit increase?

15          A.    I don't think -- well, no, I wouldn't

16    call that a benefit.

17          Q.    Would it be safe to say you're perhaps

18    a little unsure about that one or no?

19          A.    Sure.

20          Q.    Okay.  Were you unsure about the

21    annual incentive plan?

22          A.    I don't think that's a -- in my

23    opinion, it would be classified as a benefit.

24          Q.    Okay.  Back down to the little
```

1    sandwich language on the bottom right-hand side, do

2    you see as well the language that says, Plan

3    provisions and eligibility do not constitute an

4    employment contract with any individual?

5        A.    Right.

6        Q.    Okay.  And what did you understand

7    that to mean at the time that you read it?

8        A.    The benefit plans, the packages, like

9    the 401K and the life insurance and health

10   insurance.

11       Q.    That they what?

12       A.    The benefit package -- what I call as

13   the benefit package, the medical, life insurance,

14   those things, that's not a contract.

15       Q.    And you exclude from that, then,

16   anything related to salary?

17       A.    Correct.

18       Q.    Can I ask you why?  I don't understand

19   why.

20       A.    Well, the salary is a specific number

21   in writing.

22       Q.    But it certainly isn't in Exhibit 2.

23       A.    This doesn't address salary, Exhibit

24   2, I don't think.

1          Q.     All right.  You received a transition

2     bonus, correct?

3          A.     That's correct.

4          Q.     All right.  And I see in your hire

5     letter, for example, Exhibit 122, it says, "This

6     bonus is designed to address any monetary

7     differences between Ford benefits and ZF Batavia's

8     new plan."  Do you see that language?

9          A.     Yes.

10          Q.     Do you believe that that statement is

11     an accurate representation of what the money was

12     directed for?

13          A.     I wasn't under that impression.

14          Q.     Okay.

15          A.     I was under the impression talking to

16     Hassan that this was to take the place of the A

17     Plan, which we were no longer eligible for.

18          Q.     Well, when you read your hire letter

19     and it says something different than what you had

20     been told by Hassan, did you become concerned?

21          A.     No.

22          Q.     Well, it involved a fair amount of

23     money there, didn't it, $25,000?

24          A.     Oh, sure.

1          Q.      You didn't feel compelled to ask

2     somebody what the difference was?

3          A.      No.  I just assumed it was from his

4     statements.  He didn't specifically say this is to

5     take the A Plan --

6          Q.      Okay.

7          A.      -- nothing else.

8          Q.      Okay.

9          A.      But the impression I got was this was

10    to make up the loss of the A Plan.

11         Q.      And I have to confess, but that's just

12    contrary to what it says in the letter, isn't it?

13              MR. SIMON:  Objection.  The document

14    speaks for itself, argumentative.  You can answer.

15         Q.      That's not what the letter says, is

16    it?

17              MR. SIMON:  Same objection.

18         A.      The letter does not say that, no.

19         Q.      Okay.

20         A.      But I just -- that was my impression.

21         Q.      Sure, okay.  Mr. Edrington, we've

22    handed you what's been marked for identification as

23    Exhibit 123.  If you could, take a moment to review

24    that document for me.

1          A.    Okay.

2          Q.    Have you seen document 123 ever?

3          A.    Yes.

4          Q.    Okay.  I note that this is an

5    application for employment for yourself?

6          A.    Correct.

7          Q.    Okay.  You will note that the document

8    is unsigned.  Do you ever remember signing a copy

9    of this document?

10         A.    No, I don't remember.

11         Q.    Do you know how it is that you filled

12   out apparently the front package, but didn't sign

13   the back page?

14         A.    No, I don't know how that came to be.

15         Q.    Was that a conscious decision, if you

16   know, on your part?

17         A.    No.  I was told this was just a

18   formality.  We had to have an application in to

19   satisfy some kind of government regulations.

20         Q.    Okay.  Do you remember reading the

21   document before you filled out the document?

22         A.    No.  I didn't put much importance on

23   us because they said it was just a formality, quite

24   frankly.

```
 1          Q.    Okay.  Was that somebody up in HR?

 2          A.    I believe that's the case, yeah.

 3          Q.    Okay.

 4          A.    I can't give you a name.

 5          Q.    Okay.

 6                MR. SIMON:  He didn't ask you for a

 7    name.  Do you want to know a name?

 8                MR. HUNTER:  If he knows, sure.

 9          A.    I don't.

10          Q.    Okay.

11          A.    Here, again, this was how long ago?

12          Q.    Four-plus years.  All right.  We're

13    done with that document, unsigned and otherwise.

14                I have received from you -- from your

15    attorney certain answers to interrogatories.  And

16    in those answers, you indicated that you had a loss

17    of $7,970.  Do you remember giving your attorney

18    that information?

19          A.    Yes.

20          Q.    Okay.  Can you tell me, how did you

21    get to that number?

22          A.    Overtime that I was not paid for and,

23    if I'm not mistaken, a couple of bereavement days

24    that I didn't get paid for.
```

```
 1          Q.     Okay.

 2          A.     It was my father-in-law.

 3          Q.     Let's talk about the overtime for a

 4    minute.  How did you -- how did you calculate the

 5    overtime component of that number?

 6          A.     I just looked at the hours worked and

 7    hours I got paid for.

 8          Q.     Okay.  So you have all your time slips

 9    relevant to your calculation?

10          A.     Part of them, I'm sure.

11          Q.     Okay.  Did you give those all to your

12    attorney?

13          A.     I believe.  I could be wrong.

14          Q.     All right.  So if I take the time

15    slips that I received from your attorney and I

16    compared them to -- well, let's strike that.

17          A.     What I was actually paid for?

18          Q.     Yeah.  Let's try and do it this way.

19    Do they cover a specific time period, in terms of

20    the entire time that you worked at ZF Batavia or

21    only after the change in policy?

22          A.     After that casual hour --

23          Q.     Okay.

24          A.     -- was instituted, I believe.
```

1       Q.    So would you agree with me that prior

2    to the memo from Len Sennish with regard to the

3    nine-hour day, that you were paid what you were

4    entitled to be paid or thought you were going to be

5    paid when you came over to ZF Batavia?

6       A.    Salary, yeah.

7       Q.    Well --

8       A.    Overtime, that's salary.

9       Q.    Yes.  I understand that after the

10   hour -- announcement about nine hours, I think what

11   you're telling me is you have an issue with

12   overtime after that date?

13      A.    Sure.

14      Q.    Okay.  Prior to that date, again, did

15   you receive what you believe you were entitled to

16   receive from ZF Batavia, regards to overtime?

17      A.    I believe so, yes.

18      Q.    Okay.  And as I understand it, the

19   issue with respect to the overtime -- well, maybe

20   you better explain it to me because -- are you

21   saying that you should have been paid every hour or

22   increment over eight or how did you calculate that

23   number?

24      A.    Just for instance --

1          Q.     Sure.

2          A.     -- if I go in at seven at night and

3     work till 7:30 in the morning, that's a 12-hour

4     time span.

5          Q.     Okay.

6          A.     Before the hour decision came up, I

7     would have been paid four hours overtime.

8          Q.     Okay.

9          A.     But I was actually there 12 and a

10    half.

11         Q.     Well, I thought -- okay.  You have

12    confused me because I thought you said seven to

13    7:30, right?

14         A.     Seven at night till 7:30 in the

15    morning, just for instance.

16         Q.     Okay.  Isn't that 12 and a half hours?

17         A.     Correct, but I've got four hours

18    overtime pay.

19         Q.     All right.

20         A.     Currently I only get three hours

21    overtime pay for the same amount of time.

22         Q.     Under that scenario that you've given

23    me, do you have an opinion as to what you would

24    have been paid if you were still working for Ford

1    Motor Company?

2        A.    I would have been paid four hours

3    overtime.

4        Q.    Okay.  If you were working a normal

5    shift, a regular shift maybe is the better term,

6    what time would you normally start?

7        A.    11 at night.

8        Q.    Okay.  Until when?

9        A.    7:30 in the morning.

10        Q.    And if you had worked from 11 to 7:30,

11    you would receive no overtime, correct?

12        A.    Yeah, unless it's Saturday is --

13        Q.    Sure.

14        A.    During the week, during the week, yes.

15        Q.    Yeah, Saturday, Sunday or holidays,

16    obviously that would be an extra shift?

17        A.    Correct.

18        Q.    Okay.  Normal shift, 11 to 7:30, no

19    overtime?

20        A.    No overtime.

21        Q.    And what if you worked until 11 until

22    8:15?

23        A.    No overtime.

24        Q.    And would that be the same at Ford?

43

```
 1          A.     I believe or I wouldn't have put it

 2   down.

 3          Q.     Because you knew it wasn't going to be

 4   paid?

 5          A.     Right, it's less than an hour.

 6          Q.     Okay.  And I guess that's kind of

 7   where I'm headed is to the less than an hour.  And

 8   we've had a number of folks indicate that at Ford,

 9   their perception was at 59 minutes, it was simply

10   not going to be paid, but it kind of -- when you

11   got to the hour, that it would be paid.  Is that

12   your understanding?

13          A.     Yeah.

14          Q.     Okay.

15          A.     That was under the Ford --

16          Q.     Mm-hmm.

17          A.     -- the old original --

18          Q.     Mm-hmm.

19          A.     -- yes.

20          Q.     Mm-hmm.  And so isn't the difference

21   we're talking about here at Batavia in one sense

22   the difference of a minute?

23              MR. SIMON:  Objection, vague and

24   ambiguous, but go ahead.
```

44

1          A.     I don't understand.

2          Q.     Sure.  If you worked at Ford 59

3     minutes over, you would agree with me that you

4     would not be paid, correct?

5          A.     Probably not.

6          Q.     Okay.  Regardless of whether or not

7     you would have marked it down --

8          A.     That's correct.

9          Q.     -- you wouldn't have been paid?  And

10    so you would agree with me that it would be

11    appropriate at ZF Batavia if you worked 59 minutes

12    over to not be paid for that 59 minutes?

13         A.     Right.

14         Q.     All right.

15         A.     But under the Ford, we didn't have to

16    do that.

17         Q.     Okay.

18         A.     When we had our stuff done, we could

19    go.

20         Q.     Well, are you saying that at ZF

21    Batavia, you absolutely positively have to work

22    that ninth hour?

23         A.     According to the letter that came out.

24    Excuse me.

1        Q.     Has anybody ever told you that that's

2    the absolute requirement?

3        A.     I believe it was on the letter.

4        Q.     Okay.  But that's the only

5    communication that you have with respect to that

6    ninth hour?

7        A.     That I can think of off the top of my

8    head, yes.

9        Q.     Does -- who is your immediate

10   supervisor now?

11       A.     Probably Milt Gross.

12       Q.     Much like --

13       A.     Well, things have been changing a lot.

14       Q.     Yeah, we had somebody else that didn't

15   know who her immediate supervisor was and I just

16   was surprised by that answer.

17       A.     There's like a general foreman what's

18   called now a maintenance planning specialist.  He

19   like assigns jobs and he says you guys are screwing

20   up.  He says you guys are screwing up.  But I guess

21   officially in a flow chart, Milt Gross would be my

22   supervisor.

23       Q.     Okay.  Has Milt ever indicated to you

24   that, Ted, you got to be here for nine hours or

1    else?

2         A.    Not that I can recall.

3         Q.    Isn't it more of a matter of, Milt --

4    or, Ted, you got to get your work done?

5         A.    Oh, yeah.

6         Q.    Pardon me?

7         A.    We do that.

8         Q.    Okay.  I guess I'm trying to

9    understand the compulsory nature of what you're

10   telling me because what you're telling me is that

11   your immediate supervisor is not telling you you

12   have to stay absolutely nine hours, correct?

13        A.    That's correct, that I can recall.

14        Q.    Okay.  And I assume that while you're

15   there that nine hours, you are remaining busy?

16        A.    Well, of course.

17        Q.    And so I think what you told me at

18   Ford was you did what you had to do to get the job

19   done, correct?  Isn't that --

20        A.    Yes.

21        Q.    -- the same thing you're doing at

22   Batavia?

23        A.    Yes.

24        Q.    Okay.  You stay the time necessary to

1    get the job done?

2         A.    Yes.  It's not -- It's not the one

3    hour a day.  I don't have a problem with that,

4    unless it's absolutely enforced right to the

5    letter.

6         Q.    Okay.

7         A.    What I took exception was that I

8    didn't hear him say it personally was Sennish --

9    Mr. Sennish said something to the effect if they --

10   if they don't have the work done, they're going to

11   stay and finish it no matter how long it takes,

12   period.

13            Which, say, in an accounting function

14   or something of that nature where you got a fixed

15   task to do, I could say, Well, that -- the guys are

16   goofing off all day and they need to finish it,

17   they should finish it.

18        Q.    Okay.

19        A.    But like say, for instance, I went in

20   early last night.  I went in seven to 11.  That was

21   covering somebody else's shift.

22        Q.    Okay.

23        A.    That was not my choosing.  I didn't --

24   I didn't want to do it, but that extra four hours,

48

1       I feel I should get paid for --

2            Q.    Okay.

3            A.    -- 'cause I'm required to be there

4       above and beyond the normal eight hours.

5            Q.    All right.  You had mentioned -- and I

6       got way off base there -- in your calculation of

7       damages that you included two bereavement days?

8            A.    Correct.

9            Q.    Okay.  Apparently I think you told me

10      you had lost your father-in-law?

11           A.    Correct.

12           Q.    How many bereavement days were you

13      granted?

14           A.    One.

15           Q.    One?  And you took three?

16           A.    I think I took two vacation days

17      instead of --

18           Q.    I said that poorly.  You would have

19      taken three, had you had the bereavement days?

20           A.    That's correct.

21           Q.    And instead, you used two vacation

22      days?

23           A.    I believe that's the case.

24           Q.    Okay.

```
 1          A.    Without seeing the time sheet, I

 2   couldn't say for sure, but I think that's the case.

 3          Q.    Do you remember what year that was?

 4          A.    Oh, it was last year.

 5          Q.    2002?

 6          A.    (Witness nodded.)  It was either that

 7   or the first part of this year.

 8          Q.    Okay.

 9          A.    It was cold.

10          Q.    Okay.

11          A.    It was a hectic time.  It had been --

12   I'm sorry.

13          Q.    Do you need to take a break?

14          A.    No, he had been very ill for quite

15   awhile --

16          Q.    Okay.

17          A.    -- and it was a strain on the family.

18                MR. SIMON:  Are we at a good -- we've

19   been at it an hour and a half.  Why don't you take

20   a break here now, Mr. Hunter?

21                MR. HUNTER:  Sure.  If I could, just

22   one more question.

23                MR. SIMON:  Okay.

24          Q.    Mr. Edrington, we've been discussing a
```

```
 1    number of issues here this afternoon.  At this

 2    point in time, is there anything in terms of your

 3    testimony that you feel you need to change or

 4    correct?

 5         A.    I don't know.  I don't think so.  I

 6    don't know.

 7              MR. HUNTER:  Okay.  Fair enough.

 8         (Off the record:  2:27 p.m. -  2:36 p.m.)

 9         Q.    All right.  Mr. Edrington, I think

10    we're back on the record.  We were talking about

11    bereavement and I think we've talked about

12    overtime.  I guess we haven't spent a great deal of

13    time on paid personal days.  Probably ought to do

14    that.

15              Your comment to me was that they

16    changed it from five to three, I believe?

17         A.    Or five to two.  I think it was five

18    to two.

19         Q.    Okay.  Do you remember how many

20    personal days you had at Ford?

21         A.    No, but it was more than five, it

22    seems like.  I hardly ever use them --

23         Q.    Okay.

24         A.    -- so it really never came up.
```

1          Q.     Well, maybe, then, that's the question

2     I should ask you.  With respect to the personal

3     days, my understanding is that that was kind of a

4     temporary change at ZF Batavia?

5          A.     It turned out to be that way.

6          Q.     Okay.  And during the time -- and I

7     believe, quite honestly, that it was three days it

8     was cut to, not two, but --

9          A.     That could be.

10         Q.     -- whatever that change was, did you

11    have a need for additional personal days during

12    that time that the amount of personal days was

13    reduced?

14         A.     Not that I know of unless it was a

15    time at the funeral --

16         Q.     Okay.

17         A.     -- and here, again, I can't --

18         Q.     As we have discussed things this

19    afternoon, have you recalled any additional

20    representations, promises or whatever that you feel

21    ZF Batavia has not lived up to?

22         A.     I -- I'm a little ambiguous about the

23    AIP bonus.  I got a problem with that, yes.

24         Q.     Okay.

1          A.      We were told that it was strictly upon

2     plant performance and it didn't matter whether you

3     were transitional or new hire or an old Ford guy.

4     Plant performance.  Well, you got whatever

5     percentage of -- I didn't know how they figured it.

6     But some people got less than others and they

7     worked in the same plant and still came in every

8     day and did the best they could to make the plant

9     go.  I didn't think it was right that some people

10    got different percentage.

11         Q.      Okay.  Do you know how that affected

12    you personally or did it affect you personally?

13         A.      I got a bonus, but I don't think it

14    was as high as it would have been at -- had I

15    stayed at Ford.

16         Q.      Do you have any facts that you can

17    base that on?

18         A.      No, 'cause -- I mean, that's

19    speculation.

20         Q.      Okay.

21         A.      Had I stayed at Ford, none of this

22    probably would have come up to start with.

23         Q.      In terms of -- I guess my question was

24    more of a -- are you familiar, for example, I would

1    use Sharonville as perhaps being relatively the

2    same as Batavia.  Any idea what a maintenance

3    supervisor at Ford received?

4         A.    No, sir.

5         Q.    Okay.

6         A.    And I don't even know if all of those

7    people got the same percentage or not.  I don't

8    know.

9         Q.    Now, you made the comment that you

10   thought or you were told that plant performance --

11   that the AIP would be based upon plant performance?

12        A.    Correct.

13        Q.    In our discussion previously, you

14   didn't indicate that that was discussed between

15   yourself and Hassan or even at the meeting.  So is

16   this just --

17        A.    Well, that's one of those -- what I

18   considered benefits versus salary of what we should

19   get.

20        Q.    All right.  So do you remember

21   specifically that somebody said that or is that the

22   way you interpreted Exhibit 2?

23        A.    That the AIP was a benefit versus

24   salary.

1          Q.     No, sir.  Again, and I'm kind of

2    paraphrasing here.  But your comment was that AIP

3    would be based on kind of overall plant

4    performance --

5          A.     Mm-hmm.

6          Q.     -- as opposed to some individual

7    measure or something like that?

8          A.     Correct.

9          Q.     And I thought you said that they used

10    the term they told us?

11          A.     (Witness nodded.)

12          Q.     Okay.  When you say they told us, do

13    you mean figuratively, in terms of that's the way

14    you read Exhibit 2, or did somebody specifically

15    tell you that?

16          A.     That it would stay about the same

17    as -- equivalent to Ford's?

18          Q.     Whatever you were -- whatever your

19    understanding was, yes.

20          A.     Yeah.  I -- I got that impression in

21    the meeting in the cafeteria.

22          Q.     All right.  Let's talk, I guess, just

23    to clarify.  What statements do you remember being

24    made that would have given you that impression?

1          A.      That our employment would be at the

2     new joint venture, just generally just like we

3     worked at Ford.

4          Q.      Okay.  I guess I was -- and from that

5     statement, you interpreted that with respect to the

6     AIP plan?

7          A.      Yeah.

8          Q.      But if I'm not mistaken, Ford doesn't

9     have an AIP plan, do they?

10         A.      Well, they have like profit sharing.

11         Q.      Okay.

12         A.      And I think those are percentage-wise,

13    the same for all our people.

14         Q.      Certainly nobody told you that the AIP

15    plan wouldn't have some individual component to it,

16    did they?

17         A.      They didn't say it wouldn't.

18         Q.      Okay.  Did you discuss anything with

19    respect to AIP and Mr. Saleh?

20         A.      Specifically, I don't remember.

21         Q.      Okay.

22         A.      In fact, I didn't remember this being

23    in here till I just flipped over to it again.

24         Q.      When you say "this," you mean the

56

```
 1   language regarding --
 2        A.    Oh, I'm sorry.  Exhibit 2, page 2.
 3        Q.    Okay.  The language about the annual
 4   incentive plan?
 5        A.    Correct.
 6        Q.    Okay.  All right.  I understand at
 7   this point that we've talked about overtime and
 8   your losses with respect to overtime.
 9        A.    Okay.
10        Q.    I understand your losses with respect
11   to the two bereavement days where you used vacation
12   days.
13        A.    Well, that may not have been a
14   monetary loss, if you -- you think about it.  It
15   was just time that I didn't get as vacation days
16   that I had to use for a unpleasant situation.
17        Q.    Okay.  Do you know, did you use, then,
18   all of your vacation days for whatever period you
19   used those two?
20        A.    I still have some left this year, so
21   I --
22        Q.    Okay.
23        A.    Did I use all my vacation that -- I'm
24   sure -- I know -- I'm sure I did last year.
```

1          Q.    Okay.

2          A.    This year, I still have a couple weeks

3     left, I believe.

4          Q.    Okay.  And so, again, we have the

5     overtime, the two days, okay, whether or not you

6     count that, understood.  You don't have really a

7     number, in terms of your loss for the AIP payment?

8          A.    No, 'cause I don't know what it would

9     have been had everybody stayed the same.

10         Q.    Okay.  And I think that covers the

11    list that you have given me with respect to your

12    concerns about representations or promises that

13    were made to you to come over to ZF Batavia,

14    correct?

15         A.    That I can think of, yes.

16         Q.    Okay.  With respect to your merit

17    increase, you're satisfied with the merit increases

18    that you have received?

19         A.    Yeah.

20         Q.    And you believe you've received what

21    you were entitled to or what you expected when you

22    joined the joint venture?

23         A.    I think so.

24         Q.    Okay.

1          A.      The merit increase, I don't have a

2     problem.   I work hard and I get rewarded.   That's

3     not a problem.

4          Q.      Okay.   Let me just shorten this, then.

5     Is there anything else, as we sit here today, that

6     you can think of, again, that you believe you were

7     entitled to when you came over that you haven't

8     received, except that which we've already spoken

9     about?

10          A.      Definitely, absolutely, definitely,

11     no, but I -- I don't think that the transitional

12     people were really considered fairly for CVT

13     positions.

14          Q.      Okay.

15          A.      But I have no facts to base that on.

16          Q.      I don't believe -- you're not working

17     in CVT right now are you?

18          A.      No, sir.

19          Q.      Is it your preference that you would

20     be working in CVT?

21          A.      Not really, but I'd like the

22     opportunity or at least I would like to be

23     considered for one of the positions over there.

24          Q.      Okay.   Is it your perception that you

1    haven't been considered?

2         A.    That's perception, yeah --

3         Q.    Is it your perception --

4         A.    -- because some other maintenance

5    supervisors have gone and they were transitional

6    Ford people that went over there.

7         Q.    Okay.

8         A.    And nobody came to me and said, Hey,

9    we've got this position open.  Would you like to go

10   apply for it or would you be interested in doing

11   whatever job is available?

12        Q.    But from your statement, I would take

13   it that there are some Ford transitionals that have

14   moved over to CVT --

15        A.    Yes.

16        Q.    -- just not you?

17        A.    Correct.

18        Q.    Okay.  All right.  Other than all of

19   the foregoing, anything else that you can think of?

20        A.    Not that I can think of right now.

21        Q.    Okay.  With respect to your salaried

22   time statement, we talked before about overtime and

23   base salary.  I think you told me you have always

24   received your base salary?

1          A.     I think so.

2          Q.     Okay.  Has anyone ever come up to you

3     and said, Hey, Ted, we think we need to dock your

4     paycheck because your Honeywell reader doesn't

5     match your salaried time statements, anything like

6     that?

7          A.     Mine personally, not that I can

8     recall.

9          Q.     Now, you said "mine personally."  That

10    would leave me to believe that you're aware of some

11    other situation?

12         A.     I haven't seen the -- yeah, I've heard

13    that at least one other guy has been docked.

14         Q.     All right.  And tell me what you've

15    heard.

16         A.     That a guy was there and he couldn't

17    get through the gate on time because it wouldn't

18    open or whatever.  Had to go around the building,

19    big facility.  And by the time he got there, he was

20    late and he was docked.

21         Q.     Okay.  Was this a salaried person?

22         A.     Correct.

23         Q.     Do you know this person's name?

24         A.     Kevin O'Hagan.

1          Q.     Do you know who docked him?

2          A.     Not -- not actually, no.

3          Q.     Well, have you heard anything or no?

4          A.     Heard it was Milt Gross.

5          Q.     Do you know how much?

6          A.     No, sir, I don't.

7          Q.     Do you know or have you heard about

8    anything else or anyone else that that's happened

9    to?

10         A.     Not that I've heard of.

11         Q.     And, again, I think you acknowledged

12   that it certainly never happened to you?

13         A.     Not that I -- I don't think so.

14         Q.     Okay.

15         A.     I've never -- you might find it hard

16   to believe, but I normally don't look at my

17   paycheck that closely.

18         Q.     Okay.

19         A.     The time sheets that I fill out

20   normally get signed and passed on to payroll and

21   they figure my pay and give it to me.  And I don't

22   double check their figures with mine, except when I

23   know I've got overtime and didn't get paid for it.

24   I know -- I mean, if you're going to miss two

1    weekends, for instance --

2         Q.    Okay.

3         A.    -- that's pretty glaring.

4         Q.    Okay.  I guess I better ask that.  I'm

5    aware that at some point in time, some folks in

6    maintenance worked a couple of weekends --

7         A.    Yes.

8         Q.    -- and didn't get paid.  Are you one

9    of those folks?

10        A.    Yes.

11        Q.    Okay.  Somehow I guess we missed that

12   before.  Let's talk about that.  Well, the number

13   that you gave me as your damages $7,970 --

14        A.    Correct.

15        Q.    -- does that include those weekends

16   where you didn't get paid?

17        A.    Yes.

18        Q.    All right.  Do you remember when those

19   weekends were?

20        A.    No, sir.

21        Q.    Does approximately April of 2002 sound

22   in the ballpark?

23        A.    Yeah.

24        Q.    Okay.

1          A.     It was after the one-hour thing came

2     about.

3          Q.     How many shifts did you work that you

4     did not get paid for?

5          A.     At least four.

6          Q.     And would those have been eights,

7     tens, twelves, if you know?

8          A.     Eights, I believe.

9          Q.     And you received no overtime

10    compensation during that time period?

11         A.     Correct.  It's on my time sheets.

12         Q.     Do you remember who told you you had

13    to work those shifts without pay?

14         A.     It was either Milt Gross personally or

15    Ron Pearce, the maintenance planning specialist,

16    who was relaying the message, I'm pretty sure.

17              The disparity was what bothered me

18    'cause the production guys work and got paid

19    straight to, right down to the change.  That was --

20    that was pretty much an insult.

21         Q.     Okay.  In terms of other individuals

22    that didn't get paid that weekend, are you aware of

23    any others that didn't get paid for any of those

24    shifts or weekends that you worked?

64

1          A.    I'm pretty sure Wayne Whisman.

2          Q.    Okay.

3          A.    Maybe Ron Pearce.

4          Q.    Okay.

5          A.    I don't remember who else might have

6     been there at that time.

7          Q.    Other than these four shifts sometime,

8     I think, second quarter of 2002, have you been paid

9     overtime for the shifts that you have worked?

10         A.    With the exception of that hour, which

11    there were a lot of those.

12         Q.    Okay.

13         A.    One, for instance, would be if I've

14    put in an eight-hour shift and then stay over four

15    hours for fire brigade training.  I feel I should

16    be paid for those four hours.

17         Q.    But instead you're being paid for

18    three?

19         A.    Correct, a lot of those.

20         Q.    In terms of your time reports, the

21    salaried time statements, do those reflect when you

22    come through the door at the plant or some time

23    other than that?

24         A.    Some time other than that.

1       Q.    Why might they show something other

2    than basically when you walk through the door?

3       A.    Well, just, for instance, if I know

4    we're going to have a big rainstorm, 'cause I'm

5    part of building maintenance, before I go in, I'll

6    go through the parking lot and check the grates,

7    make sure there's nothing -- plastic and paper

8    'cause we've had that problem.

9       Q.    Okay.

10       A.    A visual inspection of the parking lot

11    before I actually go in the door.  But just, for

12    instance, say it's 20 minutes to 11 and I do the

13    tour, whatever, I clock -- you know card, go on and

14    do.  Then I just put down 11:00.

15       Q.    Okay.

16       A.    And if I say, well, I'm just about

17    finished.  I got a couple more things to do.  My --

18    my stopping time -- my stopping time, I might put

19    down as eight, 8:30, and maybe I want to go just

20    look at something real fast.  I don't -- I just put

21    down 8:30.

22       Q.    Okay.

23       A.    And I may actually clock out later

24    than that.

66

1      Q.    All right.  Does it reflect any

2    deduction for lunch?

3      A.    Oh, no.  I don't hardly ever get

4    lunch.

5            MR. HUNTER:  Okay.  All right.  I

6    think that I can turn that over to Mr. VanWay.

7                       EXAMINATION

8    BY MR. VANWAY:

9      Q.    Mr. Edrington, I know we shook hands

10   earlier today.  I'm Jeff VanWay.  I represent Ford

11   in this case.  I have a few questions for you

12   today.

13           Let me make sure I understood your

14   testimony on some points.  With regard to Exhibit

15   2 --

16     A.    Okay.

17     Q.    -- the brochure, I know Mr. Hunter

18   asked you some questions about the language at the

19   very end on page 2 that's kind of in those double

20   lines.

21           It was your understanding, then, that

22   the only things that were subject to change are

23   those things that you described as benefits; is

24   that right?

1          A.    That's correct.

2          Q.    Can you just real quickly kind of go

3    through Exhibit 2 here and tell me which are

4    benefits and which are not, according to your

5    understanding?

6                MR. SIMON:  Objection, asked and

7    answered.  You can go ahead, Ted.  I'm making an

8    objection, but you can answer his question.

9                THE WITNESS:  Okay.

10         Q.    And the reason I'm asking,

11   Mr. Edrington, I don't believe that all of these we

12   went through -- I know you talked about some of

13   them, but I didn't follow them all or I wasn't

14   sure.  Salary, is that a benefit?

15         A.    No.

16               MR. SIMON:  Same objection.

17         Q.    That is -- you have some other

18   classification for it?  It's a --

19         A.    It's compensation for a job.

20         Q.    Okay.  Overtime, is that a benefit or

21   is that --

22         A.    No.

23         Q.    -- does that fit in compensation?

24         A.    No, that's compensation, as I see it.

 1          Q.    Sure.  I understand.

 2          A.    I could be wrong.  I'm just --

 3          Q.    And this is just your understanding?

 4          A.    That's correct.

 5          Q.    Okay.  Annual incentive plan, where

 6    does that fit, benefit or compensation?

 7          A.    I would think it would be

 8    compensation.

 9          Q.    Medical insurance?

10          A.    That's a benefit.

11          Q.    Okay.  Dental insurance?

12          A.    Benefit.

13          Q.    Flexible spending account?

14          A.    A benefit.

15          Q.    Life insurance?

16          A.    A benefit.

17          Q.    AD and D?  Accidental death --

18          A.    Oh.

19          Q.    -- and dismemberment?

20          A.    That's a benefit.

21          Q.    Disability?

22          A.    A benefit.

23          Q.    Ford money market?

24          A.    That's a benefit.  That's 401K.

1          Q.     Tuition reimbursement?

2          A.     That would be a benefit.

3          Q.     Vacation?

4          A.     As I see it, that would be part of

5    your salary package, like a paid holiday.

6          Q.     You jumped ahead.  Holidays as well

7    would be salary, then, or compensation, as opposed

8    to benefit; is that --

9          A.     Correct.

10         Q.     Okay.  What about the various leaves

11   that are listed here, funeral leave, personal or

12   sick leave.  Well, we'll go one at a time.  Funeral

13   leave, is that a benefit or is that compensation?

14         A.     I think it should be compensation, but

15   whether it's -- my perception is --

16         Q.     I just want to know what your

17   understanding --

18         A.     I would say it's part of your

19   compensation package.

20         Q.     Okay.  And what about personal or sick

21   leave?

22         A.     I consider that part of your salary

23   compensation package.

24         Q.     How about jury duty, leave for jury

1   duty?

2        A.    That's compensation.  That's automatic

3   anywhere.

4        Q.    I think we'll skip maternity.

5        A.    Okay.

6        Q.    Military leave?

7        A.    That's a benefit.  Well, that could go

8   either way, really.  It's kind of a law -- that's

9   the law, isn't it?

10        Q.    You're correct.  I'm just asking for

11   your understanding.  Did that fit into what you

12   regard as benefits or what you classified as

13   compensation?

14        A.    In that case, I've -- from a legal

15   standpoint, I'd say compensation.  You have to do

16   that.

17        Q.    Okay.  The family leave?

18        A.    That would be, I think, a benefit.

19        Q.    Okay.  401K?

20        A.    Benefit.

21        Q.    And retirement?

22        A.    That's a benefit.

23        Q.    Okay.  Now, you also testified that

24   when you spoke to Hassan and when you were at the

1    employee meetings, you were given the impression

2    that benefits, for the most part, would stay the

3    same as they had been at Ford?

4           A.    Or comparable to Ford's, yeah.

5           Q.    And when you say benefits, you're

6    using the same definition that we just went

7    through --

8           A.    Correct.

9           Q.    -- as to what's a benefit and what's

10   compensation?

11          A.    Oh, sure.

12          Q.    Okay.

13          A.    This is my perception of these things.

14          Q.    I understand.  And that's -- then

15   that's all you can give me.  What about when you

16   were with Ford, was it your understanding that Ford

17   benefits were subject to change?

18          A.    Benefits?

19          Q.    Yes, sir.

20          A.    Yeah.

21          Q.    What about compensation, things that

22   you classified as compensation, when you were at

23   Ford, was it your understanding that those things

24   were subject to change or not?

1          A.     Well, it shouldn't be, but we got

2     raises.

3          Q.     Okay.

4          A.     So using that criteria, yeah, it was

5     subject to change.

6          Q.     Oh, okay.  They are subject to change,

7     but you don't believe they should have been.  Is

8     that -- am I understanding you correctly?

9          A.     At Ford?

10         Q.     Yes, sir.

11         A.     Well, they should -- well, yeah, sure.

12    If you get demoted to a lower position, you would

13    naturally take a decrease in pay.

14         Q.     Well, with respect to all the things

15    that you listed as compensation -- and we won't go

16    through all of them.  But salary, overtime,

17    vacation, et cetera, did you believe that those

18    sorts of things were subject to change while you

19    were with Ford?

20         A.     No.

21              MR. SIMON:  Objection.  Calls for a

22    legal conclusion.  Go ahead.

23         A.     I would say no --

24         Q.     Okay.

1          A.      -- 'cause that's kind of a contract.

2          Q.      And did you have a written contract

3     with Ford that said those things were not subject

4     to change?

5                  MR. SIMON:  Objection.  Calls for a

6     legal conclusion.

7          A.      I don't know.

8          Q.      Do you remember any written document

9     that you signed with Ford that stated that those

10    sorts of things were not subject to change?

11         A.      I don't remember a document, no.

12         Q.      Okay.  Now, while you were with Ford,

13    you received profit sharing, correct?

14         A.      Correct.

15         Q.      Were there years when no profit

16    sharing was paid --

17         A.      Correct.

18         Q.      -- while you were there?

19         A.      Correct.

20         Q.      Zero percent those years, right?

21         A.      I believe that's the case, yeah.

22         Q.      And you understood that that was up to

23    the company as to whether profit sharing was going

24    to be paid or not, correct?

1        A.    Sure.  Those years nobody got

2   anything, as far as I knew.

3        Q.    No one at Ford?

4        A.    Correct.  So it was fair and equal

5   across the board.

6        Q.    I apologize for that.  Every time I

7   move, I forget things.  Mr. Edrington, you've been

8   handed Exhibit 124.  And, if you would, take a

9   moment and review that and let me know when you've

10  done so, please.  Have you had an opportunity to

11  look at Exhibit 124, Mr. Edrington?

12       A.    Yes.

13       Q.    That appears to be the application for

14  salaried employment that you filled out with Ford;

15  is that correct?  Is that what that document is?

16       A.    I may have -- this may be an hourly

17  application.

18       Q.    If you look at the top -- and I know

19  there's some punched holes there --

20       A.    Oh, yes.

21       Q.    -- but it looks like it says

22  "Application For Salaried Employment"?

23       A.    You're right.

24       Q.    Okay.  Any reason to dispute that

1    that's what this is?

2        A.    No.

3        Q.    Is this your handwriting that appears

4    on this document?

5        A.    Yes.

6        Q.    On the second page, is that your

7    signature there?

8        A.    Yes.

9        Q.    Okay.  And it's dated 6/26/1990.  Is

10   that around the time that you got hired by Ford as

11   a salaried employee?

12       A.    Correct.

13       Q.    Okay.  We're done with Exhibit 124.

14   And if you could, Mr. Edrington, now you've got

15   Exhibit 125 in front of you.  Feel free to read the

16   whole thing, if you want to.  I really just want to

17   know if it's your signature on there and if you

18   signed it while you were with Ford.  But if you

19   want to review the whole thing, that's fine.

20       A.    Doesn't have a date.  It's my

21   signature.

22       Q.    Okay.  And I'll submit to you, Mr.

23   Edrington, that this was produced by Ford in this

24   case as a part of your salaried personnel file.  Do

1   you agree with me that you signed this while you

2   were a salaried employee with Ford?

3          A.     I believe that's the case, yeah.

4          Q.     And you're correct that it's not

5   dated.  I believe that this is something you would

6   have signed right around the time you got hired.

7   Does that sound accurate to you?

8          A.     Sure.

9          Q.     Okay.  The signature of the company

10  representative is -- I think that's Ann Jones.  Do

11  you remember Ann Jones?

12         A.     Yes.

13         Q.     Was she in personnel?

14         A.     HR, yeah.

15         Q.     Okay.  Finished with Exhibit 125, Mr.

16  Edrington.  Mr. Hunter asked you a question earlier

17  today, asked you to kind of list for him promises

18  that ZF Batavia has not lived up to.  And you named

19  several.  And I just want to make sure that I've

20  got your total testimony here.

21             The specific question you were asked

22  was promises ZF Batavia has not lived up to.  Are

23  you alleging as well that there are promises that

24  Ford has not lived up to in this case?

1          A.     Yeah.

2          Q.     And would those be the same as what

3     you believe ZF Batavia has not lived up to?

4          A.     Yeah.

5          Q.     Okay.  Now, with respect to your

6     decision to accept employment with ZF Batavia, had

7     you known that after you accepted, sometime down

8     the road, ZF Batavia was going to change its

9     bereavement leave policy like they did, had you

10    known that, would you have accepted employment with

11    ZF Batavia?

12         A.     On that one item?

13         Q.     Yes, sir.

14         A.     Probably not.

15         Q.     Probably wouldn't have accepted

16    employment or probably would have?

17         A.     Probably would not have accepted

18    employment.

19         Q.     Just over a change in bereavement from

20    three to one, that would have been significant

21    enough for you not to accept employment with ZF

22    Batavia?

23         A.     Yes.

24         Q.     And why would that one thing have been

78

1    so significant to you?

2         A.    Well, if they're going to change that,

3    then they'll probably change some other things as

4    well.  That would only be to some people very

5    insignificant, but it's underlying of the concept

6    that we can just randomly change things.

7         Q.    Okay.  Let me -- that's a fair point.

8    Let me ask you this question.  Had you known up

9    front that bereavement leave was only going to be

10   one day in certain circumstances rather than three

11   days, had you known that up front, would you still

12   have accepted employment with ZF Batavia?  In other

13   words, if --

14        A.    Yes.

15        Q.    -- they had told you up front --

16        A.    Yes.

17        Q.    -- you still would have accepted?

18        A.    Correct.

19        Q.    Because that slight change from one --

20   or from three to one days wasn't significant enough

21   for you to decide I don't want to go to work for ZF

22   Batavia, right?

23        A.    Probably, yes.

24        Q.    Okay.  What about the change in

1    personal days, had you known up front that ZF

2    Batavia -- strike that.

3            Had you known up front that personal

4    days were only going to be for a one-year period

5    three instead of five, would you have still

6    accepted employment with ZF Batavia?

7        A.    No, I don't think so.

8        Q.    And why is that?

9        A.    I figured that's part of my overall

10   compensation package and I probably wouldn't have

11   accepted it.

12       Q.    Okay.  And I'm not asking if you had

13   known they were going to change it, but instead I'm

14   asking you if they had told you up front at the

15   time you were making the decision as to whether you

16   were coming over or not, if someone had said to

17   you, Mr. Edrington, you can only get three personal

18   days, would you come to ZF Batavia, would you still

19   have come to ZF Batavia or not?

20       A.    Probably not.

21       Q.    And what would that reason be?  Why

22   would you have made the decision not to?

23       A.    Okay.  I have vacation time that I

24   take to go on vacation and enjoy myself.  The

1    personal days I consider -- I need some of them

2    'cause you never know when something comes up.

3        Q.    No, I understand.  I just want to make

4    sure I'm clear.  So, in other words, if you'd known

5    up front that instead of five days, you were going

6    to get three days for one year, then you would have

7    said, No, I'm not coming to ZF Batavia?

8        A.    I believe that's the case, yes.

9        Q.    Okay.  What about overtime, if you'd

10   known up front that there was going to be this

11   nine-hour rule, would you have come to ZF Batavia?

12       A.    No.

13       Q.    You would have stayed with Ford?

14       A.    Yes.

15       Q.    Did you have any offers from any other

16   Ford plants at the time you decided to come to ZF

17   Batavia?

18       A.    No.

19       Q.    Had you interviewed with any Ford

20   plants?

21       A.    No.

22       Q.    If the only opportunities to stay with

23   Ford had been at somewhere other than Sharonville,

24   would you still have stayed with Ford?

81

```
1        A.    Given the -- taking off the personal

2    days and things --

3        Q.    Yeah.

4        A.    -- or just in general?

5        Q.    Start with it, if you'd known --

6        A.    Me, I would have stayed with Ford,

7    yeah.  For whatever reason I decided not to go with

8    ZF, would I have gone to another Ford facility,

9    yeah.

10        Q.    Even if it would have meant

11    relocating --

12        A.    Yes.

13        Q.    -- out of the area?

14        A.    Yes, yes.

15        Q.    Okay.  Now, you testified earlier as

16    to who you remembered being present at the May 27,

17    1999 meeting.

18        A.    Mm-hmm.

19        Q.    You didn't name Tony DeShaw.  Do you

20    remember Mr. DeShaw being present at all at that

21    meeting?

22        A.    Can you describe him?

23        Q.    I'm afraid I can't.  He was, as I

24    understand it, someone that worked for ZF that
```

1    basically was kind of their benefits guy.  Do you

2    remember -- name doesn't ring a bell?

3         A.    No.

4         Q.    Okay.  That's fine.

5         A.    It's a long time ago.

6         Q.    And you understood from the discussion

7    at the May 27th meeting that there were going to be

8    some benefits, at least, that were going to be

9    different at ZF Batavia than they had been at Ford?

10        A.    Yeah, but they would be comparable.

11        Q.    Okay.  I'm not sure I know what that

12   means.  Would they be different?

13        A.    Well, they could be.

14        Q.    Okay.  And you knew that going in?

15        A.    That they could be different, yeah.

16        Q.    Okay.  And you also recognized, didn't

17   you, that, down the road, as the company grew,

18   there might be other changes in benefits?

19        A.    Sure.

20        Q.    In other words, what -- the benefits

21   you had on day one might not be the same as the

22   benefits you had on year five, for example?

23        A.    Right.  That's the case.  Insurance

24   changes, we pay more out of pocket now than we used

1   to, co-pays, things like that.

2        Q.    Places you worked before, that's

3   generally the way it operated?

4        A.    That happens.  That's in the business

5   world.

6        Q.    Benefits change.  And no one ever told

7   you, in fact, that your benefits would never

8   change?

9        A.    No, nobody said that.

10       Q.    And that --

11       A.    That --

12       Q.    That would have struck you as odd?

13       A.    That's -- yeah, not realistic.

14       Q.    In your conversations with Hassan, did

15   he have any conversations with you about overtime?

16       A.    Yeah, we keep our overtime.

17       Q.    Poor question.  Did he have any

18   questions with you about what overtime was going to

19   be like at ZF Batavia?

20       A.    Well, as far as number of hours?

21       Q.    Well, anything about overtime.

22       A.    It would stay just like we were at

23   Ford.

24       Q.    Did he specifically say what that

1 meant?  Did he say, for example, that your rate of

2 pay would be the same as it had been at Ford?

3   A. I believe so.

4   Q. And when did he say that, do you

5 remember?

6   A. No.

7   Q. In fact, I thought you testified that

8 there were two conversations with him.  Do you

9 remember if that was in the first or the second

10 conversation?

11   A. I believe it was the first.

12   Q. Okay.  And he said that your rate of

13 pay for overtime --

14   A. Well, not specific dollar amount, no.

15 But we would have what -- forgive me.  But it's

16 easy for us to call it time and a half and double

17 time.  All right.  Time and a half would be over

18 eight hours on a day.  Double time is Sunday 'cause

19 it's easier to refer to it that way.

20   Q. Right, I understand.  Is that what he

21 told you, then, that you'd get time and a half at

22 ZF Batavia and that you'd get double time?

23   A. Well, whatever the rate was.

24   Q. Did he tell you what the rate was?

1          A.    No, sir.

2          Q.    Okay.  Did he tell you that --

3          A.    He said it would stay the same as

4    Ford.  Our pay and overtime rate would stay just

5    like we had stayed at Ford.

6          Q.    So it would be the same as it was at

7    Ford at that time?

8          A.    Correct --

9          Q.    Okay.

10         A.    -- right.

11         Q.    Did he say anything about what it

12    might be in the future?

13         A.    No, not that I can think of.

14         Q.    Okay.  What about casual time, did he

15    have any discussions with you about what casual --

16         A.    No.

17         Q.    -- time was going to be like at ZF

18    Batavia?  What about bereavement leave, did you

19    discuss bereavement leave with him, in terms of

20    what the policy --

21         A.    Yeah, that was part of what I call the

22    benefits package.

23         Q.    Right.  And that was part of what was

24    listed in Exhibit 2?

1          A.      That stays the same.

2          Q.      But did Hassan specifically talk to

3     you about bereavement leave?

4          A.      Not specifically about bereavement,

5     but he said your benefits will stay the same.

6          Q.      Okay.  And what about personal leave,

7     did he talk to you specifically about personal

8     leave?

9          A.      Not that I can recall.

10          Q.      Okay.  Now, with regard to the

11     transition bonus --

12          A.      Okay.

13          Q.      -- which I think in your case was

14     $25,000?

15          A.      Mm-hmm.

16          Q.      I believe you said that your

17     impression was that it was designed to offset the

18     loss of the A Plan?

19          A.      Correct, over a three-year period.

20          Q.      Did Hassan specifically say anything

21     to you about what the transition bonus was for?

22          A.      Not that I can recall.

23          Q.      Okay.  What about at the employee

24     meeting that you went to in May, did anyone at that

1    meeting say specifically what the transition bonus

2    was for?

3         A.    Not that I can recall.

4         Q.    Okay.

5         A.    It was just the impression I got.  It

6    was to offset the A Plan.  I think that was

7    speculation from somebody, said, yeah, that's what

8    it is.

9         Q.    Well, do you remember who speculated

10   that?

11        A.    No, sir, I don't.

12        Q.    You were speculating that that's what

13   it was for?

14        A.    Well, sure.  That's -- that's the

15   impression I was given from listening to -- whether

16   people knew what they were talking about or not --

17        Q.    Listening to co-workers or --

18        A.    Co-workers and managing -- the upper

19   management people.

20        Q.    But no one --

21        A.    Specifically they didn't say this is

22   because you don't have the A Plan anymore.

23        Q.    Okay.

24        A.    I don't think they said that

88

1    specifically.

2        Q.    Okay.  And was there anything at that

3    May 27, '99 meeting that was said about the

4    transition bonus at all that you remember?

5        A.    I don't remember.

6        Q.    Okay.  Now, with regard to personal

7    days --

8        A.    Yeah.

9        Q.    -- my understanding is you can't carry

10   over unused dates from year to year, right?

11       A.    That's correct.

12       Q.    And I believe you testified that

13   when -- during that year when the change was made,

14   you wouldn't have used the extra days that year?

15       A.    No, I don't think so.

16       Q.    Okay.  And so I take it, then, that

17   for that one-year change, you haven't actually

18   suffered any damage as a result of that change that

19   was made?

20       A.    From the personal days?

21       Q.    Yes, sir.

22       A.    Not a monetary did I -- not that I

23   know of, no.

24       Q.    Okay.  Prior to the time you accepted

1    employment with ZF Batavia, did anyone tell you

2    that you would be working in CVT at some point?

3         A.    No, not specifically.

4         Q.    You were just hoping you would get

5    that opportunity?

6         A.    Sure.

7         Q.    And still hope, I take it?

8         A.    I was -- I was assuming was that when

9    CD4 went away -- CD4E went away, the whole place

10   would open up and really develop a whole -- really

11   produce a lot of CVTs.

12        Q.    Okay.  And CD4E hasn't gone away yet,

13   has it?

14        A.    No.  It's been extended past what it

15   was supposed to be originally.

16        Q.    Okay.  Now, with respect to the -- the

17   different promises, representations that you've

18   testified were made and haven't been kept, I

19   believe the first one you said was the personal

20   days.  And you testified already about the change

21   from five to either three or two.

22              As you sit here today, do you have any

23   reason to believe that anyone from Ford, Ford Motor

24   Company was involved in that decision to make that

1   change?

2       A.   I don't know if they were involved in

3   the decision.  I think it was known.

4       Q.   I'm sorry.  I didn't hear the --

5       A.   I think it was Ford -- somebody from

6   Ford had knowledge of it, but whether they made the

7   decision or not, I don't know.

8       Q.   You think that after the decision was

9   made, someone from Ford found out about it?  Is

10   that what --

11       A.   Sure, I think so.

12       Q.   Do you have any reason to believe that

13   Ford was involved in any way before the decision

14   was made?

15       A.   I don't know.

16       Q.   Do you have any reason to believe that

17   anyone from Ford approved that decision before it

18   took effect?

19       A.   Possibly.

20       Q.   Okay.  And why do you say "possibly"?

21       A.   Well, 49 percent of the joint venture

22   is owned by Ford and I was under the impression

23   that it was Ford board of directors and ZF board of

24   directors as -- acting as a head of ZF Batavia.

1          Q.     Okay.  And when you say a Ford board

2    of directors and a ZF board of directors, there's

3    really only one board of directors for --

4          A.     Correct --

5          Q.     -- ZF, right?

6          A.     -- but basically -- but basically Ford

7    people, basically ZF people running ZF Batavia.

8          Q.     Oh, okay.  And together through that

9    board of directors, they make certain decisions?

10         A.     Right.

11         Q.     And you believe that it's possible the

12   board of directors might have reviewed the change

13   in the personal days?

14         A.     That's correct.

15         Q.     You don't know for sure whether that's

16   something that went up as high as the board of

17   directors, do you?

18         A.     That's correct.  I do not know.

19         Q.     You've never seen any minutes from the

20   board of directors that reflect that?

21         A.     No.

22         Q.     And have you ever attended any board

23   of directors meetings?

24         A.     No.

1          Q.     With regard to the change in

2     bereavement leave that you testified about, do you

3     have any reason to believe that anyone from Ford

4     was involved in the decision to make that policy

5     change?

6          A.     I don't know.

7          Q.     Okay.  And would your testimony be the

8     same as with regard to personal days, that it's

9     possible the board of directors may --

10          A.     That's correct.

11          Q.     -- have reviewed that decision?

12          A.     That's correct.

13          Q.     Okay.  The change in overtime, which

14     is, as I understand, basically you have two

15     overtime claims.  One is the nine-hour rule, so to

16     speak --

17          A.     Yeah.

18          Q.     -- and the other is for some period of

19     time you weren't paid for certain weekends?

20          A.     Correct.

21          Q.     That's everything that's involved in

22     your overtime claim, right?

23          A.     Basically.

24          Q.     Okay.  You say "basically."

1           A.     That I can think of.

2           Q.     Is there anything else?

3           A.     There may be some other specifics, but

4     I don't think so.  Not that I can think of right

5     offhand.

6           Q.     Okay.  Let's start with the nine-hour

7     rule.

8           A.     Okay.

9           Q.     Do you have any reason to believe that

10    anyone from Ford was involved in the decision to

11    put that nine-hour rule into effect?

12          A.     I don't know, but I'm sure they heard

13    about it.

14          Q.     You think they may have heard about it

15    after the decision --

16          A.     Oh, yeah.

17          Q.     Why do you say that?

18          A.     Because it was a big uproar.

19          Q.     People were upset after it happened?

20          A.     Oh, yeah.

21          Q.     And so you think that somehow Ford may

22    have got wind after the fact that this is what ZF

23    Batavia had done?

24          A.     If not before, yeah.  But after the

94

1   fact, I'm sure they heard about it.

2        Q.    And do you have any reason to say that

3   Ford may have known before it took effect?

4        A.    I don't know.

5        Q.    Okay.  And with regard to Ford

6   approving of the change to put in the nine-hour

7   rule, do you have any reason to believe that Ford

8   approved of that change?

9        A.    I don't know.

10       Q.    Then the second piece of your overtime

11   claim with regard to the weekends that you were not

12   paid for, do you have any reason to believe that

13   anyone from Ford was involved in the decision not

14   to pay you for those weekends?

15       A.    Yes.

16       Q.    Okay.  And why do you believe that

17   Ford was involved in that decision?

18       A.    'Cause before it actually occurred, it

19   was a big -- everybody -- I'm just -- everybody

20   that was going to be affected, maintenance

21   supervisors were really complaining that this isn't

22   right.  And that had to go up higher than middle

23   management, I would think.

24       Q.    Okay.  And so who do you think it went

95

1    to?

2         A.    I think it went -- I would hope it

3    would go to the board of directors, something of

4    that magnitude.

5         Q.    You don't know whether that happened?

6         A.    No, I don't, no.

7         Q.    And you're speculating that because it

8    was such a big deal that --

9         A.    Exactly.

10         Q.    -- it seems like it should have gone

11    to the board?

12         A.    Exactly --

13         Q.    Okay.

14         A.    -- yeah.

15         Q.    And you don't know, for example, do

16    you, whether that may have stopped with the head of

17    the maintenance department and not gone any

18    further?

19         A.    It could have stopped at the head of

20    the maintenance department.

21         Q.    Okay.

22         A.    It could have stopped at Len Sennish

23    or anywhere above that.

24         Q.    Okay.  And you just don't know?

```
 1          A.    I just don't know --

 2          Q.    Okay.  Fair enough.

 3          A.    -- you're right.

 4          Q.    With regard to the AIP, and I believe

 5    that your issue with regard to the AIP is that some

 6    new hires may have received a higher percentage AIP

 7    than you.  Is that --

 8          A.    Sure.

 9          Q.    Am I understanding the issue

10    correctly?  Do you know in a dollar figure how much

11    that is?

12          A.    Oh, no.

13          Q.    Prior to the time you accepted

14    employment with ZF Batavia, did anyone communicate

15    to you that you would get a higher percentage AIP

16    than what new hires would get?

17          A.    I don't think so.

18          Q.    Wasn't much said about new hires, was

19    there?

20          A.    No.

21          Q.    And no one communicated to you what

22    their benefits were going to be, did they?

23          A.    Not that I can recall.

24          Q.    And it wasn't really any of your
```

97

1    concern what the new hires --

2         A.    Right.

3         Q.    -- were being paid, right?

4         A.    Exactly.

5         Q.    So regardless of what the company was

6    going to do with new hires, that wasn't impacting

7    your decision to come over to ZF Batavia, was it?

8         A.    That's correct.

9         Q.    Okay.  With regard to the change

10   that's been made in AIP and your claim in this

11   case, do you have any reason to believe that Ford

12   was involved in that change?

13        A.    Yeah.

14        Q.    And, again, is that because you

15   believe that it's such a big issue that it may have

16   went up to the board of directors?

17        A.    Well, it's a pretty big issue.

18        Q.    Do you know whether that went up to

19   the board of directors?

20        A.    No, sir, I don't.

21        Q.    And other than your belief that

22   because of the type of issue it is, it should have

23   gone to the board of directors, do you have any

24   other reason to believe that Ford was involved in

1     that decision or that change?

2          A.     Well, here, again, it's -- part of our

3     board of directors is Ford.

4          Q.     Ford has representatives on the

5     board --

6          A.     Correct.

7          Q.     -- right?  And other than the fact

8     that Ford has representatives on the board and you

9     believe that that's a decision that the board ought

10    to be involved in, do you have any reason to

11    believe that Ford was involved in the decision?

12         A.     No.

13         Q.     Okay.  And with regard to approving

14    the decision, again, other than --

15         A.     Same thing.

16         Q.     -- possibly through the board of

17    directors, no reason to believe that Ford was

18    involved in the approval of the decision?

19         A.     That's correct, other than through the

20    board of directors.

21         Q.     And, again, you're not sure whether

22    the board was involved or not?

23         A.     That's correct.  I don't know.

24         Q.     Okay.

```
 1          A.    I have no way of knowing.

 2          Q.    I understand.  At the time you had

 3   conversations with Hassan prior to coming over to

 4   join ZF Batavia, you believed Hassan was being

 5   truthful with you, didn't you?

 6          A.    Yes, oh, yeah.

 7          Q.    If you thought he was lying, you

 8   wouldn't have come over?

 9          A.    Exactly.

10          Q.    Do you still believe that Hassan was

11   being truthful with you?

12          A.    I believe he was being truthful as far

13   as he knew.  I don't think he intentionally lied.

14          Q.    Okay.

15          A.    But then I tend to be on the positive

16   side of things, too.

17          Q.    I understand.  With regard to the

18   people who are at the employee meeting who are

19   doing the presentations in the cafeteria --

20          A.    Slides shows?

21          Q.    Yes, sir.

22          A.    Yeah.

23          Q.    I think you mentioned Mr. Kehr,

24   Mr. Adams.  Do you believe that those individuals
```

1    were being untruthful with you?

2         A.    I don't know.

3         Q.    Okay.  But certainly at the time they

4    were communicating, you believed they were telling

5    the truth?

6         A.    That's correct.

7         Q.    And now, just -- is it my

8    understanding that because, in your opinion,

9    promises haven't been kept that causes you to

10   believe that maybe those individuals might have

11   been untruthful?

12        A.    That's true.  That's a true statement.

13   You know what was really the topper?  Am I allowed

14   to say that?

15        Q.    Go ahead.  Go ahead, sir.

16        A.    I can't help it.  I got to say it.

17        Q.    What was the topper, sir?

18        A.    When we asked why salary people clock

19   in and out and hourly people only clock in card

20   readers --

21        Q.    Yes, sir.

22        A.    -- the story was because it's a

23   foreign trade zone and we have to know who's here,

24   whatever the rest of that statement was.

101

1    Intellectually, I'm thinking if it applies to

2    salary, it should apply to hourly and if this is

3    reason for salary to have to do it, it should be

4    the same reason for the hourly guys and I'm not

5    buying this story.

6        Q.    Did anyone ever communicate to you

7    that the reason it couldn't be done with regard to

8    hourly because they were covered under a UAW

9    agreement and it would be problematic to try and

10   get that pushed through the union?

11       A.    The story -- yes, I heard the story.

12       Q.    Okay.

13       A.    I didn't believe that.

14       Q.    You just don't believe it?

15       A.    No.

16       Q.    Okay.

17       A.    It's their company.

18       Q.    You don't know whether it's true or

19   not?

20       A.    What's that, because it's problematic,

21   they couldn't implement it on the hourly side?

22       Q.    Yes, sir.

23       A.    I don't buy that.

24       Q.    Okay.

1        A.    I don't believe it.

2        Q.    You don't know.  It's just your belief

3   that it's not true?

4        A.    That's totally my belief.

5        Q.    Okay.  I mean, you hadn't had any

6   conversations with the UAW about whether that would

7   fly, have you?

8        A.    Well, they said it won't fly.

9        Q.    Okay.

10       A.    And I said, Well, it's our company.

11  We're managing it.  We can do what we want.  If you

12  don't like it, hit the street.  That was my answer.

13  We need -- we need to manage our business.  I don't

14  want to get --

15       Q.    No, no.

16       A.    -- on a rant here.

17       Q.    That's perfectly all right.

18       A.    If this is a legal requirement from

19  the government apparently about the foreign trade

20  zone or whatever they called it, then it should be

21  a requirement for the UAW to follow as well.

22       Q.    Okay.  And ZF Batavia, they're the

23  ones that explained to you that there was this

24  foreign trade zone requirement, right?

1          A.     Here, again, we got the Ford board --

2     guys on the board of directors and I think this is

3     a pretty big issue.

4          Q.     Okay.  Do you know whether anyone from

5     Ford was involved in that at all?

6          A.     No, I don't know.

7          Q.     Okay.  Since the time you left Ford,

8     your annual salary has gone up every year, hasn't

9     it?

10          A.     That's correct.

11          Q.     And, in fact, your -- if we pulled out

12     your W-2s, your W-2 wages from the time you been at

13     ZF Batavia would be higher than from the time you

14     were at Ford, wouldn't they?

15          A.     Yeah.

16          Q.     Okay.  Do you know an employee by the

17     name of Eddie Adams?

18          A.     Yes.

19          Q.     Have you had any conversations with

20     Mr. Adams about this lawsuit?

21          A.     Other than there's an alleged lawsuit

22     that salary guys didn't get paid overtime and we

23     think they should.

24          Q.     You didn't tell him there was an

1    alleged lawsuit, did you?

2         A.    Yes, I most certainly did.

3         Q.    Okay.  Did you discuss anything else

4    with Mr. Adams, other than telling him that there

5    was this lawsuit?

6         A.    Nope.

7         Q.    Did you discuss with him the

8    possibility of him being a witness --

9         A.    No.

10         Q.    -- in this case?  Is it -- your

11    attorneys have listed Mr. Adams as a potential

12    witness.  As you sit here today, do you have any

13    reason to believe that Mr. Adams has any knowledge

14    that's relevant to this case?

15         A.    I don't know.

16         Q.    Did you have any discussions with

17    Mr. Adams about Ford, Ford's control or lack of

18    control over the plant?

19         A.    No, not that I can recall.

20         Q.    He's an hourly employee, right?

21         A.    Yeah, he's a union representative.

22         Q.    Okay.  And is he a full-time release

23    guy with the UAW or does he work a shift as well?

24         A.    I believe he's a full-time

1   committeeman --

2          Q.     Okay.

3          A.     -- or a skilled trades representative

4   as well.

5          Q.     He's the skilled trades

6   representative, is that what you're saying?

7          A.     I believe that's the case.

8          Q.     Okay.

9          A.     And full-time committeeman.

10         Q.     Mr. Edrington, you've given quite a

11  bit of testimony today.  As you sit here today, do

12  you believe that there are any other facts, other

13  than those you've testified to that support your

14  claim in this case?

15         A.     Not that I can think of right now, no,

16  I can't.

17         Q.     Now, with regard to your claims that

18  certain promises haven't been kept, have you ever

19  complained to anyone at Ford about that?

20         A.     Yes, but to who, I cannot --

21         Q.     Was that a recent complaint you made?

22         A.     It's a constant complaint.

23         Q.     Well, who do you make that complaint

24  to?

1         A.    Just generally complaining to anybody

2    who will listen basically.

3         Q.    And are some of those people that

4    you're complaining to, are those Ford

5    representatives or are they ZF Batavia

6    representatives?

7         A.    Just ZF Batavia.

8         Q.    Okay.  Have you complained to anyone

9    from Ford?

10        A.    Officially, no.

11        Q.    Okay.  Why, sir, have you not

12   complained to anyone at Ford?

13        A.    I can't answer that.  I don't know.

14        Q.    Has it ever occurred to you to

15   complain at Ford about it?

16        A.    I didn't think it would be worth the

17   effort 'cause I figured they already knew about it.

18        Q.    You also figured, didn't you, since ZF

19   Batavia made these changes, if you're going to

20   complain, you ought complain to ZF Batavia and not

21   Ford?

22        A.    Yeah, partially, yeah.

23             MR. VANWAY:  Okay.  I don't think I

24   have any further questions, Mr. Edrington.  Thank

1    you, sir.

2                    THE WITNESS:  Okay.

3                              EXAMINATION

4    BY MR. HUNTER:

5         Q.    Mr. Edrington, I just have a couple of

6    follow-up questions and see if we can get you on

7    the bargaining committee with the UAW, I don't

8    know.

9         A.    I don't want to be on the bargaining

10   committee.

11        Q.    I think you made the comment something

12   along the lines of it's our business.  We need to

13   be able to manage it, correct?

14        A.    Yes.

15        Q.    You understand that with respect to

16   the UAW, there is a written agreement with the UAW,

17   correct?

18        A.    There's a contract with the UAW, yes.

19        Q.    Okay.  And you understood there are

20   opportunities to change that contract, correct?

21        A.    Yes.

22        Q.    And is that what you're saying is that

23   we should change that contract with the UAW?

24        A.    In regard to the clocking in and out?

1          Q.     Mm-hmm.

2          A.     If it's a legal matter, as far as I'm

3    concerned, yeah, absolutely.

4          Q.     Well, are there other things that can

5    be changed within that legal agreement?

6                 MR. SIMON:  Objection.

7          A.     I don't know.

8                 MR. SIMON:  Calls for a legal

9    conclusion.

10         A.     I don't know.

11         Q.     Well, when you say that it's our

12   business, we need to manage it, I guess to manage

13   it, I guess, what do you mean by that?

14         A.     Well, I believe we're allowed to set

15   rules and enforce them.

16         Q.     And included in that belief is the

17   ability to change and make rules as we go along?

18         A.     Sure, that's -- you can negotiate

19   those things.

20         Q.     Okay.  With respect to your complaints

21   about the lack of follow through on promises or

22   representations, you haven't indicated that you

23   went back to Hassan at any point.  Did you ever go

24   back and complain to Hassan?

1          A.    No.

2          Q.    Well, why didn't you go back and

3    complain to Hassan?

4          A.    I didn't think it was worth the time.

5          Q.    Because you knew Hassan didn't have

6    the authority to do anything about it?

7          A.    I didn't think he did 'cause I don't

8    think the decision came from him.

9          Q.    Would you consider Hassan to be a

10   decision maker?

11         A.    Not a high level decision maker.  I

12   don't think so.

13         Q.    Well, do you think he has the

14   authority to bind the company?

15         A.    Well, sure.  I think so.

16         Q.    Then why wouldn't you go to him with

17   respect to these problems?

18         A.    I just didn't think it would do any

19   good.  I -- I honestly believed it would be a waste

20   of time.

21              MR. HUNTER:  Okay.  I don't think I

22   have anything further.

23              MR. VANWAY:  Okay.  I just have one

24   more, Mr. Edrington.

110

```
 1                    EXAMINATION

 2   BY MR. VANWAY:

 3        Q.    You testified about conversations or

 4   meetings where you were told that benefits would

 5   remain the same.  Other than -- or essentially the

 6   same.

 7        A.    Essentially the same as Ford.

 8        Q.    Other than those conversations, were

 9   you told that anything else would remain the same

10   as it had been at Ford?

11              MR. SIMON:  I missed -- in what

12   context are you asking this?

13              MR. VANWAY:  Employee meetings or

14   conversations with Hassan.

15        Q.    Did they say -- other than saying that

16   benefits would essentially remain the same, did

17   they communicate to you that anything else would

18   remain the same?

19              MR. SIMON:  Objection, asked and

20   answered.  He testified to what Hassan had said.

21   You can go ahead and answer.

22        A.    The impression I got was everything

23   would remain comparable to what we had, had we

24   stayed at Ford.
```

 1          Q.    Okay.  Benefits?

 2          A.    The salary and everything.

 3          Q.    Did someone say that salary would be

 4    the same?

 5                MR. SIMON:  Objection, asked and

 6    answered.  Go ahead.

 7          A.    No, it's an assumption I got,

 8    impression I got.

 9                MR. VANWAY:  Okay.  No, I understand.

10    No further questions.

11                MR. SIMON:  I just have a question.

12                          EXAMINATION

13    BY MR. SIMON:

14          Q.    What time did you work last night,

15    Mr. Edrington?

16          A.    I went in at 7:00 last night.

17          Q.    And what time did your shift end?

18          A.    I left about 8:00 this morning.

19          Q.    I think the deposition began around

20    1:30 today.  You got here around quarter till one;

21    is that right?

22          A.    I think so.

23          Q.    How many hours of sleep did you get

24    this morning?

1          A.    About an hour and a half.

2          Q.    If not for this deposition, would you

3    have slept longer?

4          A.    Oh, yeah, yes.

5               MR. SIMON:   Okay.  Those are the only

6    questions I have.  We can just go off the record.

7               (Deposition concluded at 3:39 p.m.)

8

9

10

11                   _____
                            Ted Edrington

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                 C E R T I F I C A T E

 2

 3     STATE OF OHIO          :

 4                            :    SS

 5     COUNTY OF HAMILTON     :

 6

 7          I, Susan M. Barhorst, a Notary Public in

 8     and for the State of Ohio, duly commissioned and

 9     qualified, do hereby certify that prior to the

10     giving of this deposition the within-named TED

11     EDRINGTON was by me first duly sworn to testify the

12     truth, the whole truth, and nothing but the truth;

13     that the foregoing pages constitute a true,

14     correct, and complete transcript of the testimony

15     of said deponent, which was recorded in stenotypy

16     by me, and on the 27th day of October 2003 was

17     submitted to counsel for deponent's signature.

18          I further certify the within deposition was

19     duly taken before me at the time and place stated,

20     pursuant to the Federal Rules of Civil Procedure;

21     that I am not counsel, attorney, relative or

22     employee of any of the parties hereto, or their

23     counsel, or financially or in any way interested in

24     the within action, and that I was at the time of
```

114

1   taking said deposition a Notary Public in and for

2   the State of Ohio.

3           IN WITNESS WHEREOF, I have hereunto set my

4   hand and notarial seal at Cincinnati, Ohio, this

5   27th day of October 2003.

6

7

8

9                   Susan M. Barhorst, Notary Public
                    in and for the State of Ohio.
10                  My commission expires
                    February 18, 2004
11

12

13

14

15

16

17

18

19

20

21

22

23

24