1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF OHIO

 3              WESTERN DIVISION, CINCINNATI

 4
     EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
 5
           Plaintiffs,        : Judge Beckwith
 6
     V.                       : Magistrate Sherman
 7
     ZF BATAVIA, LLC, et al., :
 8
           Defendants.        :
 9    _____

10        Deposition of RICK ERVIN, taken on Tuesday,

11   August 5, 2003, commencing at 1:47 p.m., at the

12   offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20
                  GIGLIO REPORTING SERVICES
21                    3 CYPRESS GARDEN
                   CINCINNATI, OHIO 45220
22                      513-861-2200

23

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     Wayne Whisman

 7   On behalf of Defendant ZF Batavia, LLC:

 8     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 9     1700 Canton Ave.
       Toledo, Ohio 43624
10
     Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16
     Cross-Examination
17
       by Mr. Hunter                4, 137
18
       by Mr. VanWay                80, 144
19

20

21

22

23

24
```

3

| | ERVIN DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 20 |
| 3 | | |
| 4 | 4 | 87 |
| 5 | | |
| 6 | 16 | 70 |
| 7 | | |
| 8 | 84 | 50 |
| 9 | 85 | 52 |
| 10 | 86 | 73 |
| 11 | 87 | 74 |
| 12 | 88 | 97 |
| 13 | 89 | 144 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    RICK ERVIN

 2   being first duly sworn, testified as follows:

 3                    EXAMINATION

 4   BY MR. HUNTER:

 5        Q.    Will you please state your name for

 6   the record?

 7        A.    Rick Ervin.

 8        Q.    Rick, you know me.  I have --

 9   obviously represent Batavia.  Have you ever been

10   deposed before?

11        A.    No, I have not.

12        Q.    Okay.  And I think you came in late

13   this morning.  So let me try and give you a couple

14   ground rules, in terms of the deposition.  I have a

15   tendency to speak rather quickly from time to time.

16             So if I either mumble, you can't

17   understand me, can't hear me, whatever, and you

18   feel you can't fairly answer my question, just stop

19   me and let me know and I'm happy enough to fix that

20   for you --

21        A.    Okay.

22        Q.    -- okay?

23        A.    Yes.

24        Q.    If at any time you need a break, feel
```

1    free to take a break.  I would ask that if you need

2    that break, that if there's a question that hasn't

3    been answered, that before you take the break, you

4    answer the question and we can kind of -- we can go

5    from there.

6        A.    Okay.

7        Q.    Is there anything today, in terms of a

8    medical or other personal type issue that would

9    prevent you from being able to go forward with your

10   deposition today?

11       A.    No.

12       Q.    Okay.  I will -- Rick, what's your

13   current address?

14       A.    3470 White Oak Road, Blue Creek, Ohio

15   45616.

16       Q.    Okay.  And your current position with

17   Batavia is?

18       A.    LPM, production.

19       Q.    And if I say the term "Ford

20   transitional," what does that mean to you?

21       A.    Ford transitional, that means a former

22   Ford employee who transitioned to ZF.

23       Q.    Okay.  And that would be someone that

24   basically quit Ford Motor Company and came on as

6

1     a -- an employee of ZF Batavia?

2          A.    Yes.

3          Q.    Okay.  And you would be a Ford

4     transitional, right?

5          A.    Yes, I am.

6          Q.    Okay.  Just wanted to make sure before

7     we get too far in the discussion today we use the

8     same vernacular, so -- all right.

9               My understanding is that there is a

10    perception that certain -- I think the term has

11    been used promises or representations have been

12    made to Ford transitional employees that have not

13    been followed through on by ZF Batavia.  Do you

14    share that understanding?

15         A.    Yes, I do.

16         Q.    Can you tell me what representations

17    or promises were made from your point of view that

18    have not been followed through on?

19         A.    I can try.

20         Q.    Okay.

21         A.    The ones I can remember or come to

22    mind, Pay for overtime would be one.  The amount of

23    personal days, which has been rectified.

24         Q.    Okay.

7

1          A.    The ability to retire and hire back.

2          Q.    Okay.

3          A.    The -- the opportunity to get into CVT

4    on the ground floor.

5          Q.    Okay.

6          A.    To be represented by -- by a committee

7    to take a look after the transition employees' best

8    interests.  That's all that come to mind right now.

9          Q.    If you think of something -- now it's

10   not a trick question.

11         A.    Okay.  That's all that come to mind

12   right now.

13         Q.    And if I were to guess, my perception

14   is that the retire-rehire is your primary issue; is

15   that fair?

16         A.    No, I wouldn't say --

17         Q.    Okay.

18         A.    No.  It is an issue.  I have issue

19   with -- I had issue -- I've always had issues with

20   all of those.

21         Q.    Okay.

22         A.    The most recent were the retirement

23   issue and then a -- and then a demotion also.

24         Q.    Okay.

1          A.     And -- and those were the most recent.

2          Q.     All right.  Well, let's talk about the

3     demotion issue --

4          A.     Okay.

5          A.     -- for a second because you didn't

6     mention that in the first instance.

7          A.     Right.

8          Q.     Do you feel there was a -- some sort

9     of promise or something made to you personally with

10    respect to the motions or -- I guess can you flush

11    that out for me a little bit?

12         A.     Yeah, I think I can.

13         Q.     When I transitioned from Ford where

14    I'd been for 26 and a half years, I was one of the

15    two production superintendents for ZF.  I

16    functioned at that level, which subsequently became

17    champion, area manager, business manager, business

18    operations manager, a lot of different titles.

19              But during the time I been with ZF,

20    I've had very good reviews, extremely good.  I've

21    done very well.  And recently I was demoted and

22    I'll say without -- without cause.

23              And I say that because we had a

24    meeting.  Dave Adams called a meeting where I had

1  to sit in this meeting and in the meeting, he said,

2  Rick, I have -- I have reason to believe or I

3  suspect that you're a little upset with us.  And I

4  said, Well, yeah, yes, Dave I am.    And because I

5  had just been demoted.

6           And he said, Well, why do you think

7  that is?  And I said, I don't know.  And he went to

8  Len Sennish, who was sitting there and said, Len,

9  Rick's worked for you the last year on two

10  different jobs, training manager and temporary HR

11  manager.  Has he done what you asked him to do, to

12  which Len responded, He's done everything I asked

13  him to do and then some?

14           Reuger was there, but he didn't say

15  anything.  Dick Newark, then, said, Well, I just

16  decided that I wanted to go in a different

17  direction and I wanted to try some combinations.

18  And I think putting Rick with Keith in assembly is

19  what I want to try.

20       Q.    Hang on one second.  Keith Holmes?

21       A.    Yes.

22       Q.    And putting Rick with Keith, who's

23  Rick?

24       A.    Me.

10

1          Q.    Okay.

2          A.    I'm sorry.

3          Q.    I wanted to make sure I knew who --

4    which Rick we're talking about.

5          A.    At that point, he also -- Dick also

6    said that, even though he's going to be an LPM or

7    function as an LPM, I'm going to leave him at the

8    BM level.  But a week later on the organizational

9    chart, it's an LPM and that's what it is.  It's

10   been referred to that since then.

11         Q.    Okay.

12         A.    And that's what I mean by the

13   demotional thing.

14         Q.    Okay.  Is that --

15         A.    I'm sorry.  I'm a lower level now than

16   I was when I transitioned.

17         Q.    In terms of your perception of your

18   responsibilities?

19         A.    (Witness nodded.)

20         Q.    But there hasn't been any economic

21   consequences, certainly, has there?  Your salary

22   hasn't been reduced?

23         A.    No, it has not been reduced.

24         Q.    Okay.

1        A.    Now, would it have increased if I'd

2    stayed at that level?  I don't know that it could

3    have if I stayed at a BM level.

4        Q.    Okay.  Well, I mean, but as I

5    understand it, your history -- your pay has

6    increased every year since you came over to the

7    joint venture?

8        A.    Yes, it has.

9        Q.    Okay.  Are you telling me you think it

10   would have increased more or --

11       A.    I think if I had -- maybe I'm jumping

12   the question.  If I had stayed Ford, it very well

13   could have jumped quite a bit more.

14       Q.    Okay.

15       A.    With ZF, yes, it has increased every

16   year.  Would it have -- I mean, I just had this

17   demotion recently, so I have no way of knowing that

18   yet.

19       Q.    Okay.  And I guess to go back a little

20   bit, though, in terms of what was told to Ford

21   employees who became transitionals, do you think --

22   is your allegation that your demotion is somehow

23   related to a promise or representation that was

24   made to you, or is it just something more specific

1    to Rick Ervin?

2            A.    Okay.  I guess both.  I think, yes,

3    it's got something to do with Rick Ervin and that

4    might be the plant manager and Rick Ervin.

5            Q.    Okay.

6            A.    Do I think that it's something to do

7    with the transitional, very well could be because

8    I -- I do think there are a lot things, decisions

9    made that do affect the transitional people

10   differently.

11           Q.    Such as?

12           A.    Such as -- well, one meeting comes to

13   mind and -- and I don't want to --

14           Q.    That's okay.

15           A.    -- get into long stories.  But when I

16   transitioned -- as I told you, I was the

17   superintendent.  And then Dick changed it to area

18   managers.  And we did that for about six to nine

19   months.

20           At that point, Dave Adams called me in

21   his office, wanted to have a meeting with me.  And

22   I went in there and he said, Rick, we've just been

23   talking, ZF management, and we've decided -- and

24   the only reason I'm talking to you today is we've

1    decided you're salvageable.  And I said, Well, what

2    does mean, Dave?  He said that means that we think

3    we can get the Ford mentality out of you and get

4    you into the ZF way of thinking.  That would be

5    what I would say is a strong example of the

6    difference in Ford and ZF.

7              Then another example would be with

8    Dick Newark.  During that meeting with Dave, he

9    asked me to go to another part of the building,

10   which he classified as the armpit of the building

11   at the time.

12             Over the next year, we, as a team,

13   turned that whole area around.  Well, Dick Newark

14   came down and after about a year and said, Rick,

15   I'm taking you off this job.  I said, Oh, okay.

16   You're the boss, but why?  And he said, Well, I

17   want to try to get the Ford influence off the floor

18   and go in a new direction.

19        Q.    With respect to the Ford influence,

20   you understand the concept or the differentiation

21   and the concept of lean manufacturing versus what

22   was historically at Ford Batavia, which was mass

23   production, though?

24        A.    I understand the concept of lean

1    manufacturing.  But whether they called it that or

2    not, I think Ford, even though it was mass

3    production, also operated under lean manufacturing

4    quite a bit because lean manufacturing with ZF

5    hasn't changed much at all versus what it was with

6    Ford, hardly any, if any, other than terminologies.

7         Q.    Okay.

8         A.    Like I'm a lean processing manager

9    now.

10        Q.    With respect to the comments that

11   you've contributed to Dick and Dave, is it your

12   opinion that that's not the influence that they

13   meant?  Did they mean something else by that, then?

14        A.    The fact that they used -- that both

15   of them used Ford in those statements, to me, would

16   say that -- you know, they -- they -- yes, they

17   have a different feeling about Ford people.

18        Q.    Okay.

19        A.    And I have -- I been in -- and I don't

20   remember all -- but I been in a lot of the meetings

21   up front when they've talked.  I remember Dick

22   and -- and Len in a meeting saying, Well, you'll

23   never see us drive a Ford car.  So, yes, there have

24   been specific instances and -- and I do believe

1    that.

2        Q.    Okay.  All right.  The first item that

3    I think you mentioned was pay for overtime.  What

4    was -- to your way of recollection, what was told

5    to you about overtime pay?

6        A.    Okay.  Back when we were in the

7    meetings, meetings up front, that was on a lot of

8    people's minds that were trying to make the

9    decision whether to transition or not.  That was

10   one of the main things that was on everybody's

11   mind.

12            And during that time period in those

13   meetings, those questions were asked.  I didn't ask

14   it specifically, but it was asked, Do we get -- do

15   we still get paid for overtime?  And the answer was

16   your pay structure won't change.

17            The guy that I contacted with mostly

18   then was a guy named Rick Williams, who, at the

19   time, was the first production manager under ZF.

20   Now he's the quality direct for ZF.  And I did a

21   lot of talking with -- with Rick and Jerry Priest,

22   Hassan Saleh about those kind of questions and --

23   and I brought those up subsequently with them.  And

24   they said the same thing.  Well, yeah, your

1    overtime or your pay structure will stay the same.

2    If you get paid now, you'll get paid then.

3          That -- that -- for me ultimately came

4    to a head when I was working for Ray Pablice and he

5    came to me and said, Rick, you're not going to get

6    paid for overtime any more.  And I said, Ray, how

7    can that be?  I was told that nothing would change,

8    that it would remain the same.  And he said, Well,

9    let me get back to you.

10          And he came back the next day and

11    said, Well, they said -- and he didn't define

12    "they."  But they said that no matter what you were

13    promised before, they're here now and they're going

14    to do what's best for ZF, you know.  And they're

15    going to make the decisions that are best for ZF.

16    So you don't get paid for it anymore.

17          Q.    Okay.  Let me go back and get a little

18    more, okay?   Now, you made the reference to

19    meetings, your comment was that these meetings had

20    made --

21          A.    The -- the meetings up front where

22    Ford came down and it was a -- Ford and Dave Adams,

23    Karl Kehr.  I don't remember all the names, but --

24          Q.    Was this what we've referred to before

1    as the May meeting in the cafeteria?

2         A.    Yes.

3         Q.    Okay.

4         A.    There were -- there was more than one.

5         Q.    There were two on May 27th, one for

6    like the day shift and one for the night shift or

7    afternoon shift.  Does that sound right?

8         A.    Probably.  That sounds like it could

9    be right, but I only know about the one on day

10   shift because that's the one I went to.

11        Q.    Okay.  Which would have begun perhaps

12   around 8:30 in the morning, that one?

13        A.    Yes.

14        Q.    Okay.  Had you been presented your

15   offer letter prior to that May meeting?

16        A.    I don't recall.

17        Q.    Okay.  All right.  So you were present

18   at the May 27th meeting.  You went to the one in

19   the morning because you were working days at that

20   time?

21        A.    Yes.

22        Q.    All right.  Do you remember any

23   specific quotes from that meeting, in terms of what

24   you were told?

 1          A.     No, not specific --

 2          Q.     Okay.

 3          A.     -- quotes, I don't 'cause we followed

 4    a presentation and then they had questions

 5    afterwards and everyone just asked the questions

 6    that they wanted to know.

 7          Q.     Okay.  Well, when you say there was "a

 8    presentation," was that the slide presentation?

 9          A.     I remember the slide presentation.  I

10    think it was that meeting.

11          Q.     Okay.  Do you remember who spoke at

12    the meeting?

13          A.     I remember from -- from Ford, there

14    was a guy named Lee Mezza at one of the meetings.

15    I don't know if it was that meeting specifically

16    because they kind of run together.  Hart -- Hartman

17    or someone like -- I remember that name.  And then

18    there was at those meetings, Karl Kehr, Dave Adams

19    and I don't recall the other people.

20          Q.     Now, and you say "at those meetings,"

21    but, in fact, you only went to the one, correct,

22    the morning one?

23          A.     Well, there was -- I -- there was

24    another meeting up front.  We had a couple meetings

1    up front with the same basic -- Ford came down and

2    representatives --

3            Q.    Okay.

4            A.    -- talked to us.  But at that one,

5    that's what I mean about the meetings running

6    together.

7            Q.    Okay.  And that's what I want to try

8    do.  As much as you can, let's stick right now with

9    the May 27th one.  And it sounds like there's

10   meetings before that and we'll talk about it in a

11   second.  All right.

12           So just so we're clear, you remember

13   Lee Mezza, maybe Hartman, Karl Kehr, Dave Adams, I

14   think was the list you gave me for the 27th?

15           A.    I -- I can't --

16           Q.    Just what you remember.

17           A.    -- be sure.  Yeah, I believe Dave

18   Adams.  I can't remember if he was at that one, but

19   I thought he was at all of them.  The other ones, I

20   remember those guys.

21           Q.    But there's no specific quotes that

22   you could remember as to any of these gentlemen or

23   what was said there?

24           A.    No.

1          Q.    All right.  Do you remember -- can we

2     have Exhibit 2?  Are you familiar with Exhibit 2,

3     Rick?

4          A.    Yes, I am.

5          Q.    Okay.  Do you remember, did you have

6     one of these at the meeting on the 27th, Exhibit 2?

7          A.    I do not remember that.

8          Q.    Okay.

9          A.    I'm trying to remember when the --

10    when these came out or when exactly that I remember

11    seeing these and I can't -- I can't remember

12    exactly.  It could have been attached to some

13    papers they gave me or it could have been handed

14    out at one of the meetings.  But I've had several

15    of these over the years and I don't really remember

16    when I first got them.

17         Q.    Okay.  All right.  Now, let's go back

18    in time from May 27th.  I think you'd mentioned you

19    had discussions, meetings with Rick Williams, Jerry

20    Priest and Hassan Saleh?

21         A.    Yes, sir.

22         Q.    Can you give me how many meetings or

23    were these discussions just out on the plant floor

24    or --

1          A.     The discussions were mainly out on the

2     plant floor --

3          Q.     Okay.

4          A.     -- with Jerry and Hassan.  And at the

5     time, Jerry, Hassan, Rick were all also trying to

6     make a decision whether they are going to

7     transition.  So it was general discussion 'cause I

8     know them all very well.  What do you think about

9     this or that, and I don't remember specifics.

10          But with Rick Williams, he was my boss

11     at the time and we had a lot of discussions in his

12     office up in our block house.

13          Q.     Okay.  And --

14          A.     And Rick was a guy that everyone went

15     to with a lot of questions.  I mean, Rick had a lot

16     of information.

17          Q.     Okay.  And to a certain extent, I

18     would assume, though, that aside from these

19     gentlemen, that there were others out there that

20     you had discussions with because, to a certain

21     extent, all the salaried folks were at least at

22     this point in time, in terms of when am I going to

23     go, am I not going to go, correct?

24          A.     There were a lot of people in that

1    position, but I don't remember having conversations

2    with them.  I may have in passing, but when I

3    wanted the information, I wanted to go to the

4    people that I thought would really know.

5         Q.    Okay.

6         A.    And most of the people -- other people

7    knew less than I did probably, so --

8         Q.    Okay.  All right.  Are there any

9    specific conversations that you can recall with

10   respect to Rick, Jerry or Hassan?

11        A.    With Rick, I recall asking him about

12   the retirement plan because he was fairly close to

13   the same position.  He has a couple less years'

14   seniority than I do, so that -- I knew that would

15   be -- that would interest him and also Jerry

16   Priest, who actually has a couple months more

17   seniority than I did.  And they were both concerned

18   about it.

19             Ultimately Rick basically said the

20   same thing.  And he's a director now, and that is,

21   oh, yeah.  When you retire, when you get your 30

22   years combined service, you can retire and hire

23   back with ZF, which was a big point -- you know,

24   that some of the people -- okay.  That's great.  I

 1   like that.  And let me expound on that, if I can.

 2          Q.     Mm-hmm.

 3          A.     I know that after the meeting that I

 4   referred to with Dave Adams earlier, I know that

 5   Dave Adams went to Rick and said, I believe Rick --

 6   this Rick, is upset.  Do you know why?

 7                And Rick, because I talk to Rick,

 8   said, Well, yeah, Dave.  There's some things -- you

 9   know, that -- you know, one, you demoted him, can't

10   even give him a reason.  And, two, you told -- you

11   told us we could retire and hire back.    And now

12   we're not going to do that.

13                And I say "we're not going to do that"

14   because I had a running conversation with Sarah

15   Orwig, HR in Dearborn; with Karen Taylor, NESC; and

16   Len Sennish about that topic because it was getting

17   close for me, to which originally Sarah, Karen and

18   Len all said, Well, yes, you can do that.  What you

19   did with Ford is your business, so -- you know,

20   that's not a problem.

21          Q.     Okay.  Well, let's put a time frame on

22   that.  The conversation you're referring to with

23   Sarah, Karen and Len Sennish was in December last

24   year, January of this year?

1          A.     Something like that, yes.

2          Q.     Okay.  So it wasn't anywhere near May

3     of 1999?

4          A.     Right.

5          Q.     Okay.

6          A.     Okay.  The original question with Rick

7     Williams, yes, that's what he had said.  He -- he

8     felt the same way.

9          Q.     Okay.  And I didn't mean to cut you

10    off --

11         A.     No, that's okay.

12         Q.     -- in that comment, but just to

13    understand the timing here.

14         A.     Yes.  Another thing with Rick at that

15    time was I remember going to him and saying, Rick,

16    I do have some concerns.  You know, I'm getting

17    ready to make this decision.  I have heard that all

18    the engineers in the building have decided not

19    to -- not to go with ZF, to stay with Ford.  That

20    would kill us.

21              And he said, Yes, we've heard the same

22    thing.  We have a plan for that, you know.  And

23    that plan is we're going to make them stay here.

24    We're going to keep them here two to four years,

1    hire people and let them buddy up with them and

2    learn the jobs and then start releasing them.  I

3    said, Okay.  That sounds like a good plan, thanks.

4              Now, subsequently, I was in a meeting

5    where Dave Adams said if -- if they have no more

6    loyalty than that, then get them out of here.  And

7    they let them all pretty much go.

8         Q.    Okay.

9         A.    And those were the questions -- that's

10   all I can remember asking Rick at that time about

11   the transition.

12        Q.    Okay.  What about Jerry?

13        A.    Jerry was mostly a retirement thing.

14   He was under the same understanding and -- and --

15   Hassan, I don't remember.  I don't remember.  I

16   remember talking to him, but I don't remember

17   exactly what it was about.

18        Q.    Let's back up to Jerry for a second.

19   Jerry has since retired from Ford, hasn't he?

20        A.    Yes, he has.

21        Q.    To your knowledge, Jerry has not been

22   rehired by ZF Batavia as an employee, has he?

23        A.    No.  Now, if I could say something

24   else about that --

1          Q.    Okay.

2          A.    Jerry, at the time I was contacting

3     NESC, was waiting to see what was going to happen.

4     Now, when I went back to him and said, Well, they

5     called me in a meeting and said they're not going

6     to let me do this because I'm a transition

7     employee, then Jerry said, Okay.  And then a short

8     while after that, he did retire.

9          Q.    Jerry hasn't filed suit over that, has

10    he?

11         A.    No, I don't think so.

12         Q.    And he would be a Ford transitional?

13         A.    Yes, he was.

14         Q.    Okay.  And aside from the retirement

15    with Jerry, that's the only discussion that you can

16    recall?

17         A.    That I can recall.  I think we talked

18    about the engineers also because that was important

19    with -- with Jerry, too.  Jerry ended up being the

20    afternoon shift leader, production leader.

21         Q.    Okay.  I think you said Hassan,

22    nothing particular comes to mind?

23         A.    No.  Hassan talks about everything.

24    Everything Hassan says kind of runs together

1   because he talks a lot.

2        Q.    Anybody else that you remember any

3   specific discussions about what you thought the

4   move to the joint venture held, in terms of

5   representations to you or that you relied?

6        A.    No.  I -- I remember leaving -- when I

7   was leaving one day, Mike Warden was outside.  He

8   used to smoke at the same spot every day on the

9   east side of the salary lot.

10           As I was leaving, he was standing out

11   there and I knew Mike a little bit.  And I asked

12   Mike at one point if -- if he thought I'd be able

13   to go to Sharonville.  He said, No, I don't think

14   so.  There's no opening there or -- you know, can I

15   stay -- can I stay here, just remain Ford and stay

16   in this building.  My dad worked here 35 years.

17   When he retired, I was in here 26 and a half.  I

18   kind of bleed Ford blue.  And he laughed and said,

19   You know, I don't think that can happen, either.

20   So okay.

21        Q.    Do you remember approximately when

22   that discussion was?

23        A.    No, that would have been around

24   probably the March, April frame of '99 --

28

1        Q.    Okay.

2        A.    -- because I can't remember the exact

3    date that I hired with ZF on, but I'm thinking the

4    beginning of September or October.  I think mine

5    was delayed a month because I had knee replacement

6    surgery.

7        Q.    Now, if you had stayed with Ford, to

8    your knowledge, would you have been able to retire

9    from Ford and hire back in, right back in with Ford

10   at Batavia, for example?

11       A.    No, I wouldn't have had any knowledge

12   of that.

13       Q.    You couldn't do it, could you, to the

14   best of your knowledge?

15       A.    Could I retire from Ford and hire back

16   with ZF?

17       Q.    No, no.  Hire back with Ford.

18             MR. SIMON:  Objection, asked and

19   answered.  He said he didn't know.  Go ahead.

20       A.    I don't know that.  Ford does hire

21   back retirees, but I don't know what the situation

22   would be.  I have no clue -- you know, what that

23   situation is over there right now, or any other

24   Ford location, for that matter.

```
 1        Q.    Okay.  In making your decision to come
 2   to the joint venture, were there any -- was there
 3   anything else that you relied on to -- to help you
 4   make that decision?
 5        A.    Probably the biggest -- I mean, I --
 6   and it may sound a little soapy, but I wanted ZF --
 7   I wanted to help ZF.  When we first talked about
 8   the transitioning, there was a lot of -- and I
 9   believe that's why the Ford people came down.  Gee,
10   we have ZF here with -- with tremendous engineering
11   knowledge.  We have Ford with mass production.  You
12   have a ton of experience in production.
13             You know, we really need some people
14   to stay here and try to help this go and give them
15   some help and experience and all that.  And -- and
16   I remember at that time saying, Well, I just bought
17   a farm 50 miles east of this building.  I would
18   really like to stay in the area.  Can I stay here
19   as Ford?  I'll stay here as long as you want.  No,
20   you can't do that.
21             But then subsequently, quite a few
22   people did and there's -- there's still one or two
23   there.  And then I said, if I can't do that, can
24   I go to Sharonville and remain Ford?  No, there's
```

1    no openings there.  You can't do that.

2              Well, then, you have to make a

3    decision.  And I weighed all that and I felt like

4    it was the right thing to do.  And so then I agreed

5    to transition to ZF.

6         Q.    Okay.  And it sounds like you relayed

7    a bit of a discussion to me.  And I think we've

8    talked aready about all the discussions that you

9    had.  Was there anything else that you relied upon,

10   then, in making a decision to join the joint

11   venture?

12        A.    No.

13        Q.    Okay.

14        A.    Not that I can recall.  I don't think

15   so.

16        Q.    Okay.

17        A.    Maybe something will come to mind,

18   but --

19        Q.    All right.  When you were turned down

20   to take the retirement from Ford and rehire at

21   Batavia, did you go ask Rick Williams for help with

22   that issue?

23        A.    When I was turned down?  Ask the

24   question again, please.

 1          Q.     Sure.  Earlier this year, late last

 2    year, you made the request to retire from Ford and

 3    basically rehire at your same job at Batavia.  Do

 4    you remember that?

 5          A.     Yes, I do.

 6          Q.     Help me with the timing.  Was that

 7    late last year or early this year?  I just don't

 8    remember off the top of my head.

 9          A.     I believe it was early this year

10    because I remember calling -- it was early this

11    year because I remember -- I remember sending an

12    e-mail to Herb saying that when I come back from

13    Christmas break, I am going to contact NESC because

14    you have to wait a certain time period.  April 1st

15    was the date that I was eligible to do that.

16          Q.     Okay.

17          A.     Now -- no.  At that point, I did

18    not -- I hadn't talked to Rick.  I had a meeting

19    then and all that was -- looked good and -- and the

20    e-mails I had with Len, he said, Looks good.  I

21    think this will happen.  I think this is okay.  And

22    I said, Okay, great.

23               At that time, then -- then I had a

24    meeting I was called into with Len and Herb where

1    Len said, we had a meeting today and I've got bad

2    news for you.  And I said, Well, now is the time to

3    give it to me 'cause Dick just told me he's sending

4    me back to the floor.  He said, Well, we decided

5    we're not going to let you do that.  And I said,

6    What do you mean you're not going to let me do

7    that?  And he said, Well, you can still retire with

8    your 30 and out Ford retirement, but we -- we won't

9    hire you back with ZF.

10             I said, Why?  You told me -- I was

11    told I could do this.  And he said, Well, because

12    you're a transition employee.  If we allow you to

13    do that, then that will open the flood gates for

14    all the other ones.

15             I said, But that's something we were

16    all told we could do, Len.  But he said, No, you

17    can't.  Now, you have talked to me about becoming a

18    contract person like Jerry.  And I said, No, no,

19    no, I'm not doing that.  Now, subsequently, then I

20    went to Rick Williams --

21        Q.    Okay.

22        A.    -- yes.  And I mentioned that to him

23    because -- and then I went to Jerry Priest and I

24    mentioned that to him.  The people I knew that had

1    an interest in that that really were kind of

2    waiting to see what happened.

3        Q.    Well, why didn't you go to Rick to

4    kind of fix the problem for you?  Is it because you

5    knew he didn't have the authority to do that?

6        A.    That's not why I didn't go to him.  I

7    just didn't go to him because during everything

8    that was going on, that really wasn't his business.

9    It wasn't.  He was a quality director.  I tried to

10   do everything with Sarah Orwig and Karen Taylor and

11   Len.

12       Q.    Okay.

13       A.    Then I told Rick about that.  And that

14   was all -- all that we really talked about there.

15   After the meeting with Dave Adams, he went to Rick

16   and said, What's up with this?  You know, why is

17   Rick upset?  And he said, Well -- and that was one

18   of the things he mentioned.

19           And Dave Adams then told Rick

20   Williams, Well, then make it right.  If we told him

21   that, make it right.  Go to the policy committee

22   and make it right, which Rick went to Karl Kehr.

23   And I think Karl did get hold of Ford, and at that

24   point, Ford said, Well, wait a minute.  Time out.

1    There's a same desk policy and -- you know, then

2    that stopped it dead.

3        Q.    Okay.  To your way of thinking, if you

4    know, is it ZF Batavia that told you no or Ford

5    that told you no as to this issue, if you know?

6        A.    Well, I can't -- I can't know for

7    sure, but, to me, having just talked to HR and Ford

8    and NESC and they say, yes, you can.  Talking to

9    Len and him saying, yes, you can.  Dave telling

10   Rick have the policy committee make it right.  All

11   that seemed to be ZF was okay with it because, as

12   they said, this is your business with Ford.

13          A lot of other people had done it,

14   Ford people.  Subsequently I found out that they

15   had an amendment written that they didn't write for

16   us, but we weren't told that during transition

17   time.  We were just told we could do the same thing

18   when we got 30 years combined service.

19          Now, when Ford -- and I got that

20   e-mail back from Karl, I think through Dave or Len,

21   saying -- you know, here's what Ford -- Ford

22   policy.  Legal says you can't do it because of

23   this.

24       Q.    Okay.  And when you talk about the

1    retirement and what you were told, if I understand

2    your testimony right, it isn't what you were told

3    necessarily at the group meeting.  It's what you

4    were told by Rick Williams and Jerry Priest?

5         A.    And the questions that were asked in

6    the -- in the -- in those meetings.

7         Q.    Okay.  Do you remember -- but you

8    think you told me you don't remember any specific

9    quotes or comments --

10        A.    No, I don't.

11        Q.    -- from those meetings?

12        A.    No, I do not.

13        Q.    All right.  Somehow, awhile ago, I

14   thought we were talking about overtime and maybe we

15   weren't.  What representation do you think was made

16   to you or representations regarding the payment of

17   overtime?

18        A.    Well, just what I was told, and that

19   is your pay structure won't change, as far as

20   overtime.  If you're being paid overtime now,

21   you'll continue to be paid overtime.  We're going

22   to try to mirror the Ford policies.  And -- and I

23   was paid overtime for -- for a period of time.  And

24   so -- you know, they changed their mind.

1          Q.    All right.  Let's -- little more

2     detail in there for me.  In terms of the comments

3     about the Ford structure and pay you overtime if

4     you're paid now, was that the May meeting or was

5     that something from Jerry and Rick Williams?

6          A.    That was -- that was one of the

7     questions that was asked at one of these meetings

8     in the informational -- half the room -- everyone

9     was asking questions --

10         Q.    Okay.

11         A.    -- 'cause several people asked that

12    question.

13         Q.    Now, within Ford -- and you were there

14    for 26 and a half years or so, does everybody get

15    overtime?

16         A.    I don't know at what -- I know that

17    that levels nine and 10, which were superintendents

18    for Ford, were paid overtime.  And that's what I --

19    that's the level I was when I -- I was -- I was an

20    MPS, which is comparable to an LPM when I

21    transitioned --

22         Q.    Okay.

23         A.    -- became a superintendent-like level.

24    And we were called superintendents at the outset.

1  So, yes --

2        Q.    Okay.  Well --

3        A.    -- it was my understanding then that I

4   would.

5        Q.    You would, but what I had asked you,

6   does everybody at Ford, salary, salary exempt,

7   whatever, get paid for overtime?

8        A.    I think there's a level and I'm not

9   sure what that level is that they don't.

10       Q.    And the Ford policies regarding

11  overtime in the years that you were at Ford changed

12  from time to time?

13       A.    The only way that I can remember it

14  changing, it might have been early nineties when

15  things were slow.  And they did go to the buildings

16  and said, We need to try to cut back on overtime

17  payments.

18            So we're going to substitute a -- comp

19  days, compensatory.  So instead of if you work

20  eight hours of overtime, we'll give you a day off.

21  I remember that.  That was adjusting it, but

22  that's -- that's the only time I can remember.

23       Q.    Okay.  So when you say that it was

24  going to follow the Ford structure, did that -- I

1    guess, what did that mean to you?

2         A.    Okay.  To me, that meant if you are

3    required to work overtime, that you be paid for it,

4    it would have to be approved --

5         Q.    Okay.

6         A.    -- which it always was.

7         Q.    Okay.  Ford had the notion of casual

8    time though, didn't it?

9         A.    Ford had the notion of casual time.

10   See, we -- casual time with Ford was -- and I don't

11   know that I ever saw that in writing, but it was

12   pretty much understood if you were in production,

13   manufacturing, that you needed to get to work a

14   half hour ahead of time.

15        Q.    Okay.

16        A.    You needed to hang around a half hour

17   after work, just to shake hands, so-to-speak, with

18   the other shift and line them up.

19             Now, that half hour -- that hour was

20   sometimes paid, sometimes not.  If you worked 10

21   hours, then you were paid all of it.  If you

22   worked -- if you worked nine hours, you were paid

23   nine hours.  If it was less than nine hours, no.

24   It was casual, true casual.  But if it was nine

1   hours, you were paid nine hours.  And if it was --

2        Q.    I think the example that Mr. Whisman

3   used yesterday was 59 minutes.  Well, that would

4   have not been paid.

5        A.    Correct.

6        Q.    Okay.

7        A.    However, 61 minutes would have been

8   1.1.

9        Q.    And I understand that was his

10   testimony, as I recall, something along those

11   lines.  With respect to ZF Batavia, is your

12   testimony that the ZF Batavia overtime policy,

13   then, differs from Ford?

14        A.    Does it differ?  If it's -- if it's

15   paid, if they -- if they allow it, yes, it's the

16   same.

17        MR. SIMON:  You might have to clarify.

18   What do you mean by "differ"?  I think he's

19   struggling with --

20        THE WITNESS:  Yeah, I'm not sure what

21   you mean.

22        Q.    Well, what's different about the ZF

23   Batavia policy versus the Ford policy, if there's

24   any difference?

1         A.    ZF pays overtime.

2         Q.    Okay.

3         A.    They pay it at a different rate than

4    Ford did and I'm not sure what the Ford rate is

5    now.

6         Q.    Then how do you know it's different?

7         A.    Well, with Ford, it was time and a

8    half.  With ZF, there's a certain dollar figure on

9    regular overtime and then another dollar figure for

10   Sunday work or holiday work.

11            And I know that's different.  I'm not

12   sure how different, and maybe Ford has changed that

13   in the last four and a half years.  But we still go

14   through the procedure of getting it approved and

15   we're still paid overtime.  The difference would be

16   the -- who qualifies for that overtime.

17            Where ZF -- with Ford, superintendent

18   level down, as far as I know, everyone was paid

19   overtime.  With ZF, they have differing --

20   differing ways they paid people, who gets paid and

21   who doesn't because I know people on the MR role

22   that are BMs that get paid overtime.  And I know

23   BMs that do not get paid overtime.  So they are --

24   they're kind of selective on who they pay overtime.

1       Q.   Does that selection depend upon the

2   work that that BM is doing?  If that business

3   manager is covering for a group leader --

4       A.   No.

5       Q.   -- that person gets paid, don't they?

6       A.   A BM -- there are some BMs that don't

7   get paid any overtime.

8       Q.   Okay.

9       A.   And I can -- I can say Dan Sullivan,

10   Eric Spencer.  And then there are other BMs that do

11   get paid overtime, whether they're covering

12   somebody or not.

13       Q.   Who would those folks be?

14       A.   I know Keith Holmes would be one --

15       Q.   Okay.

16       A.   -- and Dennis Baker would be another.

17       Q.   Well, now Dennis is a Ford

18   transitional though, right?

19       A.   Yes.

20       Q.   Is Dan Sullivan a Ford transitional?

21       A.   No.

22       Q.   Any other differences in the overtime?

23       A.   Not -- not that come to mind.

24       Q.   Okay.  You next told me that personal

42

1    days you felt was a representation that hasn't been

2    followed through on?

3         A.    Well, the personal days -- I mean,

4    they were cut from -- from five to three and then

5    they went back to five.

6         Q.    Is it your recollection that you had

7    five personal days at Ford?

8         A.    I don't know that they were called

9    "personal days."  But, yes, we had -- we had five

10    days, but I don't remember what they were called.

11    I don't think they were sick days or anything

12    'cause I -- I honestly, in all the years I worked

13    there, I don't think I took any of them, so I

14    don't --

15         Q.    That was going to be my next question

16    is, if I'm not mistaken, I think that the personal

17    day issue went for about one calendar year

18    approximately, in terms of the five to three, if

19    you remember?

20         A.    No, I don't remember.

21         Q.    Okay.  Do you remember wanting to or

22    needing those personal days and not having them

23    available to you?

24         A.    No, I don't remember that being the

43

1   case.

2       Q.   You didn't use -- did you use any of

3   your personal days, do you know?

4       A.   I think I used a couple of them.

5       Q.   Okay.  You also mentioned the

6   opportunities with respect to CVT.  What

7   representations were made to you about that?

8       A.   Okay.  As part of the -- the meetings

9   again and in talking to Rick Williams, my go-to

10   person -- because I felt like, okay.  This -- I

11   think this is going to be exciting.  I think ZF and

12   this new venture and all of this is going to be

13   exciting.  This CVT transmission or CFT

14   transmission is going to be the thing of the

15   future.  I really believe that -- I forgot what

16   your question was.

17       Q.   The representations that were made to

18   you regarding CVT.

19       A.   Okay.  Getting in on the ground floor

20   is an important thing.  If I'm going to be CVT and

21   at some point, Ford is going to be -- this

22   transmission may not last.  Who knows what the life

23   of the transmission is going to be?  It would be

24   great to get in on the ground floor.

1              And that didn't happen.  I -- I don't

2     think there have been -- this is an opinion.  I

3     don't think there have been any transition

4     employees in CVT in manufacturing.

5              I remember doing interviews with

6     group -- potential group leaders where I -- I told

7     them the same thing.  If you come here, you're

8     going to have the potential of getting in on the

9     ground floor with CVT and they were excited about

10    that.  And some of those have definitely come back

11    and said, Rick, you told me I had a chance and

12    they -- they won't even consider me.

13             So I thought that was something

14    that -- that was -- that we were told we would have

15    an opportunity for and I don't -- I just don't

16    think we got that opportunity.

17        Q.    Okay.  Would your preference today be

18    in CVT, as opposed to your current position?

19        A.    I really can't answer that because

20    only if I had a crystal ball here and could see

21    what the future held for both organizations, to be

22    honest with you.  I wouldn't have a problem staying

23    right where I am --

24        Q.    Okay.

1      A.    -- until such time as I desired to

2    retire, if -- if the place -- if everything goes

3    okay.  And, yes, CVT would still be a viable option

4    that -- you know, I still think if they work out

5    the bugs that they have, that that would be an

6    exciting thing.  I haven't changed on that.  I

7    think that would be great.

8      Q.    Are your concerns related to the

9    CFT26 --

10     A.    Yes.

11     Q.    -- and the issues with that program?

12     A.    Yes, it is.

13     Q.    And so to a certain extent, are you

14    telling me you feel lucky not to be over in CVT?

15     A.    No, because those people are all still

16    there.  They're not -- they haven't released

17    anybody and -- and the people I talked to, there

18    aren't any plans to release anybody because they're

19    still working on the other programs, the 30 and the

20    23.  And there's still a 30,000 a year volume on

21    that.

22          So they're using all those people.

23    And they're still working on engineering issues and

24    bugs on the lines and stuff like that.  So I

1    haven't heard of any plans.  So I don't know of any

2    plans that they're going --

3          Q.    Okay.

4          A.    -- to reduce those people.

5          Q.    With respect to -- you had mentioned

6    representation by a committee, I think was the term

7    you used.  What is that?

8          A.    Okay.  And this I heard -- and it was

9    either Dave Adams or Karl Kehr when they were

10   talking.  We talked about -- the question was

11   asked, Well, who's going to -- now, if we

12   transition from Ford and we leave Ford, who's going

13   to look after our best interests?  You know, here

14   we're going to be in a -- in a company, ZF, as

15   transition employees.  If we have questions or

16   concerns or if we don't think we're being treated

17   fairly, and they said, there's going to be a

18   committee formed to look after your best interests.

19          And to my knowledge, that -- that

20   never happened.  I never saw any communications

21   where they had a committee or -- or anything like

22   that.  I know there's a board of directors, I

23   guess, that have Ford and ZF on -- on that, but

24   that's more of a plant-wide level.

47

1          Q.     Okay.  And this question and answer,

2     was it that May 27th meeting?

3          A.     Or the other one.  There was another

4     meeting and -- I can't remember.  I can't remember

5     the date on that.  Another meeting up front.

6          Q.     When you say "up front" --

7          A.     In the cafeteria.

8          Q.     Oh, okay.  You mentioned, for example,

9     that the opportunity to be in CVT was important to

10    you to make your decision.  But if I understand

11    your testimony, you really made the decision

12    because you felt you had no where else to go,

13    didn't you?

14         A.     Yes, I did.

15         Q.     Okay.

16         A.     Back when I made that decision,

17    because of the length of time I had with Ford, I

18    would have stayed with Ford.  I really would have

19    stayed with Ford.  Once that became what looked

20    like an impossibility, then I looked at ZF and --

21    and I remember telling Dave Adams -- 'cause he

22    asked me if I had decided.

23              And I said, Dave, if you're not going

24    to let me go back to Ford, then, yeah.  I -- I --

1    this is okay.  And I'll give you my -- I'll give

2    you a hundred percent 'cause I -- this is -- this

3    is exciting.  It is exciting.  And it's not

4    discounting that ZF was an exciting thing and that

5    this was an exciting venture.

6           You know, because on one hand, you've

7    got some tenure with -- with a company, a big

8    company and then this is a fledgling company that

9    hopes to make it and they're really going to try.

10   So there's a lot of excitement with that.

11          Q.    Okay.

12          A.    So even though, yes, I guess I -- I --

13   that's why I still wanted ZF to do well and I

14   wanted to do very well today.  I have a son that

15   works there hourly and I want them to do well.

16          Q.    And I understand that.  But in terms

17   of what made your decision for you, from what

18   you're telling me, it was -- what I perceive is,

19   anyhow, that you really didn't perceive that you

20   had an opportunity to stay with Ford, at -- at

21   least in Sharonville or Batavia?

22          A.    I asked the --

23          MR. SIMON:  Note my objection.

24          MR. HUNTER:  Okay.

1          MR. SIMON:   He -- the witness has

2    testified to a number of things that factored into

3    his decision, but go ahead and answer that

4    question.

5          A.    Okay.  That's what I was going to say.

6    Yeah, those were two of the things 'cause I had

7    asked about staying with Ford and I had asked about

8    staying with Ford at Batavia or Sharonville.  Those

9    were options and those were questions that I had to

10   ask.

11          When you get the answers to those, you

12   move on.  And -- and once I had those answers, I

13   moved on to, okay, then what's going on at ZF?

14   What's the future going to be?  What products?

15   What do you envision those to be?  How successful?

16   What's going to happen with this building?  How

17   many are we talking about making and will I have an

18   opportunity to get in on the ground floor of that?

19   Those -- those kind of lead into the other -- the

20   other things.

21          Q.    Okay.  Do you remember off the top of

22   your head approximately when you agreed to sign on

23   with Batavia?

24          A.    Not off the top of my head.

1         Q.    Was it after the May 27th meeting?

2              MR. SIMON:  Objection, asked and

3     answered.  You can answer again.

4              THE WITNESS:  I'm sorry?

5              MR. SIMON:  You can answer again.  Go

6     ahead and answer.

7         A.    I think it was after the 27th meeting.

8     That would -- I think, off the top of my head.

9         Q.    Okay.

10        A.    But it was close to that time period

11    because in June is when I actually went on medical

12    and had my knee replaced.

13             MR. SIMON:  Off the record.

14             (Off-the-record discussion.)

15        Q.    Mr. Ervin, you've been handed Exhibit

16    84.  Have you ever seen that document before?

17        A.    Yes, I have.

18        Q.    Can you tell me what that document is?

19        A.    It's an offer for employment with ZF.

20        Q.    It's your offer, wasn't it, that you

21    received?

22        A.    Yes.

23        Q.    Do you remember having seen this

24    document?  Do you know approximately when you might

1    have received that?

2            A.    It would have been sometime in May.

3    Well, the date's the 17th of May and I signed it on

4    the 7th of June.  So sometime in that time period.

5            Q.    Okay.  With respect to this document,

6    do you remember reading the document?

7            A.    Yes.

8            Q.    Okay.  And certainly, then, you read

9    it before you signed it?

10           A.    Yes.

11           Q.    Okay.  The -- were there any

12   additional documents given to you at the same time

13   you received Exhibit 84?

14           A.    At the same time?

15           Q.    Mm-hmm.

16           A.    I don't remember that.

17           Q.    Okay.  Do you remember, did Glenn

18   Marinetti give you this document or somebody else?

19           A.    I believe, the best of my

20   recollection, Rick Williams gave me this.  Glenn

21   Marinetti was his boss.

22           Q.    Okay.  Did Rick say anything to you at

23   the time that you recall that he gave you this?

24           A.    No, I don't recall.

52

1        Q.    Do you remember, did you sign it right

2    then and there or how soon after you received it

3    did you sign it?

4        A.    I don't remember that, either.

5        Q.    Okay.

6        A.    Would think I wouldn't have signed it

7    right then and there.  I would have looked it over

8    and thought about it, but I can't say that for

9    sure.

10        Q.    Now, I see a notation on the bottom

11    right of Exhibit 84, will start September 1, '99

12    and I think that's Mike Warden's signature?

13        A.    Looks like it.

14        Q.    And you made a reference -- you

15    apparently had knee surgery or something?

16        A.    Yeah.

17        Q.    Okay.

18        A.    That's why they put that on there,

19    that I started a month or so later than most people

20    that -- that did accept.

21        Q.    Rick, we've handed you Exhibit 85.

22    Does that one look familiar?

23        A.    Yes.

24        Q.    Okay.  Is that your application for

1    employment at Batavia, at ZF Batavia?

2         A.    Yes, I think so.

3         Q.    Well, take a minute and review it, in

4    case you're unsure.

5         A.    No, I'm sure.

6         Q.    Okay.

7               MR. SIMON:  Take as much time as you

8    need, Rick, to review the documents he gives you.

9               THE WITNESS:  Okay.

10        A.    Okay.

11        Q.    All right.  You've had a chance to

12    review Exhibit 85?

13        A.    Yes.

14        Q.    On the second page of Exhibit 85, it

15    appears that that would be your signature in there

16    in three different places?

17        A.    Yes, it is.

18        Q.    Okay.  And just as with the hire

19    letter, I trust you read this before you signed it?

20        A.    I can't remember reading it, but I

21    signed it.  I mean, that's --

22        Q.    Is it your practice to sign things

23    without reading them?

24        A.    Probably -- probably only when I'm

1    being given a job and if I don't sign it, I won't

2    get that job, that could be.  No, I think I

3    probably glanced over it, yes.

4        Q.    Okay.  I'm not trying to trick you or

5    anything.

6        A.    I -- I -- you know, and I'm trying to

7    be honest with you here.  You know, I see this and

8    I can't remember sitting down and reading every one

9    of these words.

10       Q.    Okay.  Is it safe to say that in

11   either one of these documents, there is nothing in

12   these documents regarding any of the

13   representations that we've talked about with

14   respect to retirement or overtime or the committee

15   or bereavement days?

16       A.    You mean, is it mentioned in those?

17       Q.    Yeah, with respect to Exhibits 84 and

18   85 --

19       A.    Okay.

20       Q.    -- your offer letter that you signed

21   and your application that you signed --

22       A.    Okay.

23       Q.    -- is there anything in either one of

24   those documents about those items, the retirement,

1    the overtime, the committee?

2         A.    Well, let me look at it again.

3         Q.    Okay.

4         A.    No, there's nothing mentioned in -- in

5    either of those about that.

6         Q.    Okay.  In -- in this litigation, you

7    answered certain interrogatories, questions that

8    were given to you by Ford Motor Company.  Do you

9    remember that?

10        A.    In -- in what now?

11        Q.    Relative to this litigation --

12        A.    Oh, yes, yes.  Now I know, yes, this.

13        Q.    Lawyers use the word

14   "interrogatories."  Most people would call them

15   questions.  Does that sound familiar with you?

16              MR. SIMON:  Are you done with 84 and

17   85?

18              MR. HUNTER:  For the time being, yes.

19   You can set those off to the side.

20        Q.    When you responded to those

21   interrogatories, you indicated that you had a loss

22   of $29,560.  Does that sound familiar?

23        A.    Yes, it does.

24        Q.    All right.  Can you tell me what that

1  number represents?

2          MR. SIMON:  Just note my objection.

3  You misstated what it says in the interrogatory,

4  but --

5          MR HUNTER:  Well, I'm sorry.  Let's

6  correct the issue.

7          MR. SIMON:  He answered -- he gave

8  that estimate regarding his overtime loss.

9  BY MR. HUNTER:

10      Q.    All right.  Let's go right to the

11  document.  Now, do you see on page 6 of your

12  answers to interrogatories, a sentence that reads,

13  At this time, plaintiff estimates a loss of

14  $29,560.  You see that sentence?

15      A.    Yes, I do.

16      Q.    Okay.  What does that $29,560, what is

17  that number comprised of?

18      A.    That number is comprised of overtime

19  that I was not paid -- that I worked that I was not

20  paid for.

21      Q.    Okay.  Is there anything else that

22  that number is comprised of?

23      A.    Not that I know of.  I think it was

24  strictly overtime that I did not get paid for.

1          Q.    Okay.  Now let's talk about that

2     overtime.  From when to when?

3          A.    Okay.  2001 was an estimate and that

4     was based on working nine hour days, a conservative

5     estimate I should add.  But 2002 -- let's see.

6     Make sure I got this right.  And -- no.  2000 was

7     the first one.  2001 and two I had all my time

8     statements for and those were when I was in

9     production and when I was in Len's organization

10    that I didn't get paid for overtime.  When I was in

11    Len's organization, I didn't get paid for any

12    overtime and was mandated that I work at least 10

13    every day.

14         Q.    Your attorneys have supplied me with

15    timecards --

16         A.    Yes.

17         Q.    -- for you.  Are those the timecards

18    to the extent you -- strike that.

19              The timecards you referenced for 2001

20    and 2002, have those been provided to your

21    attorney?

22         A.    Yes.

23         Q.    Okay.  Do you recall how much you used

24    as your estimate for 2000?

58

1        A.    Now, this -- this would be a guess.

2        Q.    Okay.

3        A.    2002 would have been about 400 hours;

4    2001, 300 hours and 2000, maybe 200 hours, 150 to

5    200, something like that.  I don't know offhand

6    exactly, though.

7        Q.    Okay.  I guess I want to clarify.  I

8    thought you told me 2000 was an estimate --

9        A.    Yes.

10        Q.    -- and that 2001 and 2002, actually

11    kind of audited your timecards?

12        A.    Right.

13        Q.    Do you know, then, specifically what

14    your claim is for 2001?

15        A.    I don't have it in front of me.  I do

16    have it -- my lawyer has it.

17        Q.    Okay.  Is there a similar claim for

18    2003?

19        A.    No.  Since I been in production now,

20    when Keith asks me to work overtime, he pays me

21    overtime, which isn't very much, not very often.

22    But let me -- I said, You're going to have to tell

23    me to do it and then he said, Okay.

24        Q.    By his telling you to do it, that

1  would be scheduled, authorized --

2       A.    Yes.

3       Q.    -- overtime in your mind?

4       A.    Yes.  Well, and then he signs a sheet

5  that I provide him, you know.

6       Q.    Okay.  There's been some testimony

7  along the lines of that -- whether or not you get

8  paid overtime may, in part, depend on who your

9  manager is.  Would you consider that a fair

10  statement?

11       A.    I can't talk for everybody.  I mean,

12  I've heard that.  I've heard that.  Just like Mark

13  Calhoun, who just went to CVT.  When he was working

14  for Eric Spencer, who doesn't get paid overtime, he

15  didn't get paid overtime.  But then other managers,

16  yes, the people below them do get paid overtime.

17       Q.    If I'm not misunderstanding you, even

18  in your case, Keith Holmes is paying you overtime.

19  When, for example, you weren't paid in Len

20  Sennish's group and you made a reference to

21  somebody else's group where you weren't being paid

22  overtime?

23       A.    Right.

24       Q.    So is it your opinion that it's a ZF

1    Batavia policy regarding overtime or, again, it's

2    more of a manager's discretion issue, if you know?

3        A.    Well, I'm trying to make sure that I

4    answer it right.  I think it's a manager discretion

5    issue.

6        Q.    Okay.  And with respect to 2003,

7    you're being paid the overtime to which you're

8    entitled, at least through today's date?

9        A.    Yes.

10           MR. HUNTER:  You want to take a break?

11    We've been at it an hour and a half.

12           THE WITNESS:  It's up to you.  I'm

13    okay if you're okay.

14           MR. VANWAY:  Yes.

15        (Off the record:  2:51 p.m. - 3:05 p.m.)

16           MR. SIMON:  There was some testimony I

17    wanted to clarify.

18           MR. HUNTER:  Are we on the record?

19           MR. SIMON:  Rick had made a comment

20    about he had been told that the pay structure would

21    stay the same.  And I don't know that we ever got

22    in context who said it or not.  Perhaps it was on

23    the record, but I kind of wanted Rick to clarify

24    that.

1              MR HUNTER:   Sure.

2         A.    That was Rick Williams.   After the

3    meetings and we'd talked about it and he said that

4    pay structure would be basically the same as it was

5    when you were at Ford.

6         Q.    To your way of thinking, Rick, what

7    does "pay structure" mean?

8         A.    Pay for overtime, bereavement days,

9    vacation days, personal days, so those kind of

10   things, pay structure.

11        Q.    See, 'cause I look at pay structure,

12   and I guess, to me, that would mean -- for example,

13   Ford had grades and ZF Batavia has salary bands.

14   So is that pay structure or a component of it or --

15        A.    That's not what -- what I thought it

16   to be.

17        Q.    Okay.  Well, okay.  So you mentioned,

18   I think, bereavement days, vacation days.  Are you

19   telling me -- is it your testimony now that ZF

20   Batavia has not lived up to some representations or

21   commitments with respect to those issues as well?

22        A.    No, I didn't --

23        Q.    Oh, okay.

24        A.    I'm not saying that.  I'm saying that

1    as part of the pay structure, that's what I would

2    envision.  And have they lived up to that, we've

3    talked about the personal days from five to three.

4    Bereavement, I -- I believe also changed.  But

5    those things haven't affected me particularly, or

6    the vacation has not affected me in particular.

7    I'm not sure about the vacation.  I know there's

8    people that negotiate that all the time.

9         Q.    New hires negotiate that?

10         A.    New hires negotiate the vacation.

11    Others try and negotiate the vacation.

12         Q.    I think Dennis Baker had said he's

13    tried --

14         A.    Yes.

15         Q.    -- very hard to negotiate that, but to

16    no avail?

17         A.    Right.

18         Q.    The -- okay.  With respect to any

19    losses that Rick Ervin has, I understand that of

20    the 29,560.  Are there any other monetary losses

21    that you feel you have?

22         A.    That's difficult to answer, just

23    because I'm not sure how -- when Dick said, let's

24    sit down and talk about Rick Ervin's AIP or

1    bonuses, how those are affected, how they base

2    that.  So I don't know that.  Are they what they

3    could have been, I don't know.  So I'm not sure I

4    can answer that, really.

5              As far as vacation though, that's --

6    that's okay because I have the max because of the

7    amount of time I have in.  The overtime, we talked

8    about.  The retirement could -- I don't -- see, I

9    don't know that there could be a value on that or

10   not, I don't know.  I don't even know if that's

11   something that's -- it's an issue.  It was a

12   promise and that's why I -- that's why I brought it

13   up.  That's why it was important to me and others.

14   It was in a promise that we were told we could do

15   and others have gotten to do it.

16        Q.    Well, okay.  Let's talk about the

17   component of it.  You say that was a promise.  It

18   was a promise from who?

19        A.    From -- and I'm going to say Ford and

20   ZF jointly because it was -- it was brought up in

21   the meetings.

22        Q.    Well, wait a minute.  I thought you

23   told me Rick Williams is the one that told you you

24   could make the jump?

1          A.      Yes.

2          Q.      Okay.

3          A.      It was brought up in the meetings

4     and -- and also Rick Williams 'cause I talked to

5     him, too, about some of the questions that I had,

6     and that was one of them.  And Jerry, I think I

7     mentioned.  He also talked about that because those

8     were important issues, especially with people --

9     people had different issues that were of different

10    levels of importance for them, all of which were

11    important, but -- and retirement was an issue we

12    talked about.

13         Q.      Okay.  So Rick Williams said that he

14    promised that ZF Batavia would permit you to retire

15    and rehire right in?

16         A.      We talked about the meetings, the

17    meetings and the questions afterwards and the one

18    about retirement and they said you would -- that

19    when you retire, when you had your 30 years, you

20    could -- you could retire and hire back with ZF.

21    And that's a question that, yes, I asked Rick

22    Williams and he confirmed that's his understanding

23    also.

24         Q.      Okay.  That's his understanding, not

 1    that he committed to you that you could do that,

 2    but that was his understanding?

 3            A.    Right, him being my boss and I went to

 4    him and asked him -- you know, Rick, what -- how do

 5    you see this?  And he said, Well, that's my

 6    understanding.  I believe that to be true also.

 7    And -- you know, he's gone to Dave Adams and said

 8    the same.  I believe that was something that they

 9    told us we could do.

10            Q.    You've got Exhibit 2 in front of you

11    there?

12            A.    Yes.

13            Q.    Okay.  Have you ever seen that

14    document before?

15            A.    Yes, I have.

16            Q.    Okay.  Can you take a look at the --

17    I'll call it the first page, but you understand

18    this is a tri-fold --

19            A.    Yes, sir.

20            Q.    -- document?  So what is the first

21    page is not necessarily the first page?

22            A.    Yes, sir.  I think this was the last

23    page.

24            Q.    Okay.  There you go.  All right.  And

1    up in the left-hand corner there, it says, Ford

2    general plan retirement benefits.

3          A.    Yes.

4          Q.    Can you take a second to review that

5    for me, Rick?

6          A.    Okay.

7          Q.    Okay.  That language clearly does not

8    mirror what you recited to me as being your

9    understanding and Rick Williams' understanding with

10   respect to retirement benefits, correct?

11         A.    No, I believe it does.

12         Q.    Okay.

13         A.    I believe they -- they have two

14   paragraphs and they separated the two.

15         Q.    Okay.

16         A.    And the second one says, Remain

17   employed by ZF Batavia until your age and combined

18   GRP and ZF retirement meet the -- the requirements.

19   And then I think it says that you -- until you have

20   separated employment from ZF Batavia.  And that was

21   the topic of conversation and something we talked

22   about, the length of time separated from ZF

23   Batavia.

24         Q.    Where in there does it say that ZF

1    Batavia will rehire you if you retire from Ford?

2         A.    Well, I don't see it specifically in

3    there, but that was my understanding.  That was my

4    understanding from the meetings that we had and the

5    conversations that we had, that that was something

6    that they said we could do.

7         Q.    Okay.  And would you acknowledge that

8    this, again, relates to the Ford general retirement

9    plan, correct?

10        A.    Yes.

11        Q.    And that is a plan, sort of an ERISA

12   type plan?

13        A.    I'm not familiar with ERISA.

14        Q.    Okay.  Do you see on -- I'll call it

15   the second page of Exhibit 2, on the right-hand

16   side, down towards the bottom where it says, Plans

17   described here are subject to change.  Do you see

18   that language?

19        A.    I'm looking for it.

20        Q.    Way down on the right-hand side.

21        A.    Yes.

22        Q.    Okay.  And you would acknowledge that

23   language was in this document as well at the time,

24   it's all part of the same document?

1          A.     It's -- it's in that document, yes.

2          Q.     Okay.

3                 MR. SIMON:  John, is it the

4     defendants' position that the plans' language

5     refers to ERISA plans, does it?

6                 MR. HUNTER:  I'm sorry.  Was that an

7     objection or --

8                 MR. SIMON:  Based on your question,

9     that's what I thought that you were saying.

10                MR. VANWAY:  That sounds more like an

11    instruction to the witness.

12                MR. SIMON:  He already answered the

13    question.  It has --

14                MR. HUNTER:  So then I would really

15    appreciate if we could keep comments limited to

16    objections.

17    BY MR. HUNTER:

18         Q.     All right.  Rick, how do you fill out

19    a timecard or a time sheet, I guess, maybe is the

20    better description?

21         A.     I have a pay sheet.  Everyone has a

22    pay sheet.

23         Q.     Okay.

24         A.     Every day when I walk in the building,

1    I swipe my card in.

2           Q.    Okay.

3           A.    During that day or the next day, I

4    fill in what time I started and what time I left.

5           Q.    Okay.  Do you swipe out every day?

6           A.    Yes.

7           Q.    Okay.

8           A.    Now, there might be times when I --

9    when I forget, yes --

10          Q.    Sure.

11          A.    -- but not very often, rarely.

12          Q.    Okay.  And in the time that you've

13   been with ZF Batavia since September of 1999, have

14   you ever had somebody come to you and say, Rick,

15   we're going to reduce your salary because of some

16   irregularity on your time sheets or anything like

17   that?

18          A.    I remember a communication, and I

19   don't have the specifics, which said that we were

20   required to swipe out --

21          Q.    Okay.

22          A.    -- as well as in.  The hourly people

23   only have to swipe in.  We have to swipe out also.

24   And then the rest of the question was, has anyone

1    ever said that I would be in trouble for that?

2         Q.    No.  Has anyone ever come to you and

3    said, Hey, Rick.  We looked at your timecards and

4    they don't seem right.  We're going to --

5         A.    No, sir.

6         Q.    -- dock your salary or anything like

7    that?

8         A.    No, sir.

9         Q.    Let me help you, if I can.  You got

10   16?

11            MR. SIMON:  Yeah, go ahead and give it

12   to him.  Oh, for him, right.

13        Q.    Okay.  Your counsel has been kind

14   enough to hand you Exhibit 16.  Take a second or

15   minute, however long you need to review that,

16   please.  Some of us are speed readers.

17        A.    Okay.

18        Q.    Is Exhibit 16, is that the document

19   you made reference to a couple minutes ago?

20        A.    It appears to be.

21        Q.    Okay.  And that's the notice that said

22   you had to swipe in and swipe out?

23        A.    Yes.

24        Q.    Okay.

1          A.    I don't remember reading this

2     document, but yes.  In reading it, it says that.

3          Q.    Okay.  And, again, with respect to the

4     swipe in and swipe out, that's never been an issue

5     for you, personally?

6          A.    No.

7          Q.    And nobody has ever come back to you

8     again and said, jeez, Rick, we compared your

9     timecards with the swipes and we have a problem?

10         A.    Not that I recall, no.

11         Q.    Okay.  Are you aware of any employee

12    in the plant -- any salaried employee in the plant

13    where that has been an issue?

14         A.    No, not personally.  I -- hearsay

15    of -- of an employee.

16         Q.    One employee?

17         A.    Yes.  That's all I heard about, and I

18    don't even remember the name, no.

19         Q.    All right.

20         A.    Now, I have -- I have checked bad

21    swipes myself for employees that work for me,

22    contract employees.

23         Q.    And when you say a contract employee,

24    you're talking a -- an employee -- an independent

72

1    contractor for ZF Batavia, not a --

2         A.    Yes, that's correct.

3         Q.    -- a salaried -- not somebody on ZF

4    Batavia's payroll?

5         A.    That's correct.

6         Q.    Okay.  You don't believe that ZF

7    Batavia maintains a policy of deducting pay for

8    alleged discrepancy, then, in time sheets?

9         A.    I believe -- yes, I believe they

10   definitely would.

11        Q.    You're not aware of any instance where

12   that's ever occurred?

13        A.    No, but I believe they would.  Just --

14   just the fact that I don't have knowledge of that,

15   I -- I believe that if I falsify my timecard, I

16   would -- I would think, yes, they would -- they

17   would do something about that.

18        Q.    Well, why do you believe that?

19        A.    Because they said they were going

20   to -- that we had to swipe in and out and that they

21   were going to audit those cards.

22        Q.    To the best of your knowledge, do your

23   time sheets always reflect -- well, strike that.

24              In terms of your time sheet, does it

1    reflect the minute you walk in the plant, the

2    minute you start working or what time does that

3    time sheet reflect?

4         A.    It's pretty close to the minute I walk

5    in the plant when I swipe the card.

6         Q.    Okay.  Certainly there are days where

7    that time sheet's not going to be right to the

8    minute with respect to the time -- the time noted

9    on your time sheet will not be duplicated, in terms

10   of the time on the Honeywell reader, correct?

11        A.    That could happen.

12        Q.    Okay.  And you have never had your pay

13   adjusted because of that, have you, because of that

14   difference?

15        A.    Not to my knowledge.

16        Q.    But as we sit here today, are you

17   saying that you believe you could or that the

18   company even would?

19        A.    Yes, I believe they would.

20             MR. HUNTER:  And I apologize.  I don't

21   have copies.  Let's go off the record for a second.

22        (Off the record:  3:22 p.m. - 3:24 p.m.)

23        Q.    Rick, we've handed you what's been

24   marked as Exhibit 86.  Do you see that --

1          A.    Yes, sir.

2          Q.    -- document?  Is that your time sheet?

3          A.    Looks like my handwriting.

4          Q.    Okay.  For the -- for -- certainly not

5    Mr. Sennish's signature, but the times that are in

6    there --

7          A.    Oh.

8          Q.    -- appear to be your handwriting,

9    correct?

10         A.    Yes, they appear to be.

11         Q.    Okay.  And if I'm not mistaken, that

12   would be for the time period for the week beginning

13   February 1, 2002 and ending February 15th, 2002,

14   correct?

15         A.    Yes.

16         Q.    And I've now handed you page -- or

17   Exhibit 87.

18              MR. SIMON:  Can I just stop you just

19   for a second?  Sorry about the question.  I see the

20   Bates number 4594.  Are these the documents that

21   were in the box from me yesterday?

22              MR. HUNTER:  Yep.

23              MR. SIMON:  Note my objection to

24   asking this witness.  I haven't had the opportunity

1 to go through that entire box yesterday or today,

2 obviously.  So with that objection, go ahead.

3   Q. With respect to Exhibit 87, you would

4 acknowledge that that's a portion of a group card

5 trail report?

6   A. Yes.

7   Q. Okay.  And we can do this if we need

8 to.  I've given you one page out of that.  I guess

9 in all fairness -- counsel, leave it up to you.  I

10 have with me the entire report for Mr. Ervin.  We

11 can put that in as an exhibit and it is 59 pages,

12 or I can show you that it came out of his group

13 trail report.

14    MR. SIMON:  Well, gee, represent the

15 accounting -- what are the Bates stamped documents,

16 the 59 pages you refer to?

17    MR. HUNTER:  The -- Rick's group

18 trail -- group card trail report and the documents

19 that have been provided is 004585 through 004643.

20 And as you can see, this is 4594.

21    MR. SIMON:  Does 4585 have his name on

22 it?

23    MR. HUNTER:  Yes.

24    MR. SIMON:  Make 4585 -- that's fine.

1    4585 reflects that it's his name.  I reserve the

2    right to disagree about whether it is, but if you

3    say that's what it is, that's what it is.

4                MR. HUNTER:  All right.  Understood.

5    BY MR. HUNTER:

6        Q.    Rick, for purposes of this line of

7    questioning, I think there's an understanding that

8    we've taken a page, Exhibit 87, out of your --

9    basically a card report for your card swipes.

10       A.    Okay.

11       Q.    If I take a look at, for example, the

12   entries on your time sheet now for February 4th, I

13   see that you clocked in on the time sheet at 6:40,

14   correct?  And I'm talking right now on the time

15   sheet, not the trail report.

16       A.    Yes.

17       Q.    Okay.  And according to the time

18   sheet, you left at -- what is that, 5:15, correct?

19       A.    Yes.

20       Q.    Now, if I look at the trail report, I

21   see that you swiped into the building at 6:43 --

22       A.    Yes.

23       Q.    -- okay?  And that you swiped out of

24   the building at seven after five, correct?

1          A.    Six after five.  Oh, seven after five,

2    right.  It's two different doors.

3          Q.    Okay.  And I'm not here to pick nits,

4    but it's -- it's a discrepancy, but you certainly

5    were never taken to task by Batavia for that

6    discrepancy, correct?

7          A.    That's correct.

8          Q.    And if we look at February 5th, a

9    similar type of discrepancy, isn't it?

10          A.    Yes.

11          Q.    Okay.  And Batavia has never come to

12    you and said, Rick, we're going to dock you for

13    this, have they?

14          A.    No.

15          Q.    Okay.  Given your testimony before

16    that you thought they would, how can you reconcile

17    that with your own time records?

18          A.    Because these are a few minutes here

19    or there and I think everyone, like I said, fill

20    out their time sheets mainly the day after 'cause

21    you don't walk back in and fill it out after you're

22    leaving.  So you're going by your best recollection

23    and they're fairly close.

24              But, however, I -- I believe that if I

1    had a pattern of -- of falsifying times on some of

2    them that may not show here where I put down that I

3    was here less time than I actually was or that I

4    started and I actually started earlier than that,

5    do I think they would do something?  Yes, I still

6    believe they would.  And why I say that, I just --

7    I guess, just -- I just -- because I don't trust

8    them.  I don't trust them at all.

9        Q.    Not because you're aware they've ever

10    done it to anybody else?

11        A.    Only that -- I told you I heard about

12    one person.

13        Q.    Okay.

14        A.    But have they ever done with me, no.

15    No, sir, they haven't.

16        Q.    I think before we got off on that

17    tangent, we had -- let me make sure we covered

18    everything.  Is there any other monetary loss that

19    you can tell me about that we haven't already

20    discussed today?

21        MR. SIMON:  Just note an objection.

22    This might be a continuing objection in the

23    depositions we had, the interrogatory answers

24    provided as to specific damages, whether or not the

1   witness is going to remember everything he put in

2   in the interrogatory answers, I don't know.  But,

3   Rick, you can go ahead and answer his question.

4        A.    I don't remember.  I mean, I don't.

5             MR. HUNTER:  Okay.  Because it is 3:30

6   and I do want to give Mr. VanWay the opportunity to

7   inquire, I'll take a break for right now.

8        (Off the record:  3:31 p.m. - 3:33 p.m.)

9             THE WITNESS:  Jeff, I believe you're

10  the only one I haven't met.

11            MR. VANWAY:  You're right.

12            THE WITNESS:  That's terrible today.

13  It's nice to meet you.

14            MR. VANWAY:  Mr. Ervin, thank you.

15  I'm Jeff VanWay.  I represent Ford.  You're right.

16  I don't think we've officially met, although we've

17  been looking across the table at each other for

18  awhile today.

19            I do represent Ford in this case.  I

20  have some questions for you today.  Mr. Hunter has

21  already touched on a lot of the subjects that I

22  might have asked questions on, so hopefully that

23  will speed up my examination and I won't take as

24  much time.

```
 1              I'll try not to repeat any questions
 2    that Mr. Hunter has asked, but if I do, bear with
 3    me.  It's not intentional, and we do have somewhat
 4    different interests here.
 5                        EXAMINATION
 6    BY MR. VANWAY:
 7         Q.    Now, I'm sorry.  Tell me again your
 8    date of hire with Ford.
 9         A.    With Ford, 6/11/73.
10         Q.    When you started, were you an hourly
11    employee --
12         A.    Yes, I was.
13         Q.    -- with Ford?  How long were you an
14    hourly employee?
15         A.    One and a half years.
16         Q.    Okay.  So '74 --
17         A.    Till January of --
18         Q.    -- '75?
19         A.    Till January of '75.
20         Q.    And then you became --
21         A.    Salaried.
22         Q.    -- a salary employee?
23         A.    Yes, sir.
24         Q.    And the rest of your time with Ford,
```

1    you were a salaried employee?

2          A.    Yes, sir.

3          Q.    Okay.  Then you, I assume, clearly

4    understood since you were both an hourly and a

5    salaried employee, that Ford basically had two

6    groups of employees, hourly and salaried?

7          A.    Yes.

8          Q.    And the hourly were represented by the

9    UAW?

10          A.    Yes, sir.

11          Q.    And you were a member of the UAW when

12    you were an --

13          A.    Yes, sir, I was.

14          Q.    -- hourly employee?  And you had a

15    labor contract that set forth the terms and

16    conditions of your employment, your compensation

17    benefits, et cetera, correct?

18          A.    Yes.

19          Q.    Now, when you became a salaried

20    employee, you no longer had a contract that set

21    forth the terms and conditions of your employment,

22    did you?

23          A.    No, not a contract, a verbal -- an

24    agreement.  Yes, I had an agreement that I would

1    say would be a contract.  When I hired in salary,

2    they sat down and said, Rick, we will -- we'll pay

3    you if you do this job and we'll provide benefits

4    and -- and compensation and everything like that.

5           I would view that as a contract.  I --

6    I don't know that it's -- that it was written that

7    way.  It was a long time ago, but --

8           Q.    Do you recall if there was anything in

9    writing as to --

10          A.    I don't recall.

11          Q.    Okay.  And do you recall who it is

12   that made that verbal commitment to you back in

13   1975 as to what your salary and your benefits were

14   going to be?

15          A.    I believe it was the HR manager at the

16   time.  Who his name was, the only name that comes

17   to mind that far ago was a guy named Larry Long.

18          Q.    But it was someone in HR?

19          A.    Yes, sir.

20          Q.    And normally that's who it would be

21   that would tell you what your compensation and

22   benefits would be --

23          A.    Yes.

24          Q.    -- would be HR, right?

1          A.    Yes, sir.

2          Q.    Now, is it your understanding that

3    your compensation and benefits would be the same as

4    long as you were with Ford?  In other words, that

5    it would never change during the 20-some odd years

6    that you were a salaried employee?

7          A.    No, I expected it to change.  I had

8    hoped it would change.

9          Q.    And, in fact, it changed many times?

10         A.    Yes, yes, it did.

11         Q.    And it changed according to the

12    company's discretion, correct?  In other words, the

13    company told you what your compensation and

14    benefits were going to be, didn't they?

15         A.    Yes, they did.

16         Q.    They didn't come to you when they were

17    going to make a change and get your approval to

18    change your benefits, did they?

19         A.    No, but compensation, I guess, maybe

20    you could say that I had a -- an active role in

21    that through performance reviews and -- what do you

22    call it?  You know, your plan for the next -- next

23    year and -- you know, your input into that and what

24    you expected, if you expected to maintain those

1    goals.

2           Q.    So essentially, in other words,

3    your -- they rewarded you for your performance?

4           A.    Yes.

5           Q.    Okay.  But they didn't, for example,

6    come to you and say, We're only going to give you a

7    three percent this year.  Is that okay with you?  I

8    mean, they didn't get your approval for something

9    like that, did they?

10          A.    Well, I don't know if it was asking

11   for approval.  They always notified me.  And then

12   notifying me, I would -- would say they were

13   looking for an input, a discussion about it.  I

14   don't think it was just a -- otherwise, they just

15   would do it.

16          Q.    They notified you of what their

17   decision was?

18          A.    Yes.

19          Q.    And you had the ability to accept

20   their decision or to leave, correct?

21          A.    Argue the point and -- and maybe that

22   would affect it because most of those things were

23   individual.  You didn't get a raise based on

24   individuality.  I mean, not everybody together, I

1   mean.  Just the opposite.  You got it on an

2   individual basis.

3        Q.     Okay.

4        A.     So it wasn't -- you know, everyone is

5   going to get a three-percent raise this year.  It

6   was, Rick, here's your performance review.  Based

7   on that, you'll either get a three percent or a

8   four percent or a five percent.  Is that what you

9   mean?

10       Q.     No.  You've answered my question.  I

11  appreciate that.  Let's talk things other than your

12  pay.

13            For example, your -- your benefits,

14  your health insurance, vacation, things of that

15  nature.  Those were generally, as you understood

16  it, the same for all salaried employees, weren't

17  they?

18       A.     As I understood it, yes.

19       Q.     And when the company was going to make

20  a change, for example, to health insurance, they

21  didn't come to get your approval before they'd do

22  that?

23       A.     No, they didn't come to get my

24  approval.  We had meetings where they informed us

1    what they were going to do -- or the way they might

2    go, the path they would want to go.  But they

3    didn't change a whole lot over the time I'd been

4    salary with Ford.  Not a whole heck of a lot that

5    you would recognize that way.

6        Q.    Okay.  Well, we'll talk about some

7    changes here -- here in a minute.    Are you familiar

8    with the concept of at-will employment?  Have you

9    ever heard of that before?

10        A.    Just recently.

11        Q.    As part of this lawsuit?

12        A.    No, before that with -- with -- I

13    worked in Len's area.  I heard of lot of those

14    comments.  And at will, the first I heard that was

15    working for Len.

16        Q.    Okay.  While you were a salaried

17    employee at Ford, there were years, weren't there,

18    that you didn't get a merit increase at all?

19        A.    There may have been.  Do I remember

20    those?  No, not specifically 'cause Ford has

21    been -- other than what I mentioned earlier, the

22    early nineties is what comes to mind -- come to my

23    mind.  Generally they've done very well and

24    there've been lots of opportunities for increases.

1     Q.    Do you remember some lean years in the

2  early eighties, perhaps '82 and '83 where merit

3  increases weren't given?

4     A.    I don't remember.

5     Q.    Is it possible?

6     A.    Yes, yes.

7     Q.    Is it your understanding that the

8  company decided not to give you a merit increase

9  for whatever reason, that they had the ability to

10  make that decision?

11     A.    Yes.

12     Q.    And you received profit sharing while

13  you were a salaried employee?

14     A.    Yes, I did.

15     Q.    There were years, weren't there, that

16  you didn't receive any profit sharing at all?

17     A.    I can't remember.  There might have

18  been a couple.  I don't remember many, if any.

19     Q.    Okay.  Early nineties, does that ring

20  a bell as to --

21     A.    That would have been the time frame.

22     Q.    Okay.  And I think you have Exhibit 4

23  in front of you.  If you could just take a moment

24  and flip to page -- bear with me.  I had this

1    marked earlier.  It's Bates stamped page 18,

2    towards the back.  The chart that says, Ford

3    historical profit sharing.  Are we on the same

4    page?

5         A.    Yes, sir.

6         Q.    Okay.  If you look at the years '91,

7    '92 and '93, this chart appears to indicate that

8    the amount of profit sharing for those years was

9    zero percent.

10        A.    Yes.

11        Q.    Does that refresh your memory as to

12   whether there may have been some years where you

13   didn't receive profit sharing?

14        A.    I had said earlier that the early

15   nineties would have been -- if it was, that's when

16   it would have been.  It looks like that's how it

17   was.

18        Q.    You understood while you were with

19   Ford that there was no guarantee that you'd receive

20   profit sharing?

21        A.    Correct.

22        Q.    All right.  If the company was having

23   a bad year, you might not get anything at all?

24        A.    Yes.

```
 1        Q.    And the amount that you received was

 2   solely up to the company, right?

 3        A.    Yes.

 4        Q.    Okay.  At some point while you were

 5   with Ford, did the company -- and by "the company,"

 6   I mean Ford.  Did they change from a profit sharing

 7   to a performance bonus plan?  Do you remember that?

 8        A.    No, I don't.

 9        Q.    Okay.  During your employment with

10   Ford, do you recall Ford ever changing the amount

11   of your health insurance premiums, the amount you

12   paid out of pocket yourself for your health

13   insurance?

14        A.    Yes.

15        Q.    Typically they increased those

16   premiums that you paid, right?

17        A.    I don't remember them decreasing.

18        Q.    Okay.  Do you remember also them

19   changing the co-pays that you would pay for certain

20   doctor's visits, et cetera?

21        A.    I remember that happening, yes, but I

22   don't remember when.

23        Q.    And typically those went up, not down,

24   correct?
```

90

```
 1        A.    Yes.

 2        Q.    Okay.  Do you also recall that they

 3   made certain changes as to what was covered under

 4   the health insurance plan?

 5        A.    Yes.

 6        Q.    And you don't dispute, do you, that

 7   the company had the right to make those various

 8   changes to the health insurance?

 9        A.    No, I don't.  I don't dispute that,

10   that they did.  I -- I still think, like I said

11   earlier, that they tried to communicate with the

12   employees a lot during that time period on things

13   because they -- the employees did have options.  It

14   wasn't just -- you know, you could go with John

15   Hancock or you could do something different.  I

16   know at one point, we could do something besides

17   John Hancock.

18        Q.    Options in terms of which health

19   insurance plan you --

20        A.    Yes.

21        Q.    -- chose?  Okay.  Do you recall there

22   being a time, perhaps 1982 where, because of some

23   lean times, the company canceled vacation days or a

24   portion of vacation days?
```

1          A.     No, I don't recall that.

2          Q.     Is it possible that happened and you

3     just don't recall?

4          A.     It's possible.

5          Q.     Do you recall, again in the early

6     eighties, the company canceling a comp day?

7          A.     I never received a comp day, but I --

8     I -- as I mentioned earlier to John, there was a

9     time when -- you know, it might have been that time

10    period where, instead of getting paid for overtime,

11    you received comp days instead.

12             And I know they -- that a lot of

13    people did receive comp days, but I don't know that

14    much about it.  I never had -- had a comp day.

15         Q.     When Ford made this change from paying

16    overtime to giving comp days, did they come to

17    salaried employees and get their approval before

18    doing that?

19         A.     Approval, I don't believe so.  We

20    discussed it, we talked about it in meetings.

21         Q.     They communicated what their decision

22    was?

23         A.     And everyone had an opportunity to

24    voice they liked that or they didn't like that.

1    And I'm not sure that made any difference, but I

2    guess they did have the opportunity.

3        Q.    Okay.  Do you recall, sir, a time in

4    the early eighties where overtime, but before the

5    comp time provision was put in, that overtime pay

6    was limited to straight time instead of time and a

7    half?

8        A.    No, I don't recall that.

9        Q.    Now, I believe you testified earlier

10    that one of the changes in the -- in the overtime

11    from Ford to ZF was that when you were with Ford,

12    it was always time and a half, whereas ZF has some

13    flat rates for overtime; is that correct?

14        A.    Yes, they did.

15        Q.    At any time while you were with Ford,

16    did Ford have flat rates for overtime?

17        A.    I don't remember.  I wouldn't have

18    said that.  I didn't remember that.  I don't

19    remember them ever having that.

20        Q.    Okay.  Can you turn back to Exhibit 4

21    again?  I believe it's Bates stamped page 6.  Do

22    you remember this page that's shown here as Bates

23    stamped page 6?  Do you remember that being

24    displayed as a slide at the May 27th, '99 meeting?

1     A.     I don't remember it specifically, but

2  it could have been 'cause we talked about those

3  kind of things.

4     Q.     At the meeting, do you remember there

5  being discussion of these overtime rates or of what

6  ZF's overtime rates were?

7     A.     Yes.

8     Q.     Okay.  And so you knew, didn't you, as

9  of May 27th, '99, that ZF was going to pay flat

10  rates for overtime, as opposed to time and a half

11  for all overtime?

12     A.     It was something that was discussed.

13  Did we know -- was it -- did they say this is how

14  it's going to be?  I don't remember them saying

15  that.  I remember them saying here's -- here's

16  something that we're talking about doing.

17     Q.     Oh, okay.

18     A.     A lot of those slides said -- you

19  know, we're not going to have lease cars in the

20  future, things like that.

21     Q.     So you understood the slides that were

22  being put up May 27th as things that might happen

23  at ZF Batavia?

24     A.     Yes.

94

1          Q.    But no one was saying that this was

2    definite, that this is the way things were going to

3    be at ZF Batavia?

4          A.    See, I can't say that for sure because

5    some of the things I understood them as, yes, this

6    is how it's going to be and some of them they'd

7    talk about it.

8          Q.    Okay.  Well, can you -- if you flip

9    to -- I'm sorry.  Tell me again, did you attend the

10   a.m. or the p.m. meeting?

11         A.    A.M.

12         Q.    Okay.  If you'd flip to Bates stamp

13   page 1, and that appears to be the agenda for the

14   May 27th meeting.  As you look at that agenda, do

15   you agree with me that those topics were discussed

16   at the May 27th meeting?

17         A.    I remember some of them, yes.

18         Q.    Okay.

19         A.    I can't say I remember all of them,

20   but I remember some of them.

21         Q.    Which ones do you remember being

22   discussed?

23         A.    The vehicle program, annual incentive

24   plan, merit increase, the health.  The Hartford,

1    I -- I remember them having someone -- I believe

2    someone came in to talk about that.  The flexible

3    spending accounts, tuition reimbursement, 401K plan

4    and retirement plan, which, as I recall, was mostly

5    for the employees that were immediately eligible to

6    retire.

7         Q.    Which you were not, correct?

8         A.    Correct.

9         Q.    Now, as you look beside each of those

10   various topics, there is a name listed, which I

11   presume is the individual who is going to be the

12   presenter for that particular topic.  As you look

13   at the agenda, do you have any reason to believe

14   that the individuals who are listed as the speaker

15   for each topic are -- are not, in fact, the people

16   who spoke on those topics at the meeting on May

17   27th?

18        A.    I don't -- I don't remember.

19        Q.    Okay.  Of the various topics that you

20   recalled being discussed at the May 27th meeting,

21   are you able to narrow that list down, in terms of

22   which ones you believe were being discussed, in

23   terms of this might be what happens at ZF Batavia,

24   as opposed to those that -- where it was said, this

96

1    is what it's going to be at ZF Batavia?

2        A.    Okay.  The vehicle program, I remember

3    that as being something they talked about might

4    happen because they were still looking into it and

5    how they were going to handle that program.  I

6    don't remember that much about it then.  It didn't

7    apply to me.

8            The annual incentive plan, then they

9    talked about a plan of how they were going to

10   compensate, but I don't remember the specifics

11   but --

12       Q.    Do you remember what --

13       A.    -- I believed -- I believed that was

14   going to happen, yes.

15       Q.    You believed that was a definite, as

16   opposed to a maybe?

17       A.    Yes.

18       Q.    Okay.

19       A.    And the same with the merit increase

20   program.  United Health Care, that that was going

21   to be our provider.  I thought that was a definite.

22   And the dental with Unicare.  I don't remember that

23   much about the Hartford.

24            The flexible spending accounts, I

1    can't remember about those.  Tuition reimbursement,

2    I think that was -- I -- I don't think that that

3    had been hammered out as a definite at that point

4    'cause I was interested in that 'cause I was

5    finishing up school.

6              And the 401K plan, that was -- I

7    believe that was going to happen, yet you had

8    options with that.  There was a lot of different

9    ways you could -- what you could do with your 401K,

10   different accounts and different things that you

11   had to choose, and that's all.

12        Q.    What about retirement, do you remember

13   that as being firmed up or is that still in the

14   planning stage at the meeting?

15        A.    I don't remember.

16        Q.    Mr. Ervin, you've been handed what the

17   court reporter has marked as Exhibit 88.  I'll

18   submit to you that this is a document Ford produced

19   in this case.  It was part of your personnel file

20   from Ford Motor Company, part of your salary,

21   personnel file.  As you look at the bottom of that

22   document, is that your signature there?

23        A.    Yes, it is.

24        Q.    Do you remember signing this document

1    when you became a salaried employee?

2            A.    No, I do not.

3            Q.    You don't have any reason to dispute

4    that you did sign this document, though, do you?

5            A.    No, I don't.

6            Q.    Okay.  If you look to the -- well,

7    actually there are a couple of different documents

8    that appear to have been photocopied onto here, but

9    I want to focus on the part that says "Employment

10   Agreement."  And if you look under "Employment

11   Agreement," there are various paragraphs.

12            If you look to the third paragraph

13   there, could you take just a moment and read that

14   paragraph to yourself and let me know when you've

15   done so?

16           A.    Okay.

17           Q.    Now, if you look, it may be one long

18   sentence here, but as you look to the second line

19   there, I guess there's -- at the beginning of that

20   sentence there are a few words in there and then a

21   semi colon and then it says that my employment is

22   subject to such rules, regulations and personnel

23   practices and policies and changes therein as my

24   employer may from time to time adopt.  Is that

99

1    consistent with your understanding as to how your

2    employment operated at Ford?

3        A.    No.  And I say that because I -- I

4    can't recall any employee's salary just being --

5    just terminated or their employment stopped because

6    they -- they wanted to.

7        Q.    Because who wanted to?

8        A.    Ford.

9        Q.    You don't recall anyone being

10   terminated because the company wanted to terminate

11   someone?

12       A.    Well, not just -- without a reason.

13   Without a definable, justifiable cause where --

14   where they had a hearing and you sat down and went

15   through that.  And the way that I -- that I read

16   that was they could -- subject could be terminated

17   at any time without advance.

18       Q.    And you didn't believe that's the way

19   things were operating?

20       A.    No, I don't.  I didn't.

21       Q.    If you focus on the sentence or the

22   clause that I read --

23       A.    Okay.

24       Q.    -- which, if I could paraphrase it,

1    essentially says that Ford could make rules,

2    regulations and policies and then make changes to

3    those.

4            Do you agree with me that Ford had the

5    ability while you were a salaried employee to make

6    policies and procedures and to change those

7    policies and procedures?

8        A.    Yes.

9        Q.    And you would also agree that you were

10   required to follow those policies and procedures?

11       A.    Yes, I was.

12       Q.    And, then, if you look to the third

13   line towards the end of that line, there's a clause

14   that says, and my compensation to such adjustments,

15   as my employer from time to time determine.  And I

16   think this is consistent with your earlier

17   testimony.

18           It was your understanding that it

19   was -- Ford had the right to determine what your

20   compensation and your benefits were going to be,

21   correct?

22       A.    Yes, they did, but we talked about it.

23   I mean, compensation, I think I mentioned that it

24   was something -- we had a performance review, and

1    you talk about it and that's how your compensation

2    was determined, whether your raises or what the

3    rates would be and percentages and things like

4    that.  But, yes, they had the --

5        Q.    And when --

6        A.    They ultimately did it, yes.

7        Q.    Okay.  And with regard to

8    compensation, I mean, Ford set up a compensation

9    program that included performance reviews, correct?

10        A.    Yes, sir.

11        Q.    And Ford ranked you according to your

12    performance, correct?

13        A.    Yes.

14        Q.    And then based on your performance,

15    according to their rankings, Ford determined what

16    your increase was going to be?

17        A.    They did.  When you say "Ford," I

18    guess that would -- that would include your boss.

19    Yes, I guess that -- that would be something where

20    it was discussed.  Your -- your raise will be what

21    percentage, and then that was divided, depending on

22    an area and -- you know, but yes.

23        Q.    Okay.

24        Q.    Now, since the time that you left Ford

1  as a salaried employee, which was sometime in 1999,

2  correct?

3        A.    Yes.

4        Q.    Are you aware that -- that Ford has

5  made changes to the compensation and benefits of

6  salaried employees that continued to work for Ford?

7        A.    No.

8              MR. SIMON:  Jeff, counselor, note my

9  earlier objection at the last deposition.  If there

10  are documents that support these assertions you're

11  making, then I think we were entitled to copies

12  that support this.

13        Q.    Are you aware, for instance, Mr.

14  Ervin, that Ford no longer has a 401K match for its

15  salaried employees?

16        A.    No, I'm not.

17        Q.    As a ZF employee, you still receive a

18  401K match, don't you?

19        A.    Yes, sir.

20        Q.    Are you aware that Ford has stopped

21  paying performance bonuses to salaried employees?

22        A.    No.

23        Q.    Or that performance bonuses have been

24  in minimal amounts, such as $100, are you aware of

1    that?

2          A.    No.

3          Q.    And you continue to receive

4    performance or AIP bonuses at ZF, don't you?

5          A.    Yes, I do, but other employees --

6    $100, it's probably comparable or -- or less.

7          Q.    Have you ever received an AIP bonus at

8    ZF that was as little --

9          A.    No, I have not.

10         Q.    -- as $100?

11         A.    No.

12         Q.    Are you aware that Ford recently

13   announced that it was going to be cutting salary-

14   related costs by 10 percent?

15         A.    I remember seeing something in the

16   newspaper, but not specifically.

17         Q.    Okay.  Are you aware that there's --

18   other than what you may have heard in Mr. Warden's

19   deposition, if you were here today, that Ford is

20   contemplating cutting or reducing salaried

21   overtime?

22         A.    No.  I'm sorry.  Did you say

23   contemplating or they're -- they're doing it?

24         Q.    Contemplating.

```
 1         A.    No, I haven't.

 2         Q.    Now, it's my understanding from your

 3   responses to Mr. Hunter's questions that you

 4   believe certain individuals made promises to you

 5   about what things would be like at ZF.  Did I state

 6   that accurately?

 7         A.    Yes.

 8         Q.    I mean, do you believe that -- and

 9   we're talking about folks like Hassan, Jerry

10   Priest, Rick Williams, right?

11         A.    Yes.

12         Q.    Okay.  Do you believe that those were

13   promises or do you believe that they were telling

14   you what they thought things were going to be like

15   at ZF Batavia?

16         A.    I believe that those were things that

17   they were told and when they -- I know that they

18   were told that if you're going to transition over,

19   then you need to get the people to work for you

20   that you want.

21              So when Rick Williams came to me and

22   talked to me about transitioning, he's the guy I

23   dealt with and I asked questions about all those

24   things.  Why, I probably had an option to talk to
```

1    Mike and I -- and I said I talked to him a couple

2    of times, but Rick is the guy that I went to about

3    all those things.

4         Q.    Now, at Ford while you were there, the

5    people that were responsibile for compensation and

6    benefits, those were people in the human resources

7    department, right?

8         A.    Yes.

9         Q.    Rick Williams wasn't in human

10   resources, was he?

11        A.    No, he was not.

12        Q.    Hassan wasn't in human resources?

13        A.    No.

14        Q.    Jerry Priest is not in human

15   resources?

16        A.    No.

17        Q.    Other than Mr. Williams, Hassan, Jerry

18   Priest and I think you testified about one

19   conversation with Mike Warden, did any other

20   representatives of Ford make any promises to you

21   about what things were going to be like at ZF?

22        A.    In the meetings -- the meetings on the

23   27th and there were other meetings.  The promises

24   that I'm talking about are what I mentioned earlier

1    that -- and the questions afterwards is when the

2    people that were contemplating transitioning asked

3    those questions, what about compensation and what

4    about the vacation times, those kind of questions.

5              And those were -- I think everyone

6    took that as -- you know, these are -- these are

7    the commitments they're giving us.  This is -- this

8    is a promise.  They're telling us this is how it's

9    going to be.  We -- I know I did, and I believe a

10   lot of other people took that as, yeah, that's --

11   that's legit.  I can -- I can count on that.

12        Q.    Who in those meetings, who --

13        A.    Karl Kehr, Dave Adams --

14        Q.    -- made those promises?

15        A.    -- were the ZF reps.  And that -- that

16   would probably be all that I can remember.

17        Q.    What do you specifically remember

18   Mr. Kehr promising during those meetings?

19        A.    Karl said that -- that the

20   compensation or that the pay structure wouldn't

21   change, that it would pretty much be the same.

22        Q.    Now let me stop you for just a minute.

23        A.    Okay.

24        Q.    Did he say it wouldn't change or did

1    he say it would pretty much be the same?

2        A.    I recall it being wouldn't change.

3        Q.    Okay.  Anything else that Mr. Kehr

4    promised?

5        A.    No, not that I can recall.  I mean,

6    Karl and Dave both, everything that they talked

7    about was trying to entice the Ford people to

8    transition to ZF.  So I think everything they were

9    saying was -- you know, good things.  You know,

10   this -- everything is going to be okay.  Dave

11   mentioned we're going to try to mirror what you're

12   used to at Ford.  We're going to try to mirror that

13   with ZF.

14       Q.    He said we'll try to mirror?

15       A.    Yes.

16       Q.    He didn't say will definitely mirror?

17       A.    No, he did not.

18       Q.    And when Mr. Kehr said the

19   compensation and pay structure will not change, did

20   he specifically say the overtime pay arrangements

21   will not change?

22       A.    He didn't specifically say that in a

23   presentation.  When people asked the question, how

24   about our pay?  And, yes, he did say in the

1    question period that your pay structure will

2    basically stay the same.  If you're getting paid

3    overtime at Ford, you'll get -- you'll get paid

4    overtime with ZF.  If everything else, they're

5    trying -- we're trying to do the same thing that

6    Ford is doing.

7          Q.    Did Mr. Kehr ever say to you things

8    will never change at ZF?

9          A.    No.

10          Q.    They'll always be the same?

11          A.    No.

12          Q.    Never said anything --

13          A.    No.

14          Q.    And your understanding, at least with

15    Ford, certainly was that things changed frequently?

16          A.    No.

17          Q.    Things changed.  You understood --

18          A.    I understand --

19          Q.    -- at Ford, things changed?

20          A.    Yeah, yeah.  I - 'cause I remember

21    saying for many, many years, things were very good.

22    They didn't change.  If they did change, they were

23    for the better.

24          Q.    But sometimes they were for the worst?

1    For example, they --

2         A.    Occasionally --

3         Q.    -- increased health insurance, et

4    cetera?

5         A.    -- yes, yes.

6         Q.    And did you have that same expectation

7    that at ZF, things might change for the worst as

8    well?

9         A.    With health insurance and things?

10        Q.    With any -- with any benefits, things

11   might change for the worse.

12        A.    Yes.

13        Q.    Okay.  Now, you understood that when

14   you accepted the offer from ZF, that you were going

15   to be working for ZF and not Ford, correct?

16        A.    Yes.

17        Q.    And you understood that ZF Batavia

18   would be responsible for your compensation and

19   benefits and not Ford, correct?

20        A.    I understood that Ford and ZF together

21   were working on -- you know, there were -- it was a

22   joint venture.  But Ford was involved -- and it was

23   my understanding and I'm not going to talk for

24   anyone else, but that all -- a lot of the

1    decisions, the policies, everything that was

2    involved with the transition, that Ford was a big

3    part of that.  They were 49 percent.  They have a

4    big say in everything that goes on right now.  So

5    even though, yes, I -- I agree.  I work for ZF.  ZF

6    is -- is the person I work for.  I think Ford has

7    been a big part of that from the beginning and I

8    think they still are.

9        Q.    By virtue of the fact that they're 49

10   percent interest holder in the joint venture,

11   right?

12       A.    Yes.

13       Q.    And you understood that once you went

14   to work for ZF Batavia, that you'd be subject to

15   whatever policies and procedures they put in,

16   right?

17       A.    Yes.

18       Q.    And you also understood, didn't you,

19   when you accepted employment with ZF Batavia, that

20   there were going to be differences between the

21   benefits that ZF Batavia was going to offer and the

22   benefits that you'd received at Ford?

23       A.    I understood that there might be --

24   might be differences, but I understood also that

1    they would be fairly close together.  That's what

2    mirrored would mean, that they would be comparable.

3         Q.    You received a transition bonus when

4    you accepted employment with ZF Batavia, didn't

5    you?

6         A.    Yes, I did.

7         Q.    And that transition bonus was

8    designed, wasn't it, to address differences between

9    ZF's benefits and Ford's benefits?

10         A.    Some of the benefits.  I'm not sure

11    what all that included.  I know that took into

12    account things like leased cars and some of the

13    differences, yes.

14         Q.    Were you ever told specifically what

15    differences the transition bonus was designed to

16    address?

17         A.    Not that I recall.

18         Q.    Do you still have Exhibit 85, which is

19    your ZF Batavia application?  If you would turn,

20    Mr. Ervin, to the second page of that document.

21    The second page of that document, the first place

22    that your signature appears, do you see that?

23         A.    Yes.

24         Q.    And then there are three paragraphs

1   above that.  Do you see where I'm at?

2          A.    Yes.

3          Q.    If you'd look to the middle paragraph

4   and the second sentence there, it says, I

5   understand my employment is not to be for any

6   definite term, may be terminated at any time by

7   either myself or my employer.  Do you see where I'm

8   at?

9          A.    Yes.

10         Q.    Would you read that whole sentence to

11  yourself and let me know when you're done, sir?

12         A.    Okay.  The sentence, yes.

13         Q.    Okay.  Now, the last part of that

14  sentence says, the only way any differing

15  commitment regarding my employment may be made is

16  by a written agreement signed by the director of

17  human resources of the company.

18            The director of human resources is Len

19  Sennish, right?

20         A.    Yes.

21         Q.    And do you have any written agreement

22  with Len Sennish setting forth terms and conditions

23  of your employment?

24         A.    Written agreement, no.  An --

```
1          Q.    Okay.

2          A.    -- understanding, yes.  And that's

3    what I mean by -- and the understanding being

4    everybody has the understanding that I do the job

5    that I'm supposed to do and ZF provides the

6    benefits and compensation and things like that.

7    That would be my understanding.

8          Q.    Okay.

9          A.    Not that Len can -- you know, at any

10   time just say, Rick, I'm sorry, but you're gone

11   today.

12         Q.    Okay.  But you do see in that

13   paragraph where it says, my employment is not for

14   any definite term and may be terminated at any time

15   by either myself or my employer?

16         A.    Yes, I do.

17         Q.    Okay.  You just don't believe it works

18   that way?

19         A.    No, I don't.

20         Q.    Okay.

21         A.    I would hope that it doesn't work that

22   way anywhere.

23         Q.    By the time you went to the May 27th,

24   1999 meeting, had you already made up your mind
```

1    that you were going to accept employment with ZF

2    Batavia?

3          A.    I can't remember.

4          Q.    Do you remember specifically when it

5    is that you made up your mind that you were going

6    to accept employment with ZF Batavia?

7          A.    I -- I believe it was in the late May,

8    early June time frame.  Yes, 'cause I had to make a

9    decision before I went on medical.

10          Q.    Now, one of the things you testified

11    about earlier was your belief that there had been a

12    promise to you about your ability to retire and

13    then be rehired by ZF.  And I believe you testified

14    that you had conversations with Mr. Priest and

15    Mr. Williams about that?

16          A.    Yes.

17          Q.    Now, later when you made your decision

18    that you wanted to retire, you contacted someone

19    from the NESC, didn't you?

20          A.    Yes, sir.

21          Q.    And you contacted NESC because you

22    understood those were the individuals responsible

23    for the retirement plan, right?

24          A.    I contacted Sarah Orwig in HR at

1    Dearborn and she recommended that I contact -- she

2    said, yes, I believe you should be able to do that,

3    but you should contact NESC.

4          Q.    Okay.  But you understood that either

5    HR or NESC were the folks that if you had

6    retirement questions, those folks were who you

7    directed your retirement questions to, correct?

8          A.    No, that wouldn't be correct.  They

9    would be a part of the process, yes.  But I also

10   believe Len Sennish, being the HR rep there at ZF,

11   would be a huge part of that process also.

12         Q.    Okay.  You didn't believe, though,

13   that Mr. Williams, for example, was an expert in

14   the retirement system, did you?

15         A.    No, not an expert, just a resource.

16         Q.    Okay.  You didn't believe that Hassan

17   was an expert in the retirement system, did you?

18         A.    No.

19         Q.    Or Mr. Priest?

20         A.    No.

21         Q.    And if you had specific questions

22   about how the retirement system worked, you were

23   going to direct those to HR, either at Ford or at

24   ZF or to NESC, correct?

1          A.     I did that.

2          Q.     Okay.  Now, at this May '99 meeting,

3     was there any specific discussion there about your

4     ability to retire from Ford after you had accepted

5     employment with ZF and then get rehired by ZF?

6          A.     Yes.  This was one of the questions

7     that was asked.

8          Q.     What was the specific question that

9     was asked?

10          A.     Okay.  We, as transition people, when

11     we get 30 years combined service and we retire,

12     start drawing our retirement benefits and then hire

13     back with ZF, and they said, Yes.  You'd be able to

14     do that just like the Ford people who are going to

15     be able to do that.

16          Q.     Who said yes?

17          A.     I can't remember.  I don't remember,

18     but it was directed at Karl Kehr.  I don't know if

19     he specifically answered the question or someone

20     else that was in that group.

21          Q.     And the ability to retire and then be

22     rehired by ZF was important to you?

23          A.     It was one of the things that was

24     important to me, yes.

1          Q.     If you had been told that you wouldn't

2    be able to do that, would you have accepted the job

3    with ZF Batavia?

4          A.     Yes.

5          Q.     You would have taken the job anyway?

6          A.     Yes.

7          Q.     Okay.  So -- and I know you testified

8    earlier that in your offer letter, which is Exhibit

9    84, it doesn't say anything about retirement and

10   rehire?

11         A.     No.

12         Q.     In fact, you never got that in

13   writing, did you?  Before you accepted employment

14   with ZF Batavia, you never got that in writing, did

15   you?

16         A.     No.

17         Q.     And it didn't concern you that you

18   didn't have it in writing, did it?

19         A.     No, it didn't concern me because the

20   people I talked to, I trusted that they were giving

21   me correct information and they believed so also,

22   even to a director level, that they were under the

23   same belief.

24         Q.     By -- the people you're referring to,

```
 1    Mr. Williams --

 2            A.    And Mr. Priest.

 3            Q.    -- and Hassan as well?

 4            A.    No, not him on that.

 5            Q.    Okay.  Mr. Williams and Mr. Priest?

 6            A.    Yes.

 7            Q.    And you believed that they were

 8    telling you the truth?

 9            A.    Yes.

10            Q.    Okay.  And --

11            A.    I believe they -- they were telling me

12    what they thought --

13            Q.    Okay.

14            A.    -- to be the truth, yes, 'cause they

15    both expressed that to me at a later date.

16            Q.    Sure.  And you don't have any reason

17    to believe that at the time they told you that,

18    that they knew that it wasn't really true?

19            A.    No, I don't have any reason to believe

20    that.

21            Q.    Or that they knew that years down the

22    road, someone at NESC or someone else would say,

23    no, you can't retire?

24            A.    No, 'cause they were counting on it,
```

1   too.

2        Q.    Now, you also testified about your

3   belief that there was going to be some sort of

4   committee to look after the transitional employees.

5   Did you ever see that put in writing, that there

6   would be such a committee?

7        A.    I have seen that in writing, but I

8   don't remember where.  I don't remember.  It

9   could -- it could even be -- it could even be part

10  of our -- our package.

11       Q.    Part of what package?

12       A.    The transitional lawsuit information,

13  maybe.  I don't remember.  I've seen it somewhere

14  and I can't recall if it was back then or something

15  that I've seen going through -- through things.

16       Q.    Okay.  You would agree with me that

17  it's not listed in Exhibit 2 and it's not listed in

18  your offer letter and it's not listed in the slides

19  from Exhibit 4, wouldn't you?

20       A.    Yes.

21       Q.    Okay.  Were you ever told who would be

22  on this committee?

23       A.    Yes, they told us, but I don't

24  remember the makeup of it, but that -- when the

1    meeting -- when they talk about it -- because the

2    question that was asked, What about us?  Who's

3    going to watch after our interests since we're

4    going to be transition employees with ZF and we're

5    cutting ties with Ford?  And they said there's

6    going to be a committee that will look after your

7    best interests.  No, I don't remember how that was

8    to be -- what it was supposed to be composed of.

9        Q.    Do you remember specifically who said

10    that, that there would be such a committee?

11        A.    Karl Kehr.

12        Q.    And this -- you believe this was at

13    the May '99 meeting?

14        A.    Yes, one of those meetings.  I don't

15    remember if it was the 27th of May.

16        Q.    Had you known that there wouldn't be

17    such a committee, would you have accepted

18    employment with ZF Batavia?

19        A.    I don't know.  I don't know.  At a

20    certain point, I think of -- if I had known this

21    and known this, there would have been a certain

22    point when enough of that, I would have -- yes, it

23    would have affected.  Would that in itself, not

24    knowing the other things, no.

1          Q.    Okay.  Do you have any reason to

2     believe that Mr. Kehr was -- or at the time he made

3     that statement about this committee, that he knew

4     there really wouldn't be a committee?

5          A.    No.

6          Q.    Now, you've testified about various

7     changes in policies that -- or changes to promises

8     that have been made.  And I believe that you've

9     testified about five, overtime pay, personal days,

10    the ability to retire and hire back, the

11    opportunity to get into CVT and then this

12    committee.  And I don't have any others in my list.

13    Are those the only ones that you can recall in

14    terms of promises that you believe were not

15    followed through on?

16              MR. SIMON:  Objection.  The record

17    speaks for itself.  Go ahead and answer it.

18         A.    Yes, I believe that's -- that's all I

19    can recall.

20         Q.    Okay.  Let's set aside the retirement

21    issue for a minute, come back to that.  With regard

22    to the change in overtime policy, that change was

23    made by ZF, correct?

24         A.    As -- as far as I know, yes.

1          Q.     Do you have any knowledge of anyone

2     from Ford being involved in that change?

3          A.     No, I don't.

4          Q.     Do you have any knowledge of anyone

5     from Ford approving that change?

6          A.     No, I don't.

7          Q.     And the change in personal days was

8     also made by ZF?

9          A.     I don't know.  I don't know if Ford

10    and ZF talked about those things.  I mentioned

11    before I think they do talk about a lot of policies

12    and things.  I don't know if Ford was involved in

13    that or not.  No, I heard about it from ZF.

14         Q.     What sort of policies do Ford and ZF

15    talk about?

16         A.     I don't know.

17         Q.     Do you know as you sit here whether ZF

18    and Ford consult on what the changes to benefit

19    policies are going to be?

20         A.     No, I do not.

21         Q.     Do you have any knowledge as to

22    whether Ford approved the change in personal days?

23         A.     No, I don't.

24         Q.     Okay.  With regard to the opportunity

 1    to get into CVT, now when you accepted the offer

 2    with ZF Batavia, you knew you were going to go or

 3    continue to working in CD4E at that point, right?

 4         A.    It wasn't discussed.  It was -- that's

 5    what -- that's all there was at that point.  Now,

 6    in the future when -- when CVT started, my

 7    understanding was, yes, I'd have the opportunity to

 8    go over there.

 9         Q.    You'd have an opportunity, that's what

10    you were told?

11         A.    Yes.

12         Q.    Were you told that you would be

13    guaranteed --

14         A.    No.

15         Q.    -- to be working in CVT?

16         A.    No.

17         Q.    In fact, CVT is not yet up, running

18    production, right?

19         A.    Well, they're in the beginning -- they

20    were supposed to run a hundred pieces this week.

21         Q.    Have there been any CVT transmissions

22    go out the door yet?

23         A.    Just two prototypes --

24         Q.    Okay.

1       A.      -- to be used in demonstration cars

2    and stuff.

3       Q.      And do you know, as you sit here

4    today, whether or not, in fact, you have ever been

5    considered for positions in CVT?

6       A.      No, I do not.

7       Q.      Have you applied for any positions in

8    CVT?

9       A.      No, I have not.

10      Q.      And, again, back to this committee, do

11   you have an understanding as to whether or not that

12   was going to consist of ZF people or Ford people?

13      A.      My understanding is that it would have

14   been Ford people and ZF together because the board

15   of directors was made up of both.  And it was my

16   understanding this will be a committee that would

17   also be made up of both.

18      Q.      Was it your understanding that the

19   committee and the board of directors were the same

20   thing?

21      A.      No.

22      Q.      Or that the committee was going to be

23   part of the board of directors?

24      A.      No.

1         Q.     And I believe you testified that with

2    regard to the promises about overtime, that that

3    was, in addition to Mr. Kehr, that there may have

4    been some conversations with Mr. Williams and

5    Hassan and Mr. Priest about overtime?

6         A.     Yes, just the discussion on we're

7    going -- the pay structure stays the same.  And,

8    yes, that's the way we understand it also.

9         Q.     Okay.  Do you have any reason, as you

10   sit here today, to believe that at the time Hassan

11   or Mr. Priest or Mr. Williams or Mr. Kehr discussed

12   with you the pay structure, that they weren't

13   telling you the truth?

14        A.     I don't believe that Mr. Williams or

15   Mr. Saleh or Mr. Priest would -- I believe what

16   they told me was true.  Karl, I -- I don't know.

17        Q.     Okay.

18        A.     He's been involved in enough of this

19   stuff that we've talked about that I -- I can't

20   say.

21        Q.     And you don't have any reason to

22   believe that Mr. Saleh or Mr. Williams or

23   Mr. Priest at the time they had those conversations

24   with you, knew that, down the road, ZF was going to

1    change the way that it paid overtime?

2         A.    No, I don't know.

3         Q.    And same question with regard to

4    personal days.  Well, let me ask you first, did you

5    have any discussions with Mr. Saleh or Mr. Williams

6    or Mr. Priest about personal days?

7         A.    No, I didn't.

8         Q.    Who, if anyone, made a commitment to

9    you about what the personal days were going to be

10   at ZF Batavia?

11        A.    I don't recall anyone talking about

12   those.

13        Q.    Okay.  Now --

14        A.    The only thing I remember about that

15   was when the communication came out that they were

16   being changed.

17        Q.    Exhibit 2, which I think is right to

18   your left there, is a document we've referred to as

19   the gray brochure.  And I apologize if you've

20   answered this already.  I'm not clear on it.  At

21   the time you made your decision to accept

22   employment with ZF Batavia, had you seen that

23   document before?

24        A.    And I believe I answered earlier that

1    I don't recall.  It could have been.  I remember

2    seeing it around that time frame.  It could have

3    been attached to -- to my employment thing or

4    passed out at one of the meetings and I don't

5    remember.

6         Q.    Okay.  And I thought you testified

7    earlier that it was not attached to your --

8         A.    Oh, I think I said it could have been,

9    but I don't remember it being.

10        Q.    Okay.  Now, if you look to the first

11   page of this document, where it says Ford general

12   retirement plan benefits at the time top.  And I

13   know Mr. Hunter reviewed this language with you

14   earlier.  It appears to me that it basically has

15   two categories of employees.  Employees who are

16   immediately eligible to retire and -- and other

17   employees.  Do you agree with me?

18        A.    Yes.

19        Q.    You were not immediately eligible to

20   retire?

21        A.    Correct.

22        Q.    So you were in the second category

23   covered by the language that says, otherwise an

24   employee may not in the future begin benefit

1    payment from the GRP until they have separated

2    employment from ZF Batavia?

3         A.    Yes.

4         Q.    During any of the discussions that you

5    had with any of individuals you've named or

6    discussions at the questions and answers at the

7    meetings, do you recall any discussion as to what

8    separated employment from ZF Batavia meant?

9         A.    No.

10        Q.    Or do you recall anyone saying that

11   you can quit ZF Batavia today and rehire tomorrow?

12        A.    Not in those meetings.  However, the

13   first that I talked about that was to NESC and then

14   Len Sennish.

15        Q.    And that was well after you had

16   already --

17        A.    That was well after --

18        Q.    -- accepted employment at ZF Batavia?

19        A.    Yes.

20        Q.    Now, who do you currently report to at

21   ZF Batavia?

22        A.    Keith Holmes.

23        Q.    He's a ZF Batavia employee?

24        A.    Yes, sir.  He's a business manager.

```
 1          Q.     Would you look at Exhibit 2?  Was it

 2     your understanding that this document was a summary

 3     of what the benefits were going to be at ZF

 4     Batavia?

 5          A.     Yes, I believe that this was what we

 6     were going to have, yes.

 7          Q.     You didn't believe that it was a

 8     detailed listing of all the policies and procedures

 9     that applied to various benefits, did you?

10          A.     I honestly didn't even think about

11     that.  It was something that I took as being, this

12     is what our agreement is and this is what I'm going

13     by and this is what I used to be a part of my

14     decision.

15          Q.     Well, now you're not --

16          A.     And --

17          Q.     -- actually sure about that?

18          A.     No, no, 'cause we -- I'm not sure when

19     I got it exactly, but when -- when we got it, that

20     was part of -- you know, yes, I -- we've talked

21     about a lot of these things.

22          Q.     Right.  But you could have received

23     this after you had already made your decision to

24     join up with ZF Batavia, correct?
```

```
 1          A.     Yes.

 2          Q.     If you look at the second page, I know

 3     Mr. Hunter discussed this with you briefly  the

 4     paragraph at the very bottom there.  And I'll

 5     submit to you that the language speaks for itself

 6     where it says there the plans described here are

 7     subject to change.  Do you remember reading that at

 8     the time you received this brochure?

 9          A.     No.

10          Q.     Okay.  Was it your impression that the

11     benefits at ZF Batavia were subject to change?

12          A.     The benefits, yes.

13          Q.     Okay.  It also says --

14                 MR. SIMON:  I'm sorry.  Interpose a

15     late objection on the benefits.  That might be

16     unclear, but go ahead and ask your next question.

17          Q.     I think it's pretty clear.  It also

18     says in that paragraph that plan provisions and

19     elgibility do not constitute an employment contract

20     with any individual.  Was it your understanding

21     that you had an employment contract with ZF

22     Batavia?

23          A.     Yes.

24          Q.     And what was it that you believe --
```

1   did you believe you had a written employment

2   contract?

3          A.    Well, I believe this was part of the

4   contract.  I believe everything -- that everything

5   we had talked about and that we were told in the

6   meetings were -- were what we were going to get --

7          Q.    I want to --

8          A.    -- as --

9          Q.    I don't mean to cut you off.  Focus

10  specifically on whether or not you believe you had

11  a written contract or not.

12         A.    Yes.

13         Q.    And what did you believe -- what

14  document, if you can point to it, was the written

15  contract?

16         A.    The one that I signed, the

17  employment --

18         Q.    Okay.  The offer letter that you

19  signed?

20         A.    Yes.

21                MR. SIMON:  Exhibit 84.

22         Q.    Any other documents that were part of

23  your written employment contract?

24         A.    Not that I remember.

```
 1          Q.    Okay.  Now, you testified earlier

 2    about a demotion issue and I wasn't clear.  Is that

 3    an issue that involves Ford at all?

 4          A.    No.

 5          Q.    Okay.  No one at Ford, to the best of

 6    your knowledge, was involved in demoting you in any

 7    way?

 8          A.    No.

 9          Q.    You also testified, I believe, that --

10    well, strike that.

11               While you were with Ford, your job

12    assignments changed from time to time, didn't they?

13          A.    Yes.

14          Q.    You don't dispute that Ford had the

15    ability to change your job assignments, do you?

16          A.    No, I don't.

17          Q.    You testified earlier about Jerry

18    Priest and about him being concerned about

19    retirement as well.  And I believe you said that he

20    has not been rehired by -- by ZF.  Was he ever

21    hired by ZF Batavia, do you know, Mr. Priest?

22          A.    I didn't say that, John did, that he

23    was hired as a contract guy.

24          Q.    Oh, okay.
```

```
 1          A.    He was a transition employee, yes.

 2          Q.    Okay.  Do you know if he ever accepted

 3    an offer of ZF Batavia?

 4          A.    As a transition employee?  You mean --

 5    I'm not --

 6          Q.    Well, did he ever --

 7          A.    I don't understand.

 8          Q.    Did he ever become a ZF Batavia

 9    employee?

10          A.    You mean just without a transition tag

11    on it?

12          Q.    Either way.  I mean, you're a ZF

13    employee, right?

14          A.    Yes.

15          Q.    Did he --

16          A.    Yes.

17          Q.    -- ever become a ZF employee?

18          A.    Yes.

19          Q.    Okay.  You said that you had a

20    conversation with Mr. Warden in approximately April

21    '99 about whether or not you could go to

22    Sharonville and that he said he didn't think there

23    were any openings in Sharonville.

24          A.    Right.
```

1       Q.     Do you know one way or the other

2   whether there were openings at Sharonville at the

3   time you had that conversation with Mr. Warden?

4       A.     At the time, there were -- there were

5   people that asked that question and there weren't

6   any openings.  However, shortly thereafter, a lot

7   of people went to Sharonville.

8       Q.     Okay.  Did you ever go back to

9   Mr. Warden again after you learned that there were

10   openings and ask if you could go to Sharonville?

11       A.     I think -- I believe at the time I had

12   already signed with -- with ZF.

13       Q.     Okay.  You also testified that lots of

14   other employees were allowed to retire or --

15   rather, I guess, take the retirement benefits, quit

16   ZF, and then get rehired by ZF.  Did I understand

17   that correctly?

18       A.     I don't remember if I said "lots," but

19   I said some, at least.

20       Q.     Okay.  Who has been allowed to do

21   that?

22       A.     Gary McGee, Carolyn Malone.  There are

23   more.  Let me think. I know there are more, but I

24   can't remember them right now.

1        Q.     Okay.  As we're wrapping up today, if

2     you think of any more, will you --

3        A.     Okay.

4        Q.     -- let me know?

5        A.     Yes, I will.  Mike Morfino.

6        Q.     Any idea how to spell Morfino?

7        A.     I think it's just M-O-R-F-I-N-O.

8        Q.     Okay.  Anyone else off the top of your

9     head?

10       A.     Not off the top.

11       Q.     Okay.  Now, since the time that you

12     left Ford and started employment with ZF Batavia,

13     your annual wages at ZF Batavia have been higher

14     than they were at Ford, correct?

15       A.     Yes.

16       Q.     You were -- I believe your starting

17     salary at ZF Batavia was $93,600.  Does that sound

18     right?

19       A.     That sounds about right.

20       Q.     Your last salary at Ford was, I think,

21     83,000 and some change.  Does that about right?

22       A.     Sounds about right.

23       Q.     So you got about a $10,000 increase

24     when you went to ZF Batavia?

1          A.    (Witness nodded.)

2          Q.    You just need to answer audibly.

3          A.    Yes.  Oh, no shaking of the head,

4     right?

5          Q.    Did you get a promotion by going to ZF

6     Batavia?

7          A.    Yes, I did.

8          Q.    What was your last job at Ford?

9          A.    MPS.

10          Q.    And then at Batavia, what --

11          A.    Superintendent.

12          Q.    Now, the records that I have show that

13     you received an AIP bonus from ZF Batavia in the

14     year 2000 of almost $11,000.  Does that sound about

15     right?

16          A.    Sounds about right.

17          Q.    Okay.  You've also produced in this

18     case copies of W-2s from your employment at Ford,

19     as well as your employment with ZF Batavia.  And as

20     I looked at those, it looks as though the gross

21     wages from your time at ZF Batavia are quite a bit

22     more than the gross wages from your time at Ford.

23     Would you agree with me?

24          A.    Yes.

```
 1        Q.    Okay.  Now you've testified for quite

 2   some time today about a lot of different things.

 3   As you sit here today, are you aware of any other

 4   facts that support any of your claims against Ford

 5   in this case?

 6        A.    No.

 7              MR. VANWAY:  Okay.  I think I'm done.

 8   I want to double check documents, but maybe while I

 9   do that, I don't know if Mr. Hunter has some more

10   questions or not.

11              MR. HUNTER:  One or two for short

12   follow-up.  We don't need to move seats.

13                         EXAMINATION

14   BY MR. HUNTER:

15        Q.    Rick, if I recall correctly, I think

16   you made a comment in our discussion that you were

17   maxed on the vacation?

18        A.    Yes.

19        Q.    What did you mean by that?

20        A.    I have five weeks --

21        Q.    Okay.

22        A.    -- and you can't get any more than

23   that, to my knowledge.  If there is, I'll talk to

24   Herb afterwards.
```

1          Q.     Okay.  And so it's safe to say that a

2     component of your claim as to Rick Ervin -- and

3     certainly there's no request for additional

4     vacation or anything like that?

5          A.     Correct.

6          Q.     Okay.  I mean, you got what you

7     understood what you were going to get?

8          A.     On vacation?

9          Q.     Yes.

10         A.     Yes.

11         Q.     Okay.  When Mr. VanWay was speaking

12    about what individuals knew at the time with

13    respect to the representations they were making

14    regarding the pay structure, I think was the term

15    you used.  You excluded Karl Kehr from the list of

16    individuals that you felt was -- let me rephrase

17    that, okay?

18              You indicated to Mr. VanWay that you

19    had no issue whatsoever and that Jerry Priest, Rick

20    Williams and Hassan conveyed to you what they fully

21    believed with respect to pay structure.  Do you

22    remember that statement?

23         A.     No, but okay.  Go ahead.

24         Q.     Well, to my way of recollection, you

1    distinctly left Karl Kehr out of that list, in

2    terms of feeling that Karl, for example, was fully

3    truthful or -- or disclosed everything he knew at

4    the time that he had the discussions about pay

5    structure and items of that nature.  Do you

6    remember your testimony there?

7           A.    I remember part of that, yes.  I

8    remember saying that I went to Hassan and Dick --

9    or Hassan, Rick and Jerry about a lot of the

10   questions I had because -- you know, I trusted them

11   and they'd been there and that was their

12   recollection and their feeling both.

13              With Karl, I didn't include him as

14   part of that because Karl was a part of all -- all

15   this that we're talking about.  And just my own

16   personal feeling is I don't -- I don't trust what

17   Karl tells me.  And I may sound blunt, but I don't.

18   I mean, that's my feeling.

19          Q.    And I guess, to that end, you don't

20   trust him as we sit here today, or you didn't trust

21   him back in 1999?

22          A.    As we sit here today.

23          Q.    Okay.  So you believed what he told

24   you back in 1999?

1          A.     Yes.  Believed, hoped it to be true,

2     yes.

3          Q.     All right.  And do you have any

4     information available to you to indicate that he

5     wasn't completely honest and accurate at the time?

6          A.     Hearsay.

7          Q.     Okay.  Well, what have you heard?

8          A.     And I can't -- and I can't be specific

9     on it, just that some of the questions, I guess, in

10    his deposition.

11         Q.     Okay.  Well, let's talk about that for

12    a second.  Have you seen Karl's deposition?

13         A.     No, but I've talked to the people

14    that -- that I think were in his deposition.

15         Q.     Okay.  Who have you spoken to?

16         A.     I believe it was Wayne.

17         Q.     And what did Wayne tell you about

18    Karl's deposition?

19         A.     Generalities --

20         Q.     Okay.

21         A.     -- just some of the things that --

22    that he said weren't -- weren't correct, I think,

23    as he remembered it.

24         Q.     What things did Wayne say weren't

1   correct?

2        A.    I can't remember.  I can't remember

3   what those are.

4             MR. HUNTER:  Mr. Simon, if you have an

5   objection, I guess I would ask that you put it on

6   the record.  You're giving, to my way of thinking,

7   signals --

8             THE WITNESS:  No, that wouldn't have

9   changed my response.  I can't remember exactly.

10            MR. SIMON:  I was not signaling him.

11  I was weighing whether I had an objection.  It's

12  perilously close to attorney-client privilege.  I

13  mean, Mr. Whisman, if he's at the deposition and

14  Mr. Whisman believes it's part of his obligation to

15  tell all the clients what happened at the

16  deposition, then I think it was close to attorney-

17  client privilege.

18            So I was debating if -- I didn't

19  launch the objection.  I think you're really close

20  to intruding in that area.  If a client goes out

21  and is doing anything in connection with his

22  lawsuit or doing something with his attorney with a

23  group of other clients, I think it's turning into a

24  real attorney-client issue here.

1               We don't have to debate it.  If you

2     ask him why, I'll just note the objection.

3          Q.    Mr. Ervin, in your discussions with

4     Mr. Whisman, was Mr. Simon or Mr. Cook or any other

5     attorney of yours present for any of those

6     discussions?

7          A.    No.

8          Q.    This is just a general discussion that

9     you had with Wayne saying, how did Karl's --

10         A.    And that's why I hesitated --

11         Q.    -- deposition go?

12         A.    -- even -- even asking -- even saying

13    that because it was just a general statement.  It

14    wasn't anything specific.

15         Q.    Okay.  Did you talk to Gary about --

16    Gary Vories about the deposition?

17         A.    No.

18         Q.    How about Don Williams?

19         A.    No.

20         Q.    And you don't remember any specifics?

21         A.    No.

22         Q.    Other than this hearsay, as I think

23    the term was, do you have any other information

24    that would lead you to believe that Karl Kehr was

1    not accurate or honest in his presentation in 1999?

2         A.    Not in the specifics, just in the

3    generalities.  He was one of the spokesmen that

4    said that -- you know, these things were happening

5    and you'd be taken care of and all those things.

6    And I guess that's why I referred to them, more

7    than anything.  And -- and I have to say -- you

8    know, him and Dave was in the same group at that

9    time.

10        Q.    Well, Karl was a Ford transition

11   employee as well, right?

12        A.    (Witness nodded.)

13        Q.    Is that correct?

14        A.    Yes.

15        Q.    Was he any different, then, than Jerry

16   Priest or Rick Williams?

17        A.    He's the guy that made the company --

18   that actually got hold of all the people that

19   contacted Ernst and Young and -- and did a lot of

20   the ground work on ZF on that.  I guess he had a

21   lot more to do than Rick Williams and Jerry Priest.

22             MR. HUNTER:  Okay.  I don't think I

23   have anything else at this time.

24             MR. VANWAY:  Sir, I just have a couple

 1    more and I think maybe one or two more documents.

 2                         EXAMINATION

 3    BY MR. VANWAY:

 4        Q.    One, just a quick follow-up based on

 5    questions Mr. Hunter just asked.  I just want to

 6    make sure I got this right.  Up until the time you

 7    talked to Mr. Whisman about Mr. Kehr's deposition,

 8    you had no reason to disbelieve Mr. Kehr; is that

 9    accurate?

10        A.    Other than what I said, that things

11    were -- he was one of the representatives and

12    things haven't gone well with the things that we

13    were told and the transition people and all that

14    and I categorize him as one of the representatives

15    that was a big part of that.

16        Q.    Okay.  Now, let's go ahead and mark

17    this.  Mr. Ervin, you've been handed what's been

18    marked as Exhibit 89, which is a series of e-mails,

19    all of which appear to relate to your specific

20    retirement issue.  And feel free to take as much

21    time as you want to review that document.  I don't

22    have a lot of specific questions on it, but feel

23    free to take your time to review it.  Whenever

24    you're ready to go, let me know.

```
 1          A.    Okay.

 2          Q.    Have you seen this document before,

 3   Mr. Ervin?

 4          A.    I have not seen the -- the top page,

 5   that I can remember.  Yes, I -- yes, I did.  This

 6   is what I was sent after Karl talked with Ford

 7   legal.

 8          Q.    Okay.  Have you seen all pages, 000262

 9   to 266?

10          A.    Yes, I submitted them.

11          Q.    This is, in fact, one of various

12   e-mails you submitted and responses thereto

13   regarding retirement issues?

14          A.    Yes.

15          Q.    You testified earlier about an

16   amendment, that you were told there was an

17   amendment that covered some people, but didn't

18   cover you?

19          A.    Yes.

20          Q.    If you look on the first page of this

21   Exhibit 89, second-to-the-last paragraph, it says

22   we did amend the GRP, et cetera.  Is that the

23   amendment that you were referring to when you

24   testified earlier?
```

1        A.     No.

2        Q.     What amendment were you referring to?

3        A.     The people that -- that you asked for

4    the names for, like Carolyn Malone and Gary McGee

5    and those people.  Those people also -- an

6    amendment was written so that they could retire

7    with 30 years combined service and hire back with

8    ZF.  They were Ford employees, not transition

9    employees.

10        Q.     Have you heard the term "30 and three"

11    before?

12        A.     No.

13        Q.     No?  My understanding was that there

14    was some sort of policy or plan where, if you were

15    going to have 30 years of service within three

16    years of the joint venture, that then you could

17    retire, draw your retirement and go work for ZF.

18    Are you familiar with that concept or not?

19        A.     No.

20        Q.     Okay.  You wouldn't -- if there were

21    such a classification, you wouldn't fit within that

22    classification, right?  You would not have had 30

23    years of service within three years of accepting

24    employment with --

1          A.     No, three and a half years.

2          Q.     Missed it by six months then, okay.

3    In fact, your eligibility for retirement was April

4    '03?

5          A.     Yes.

6          Q.     Okay.  And I'm still not clear on this

7    amendment that you're talking about.  I mean,

8    what -- do you understand what the difference was

9    between the employees that were allowed to retire,

10   Carolyn Malone and the others that you testified

11   about --

12         A.     Okay.

13         Q.     -- and yourself?

14         A.     My understanding -- this is my

15   understanding --

16         Q.     Sure.

17         A.     -- is that there was an amendment

18   written for the Ford employees.  Those that stayed

19   Ford that decided I'm not going to join ZF and I'm

20   staying here 'cause all of those employees stayed

21   at ZF Batavia.  Those people don't have -- I don't

22   know about the 30 and three, but same desk rule.

23   An amendment to bypass the same desk rule, IRS same

24   desk rule policy because they are doing the same

1    job one minute later than they were doing when they

2    retired.

3         Q.    Is it your understanding that you fit

4    within that amendment or that you don't?

5         A.    I'm not sure how the amendment was

6    written, but I don't understand why the transition

7    people would be treated any differently than that

8    because in these things it said -- part of it is

9    they can hire back at a later date.  And it was

10   mentioned that that would be six months later.

11            Well, if they were -- had the ability

12   to hire back one minute later or whatever --

13   whatever, however it was done, why couldn't we?

14        Q.    And by "we," you're referring to the

15   transition employees?

16        A.    Transition people, yes.

17        Q.    And do you know off the top of your

18   head with respect to Carolyn Malone and I think the

19   other two employees that you mentioned, do you know

20   when they became eligible to retire?  Do you know

21   what year it was?

22        A.    I believe it was last year and this

23   year.

24        Q.    You believe that some retired in 2003?

1        A.    I can't remember the timing on it, but

2    I think -- I think Carolyn might have been in

3    that -- in that time period or just -- just before.

4        Q.    So it's possible that all of them may

5    have retired prior to 2003?

6        A.    Possible.

7             MR. VANWAY:  Okay.  Mr. Ervin, I don't

8    believe I have any further -- oh, I'm sorry.

9    Another false start.

10   BY MR. VANWAY:

11       Q.    I do have this.  I received some

12   documents last week from your attorneys and I'm

13   just not sure what they are and I'm wondering if

14   you might be able to help me with it.  And I don't

15   think I need to mark these necessarily, but they're

16   Bates stamped at P01011 through P01015.

17             And I ask if you could just take a

18   moment to review those and let me know when you've

19   done so.

20             MR. SIMON:  I think his question is

21   whether you've seen the document before.

22             MR. VANWAY:  Steve, you're predicting

23   my question.  That is going to be my question.

24       A.    No, I have not seen that one.

1          Q.    That's easier.  Mr. Simon is right.

2     We can short circuit it.  If you can just go

3     through each one of those, tell me if you've ever

4     seen any of those documents before.

5                MR. SIMON:  I thought I might be

6     accused of coaching the witness there, but I

7     thought I was being helpful.

8                MR. VANWAY:  You were being helpful

9     and I appreciate that.  I would never falsely

10    accuse you.

11               MR. SIMON:  I think I was a couple

12    times today, but I'll let it go.

13         A.    No, no, I have not.

14         Q.    Okay.  By the way, Mr. Ervin, the

15    records that I have show that the last profit

16    sharing that you received from Ford was a little

17    over $9,000.  Does that sound about right?

18         A.    I have no idea.

19               MR. VANWAY:  Okay.  Fair enough.

20    Thank you, Mr. Ervin.  Now -- now I'm finished.  I

21    don't know if Mr. Hunter has any more or not.

22               MR. SIMON:  No questions.  We will not

23    waive signature.

24                              * * *

151

1             (Deposition concluded at 4:49 p.m.)

2

3

4

5

6              _____
                          Rick Ervin

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO         :

 4                          :  SS

 5    COUNTY OF HAMILTON    :

 6

 7         I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named RICK

11    ERVIN was by me first duly sworn to testify the

12    truth, the whole truth, and nothing but the truth;

13    that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the        day of October 2003 was

17    submitted to counsel for deponent's signature.

18      I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

153

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3        IN WITNESS WHEREOF, I have hereunto set my hand

4    and notarial seal at Cincinnati, Ohio, this

5    day of October 2003.

6

7

8
                    Susan M. Barhorst, Notary Public
9                   in and for the State of Ohio.
                    My commission expires
10                  February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24