Case 1:02-cv-00406-SSB-TSB    Document 51-2    Filed 11/21/2003    Page 1 of 65
EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, CINCINNATI

EVERETT W. WHISMAN, et al.,           :
        Plaintiffs                    :
        -v-                           : Case No. C-1-02-406
                                      : (Judge Beckwith)
                                      : (Magistrate Sherman)
ZF BATAVIA, LLC, et al.,              :
        Defendants                    :

- 0 -

The deposition of KARL S. KEHR, taken before
Susan K. Lee, CVR-CM, Court Reporter and Notary Public
in and for the State of Ohio, at the law offices of
David M. Cook, LLC, 22 West Ninth Street, Cincinnati,
Ohio, on the 18th day of March, 2003, beginning at the
hour of 10:15 a.m. and ending at 6:00 p.m. of the same
date.

- 0 -

RIVERSIDE REPORTING
Certified Court Reporters
P.O. Box 949
Covington, Kentucky  41012
KY(859)291-6110  OH(513)574-7017

◻ **COPY**

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

**PAGE 2**

2

APPEARANCES:

FOR THE PLAINTIFFS:    STEPHEN A. SIMON, Esq.
                       Attorney at Law
                       22 West Ninth Street
                       Cincinnati, Ohio 45202

FOR THE DEFENDANTS:    JOHN J. HUNTER, JR., Esq.
                       Attorney at Law
                       One Canton Square
                       1700 Canton Avenue
                       Toledo, Ohio 43264

                       JEFFREY L. VANWAY, Esq.
                       Attorney at Law
                       312 Walnut Street
                       Suite 3200
                       Cincinnati, Ohio 45202-4074

ALSO PRESENT:          MR. E. DONALD WILLIAMS, II
                       MR. GARY VORIES
                       MR. E. WAYNE WHISMAN
                       MR. MICHAEL WARDEN
                       MR. HERBERT HUEBNER
                       - 0 -
                       STIPULATIONS:
          It is stipulated by and between counsel
for the respective parties that the deposition of KARL
S. KEHR, a witness herein, may be taken at this time
pursuant to the Federal Rules of Civil Procedure and
Notice; that the deposition may be taken via Stenomask
by the Notary Public/Court Reporter, and transcribed by
her out of the presence of witness; that the deposition
was submitted to counsel for the witness for reading
and signature.
                       - 0 -

---

**PAGE 3**

3

INDEX OF EXAMINATION:
By Mr. Simon........................................4
INDEX OF EXHIBITS:
1   9/30/99 letter to Mr. Kehr from Mr. Adams.....17
2   document, "ZF Batavia L.L.C. offers you"......21
3   11/30/99 letter to Mr. Whisman from
    Mr. Saleh....................................30
4   documents related to May 27, 1999 meeting.....66
5   e-mails.....................................149
6   "Ford Salaried Employees at ZF Batavia"......156
7   "Transition Plan, Ford Salaried Employees
    at ZF Batavia"..............................156
8   "Ford Salaried Employees at ZF Batavia".....156
9   2000 AIP award document.....................172
10  3/28/02 letter to All Exempt Salaried
    Employees from Mr. Sennish..................192
11  12/1/98 memo to Batavia Plant Salaried
    Employees...................................194
12  e-mails.....................................195
13  e-mails.....................................209
14  e-mails.....................................209
15  e-mails.....................................220
16  notice regarding Foreign Trade Zone
    regulations.................................222

---

**PAGE 4**

4

1   KARL S. KEHR, called as a witness, being first duly
2   sworn, testified as follows:
3                    MR. SIMON:  Mr. Kehr, my name is Steve
4          Simon.  I'm an attorney for the plaintiffs in
5          this lawsuit against ZF Batavia and Ford Motor
6          Company, and what we're doing now is taking
7          your deposition.  Have you ever had your
8          deposition taken before?
9                    THE WITNESS:  Yes, I have.
10                   MR. SIMON:  Well, let's start there.
11  BY MR. SIMON:
12         Q      How many times have you had your
13  deposition taken?
14         A      Do you mean pieces of separate
15  litigation or multiple depositions around the same
16  litigation?
17         Q      I'll take total number of depositions.
18         A      Probably hundreds.
19         Q      Hundreds?  All right.  Was one of the
20  -- I think you indicated that you've had your
21  deposition taken once in this same lawsuit?
22         A      Well, there was a -- Ford Motor Company
23  sold Ford Aerospace and it went into arbitration
24  proceedings and it lasted six months and dealt with
25  $130 million disputed transaction price.  So over a

---

**PAGE 5**

5

1   six-month period there was a fair amount of discussions
2   and court reporting like you've got here.
3          Q      And you had your deposition taken for
4   that?
5          A      Well, I'm not sure if they were
6   depositions, but it was an atmosphere like this.
7          Q      Okay.
8          A      Questions are asked, minutes are
9   recorded.
10         Q      You gave sworn testimony?
11         A      Yes.
12         Q      Okay.  And how long ago was this?
13         A      It would have been 1990.
14         Q      Okay.  Any other litigation of any kind
15  that you've given depositions?
16         A      Yeah.  My neighbor a couple of years
17  ago wasn't pleased with my garage that I was building,
18  so that turned into a little bit of a litigation and
19  required some depositions.
20         Q      Where was that litigation?  I mean --
21  when I say where, I mean what court?
22         A      Clermont County.
23         Q      Okay.  What year when you gave your
24  deposition in that case?
25         A      That would have been within the last

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 6

6

1 two years. About two years ago.

2 Q    Is that matter still pending?

3 A    No.

4 Q    Now, you said you had your deposition

5 taken hundreds of times?

6 A    It was related to the sale price of a

7 company and there was business people from Loral and

8 Ford business people and we asked questions and I

9 responded to the questions and it was documented like

10 this. I don't know if legally it's called a deposition

11 or if it's whatever, but it was fundamentally like

12 this, asking questions.

13 Q    And it was -- and this is separate from

14 the Ford Motor/Ford Aerospace thing?

15 A    It was all related to that.

16 Q    Other than that matter and your

17 incident with the garage, have you ever given any sworn

18 testimony in any other legal matter?

19 A    Not that I remember.

20 Q    Okay. And just because I'm still

21 curious, the Ford Motor/Ford Aerospace matter, are you

22 saying that on 100 different occasions you gave some

23 sort of sworn testimony or you attended hearings where

24 other people gave?

25 A    No. I was the finance manager so I

---

PAGE 7

7

1 knew the bookkeeping associated with the transaction,

2 so over a six-month period I went back and forth from

3 California to New York City where these discussions

4 were held and it was a six-month process with, you

5 know, literally 50 to 100 government contracts that

6 they asked questions about the bookkeeping for those

7 and whatnot.

8        MR. SIMON: Okay. All right. Well, it

9 sounds like then you're familiar with perhaps

10 the ground rules of the deposition. I just

11 want to go over those with you. You're going

12 to be answering questions under oath. The

13 court reporter is going to be taking down your

14 answers. And because she's taking down your

15 answers, it's important that you give verbal

16 responses. If you give a little grunt or a

17 shake of the head, it's hard for that to be

18 recorded, so where you can, if you can give a

19 yes or no answer, I'd appreciate that. Can you

20 do that?

21        THE WITNESS: Yes, I can.

22        MR. SIMON: All right. Where possible,

23 this is hard to do over the course of a

24 deposition sometimes, but I'll wait for you to

25 finish your answer if you do the same and wait

---

PAGE 8

8

1        for me to finish my question. That way we

2        don't talk over each other and it makes it

3        easier for the court reporter; sound fair?

4        THE WITNESS: That's okay.

5        MR. SIMON: This one is very important.

6        If you don't understand my question on any

7        level for whatever reason, either you didn't

8        hear it, you don't understand what I said,

9        please ask me to rephrase the question or just

10        re-ask the question because if you don't,

11        somebody reading the transcript is going to

12        assume when you answered the question that you

13        understood the question. Will you do that?

14        THE WITNESS: Yes, that's fair enough.

15        MR. SIMON: All right.

16 BY MR. SIMON:

17 Q    Do you know in that Ford Motor/Ford

18 Aerospace matter if transcripts were retained of your

19 deposition testimony?

20 A    I wouldn't know.

21 Q    And I don't know if I've yet to do

22 this. Just state your full name for the record.

23 A    Karl Stephen Kehr.

24 Q    Okay. And you're currently employed by

25 ZF Batavia?

---

PAGE 9

9

1 A    That's correct.

2 Q    All right. And what is your position?

3 A    I'm the Chief Financial Officer --

4 Q    All right.

5 A    -- of ZF Batavia and ZFTT.

6 Q    What was that second one?

7 A    ZF Transmissions Technologies. There's

8 two companies affiliated with the Ford and ZF joint

9 venture.

10 Q    The first is ZF Batavia, LLC, correct?

11 A    Yeah. It's on my business card.

12 Q    All right. And, now, the joint venture

13 was created in 1999 between Ford Motor Company and ZF

14 Friedrichshafen?

15 A    Yeah, they're the parent companies,

16 Ford and ZFAG.

17 Q    And we'll provide a spelling for the

18 court reporter of ZF Friedrichshafen. But so I

19 understand, even though you're CFO for two different

20 companies, I probably throughout the deposition will

21 refer to ZF Batavia, and you understand when I refer to

22 ZF Batavia, I'm referring to ZF Batavia, LLC, right?

23 A    Okay. And not ZFTT at all or --

24 Q    We may refer to ZFTT. If I refer to

25 ZFTT, I'll call it ZFTT.

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 10

```
                                                10
 1      A     So you'll differentiate the two?
 2      Q     I will.  I will.  Now, when was -- ZF
 3  Batavia, LLC was created through a joint venture
 4  between Ford Motor Company and ZF, right?
 5      A     Yes.
 6      Q     All right.  When was ZFTT created?
 7      A     I believe that was April of 2001, I
 8  believe.
 9      Q     Okay.  Are your job duties for ZF
10  Batavia and ZFTT the same?
11      A     Yes.
12      Q     And just generally -- we'll talk in
13  more detail -- what are your job duties?
14      A     They're specified in the joint venture
15  agreements, but I'm financially responsible fiduciary
16  for the assets of the company in terms of cash
17  management.  As an officer of the company, I deport
18  to the board and do attend the board meetings and
19  report out, borrow money, otherwise secure financing as
20  required, approvals for certain thresholds of
21  investment or whatnot.  Typical CFO kind of functions.
22      Q     All right.  And you previously were a
23  Ford employee?
24      A     That's correct.
25      Q     When did you first start at Ford?
```

PAGE 11

```
                                                11
 1      A     It would have been April of 1985.
 2      Q     Just take me through, then, your job
 3  history at Ford, what position you started at and what
 4  your position was before you came to ZF Batavia.
 5      A     I started as a financial analyst on the
 6  F18 program in Newport Beach, California.  It's part of
 7  Ford Aerospace.  I worked out there for a couple of
 8  years and then I was promoted to a finance supervisor,
 9  1987, and came back to the Renaissance Center in
10  Detroit.  I spent a year there, then we moved the
11  corporate office back to southern California.
12      Q     Let me stop you right there.  When did
13  you go back to Detroit?
14      A     1987.
15      Q     Okay.  And when you went to Detroit,
16  what was your capacity with the company?
17      A     I was the finance supervisor on
18  corporate staff for Ford Aerospace.
19      Q     Okay.  So you changed locations, but
20  your job was the same?
21      A     No.  I was promoted when I went back in
22  1987.
23      Q     I got you.  All right.  I interrupted
24  you.  Then from there where do we go?
25      A     Okay.  Then in 1988 the corporate
```

PAGE 12

```
                                                12
 1  office was moved to southern California.
 2      Q     The corporate office of Ford Aerospace?
 3      A     That's correct.
 4      Q     Okay.
 5      A     So I moved back to southern California.
 6  And between 1988 and 1990 I was promoted to a manager
 7  position on corporate staff and the back end of that
 8  two-year period we sold Ford Aerospace.  Then I took an
 9  offer from Ford Motor Company in 1990, as did my wife,
10  to move to Michigan and work for the parent company.
11      Q     And what position did you take at that
12  point?
13      A     I was a -- it was an MR position
14  working in the facilities and tooling approval area for
15  Ford's North American Automotive Operations.
16      Q     What does MR mean?
17      A     Management Role.
18      Q     How long did you hold that position?
19      A     About a year, I guess.  About a year.
20      Q     All right.
21      A     Then I was promoted to what they called
22  a supplemental compensation role probably in around
23  about 1992 and I took a job as the finance manager for
24  engineering expenses for North American Automotive
25  Operations.
```

PAGE 13

```
                                                13
 1      Q     That was in 1991 that you started that
 2  position?
 3      A     Well, it was probably more like '92 or
 4  '93.
 5      Q     Okay.  And did you hold any other
 6  positions before you went to ZF Batavia?
 7      A     Oh, yeah.  So I did that one probably
 8  for about a year, in terms of the engineering analysis
 9  position.  Then I went on a special assignment for nine
10  months working on Ford's worldwide transfer price
11  policy.  That was a special assignment about nine
12  months.  And then on the back side of that I was asked
13  to go down and help Ford Motor Company in South America
14  dissolve the joint venture between Ford and VW in
15  Brazil and Argentina.  I spent about 15 months
16  traveling back and forth dissolving that joint venture.
17  And that would have been up to about '95, I guess.
18      Q     Okay.
19      A     Then when I came back from that
20  assignment, I was sent over to power train operations
21  engine engineering group as a finance manager.
22      Q     Where were you located at that point?
23      A     That would have been in Dearborn,
24  Michigan.
25      Q     Okay.
```

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 14

14

1    A    Then from there I probably spent 15
2 months on that job, then I was sent out to Ford's
3 automatic transmission operations group in Livonia as
4 the finance manager for new product.  And that should
5 get me up to about the end of 1997.
6    Q    Okay.
7    A    I probably spent about a year there and
8 then I was off to world headquarters where I was
9 working in the mergers and acquisitions group.  I was
10 on that job about six months, early part of '98.  Did a
11 trip to Bangkok and a few other transactions and then I
12 went and first met ZF in Germany in May or June of '98.
13 The purpose of those discussions were to determine if
14 there was a -- a joint venture or some business
15 proposition that could be reasonably put together
16 between ZF and Ford.
17    Q    And this was 1998?
18    A    Yeah, the summer of '98.
19    Q    Who was with you on that trip?  I'm
20 sure a lot of people.
21    A    Oh, yeah.  From where?  From Ford or --
22    Q    From Ford.
23    A    It would have been myself, Stan Meyer,
24 Angelo Guido.  I think Gordon Willis participated in
25 some of the discussions.

---

PAGE 15

15

1    Q    Where did you actually meet with the ZF
2 people?
3    A    It was at the Jagerhof, which is in
4 Passau, Germany.
5    Q    For lack of a better word, who was in
6 charge in terms of the Ford delegation with this
7 meeting with ZF?
8    A    I'm not sure if there was anybody
9 really in charge.  We had our roles.  It was a team.  I
10 was the mergers and acquisitions, finance person.  Stan
11 Meyer was the -- at the time he was automatic
12 transmission operations business planning manager, so
13 he was, I guess you'd say, operational sort of guy.
14 And then Angelo was the -- I'm not sure -- I don't
15 think he had a title of chief engineer, but he was a
16 transmission engineer, a senior transmission engineer
17 at ATO.
18    Q    Did you say what Mr. Willis -- what his
19 role was?
20    A    He was chief engineer for Ford's
21 transmission operations.
22    MR. SIMON:  All right.  I want to go
23    off the record for just a second.
24    (OFF THE RECORD)
25    MR. SIMON:  The lawyers have had an

---

PAGE 16

16

1    off-the-record conversation about confidential
2 matters concerning Ford or ZF or both companies
3 that we agreed that instead of the lawyers for
4 the defendants objecting or requesting that the
5 transcript -- that we go under seal during the
6 deposition, instead the defendants' counsel
7 will have an opportunity to review the
8 deposition after the transcript is completed
9 and identify those pages that should be put
10 under seal.  Is that our agreement, gentlemen?
11    MR. VANWAY:  Yes.
12    MR. HUNTER:  Yes.
13    MR. SIMON:  Okay.  All right.
14 BY MR. SIMON:
15    Q    I'm slightly out of order here, Mr.
16 Kehr.  What is your education?  What's your background
17 before you got to Ford?
18    A    I graduated from the University of
19 Delaware with a major in economics and a minor in
20 business administration and that would have been in
21 December of 1981.  Then I moved to southern California
22 and got a job briefly with ADP in their pension
23 department.  That was only about four months.  And then
24 I got a job with Rockwell International and I began my
25 MBA program at night school and graduated from what is

---

PAGE 17

17

1 now Chapman University in Orange, California, with an
2 MBA in 19 -- it would have been 1985 when I graduated.
3    Q    Do you have roots in southern
4 California or Delaware or Cincinnati?
5    A    No.  I grew up outside of Philadelphia.
6    Q    All right.  So you don't have a -- you
7 don't have a scientific background?
8    A    I started in chemical engineering at
9 University of Delaware, but that's the limit of my
10 scientific endeavors.
11    Q    All right.  Let's see.  Okay.  So then
12 you went from Ford to ZF Batavia in '99, right?
13    A    That's correct.
14    Q    And do you have an employment agreement
15 with ZF Batavia?
16    A    I have an employment agreement with the
17 -- I'm not sure if it's ZF Batavia or the board of
18 directors.  I believe I report to the board of
19 directors and there is a compensation committee of the
20 board that approves my contract.
21    Q    Okay.  We'll get our first exhibit
22 today.  We'll make this Exhibit 1.  There you go, sir.
23 I've got one for you, Mr. Hunter.  Everybody is taken
24 care of.
25    MR. HUNTER:  I'm sorry, Steve.  You

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 18

18

1    called that 1, correct?
2                MR. SIMON: I called it 1.
3    BY MR. SIMON:
4        Q    Mr. Kehr, I see you're reviewing
5    Exhibit 1. Have you seen this document before?
6        A    I believe so.
7        Q    Okay. It appears to be a -- well, it
8    has D. Adams signature at the bottom and it's addressed
9    to Mr. Kehr. Is D. Adams Dave Adams?
10       A    Yes.
11       Q    And he's currently the president of ZF
12   Batavia?
13       A    President and CEO.
14       Q    Okay. And I see it's dated September,
15   30th, 1999. And would you agree that it sets out
16   various terms of your compensation as CFO for ZF
17   Batavia?
18       A    Yes.
19       Q    All right. When you were referring to
20   your agreement with either ZF Batavia or I think you
21   went on to say agreement with the board or directors,
22   were you referring to what is Exhibit 1?
23       A    Exhibit 1 is the offer letter, my
24   particular offer letter from ZF Batavia, stipulating
25   the terms of my employment for '99.

PAGE 19

19

1        Q    Well, it has an accept and decline at
2    the bottom; do you see that?
3        A    Mm-hmm.
4        Q    I take it you checked off the box
5    accept at some point?
6        A    I believe so.
7        Q    Okay. When you checked off accept, did
8    you believe that you had an agreement with ZF Batavia
9    regarding your compensation at ZF Batavia?
10       A    Subsequent to these documents there
11   were contracts prepared for the officers of Batavia
12   that were fundamentally not opposed to what is in this
13   letter, but there were adjustments made and discussions
14   took place around those contracts and I can't remember
15   when that contract was actually signed. So I would say
16   that this was -- yes, valid in the 1999 period and then
17   subsequent to this there are three-year management
18   contracts for all of the officers.
19       Q    So you signed supplemental agreements
20   in 2000, 2001 and 2002?
21       A    No. They're three-year contracts.
22       Q    Oh, three-year contracts.
23       A    I believe I signed one -- I don't know
24   when I actually signed the first one, but they're
25   three-year contracts, so it would have been effective,

PAGE 20

20

1    yeah, January, '99 through January of 2002 and then
2    it's subsequently been renewed.
3        Q    So you're saying that this document,
4    Exhibit 1 -- does it take you through January of 2002?
5        A    No.
6        Q    There's a different document that
7    you're referring to that sets out your terms and
8    conditions of employment from '99 to 2002?
9        A    That's correct.
10       Q    Okay. Do you know when you --and I
11   assume you have a copy of that agreement?
12       A    Yes, I do.
13       Q    Do you know when you signed that
14   agreement?
15       A    I don't remember off the top of my
16   head.
17       Q    Okay.
18       A    It could have been late '99, early
19   2000. And I re-signed for the extension it would have
20   been probably in late 2001.
21       Q    So Exhibit 1 you considered to be an
22   agreement between you and ZF Batavia regarding what
23   your pay would be through December 31st, 1999?
24       A    I would say yeah, compensation valid
25   for the period of 1999, yes.

PAGE 21

21

1        Q    Okay.
2        A    The reason I make the distinction is
3    some of the bonus payments for '99 are actually made in
4    the beginning of 2002.
5                MR. SIMON: All right. I'll hand you
6        Exhibit 2, which I'm sure we'll be talking
7        about a lot. You can make a pile here, Mr.
8        Kehr. This will be the court reporter's
9        copies, but we'll try to keep that in order
10       should we have to go back to them. This is
11       Exhibit 2.
12               Mr. Kehr, I should warn you that if
13       you're writing things down, I might ask to look
14       at them. So any notes you write I might at the
15       end of the deposition have to look at the notes
16       just because that's how this process works.
17   BY MR. SIMON:
18       Q    Exhibit 2, have you seen this document
19   before, Mr. Kehr?
20       A    Yes, I have.
21       Q    All right. I'll just state for the
22   record that this two-page document has been produced by
23   the defendants and it had a Bates stamp number when it
24   was produced and I think ZF Batavia produced it back to
25   us. I chose this copy because it was the best, clean

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

## PAGE 22

22

1 copy I had, but as far as I know, it's identical to the
2 documents that we've traded back and forth in
3 discovery. Mr. Kehr, what is this document?
4 A      Well, this is a copy of a three-page --
5 or I should say a tri-fold document that we prepared
6 that was provided to the Ford employees who were
7 interested in joining ZF Batavia and it, at a
8 relatively high level, outlined the fundamentals of the
9 programs.
10 Q      Okay.  And looking at your Exhibit 1,
11 Mr. Kehr, there's a reason I've asked you to look at
12 these documents together.  Do you see in the paragraph,
13 let's see, one, two, three, four, down, where it says
14 summary attached?
15 A      I'm sorry.  Where do you see that?
16 Okay.
17 Q      All right.  The reference to summary
18 attached in Exhibit 1, is that referring to Exhibit 2?
19 A      I don't remember.
20 Q      Okay.  If someone suggested that
21 Exhibit 2 was the summary attached to Exhibit 1, would
22 you have any reason to not believe that?
23 A      No, I wouldn't.
24 Q      Okay.  Did you think that Exhibit 2
25 which you have described, did that apply to the package

## PAGE 23

23

1 of benefits and compensation that ZF Batavia was
2 presenting to you in 1999?
3 A      Certainly in most regards, yes.
4 Q      Okay.  Well, let's actually kind of
5 walk through it I guess.  On Exhibit 2 -- I see you
6 looking through it -- is there anything in there, in
7 Exhibit 2, that you didn't think applied to your
8 package of compensation and benefits?
9 A      Well, the -- I think the base salary
10 starting at your current Ford salary probably would not
11 be indicative of the offer letter that was presented.
12 I believe we added this in here to indicate that there
13 wouldn't be any, you know, pay reductions associated
14 with the employment offers.  So _In starting at,_ I
15 think that was basically a minimum in terms of
16 salary.
17 Q      I don't want to get into -- I know it's
18 embarrassing to talk about salaries on the record and
19 I'm going to try to avoid that where I can but -- I
20 don't know if embarrassing is the right word, but I
21 know it's personal.
22          Did your salary go up or down when you
23 went from your position at Ford Motor Company to CFO of
24 ZF Batavia and ZFTT?
25 A      My salary went up.

## PAGE 24

24

1 Q      Okay.  You were going through the
2 agreement identifying provisions that you didn't think
3 specifically applied to your package of compensation
4 and benefits.  Are there any others?
5 A      Well, this one states that I was --
6 "Your classification will be Chief Financial Officer."
7 I think that fell into the officer when it says "Broad
8 banding replaces salary grades."  So I guess that would
9 certainly apply to me.  "Authorized overtime will be
10 paid."  It's been probably 15 years since I've been
11 paid overtime, so I didn't think that was going to work
12 for me.
13 Q      Okay.
14 A      I did get paid twice a month.  The
15 annual incentive plan clearly applies to me.  And
16 there's two elements.
17 Q      Did you say totally applies to you?
18 A      There's two elements to my bonus.  One
19 is a guaranteed amount which is not subject to the
20 annual incentive plan.  And the other portion which is
21 more substantive is a direct roll-out of this annual
22 incentive plan as described here.
23 Q      Okay.
24 A      And I do participate in the merit
25 program.  I'm subject to all the benefits in terms of

## PAGE 25

25

1 offerings, in terms of United Healthcare, dental,
2 medicals.  Opt outs would apply to me.  Flexible
3 spending accounts would apply to me.  Life insurance
4 applies.  I believe in my latest contract there's a --
5 I'm not sure if there's any incremental life insurance,
6 but officers occasionally are entitled to other
7 supplemental benefits, if you would.  There may be a
8 piece in my latest contract that this would be the
9 minimum and there may be some added.  Accidental death
10 would probably apply to me.  Dependents, disability,
11 Ford money market applies.  Tuition, vacations applies
12 to me.  Holidays, leaves, jury duty, maternity to the
13 extent it would apply.  Military, family and the 401
14 savings plan.
15 Q      Okay.
16 A      Also the entire back stub applies to
17 me.
18 Q      Okay.  I appreciate that.  And I think
19 you indicated that then the supplemental agreement that
20 you signed that took you from '99 to January of 2002,
21 it reflects a lot of these same terms, but by its
22 nature supplements it with some additional terms
23 regarding your bonus and --
24 A      Well, I wouldn't say it's a
25 supplemental agreement.  I would characterize it as

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 26

26

1 superceding or replacing this agreement.
2     Q     Okay.
3     A     Fundamentally it's a three-year
4 management contract, so it would reflect things that
5 managers negotiate in their contract and it's valid for
6 a three-year period and it's got stipulations about,
7 you know, if I resign, there's one outcome, if I'm
8 fired, then there's another outcome, if it's not
9 renewed for whatever reason, it's another outcome. And
10 it also stipulates bonus amounts, base pay and
11 obviously the transition bonus and some of the things
12 on here just no longer apply, but it does not by any
13 means go into all these kind of details. It just says
14 I'm subject to the ZF Batavia programs, as are other
15 salaried employees.
16     Q     Okay. It kind of -- it references
17 Exhibit 2?
18     A     What references it?
19     Q     I'm sorry. This '99 to 2002 agreement
20 that you signed, you say it references Exhibit 2?
21     A     No, I didn't say that.
22     Q     Well, it doesn't reference it by name,
23 but you understand that even though all of these items
24 that are set out on Exhibit 2 -- you understand that
25 you're still entitled to them even though they aren't

---

PAGE 27

27

1 set out in this '99 to 2002 agreement; is that fair?
2     A     I'm not sure if I understood the
3 question.
4     Q     I thought you said that -- and I know
5 we don't have it in front of us and we'll ask for lots
6 of documents after the deposition, but -- let me just
7 stop there actually. Did you review that agreement
8 that we're talking about in preparation for this
9 deposition?
10     A     No.
11     Q     Okay. Did you review any documents in
12 preparation for this deposition?
13     A     Review any documents? Well, we met
14 yesterday afternoon to discuss what to expect today and
15 there were some documents handed out. I believe this
16 was one of them. But we didn't go through any
17 documents in any kind of detail. It was more general.
18     Q     Okay. I can ask you this and your
19 lawyer can pipe in. Do you know if you went over any
20 documents in preparing for the deposition to assist
21 your recollection of these events that ZF has not
22 already produced in this case?
23     A     I don't know what has been produced in
24 this case. I mean, I guess I'll find out more as we go
25 through the exhibits. I don't know.

---

PAGE 28

28

1     Q     Sure.
2     MR. SIMON: Well, I would just say, Mr.
3 Hunter, if you reviewed documents to assist his
4 recollection in preparing for the deposition
5 and it's a document that we don't have, that
6 I'm entitled to have that produced today. Is
7 there such a document?
8     MR. HUNTER: No. We didn't go through
9 anything that hasn't been produced.
10     MR. SIMON: Okay. That was the
11 question.
12 BY MR. SIMON:
13     Q     All right. This '99 to 2002 agreement,
14 it doesn't set out all of the different items that are
15 in Exhibit 2, such as your dental insurance, your
16 disability insurance and the like; is that fair?
17     A     That's correct.
18     Q     All right. But does it refer to those
19 benefits at all, such as health insurance?
20     A     It's a broad statement that says the
21 other -- I'm not sure exactly what it says, but
22 fundamentally it says any other benefit programs that
23 ZF Batavia offers to other salaried employees also
24 applies to me. It doesn't reference any document or
25 any detail. It just says if it's not reflected

---

PAGE 29

29

1 differently in the contract, then those other benefits
2 and whatnot apply to me, as all other salaried
3 employees.
4     Q     I got you. So to the extent that in
5 Exhibit 2 you identified most of these items, although
6 not all, as applying to your employment at ZF Batavia,
7 as you sit here today, you believe that you're entitled
8 to the different benefits that apply to you that are in
9 Exhibit 2?
10     A     Well, I think, as the record would
11 indicate, yes, I went down and most of these do apply
12 to me. In fact, all of them apply to one -- I think
13 one extent or another.
14     Q     Okay. It's another way of saying as
15 you sit here today, you certainly expect ZF Batavia to
16 continue to provide these benefits to you as long as
17 you are CFO of ZF Batavia?
18     A     No, I wouldn't say that. I would say
19 that at a point in time you have benefit programs that
20 -- there's no guarantees, they're subject to change
21 over time, and I'm sure some of these, frankly, since
22 '99 probably have changed and probably more changes
23 will be incorporated as the business conditions
24 warrant.
25     Q     Okay. Exhibit 1, which you're not

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 30

30

1  sure, but let's assume that summary attached does
2  reference Exhibit 2, you believe through December 31st,
3  1999 that ZF Batavia would provide you the compensation
4  and benefits that they identified in Exhibit 1 and then
5  went into some more detail in Exhibit 2 through the end
6  of 1999?
7          A     Yeah, that's probably true.  Yes.
8          Q     Okay.
9                MR. SIMON:  Mr. Kehr, as I see you get
10 a drink of water, I neglected to mention at the
11 beginning if you need to take a break at any
12 time in the deposition, as long as there isn't
13 a question still standing, you may certainly do
14 that.
15               THE WITNESS:  Okay.  Thank you.
16 BY MR. SIMON:
17         Q     While you're doing that, I'll hand you
18 Exhibit 3.  This is Exhibit 3.  I don't know if you've
19 ever seen Exhibit 3 before, Mr. Kehr.
20         A     No, I have not.
21         Q     I'll identify it for the record.  It's
22 a document with a Bates stamped number 38 and it's
23 dated May 17th, 1999 and that's crossed out with
24 November 30th, 1999 written in and it's addressed to
25 Mr. Whisman and it's signed by Hassan Saleh.  Who is

PAGE 31

31

1  Hassan Saleh?  That's S-A-L-E-H, is his last name.
2          A     Who is Hassan Saleh?
3          Q     Yeah.
4          A     I think he is currently our maintenance
5  manager.
6          Q     Okay.
7          A     A salaried employee.
8          Q     Was he formerly a Ford employee?
9          A     Yes, he was.
10         Q     Okay.  Well, I'll identify for the
11 record, too, Mr. Whisman in that letter is Wayne
12 Whisman who is here today.  He's one of the plaintiffs.
13 You certainly don't have any reason to believe that
14 this Exhibit 3 refers to anybody but Mr. Wayne Whisman;
15 is that fair?
16         A     That's probably correct, yes.
17         Q     You're not aware of any other Whisman
18 who works at ZF Batavia?
19         A     Not to my knowledge.
20         Q     Okay.  There were a group of Ford
21 salaried employees who worked in the Batavia plant
22 prior to the joint venture beginning in 1998, right?
23         A     The joint venture began in '99.
24         Q     '99.
25         A     Yes, your statement is correct.

PAGE 32

32

1          Q     Okay.  And there were meetings held in
2  1999 with these Ford salaried employees to discuss the
3  prospect of them joining ZF Batavia in 1999; is that
4  correct?
5          A     That's correct.
6          Q     And ultimately certain Ford salaried
7  employees were offered employment with ZF Batavia on
8  the condition that they resign their employment from
9  Ford Motor Company; is that right?
10         A     I'm not sure if resign is the right
11 word.  But, yeah, they would have been made offers to
12 join ZF Batavia and would have had to terminate their
13 employment with Ford or whatever other term you might
14 want to use.
15         Q     Okay.  And in connection with that,
16 their agreeing to join ZF Batavia was initiated by a
17 letter such as Exhibit 3 to those employees; is that
18 right?
19         A     I wouldn't necessarily say that --
20 their employment with ZF Batavia would have been
21 initiated once they transferred off the Ford payroll
22 and onto ZF Batavia payroll, but discussions obviously
23 would have initiated sooner and they would have
24 culminated and resulted in the offer letter and the
25 acceptance or declining of -- of an offer.

PAGE 33

33

1          Q     All right.  Would you agree that
2  Exhibit 3 and Exhibit 1 -- and I'm comparing Mr.
3  Whisman's letter and your letter -- that they're
4  similar in their form?  Do you have Exhibit 1 there?
5          A     Yes, that' correct.
6          Q     All right.  And you see that Mr.
7  Whisman's letter also references a summary attached?
8  Do you see that there in the first full paragraph?
9          A     Yes.
10         Q     And do you know if that reference to
11 summary attached is, in fact, a reference to Exhibit 2?
12         A     I believe I answered that question
13 before.  I don't know.  I don't remember, but it's not
14 unreasonable to believe that that document was what was
15 attached.
16         Q     The reason I ask that question again is
17 you said that in reference to your letter.  I didn't
18 know if you knew differently for Mr. Whisman's and the
19 others.  But you answered my question.  All right.
20               Certainly Mr. Whisman -- it's noted on
21 Exhibit 3 that he accepted this offer, that these terms
22 set forth in Exhibit 2 regarding his compensation and
23 benefits he would certainly, from your viewpoint,
24 expect to apply to his employment at ZF Batavia?
25               MR. HUNTER:  Objection.  I don't know

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 34

34

1        how Mr. Kehr could know what his expectations
2    were.
3    BY MR. SIMON:
4        Q      Let's back up a second then.  What was
5    your role in offering employment to the Ford salaried
6    employees in 1999?
7        A      Well, that's a pretty broad question.
8    I did not get involved in any particular individuals
9    other than perhaps my controller, but obviously I was
10   in the process.  So I'm not sure exactly how
11   to answer your question.
12       Q      Well, at some point was there a
13   decision made either between ZF Batavia and Ford or at
14   Ford or at ZF Batavia that they desired to have certain
15   Ford salaried employees who were working in the Batavia
16   plant in 1999 to leave their employment with Ford and
17   join ZF Batavia?  Did you ever become aware of that
18   decision at some point?
19       A      Well, during 1998 after the joint
20   venture was made public through a press announcement by
21   Jacques Nasser and Dr. Klaus Bleyer, there were
22   discussions at, I think, Ford -- at that time I was
23   still a Ford salaried employee and hadn't begun my new
24   job as the CFO.  I think Ford's expectation would have
25   been that all of the Ford salaried employees in Batavia

PAGE 35

35

1    would have joined the new company.
2        Q      In 1998?  Is that what you said?
3        A      I said Ford -- in 1998 during the
4    discussions that I took place in, is Ford would have
5    expected that all the Ford salaried employees in
6    Batavia would potentially receive and possibly accept
7    offers.  Absent that, then Ford would have -- you know,
8    and has ultimately found themselves in a position of
9    not having all the employees at the factory join the
10   new company.
11       Q      All right.  When you're referring to
12   1998 then, you're referring to your discussions with
13   the people in Germany?
14       A      No.  It would have been after those
15   discussions in Germany.  It would have been Ford --
16   Ford-only-type discussions and how to structure the
17   deal and how are we going to handle the employees and,
18   you know, the different planning that goes around a
19   joint venture arrangement involving $500 million of
20   annual sales.
21       Q      We don't need to make this an exhibit
22   and I don't have copies for everybody, but here I'm
23   handing you Ford Company's initial disclosures.  You'll
24   have to share with Mr. Hunter I'm afraid.
25            MR. HUNTER:  Are you going to make that

PAGE 36

36

1    4, Steve?
2            MR. SIMON:  No.  I'm just showing it to
3        you for reference because I think this may be
4        helpful at this point.
5    BY MR. SIMON:
6        Q      Mr. Kehr, this document identifies 46
7    different people that may have knowledge regarding the
8    subject matter of this litigation, so I just want to go
9    over some of those people because some of these people
10   may be the people who were involved in the discussions
11   that you're about to testify about.  If you could turn
12   to page two in the document.
13       A      Okay.
14       Q      Let's see.  I think I know who -- well,
15   let's just take them order.  That would be the easiest
16   way to do it.  The first person after your name, I see
17   Tony Deshaw.  Who is Tony Deshaw, if you know?  And
18   I'll obviously represent for the record this was Ford's
19   disclosure and you work for ZF Batavia, but I have an
20   inkling that you know who some of these people are, so
21   --
22       A      That's correct.  Tony Deshaw was the
23   salary -- I guess, wage and benefits manager, worked
24   for me for a period of time.  And then when we hired
25   Len Sennish, then Tony Deshaw sort of co-reported to

PAGE 37

37

1    myself and Len Sennish.  Tony is no longer employed
2    with Batavia now for two or three years I guess.
3        Q      He doesn't work for Ford either?
4        A      That's correct.
5        Q      Okay.  And you think he separated his
6    employment in 2000 or 2001?
7        A      I would think it would be, yeah,
8    probably in that time frame.  Yes.
9        Q      The address next to his name, 1981
10   Frontwheel Drive, that's the address of the Batavia
11   plant, correct?
12       A      That is correct.
13            MR. SIMON:  Okay.  Mr. Hunter, can we
14        possibly have Mr. Deshaw's last known address?
15        Or should I direct this to --
16            MR. HUNTER:  It's actually in our
17        initial disclosures.
18            MR. SIMON:  In your initial disclosures
19        you have Mr. Deshaw's --
20            MR. HUNTER:  Well, his current address
21        as of four or five months ago.
22            MR. SIMON:  Okay.  Yeah.  All right.
23            MR. HUNTER:  His name you'll see on the
24        disclosures is actually Devere.  Everybody
25        calls him Tony, but it's Devere.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 38

```
38
1                  MR. SIMON:  All right.  That's what I
2         assumed there.
3    BY MR. SIMON:
4         Q         The next person is -- well, so Mr.
5    Deshaw wasn't involved in any of these internal Ford
6    discussions regarding the joint venture that you had
7    with other Ford people in the '99 --
8         A         That's correct.
9         Q         Let me -- I'll finish the question.  He
10   wasn't involved in the discussions in 1998 that you had
11   with Ford internally about the joint venture?
12        A         That's correct.
13        Q         All right.  The next name is Connie
14   Carlson of United Healthcare.  Ms. Carlson, was she --
15   did she attend the meeting in 1999 that was given to
16   the salaried employees regarding health benefits?
17        A         I don't remember.
18        Q         Do you --
19        A         We did use, I believe, United
20   Healthcare at the time, so it wouldn't surprise me if
21   she came in as a representative from United Healthcare,
22   but I don't remember.
23        Q         Okay.  The next name is D. Glennings of
24   Hartford.  Do you remember what his role was?
25        A         Well, I think Hartford was our
```

PAGE 39

```
39
1    insurance company provider in this time frame, so if I
2    had to speculate, I'd presume he had the same role as
3    Connie, perhaps came into the factory for the meeting
4    we had in May and talked about the programs.
5         Q         Okay.  The next name is Lee Mezza of
6    Ford Motor Company.  Do you know who Mr. Mezza is?
7         A         Yes, I do.
8         Q         What is his current role with the
9    company -- with Ford Motor Company, if you know?
10        A         Yeah.  I believe he's in the human
11   resources area, a fairly senior manager.  I'm not sure
12   if he deals with only salary and/or hourly employment
13   wage and benefit type things, but he's an HR
14   professional.
15        Q         And just so you'll understand the
16   context, we were talking -- the time frame we're
17   talking about, Mr. Kehr, is this time frame from you
18   meeting with the people at ZF in 1998 and then we're
19   going to take it through basically Mr. Whisman's
20   letter, Exhibit 3.  So I'm trying to figure out what
21   discussions were had and who was involved, just so you
22   understand, so there's no confusion about where I'm
23   going with these questions.  Because that's not my
24   intent, to confuse you.  What was Mr. Mezza's role in
25   this effort?
```

PAGE 40

```
40
1         A         Lee helped me define the wage and
2    benefit program.  I mean he was -- he wasn't
3    responsible for getting the wage and benefit programs
4    in place, but he was instrumental in identifying and
5    whatnot the existing Ford Motor Company benefit
6    structure.  Lee did go with me to New York for two days
7    of meetings where Tony Deshaw was also there and we met
8    with Ernst & Young and went through a litany of wage
9    and benefit discussions around what we would want to do
10   for ZF Batavia, what was appropriate, what was
11   competitive as a tier one supplier in the transmission
12   business, or I should say the automotive business.  And
13   then Lee also worked very closely with us in defining
14   specifically the Ford transition benefits that were
15   unique to the Ford employees that would not be
16   available to, let's say, new hire employees off the
17   street.
18        Q         To the best that you recall, this two
19   day meeting in New York, when was that?
20        A         That would have been as late as, I
21   would say probably in the March, April, 1999 time
22   frame.
23        Q         What was your role in determining what
24   salary and package of compensation and benefits would
25   be offered to these Ford salaried employees?
```

PAGE 41

```
41
1         A         Well, I was sort of the technician, if
2    you will.  I looked at things in more of a macro level,
3    so I never got involved, as I mentioned, in any
4    particular individual's offers and whatnot, in terms of
5    Ford transition, other than, like I say, maybe Mark
6    Bugajski my controller.  But rather we went off and
7    had a competitive salary analysis performed in the
8    Cincinnati region to define, you know, basically what
9    competitive offers would be for new hire employees in
10   the Cincinnati region and that basically defined the
11   new hire programs.  And then for the Ford, you know,
12   transition employees, as it implies, obviously they're
13   going to come over at their Ford salaries or better and
14   would be entitled to different benefits, a few
15   different benefits.  And I helped bring the whole thing
16   together with Tony Deshaw and Lee Mezza and a few
17   others.
18             I mean, this was a manufacturing
19   company.  It didn't have payroll.  It didn't have
20   banking, didn't have wage and benefits assigned or even
21   identified for new hire employees.  So all that had to
22   be put together fundamentally in the February through,
23   you know, possibly the May time frame of '99.  And all
24   the details would have been put in place and worked
25   through presumably by the end of '99.
```

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 42

42

1    Q    Okay.  Let's move on to the next name
2  then, Charlie Corbet.
3    A    I believe Charlie, he doesn't work for
4  Lee.  He works with Lee.  I'm not sure in what
5  capacity.  But Charlie also helped Lee and I and a few
6  others put together some of the information material.
7    Q    And is Charlie like Lee Mezza, in that
8  he helped -- you said with Lee Mezza he helped define
9  what the wage and benefits would be, as opposed to, I
10  think you said, he wasn't responsible for them.
11          And what I guess I'm trying to get at
12  is:  Who was responsible ultimately for deciding if not
13  what individual employees are going to be offered, but
14  generally speaking who made the decision that this is
15  the package that we're going to offer to the group?
16    A    I would say I had primary
17  responsibility for that with obviously subsequent
18  approvals of the appropriate authorities and whatnot.
19  We did have a meeting with the senior management team,
20  at least those that were in place at the time, I'm
21  thinking February, March, where Ernst & Young came in
22  and hosted a two-day discussion around the philosophies
23  of compensation in terms of, you know, traditional
24  firms having relatively high fixed compensation, you
25  know, very strong retirements and whatnot, you know, an

PAGE 43

43

1  IBM, Ford Motor Company kind of image.  And then you've
2  got on the extreme your dot-coms where, you know, lunch
3  is free and everything else is stock options.  So
4  you've got that whole gamut.
5          And we had a couple-day meeting about
6  what was important to the company's compensation
7  program in terms of, you know,, not just wage and
8  benefits but also education, whatnot.  And we had
9  discussions, some stuff was documented, said okay,
10  that's what we want to go -- that's the flavor or the
11  results we're trying to achieve, and the program was
12  structured around that.  So I was responsible for the
13  execution or whatever, but I certainly didn't do it in
14  a vacuum.
15    Q    Okay.  So in context of your making
16  this decision or making the final decision on the
17  package of compensation and benefits offered to the
18  Ford salaried employees, I mean, you certainly did your
19  homework, right?
20    A    I thought so, yeah.
21    Q    And you certainly were aware, generally
22  speaking, how much -- what kind of salaries these Ford
23  salaried employees had, right?
24    A    Generally aware, yeah.
25    Q    Okay.  I mean, certainly when you

PAGE 44

44

1  offered -- when they were ultimately offered to work
2  with ZF for these salaries and these packs of
3  compensation and benefits, you didn't think you were
4  killing the company by doing that, right?
5    A    I was not personally involved in any of
6  these letters.  I think I probably reviewed the draft
7  of the letters and, you know, what was important and
8  how we were going to lay the documents out, but as I
9  said, I did not get involved with any particular
10  individuals that -- the thought was that people would
11  be carried over at their existing Ford salary and all
12  those benefits and whatnot would apply for at least
13  that period of time and in some cases I knew there were
14  some promotional opportunities being offered to fill
15  some certain positions and whatnot, but I personally
16  did not get involved in that whatsoever.  And as
17  indicated, this is, you know, Hassan probably working
18  with HR and whatnot made this offer letter.  But I
19  couldn't tell you if that was Mr. Whisman's Ford salary
20  or not.
21    Q    Right.  Even though you weren't -- I
22  understand that you weren't directly involved in the
23  individual offers to individual employees.  When you
24  were making this decision, were you actually CFO of ZF
25  Batavia at that time?

PAGE 45

45

1    A    Which decision?
2    Q    Well, the decision to -- you said you
3  ultimately were responsible for the decision to offer a
4  package of compensation and benefits to the Ford
5  salaried employees, right?
6    A    Well, I don't believe that's what I
7  said.  What I said was I was responsible for preparing
8  it and determining what we would want to do, but it was
9  subject to the approval of the board and my senior
10  management.
11    Q    Okay.  But at some point did you
12  recommend to those higher-ups that this is what we
13  should do?
14    A    Yes.
15    Q    Okay.  And even though you didn't know
16  what individual salaries these Ford employees were
17  going to get, you were aware generally of the package
18  of compensation and benefits that you were giving to
19  the group?
20    A    Yes.
21    Q    Okay.  And you thought that in doing so
22  it as a good deal for the company?
23    A    Which company?
24    Q    ZF Batavia.
25    A    I think it was -- it was a reasonable

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 46

46

1  balance between the requirements of ZF Batavia and the
2  needs of the employees who were faced with a, you know,
3  difficult decision to -- to leave one employer and go
4  to a new one.
5      Q    Okay. Did you think at that point that
6  the Ford employees were overpaid?
7      A    In terms of what?
8      Q    Their worth to the company.
9      A    Are you talking about base pay or
10 benefits or --
11     Q    All of it, their whole package of
12 compensation and benefits that they had at Ford. Did
13 you think they were overpaid?
14     A    No.
15     Q    Did you think you were overpaying the
16 Ford salaried employees when they were offered this
17 package of compensation and benefits?
18     A    No. I believe Ford Motor Company does
19 the appropriate benchmarking and they believe they have
20 competitive wage and benefit programs for their
21 salaried employees as it relates to, you know, an OEM,
22 original equipment manufacturer.
23     Q    All right. Back to the list, 14 and 15
24 are Cary Jennings from Unicare and John Kahle from
25 Fidelity. I take it these are just people that helped

---

PAGE 47

47

1  with the details of the health plan and then I guess
2  the 401(k) plan?
3      A    That's correct. Yeah, I do remember
4  John specifically because the 401(k) plan was very
5  important to make sure we had the right mix of funds
6  and whatnot, so I personally got involved in a bit of
7  that detail.
8      Q    Okay. All right. Let's move on to
9  Dennis Cirbes. I don't know if I'm pronouncing that
10 right.
11     A    Cirbes.
12     Q    Okay. Cirbes, C-I-R-B-E-S. What's his
13 position with Ford Motor Company?
14     A    I think currently he was recently
15 promoted to a vice president in charge of Ford's labor
16 affairs, so he has the unfortunate circumstance of
17 negotiating the Ford hourly contract. In September of
18 '99, back in the joint venture, '98, '99 window, Dennis
19 Cirbes worked in a group not dissimilar to Lee Mezza's
20 group and I think Dennis at that time was primarily
21 responsible for the discussions we had with the hourly
22 representation, I guess, the international, national
23 Ford department and perhaps the local union. He was
24 primarily all labor relations, hourly.
25     Q    Did Mr. Cirbes have any role in the

---

PAGE 48

48

1  offers to the salaried employees?
2      A    No, not to my knowledge.
3      Q    Moving on to Tim Hartmann. What is his
4  position with the company?
5      A    I'm not sure what Tim is doing today,
6  but back in, like I say, the '98, '99 time frame here
7  that you appropriately bracketed for me he was -- I
8  believe he was working for Dennis Cirbes, so he would
9  have dealt with the -- I believe mostly the hourly
10 side.
11     Q    You're not aware of any role he had
12 regarding the Ford salaried employees?
13     A    I don't believe so, no.
14     Q    I think the next gentleman is present
15 here. Is that Mike Warden? What's his current -- and
16 he is here today, correct?
17     A    Yes, he is.
18     Q    What's his position with the company?
19 I'm referring to Ford.
20     A    Currently, I believe, Mike is the HR
21 manager at Ford's Chicago assembly plant. As it
22 indicates here, he had a similar position at Ford's
23 Batavia Manufacturing location prior to the joint
24 venture, then Mike helped us, stayed on for about a
25 year, 15 months maybe, once the joint venture

---

PAGE 49

49

1  consummated, if you will, and was a very valued
2  contributor to the management team in Batavia.
3      Q    What then was Mr. Warden's role in '99
4  regarding the offers to the Ford salaried employees?
5      A    What do you mean, in terms of the
6  offers?
7      Q    Well, was he, for instance, involved in
8  explaining to the Ford salaried employees at the plant
9  what they could expect in terms of compensation and
10 benefits at ZF Batavia?
11     A    Well, there was a series of discussions
12 that started in late 1998 when the joint venture first
13 became known. And obviously it's potentially a
14 troubling circumstance for the people working in a
15 factory like that, so there was a series of
16 communications, you know, Q's and A's and whatnot. But
17 I don't believe, to my knowledge, that Mike actually
18 went through and defined the wage and benefit programs
19 for ZF Batavia because Mike wasn't going to be working
20 for ZF Batavia. And, you know, I think he would have
21 fundamentally deferred that to myself and Tony Deshaw,
22 who was putting together the package. I'm sure Mike
23 sat in some discussions about what we were doing and
24 whatnot, but I don't think he would have a vested
25 interest in the benefit side of it and I would imagine

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 50

50

1  that the actual offer letters were produced out of
2  Mike's area.
3       Q     So Mr. Warden wasn't really a decision-
4  maker in terms of what ultimately the terms of the
5  package of compensation and benefits to the employees
6  would be?
7       A     I would say from the benefit standpoint
8  that's probably a true statement you said.  I don't
9  know what Mike's -- or don't remember exactly what
10 Mike's role was in the planning, the actual offer in
11 terms of base salary.  We would have defined the AIP
12 structure for Mike, so he wouldn't have had to
13 necessarily do that effort, but he would have been
14 very, I think, instrumental in the base pay side.
15      Q     Okay.
16      A     He had access to the Ford Motor Company
17 payroll records and knew what people were making and
18 would have known what assignments they were taking in
19 terms of the employment offers.
20      Q     At some point -- and we haven't gone
21 through all the names here.  At some point in this
22 process did you or others decide that the Ford salaried
23 employees needed to hear from Ford managers about this
24 offer to join ZF Batavia?
25      A     Well, I think the Ford employees needed

PAGE 51

51

1  to hear from Ford management.  They worked for Ford,
2  yes.  But I'm not sure what you said in terms of their
3  offers with ZF Batavia.  Ford management did not
4  particularly get involved in determining what that
5  offer would be.  I mean, Lee supported the effort, but
6  it was the joint venture management team's
7  responsibility to put in the appropriate compensation
8  and benefits structure.
9       Q     Are you saying that there was no one at
10 Ford Motor Company who had say in what was going to be
11 offered to the employees who were leaving Ford and
12 going to ZF Batavia?
13      A     Oh, yeah, they -- they had some input
14 to it, yes.  As I just mentioned, Lee Mezza was very
15 supportive and then they obviously had to go back to
16 the legal route to make sure that the retirement and --
17 the retirement benefits in terms of both pension and
18 post-retirement medical were a couple of the big issues
19 that needed to be sorted out inside of Ford, and Lee
20 Mezza worked on that with us and fundamentally helped
21 us get the Ford agreement that that's how, in fact,
22 they would handle those benefits for the transition
23 employees.
24      Q     We're going to keep moving through the
25 list here.  The next one is Jeff Faistenhammer.

PAGE 52

52

1       A     Yeah, Faistenhammer.  He worked in
2  Ford's HR group.  He was a fairly senior manager and I
3  believe he dealt primarily on the salaried side.  I do
4  recall Jeff.
5       Q     You said he worked on the salaried
6  side?
7       A     Yeah, I mean, Ford Motor Company splits
8  their human resources departments fairly strongly
9  between salaried and hourly.  He was clearly on the
10 salaried side, if I recall.
11      Q     So what role, if any, did he play in
12 this effort to have the Ford salaried employees join ZF
13 Batavia?
14      A     I believe I had a couple of meetings
15 with Jeff where we laid out sort of broadly what we
16 were thinking in terms of the offers and whether he had
17 any input or, you know, wanted to suggest changes and
18 whatnot.  So he basically showed an interest in -- in
19 the propositions, if you will, that we were coming up
20 with to attract some of the Ford employees to the joint
21 venture.
22      Q     Okay.  Did Mr. Faistenhammer or anybody
23 else from Ford tell you that it was important for the
24 Ford salaried employees to have this package of
25 compensation and benefits explained to them by a Ford

PAGE 53

53

1  Motor Company management official?
2       A     Not that I remember.
3       Q     But to your knowledge, did someone from
4  Ford Motor Company explain to these employees what the
5  package of benefits was going to be at ZF Batavia?
6       A     Oh, yeah, Lee Mezza presented, if I
7  recall, in the May meeting specific elements of that
8  package, particularly as it related to the retirement
9  benefits that Ford was going to provide.  But as I
10 indicated, they did not take an active role and would
11 not certainly have communicated anything as it relates
12 to the ZF Batavia, you know, programs.  That was ZF
13 Batavia's responsibility.
14      Q     Moving on to the next name on this
15 list, George Lindstrom.  Who is Mr. Lindstrom?
16      A     George Lindstrom worked in the Ford
17 human resources area again and he was very instrumental
18 in the discussions with, I think, Tim Hartmann and
19 Dennis Cirbes on the hourly side.
20      Q     Okay.
21      A     I don't recall George taking much
22 interest in the salaried folks.
23      Q     All right.  Let's move to the next name
24 which I hope is the site of our next deposition.  Who
25 is Cindy Walters?

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 54

54

1  A    I think Cindy Walters was a human
2  resource person again and I think she had
3  responsibility for the hourly, but I'm not sure. I
4  don't know. I don't believe she was instrumental -- if
5  you're trying to find out who you want to talk to next,
6  I don't think she was instrumental in the '98, '99
7  discussions. I think she came on sometime after that.
8  Q    I haven't asked this directly. I know
9  we're jumping around a bit. But the conversations you
10 had internally with Ford after you met with ZF people
11 in Germany, did you meet with any of the people that we
12 have already gone over here who were at Ford in that
13 time?
14 A    Yes. Yes, I have.
15 Q    Who was that?
16 A    Lee Mezza, Charlie Corbet. I'm sorry.
17 You're talking between the summer of '98 and January
18 the 1st of '99? Prior to the joint venture or --
19 Q    I'm not sure actually of the time. You
20 said that after you went to Germany in '98, then there
21 were internal Ford discussions about if this was a --
22 about the joint venture possibility.
23 A    Yeah.
24 Q    And so I'm trying to figure out who was
25 involved in those discussions and especially those

PAGE 55

55

1  discussions that had to do with the labor force. So
2  Mr. Mezza was one of them?
3  A    Yeah, I've got to believe I met with
4  Lee prior to January of '99, but I guess I can't be
5  certain.
6  Q    Okay. Would you have met with Mr.
7  Corbet?
8  A    That would be the same as Lee. If it
9  wasn't in late '98, it would have been in early '99. I
10 do recall meeting with Dennis Cirbes at the national
11 Ford department office, Tim Hartmann. I did have some
12 meetings with Mike Warden, Jeff Paistenhammer, George
13 Lindstrom. I don't believe I sat in any meetings with
14 Mike Bush nor Cindy. And I think that's about where we
15 were.
16 Q    Well, as we go through this list -- and
17 I'll try to move through it expeditiously here -- if
18 you could identify those people that you talked to
19 after you met with the ZF people in '98 and then you
20 continued on this Ford discussions, I'm trying to
21 identify who those people are you talked to. And I'm
22 also trying to identify those people that were involved
23 in putting together this package of compensation and
24 benefits to the Ford salaried employees.
25 MR. HUNTER: Steve, just so we're

PAGE 56

56

1  clear, so we're back to talking -- what I
2  thought we had been talking about, mid '98
3  through the end of '99, that time period?
4  MR. SIMON: That's generally the time
5  period, yes.
6  MR. HUNTER: Okay.
7  THE WITNESS: As it relates
8  specifically to internal Ford and Ford only
9  discussions?
10 MR. SIMON: Well --
11 THE WITNESS: Because there was clearly
12 an evolving process, right?
13 BY MR. SIMON:
14 Q    Right, right. And I realize you don't
15 remember every meeting you attended, but I'm just
16 trying to see how everyone fits in, so that would be
17 the best way, to go through the list.
18 A    Jim Quinlan. I met with Jim Quinlan,
19 it would have been in '98. I think Paistenhammer and
20 he might have been in the same meeting with me. He was
21 a salaried guy. Don't believe I met with Carolyn
22 Malone. She -- she was working in Batavia at the time
23 and certainly wouldn't have partaken in any Ford Motor
24 Company specific proprietary discussions. I don't know
25 who Marty is. Keith Kleinsmith, wouldn't know. Ann

PAGE 57

57

1  Appleton was hired in much later, so she was not even a
2  player at the time. I don't know who Quentin is, nor
3  Michelle Garvey or Robert Kuhl . Vic Kane was, to my
4  knowledge, not involved in any of the -- the internal
5  Ford discussions.
6  Q    You skipped over Mark Leksan.
7  A    Mark Leksan, wouldn't have had any
8  discussions with him either. I believe at the time he
9  was the controller at the Batavia facility.
10 Q    Okay.
11 A    Nor Jim Solberg. Len Sennish was hired
12 at the end of '99 and wouldn't have been party to any
13 internal Ford discussions. Rhoshonda Knox, don't
14 believe so. Earl Taliaferro, I don't believe so. Doug
15 Szopo was a planning individual. He wouldn't have
16 gotten in any salary labor discussions, nor Dave
17 Prystash , nor Dick Bair, who was the plant manager.
18 Alan Evans, don't know who that is. Sharlene Gage.
19 Sharlene Gage may have worked for Lee Mezza doing some
20 of the detailed pension-type calculations and stuff.
21 Ed Thompson, the name doesn't ring a bell.
22 Q    Okay. You may have -- I didn't hear
23 you comment on a couple here. Page four, Karen Horan,
24 Ford of Australia, number 24 on my list.
25 A    I think Karen Horan came in subsequent

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

## PAGE 58

58

1  to the '98, '99 window, but it may have been on the
2  back end.
3      Q      Okay.  James Suber, I didn't hear you
4  say that.
5      A      I'm not sure who Jim Suber is.  Maybe I
6  should.  I don't know.  It doesn't ring a bell.
7      Q      And I'm not sure if I heard Jonathan
8  Tavalin.
9      A      Doesn't ring a bell either.
10     Q      All right.  Let's see if I'm coming
11  close here.  These internal Ford discussions that you
12  had after meeting the ZF people in '98, you would have
13  talked to Dennis Cirbes, Tim Hartmann, Mr. Warden, Mr.
14  Lindstrom, and I think you said Mr. Faistenhammer.
15     A      Yeah.
16     Q      Anybody else who isn't on the list or
17  is on the list, I just didn't say there, who you would
18  have talked to during that time?
19     A      And we're talking specifically
20  salaried-type, labor -- or salaried employee
21  discussions?
22     A      Yes.
23     A      Because there was -- it would be a very
24  long list if you want to get into all the other
25  business aspects.

## PAGE 59

59

1      Q      Let's stick to the labor side of this.
2      A      I believe that was -- to my
3  recollection, that was basically the field of folks
4  that we were dealing with.
5      Q      When were you first approached about
6  becoming the CFO of this new joint venture?
7      A      That would have been late '98, 1998.
8      Q      Who approached you about that?
9      A      ZF, Orchard.  ZF, Jim Orchard.
10     Q      What was Mr. Orchard's position with
11  ZF?
12     A      At the time Jim was the CEO for ZF's
13  North American operations.
14     Q      Well, did you have to be sold on it?
15     A      Yeah.  There were some discussions,
16  both on the ZF and the Ford side, as with many of the
17  senior management people.
18     Q      Okay.  At what point did some of these
19  terms that are in Exhibit 1, this letter to you dated
20  September 30th, 1999, at what point did that take
21  shape?
22     A      I'm sorry.  Could you be more specific?
23     Q      Well, you first were approached by Mr.
24  Orchard, you said, in late '98 about being the CFO and
25  then we have this September 30th, 1999 letter to you

## PAGE 60

60

1  from Dave Adams setting forth your salary and bonus and
2  that sort of thing.  Was all this decided right before
3  the date of this letter, September 30th, 1999 or had it
4  been hashed out much earlier than that?
5      A      Well, when Jim approached me, it was --
6  in late '98, it was just a general question of would I
7  be interested and whatnot, and I said sure, given the
8  right conditions and whatnot.  It seemed like an
9  interesting challenge to launch the new company.  So he
10  went back and, I believe, talked with Ford management.
11  And then subsequent to that I would have gotten into
12  some discussions with my boss, who at the time would
13  have been Tom Gorman.  And I was -- we talked
14  specifically about a range, I think, for a starting
15  salary and a bit about the bonus structure, but none of
16  the details in terms of vehicle allowances, signing
17  bonuses or transition bonuses were ever discussed.
18  Those things evolved over time.  None of the wage and
19  benefits was in place obviously in late '98, so it was
20  a relatively high level -- I'd say a little bit more of
21  a gentleman's agreement, but there was no -- no
22  contract written.  It was just general compensation
23  levels so that I could go put in place what had to be
24  put in place in terms of defining all the structure
25  we're talking about here.

## PAGE 61

61

1      Q      And so previous to September 30th, 1999
2  you had sort of a gentleman's agreement; is that what
3  you said?
4      A      I was getting paid by Ford Motor
5  Company.  I was on the Ford Motor Company payroll, I
6  believe, up through probably September/October of 1999.
7  And I was being compensated at base salaries that --
8  probably reflective of that number there on the first
9  paragraph, base pay.
10     Q      When did you officially become CFO of
11  ZF Batavia?
12     A      January 1st, 1999.
13     Q      So January 1st, 1999 through September
14  30th, 1999 you were being paid by Ford?
15     A      Well, the date of that offer letter
16  doesn't necessarily indicate the day one changes their
17  payroll.
18     Q      Okay.
19     A      So it would have been probably sometime
20  after that letter.
21     Q      Was that unusual, that you would have
22  been ZF Batavia's CFO during that period, but you were
23  paid by Ford Motor Company?
24     A      I would say for a joint venture company
25  being crafted out of a Ford manufacturing facility, no,

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 62

62

1   that wouldn't be unusual at all.  There was no payroll
2   for ZF Batavia until, I believe, the summer of '99, so
3   anybody who was working there was either a Ford Motor
4   Company or a ZF employee in terms of the payroll.
5            Q    Okay.  Going back to our Exhibit 3, Mr.
6   Whisman's letter.  I mean, do you consider this an
7   employment agreement between ZF Batavia and Mr.
8   Whisman?
9            MR. HUNTER:  Objection.  Requires a
10  legal conclusion outside the scope of this
11  witness' knowledge.  You can answer the
12  question.
13           THE WITNESS:  I'm sorry.  State your
14  question again.
15  BY MR. SIMON:
16           Q    Do you consider Exhibit 3 to be an
17  employment agreement between Mr. Whisman and ZF
18  Batavia?
19           A    I would not believe that's an
20  employment agreement, no.
21           Q    Okay.  I think we were referring to
22  your letter, Exhibit 1, that you expected that ZF
23  Batavia would honor the various items that are set
24  forth in Exhibit 1 and then also are referenced in the
25  summary at least through the end of 1999; is that

---

PAGE 63

63

1   right?
2            A    Can you be more specific?
3            Q    I think you said earlier that you
4   expected when you got Exhibit 1 -- and we assume that
5   at some point you accepted that -- that you understood
6   that that was your salary and your compensation and
7   benefits through at least '99, end of 1999.
8            A    Well, yeah.  I mean, the bonus, though,
9   is subject to the final performance results of the
10  company and myself individually and whatnot, so there
11  was no guarantees in terms of the bonus.  But yeah, I
12  would assume the monthly salary and some of these other
13  things were, yeah, determined at the time and this was
14  a high-level summary of the benefit program surrounding
15  that letter.
16           Q    All right.  So given your perspective
17  on your own agreement, would you -- would there be any
18  reason that you know of for Mr. Whisman not to think
19  that ZF Batavia was going to honor the items set forth
20  in Exhibit 3 while he was a ZF Batavia employee?
21           MR. HUNTER:  Again, objection.  What
22  Mr. Whisman thinks is not within the scope of
23  knowledge of this witness.
24           THE WITNESS:  I don't know what Mr.
25  Whisman believes at that time or today,

---

PAGE 64

64

1        frankly.
2            MR. SIMON:  All right.
3   BY MR. SIMON:
4            Q    Even though you individually didn't
5   review each of these letters, which is correct -- did
6   you review Exhibit 3 before it was given to Mr.
7   Whisman, to your knowledge?
8            A    No.
9            Q    Okay.  But we've discussed your role in
10  putting this package together.  Did you think that ZF
11  Batavia was offering -- was making an agreement with
12  Mr. Whisman and the other Ford salaried employees to
13  come on board with ZF Batavia?
14           A    I don't know what you mean by an
15  agreement.
16           Q    Did you think ZF Batavia was making
17  certain promises to Mr. Whisman that they were going to
18  honor?
19           A    I don't know what you mean by certain
20  promises.  I'm sorry.
21           Q    Well, the promises set forth in Exhibit
22  2, for instance.  In the middle of Exhibit 2, Mr. Kehr,
23  it has -- it references vacation and it explains how
24  many weeks of vacation the person is going to get.  You
25  see that there?

---

PAGE 65

65

1            A    Yes.  Well, I make a distinction
2   between a promise and a summary of the benefits and
3   whatnot that are available to the salaried employees.
4   But I wouldn't say anything particular was promised as
5   it relates to each and every single line item on here
6   because frankly at some point in time possibly the
7   medical/dental employee contribution rates may have
8   been ultimately something a little bit different than
9   this.  I don't know because this was done mid '99 and
10  all the details of the programs were worked out with
11  the service providers through '99.
12           But I think this adequately -- to
13  answer your question, adequately represents a
14  reasonable assurance of what one would have expected to
15  receive from the company in terms of the benefits as
16  well as the base compensation and bonuses.
17           Q    All right.  When you say assurance, do
18  you mean that from your perspective you understood that
19  ZF Batavia could change their mind about some of these
20  assurances at some later date?
21           A    Well, I believe it says this brochure,
22  you know, includes key features applicable to any of
23  the Ford employees and that, you know, subject to
24  change.  And there's also other documents that were
25  kind of behind this that obviously were put in as

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 66

66

1  disclaimers that say you've got to go to the base
2  document to the extent there's a disagreement and plans
3  described here subject to change.
4        So when you go out with these things,
5  you try and define them the best you can and then go
6  work to deliver it, but, you know, there's no promises,
7  no guarantees. But I think this adequately represents
8  what was fundamentally put in place, yes.
9        Q    Let's see.
10       MR. HUNTER:  Is this a good point to
11  take a break?  It just seemed like you were at
12  a break there, so --
13       MR. SIMON:  Oh, well, I don't know that
14  I was, but -- I didn't mean to be so dramatic.
15  Sure.
16       MR. HUNTER:  Okay.
17        (RECESS)
18  BY MR. SIMON:
19       Q    You understand you're still under oath,
20  sir?
21       A    Yes, sir.
22       Q    All right.  This is Exhibit 4.  Take a
23  look at that.  It's a multi-document -- a multi-page
24  document.  Mr. Kehr, I'm going to ask you about
25  individual pages as we go through it, but I want to

PAGE 67

67

1  give you a chance to familiarize yourself with the
2  document.  Have you had a chance to do that?
3       A    Yes.
4       Q    Okay.  Exhibit 4 appears to be
5  documents that were distributed in connection with a
6  meeting on May 27th, 1999; is that correct?
7       A    I don't believe they were distributed.
8  I'm not sure if this was indicative of the material we
9  went through or not, to be honest with you.  This one
10  page, I don't know if I recall having that being
11  presented, but most of the material I recognize and was
12  presented at this meeting.
13       Q    Do you know why this particular
14  document was prepared that is Exhibit 4?
15       A    It was prepared for purposes of having
16  it looks like two meetings, different times of the day,
17  to share in more detail perhaps maybe when the brochure
18  -- in terms of what at least the key elements were as
19  relates to the Ford salaried transition employees.
20       Q    Are you unsure if this document that's
21  Exhibit 4, if this was given just to the presenters at
22  the meeting or if this was given to the attendees or
23  some other group of people?
24       A    I'm sure the presenters would have had
25  a chance to review it.  In fact, some of the presenters

PAGE 68

68

1  provided the material.  But this was not, to my
2  knowledge, distributed.
3       Q    Okay.  How did it come to pass that
4  this meeting was held?
5       A    Come to pass?
6       Q    Whose idea was it to have this meeting,
7  if you know?
8       A    Well, it would have been the joint
9  team, myself included, that felt it was needed to
10  address more specifically some of the issues that were
11  important to the Ford employees who might consider
12  accepting offers from ZF Batavia.
13       Q    When you say the joint team, again,
14  we're trying to get all the people identified.  You had
15  identified a group of people that you had had internal
16  discussions with at Ford following your meeting with ZF
17  in '98.  Who was on the joint team?
18       A    Well, if you look at the presenters, I
19  believe myself, Tony Deshaw, Lee Mezza and Charlie
20  Corbet would have been fairly instrumental in pulling
21  the material together.
22       Q    Is there anybody else at ZF Batavia or
23  at ZF who you were working with in connection with this
24  offer of employment to the salaried Ford employees?
25       A    Well, I'm sure Mike Warden

PAGE 69

69

1  been a party to some of the discussions around it,
2  maybe not some of the specifics of the material.  But,
3  I mean, any time you've got a circumstance like this,
4  communication is important.  So, yeah, we would have
5  had probably Mike's involvement and the presenters, but
6  I don't recall having any other specific meetings with,
7  you know, Ford or Batavia people to review or otherwise
8  comment on this material.
9       And not just this material, but, again,
10  just generally putting together the package of
11  compensation and benefits that were presented to the
12  Ford salaried employees, who else was involved at ZF
13  Batavia other than you?
14       A    As I indicated, Mike Warden would have
15  been involved.  I don't recall specifically, you know,
16  any other detailed discussions.  I'm sure Dave Adams, I
17  would have had some discussion with him around some of
18  the elements of this.  We did do, you know, as
19  indicated previously, benchmark of Ford benefit
20  programs.  We also looked at the ZF North American
21  benefit programs, and Dave and I would have gone
22  through and agreed that, yeah, we thought this was
23  right.  For instance, Dave was very instrumental in
24  saying we wanted to get paid or thought we ought to get
25  paid twice a month.  I would have preferred monthly, so

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 70

70

1  there were some discussions like that.
2          Q       Okay.  Anybody --
3          A       He was a ZF employee in North America
4  and obviously he knew more about their programs, at
5  least in terms of being an employee, than I would have
6  just looking at their -- some of the summaries of the
7  programs that they were currently offering.
8          Q       Before Mr. Adams became president/CEO
9  of ZF Batavia, he was employed at ZF of North America?
10         A       That's correct.  He was the plant
11 manager at their Gainesville, Georgia transmission
12 plant.
13         Q       Mr. Warden was an employee of Ford at
14 the time?
15         A       That's correct.
16         Q       Okay.  Anybody else other than Mr.
17 Adams who was an employee of ZF Batavia or ZF that you
18 had discussions with in formulating this package of
19 compensation and benefits for the salaried employees?
20         A       Lee Mezza, Charlie Corbet.
21         Q       From Ford?
22         A       Yes.
23         Q       Anybody else from ZF besides Mr. Adams?
24         A       Well, maybe this is a distinction
25 without difference, but in this time frame there were

PAGE 71

71

1  no employees of ZF Batavia, okay?  You were on the
2  payroll of Ford or payroll of ZF.
3          Q       Then I'm just looking for anybody who
4  was an employee of ZF who you had these discussions
5  with besides Mr. Adams.
6          A       No.  Other than Mr. Adams, I don't
7  recall.
8          Q       Okay.
9          A       And Mike -- well, Mike is an employee
10 of Ford.
11         Q       Okay.
12         A       But I want to make sure it's clear that
13 I did have the two-day meeting facilitated by Ernst &
14 Young that defined our compensation philosophies and
15 whatnot, but by no means, you know, any of this detail.
16 Frankly most people other than, you know, HR
17 professionals and myself who was deeply involved
18 wouldn't, you know, typically get into this kind of
19 minutia, if you will.
20         Q       Right.  Other than Dave Adams then, to
21 the best you can recall, all of your discussions and
22 communication in connection with putting together this
23 package of compensation and benefits to the Ford
24 salaried employees was with other Ford employees such
25 as Mr. Mezza, Mr. Corbet, Mr. Warden?

PAGE 72

72

1          A       I had conversations with Bonnie
2  Gorichan, who was a Ford attorney who helped us with
3  the tri-fold brochure which is Exhibit 2.  She
4  obviously worked with Lee because Lee was a non-
5  attorney, so Lee did some stuff in the background that
6  I know Bonnie was an instrumental player.  I did talk
7  to her specifically and exchange some e-mails, but I
8  can't recall any other Ford employees specifically or
9  ZF.
10         Q       Just so the record is clear, the only
11 ZF employee that you recall discussing this subject
12 with was Dave Adams?
13         A       Up to this point in time, that's
14 correct.  As I indicated, we did need to go to the
15 board of directors for approval of the overall
16 compensation and benefits structure.  And on the board
17 we have three -- at the time we had three Ford board
18 members and three ZF board members, to which Jim
19 Orchard was one of them.
20         Q       This is a good time to ask you about
21 that.  When the joint venture was created, how many
22 members were on the board of directors?
23         A       Six.  Three from each parent.
24         Q       And were there non-voting members on
25 the board?

PAGE 73

73

1          A       That's a good question.  Dave Adams
2  believes that he was a non-voting board member, and I
3  think maybe at the time he was.  It's unclear whether
4  he was or wasn't, but I'm not sure if it's relevant.
5          Q       Any other non-voting members?
6          A       Not at the time, no.
7          Q       Okay.  So when you went to the board of
8  directors regarding this package presented to the
9  salaried employees at Ford, you were reporting to the
10 six people on the board of directors plus maybe Mr.
11 Adams?
12         A       Yeah.  Dave Adams and I go to the board
13 and we present the joint venture material.  Tom Schank
14 is the company secretary, so obviously he was present.
15 Yeah, it would have been -- you know, those six were
16 the decision-makers.
17         Q       Well, I know we're going through a lot
18 of names here, but who were those six people?  You
19 identified one.
20         A       At that point in time, I know -- I
21 think it was Jim Orchard, Dr. Michael Paul.
22         Q       What was that name?
23         A       Dr. Michael Paul.
24         Q       Okay.
25         A       And I believe the third ZF was Gunter

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

## PAGE 74

74

1    Hemminger.
2          Q      You want to spell his last name the
3    best you can?
4          A      H-E-M-M-I-N-G-E-R.
5          Q      All right.  Who were the Ford
6    representatives on the board?
7          A      I -- I don't recall.  There's been a
8    fair amount of changeover in the Ford board members, so
9    I'd be speculating as to who exactly was on the board
10   at that point in time.
11         Q      Are any of those three ZF members still
12   on the board?
13         A      Two out of the three are, yes.
14         Q      Which two?
15         A      Mr. Hemminger and Dr. Paul.
16         Q      Do you know who the -- who's the other
17   ZF person on the board?  Is there one?
18         A      Well, Jim Orchard was the third.  He's
19   no longer a board member.
20         Q      Today.
21         A      Today there is four from each parent.
22         Q      Okay.  When was that change made?
23         A      Probably in the last -- it may have
24   been as recent as the fall of 2002 or it could have
25   been over the summer.  But it's been in the last year I

## PAGE 75

75

1    believe.
2          Q      All right.  Are there any non-voting
3    members on the board currently?
4          A      Yeah.  There's -- today we have Glenn
5    Warren, Gerhard -- Dr. Gerhard Wagner.
6          Q      How do you spell that last name?
7          A      Wagner, W-A-G -- Wagner.  Wagner in
8    American.
9          Q      Sure.  Okay.  That helps.  So Mr.
10   Warren and Dr. Wagner.  And is that the only two non-
11   voting members?
12         A      Yes.
13         Q      And which companies do they represent?
14         A      Glenn Warren works for Ford Motor
15   Company and Gerhard works for ZF.
16         Q      When we say ZF, we're referring again
17   to ZF Friedrichshafen?
18         A      No.  There's a legal entity called ZF
19   Saarbrucken which is a division of ZF.  I believe
20   Gerhart is an employee of ZF Saarbrucken.
21         Q      I got you.  We won't go through these
22   names right now, but the other eight people on the
23   board are four from Ford Motor Company and four from
24   ZF?
25         A      That's correct.

## PAGE 76

76

1          Q      Okay.  Just generally what's the
2    mechanism or procedure, practice for Ford
3    representatives joining the board and leaving the board
4    which you kind of made reference to?
5          A      I'm sorry?
6          Q      You made reference to Ford people
7    coming on the board and leaving the board so, I guess,
8    is there a reason for that that you're aware of?
9          A      Well, yeah.  Back in the early -- early
10   days of the joint venture there were -- and they were
11   by any standard senior management, but they were not,
12   you know, vice president-type folks from Ford, and this
13   was a -- difficult is probably not the right term.  You
14   know, when you set up a new company like this and
15   you're talking about upwards of a $700 to $800 million
16   dollar investment, it's a very, very important project
17   to both parents, and the Ford board members that were
18   assigned at the time were not influential enough to
19   make things happen within Ford, particularly around the
20   product vehicle center, you know, the execution of
21   vehicle programs and whatnot and they were a bit, you
22   know, stymied, if you will, by the various factions
23   within Ford.  So Ford basically moved those folks off
24   and elevated more senior board members who could be
25   more influential in terms of causing events to take

## PAGE 77

77

1    place and I believe there was a retirement or two here
2    and there.  Maybe one was reassigned to a new job and
3    it just wouldn't have made sense to remain on the
4    board.  And that's, generally speaking, sort of what --
5    what occurred.
6          Q      When did --
7          A      But it's been fairly stable in the last
8    couple of years.
9          Q      When did Ford make that move to get
10   more senior people on the board?
11         A      I think it may have been 2000.
12         Q      Okay.  Were there minutes taken of
13   meetings that you had with the board in connection with
14   the package offered to the Ford salaried employees?
15         A      We prepare material in hard copy for
16   the board and there's also minutes taken, yes.
17         Q      And you retain those for a number of
18   years?
19         A      Yes, yes.
20         Q      Would you expect that the minutes from
21   those meetings in '99 regarding the package would still
22   be retained?
23         A      I would say they'd be -- yes.  The
24   board presentation material and the minutes of the
25   board meeting would have been retained, but I can

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 78

78

1  assure you that by no means did the board see this
2  level of detail as it related to either the Ford
3  transition employees or our overall salary and wage and
4  benefit plan.  It would have been obviously much more
5  succinct.
6        Q     Just so I understand, you said you
7  produced a hard copy to the board.  Do you mean you
8  produced some sort of materials for them to look at
9  during the meeting?
10       A     Yes.  They get a board book.
11       Q     Okay.  Do you know if -- perhaps I can
12  use some shorthand.  When I'm referring to the package
13  of compensation and benefits that were offered to the
14  Ford salaried employees in '99, I might just refer to
15  that as the package; is that okay?  If I say the
16  package, you'll understand what I'm referring to?
17       A     Not -- not exactly.
18       Q     Well, then I'll keep --
19       A     Exhibit 2 or --
20       Q     Well, I won't use any abbreviations
21  then.  I just mean kind of the subject generally of the
22  compensation and benefits package that was offered to
23  these salaried employees.  My question was whether that
24  subject was discussed at more than one board meeting in
25  '99, to the best of your recollection.  Or was there a

PAGE 79

79

1  particular meeting that you recall where that was
2  discussed?
3        A     Well, I definitely do recall one
4  meeting where we got approval, you know, to proceed.
5  It wouldn't surprise me if perhaps a board meeting or
6  two prior to that we may have shared with them the
7  direction we were heading to make sure that people were
8  comfortable before we had the -- you know, the program
9  completely buttoned up.
10       Q     Do you recall any difficulties or
11  objections that the board members raised regarding this
12  package of compensation offered to these Ford salaried
13  employees?
14       A     I don't recall any specifically, no.
15       Q     Or even generally?
16       A     No.
17       Q     It's fair to say that you were the
18  critical decision-maker in deciding the package that
19  would be presented to these Ford salaried employees?
20       A     Well, I wouldn't characterize it as a
21  decision-maker.  I did have some authority delegated to
22  me as an officer to go make certain decisions and, you
23  know, meeting with Ernst & Young, I went through things
24  from maternity leave to, you know, one thing after
25  another and had to take a decision that says "I agree

PAGE 80

80

1  with this.  I want it tailored or modified or..." --
2  yeah, I mean, constructing the whole thing and then
3  taking it back and getting other people's input and
4  whatnot and then getting it approved as presented to
5  the board.
6        Q     And it was your decision to decide what
7  was actually going to be presented to the board
8  ultimately?
9        A     Dave Adams and I jointly prepared the
10  board material.
11       Q     I guess what I'm saying is these other
12  people that had input, it was input that they -- such
13  as the Ford employees, Lee Mezza and others that you've
14  identified, they gave you input regarding these various
15  benefits and compensation and then you and, I guess,
16  Mr. Adams ultimately decided this is what we're going
17  to put together and we're going to present it to the
18  board; is that a fair summary?
19       A     Well, I don't think I'm going to
20  disagree.  Lee Mezza helped us fully understand the
21  Ford programs that currently existed, which is a very
22  important element to understand.  And then Lee also
23  helped with "Okay, what if I got a green field company?
24  What would you do differently?"  "Ford Motor Company,
25  if you had a green field opportunity to start afresh

PAGE 81

81

1  with some stuff, what would you do?"  "Well, I
2  wouldn't put a pension program in place, I'll tell you
3  that, a defined benefit plan."
4        So, you know, some of those things they
5  talked about as being, you know, HR professionals
6  because as good as Mike Warden is, he's not -- you
7  know, what we saw in Batavia was not the capability to
8  define this.  It was all managed by Ford centrally and
9  ZF has no central North American compensation HR
10  professionals.  So Lee was helping me construct kind of
11  a green field site scenario and bringing together the
12  Ford programs and here's what we have for ZF and, you
13  know, Lee was very helpful.  But, again, Tony Deshaw
14  and myself made many of the decisions as to what
15  exactly we were going to define.  And then we had -- as
16  I indicated, I've had some discussion with Dave Adams,
17  being the president, about what he thought about some
18  elements and, as I indicated previously, there were
19  some modifications made in terms of the number of times
20  employees would be paid and some of those things.
21       Q     Regardless of what Mr. Deshaw told you,
22  you had the authority whether to say yea or nay on any
23  given proposal he gave you; is that fair?
24       A     Well, to the extent it was material
25  enough that he thought he should bring it to my

RIVERSIDE REPORTING
(859)291-6110(KY) -- (513)574-7017(OH)

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 82

82

1  attention.

2      Q     Okay.

3      A     But, yeah, I mean, I was deeply
4  involved in going through all the different elements of
5  it.  That was basically my full-time assignment for two
6  or three months, to go get all of that done.

7      Q     Okay.  Now, you made reference to a
8  defined benefit plan.  Now, the Ford salaried employees
9  had a defined benefit plan while they were Ford
10 employees?

11     A     Yes.

12     Q     And you were told that if you had to
13 start from square one, you wouldn't have a defined
14 benefit plan?

15     A     Correct.  I mean, most new companies
16 move away from -- they don't want to do defined benefit
17 plans and, you know, 401(k)s and other instruments
18 which seem to be the way to go.

19     Q     But these Ford employees who came to ZF
20 Batavia, they were told that they would continue to get
21 their benefits under the defined benefit plan, correct?

22     A     Not exactly.  It's described in the
23 brochure.  Ford agreed to lock in the years of service,
24 but would allow employees who retired from ZF Batavia
25 to use their last five-year income levels to determine

---

PAGE 83

83

1  what it would be -- what their Ford pension would be
2  calculated at.

3      Q     Okay.  The only reason that you offered
4  any sort of defined benefits plan to the Ford salaried
5  employees coming to ZF Batavia was because Ford Motor
6  Company already had this preexisting obligation?

7      A     We don't offer a defined benefit plan
8  at ZF Batavia.

9      Q     What do you mean by green field?

10     A     Well, you have a -- I'd describe a
11 gutted Ford manufacturing facility.  You know, there is
12 no purchasing on site, very limited accounting
13 financial support, no product development, no sales and
14 planning, very limited IT infrastructure, you know, no
15 payroll, no wage and benefits.  I mean, it was a Ford
16 manufacturing plant and Ford has most of all their
17 activities centralized and administered, you know, out
18 of Dearborn.  So, I mean, obviously it wasn't a green
19 field site in the literal sense, but if you're going to
20 put a wage and benefit program in place, for all
21 intents and purposes it was a green field site because
22 none had existed previously.

23     Q     And I apologize.  I think I asked you
24 this, but I can't recall the answer.  Whose idea
25 ultimately was it to have the meeting on May 27th,

---

PAGE 84

84

1  1999?

2      A     I don't recall that anybody ultimately
3  had the decision we were going to have the meeting or
4  not.  I believe it was Tony, myself, Lee, probably Mike
5  and perhaps some other people at Ford that said yeah,
6  we ought to go talk to the employees and provide them
7  more detail.  And leading up to this meeting,, it was
8  established probably, I don't know, I guess in our
9  minds, the people working on this, you know, a month,
10 two months in advance that we are going to work towards
11 and get all this work done so we can go have this
12 meeting and get on with making employment offers and
13 executing what needed to be done.  So it was clearly a
14 joint milestone event.

15     Q     Okay.  Were you aware of any anxiety in
16 the plant prior to this meeting about what exactly
17 would become of the Ford salaried employees?

18     A     I'm sorry.  Did you say any anxiety?

19     Q     Any anxiety on behalf of the Ford
20 salaried employees about what their future held.

21     A     Yeah.  There was a mixed gamut.  I
22 mean, for instance, myself, my avenue and what was
23 going to happen to me was fairly clear.  There were
24 some salaried -- Ford salaried employees who frankly
25 weren't interested in entertaining any propositions

---

PAGE 85

85

1  about joining the company.  And then there was
2  everything in between.  Some people were very
3  interested, some were not so interested, some were
4  frankly skeptical, some were very -- just concerned
5  about, you know, things as it relates to them as
6  individuals, their families, all the circumstances
7  that, you know, come into play when you're dealing with
8  160 employees.

9      Q     Okay.  I think you had said earlier in
10 the deposition that when you met with ZF back in
11 Germany in '98, that it was Ford's expectation that all
12 of the Ford salaried employees would come on board the
13 joint venture once it was created; is that right?

14     A     The -- the meetings with ZF in the
15 summer of '98 dealt with much higher-level issues, in
16 terms of the contribution values, you know, the cash,
17 the business plan.  It was much higher, you know, in
18 terms of getting the fundamentals in place that said
19 the parents wanted to proceed and then evolving from
20 that kind of a decision to go pursue, then all kinds of
21 things were looked at.  I mean, IT systems, I had
22 meetings with 60 IT professionals inside of Ford to
23 make sure that on January 1st that the plant ran and
24 things didn't collapse and paychecks were run and all
25 those things.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 86

86

1    And in the meetings with Ford that
2 evolved, okay, how do we want to handle, you know, the
3 Ford employees in the factory. Well, they're going to
4 be very important to the -- the ability to manufacture
5 transmissions. I mean, that is our jobs. So the
6 expectation is that we would keep the Ford salaried
7 work force, you know, in place and, in fact, there may
8 have been even maybe a six-month window where people
9 were not allowed to -- to move out of Batavia to ensure
10 that we protected Ford's, you know, transmission
11 deliveries.
12    But, you know, Ford would have -- would
13 have wanted, you know, all -- all the Ford employees
14 fundamentally to join the new company. In fact, many
15 transactions are structured that way. If you're at
16 this site and it's sold or otherwise merged or
17 whatever, some instances even structured that salaried
18 employees have to change employment. There is no
19 option for other deals. So, you know, we worked
20 through those outcomes or possibilities, but not in
21 front of ZF in the summer of '98. That -- those
22 discussions would have taken place more in the fall.
23    Q    All right.
24    A    And even into the following year.
25    Q    But ultimately not all Ford salaried

PAGE 87

87

1 employees were offered employment at ZF Batavia; is
2 that right?
3    A    That's correct.
4    Q    Why is that?
5    A    Well, there's two things. Of the 160
6 salaried employees that were in Batavia at the time, I
7 believe that it was -- I don't know exactly but in the
8 range of, let's say, 30 to 40 employees, and we sent a
9 letter out and said, you know, would you be interested
10 in entertaining an offer to join the new company, and
11 30 to 40 employees, I think, Ford employees, may have
12 said Well, I'm not really interested but thanks
13 anyway.
14    And then there was a group of meetings
15 held by the Ford management team in Batavia at the time
16 who knew the work force. Many of us hadn't set foot in
17 the facility at all, didn't know the people and weren't
18 in an appropriate position to make assessments and
19 there was discussions of each and every employee of the
20 120, let's say, 130 who were interested in receiving
21 offers. There were some discussions about "Is this
22 employee going to be -- do you think that they would
23 work well in this new, uncertain environment?" You
24 know, do we think this and that.
25    And it was an assessment made as to

PAGE 88

88

1 what we thought their ability to support the joint
2 venture would be going forward. And that list then was
3 provided and I think of the 120 or 30 names on that, I
4 think -- God, there's probably 85, 90 percent of the
5 employees ultimately received offers. There was a
6 select handful that for various reasons offers were not
7 made.
8    Q    What were the various --
9    A    And I'm not sure of those. I'm not
10 sure of the specifics. I didn't participate in those
11 discussions.
12    Q    Those were discussions among Ford
13 management you said?
14    A    They were the existing Ford salaried
15 management team that had been in Batavia prior to the
16 joint venture and were still in place frankly up
17 through this point in time.
18    Q    Do you know who those people were?
19    A    Oh, I could name some -- I'm not sure
20 who was in the actual meeting. I mean, it --
21    Q    Jerry Priest, is that like one of the
22 managers who would have been involved in these
23 discussions?
24    A    I don't recall. Like I say, I wasn't
25 in the meetings. I don't know who all participated.

PAGE 89

89

1    Q    All right. But this group of people
2 then reported back to you that we're going to make
3 offers to 85 to 90 percent?
4    A    Yeah. They produced by name who would
5 -- who they thought, you know, ought to receive offers.
6    Q    And this was done sometime before the
7 May 27th meeting?
8    A    I don't now if that was done before or
9 after May. I mean, I think the offer letters may have
10 started to go out. I mean, here are some, it looks
11 like they're as early as May, so maybe it was complete.
12 I just don't recall exactly the time that that list was
13 produced.
14    Q    Well, let's go through Exhibit 4 while
15 we've got it in front of you there. You obviously were
16 indeed at this meeting, correct?
17    A    Yes, both meetings.
18    Q    Both meetings. We assume both meetings
19 are referring to the morning and afternoon?
20    A    That's correct.
21    Q    Okay. Let's see. It looks like you
22 talked about a couple of different topics here, such as
23 salary compensation. Do you see where it says that on
24 the agenda?
25    A    Yes, I do.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 90

90

1  Q    If you look to what's -- that Bates
2  stamp number with all the zeros at the top, 000003,
3  it's titled Ford transitional employee base salary
4  bands, do you see that?
5  A    Yes.
6  Q    Now, is this something that -- this
7  particular single document, did you produce this at the
8  meeting?  Did you put it on an overhead, anything like
9  that?
10  A    I guess -- I'm not -- since I got this
11  from you and we did not provide any handouts at the
12  meeting, it's a little bit unclear to me whether this
13  represents what was actually shown or not.  So you'll
14  have to bear for some time with me because I have not
15  gone back and revisited what I would have believed to
16  be the original document versus what you've now
17  presented to me.
18        But I do believe that this slide was
19  one of the slides that was presented to the salaried
20  employees at the time, defining the salary bands and
21  the minimum and the maximums within the ranges and
22  compares it to their, at the time, existing salary
23  grades within Ford Motor Company.
24  Q    You kind of gave me the lay of the land
25  there.  There was a slide show that accompanied the

PAGE 91

91

1  presentations?
2  A    It was all a slide show.
3  Q    All slide show, okay.  And so even
4  though you're not sure, it may be that these different
5  documents that make up Exhibit 4 may, in fact, be the
6  copies of the slides that were shown the employees?
7  A    Well, they may or may not be exactly
8  what was shown because, like I said, you've given this
9  to me and I don't know if this is exactly what was
10  shown or not.
11  Q    Just so you understand, this was
12  produced by ZF Batavia to us, this particular set of
13  documents.
14        Well, just generally what do you recall
15  talking -- stepping back for a second, how many --
16  where was this held?  It was held in the cafeteria, I
17  see?
18  A    Correct.
19  Q    And all the people who are listed as
20  presenters were obviously there, the best you can
21  recall?
22  A    Yes, they were there.
23  Q    And how many people attended among the
24  employees?
25  A    Well, we had two meetings because we do

PAGE 92

92

1  have salaried employees that work both afternoon and
2  evening shifts, so we set it up so that it was
3  convenient for them to attend one or the other.  And I
4  would say probably -- clearly the morning session would
5  have been the more heavily populated than the afternoon
6  session, but, I mean, there were large numbers.  I'm
7  not sure if it was every single individual of the 160,
8  but a large number of salaried employees attended this
9  meeting.
10  Q    To the best you recall, what did you --
11  did you make -- it looks like you made some
12  introductory remarks at the beginning of each meeting.
13  Do you recall what you said?  I don't mean verbatim,
14  but  did you explain at the beginning of the meeting
15  that we're going to go through the package that we've
16  put together that we're offering you if you want to
17  join ZF Batavia?  I mean, did you make it clear to the
18  group what this meeting was about?
19  A    Yes.  Yes, we certainly did.  I mean, I
20  would have gone -- probably indicated that, you know,
21  we've gone back, looked at the Ford programs and
22  compared those and used those frankly to help create
23  some of these things.  And would have told them that,
24  yeah, this is -- we want to give some details and then
25  make available for individual questions.  Obviously an

PAGE 93

93

1  individual's question about a health care plan might be
2  personal in nature, so we told them that there would be
3  plenty of opportunity at the back end for Q's and A's
4  and whatnot.  So we'll got through the presentation and
5  be available to answer questions.
6  Q    Okay.  So regarding the salary
7  compensation, what information were you trying to
8  convey to them about that?
9  A    You're back on the 03 page?
10  Q    Yeah.
11  A    Well, if you recall, we -- at the time
12  we said salary compensation and we agreed that we were
13  going to have bands, salary bands rather than specific
14  salary grades.  So we said, you know,
15  administrative/clerical band would be comparable to
16  Ford grades one through four, the GSR band was grades
17  five through eight, the MR bands would be grades nine
18  through ten, and based upon the Ford, you know, salary
19  structure and whatnot and what we were going to do in
20  ZF Batavia, this would be the bands that people would
21  fall in as it relates to the new salary band structure
22  versus the Ford salary grade structure.
23  Q    Whose idea was it to have the band
24  structure?
25  A    Well, I would have fundamentally agreed

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 94

94

1  with the concept. It was one of those green field
2  sites. In fact, Ford Motor Company, subsequent to all
3  this, has, in fact, gone to bands as well and it was
4  what a company who was establishing such a structure
5  would probably put in place. So it was, you know,
6  state of the art or best practices or whatnot.
7      Q    It refers to AC band. What does AC
8  stand for?
9      A    Administrative/clerical.
10     Q    And GSR?
11     A    General salary role.
12     Q    And you've already said MR is
13 management role.
14     A    Management role.
15     Q    We'll just go through in order, Mr.
16 Kehr. Let's mark number four up at the top corner of
17 this page, and we're still on Exhibit 4. There
18 obviously was some discussion about the vehicle
19 program?
20     A    Yes.
21     Q    It looks like that was you who talked
22 about that.
23     A    Yeah. I believe we followed the
24 agenda.
25     Q    Okay. Let's go to the next page,

PAGE 95

95

1  number six. It says ZF Batavia overtime rates for
2  salaried employees. Do you see that?
3      A    Yes.
4      Q    It looks like, based on the agenda,
5  that's Mr. Deshaw who spoke about that; is that what
6  you recall?
7      A    I believe so, yes.
8      Q    And even though you weren't the speaker
9  at that point -- you attended the entire meeting even
10 when you weren't speaking?
11     A    Yes, both meetings.
12     Q    Okay. Both meetings. Thank you. What
13 does number six of Exhibit 4 -- what does that
14 represent to you?
15     A    What it represents is the rate to which
16 salaried employees would be paid for overtime. And I
17 believe at the time this was consistent with the Ford
18 pay structure for overtime.
19     Q    You said consistent. Do you know if it
20 was different in any way from the Ford practice at the
21 time regarding overtime?
22     A    Well, if you're asking specific about
23 this page, my recollection is these rates, the
24 over/unders and whatnot is exactly what Ford offered at
25 the time.

PAGE 96

96

1      Q    Okay. And obviously these charts
2  provide that, for instance, I guess that's during the
3  regular work week if your salary is under $4100 a
4  month, then you get time and half for all overtime
5  hours worked?
6          MR. HUNTER: Objection. That's a
7      mischaracterization of the document.
8  BY MR. SIMON:
9      Q    Well, Mr. Kehr, you describe what the
10 top part of that chart means when it says monthly
11 salary under $4100, time and one-half. What does that
12 refer to?
13     A    It refers to approved overtime would be
14 compensated at time and a half if you made less than
15 $4100 a month. At this point in time there were no
16 unique ZF Batavia programs in place or policies or
17 anything else. So what would have been underlying
18 this, to answer your question, I think you're getting a
19 little bit into the overtime approval processes and
20 whatnot. We would have used Ford's pre-approved
21 overtime policy and, you know, that was approved, would
22 have been compensated, and not all hours worked are
23 compensated by definition. So approved overtime,
24 subject to the then existing Ford policy, the overtime
25 procedures as they relate to the Batavia plant, this

PAGE 97

97

1  would have been the rate at which people were
2  compensated.
3      Q    Well, what was the Ford policy at the
4  time regarding overtime for salaried employees?
5      A    Well, I can talk to it generally. I
6  mean, Ford Motor Company has and to some degree
7  continues to pay salaried employees for overtime.
8  There's assumptions in terms of casual overtime that is
9  uncompensated and casual work hours and salaried
10 positions don't always get overtime.
11         The finance group typically is a little
12 bit more stringent. The expectation is that, you know,
13 people have a job to do and they need to get the job
14 done. When you go to the manufacturing area, it's a
15 little bit different. If you have to run a rate -- you
16 know, run a line you have to schedule the overtime.
17 And that's why Ford, I think, at the time does pay for
18 overtime because it is a production facility unlike,
19 you know, some more administrative-type positions.
20     Q    Are you saying what was being
21 communicated at this May 27th meeting was that if you
22 -- to these Ford salaried employees at the time is that
23 if you join ZF Batavia, we're going to follow Ford's
24 overtime policy if you join ZF Batavia; is that what
25 was said at this meeting?

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 98

```
                                                              98
1        A      I can't recall exactly what was said.
2   Like I say, this page deals with the compensation
3   amounts for approved overtime and I think what we put
4   in the brochure, you know, authorized overtime will be
5   paid.  And I'm not sure what was communicated to the
6   employees, but practically speaking we were continuing
7   to operate the factory fundamentally, you know,
8   subject to the existing Ford policies and procedures,
9   you know, absent any -- any new guidelines.  That was
10  fundamentally the way we were operating the factory at
11  this time.
12       Q      Even though you can't recall
13  specifically, was it generally the thrust of the
14  presentation on this overtime issue that we're going to
15  follow Ford's overtime policy and we're going to follow
16  these rates that are on time, page six?
17       A      I'd say that's a fair characterization.
18       Q      Okay.
19       A      At least at this point in time.
20       Q      And earlier when you were talking about
21  Ford's policy, do you understand Ford's policy at time
22  that they didn't pay for casual time?  They didn't pay
23  overtime for casual time?
24       A      I think -- I don't know.  I don't
25  recall actually reading the thing in detail.  I did
```

PAGE 99

```
                                                              99
1   work for Ford for 15 years and, you know, depending
2   upon where you are, in what areas and whatnot, I don't
3   recall getting paid overtime for, you know, like I say,
4   a long, long, time and I work, you know, 60, 65-hour
5   weeks.
6        Q      But in this presentation the people
7   speaking, some from Ford Motor Company, some from ZF
8   Batavia, they were advising this group of employees who
9   were considering going to ZF Batavia that they, in
10  fact, would be paid overtime for their work generally
11  speaking in the same way that they were being paid
12  overtime under Ford, right?
13       A      Yeah.  Yeah, I don't think that's an
14  unfair characterization.  It would have been a
15  continuation of Ford's -- the Ford policy regarding
16  overtime at this point in time, yes.
17       Q      Okay.  Did anybody at that meeting say
18  anything like _Well, we're going to pay overtime for a
19  period of time, but then there might come a time when
20  we're not going to pay overtime at all_?  Did anybody
21  say anything like that at the meeting?  Either meeting,
22  the morning or afternoon meeting.
23       A      I doubt there was any specific
24  statements made about any, you know, one aspect of this
25  package or whatnot.  But I would believe that there
```

PAGE 100

```
                                                             100
1   were the appropriate characterizations around this kind
2   of material perhaps in my introduction that, you know,
3   this is what we've currently defined and, you know, as
4   you see in the brochure, everything is subject to
5   change and revision over time and it certainly wouldn't
6   have been characterized as this is a guaranteed,
7   assured, lifetime commitment from the company.
8        Q      You're sure that you said that?
9        A      Yes, I'm sure that in the meeting there
10  would have been a characterization that this is a
11  point-in-time look that we're going to offer and that
12  it is, you know, subject to change as conditions
13  warrant.
14       Q      Did anybody else say that besides you
15  among the presenters?
16       A      I don't recall.
17       Q      Then there was a question-and-answer
18  session for each meeting?  It's listed on agenda as
19  having time for one.
20       A      There was a combination of question-
21  and-answer sessions after the meeting that would have
22  been in a group forum.  And then I believe some of
23  these folks who presented, like Connie and Carl and
24  John, those folks were off in separate rooms and
25  available I think for two or three days for anybody
```

PAGE 101

```
                                                             101
1   could come in and talk to them about specifics as it
2   deal with their circumstance to better understand how
3   these things would apply to them and what the
4   stipulations would be.
5        Q      Did anyone during the meetings that you
6   attended on May 27th, among the group that was
7   listening to the presentation, ask a question about
8   _What do you mean by everything's subject to change_ or
9   any sort of concern like that raised by someone in the
10  group?  Do you recall anything like that?
11       A      No, I don't recall any broad-brush
12  questions of that nature.  I believe a lot of the -- of
13  the questions that we got were more specifically
14  directed towards the retirement aspects of the program
15  because that was a big issue, was the retirement
16  programs.
17       Q      These other people, presenters, you say
18  they made themselves available after this meeting for
19  maybe a couple of days to field individual questions
20  from the group?
21       A      I wouldn't say all the presenters.  The
22  ones that were specific to the benefit programs or
23  whatnot were available.  And obviously, you know, I
24  have an open-door policy and some Ford employees did
25  come in and talk to me specifically after the meeting
```

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 102

102

1  about certain aspects of the program.
2        Q      Do you recall who?
3        A      I think Rick Williams may have come in
4  and talked to me.  There was a handful of other folks.
5  I can't recall their names.  Some of them were hourly
6  even.  Particularly the salaried folks on the shop
7  floor, some of them were concerned about the
8  disposition of the Ford company stock as related to the
9  401(k) plan.
10        Q      This May 27th meeting, was this for
11  salaried and hourly or just the salaried?
12        A      Salaried only.
13        Q      Okay.  Did anybody who was a presenter
14  or even somebody who wasn't presenter, like Mike
15  Warden, tell you at anytime in '99 or in or around this
16  meeting on May 27th that these salaried employees at
17  Ford are concerned that this package is being made
18  available now, but it's subject to change at a moment's
19  notice?  Were there any of those kind of concerns
20  raised, not directly to you, but reported to you by
21  some of the other members of the team?
22        A      Well, I'm not sure if I'd characterize
23  it as it can be changed at a moment's notice.  There
24  was probably some concerns, some questions about the
25  longevity of the joint venture  and, you know, what

PAGE 103

103

1  assurance do we have if we join a new company that, in
2  fact, it's even going to exist down the road.  They
3  were much more, I think -- what came to my attention
4  was more general discussions around those types of
5  things.  I don't remember specifically my getting
6  involved.  There were some Q's and A's that went around
7  and I do remember reading those.  But it was probably a
8  better part of 12 months that there was a communication
9  roll-out strategy including Q's and A's and obviously
10  people's level of comfort with the new company.  And
11  the management team evolved and improved over time when
12  you started seeing people and whatnot.  So I guess I
13  can't -- I don't know if I can answer your question
14  specifically.
15        Q      Is it your testimony that when you were
16  at the May 27th meeting and you were explaining this
17  package with its compensation and benefits are subject
18  to change, are you saying that you referred
19  specifically to the last paragraph on the second page
20  of Exhibit 2?
21        A      No, I can't -- I can't testify to that.
22  What I can tell you is as we prepared the material, we
23  were advised by counsel to make sure that it wasn't
24  portrayed as that this is a done deal and it's a
25  guarantee or promise and that the appropriate caveats

PAGE 104

104

1  need to be communicated that indicate that, you know,
2  things are subject to change and, in fact, that's
3  probably one of the reasons why this thing wasn't
4  distributed in hard copy.
5        MR. SIMON:  Off the record for a
6  second.
7              (OFF THE RECORD)
8  BY MR. SIMON:
9        Q      Moving to page seven, Mr. Kehr, and I
10  think we're still on Exhibit 4.  And I think this was
11  one that you talked about, the annual -- I'm sorry.
12  The annual incentive plan was presented by Mr. Deshaw;
13  is that what you recall?
14        A      I don't recall, but I imagine based
15  upon the agenda, that Tony would have discussed this
16  page.
17        Q      And what generally then, using page
18  seven as a guide, what generally was the annual
19  incentive plan that was being presented to this group?
20        A      Well, I think really what we talked
21  about on this page was a bit of a movement from the
22  Ford historical practices.  You see on the bottom the
23  profit sharing numbers that Ford employees enjoyed from
24  salary grades one through nine were the same percentage
25  of income, and we showed those historical payouts and

PAGE 105

105

1  we indicated that we were going to be using an
2  incentive plan that was more leveraged towards higher
3  -- what's the right term -- employees with more
4  responsibility would have fundamentally more
5  compensation at risk.  So you'll see the maximum
6  percent of base for the administrative/clerical is less
7  than the historical number and for the MR bands it was
8  actually higher at 11.3.  So -- and then it would be
9  indicated that we were targeting a payout at 75 percent
10  of the maximum and that, you know, if we meet our
11  objectives, then that would be the -- you know, the
12  percentages within those bands that would be available,
13  you know, for distribution.  And that we were in
14  essence structuring a program that was more variable
15  compensation based rather than fixed.
16        Q      And turning to Exhibit 2, if you could,
17  that references the annual incentive plan at the top.
18  Do you see where it says -- I'll just read this.  It
19  says _Annual incentive plan reward program based on ZF
20  Batavia's success determined by product quality, timing
21  and delivery of new and existing products and
22  profitability._
23        A      Mm-hmm.
24        Q      And it then was explained to the
25  employees at this meeting and perhaps other

Case 1:02-cv-00406-SSB-TSB    Document 51-2    Filed 11/21/2003    Page 28 of 65

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 106

106

1  conversations you had that whether or not you get any
2  bonus at the end of the incentive plan depends on these
3  things that I just read in Exhibit 2, right?
4          A    No.  I'm not sure if I agree with that.
5  What was shown here was the AIP structure as relates to
6  the salary bands and the 75 percent target and what
7  would be used to determine pools of incentive plan
8  models.  This wasn't necessarily and I wouldn't have
9  characterized this as single individuals, here's what
10 you should expect.
11         If you are in this band between the
12 high and the lows, this is our overall program
13 structure and reflecting the philosophies of what we
14 were trying to accomplish in having more at risk
15 compensation for those who have more ability to
16 influence the results of the business.  And then the
17 next two pages we showed what the Batavia preliminary
18 objectives were for 1999 and this, in fact, is what
19 generates the pool of funds available to be distributed
20 to the employees as, you know, management deems
21 appropriate.
22         Q    So the bonus pool is determined by how
23 the company, that being ZF Batavia, met these
24 objectives?
25         A    Yeah.  And there's a range of outcomes

PAGE 107

107

1  around the different objectives.  You know, if you
2  over-achieve, you get a 150 percent for that line item.
3  If you under-achieve, you only get 25 percent or zero.
4  So there's a range of outcomes against these, to which
5  you do a weighted average and calculate what the plan
6  is in terms of the overall accomplishments to those
7  objectives.
8          Q    So looking at number seven, if somebody
9  who has a general salaried -- in a general salaried
10 role, GSR, is it right that their bonus would max out
11 at $7692 if the company met all of its objectives?
12         A    No.  I think what it says is it can
13 range between zero and $7692 at, you know, the '99 time
14 frame, it would be in that range.  And if the company
15 met on average its objectives, the payout would be at
16 the target amount.  Only if you over-achieved the
17 objectives would you get paid in excess of the target
18 amount.
19         Q    All right.  And all of this was
20 explained during the meeting?
21         A    Yes, I believe so.
22         Q    Okay.  Was there any discussion at the
23 meeting that you recall about whether working overtime
24 would affect your bonus on the annual incentive plan?
25         A    Oh, gosh.  I don't recall anything

PAGE 108

108

1  specifically tying the annual incentive plan to
2  overtime hours worked.  I think that would have been
3  potentially inappropriate for a meeting like this.  But
4  clearly the flavor of the ZF Batavia's compensation and
5  benefit program is performance-based results by
6  individuals working both on their own behalf in teams
7  and for the company, and that was clearly the
8  expectation, I think, in trying to lay this out for
9  folks is that they understand that, you know, nobody is
10 going to get, you know, fixed amounts depending upon
11 the fact that they showed up and this is the company's
12 results.  It was, you know, a performance-based
13 program.  It isn't based upon, you know, the bottom
14 line financial result, you know, like the old Ford
15 program.  This was a more performance-oriented
16 incentive plan.
17         Q    All right.  So if you worked hard and
18 did your job, you stood a better chance individually of
19 getting a bonus under this plan, right?
20         A    In fact, if you -- well, I don't know.
21 Some people don't seem to work that hard, but they get
22 their job done and they perform very well.  So yeah,
23 performance will assure you bonuses if -- if you're
24 accomplishing the work objective.
25         Q    Nobody said during this meeting or any

PAGE 109

109

1  other discussions you had in '99 that if you work a lot
2  of overtime, your bonus might be jeopardized?
3          A    No, I don't believe there was any
4  discussion like that.
5          Q    All right.  During this meeting -- I
6  don't mean literally during this meeting, but at the
7  time of this meeting and in this period of '99 when
8  these Ford salaried employees were coming on board ZF
9  Batavia, did you think at some point that I don't think
10 it's really likely in a couple of years we're going to
11 be able to keep paying them overtime as Ford has?
12         A    I'm sorry.  Ask that question again.
13         Q    Did you have some concerns with
14 following Ford's overtime policy for salaried employees
15 in '99?
16         A    I think we -- I do recall some
17 discussion around the rate of overtime pay because of
18 the Ford rate structure and we didn't want to have two
19 overtime pay rate policies, so I think there was a
20 recognition that the rate of pay around the overtime
21 policy would also apply to the new hire employees and
22 perhaps was more lucrative than we could afford as a
23 tier one supplier going into the future.  So there was
24 around all of these some conscious criteria to
25 undertaking or futuring, if you will, about is this

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 110

110

1  going to jeopardize the long term competitiveness of
2  the salaried workforce.  And in any areas where we had
3  that of any substance we came up with a different
4  solution.  So the Ford salaried employees came over at
5  or better base pay.  Their incentive plan package in
6  dollar terms is the same as what the new hire ZF
7  Batavia employees enjoy.  Obviously the new hires have
8  a lower rate of base pay, so their percentage may be
9  higher, but the absolutes were the same, so I said
10  that's okay, that's not going to hurt me long term.
11  And the defined contribution to the 401(k) for Ford
12  transition employees was isolated to them.
13        So I tried to make sure -- we
14  collectively tried to make sure that we had programs
15  that were fair and equitable for the Ford transition
16  employees going into the future and it didn't
17  jeopardize our long term competitiveness and the
18  business plan reflected and supported it.  So I don't
19  think there was any thought that, you know, these plans
20  would, you know, quickly be changed or were
21  fundamentally unsustainable in the long term, as we
22  understood the business conditions at the time.  I
23  mean, there was -- in fact, I personally being part of
24  this Ford transition group insured that we were going
25  to fundamentally live up to these obligations.

PAGE 111

111

1        There was some concern among people
2  that, you know, well, they'll just be -- you know, work
3  for a couple of years and then because their base pay
4  is a little be higher, they'll be fired.  I mean, there
5  were some issues about, you know, whether they were
6  really going to be valued employees long term, and I
7  consciously went out of my way and took decisions and
8  continue to enforce that these programs are in place
9  and whether you're a Ford transition employee or a new
10  hire, whatever, you know, we treat everybody fairly and
11  we have these underlying differences that are
12  fundamentally pretty much transparent and you'll find
13  that there's only a couple of elements to this program
14  for Ford transition employees that don't apply to the
15  workforce at large.
16     Q     Which two are those?
17     A     Well, the 401(k) defined contribution
18  benefit for the Ford transition employees and then
19  retirement grow-in are the two that come out as being,
20  I think, the most important.  And obviously we've
21  maintained the difference in the salary -- underlying
22  salary base pay structure.
23     Q     You were saying a moment ago that --
24  about employees at Ford had a concern whether or not
25  they'd be valued once they joined ZF Batavia; is that

PAGE 112

112

1  what was reported to you?
2     A     I wouldn't say a -- a concern.  It was
3  -- some people, you know, they've seen companies that
4  got formed up and you wonder how the new management
5  team is going to come in -- you know, many of the
6  people -- in fact, I hadn't even moved to Cincinnati at
7  the time of this presentation.  I was still living in
8  Michigan.  And, you know, until you see the management
9  team and really get comfortable with it, there's always
10  a level of uncertainty about the future of the business
11  and me as an individual, you know, how am I going to
12  play out in this thing.  So it was questions of that
13  nature.  But I don't -- you know, nobody said "Well,
14  are you going to fire me in two years?" or, you know,
15  are you going to do this or that.  It wasn't anything
16  that specific.  It was just concerns about going from a
17  company like Ford Motor Company to a joint venture that
18  has stand-alone treasury and financing and whatnot.  It
19  doesn't have the deep pockets of Ford Motor Company.
20  And there was just some concern, like I say, by some
21  employees, others weren't necessarily concerned about
22  it at all, thought it was a great opportunity, just as
23  soon get out of the bureaucratic mess of the, you know,
24  big blue label and get on to something that was a bit
25  smaller and they had better control and influence on

PAGE 113

113

1  the -- on the results of the operations.  So there was
2  a gamut from both extremes.
3     Q     For those employees that were
4  concerned, you yourself assured them that they would,
5  in fact, be valued employees once they came over to ZF
6  Batavia?
7     A     I didn't assure them that they would be
8  valued employees.  What I said is then we plan on
9  treating them fairly, as we would any other salaried
10  employee, and I am a Ford transition employee and I
11  believe that the package we had crafted made the
12  decision in the employee's mind a non-economic decision
13  but rather a personal preference.  Do I want to come to
14  the new company and be a tier one supplier of new
15  technology transmissions or I'd rather go back for
16  family reasons, maybe they didn't want to move, I don't
17  know.  But my intention in crafting it was to make it
18  an economically neutral circumstance at the point in
19  time of the offers that employees couldn't say "Oh,
20  well, I'm getting, you know, unfairly compensated
21  through all this and, therefore, I don't want to take
22  it" or did I have the expectation that I was going to
23  offer a more lucrative program to attract them out of
24  Ford because that would have been unsustainable in the
25  long term.  So it was crafted to be economically

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 114

114

1  neutral.
2      Q      It was crafted to be economically
3  neutral and economically sustained?
4      A      Yes.
5      Q      And we haven't talked about this much,
6  but the future of this plant was -- with the joint
7  venture was the CVT transmission, right?
8      A      Well you say the future, that was the
9  long term product offering, yes.
10     Q      All right. And certainly you knew it
11  was important to the employees that they have
12  opportunities to be part of the CVT project, correct?
13     A      I'm not sure if I understand the
14  question.
15     Q      Well, when we're talking about -- did
16  you or anyone with either ZF Batavia or Ford tell these
17  salaried employees at the time that they'd be getting
18  in on the ground floor on the CVT?
19     A      I don't know if it was worded exactly
20  like that, but there was clearly an indication that,
21  yeah, this is the beginnings of a new company with a
22  very exciting future.
23            Batavia was planned to be shut down by
24  Ford Motor Company in around about 2004. There
25  wouldn't have been a future in the factory and we

PAGE 115

115

1  offered the folks the excitement of an opportunity that
2  would continue, the ability for them to work, you know,
3  indefinitely in the current facility. I mean, there
4  was the real potential outcome that Ford was going to
5  shut the factory down and there wouldn't be employment
6  for anybody.
7      Q      Right.
8      A      So you got the ground floor of the new
9  management team, new ownership, if you will, that was
10  the joint venture.
11     Q      Were any assurances made in 1999 that
12  the Ford transition employees would get an opportunity,
13  like all other ZF employees, to be a part of the CVT
14  transmission production?
15     A      You seem to be making a distinction
16  between CVT and, I guess, the existing CD4E product. I
17  don't remember any discussions about saying Ford
18  employees would specifically be entitled to this and
19  not that or anything else. It was a team and trying to
20  build a team and saying yeah, the opportunity is here
21  for everybody.
22     Q      It was -- I'm just basing it on some of
23  the things that you said about some of the concerns
24  that employees raised. Were there assurances made to
25  these transition employees that they, in fact, would

PAGE 116

116

1  have the same opportunities to be promoted, to move up
2  in the company at ZF Batavia just like every other ZF
3  Batavia employee that was hired outside of Ford?
4      A      Well, you keep using the word -- I
5  don't think there was any assurances made, but some of
6  the Ford transition employees were, in fact, promoted
7  to join the company, to fill the key positions, and
8  some have continued to get promoted and, to my
9  knowledge, there's no conscious decision on anybody's
10  part that says well, this employee is different than
11  this because that's Ford heritage or ZF heritage.
12  There's -- there isn't any of that taking place. It's
13  based upon people's individual competence and being
14  able to work in teams and those who do well are
15  entitled to promotional opportunities and those who
16  don't, don't get promotional opportunities is the best
17  I can characterize it.
18     Q      Has Mr. Adams ever commented that he
19  wanted to get the Ford influence off the floor?
20     A      The Ford influence off the floor?
21     Q      Off the floor.
22     A      I don't think I've ever heard him
23  characterize it that way. There was a clear
24  acknowledgment by both Ford and ZF, as represented by
25  the fact that Ford was planning on shutting the factory

PAGE 117

117

1  down and when Batavia lost the -- FN transmission
2  opportunity in late probably '96, '97, they couldn't
3  come to a working pattern agreement with the --
4  primarily the hourly employees in the factory, that
5  there's just no -- there's no future for this factory
6  down the road. And it was further evidenced by, you
7  know, the Harburg (phonetic) competitive data studies
8  that we disclosed to ZF that said this is the worst-
9  performing transmission plant in the Ford system and
10  one of the worst in North America and this is going to
11  have to be worked on to make it, you know, competitive
12  in the long term.
13            So there was acknowledgment that for
14  whatever reason -- you know, it's not that it's Ford,
15  it's certainly not in the water, but it was recognized
16  that this factory had some fundamental productivity
17  issues that were going to have to be overcome over
18  time. And, you know, you can say that clearly
19  management recognized that we need to change the
20  culture in the factory, and you don't change culture by
21  just, you know, cleaning house and bringing all new
22  people in. That's not the way you get there. You need
23  to move the facility forward and change the culture
24  that creates an atmosphere that is, in fact, better
25  than what -- you know, what it was.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 118

118

1  Q    When was it that were you notified that
2  this was the worst-performing plant?
3  A    Well, I knew it in my automatic
4  transmission job back in '96-'97. Ford had five
5  transmission plants and this one stood out continuously
6  as being the least efficient of any of them for
7  whatever reason. I mean, I can speculate that there
8  were three or four primary reasons but --
9  Q    Let's see. Mr. Kehr, we've tried to
10 this morning go through the process. We haven't hit
11 all the details, I suppose, around the joint venture,
12 but this process of offering packages of compensation
13 and benefits to these salaried employees of Ford that
14 joined ZF, are there any other -- are there any
15 significant conversations that you recall among your
16 management team or other people at Ford or with the
17 various salaried employees that were making this
18 decision that you haven't already testified to about?
19 A    Are you talking about in group settings
20 or, I mean --
21 Q    Group or private.
22 A    Well, I mean, people came up to me in
23 the hallway occasionally and I -- you know, I don't
24 know 20, 25, I mean large numbers, individually with
25 some specific questions here and there that I tried to

PAGE 119

119

1  the best of my ability to answer, you know, fairly.
2  I'm sure Tony Deshaw probably fielded some and he and I
3  fielded some together and sometimes people came to me
4  and said we got this question, you know, how do you
5  think -- you know, what's the right answer to it. So,
6  yeah, I mean, it was 12 months and a lot of things
7  happened. So, I mean, it's not to say that down the
8  road somebody won't say well do you remember this, and
9  maybe I'll recall it. So, I mean, to the best of my
10 ability sitting here today, I believe I reasonably, to
11 the best of my knowledge, articulated to you what I
12 think occurred.
13 Q    And these communications you had with
14 your team, I imagine you had a lot of e-mail
15 communication back and forth putting this package
16 together and receiving the responses from the salaried
17 employees in '99?
18 A    No, I didn't receive responses from
19 salaried employees
20 Q    Let me re-ask the question: I imagine
21 you obviously had lots of verbal discussions with
22 people. Did you have written communication as well by
23 e-mail or otherwise in connection with putting this
24 package together, offering it to the employees, et
25 cetera?

PAGE 120

120

1  A    Oh, I'm sure that there was some e-mail
2  written around some of the programs. I can't
3  specifically, you know, go back and think of any
4  particularly important ones. And perhaps I got an e-
5  mail or two from an employee with a question here and
6  there, but anything that would have been communicated
7  to the employees, you know, in mass, I think this is a
8  key document, this is an important document. So I
9  think this -- I mean, we were careful about we shared
10 with employees until it was reasonably well understood
11 because the last thing you want to do is get people
12 confused with a moving target.
13       So it was -- it was reasonably
14 controlled in terms of what was communicated. That's
15 why we had them write down their Q's and A's. People
16 would review them before the answers went out. And who
17 reviewed those changed over time obviously during the
18 12-month period that was involved.
19 Q    You wanted to give out accurate
20 information, right?
21 A    Yeah, as best we could. That was
22 really our objective.
23 Q    And were you at all times honest and
24 forthright about this package that was offered to the
25 ZF --

PAGE 121

121

1  A    Yes, sir.
2  Q    -- to these employees? And you
3  certainly expected the employees, based on verbal
4  representations that you and others made at meetings
5  such as May 27th, '99, as well as Exhibit 2, the
6  information contained in here, based on all that
7  information, you expected the employees to make a
8  decision based on the information that you gave out
9  verbally and in writing?
10 A    Yeah. Primarily the in-writing stuff,
11 I think, would have been obviously more important than
12 the presentations. Those are -- as I recall, we
13 specifically did not want to distribute this, but
14 rather share that with the employees in that this was
15 what we felt would be appropriate to share at that
16 point in time.
17 Q    And your expectations regarding the
18 agreement that you entered into with ZF Batavia, did
19 you expect that ZF Batavia would significantly change
20 the package of compensation and benefits they had
21 offered in '99, come 2000 or perhaps the next year in
22 2001? What was your expectation?
23 A    My expectation was that the programs
24 would evolve over time as appropriate given the
25 business circumstance and this and that, but there was

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 122

122

1    no specific discussion about any particular element of
2    it and how that may change over time, over a period of
3    time.  There was, I think, recognition that the
4    overtime pay rate we probably would leave relatively --
5    or leave it unchanged.  But no, there was no conscious
6    decisions or thoughts about any particular element of
7    it, how it may change over time.
8        Q      But in terms of your own compensation
9    package, you expected in '99 that ZF Batavia would
10   follow the promises it made about your own bonus plan
11   in 2000, 2001?
12       A      Well, yes, subject to business
13   conditions.
14       Q      All right.  I mean, were you told that
15   there was something on the horizon that would not
16   permit ZF Batavia to meet these promises regarding
17   bonus for your compensation?
18       A      I'm not sure what you mean by promises.
19   There was an annual incentive established.  And every
20   year we have to go propose to the board the objectives,
21   and you're substantially at risk just because you've
22   got a number written down and the board says "Well, we
23   want you to be at 150 percent, you know, achievement of
24   all of these."
25               So, no, there's no guarantees other

PAGE 123

123

1    than, yeah, there will be an annual incentive plan.
2    The targeted pay-out is 75 percent, there is ranges.  I
3    had a number in my contract and it was subject to the
4    performance of the company and the management team and
5    individuals and all.  The range of outcomes could vary
6    significantly.  I mean, there's a lot of risk
7    associated with incentive plans.  I mean, that's why
8    they call them incentive plans, right?
9        Q      In 1999 did you expect that ZF Batavia
10   would be able to pay overtime for salaried employees at
11   some future date?
12       A      Well, there's the, I think, lifelong
13   discussion that always goes on about the
14   appropriateness of paying any salaried overtime.  Many
15   companies just don't pay it, period.  Ford did.  ZF
16   does.  And we decided that we would continue an
17   overtime policy that allowed for the compensation for
18   approved overtime.
19       Q      Is it your testimony that in 1999 you
20   had no idea that one, two, three years down the road
21   that ZF Batavia could no longer afford to pay the
22   salaried employees overtime compensation?
23       A      We still do pay salaried overtime
24   compensation.  I'm unclear on your question.  It makes
25   it sound like we're not paying it.  We're paying it.

PAGE 124

124

1        Q      Is your testimony that in the last
2    couple of years ZF Batavia management has not -- has
3    reported to salaried employees that they may not get
4    paid overtime in the future?
5        A      We had a circumstance that the
6    overtime, salaried overtime and hourly overtime, in
7    2000 was unsustainable.  The business could not support
8    the rate of overtime.  It was higher than historical
9    levels and in my assessment and  many of the management
10   team it was out of control.
11               The policy frankly may not have been
12   followed in terms of the preapproval and the aspect of
13   having some level of uncompensated casual time,
14   whatever you want to call it.  And we looked at the
15   numbers and said we've got so much budget and we need
16   to manage the overtime, like material costs and any
17   other costs.  We need to manage it to the budgeted
18   levels.
19       Q      This is a conversation that management
20   had in 2000?
21       A      No.  That would have been later.  I'm
22   thinking 2000, maybe as early as 2001 when we looked at
23   the 2000 actual overtimes vis a vis the budget levels
24   and we said "Look, we've got this huge disconnect.  You
25   guys are going to run out of overtime money if you're

PAGE 125

125

1    going to spend at these historically high levels.  And
2    let's go as a management team, sort out the overtime
3    that we're going to pre-approve and how can we manage
4    to get people to charge less overtime."
5               And frankly there was a fair amount of
6    discussion about why are we making people work so many
7    hours?  What's going on?  This isn't sustainable, you
8    know, in terms of people's lives, let alone
9    financially.  So there was a whole discussion about the
10   rate of overtime spinning all out of control.  Now,
11   what are we going to do to get it back in the bag?
12       Q      Did ZF Batavia at any time make a
13   change in their policy regarding payment of overtime to
14   salaried employees?
15       A      Like I said, we started off using the
16   Ford plan and then we did establish a policy, it was in
17   strategy committee with selected senior folks that went
18   through and continue to work through, you know, a gamut
19   of employee policies and procedures, to which the
20   overtime did come into that discussion and it was
21   agreed that, you know, we'd fundamentally continue
22   Ford's casual overtime program and I think we defined
23   it as being, you know, up to nine hours a day.  It had
24   to be pre-approved.  And I don't know, I haven't gone
25   back and read the overtime policy in detail, so I don't

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 126

126

1  think it's fundamentally changed from the Ford program.
2  I think maybe the -- the robustness about which that
3  policy was enforced on the shop floor may have changed
4  somewhat.
5            MR. VANWAY:  Steve, where are we in
6       terms of --
7            MR. SIMON:  As soon as I'm done with
8       this line of questioning, then we'll take a
9       break.
10 BY MR. SIMON:
11       Q    Was there a meeting held or a series of
12  meetings held last year, in 2002, with members of the
13  HR department and salaried employees where they were
14  told that you were going to continue to work overtime,
15  but you won't be paid for it?
16       A    I don't recall such meetings.
17  Certainly not that I participated in.
18       Q    All right.  So as you sit here today,
19  it's your understanding, and maybe you're unsure of
20  some of the details, but for salaried employees that
21  work in excess of nine hours and it's authorized, you
22  understood that they would paid overtime in connection
23  with the rates that we've talked about before?
24       A    Yeah.  If it's pre-approved and it's
25  consistent with the overtime policy, yeah, I would have

PAGE 127

127

1  expected it would have been paid.
2            Now, there may have been some short
3  window when we had some difficulties with the overtime
4  budget and we were trying to manage to the budget and
5  some folks may have kind of run out of overtime budget
6  and, therefore, weren't authorized to provide any more
7  budget and, therefore, shouldn't have been pre-
8  approving any overtime because they don't have any
9  budget and it came to a very difficult circumstance for
10 a relatively short window.  And in essence we finally
11 got in my judgement, being the CFO, operation
12 management attention that said _Oh, we're serious about
13 this.  We're not just going to do business as we always
14 have and run these exorbitant overtime rates._  And we
15 agreed to provide another million dollars, if I recall,
16 or something to that magnitude that would allow us to
17 find a middle ground between historical unacceptable
18 rates and much more aggressive rates that we had
19 established in the budget and we found a middle ground
20 and we got on with life.
21       Q    Would it surprise you if salaried
22  employees reported to you that they've worked lots of
23  overtime hours that they've not been paid overtime?
24       A    Yeah.  I've got people in my group
25  that, subject to the overtime policy, it's not pre-

PAGE 128

128

1  approved and they work 60 hours a week.  I only pay
2  salaried overtime in my area where I directly, you
3  know, control it for pre-approved, you know, special --
4  special reasons.  And other parts of the factory --
5  obviously, you know, when you get down to shop floor,
6  it becomes a little bit different.  But when I sit up
7  there and look at numbers and it says we're only making
8  80 percent of the parts day in and day out that this
9  equipment is capable of making, why don't we make 100
10 percent of the parts that it's capable of making in
11 five days and don't do overtime.  So I tell my people
12 "Get your work done and you don't have to work casual
13 overtime."
14            So it's not like we, you know, tie
15 people to their desks that work 45 hours or 50 hours or
16 60 hours.  The expectation is people are going to work,
17 you know, 45 hours or better without being compensated
18 for overtime.
19       Q    But if they work beyond that, the
20  policy is to compensate them?
21       A    No, no.  It has to be approved.  And
22  you say "Well, why are you working Saturday, John or
23  Sally?"  "Well, I didn't get my work done.  You know,
24  you gave me this assignment."  Well, sorry, you're a
25  salaried employee, you ought to come in and get your

PAGE 129

129

1  work done because you could have gotten it done, in my
2  assessment as a manager.  You could have achieved your
3  work product in the time, within the 45-hour window,
4  let's say, so you're not going to get paid, but I
5  expect the job to get done.  I mean, that's simple
6  management, right?
7       Q    Now, you're saying -- is it a different
8  calculation on the plant floor?
9       A    No.  The assessment is different on the
10 shop floor.  I mean, it's more difficult when you're
11 scheduling production lines.  "Well, why do we have to
12 schedule the production line for Saturday?"  "Oh, we
13 had a machine break down on Tuesday and, therefore,
14 they couldn't make their parts."  "Oh, okay.  Well,
15 that's probably more justified than other cases," and,
16 you know, went down to the group leader level, the
17 manager level, circumstances related to why it was
18 required and not required, and all that stuff has to be
19 sorted out and in the judgement of management dealt
20 with fairly consistent with the overtime policy.
21            So to the extent you're saying that
22 some people worked overtime -- worked in the factory
23 and weren't paid for it doesn't surprise me at all
24 because frankly some of it probably wasn't justified to
25 be paid, and that's what the policy allows for.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 130

130

1  Q   All right. So you're saying the policy
2  regarding overtime didn't change, but the enforcement
3  of whether somebody actually worked authorized
4  overtime, that was changed?
5  A   People started asking the appropriate
6  questions as to why are we going to -- you know, why
7  should I pre-approve this overtime. It's like anything
8  else, right? I mean, you've got travel expenses. You
9  only have so much travel budget. Then somebody comes
10 in and says "I want to take a trip." "Well, why?
11 Can't you do it else way?" So it's all those
12 questions.
13     They started asking, I think, better
14 questions and started getting, you know, in my
15 assessment, to the right balance between, you know, is
16 it really a performance issue or is it justified, not
17 just blanket statement, "Oh, it's over nine hours,
18 therefore, blank, blank, blank," and just, you know,
19 roll the money out the door.
20     MR. SIMON:  Off the record. We're at a
21 good time for a break.
22     (RECESS)
23 BY MR. SIMON:
24     Q   All right. Mr. Kehr, we've taken a
25 break, and you understand you're still under oath, sir?

---

PAGE 131

131

1  A   Yes, sir.
2  Q   We were talking about the overtime
3  policy at ZF Batavia before the break and I want to ask
4  at least a couple more questions about that.
5     The current ZF Batavia policy for
6  salaried employees, is a salaried employee paid
7  overtime if his supervisor requires him to work beyond
8  the nine hours?
9  A   If it's pre-approved overtime, yeah, I
10 believe the policy says they get paid for it.
11 Q   Well, are you saying -- is there a
12 situation where the supervisor says "You're going to
13 stay here an additional three or four hours on the
14 floor," the employee works that extra time, is there a
15 situation that you can identify for me where that
16 employee doesn't get paid the overtime?
17 A   Not specifically, no, but I would
18 imagine that occurs.
19 Q   What's that?
20 A   Not specifically, but I would imagine
21 that that occurs.
22 Q   It occurs that in those situations
23 where a supervisor tells a salaried employee "You're
24 going to stay here and work extra hours but not get
25 paid overtime," you're saying that situation occurs?

---

PAGE 132

132

1  A   Well, maybe we're bordering on
2  speculation here, but if an employee in my area, for
3  instance, in the finance group needs to have a schedule
4  done to support a meeting the following day and in the
5  judgement of the supervisor the schedule should have
6  been completed and it is not completed and they've got
7  to work all night frankly to get the schedule
8  completed, an extreme circumstance, I could -- yeah,
9  they wouldn't necessarily get paid overtime.
10 Q   And that same thing could occur on the
11 plant floor?
12 A   Yeah. For obviously different reasons,
13 but yeah.
14 Q   What if the supervisor tells a salaried
15 employee "You're going to work weekends without
16 overtime pay," is that consistent with ZF Batavia's
17 policy on overtime?
18 A   Yeah, depending upon the circumstance.
19 In finance, where I have specific knowledge, we have
20 salaried employees who work weekends and do not get
21 paid. We also have some who work weekends and do get
22 paid. It depends upon the case.
23 Q   Are you aware of any announcement or
24 communication to salaried employees last year that
25 "From here on out you're going to work weekends and

---

PAGE 133

133

1  you're not going to get paid overtime"?
2  A   Not that I recall.
3  Q   Okay. So since -- at some point, and I
4  don't know if we've identified the year, ZF Batavia
5  started enforcing its overtime policy differently; is
6  that right?
7  A   I wouldn't say we're enforcing it
8  differently. There was a heightened awareness that we
9  needed to manage overtime using the policy to the
10 budgeted levels.
11 Q   And when did that occur?
12 A   I'm thinking that was in early 2001.
13 Q   Were there any changes in the overtime
14 policy whatsoever, including the enforcement of the
15 policy, in 2002?
16 A   Not that I recall.
17 Q   Do you know of any reason why salaried
18 employees at ZF Batavia in 2002 would become concerned
19 that they were going to be required to work overtime
20 hours without being paid overtime?
21 A   I don't know specifically about the
22 overtime. I do know that we have to launch 600,000
23 units of new transmissions starting this year, next
24 year and the year after, and there's going to be a lot

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 134

134

1  of work to be done in this time frame and that there's
2  going to be strains on people, whether they're being
3  paid or not being paid.  You know, it's just a very
4  difficult circumstance when you're trying to accomplish
5  what we're trying to accomplish.  But not in the
6  context of whether people are or aren't going to get
7  paid overtime on any kind of a broad brush, you know,
8  policy circumstance, not that I'm aware of.
9          Q       Okay.  Just because my question was
10 kind of long and your answer was kind of long, I might
11 just pinpoint a little bit on that, on this subject.
12                 There was no -- to the extent you're
13 aware, there was no reason why any salaried employee
14 would believe that the overtime policy for salaried
15 employees changed in any significant way in 2002?
16         A       Not that I'm aware of.
17         Q       And I take it if there was some
18 significant change in overtime policy, you would be
19 made aware?
20         A       I would think I would be aware of it.
21         Q       It would come as a surprise to you if
22 there was some significant change in the overtime
23 policy that you weren't made aware of; is that fair?
24         A       Yes.
25         Q       Backing up a second to 1999, this joint

---

PAGE 135

135

1  venture was -- based on what I understand, you were
2  combining the history and ability of Ford Motor Company
3  to mass produce transmissions along with ZF's
4  engineering capability regarding transmissions?  That's
5  probably not a very -- is that accurate in any way?
6          A       Well, yeah.  Ford has an existing high
7  volume manufacturing plant at the time, in '99, '98,
8  and ZF also produces automatic transmissions in high
9  volume in Germany.  What was particularly interesting
10 to Ford in the joint venture was the CVT transmission
11 technology that ZF contributed to the joint venture so
12 that we could produce the CVTs in high volume using the
13 existing facility infrastructure.
14         Q       All right.  Well, why was it important,
15 if at all, to have these Ford salaried employees that
16 were already at the Batavia plant in '99 to join the
17 joint venture?
18         A       Well, ZF would have preferred that all
19 the employees change employment from Ford to the joint
20 venture.  In fact, I believe it's German law that with
21 such a transaction it's required by law that the
22 employees change.  So the folks I was dealing with were
23 a little bit surprised that there was the wide gamut of
24 potential outcomes as it related to the workforce.  And
25 ZF's business model around the world is to have their

---

PAGE 136

136

1  salaried employees and, to the extent possible, the
2  hourly obviously be on the payroll of the joint venture
3  company.  ZF doesn't believe in centralized payroll and
4  infrastructure like Ford does.  They're very P & L
5  oriented and operation by operation being P & L
6  centers, so they like to have their employees with a
7  vested interest as it relates to the outcome of the
8  location where they work.
9          Q       Okay.  So ZF wanted all the Ford -- any
10 Ford employee that stayed in the plant to be a ZFB
11 employee, ZF Batavia employee?
12         A       Well, I wouldn't say it so strongly,
13 but yeah, that was -- the intention is to continue with
14 as much of the workforce that already existed as
15 practically possible.
16         Q       And, in fact, today there are numerous
17 salaried and hourly employees in the plant that are
18 still employees of Ford?
19         A       That's not correct.  I believe there's
20 only one Ford salaried employee who still works in the
21 factory, and he seconded from Ford under a leased
22 employee, if you will.  And then we have one ZF
23 seconded employee.  And there may be a handful of what
24 they call division engineers from Ford that were in the
25 factory under purchased service arrangement.  But of

---

PAGE 137

137

1  the 300-odd salaried employees, just a small handful
2  that fit into that category.
3                 Now, the hourly employees are about
4  three-fourths Ford and one-fourth ZF Batavia.
5          Q       Why is it that the majority of the
6  hourly employees are still Ford employees yet, as you
7  say, only a small handful of the salaried employees are
8  Ford?
9          A       Well, the reason is we've never offered
10 any of the Ford hourly employees the opportunity to
11 work for ZF Batavia under a transition program.  So the
12 reason there's that many Ford employees in the factory
13 is because we started with roughly probably 1100 Ford
14 hourly employees and due to attrition, potential -- you
15 know, a few transfers maybe to Sharonville, another
16 Ford location, and for other reasons the absolute
17 numbers have gone down over time, but not through any,
18 you know, management course of action or whatnot or
19 causing that number to be anything other than what it
20 is.
21         Q       Who is the one Ford salaried employee
22 in the factory that you identified?
23         A       Adam Vahratian.
24         Q       How do you spell his last name?
25         A       V-A-H-R-A-T-I-A-N.  Now, he's one Ford

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 138

138

1  salaried employee that's on the secondment agreement,
2  okay?  The other ones -- and I'm not even sure how many
3  there are.  I guess there may be five or six that are
4  there providing some engineering --
5  manufacturing/engineering support under a purchased
6  service agreement with Ford, which the joint venture
7  agreements, you know, allow for the joint venture to
8  purchase from either parent, if you will, necessary
9  services including, you know, people.
10      Q      Does a man named Clyde LaJoye work
11 there?
12      A      Clyde LaJoye is -- yes.  He works in
13 the factory.  He's not a ZF Batavia nor a Ford employee
14 to my knowledge.
15      Q      Who's the employer?
16      A      I'm not sure if he's self-employed or
17 if he works for an agency at this point, but he's
18 neither a ZF Batavia or a Ford employee.
19      Q      What's his current position?
20      A      I believe he's helping Dick Newark in
21 the manufacturing area.
22      Q      Dick Newark is the plant manager?
23      A      Yeah, operations manager, plant
24 manager.
25      Q      In '99 the salaried employees were told

PAGE 139

139

1  that they couldn't -- for a period of time that they
2  couldn't transfer to Sharonville; is that right?
3      A      I think they were told that they
4  couldn't transfer out of Batavia.  I don't think it was
5  specifically limited to Sharonville, but transfers were
6  frozen for a period of time.
7      Q      Do you know when that freeze was
8  lifted?
9      A      No, I don't.  It would have been
10 sometime in '99 I'm sure.
11      Q      What were salaried employees told would
12 happen if they decided not to accept this package
13 offered to them by ZF Batavia?
14      A      In what form or what setting?
15      Q      Well, they're in the Batavia plant and
16 they're salaried employees, they're offered this
17 package to come on board ZF Batavia.  What were they
18 told would happen if they didn't accept that package?
19      A      I don't know if I was in any meetings
20 where that was necessarily articulated.  My
21 understanding of what was in -- what the Ford employees
22 were informed is that they could accept offers from the
23 new company, that was encouraged obviously, and then
24 they would be -- those who did not accept offers would
25 be metered out of Batavia to either Sharonville or

PAGE 140

140

1  another Ford location as openings permitted, but there
2  was a period of time by which people needed to take a
3  decision and that they would not be able to work in
4  Batavia indefinitely.
5      Q      All right.
6      A      And the expectation, I think, that --
7  you know, that there would not be any layoffs or, you
8  know, reduction in force, they would make every
9  opportunity available for them to interview and get
10 reassigned within Ford.
11      Q      Were they told that they could only
12 have two interviews?
13      A      I thought it was three.  They were
14 allowed three and they needed to take a decision, if I
15 recall.
16      Q      When we're talking about interviews,
17 this is interviews with other Ford locations, right?
18      A      I believe so, yes.
19      Q      How did this three-interview process
20 work during the time that you could transfer out of
21 Batavia?
22      A      I don't believe the interview process
23 began until later when the workforce circumstance,
24 those accepting offers, those not accepting offers,
25 until, I believe, we sized it up did we really begin to

PAGE 141

141

1  -- to lay out the details for that.  And at that point
2  in time frankly those were Ford employees remaining
3  with Ford, and I was on with the joint venture, and
4  that to a large degree was handled by Ford, dealing
5  with their salaried employees, and my involvement was
6  more or less limited to ensuring that there was, in
7  fact, a process in place to ensure the interviews took
8  place and that we metered out people appropriately over
9  time so that we could ensure the operations would run
10 and we didn't have a mass exodus in a given month and
11 that we could hire new people in and train them
12 satisfactorily to replace these, you know, skilled
13 salaried employees.
14      Q      Were people made any -- these salaried
15 employees, were they made any promises or were any
16 statements made to the effect that they could always
17 return back to Ford if they hired on with ZF Batavia?
18      A      Those questions were probably asked and
19 I believe we basically stated that wasn't, you know,
20 the intentions of the transition program, that once you
21 came to ZF Batavia the expectation is that you would
22 not necessarily go back to Ford.  But, I mean, slavery
23 has been abolished, so people can do what they want
24 over time and perhaps some have gone back to Ford that
25 I may or may not be aware of.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 142

142

```
1    Q      Do you know who Julie Hallere is?
2    A      Yes.
3    Q      H-A-L-E-R-E, I think.
4    A      Yes.
5    Q      Is she someone that was permitted to go
6  back to Ford after '99?
7    A      Yes, I believe she did go back to Ford.
8    Q      Was she given some sort of special
9  exception or was this just the policy about going back
10 to Ford?
11   A      I'm not familiar with any of the
12 specifics around that circumstance.
13   Q      Does ZF Batavia currently have a policy
14 about whether salaried employees can return to Ford?
15   A      No, I don't believe we have a policy on
16 something like that.
17   Q      I mean, if ZF Batavia salaried
18 employees are unhappy at ZF Batavia, are they free to
19 go back to Ford?
20   A      Well, yeah, salaried employees are free
21 to go work for anybody they wish to go work for if they
22 can work out, I guess, what they find to be acceptable.
23   Q      Has anyone from Ford intimated to you
24 at any time since 1999 about whether they'll take back
25 salaried employees that wish to come back to Ford?
```

PAGE 143

143

```
1    A      I don't know.  I've never -- I've never
2  engaged in a discussion on that front.
3    Q      Do you have an agreement that you're
4  permitted to go back to Ford if you choose?
5    A      No.
6    Q      In 1998 or 1999 did anyone, to your
7  knowledge, ever tell Ford salaried employees that they
8  were simply going to be able to be permitted to stay in
9  the Batavia plant and be Ford salaried employees
10 without having to make a choice about to join ZF
11 Batavia?
12   A      I'm sorry.  Did you ask if employees
13 were told if they could stay?
14   Q      Yes.
15   A      No.  They were told just the opposite.
16 They could not stay indefinitely.
17   Q      You remember you identified a 19 -- I
18 think it was a 1998 meeting that was a big announcement
19 where Jacques Nasser spoke, I think, through video
20 conferencing I assume or maybe he was there in person?
21   A      It was video-conferenced into the
22 factory, but it was a press -- press announcement out
23 of Dearborn, Michigan.
24   Q      Okay.  And when was that?
25   A      I believe it was October of '98.
```

PAGE 144

144

```
1    Q      And when this was announced, even the
2  employees who were in the plant previously didn't know
3  about this joint venture; is that your understanding?
4    A      There was an individual or two who knew
5  just weeks before the announcement that this joint
6  venture had been negotiated.  And then there was a
7  whole communication strategy worked out with some folks
8  from ZF and Ford going to Batavia early in the morning
9  of the press announcement and they, I believe,
10 communicated to the then management team that there was
11 going to be this thing and blah, blah, blah.  So they
12 were given very limited advance notice but were
13 informed prior to the press release.
14   Q      Like within a couple of days or hours?
15   A      No.  I believe it was the morning of
16 the press release that the senior management became
17 aware.
18   Q      I think you referenced an individual
19 who knew a couple of weeks before.
20   A      Yes.
21   Q      Who were you referring to?
22   A      Mike Warden.
23   Q      Okay.  Do you know if anybody said in
24 that press conference, that meeting in 1998, that Ford
25 employees could simply stay at the plant?
```

PAGE 145

145

```
1    A      There was an evolving circumstance
2  there.  I was at the -- I'd say the negotiating table
3  representing Ford in the negotiations with ZF, and ZF
4  started out "Well, maybe we won't require that the
5  workforce -- the salaried workforce transitions.  Maybe
6  they could remain Ford employees."  And then -- and I'm
7  not sure when this evolved as it relates to that press
8  announcement.  I was not in Batavia.  I was, in fact,
9  at the TV station, if you will, in Dearborn.  So there
10 was an evolving circumstance where it started out that
11 none of the salaried employees would necessarily need
12 to do anything and then it was the senior management
13 folks would need to be ZF Batavia employees.  And then
14 ultimately by the time we wrapped up 1998, it was
15 determined that all of the salaried employees would
16 need to either change to the new company or be moved
17 out.
18         And it wasn't so much dealing with the
19 -- with the Ford salaried employees, but ZF and Ford
20 agreed that for the joint venture to be successful they
21 needed a ZF Batavia salaried workforce that has a
22 vested interest obviously in the success of the joint
23 venture.  And the more Ford people that can come over,
24 that's great, and we'll supplement it with some other
25 obviously new hires and both parents sent in some --
```

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 146

146

1 sent in some highly-placed management folks to provide
2 the correct leadership.
3       Q    So it may have been at that '98 meeting
4 the employees may have been told that you can stay with
5 Ford and stay at the plant?
6       A    It's possible.
7       Q    Okay.  And then later they were told
8 that's not the case.  You're going to have make a
9 decision about whether to join ZF Batavia if you want
10 to stay in the plant?
11      A    Yes, I think that's correct.
12      Q    In '99 did anyone, to your knowledge,
13 make a statement to one or more of the Ford salaried
14 employees that they'd have Ford on the board of
15 directors who would be looking out for their interests
16 once they joined ZF Batavia?
17      A    I'm not sure if it was communicated at
18 a board of directors level because the board of
19 directors for the joint venture has fiduciary
20 responsibility to the joint venture and don't
21 necessarily represent the parent companies' interests.
22 But I think -- notwithstanding that difference with the
23 board, I think Ford labor relations or Ford human
24 resources did make some assurances to the Ford salaried
25 employees that they would watch after them in terms of

PAGE 147

147

1 their performance reviews and merit increases as long
2 as they remained Ford employees and would not forget
3 about them in Batavia and would find employment
4 opportunities elsewhere within Ford.  But Ford didn't
5 make any assurance as to what would necessarily occur
6 with the employees who changed over to the joint
7 venture.
8       Q    So if someone told you that, in fact,
9 people had told the salaried employees that even once
10 you go to ZF Batavia, Ford is going to look for you,
11 that would be news to you?
12      A    That would be news to me.
13      Q    Okay.  And that also would be
14 incorrect?
15      A    Yeah.  Well, it would be inappropriate
16 for the Ford people to say that they're going to look
17 out for the Ford employees who make the transition
18 program.  So both inappropriate and, to my knowledge,
19 no assurances or discussions around that were -- were
20 ever made.  I mean, I personally took on an obligation,
21 being a Ford transition employee and putting this
22 package together in place, to make sure that we
23 continued to treat the Ford transition employees fairly
24 and that the programs as we fundamentally laid out
25 would continue and whatnot, subject to the business

PAGE 148

148

1 conditions and all.  So -- and I'm actually quite,
2 quite proud of the way the program laid out and what
3 we've accomplished with it.
4       Q    If somebody from Ford management or ZF
5 Batavia management said to the Ford salaried employees
6 in '99 that people at Ford are going to continue to
7 look out for you even after you're with ZF Batavia,
8 that statement indeed would have been false, right?
9       A    Well, it didn't occur to my mind -- to
10 my knowledge, and yeah, I think it would have been --
11 was false, inappropriate.  I don't know what the right
12 term is.
13           But I guess now that you mention it,
14 there is one exception.  Clearly Ford has an ongoing
15 responsibility as it relates to the retirement and
16 post-retirement medical associated with the transition
17 employees because that is a continuing Ford obligation
18 to these employees under the stipulation stated.
19      Q    But other than that issue with the
20 benefits, it would not be a true statement for someone
21 to say that Ford is going to continue to look out for
22 you even after you join ZF Batavia, other than the
23 benefit issue you've identified?
24      A    You got me with a couple of double
25 negative there.

PAGE 149

149

1       Q    Well, I'll re-ask the question.  You've
2 identified that the benefit issue is an obligation that
3 Ford was going to continue to have to oversee even
4 after somebody joined ZF, right?
5       A    Correct.
6       Q    Other than that, though, there was no
7 basis for anyone to tell salaried employees that Ford
8 is going to look out for you after you join ZF Batavia?
9       A    Yeah, I think that's correct.  There's
10 no basis for that statement.  I mean, obviously Ford,
11 with an equity position in the joint venture, wants to
12 look our for the interest of the joint venture as it
13 relates to all facets of the business, including the
14 salaried employees, whether they be Ford or otherwise.
15           MR. SIMON:  All right.  Well, let's go
16 through some more documents, Mr. Kehr,
17 hopefully expeditiously.  This is Exhibit 5.
18 We'll try to keep that pile as neat as
19 possible, but we'll see what happens.  Exhibit
20 5.  It's a two-page document.  I'll give you a
21 chance to familiarize yourself with it, sir.
22 BY MR. SIMON:
23      Q    Have you had a chance to take a look at
24 that, sir?
25      A    I'm almost halfway done.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 150

150

1    Q    Okay.  Take your time.
2    A    Okay.
3    Q    Have you seen this document before?
4    A    Well, yeah.  It's from me.  Yeah, it
5 looks familiar.
6    Q    Okay.  This is just -- you would agree
7 that this document reflects an e-mail exchange between
8 you and others in August of '99; that's right?
9    A    Correct.
10    Q    All right.  The one e-mail in the
11 middle is August 12th, 1999 from you to Mr. Warden; is
12 that right?
13    A    That's correct.  Yeah.
14    Q    What issue were you trying to address
15 with Mr. Warden in that e-mail?
16    A    Well, I think as I mentioned earlier
17 today, the transition of the Ford employees back to
18 Ford or out of Batavia was subject to a fair amount of
19 discussion in terms of how would it be conducted.  And
20 I was afraid that the good Ford employees that were
21 going to be leaving would be swept up very quickly and
22 we'd have a relatively large mass exodus in a period of
23 time and at a rate at which would fundamentally
24 jeopardize the operations of the business, so I think
25 what I was encouraging Mike to do here in the second

PAGE 151

151

1 paragraph is fill out the transition schedule and stick
2 to it.  So that even if the good people -- and we can't
3 afford to let them go for seven months.  They're still
4 available but not before seven months.  And if we would
5 have allowed Ford Motor Company to pull out the people
6 they wanted as quickly as they wanted them necessarily,
7 we wouldn't have been able to sustain the business.
8        So I think that's fundamentally what
9 the question is addressing.  And then there are a
10 couple of specifics about some folks who were on like a
11 special assignment, I guess, over at Sharonville or
12 someplace else that actually had not yet been processed
13 out of Batavia's payroll location code within Ford.
14    Q    Your phrase that you use in your e-
15 mail, back-to-Ford employees, are you referring to
16 employees then who went to ZF Batavia and returned to
17 Ford?
18    A    Oh, no.  These are Ford salaried
19 employees who were not going to accept offers to join
20 the new company and, therefore, would be -- needed to
21 be transitioned back to Ford.
22    Q    Okay.  Even though you used the phrase
23 back-to-Ford, these are employees who have never left
24 Ford?
25    A    That's correct.

PAGE 152

152

1    Q    Okay.
2    A    In this time frame.  I'm not even sure
3 that anybody had even left Ford to begin with.  They're
4 still on Ford payroll at this point in time.  But this
5 is the window when we first, I believe, obtained the
6 opportunity to hire people onto the payroll of ZF
7 Batavia.  But that notwithstanding, this without a
8 doubt in my mind deals only with the Ford salaried
9 employees who were going to have to go back to Ford at
10 sometime in the future because they were not going to
11 accept offers.
12    Q    When the salaried employees accepted
13 employment with ZF Batavia, were they instantly put on
14 the ZF Batavia payroll or was there some sort of lag?
15    A    We gave them the opportunity to
16 transition to the ZF Batavia payroll anytime from the
17 point of their offer to December 31st, 1999.  That was
18 the window.
19    Q    After December 31st, 1999 to the
20 present has Ford contributed in any way to the payment
21 of salaries for these transitional ZF Batavia
22 employees?
23    A    What do you mean by the salaries of the
24 --
25    Q    Well, is -- all right.  Is Ford --

PAGE 153

153

1    A    Maybe what you could do is -- you could
2 help me out.  If you refer to them as Ford transition
3 employees, that means they're --
4    Q    Okay.  That's fine.  I knew when it
5 came out, I didn't like how it sounded.  I'll refer to
6 them as Ford transitionals.  That's what they're
7 referred to in the plant, aren't they?
8    A    Yes.
9    Q    Okay.  When the Ford transitional
10 employees came to ZF Batavia, has Ford in any way
11 contributed monetarily to the payment of their
12 salaries, either directly or reimbursing ZF Batavia for
13 the payment of the salaries?
14    A    Well, the terms of the joint venture
15 agreement allows for cost-plus -- cost-plus pricing on
16 the current transmissions we manufacture, so subject to
17 the joint venture agreement -- I mean, fundamentally
18 Ford is paying for all of the costs of all the
19 employees and depreciation, all the costs associated
20 with manufacturing CD4E transmissions, but they're
21 paying for that through the price of the transmission
22 and is not relationally related to any single
23 individual or cost element.
24    Q    When you say Ford is paying all the
25 costs, that would include the labor cost?

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 154

154

1    A    Yeah. Labor, material, depreciation.
2    Q    In talking about this e-mail you were
3    saying, I think -- correct me if I'm wrong -- that you
4    were concerned that a lot of the Ford salaried
5    employees would leave the Batavia plant and go
6    elsewhere and that would present a problem for you; is
7    that fair?
8    A    Well, the expectation, they all would
9    eventually go back to Ford locations. The question was
10    at what rate and over what period of time was
11    sustainable in terms of hiring and training backfills.
12    Q    What I was trying to ask was: Why was
13    it so important to keep these Ford salaried employees
14    working at the Batavia plant?
15    A    Because Ford Motor Company needed
16    transmissions produced and shipped to their assembly
17    plants, and when you have 160 salaried employees and
18    around about 50 to 60 of them accept offers, you're
19    talking about 100 employees who did not accept offers,
20    so you're talking about over half the salaried
21    workforce will need to be transitioned out of Batavia
22    and back to Ford locations and that's a fairly
23    substantial number that has to be managed appropriately
24    or, you know, the business will suffer.
25    Q    Why was it important at all to keep the

PAGE 155

155

1    Ford transitional employees in the plant as ZF Batavia
2    employees?
3    A    Well, for -- for the same reason.
4    We're trying to continue to make CD4E transmissions and
5    Ford has got very competent manufacturing people in the
6    factory and for their skills and their competencies,
7    they're familiar with the transmission. I mean, for
8    all the obvious reasons you'd like to keep as much of
9    the existing workforce in place as possible, for the
10    continuity or whatever other reasons.
11    Q    I asked that question poorly. But I
12    mean, the reason that you offered employment with ZF
13    Batavia to these Ford salaried employees is because
14    they had some value to the plant, right?
15    A    Yes.
16    Q    They had the experience with
17    transmissions, right?
18    A    Well, they had functional competencies.
19    They may not necessarily know transmissions. Maybe
20    they know MP&L or material logistics. Yeah, they have
21    the ability to provide great assistance to the joint
22    venture.
23    Q    And specifically would you say
24    producing the CD4E at that time?
25    A    Well, that was the concern, was to

PAGE 156

156

1    maintain CD4E production both near term and to provide
2    the necessary resources and competencies long term so
3    the joint venture could be successful, including the
4    CVT business.
5        MR. SIMON: I'm going to hand you a set
6    of exhibits, Mr. Kehr, so we can look at those
7    jointly. It will be Exhibits 6, 7, and 8. Mr.
8    Kehr, I'm going to give you full opportunity,
9    to the extent you need it, to look at Exhibit
10    6, 7, 8, but I think you'll find that some of
11    the subject matter is similar in these
12    documents and you might be able to explain the
13    relationship of these three documents, so
14    that's why she'll introduce them to you
15    jointly.
16    BY MR. SIMON:
17    Q    So after you have enough time to look
18    at these three exhibits, my question will be if you can
19    explain what they are.
20    A    Okay.
21    Q    What are Exhibits 6, 7 and 8?
22        MR. HUNTER: How about we go one at a
23    time?
24        MR. SIMON: Well, the reason I asked it
25    that way is that they seem to be closely

PAGE 157

157

1    related. I'm not sure if one might be a draft
2    of the other. But I'll certainly take your
3    suggestion. We'll go one at a time.
4    BY MR. SIMON:
5    Q    What is Exhibit 6, Mr. Kehr?
6    A    Well, first of all, I haven't seen this
7    previously. It appears to me to be an internal Ford
8    document representing the status of the Ford salaried
9    transition program for the employees being metered out
10    of Batavia. That's what it appears to be. And that's
11    true for Exhibits 6, 7 and 8.
12    Q    Do you know who the author of these
13    documents are?
14    A    I have no idea.
15    Q    And never seen them before today?
16    A    That's correct, to my knowledge. I'm
17    not aware of having ever seen them.
18    Q    Is there a reason that you thought it
19    was an internal Ford document as opposed to a ZF
20    Batavia document?
21    A    Well, one statement says _See ZF status
22    report._ They certainly wouldn't have done that on an
23    internal ZF document. It's got the look of a Ford one-
24    pager.
25    Q    And I understand that you don't know

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 158

158

1  who the author is. Would you care to --
2       A      Well, they've got the contact name down
3  here. I guess I could guess, but I don't know.
4       Q      Well, go ahead.
5       A      I don't know.
6       Q      Well, take a guess.
7       A      I don't know.
8       Q      Okay. Is it something that looks to be
9  produced by an HR department or --
10      A      I think it's an internal Ford document,
11 that I don't know who produced it or necessarily for
12 what purpose.
13      Q      Okay. Turning your attention to
14 Exhibit 7, that's the one that says transition plan at
15 the top. I understand you haven't seen this before,
16 but I just want to see if you agree with at least one
17 of the statements in here.
18             Under where it says background it says
19 in the second sentence At the onset, an agreement was
20 made to transition out the Ford salaried workforce over
21 a period of 2-3 years, with year-end 2002 as the target
22 date for completion.  Do you see that sentence there,
23 sir?
24      A      Mm-hmm. Yes, I do.
25      Q      Do you agree with that statement?

---

PAGE 159

159

1       A      Yes.
2       Q      All right. When was it decided, to
3  your knowledge, that Ford salaried employees would be
4  out of the plant by the end of 2002?
5       A      I would say on or about the date of
6  this document, May 5th, 2000. Once we understood who
7  all was going to accept and, you know, some of the
8  terms in there, we've used those, critical positions,
9  and we set up the metering program that realistically
10 was going to take probably that length of time to
11 accommodate the transfer out of 100 employees.
12      Q      All right. Were you concerned in 1999
13 that you'd have these ZF employees hired off the
14 street, if you will, to work for ZF Batavia as opposed
15 to the Ford transitional employees, that there might be
16 a gap, given the Ford salaried employees salary
17 history, between their salaries at ZF Batavia and these
18 employees who were hired off the street?
19      A      There was anticipated to be a gap, yes.
20 Was it of great concern? Not particularly.
21      Q      Were you interested in '99 in closing
22 the gap at some point?
23      A      No.
24      Q      Did you think that that would -- in
25 '99, and you obviously described the work you went into

---

PAGE 160

160

1  in preparing for the joint venture and the employees
2  coming over to ZF Batavia, were you concerned down the
3  road that you might have a Ford transitional employee
4  making a lot more than a ZF Batavia salaried employee
5  working in virtually the same job?
6       A      No. It didn't particularly concern me
7  because frankly we've got some alternatives where -- or
8  scenarios where new hire people are making more than
9  the existing workforce because they're maybe in higher
10 levels of management so no. I was very comfortable
11 with the structure of the transition program vis a vis
12 the long term viability of the joint venture and I had
13 no concerns.
14      Q      In '99 or since then, all the way up to
15 the current date, has anyone at ZF Batavia complained
16 that the Ford transitional employees make too much
17 money?
18      A      No, not that I'm aware of.
19      Q      All right. You're not aware of any
20 concern among anyone at ZF Batavia that Ford
21 transitional employees are making more money than a ZF
22 Batavia comparable salaried employee?
23      A      Not that I'm aware of.
24      Q      Okay. Regarding the AIP plan, Mr.
25 Kehr, is there in any way a separate calculation for ZF

---

PAGE 161

161

1  Batavia salaried employees versus Ford transitional
2  employees in terms of what bonus they're going to
3  receive under the annual incentive plan?
4       A      Why don't you try that one one more
5  time, please?
6       Q      When you're awarding bonuses under the
7  annual incentive plan, does it make any difference that
8  the salaried employee is a Ford transitional employee?
9       A      No, I don't think the end result makes
10 any difference. There may be mechanical differences in
11 the way the -- the way the monies are calculated and
12 totaled, but at the end of the day, as I indicated
13 earlier, the anticipation is that the dollar amount
14 available to Ford transition or non-Ford-transition,
15 given the comparable salary band, would be the same
16 dollar amount that would then be adjusted for
17 individual performance and team contributions.
18             But the end result is, no, there is not
19 an inherit bias one way or another, if that's what
20 you're asking.
21      Q      Has there been any significant change
22 in how ZF Batavia awards the bonus under the AIP since
23 the joint venture began in '99?
24      A      In terms of the philosophy of paying
25 bonuses or the mechanics or the paychecks? I'm not

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 162

162

1  sure --
2        Q      Well, were bonuses awarded for 2002,
3  this year?
4        A      Yes.  They were paid last Friday.
5        Q      Okay.  And generally speaking, how does
6  ZF Batavia determine what each salaried employee will
7  get under the plan?
8        A      Well, the first step is to take the
9  annual incentive plan metrics that are approved by the
10  board and then we report to the board what the final
11  results are for the given calendar year, and then that
12  achievement then is weighed in against the total salary
13  cost of all of Batavia that calculates an available
14  amount of money.  Let's just say it's a million
15  dollars.  This level of company performance yields a
16  million dollars of available payout.
17            Then we go and we apply what we call,
18  let's say, a fair share to each and every employee by
19  department or what we call our directors and they get
20  the -- their share of the AIP dollar amount, to which
21  they go -- and depending upon which director you're
22  talking about, they may have a larger organization,
23  smaller organization.  And then they go and they talk
24  to their supervisors, maybe cross-functional people,
25  and make assessments individual by individual on many

PAGE 163

163

1  criteria to determine whether they think that person
2  should get, let's say, their fair share which would be
3  what's indicated in that one exhibit, within that
4  range.  Let's say it's $5000 for an individual.  They
5  can determine whether that should be uplifted a little
6  bit or taken down individual by individual.  And then
7  as long as the total being paid out for their
8  department is no greater than the available money to be
9  paid out, then they're done.  Then they submit that in
10  and then there's some reviews that take place by human
11  resources.  I myself look at it, cursory, in terms of
12  the philosophies that I see the different directors
13  using in terms of what they're doing.  Some make
14  greater distinctions amongst performance than others
15  depending upon you know, the way they go about it.
16  They prepare performance reviews.  So that's basically
17  what happens.
18            Then it gets submitted and I approve
19  the payout and that's submitted.  I may go back and
20  talk to some directors about things here and there.  So
21  that's how the bulk of the workforce AIP comes
22  together.  For the officers and the senior management
23  the board approves our annual incentive plan.
24        Q      Let's see if I -- I appreciate that
25  answer.  Let's see if I can try to summarize it.  What

PAGE 164

164

1  you said is on the record, but let's see if I can try
2  to summarize it a little bit just to help my
3  understanding.
4            The first step in the process is to
5  determine how well the plant did as a whole; is that
6  fair?
7        A      The company, yes.
8        Q      Okay.  And then from that it's
9  determined how much -- how large the bonus pool will
10  be?
11        A      Correct.
12        Q      And then from there what's the decision
13  on which department gets what portion of that pool?
14        A      It's based upon the salaried payroll,
15  department by department.  So if -- you've got X
16  numbers of GSR bands, okay, and the GSR band payout is
17  some percentage.  You take your total salary cost for
18  that band within that department and you apply the math
19  across that, such that there's comparable dollar
20  figures provided and also percentages.  I mean, when
21  you get into the game, it's always dollars or
22  percentages and sometimes, you know, you look at both.
23            So I'm not sure exactly 100 percent the
24  mechanics of how it's divvied up, but the expectation
25  is it's being done -- in my mind it's being done on the

PAGE 165

165

1  salaried payroll costs department by department,
2  adjusted for the number of bands and whatnot.
3        Q      The amount of money from the pool that
4  goes to the different departments isn't based on the
5  department's performance, it's based on a formula in
6  terms of how much salary their employees make in that
7  department?
8        A      Yeah, I think that's generally true.
9  There's one exception.  When -- when we did the
10  calculations for, I believe, the 2002 payout, which
11  would have been for the 2001 calendar year, when we
12  had, as I indicated, this large overtime issue, we went
13  back and made adjustment not by individual but in total
14  against selected departments where we had substantial
15  overruns as it related to overtime budgets and didn't
16  have the commensurate productivity improvements and
17  whatnot.  So there was an adjustment made that was
18  agreed by all the senior management people including
19  those affected that their organization -- they thought
20  that was appropriate, and we made those adjustments and
21  then sent out the AIP amount that was available for
22  payout, but the managers then determined, you know, how
23  they wanted to proportion that.  I think the hold-back
24  was probably $125,000 is what we withheld.  I've kept
25  it accrued on the balance sheet and the expectation was

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 166

166

1    that if plant performance improved, that that money
2    would be put back into or made available to the
3    organizations where we withheld it.
4         Q    Again, let me try to summarize that so
5    I understand. Because certain salaried employees
6    worked a lot of overtime in 2001, there was a decision
7    to cut their bonuses under the annual incentive plan to
8    reflect that?
9         A    No, that's not it. We looked at
10   organizations, departments and said this department
11   overran their overtime budget by, let's say, 100
12   percent and another department by 50 percent, so it was
13   done at a department level. That represented a
14   reduction to the total amount of the AIP payment
15   available for that department. So let's say that
16   department would have gotten $200,000 had it not been
17   for the overtime productivity disaster -- somewhere
18   from $200,000 to, let's say, $150,000, and everybody
19   got their fair share of the $150,000 on the spreadsheet
20   that was provided and then the directors had the
21   responsibility to go down the list and make adjustments
22   as they felt appropriate, individual by individual, as
23   long as they didn't spend more than $150,000.
24        Q    All right. So, for instance, if the
25   maintenance department had excessive overtime in your

PAGE 167

167

1    mind in 2001 you made an adjustment by reducing the
2    pool of money that was available to the maintenance
3    department to distribute bonuses under the AIP, right?
4         A    I don't know if it distributed at the
5    maintenance department level. I think it's at the
6    operations level, to which maintenance is a subset.
7    But I'm not sure exactly the level of detail that we
8    segregate the amounts. I would have believed -- I
9    would believe it's at the operation level.
10        Q    Do you mean if employees in the --
11   well, help me understand that. Did you look at
12   individually whether there was excessive overtime in
13   maintenance department versus production, for example?
14        A    No, I personally did not, but let me
15   see if I can try to explain it. Dick Newark is the
16   operations manager. Maintenance works for him, MP&L
17   works for him, various other organizations work for
18   him. Dick Newark gets the AIP and he then determines
19   how he wants to distribute it amongst his total --
20   total organization, including maintenance and the other
21   functions. But I can tell you that the total money --
22   the total money being available to Dick Newark to
23   disburse to his group was reduced as related to the
24   2001 performance of operations in total, including both
25   overtime, productivity, scrap, you know, you name it.

PAGE 168

168

1    It was a bad year and everybody at senior management
2    level decided that something had to be done, so it was
3    -- it was carved off a bit.
4         Q    And your testimony is that the pool of
5    money that was carved off a bit was in the neighborhood
6    of $120,000?
7         A    In total for ZF Batavia. I can't say
8    that that's the number that dealt specifically with
9    operations.
10        Q    But you refer to it as a hold-back,
11   meaning that perhaps in subsequent years or in a
12   different period of time that bonus pool might be
13   returned to the operations area so that bonuses would
14   be increased in coming years?
15        A    Yes, that was exactly what was
16   anticipated.
17        Q    Did that happen?
18        A    Some of it has gone back this past
19   year. There's still some left over. And the way we
20   requested operation management to communicate it is
21   look, you know, speaking as the operations manager to
22   his reports, is Look, you know, we had a bad year
23   guys, gals. It didn't come in very well and there's
24   less money available for us and -- but it's not gone
25   forever. There's still some being held back. And if

PAGE 169

169

1    we can, in fact, improve the results, the money is
2    still going to be available for payout but not this
3    year. Perhaps in the future.
4         Q    But some of that $120,000 you're saying
5    was returned for 2002 AIP plan bonuses?
6         A    I believe we spent a little bit of the
7    $125,000 this past year. Some of it in the operations
8    area and some elsewhere. I mean, operations, even 2002
9    was a reasonably good year relative to 2001, but they
10   still missed their jobs per hour productivity
11   commitment by close to an hour an unit. So they're
12   still not where they've committed they'd be, so we're
13   patiently waiting for the continued improvements.
14        Q    Just so I understand this, this hold-
15   back of $120,000, what ultimately did the excessive
16   overtime play a factor in making that decision to hold
17   that money back? Was that the driving force for
18   holding back that sum?
19        A    Well, I would say the lack of
20   performance, you know, productivity, quality, on top of
21   the variance in the overtime spent versus budget. I
22   mean, it's one thing to say in anybody's judgment
23   what's excessive. If we define excessive anything in
24   excess of the budget, yeah, that was weighed in as
25   well. So I think the overtime was clearly a factor.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 170

170

1  Q      Was there a determination at any level
2  of ZF Batavia management that employees who worked a
3  lot of overtime in 2001 were paid for that overtime,
4  therefore, their AIP bonuses should be lowered
5  correspondingly?
6  A      There was the connection between the
7  variance to the overtime budget and the total pool of
8  funds available.  And then the conversation and the
9  direction provided was as it relates to any given
10 individual, overtime -- levels of overtime should be
11 considered amongst the other factors.  Are they good
12 team players, whatnot, all the good things that you
13 consider.  And in some instances people had very high
14 levels of overtime and didn't receive a reduction in
15 the AIP amount.  Other people, in management's opinion,
16 worked a lot of overtime and it was unjustified,
17 unwarranted, whatever you want to say, and they
18 received anything from, you know, their fair-share
19 amount on down to zero, depending upon in their mind
20 the extent of the inappropriate overtime given the
21 performance.  And I can't really say that -- you know,
22 you just can't look at overtime hours worked in a
23 vacuum.  You got to say, well, what was achieved?  What
24 was the performance?  What was the outcome of the work
25 effort, whether it was 40 hours or 80 hours?  Does it

PAGE 171

171

1  make sense what we're talking about here?  And,
2  therefore, there was adjustments made individually with
3  overtime as one of the factors considered, but it was
4  primarily performance based.
5  Q      To your knowledge, was any of the money
6  that was held back in the bonus pool for the reasons
7  you've described -- was any of that money then
8  distributed to other employees who received a higher
9  bonus as a result?
10 A      In 2000 --
11 Q      The bonus for 2001?
12 A      No, it was held back.
13 Q      It's your testimony that no one who
14 didn't work on the plant floor, for example, at ZF
15 Batavia may have received a higher bonus because people
16 on the floor had a lower bonus as a result of the
17 reasons you've given?
18 A      Well, the way the bonus pool in its
19 entirety is calculated, it's upon the results of the
20 operations of Batavia, including both the shop floor,
21 material costs which is purchasing's responsibility, so
22 everybody has influence and that's why they're company-
23 wide objectives.  The fact that we missed the
24 productivity, the quality wasn't where it needed to be,
25 the costs were too high, the total AIP pool was, I

PAGE 172

172

1  believe, down year for year from 2000 levels by, I
2  don't know, I'm speculating, probably 15 to 25 percent.
3         So everybody in the factory got a
4  reduced bonus versus the prior year because
5  collectively we didn't perform as well to the
6  objectives as perhaps we could have.  So everybody got
7  less.  And specifically as it related to the areas
8  where we thought least performed, overtime being one of
9  the indications of variance to budget, there was
10 additional monies -- you know, there was monies held
11 back and set aside.  That money was not redistributed
12 amongst other locations.
13 Q      This is Exhibit 9.  It's a one-page
14 document, Mr. Kehr.
15 A      Okay.
16 Q      Have you ever seen Exhibit 9 before?
17 A      Yes.
18 Q      And what is that?
19 A      It looks like the percentage payouts as
20 it related to the 2000 AIP award.
21 Q      To the which year?  I'm sorry?
22 A      2000.  Yeah, 2000.
23 Q      Explain if you can then -- well, who
24 authored this document; do you know?
25 A      I don't know.  Don't recall.  It would

PAGE 173

173

1  have been somebody in Batavia, if that's what you're
2  asking, yes.
3  Q      Explain if you can where these
4  different numbers come from.
5  A      Well, if you remember, going back to
6  this other exhibit where we had the salary bands and
7  the targeted payouts, this happens to be the Ford
8  transitional employees, so the Ford transition
9  employees would have received a three percent award,
10 around about -- this is general terms, not individual
11 specific, but rather this would be an indication of
12 what the payouts would be.  It would have been three
13 percent, which happens to be a bit over the targeted
14 level.  7.4 would have been the amount versus this
15 range over here.  And then for the Ford MR is 8.9.  And
16 then there is a similar schedule to this Ford salaried
17 base bands, and as I indicated to you before, because
18 the new hire employees have a lower base pay, they have
19 a higher AIP award amount in percentage terms.  So when
20 you see the ZF at 3.4 percent, their salaries
21 theoretically on average are somewhat lower then the
22 Ford folks, so the 3.4 and the 3 derive approximately
23 the same dollar payout.  So that's telling people,
24 depending upon whether you're Ford transition or ZF
25 transition -- or ZF employee, what you -- what your

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

## PAGE 174

174

1    potential award could be if you looked at it on average
2    by the bands.
3         Q    Well, who was this document prepared
4    for; do you know?
5         A    No, I don't know what package or what
6    -- what this was specifically provided for.
7         Q    Do you understand this may have been
8    distributed to salaried employees?
9         A    Well, if not distributed, somehow made
10   available.
11        Q    And so it's your explanation that you
12   have the Ford transitionals with a lower percentage
13   award for the ZF under each of the categories, AC, GSR
14   and MR, and it's your testimony that the reason for
15   that is because the Ford salaried employees' base pay
16   was higher?
17        A    On average, okay, the Ford transitional
18   salary structure is anywhere from 10 to 20 percent
19   higher than is the ZF Batavia new hire.  Now, like I
20   said there's circumstances where that -- because of
21   background or whatever, there are some ZF people that
22   have comparable pay to the Ford people, let's say, for
23   the same job, but on average our structure for new hire
24   people is lower and, therefore, when you take the same
25   or equivalent dollar amount and divide it by two

## PAGE 175

175

1    different numbers, you get different percentages.
2         Q    Okay.
3         A    And this would indicate, if you look at
4    it, roughly three points on three percent gives you
5    about 10 to 12 percent difference between the salary
6    structures of the two groups.
7         Q    So it's your testimony the purpose of
8    these calculations is to ensure that the ZF Batavia new
9    hires and the Ford transitionals' payout under the AIP
10   award is roughly the same as long as other factors are
11   met?
12        A    Yeah, comparable performance,
13   comparable salary bands, you would have equal award
14   dollars.
15        Q    We won't make this an exhibit.  I'll
16   just show it to you.  I'm handing you what is ZF
17   Batavia's answer that they filed in this case.  And I
18   know you all have copies, but here's another one.
19             MR. HUNTER:  This isn't going to be an
20        exhibit?
21             MR. SIMON:  No.  We won't make it an
22        exhibit.
23   BY MR. SIMON:
24        Q    If you could turn to -- and I won't
25   have you review this whole document, Mr. Kehr, because

## PAGE 176

176

1    quite honestly it may be a bit hard to comprehend
2    without the complaint right next to it.  And obviously
3    you didn't prepare this document, correct?
4         A    That's correct.
5         Q    All right.  Did you have a chance to
6    review it before it was filed?
7         A    I don't believe so.
8         Q    Well, turning to page five of the
9    answer, paragraph 26, do you see that paragraph?
10        A    Yes, I do.
11        Q    The first sentence that says _With
12   respect to the allegations in paragraph 26 of the
13   complaint, ZFB admits that it is in the process of
14   changing policies and procedures with respect to its
15   salaried employees.  Do you see that?
16        A    Yes.
17        Q    I'll just represent for the record that
18   this was filed and served on or about July 22nd, 2002.
19   So my question is:  In July of 2002 is it a true
20   statement that ZF Batavia was in the process of
21   changing policies and procedures with respect to its
22   salaried employees?
23        A    I don't know.  This is a Ford Motor
24   Company document so -- or is it?  This is ours?  Okay.
25   Yeah, I mean, we are constantly in the process of

## PAGE 177

177

1    changing, reviewing, modifying policies and it looks,
2    as I read on here, that this apparently occurred in the
3    time frame of the foreign trade zone designation.
4         Q    Are you aware of any other changes in
5    2002 or perhaps in 2001 regarding sick leave, vacation
6    pay or bereavement leave?
7         A    Yeah.  We revised down the amount of
8    sick and personal days from five to three.
9         Q    Are you aware of any changes in the
10   bereavement leave policy?
11        A    I don't recall a change in the
12   bereavement policy from the beginning of the joint
13   venture.  I do remember having discussions around the
14   Ford bereavement policy, but no, I'm not familiar with
15   any changes we may have made there, not to say that we
16   couldn't have.
17        Q    Did you make any changes regarding the
18   vacation in terms of the number of weeks an employee
19   can get under ZF Batavia's policy?
20        A    Not that I'm aware of.
21        Q    Turning your attention to -- turning
22   back to Exhibit 2, Mr. Kehr, that's the -- did you have
23   a name, by the way, for Exhibit 2 that you referred to
24   this?  Did you refer to it as the brochure or --
25        A    Yeah.  The Ford transition brochure.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 178

178

1    Q       Ford transition brochure, okay.
2  Looking at Exhibit 2, which is identified the Ford
3  transition brochure, do you see in the middle column on
4  the second page where it references personal and sick
5  days?
6    A       Oh, at the very bottom.  Yes, I do.
7    Q       So you testified a moment ago that, I
8  guess, the policy had been up until this change you've
9  referenced that salaried employees were entitled to
10 five sick days a year?
11   A       I think they were entitled up to five
12 days for things such as sickness or other personal
13 matters, yeah.  They were entitled to five days.  They
14 -- they could take up to five days.
15   Q       And when was this change made regarding
16 the three days?
17   A       I don't know.  I know we've
18 subsequently revised it back up to five days.  But what
19 occurred that made the change -- because we don't
20 change these things just, you know, willy-nilly.  There
21 was clear evidence that employees, salaried employees,
22 were considering these five days as being sort of
23 entitlements and there was evidence that people were
24 actually scheduling them in advance, and management,
25 much like the overtime policy, wasn't asking the right

PAGE 179

179

1  questions and addressing this in the manner that I and
2  the policy strategy committee felt appropriate and we
3  made the decision that if management isn't going to
4  enforce the reasonableness of up to five days, then
5  we're going to reduce the benefit from five to three
6  days and reduce effectively -- unfortunately employees
7  who weren't abusing the policy were also affected.  But
8  we made the hard decision that we needed also to send a
9  message on this front, not unlike the overtime
10 circumstance, abuses of the programs aren't going to be
11 tolerated and, therefore, we legislated a reduction,
12 sent the message.  And since then management has, you
13 know, gotten the attention and they're asking the right
14 questions and we felt that the policy was back being
15 controlled appropriately, so we relaxed the restriction
16 and went back to five days.  So it was an action taken
17 by management given the circumstances around the
18 perceived abuse of this policy.
19   Q       Is the reason that you went back to
20 five days for sick or personal leave because of this
21 lawsuit?
22   A       No.  The lawsuit had nothing to do with
23 it.
24   Q       Were people -- is the reason that
25 people were paid a bonus under the AIP plan for 2002

PAGE 180

180

1  where they weren't -- where they didn't receive a bonus
2  in 2001, is that because of the lawsuit?
3    A       To my knowledge, there's been no change
4  in the operations of the factory or the policies or
5  procedures that relate at all to this litigation.
6    Q       And would that also include then
7  performance evaluations of employees?
8    A       I don't believe we've made any
9  adjustments for operating procedure or policy changes
10 whatsoever as it relates to this litigation.
11   Q       Did you believe when you -- and I don't
12 think we've pinpointed it, Mr. Kehr.  I apologize if
13 you said it.  The change in the policy down to three
14 days for sick and personal, that was when, 2001, 2002?
15   A       I think it was probably in 2001, but I
16 -- I don't recall exactly.
17   Q       And were you concerned -- you, of
18 course, were told this policy before it was -- change
19 before it was announced to the group?
20   A       Oh, I was a party to the discussion to
21 change it from five to three.
22   Q       And you discussed that with HR staff I
23 imagine?
24   A       Yeah, the policy and strategy
25 committee.

PAGE 181

181

1    Q       Who's that?
2    A       It's primarily myself, Herb Huebner,
3  Len Sennish, Ludger Reckmann.  I'm not sure exactly who
4  the official group is, but it's the folks who have the
5  responsibility for some of the fiduciary aspects and
6  monitoring hourly pension plans and 401(k) plans.  We
7  meet periodically and make sort of broad, high-level
8  decisions around changes in these policies and that
9  would have been discussed in that forum.
10   Q       And it's called the policy and strategy
11 committee?
12   A       Yes.
13   Q       And does it just concern labor
14 relations?
15   A       It's primarily -- well, it's primarily
16 around personnel related.  Labor relations has an
17 hourly connotation.
18   Q       Right.  I understand.  And have you
19 always been a member of this committee --
20   A       Yes.
21   Q       -- since the joint venture started?
22 You mentioned Lou -- who's the COO?
23   A       Dr. Ludger Reckmann.
24   Q       How do you spell his last name?
25   A       R-E-C-K-M-A-N-N.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 182

182

```
1       Q       When did he come on board ZF Batavia?
2       A       February of 2002.
3               REPORTER:  Excuse me.  What did you say
4       his first name was?
5               THE WITNESS:  Ludger, L-U-D-G-E-R.
6               REPORTER:  Okay.  Thank you.
7   BY MR. SIMON:
8       Q       Do they call him Lou?
9       A       Yeah.  Ludger.
10      Q       Who held his position before February
11  of 2002?
12      A       There was -- that position was created
13  at that point in time.
14      Q       So currently Mr. Reckmann, you, Len
15  Sennish and Herb Huebner are on this policy and
16  strategy committee?
17      A       Well, I would say we're the key
18  members of these types of discussion.  I don't recall
19  exactly who is on the official roster, if you will.
20      Q       How many more people are we talking
21  about?
22      A       I wouldn't think there was more than
23  maybe another one or two.
24      Q       Okay.
25      A       I believe Ann Appleton may be on it.
```

PAGE 183

183

```
1   We try and get a cross-section of, you know, plant --
2   some diversity and whatnot so that we get everybody's
3   opinions.  I think Herbert Moser may be on it as well,
4   in terms of the German influence.
5       Q       All right.  In your discussions with
6   the people you've identified on the policy and strategy
7   committee or anyone else, for that matter, did you or
8   anyone else raise a concern that this change from five
9   days to three days for personal or sick leave
10  contradicted the statement in Exhibit 2 regarding
11  personal or sick leave?
12      A       Well, I don't think anybody
13  specifically associated it back to Exhibit 2 in terms
14  of being a change from what Exhibit 2 represented.
15  There was clearly a fair amount of discussion about the
16  ramifications it would have on not just the Ford
17  transition employees but also the other ZF salaried
18  employees, that you're taking away what some perceive
19  to be a very precious benefit and that this will have
20  -- I mean, if you want to send a message that you think
21  a program is being abused, knock it off from five to
22  three days.  And there was discussion around, well, how
23  is the workforce going to react, how do we communicate
24  this change in the policy to all of the salaried
25  employees such that it's understood for what was
```

PAGE 184

184

```
1   intended and not viewed as being punitive to the
2   workforce at large, but rather a message that we're not
3   going to tolerate abuse of policies.
4       Q       Did you think that Exhibit 2 contained
5   a set of promises from ZF Batavia to the Ford
6   transitional employees?
7               MR. HUNTER:  Object.  Asked and
8       answered a couple of times now.  You can answer
9       it again if you want.
10              THE WITNESS:  I mean -- no.  This was a
11      point in time and it's subject to change.  The
12      business conditions -- and, in fact, I think
13      some of the things we've actually improved
14      relative to this.  I know we've done things for
15      books and stuff.  So this is a point in time
16      that you evolve off of.  And, yeah, it was a
17      take-away, but it had nothing to do with this
18      or any promises or assurance.  That was just a
19      point in time.
20  BY MR. SIMON:
21      Q       What things have you improved?
22      A       Well, I know from the Ford program,
23  when we put it in place -- when we looked at the Ford
24  program -- well, tuition reimbursement, for instance.
25  I presume this reflects the latest.  But we -- we upped
```

PAGE 185

185

```
1   the amount allowable for books under the tuition
2   reimbursement program.  I can't think of any other one
3   specifically.  I know we've -- we have maintained the
4   three percent gain-sharing contribution that frankly or
5   possibly you know, could have been looked at in this
6   time frame.  So we've made very few modifications to
7   those programs.
8       Q       When you made the change from five days
9   to three days of personal/sick leave, did you think you
10  were breaking an agreement that you had with the Ford
11  transitional employees?
12      A       No.  There was no agreement.  In fact,
13  I keep going back, but the point is I felt and the
14  committee felt that employees, unfortunately some in
15  management, were abusing a program that was put in
16  place for all the good intentions and we're not going
17  to tolerate abuse.  So we put it in place going from
18  five to three days to send a message that, you know,
19  people are expected to come to work when possible and
20  for all those good reasons.  And that was why it was
21  undertaken was to send a message, make corrective
22  action so that people are doing the right things.
23      Q       Did you think you were entitled as you
24  -- moving back to 1999 when these summaries that are
25  Exhibit 2 were presented to the Ford transitional
```

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

## PAGE 186

186

1  employees, did you think at that time that ZF Batavia
2  was entitled, should they desire, to modify all these
3  different terms contained in Exhibit 2 starting in
4  January of 2000?
5      A      Well, I would say not only are they
6  entitled, but they're obligated as a management team
7  trying to run a business to review and make
8  modifications as appropriate across the whole avenue of
9  -- of spectrum, including this element.
10             And, in fact, if I go back and I look
11 at the results in Batavia versus Ford, for instance,
12 Ford has taken away substantial benefit packages and
13 reductions to their salaried work force that we looked
14 at, contemplated, and said the results of the
15 operations in Batavia are not as bad as Ford is, so we
16 will not go back and eliminate the 401(k) match. So
17 Ford has done, in their financial predicament, far more
18 Draconian cost reduction measures than we have taken in
19 Batavia.
20             We felt it was appropriate to look at
21 the overtime, the personal days off, and we put in a
22 discretionary spending thing that said no more coffee
23 and doughnuts in conference rooms and also we
24 constantly look at the state of the business and say
25 what corrections or what modifications need to occur.

## PAGE 187

187

1      Q      And you make those changes without
2  regard to what's in Exhibit 2?
3      A      That's correct.  I mean, this thing is
4  not even -- I mean, it's not on the wall anywhere, I
5  can assure you that.  And it's -- this only relates to
6  the Ford transition employees, right?
7      Q      Yeah.
8      A      Which is a small set of the total,
9  okay?  And all of these programs except for these few
10 retirement ones I mentioned, all the programs are the
11 same across the entire workforce.  And anytime you want
12 to make changes, we talk about it and say what is the
13 rationale, what are we trying send as the business
14 message, why are we doing it?  We don't just go off
15 willy-nilly change things because we feel like we want
16 to change them and we're not on any, you know, program
17 that says we're going to slowly but surely reduce the
18 value of all these programs.  We react to competitive
19 data and the state of the business and make corrective
20 actions as appropriate.
21     Q      Did you at any time tell the Ford
22 transitional employees in 1999 that ZF Batavia
23 management was going to make decisions regarding their
24 compensation and benefits without regard to Exhibit 2?
25     A      No.  I'm sure we wouldn't have told

## PAGE 188

188

1  them that, no.
2      Q      Why not?
3      A      Why wouldn't we --
4      Q      Well, if I understood you correctly,
5  you've made decisions since then, 2000, 2001, et
6  cetera, you've made policy changes regarding personnel
7  issues based on the business needs for ZF Batavia,
8  right?
9      A      Business, operational, financial.
10 Yeah, all those reasons.
11     Q      And I think you also said that you make
12 those decisions without regard to what's in Exhibit 2.
13     A      We take them in regard to the total
14 wage and benefit programs as it relates to our entire
15 salaried workforce and the changes that we make is
16 unrelated to specifically what was in the Ford
17 transition program because it's the same as it is for
18 the rest of the salaried workforce.  And as that
19 evolves over time, we consciously know what our wage
20 and benefit package is, and any changes we want to make
21 we talk about and we understand the significance of
22 those as it relates to the workforce.  Where, for
23 instance, if you go back and I believe the numbers are
24 -- at this point in time these contribution rates, I
25 think they were 92 -- I'm sorry, eight percent, in

## PAGE 189

189

1  Exhibit 2, eight percent of the total cost of those
2  medical programs, employees had to match eight percent,
3  while we've seen 15, 17, 18 percent increases in
4  medical care premiums.  And the employees continue to
5  pay eight percent of the total and the company pays 92
6  percent.  So the premiums have gone up related to the
7  -- to the programs.  I think we've even made some
8  changes in the programs as it relates to prescription
9  drugs and things because you can't sit there and sit
10 idle, looking at 15 to 20 percent increases in a fairly
11 sizeable cost of your business.  Ford has done it,
12 everybody's doing it.
13             So there are changes taking place
14 continuously.  But to answer your question, we do not
15 sit in a meeting and say okay, let me see this page,
16 what are we changing off this page.  That does not
17 occur.  But in totality people understand where we are
18 and what we're doing on an incremental year-to-year
19 basis.
20     Q      I understand that you don't have
21 Exhibit 2 on a wall and you testified that you don't
22 specifically refer to Exhibit 2.  But just so I can
23 further understand your testimony, for example, when
24 you were you discussing the change from five days to
25 three days for personal sick leave, no one in the

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 190
190

1    meeting said "Well, wait a minute.  Can we do this
2    because of what we promised in the summary we gave to
3    the transitional employees in '99?"
4        A    Well, yeah, because it wasn't promised.
5        Q    All right.
6        A    You keep going back to the promises and
7    agreements.  This was shown, and yes, we're very
8    sensitive to the evolution of our programs over time as
9    it relates to both the Ford transition and our other
10   salaried people.  So we are cognizant of what we're
11   doing and we're justifying it and reacting to
12   competitive -- and the environment we deal with.
13       Q    All right.  No one has said during
14   those discussions about the change from five days to
15   three days of leave that "Wait a minute.  We shouldn't
16   do this because we made these statements in Exhibit 2
17   in '99"?  Has anyone made that -- anyone make any
18   comment like that at all?
19       A    No.  The comments are to quite the
20   contrary, that we make this offer available to five
21   days for all employees.  We don't talk about Ford
22   transition and ZF Batavia people in these discussions.
23   It's our salaried workforce, okay?  There is no
24   distinctions being made.  And the discussion was this
25   is going to have implications on the salaried workforce

PAGE 191
191

1    morale and whatnot that we need to be sensitive to, but
2    also, at the same time, is when you make benefit
3    programs available to people, management also has the
4    expectation that the employees are going to act
5    reasonably and fair.  And if employees are abusing it,
6    then you have to go and say "Look, you know, a deal is
7    a deal here, right?  If you guys wouldn't abuse it, I'd
8    give you five.  You're abusing it, and I cut it to
9    three.  Okay.  Now what do you want to do?"
10            Just like the overtime thing, right?
11   There's only so much budget.  And, in fact, people have
12   changed.  I've seen real improvement in the management
13   around it, so we took it back to five.  Just like the
14   overtime.  We took it to some arbitrary low number, got
15   people's attention, negotiated a deal about what the
16   right budget number ought to be for overtime.  They had
17   plans to go deliver it and we worked our way through
18   the issue.
19       Q    Did you think it was reasonable for the
20   transitional employees in '99 to expect that the
21   statements in Exhibit 2 might afford them some
22   protection down the road while they're employed at ZF
23   Batavia?
24       A    Afford them some protection?  I -- I
25   don't -- I mean, to the extent that they're not going

PAGE 192
192

1    to change radically, quickly, yeah, there's probably
2    some assurances there.  But over time all policies and
3    procedures are subject to revisions and subject to
4    change and at least you know where you're starting from
5    and over time, you know, there's a reasonable
6    expectation of what range you could end up with, let's
7    say, in 10 years depending upon the business results
8    and whatnot.  So I think it does provide some
9    assurance.  Guarantees, promises, clearly not.
10       Q    I'm handing you what's marked as
11   Exhibit 10.  If you could just familiarize yourself
12   with that document, I'll just ask a few questions, Mr.
13   Kehr.
14       A    Okay.
15       Q    This exhibit is dated March 28th, 2002,
16   signed by Mr. Sennish.  He's your human resources
17   director?
18       A    Well, I think it's prepared by him.
19   I'm not sure if he signed it.
20       Q    I see.  Prepared by him.
21       A    But yes, he is the human resources
22   director.
23       Q    All right.  Was this document
24   distributed to all exempt salaried employees, to your
25   knowledge?

PAGE 193
193

1        A    Yes.
2        Q    Okay.  Did you approve of this before
3    it was sent out?
4        A    I believe I looked at an earlier -- a
5    draft, yes.
6        Q    I know you had a chance to review this
7    document.  Do the statements in Exhibit 10 appear to be
8    accurate?
9        A    Yes.
10       Q    Okay.  You testified about how overtime
11   may be worked by certain salaried employees, but it
12   will be paid only if that overtime was deemed necessary
13   by management; is that a fair statement?
14       A    Yes.
15       Q    Okay.  Would you say that Exhibit 10 is
16   communicating the same thing that you said in your
17   testimony?
18       A    Well, yeah.  I mean, if you just go
19   through the paragraphs, it says that, you know, we were
20   over budget extraordinary levels unjustified by the
21   business performance, seeing how it actually
22   deteriorated.  Unacceptable operating patterns
23   precipitated reexamination of the practices regarding
24   the budget compliance.  Yeah, I talked about all that.
25   And, therefore, necessary to make fundamental -- ZF

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 194

194

1  Batavia modifies existing policies and procedures to
2  align compensation with its business results. And
3  then, yeah, I went down to specify the -- I think I
4  said that up to an hour around about nine hours of
5  uncompensated time worked -- I should say it's
6  compensated but not on overtime.
7        And also I think we alluded to the fact
8  that people are going to react negatively, at least
9  those who perhaps are abusing it, they're going to
10 react negatively, but sometimes that's what management
11 has to do.
12        MR. SIMON: All right. Off the record
13    for just a second.
14        (OFF THE RECORD)
15        MR. SIMON: I'll hand you, I guess,
16    Exhibit 11, and just take a moment or two to
17    look over that document, Mr. Kehr.
18        THE WITNESS: Okay.
19 BY MR. SIMON:
20    Q    Have you seen this document before
21 today?
22    A    I don't recall actually seeing the
23 document, no.
24    Q    Do you know who the author is?
25    A    No, I don't.

PAGE 195

195

1    Q    Do you recall any discussions with
2  people at ZF Batavia or Ford regarding this document?
3    A    Not regarding this document
4  specifically but the -- all the elements of it, it
5  seems to be extremely factual in terms of what the
6  discussions that took place were and what the
7  intentions were, yes.
8    Q    Okay. Everything appear to be accurate
9  in that Exhibit 11?
10    A    Nothing jumps out at me as being
11 anything other than factual.
12    Q    All right. I'm going to skip that one.
13 I'll hand you Exhibit 12, which is a two-page document.
14    A    Okay.
15    Q    All right. Now, you've not seen this
16 document before, have you?
17    A    That's correct.
18    Q    All right. Would you agree that it's
19 an e-mail exchange between Michael Warden, Mr. Hartmann
20 and others in February of 1999?
21    A    That's correct.
22    Q    I was just wondering if you agree with
23 some of the sentiments that are included in Mr.
24 Warden's e-mail in the middle on that first page. It
25 says _Tim, now that the JV has been agreed on, I

PAGE 196

196

1  believe it would be helpful if some senior Ford HR
2  people were to visit to talk with our salaried
3  employees._
4        I understand that's not your statement,
5  but do you agree that that statement is true?
6    A    Yeah. There was ongoing concern about
7  communication and trying to weigh in on concerns and
8  whatnot that were being expressed, yes.
9    Q    You agree then that it was important
10 that senior Ford HR people talk to the Ford salaried
11 employees about these issues?
12    A    I'm not sure if I understand the
13 question.
14    Q    In his statement it says _I believe it
15 would be helpful if some senior Ford HR people were to
16 visit to talk with our salaried employees._ Do you
17 agree that it was helpful?
18    A    Yes. Yeah. I think any Ford HR people
19 that talk to the Ford salaried employees is generally
20 helpful. Not always but often.
21    Q    He further writes down below that
22 _Salaried employees remain suspicious about their
23 futures._ Now, I think you've indicated in your
24 testimony there were a number of salaried employees
25 that were suspicious about their futures at that time

PAGE 197

197

1  in '99, correct?
2    A    Yeah. That's correct.
3    Q    And would you agree with his next
4  statement, _They do not have a high trust level that
5  any offers from the JV will be competitive with Ford
6  compensation and benefits_?
7    A    Yeah. I think, as I indicated before,
8  there was a range amongst the 160 salaried employees at
9  the time that certainly there were some who were more
10 skeptical and maybe used terms like suspicious and not
11 trustworthy or not trusting. I'm sure there was a
12 group of employees in that category. I don't know how
13 large it was, but there was clearly some that would use
14 terminology like this.
15    Q    All right. And turning to his third
16 paragraph -- the third bullet point, rather, of Mr.
17 Warden's e-mail, it says _Salaried employees believe
18 that they will not have any opportunities in the new ZF
19 Batavia departments regardless of their qualifications
20 or abilities...that for as long as they remain at
21 Batavia they will be second-class citizens._
22        Were you aware of such sentiments among
23 the salaried employees at that time?
24    A    I would say a limited number, yes.
25 This says salaried employees. It doesn't quantify the

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 198

198

1  extent of the concerns.  But yeah, I think some of them
2  had that sentiment, yes.
3       Q     All right.  Did you think that
4  presenting those Ford salaried employees the ZF Batavia
5  summary which is Exhibit 2 -- do you think that
6  presenting them that summary in '99 helped alleviate
7  some of these concerns that were out there about what
8  would happen with their employment at ZF Batavia?
9       A     Well, yeah, given the date, that this
10 was back in February of '99, what, three -- three
11 months of hard work evolved into what I indicated
12 previously I thought were very reasonable offers in
13 terms of both base pay and benefits.
14       So, yeah, I would imagine that for many
15 of these folks this would have alleviated much of their
16 concern for those who had it.  But, you know, despite
17 that information, as I indicated, 30, 35 of them
18 elected not even to receive offers, so I don't know if
19 those would still believe this statement or not.
20       Q     Did you or anyone else, to your
21 knowledge, tell these Ford salaried people that they
22 won't be treated like second-class citizens at ZF
23 Batavia?
24       A     To my knowledge, what we tried to
25 communicate to the salaried workforce was that we

---

PAGE 199

199

1  wanted to bring as many as feasible to the new company
2  to join in the opportunities going back to -- I think
3  some of these other things had the more positive spin
4  in terms of what we were hoping to achieve and what the
5  expectations were.  But I think we were trying to
6  alleviate fears that, yeah, there are no -- there are
7  no second-class citizens.  I mean, everybody is looked
8  as being equally valued.
9       Q     I know you may not recall specific
10 conversations, but you believe that statement you just
11 made was in some way conveyed to the Ford salaried
12 employees in 1999?
13       A     Yes.  To some degree or another, yes.
14       Q     Is it true that today they are treated
15 like second-class citizens?
16       A     No, it's not true.
17       Q     Has Dave Adams ever said that he wants
18 to get the -- that there's a Ford taint in the plant?
19       A     I think it goes back -- Dave Adams has
20 made some comments I think have been probably
21 misinterpreted.  It goes back to my cultural issue and
22 the under-performance of this facility for many, many,
23 many years.  And with the loss of the FN business, Ford
24 basically came to the conclusion that whether it's in
25 the water or for whatever reason this factory doesn't

---

PAGE 200

200

1  seem to be productive and was going to shut it down.
2  And that just say culture, whether it be Ford -- and
3  Ford has got some very good plants and Ford has some
4  not so good plants.  This happened to be one of Ford's
5  most troubled plants and the culture was such that
6  collectively they weren't getting a good result and
7  that we needed to move away from the culture that was
8  not successful and move it to a successful culture.
9       And I can't tell you what Dave Adams'
10 deep thoughts were on it, but you can't take a factory
11 and convert it with an all new workforce and expect to
12 get some kind of a different result.  So I'm not sure
13 how people interpreted -- interpreted Dave Adams'
14 comments, but by no means, in my judgment, did Dave
15 Adams have anything against Ford employees.  Because,
16 in fact, I'm a Ford employee and there's many Ford
17 employees in there that Dave Adams is extremely
18 supportive.  And there's some Ford employees and
19 some new hire salaried employees that management
20 doesn't look with quite as high a regard.  But it's not
21 because they came Ford or they came from ZF or they
22 came from the outside.  People are all valued based
23 upon their individual contributions.
24       Q     What Ford employees is Dave Adams
25 supportive of?

---

PAGE 201

201

1       A     I think he's supportive of myself and
2  Rick Williams and many of them.  I mean, I guess if you
3  asked Dave, to force rank, what he thought of all of
4  his Ford transition employees, I'm sure there's a gamut
5  to the extent he knows some better than others.  But
6  Dave Adams does, in my judgment, not have anything
7  against Ford employees.
8       Q     Has he ever used that phrase, Ford
9  taint?
10       A     Not in my presence.
11       Q     Has anyone told you that he said that?
12       A     I've heard statements that -- I've
13 heard comments and whatnot that some of the statements
14 that Dave Adams has made have been -- I can't remember
15 the specifics of it, but the take-away from those who
16 heard it was Dave Adams doesn't like Ford employees.  I
17 mean, I wouldn't say that's -- probably some people
18 have that impression.
19       Q     And do you know what comments he did
20 make that drew them to that conclusion?
21       A     No, I'm not aware of any.
22       Q     I mean, you said that people told you
23 about it.  Do you remember what they told you he said?
24       MR. HUNTER:  Objection.  Hearsay.
25       MR. SIMON:  Discovery.

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.

KARL S. KEHR

3/18/03

## PAGE 202

202

1  THE WITNESS: Not that I can recall.
2  BY MR. SIMON:
3  Q  Did Dave Adams or you or anyone try to
4  address these concerns and perception that Dave Adams
5  didn't like Ford employees?
6  A  I've heard Dave make issues and I have
7  -- you know, Dave, I'm a Ford employee. There's a lot
8  of good Ford employees around here. Maybe some of your
9  comments you're making are being misperceived. And
10 then Dave -- and we're all struggling, particularly
11 Dave -- struggling with why is this factory such an
12 under-performing facility. And then, well, you know,
13 it was the Ford culture. Well, gee, Ford has got some
14 good plants, so it isn't just a Ford thing. Well,
15 maybe it's an Appalachian region. So Dave actually
16 went and read some Appalachian -- well, then, you know,
17 I took him outside the factory. I said "Dave, let's go
18 meet some other businesspeople who operate in this area
19 and they have very good performing factories."
20 So I think we got to the point where
21 it's, for whatever reason, inside the four walls of the
22 plant. And we even brought in some outside people
23 that, exposed to the culture in Batavia, become equally
24 poisoned, for lack of a better word. And frankly in
25 the last two years I've seen cultural change that the

## PAGE 203

203

1  majority of the workforce is, in fact, thinking
2  different, working better, expectations are better, and
3  it's coming out in our productivity and our quality and
4  we're turning a corner.
5  I mean, if you think about it there's
6  different reasons why factories shut down. Some of
7  them because the product is obsolete, okay, others
8  because for whatever reason they're not very productive
9  and they have to be shut down. And this happened to be
10 one of the factories in the bottom five percent that
11 for whatever reason all of the management people Ford
12 sent in could not move the needle and change the
13 circumstance. And the joint venture came in, was faced
14 with this predicament and what are we going to do, and
15 we've worked hard at it now for four years and we've
16 made substantive improvements across the factory in
17 areas that Ford struggled with for 10, 20 years.
18 Q  So Mr. Adams at some point questioned
19 whether it was the Ford culture which was hurting the
20 plant's performance?
21 A  It was the culture of the factory and
22 because Ford ran the factory, it was the Ford culture.
23 Q  But that's what he identified it as,
24 the Ford culture; is that fair?
25 A  I -- I don't know how he characterized

## PAGE 204

204

1  it in terms of the Ford culture. It was the culture of
2  the factory. And Dave knows that Ford has other good
3  factories so, therefore, it isn't a Ford thing,
4  otherwise Ford would be bankrupt if all of its
5  factories ran like Batavia ran.
6  Q  And he also, I guess, questioned
7  whether it might be the Appalachian influence on the
8  workforce?
9  A  Well, he was wondering -- you know,
10 thinking well, what is it about this place that isn't
11 where it needs to be.
12 Q  And that's one thing that he
13 identified?
14 A  Yeah. He was looking into some of
15 those. Because when you're trying to deal with a
16 culture, you need to understand the culture. And, you
17 know, culture is often a very geographic-type-oriented
18 circumstance. So he and I -- to answer your question,
19 I specifically took Dave out and tried and encouraged
20 him to characterize the circumstance better, that it is
21 unique to the four walls of the factory. It's not a
22 Ford thing.
23 So in answer to your question, yes,
24 people did consciously, you know, try and help each
25 other, you know, not just Dave but myself and other

## PAGE 205

205

1  senior management people. What do we need to do to
2  move the needle here and protect not only our jobs in
3  the future but the workforce at large?
4  Some of it frankly goes back to the
5  overtime and some of the expectations of the employees
6  in terms of entitlements. There seemed to be an
7  entitlement attitude that, you know, we've tried to
8  work on and some of that you see in part of this
9  litigation.
10 Q  You think that the plaintiffs in this
11 lawsuit suffer from an unjustified sense of
12 entitlement?
13 A  I don't know. That's outside of my
14 area.
15 Q  Well, you were saying certain employees
16 might suffer from a sense of entitlement; is that what
17 you said?
18 A  I think the factory at large were
19 lining their pockets with extensive overtime, not being
20 very productive, and it was, some people would argue, a
21 country club environment, that status quo was fine and
22 we weren't going to really seriously move the needle
23 and become competitive long term. I mean, as evidenced
24 by the loss of the FN business and other.
25 Q  Did you or Dave Adams ever suggest that

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

## PAGE 206

206

1    ZF Batavia should remove the Ford transitional
2    employees out of their positions and replace them with
3    ZF new hires to try to change the culture?
4        A      There was never any discussion about
5    blocks of employees as you just described it.
6    Individuals, whether they be Ford transition or ZF
7    employees who came to the joint venture or new hires
8    outside, yeah, there was decisions talked about with
9    people.  Are they in the right job?  Would they be able
10   to contribute better elsewhere?  But never as a -- as a
11   class, as you're questioning me.
12       Q      I mean, no one has ever said, to your
13   knowledge, including Dave Adams, that the fact that
14   somebody is from Ford is a negative in looking at their
15   performance at the plant today?
16       A      No.  I don't believe Dave Adams has
17   anything against Ford employees in general, no.
18       Q      In fact, when you hired these
19   transitional employees in '99, ZF Batavia did so
20   because it was important to continue the production at
21   the plant to have these employees; is that fair?
22       A      Yeah.  It continues to be important.
23   They're, generally speaking, contributors to the
24   organization.
25       Q      Is it fair to say that there was a --

## PAGE 207

207

1    in '99, looking ahead, you were concerned about the
2    two- to three-year period of transitioning the plant
3    from primarily the CD4E transmission to transitioning
4    to the CVT?
5        A      As it related to the salaried
6    workforce?
7        Q      Were you concerned that you had a
8    salaried workforce that could help you in that
9    transition from CD4E transmission to the CVT
10   transmission?
11       A      Well, yeah.  But in this time frame the
12   CVT transmission I don't think was scheduled to begin
13   production for probably three years away.  So it was
14   primarily focused on continuing the day-to-day, month-
15   to-month CD4E operations, knowing that we needed to
16   hire substantial new complete organizations in terms of
17   purchasing and some of those other things I mentioned
18   to you.  And, yeah, the expectation is that we would
19   put together the management team, salaried workforce
20   that would sustain us not just for the current
21   production but into the future.
22       Q      Well, is it fair to say that you
23   understood that the Ford transitional employees would
24   be less valuable once the CVT transmission production
25   kicked in?

## PAGE 208

208

1        A      No, I wouldn't say that's true at all.
2        Q      Has ZF management used the Ford
3    transitional employees to groom other ZF new hires in
4    the production of the CD4E or the CVT?
5        A      I don't know what you mean by groom,
6    but if -- yeah, if you have experienced people, whether
7    they're Ford or ZF who came to the factory, and you're
8    going to be hiring in new people, whether they be
9    hourly or salaried, that, yeah, people need to be
10   taught and trained and educated to perform adequately
11   and it's gone both ways.  Frankly some of the Ford
12   transition employees have been taught the ZF way and
13   Ford's -- you know, so you've got two cultures coming
14   together so, you know, there's a fair amount of
15   exchange of information, knowledge to the good of the
16   organization.
17       Q      Although you said it goes both ways,
18   would you agree with me that primarily it has been the
19   Ford transitional employees who have helped train the
20   ZF Batavia employees regarding the mass production of
21   transmissions?
22       A      Yeah, I guess you could say that
23   because most of the operations people were by
24   definition Ford transition people during the metering
25   process and all, then new people were brought in.  Some

## PAGE 209

209

1    of them had a fair amount of experience, some had less.
2    Some in transmissions, probably most not in
3    transmissions, but maybe they made tractors or some
4    other type stuff.  And they would have to be taught,
5    you know, the ways of Batavia, if you will, in terms of
6    the proprietary systems and processes and whatnot that
7    occur in a factory.  So I think as a matter of practice
8    that's probably a true statement.
9            MR. SIMON:  Let's do these together.
10       I'm going to hand you Exhibit 13 and 14, which
11       again are a series of e-mails.  That's 13.
12           THE WITNESS:  Who's got Exhibit 12?
13           MR. SIMON:  This is 14.  I've just
14       given you Exhibit 13 and 14 together, Mr. Kehr,
15       because they're e-mails that are -- two of the
16       e-mails are just a day apart in March '99, but
17       I just have some questions about each of them.
18       You can familiarize yourself with them.  I
19       won't be asking if you agree with everything in
20       them, just certain things.
21           THE WITNESS:  Okay.
22   BY MR. SIMON:
23       Q      All right.  Exhibit 13 and 14 are, I'll
24   just represent, Mr. Kehr, e-mail exchanges mostly by
25   Mr. Warden on March 2nd and March 3rd, 1999.  And I

Case 1:02-cv-00406-SSB-TSB    Document 51-2    Filed 11/21/2003    Page 54 of 65
EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 210

210

1   acknowledge that you're not the subject -- none of
2   these e-mails were sent to you, but I just want to ask
3   you about some of these in here.
4           Turning to Exhibit 13, if you see in
5   the middle there where it says "Batavia salaried
6   employees that wish to remain with Ford..." -- do you
7   see that in that one?
8       A   Mm-hmm.
9       Q   It says that "Consequently, they are
10  particularly sensitive to openings at Sharonville.
11  Unless they are reassured that they will not be forced
12  out of the plant in the near future, I would expect
13  serious reactions to transfers to Sharonville from
14  other locations, which could include legal action
15  and/or union activity among eligible employees. This
16  is particularly risky given the protections for
17  unionized hourly and salaried employees not afforded to
18  non-union salaried employees."
19          Were you aware of this -- well, backing
20  up a second, would you agree with Mr. Warden's
21  statement that these salaried employees needed to be
22  reassured about not being forced out of the plant in
23  the near future?
24      A   I would say selected salaried employees
25  were probably concerned about what would be the

PAGE 211

211

1   transition window and whether they would be able to go
2   to Sharonville or not, so yeah, there were concerns
3   around what was going to occur -- occur in the future.
4       Q   When you say select employees, I mean,
5   I just kind of gathered from reading these e-mails from
6   Mr. Warden -- and you can feel free to disagree-- is
7   that there was significant apprehension and anxiety
8   among the salaried workforce about what was going to
9   happen with their employment at ZF Batavia; would you
10  disagree?
11      A   Well, I keep going back to characterize
12  it that there was a range of concern and whatnot that
13  started out probably more people than less at the early
14  stages in the late '98, early '99 that I think over
15  time was substantially alleviated. Yeah, I mean,
16  people -- some people wanted to get out of Batavia as
17  soon as absolutely possible.
18      Q   But you would agree that these concerns
19  were alleviated primarily because of the statements
20  that ZF Batavia made at the May 27th, '99 meeting and
21  the statements that are in the ZF Batavia summary which
22  is Exhibit 2, that those verbal and written statements
23  about what their terms and conditions of employment
24  would be at ZF Batavia certainly alleviated the
25  concerns; is that fair?

PAGE 212

212

1       A   No. That --
2           MR. HUNTER: Objection. That is just
3   way outside the scope of knowledge of Mr. Kehr
4   to understand a group of, what, of 160 people
5   believed or could have believed, and not to
6   mention, it was a bit compound.
7           MR. SIMON: Well, that last part was
8   fair. I'll re-ask the question.
9   BY MR. SIMON:
10      Q   I mean, wasn't the May 27th, '99
11  meeting and the fact that the package of compensation
12  including salary and benefits that is in Exhibit 2,
13  wasn't that all put together -- from your perspective
14  as the CFO for ZF Batavia, wasn't that all put together
15  to alleviate these serious concerns that the Ford
16  salaried employees had about going to ZF Batavia?
17      A   I guess I wouldn't agree with that
18  statement. There was things occurring in parallel.
19  There were those who -- those Ford salaried employees
20  who were not going to join the joint venture for
21  whatever their reasons, okay? So the May 27th meeting
22  to them was a non-event, probably didn't even show up.
23  So they were off on their own avenue, and I suspect
24  those are the ones in this time frame that were making
25  most of the noise. "I don't even want to hear from the

PAGE 213

213

1   joint venture. Just get me out of here as fast as
2   possible." Okay? Then there were the other employees,
3   probably, you know, the old 80 -- or the old 20 -- you
4   know, 20, 50, 30 scenario where some employees are like
5   "Well, okay, things aren't so bad. I'll hang in here
6   and we'll see what happens," okay? And then there's
7   the other employees who -- like myself and some others
8   who had all the confidence that we would be able to
9   work through the employment offers for those who were
10  going to accept and we would make that a fair and
11  equitable deal. And then for those who -- in that
12  large group that were willing to entertain, continue to
13  work hard in the company and see its success, some of
14  those were going to join the new company and some
15  weren't. And we worked hard to get a transition plan
16  in place to deal with those who weren't going to join
17  the company.
18          And that's what most of these e-mails
19  are addressing are those who ultimately either didn't
20  receive offers or didn't join the new company and were
21  going to go back to Ford. That with dealt with over
22  100 people in this category, who frankly may or
23  may not have even attended the May meeting. That was
24  specifically for the people who were interested in
25  coming to the new company, wanted to understand it

Case 1:02-cv-00406-SSB-TSB    Document 51-2    Filed 11/21/2003    Page 55 of 65
EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 214
214

1    better. You know, "What do you guys -- you know, what
2    do you have to offer us? Show us an employment offer.
3    Make me comfortable that, you know, this makes both
4    economic and personal sense to me."
5         Q     The last paragraph in Exhibit 13 says
6    _Given the unfortunate changes in direction that have
7    occurred so far, it is important that plans are
8    communicated to the Ford employees here by senior Ford
9    management (preferably HR)._
10        Let's take the second part of it. Do
11   you agree that it was important that these plans were
12   communicated to Ford employees by senior Ford
13   management? Do you agree with that statement?
14        A     Yeah. I would characterize, blanket
15   statement, that, yeah, communications to employees are
16   generally very positive and the right thing to do
17   particularly in this uncertain environment when you've
18   got a change in ownership of a facility with, you know,
19   literally thousands of people.
20        Q     What do you think Mr. Warren was
21   referring to -- Mr. Warden, excuse me, was referring to
22   when he said _Given the unfortunate changes in
23   direction that have occurred so far_?
24        A     I would imagine -- okay, I'm
25   speculating a little bit, but there was the shift in

PAGE 215
215

1    thought that all of the Ford salaried employees could
2    stay indefinitely to well, maybe only some of them, to
3    none of them and we need a JV work force. I'm almost
4    positive that that was what he's implying to there and
5    probably the transition timing. At one time, you know,
6    some people thought that there would be large -- you
7    know, almost all the Ford employees would join the new
8    company that said the transition then of those who
9    didn't join could be executed in a year. And depending
10   upon the numbers of employees, as it turns out, the
11   transition time frame was extended a little bit because
12   we had a good process in place and everybody was to be
13   treated fairly, opportunities were made available for
14   them and it was a success story that the board, you
15   know, and both parents said, you know, this is working
16   okay. There's no reason why we need to make something
17   occur in 12 months. And I think that's why you saw
18   maybe subsequently some of the information dealt more
19   with two to three years.
20        Q     Do you think the statement _Employees
21   have no confidence in Alain Claus, Dave Adams or me,_
22   Mike Warden -- do you think that was a fair statement?
23        A     I have no idea.
24        Q     Turning to Exhibit 14, I'll kind of
25   take you in the middle here. Do you see where it says

PAGE 216
216

1    _There also was a strong fear..._ in that first
2    paragraph? And I'm reading from Mr. Warden's e-mail
3    that looks like it was dated --
4         A     The last sentence in that first
5    paragraph?
6         Q     Yeah.
7         A     Okay.
8         Q     And, again, this is Exhibit 14, an e-
9    mail from Mr. Warden to Mr. Paistenhammer, right?
10        A     That's what it appears to be, yes.
11        Q     Mr. Warden writes _There also was a
12   strong fear that any offers given to employees here
13   from the JV will result in significant loss of
14   retirement benefits and/or salaries._ And then it
15   continues, _We explained and (I believe) the employees
16   accepted that this is not true, that if it were even
17   attempted, no one would be likely to accept an offer
18   from the JV._ Do you agree with the sentiments that he
19   indicated in those two sentences?
20        A     Given the continuum of time and the
21   communications that took place, as some of the other
22   exhibits said, that, you know, there are going to be
23   offers being made, you know, they are going to be
24   competitive and, you know, be patient and let the
25   organization get its act together and bring those

PAGE 217
217

1    offers forward. And since it is an optional
2    acceptance, then I don't understand why any employee
3    would disagree that says the employee -- if the offers
4    aren't competitive to where I am today, then they're
5    not going to attract any salaried employees to the
6    venture and they're going to have a nightmare trying to
7    maintain production. So, yeah, I would say it's, you
8    know, accurate in that regard.
9         Q     All right. So to avoid that nightmare
10   in production in 1999 and 2000 you made sure that you
11   offered a package to Ford transitional employees
12   that would be acceptable by a significant amount,
13   right?
14        A     Yeah.
15        Q     All right.
16        A     By reasonable people.
17        Q     And are you saying that given that
18   perspective, that you stood up there on the May 27th
19   meeting and you explained this summary of benefits that
20   was to be provided, that you specifically said that
21   this is subject to change?
22        A     Yeah.
23        Q     And you don't recall any negative
24   reaction among the attendees at that point?
25        A     Not that I recall.

Case 1:02-cv-00406-SSB-TSB    Document 51-2    Filed 11/21/2003    Page 56 of 65
EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 218

218

1    Q    All right. Does it seem surprising
2  that a group of people that may have been concerned
3  about their future at this new company, ZF Batavia,
4  that those people might be concerned to hear from the
5  CFO that their compensation including salary and
6  benefits was subject to change?
7    A    I don't think it's any different than
8  what they would have heard from any other employer.
9  Ford Motor Company changed their policies and
10  procedures in terms of co-pays and -- and whatnot,
11  their vacation. I mean, one time they said you earned
12  it in advance, then no, you earned it retroactively.
13  And Ford does the same thing. So yeah, every month or
14  every year you're curious to find out what's the latest
15  adjustments and what's going to occur in the wage and
16  benefit programs, what's the merit increases. Yeah.
17       So I would imagine that there might
18  have been a little bit more uncertainty clearly around
19  this one in terms of what it meant and just trying to
20  understand the detail. But to me this is, you know,
21  sort of business as usual when you're told that, you
22  know, anything that you're getting in terms of wage and
23  benefits are subject to change, or your employment, for
24  that matter.
25    Q    So you believe that it was reasonable,

PAGE 219

219

1  based on what you told the salaried employees in '99,
2  that they should certainly expect that down the road ZF
3  Batavia management is going to effectively disregard
4  the summary when they're making changes regarding sick
5  days, overtime, et cetera; is that fair?
6    A    I think I disagree with about
7  everything you said.
8    Q    What do you disagree with?
9    A    Why don't you -- see, sometimes you
10  make questions and sometime you make statements, so I
11  think you made a statement that I disagreed with. If
12  you want to ask me a question, then I can answer a
13  question.
14    Q    You didn't tell the salaried employees
15  at anytime in '99 that down the road ZF Batavia
16  management is not going to consider statements in that
17  written summary when it makes decisions about
18  compensation and benefits, et cetera?
19       MR. HUNTER: Objection again. I think
20       that's asked, answered. You asked that a
21       couple of hours ago. You can ask it again.
22  BY MR. SIMON:
23    Q    In terms of the verbal statements that
24  you made at the May 1999 meeting or at any private
25  meeting you made, you told them that -- you told the

PAGE 220

220

1  salaried employees that this package of benefits is
2  subject to change, right?
3    A    Subject -- I'm not sure if I used the
4  term subject to change. Clearly in the written form
5  that was handed out it says it's subject to change.
6  And during the discussions, given the counsel that we
7  had, we were to make sure that nobody assumes that this
8  was a guarantee or promise or assurance, that any
9  benefits programs are subject to change, modification
10  into the future.
11       I can't remember exactly what the words
12  were, but the appropriate, let's say, caveats were
13  provided for.
14    Q    And you don't recall any negative
15  reaction when you made those appropriate caveats?
16    A    I don't recall any.
17    Q    Exhibit 15. And just in the way of
18  saving time, I'm going to just refer you to a certain
19  part of Exhibit 15, Mr. Kehr, so you don't have to read
20  the whole thing.
21       Exhibit 15 is a series of e-mails in
22  and around December 30th, 2000 -- excuse me, December
23  and November of 2000 from various people. I'll just
24  refer you to -- and if you have to read other parts of
25  this to familiarize yourself with it for content,

PAGE 221

221

1  that's fine, Mr. Kehr. But this is an e-mail from
2  looks like Marty Mulloy and -- sorry. It's to Marty
3  Mulloy and Karen Horan and it's from Keith Kleinsmith,
4  dated December 4th, 2000. It says that "Prior to
5  meeting with the Ford Batavia people I wanted ZF
6  management to meet with each person and confirm any
7  commitments made to them on timing remaining with ZF
8  Batavia. ZF had tried to shorten that time by one
9  year, which represented a significant problem for those
10  employees intending on retiring. ZF has agreed to
11  honor the original commitments which will allow several
12  people to work through to retirement." Do you know
13  what Mr. Kleinsmith is referring to there?
14    A    Yeah. There was -- as I mentioned
15  before, when we said people needed to change over to
16  the ZF Batavia payroll by December of '99, it was
17  because, for instance, maybe somebody was going to
18  accrue five years -- you know, five weeks of vacation
19  based on seniority in October and it made sense to them
20  for whatever reason to wait till the last minute.
21  Other people, it didn't matter. So anytime you do
22  these kinds of things, you want to set established
23  dates. So people had to change payroll by the end of
24  December and that was a line in the sand.
25       And then we had numbers of employees

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 222

222

1  who were, you know, 28, 29 years seniority.  They
2  didn't want to join the new company and we all kind of
3  collectively said well, why don't we, you know, allow
4  them to stay and work here and as long as they retire
5  or otherwise take another assignment before the end of
6  2002, couldn't this be a reasonable, you know,
7  accommodation.  We did the same thing for other
8  employees who weren't necessarily going to be
9  retirement-eligible.  So this was accommodations made
10  as it related to the transition of the employees.  And,
11  in fact, my IT manager was one of the employees
12  affected by this, that to disengage from the Ford IT
13  systems, it would have been really nice to have a good
14  Ford IT guy on site to help through that transition, so
15  Mike was put into this category.  So that was what it
16  dealt with.
17       Q     Okay.  Exhibit 16.  Have you seen
18  Exhibit 16 before, Mr. Kehr?
19       A     Yes, I believe so.  I think this was
20  posted.
21       Q     All right.  This is a notice sent out
22  to all salaried employees and contract employees and
23  it's from Len Sennish, the director of human resources,
24  right?
25       A     That's correct.

PAGE 223

223

1       Q     And if you can, how did the foreign
2  trade zone regulations result in a change in policy for
3  salaried employees at ZF Batavia?
4       A     I'm not sure if it changed any policies
5  per se, but one of the requirements of the foreign
6  trade zone was to regulate access in and out of the
7  foreign trade zone real estate, if you will.  And we
8  determined the most effective way to do that would be
9  to install and activate the badge readers and whatnot
10  so that we had a record for -- you know, it was
11  particularly a big issue with the Ford hourly
12  employees, that they had to card in that they were, in
13  fact, entering the facility so that we had the proper
14  documentation required.  I mean, the other alternative
15  was a sign-in sheet or some other evidence.  So this
16  was -- looked to be as the best means by which to
17  gather the required information related to the foreign
18  trade zone.
19       Q     Now, salaried employees, pursuant to
20  this notice, were required to swipe the card when they
21  went in the plant as well as when they went out, right?
22       A     That's what it says.
23       Q     Now, were the hourly employees required
24  to swipe their cards when they went out?
25       A     Well, it says that -- just to correct

PAGE 224

224

1  your first statement, ZF Batavia salaried employees,
2  Ford salaried, contract employees, all were required to
3  swipe in and swipe out for purposes of the foreign
4  trade zone.  And we negotiated with the union and got
5  an agreement that they would swipe in.  The Ford hourly
6  employees particularly were an issue.  That they would
7  swipe in, but I do not believe we required them to
8  swipe out because I believe the way the gates operated
9  and whatnot, it was not practical or not possible.  I
10  don't know all of the details, but I know -- I think
11  they do swipe in.
12       Q     But the salaried employees swipe out?
13       A     Yes.
14       Q     I guess I don't understand.  How is it
15  not practical for the hourly employees to swipe out,
16  but it is practical for the salaried employees to swipe
17  out?
18       A     Well, I think it may be the way the --
19  the gates are set up.  I mean, you're talking about
20  1000, over 1000 hourly employees, and, therefore, you
21  have a different fundamental exit and entrance, you
22  know, security guards with whatnot.  I don't know -- I
23  don't know the specifics in terms of the mechanics as
24  to why necessarily the hourly employees couldn't swipe
25  out as well.  It could very well be a union -- a union

PAGE 225

225

1  issue.
2            Under the foreign trade zone the
3  requirement is -- is to know who enters the zone, okay?
4  The time that people, you know, leave or whatnot, it's
5  not, I don't believe, a requirement of the foreign
6  trade zone.  But if something should occur in a
7  facility, it would be nice to have as much information
8  as possible to see who was physically on the premises
9  at the time it occurred.  Because this foreign trade
10  zone is a very serious thing and those who don't follow
11  the requirements are subject to severe penalties.  So
12  more information is better.
13       Q     And this notice reflects the current
14  policy at ZF Batavia for swiping in and swiping out?
15       A     I don't know if it's a policy, if it's
16  a procedure or an operating pattern that, yeah, we
17  request salaried employees to badge in and badge out,
18  obviously while they're on the site.
19       Q     It says in that third paragraph,
20  _Please be advised that salaried timesheets will be
21  audited against Honeywell system readouts.  Your
22  manager will be asked to clarify notable differences
23  between them, and pay adjustments are a possibility if
24  no justification is forthcoming._
25            As you've explained the relationship

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 226

226

1  between the foreign trade zone regulations and this
2  notice, why did ZF Batavia -- why does ZF Batavia have
3  an audit of the swipes as compared to the salaried
4  timesheets?
5          A      Well, let's break it into its
6  constituents here.  You've got a foreign trade zone
7  regulation that requires a certain action on
8  management's part to meet the requirements.  Okay?
9  Then -- and I don't specifically know if this is the
10 right time frame, but we have had and frankly continue
11 to have some instances where you have what's called a
12 get-and-go, where if they can get their parts in eight
13 hours, then they get to leave and they get paid maybe
14 up to 12 hours, which is a fundamental breakdown and
15 can't be allowed to occur.
16         So we have on occasion said okay, well,
17 what is another means to justify and look at whether
18 hourly and salaried supervision are, in fact, in the
19 factory doing what they're supposed to be doing and not
20 running a get-and-go process.  So we have used this
21 data occasionally, as well as other information coming
22 off the part counters, to look at what parts were
23 produced, who is getting paid, including both hourly
24 and salaried people, to basically ensure that the
25 policies and the procedures and the pay scale and the

PAGE 227

227

1  wage and benefits programs are all being followed
2  appropriately.
3          Q      What does it mean by _Pay adjustments
4  are a possibility_?
5          A      Well, for instance, if we find out that
6  there's a salaried supervisor who met his part counts
7  and sent the guys over to the bowling alley and he was
8  going to buy beers and he left the factory, but decided
9  he was going to get paid for the full overtime of 12
10 hours -- I mean, that's an extreme example of how this
11 information would be compared to the timesheets to find
12 misreporting of hours worked.
13         Q      Well, wouldn't there be pay adjustments
14 also if the salaried employee put on his timesheet that
15 he worked eight hours when, in fact, the audit of the
16 card showed that he only worked seven and a half hours?
17         A      I don't know about that specifically.
18 All I can tell you is that in this time frame we had
19 the get-and-go circumstance and there was a conscious
20 decision by management to look at this information as
21 related to very serious offenses, Fair Labor Standard
22 Acts, I mean, you name it.  And, to my knowledge, it
23 was not intended to look at half-hour discrepancies or
24 any details like you're describing, for the purposes of
25 docking a salaried person for half an hour.  In fact,

PAGE 228

228

1  I'm not even sure if it's, you know, appropriate.  And
2  if it has occurred, it must be in a relatively limited
3  numbers in my judgment, but I'm not that -- that close
4  to it.
5          Q      All right.  You would agree that this
6  -- these two sentences that we just read, they don't
7  make any reference to overtime; would you agree with
8  me?  Where it says pay adjustments, do you see
9  anything in there, in those two sentences, that
10 reference that pay adjustments will be made regarding
11 overtime?
12         A      Well, it just talks about differences
13 between the salaried timesheets and what the Honeywell
14 readers indicate as the start and end of work.  And pay
15 adjustments could mean base or overtime I guess.
16         MR. SIMON:  Okay.  Let's go off the
17 record.
18         (RECESS)
19 BY MR. SIMON:
20         Q      We're back on the record, Mr. Kehr.
21 I'm going to kind of jump around a little bit and
22 actually go into some documents that, despite the size
23 of that stack, I think we can get through quickly.
24         The CD4E transmission, is that made
25 exclusively for Ford automobiles?

PAGE 229

229

1          A      Ford and its affiliates, yes.
2          Q      Okay.  One of the big -- one of the
3  main automobiles that it's used for is the Ford Escape?
4          A      That's correct.
5          Q      All right.  Has Dave Adams ever said
6  that the CD4E is just practice for the CVT?
7          A      Yeah.  I think I've seen that
8  terminology used, yes.
9          Q      Is that something that people at Ford
10 agree with?
11         A      Somebody -- well, I don't know what
12 Ford's -- what Ford believes of it.
13         Q      Have they ever told you their reaction
14 to that kind of sentiment?
15         A      No, I've never heard any reaction from
16 Ford on that sentiment.
17         Q      But Mr. Adams has said that CD4E is
18 just practice for the CVT or words to that effect?
19         A      I've seen written notes, you know,
20 practice for the CVT, yes.
21         Q      Okay.  Have the Ford transitional
22 employees been given fair opportunities to work on the
23 CVT?
24         A      Yes, to my knowledge.
25         Q      Do you know how many Ford transitional

Case 1:02-cv-00406-SSB-TSB    Document 51-2    Filed 11/21/2003    Page 59 of 65
EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 230

230

1  employees are currently part of the CVT transmission
2  production?
3          A       We're not producing the transmission.
4  But no, I don't know.
5          Q       Well, what do you call it?  What stage
6  do you refer to it as?
7          A       Well, we're beginning pre-production
8  builds, yes.
9          Q       All right.  If I told you that only two
10 Ford transitional employees were working on the CVT
11 transmission pre-production, would you be surprised?
12         A       Salaried people?
13         Q       Yes.
14         A       I guess I'm not surprised.  I think
15 there's only a total of seven.
16         Q       There's only -- there's only seven
17 salaried employees working on the CVT pre-production?
18         A       From the operations standpoint, to my
19 knowledge, yes.  Now, there's, you know, installation
20 of equipment going on where there's salaried people
21 supervising the installation of the equipment and doing
22 some validation prove-outs.  But I believe the budget
23 is seven or eight salaried heads for operations in the
24 CVT area.
25         Q       What about this other related work that

PAGE 231

231

1  you referenced, how many other salaried employees are
2  involved in that?
3          A       Oh, gosh, I don't know.  I believe
4  there's at least one maintenance supervisor assigned
5  full time, but I don't know what the salary
6  infrastructure is around that.
7          Q       Julie Hallere's replacement was Adam,
8  correct?
9          A       Adam Vahratian.
10         Q       And Julie was a ZF Batavia employee and
11 now she's back with Ford, right?
12         A       That's my understanding, yes.
13         Q       And Adam is also with Ford or with ZF
14 Batavia?
15         A       I think I mentioned earlier, I believe
16 he is a Ford seconded employee.
17         Q       Do you know why a ZF Batavia employee
18 was replaced by a Ford seconded employee?
19         A       Well, I think that position is the CVT
20 program manager and it's not deemed to be a long term
21 salaried requirement, so that's one reason why it would
22 make sense to put in a non-permanent ZF Batavia
23 salaried person.  And also, frankly I think the Ford
24 board members and management within Ford believes that
25 that position offers a good opportunity to train a Ford

PAGE 232

232

1  salaried person in, you know, the aspects of a stand-
2  alone business and it does have close ties back to the
3  Ford product development arena, so I think it's sort of
4  a natural fit for a Ford or ex-Ford employee to be in
5  that circumstance.
6          Q       All right.  Let me refer you to some
7  documents.  We won't make these exhibits.  It might
8  make things easier.  This is a document that is Bates
9  stamped number 218.  I believe that was produced by us,
10 the defendants.  And it says at the top _Critical plant
11 designation._  Do you know, have you ever seen this
12 document before?
13         A       Not to my knowledge.
14         Q       Do you know what a critical plant
15 designation is?
16         A       Yes, I do.
17         Q       Well, what is that?
18         A       I believe it's a -- term related to
19 the hourly contract that there are stipulations about
20 how many, I guess, overtime hours or overtime shifts
21 you can schedule hourly employees unless you go to a
22 critical plant designation, to which you get some
23 relief.  Apparently it's 90 days.  And it's something
24 that you do if you're really hard pressed to meet your
25 assembly plant requirements in our case.

PAGE 233

233

1          Q       And the plant was designated as
2  critical status in May of 2001?
3          A       I believe that's correct, yes.
4          Q       Was it taken off critical status 90
5  days after that?
6          A       We're no longer on critical plant
7  status.  I don't know when we came off of it.
8          Q       Whose decision is that to take the
9  plant off critical status?
10         A       To take it off and on I would say is
11 both operations, HR and probably somebody like Dave
12 Adams.
13         Q       All right.  Okay.  That's all I had for
14 that one.  We'll put that in a separate stack since we
15 won't make that an exhibit.
16                 This document is marked EWW10774,
17 produced by Ford.  And it says at the top _Appendix
18 three, allocation of separation incentive costs Batavia
19 salaried employees._  It has a little post-it note at
20 the bottom that says _To Ed Thompson from Karl Kehr._
21 Have you ever seen this document before?
22         A       Yes, I have.
23         Q       If you could just generally explain
24 what this document is.
25         A       Well, during the initial discussions,

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

PAGE 234

234

1  obviously when you negotiate a transaction of this
2  magnitude, you try and provide some direction or
3  clarification about how you would proceed if certain
4  events occur, and there was some discussion that if for
5  some reason there would be a separation incentive
6  program instituted, that the joint venture would
7  perhaps participate in sharing some of the costs. And
8  there was -- quite frankly, this was referred to as the
9  Tom Gorman schedule -- calculations as relates to how
10 the sharing of those costs would take place between
11 Ford and ZF. And frankly I don't think this was ever
12 agreed to and certainly never implemented.
13     Q.    Okay. And who authored this document?
14     A.    I believe it was Tom Gorman.
15     Q.    Okay. And who is Tom Gorman?
16     A.    Tom Gorman was my boss at the time,
17 when I was working at Ford in the mergers and
18 acquisitions group.
19     Q.    Okay. This is a multi-page affair that
20 was produced by Ford, EWW10636, and it says at the top
21 _7 week team, ZF/Ford Greater JV,_ it also says draft.
22 Just for expedience sake I'm not going to ask you to
23 review every one of these pages, Mr. Kehr, but if you
24 could try and identify, if you know, what this set of
25 documents concerns.

---

PAGE 235

235

1          Feel free to read all of the documents,
2  Mr. Kehr. My only question of you is just to give me a
3  general understanding to the extent you know about what
4  these documents concern. And I'm not going to ask you
5  to verify that because.
6      A.    Yeah, I guess I generally know what the
7  concept and the flavor of these are. And it seems like
8  there's two copies in here but okay.
9      Q.    Go ahead then, enlighten us as to what
10 these are.
11     A.    Okay. This seems to deal with the time
12 frame and maybe the discussion was taking place around,
13 I think, what ultimately became ZF Transmission
14 Technologies, LLC that I mentioned to you at the
15 beginning of the discussions. There were some
16 different scenarios looked about you know, with the
17 parents that frankly I participated in some of the
18 discussions, but most of them were held at the parental
19 level, as you can see by the documents. And I think it
20 ultimately culminated in the creation of ZFTT.
21     Q.    Do you know who created these
22 documents?
23     A.    Not specifically, no.
24     Q.    Is it Ford or ZF Batavia who created
25 them?

---

PAGE 236

236

1      A.    I would say that these were created not
2  at ZF Batavia. They were created by either Ford and/or
3  ZF, clearly a combination.
4      Q.    I see.
5      A.    It looks to me like it's a ZF-prepared
6  document. This P over here is probably the P division,
7  so this would probably have been done by the
8  Saarbrucken group. And the ZF logo. This was not, to
9  my knowledge, prepared by Batavia.
10     Q.    Now turn to page 659, which is the
11 second-to-last page there.
12     A.    Okay.
13     Q.    Do yo see where it says board of
14 directors and lists some names there?
15     A.    Yes.
16     Q.    I think you mentioned some of those
17 names before for ZF. Given the names listed as the
18 Ford directors, do you know what time period this was?
19     A.    Well, it was certainly beyond '99. I
20 would imagine, based on the date of some of this other
21 stuff, it would have been some time in, I guess, 2000,
22 2001 even. I don't know.
23     Q.    These three individuals that are listed
24 under Ford directors -- do you see the three names
25 there under Ford?

---

PAGE 237

237

1      A.    Yes.
2      Q.    Were these the people who were there
3  after Ford moved more senior people on the board of
4  directors or are these the people that were on the
5  board for Ford before that move occurred?
6      A.    Roman Krygier and Dave Szczupak clearly
7  came in as part of the move to, let's say, upgrade the
8  Ford board members. Roman is now a group vice
9  president. Dave Szczupak is a vice president. Jim
10 Donaldson retired perhaps last year. He may have been
11 one of the earlier board members or maybe an interim
12 step, but he was a board member with Jim Provit
13 (phonetic). I don't think he was a board member in
14 '99, but I could be mistaken.
15     Q.    How often does the board of directors
16 meet?
17     A.    We were meeting four times a year. Now
18 we meet three or four times a year, depending upon the
19 availability and the requirements.
20     Q.    Since 1999 has the subject of the Ford
21 transitional employees and their compensation and
22 benefits -- including benefits been raised at any of
23 those board meetings that you recall?
24     A.    No.
25     Q.    I'll hand these jointly to you, sir.

---

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 238

238

1  Again, we're not going to make an exhibit. There you
2  are. For the record, I'm handing you a single document
3  that's marked EWW10556 produced by Ford, as well as a
4  set of documents produced by Ford, Bates stamped 685
5  through 700. They both reference PTO. I'm just
6  showing these to you jointly. Let's take them
7  individually if we can. If you have to review the
8  documents further to give testimony, that's fine.
9          But the document marked 556 that says
10 PTO PVC 4/5 at the top, do you know what that document
11 is?
12     A      I have no idea. I haven't seen it. I
13 don't -- I can't even glean from the content what it's
14 even talking about.
15     Q      We'll move on to the next one.
16     A      Sorry.
17     Q      This one I have a feeling you'll know
18 more about. This is the set of documents beginning
19 with number 685 that says "ZF Batavia PTO management
20 discussion, February 11th, 2000" and continues through
21 document number 700. What was this about?
22     A      Let me take a look at it.
23     Q      Sure. Take your time.
24     A      Okay.
25     Q      All right. After reviewing this set of

PAGE 239

239

1  documents, can you explain what these documents are and
2  what perhaps this meeting on February 11th, 2000 was
3  about?
4      A      Yeah. I don't recall being in the
5  meeting itself, but looking at the document, it deals
6  with really, I think, two facets. One is the
7  continuing productivity and meeting schedule issues
8  that I've already talked to you about, so it looks like
9  it's reporting that continued lack of good performance
10 from the factory.
11          And then I think probably most
12 importantly what this is dealing with is a re-balance
13 in the window of balancing out the Contour/Mystique
14 CD4E production and getting ready to launch the Ford
15 Escape CD4E production and the need to, I guess,
16 furlough, lay off or otherwise accommodate hourly
17 employees in this valley preparing for the launch of
18 the Escape. Retooling the Kansas City assembly plant
19 was the driver, it appears, behind a lot of this.
20     Q      All right. Well, since you don't
21 remember being at the meeting, I won't be able to ask
22 you who else was at the meeting that you don't
23 remember. But notwithstanding that, who typically
24 would attend this kind of meeting?
25     A      I don't know. I would think that given

PAGE 240

240

1  this, it was probably something that Dave Adams may
2  have participated in, perhaps Len Sennish because of
3  the HR details, and possibly obviously power train
4  management. There must have been some people from
5  Ford's power train operations management. That's what
6  PTO is. It may have included a combination of
7  operating types, as well as some labor relations folks.
8  But that's really only a guess based upon the content
9  of the package.
10     Q      All right. This document I'm afraid I
11 only have a couple copies of, but this is documents
12 that we produced by fax yesterday and hard copies were
13 given to counsel this morning. It concerns employment
14 of Rick Ervin, which is one of the three new plaintiffs
15 added to the lawsuit, so that's why this production was
16 made supplementally by the plaintiffs. It's marked
17 numbers 262 through 266 and it involves an e-mail
18 exchange with Mr. Ervin and Mr. Kehr and others in
19 January of 2003.
20          Generally, Mr. Kehr, were you aware of
21 Mr. Ervin's inquiry into whether he could obtain
22 retirement benefits from Ford and still retain his
23 employment at ZF Batavia?
24     A      Well, I'm aware of the issue that was
25 brought to my attention by Len Sennish on January 13th,

PAGE 241

241

1  so I read the subsequent e-mails at the time and
2  determined that Bonnie Gorichan, who is the Ford labor-
3  type attorney, would be the best person to, you know,
4  opine on this matter, so I left her a voice mail, said
5  I was going to send her an e-mail chain and would
6  appreciate getting back to me, which she subsequently
7  did.
8      Q      Ms. Gorichan, whose name appears on the
9  first page of this document, number 262, she's an
10 attorney with Ford?
11     A      That's correct.
12     Q      And where does she -- where does she
13 work?
14     A      Well, she works in Dearborn somewhere
15 and she's a labor expert inside of Ford. In fact,
16 Bonnie has, you know, worked with us since the
17 beginning of the joint venture. She helped review that
18 tri-fold document, Exhibit 2, I believe, at the time,
19 so she was extremely familiar with what the intentions
20 were and the wording and whatnot around this Ford
21 transition retirement benefits, so I thought she was
22 the best person to address this.
23     Q      All right.
24     A      I also forwarded this to Lee Mezza when
25 I heard back from Bonnie, and asked Lee Mezza to let me

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 242

```
                                                         242
 1    know if he disagreed with Bonnie's assessment because,
 2    notwithstanding those present, you can't always take
 3    the attorney's response at face value, so I went to a
 4    businessman.
 5        Q        Did he give you a different opinion?
 6        A        No.  He didn't respond back.  I told
 7    him only to get back to me if he disagreed, so I think
 8    he agreed.
 9        Q        All right.  So the position as set
10    forth by Ms. Gorichan hasn't changed since then
11    regarding Mr. Ervin's retirement?
12        A        Not to my knowledge.  And frankly I
13    think ZF -- well, I know ZF Batavia, I personally
14    support her recommendation as being consistent with the
15    intentions of what we were offering, so it wasn't like
16    I disagreed with her and wanted to take this on at any
17    kind of a higher level.  She basically reconfirmed what
18    I thought the answer would be.  But as you can see by
19    my e-mail, I did not lead her by any means as to what I
20    thought the outcome should have been.  In fact, if she
21    would have come back and said, oh, no, let's go ahead
22    and do that, I would have been elated that we could
23    have made this available to some of these Ford
24    transition employees.
25              I did request that Lee Mezza go back to
```

PAGE 243

```
                                                         243
 1    the NESC desk, though, and clarify that those people --
 2    when it comes to the Ford transition employees, because
 3    of the uniqueness of this language around the grow-in
 4    provisions and whatnot, that there be a flag put in
 5    there that says these types of questions from these
 6    types of employees should be elevated to the
 7    appropriate people who are familiar with the underlying
 8    programs because this is a quite -- quite unique
 9    structure within Ford.
10        Q        I'm not going to make this an exhibit
11    either.  This is a document that says at the top
12    "Batavia salaried employee retirement transition
13    agreement" that was produced by Ford, Bates stamp
14    number EWW1504 through 514.
15        A        I'm familiar with this.  In fact, I
16    signed it.
17        Q        All right.  Are the last several --
18    let's see here.  Turning your attention to 510, do you
19    see your signature?
20        A        Yes.
21        Q        And then is 511 indeed -- is that an
22    exhibit to this agreement, if you know?
23        A        I think 511 to 514, at least --
24        Q        Thirteen is missing.
25        A        I -- I don't know if this was attached
```

PAGE 244

```
                                                         244
 1    to it or not.  I mean, I'd have to read the document to
 2    find out if this is an attachment.  But I think some of
 3    these things were part of the joint venture agreements
 4    or the secondment agreements as part of the joint
 5    venture transaction that possibly could have been
 6    attached as reference to this particular agreement.
 7        Q        Putting aside the issue of whether the
 8    exhibits are attached then, I guess numbers 504 through
 9    510, which is the page with your signature, is it your
10    understanding that this is the current agreement that
11    governs the retirement benefits for Batavia salaried
12    transition employees?
13        A        Yeah.  I think this document required
14    that Ford go make sure this stuff happened, like the
15    amendments to the general retirement plan was going to
16    be modified.  And this was my assurance that those
17    retirement-related benefits that affected the Ford
18    transition employees, in fact, did occur and didn't get
19    lost somehow in the Ford system, so we put this
20    document together.  Does that answer your question?  To
21    my knowledge, it has not been modified.
22        Q        All right.  Just to prove that I like
23    to do things backwards, let me show you the joint
24    venture agreement.
25        A        These I think I've memorized.
```

PAGE 245

```
                                                         245
 1        Q        I'm not going to make this an exhibit.
 2    It's not necessary to do so.  But it's marked --
 3    produced by Ford, Bates stamped EWW1380 through 415.
 4    I'm also handing you the amended and restated joint
 5    venture agreement that's marked Bates stamp 472 through
 6    501 -- pardon me, that's 472 through 503 is the amended
 7    and restated joint venture agreement.
 8              Now, the joint venture agreement was
 9    entered into January 1st, 1999, correct, Mr. Kehr?
10        A        That's correct.
11        Q        And then the amended and restated joint
12    venture agreement -- it says it right on the agreement
13    -- was entered into April 12th, 2001.
14        A        That's correct.
15        Q        And is it my understanding that the
16    purpose of the amended and restated joint venture
17    agreement was for the purpose of creating ZF
18    Transmission Technologies?
19        A        I believe that was the primary purpose
20    of this document.  I believe we also cleaned up, if you
21    will, or made clarifying changes to some of the
22    language that was in the original joint venture
23    agreement.  But the primary purpose was to create ZFTT.
24        Q        I might point out that one difference
25    is -- if you look at paragraph 7.1 of the original
```

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 246

246

1 agreement, which is Article VII, employee relations,
2 would you agree with me that the employee relations
3 section that's in the first joint venture is not in the
4 amended and restated joint venture agreement?
5         And I'm not trying to trick you, Mr.
6 Kehr. The document is what it is but --
7     A    I don't know.
8     Q    Okay. All right. Focusing then on
9 paragraph 7.1 of the original joint venture -- do you
10 have that in front of you?
11    A    Mm-hmm.
12    Q    It provides that "Salary employees of
13 Ford who are presently assigned to the Batavia facility
14 will be provided to the Company..." which is ZF Batavia
15 "...by Ford in accordance with employee secondment
16 agreements." Indeed is that what occurred?
17    A    Yes.
18    Q    And would you agree that it was
19 important, an integral part of the joint venture, that
20 Ford provide these salaried and hourly employees to ZF
21 Batavia?
22    A    Yes. And under what terms they'd be
23 compensated, yeah. I mean, that was what that was
24 mostly about.
25    Q    Paragraph 7.3.1, I'm just going to pick

PAGE 247

247

1 it up in the second sentence of 7.3.1. "Subsequent to
2 the Company's employment offers, but no sooner than one
3 (1) year after the closing date, Ford will accept from
4 the Company..." -- and I'll stop for a second. The
5 company, would you agree with me, is identified as ZF
6 Batavia, LLC?
7     A    I agree.
8     Q    Okay. It goes on to say that "...Ford
9 will accept from the Company, within a commercially
10 reasonable period of time and consistent with the
11 ongoing needs of the Company, all Ford salaried
12 employees not receiving offers of employment from the
13 Company." Did Ford meet that obligation, to your
14 knowledge?
15    A    Well, I'm sure it met the spirit of the
16 agreement. I -- I don't know if -- no sooner than one
17 year after, I don't know. But I'd say reasonably
18 commercial terms were established and met at the two to
19 three years and, to my knowledge, all the Ford salaried
20 employees have been dispositioned by one means or
21 another.
22    Q    Did they all accept -- those employees,
23 did they all continue their employment with Ford or did
24 some of them experience a separation of employment?
25    A    Well, there was over 100 of them. I

PAGE 248

248

1 believe the majority of them were reassigned, some
2 retired during the course, some retired and then joined
3 Batavia. And I think, to my knowledge, there were no
4 separations, but there might have been a couple of the
5 Ford salaried employees near the back end that frankly
6 just couldn't seem to be placed, so I don't know. But
7 if there were any, I think you asked me about
8 separations, it was extremely limited numbers and I'm
9 not aware, in fact, even if there were any.
10    Q    Okay. 7.3.3, I'll just read it for
11 you. "As job openings occur within the Company..."
12 which is ZF Batavia "...for both salary and hourly
13 positions, the Company shall hire its own workforce
14 with the ultimate goal of having all positions filled
15 by employees of the Company." Has that taken place?
16    A    Yeah, I would say in, you know, 99.9
17 percent of the instances as we have openings occur, we
18 hire either ZF Batavia salaried employees or ZF Batavia
19 hourly employees. And in rare instances we might have
20 a parent, for instance, Adam Vahratian, come in and
21 fill a particular salaried position, but that's by far
22 the exception.
23    Q    7.4.3, it says "The Parties shall use
24 good-faith efforts to facilitate the timely transition
25 of the Company's workforce to the Company's payroll to

PAGE 249

249

1 achieve the labor cost structure contained in the
2 initial Business Plan." Has that happened?
3     A    Yes. Extremely good-faith effort.
4     Q    Have you achieved the labor cost
5 structure contained in the initial business plan?
6     A    From the salaried standpoint, yes.
7     Q    And when was this business plan
8 created?
9     A    It was created during the negotiations
10 between Ford and ZF back in 1998.
11    Q    To your knowledge, has a copy of that
12 been retained?
13    A    Oh, yeah. Yeah, the original business
14 plan is available.
15    Q    Is it updated?
16    A    No. Well, the business plan is
17 prepared more often than I care for, but the original
18 business plan is clearly, you know, understood by all
19 the parties. When you say original business plan,
20 that's what, you know, this would have been referring
21 to when it says in the initial business plan.
22    Q    And when you talk about the other
23 business plans that you prepare often, is that done on
24 an annual basis or --
25    A    Yeah. We have an annual business

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

PAGE 250
250
1  planning process, but given the nature of the joint
2  venture and whatnot, we often prepare more than one
3  business plan a year.  Unfortunately sometimes it's as
4  high as 20.
5      Q      As high as 20 business plans?
6      A      Twenty business plans, different cuts,
7  different looks, depending upon all this stuff.  We
8  don't need to go there.
9      Q      Okay.  Paragraph 10.1, it says Article
10 X, Management.  10.1 says "The Company shall be managed
11 and operated consisted with the business objectives
12 outlined in Article III and its Business Plan, and in
13 accordance with its Articles of Organization and
14 Operating Agreement."  Does the company retain a copy
15 of the operating agreement?
16     A      Yes.
17     Q      Is that updated from year to year?
18     A      Well, as I understand the legalisms of
19 an LLC, the operating agreement is something that's
20 required and it defines, I think, some management
21 responsibilities, authorities, but predominantly with
22 an LLC the operating agreement has less substance to it
23 and it's really the joint venture agreements that are
24 most important.  But I do occasionally refer to the
25 operating agreement and read certain sections as

PAGE 251
251
1  relates to my job.
2      Q      10.2 there refers to the board of
3  directors.  It refers to the president of the company
4  as being a director.  Is that currently the case?
5      A      No.  I think, as I mentioned earlier
6  today, there was -- I think Dave Adams was shown as a
7  non-voting member of the board, being the seventh
8  director, and then I think in this latest agreement
9  that no longer is the case.  I think it's Glenn Warren
10 and Gerhard Wagner, so that's what I alluded to
11 previously.
12     Q      Are there any significant decisions
13 made in the plant that don't get Ford's approval?
14     A      Oh, many, most, almost all.  If you go
15 to these agreements and the operating, there's a great
16 deal of delegated authority to the joint venture
17 management team, that, yeah, we're responsible for
18 running the business and we report to the board.  And
19 there are some things that the board needs to approve,
20 like charitable contributions and a few other things.
21 And as long as we're operating in the normal course of
22 business, operating management has the authority to do
23 what it needs -- needs to do.  Obviously if we're going
24 to go buy vacant land someplace, that would be a board
25 required.  So there's -- there's a list of things that

PAGE 252
252
1  the board has to approve and then also what the members
2  have to approve.  But it was structured for Batavia to
3  be a stand-alone company with the authority to execute
4  the business as it sees fit.
5      Q      When you referred to the things that
6  the board has to approve or the members have to
7  approve, what documents set forth those --
8      A      I'm surprised --
9      Q      -- understandings?
10     A      I'm sorry.  Were you done?
11     Q      Yes.
12     A      I'm surprised it's not in here.  If
13 it's not in here, it must be in the operating
14 agreement.
15     Q      Your attorney is nodding, so --
16         MR. HUNTER:  I'm just trying to be
17 helpful.  Sorry.
18         MR. SIMON:  Yes, that's fine.  That's
19 quite all right.
20 BY MR. SIMON:
21     Q      Do you know of a Mr. McDonald who was
22 ever on the board of directors?
23     A      Mac MacDonald?
24     Q      I don't know his first name.
25     A      Well, there was a Mr. MacDonald that

PAGE 253
253
1  was the Ford treasurer, still is the Ford treasurer,
2  that was never -- to my knowledge, no, he was not a
3  board member.
4      Q      He still is the Ford treasurer?
5      A      Yes.  Well, he was at the time of the
6  joint venture.  In fact, he was sort of a second-level
7  boss to me when I was in the mergers and acquisitions
8  group and then he went off and did some other stuff and
9  then he's actually come back into that same position,
10 if it's the same Mr. MacDonald.
11     Q      His first name is Mac?
12     A      Is it spelled M-A-C?
13     Q      I don't know.
14     A      Oh, okay.
15     Q      Did you say his first name -- I think I
16 misunderstood you.
17     A      Well, you said Mr. MacDonald.  The only
18 one I'm aware of that had anything to do with this,
19 McDonald, is Mac MacDonald who is the Ford treasurer,
20 but I'm -- I don't know.
21     Q      What did he have to do with the joint
22 venture, if anything?
23     A      Well, Tom Gorman, my boss, worked for
24 Mac MacDonald, co-reported to him and I believe it may
25 have been Jim Donaldson, the business strategy office,

RIVERSIDE REPORTING
(859)291-6110(KY) -- (513)574-7017(OH)

EVERETT W. WHISMAN, et al. vs. ZF BATAVIA, LLC, et al.
KARL S. KEHR
3/18/03

---

**PAGE 254**

254

1  and Mac's role would be -- would have been the
2  fiduciary responsibility around looking at the
3  valuations of the contributed assets, the structure of
4  the business, all the things that, you know, treasurers
5  do is what his role was in this.  I had numerous
6  meetings with Mac in -- in structuring the -- the joint
7  venture.  But in terms of setting it up operationally
8  and any involvement since the beginning, it's been
9  essentially nil.
10       Q     Do you know of any Mr. McDonald at Ford
11  who has responsibility in connection with hourly
12  employees at ZF Batavia?
13       A     No, not that I'm aware of.
14       Q     Is there a Jim Donaldson that works at
15  Ford?
16       A     Jim Donaldson is retired now, but he
17  was shown on some of the other documents.  I'm not sure
18  if they're exhibits or not, but I did see Jim
19  Donaldson's name on there.  And, yeah, he was a board
20  member for a period of time.  I believe he was also a
21  vice president.
22       Q     Vice president at Ford?
23       A     For Ford, yeah.
24       Q     Did he have responsibilities in
25  connection with the labor force at ZF Batavia?

---

**PAGE 255**

255

1       A     No, not that I'm aware of.  When you
2  say the labor force, are you talking about hourly or
3  salaried?
4       Q     Either one.
5       A     When you say labor, I always think
6  hourly.  Jim wouldn't have any involvement on the
7  hourly side.  I do recall having a meeting with Jim
8  Donaldson prior to a board meeting where we got these
9  benefit programs approved.  And Jim had asked me to
10  come up and bring him up to speed, I think, with the
11  joint venture.  And I went through with him the wage
12  and benefit programs and whatnot, not just for the
13  transition employees but at large.  And he asked me
14  questions about, you know, are we getting everything
15  set up and da, da, da, da.  And I thought the review
16  went very well and didn't hear or have any other
17  meetings with him specifically as it dealt with wage
18  and benefit programs.
19       Q     All right.  The amended and restated
20  joint venture agreement refers to an alternate dispute
21  resolution provision, which is not unusual in this type
22  of agreement.  Have you ever exercised that provision
23  in any dispute between Ford and ZF Batavia?
24       A     No, not that I'm aware of.
25             MR. SIMON:  I think I'm done.  Off the

---

**PAGE 256**

256

1             record for a second.
2                  (OFF THE RECORD)
3             MR. SIMON:  Back on the record.  I have
4  no further questions.  Thank you, Mr. Kehr.
5             THE WITNESS:  Thank you.
                     - 0 -
           (AND FURTHER THE DEPONENT SAITH NAUGHT)
                     - 0 -

_____
        Karl S. Kehr

---

**PAGE 257**

257

            C-E-R-T-I-F-I-C-A-T-I-O-N
STATE OF OHIO,
COUNTY OF HAMILTON, To-wit;
             I, Susan K. Lee, CVR-CM, Court Reporter
and Notary Public in and for the State of Ohio, do
hereby certify;
             That on the 18th day of March, 2003,
there appeared before me pursuant to Notice and
agreement of counsel, KARL S. KEHR, as a witness in the
previously entitled cause;
             That the said witness was sworn by me
and examined to tell the truth, the whole truth, and
nothing but the truth in said cause;
             That the deposition was taken by me via
Stenomask and electronic recording and the foregoing
256 pages contain a true, full and correct
transcription of all the testimony of said witness;
             That the deposition was submitted to
counsel for the witness for reading and signature;
             That I am not related to or in any way
associated with any of the parties to said cause of
action, or their counsel, and that I am not interested
in the event thereof.
             IN WITNESS WHEREOF, I have hereunto set
my hand this 19th day of April, 2003.


                     _____
                     Susan K. Lee, CVR-CM
                     My commission expires:
                     August 30, 2004

---