1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION, CINCINNATI

4
   EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
5
          Plaintiffs,         : Judge Beckwith
6
   V.                         : Magistrate Sherman
7
   ZF BATAVIA, LLC, et al.,   :
8
          Defendants.         :
9    _____

10        Deposition of RANDALL NEWSOME, taken on

11   Thursday, August 21, 2003, commencing at 10:55

12   a.m., at the offices of Baker & Hostetler LLP, 312

13   Walnut Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20
                   GIGLIO REPORTING SERVICES
21                     3 CYPRESS GARDEN
                   CINCINNATI, OHIO 45220
22                      513-861-2200

23

24

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3      Stephen A. Simon, Esq.
        22 West Ninth Street
 4      Cincinnati, Ohio 45202

 5   On behalf of Defendant ZF Batavia, LLC:

 6      John J. Hunter, Jr., Esq.
        Hunter & Schank Co., L.P.A.
 7      1700 Canton Ave.
        Toledo, Ohio 43624

 8
     Also present:
 9
        Herb Huebner
10
     On behalf of Defendant Ford Motor Company:
11
        Jeffrey L. VanWay, Esq.
12      Baker & Hostetler LLP
        312 Walnut Street, Suite 3200
13      Cincinnati, Ohio 45202

14
     Cross-Examination
15
        by Mr. Hunter                    4, 76
16
        by Mr. VanWay                    48
17

18

19

20

21

22

23

24
```

3

| | NEWSOME DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 27 |
| 3 | | |
| 4 | 4 | 23 |
| 5 | | |
| 6 | 119 | 29 |
| 7 | 120 | 34 |
| 8 | 121 | 55 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    RANDALL NEWSOME
 2    being first duly sworn, testified as follows:
 3                    CROSS-EXAMINATION
 4    BY MR. HUNTER:
 5         Q.    Sir, would you please state your name
 6    for the record?
 7         A.    Randall Newsome.
 8         Q.    And your current address, Mr. Newsome?
 9         A.    1136 Stewarton Avenue -- or Street --
10    or Drive -- 1136 Stewarton Drive, Amelia, Ohio
11    45102.
12         Q.    Mr. Newsome, you got here a little
13    late -- not actually late, after we started Ms.
14    Parker's deposition this morning, I believe?
15         A.    Mm-hmm.
16         Q.    Have you ever had your deposition
17    taken before?
18         A.    No.
19         Q.    Okay.  I want to talk a little bit
20    about kind of the ground rules.  And I understand
21    you saw part of Ms. Parker's, but in terms of the
22    format today, it's really going to be kind of a
23    question and answer format.
24              I'm going to ask you questions about
```

1    litigation that you have brought against the

2    company.  Hopefully I will do so in a clear manner

3    and loud enough that you can hear me.

4          If at any point you don't hear what

5    I've said, you don't understand what I've said, or

6    for whatever reason, you just can't fairly answer

7    my question, I want you to let me know that, okay?

8          A.    Okay.

9          Q.    Is there anything today that would

10   prevent you from being able to go forward with your

11   deposition, in terms of a personal issue, a medical

12   issue or anything like that?

13         A.    No.

14         Q.    If I use the term "transitional

15   employee," what does that term mean to you?

16         A.    "Transitional" means I transitioned --

17   I was a Ford Motor Company employee and I

18   transitioned to ZF Batavia.

19         Q.    Okay.  And are you a Ford transition

20   employee?

21         A.    Yes.

22         Q.    Okay.  Prior to coming over to ZF

23   Batavia, how long had you been with Ford?

24         A.    23 years, I believe three months, two

1    months, something like that.

2         Q.    Okay.  Do you remember what you hired

3    into Ford as?

4         A.    I was an hourly person hired in as a

5    final inspector.

6         Q.    Were you covered under the collective

7    bargaining agreement then at that point?

8         A.    Yes.

9         Q.    Do you remember what position you

10   moved to next?

11        A.    Next, I believe I was a general

12   inspector.

13        Q.    And was that still hourly?

14        A.    Yes.

15        Q.    Okay.  And after that?

16        A.    After that, then I believe it was a

17   floor final inspector.

18        Q.    Okay.  And that still would have been

19   an hourly position?

20        A.    Yes.

21        Q.    Okay.  And after that one?

22        A.    After that, I believe the next

23   position would have been -- there was periods of

24   being laid off and stuff in there, too.  So when I

```
 1    was called back, there was some -- you know, just

 2    TSR's I think is what they called them, just a

 3    temporary person.  But my last position was a -- as

 4    an hourly was a -- I guess now is what they would

 5    call a manufacturing tech, I guess.

 6         Q.    Okay.  At some point in time, then,

 7    apparently after the manufacturing tech position,

 8    you became salaried?

 9         A.    Yes.

10         Q.    What was your first salaried position?

11         A.    Line supervisor on the case line in

12    the valve biting machining area.

13         Q.    Now, approximately what year was that?

14         A.    I believe that was April of 1990.

15         Q.    Of '91?

16         A.    '90.

17         Q.    '90?  Was that over at Batavia or

18    Sharonville?

19         A.    Batavia.

20         Q.    Are you one of those guys that was in

21    Batavia when they opened the doors?

22         A.    Yes.

23         Q.    Okay.

24         A.    I actually started at -- at
```

8

```
 1   Sharonville --

 2        Q.    Okay.

 3        A.    -- in '76, June '76.

 4        Q.    And Batavia opened in --

 5        A.    And I went from Sharonville, I left

 6   there in '79 and came to Batavia in 1980, June or

 7   July of 1980.

 8        Q.    Okay.  And that would have been when

 9   you were an hourly --

10        A.    Yes.

11        Q.    -- under the collective bargaining --

12        A.    Yes.

13        Q.    -- agreement?  All right.  The line

14   supervisor was your first salaried position.  Do

15   you remember where you next moved to?

16        A.    Next moved to a -- I believe was a

17   group leader's position of a work team of

18   department 230.

19        Q.    What's 230?  Which one is that?

20        A.    It was department 230.  It was small

21   aluminum --

22        Q.    Oh, okay.

23        A.    -- machining area.

24        Q.    And how many people did you supervise
```

9

1   at that point?

2        A.    I don't remember the exact numbers,

3   10, 12, something --

4        Q.    Okay.

5        A.    -- like that.

6        Q.    How long did you hold the position of

7   group leader?

8        A.    That position, approximately eight,

9   nine months, I believe.

10        Q.    Okay.  Then where did you move to?

11        A.    Then, from that position, I moved to

12   group leader in the new CD4E area.  Took over the

13   clutch machining and assembly area.

14        Q.    Okay.  And after that?

15        A.    After that, I moved to maintenance

16   expeditor.

17        Q.    Did you continue to manage people at

18   that position?

19        A.    No.

20        Q.    What were your responsibilities as a

21   maintenance expeditor?

22        A.    I purchased repair machine parts for

23   machines that were broken down.  That was the main

24   function of that job.

1          Q.    Okay.  And that sounds like that was

2    your first foray into the maintenance department?

3          A.    Yes.

4          Q.    Okay.  Have you been in maintenance

5    since that time?

6          A.    No.

7          Q.    Okay.  All right.  Let's go through

8    here.  All right.  So you were a maintenance

9    expeditor.  Where did you move to next?

10          A.    From maintenance, then I went into

11    material control --

12          Q.    Okay.

13          A.    -- and this was with -- when I --

14    after I transitioned to ZF Batavia.

15          Q.    Oh, okay.  Well, let's -- yeah, let's

16    stick with your Ford tenure.

17          A.    Okay.

18          Q.    All right.  So prior to coming on to

19    Batavia, just prior, apparently you would have

20    been, then, the maintenance expeditor?

21          A.    Yes.

22          Q.    All right.

23          A.    And when I -- and then when I went

24    into -- when I came on to ZF Batavia, I was also a

 1   maintenance expeditor.

 2          Q.     Okay.  Well, that's what I thought.

 3          A.     Yeah.

 4          Q.     And now --

 5          A.     Yeah.

 6          Q.     -- since you been at Batavia, you're

 7   now in material control?

 8          A.     I was and now I'm into a different

 9   position.

10          Q.     Okay.  And what's that?

11          A.     I'm now in the admin -- admin

12   engineering group.  I handle the billing materials

13   and manage the change for the plant.

14          Q.     And what do those responsibilities

15   entail?

16          A.     Those entail taking the design bill of

17   the transmissions and putting them into a

18   manufacturing bill so that the floor knows all the

19   components that go into the transmissions.  And I

20   have the responsibility of the CD4E, the U204s and

21   also the new CVT transmissions that's coming

22   online.

23               The manage -- the change portion of it

24   is -- is managing those changes on the floor from

1  starting the changes and making sure that those

2  changes happen on a timely basis.

3       Q.    And when you say about "change," are

4  you talking about design changes --

5       A.    Yes.

6       Q.    -- or application --

7       A.    Design changes to the transmission.

8       Q.    Okay.

9       A.    They may change a seal or may change

10  the design of a piston or whatever, making sure

11  that those designs are incorporated when they're

12  supposed to be.

13       Q.    Okay.  How long have you been in the

14  administrative engineering, just roughly?

15       A.    Approximately -- I believe about a

16  little over two years.

17       Q.    Okay.  With respect to the litigation

18  that has been brought, it's my understanding that

19  there's a list or array of issues that -- that

20  exist, in terms of promises or representations that

21  the Ford transitionals feel were made to them that

22  ZF Batavia has not followed through on.

23       A.    Yes.

24       Q.    Can you kind of give me that laundry

13

```
 1   list of concerns from your point of view?

 2          A.    One is overtime.

 3          Q.    Okay.

 4          A.    The vacation pay -- or vacation.   The

 5   AIPs.  The mind has gone blank.

 6          Q.    It's not really a quiz.  If you think

 7   of them later, we can talk about them and they may

 8   come to you.

 9          A.    Bereavement was one.  I can't

10   remember.

11          Q.    Okay.

12          A.    I know there was several of them, but

13   I just can't remember at this time.

14          Q.    Oh, sure.  And that's all right.  If

15   you think of them as we discuss them -- I suspect

16   that may happen -- just let me know --

17          A.    Okay.

18          Q.    -- okay?  Overtime, let's talk about

19   your concerns with respect to overtime.  What are

20   your concerns or issues with respect to overtime?

21          A.    With the overtime was -- was that if

22   we weren't -- we had to work 10 hours to be paid

23   for one hour overtime.

24          Q.    Okay.
```

 1          A.    But it was -- it was like we were

 2    mandatorily saying we had to give one hour to the

 3    company.  Now, when we were at Ford, if we worked

 4    an hour over, we were paid that hour.

 5          Q.    And this may sound like a silly

 6    question, but what if you worked 59 minutes over,

 7    were you paid for that?

 8          A.    No.

 9          Q.    And that's what many others have told

10    me is that in one sense, what we seem to be talking

11    about here is a minute difference.  Is that your

12    understanding?

13          A.    Yes.

14          Q.    Okay.

15          A.    I mean, there was a lot of times

16    that -- you know, with Ford, that I may have worked

17    an hour, hour and a half that was never put on the

18    timecard, but that was my choice.

19          Q.    Is that what I've heard referred to as

20    casual time?

21          A.    Yes.

22          Q.    Did you have an understanding at Ford,

23    in terms of Ford's expectations regarding casual

24    time?

15

1       A.   Yes.  When I went into supervision,

2  casual -- it was expected that you come in anywhere

3  from a half hour to 15 minutes before your shift

4  and usually 15 minutes to a half hour after your

5  shift to -- to get lined up, if there was any

6  problems before the shift, to make contact with the

7  supervisor.  And then if you were followed by a

8  supervisor, to make sure that you lined up the

9  supervisor following you.

10      Q.   Okay.  And that supervisor, you're

11  saying over a half hour, that supervisor would be

12  in a half hour early and you'd do the hand off, or

13  whatever you want to call that?

14      A.   Exactly, yeah.

15      Q.   Any other issues with respect to

16  overtime?

17      A.   No.

18      Q.   Okay.  Now, with respect to your

19  understanding or what you thought you were going --

20  how you were going to be treated for overtime,

21  where did you develop your understanding, in terms

22  of what you thought you were going to receive when

23  you came over to ZF Batavia?

24      A.   On the -- on our brochure, the

1    brochure says we would be paid for our overtime and

2    that was in our -- in the meetings, they said we

3    would be paid for our overtime, just like we would

4    be if we were still with Ford.

5        Q.    I want to talk about briefly, you were

6    in material control for awhile, correct?

7        A.    Yes.

8        Q.    I've heard about some folks in

9    maintenance and then Ms. Parker told me just a

10   minute ago that material control, there was some

11   people that didn't get paid maybe three weekends in

12   April of 2002 for overtime worked.

13       A.    Yes.

14       Q.    Are you one of those people?

15       A.    No.

16       Q.    Okay.  Do you know anything about the

17   people that that might apply to?

18       A.    I know some of them, yes.

19       Q.    Who was that that didn't get paid?

20       A.    It was mostly -- it was the

21   maintenance supervisors.

22       Q.    Okay.  I've heard Wayne Whisman and

23   Jim Crump, but I'm not aware of anybody else.

24   Other than those two individuals, do you have

1   personal knowledge of -- as to anybody else?

2            MR. SIMON:  Objection.

3   Mischaracterizes the record.  Perhaps you're

4   forgetting some people, but go ahead.

5        A.    I -- truthfully, I don't know.

6        Q.    Okay.

7        A.    I don't know.  I don't know.  I don't

8   know exactly who didn't get paid.  I just know

9   there was some maintenance supervisors.

10        Q.    Okay.  But you've been paid, but for

11   the hour difference --

12        A.    Yes.

13        Q.    -- apparently?

14        A.    Yes.

15        Q.    Okay.  And, again, aside from what

16   we've talked about already with overtime, you

17   otherwise feel that you're getting what you were

18   supposed to get with respect to overtime?

19        A.    Rephrase that.

20        Q.    Other than what we've talked about so

21   far, the one hour difference, okay?

22        A.    Mm-hmm.

23        Q.    Is it your position that ZF Batavia is

24   living up to whatever commitments it made to you

1    with respect to overtime?

2        A.    Yes.

3        Q.    The next item you mentioned was

4    vacation.  What are the concerns or issues on

5    vacation?

6        A.    Okay.  When we first transitioned

7    over, we were able to purchase the five days, extra

8    five days, if we wanted to.

9        Q.    Okay.

10       A.    Since then, that has been removed.

11       Q.    Now, are you one of the employees that

12   has five weeks or do you have four weeks?

13       A.    I have five weeks.

14       Q.    Okay.  Any other issues on vacation?

15       A.    No.

16       Q.    You next mentioned AIP.

17       A.    Yeah.

18       Q.    Okay.  What's the issue on the AIP?

19       A.    Well, the AIP was -- I've heard that

20   they were paying the ZF people a different

21   percentage than what they were paying the Ford

22   transitional personnel.

23       Q.    Do you know what the --

24       A.    I don't know what the percentages were

1    or what the differences were.  I've heard that

2    that's what the difference -- that there was

3    differences, at least -- in my opinion, with -- at

4    least with Ford, when a bonus was paid, everybody

5    got the same amount.

6         Q.    Well, they didn't --

7         A.    I mean, they got the same percentage.

8         Q.    Okay.

9         A.    Same percentage.  Not the same amount,

10    but the same percentage.

11         Q.    Okay.

12         A.    And from what I've heard is the reason

13    that -- that -- that one person -- or the ZF are

14    getting more of a percentage and we're getting a

15    less of a percentage is -- is because we make too

16    much money.  It's to offset -- to bring them up, I

17    guess, to more comparable to what we're making.

18         Q.    Well, have you heard anything, in

19    terms of the company trying to equalize essentially

20    the real dollars realized?

21         A.    Rephrase that.

22         Q.    Well, if -- would you acknowledge that

23    the Ford transitionals' salaries are generally

24    higher than the ZF employees -- new hires, I guess,

20

1    is the better term, salaries?

2        A.    At which level?

3        Q.    At any level.

4        A.    Not what I've heard.

5        Q.    Okay.  So you don't have an

6    understanding, then?

7        A.    No.

8        Q.    Would you say that it is inappropriate

9    for ZF Batavia to want to pay people an equal-

10    dollar bonus for the same job?

11        A.    Say that again.

12        Q.    Well --

13        A.    I don't know if I'm --

14        Q.    Yeah.

15        A.    -- quite following you here.

16        Q.    Yeah.  Let's strike that.  Let's --

17    all right.

18            With respect to AIP, any other

19    concerns?

20        A.    No.

21        Q.    In terms of -- strike that.

22            Bereavement was the next issue that

23    you had listed.  What's your concerns on

24    bereavement?

1          A.    Well, with bereavement, we had three

2    days of bereavement with Ford.

3          Q.    Okay.

4          A.    And now I understand it's only one day

5    with bereavement and I believe we had -- with Ford,

6    we had a much broader range of -- of people that we

7    could or -- maybe aunts, or maybe -- I don't know.

8    It was aunts, uncles.  You know, person that passed

9    on, that we could take the three days.

10          Now it's much more strict or limited

11    to who you get those days with.  I'm not really

12    sure what the policy is now.  But I'm sure -- I

13    know it's one day for some, but I know there's some

14    that's only had been able to take one day.  And --

15    and when we transitioned over, it said we would not

16    lose any of our current -- I guess benefits that we

17    had with Ford.

18          Q.    Okay.  And did you consider

19    bereavement a benefit?

20          A.    "Benefit" is not the word.  I don't

21    know --

22          Q.    Okay.

23          A.    -- or maybe it is.  I don't know what

24    other word to use, but any of the items that we had

22

1    with Ford, we would not lose.

2         Q.    Okay.  Let's talk a little bit

3    about -- you made reference, I think, to meetings

4    and whatnot.  You apparently went to one or more

5    meetings regarding the transition over to ZF

6    Batavia?

7         A.    Yes.

8         Q.    How many meetings did you personally

9    go to?

10        A.    I can remember two.

11        Q.    Okay.  Do you remember the month,

12   maybe of those meetings or months, I should say, I

13   suppose?

14        A.    I don't know.  I know one was this --

15   was this one, the May 27th meeting --

16        Q.    Do you remember, did you go to the

17   morning or afternoon session?

18        A.    I believe it was the morning session.

19        Q.    Okay.  Any other meeting?

20        A.    And then there was another one about

21   the northern -- there was another one about the --

22   the 401K.

23        Q.    Was that -- do you remember, was that

24   before or after the May 27th meeting?

1          A.    I believe it was after, but I'm not --

2     I'm not sure.

3          Q.    With the May 27th meeting, do you

4     remember who was in attendance?

5          A.    There was several people.  I know Karl

6     Kehr was there and Dave Adams.  Several people from

7     Ford.

8          Q.    Anybody else?

9          A.    Tony DeShaw I know was there.  That's

10    the only ones I can --

11         Q.    Okay.

12         A.    -- recall their names.  I know there

13    was -- there was others there, but I don't recall

14    their names.

15         Q.    Okay.  Do you remember anything in

16    particular that Karl said at the meeting?

17         A.    I think he just more or less presented

18    the -- what was in this, this Exhibit 4, that page.

19         Q.    And Exhibit 4, now that wasn't handed

20    out at the meeting, was it?

21         A.    No.

22         Q.    Okay.  I think they had some slides

23    and --

24         A.    Yeah, they had some slides and pretty

```
 1    much Mark Bugajski was there as well 'cause he did

 2    some presentation.  I remember that, too.  And they

 3    just more or less presented this stuff to us.

 4            Q.    Do you remember, did the discussion

 5    pretty much follow the slide presentation that was

 6    being made?

 7            A.    I believe it did.

 8            Q.    Do you remember any inconsistencies

 9    between what essentially was being told to you and

10    what was being presented on the slide?

11            A.    I don't recall there being --

12            Q.    At the time you went to the meeting on

13    May 27th, had you made up your mind as to whether

14    or not you were going to join Batavia --

15            A.    No.

16            Q.    -- ZF Batavia?

17            A.    No.

18            Q.    The way you answer that, is it safe to

19    say you had not intended to join ZF Batavia at that

20    point?

21            A.    No.

22            Q.    Oh, okay.

23            A.    I just hadn't made up my mind.

24            Q.    All right.  After the meeting, had you
```

1   made up your mind?

2          A.     No.

3          Q.     What were the open issues for you at

4   that point in time?  And I'm talking about after

5   the meeting.

6          A.     The biggest concern was retirement.

7          Q.     And what we've discussed so far today,

8   you've not indicated that ZF Batavia has not lived

9   up to you -- with respect to your expectations for

10  retirement.  Is that still the case?  I said

11  that --

12         A.     Say that again.

13         Q.     -- very poorly, yeah.  Has ZF Batavia

14  lived up to its -- to your expectations with

15  respect to retirement?

16         A.     Well, I guess I would have to say yes.

17         Q.     Okay.  Retirement, you indicated, was

18  a concern even after the meeting.  What was your

19  concerns, if you can tell me that?

20         A.     Well, my biggest concern was how was

21  it going to be handled once I got to the point of

22  retirement.  Who was going to pay what and how

23  would the 40 -- 401 was going to work with ZF

24  'cause I know they didn't have a retirement plan,

1    but we had the 401K and how was that going to

2    supplement and -- with the Ford.

3         Q.    Okay.  Was there anything else that

4    was of concern to you at that point?

5         A.    And the other -- the other thing was

6    also the -- that we didn't lose any of the benefits

7    that we currently enjoyed.

8         Q.    Well, would it be safe to say that you

9    weren't convinced at the meeting about what you

10   were going to receive at ZF Batavia?

11        A.    Yes.

12        Q.    Okay.  Obviously at some point in

13   time, you joined ZF Batavia?

14        A.    Yeah.

15        Q.    After the meeting on the 27th, and --

16   did you do other investigation?  Did you go to

17   another meeting?  Did -- what else did you do,

18   then, to try and make this decision?

19        A.    Well, after that, there was another --

20   there was another meeting with the -- I believe

21   with the Fidelity group.  They had another meeting

22   explaining the 401K and that, how that would work.

23   And I think possibly I -- if I remember correctly,

24   right after the morning session, there was also

1    some sub-meetings with -- about the medical

2    benefits and the other things there, too.

3            Q.    Did you go to those sub-meetings?

4            A.    I'm sure I did.

5            Q.    Do you remember what was discussed at

6    those sub-meetings?

7            A.    I -- I believe they just -- it was

8    mostly giving information out for you to review.

9            Q.    The gray brochure, Exhibit Number 2,

10   you didn't have that as of May 27th, did you?

11           A.    I don't recall having it, no.

12           Q.    Okay.  And you wouldn't have gotten

13   that at any of the sub-meetings or anything like

14   that?

15           A.    No.

16           Q.    As a result of the sub-meetings, you

17   had still not made up your mind to come over to ZF

18   Batavia, though?

19           A.    No.

20           Q.    All right.  After the sub-meetings and

21   before you signed on, did you do anything else, in

22   terms of investigation or trying to decide that --

23   you know, am I going to make the jump or not?

24           A.    Nothing, other than just taking the

1   data that I had been -- had been given and reading

2   it and seeing --

3          Q.    Did you have discussions with other

4   Ford transitional folks?

5          A.    Well, Hassan talked to me --

6          Q.    Okay.

7          A.    -- several times as well.  In fact, he

8   spoke to me even before, actually quite -- after

9   the joint venture was announced, back in like

10  October of '98 --

11         Q.    Okay.

12         A.    -- if I would be interested in -- in

13  coming over to the -- ZF was my first contact

14  with -- with it.  And I said, Well, I'd be open to

15  the idea.

16         Q.    Okay.  Now, Hassan, certainly in

17  October of '98 was still a Ford person at that

18  point?

19         A.    Yes.

20         Q.    Do you know when he made the jump over

21  to ZF Batavia?

22         A.    I'm not sure.

23         Q.    All right.  And, again, even as late

24  as apparently the end of May, though, you'd been in

29

1   discussions with Hassan and still you were not sure

2   what you were going to do?

3       A.    Right.

4       Q.    Is there some event or occurrence that

5   helped you make the decision?

6       A.    No, not really.

7       Q.    Can you tell me why you made the

8   decision, then, after the 27th?

9       A.    I guess at the time, I just felt like

10  it was the best thing for me to do.

11      Q.    Okay.  Mr. Newsome, you've been handed

12  Exhibit 119.  If you could, take a moment to go

13  through that.  Okay.  Have you seen Exhibit 119

14  before?

15      A.    Yes.

16      Q.    And is that your signature down there

17  at the bottom left?

18      A.    Yes.

19      Q.    And this is the offer -- hire letter

20  that you signed to come over to ZF Batavia?

21      A.    Yes.

22      Q.    And I see that was signed by John

23  Zielke.  Is John the one that presented you the

24  offer, if you remember?

30

```
 1          A.    No, he's not.

 2          Q.    Was it Hassan or who --

 3          A.    Hassan.

 4          Q.    Okay.  Do you remember, did Hassan

 5   come out to the floor with the offer?  Did he call

 6   you up front or how did you receive -- physically

 7   receive that offer?

 8          A.    He came out on the floor.

 9          Q.    Okay.  Did you know that Hassan was

10   going to bring you this offer?

11          A.    No --

12          Q.    Okay.

13          A.    -- not until he brought it out to me.

14          Q.    So while you apparently had some

15   discussions with him, apparently you didn't have a

16   discussion regarding Exhibit 119?

17          A.    No.

18          Q.    Do you remember what date he brought

19   that to you on?

20          A.    No.

21          Q.    I see it was signed on June 21st of

22   1999.  Was that the date that he brought it to you?

23          A.    I don't remember.

24          Q.    All right.  He brought it to you out
```

1   on the floor.  Do you remember anything about the

2   meeting or discussion -- I'm sorry.  -- at that

3   time?

4         A.    No, I really don't.

5         Q.    Okay.

6         A.    I -- I don't remember if I signed it

7   then or if I held on to it for a few days or -- to

8   make up my mind or not.

9         Q.    Okay.  Did Hassan hand you anything

10  else when he handed you the offer?

11        A.    I believe this, Exhibit 2 was

12  attached, the summary.

13        Q.    Do you remember, was it stapled or

14  clipped or --

15        A.    I believe it was just paperclipped, I

16  think.

17        Q.    Okay.  Do you remember anything that

18  Hassan might have said to you at that point in

19  time?

20        A.    I think -- I believe -- I don't really

21  remember everything.  He just sort of skimmed over

22  it and told me that -- what position I would have,

23  what my monthly salary would be, that there would

24  be a signing bonus and a bonus.

1          Q.    Do you remember, did you review

2    Exhibit 2, the gray brochure, at that time?

3          A.    I don't believe we did.

4          Q.    Okay.  Do you remember after Mr. Saleh

5    had given you the offer letter, and I think you've

6    testified the gray brochure, did you review the

7    gray brochure after that?

8          A.    Yes, I did.

9          Q.    Okay.  After you received the offer

10   letter, did you have any other discussions with

11   anyone from ZF Batavia or Ford regarding your

12   decision to accept the employment?

13         A.    With anyone?

14         Q.    Mm-hmm.  Well, you might have

15   discussed it with your wife, I suppose, but anybody

16   from ZF Batavia or Ford.

17         A.    I don't believe I did.

18         Q.    Okay.  Didn't have any further

19   discussions with Mr. Saleh?

20         A.    No, I don't think I did.

21         Q.    Okay.  I would gather that as of then,

22   whatever date you received the offer letter, you

23   still apparently had not made up your mind to join

24   ZF Batavia?

```
 1          A.    No.

 2          Q.    And, again, is there anything that you

 3   can point to that -- you know, sometime between

 4   when you received the offer letter and when you

 5   decided that said, Okay.  This event occurred or

 6   I've learned this or whatever, that I'm going to

 7   make the jump?

 8          A.    No, I really can't.

 9          Q.    Okay.  In the gray brochure, if you

10   can pull up Exhibit 2 for me.  Do you remember

11   reading this in any detail whatsoever?

12          A.    I'm sure I did.

13          Q.    Okay.  I direct your attention to

14   what's the second page of Exhibit 2.  Down on the

15   right-hand side, do you see the -- towards the

16   bottom, the two kind of thicker black lines?  Do

17   you see that section?

18          A.    Yeah.

19          Q.    Do you remember reading that section?

20          A.    No.

21          Q.    Okay.  Could you have read it or -- I

22   mean, you just don't remember or --

23          A.    I --

24                MR. SIMON:  Objection, asked and
```

1    answered.  Go ahead.

2           A.    Don't remember.

3           Q.    Okay.  Do you remember reading any

4    other sections out of this thing, Exhibit 2?

5           A.    Oh, I do remember reading about

6    medical, the salary, the vacation, life insurance,

7    401.

8           Q.    But no recollection of reading the

9    language --

10          A.    No.

11          Q.    -- at the bottom right on page 2?

12          A.    No, no.

13          Q.    Ultimately then on June 21st, you

14   signed Exhibit 119?

15          A.    Yes.

16          Q.    Okay.  Mr. Newsome, you've been handed

17   Exhibit Number 120.  If you would, take a moment to

18   review that document for me.  You've had a chance

19   to review Exhibit 120?

20          A.    Yes.

21          Q.    And on the second page of Exhibit 120,

22   it appears to have your signature there in three

23   different places?

24          A.    Yes.

1          Q.    Did you review this document before

2    you signed it?  Did you sign the document?

3          A.    Yes.

4          Q.    Okay.  Did you review the document

5    before you signed it?

6          A.    Yes.

7          Q.    Okay.  Do you receive a base salary at

8    ZF Batavia?

9          A.    Yes.

10         Q.    Have you always received that base

11   salary?  Not the same base salary, but you've

12   always been -- you've always received your pay, in

13   terms of your base salary pay?

14         A.    Since I've been salaried, yes.

15         Q.    Okay.  You've always been salaried at

16   ZF Batavia?

17         A.    Yes.

18         Q.    Okay.  You've never had any deductions

19   from your base salary or anything like that?

20         A.    What do you mean, "deductions"?  Well,

21   there's --

22         Q.    Anything less than -- have you ever

23   been paid anything less than your full, base

24   salary?

1          A.    I'm not sure I understand.

2          Q.    Okay.  You get paid a salary, correct?

3          A.    Yes.

4          Q.    And you get paid overtime?

5          A.    (Witness nodded.)

6          Q.    And I understand there's a -- you have

7     to say out loud the answers so the court reporter

8     can take it down.

9                You've always received a base salary?

10         A.    Yes.

11         Q.    Overtime, I understand there's an

12    issue?

13         A.    Yes.

14         Q.    Okay.  In the answers to

15    interrogatories that you gave, you indicated an

16    amount of, I believe, $6,700?  Hang on.  $6,370.

17    All right.  Can you tell me what that number -- how

18    did you arrive up to that number?

19         A.    The bulk of it is overtime.  Two days

20    was sick days that was taken back.

21         Q.    Did you actually miss or have to use

22    vacation time or something to cover sick days?

23         A.    No.  I was actually on -- on sick days

24    that I put down on my timecards and then with -- at

1  the end of the year, those two days were deducted

2  from my pay.

3       Q.    Okay.  Is there anything else that

4  makes up that $6,370?

5       A.    I don't believe there is.  I -- just

6  overtime, the overtime and the sick days.

7       Q.    Okay.  My understanding is that the --

8  well, a number of people have said that there was a

9  change in the overtime policy, that at some point

10  in time, Len Sennish sent out a memo that said

11  basically you've got to work 10 hours to get paid

12  for nine.  Does that sound accurate?

13      A.    Yes.

14      Q.    And do you remember that memo?

15      A.    Yeah.

16      Q.    Would you agree with me that prior to

17  the issuance of that memo, that you were paid what

18  you thought or what you expected you were going to

19  be paid when you came over to the joint venture?

20      A.    Rephrase that.

21      Q.    Sure.  The memo from Len Sennish, did

22  you consider that a change in policy at ZF Batavia?

23      A.    Do I consider it a change of policy?

24      Q.    Mm-hmm.

1          A.     I would consider it a -- it was a

2    change to what I -- what I was promised when I came

3    over.

4          Q.     Okay.  It was -- it was -- all right.

5    Let's call it -- it was a change?

6          A.     Yes.

7          Q.     Okay.  And all I'm asking is, prior to

8    the issuance of that memo that I'm fervently

9    looking for here, do you feel that ZF Batavia had

10   lived up to your expectations with respect to the

11   payment of overtime?

12         A.     Prior to that?

13         Q.     Mm-hmm.

14         A.     Yes.

15         Q.     Okay.  And that subsequent to the

16   issuance of that memo by Mr. Sennish, the issue

17   relates to, again, the one hour of casual overtime

18   every day requirement?

19         A.     Say that --

20         Q.     Okay.

21         A.     Restate that.

22         Q.     Well, let's try it this way.  What was

23   your understanding or how did you feel that the

24   policy or term or whatever you want to call it had

1    changed as a result of the Sennish memo?

2          A.    I'm not sure that I'm --

3          Q.    Okay.

4          A.    -- following you.

5          Q.    You remember the Sennish memo?

6          A.    Yes, I --

7          Q.    Okay.  What was the change as a result

8    of that memo?

9          A.    To me, it meant that he was requiring

10   us to work nine hours and only be paid for eight,

11   which didn't mean that that ninth hour was -- was

12   any longer -- to me, was casual time.  It was

13   required.  And, to me, if you're going to require

14   me to work that ninth hour, then you're going to

15   pay me for that ninth hour.

16         Q.    With respect to your practice prior to

17   that change, had you generally worked pretty close

18   to nine hours anyhow?

19         A.    Yes.

20         Q.    So is it fair to say that the issue

21   here really is that you just, in a sense, didn't

22   like being told you were going to work nine hours?

23         A.    Probably.

24         Q.    Okay.  Because practically, it sounds

1    like it didn't make a great deal of difference, in

2    terms of your practices or pay?

3             MR. SIMON:  Objection.

4    Mischaracterizes his testimony.  Go ahead and

5    answer.

6        A.    I mean, when we were -- when I was on

7    salary with Ford, we always did put in casual time,

8    but that was -- you know, our choice.  But when

9    they -- when you get a letter that comes out and

10   says you are required and you must and you have to

11   do this, then, to me, that's telling me that you

12   have to work these nine hours.  That's putting you

13   on a nine-hour schedule.  And I think you should be

14   compensated for that ninth hour.

15       Q.    Okay.  All right.  With respect to --

16       A.    And there's always with being -- you

17   know, and then there's always casual time over the

18   ninth hour.

19       Q.    Well, was it your understanding that

20   the ninth -- nine hours could not or would not

21   include casual time?

22       A.    I'm not really sure what it would or

23   wouldn't include.

24       Q.    Okay.  With respect to overtime, any

1   other issues that we haven't already discussed, in

2   terms of, again, shortcomings on the part of ZF

3   Batavia?

4          A.    I don't think so.

5          Q.    Okay.  With respect to your AIP

6   payment and the two percent that you mentioned

7   earlier, is that two percent or percentage

8   difference reflected in your $6,370 number?

9          A.    Yes, I believe it is.

10         Q.    Okay.  Now, Ms. Parker told me, for

11  example, that she was satisfied with what she had

12  received and that Batavia had lived up to its

13  obligations to her with respect to merit.  Do you

14  feel the same way?  Merit -- I should say merit

15  increases.  Do you feel the same way?

16         A.    Yes, I -- I think so.

17         Q.    Okay.  And I guess we should go back

18  to this.  With respect to your timekeeping, you

19  fill out a salaried time statement?

20         A.    Yes.

21         Q.    All right.  How do you report your

22  hours, in terms of on that time statement?

23         A.    What are you --

24         Q.    Well, does it -- if I looked at your

1    salaried time statement, would that reflect

2    basically the time that you walked into the plant

3    or is it something other than that?

4         A.    Normally the start time is when I

5    usually sit down at my computer and start and when

6    I turn it off at the end of the day.

7         Q.    From what I gather, you currently

8    spend a lot time, then, at the computer --

9         A.    Yes.

10        Q.    -- as opposed to out on the production

11   floor?

12        A.    Yes.  In my current position, yes,

13   it's all at the computer.

14        Q.    Okay.

15        A.    Or at least 90 percent of it.

16        Q.    Okay.  The -- are there any other

17   entries on there that reflect -- that would be

18   reflected on your time statement, in terms of

19   marking out for lunch or anything like that?

20        A.    No.

21        Q.    Does the salary time statement in any

22   way reflect any casual time?

23        A.    No.

24        Q.    And I guess I want to clarify.  Prior

43

1    to the Sennish memo that we talked about before

2    that kind of -- that's called the change, would

3    your time statements, salary statement reflect any

4    amount of casual time?

5        A.    No.

6        Q.    You're familiar with the Honeywell

7    readers, the card readers to swipe in and out of

8    the plant?

9        A.    Yeah.

10       Q.    You understand that those were put in

11   there because of the foreign trade zone

12   requirement?

13       A.    Yes.

14       Q.    Has anyone ever challenged you with

15   respect to your salaried time statements and the

16   times reflected on the Honeywell readers?

17       A.    No.

18       Q.    Are you aware of any employees that

19   have ever been questioned or challenged about that

20   issue?

21       A.    I've heard of one.

22       Q.    That would be Mr. O'Hagan?

23       A.    Yes.

24       Q.    Nobody to date has told me the

44

```
 1    details.  Do you have any details with --

 2         A.    No.

 3         Q.    -- respect to that?  And who did you

 4    hear about Mr. O'Hagan from?

 5         A.    I don't really recall who it was.  I

 6    just heard that.

 7         Q.    Do you remember at all what you heard?

 8         A.    Just that he was docked an hour.

 9         Q.    Other than Mr. O'Hagan, you've not

10    heard or not aware of --

11         A.    No.

12         Q.    -- certainly of anybody else that --

13         A.    No.

14         Q.    And it's certainly never happened to

15    you?

16         A.    No.

17         Q.    Do you have any reason to believe that

18    the company makes such a review of your timecard?

19         A.    Yes, I believe they do.

20         Q.    And what do you base that on?

21         A.    I just believe they do.  I don't know

22    why, but I just -- I just believe that they would.

23         Q.    Well, that they would or that they do?

24         A.    I -- I certainly believe that they
```

1    have the capability of doing it.  Whether or not

2    they do, I don't know.

3         Q.    Okay.  Well, I think --

4         A.    I can't -- I can't say that they do,

5    but I -- they certainly have the capability.

6         Q.    Well, certainly the card reader

7    exists --

8         A.    Yes.

9         Q.    -- and so they could.  But I

10   understand that they could, but do you think they

11   do?

12        A.    I don't know.

13        Q.    Okay.

14             MR. VANWAY:  Can we go off the record

15   for just a second?

16        (Off the record:  11:52 a.m. - 11:53 a.m.)

17        Q.    With respect, Mr. Newsome, to the

18   testimony that you've already given me this

19   morning, is there anything that you feel that is

20   unclear or needs to be changed?

21        A.    Not at this time.

22             MR. SIMON:  Okay.  Let me interject.

23   You had asked him about the --

24             MR. HUNTER:  Is this an objection

```
 1   or --

 2              MR. SIMON:  Well, I'm putting it on

 3   the record.  6,370 figure, which was in an

 4   interrogatory answer, you asked him what that

 5   encompassed.  It says right on the interrogatory

 6   answer it's part of the overtime.  You had asked

 7   him if the two days of sick leave was part of that.

 8   I think he said he did, but the interrogatory

 9   speaks for itself.

10              You didn't show Mr. Newsome the

11   interrogatory answer when you asked him about that,

12   so I'm putting it on the record.

13              MR. HUNTER:  Okay.

14              MR. SIMON:  All right.

15              MR. HUNTER:  I guess we start back at

16   12:30.

17         (Off the record:  11:54 p.m. - 12:47 p.m.)

18         Q.   All right.  Mr. Newsome, we're back on

19   the record.  Just a couple of follow-up questions.

20              We spoke this morning about the merit

21   increase and I think you had told me you were

22   satisfied that you received what you were supposed

23   to receive with respect to merit increases?

24         A.   Yes.
```

1      Q.    Okay.  And is it your understanding

2  that merit increases are based upon at least, in

3  part, the individual job performance of that

4  employee that receives the merit increase?

5      A.    Yes.

6      Q.    And that was your understanding when

7  you entered into your employment with ZF Batavia?

8      A.    Yes.

9      Q.    Okay.  Were there any other documents

10  that you relied on to make your decision to come

11  over to ZF Batavia, other than those documents that

12  we've already discussed?

13      A.    No.

14          MR. SIMON:  I'm not sure.  We had a

15  break, John.  I'm not sure what document we

16  discussed.

17      A.    Other than the -- it was what the

18  Exhibit 2 and 4 and the other ones that I collected

19  on the -- on the benefits and the retirement.

20      Q.    Okay.  And I guess just to make sure,

21  we've talked about Exhibit Number 2, the gray

22  brochure; we've talked about your hire letters,

23  correct?

24      A.    Yes.

1          Q.    And then I think you made a reference

2     kind of to Exhibit 4, but I want to be clear.  You

3     were never given a copy of Exhibit 4.  I believe

4     those were just slides of at least some of the

5     pages?

6          A.    Yes.

7               MR. HUNTER:  I think at this point, I

8     have nothing further.  Turn that over to

9     Mr. VanWay.

10               MR. SIMON:  Off the record for a

11     second.

12          (Off the record:  1:49 p.m. - 1:50 p.m.)

13                         EXAMINATION

14     BY MR. VANWAY:

15          Q.    Afternoon, Mr. Newsome.  My name's

16     Jeff VanWay.  I represent Ford in this case.  I

17     have a few questions for you today.  Try not to

18     repeat the things that Mr. Hunter has already asked

19     you about.

20               And I believe you testified that when

21     you first started with Ford, you were part of the

22     UAW --

23          A.    Yes.

24          Q.    -- hourly employee?  And then your

1    compensation and benefits, those were set according

2    to what was set in the collective bargaining

3    agreement, correct?

4         A.    Yes.

5         Q.    After you become a salaried employee

6    with Ford, collective bargaining agreement no

7    longer applied to you, right?

8         A.    Correct.

9         Q.    Did you have any contract at all after

10   you became a salaried employee?

11        A.    I believe I did.

12        Q.    Was it a written document?

13        A.    It was salary application, yes.

14        Q.    The application for employment that

15   you filled out?

16        A.    Yes.

17        Q.    And it didn't say anything about what

18   your salary was going to be, did it?

19        A.    No, I don't believe it did.

20        Q.    You believe it did?

21        A.    I don't believe it did.

22        Q.    Okay.  Did it say anything about your

23   benefits, do you recall?

24        A.    No.

1          Q.    Okay.  Did you have any sort of

2     written agreement with Ford as to what your

3     compensation and benefits were going to be as a

4     salaried employee?

5          A.    I don't remember.

6          Q.    Well, let me ask it this way.  It's my

7     understanding that while you were a salaried

8     employee with Ford, your compensation and benefits

9     were set by Ford; is that correct?  I mean, they

10    determined what your compensation and your benefits

11    were going to be?

12         A.    Yes.

13         Q.    And that was at their discretion,

14    correct?  In other words, you didn't go to them and

15    tell them what your salary and benefits were going

16    to be, did you?

17         A.    No.

18         Q.    And you didn't sit down and bargain --

19         A.    No.

20         Q.    -- with them over your salary and

21    benefits --

22         A.    No.

23         Q.    -- right?  They told you what it was

24    going to be and that's what it was, right?

1           A.      Well, they -- I guess they give me

2   a -- I don't remember when I transitioned, but I'm

3   sure they give me an offer saying they were going

4   to pay me this much or whatever.   And I either --

5   well, in this case, I accepted or would have

6   declined.

7           Q.      Okay.   And you accepted --

8           A.      Yeah, yeah.

9           Q.      -- and became a salaried employee?

10          A.      Yes.

11          Q.      And then from year to year, sometimes

12  your compensation or your benefits would change,

13  didn't they?

14          A.      Yes.

15          Q.      And when those changes would take

16  place, Ford did never ask you if that was okay, did

17  they?   I mean, they just went ahead and made the

18  changes, right?

19          A.      In later years, we had the opportunity

20  to choose the benefits when the -- with the flex

21  plan to choose our benefits.

22          Q.      To choose which package --

23          A.      Yes.

24          Q.      -- of benefits you wanted?

```
 1          A.    Yes.

 2          Q.    You didn't have the option to choose

 3    something outside of the package, right?

 4          A.    Right.

 5          Q.    Now, you received merit increases

 6    while you were a salaried employee at Ford,

 7    correct?

 8          A.    Yes.

 9          Q.    And the amount of those increases

10    varied from year to year, didn't they?

11          A.    Yes.

12          Q.    Were there ever any years where you

13    didn't receive a merit increase at all?

14          A.    No.

15          Q.    Profit sharing, did you receive profit

16    sharing at Ford?

17          A.    Yes.

18          Q.    And did the amount of profit sharing

19    vary from year to year as well?

20          A.    Yes, it did.

21          Q.    Were there years that there was no

22    profit sharing paid?

23          A.    Yes.

24          Q.    And you understood that the amount of
```

53

1    profit sharing you received was up to the company,

2    right?

3        A.    Yes, it -- yes.

4        Q.    And am I correct also that your health

5    insurance premiums, the amount you paid out of

6    pocket as a salaried employee, those changed from

7    year to year?

8        A.    Health insurance?

9        Q.    Let me back up.  For your health

10   insurance as a salaried employee, did you pay a

11   portion of that or was it a hundred percent company

12   paid?

13       A.    In the beginning, it was all company

14   paid.  When we went to the flex program, depending

15   on the program that you selected, it could either

16   all be paid or you had to pay some out of pocket.

17   And you were given a -- you were reimbursed some

18   money for flex dollars.  They call it flex dollars.

19   You were reimbursed some money to -- to help offset

20   some of that cost.

21       Q.    Okay.  And under your health

22   insurance, did the level of benefits change from

23   time to time, in terms of what was going to be

24   covered, for example?

1          A.     As far as --

2          Q.     Well, let me ask you it this way.  My

3     understanding is that with some of the health

4     insurance plans, there were co-pays.  You would pay

5     a certain amount when you would go to the doctor.

6     Did you have that type of health insurance plan at

7     Ford?

8          A.     I didn't, no.

9          Q.     Okay.  Well, what -- what sort of

10    health insurance plan did you have as a salaried

11    employee once you made that -- once the flex plan

12    came into existence?

13         A.     I had the John Hancock and Blue

14    Shield, Blue Cross-Blue Shield John Hancock

15    comprehensive plan, which paid for everything.

16         Q.     Okay.  And from the time that that was

17    first offered up until the time you resigned your

18    employment with Ford, were there ever any changes

19    made in that health insurance plan?

20         A.     Yes.  There was different providers --

21    I think different providers and things like that.

22         Q.     Okay.  And when those changes were

23    made, the company would make the change and then

24    tell you what it was, right?

55

```
1          A.    Can you restate that?

2          Q.    Sure.  My question really is, they

3    didn't ask your approval before they'd make those

4    changes, right?  I mean, they -- they just did it,

5    correct?

6          A.    Correct.

7          Q.    Okay.  Back in the early eighties,

8    were you a salaried employee at that time?

9          A.    No.

10         Q.    Mr. Newsome, you have in front of you

11   Exhibit 121, which I'll submit to you is a document

12   that Ford produced in this case that came from your

13   personnel file with Ford, your salaried personnel

14   file.  Let me ask you first, the bottom left of

15   this document, is that your signature there?

16         A.    Yes.

17         Q.    Okay.  And do you have any reason to

18   dispute that this is a document you signed while

19   you were a salaried employee with Ford?

20         A.    No.

21         Q.    No, you have no reason to dispute

22   that?

23         A.    No.

24         Q.    Okay.  Now, I believe that you
```

1    testified as you went through the different --

2    excuse me.  -- the different promises,

3    representations that you said were made and not

4    fulfilled.  One of those you said was overtime.

5    And I believe you said the issue with overtime was

6    this change and putting in basically what's been

7    called a nine-hour rule.

8              As you sit here today, are you aware

9    of Ford having any involvement in that decision to

10   change that rule?

11        A.    No.

12        Q.    Are you aware of anyone from Ford at

13   all having any involvement in that?

14        A.    No.

15        Q.    Anyone from Ford approving of that

16   decision?

17        A.    No.

18        Q.    As far as you know, that was ZF

19   Batavia representatives that made that change?

20        A.    As far as I know.

21        Q.    Okay.  You also mentioned the change

22   in vacation, the change from where you're no longer

23   allowed to buy the extra week of vacation.  Do you

24   have a sense of when that change took effect?

1        A.    I believe it was in 2002.

2        Q.    Okay.  And prior to that, you were

3    allowed to buy the week of vacation --

4        A.    Yes.

5        Q.    -- just as you believed you'd be able

6    to do when you came over to ZF Batavia?

7        A.    Yes, the first -- when I first

8    transitioned, you were allowed to buy extra week.

9        Q.    Okay.  And sometime in 2002, someone

10   from ZF Batavia said you can't do that anymore?

11       A.    Someone.

12       Q.    Well, do you know -- do you know who

13   made --

14       A.    No, I don't know who, but someone.

15       Q.    As you sit here today, do you have any

16   reason to believe that anyone from Ford was

17   involved in that policy change?

18       A.    I -- no, I don't know.

19       Q.    Any reason to believe that anyone from

20   Ford approved of that policy change?

21       A.    I don't know.

22       Q.    Okay.  With respect to the AIP, I

23   believe you testified that the issue was on a

24   percentage basis, your AIP was less than some of

1    the new hires.  As you sit here today, are you

2    aware of anyone from Ford being involved in the

3    decision to make that change?

4         A.    No.

5         Q.    Are you aware of anyone from Ford

6    approving of that decision?

7         A.    No.

8         Q.    Now, you also testified about the

9    change in bereavement leave.  Has that change

10   affected you individually?

11        A.    No, it hasn't.

12        Q.    Okay.  Do you know when that change

13   took effect?

14        A.    No, I really don't.

15        Q.    As you sit here today, do you have any

16   reason to believe that anyone from Ford was

17   involved in the decision to change the bereavement

18   leave policy?

19        A.    No.

20        Q.    Or that anyone from Ford approved of

21   that change that ZF Batavia made?

22        A.    No.

23             MR. VANWAY:  Do you have a copy of the

24   interrogatories that you could show Mr. Newsome?

59

1          MR. SIMON:  Nope.

2          MR. VANWAY:  All right.  He can look

3     at mine.

4          Q.   Mr. Newsome, I want to show you one of

5     your interrogatory responses here.  It's response

6     to interrogatory number nine.  Okay, great.  That

7     will make this a little bit easier.

8          So that we're both looking off the

9     same page, Mr. Newsome, interrogatory nine starts

10    on page 5.  Basically ask you to list the various

11    changes that you allege were made and then also who

12    made the change.

13         And then your response goes all the

14    way over to page 7.  And if you see on page 7 where

15    there are several indented paragraphs and then

16    there's a big block paragraph that starts with,

17    Plaintiff asserts?

18         A.   Yes.

19         Q.   Now, in that paragraph, it says,

20    Plaintiff asserts each of the policies as

21    authorized by ZF Batavia and Ford management.  And

22    that seems inconsistent with what you've told me in

23    your deposition today.  And so I just want to make

24    sure that I've got your testimony clear.

1           As you sit here today, you have no

2    reason to believe that Ford management was involved

3    in any of these policy changes; is that correct?

4           A.    I don't know that Ford management was.

5    However, with Ford being part of the board, board

6    of -- you know the ZF board, I'm -- I would think

7    that these decisions would come from the board of

8    directors and I think Ford is part of that board of

9    directors.

10          Q.    Okay.  Other than through Ford's

11   involvement as a 49 percent shareholder and,

12   therefore, having members on the board of

13   directors, do you believe in any other way that

14   Ford was involved in any of these policy changes?

15          A.    No.

16          Q.    And do you know, as you sit here

17   today, whether these various policy changes that

18   you've testified about were reviewed by the board

19   of directors at all?

20          A.    I don't know --

21          Q.    Okay.

22          A.    -- if they were.

23          Q.    Okay.

24          A.    I would assume that they were.

1          Q.    Okay.  But you don't know?

2          A.    No.

3          Q.    You haven't seen any minutes that

4    reflect that, haven't attended any board meetings

5    where those were discussed?

6          A.    No.

7          Q.    Now, I believe you testified earlier

8    with regard to overtime that you were told in

9    meetings that you'd be paid for overtime like you

10   had been at Ford.  Is that a fair characterization

11   of your understanding as to the overtime, what was

12   said --

13         A.    Yes, I think so.

14         Q.    -- in -- do you remember who said

15   that?

16         A.    It's -- it's in the summary.

17         Q.    Of what -- that's -- it's in Exhibit

18   2?

19         A.    Yes.

20         Q.    Okay.  Can you show me in Exhibit 2

21   what you're referring to?

22         A.    Under salary, then it says authorized

23   overtime will be paid.

24         Q.    And then is it your testimony you took

1    that to mean overtime would be just like it had

2    been at Ford?

3         A.    We were told that our benefits would

4    be the same as -- as if we were working for Ford.

5         Q.    Okay.  Well, let's focus on overtime

6    first, if we can.  Did anyone -- other than what

7    you read in Exhibit 2, did anyone specifically say

8    to you overtime will be paid just as it is at Ford?

9         A.    Yeah.

10        Q.    And who said that?

11        A.    Hassan.

12        Q.    And when did he say that, do you know?

13        A.    In our discussions and -- and stuff

14   that he had with us and with me one on one.

15        Q.    What specifically did Hassan say about

16   overtime?

17        A.    That we would -- that I would be paid

18   for my overtime that I worked.

19        Q.    Did he say anything other than you'll

20   be paid for your overtime that you work?

21        A.    No, that was --

22        Q.    Anyone other than Hassan say anything

23   to you about overtime?

24        A.    I can't recall anyone else, others

63

1    saying that, other than it might have been

2    mentioned in the -- in the May meeting, but I

3    can't -- I can't recall that, if it really was or

4    not.

5          Q.    Okay.  What about the vacation, did

6    anyone ever say to you prior to the time you

7    accepted employment with ZF Batavia that you would

8    be allowed to purchase this additional week of

9    vacation?

10         A.    That's -- that's also in the brochure.

11         Q.    Okay.  Other than what -- and I

12   understand that Exhibit 2 says what it says,

13   although we may not agree on that language.

14   But I want to ask you in terms of anybody actually

15   saying to you -- not showing you Exhibit 2, but

16   actually having a conversation with you about

17   purchasing that fifth week -- or I'm sorry -- that

18   additional week prior to the time that you accepted

19   employment with ZF Batavia, did that ever happen?

20         A.    Well, I know Karl Kehr mentioned it in

21   the -- in the May 27th meeting that we could

22   purchase an extra week of vacation.

23         Q.    Do you remember specifically what

24   Mr. Kehr said?

1          A.     Not specifically, no.

2          Q.     Did he say whether that was something

3     that applied to all employees?

4          A.     I really don't remember.  I just

5     remember him saying that we could purchase up to a

6     week of vacation.

7          Q.     Did he say anything about how much

8     total weeks of vacation you could have?

9          A.     He said as a ZF employee, you could

10    have up -- total of four weeks.  A new -- new hire

11    would have a total of four weeks.

12         Q.     Did he communicate anything as to what

13    the transitional employees could have?

14         A.     If you had less than four weeks, you

15    could earn up to four weeks of vacation.

16         Q.     And what about if you already had five

17    weeks?

18         A.     That we would retain that fifth week.

19         Q.     He said that?

20         A.     Yes.

21         Q.     At that time, were you a five week --

22         A.     Yes.

23         Q.     And did he say anything about if you

24    already have five weeks, you can also purchase an

1    additional week?

2         A.    I don't remember him saying that,

3    but -- I really don't remember him saying that --

4         Q.    Okay.

5         A.    -- specifically.

6         Q.    Okay.  Other than Mr. Kehr, did anyone

7    else have any conversations prior to the time you

8    accepted employment with ZF Batavia about this,

9    purchasing an additional week of vacation?

10        A.    No, not -- no.

11        Q.    That didn't come up in your

12   conversations with Hassan?

13        A.    No.

14        Q.    Now, what about AIP, were there ever

15   any discussions with anyone from Ford or ZF prior

16   to the time you accepted employment with ZF Batavia

17   about how much the AIP would be?

18        A.    No.

19        Q.    Now, were you ever promised that you'd

20   get a specific dollar number?

21        A.    No.

22        Q.    Or that you'd get a specific

23   percentage?

24        A.    No.

1      Q.    Was there ever any discussions about

2   comparing your AIP to what the AIP of new hires

3   would be?

4      A.    I don't remember any discussion.

5      Q.    No one ever committed to you that you

6   would get more -- higher percentage than the new

7   hires would?

8      A.    No.

9      Q.    Okay.  During your discussions with

10  Hassan, did AIP come up during those discussions?

11     A.    I don't recall that.  I would think

12  that it had, but I -- I don't recall.

13     Q.    Well, do you remember discussing

14  anything with Hassan, other than -- I believe you

15  testified earlier when he came out, he gave you the

16  letter and he talked briefly about salary and about

17  compensation and about what the job was going to

18  be.  Do you remember discussing specifically with

19  Hassan any specific benefits or the bonus?

20     A.    No.

21     Q.    Okay.

22     A.    No.

23     Q.    Now, with respect to bereavement

24  leave, other than what you may have read in Exhibit

```
 1    2, prior to the time that you accepted employment

 2    with ZF Batavia, did you have any conversations

 3    with anybody, either in meetings or in one on ones

 4    about what the bereavement leave policy was going

 5    to be?

 6         A.   Can you --

 7         Q.   Sure.

 8         A.   -- rephrase that?

 9         Q.   I understand Exhibit 2 has certain

10    information in it about bereavement leave.  My

11    question is, if either in the employee meetings

12    that you attended or in the one on ones that you

13    testified you had with Hassan, was there any

14    discussion on bereavement?

15         A.   The only thing I can recall is -- is

16    that -- was the -- that our -- biggest thing was --

17    was told that we would have the same benefits that

18    we had enjoyed with Ford.

19         Q.   And were there any --

20         A.   Whether -- I don't know if it

21    specifically -- if anyone said specifically about

22    bereavement or not.

23         Q.   Okay.  Now, you understood, though,

24    that there were going to be some changes in the
```

1    benefits, didn't you?

2        A.    Yes.

3        Q.    Okay.  And so you -- when you heard

4    the statement that it would be the same as it was

5    at Ford, you knew that wasn't necessarily accurate

6    because there were going to be some differences?

7        A.    Correct.  But they would be comparable

8    to what we had with Ford, as far as our medical and

9    our dental and items of that nature.

10       Q.    Now, did anyone communicate to you

11   that your benefits would never change at any time

12   during your employment with ZF Batavia?

13       A.    No.

14       Q.    In fact, that would have been an

15   unrealistic expectation, wouldn't it?

16       A.    Yes.

17       Q.    Because certainly at Ford, your

18   benefits were subject to change --

19       A.    Yes.

20       Q.    -- weren't they?  You testified that

21   the first conversation you remembered with Hassan

22   about the joint venture was shortly after the

23   announcement in October '98 time frame.  At that

24   time, at the time of that conversation, there was

1    still a lot of uncertainty as to certainly what the

2    benefits were going to be at the joint venture,

3    right?

4         A.    Yes.

5         Q.    And I take it Hassan didn't make any

6    representations at that time about what the

7    benefits would be at ZF Batavia, did he?

8         A.    Correct.

9         Q.    I noticed in your offer letter, which

10   is Exhibit 119, in the second-to-the-last paragraph

11   it says essentially if you're going to accept the

12   offer return -- sign this and return it to salaried

13   personnel by June 14th.

14            But I note you didn't sign it until

15   June 21st.  I just wondered, was there -- did

16   someone give you an extension or do you know what

17   the difference for the discrepancy between June

18   14th and June 21st is?

19        A.    I -- no.

20        Q.    Okay.  You didn't go to Hassan or

21   salaried personnel or anyone and say, I need more

22   time to make this decision?

23        A.    I'm -- I'm not really sure when it was

24   that they gave me this letter and I'm sure that if

1    they said return it to personnel by the 14th, that

2    I definitely didn't return it on the 14th, so --

3         Q.    Okay.  And I was just curious if you

4    knew what had happened -- if something had happened

5    to cause you not to be --

6         A.    And he probably did come to me, said,

7    Sir, do you want to accept or not and I said, I

8    need more -- probably told him that I did need more

9    time to think about it.

10        Q.    Okay.  And I take it this nine-hour

11   rule that you've testified was put in sometime

12   after you started at ZF Batavia, I take it there

13   wasn't any discussion of that nine-hour rule prior

14   to the time that you accepted employment with ZF

15   Batavia?

16        A.    Correct.

17        Q.    And I thought you testified earlier

18   that with regard to casual time at Ford, that was

19   strictly your choice, as to whether you came in

20   early or stayed late.  Did I understand that

21   correctly?

22        A.    Well, it wasn't really my -- it's not

23   really my choice.  It was sort of expected, I

24   guess.  You were expected to give at least -- you

1    know, 15 minutes -- at least 15 minutes before and

2    after the shift.

3        Q.    How is that different, if it is, than,

4    I guess, the expectation at ZF Batavia now?

5        A.    It just, to me -- well, I guess -- you

6    know, when you did work the extra hour, if you did

7    work an extra hour with Ford, you did get paid for

8    it.  But now -- now it's saying that you've got to

9    put in the extra hour.  But then to get overtime,

10   you got to put in another hour, which means you

11   work 10 hours and you only get nine hours' pay.

12       Q.    But at Ford, if you worked 10 hours,

13   you didn't always get paid overtime, did you?

14       A.    Yes.  If I worked 10 hours, I got paid

15   10 hours.

16       Q.    I -- I thought you said that there

17   were -- lots of times I thought you said that you

18   didn't turn in the time, so you didn't get paid

19   overtime; is that right or not?

20       A.    There was a few times, yes.

21       Q.    Okay.

22       A.    But that was my choice.

23       Q.    That was your choice, okay.  Now, at

24   Ford, they had various policies and procedures that

72

1    you were required to follow as an employee,

2    correct?

3        A.    Say that again.

4        Q.    Ford had policies and procedures that

5    employees like yourself were required to follow,

6    right?

7        A.    Yeah.

8        Q.    And you understood that, just because

9    you were changing employers, that didn't mean you

10    wouldn't be required to follow policies and

11    procedures at your new place of employment, right?

12        A.    Right.

13        Q.    You received, I noticed in Exhibit

14    119, a transition bonus of $17,000.  Do you know

15    what that transition bonus was for?

16        A.    Truthfully?

17        Q.    Yes, sir.

18        A.    No.

19        Q.    Did anyone ever communicate to you

20    what the transition bonus was for that you can

21    recall?

22        A.    Really I -- I just -- I -- I really

23    don't know what it was for.

24        Q.    Okay.  Someone offers $17,000, you

1    don't ask questions.

2         A.    I mean, I just thought it was just for

3    transitioning from Ford to ZF, but --

4         Q.    Okay.  Well, it says in -- in the

5    letter, it says, "This bonus is designed to address

6    any monetary differences between Ford benefits and

7    ZF Batavia's new plan."  Is that what you thought

8    it was for?

9         A.    I really thought it was to help offset

10   any -- any bonuses that -- from Ford that I might

11   have lost over the next three years or something.

12   That that's what I really, in my mind, what I

13   thought it was for.

14        Q.    Okay.  And you've been paid that full

15   $17,000, right?

16        A.    Yes.

17        Q.    I take it that when you had these

18   one-on-one conversations with Hassan about what

19   things were going to be like at ZF Batavia, you

20   believed what he was saying, right?

21        A.    Yes.

22        Q.    You didn't have any reason to believe

23   he was being untruthful with you?

24        A.    Correct.

74

1      Q.    And as you sit here today, do you have
2  any reason to believe that Hassan was being
3  untruthful with you?
4      A.    No.
5      Q.    Do you have any reason to believe that
6  he knew, down the road, ZF Batavia was going to
7  make certain policy changes?
8      A.    No.
9      Q.    Who do you currently report to,
10  Mr. Newsome?
11      A.    Gary McGee.
12      Q.    What is Mr. McGee's job?
13      A.    Industrial engineering supervisor.
14      Q.    Is he a ZF Batavia employee?
15      A.    Yes.
16      Q.    Do you report to anyone from Ford?
17      A.    No.  He's a retired Ford person.
18      Q.    Since the time that you left Ford and
19  went to work for ZF Batavia, your wages have gone
20  up every year, haven't they?
21      A.    Yes.
22      Q.    Do you know an employee by the name of
23  Eddie Adams?
24      A.    Yes.

1          Q.     Have you had any conversations with

2     Mr. Adams about this lawsuit?

3          A.     No.

4          Q.     Or any conversation with Mr. Adams

5     about the promises that you believe weren't kept?

6          A.     No.

7          Q.     Mr. Adams has been listed by your

8     attorneys as a possible witness in this case.  Do

9     you have any knowledge as to why Mr. Adams might be

10    a witness in this case?

11         A.     No.

12         Q.     With respect to the various promises

13    that you've testified ZF Batavia has not kept, have

14    you made any complaints to anyone from Ford about

15    those issues?

16         A.     No.

17         Q.     And why is that?

18         A.     I don't know.

19         Q.     Have you complained to anyone from ZF

20    Batavia about it?

21         A.     No.

22                MR. VANWAY:  Mr. Newsome, I don't

23    think I have any further questions.  Thank you,

24    sir.

```
 1              MR. HUNTER:  Just a couple follow-up

 2     questions.

 3                         EXAMINATION

 4     BY MR. HUNTER:

 5          Q.    Mr. Newsome, in the progression of

 6     employment that you described for me earlier, you

 7     have changed positions since you've been at ZF

 8     Batavia?

 9          A.    Yes.

10          Q.    Were those positions promotions?

11          A.    No.

12          Q.    Just a lateral move --

13          A.    Yes.

14          Q.    -- in terms of responsibility?

15          A.    Yes.

16          Q.    And you currently are engaged to work

17     with the CVT program, correct?

18          A.    Well, yeah.  Since I -- since I'm the

19     only one in the plant that deal with the building

20     materials, yes, I do handle build materials for

21     CVT.

22              MR. HUNTER:  I don't believe I have

23     anything else.

24              MR. SIMON:  I think we're done.  We
```

1    will not waive signature.

2                (Deposition concluded at 1:19 p.m.)

3

4

5                _____

6                        Randall Newsome

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

78

```
 1                C E R T I F I C A T E

 2

 3      STATE OF OHIO         :

 4                            :    SS

 5      COUNTY OF HAMILTON    :

 6

 7            I, Susan M. Barhorst, a Notary Public in

 8      and for the State of Ohio, duly commissioned and

 9      qualified, do hereby certify that prior to the

10      giving of this deposition the within-named RANDALL

11      NEWSOME was by me first duly sworn to testify the

12      truth, the whole truth, and nothing but the truth;

13      that the foregoing pages constitute a true,

14      correct, and complete transcript of the testimony

15      of said deponent, which was recorded in stenotypy

16      by me, and on the 24th day of October 2003 was

17      submitted to counsel for deponent's signature.

18            I further certify the within deposition was

19      duly taken before me at the time and place stated,

20      pursuant to the Federal Rules of Civil Procedure;

21      that I am not counsel, attorney, relative or

22      employee of any of the parties hereto, or their

23      counsel, or financially or in any way interested in

24      the within action, and that I was at the time of
```

79

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3        IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    24th day of October 2003.

6

7

8

                Susan M. Barhorst, Notary Public
9               in and for the State of Ohio.
                My commission expires
10              February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24