1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION, CINCINNATI

4
    EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
5
            Plaintiffs,        : Judge Beckwith
6
    V.                         : Magistrate Sherman
7
    ZF BATAVIA, LLC, et al.,   :
8
            Defendants.        :
9   _____

10         Deposition of TERI PARKER, taken on

11   Thursday, August 21, 2003, commencing at 8:16 a.m.,

12   at the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20                 GIGLIO REPORTING SERVICES
21                    3 CYPRESS GARDEN
                    CINCINNATI, OHIO 45220
22                     513-861-2200

23

24

2

```
1    APPEARANCES:

2    On behalf of Plaintiffs:

3       Stephen A. Simon, Esq.
         22 West Ninth Street
4        Cincinnati, Ohio 45202

5    Also present:

6       Randall Newsome

7    On behalf of Defendant ZF Batavia, LLC:

8       John J. Hunter, Jr., Esq.
         Hunter & Schank Co., L.P.A.
9        1700 Canton Ave.
         Toledo, Ohio 43624
10
     Also present:
11
        Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
        Jeffrey L. VanWay, Esq.
14       Baker & Hostetler LLP
         312 Walnut Street, Suite 3200
15       Cincinnati, Ohio 45202

16
     Cross-Examination
17
        by Mr. Hunter                    4, 120
18
        by Mr. VanWay                    84
19

20

21

22

23

24
```

3

| | PARKER DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 55 |
| 3 | | |
| 4 | 4 | 106 |
| 5 | | |
| 6 | 115 | 19 |
| 7 | 116 | 29 |
| 8 | 117 | 33 |
| 9 | 118 | 54 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    TERI PARKER
 2   being first duly sworn, testified as follows:
 3                    CROSS-EXAMINATION
 4   BY MR. HUNTER:
 5        Q.    Good morning.  Would you please state
 6   your name for the record?
 7        A.    Teri Parker.
 8        Q.    Ms. Parker, what's your address?
 9        A.    8769 Whales Drive, Cincinnati, 45249.
10        Q.    Ms. Parker, my name is John Hunter.
11   And I think I've seen you around the facility
12   before, but I don't know that we've ever met.  I
13   represent ZF Batavia in the litigation that you
14   have filed against ZF Batavia and Ford.
15             Have you ever had your deposition
16   taken before?
17        A.    No, I have not.
18        Q.    Okay.  Ever sat through or are you
19   familiar at all with how this is going to work?
20        A.    No.
21        Q.    Okay.  What this is is really just a
22   question and answer session with respect to the
23   litigation that's been brought.  The company has a
24   number of questions regarding your claims and
```

1    concerns.  And this provides us with an opportunity

2    to have a discussion regarding those claims,

3    questions and concerns.

4            The court reporter here will take down

5    your testimony.  I'm going to ask you a series of

6    questions.  If at any time you don't hear me, you

7    don't understand me because I do speak rather

8    quickly, I regularly mumble and have a number of

9    other bad habits, just stop me and say, Hey, John.

10   Wait a minute.  You lost me.  I didn't hear you or

11   whatever -- you know, whatever the issue might be,

12   okay?

13       A.    Okay.

14       Q.    Is there anything today, a personal

15   issue, a health issue or otherwise that would

16   prevent you from being able to go forward with your

17   deposition?

18       A.    No.

19       Q.    If I use the term "Ford transitional,"

20   what does that mean to you?

21       A.    Ford transitional, that means I worked

22   with Ford and I transitioned over to ZF Batavia.

23       Q.    Okay.  You're familiar with the group

24   of employees currently with ZF Batavia that worked

 1    at Ford previously at the ZF plant and in 1999, at

 2    least for the most part, in 1999 transitioned or

 3    changed their employer to -- from Ford Motor

 4    Company to ZF Batavia?

 5         A.    Yes.

 6         Q.    And you consider yourself a

 7    transitional employee?

 8         A.    Yes.

 9         Q.    Okay.  The lawsuit that has been

10    brought has indicated that a number of

11    representations or promises were made to the

12    transitional employees that haven't been followed

13    through on.  Are you familiar with those promises

14    or representations?

15         A.    Yes.

16         Q.    Can you tell me your opinion, in terms

17    of -- let's -- as opposed to getting into too much

18    detail, but maybe there's a way to categorize those

19    issues that you might have?

20         A.    Could you repeat that, please?

21         Q.    Sure.  With respect to kind of the

22    promises or representations that were made and you

23    feel haven't been followed through on, is there

24    like a laundry list of those items that you could

7

1    go through for me?

2         A.    Yes.

3         Q.    Okay.

4         A.    Overtime.

5         Q.    Okay.

6         A.    Vacation.

7         Q.    Okay.

8         A.    We had 401K.

9         Q.    Okay.

10        A.    There was bereavement pay.

11        Q.    Okay.

12        A.    I think that's -- and AIP.

13        Q.    Okay.  If something else comes to you

14   while we're having the discussion this morning --

15        A.    Okay.

16        Q.    -- just feel free to let me know.

17   Let's talk a little bit about your work history

18   before we get into the details with respect to

19   that.  How long were you with Ford Motor?

20        A.    20.6 years.

21        Q.    And in terms of location, prior to

22   coming to Batavia, where were you?

23        A.    Batavia.

24        Q.    You were at Batavia?  You're --

8

1          A.     I've been in the building since it --

2          Q.     I was going to say, you're one of the

3   ones that when they opened the door, you were

4   there?

5          A.     Yes.

6          Q.     Okay.  When you hired in with Ford,

7   what was your initial position?

8          A.     Oh, my.

9          Q.     If you remember.

10          A.     I came in in accounts payable.

11          Q.     Okay.  Do you remember where you went

12   from there?

13          A.     Accounts payable.  I don't know if

14   this is in exact order, but I've been in inter-

15   company payables.  I was the cashier.  I was in

16   receivables.  I was in payroll.  I was in time

17   office.

18          Q.     Okay.

19          A.     Maintenance expeditor.  I worked in

20   construction.

21          Q.     Okay.

22          A.     I scheduled overtime.  I -- I think

23   that's about it.

24          Q.     Sounds like you've been busy out

9

1    there.

2          A.    Yes.

3          Q.    Let's talk a little bit about salaried

4    positions.  Were always those positions salaried?

5          A.    Yes, they were.

6          Q.    Okay.  And so, as a salaried position,

7    you would have received a base salary?

8          A.    Yes.

9          Q.    Did you receive any benefits with that

10   salary, and I suspect it changed over time?

11         A.    What do you mean by "benefits"?

12         Q.    Well, I guess I consider a lot of

13   things benefits.  What do you consider, I guess,

14   benefits?

15         A.    Well, I -- you know, I -- I got paid.

16   I got paid overtime.

17         Q.    Okay.

18         A.    I had vacation.  I had medical

19   insurance.  To me, those are benefits.

20         Q.    Okay.

21         A.    I had all of that.

22         Q.    All right.  Ford didn't have like a --

23   was it the A Plan, the X Plan?

24         A.    Oh, yes.  I'm sorry, A Plan.

```
 1        Q.    That's okay.  All right.  And so A

 2   Plan is another benefit of your employment?

 3        A.    Mm-hmm.

 4        Q.    -- with Ford?  I think you probably

 5   had dental?

 6        A.    Dental, medical --

 7        Q.    All right.

 8        A.    -- all those.  Life insurance, 401K

 9   plan.

10        Q.    Now, Ford had as one of their

11   benefits, benefit plans, if you will, a -- I don't

12   want to say AIP.  They had a profit sharing, didn't

13   they?

14        A.    Yes, they did.

15        Q.    Did they always have a profit sharing

16   plan?

17        A.    There was always a plan, whether it

18   was paid every year --

19        Q.    Okay.  I think there were some years

20   where it wasn't paid, if I recall correctly?

21        A.    That's correct.

22        Q.    Okay.  All right.  Just so that I

23   understand, I think what we talked about and I

24   think we've covered most everything.  The related
```

 1    benefits during your tenure at Ford as a salaried

 2    person was the paid overtime, vacation time,

 3    medical, A Plan, dental, life 401K, bereavement

 4    probably?

 5         A.    Mm-hmm.

 6         Q.    If we think of another one, let me

 7    know.

 8         A.    Yes, I will.

 9         Q.    Okay.  Now, as you were salaried in

10    those various positions that we talked about, and

11    you've mentioned you had paid overtime.  How did

12    that work when you were at Ford Motor Company?

13         A.    It depended on the salary range.  If

14    you are below a salary range, I was paid time and a

15    half and double time for all hours I worked.  If

16    you reached a certain range, then you got paid flat

17    rate.

18         Q.    Okay.  And you use the term "range."

19    And they actually had -- Ford had pay grades,

20    didn't they?

21         A.    Yes, they did.

22         Q.    Okay.  And I know at ZF Batavia, we

23    have bands, which apparently would encompass a

24    number of pay grades?

```
 1          A.    Yes.

 2          Q.    Okay.  Are you familiar with the

 3   concept or the term "casual time"?

 4          A.    Yes.

 5          Q.    You indicated you were paid for every

 6   hour.  Did you not have casual time?

 7                MR. SIMON:  Are you still talking

 8   about Ford?

 9                MR. HUNTER:  Yes.

10          A.    With Ford?

11          Q.    Mm-hmm.

12          A.    No.  There was casual time.  It was

13   never -- I mean, I didn't put down every minute I

14   was in the building.

15          Q.    Okay.

16          A.    I mean, you come in 15, 20, 30 minutes

17   early and if you didn't -- you know --

18          Q.    Okay.

19          A.    It's just -- to me, that's casual

20   time.

21          Q.    Okay.  The -- because, well,

22   obviously, as you may well know, spoken with a

23   number of plaintiffs already, in terms of the

24   depositions and pretty uniformly everybody has
```

1    acknowledged there was some form or another of

2    casual time.  And that's why your statement

3    confused me.

4           I think maybe what I should do is,

5    let's talk about how you keep track of time or how

6    you kept track of time at Ford, in terms of you had

7    a salaried time statement or a time sheet?

8    A.    That -- until they went

9    electronically, yes.

10   Q.    Well, okay.  And so, in terms of when

11   you had a salaried time sheet, how would you fill

12   that out?  I think you've already said, Well, it

13   wouldn't reflect the minute I walked into the

14   building.

15   A.    Well, it would reflect the time I

16   walked in.

17   Q.    Okay.

18   A.    But whether I put overtime down or

19   not --

20   Q.    All right.

21   A.    And we were -- also were not required

22   to do that.  It's an exception reporting system.

23   So you didn't have to put a time down and quitting

24   time unless you worked overtime or you left early

1    for vacation or something.

2          Q.    Okay.

3          A.    It was exception reporting.

4          Q.    Okay.  All right.  But as a matter of

5    practice, what did you do?  Did you mark -- at

6    least while they didn't have the electronic, did

7    you mark when you got there and when you left, or

8    did you follow the other process, if you remember?

9          A.    I don't remember.

10         Q.    Okay.

11         A.    I probably did write down -- I'm not

12   sure.

13         Q.    Okay.  But it sounds like -- you would

14   acknowledge there is some degree of casual time and

15   apparently that did occur during your tenure with

16   Ford?

17         A.    Yes.

18         Q.    Okay.  Some folks have said that it

19   was -- I think the term you -- or the phrase you

20   used, 15 to 30 minutes ahead of time.  I had some

21   of the plaintiffs also say it was -- you know,

22   perhaps 15 to 30 minutes at the end of the shift in

23   order to hand off, or whatever you want to call

24   that.  Would that be a fair statement with respect

1    to your position?

2         A.    No --

3         Q.    Okay.

4         A.    -- because I was not on the production

5    floor.

6         Q.    Okay.

7         A.    I had nothing to hand off to someone

8    else.

9         Q.    Okay.  So at the end of the day, you

10   were just done?

11        A.    Mm-hmm.

12        Q.    Okay.  I think -- well, you told me

13   you were a maintenance expeditor, and then so you

14   wouldn't have been out on the floor at all for

15   that?

16        A.    No.  Well, I might be required to go

17   on the floor, but I didn't supervise hourly

18   employees.

19        Q.    Okay.  How did things work once Ford

20   went to the electronic time keeping that you made

21   reference to?

22        A.    How did it work?

23        Q.    How did it --

24        A.    Same basic way, only it was done on

1    the computer.

2         Q.    Okay.  Did you have a card swipe or

3    how did the --

4         A.    No.

5         Q.    -- time get entered?

6         A.    You entered it into -- I forget what

7    the system is.  IDMS3 something.  You go into that

8    and entered your time --

9         Q.    Okay.

10        A.    -- any exceptions.

11        Q.    Okay.  And so the real difference, it

12   sounds like, was as opposed to writing it out, you

13   type it in somewhere?

14        A.    In -- into the computer, that's all,

15   you know.

16        Q.    Okay.

17        A.    No difference.

18        Q.    Okay.  Do you remember what your

19   position was at the time in 1999 when you made the

20   move from Ford Motor to Batavia, ZF Batavia?

21        A.    Oh, yes, I forgot to tell you.  I was

22   in production, material control.  I forgot to add

23   that as one of the things I've done.

24        Q.    That's okay.  All right.  Now, was

1    that as well an office job, as opposed --

2          A.    Yes.

3          Q.    -- to production type job?

4          A.    Yes, but I was out on the floor a lot

5    cycling production parts.

6          Q.    Okay.  Did that job require a hand off

7    or whatever at the end of the day?

8          A.    No, I've never had that.

9          Q.    Okay.  Now, with respect to your move

10   to ZF Batavia, is there any reason or is there

11   anything in particular with you that made you

12   decide to take the -- the move over to ZF Batavia?

13         A.    Are you asking me why I --

14         Q.    Maybe that's a shorter, better way to

15   put it.

16         A.    Okay.

17         Q.    Yeah, why did you make the jump to

18   Batavia?

19         A.    To ZF Batavia?

20         Q.    To ZF Batavia, yes.

21         A.    Every morning Hassan Saleh came to my

22   desk asking me and telling me his -- he was giving

23   the -- given the job to get me to sign over as

24   maintenance expeditor for ZF Batavia.

1        Q.    Okay.  You got tired of Hassan coming

2    to you and just gave up?  Or help me with that.

3    Hassan, I'm coming?

4        A.    Well, I'm sorry.  Just every morning

5    he came to me and just talked to me.  He

6    stressed -- you know, things would be the same,

7    everything would just about stay the same, except

8    for like my 401K.  That would be different because

9    it would be no longer Ford.  And, of course, the

10    medical benefits would not be Ford.

11        The other decision I made was I -- my

12    vacation, I got to keep the five weeks vacation

13    when I came over and my salary would be -- would be

14    basically the same.  I'd get paid overtime the

15    same.  Everything would be the same, except for

16    like the -- you know, the -- the 401K and my health

17    benefits.

18        Q.    And do you remember kind of the time

19    period?  And I don't necessarily mean the day.  But

20    was this like a week where Hassan was coming in

21    daily or two weeks or a month or --

22        A.    I -- I actually don't remember how

23    long it was, but it was quite a few mornings.

24        Q.    Two weeks, three weeks?

19

```
1          A.    Oh --

2          Q.    I mean, just if you remember.

3          A.    No, I don't.

4          Q.    Okay.

5          A.    I don't remember when he started and I

6    don't remember -- he didn't quit until I said

7    yes --

8          Q.    I think I --

9          A.    -- so --

10         Q.    All right.  The -- was there anything

11   else that you based your decision on, in terms of

12   making the move over to ZF Batavia?

13         A.    No.

14         Q.    Okay.

15         A.    Those items.

16         Q.    Now, my understanding is that you

17   really didn't -- there was a -- you rejected one

18   offer, didn't you?

19         A.    Yes, I did.

20         Q.    Okay.  All right.  Ms. Parker, we've

21   handed you what we've marked for identification

22   purposes as Exhibit 115.  Can you take a moment to

23   go through that for me?  Have you had a chance to

24   review Exhibit 115?
```

20

1          A.    Yes.

2          Q.    Okay.  Is that the offer that you

3    declined?

4          A.    Yes, it is.

5          Q.    Okay.  And you'll see on there the

6    date of June 1, 1999 there at the bottom --

7          A.    Yes.

8          Q.    -- together -- and that's your

9    signature there next to that?

10         A.    Yes, it is.

11         Q.    All right.  Does that help you kind of

12   remember when Hassan had been talking to you on a

13   daily basis?  Would it be around that date or no?

14         A.    I don't know.  It had to be between

15   the date I declined this and the date I signed.

16   I -- I don't know.

17         Q.    Okay.  All right.  Well, maybe

18   that's -- maybe that's the way to approach this.

19   Did Hassan come to you after you told him no?

20   After you told --

21         A.    Yes.

22         Q.    -- ZF -- all right.  There we go.  All

23   right.  So to my way of understanding, then, as of

24   June 1st, you'd said, Not going to happen.  Not

1    going over?

2          A.    Correct.

3          Q.    Okay.  And after that, Hassan, on a

4    semi-regular basis apparently -- all right.

5          A.    Appeared at my desk every morning.

6          Q.    Okay.  And that would -- we'll talk

7    about that in a minute.  You signed on on July

8    22nd.  So somewhere between June 1st and July 22nd,

9    Hassan -- and it may have been every day, Hassan --

10          A.    He came -- yes.

11          Q.    Okay.  Was there anything in

12    particular that caused you to -- to decline on June

13    1st of 1999?

14          A.    Nothing in particular, no.  I was a

15    Ford employee and I wanted to stay a Ford employee.

16          Q.    Okay.  The -- there was some meetings,

17    as I recall, out there at the facility?

18          A.    Yes.

19          Q.    And those were prior to June 1st of

20    1999?

21          A.    Yes.

22          Q.    All right.  Did you attend any of

23    those meetings?

24          A.    I recall attending one.

1          Q.     All right.  Was that one of the ones

2     in the cafeteria?

3          A.     Yes.

4          Q.     Was it one of those general meetings

5     that were held there, if you remember?

6          A.     What is a "general meeting"?

7          Q.     Where they had all of the Ford

8     salaried employees and I think a couple folks down

9     from Ford and a couple from Batavia --

10         A.     Yes.

11         Q.     -- ZF Batavia?

12         A.     Yes.

13         Q.     All right.  There was a day, I believe

14    May 27th of 1999, there was a morning session --

15    day session and afternoon session.  Do you remember

16    any of that?

17         A.     I don't remember the date.  I remember

18    going to one meeting, yes.

19         Q.     Okay.  Do you remember, were there

20    slides and things like that shown at the meeting

21    that you went at?

22         A.     Yes, there was.

23         Q.     Okay.  And the -- somewhere around the

24    end of May sounds about like the meeting you went

23

1    to?

2         A.    I think so.

3         Q.    All right.  Do you -- when you went to

4    the meeting, did you go because you were interested

5    in coming over to ZF Batavia or what was your

6    purpose for going to that meeting?

7         A.    I went to the meeting to hear what

8    they had to say.

9         Q.    Okay.  But apparently there was

10   something out there that you weren't convinced to

11   make the move over, at least as of the date of the

12   meeting?

13        A.    Yes.

14        Q.    As we sit here today, do you remember

15   what -- what the issues or the concerns were that

16   you had?

17        A.    Well, I was concerned about my

18   retirement.  I had 20.6 years in.  I was concerned

19   about my vacation.  I had five weeks.  You know, I

20   was just -- I was just concerned about all those

21   things.

22        Q.    Okay.  Apparently the meeting did not

23   convince you or satisfy you with respect to those

24   concerns because, again, I see on June 1st, you

1    declined the offer?

2         A.    Yes.

3         Q.    Okay.  With respect to the meeting, do

4    you remember any of the discussions or presenters

5    or anything from that meeting?

6         A.    I remember Karl Kehr was there.  I

7    remember Dave Adams was there, Tony DeShaw.  That's

8    just about all that I remember.

9         Q.    Okay.  Do you remember what Karl said,

10   for example?

11        A.    No.

12        Q.    How about Dave?

13        A.    I remember him saying he was a ZF

14   employee and, no, I really don't.

15        Q.    Tony DeShaw?

16        A.    He talked about benefits.

17        Q.    Okay.

18        A.    I do know that.

19        Q.    Okay.  Do you remember, was -- there

20   was a question and answer session at that time as

21   well?

22        A.    Yes.  They did allow some questions.

23        Q.    Okay.  Did you ask --

24        A.    And I --

1          Q.    I'm sorry.  Go ahead.

2          A.    Questions, and then they answered

3    them.

4          Q.    Okay.  Did you ask any questions?

5          A.    No.

6          Q.    Did you feel you had any questions at

7    that point or --

8          A.    I sit and listened.

9          Q.    Okay.  After the meeting, had you made

10   up your mind that you weren't going to move to ZF

11   Batavia?

12         A.    No.

13         Q.    Okay.  At what point in time did you

14   decide to decline that June 1st offer?

15         A.    I guess on June 1st when I signed it.

16         Q.    Okay.  Was there anything that

17   happened between that May meeting and June 1st

18   that --

19         A.    No.

20         Q.    -- helped influence the decision?

21         A.    No.

22         Q.    That was just a --

23         A.    It was just --

24         Q.    -- time to think about it?

1          A.    It was not -- yes.  It just -- I was

2    not going to sign over.

3          Q.    Okay.  Did you speak with anybody else

4    besides Hassan about the move from Ford to ZF

5    Batavia in between the time of June 1st and July

6    22nd of 1999?

7          A.    Probably my supervisor at the time.

8          Q.    And who was that?

9          A.    Ken Kaffenberger.

10          Q.    Do you remember the nature of your

11    discussions with Ken?

12          A.    Probably we just discussed what we

13    thought was going on and -- precisely, no.

14          Q.    Okay.

15          A.    Just --

16          Q.    And he was an immediate supervisor to

17    you?

18          A.    Yes, he was.

19          Q.    All right.  Did he -- he didn't move

20    over to ZF Batavia, did he?

21          A.    No, he did not.

22          Q.    Okay.  Did he receive an offer, do you

23    know?

24          A.    I don't know.

1          Q.    He would have been or could have been,

2     I guess I should say, a Ford transitional, correct?

3          A.    Yes, he could have been.

4          Q.    Do you know, did he go to the meeting

5     under -- meeting that you went to?

6          A.    I don't know.

7          Q.    Okay.  Aside from Mr. Saleh and

8     Mr. Kaffenberger, any other discussions about the

9     move over to Batavia, ZF Batavia?

10          A.    No.

11          Q.    I guess I'm little surprised.  Not

12     even discussions just with other co-workers or

13     anything about -- about the --

14          A.    Oh, well, I thought you meant did I

15     discuss what would happen -- no, I probably did.

16          Q.    Okay.

17          A.    I mean, we all were talking about it.

18     That was all over the plant.

19          Q.    Okay.  Well, that's what I was

20     thinking is, well, we've -- what I've distilled

21     from some of the other comments is being -- you

22     know, this is a major life decision and everybody

23     was talking about it.

24          A.    Well, yeah.

1          Q.    Okay.

2          A.    I thought you meant did I discuss with

3     someone personally why are you coming over here --

4          Q.    Oh, okay.

5          A.    -- officially.

6          Q.    No.  But, I mean, you had other

7     general discussions with employees about making the

8     move?

9          A.    Correct.

10         Q.    Okay.  Do you know, did those

11    employees go to the meetings on the 27th?

12         A.    Jeez.  There was a lot of salary

13    people there.

14         Q.    Okay.

15         A.    I mean, we probably all were there.

16         Q.    Okay.  All right.

17         A.    No, I don't remember face to face --

18    you know, everyone that was there.  No, I do not.

19         Q.    The -- at some point in time, then,

20    you made a decision to come over to ZF Batavia?

21         A.    Yes.

22         Q.    You were presented an offer.  Do you

23    know or do you remember who presented you the

24    offer?

29

```
 1          A.     Hassan.

 2          Q.     Okay.  Did --

 3          A.     Or wait a minute.  Yes, I think it was

 4    Hassan.

 5          Q.     Okay.  I -- on the second offer that

 6    was made to you, I note that the salary was

 7    increased.

 8          A.     Yes, it was.

 9          Q.     Do you know how that happened?

10          A.     He offered -- Hassan offered me that.

11          Q.     Okay.  Was that a number that you had

12    discussed in advance of the offer?

13          A.     Yes, it was.

14          Q.     Okay.  Ms. Parker, I've handed you

15    what we've marked for identification purposes as

16    Exhibit 116.  If you would, take a moment to review

17    that.

18          A.     Okay.

19          Q.     Okay.  You've had a chance to review

20    Exhibit 116.  We've been talking about a second

21    offer.  Is Exhibit 116 that second offer?

22          A.     Yes, it is.

23          Q.     All right.  And that's your signature

24    down there at the bottom left?
```

1          A.     Yes.

2          Q.     And the date reflected on there, July

3    22nd of 1999, is that the date you signed that

4    document?

5          A.     Yes, that's what's there.

6          Q.     Well, some people, for whatever

7    reason, don't always put the correct date.  So

8    that's why I'd asked.  And the 4,850 per month

9    salary, that was something that you and Mr. Saleh

10   discussed?

11         A.     That's correct.

12         Q.     All right.  And the position was

13   maintenance associate, which I think was different

14   than the initial offer as well, correct?

15         A.     That is correct.

16         Q.     And so apparently there was some

17   discussions with respect to what your position

18   would be at ZF Batavia?

19         A.     Yes.

20         Q.     All right.  Do you remember, can you

21   relate to me the discussions regarding your

22   position or salary?

23         A.     Would you repeat that, please?

24         Q.     The discussions that you had with

1     Hassan regarding your position or salary, do you

2     remember the nature of any of those discussions or

3     anything that was said with Hassan regarding the

4     changes?

5           A.    It was his objective to get me to come

6     to work for ZF Batavia --

7           Q.    Okay.

8           A.    -- every morning.

9           Q.    Okay.  But apparently somebody came up

10    with the idea that, well, look.  Teri Parker was

11    going to receive a salary increase and a change in

12    position, yes?

13          A.    He offered me that, would I take this

14    job if such and such and --

15          Q.    Okay.  And so this, again, what's on

16    the July 21, 1999 letter represents that

17    negotiation that you had for your position?

18          A.    Yes.

19          Q.    Okay.  And to your understanding, did

20    that -- is Exhibit 116 a fair representation of the

21    arrangement you struck with ZF Batavia?

22          A.    Salary-wise.

23          Q.    Okay.  Now, with respect to Exhibit

24    116, do you remember, did you go to Hassan's

1    office?  Where did he give you this offer?

2         A.    He came and got me from my desk --

3         Q.    Okay.

4         A.    -- and took me into a conference room.

5         Q.    Okay.  Was it just you and Hassan?

6         A.    Yes, it was.

7         Q.    All right.  Did he give you any other

8    documents at that time?

9         A.    I don't remember.

10        Q.    In terms of the discussion, Hassan

11   came and physically got you from your desk.  Did he

12   tell you what he wanted at that point?

13        A.    Which time?

14        Q.    I'm sorry.  On the day that you signed

15   up, July 22nd, 1999.

16        A.    Yes.  I think he said I have -- he

17   just asked if I could -- I think he asked me, Can I

18   see you in the conference room and he had an offer

19   for me.

20        Q.    Okay.  I note the date of the letter

21   is the 21st.  You signed it on the 22nd.  Did you

22   sign it at the time Hassan gave it to you or did

23   you have it a day early or do you remember?

24        A.    I don't remember.  I don't remember

1   whether I did it right at the time or not.

2         Q.    Okay.  The offer that was made in July

3   of 1999 did represent a pay increase, didn't it,

4   from what you were receiving at Ford?

5         A.    Yes, it did.

6         Q.    Okay.  Ms. Parker, I've handed you

7   what's been marked for identification purposes as

8   Exhibit 117.  Can you take a moment to review that

9   document, please?

10        A.    Okay.

11        Q.    All right.  Exhibit 117 appears to be

12  your application for employment with ZF Batavia?

13        A.    Yes.

14        Q.    And on the second page of that

15  document, it appears to have three places to sign

16  and it appears to be your signature there?

17        A.    Yes.

18        Q.    A little bit ago, we talked about your

19  concerns with respect to ZF Batavia and

20  expectations of yours that were not met.  I think

21  you mentioned an array of six or seven different

22  items.  I'd like to talk a little bit now about

23  those issues.

24              I think you started with overtime.

1    What are your concerns with respect to overtime?

2          A.      What are my concerns right now?

3          Q.      Mm-hmm.

4          A.      The -- we were never -- with Ford, we

5    were never forced to work the hour.  Now we work

6    the hour before you get paid.

7          Q.      Okay.

8          A.      What other concerns are you talking

9    about?

10          Q.      You have obviously sued the company

11    and made allegations that the company has failed to

12    do certain things.  You listed -- let's see.  A --

13    right now I have a list of five issues, overtime,

14    vacation, 401K, bereavement and AIP.

15                 What I'm trying to understand is, with

16    respect to overtime, what has the company failed to

17    do that you believe it should have?

18          A.      Well, it has failed to pay some people

19    overtime.

20          Q.      Okay.  Do you know who those people

21    are, if you remember?

22          A.      Can we take a minute, please?

23                 MR. SIMON:  Well, he's got a -- the

24    rule is that if he asks a question --

```
 1              THE WITNESS:  Oh, oh, sure.  I'm

 2    sorry.  I just --

 3         Q.    And I'm not trying to make you

 4    uncomfortable.  Let's do this before we do that.

 5    Again, I understand you've asked for a break.

 6              At this point in time, is there

 7    anything in your testimony that you feel you need

 8    to change or clarify?

 9         A.    No.

10              MR. HUNTER:  Okay.  Let's go ahead and

11    take a break.

12         (Off the record:  8:49 a.m. - 8:56 a.m.)

13              MR. SIMON:  Counselor, I appreciate

14    you letting Ms. Parker take a break.  She got here

15    very early before the deposition, so she needed a

16    rest room break.  And then she had some concerns

17    about your question that you asked and she'll

18    explain.

19              MR. HUNTER:  Okay.

20              THE WITNESS:  My concerns are that I

21    was in payroll --

22              MR. HUNTER:  Okay.

23              THE WITNESS:  -- and I didn't know how

24    to answer that, knowing the confidentiality or the
```

1   professionalism of being in payroll.

2               MR. HUNTER:  Hopefully Steve told you

3   you can tell me.

4               MR. SIMON:  Don't say what I said.  I

5   expect Mr. Hunter is going to tell you that it's

6   okay for you to talk about other people's pay in

7   here, right?

8               MR. HUNTER:  Yep.

9               THE WITNESS:  And I don't feel

10  comfortable doing that, but okay.

11  BY MR. HUNTER:

12       Q.    Okay.  The question was or the

13  discussion was you made a comment, ZF Batavia

14  failed to pay some people for overtime.

15       A.    That's correct.

16       Q.    Okay.  Do you know or remember who

17  that was?

18       A.    No, I don't remember the names.  I

19  just remember there were areas.

20       Q.    Okay.  All right.  What areas?

21       A.    There was material control and

22  maintenance.

23       Q.    And I've heard from Mr. Whisman,

24  Mr. Crump -- and my memory is not so good.  Both of

37

1    those gentlemen, I think one or two others, that

2    there were some weekends -- about a three-weekend

3    period where they were scheduled for overtime and

4    didn't get paid for that scheduled overtime.  Is

5    that what you're talking about here?

6          A.    That is correct.

7          Q.    Okay.  And when I say Jim Crump and

8    Wayne Whisman, you obviously know who I'm talking

9    about?

10         A.    Well, that's maintenance.

11         Q.    Right, right.  Okay.  Do you have any

12   specific recollection that either Mr. Crump or

13   Mr. Whisman didn't get paid?

14         A.    Them personally?

15         Q.    Mm-hmm.

16         A.    I don't remember the exact names, no.

17         Q.    Okay.  In terms of -- let's talk about

18   material controls.  Do you remember any details, in

19   terms of -- of how many people didn't get paid or

20   how many hours went unpaid or any of that?

21         A.    No, I don't.

22         Q.    Okay.

23         A.    I don't -- I just knew there were some

24   areas that did not get paid.

```
 1          Q.    All right.  And, again, as I
 2   understand it, about a three, maybe four-week
 3   period, but I believe it was a three-week period in
 4   April or May, perhaps, of about 2001?
 5          A.    I think -- what is this, three?
 6          Q.    Yeah.  I'm sorry, 2002.
 7          A.    Yes.
 8          Q.    Okay.  With respect to overtime, are
 9   there any other issues or concerns or failures on
10   the part of ZF Batavia?
11          A.    No.
12          Q.    And with respect to yourself, the
13   overtime that was unpaid certainly doesn't apply to
14   you.  You weren't in material control or
15   maintenance at that time?
16          A.    No, that did not affect me.
17          Q.    Okay.  I think the next area that you
18   mentioned was vacation?
19          A.    Yes.
20          Q.    Okay.  Now, I think you had said
21   earlier you had five weeks of vacation?
22          A.    That is correct.
23          Q.    Okay.  What's the issue, then, with
24   vacation?
```

1          A.     There was a statement that we could

2     buy or sell a week of vacation, but they -- if you

3     had five weeks or more, they stopped the allowing

4     you to buy another week.

5          Q.     All right.  Who made the statement

6     that you could buy or sell vacation?

7          A.     I think that was one of the things

8     mentioned, along with the vacation and in one of

9     those -- in that meeting, but I'm -- I think that's

10    where I heard it, yes.

11         Q.     And you only went to one meeting, as I

12    recall?

13         A.     I think so, yes.

14         Q.     Okay.  Do you remember who said that?

15         A.     No.

16         Q.     Okay.

17         A.     I -- I would just be guessing if I --

18         Q.     And has that personally affected you?

19         A.     Not being allowed to buy one week,

20    yes.

21         Q.     Okay.  You basically would prefer to

22    buy an extra week's vacation apparently or would

23    you want to sell one?

24         A.     I probably would prefer to buy one.

40

1          Q.    Okay.  I was guessing that, but I

2     really should make sure.  All right.  Any other

3     issues on the vacation?

4          A.    No.

5          Q.    The next issue you listed was 401K.

6     What's the concern there?

7          A.    I think I just missed -- I think I

8     said that by mistake.

9          Q.    Okay.  So you're happy with the 401K?

10         A.    Yes, I apologize on that.

11         Q.    That's all right.  Bereavement?

12         A.    Yes, that was changed.

13         Q.    What was the policy while you were at

14    Ford?

15         A.    Five days.

16         Q.    Did that ever change while you were at

17    Ford?

18         A.    It increased.  Went from three to

19    five, I think --

20         Q.    Okay.

21         A.    -- yes.

22         Q.    So it'd be safe to say that it

23    changed?

24         A.    Yes, it changed.

1          Q.    Okay.  And at Batavia, I think the

2     policy is three days in certain circumstances?

3          A.    I don't remember.

4          Q.    You made the statement that at Ford,

5     the bereavement was five days, yes?

6          A.    Yes.

7          Q.    All right.  When you came over to ZF

8     Batavia, you knew the policy was going to be

9     something less than five days, didn't you?

10         A.    Yes.  And now I'm thinking I have it

11    confused with the hourly.

12         Q.    Okay.

13         A.    You know, I think I do have it

14    confused with the hourly 'cause I was in hourly

15    payroll, too.  I apologize for that.

16         Q.    That's all right.

17         A.    I think it's three days.  I'm not

18    sure.

19         Q.    Okay.  Did the bereavement leave issue

20    affect you, in terms of did you need additional

21    days?

22         A.    No.

23         Q.    Any other issues with respect to the

24    bereavement?

1          A.    No.

2          Q.    AIP, you mentioned that in your list.

3    What's the concern with AIP?

4          A.    Well, like I said, when I signed over,

5    I was told that everything would be the same.  No

6    one -- they failed to tell me that because I was a

7    Ford transitional employee, that I would receive

8    two percent less than a ZF employee.

9          Q.    Well, you said they told you

10   everything would be the same.  Who told you that?

11         A.    Hassan.

12         Q.    Okay.  And did he say that in the

13   context of AIP or --

14         A.    He said that in the context of that

15   basically everything would stay the same as it was

16   with Ford, with the exception of the 401K and your

17   health benefits.

18         Q.    Ford didn't have an AIP, did they?

19         A.    No, they had a profit sharing, but --

20   never mind.

21         Q.    No, that's --

22         A.    No.

23         Q.    Okay.  Do you remember any other

24   statements made by Hassan?

1         A.    No.

2         Q.    Okay.  The -- do you have actual

3    knowledge that you received two percent less than

4    anybody else in the plant?

5         A.    Yes.

6         Q.    Okay.  Tell me what you know about

7    that or what facts you have.

8         A.    It's payroll concerning again.

9         Q.    You can tell me.  I'm the company's

10   attorney.

11        A.    That just bothers me.  You don't

12   understand.  Yes.

13        Q.    All right.  Tell me what you know if

14   you could, Ms. Parker.  And I'm not trying to put

15   you on the spot, but I can't address your concerns

16   unless I understand them.

17        A.    Yes, I know that I received two

18   percent less than ZF employees.  We were also told

19   in meetings -- this last year in a department

20   meeting that we received less, Ford transitional

21   employees did --

22        Q.    When you --

23        A.    -- percentage-wise.

24        Q.    I was going to say, when you say you

44

1    received less, that would be true perhaps on a

2    percentage basis, but on an actual dollar basis --

3          A.    That's correct, percentage.

4          Q.    All right.  So you would agree with me

5    that, from a real dollar -- $10 being $10, you

6    received substantially the same as a ZFBA employee?

7          A.    No.

8          Q.    Okay.  Why not?

9          A.    No, because they received a

10   percentage.  I received a percentage.

11         Q.    Okay.  And if you multiply a

12   percentage times a base salary amount, if the base

13   salary is higher, the actual dollar number is going

14   to come out higher --

15         A.    That is --

16         Q.    -- isn't it?

17         A.    -- correct.

18         Q.    All right.  So, in terms of actual

19   dollars, how much less did you receive than a ZF

20   employee?

21         A.    That, I do not know how much less.  I

22   know the percentage.

23         Q.    Okay.  Did anybody ever tell you that

24   you would receive the exact same percentage as any

1    other employee in the facility?

2          A.    That was based on the company's

3    performance.

4          Q.    Okay.

5          A.    And we -- and we would -- no one ever

6    told me, no, I would get less percentage.

7          Q.    I asked you if anyone ever told you

8    that you would get the same percentage as --

9          A.    No, I'm sorry.

10         Q.    -- everybody else.  Any other issues

11   on AIP?

12         A.    No.

13         Q.    Do you know for how many years you

14   received the two percent less?

15         A.    No.

16         Q.    You also received a true-up payment,

17   didn't you, on your initial -- when you made the

18   jump over?

19         A.    A true up?

20         Q.    An additional payment.

21         A.    An additional payment from?

22         Q.    From Ford or ZF.

23         A.    From Ford and ZF, yes.

24         Q.    Okay.  And at the time that you hired

1 on, did anybody tell you anything about that

2 payment?

3    A. Which one?

4    Q. The one we just talked about, the

5 true-up payment.

6    A. The one from Ford --

7    Q. Mm-hmm.

8    A. -- or the one from ZF?

9    Q. The one from Ford.

10    A. The one from Ford was to make up from

11 the -- from the time that it was figured on the

12 years that I had left to retire, that I had lost on

13 the A Plan or I had lost -- it made up for those

14 differences.

15    Q. All right.  I don't think we're

16 talking about the same thing.

17    A. Yeah, this transition bonus.

18    Q. Yeah.  What I'm talking about is a

19 true-up payment.  I haven't marked this, but --

20    A. What's a true-up payment?

21    Q. And I don't have copies of that.  Take

22 a minute and see if that helps.

23    A. What was your question?

24    Q. Okay.  I've handed you a document.  I

47

1    don't have a Bates stamp number on there.

2              MR. SIMON:  35.

3         Q.    Document Bates stamped number 000735.

4    It's a document produced by ZF Batavia and it

5    represents a salary/AIP notification for Teri

6    Parker, effective March 15th of 2000.  And it shows

7    a ZFB bonus of $1,500 and a one-time adjustment of

8    $2,214.50.  Have you had a chance to review that

9    document?

10        A.    May I see that again, please?

11        Q.    Sure.

12             MR. SIMON:  You want to take a break

13   and make copies?

14             MR. HUNTER:  I don't know if we need

15   it as an exhibit, but if she remembers the

16   payment -- I get the feeling she may not remember

17   the payment.  It may not matter.

18        A.    Yes, I do remember that.

19        Q.    All right.  Was that payment ever

20   discussed in any detail with anyone?

21        A.    Did I discuss that with someone?

22        Q.    Mm-hmm.

23        A.    No.

24        Q.    Did anyone discuss the payment with

48

1    you?

2         A.    No.

3         Q.    And it certainly isn't reflected in

4    the offer letter or otherwise, correct?

5         A.    That is correct.

6         Q.    Okay.  Are there any other issues with

7    respect to AIP?

8         A.    No.

9         Q.    Okay.  We've been discussing a number

10   of issues and we started out with the

11   representations or promises you feel that ZF

12   Batavia had not followed through on.  As we've

13   discussed this, are there any other issues that

14   come to mind for you?

15        A.    Other issues that I didn't mention in

16   the beginning?

17        Q.    Mm-hmm.

18        A.    The personal time was also -- when I

19   originally went over, we had five days and it was

20   cut back to three days.

21        Q.    How many days did you have at Ford?

22        A.    21 days.

23        Q.    Okay.  And I've heard --

24        A.    That was -- I'm sorry.  The five

1   personal days  --

2          Q.    Okay.

3          A.    -- at -- and the other 16 were sick

4   days.  I apologize.  But it was a total of 21 days.

5          Q.    Okay.  And I remember one of the

6   plaintiffs telling me -- I thought they had 30

7   days, which seemed a little high to me.  Does that

8   sound accurate to you?

9          A.    30 days of personal --

10         Q.    Apparently --

11         A.    -- and sick?

12         Q.    -- personal or sick time, something

13  like that.

14         A.    I don't remember.  I don't -- I know I

15  had 21 days.

16         Q.    Okay.  The number of days you had,

17  would that have varied, based upon your salary

18  grade or position or longevity with Ford?

19         A.    I don't know.

20         Q.    At some point in time with ZF Batavia

21  in approximately March of 2001, you changed

22  positions, didn't you?

23         A.    Yes, I did.

24         Q.    Went to payroll administrator?

```
 1           A.     That is correct.

 2           Q.     All right.  And at that point in time,

 3    Hassan had not -- Hassan didn't solicit you for

 4    that position, did he?

 5           A.     No.

 6           Q.     There certainly weren't any group

 7    meetings or anything like that.  That was an

 8    individual change that was made as to Teri Parker?

 9           A.     There was no group meetings, that's

10    correct.  That concerned me.

11           Q.     All right.  Did you have any meetings

12    with anybody regarding that change in position?

13           A.     Yes, Mark Bugajski.

14           Q.     Do you remember the nature of those

15    discussions with Mark?

16           A.     Yes.  He came to me and asked me what

17    the perfect job would be.

18           Q.     And you told him payroll

19    administrator?

20           A.     No, I did not.

21           Q.     I wouldn't have thought so.  All

22    right.

23           A.     No, I did not.

24           Q.     How did you respond or what happened
```

1  next in that meeting?

2       A.   Asked me what the perfect job would be

3  and I told him I had the perfect job as maintenance

4  expeditor.

5       Q.   Okay.  At some point in time, though,

6  you apparently became payroll administrator?

7       A.   That is correct.

8       Q.   All right.  How did that happen?

9       A.   I didn't have a choice.

10      Q.   I see.  In terms of -- why didn't you

11  have a choice?

12      A.   Well, because the girl that had the

13  payroll before was not staying and left to go to

14  Sharonville.

15      Q.   Okay.

16      A.   Mark Bugajski came to me.  They found

17  out that I had had payroll experience.  Came to me

18  and asked me what the perfect job would be.  And I

19  told him, I had the perfect job.  And I guess we

20  had several discussions and basically they needed

21  me in payroll, the company did.

22      Q.   Okay.  Did he tell you you were going

23  to be fired if you didn't make the move --

24      A.   Oh, no.

1          Q.     -- or anything like that?  All right.

2          A.     No.

3          Q.     So, I mean, you had a choice.  It's

4     not that your position was threatened with the

5     company?

6          A.     No, my position was not threatened.

7          Q.     Okay.  Other than your discussions

8     with Mark, did you discuss the position with

9     anybody else?

10         A.     Probably the -- my immediate

11    supervisor that I would have.  I think it was Mark

12    Kolakowski.

13         Q.     Okay.

14         A.     I may have discussed with Ruth Ann,

15    she was the prior payroll person.

16         Q.     Okay.  In terms of the discussions

17    with Mark Kolakowski, did you discuss with him

18    and -- the pay or the benefits or anything like

19    that?

20         A.     Yes, I think they did.

21         Q.     Well, not they, but did you?

22         A.     Did I discuss with Mark -- Mark

23    Kolakowski?  Let me think.  I don't know whether it

24    was him.  That -- at that point, yes, it was with

53

1    Mark K. and -- Mark Kolakowski and I don't remember

2    who the salary person that was in there with us.

3        Q.    Do you remember the nature of that

4    discussion?

5        A.    The nature?

6        Q.    Mm-hmm.  Do you remember at all what

7    you talked about?

8        A.    They wanted me to come to payroll.

9        Q.    Okay.

10        A.    We just discussed that position.

11        Q.    All right.  Did you discuss, again,

12    any of the benefits or terms or anything else with

13    respect to that position?

14        A.    They said everything would stay the

15    same.  Of course, again, since -- except my salary.

16    It was changing.

17        Q.    Well, now, Mr. Kolakowski, if I

18    remember, came over from ZF Lemforder Corporation

19    not long before March of 2001.  Does that sound

20    right to you?

21        A.    I don't know.  I don't know when he

22    came.

23        Q.    Do you -- are you aware that he has

24    any background at Ford?

1          A.    Mark Kolakowski?

2          Q.    Mm-hmm.

3          A.    I don't know.

4          Q.    Okay.  Did you have any discussions

5     with Mr. Sennish?

6          A.    No.

7          Q.    And I need to make copies of that.

8     Let's mark that 118.  You've got to share that one.

9     I apologize for not having a copy of that.  If

10    they're in there, I don't see them.

11              (Off-the-record discussion.)

12         Q.    All right.  Ms. Parker, you've had a

13    chance to review document 118?

14         A.    Mm-hmm.

15         Q.    And that appears to be your offer

16    letter that we've been talking about where you came

17    up to the perfect job?

18         A.    Yes.

19         Q.    Okay.  And that's your signature on

20    the document?

21         A.    Yes.

22         Q.    Okay.  And I see, for example, in

23    there it has some specific terms with respect to

24    increases that you were to receive?

1          A.     Increases?

2          Q.     In the handwriting down there on the

3     bottom right-hand side.

4          A.     Yes.

5          Q.     Okay.  And does that, in fact, now

6     that you've had a chance to see that, refresh your

7     recollection?  Is that the agreement that you

8     signed with the company in 2001?

9          A.     Yes, it is.

10          Q.     Okay.  Any other documents executed in

11     conjunction with that?

12          A.     No.

13          Q.     Any other documents that you recall

14     that might have been attached or given to you with

15     that document?

16          A.     No, I don't remember.

17          Q.     Okay.

18          A.     I don't think there was.  I think it

19     was just this.

20          MR. HUNTER:  Okay.  Hand that down to

21     Ford.  Steal that one back.  Exhibit 2, Steve,

22     we're going to need.

23          MR. SIMON:  I ask that we make a copy

24     of that before the end of the deposition or after

1    the deposition.

2         Q.    Ms. Parker, you have in front of you

3    Exhibit 2.  Can you take a moment to review that?

4         A.    Okay.

5         Q.    You reviewed that pretty quickly.  I

6    gather, perhaps, you've seen that document before?

7         A.    Yes, I have.

8         Q.    Okay.  When was the last time you saw

9    that document?

10        A.    When was the last time I saw this?

11        Q.    Mm-hmm.

12        A.    Probably a couple days ago.

13        Q.    Okay.  And I would presume that was in

14   preparation for today's deposition?

15        A.    Yes.

16        Q.    Do you remember any other documents

17   you reviewed at that time?

18        A.    That I reviewed at that time?

19        Q.    Yeah, two days ago.

20        A.    No.

21        Q.    Okay.  With respect to Exhibit 2, you

22   hadn't mentioned this brochure before.  Do you

23   remember now the first time you saw this brochure?

24        A.    I want to say it was attached to the

1    offer letter -- offer letter from Hassan.

2          Q.     But you sound unsure because you say

3    you want to say.

4          A.     Right.  I'm not exactly sure the first

5    time I saw it.

6          Q.     Okay.  Do you remember reading it or

7    going through it at all with Hassan or anybody

8    else?

9          A.     Yes, I read through it.

10         Q.     Okay.  In terms of the -- of the

11   document, do you remember with respect to your July

12   offer, if you remember -- if you remember seeing it

13   at that time, seeing Exhibit 2 at that time?

14         A.     When I signed?

15         Q.     Mm-hmm.

16         A.     Yes, I think that's when I saw this

17   document.

18         Q.     You think you saw it for the first

19   time then?

20         A.     Yes, I think I did.

21         Q.     Okay.  The -- the document has a -- in

22   its original form, would have been what I call a

23   tri-fold brochure --

24         A.     Yes.

1          Q.     -- does that sound right?  And it

2     lists a whole lot of items in there, in terms of

3     compensation and incentive plan and merit

4     increases, things like that.  When you reviewed the

5     document, did you notice the language in there

6     about change and things of that nature?

7          A.     Where do you see change?

8          Q.     Okay.  Let's take a look -- I'm going

9     to call it the second page of the document.  We all

10    understand it's not in one sense the second page.

11    But the two black lines on the second page of

12    Exhibit 2, down towards the right-hand side, you

13    see those two big black lines?

14         A.     Right here?

15         Q.     Yes, ma'am.

16         A.     The two black lines, yes.

17         Q.     All right.  Do you see the language in

18    there that says, Plans described here are subject

19    to change?

20         A.     Yes.

21         Q.     Okay.  And do you see as well that it

22    says, Plan provisions and eligibility do not

23    constitute an employment contract with any

24    individual?

1        A.    Yes.

2        Q.    Do you remember reading that at the

3    time that you reviewed the document?

4        A.    No.

5        Q.    Okay.  Are there any parts of the

6    document that you remember reading at the time that

7    you signed the employment --

8        A.    Yes, I read all of this.  I probably

9    read this, but I don't remember reading it.

10        Q.    Okay.  With respect to, for example,

11    the annual incentive plan, it certainly doesn't say

12    anything in there, in terms of the percentage to be

13    paid or anything of that nature, does it?

14        A.    No, it doesn't.

15            MR. SIMON:  Objection.  The document

16    speaks for itself.

17        Q.    Did you have any understanding with

18    respect to the language about change at the time

19    you read it?

20            MR. SIMON:  Well, that's not what

21    she's -- I don't think that's her testimony, but go

22    ahead and answer.

23        A.    I don't know what you're asking me.

24        Q.    When you read the language about plans

```
 1   described here as subject to change, what did that

 2   mean to you?

 3           MR. SIMON:  Objection.

 4       A.    I don't remember.

 5           MR. SIMON:  Go ahead.

 6       A.    I'm sorry.  I don't remember reading

 7   this.

 8       Q.    Okay.  And the language about the

 9   eligibility and the employment contract, you don't

10   remember reading that, either?

11           MR. SIMON:  Objection, asked and

12   answered.

13       A.    I don't remember reading what?

14       Q.    The last sentence or the next sentence

15   there where it says --

16       A.    I said, I don't remember reading this.

17       Q.    Okay.  I just want to be clear, all

18   right?

19       A.    Okay.

20       Q.    But you do remember reading some of

21   the other --

22       A.    Well, yes.

23       Q.    Do you remember specifically which

24   other sections you remember reading?
```

```
 1          A.    The vacation, the -- I remember

 2    reading the vacation, the holidays, the leaves, all

 3    of it.

 4          Q.    Now, that --

 5          A.    Go ahead.

 6          Q.    I notice on the vacation that it says

 7    that it's a maximum of four weeks, correct?

 8          A.    That is correct.

 9          Q.    I think you told me you had five

10    weeks?

11          A.    That is correct.

12          Q.    Okay.  That seems inconsistent, then,

13    between what you have and what this document says.

14          A.    I -- that was part of the agreement

15    when I signed over, that I kept my five weeks

16    vacation.

17          Q.    On Exhibit 116, am I missing that?  I

18    don't think I see that in there.

19          A.    Where's 116?

20                MR. SIMON:  Objection.  The document

21    speaks for itself.  You can answer the question.

22          A.    No.

23          Q.    Okay.  With respect to ZF Batavia and

24    the issues raised in the lawsuit, do you have any
```

1   issues with respect to ZF Batavia and the

2   retirement plan?

3        A.    And the retirement plan?

4        Q.    You feel that ZF Batavia has lived up

5   to its obligations there?

6        A.    Yes.

7        Q.    With respect to the merit increase

8   program, would it be safe to say that you feel ZF

9   Batavia has lived up to its obligation there?

10       A.    No.

11       Q.    Okay.  Well, you didn't mention that

12  one before.  So let's talk about what shortcomings

13  are there with merit increase?

14       A.    There is also -- as long as -- also

15  with the AIP, there is a difference in the

16  percentages, the merit -- merit increase --

17       Q.    Mm-hmm.

18       A.    -- yes.

19       Q.    Now, you had a specific written

20  agreement with the company regarding your merit

21  increase, correct?

22       A.    A specific --

23       Q.    Specific agreement.

24       A.    -- agreement?  What do you mean by --

1          Q.    Well, Exhibit 118 lists -- and I think

2    I have that.  -- the merit increases that you're

3    entitled to, does it not?

4          A.    At that time, yes.  Maybe I'm

5    confused.  The merit increase is not a yearly

6    thing.

7          Q.    Okay.

8          A.    It's -- the merit increase is a yearly

9    thing.

10         Q.    Okay.

11         A.    This was for this position.

12         Q.    Well, so is it your position that

13   you're entitled to the merit increases in your

14   separate agreement in 118 -- strike that.

15              Is it your position that you're

16   entitled to the increases in Exhibit 118, plus

17   merit increases on top of that?

18         A.    This was what I signed for at that

19   time.

20         Q.    In March of '01?

21         A.    Right.  Merit increases are given

22   yearly on your performance.

23         Q.    Okay.

24         A.    So I guess I don't understand what

1    you're asking me.

2        Q.    What merit increases -- let me try it

3    this way.

4            What merit increases do you feel

5    you're entitled to that you haven't received?

6        A.    I guess maybe I misunderstood the

7    first question you asked me and I must have

8    answered it wrong.

9        Q.    Okay.  Well, that's all right.  Well,

10    let's get to the right answer.

11        A.    As I'm -- I'm getting -- okay.  Now

12    can we start over --

13        Q.    Sure.

14        A.    -- please?  Ask me again and let me --

15        Q.    Okay.  Where I started with is you've

16    brought up the issue of -- that ZF Batavia hasn't

17    done what you thought it was going to do with

18    respect to the merit increase program.  I think

19    that's what you told me?

20        A.    And I think I answered that

21    incorrectly.

22        Q.    Oh, okay.

23        A.    The merit increase, I don't expect --

24    that is performance.  So if I perform well, I

```
 1    expect it.  I guess that's what I meant.

 2           Q.    All right.

 3           A.    And I guess I misunderstand the way

 4    you asked me.  I --

 5           Q.    Okay.  Let's try this.  I think what

 6    you're telling me, merit increase is something

 7    that's going to be individual performance based?  I

 8    mean --

 9           A.    That's the way I understand it, yes.

10           Q.    Okay.  So, as you said, if Teri Parker

11    does a good job, then Teri Parker should get a good

12    merit increase?

13           A.    Correct.

14           Q.    And what you're telling me is -- I

15    think what you're telling me is that Teri Parker is

16    not getting the merit increase, though, that Teri

17    Parker is entitled to?

18           A.    No.

19           Q.    Okay.

20           A.    I answered that wrong.

21           Q.    Okay.

22           A.    I'm fine with the merit increase.

23           Q.    All right.  And you would agree that

24    it's appropriate to be individual performance
```

66

1    based?

2         A.    Yes.

3         Q.    And that's kind of the concept, if I

4    understand, isn't it?

5         A.    Please?

6         Q.    Isn't that the whole point of --

7         A.    Yes.

8         Q.    -- merit increase?  And I think --

9    well, let's talk about it.  With respect to the

10   benefits, the medical, dental, do you feel that ZF

11   Batavia is doing what it's supposed to be doing

12   with respect to those benefits?

13        A.    Yes.

14        Q.    The life insurance?

15        A.    Yes.

16        Q.    Accidental death and dismemberment?

17        A.    Yes.

18        Q.    Disability?

19        A.    Yes.

20        Q.    Tuition reimbursement?

21        A.    Yes.

22        Q.    How about holidays?

23        A.    Yes.

24        Q.    And we talked a little bit about

1    leaves.  I think we talked about bereavement.

2    Well, I'm just going to ask it.  What about

3    personal days?  I think there is a -- I think we

4    talked a little bit about the issue on personal

5    days.

6              Were you personally affected by the

7    change in personal days?

8         A.    Yes.

9         Q.    Okay.  So you would have needed the

10   additional two personal days?

11        A.    I would have needed them?

12        Q.    Mm-hmm.

13        A.    Yes.

14        Q.    Okay.  Was there an illness or

15   something in -- in that time period that those were

16   changed?

17        A.    Yes.

18        Q.    Okay.  Any issues with jury duty?

19        A.    No.

20        Q.    Maternity?

21        A.    No.

22        Q.    Military?

23        A.    No.

24        Q.    FMLA, I hope we're complying with

68

1     that.  There's no issues there?

2          A.     No.

3          Q.     I think initially you said you had

4     some concerns on the 401K, but I think you told me

5     you're happy with that?

6          A.     Yes.

7          Q.     Okay.  As far you're concerned, have

8     we covered the list, in terms of issues that you

9     have?

10         A.     Yes, I think so.

11         Q.     Okay.  We talked awhile ago about your

12    time reporting, in terms of how you did things at

13    Ford.  I don't know that we spent a great deal of

14    time talking about time at ZF Batavia.  And let's

15    talk, in a sense, how you started when you made the

16    transition over in 1999.

17                You came over as a salaried person?

18         A.     Yes.

19         Q.     How did you report time for the

20    company at that point in time for Teri Parker?

21         A.     With a time sheet.

22         Q.     Okay.  And that was a document, I

23    think, called a salaried time statement?

24         A.     That is correct.

69

```
 1          Q.    And what did that time sheet reflect?

 2          A.    That reflected anything that happened

 3    to me in that time frame.  When I started, when I

 4    quit.

 5          Q.    Okay.

 6          A.    Sometimes -- it was also another

 7    exception reporting.

 8          Q.    The -- on the time sheet that you

 9    would have kept for Teri Parker, would that reflect

10    generally the time into the building and the time

11    out of the building or was there a component of

12    casual time or how did you report that?

13          A.    I reported it when I came in and when

14    I left.

15          Q.    Okay.  How would that reflect, then,

16    casual time?

17          A.    How would it reflect it?

18          Q.    Mm-hmm.

19          A.    It would be there if I -- it would be

20    in my starting or quitting time --

21          Q.    If --

22          A.    -- between there.

23          Q.    Okay.  So that -- I'm -- I think I've

24    said this poorly.  But the time sheet would reflect
```

1    the time basically that you got to the facility or

2    would it reflect that 15 to 30 minutes that you

3    referenced, for example, with Ford?

4        A.    I usually put the time I walked in --

5        Q.    Okay.

6        A.    -- because the time I walked in, I

7    usually start work.

8        Q.    Okay.  And then the other entry on

9    there would be the -- basically the time that you

10    walked out of the facility?

11        A.    Correct.

12        Q.    Okay.  Did it reflect anything for

13    lunch or otherwise?

14        A.    No.

15        Q.    Okay.  Was that how you reported time

16    at Ford?

17        A.    Yes.

18        Q.    Okay.  Has that process or form

19    changed since you've been with ZF Batavia?

20        A.    Of reporting my time on a time sheet?

21        Q.    Mm-hmm.

22        A.    Not reporting on the time sheet, no.

23        Q.    Okay.  The way you said it, has some

24    other function or something else changed about

1    that?

2        A.    Well, we clock in and out now with a

3    badge.

4        Q.    Okay.  And you're familiar that that

5    was required by foreign trade zone requirements?

6        A.    Yes.

7        Q.    And that's the Honeywell reader card

8    swipe --

9        A.    Yes.

10       Q.    -- where you take your badge and have

11   to swipe that to get -- physically get the door to

12   unlock?

13       A.    Yes.

14       Q.    Other than having to swipe the card,

15   have there been any other changes, in terms of the

16   time reporting, since you came on with ZF Batavia?

17       A.    Na-huh.

18       Q.    Have there been any changes in the way

19   that you have been paid since you came to ZF

20   Batavia?

21       A.    Besides the salary -- the way I been

22   paid?

23       Q.    Well, the way you've been paid or

24   how -- how overtime is paid or anything like that.

72

```
 1        A.    Yes.  They recently changed that to

 2    the -- you need to be -- in order to be paid for

 3    any overtime, you needed to work nine hours or

 4    more.

 5        Q.    Okay.  Do you remember when that

 6    change came about?

 7        A.    No, I do not remember the exact date.

 8        Q.    I think Len Sennish sent out a memo on

 9    something about that.  Do you remember that memo?

10        A.    About changing, working the --

11        Q.    About the nine hours.

12        A.    Do I remember it?

13        Q.    Mm-hmm.

14        A.    I remember reading something, yes.

15    When, no.

16        Q.    Okay.  Did you change anything you

17    did, in terms of -- of your hours reporting or

18    otherwise as a result of the memo from Mr. Sennish?

19        A.    As reporting it on my timecard?

20        Q.    Mm-hmm.

21        A.    No.

22        Q.    Okay.  As far as you know, did it

23    affect the amount of pay that you received in any

24    fashion?
```

1        A.    Yes.

2        Q.    Okay.  And I note in your answers to

3   interrogatories, you claim -- that's about $2,300,

4   I believe, in losses?

5        A.    Yes.

6        Q.    Okay.  Is that overtime?

7        A.    Is that overtime?

8        Q.    Does that number represent unpaid

9   overtime or what does that number represent?

10       A.    That -- that number represented the

11  hour that I had to work before I got paid anything.

12       Q.    Okay.  Generally speaking, how many --

13  when you were back as the -- before the change to

14  payroll administrator, generally how many hours a

15  day were you working?

16       A.    Generally --

17       Q.    Mm-hmm.

18       A.    -- as a maintenance -- it could have

19  been nine, 10, 11 hours.  It varied.  There was

20  no -- I didn't have a certain --

21       Q.    Did you receive overtime compensation

22  at that point?

23       A.    Yes.

24       Q.    Okay.  And the -- was there ever a

74

```
 1   point at ZF Batavia that you were paid for that

 2   first hour of overtime?

 3        A.    Yes, before they changed it.

 4        Q.    Okay.  ZF Batavia didn't have a

 5   concept of casual overtime?

 6        A.    They don't have a concept of that?

 7        Q.    Mm-hmm.

 8        A.    What do you mean by "concept of that"?

 9        Q.    Well, there -- prior to the

10   announcement from Mr. Sennish, there were days,

11   certainly, where you worked in excess of eight

12   hours, but maybe not up to nine hours --

13        A.    That's --

14        Q.    -- correct?

15        A.    -- correct.

16        Q.    You never received overtime

17   compensation for that difference between the eighth

18   and ninth hour, did you?

19        A.    No.

20        Q.    And you wouldn't have received that at

21   Ford?

22        A.    Between the eighth and the ninth?

23        Q.    Mm-hmm.

24        A.    With Ford, if it was the ninth hour, I
```

1      would receive the hour.

2          Q.    But, again, what I'm talking about is

3      that spread between the eight hours and nine hours

4      would not have been paid at Ford?

5          A.    The spread, if it was eight and a

6      half, no.  If it was eight and three-quarters, no.

7          Q.    I think somebody even once said that

8      it was -- if you made the 59 minutes and you

9      weren't going to get paid, but you made it to that

10     ninth hour, their perception was that they would

11     have been paid?

12         A.    Yes.

13         Q.    Okay.  And that sounds accurate to

14     you?

15         A.    Yes.

16         Q.    Okay.  Would it be safe to say, then,

17     what we're talking about is a -- a -- essentially a

18     one-minute difference when we talk about that first

19     hour of overtime?

20             MR. SIMON:  Objection.  Vague and

21     ambiguous.  You can answer.

22         A.    Repeat that, please.

23         Q.    Sure.  I think you've acknowledged for

24     me at Ford, 59 minutes would not have been paid,

1    correct?

2          A.    Mm-hmm.

3          Q.    And at ZF Batavia, if it's 60 minutes,

4    you don't get paid, correct?

5          A.    That's correct.

6          Q.    So we're talking about an incremental

7    difference of one minute?

8          A.    One minute.

9          Q.    Okay.  Agreed?

10         A.    Yes.

11         Q.    Okay.  With respect to overtime, are

12   there any other issues?

13         A.    No.

14         Q.    And the amount that you set forth --

15   try and be exact here.  I said 2,400.  I apologize.

16   It's $2,715.  Included in that number, I think you

17   told me would be the one hour overtime, correct?

18         A.    Yes.

19         Q.    Okay.  Is there anything else that is

20   encompassed within that number?

21         A.    No.

22         Q.    Okay.  Can you give me a time line, in

23   terms of when the overtime hours were incurred?  I

24   mean, was this from 1999 to the present or 1999

1   till the time you went up to payroll administrator

2   or --

3               MR. SIMON:  Objection.  The

4   interrogatory explains that part.  You can go ahead

5   and answer, Teri.

6               MR. HUNTER:  Well, I guess I would put

7   on the record -- and the interrogatory speaks for

8   itself.  But the interrogatory says that they can't

9   identify.  I think I'm entitled to identify the

10  damages.

11              MR. SIMON:  It says can't identify?

12              MR. HUNTER:  Yeah, plaintiff cannot

13  currently identify precisely the amount of damages

14  suffered.

15              MR. SIMON:  You were asking her for

16  the time frame and the interrogatory answer does

17  provide a time frame.

18              MR. HUNTER:  I respectfully disagree.

19  It does not.

20              MR. SIMON:  As you said, the

21  interrogatory speaks for itself.  Ms. Parker can

22  answer, if she can.

23              THE WITNESS:  Okay.  After that, you

24  have to repeat what you --

78

 1           MR. HUNTER:  Sure.

 2           THE WITNESS:  -- asked me again,

 3    please.

 4    BY MR. HUNTER:

 5       Q.    Sure.  Ms. Parker, I'm just trying to

 6    understand from when to when does this $2,715

 7    damage claim, when did you incur this overtime that

 8    was uncompensated?

 9       A.    From the time they stopped the -- I

10    guess from the time they announced the nine-hour

11    rule.

12       Q.    Okay.  Until -- well, until

13    sometime -- I think it was May when you did these

14    answers?

15       A.    Right.

16       Q.    Okay.  Prior to the memo being issued

17    by Mr. Sennish, then, I would gather that you were

18    satisfied with the way you were paid for overtime?

19       A.    Yes.

20       Q.    Okay.  And to your way of

21    understanding, the overtime was paid in accord with

22    apparently what you understood the agreement to be

23    with ZF Batavia and the Ford transitionals?

24       A.    Correct.

1        Q.    Aside from that one hour of overtime,

2    is there any other overtime or pay that you believe

3    you're entitled to that has not been paid to you?

4        A.    No.

5        Q.    Certainly you've always received your

6    base salary?

7        A.    Yes.

8        Q.    Have you ever had your salary docked

9    for any reason?

10        A.    No.

11        Q.    Has anyone ever challenged you about

12    your timecards?

13        A.    No.

14        Q.    When you went up to payroll, Mark

15    Kolakowski was your direct supervisor?

16        A.    Yes.

17        Q.    And so, then, above Mark would have

18    been Mark Bugajski?

19        A.    Yes.

20        Q.    Did you have any discussions with

21    either one of the Marks about overtime in that

22    department?

23        A.    No.

24        Q.    Are you aware of any individuals at ZF

1   Batavia that have had their base salary docked for

2   something other than a disciplinary issue?

3          A.    No.  Well, if they -- I need to take

4   that back, please.

5          Q.    Okay.

6          A.    If they went over any of their sick

7   time or their personal time --

8          Q.    Okay.

9          A.    -- then that was docked.

10          Q.    Do you have any specific knowledge as

11   to anybody or do you recall anybody that was ever

12   docked for the excess, in terms of personal time or

13   sick time?

14          A.    Or vacation, no.

15          Q.    Or I'm sorry, vacation.  So if

16   somebody was out an extra day, then over the -- for

17   example, the five sick days, they would lose one

18   full day of -- of base salary?

19          A.    They had the choice whether to use

20   their vacation time that was left or be docked,

21   yes.

22          Q.    Okay.  Are you aware of any

23   circumstances where anyone would have been docked a

24   partial day or anything like that?

1          A.     Four hours or more.

2          Q.     Well, I think your reference goes to

3     if somebody is out more than four hours, then

4     they're required to take a full day, correct?

5          A.     No.

6          Q.     Okay.  What is your understanding?

7          A.     Not -- not at the time that I was in

8     payroll.

9          Q.     Okay.  Well, what was your

10    understanding?

11         A.     If they -- if they -- how do I want to

12    say -- I'm trying to say this so I don't get --

13    if -- if they were out five hours, then they

14    were -- only had -- they only accounted for the

15    four hours.

16         Q.     Okay.  I don't understand what you

17    mean.

18         A.     They never had to take a whole day --

19         Q.     Okay.

20         A.     -- okay?  So if someone's timecard

21    came in with anything less than four hours, it was

22    just noted on their timecard.

23         Q.     Okay.  But there was no pay

24    adjustment?

1          A.     No.

2          Q.     Okay.  If they came in with more than

3    four hours, what happened?

4          A.     They -- with more than four hours?

5          Q.     Well, you said "less than," so I guess

6    I'm trying to figure out --

7          A.     I know.  I'm trying to -- okay.  If it

8    came in and they were like six hours personal

9    business, they got charged in increments of four

10   hours.

11         Q.     Are you aware of any specific

12   instances where that occurred?

13         A.     Well, that happened -- no specific,

14   no.  That was on timecards.

15         Q.     But you can't give any specific

16   instances where that occurred?

17         A.     No, I can't remember that.

18         Q.     Okay.  Are you familiar with Kevin

19   O'Hagan?

20         A.     Yes.

21         Q.     His -- his name has come up in this

22   litigation, but I haven't had anybody be able to

23   explain to me what the issue is with Mr. O'Hagan.

24   Are you familiar with it?

1          A.    What issue?

2          Q.    Where apparently he was docked or

3    something with respect to his timecard.

4          A.    And what was he docked for?

5          Q.    Some discrepancy or something with his

6    time reader or -- I -- nobody has been able to tell

7    me yet.

8          A.    Well, I only go by what is on the

9    timecards.  So whatever came to me is what I did.

10   Now, if someone did something before that, I don't

11   know.

12         Q.    All right.  Do you have any knowledge

13   about Mr. O'Hagan's base salary being docked

14   because of a discrepancy or something with respect

15   to his timecard and his time sheet?

16         A.    No.

17         Q.    Okay.  Other than what we've already

18   discussed, is there, to your knowledge, any other

19   manner in which somebody's base salary could be

20   reduced?

21         A.    The base salary?

22         Q.    Mm-hmm.

23         A.    (Witness nodded.)

24         Q.    You were payroll administrator from

84

1    March, I believe, of '01 through late last year?

2         A.    This year.

3         Q.    Was that into this year?  Okay.  And

4    until you moved to the current position?

5         A.    Mm-hmm.

6         Q.    Okay.  All right.  At this point in

7    your testimony, is there anything else or is there

8    anything that you feel we need to clarify or is

9    unclear?

10        A.    I don't think so.

11             MR. HUNTER:  Okay.  Let's take a

12   couple minutes, take a break and I think we'll have

13   Mr. VanWay ask you some questions next.

14             THE WITNESS:  Okay.

15        (Off the record:  9:51 a.m. - 10:04 a.m.)

16                      EXAMINATION

17   BY MR. VANWAY:

18        Q.    Ms. Parker, we met briefly before the

19   deposition started this morning.  I'm Jeff VanWay.

20   I represent Ford in this case.  I just have a few

21   questions for you this morning.

22             I know that you testified -- I think

23   you were with Ford for a little over 20 years.  You

24   were always a salaried employee, right?

1          A.    Yes.

2          Q.    Never in the union?

3          A.    No.

4          Q.    As a salaried employee, you didn't

5    have any sort of employment contracts, did you,

6    when you worked for Ford?

7          A.    Yes, when I hired in.

8          Q.    You mean an offer letter, is that what

9    you had --

10         A.    Yeah.

11         Q.    -- that said what your starting salary

12   is going to be?

13         A.    Yes.

14         Q.    Okay.  Other than that offer letter,

15   did you have anything else that you believed was an

16   employment contract with Ford while you worked for

17   Ford?

18         A.    Yes.  I believe that -- you know,

19   that's -- when I came in, that's what I was going

20   to get.

21         Q.    Okay.  And other than that, at any

22   other time while you were with Ford, did you sign

23   or receive any other documents that you believe

24   were an employment contract?

```
 1          A.    Over the 20 years, no.

 2          Q.    Okay.

 3          A.    Just from the beginning when I went

 4    in.

 5          Q.    Okay.  And you understood that -- your

 6    understanding was that what was in your offer

 7    letter when you hired with Ford was what your

 8    starting salary would be?

 9          A.    Yes.

10          Q.    And your starting job?

11          A.    Yes.

12          Q.    Did it address benefits at all?

13          A.    Benefits, we -- yes, all of that was

14    discussed when we were hired -- I was hired in.

15          Q.    Okay.  And your understanding was that

16    all of that was going to be what you started at

17    with Ford?

18          A.    Yes.

19          Q.    Okay.  You also recognized, didn't

20    you, that if you continued with Ford, some of that

21    might change over the years?

22          A.    Yes.

23          Q.    Okay.  And did you believe that there

24    were any restrictions on the company, in terms of
```

1    what they could or couldn't change while you worked

2    for Ford?

3         A.    No.

4         Q.    Okay.  And, in fact, during the

5    20-plus years you were with Ford, your compensation

6    and benefits did change from time to time, didn't

7    they?

8         A.    Yes.

9         Q.    Okay.  Your merit increases, for

10   example, I assume you got merit increases while you

11   were there?

12        A.    Yes.

13        Q.    Were there years that you didn't

14   receive a merit increase?

15        A.    I don't think so, but I don't remember

16   them.  That was 20 years.

17        Q.    Sure.  No, I understand.  But there

18   wasn't any guarantee, was there, that you'd receive

19   a merit increase while you were with Ford?

20        A.    No.

21        Q.    And I believe you testified earlier

22   that there was some years that you may not have

23   received profit sharing?

24        A.    Yes.

88

```
 1          Q.     Your health insurance benefits, did

 2    those change from time to time while you were with

 3    Ford?

 4          A.     It changed as far as who we had and

 5    that, but as --

 6          Q.     Who your carrier was?

 7          A.     Right.

 8          Q.     Did the amount that you paid out of

 9    your own pocket for your insurance, did that change

10    from time to time?

11          A.     I don't think I ever had to pay.

12          Q.     Oh, it was always a hundred percent

13    paid by Ford?

14          A.     I think so.

15          Q.     Nothing deducted from your check or --

16          A.     No.

17          Q.     -- anything like that?

18          A.     No.

19          Q.     Okay.  Were there co-pays as part of

20    your health insurance?  You know what I mean by

21    "co-pay"?  You go to the doctor --

22          A.     It depended on --

23          Q.     -- and you pay $10?

24          A.     -- who you picked.
```

```
 1          Q.     Okay.  And under any of the plans you

 2    were under at Ford, did you have co-pays, if you

 3    can remember?

 4          A.     I don't -- I don't -- that, I don't

 5    know.

 6          Q.     Okay.

 7          A.     I can't remember that.

 8          Q.     Do you recall when you were with Ford

 9    back in the early eighties, I think it was, that

10    the company canceled some vacation days?  Do you

11    recall that happening?

12          A.     In the early eighties?

13          Q.     I think 1981, 1982.  My understanding

14    is that the company was facing some lean times and

15    they put in some different cost-cutting measures,

16    one of which was canceling vacation -- some

17    vacation days towards the end of the year.

18          A.     Yes.

19          Q.     Do you remember that happening?

20          A.     I think so, yes.

21          Q.     Did that affect you?

22          A.     I don't think it did.

23          Q.     Okay.

24          A.     I'd only been there a couple of years.
```

1          Q.    But did it affect some other salaried

2    employees?

3          A.    I think it did, yes.

4          Q.    Do you recall that at some point, Ford

5    changed the way it was paying overtime as well and

6    may have went to comp time for some period of time?

7          A.    Instead of being paid overtime?

8          Q.    Yes.

9          A.    No.

10         Q.    You don't remember that?

11         A.    No.

12         Q.    Okay.  Now, I believe you testified

13   earlier about sort of these daily conversations, if

14   you will, for some period of time with Mr. -- or

15   with Hassan.  And I believe you said that he said

16   words to the effect of everything would be just

17   about the same.

18              Do you remember exactly what Hassan

19   said, in terms of compensation and benefits?

20         A.    His exact words?

21         Q.    Yes.

22         A.    No.

23         Q.    Did he go sort of benefit by benefit

24   and say, Okay.  Vacation will be the same, 401K

91

1      will be the same, AIP will be the same?

2          A.    No, he did not.  He said the

3      overtime -- you would be paid the same way.

4          Q.    Did he specifically say "overtime"?

5          A.    He said, Your salary and your

6      overtime, yes.  Everything would stay the same as

7      it is as you have with Ford.

8          Q.    He said your salary and overtime will

9      stay as it is now with Ford or as it was at that

10     time?  Is that what he said?

11         A.    He said basically with what I'm --

12     what you're being offered now, the overtime and

13     everything, it would be paid -- paid like you are

14     being paid now.

15         Q.    Okay.  Did he say that -- that it

16     would never change after you went to ZF Batavia?

17         A.    Did he say it would never change?

18         Q.    Yes.

19         A.    No, he never said that.

20         Q.    Was it your understanding that ZF

21     Batavia would never have the ability to change your

22     compensation or benefits once you went over there?

23              MR. SIMON:  Objection to the term

24     "ability," vague and ambiguous.  You can answer.

92

1         A.    No.   I -- I took it that once they

2    showed me that, that's what I would get.

3         Q.    That's what you would start with?

4         A.    Yes.

5         Q.    Did you believe that that's what you

6    would have forever, for as long as you worked for

7    ZF Batavia?

8         A.    Forever?

9         Q.    Yes.

10        A.    I -- I believed that, yes, I would be

11   paid my overtime for -- I -- I understand that the

12   benefits change, as far as the health benefits and

13   those things, yes.  I believe those would change.

14        Q.    When you say "those things," you

15   mentioned health benefits.  What other things did

16   you believe would change?

17        A.    Well, any of the benefits, like the --

18   you know, the health benefits, they always change.

19   That, I recognize that.

20        Q.    You referenced or think kind of

21   pointed to Exhibit 2 as you were talking.  Am I

22   understanding your testimony, then, that you

23   understood the things described in Exhibit 2 might

24   change after you went over?

1          A.     Not all of them, no, I didn't.  I

2     meant like the -- the -- maybe the 401 might change

3     or any of the plans, the health plans.

4          Q.     Okay.

5          A.     Life insurance and that, that always

6     changes.

7          Q.     And this was your understanding when

8     you accepted employment with ZF Batavia?

9          A.     Yes.

10         Q.     Okay.  And how did you reach that

11     understanding?  Did someone tell you that that's

12     the way things would be?

13         A.     No.

14         Q.     And how did you reach that

15     understanding?

16         A.     How did I reach what understanding?

17         Q.     The understanding that we've just been

18     talking about, that you believe certain things

19     would change or might change after you went to -- -

20         A.     I --

21         Q.     -- ZF Batavia.

22         A.     -- understood that the benefits, as

23     the savings plans and those, those are all plans.

24     And the plans change, as far as -- so, yes, I

1   understood that those probably change.  That is --

2   they always change.  But as far as my -- my

3   overtime, I expected that I would get paid the

4   overtime all the time.

5        Q.    Now, at Ford, were there ever changes

6   in overtime while you were there?

7        A.    Only when my salary changed.

8        Q.    And that caused -- because of the

9   salary change, it caused your overtime rate to

10  change?

11       A.    Yes.

12       Q.    Was it your understanding that those

13  overtime rates were locked in and Ford could not

14  change those?

15       A.    No, those change.  Those always went

16  up.

17       Q.    Okay.  Was it your understanding they

18  could only go up or did you believe they could go

19  down if that's what the company --

20       A.    No.

21       Q.    -- felt was necessary?

22       A.    I never seen them go down.  I never

23  thought that they would go down.

24       Q.    Okay.  Did you believe that Ford had

1    the ability to cause them to go down, if that's

2    what Ford believed was best?

3              MR. SIMON:  Objection to the word

4    "ability," vague and ambiguous.  Go ahead.

5         A.    Would you repeat that, please?

6         Q.    Sure.  My understanding from your

7    earlier testimony is that you had an understanding

8    when you went to Ford as to what things would be at

9    day one, but you expected that over the time that

10    you were there, things would change.

11             And I guess my question is, was it

12    also your understanding that overtime while you

13    were with Ford might change, in terms of the rates

14    that the company paid for overtime?

15        A.    Yes.

16        Q.    Did you have an understanding that

17    that could change?  Okay.  Did you also have an

18    understanding that if Ford decided not to pay

19    salaried employees overtime anymore, that they

20    could do that as well?

21             MR. SIMON:  Objection.  Calls for

22    legal conclusion.  Go ahead.

23        A.    I don't understand that.  I don't

24    understand.  How would I know that?  No.  I don't

1    know how -- I don't how you want -- how I should

2    answer that.  I don't know that they would have the

3    ability to change those things.

4         Q.    Okay.  Is there some reason you

5    believe that they wouldn't have the ability to

6    change that?

7              MR. SIMON:  Same objection.

8         A.    Is there some reason -- repeat that,

9    please.

10        Q.    Sure.

11        A.    You're talking fast on me.

12        Q.    I'll try not to.  Is there some reason

13   that you believe Ford would not have had the

14   ability to make changes in overtime?

15        A.    No.

16        Q.    And is there any reason that you

17   believe ZF Batavia would not have had the ability

18   to make changes in overtime?

19             MR. SIMON:  Same objection.

20        A.    No.

21        Q.    Now, earlier Mr. Hunter asked you

22   about language here on the second page of Exhibit

23   2.  I believe your testimony was you don't remember

24   reading that, didn't really have an understanding

1    of it at the time.

2              Would I be correct, then, that that

3    information at the bottom of the second page of

4    Exhibit 2 didn't have any impact on you one way or

5    the other, in terms of you making your decision to

6    except employment with ZF Batavia?

7         A.    I don't remember reading that.

8         Q.    Okay.

9         A.    This right here?

10        Q.    Right.

11        A.    I don't remember reading that.

12        Q.    Okay.  And so, as far as you know,

13    that information didn't influence you one way or

14    the other as to whether or not you were going to go

15    with ZF Batavia?

16        A.    It couldn't influence me because I

17    don't remember reading it.

18        Q.    Okay.

19              MR. SIMON:  It's clear that's she's

20    pointed to --

21              THE WITNESS:  This.

22              MR. SIMON:  -- the lower --

23              THE WITNESS:  This.

24              MR. SIMON:  -- right-hand column --

1                THE WITNESS:  This.

2                MR. SIMON:  -- of section -- Exhibit

3     2, second page.

4                THE WITNESS:  Is that what you were

5     talking about?

6                MR. VANWAY:  Right, and I think it's

7     what in all the depositions we've been referring to

8     as sort of the subject to change language or the

9     language that includes the phrase, subject to

10    change.

11               MR. SIMON:  Okay.

12    BY MR. VANWAY:

13        Q.   Now, after you declined the first

14    offer, Hassan kept working on you basically to get

15    you to accept and finally came back with an offer

16    of a different position that paid more money,

17    right?

18        A.   Yes.

19        Q.   And did you accept that second offer

20    because it was a different position and it paid

21    more money?

22        A.   I accepted that offer 'cause it was a

23    different position.

24        Q.   The fact that it paid more, did that

99

1    influence your decision to accept?

2        A.    Yes.

3        Q.    Okay.  If it hadn't been a different

4    position, if he had brought back to you this -- an

5    offer, again, for production control associate,

6    would you have accepted that?

7        A.    No.

8        Q.    If it had not been a increase in pay,

9    would you have accepted it?

10        A.    If it had not been an increase in pay?

11        Q.    Correct.

12        A.    Accepted the --

13        Q.    If he brought it back to you and it

14    still said $4,410 per month, would you have

15    accepted the offer?

16        A.    I don't know.

17        Q.    Okay.  So it sounds as though the

18    difference in job was more influencing to you than

19    the difference in pay; is that a fair statement?

20        A.    Mm-hmm.

21        Q.    Okay.  Do you know, by the time Hassan

22    started his recruiting of you, which sounds like it

23    was sometime between June and July, had he already

24    signed on with ZF Batavia?

```
 1          A.    I don't know.

 2          Q.    Was it important to you that he sign

 3   on with ZF Batavia?

 4          A.    Yes, I think it was.

 5          Q.    I assume that --

 6          A.    Yes.

 7          Q.    -- since he's the one recruiting, you

 8   wanted to know that he was going with the new

 9   company --

10          A.    Yes.

11          Q.    -- as well?  But you don't remember at

12   what point he actually signed on with the new

13   company?

14          A.    No, I don't know what date he actually

15   signed, no.

16          Q.    Was it your understanding that by the

17   time you accepted offer number two on July 22nd,

18   that Hassan had already signed up with ZF Batavia?

19          A.    Yes, I think so.

20          Q.    Now, you testified, Ms. Parker, about

21   different -- what I called unfulfilled promises or

22   representations that you believe were made to you

23   that haven't been kept.  I think the first one you

24   testified about was the overtime and you basically
```

1    classified that -- I think you said it's -- they

2    put in a nine-hour rule?

3          A.      Mm-hmm.

4          Q.      And that occurred, as I understand it,

5    a couple of years into your employment with ZF

6    Batavia; is that right?  You started in '99.  That

7    change took place sometime 2001 or so.  Does that

8    sound right?

9          A.      I don't remember the exact date, but

10   yes.

11         Q.      But it wasn't immediately, right?

12         A.      No, it was not immediate.

13         Q.      And there was a period of time where

14   you worked and things were, at least with respect

15   to overtime, as you expected them to be?

16         A.      Yes.

17         Q.      When the change occurred, who made

18   that change in the -- who put in the nine-hour

19   rule, do you know?

20         A.      I would take it that the company did.

21         Q.      And who do you mean by "the company"?

22         A.      Whoever is in charge of the company,

23   the committees or the -- whoever.

24         Q.      You got a memo from Len Sennish, I

```
 1   think, that said --

 2        A.    Yes.

 3        Q.    Len Sennish works for ZF Batavia,

 4   correct?

 5        A.    Yes.

 6        Q.    He's never worked with Ford that

 7   you're aware of, has he?

 8        A.    I don't know.

 9        Q.    At least while you were at Batavia, he

10   was never a Ford employee at Batavia, was he?

11        A.    I don't know.

12        Q.    He came to the company after the joint

13   venture was announced, right?

14        A.    Yes, he did.

15        Q.    He came to Batavia after --

16        A.    Yes, I --

17        Q.    -- the joint venture was announced?

18        A.    -- think he did, yes.

19        Q.    Okay.  As you sit here today, do you

20   have any reason to believe that Ford, Ford Motor

21   Company was involved in the decision to put in that

22   nine-hour rule?

23        A.    I don't know who made that decision.

24        Q.    Okay.  Do you have any reason to
```

1    believe that anyone from Ford Motor Company

2    approved the change to that nine-hour rule?

3        A.    Well, they're probably involved in

4    something of the company with them still owning

5    part of it.  I don't know.  I don't know if they

6    were involved with making that decision, no.

7        Q.    Okay.  And when you say that they

8    still own part of it, you're referring to the fact

9    that Ford is a minority shareholder in the --

10       A.    Yes.

11       Q.    -- joint venture?  Okay.

12             MR. SIMON:  Off the record for a

13   second.  Mr. Newsome is here.  I'd just like to

14   have him --

15             MR. VANWAY:  Sure.

16             MR. SIMON:  -- join us.

17       (Off the record:  10:20 a.m. - 10:21 a.m.)

18       Q.    Ms. Parker, you also testified about a

19   change in vacation that you believe has affected

20   you.  And I believe, if I'm understanding your

21   testimony, it's that you believe you should be

22   allowed to buy an extra week in addition to the

23   five weeks that you already have.  Is that --

24       A.    Yes.

104

1         Q.     Am I right?

2         A.     Yes.

3         Q.     Who told you that you'd be able to buy

4     an extra week in addition to your five weeks?

5         A.     That is in -- there's a paper that

6     comes out that you're entitled -- that you can buy

7     that extra week.  HR sends it out once a year.

8         Q.     HR -- HR from who sent it out?

9         A.     ZF, there at the plant.

10        Q.     Okay.  Did you have an understanding

11    at the time you accepted employment with ZF Batavia

12    that you'd be able to buy an extra week?

13        A.     Yes.

14        Q.     And do you remember, was there some

15    sort of document that you saw before you signed up

16    with ZF Batavia that said you'd be able to buy an

17    extra week?

18        A.     Yes, it's -- you have an option to buy

19    or sell the five days.

20        Q.     Okay.  And I guess I'm trying to find

21    out when the first time is that that was

22    communicated to you, that not only would you get to

23    keep your five weeks when you came over, but you

24    would also have the option to buy an additional

1     week?

2          A.     I think that was also with the -- in

3     the offer.  I mean, some -- part of the benefit not

4     written in the offers.

5          Q.     Okay.  I'm not sure I'm following you.

6     It wasn't in writing.  It wasn't in Exhibit 2,

7     right?

8          A.     I don't remember where I saw it.  It

9     is here.  Option to buy or sell five days of

10    vacation.

11         Q.     Okay.  But as Mr. Hunter and you

12    already discussed, there's nothing in that vacation

13    section that says anything about you being entitled

14    to five weeks?

15         A.     In this, no.

16         Q.     Okay.  So was there some other

17    document that you remember seeing that said if you

18    had five weeks before, you'd get to keep five weeks

19    when you came over to ZF Batavia and that you would

20    also have an option to buy an additional week?

21         A.     Not together, no.

22         Q.     Okay.  Well, let's break it up, then.

23    Was there some document you remember seeing that

24    said if you had five weeks, you'd be able to keep

1    five weeks?

2         A.    Yes --

3         Q.    Okay.

4         A.    -- that was a term.  That was -- yes.

5         Q.    And what document was that, do you

6    remember?

7         A.    That was in their -- that was part of

8    the -- in one of the meetings.

9         Q.    Okay.  At the one meeting that you

10    went to, was that a slide that was put up?

11         A.    I think it was.

12         Q.    Okay.  Why don't we do this, if you

13    would.  I think you have Exhibit 4 or I think

14    Mr. Simon has got Exhibit 4 out.  If you could take

15    a look at Exhibit 4.

16         First of all, can you just kind of

17    flip through Exhibit 4 and tell me what this

18    document is, if you know?  Do you know what Exhibit

19    4 is?  Have you ever seen it before?

20         A.    This is what we had at those meetings

21    or after we got the meetings -- the minutes of

22    those meetings, what we discussed, the copies of

23    the slides they made for us.

24         Q.    Okay.  Were these actually copied,

1     handed out to employees like yourself?

2          A.    This, I remember getting something

3     that were slides.  Whether it was this exact

4     document, I don't know.

5          Q.    Okay.  But --

6          A.    That --

7          Q.    -- as far as you know, these are the

8     slides that were shown at the one meeting that you

9     went to; is that right?

10         A.    It has that information in it, yes.

11         Q.    Okay.  And if you flip to Bates stamp

12    page 12 --

13         A.    Yes.

14         Q.    -- is that the information that you

15    were testifying about earlier with regard to your

16    ability to keep your fifth week of vacation?

17         A.    This was when I first saw it, yes.

18         Q.    Okay.  And were there other documents

19    you saw that said you'd be able to keep that five

20    weeks?

21         A.    Somewhere there -- I can tell you that

22    somewhere there it was written down that I would

23    get those five weeks.  That was important to me.

24         Q.    Okay.  And wherever that other

1   document might be, it didn't say anything, though,

2   about keeping or about the ability to buy --

3         A.    No.

4         Q.    -- an extra week?

5         A.    No, not in the same --

6         Q.    Okay.

7         A.    -- no.

8         Q.    Other than Exhibit 2, which has

9   language that you've pointed to about the option to

10  sell or buy five days of vacation.  Do you remember

11  seeing anything else in writing that said you'd

12  have an option to buy an additional week?

13        A.    No.

14        Q.    Okay.  And that at this employee

15  meeting that you attended, was there any discussion

16  about the option to buy an additional week?

17        A.    No.

18        Q.    Did Hassan discuss that with you when

19  he spoke with you?

20        A.    No.

21        Q.    And so would it be fair to state,

22  then, that you got your understanding as to your

23  ability to buy an extra week from Exhibit 2?

24        A.    Yes.

1          Q.    Okay.  Now, it's probably just me, Ms.

2     Parker, but I wasn't clear from your earlier

3     testimony about what the issue is with bereavement

4     leave.  Has there been a change in bereavement

5     leave at ZF Batavia or not?

6          A.    I'm going to have to say I don't know.

7          Q.    Okay.  Are you claiming in this case

8     that there was a promise about bereavement leave

9     that hasn't been kept?

10          A.    I can't remember the bereavement.  I'm

11     confused on it.

12          Q.    Okay.  I think you did testify,

13     though, that you had an understanding when you made

14     the switch to ZF Batavia that bereavement leave was

15     going to be different than it had been at Ford?

16          A.    It was going to be three days.

17          Q.    Okay.  And it had been more than that

18     at Ford?

19          A.    I think so, yes.  I --

20          Q.    Okay.

21          A.    I'm not quite sure on that.

22          Q.    Okay.  But that, whether there was a

23     change or not, it hasn't affected you because you

24     haven't taken any bereavement since you've been at

1    ZF Batavia; is that right?

2         A.    No.

3         Q.    That's correct that you --

4         A.    That is correct.

5         Q.    -- haven't taken any?  Now, when

6    Hassan told you that things would be the same, I

7    believe you said he then noted some exceptions,

8    some things that wouldn't be the same.  Did he say

9    that there were some exceptions, things that

10   wouldn't be the same or did he just say everything

11   will be the same?

12        A.    He just told me that we'd be basically

13   paid the same way we were with Ford.

14        Q.    Did he say that the 401K would be

15   different?

16        A.    No.

17        Q.    Did he say that the AIP would be

18   different?

19        A.    No.

20        Q.    Did he say anything about the AIP at

21   all?

22        A.    No.

23        Q.    Now, you knew when you accepted

24   employment with ZF Batavia, that there were going

1    to be some things that were going to be different,

2    right?

3          A.    Yes.

4          Q.    You knew that bereavement leave, for

5    example, would be different, correct?

6          A.    You keep going back to that and I -- I

7    told -- I said I'm not sure on that bereavement.

8          Q.    Okay.  Sick days, you knew that there

9    was going to be a difference --

10         A.    Yes.

11         Q.    -- in sick or personal days?  Tuition,

12   it was your understanding there was a difference in

13   tuition payments as well?

14         A.    I don't remember discussing tuition.

15         Q.    Hadn't there been at Ford some sort of

16   payment where if you had kids who were in college,

17   you could get a payment for those kids, but that

18   was not going to be the case at ZF Batavia?  Do you

19   remember that?

20         A.    No, I don't have children.  No, I

21   don't remember that.

22         Q.    Okay.  And Hassan didn't say anything

23   to you about what percentage AIP you would receive

24   at ZF Batavia, did he?

1          A.     No.

2          Q.     Or that you were guaranteed you'd

3    receive an AIP at all?

4          A.     No.

5          Q.     Okay.  And you believed the things

6    that Hassan was telling you, right?

7          A.     Yes.

8          Q.     Do you have any reason to believe that

9    Hassan was being untruthful with you?

10         A.     No.

11         Q.     Do you have any reason to believe that

12   at the time Hassan had these conversations with

13   you, that he really knew that sometime down the

14   road ZF Batavia would make certain changes in

15   benefits?

16         A.     Would you repeat that, please?

17         Q.     Sure.  It was not a very good

18   question.  I'll try again.

19               At the time Hassan was making these

20   statements to you, you believed him.  And did you

21   have any belief that Hassan really knew that, down

22   the road, the company was going to make changes and

23   they just really weren't telling you about it?

24         A.     No.

1          Q.      Now, the change in AIP, which I

2     believe you said was basically a change in the

3     percentage.  Do you have any reason to believe that

4     anyone from Ford was involved in that change in the

5     AIP?

6          A.      I don't know.

7          Q.      Have any reason to believe that anyone

8     from Ford approved the change in the AIP that ZF

9     Batavia made?

10          A.      I don't know that, either.

11          Q.      Okay.  The change in vacation, the

12     change to where you're no longer allowed to buy the

13     extra week, when did you find out that you would no

14     longer be allowed to buy an extra week?

15          A.      That was a year or two ago when it

16     first -- a year ago.

17          Q.      When you first started with ZF

18     Batavia, were you able to buy an extra week at that

19     time?

20          A.      Yes.

21          Q.      So in the year 2000, what -- in the

22     year 2000, were you able to buy an extra week that

23     year, as far as -- do you remember?

24          A.      Yes.

1          Q.    2001, were you still able to buy an

2    extra week?

3          A.    This is 2003, right?

4          Q.    Yes.

5          A.    2002, yes.

6          Q.    Okay.  And it was in 2002, then, when

7    this change took effect?

8          A.    Yes.

9          Q.    To the best of your knowledge, as you

10   sit here today, do you have any reason to believe

11   that anyone from Ford was involved in the decision

12   that ZF Batavia made to no longer allow you to buy

13   an extra week of vacation?

14         A.    I don't know that, either.

15         Q.    Any reason to believe that anyone from

16   Ford approved of that decision?

17         A.    I don't know that, either.

18         Q.    Okay.  I believe you also testified

19   that sometime after you were employed by ZF

20   Batavia, that ZF Batavia made a change in the

21   number of personal days that you were allowed.  I

22   think you changed it from five to three?

23         A.    Yes.

24         Q.    Was that -- do you remember when that

1   change took effect?  If you started with ZF Batavia

2   in '99, this is now 2003.  Can you narrow down the

3   year?

4        A.    It was last year --

5        Q.    It was 2002?

6        A.    -- 2002.

7        Q.    Was there something you needed to add

8   to your answer?

9        A.    I'm just thinking you -- the years.  I

10  was thinking of what years they were.

11       Q.    Okay.  That's fine.  As you sit here

12  today, do you have any reason to believe that

13  anyone from Ford was involved in that decision to

14  change the number of personal days from five to

15  three?

16       A.    I don't know that, either.

17       Q.    Do you have any reason to believe that

18  anyone from Ford approved that decision and the

19  number of personal days?

20       A.    I don't know that, either.

21       Q.    Okay.  Do you know an employee by the

22  name of Eddie Adams who works at ZF Batavia?

23       A.    Yes.

24       Q.    Eddie Adams has been listed by your

1    lawyers as a potential witness in this case.  Do

2    you know what, if anything, Eddie Adams knows about

3    the issues in this case?

4         A.    No.

5         Q.    Do you have any reason to believe that

6    Eddie Adams has any information that's relevant to

7    this case at all?

8         A.    I don't know.

9         Q.    Have you ever had any discussions with

10   Eddie Adams about this case?

11        A.    No.

12        Q.    Or about the unfulfilled promises that

13   you believe --

14        A.    No.

15        Q.    Or about Ford's control or lack

16   thereof of the ZF Batavia facility?

17        A.    No.

18        Q.    Earlier you were shown Exhibit 118,

19   which is, I guess, the offer letter or the change

20   of employment letter that you received from ZF

21   Batavia in March 2001.  Was Ford -- to the best of

22   your knowledge, was Ford involved at all in your

23   change from the position you had held prior to this

24   to the new position of payroll administrator?

1           A.    No.

2           Q.    This is just an agreement between you

3    and ZF Batavia?

4           A.    Yes.

5           Q.    You testified earlier about Exhibit 2

6    and about when you believed the first time was that

7    you received it.  And I believe that what you said

8    was that you thought you got it for the first time

9    when Mr. Saleh gave you the second offer letter?

10          A.    Yes.

11          Q.    Do you have Exhibits 115 and 116 in

12   front of you?  If you could, just kind of put those

13   side by side, if you would.  And I'm just -- I'm

14   just trying to see if we can pinpoint this a little

15   bit better.

16                Exhibit 115 in the second paragraph

17   has got the words "summary attached."  It talks

18   about employee benefits program, which has been

19   developed for former Ford employees and then it

20   says "summary attached"?

21          A.    Yes.

22          Q.    Do you recall, was Exhibit 2 attached

23   to Exhibit 115?

24          A.    It could have been.

1         Q.    Well, and the reason I ask this is

2    because, then, in Exhibit 116, it doesn't say

3    "summary attached."  Instead what it says is in the

4    second paragraph, it talks about the benefits and

5    it says, "a summary of which you previously

6    received."

7              And so I'm just wondering, is it

8    possible that rather than receiving this for the

9    first time when you got the second offer letter,

10   you might have received it for the first time when

11   you got the first offer letter?

12        A.    That is -- that could have happened,

13   yes.

14        Q.    Okay.  And so if that were the case,

15   you would have the opportunity to review Exhibit 2

16   before you made your decision to turn down the

17   first offer from ZF Batavia, right?

18        A.    Yes.

19        Q.    Okay.  And do you remember, in fact,

20   looking at Exhibit 2 before you turned down that

21   first offer?

22        A.    No, I don't.  I don't remember.

23        Q.    Okay.  Now, since the time that you've

24   been working for ZF Batavia, your annual wages have

1    increased every year, haven't they?

2         A.    Yes.

3         Q.    And they are, in fact, more than what

4    you were making at Ford when you were with Ford,

5    right?

6         A.    Yes.

7         Q.    And you've continued to receive

8    overtime in various forms since you've been with ZF

9    Batavia?

10        A.    Yes.

11        Q.    And who do you currently report to?

12        A.    Maintenance.

13        Q.    The name of the person -- who's your

14   boss?

15        A.    That, I'm not sure.

16        Q.    Has your job recently changed or you

17   just --

18        A.    Yeah, I'm in maintenance, back in

19   maintenance.  I don't know who I report to

20   directly.  It could be Milt Gross.

21        Q.    Okay.  Milt Gross is a ZF Batavia

22   employee, right?

23        A.    Yes.

24        Q.    Okay.  Was he a transition employee,

1    do you remember?

2        A.    He came from Ford, yes.

3        Q.    Okay.  I don't think -- well, let me

4    ask you this.  You've been testifying for awhile

5    this morning and I appreciate that.

6            As you sit here today, are you aware

7    of any other facts, other than what you've

8    testified to already that support any of your

9    claims in this case?

10       A.    No.

11           MR. VANWAY:  Okay.  I don't think I

12   have anything further, Ms. Parker.  Thank you.

13                          EXAMINATION

14   BY MR. HUNTER:

15       Q.    Ms. Parker, we talked briefly about

16   the transition bonus.  You got away from that and

17   went back to AIP.  And I think we never came back

18   to the transition bonus issue.

19           When I talk about the transition

20   bonus, do you know what I mean?

21       A.    Yes.

22       Q.    And I think you received $19,500 on

23   the transition bonus?

24       A.    Yes.

1          Q.     You had started to tell me what that

2     was for and I think I interrupted you or somehow we

3     got away from that.

4                 What is your understanding as to the

5     transition bonus?  What was that paid for?

6          A.     That was a figure that they took from

7     the time that I signed over to the end of what I

8     would have retired with Ford.  That was for like

9     some of the things that we had not -- were not

10    going to get with ZF, like the A Plan.  That was my

11    understanding.

12         Q.     And from what source did you develop

13    that understanding because I don't see it in the

14    gray brochure?

15         A.     I don't remember who told me that.

16         Q.     Was it Hassan?

17         A.     I don't remember.

18         Q.     And you've, in fact, received all of

19    those bonus payments?

20         A.     Yes.

21         Q.     Would it be fair to say that it was --

22    take a look, if you can, at Exhibit 116.  Do you

23    see there the second bullet point?

24         A.     Yes.

1        Q.    See the last sentence where it says,

2    This bonus is designed to address any monetary

3    differences between Ford benefits and ZF Batavia's

4    new plan.  Is that a fair statement of what your

5    understanding was as to the purpose of that

6    transition bonus?

7        A.    I understood it to be things like the

8    A Plan, things that were change -- you know,

9    changing, the A Plan that we didn't get anymore.

10       Q.    Okay.  Anything else other than the A

11   Plan?

12       A.    That's all I remember right at this

13   time.

14       Q.    Is it your testimony, then, that the

15   last sentence there, the second bullet point is not

16   representative of what that bonus was paid for?

17       A.    Can you repeat that, please?

18       Q.    Well, the question I asked you before

19   was, does this statement, "This bonus is designed

20   to address any monetary differences between Ford

21   benefits and ZF Batavia's new plan," is that a fair

22   statement, at least from your point of view, as to

23   what that bonus money was paid for?

24       A.    My understanding was, once again, that

1    it was for the differences of the benefits like the

2    A Plan.  From the time that I signed over till I

3    retired, they took that and -- what do I want to

4    say?  -- averaged it over the years.

5        Q.    Okay.  Again, your understanding

6    regarding the A Plan came from what source, if you

7    can remember?

8        A.    I don't remember who I discussed those

9    with.

10        Q.    With respect to your current job

11    position in maintenance, are you currently being

12    paid overtime as you believe you should be?

13        A.    No.

14        Q.    Okay.  And the difference would be

15    the --

16        A.    The one hour.

17        Q.    -- the one hour that we're talking

18    about?

19        A.    Mm-hmm.

20        Q.    Okay.  Any other differences or issues

21    with respect to overtime?

22        A.    No.

23        Q.    With respect to your testimony today,

24    the questioning from Mr. VanWay or otherwise, is

124

1    there anything that you feel you need to change or

2    let me know that maybe your testimony was in any

3    way inaccurate?

4         A.    No.

5             MR. HUNTER:  I don't believe I have

6    anything further.

7             MR. SIMON:  Let's go off the record

8    for a second.

9             (Deposition concluded at 10:42 a.m.)

10

11

12

13             _____
                             Teri Parker
14

15

16

17

18

19

20

21

22

23

24

125

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO         :

 4                          :   SS

 5    COUNTY OF HAMILTON    :

 6

 7            I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named TERI

11    PARKER was by me first duly sworn to testify the

12    truth, the whole truth, and nothing but the truth;

13    that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the 23rd day of October 2003 was

17    submitted to counsel for deponent's signature.

18            I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

126

```
1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3         IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    23rd day of October 2003.

6

7

8

              Susan M. Barhorst, Notary Public
9             in and for the State of Ohio.
              My commission expires
10            February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```