1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF OHIO

 3                 WESTERN DIVISION, CINCINNATI

 4
    EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
 5
             Plaintiffs,        : Judge Beckwith
 6
    V.                          : Magistrate Sherman
 7
    ZF BATAVIA, LLC, et al.,    :
 8
             Defendants.        :
 9  _____

10         Deposition of CHARLES R. PEARCE, taken on

11  Monday, August 11, 2003, commencing at 11:32 a.m.,

12  at the offices of Baker & Hostetler LLP, 312 Walnut

13  Street, Suite 3200, Cincinnati, Ohio, before

14  Susan M. Barhorst, Notary Public.

15

16

17

18

19

20

21               GIGLIO REPORTING SERVICES
22                  3 CYPRESS GARDEN
                 CINCINNATI, OHIO 45220
23                    513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     William DeVito

 7   On behalf of Defendant ZF Batavia, LLC:

 8     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 9     1700 Canton Ave.
       Toledo, Ohio 43624
10
     Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16
     Cross-Examination
17
       by Mr. Hunter                    4, 107
18
       by Mr. VanWay                 60, 111
19

20

21

22

23

24
```

3

| | PEARCE DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 32 |
| 3 | | |
| 4 | 4 | 68 |
| 5 | | |
| 6 | 95 | 32 |
| 7 | 96 | 39 |
| 8 | 97 | 62 |
| 9 | 98 | 76 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    CHARLES R. PEARCE
 2    being first duly sworn, testified as follows:
 3                         EXAMINATION
 4    BY MR. HUNTER:
 5         Q.    Sir, will you please state your name
 6    for the record?
 7         A.    Charles R. Pearce.
 8         Q.    And your current address?
 9         A.    4376 Eastwood Drive, Apartment 1211,
10    Batavia, Ohio 45103.
11         Q.    Mr. Pearce, I don't think we've ever
12    met.  My name's John Hunter.  I'm an attorney for
13    ZF Batavia.
14         A.    Hi, John.
15         Q.    Have you ever had your deposition
16    taken before?
17         A.    No, sir.
18         Q.    Okay.  Let me try and run you through
19    a couple ground rules, in terms of I'm going to do
20    my best to ask a clear question and hopefully loud
21    enough that you can hear me.  But I do have a bad
22    tendency of speaking quickly and sometimes mumbling
23    and other nasty habits.
24              If at any time you don't hear me, you
```

```
 1    don't understand the question or you just can't

 2    fairly answer the question, I do want you to let me

 3    know, okay?  And when you answer, you've got to

 4    say --

 5         A.    Yes.

 6         Q.    -- say the answer out loud because

 7    that's the only way the court reporter can take

 8    that down, okay?

 9         A.    Yes.

10         Q.    Is there anything today that would

11    prevent you from being able to go forward with your

12    deposition, whether it's a personal issue, a

13    medical issue or otherwise?

14         A.    Not that I'm aware of.

15         Q.    Okay.  If at any point in time during

16    the deposition you need to take a break, the only

17    thing that I would ask is that you answer any

18    question before you, and then certainly we can take

19    a break.

20         A.    Okay.

21         Q.    You've sat through a good portion of

22    Mr. Williams' deposition and we used in his

23    deposition the term Ford transitional employee.

24    You heard that?
```

1          A.    Yes, sir.

2          Q.    Okay.  To your way of thinking, what

3    is a Ford transitional employee?

4          A.    State that again.  I don't --

5          Q.    Well, do you know what I mean by a

6    Ford transitional employee?

7          A.    That's what I am, yes.  That's what

8    I'm -- yes.

9          Q.    Okay.  And what is a Ford transitional

10    employee?

11          A.    It's a group of employees that priorly

12    worked for Ford and they transitioned to ZF

13    Batavia.

14          Q.    Okay, yeah.  And I'm not trying to

15    trick you.  I want to make sure when I use that

16    term today, we have the same general understanding

17    as to what that means.

18              When did you begin with Ford?

19          A.    I'd have to pull my card out.  Almost

20    10 years ago, '90 -- whatever 10 years is.

21          Q.    All right.  And what was your original

22    position with Ford?

23          A.    I was hired as a maintenance

24    supervisor.

```
 1          Q.    And that was approximately '90, '91?

 2          A.    Yeah.  I can tell you -- I can tell

 3    exact --

 4          Q.    Okay.

 5          A.    -- if you need to know, we can do

 6    that.

 7                MR. SIMON:  They have a document, too.

 8    Go ahead.  That's fine.

 9          A.    I guess most people should know their

10    date of hire, but --

11          Q.    No, I just -- I just want to make

12    sure, again, that we are on the same wavelength

13    because one question will follow another.  And if

14    we start out not on the same page, it's only going

15    to get worse.

16          A.    So much for that lost record.

17                MR. SIMON:  You don't have to do that.

18    That's all right.  Mr. Pearce is shuffling through

19    his wallet to find --

20                THE WITNESS:  There we go, 9/16/93.

21          Q.    All right.  There we go.

22                MR. SIMON:  You were right when you

23    said 10 years ago.

24                MR. HUNTER:  Okay.
```

8

1          MR. SIMON:  10 years ago was --

2          THE WITNESS:  10 years ago, yes.

3          MR. SIMON:  -- was very accurate.

4  BY MR. HUNTER:

5      Q.    All right.  And you hired in as a

6  maintenance supervisor?

7      A.    At present?

8      Q.    No.  You hired in as a maintenance

9  supervisor?

10     A.    Yes.

11     Q.    What was the next job you held?

12     A.    The next position I held would be an

13  MPS, but that was not with Ford Motor Company.

14     Q.    Okay.  So during your tenure at Ford,

15  your employment was that of maintenance supervisor?

16     A.    That's correct.

17     Q.    Okay.  Was that a salaried position?

18     A.    Yes, sir.

19     Q.    Did you receive --

20     A.    Well, yes, sir.

21     Q.    You had hesitation.  If you want to

22  explain something there, there's an issue, just let

23  me know.

24     A.    It's not UAW.

9

```
1          Q.    Okay.

2          A.    I'll clarify it that way.

3          Q.    Okay.  Well, were you paid a salary?

4          A.    I was paid a base salary, plus

5    overtime.

6          Q.    Okay.  And how was the overtime paid?

7          A.    What do you mean?

8          Q.    How was it calculated?  How was it

9    reported?  How did you get paid overtime?

10         A.    That depended upon the direct

11   supervisor that you had, but in the maintenance

12   organization, it was always anything over one hour

13   overtime in a given day would be paid.

14         Q.    Okay.  And so it's that notion of

15   casual time?  Is that the hour --

16         A.    There was no such thing as casual

17   time.

18         Q.    Okay.  So why isn't the first hour,

19   then, paid?

20         A.    I did not say the first hour was

21   unpaid.  I said the first hour overtime -- if for

22   Ford Motor Company I worked eight and a half hours,

23   that was straight time.  That was my salary.

24         Q.    Okay.
```

```
 1        A.    Okay.  If I worked nine hours, there
 2   was no pay with the supervisor that I had.  Other
 3   supervisors in the plant actually got half hours.
 4   That's why I was saying it -- we depended upon who
 5   you were working for.
 6        Q.    Okay.
 7        A.    If I worked nine and a half hours,
 8   okay, then I received an hour overtime pay.
 9        Q.    Okay.  And with respect to -- well,
10   let me ask it this way.  You said there is no such
11   thing as casual time at Ford?
12        A.    We weren't offered casual time.  I was
13   never offered casual time at Ford.  Maybe we have a
14   different --
15        Q.    Yeah.
16        A.    -- definition as to what casual --
17        Q.    Yeah.
18        A.    -- time is.
19        Q.    Tell me what casual time is to you.
20        A.    Casual time, to me, is if I -- if I
21   worked three hours over or something, then at
22   another given day, I would get three hours off.
23        Q.    How about -- would that be comp time?
24        A.    You could use the word comp time.
```

1        Q.    Okay.  All right.  So during your

2    tenure at Ford, you were maintenance supervisor.

3    You came -- when you came over to Batavia, do you

4    remember what you came over as, what your position

5    was?

6        A.    A maintenance supervisor.  What, do

7    you mean when I came over to ZF Batavia?

8        Q.    Mm-hmm.

9        A.    Maintenance supervisor.

10       Q.    Okay.  Has your title changed since

11    you came over to ZF Batavia?

12       A.    Yes, it has.

13       Q.    Okay.  What was the first change that

14    you can recall?

15       A.    There's only been one.

16       Q.    Okay.

17       A.    I was given a position of maintenance

18    MPS, which is Maintenance Planning Specialist.

19       Q.    What's your current title at ZF

20    Batavia?

21       A.    Maintenance MPS.

22       Q.    The current position that you have

23    with ZF Batavia, are you paid overtime?

24       A.    Am I -- am I paid overtime?  Am I paid

12

1    all overtime that I should be paid for, no.  Am I

2    paid overtime, yes.

3         Q.    Okay.  Well, let's do this.  Did you

4    attend any meetings relative to your decision to

5    become a Ford transitional, to basically join ZF

6    Batavia?

7         A.    Yes, I was -- I was at the meetings

8    that were in the cafeteria; was also at the meeting

9    when they did the announcement in the plant.

10        Q.    All right.  Let's talk about the

11   announcement in the plant.  That was out in the

12   plant, outside the hospital area.  There was a

13   television screen mounted out there somewhere?

14        A.    Yes.

15        Q.    And I believe Mr. Nasser spoke at that

16   time?

17        A.    He probably did, but whether --

18        Q.    Okay.

19        A.    Okay.  He probably did.

20        Q.    You're just not sure?

21        A.    I'm in a state of shock at that point

22   in time.  Not here --

23        Q.    Back then?

24        A.    -- I mean, my plant is being sold,

1    okay, so --

2         Q.    All right.

3         A.    There was all kind of people.  The

4    Lieutenant Governor was in from Ohio; helicopters

5    were landing; news media was there; screens were

6    going off -- you know, rah, rah, great party.

7         Q.    Okay.  Do you remember anything that

8    was said at that time?

9         A.    That this was a joint venture between

10   Ford and ZF --

11        Q.    Okay.

12        A.    -- and that all the Ford people

13   were -- you know, could continue -- basically

14   continue to work there.  I -- I hate to say this,

15   but the typical management action when they come

16   in.  There will be no changes.  You know,

17   everything is going to be the same, dah, dah, dah.

18   But it was said that we would stay there.

19        Q.    You used the term "typical

20   management" --

21        A.    I been through other plant closings --

22        Q.    Okay.

23        A.    -- so when they come in, they always

24   say, there'll be no changes.  Everything is fine.

1      Q.      And I would gather from your tone, you

2    simply don't believe that to be the case?

3      A.      Not on the first announcement.

4      Q.      Okay.  Basically you're telling me you

5    didn't believe them when they came in and said

6    that?

7      A.      Ford was the first company of any size

8    that I worked for.  So I'm going to say, yes, I did

9    believe them because I thought there was integrity

10   and sincerity there.

11     Q.      Okay.  What else do you remember from

12   the meeting out there -- or in a meeting,

13   announcement, whatever you want to call it?

14     A.      Well, I found out that they said that

15   we were first in quality.

16     Q.      Okay.  Remember anything else?

17     A.      Not -- not at this time.

18     Q.      Okay.  If anything comes up, then just

19   let me know.

20     A.      Okay.  That was a long time ago.

21     Q.      Understood.  My understanding would be

22   fourth quarter of '98.  Does that sound about

23   right?

24     A.      That's probably close.

1          Q.      Okay.  You made mention that you'd

2     also attended the meetings in the cafeteria?

3          A.      Yes, sir.

4          Q.      That's the meetings out in the plant

5     cafeteria out at the Batavia facility?

6          A.      Yes, sir.

7          Q.      Okay.  How many meetings did you go to

8     out there?

9          A.      I attended two separate meetings, but

10    I cannot tell you that I was in both of those

11    meetings one hundred percent of the time --

12         Q.      Okay.

13         A.      -- 'cause I -- you know, I am a

14    maintenance supervisor and I might have been late

15    or --

16         Q.      Sure.

17         A.      -- got called out or whatever.  But I

18    did go to both meetings.

19         Q.      If you can, do you remember the dates

20    for these meetings?

21         A.      Not offhand.  Couldn't even remember

22    my hire date.

23         Q.      Okay.  With respect to these meetings,

24    were they both in the cafeteria -- and we're away

```
 1    from the initial announcement, okay, and you --

 2         A.    Right.

 3         Q.    -- told me about that.  You referenced

 4    two other meetings.  I know you don't remember the

 5    date.  Do you remember where they were or who was

 6    there?

 7         A.    They were both in the cafeteria.

 8         Q.    Okay.  Were they on the same day?

 9         A.    No.

10         Q.    Okay.  Because -- well, what else can

11    you tell me from these meetings?

12         A.    One of them was -- I'm not going to be

13    able to remember all of the people.  We had Dave

14    Adams, Karl Kehr, I think Tony DeShaw, labor

15    relations, another labor relations guy.  I think it

16    was Warren.

17         Q.    Mike Warden?

18         A.    Maybe it was Mike Warden.  No, no.

19    I'm not sure.  There was a another labor relations

20    guy there.  I'm not a hundred percent sure who that

21    was.

22         Q.    Okay.

23         A.    But basically they had a PA system set

24    up, they had slides and they basically went through
```

17

1    the new plan or the new -- I guess offers or the

2    initial offers of what was going to happen to the

3    transitional employees 'cause at this point in

4    time, there's -- there's very few, if any, ZF

5    employees in the plant.

6         Q.    Okay.  Now, with this meeting in the

7    cafeteria with the slides, do you remember, were

8    there handouts?

9         A.    I've seen handouts of it.  I can't say

10   whether there was handouts -- did I pick up a

11   handout?  That, I don't recall.

12        Q.    Okay.  And at this meeting in the

13   cafeteria, again, the one with the slides, do you

14   remember specifically what anybody said at that

15   meeting?

16        A.    We were told that our salaries would

17   stay the same.  We would be paid overtime.  There

18   would be bonuses.  The Ford pay grade thing would

19   not be -- where Ford had, I don't know.  Rankings

20   one through 16 or whatever it is, pay grades.  ZF

21   was basically going to have three.  Showed some

22   kind of a little thing there, where they just

23   combined people into different roles.  That's all I

24   can think of right now.

```
 1          Q.      Okay.

 2          A.      Well, they -- I'm sorry.  They did

 3     review our -- our medical plans would -- would be

 4     covered under whoever it was at the time.  They

 5     announced -- they did say some things about our

 6     pension and -- you know, that's about all I can

 7     remember right now.

 8               MR. VANWAY:  John, lunch has arrived,

 9     so whenever.

10               MR. HUNTER:  We can -- yeah, I guess

11     before we get into too much further, let's go ahead

12     and take a break for lunch, okay?

13          (Off the record:  11:49 a.m. - 12:26 p.m.)

14          Q.      All right.  Mr. Pearce, we were just

15     getting into the discussions about meetings and

16     meetings that you attended and things like that.  I

17     think you had told me that there were two separate

18     meetings that you attended.

19               We were talking about the first

20     meeting where you had the slides and Dave Adams,

21     Karl Kehr, Tony DeShaw and what you could remember

22     from that meeting.  And, again, I believe you told

23     me about paid overtime, bonuses, medical plans and

24     pensions.
```

1           Over the lunch break, anything else

2    come to mind from that meeting?

3           A.    No, didn't think about it.

4           Q.    Okay.  Now, that was one meeting.  You

5    said two meetings.  Do you remember any details

6    about your other meeting that you were at?

7           A.    There's a good chance I got the

8    meetings mixed up, but the -- the best I can

9    recall, the first meeting was pretty much more of a

10   general thing.  The second meeting was a little

11   more detail.  And, again, the same kind of stuff

12   was reviewed.

13          You know, you will keep your same

14   salary, you will be paid for overtime, you will

15   have -- at one point in time, pensions were

16   explained in one of the two meetings, okay?  And --

17   and I'm not going to say which 'cause I -- I really

18   just don't recall.

19          But the fixed pension that we had with

20   Ford versus the pension that ZF was going to come

21   up with, the income at the end -- at our retirement

22   date was, quote, unquote, presented as would be

23   "within a few dollars."

24          Of course, I guess it's arbitrary what

1    a few dollars is.  So when I think a few dollars --

2    you know, I'd say less than $100 a month

3    difference, so -- and I still don't understand

4    today how that's going to work.  But that's how it

5    was explained.

6         Q.    Okay.  In terms of the timing of these

7    meetings, I'll call the one the slide meeting.  Was

8    the slide meeting before or after this second

9    meeting that you've described?

10        A.    I don't recall.  Okay.  The slide

11   meeting may have been the second one.

12        Q.    Okay.

13        A.    Yeah, I don't --

14        Q.    Do you remember who was at -- at the

15   second meeting?  I hate to use that term, but I

16   don't know what else to call it.

17        A.    Well, one of the two meetings, there

18   was a lot more Ford representation, of which I have

19   no clue, as far as remembering their names --

20        Q.    Okay.

21        A.    -- okay?  But you were more heavy Ford

22   related at one of the meetings than you were the

23   other.

24        Q.    Okay.  And, again -- and I'm calling

1   it the second meeting, not because we mean that

2   orally, but just --

3        A.    Understand.

4        Q.    At the second meeting, do you remember

5   anybody that was there?

6        A.    Your -- your same core was there for

7   both.  When I say "core," I'm talking the -- Dave

8   Adams was there.  I'm drawing a blank.  Karl was at

9   both.  That's all I can recall.

10        Q.    Okay.  Do you remember any statements

11   that were made by either Mr. Kehr or Mr. Adams?

12        A.    We were told at one of the two

13   meetings that there would be this panel or board or

14   whatever you guys want to refer to it as that would

15   look over the Ford transitional employees.

16        Q.    Okay.  Remember anything else about

17   these -- well, about this second meeting?

18        A.    In one of the meetings, we were

19   advised that within the year, all the Ford people

20   that did not transition would be removed from the

21   plant.

22        Q.    And what did that mean, "removed from

23   the plant"?

24        A.    That they wouldn't -- if -- if they

1    did not accept the transitional offer, within a

2    year, there wasn't going to be any, quote, unquote,

3    "Ford people" within our facility, which is not

4    true.  We still have Ford people and we're bringing

5    more Ford people back.

6           Q.    Okay.  And when you say they were

7    going to be removed, I mean, were they going to be

8    fired from Ford or --

9           A.    No.  Ford was going to attempt to

10    place them through their placement -- I don't know

11    what you would call it, procedure or whatever.

12           Q.    Okay.  So they'd be moved to another

13    Ford facility?

14           A.    Yes.

15           Q.    Okay.  Anything else you can remember

16    from the second meeting?

17           A.    Not at this time.

18           Q.    Now, you had mentioned before the

19    break that you were going to receive paid overtime

20    and that was told to you at -- at least one of the

21    meetings.  Do you remember that?

22           A.    That was told to us at both meetings

23    and other times.

24           Q.    Okay.  Well, what other times was that

1    told to you?

2          A.    When we were made our job offers, et

3    cetera.  Also, one of the pamphlets that went

4    around that we had said that.

5          Q.    Do you remember who made you your job

6    offer?

7          A.    Yes, sir.

8          Q.    Who was that?

9          A.    Hassan Saleh.

10          Q.    And so Hassan, at the time he made you

11    your job offer, what did he discuss with you?

12          A.    That we were in the ground floor of

13    the CVT, in the joint venture, that our jobs were

14    as good or that our job was going to be as good, if

15    not better than we had with Ford, our benefits

16    weren't going to change.

17          Q.    Okay.  Did he tell you anything else

18    at that point?

19          A.    Our chances for advancement were great

20    because, again, it was ground floor.

21          Q.    And when Mr. Saleh made the job offer

22    to you, was it just yourself and Mr. Saleh or were

23    there others there or --

24          A.    No, it was just Saleh and myself.

24

```
 1          Q.    And this discussion -- and I
 2    interrupted you.  You'd made the comment that
 3    benefits wouldn't change, job as good as it was at
 4    Ford, chances for advancement.  Anything else in
 5    that discussion?
 6          A.    I mean, more or less it was said, why
 7    would any of us want to leave Ford if it's not
 8    going to be as good if not better than we have?
 9          Q.    You understood that Batavia was
10    potentially slated to close, correct?
11          A.    Batavia's been slated -- I've heard
12    rumors of Batavia and Sharonville closing for 10
13    years --
14          Q.    Okay.
15          A.    -- along with VanDyke, on and on.
16          Q.    What about Fairfax?
17          A.    Fairfax?  Fairfax did close.  How long
18    was it a rumor before it did close?
19          Q.    All right.  How long do you suppose
20    this discussion was that you had with Mr. Saleh
21    when he made you the job offer?
22          A.    Probably less than 15 minutes.
23          Q.    Okay.  Did he present a written offer
24    to you at the time?
```

1          A.     He presented two written offers to me.

2     It was two different occasions.

3          Q.     Okay.  And you ultimately accepted an

4     offer, correct?

5          A.     Yes, sir.

6          Q.     The -- on the paid overtime that we

7     kind of got off on a tangent here, but I had asked

8     you about what was told to you about overtime

9     and -- and you told me a little bit of it, about

10    what Mr. Saleh had said.

11               Again, what was your general

12    understanding as to how overtime was going to be

13    handled?

14         A.     No different than Ford.

15         Q.     And what does that mean?

16         A.     It means if you work nine hours, you

17    get paid nine hours.

18         Q.     I think you told me before, though,

19    that depended upon who your supervisor was?

20         A.     That's true.

21         Q.     Okay.

22         A.     I do know people that worked -- got

23    paid in half-hour increments with Ford.  But the

24    people I always worked for was in one-hour

1    blocks --

2          Q.    Okay.

3          A.    -- less a half hour for lunch, if we

4    want to get real specific.

5          Q.    Do you have any other understanding

6    with respect to overtime?

7          A.    I don't understand that one.

8          Q.    Aside from the comment that it would

9    be no different than Ford, okay, was anything

10   else -- what else went into your understanding of

11   the overtime?  That was it, that it's just no

12   different than Ford?

13         A.    Yes.

14         Q.    Okay.  And I would gather, then, that

15   it is your opinion that the current ZF Batavia

16   overtime policy is different than it is at Ford?

17         A.    It's definitely different.

18         Q.    Okay.  How is it different?

19         A.    The current policy that we're working

20   under right now is you work -- you are expected to

21   work a nine and a half hour day, which includes

22   your lunch, daily.

23         Q.    Okay.  Did Ford pay for lunch?

24         A.    No, I've never said paid lunch.

1          Q.    Okay.

2          A.    I was trying to be specific when I

3    said "nine hours."  It's really nine and a half

4    'cause there's a half-hour lunch.

5          Q.    Okay.  So that wouldn't be different

6    at Ford in Batavia?  If Ford didn't pay for lunch

7    and you have a half-hour lunch at Batavia, you

8    didn't get --

9          A.    Lunch has got nothing to do with it.

10   I was just trying to --

11         Q.    Oh, okay.

12         A.    When I said "nine hours," if I worked

13   nine and a half, less a half hour for lunch at

14   Ford, I got paid an hour overtime.  At Batavia, if

15   I work nine and a half hours, take off a half hour

16   for lunch, I get paid eight hours.

17         Q.    Okay.  Are there any other differences

18   in the overtime between those two, between Batavia

19   and Ford?

20         A.    I never was refused overtime from Ford

21   Motor Company for hours worked.

22         Q.    Okay.  You got to help me.  What does

23   that mean?

24         A.    I worked at ZF Batavia for three

1    weekends, Saturday and Sunday, and received no

2    overtime.

3        Q.    Do you remember when those weekends

4    were?

5        A.    No, but I'm sure our timecards will

6    show it and they're probably year and a half, two

7    years ago.

8        Q.    And was that scheduled overtime?

9        A.    I was required to be there, therefore,

10    I assume it's scheduled overtime.

11        Q.    Okay.  And that was three Saturdays

12    and Sundays that you worked?

13        A.    To the best of my memory, there was

14    three different weekends, yes.

15        Q.    Okay.  Six days?

16        A.    I -- I'm pretty sure they're six dates

17    involved.

18        Q.    Okay.  Do you remember, were they

19    eights or twelves or --

20        A.    No, sorry.

21        Q.    Okay.  And I had heard about that from

22    Mr. Whisman.  If you know, was that the same time

23    frame where Mr. Whisman might have --

24        A.    Yes.

29

```
 1        Q.    Okay.  Who else worked, if you know,

 2   during that time and was not paid for scheduled

 3   overtime?

 4        A.    It would have been supervisors within

 5   the maintenance organization because the production

 6   organization supervisors was paid for the same

 7   weekend.

 8        Q.    So it sounds -- it's a lot like Ford

 9   in that it was up to the supervisors as to whether

10   or not you were going to be paid that weekend, just

11   as it was at Ford?

12        A.    I won't agree with that 'cause I

13   was -- never at Ford did I work an eight-hour shift

14   and not receive pay or was asked to or told to.

15        Q.    All right.

16        A.    I was told to work weekends I didn't

17   want to work.

18        Q.    Okay.  Other than those three

19   weekends, any other time where you have not been

20   paid for scheduled overtime?

21        A.    Daily.

22        Q.    Okay.

23        A.    Of Ford.

24        Q.    Pardon me?
```

```
 1          A.     Of the Ford system versus the present

 2   system.

 3          Q.     Yeah, and I apologize.  It was a poor

 4   question.  At ZF Batavia, what other overtime have

 5   you worked, but not been paid for?

 6          A.     Daily.

 7          Q.     Daily?  In your answers to

 8   interrogatories, I believe you set forth an amount

 9   of $19,780.  Does that sound familiar?

10          A.     Yes, sir.

11          Q.     Is that -- what does that number

12   represent?

13          A.     That is an estimate of what I think I

14   have lost, given the hour a day or hour and a half

15   a day, that is weekends of overtime that I worked

16   and did not receive pay for it.

17          Q.     That would be the three weekends that

18   we talked about, right?

19          A.     The best I can remember.

20          Q.     Oh, sure.

21          A.     I would have to go through time sheets

22   to verify all this.

23          Q.     Okay.

24          A.     So would you.
```

1          Q.    Understood.  I'm trying to

2    understand --

3          A.    Okay.

4          Q.    -- what that number is made of.  So

5    there would be three weekends.  I'm not sure how

6    many days, but those three weekends would be

7    included in that $19,780 number?

8          A.    Okay.

9          Q.    Plus what, an hour every day that

10   you've worked at Batavia?  Hour to an hour and a

11   half?

12         A.    Or more.

13         Q.    Well, at some point in time under the

14   Batavia policy, you do receive overtime

15   compensation?

16         A.    At the 10 and a half hour, you get an

17   hour.

18         Q.    Okay.  Is there any other number or

19   basis for that number of $19,780?

20         A.    Well, in losing any of this, I'm sure

21   that affected my 401 'cause that's a straight

22   percentage that's drawn off the gross.

23         Q.    Okay.  Anything else that makes up

24   that number?

```
 1          A.    Not that I can think of right now.

 2          Q.    Okay.  At some point in time -- well,

 3     strike that.

 4                When the offer was made to you by

 5     Hassan, do you remember him giving you a document?

 6          A.    I had a document in my possession.

 7          Q.    So he didn't give it to you or --

 8          A.    That -- whether he gave it to me

 9     outside the office, in the office or it was

10     attached, I can't remember.  I had this in my

11     possession.

12          Q.    Okay.  When you say "this," you

13     referenced Exhibit Number 2.  Let's see.  Do this.

14     Let's mark that, please.

15                Mr. Pearce, I handed you what we've

16     marked for identification purposes as Exhibit 95.

17     If you would, please take a minute to go through

18     that.

19          A.    Okay.

20          Q.    Have you ever seen Exhibit 95 before?

21          A.    Yes.

22          Q.    And is that the hire letter that was

23     given to you by Mr. Saleh?

24          A.    Yes.
```

1        Q.    And is that your signature down there

2    at the bottom left?

3        A.    Yes.

4        Q.    And you'd mentioned before a

5    discussion that was no more than 15 minutes with

6    Mr. Saleh when he gave you the hire letter.  Is

7    this the hire letter that he --

8        A.    Yes.

9        Q.    -- related to that meeting?

10       A.    Yes.

11       Q.    Did he give you any other documents at

12   that time?

13       A.    I answered that before.  I said I

14   couldn't recall -- recall.  I had possession of

15   this.  I do not know if it was attached to this

16   separately in my pocket or attached to the prior

17   letter.

18       Q.    Okay.

19             MR. SIMON:  For the record,

20   Mr. Hunter, when he said "this," he held up Exhibit

21   2.  He then referred back to Exhibit 95.

22       Q.    Just so that I'm clear, with respect

23   to Exhibit 2, prior to your signing the September

24   17th letter, Exhibit 95, had you, if you know, had

1    you received Exhibit 2?

2              MR. SIMON:  Objection, asked and

3    answered.  Go ahead.

4         A.    I've already acknowledged that I've

5    seen this.  I had possession of this.

6         Q.    Okay.  Prior to the September 17th

7    letter?

8              MR. SIMON:  Objection, asked and

9    answered.  Go ahead.

10        A.    What's the -- I don't understand the

11   9/17 letter.  Is that my prior offer?  What are you

12   talking about?

13        Q.    All right.  Let's take a look at

14   Exhibit 95 --

15        A.    Okay.

16        Q.    -- okay?  And let's use the date --

17        A.    Oh, you're using the date up at the

18   top, okay.

19        Q.    -- next to your signature.

20        A.    Okay.  I'm sorry.  Now ask it again.

21        Q.    9/21/99, September 21st, '99, you

22   signed Exhibit 95, correct?

23        A.    Yes.

24        Q.    To the best of your knowledge, had you

1    received Exhibit 2 prior to the date you signed

2    Exhibit 95?

3                MR. SIMON:   Objection, asked and

4    answered.

5         A.    Do I know if I received it prior?  I

6    had this.

7         Q.    Okay.

8         A.    I don't recall when I -- I don't know

9    if it was with this or I had got it with the prior

10   offer letter.

11        Q.    Okay.  All right.  In the meeting

12   where you discussed Exhibit 95 with Mr. Saleh, did

13   you discuss Exhibit 2?

14        A.    Yes.  And, again, that's when the

15   statement was -- you know, it's as good, if -- if

16   not better than Ford.

17        Q.    Okay.  You had declined a prior offer

18   from ZF Batavia?

19        A.    Yes, sir.

20        Q.    Do you remember why you declined that

21   prior offer?

22        A.    Yes, sir.

23        Q.    And why was that?

24        A.    Because Ford was a well known, large

1    company of which I had finally connected with and

2    had five years of service.

3         Q.    I'm not sure I understand what you

4    mean by that.

5         A.    Means I felt that I worked for a very,

6    very strong blue chip company --

7         Q.    Okay.

8         A.    -- and ZF was an unknown.

9         Q.    Did you talk with anybody else about

10   the -- your decision to move to ZF Batavia?

11        A.    Meaning officially, unofficially or

12   what?

13        Q.    Either.

14        A.    Well, I think most all the

15   transitional employees were talking among

16   themselves, trying -- you know, to figure out the

17   offer.

18        Q.    Basically the group -- as a group.

19        A.    Yes.  There was a Dave Plageman who

20   was my direct supervisor at the time that, again,

21   said -- you know, and he was a Ford employee that

22   had transitioned, as good.

23        Q.    Okay.  And when you talk about

24   officially or unofficially, I think you used the

 1    term we talked as a group unofficially?

 2        A.    When I say as a group, I don't mean we

 3    all went into a room and talked.

 4        Q.    Sure.

 5        A.    I mean, if I was walking down the

 6    aisle or something, Hey, Herb, Howard, what do you

 7    think about this or what do you know about this?

 8    That's what I'm referring to.  And most of that

 9    would have been one on one.  It might be three.  It

10    wouldn't be 30.

11        Q.    Okay.  Because these were the people

12    you had worked with for years --

13        A.    Sure.

14        Q.    -- and that's who you're going to

15    discuss this offer with, correct?

16        A.    Yes.

17        Q.    And certainly, in those discussions,

18    you didn't treat those discussions as promises from

19    Ford or ZF Batavia.  It was simply a matter of

20    somebody else's opinion as to what -- what was on

21    the table, correct?

22        A.    Their opinion?

23        Q.    Mm-hmm.

24        A.    I guess you could say that.

```
 1          Q.    Well, you didn't -- you certainly

 2   might have relied on those discussions to make your

 3   decision, correct?

 4          A.    They were considered, yes.

 5          Q.    Okay.  But it isn't a matter that you

 6   felt that those people that you discussed this with

 7   had made you promises about what the future would

 8   hold, correct?

 9          A.    I didn't enter a conversation with

10   them for that reason.  That'd be like talking to my

11   equal over here, how's he going to promise me

12   anything?

13          Q.    Right.  I agree.  All right.  At what

14   point in time did you decide to accept the offer

15   from ZF Batavia?

16          A.    On or around this date.

17          Q.    And what changed your mind, because

18   obviously you'd declined the prior offer, you'd

19   already had the meetings, already received the gray

20   brochure, but decided not to join?  So what changed

21   or what changed your mind?

22          A.    Well, at the time, my father was in

23   the hospital with open heart surgery.  I did not

24   need to be in a position where I had to relocate.
```

1          Q.     Okay.  And so the reason that you came

2     to Batavia is so that you did not have to relocate?

3          A.     At that particular time, yes.

4          Q.     Okay.  Mr. Pearce, you've been handed

5     Exhibit 96.  Would ask for you to review that

6     document, please.

7          A.     Okay.

8          Q.     And have you ever seen Exhibit 96

9     before, Mr. Pearce?

10          A.     Yes.

11          Q.     And on the second page of that

12     document, does that appear to be your signature

13     there, three places?

14          A.     Yes, sir.

15          Q.     That's all I need from that one.  We

16     were talking before about what was represented to

17     you at the various meetings and whatnot.  And you

18     had made comments about overtime.  You also

19     mentioned bonuses.  What was your understanding

20     about bonuses?

21          A.     We were going to have bonuses related

22     to performance, et cetera, per our pamphlet.

23          Q.     Per Exhibit Number 2?

24          A.     Yes.

1       Q.    Okay.  And do you remember, again,

2   specifically what was said?  And, sir, I'm not

3   asking you what was said in the pamphlet.  In terms

4   of what was said --

5       A.    Well, that was basically what was

6   said.  You know, if the company performs and makes

7   a profit, per the pamphlet, okay, we will receive

8   some of that bonus.

9       Q.    So your opinion is you were told you'd

10  be paid per the gray brochure, which is Exhibit

11  Number 2?

12      A.    We were told that that is the way that

13  they will figure the bonus out, yes, sir --

14      Q.    Okay.

15      A.    -- and then divide it among the

16  employees.

17      Q.    Okay.  Were you ever told that you

18  were going to get a specific dollar amount?

19      A.    No.

20      Q.    Were you ever told that you were going

21  to get a specific percentage amount?

22      A.    No.

23      Q.    Do you believe you've been paid what

24  you're entitled to by ZF Batavia, in terms of your

 1    bonus?

 2         A.    No.

 3         Q.    Okay.  How much do you believe you're

 4    entitled to from ZF Batavia?

 5         A.    I think I'm entitled to what's fair

 6    and equitable with the rest of the plant.

 7         Q.    Okay.

 8         A.    One bonus was not paid to us.  The

 9    plant was put on critical plant status, which puts

10    the entire maintenance organization on 12 hours a

11    day, seven days a week for -- I don't know, close

12    to four months.  You couldn't buy, beg, steal a day

13    off, okay?  During that period, obviously we made a

14    sizable amount of money in overtime.

15              When the bonuses were issued, the

16    statement was made, Well, we're not giving you a

17    bonus because you made too much money in overtime.

18    But the people in the front office who weren't

19    required to work 12 hours a day, seven days a week,

20    they got a bonus.

21              So they got their time off, they

22    enjoyed their family, I didn't.  But they got a

23    bonus 'cause they got to enjoy their family and

24    have time off.  But I made too much money, so we

42

1    need to give it to them because they didn't make as

2    much, so yes.

3         Q.    For what time period did you receive

4    no bonus?

5         A.    That would be the year -- let's see.

6    I got one -- would be the year before last.

7         Q.    So it would be for calendar year 2001?

8         A.    Well, you're -- Herb can probably help

9    us with that on when bonuses are paid.  We'll say

10    that, yeah.  It's whatever year I didn't get one,

11    okay?

12         Q.    Okay.

13         A.    It's not that hard to figure out.

14         Q.    There's only one year you didn't

15    receive an AIP --

16         A.    Right.

17         Q.    -- bonus, correct?

18         A.    Yes.

19         Q.    Okay.  And other than that year, do

20    you feel you've been paid all the bonuses to which

21    you're entitled?

22         A.    I don't think the bonuses have been

23    fair and equitable within the system --

24         Q.    Okay.

1          A.      -- within the ZF system.

2          Q.      Okay.  Why not?

3          A.      That, I can't answer.  You're asking

4     me why not.  I mean, if -- within the Ford system,

5     even though at one point in time, they changed

6     their name and the way they calculated it, if it

7     was four and a half percent on gross or four and a

8     half percent on net -- you know, it was four and a

9     half percent for everybody that was there.  That

10    was the bonus --

11         Q.      Okay.

12         A.      -- okay?  It wasn't that you worked in

13    the accounting department or you worked in labor

14    relations or you worked in production or you worked

15    in maintenance.  It was consistent and that was

16    fair.

17         Q.      And when you say "it was consistent,"

18    you're saying --

19         A.      Or equitable.

20         Q.      -- the four and a half percent --

21         A.      "Equitable" would be a better word

22    than "consistent."

23         Q.      Well, you told me that it -- that it

24    changed from time to time, but that everybody got

1    the same percentage, is what I thought you told me?

2        A.    Yes.

3        Q.    So it wasn't --

4        A.    The workforce was treated equitable,

5    fairly.

6        Q.    If somebody is doing the same job as

7    you are doing --

8        A.    Mm-hmm.

9        Q.    -- okay?  And they're paid the same

10   actual dollars that you are paid for doing the same

11   job, in terms of a bonus, you're telling me that's

12   not fair?

13       A.    No, that is fair.

14       Q.    Okay.  Any other bonus dollars to

15   which you believe you're entitled?

16       A.    I can't think of one right now.

17       Q.    You also made mention of medical

18   plans.  There were representations made to you

19   about medical plans.  Do you believe that ZF

20   Batavia has followed through on whatever those

21   representations were?

22       A.    The medical plan part?

23       Q.    Mm-hmm.

24       A.    I think that's what was presented,

1   within reason, yes.

2        Q.    Okay.  You also made a comment about

3   pension plans.  Has ZF Batavia followed through

4   with respect to the pension plans?

5        A.    That's yet to be seen.

6        Q.    Okay.  Do you have any information at

7   this point that would lead you to believe that ZF

8   Batavia has not followed through on the pension

9   plans?

10       A.    Official information, no.

11       Q.    I'll take unofficial.

12       A.    Well, with the stock market the way it

13  is, I don't know how a fixed pension plan is going

14  to compete with one that was depending on the stock

15  market.

16       Q.    Okay.

17       A.    So that's what we're looking for, the

18  few dollars -- within a few dollars, you know.  But

19  that's 12 more years away for me.

20       Q.    Okay.

21       A.    How do I answer that today?

22       Q.    I understand where you're at.  All

23  right.  Any other representation --

24       A.    Or will they even -- either one of

1    them remember me 12 years from now?

2         Q.    Are there any other representations

3    that you recall being made about the pension plan?

4         A.    Yes.  I would receive medical benefits

5    from the Ford system.

6         Q.    Okay.

7         A.    I would receive the A Plan.

8         Q.    Okay.

9         A.    I would receive life insurance.

10   That's all I can recall from memory.

11        Q.    Okay.  Are there any other

12   representations that you feel were made by ZF

13   Batavia or Ford relative to your transition that

14   have not been followed through upon?

15             MR. SIMON:  Can you list the ones

16   you've already covered?

17             MR. HUNTER:  Sure.  Clearly we've

18   covered overtime, bonuses, medical plans, pensions.

19   And, so far, that's all we've talked about.

20        A.    We -- again, we were told that we

21   had -- you know, great opportunities with the joint

22   venture, being on the ground floor of CVT.

23        Q.    Okay.  And you feel that Batavia -- ZF

24   Batavia hasn't lived up to that?

```
 1          A.     No, I don't.

 2          Q.     And what has ZF Batavia failed to do?

 3          A.     If we were to be in on the ground

 4   floor, we should have already been there trying to

 5   help launch that.  Even if you go back to my offer

 6   letter, my offer letter really doesn't say

 7   maintenance supervisor.  It says quality.  I asked

 8   about that once and they said, Well, it doesn't

 9   really matter.  You're maintenance.

10          Q.     Well, what were you hired in as?

11          A.     Maintenance supervisor.

12          Q.     For what department?

13          A.     The existing department that I'm in,

14   but my offer letter doesn't say that.  Says group

15   leader for the manufacturing-quality department.

16   We're not a quality department.  I'm maintenance

17   department.

18          Q.     Okay.  All right.  Let's talk about

19   that for a second.  So you were never in the

20   manufacturing-quality department?

21          A.     No, sir.

22          Q.     Okay.  Did you ever say anything to

23   anybody that, hey --

24          A.     Oh, yeah.  I asked once.  I said, Why
```

1    don't I have the same job as Tom Bitner?  And they

2    said, Well, it doesn't mean anything.  You're a

3    maintenance guy.  That's the end of that.

4         Q.    Okay.  Did you ever say, well, I don't

5    want to work in the maintenance department?

6         A.    No, I need a job.

7         Q.    Okay.  And you knew Hassan was the

8    maintenance guy, correct?

9         A.    Hassan was the one that made the

10   offer, yes.

11        Q.    And he was a maintenance guy?

12        A.    And he was a maintenance guy, yes.

13        Q.    And your history at Ford had been in

14   maintenance?

15        A.    Yes.

16        Q.    Okay.

17        A.    So was Tom Bitner's.

18        Q.    And so do you think that somebody

19   mislead you or are you telling me there was a

20   mistake or --

21        A.    I asked about it because it was the

22   exact wording that Tom Bitner had in his offer and

23   he was in the quality organization.  And I said,

24   Cool.  Maybe I can get out of maintenance.

49

1      Q.    Okay.  And anything else that Batavia

2  hasn't -- ZF Batavia hasn't followed through on

3  with respect to your transition?

4      A.    I'm not a hundred percent sure I

5  understand the question.  I mean, are we -- is this

6  where I'm supposed to -- not supposed to, but is

7  this where vacation times were affected?

8      Q.    Okay.

9      A.    Okay.  Personal days were affected.

10  Obviously we've talked about the overtime that was

11  affected.

12      Q.    What was told to you --

13      A.    Bereavement leaves were affected.

14      Q.    What was told to you regarding

15  vacation?

16      A.    At one point in time, we -- I had to

17  threaten my direct supervisor to buy a week's

18  vacation.  He wasn't going to allow it, but it's --

19  you know, it's in our agreement and the other part

20  of the plants were doing it.

21      Q.    I guess I'm going to ask, you mean you

22  physically threatened him?

23      A.    No.  I just said, You know, we're

24  going to have to go to labor relations on this one.

```
 1          Q.    Okay.

 2          A.    You can't let some -- some people by

 3    and some people not.  Again, let's be fair and

 4    equitable.  That's really what we're asking.

 5          Q.    Well, and when you say --

 6          A.    Or what I'm asking.  I'll rephrase

 7    that.

 8          Q.    Okay.

 9          A.    It's what I'm asking.  All I want to

10    do is be treated fairly.

11          Q.    Treated fairly, would that mean

12    treated like everybody else at ZF Batavia?

13          A.    Within the group, in the organization

14    I'm in, I want to be treated fairly.  That's all.

15          Q.    Okay.  With respect to the vacation,

16    again, I guess, what representations do you recall

17    being made about vacation?

18          A.    Some of the people in the group were

19    eligible for another week.  That doesn't really

20    apply to me.  So that would probably be where that

21    statement come from.

22          Q.    Well,

23          A.    I do know --

24          Q.    Do you remember at a meeting, did
```

1    somebody say something or -- you know, I guess I

2    don't understand.  Where did you develop your

3    understanding about what the vacation policy would

4    be?

5        A.    My understanding is right now, some of

6    the people in the plant get their fifth week of

7    vacation.  Get four weeks vacation and buy a fifth.

8    Some people in the plant that are eligible for four

9    weeks of vacation don't get it.

10        Q.    And what makes them eligible --

11        A.    As far as vacation-wise, I get

12    what's -- I'm eligible for.

13        Q.    And what you thought you were going to

14    get?

15        A.    And what I thought I was going to get.

16        Q.    And what you thought you were going to

17    get, is that what's set forth in Exhibit 2, or did

18    you have a different understanding?

19        A.    Yes.  And I'm aware of this and this

20    is different than Ford's and I knew that.

21        Q.    Okay.

22        A.    That's okay.

23        Q.    All right.  You also mentioned

24    personal days.  What was your --

52

```
 1        A.    Yes, sir.

 2        Q.    What was your understanding as to what

 3   you were going to receive?

 4        A.    We were presented five -- originally

 5   five personal days, and then two of those were

 6   removed as time went on --

 7        Q.    Okay.

 8        A.    -- and then given back.

 9        Q.    Okay.  And if I'm not mistaken, the

10   personal days were shortened for a period of about

11   a year?

12        A.    Year and a half or so, yeah.

13        Q.    All right.  Did you require more than

14   three personal days at any given time?

15        A.    Well, sure.

16        Q.    Okay.  So you would have used the

17   additional two personal days?

18        A.    I'm sure I would have.

19        Q.    You have an illness or what?

20        A.    I have to go see a doctor.  I mean,

21   that's what they're for.

22        Q.    Okay.

23        A.    Please realize that I work in a

24   maintenance organization and we work seven days a
```

1    week and we work long hours.  So to get to the

2    doctor, you have to get out of there.

3          Q.    Okay.

4          A.    They don't reschedule around me.

5          Q.    And you also mentioned bereavement.

6    What's the issue with bereavement?

7          A.    Direct family was three days, and like

8    I lost a mother-in-law during this time.  And that,

9    under Ford, would have been three days.  It was one

10   day.

11         Q.    Okay.

12         A.    So there's my two personal days to be

13   with my wife on bereavement.

14         Q.    Okay.  All right.  Anything else that

15   you feel wasn't delivered to you?

16         A.    I can't think of anything right now.

17         Q.    You had made mention that you received

18   Exhibit Number 2 -- I guess it's a little unclear

19   when, but that you received it at some point,

20   correct?

21         A.    Yes.

22         Q.    And you reviewed the document?

23         A.    Yes.

24         Q.    You saw the language in there about

```
 1    subject to change?

 2         A.    Yes.

 3         Q.    And you understood, then, that the

 4    items listed in this document were subject to

 5    change?

 6         A.    No.

 7         Q.    Why not?

 8         A.    Not all items are subject to change.

 9         Q.    Why wouldn't they be?

10         A.    I was told some things were not going

11    to change.  Obviously --

12         Q.    Well, who told you that?

13              MR. SIMON:  Let him finish his answer.

14         A.    Obviously when you work at a company,

15    you see your medical plans and your dental plans

16    and these kind of things change.

17         Q.    Okay.

18         A.    All right.  You see -- we'll even go

19    so far to say incentive plans would change, meaning

20    percentages go up and down, okay?  That part of it,

21    I don't have an issue with, okay?  That was where

22    I'm going to the fair and equitable, okay?  Nobody

23    gets one, that's fine.  I don't get one, either.

24    But you don't get 20 percent and I get none, okay?
```

1              I -- I did not believe nor would I

2    went on with Ford if I thought they were going --

3    not Ford, ZF -- you know, to cut vacations and cut

4    hourly rates and stop paying overtime.  They can

5    stop paying overtime by hiring more people.  That's

6    the decision the company makes, not me.

7         Q.    But, again, the language clearly in

8    the gray brochure says that those things are

9    subject to change.  And you had made a comment

10   somebody told me -- and I meant to try to ask you

11   who.  I want to come back to that.  But who told

12   you things wouldn't change?

13        A.    In the meetings that we had up front.

14   I mean, they sat there and told us, This is the way

15   it's going to be.  So when you read this and put it

16   with the information that was -- which wasn't

17   written, I'll give you that.  This is a written

18   document, that the meetings that we had -- you

19   know, you're looking at this and you see that

20   statement, you're not thinking of salary and

21   overtime 'cause that's already there.  They've

22   already said, Hey, it's the same as it was.

23        Q.    Which it changed at Ford, though?

24        A.    Please?

56

```
 1         Q.    Your salary and overtime changed when

 2   you were at Ford?

 3         A.    It did?

 4         Q.    You never got a pay increase at Ford?

 5         A.    I got a pay increase.

 6         Q.    So it changed?

 7         A.    If you call that change.  I didn't get

 8   a reduction.

 9         Q.    You haven't had a reduction at

10   Batavia, either, have you?

11         A.    I've lost overtime.  That's a

12   reduction.

13         Q.    But that's not your salary, is it?

14         A.    That's not my salary, no.  But they

15   also told me in this pamphlet that I would be paid

16   overtime and they didn't pay me overtime.

17         Q.    Okay.  But it also says that the items

18   listed in here are subject to change as well,

19   correct?

20         A.    They said I'd be paid a bonus and they

21   didn't give me a bonus and they gave somebody else

22   a bonus.  How does this document apply to that?

23         Q.    Okay.  But the question I asked you

24   was, the document says the items listed in
```

1    document -- Exhibit 2 are subject to change,

2    correct?

3              MR. SIMON:   Objection.  Document

4    speaks for itself.  He's referring to a certain

5    sentence there.  Go ahead and answer.

6         A.    There is a statement on the document

7    that says that, yes.

8         Q.    And you read that document?

9         A.    Yes.

10        Q.    All right.  And your statement, I

11   believe, was that representatives said things would

12   be as it was at Ford, but not that things wouldn't

13   change, correct?

14        A.    I believe I said Hassan said things

15   would be as good, if not better than Ford --

16        Q.    Okay.

17        A.    -- is what I believe I said.

18        Q.    Did anybody else besides Mr. Saleh

19   ever make that comment?

20        A.    Through -- directly to me, no.

21        Q.    Okay.

22        A.    I'll recall that.  Dave Plageman

23   would -- would have said the same -- the same thing

24   to me.

1          Q.    I'm sorry.  Dave --

2          A.    Dave Plageman.  He was my direct boss

3    at the time.

4                MR. SIMON:  For the record, he had

5    already testified that Dave Plageman had said that,

6    but that's all right.

7          Q.    Was that at one of those

8    information -- or unofficial discussions that you

9    described earlier?

10          A.    Yeah, that would be just a

11    conversation between him and I.

12          Q.    Okay.  You received a transition

13    bonus, didn't you?

14          A.    Yes, sir.

15          Q.    And that was $25,000?

16          A.    Whatever the letter says, yes, sir.

17          Q.    Do you know what that was paid for?

18          A.    That was paid for future losses of --

19    the way I understood it -- like my A Plan, okay?  I

20    got 20-something years before I can go back and use

21    an A Plan.  That's not available to me till I

22    retire.

23          Q.    Okay.

24          A.    I hope everybody remembers this when I

1    retire, all right?  That was for those kind of

2    things.

3         Q.    It was for the differences between

4    what was made available --

5         A.    A few --

6         Q.    -- to you?

7         A.    -- differences that people were aware

8    of and that's what that was.  It was also to help

9    entice us to -- you know, to sign with ZF.

10        Q.    Okay.  Is there anything else that you

11   believe you are entitled to receive from ZF Batavia

12   that we haven't already talked about already today?

13        A.    Monetarily, is that what we're

14   talking?

15        Q.    Monetarily or otherwise.

16        A.    Going off of memory, monetarily, I'd

17   say that we've probably got it covered within --

18   without doing detailed records.  I still want -- I

19   want fairness within the organization.

20        Q.    Would you agree with me that fairness

21   is a bit of a personal or subjective measure?

22        A.    Oh, definitely.  That's why it exists.

23              MR. HUNTER:  Okay.  Well, I will turn

24   the chair over to Mr. VanWay, as it's about 1:30.

1    I'm not complete yet, but give Mr. VanWay an

2    opportunity here.

3             (1:19 p.m.)

4                        EXAMINATION

5    BY MR. VANWAY

6        Q.    Afternoon, Mr. Pearce.

7        A.    Hi.

8        Q.    I don't recall that we've met before.

9        A.    Don't believe we have.  I think you're

10   safe this time.

11       Q.    Trying to be more careful with that.

12   I'm Jeff VanWay.  I represent Ford in this case.  I

13   have a few questions for you today.  I'll try not

14   to repeat what Mr. Hunter has already asked you.

15            Mr. Pearce, in the six years that you

16   were working at Ford, you were always a salaried

17   employee, right?

18       A.    That's correct.

19       Q.    Never in the UAW?

20       A.    Correct.

21       Q.    Okay.  And you understood that there

22   was a difference between employees in the UAW and

23   salaried employees?

24       A.    Yes.

```
 1          Q.    UAW employees had a labor contract

 2   that set forth their wages and benefits, correct?

 3          A.    Yes.

 4          Q.    And you didn't have an agreement like

 5   that with Ford, did you?

 6          A.    Do I have a contract?

 7          Q.    Right.

 8          A.    No.

 9          Q.    Are you familiar with the term "at-

10   will employee"?  Have you ever heard that before?

11          A.    I've heard that before, yes.

12          Q.    Is it your understanding that while

13   you were at Ford, you were an at-will employee?

14          A.    Not really.

15          Q.    What did you think your status was

16   while you were with Ford?

17          A.    What do you mean?  Could I be

18   terminated or --

19          Q.    Well, did you think the company could,

20   in fact, terminate you --

21          A.    Sure.

22          Q.    -- at any time?

23          A.    Sure.

24          Q.    Okay.
```

1          A.     For just -- for just cause and under a

2     due process.

3          Q.     Under a due process, did you have a

4     right to file a grievance?  Was that your

5     understanding?

6          A.     No.

7          Q.     You say "for just cause."  You don't

8     believe that Ford could have came in and said for

9     no reason at all, Mr. Pearce, you're not going to

10    work here anymore?

11         A.     No.

12         Q.     And did someone tell you that you

13    couldn't be fired other than for just cause?

14         A.     Did someone tell me that, no, sir.

15         Q.     Then how did you come to that belief,

16    that that's how things were at Ford?

17         A.     That's the way I believe all companies

18    are.

19              MR. VANWAY:  Okay.  Can we mark this

20    as 97, I think?

21         Q.     Mr. Pearce, you've been handed what

22    we've marked as Exhibit 97, which I'll submit to

23    you came from your personnel file at Ford.  The

24    first question, is that your signature that appears

63

1    at the bottom left of that document?

2           A.    Yes, sir.

3           Q.    Okay.  You signed this while you

4    worked at Ford; is that right?

5           A.    Well, I would have to assume so.  With

6    no date on there to verify that I did, I don't

7    know.

8           Q.    I understand.  You don't dispute that

9    this is the document that you signed while you were

10   employed with Ford, do you?

11          A.    I was employed with someone that Ann

12   Jones worked for, which could have been ZF or Ford.

13          Q.    Okay.  Well, if you look in the first

14   paragraph --

15          A.    Mm-hmm.

16          Q.    -- looks like the fifth line down.

17   There's reference.  I'm sorry.  Fourth line down,

18   there's a reference to Ford Motor Company.  Does

19   that help --

20          A.    Okay.

21          Q.    -- clear up whether this was something

22   that you signed while you worked for Ford?

23          A.    All right.

24          Q.    Okay.  Do you see the third paragraph

1    in on this agreement, starting with, I understand

2    my employment is not for any definite term?

3         A.    Okay.

4         Q.    Can you take just a minute to read

5    that to yourself and let me know when you've done

6    so?

7         A.    Yes.

8         Q.    Does that paragraph accurately

9    describe your understanding of what your employment

10   relationship was like at Ford?

11        A.    Yes, but the way I really read this

12   is, it's like a layoff or something.  I don't know

13   what you're asking me.

14        Q.    I'm just asking you, is that your

15   understanding of how things were at Ford?

16        A.    Sure.

17        Q.    Okay.  And do you see towards the end

18   of that paragraph, the second-to-the-last line of

19   the paragraph, there's a clause that says, "My pay

20   and benefits to such adjustments as my employer may

21   from time to time determine."  Do you see that part

22   that I'm reading?

23        A.    Yes.

24        Q.    You'd agree with me, wouldn't you,

65

1    that your pay and benefits at Ford were subject to

2    the company's discretion?

3         A.    Pay and benefits subject to company

4    discretion?

5         Q.    Let me ask it a better way.  You

6    understood that it was the company that determined

7    what your pay was going to be?

8         A.    Within a pay range, yes, sir.

9         Q.    Okay.  You understood that the company

10    had the right to make changes to that pay range --

11         A.    Yes.

12         Q.    -- without consulting you?

13         A.    Me, personally?

14         Q.    Yes.

15         A.    No.

16         Q.    And it wasn't your understanding that

17    they had to come down and get your permission

18    before they made a change?

19         A.    Be nice if they would, but no.

20         Q.    I understand.  Same question with

21    respect to your benefits.  Did you understand that

22    the company had the right to make changes to your

23    benefits without coming down and asking you?

24         A.    Do they have the right?  I think I

1    have an agreement with Ford Motor Company and also

2    ZF that I had accepted a job under certain terms

3    and conditions.

4              I -- do things have to change, yes.

5    Does management have to change with that and make

6    decisions that may affect rates of pay and stuff,

7    yes.  Is there -- now what are the implications of

8    that?  I mean, if Ford Motor Company came out and

9    said I'm reducing everybody $50,000 a year, do they

10   have the right to do that, yes.  But they'd never

11   build another car, so I don't --

12         Q.    No, I understand.  I understand your

13   testimony.

14         A.    For me to say, yes, they have the

15   right to do, well, yeah, they have the right to do

16   it, but there's an ethical way to do it.

17         Q.    Okay.  I understand your testimony.

18   That's fine.  When you first started with Ford, I

19   think you said that was '93.  That was some lean

20   years.  That's around a lean period of time for

21   Ford, wasn't it?

22         A.    I don't know.  It was a godsend to me,

23   so --

24         Q.    Okay.  Do you remember that first

1    year, 1993?  Do you remember receiving a profit

2    sharing bonus that year?

3        A.    Yeah.

4        Q.    In 1993 or in 1994?

5        A.    I remember working -- my first year at

6    Ford when everybody -- people were getting profit

7    sharing checks and I had only been there three

8    months or something, when these -- that would

9    pertain to that period of time.  And I actually got

10    a bonus from Ford Motor Company from my boss at the

11    time.  And it wasn't a large bonus, but he said,

12    Here.  You were here for a little while.  We wanted

13    to give you a little something.

14        Q.   Was it the same percentage that

15    everybody else got?

16        A.    Oh, no.  No, it wouldn't have been.

17    Why should it be?  I wasn't there all year.

18        Q.    Well, I understand.  I thought your

19    testimony earlier was that people got maybe

20    different amounts, but the percentage was always

21    the same?

22        A.    The next year, the percentage was all

23    the same for all of us.  I guess I'm trying to say

24    it probably would have been prorated or something.

 1   Maybe the percentage was the same amount, I don't

 2   know.

 3        Q.   Okay.  Fair enough.

 4        A.   Could have been.  I don't know

 5   whether --

 6        Q.   I'm sorry.  I didn't mean to cut you

 7   off.  Do you have Exhibit 4 in front of you or,

 8   Steve, could you show him Exhibit 4?

 9            Exhibit 4, if you look at the first

10   page, in fact, it's been produced in this case,

11   which I think there's been testimony that these are

12   various slides and things that were shown at the

13   May 27th, 1999 meeting.  And if you flip to page 18

14   of this document, there's a chart there that says

15   Ford historical profit sharing.  And then there are

16   three years, '91, '92, '93 where it shows that zero

17   percent was paid out in profit sharing.

18            Does that change your testimony at all

19   as to whether or not you received any profit

20   sharing that first year you were with Ford or first

21   few months you were with Ford?

22        A.   When did I hire on?  What was my date?

23            MR. SIMON:  You testified you were

24   hired in '93.

```
 1          A.     No 'cause they paid a small percentage

 2    in '93.  The first year I was there, I got a --

 3          Q.     Okay.

 4          A.     -- bonus of some sort.

 5          Q.     I think you said you hired in in

 6    September of '93.  So would it have been on into

 7    '94 before you actually received the profit --

 8          A.     It could have been.

 9          Q.     Okay.  I think that clears it up.

10    Thank you.  While you were still with Ford before

11    you went to ZF Batavia, do you recall Ford making a

12    change in the profit sharing, changing from a

13    profit sharing plan to performance bonus?

14          A.     They changed the manner in which it

15    was calculated and renamed it, but the basic was

16    the same.

17          Q.     Was the change to where instead of

18    under profit sharing where it had been more company

19    profit driven, that the performance bonus was now,

20    in part, how an individual did, that your

21    percentage may have varied based on how you, as an

22    individual, performed?

23          A.     I don't remember that.

24          Q.     What's the change that you remember
```

1    being made?

2         A.    The change I remember was, there was

3    actually -- what words would I use to tell you?  I

4    think in prior years, Ford would say I've got this

5    much money that I'm going to put into the profit

6    sharing and then they would divide that by their

7    employees and figure out some kind of percentage

8    and everybody got the same.

9         Q.    Okay.

10        A.    When they changed the plan, it was,

11   okay.  We're going to have so much in profit.

12   We're going to put so much in this plan, if we make

13   three percent after taxes.  We're going to put so

14   much more in it if we make four percent after tax.

15   We're going to put so much more in it if we make

16   five percent after tax.  That's the way I remember

17   the plan.

18        Q.    Okay.  But it was your understanding

19   that everyone would still get the same percentage?

20        A.    It would be -- there was a formula

21   that they used to keep that what I considered fair

22   and equitable.

23        Q.    When you say everyone would get the

24   same percentage, are you talking about everyone

1    within your classification or are you talking about

2    everyone company-wide?

3         A.    I'd say everyone within my pay grade.

4    I mean, I'm sure managers and -- and et cetera get

5    a different one and stock bonuses and everything

6    else.  But, I mean, within -- the same people

7    within the same organization doing the same job

8    would get the same amount of money.

9         Q.    "Within the same organization," now

10   you referred earlier to just front office people.

11   They're not within the same organization as you

12   are, are they?

13        A.    Evidently not at ZF.  At Ford, they

14   would be.

15        Q.    At Ford, they were in the same

16   organization?

17        A.    If they were in the same pay grade.

18        Q.    Okay.  Well, what do you mean by "same

19   organization"?  Is that the same department, the

20   same plant?  What do you mean by that?

21        A.    If I was a maintenance supervisor in

22   the Ford system at Sharonville and I was a

23   maintenance super -- in the pay grade seven or pay

24   grade eight and at Batavia, I was a pay grade eight

1    maintenance supervisor for Ford at Batavia, when

2    the bonuses were calculated, each of those

3    positions would receive the same percentage amount

4    of the bonus.

5              Now, would the bonuses be identical,

6    no, because this guy may have longevity on me.  He

7    may be making more money.  He may have worked more

8    overtime, et cetera.  But the base percentage would

9    be the same for both people doing the same job

10   within the same organization.  That's what I'm

11   trying to say.

12        Q.   Okay.

13        A.   I don't know if I'm clarifying this

14   very well or not.

15        Q.   Well, let me see if I understand

16   something.  You would compare yourself, for

17   example, to someone who was in the same pay grade

18   within another transmission plant for Ford?

19        A.   No.  I wouldn't even go to a

20   transmission plant.  I wouldn't go.

21        Q.   Any other plant?

22        A.   Same pay grade level in the Ford

23   system.

24        Q.   Okay.  Now, do you know what the --

1    well, what's your pay grade at ZF Batavia?

2         A.    Well, we don't have pay grades

3    anymore.

4         Q.    Well, what's your classification?

5         A.    It would be equivalent -- I guess it

6    would be a nine now under the Ford system.

7         Q.    What's the name of your

8    classification?

9         A.    I don't know.  I'm not management

10   level, so what's the next one under?

11             MR. SIMON:  He's not going to answer.

12        A.    You'll have to help me.

13        Q.    Give me your best.

14             MR. SIMON:  A lot of people here know

15   stuff, but they can't answer.

16        A.    I -- I can't -- I don't know what it

17   is.

18        Q.    Okay.  So your understanding, then, is

19   that to be paid at ZF Batavia consistent with how

20   you were at Ford, then, whoever is in your same

21   classification at ZF Batavia should get the same as

22   what you've got.  Am I understanding your

23   testimony --

24        A.    I'm in a --

74

```
1          Q.      -- correctly?

2          A.      -- GSR band.

3          Q.      Okay.  And within the GSR band, are

4     there different levels?

5          A.      Are there different levels?

6          Q.      Right.

7          A.      I can't answer that.  I don't know.

8          Q.      Well, is it your understanding

9     everyone that's in the GSR band gets the same

10    thing?

11         A.      No, they don't.

12         Q.      Okay.  And so is it your

13    understanding, then, or is it your claim that with

14    respect to your bonus, you should have received the

15    same as what everybody else in the GSR band

16    received?

17         A.      With Ford?

18         Q.      With ZF Batavia.

19         A.      With ZF Batavia, yes.

20         Q.      Okay.  And how much more did people in

21    the GSR band at ZF Batavia receive than you did in

22    their bonus for the year in dispute?

23         A.      Thousands of percent.

24         Q.      Do you know how much?
```

1          A.    No.  I got zero.  So if they got

2     anything, it's more than mine.

3          Q.    Do you know if they got anything?

4          A.    Yes.

5          Q.    And you referred to front office

6     people before.  Are those people that are in the

7     GSR band?

8          A.    Some of them are.

9          Q.    But they don't do the same job that

10    you do, right?

11         A.    No.

12         Q.    I mean, earlier at Ford, you were

13    comparing yourself to someone else that was doing

14    the maintenance job.  Wouldn't that be the same

15    comparison that ZF Batavia, then, your bonus to

16    what another maintenance --

17         A.    Yes, but we had some --

18         Q.    -- supervisors did?

19         A.    We had some maintenance guys get

20    bonus.

21         Q.    Okay.  And were those transition

22    employees --

23         A.    Yes.

24         Q.    -- or were those new hires?

1          A.    Both.

2          Q.    Okay.  So do you know how much more

3    one of those other maintenance individuals got than

4    you did?

5          A.    Dollar amount?

6          Q.    Yeah.

7          A.    No, sir.

8          Q.    Do you know what their percentage --

9    what percentage --

10          A.    No, sir.

11          Q.    -- bonus they received?  Mr. Pearce,

12    you have in front of you Exhibit 98, which is a

13    two-page document that Ford produced in this case.

14    Appears to be the application for salaried

15    employment that you filled out with Ford back in

16    1993.  Do you agree with me that's what this

17    document is?

18          A.    Yes.

19              MR. SIMON:  Off the record for a

20    second.

21              MR. VANWAY:  Sure.

22          (Off the record:  1:36 p.m. - 1:44 p.m.)

23          Q.    Mr. Pearce, I think before we took our

24    break, I had just asked you about Exhibit 98, I

1  believe.  And I think you had just agreed with me

2  that that was your application for employment that

3  you completed with Ford; is that correct?

4        A.    Correct.

5        Q.    Is that your handwriting on this

6  document?

7        A.    Yes.

8        Q.    And on the second page, is that your

9  signature that appears --

10        A.    Yes.

11        Q.    I'm going to direct your attention to

12  the paragraph that appears right before your

13  signature on the second page, starting about almost

14  in the middle of that paragraph, there's a sentence

15  that says, I understand my employment is not to be

16  for any definite term.  Do you see where I'm at?

17        A.    Yes.

18        Q.    Towards the end of that sentence, it

19  says, The only way any differing commitment

20  regarding my employment may be made is by a written

21  agreement signed by the vice president of the

22  company in charge of employee relations.  Do you

23  see where I'm at?  Still on that same paragraph.

24  In fact, I think it's the same sentence.

78

1          A.    Yes.

2          Q.    Did you, while you were at Ford, ever

3    have a written agreement signed by the vice

4    president of the company in charge of employee

5    relations?

6          A.    (Witness nodded.)

7          Q.    I just need you to answer --

8          A.    No.

9          Q.    -- out loud.

10         A.    No.

11         Q.    Thank you.  You still have your ZF

12    Batavia application in front of you, Exhibit 96, I

13    believe?  If you could, flip to the second page of

14    that document as well.  Your signature appears

15    three times.  In the section above the first part

16    where your signature appears, there's a paragraph

17    in the middle there, which says similar to what the

18    language in the Ford application you just read, it

19    says, The only way any differing commitment

20    regarding my employment may be made is by written

21    agreement signed by the director of human resources

22    of the company.

23              Same question.  Did you ever have a

24    written agreement signed by the director of human

79

1    resources of ZF Batavia?

2         A.    No.

3         Q.    I know you testified, Mr. Pearce,

4    about -- you received basically, I guess, two

5    offers of employment from ZF Batavia.  First one

6    you declined; second one you accepted?

7         A.    Yes.

8         Q.    Do you remember on the first offer, do

9    you remember who signed that?  Was it Hassan?

10        A.    Hassan made both offers.

11        Q.    And did you -- do you remember signing

12   to decline the first offer?

13        A.    No, I did not.

14        Q.    Okay.  All right.  I don't have copies

15   of this, so we can make copies if we need it.  It's

16   a document I received from your lawyers and it's

17   Bates stamped end 05.  Can you take a moment and

18   look at that and can you tell me, is that the first

19   offer letter that you received?

20        A.    I would assume possibly -- it probably

21   is.  Would be the only way -- I mean, how do I know

22   for sure that it is, but comparing the two, I would

23   say yes.

24        Q.    Well, and the reason I ask, I haven't

1    received any other documents that purport to be

2    that first offer letter and I'm just wondering if

3    you may have it or if that's it?

4          A.    No.  I would say this is it.

5          Q.    If you could keep the two by side by

6    side for just a moment.  And by "the two," I mean

7    the second offer letter, which has been marked as

8    Exhibit 95, and the first offer letter, which we

9    haven't marked, but it's Bates stamped 005.

10          There's a substantial -- well, there's

11    a salary increase between the first offer and the

12    second offer, right?

13          A.    Yes.

14          Q.    They offered you more money after you

15    declined the offer, the first offer?

16          A.    Yes.

17          Q.    And you accepted the second offer, but

18    declined the first one?

19          A.    Yes.

20          Q.    And Exhibit 2, which I know -- which

21    is the tri-fold brochure, which you've testified

22    about at some length already.  Do you recall

23    whether that was included with the first offer that

24    you received?

1          A.    I'm going to go back to what I

2     originally said.  When I signed this offer --

3          Q.    You're pointing --

4          A.    -- I had --

5          Q.    You're pointing to 95?

6          A.    When I -- yeah.

7          Q.    Okay.

8          A.    When I signed number 95, I had in my

9     possession Exhibit 2, okay?  Whether it -- how I

10    had that, I can't answer.

11         Q.    Okay.  Fair enough.  Now, you

12    testified earlier with regard to certain -- and

13    actually I'll take the unmarked one back.

14              MR. SIMON:  Yeah.

15         Q.    You testified regarding several

16    promises that you believe were made to you that are

17    at issue in this case.  I want to make sure I just

18    have them all.  I don't mean to repeat testimony.

19    I just want to make sure I've got them all.

20              You said overtime; you said bonuses;

21    CVT; vacation; personal and bereavement.  That's --

22    I count six.  Any other promises, representations

23    that you believe that were made to you that weren't

24    followed through with?

82

```
 1          A.    I'm -- when we clarify CVT, is that

 2     the ground floor --

 3          Q.    Yes.

 4          A.    -- promotions --

 5          Q.    Yes, sir.

 6          A.    -- you know?

 7          Q.    That's what I meant by "CVT."

 8          A.    I can't think of any other at this

 9     time.

10          Q.    With respect to overtime -- and you've

11     testified, I believe, about the change in the

12     overtime policy.  With respect to daily overtime,

13     as well as the three weekends that you didn't

14     receive overtime, that's everything that is part of

15     your overtime claim, right?

16          A.    Without verifying actual timecards,

17     yes.

18          Q.    Okay.  With respect -- let's start

19     first with the change in the way daily overtime is

20     being done at ZF Batavia, as opposed to how it was

21     done at Ford.  Do you know who made that change?

22          A.    It was announced to us in a -- I'll

23     rephrase that.  Yes.

24          Q.    Okay.  Who made the change, then?
```

1          A.     It was announced to us in a

2     face-to-face meeting by Len Sennish.

3          Q.     Do you have any evidence or reason to

4     believe that someone from Ford was involved in that

5     change?

6          A.     I can't imagine that the Ford

7     directors would not be aware that the company was

8     going to do something like that 'cause there had to

9     be an impact to the company.  Whether it be a

10    financial savings, or whether it be a morale

11    problem, there had to be an impact to the company.

12         Q.     When you say "the Ford directors," are

13    you talking about the three individuals who are on

14    ZF Batavia's board of directors that are Ford

15    employees?

16         A.     We -- we were under the impression

17    that there were going to be Ford people on a board.

18    Whether that's a board of directors or a review

19    board or a employee relations board, I don't know

20    what the board was going to be.  But there was

21    going to be some people there that was supposed to

22    kind of watch over the Ford transitional employees.

23              ZF needed the transitional employees

24    and Ford needed the transitional employees to make

1    this work 'cause Ford just as easily could have

2    shut down the plant.

3         Q.    I understand.  And there is, in fact,

4    a board of directors for ZF Batavia that has three

5    ZF members and three Ford members; is that correct?

6         A.    I -- I can't answer that.

7         Q.    If you know.

8         A.    I don't know.

9         Q.    Okay.

10         A.    Should be, but I don't know.

11         Q.    And when you say the "directors," you

12    think the directors must have known, are you

13    referring to the board of directors?

14         A.    I don't believe the policy that would

15    affect the plant directly would not be known, at

16    least indirectly by the board of directors.

17         Q.    Okay.  And other than through the

18    board of directors, are you aware of whether Ford

19    had any involvement in the change in the overtime

20    policy?

21         A.    I would have no way of knowing.

22         Q.    With respect to the three weekends

23    that you weren't paid for, who made that decision,

24    do you know?

1      A.    Do I know directly who made that

2   decision, no, no, sir.  I would assume Dick Newark

3   and below.

4      Q.    Okay.  And do you have any reason to

5   believe that anyone from Ford was involved in that

6   decision not to pay you for those three weekends?

7      A.    No, sir.

8      Q.    You also testified about the AIP.  And

9   one year you didn't receive an AIP at all, right?

10     A.    That's correct.

11     Q.    Every other year, you've received an

12  AIP.  And, in fact, the AIP bonuses that you have

13  received since you've been at ZF Batavia, setting

14  aside the one year that you didn't receive a bonus,

15  the other years, those have generally been larger

16  than the bonuses that you received at Ford, haven't

17  they?

18     A.    I wouldn't say that.  Probably a mix.

19  Probably goes both ways.

20     Q.    In the records that I've reviewed show

21  that in 2000, from ZF Batavia you received a bonus

22  that was just a little over $9,900.  Does that

23  sound accurate, as far as you know?

24     A.    I can't recall here.  I'd have to look

1   at records.  We'll trust yours right now.

2       Q.    Okay.  The records that -- that I have

3   also show that, for example, in 1998, which was

4   your last full year as a Ford employee, the amount

5   of your profit sharing bonus was a little over

6   $4,700.  Does that sound right?

7       A.    You've got the sheet, yeah.

8       Q.    I'm just wondering --

9       A.    I don't know.  Well, the year prior to

10  that --

11      Q.    -- if you have any reason to doubt --

12      A.    -- what was it?

13      Q.    The records that I have, Mr. Pearce,

14  show that for '96, you received a bonus of $3,069;

15  for '97 you received a bonus of $3,071.

16      A.    Okay.

17      Q.    You wouldn't dispute, by the way,

18  would you, that, in terms of your annual W-2 wages,

19  those have been larger at ZF Batavia than they ever

20  were at Ford?

21      A.    No.

22      Q.    No, you wouldn't dispute that?

23      A.    I would not dispute that.  I worked

24  more overtime.

1          Q.     In fact, they've been quite a bit

2    larger.  The records I reviewed show that your 1998

3    W-2 wages for Ford in your last full year there

4    were approximately 96,000 and some change.  Does

5    that sound about right?

6          A.     Again, you got the records.

7          Q.     No reason to doubt it?

8          A.     Yeah, why should I doubt it?

9          Q.     In 2001, for example, I believe those

10   records show that from ZF Batavia, you received

11   136,000 and some change?

12         A.     Yes.

13         Q.     Okay.

14         A.     But I worked more overtime.

15         Q.     Okay.  Your -- just your base salary,

16   though --

17         A.     Oh, base salary increased as well,

18   yes.

19         Q.     -- at ZF Batavia -- okay.  Now, you

20   testified about the transition bonus and I believe

21   you said that you thought part of that was also an

22   enticement to encourage you to sign at ZF Batavia?

23         A.     That's the way I kind of looked at it,

24   yes.

88

1          Q.    Now, you also received a signing

2    bonus, separate and apart from the transition

3    bonus, right?

4          A.    Yes.

5          Q.    Okay.  And wasn't the signing bonus

6    really the enticement to sign on, as opposed to the

7    transition bonus?

8          A.    I don't think so.  I don't think that

9    would entice very much.

10         Q.    It was a small --

11         A.    You read it.  You read it.

12         Q.    It was a small signing bonus, okay.

13    But the transition bonus, as you understood it, was

14    there were going to be some differences in benefits

15    and that's what the transition bonus went towards?

16         A.    Yes.

17         Q.    Okay.

18         A.    20 years' loss of A plan is probably

19    that amount of money.

20         Q.    Did anyone communicate to you that

21    that's everything that that transition bonus was

22    designed to cover?

23         A.    No, I wouldn't say that, but --

24         Q.    Did you ever get any specific

1    communication as to here's what the transition

2    bonus covers?

3         A.    No.

4         Q.    With respect to the AIP bonuses and

5    the one year that you didn't receive a bonus from

6    ZF Batavia, do you have any reason to believe that

7    anyone from Ford was involved in your not receiving

8    an AIP bonus that year?

9         A.    I have no way of knowing that if they

10   knew anything about it in the beginning, I can't

11   imagine that they don't know anything about it now.

12        Q.    What do you mean, "in the beginning"?

13   I'm not sure what I -- I'm not sure I understand

14   what you mean by that.

15        A.    In other words, when the -- when the

16   bonuses were first issued by ZF Batavia or lack of

17   bonuses, whether they knew this procedure was being

18   used for the bonus, I can't answer that 'cause I

19   have no way of knowing.

20        Q.    Okay.

21        A.    But I can't believe that they haven't

22   heard that --

23        Q.    No, I understand.

24        A.    -- people were -- think that it was

1 unequitable how they did the plan.

2   Q. Okay.  And my question is not -- you

3 may have answered it and I think you did.  My

4 question is not whether Ford may have heard

5 afterwards, but whether, as you sit here today, you

6 have any evidence that Ford was actually

7 involved --

8   A. No.

9   Q. -- in that decision?

10   A. No.

11   Q. Okay.  Now, getting in on the ground

12 floor of CVT, have you ever posted for any

13 positions working in CVT?

14   A. There's no postings for it.

15   Q. Have you ever went to -- to your boss

16 and said, I want to go work in CVT?

17   A. In the beginning, we asked people and

18 said that we were very interested in being in CVT.

19   Q. "In the beginning," would be when?

20 Can you narrow that down?

21   A. When the joint venture first happened.

22   Q. Before you accepted, you said, I'd

23 like to be in CVT, if possible?

24   A. I'd say before and after --

1           Q.     Okay.

2           A.     -- I accepted.

3           Q.     When you say "after," can you narrow

4    that down to a time frame?  Was it immediately

5    after or was it three years after?

6           A.     No, I can't.

7           Q.     This year, 2003, you --

8           A.     No, I did not ask this year.

9           Q.     Okay.  Do you remember asking last

10   year, 2002?

11          A.     I'll say no.

12          Q.     What about the year before, 2000?

13          A.     There, I can't remember.

14          Q.     Do you have any reason to believe that

15   anyone from Ford has been involved in the decision

16   not to assign you to a job in CVT?

17          A.     In Ford, I'd have to say no.

18          Q.     You also testified about changes in

19   vacation, but I believe that what your testimony

20   was that those changes haven't affected you.

21   You're getting all the vacation that you believe

22   you're entitled to.  Is that a fair statement?

23          A.     Getting all the vacation that I am

24   entitled to per Exhibit 2 --

1          Q.     Okay.

2          A.     -- not what I would have at Ford.

3          Q.     I understand.  But you understood when

4     you accepted employment with ZF Batavia --

5          A.     Yes.

6          Q.     -- that there was going to be a

7     difference?

8          A.     Yes.

9          Q.     Okay.

10         A.     And that's probably what some of the

11    money was about, for -- it was something like that.

12         Q.     Okay.  Now, personal days.  I believe

13    you testified that they were -- went from five to

14    three and then back to five.  Is that what

15    happened --

16         A.     Yes.

17         Q.     -- on personal days?  Do you have any

18    reason, as you sit here today, to believe that

19    anyone from Ford was involved in the decision to

20    reduce the amount of personal days at ZF Batavia

21    from five to three?

22         A.     Again, I'm going to answer that saying

23    I can't believe labor relations is not reviewing

24    some of these things with the board, of which Ford

1    people are on that board and should be aware of it.

2    Do I know for a fact that they're aware of it, no.

3    Should they have been aware of it, yes.

4         Q.    Okay.  Now, labor relations, those are

5    folks that deal with the hourly employees, right?

6         A.    HR, then.

7         Q.    I -- I just want to make sure I

8    understand the distinctions.  So it's your

9    understanding that it seems like someone in HR

10   would have communicated that to the board of

11   directors?

12        A.    I would think, yes.

13        Q.    Okay.

14        A.    And Ford was part of the board of

15   directors.

16        Q.    Right.  Outside of Ford's involvement

17   as being a member -- or having members on the board

18   of directors, do you have reason to believe that

19   Ford was otherwise involved in the decision to

20   reduce the number of personal days?

21        A.    Run that by me one more time.

22        Q.    Sure.  I'll try to make it less

23   confusing.  You've testified that you believe if

24   Ford was involved, it was through their membership

1    on the board of directors.

2         And my question is, other than through

3    their involvement, having members on the board of

4    directors, do you believe that Ford was in any

5    other way involved in the decision to reduce the

6    personal days?

7         A.   And I'm going to go back and say the

8    board of directors is telling ZF to get their costs

9    down.  So, therefore, they may have been aware of

10   it.

11        Q.   Okay.  What about bereavement leave,

12   do you have any reason to believe that Ford may

13   have been involved to reduce the amount of

14   bereavement?

15        A.   I'm going to go with the same answer.

16        Q.   Same as for personal days?

17        A.   Yes.

18        Q.   Okay.  Did anyone ever communicate to

19   you -- prior to the time that you accepted

20   employment with ZF Batavia, did anyone ever

21   communicate to you that you would receive the same

22   AIP bonus as those in the front office would

23   receive?

24        A.   We never had the vision prior to ZF.

1    It was a plan.  Nobody -- why would anybody

2    communicate that to me?

3         Q.    I understand.  I think you've answered

4    it, but my question is just, did anyone communicate

5    that to you?  And I believe your answer is no, no

6    one communicated that?

7         A.    Nobody distinguished those two

8    examples that you gave.

9         Q.    Okay.  Now, at the time you changed

10   your mind, decided to go ahead and accept the new

11   offer from ZF Batavia, had you received an offer to

12   go to another Ford plant at that point?

13        A.    No.

14        Q.    What was your understanding as to what

15   was going to happen to you?

16        A.    I would be offered an opportunity to

17   interview for three different locations.

18        Q.    Had you had any interviews at the time

19   you accepted --

20        A.    No, we hadn't even asked for

21   interviews at that point in time.

22        Q.    Okay.  While you were with Ford, was

23   it your understanding that your work assignments

24   were subject to change?

1        A.    Any place you work, work assignments

2    are subject to change.

3        Q.    And Ford wasn't any different than any

4    other place you'd worked in that respect --

5        A.    No.

6        Q.    -- right?  You testified regarding

7    Exhibit 2, the tri-fold brochure, and the language

8    in there, the subject to change language that you

9    were asked questions about.  And I believe it was

10    your testimony that you believe certain things were

11    subject to change, but not other things.

12            When did you first come to the

13    understanding that some things in Exhibit 2 were

14    subject to change and other things were not?

15        A.    My past work history has -- has told

16    me and -- and even at Ford, that certain things

17    change.  They change with the union contract.  They

18    change -- you know, with companies -- you know they

19    change with the economy.  And that's, again,

20    medical plans, dental plans, certain things like

21    that.  Pension plans and pay practices normally

22    don't change.

23        Q.    Have you ever worked anywhere pay

24    practices did change?

```
 1          A.    No.  Glad you asked that.

 2          Q.    Okay.  So your understanding was just

 3    based on your experience in the workplace, that pay

 4    practices wouldn't change?

 5          A.    Right.  I knew what I had going in,

 6    yes.

 7          Q.    Going in?  I guess I'm not clear.  Are

 8    you saying that you believed on day one, things

 9    would be as they were communicated there, or that

10    for the entirety of your employment at ZF Batavia,

11    the next 15, 20 years, however long that might be,

12    that things would never change?

13          A.    I did not think some of the items in

14    this Exhibit 2 would change while I was still at

15    Batavia --

16          Q.    Okay.

17          A.    -- to the day I retired.

18          Q.    And those things that you believed

19    would not -- would never change, what would those

20    things be?

21          A.    Not being paid for overtime in the

22    management role that I'm in.  I did not believe

23    that my salary would go down.  I believed that --

24    you know, the number of hours that we worked may --
```

98

1    may decease -- you know, if all the overtime wasn't

2    required, okay?  But if overtime was required, I

3    believed I was going to be paid for it.

4            I did not believe that my pension was

5    going to be changed because that -- obviously I

6    wouldn't have thought that, I wouldn't have gone at

7    all because that's a long time out for me, even

8    now.

9        Q.    Anything other than overtime, salary

10   and pension that you believed would never change?

11       A.    That's -- I can't think of anything

12   right now.

13       Q.    Okay.  Now, you understood that once

14   you accepted employment with ZF Batavia, that that

15   was the end of your Ford employment, right?  That

16   you wouldn't be employed by Ford any more?

17       A.    I would not be employed by Ford is

18   correct.  I would still be associated with Ford.

19       Q.    Through the fact that Ford was a 49

20   percent shareholder in the joint venture?

21       A.    No, through the fact that I've got a

22   retirement with Ford, okay?  I've got ties to Ford.

23   I supposedly have pensions that ZF and Ford will

24   tie together so that they're within a few dollars.

1   So to say that I totally thought I was going to 100

2   percent sever from Ford, okay, no.

3        Q.    Okay.  No, I understand that.

4        A.    Was Ford going to be on my paycheck,

5   no.

6        Q.    And other than Ford continuing to

7   administer and be responsible for your pension, did

8   you believe that on a going-forward basis, that you

9   were going to receive any other benefits from Ford,

10   other than your pension and other benefits you

11   might receive then at retirement?

12        A.    No.

13        Q.    And you understood, didn't you, that

14   once you became a ZF Batavia employee, that you

15   were going to have to follow their policies and

16   procedures?

17        A.    I don't agree to that.

18        Q.    When you were with Ford, you had to

19   follow Ford's policies and procedures, right?

20        A.    Yes.

21        Q.    I mean, they were your employer --

22        A.    Yes.

23        Q.    -- and if the boss put in a policy,

24   you had to follow it, right?

1          A.    Yes.

2          Q.    And didn't you expect that the same --

3          A.    No, I'm --

4          Q.    Let me get my question out.  Didn't

5     you expect that the same thing, then, would happen

6     over at ZF Batavia, that if ZF Batavia, who was now

7     your new boss, would put in a policy, that you'd

8     have to follow that policy?

9          A.    No.  And the reason being is being a

10    transitional, there was an agreement for

11    transitional employees and then there's new ZF

12    employees.  If there wasn't a difference between

13    the two, why -- why do you distinguish between the

14    two?

15         Q.    And by "agreement," are you referring

16    to Exhibit 2 and your offer letter?  Is that what

17    the agreement was?

18         A.    And the prior meetings that was held

19    with Ford at -- at the location with us.  Those

20    kind of things.

21         Q.    Okay.  Now, in those prior meetings,

22    did anyone stand up and say, Things are subject to

23    change?

24         A.    I'm going to say I don't recall them

1    saying that 'cause I would think that that would

2    stick out.

3        Q.    Right.  I mean, that must have

4    concerned you, right?  No one had ever said subject

5    to change, and then you read in the brochure that

6    things were subject to change.  Didn't that concern

7    you that this was different than what had been

8    communicated at the employee meeting?

9        A.    No.

10        Q.    Well, let's see.  You said Hassan and

11    I think Karl Kehr and the other individuals who

12    were at the employee meetings, those are all people

13    that communicated with you about what things would

14    be like at ZF Batavia, right?  Let me ask it this

15    way.

16        A.    In management positions?

17        Q.    Right.

18        A.    Yes.

19        Q.    Other than Hassan, was everyone else,

20    people who were at the employee meetings and

21    communicated to you in that way --

22        A.    Yes.  There was no one on ones.

23        Q.    Okay.  In terms of -- let's focus on

24    Hassan, then.  Do you have any reason to believe

1    that Hassan was not being truthful with you when he

2    had communications with you about what he believed

3    things would be like at ZF Batavia?

4          A.    Why would -- I don't -- why wouldn't

5    he be truthful?

6          Q.    I'm asking, do you have any reason to

7    believe he was lying to you?

8          A.    He's a representative of management.

9    He worked for Ford.  He had more years with Ford

10   than I did.

11         Q.    You believed what he said?

12         A.    Why wouldn't I?

13         Q.    Do you have any reason to believe that

14   at the time Hassan had those communications with

15   you, that he really knew that ZF Batavia, down the

16   road, was going to change some policies and change

17   some benefits?  Do believe he knew that at the

18   time --

19         A.    No.

20         Q.    -- he told you?  Do you believe that

21   any of the individuals who were present at the

22   employee meeting then who communicated with you

23   about benefits, et cetera, that they really knew

24   that a couple years down the road, ZF Batavia would

1    change its policies or change your benefits?

2         A.    Do that one one more time.

3         Q.    Sure.  You've testified about

4    communications that were made in employee meetings,

5    cafeteria meetings.  Do you have any reason to

6    believe that any of those individuals who

7    communicated with you about what things were going

8    to be like at ZF Batavia, that at the time they

9    made that communication to you, that they knew

10   that, down the road, ZF Batavia was going to change

11   things on you?

12        A.    Okay.  I think you're asking me, did

13   the people making the presentation know in advance

14   if any of these things were going to be changed

15   when they told us?

16        Q.    Yes.  Do you have any reason to

17   believe that they knew --

18        A.    And that's it, right?

19        Q.    Yes, sir.

20        A.    I have no way of knowing.  They have

21   to settle the merger.  They have to -- they have

22   to -- you know, they're a salesman to some degree.

23   So I don't know what they knew.

24        Q.    Okay.  You testified that there are

1    still -- or that Ford is still bringing employees

2    back to the ZF Batavia plant?

3         A.    That's correct.

4         Q.    Other than hourly employees, UAW

5    represented employees, how many Ford employees are

6    present at the ZF Batavia plant today?

7         A.    I'm going to guess around 10.

8         Q.    And are all those employees engineers?

9         A.    No.

10        Q.    How many of that 10 are engineers?

11        A.    Let's -- let's go with half right now.

12   I don't know what that number would be, but let's

13   say half.

14        Q.    Okay.  Who are the other employees

15   other than the engineers, Ford employees that are

16   at the Batavia plant?  Can you name them?

17        A.    Rob Kurtz.  There's a production

18   superintendent on the case line.

19        Q.    Mr. Kurtz is a production

20   superintendent?

21        A.    Or maybe a manager.  I don't know

22   their titles anymore.

23        Q.    And he's a Ford employee?

24        A.    He's a Ford employee.

 1          Q.     How long has he been at the Batavia

 2     plant, do you know?

 3          A.     Since it opened, I think.

 4          Q.     Anyone else?

 5          A.     Jim Billman.  He's an engineer.

 6     George Barry, he's an engineer.  We had Tom Farris,

 7     who retired roughly -- I don't know, three months,

 8     six months ago.  He was a production person in the

 9     case line.

10          Q.     Do you know, did he retire in '02 or

11     '03?

12          A.     I'm going to say '03.  I really don't

13     know.

14          Q.     Okay.  Anyone else that you can think

15     of other than those individuals that you --

16          A.     Can't think of right now.

17          Q.     Okay.

18          A.     Oh, yeah.  You got Ed Zix?

19          Q.     What?  I'm sorry.

20          A.     Ed Zix.  He's a -- he's installing

21     CVT, which is the same -- the same kind of job that

22     I would do and he's a Ford employee installing CVT

23     on the ground floor and I'm working maintenance

24     'cause I can't be in CVT.  And he's a Ford

1    employee.

2        Q.    Has anyone ever told you that you

3    can't be in CVT?

4        A.    Directly, no; indirectly, yes.  I stay

5    where I'm at to keep the plant running.  That's why

6    I'm where I'm at.

7        Q.    You say "indirectly."  Someone has --

8    I'm not sure I understand.  Has someone told you, I

9    can't move you to CVT?

10       A.    I -- I was told that I wasn't going to

11   CVT to install the equipment because I was needed

12   exactly where I was at to keep that section of the

13   plant running.

14       Q.    Mr. Zix, do you know how long he's

15   been at the Batavia plant?

16       A.    Over 10 years 'cause he was there when

17   I got there --

18       Q.    Okay.

19       A.    -- and he was supposed to be gone a

20   year after I signed up with ZF, but he's still

21   there.

22       Q.    Anyone else you can think of that's a

23   Ford employee that's still out at Batavia?

24       A.    Not right this minute.

```
 1                MR. VANWAY:  Okay.  I don't think I

 2     have any further questions, Mr. Pearce.  Thank you.

 3                (2:19 p.m.)

 4                          EXAMINATION

 5     BY MR. HUNTER:

 6          Q.    Mr. Pearce, I have just a few follow-

 7     up questions.  When we spoke about your damages in

 8     this case, we talked about overtime and things like

 9     that.  Certainly you have always received your

10     salary from ZF Batavia?

11          A.    Yes.

12          Q.    Okay.  You've never been docked or

13     anything like that?

14          A.    We probably ought to define "docked."

15          Q.    Your salary, 73 -- I forget what your

16     salary is now off the top of my head.

17          A.    My base salary has never been docked?

18          Q.    Yes.

19          A.    I'll answer yes to that.

20          Q.    Okay.  And when was it docked?

21          A.    No, no, has not been.

22          Q.    Okay.

23          A.    I'm sorry.

24          Q.    There we go.  All right.  And we talk
```

1    about a base salary.  I mean, you only have one

2    salary, correct?  And then you have overtime

3    compensation?

4          A.    Yes.

5          Q.    All right.  To your knowledge, have

6    any salaried employees had their salary docked?

7          A.    I'm going to clarify it by, again,

8    going back and saying their -- their -- when you

9    say "salary," I'm calling that base.

10         Q.    And I'll try to call it base salary.

11         A.    To my knowledge, no.

12         Q.    All right.

13         A.    Okay.

14         Q.    And I understand that folks haven't

15    had overtime paid as you believe is appropriate,

16    but in terms of their base salary, that has not

17    been docked, as far as you know for any --

18         A.    Not that I'm aware of.

19         Q.    And that would include Ford

20    transitionals and or ZFBA new hires, correct?

21         A.    Again, not that I'm aware of.  I don't

22    know.

23         Q.    Okay.  Have you ever had anyone --

24         A.    I'm going to change that --

```
 1          Q.    Okay.

 2          A.    -- 'cause we've had some people that

 3     were disciplined that were ZF employees and I'm

 4     trying -- we had Dan Sullivan with a safety

 5     violation that was sent out of the plant for two

 6     weeks.  I don't know whether he was docked or not.

 7     We were told he was.  So there would be a case

 8     where he was docked.  But I bet that was for a

 9     discipline case.

10          Q.    Okay.  And you're not sure if he was

11     docked, but I would assume if he was on suspension,

12     he probably didn't get paid.

13          A.    There's no way for me to know.  I

14     don't need to know.

15          Q.    Okay.  All right.  Anybody else that

16     you can think of?

17          A.    Again, it would only be people that

18     were sent out for discipline for whatever reason.

19     There's a couple others, and I can't even think of

20     their names right now.  And, like I said, I don't

21     need to know whether they were docked or not.

22          Q.    Okay.  And with respect to yourself,

23     for example, nobody has ever come back and said,

24     Jeez, Ron, we need to adjust your pay because your
```

1   time sheets don't match with the Honeywell reader

2   or anything like that?

3       A.    Well, right now, I'm punching in the

4   plant, out of the plant.  I fill out a base salary

5   time sheet and I fill out a overtime time sheet and

6   also have been told by various people that security

7   is writing my times down when I enter and exit the

8   plant.  I guess somebody is trying to see if I'll

9   screw up on one of the sheets of paper.  And the

10  answer is, yes, sooner or later I'll screw up,

11  but --

12      Q.    Okay.

13      A.    -- I'll guarantee you it's not

14  intentional --

15      Q.    Okay.

16      A.    -- okay?  But I don't know how many

17  times you got to write your time down at this place

18  to make sure that you get paid appropriately, okay?

19  Evidently it's not enough.

20      Q.    With respect to -- I think what you've

21  told me, though, is that today nobody has come up

22  and said, Hey, Ron, we gotcha.  You screwed up,

23  correct?

24      A.    I haven't been docked on my base.  I'm

1    going to stay with the base.  I'm going to have to

2    say, no, I have not been.

3         Q.   Okay.  I think --

4         A.   You don't want to ask me about

5    overtime, though, do you?

6         Q.   I think we covered overtime.  I know

7    where you're at on overtime, sir.  If we can have a

8    minute here, I think we're all set.

9         (Off the record:  2:23 p.m. - 2:30 p.m.)

10              MR. VANWAY:  I have one.  John, did

11   you have any more?

12              MR. HUNTER:  No, I have nothing

13   further.

14                        EXAMINATION

15   BY MR. VANWAY:

16        Q.   Mr. Pearce, just one more question.

17   At the time you accepted the second offer,

18   September of 1999, do you know, was Hassan already

19   on board as a ZF Batavia employee at that time?

20        A.   In all honesty, I don't know.

21        Q.   Okay.

22        A.   I would assume that he was, but I

23   don't know.

24        Q.   Your understanding, as he was talking

1    to you about the offer, that he was already a ZF

2    Batavia employee?

3         A.    Like I said, I really don't know.

4              MR. VANWAY:  Okay.  That's all I have.

5    Thank you.

6              MR. SIMON:   I have no questions and we

7    won't waive signature.

8              (Deposition concluded at 2:30 p.m.)

9

10

11         _____

              Charles R. Pearce
12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO          :

 4                           :    SS

 5    COUNTY OF HAMILTON      :

 6

 7         I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named CHARLES

11    R. PEARCE was by me first duly sworn to testify the

12    truth, the whole truth, and nothing but the truth;

13    that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the        day of October 2003 was

17    submitted to counsel for deponent's signature.

18         I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

114

1   taking said deposition a Notary Public in and for

2   the State of Ohio.

3           IN WITNESS WHEREOF, I have hereunto set my

4   hand and notarial seal at Cincinnati, Ohio, this

5   day of October 2003.

6

7

8

            Susan M. Barhorst, Notary Public
9           in and for the State of Ohio.
            My commission expires
10          February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24