1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION, CINCINNATI

4
    EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
5
           Plaintiffs,         : Judge Beckwith
6
    V.                         : Magistrate Sherman
7
    ZF BATAVIA, LLC, et al.,   :
8
           Defendants.         :
9   _____

10         Deposition of EDWARD L. STEGMANN, taken on

11   Friday, August 22, 2003, commencing at 8:23 a.m.,

12   at the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20                  GIGLIO REPORTING SERVICES
21                    3 CYPRESS GARDEN
                     CINCINNATI, OHIO 45220
22                      513-861-2200

23

24

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   On behalf of Defendant ZF Batavia, LLC:

 6     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 7     1700 Canton Ave.
       Toledo, Ohio 43624
 8
     Also present:
 9
       Herb Huebner
10
     On behalf of Defendant Ford Motor Company:
11
       Jeffrey L. VanWay, Esq.
12     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
13     Cincinnati, Ohio 45202

14
     Cross-Examination
15
       by Mr. Hunter                 4
16
       by Mr. VanWay                74
17

18

19

20

21

22

23

24
```

3

| | STEGMANN DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 39 |
| 3 | | |
| 4 | 126 | 48 |
| 5 | 127 | 51 |
| 6 | 128 | 81 |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    EDWARD L. STEGMANN

 2  being first duly sworn, testified as follows:

 3                    CROSS-EXAMINATION

 4  BY MR. HUNTER:

 5       Q.    Sir, will you state your name for the

 6  record, please?

 7       A.    My name is Edward, middle initial "L,"

 8  last name Stegmann.

 9       Q.    And, Mr. Stegmann, what's your current

10  residential address?

11       A.    1161 Forest Run Drive in Batavia,

12  Ohio.

13       Q.    All right.  And, Mr. Stegmann, my name

14  is John Hunter.  I don't think we've ever met

15  before.

16       A.    No.

17       Q.    I represent ZF Batavia, LLC in the

18  litigation that you have filed against the company.

19  Today we're going to take your deposition.  I don't

20  know, have you ever had your deposition taken

21  before?

22       A.    No.

23       Q.    Okay.  It's pretty basic, question and

24  answer format.  I just want to have a discussion
```

```
 1    with you about the allegations that you've made in

 2    the complaint that you've filed against the

 3    company.

 4            I'm going to do my best to ask you

 5    questions in a clear, loud enough manner that you

 6    can hear me.  But occasionally I speak rather

 7    quickly or I mumble or have any of a number of

 8    other bad habits.

 9            And so at any point in time, if you

10    don't hear the question, don't understand the

11    question or just for whatever reason, feel you

12    can't fairly answer my question, I want you to stop

13    me and let me know, okay?

14        A.    Will do.

15        Q.    All right.  Is there anything today

16    that would prevent you from being able to go

17    forward with your deposition, in terms of a

18    personal issue or a medical issue or otherwise?

19        A.    Not that I'm aware.

20        Q.    Okay.  If I use the term "a Ford

21    transitional employee," what is your understanding

22    of what that would mean?

23        A.    Employees that are currently employed

24    by ZF who, prior to that employment, were employed
```

1    by Ford and offered employment at ZF.

2         Q.    Okay.  And that certainly is my

3    understanding of that term.  Are you a Ford

4    transitional employee?

5         A.    Yes, I am.

6         Q.    Prior to coming over to the joint

7    venture, how long had you been with Ford?

8         A.    23 and a half years, I believe, is

9    the -- pretty close to the exact time.

10        Q.    Okay.  And I realize it was quite some

11   time ago, but when you started with Ford, do you

12   remember what you hired in as?

13        A.    I hired in on February 2nd, 1976 as a

14   production equipment designer, grade C.

15        Q.    Okay.  And how long did you hold that

16   position or maybe let me --

17        A.    I'm going to -- we're going back a

18   ways.

19        Q.    Right.

20        A.    The best I can recollect, it was

21   approximately six months.

22        Q.    Okay.  Maybe let's do it this way.  Do

23   you remember approximately what your next position

24   was with the company?

1          A.    I was a production supervisor --

2          Q.    Okay.

3          A.    -- in steel machining.

4          Q.    Okay.  And after that?

5          A.    I was a production -- I don't know if

6    it was a different classification, but it was a

7    production supervisor in heat treat.

8          Q.    Okay.  And then?

9          A.    Plant layout engineer.

10          Q.    Okay.  And then?

11          A.    Maintenance supervisor.

12          Q.    All right.  And then?

13          A.    Back to plant layout engineer.

14          Q.    Okay.

15          A.    Then cutter-grind supervisor.

16          Q.    Okay.

17          A.    Then production supervisor in

18    assembly.

19          Q.    The assembly line?

20          A.    Yes.

21          Q.    Final assembly line?

22          A.    Final assembly, yes, that's correct.

23          Q.    Okay.

24          A.    I'm assuming you want me to go on with

8

1    the whole list; is that correct or not?

2        Q.    Well, you've moved around quite a bit.

3    Yeah, to the extent that you can remember, recall.

4        A.    After that, I was transferred to

5    Sharonville, where I worked for a division as a

6    plant design engineer.

7        Q.    Now, when you say you worked for a

8    division, are you talking like out of ATO or

9    something or what do you mean?

10        A.    Power train operations.

11        Q.    Okay.  But over at the Sharonville

12    facility?

13        A.    At the Sharonville facility, that was

14    involved with the -- the movement of the C6

15    transmission line from Lavonia to Sharonville.

16        Q.    Okay.

17        A.    And also working for -- after that,

18    working for, again, still PTO.  I was, again, a

19    maintenance supervisor.

20        Q.    Okay.

21        A.    Still at Sharonville and, again, after

22    that, still working for PTO, I was a process

23    engineer.

24        Q.    Okay.

9

1          A.     Then I came back to Batavia and that

2    was -- I don't remember.  1981, I think by then.

3    And I came back as a gauge and layout supervisor.

4          Q.     Just so that I'm clear, so all of the

5    other positions were between '76 and '81?

6          A.     Mm-hmm.

7          Q.     Wow, okay.  All right.  You're here

8    at --

9          A.     Gauge and layout supervisor.

10         Q.     Okay.

11         A.     And then I became -- I can't remember

12   the exact title, but essentially I was a quality

13   engineer --

14         Q.     Okay.

15         A.     -- which is the position I held until

16   such time as I made the transition to ZF and I

17   still hold a quality engineer position with ZF.

18         Q.     Okay.

19         A.     I don't know that that's the official

20   title, but essentially that's what it is.

21         Q.     All right.  Prior to coming to Ford in

22   1976, where had you worked?

23         A.     I worked for Cincinnati Electronics --

24         Q.     How long?

1          A.     -- as an electronic technician.

2          Q.     How long had you been with Cincinnati

3    Electronics?

4          A.     About a year.

5          Q.     And why did you leave that position?

6          A.     More money.

7          Q.     And prior to Cincinnati Electronics?

8          A.     I was in the United States Navy --

9          Q.     Okay.

10         A.     -- five years and nine months of

11   active duty.

12         Q.     All right.  In the litigation that has

13   been brought, my understanding is there are a

14   number of representations or promises that you and

15   the other plaintiffs believe that ZF Batavia and/or

16   Ford have not followed through on.

17            Can you kind of give me a laundry list

18   or short list, long list, whatever it is of those

19   issues?

20         A.     As best I can recall --

21         Q.     Mm-hmm.

22         A.     -- okay?  One, there was the

23   situation, AIP.

24         Q.     Okay.

1          A.     The overtime.

2          Q.     Okay.

3          A.     The bereavement time.

4          Q.     Okay.

5          A.     The personal, sick time, which changed

6     and has now been -- is back, but that was also one.

7          Q.     Okay.

8          A.     That's all I can recall right now.

9          Q.     Okay.  If as we discuss things today,

10    something else comes to mind, just let me know.

11    Let's talk a little bit, then, about -- about the

12    AIP issue.  What are your concerns with respect to

13    AIP?

14         A.     Well, my understanding was when the

15    whole situation was presented or the facts were

16    presented to us initially before we made -- when we

17    were given the opportunity to make the decision to

18    go to ZF, was that there were certain criteria that

19    would be utilized to determine whether AIP would be

20    awarded or not.

21              And subsequently, there was one year

22    specifically I can recall that -- I may have been

23    affected other years, but one year specifically, I

24    was told that I was not going to receive a AIP

1   because I had worked overtime, yet that had never

2   been presented as a criteria when the initial

3   package was presented to me.

4           Q.    Okay.  Let's talk about the criteria.

5           A.    And I also want to add that what

6   impact -- it appeared that there was --

7   subsequently that that's been -- impacts on my AIP,

8   based upon performance of me specifically, which

9   also was not mentioned during the -- you know, it

10  was more based upon the plant performance from a

11  variety of things, schedule, costs, things like

12  that, that -- you know, we, as a plant, would feel

13  the impact of.  And there was never any mention of

14  specific goals or factors that would weigh on AIP

15  against any one individual.

16          Q.    All right.  Well, what were the

17  measurables that you understood that would impact

18  AIP?

19          A.    Well, from what --

20          Q.    To the extent you can remember, and

21  we'll talk about documents later.

22          A.    Well, there was --

23          Q.    I mean, you mentioned schedule, costs.

24          A.    -- there was schedule.

1          Q.     Okay.

2          A.     There was quality.

3          Q.     Okay.

4          A.     There was cost.

5          Q.     Okay.

6          A.     And within cost, I mean, of course,

7    there's not only the cost of the product, but

8    that's affected by direct and indirect labor,

9    things like that.  Schedule, that we meet the

10   schedule that our customer, Ford Motor Company at

11   the time, with CD4E would -- would expect.

12         Q.     Okay.

13         A.     Now, there's more, I'm sure.  But

14   those are the ones I remember primarily.

15         Q.     Were those measurables subject to

16   change as you understood it?

17         A.     They could have been, yes, 'cause

18   Ford's --

19         Q.     Okay.

20         A.     -- schedule can change and -- and

21   that's been a factor -- you know, from the -- you

22   know, for years within -- within the plant.  But

23   whether we met the schedule is what was the

24   measurable, not whether the schedule would change.

14

1              In other words, if today we're

2      producing 2,000 transmissions and Ford says we

3      don't need 2,000.  We need 1,500.  It's not whether

4      we -- whether that's been reduced as far as the

5      schedule.  It's whether we meet that schedule.

6          Q.    Sure.  In terms of meeting schedule,

7      for example, my understanding is that the plant has

8      historically -- shouldn't say historically -- has

9      certainly since the formation of the joint venture

10     been on critical plant status, hasn't it?

11         A.    I know it has been, but whether it

12     currently is, I don't know.

13         Q.    Not currently, but historically it has

14     been?

15         A.    I wouldn't go so far as to even say

16     historically.  I know it was on critical status.

17     For how long -- now, if you're referring to just

18     since the joint venture?

19         Q.    Yes.

20         A.    I can't say for how long.  I know it

21     was put on -- we were put on critical status.  How

22     long a period of time that remained in effect, I

23     don't know.

24         Q.    And as I recall even last year, I

```
 1    think we shut down Kansas City, didn't we?
 2         A.    I'm not --
 3         Q.    Came pretty close?
 4         A.    I'm not aware of that.
 5         Q.    And with respect to costs, you
 6    indicated that a function of costs or a
 7    determinate, perhaps, of costs would be direct and
 8    indirect labor, correct?
 9         A.    That's correct.
10         Q.    And a function or a -- and one of the
11    items that would have an impact on the direct labor
12    costs certainly would be overtime, wouldn't it?
13         A.    Yes.
14         Q.    And so that -- I guess you knew back
15    in 1999 that overtime would have an impact on AIP?
16              MR. SIMON:   Objection, vague and
17    ambiguous.  You can answer.
18         A.    My personal overtime, I was not aware
19    would be -- have an impact on AIP.  The overtime
20    for the costs for the plant as a whole, yes.  But
21    when I am being compared against a fellow employee
22    who doesn't work overtime and I have, based upon
23    management's request, not my own personal -- and I
24    am -- you know, effectively penalized because I did
```

16

1    not receive as good an AIP.

2              And that's what I was told because of

3    a co-worker -- you know, that didn't.  Then I don't

4    say that that's -- that overtime has an impact on

5    AIP, okay?  If it had it across the entire plant,

6    that might be a different story.

7         Q.    Well, if I'm not mistaken, there was a

8    memo put out by Mr. Sennish at some point in time

9    related to overtime.  And, in fact, arguably there

10   was a change in policy with respect to nine-hour

11   days and things like that.  Are you familiar with

12   that?

13        A.    Yes.

14        Q.    And you're familiar with the fact that

15   the plant's position is that the overtime budget

16   historically, since the formation of the joint

17   venture, has been far -- has far exceeded what was

18   anticipated, hasn't it?

19        A.    I'm not aware of figures like that.

20   I'm not made privy to the exact number of hours

21   that are worked or aren't worked by the plant as a

22   whole.

23        Q.    All right.  I'm not looking in terms

24   of exact hours.  But I think it was made pretty

1    clear to everyone that budgets were set for

2    overtime, weren't they?

3            MR. SIMON:  Objection.  Not sure of

4    the time frame.  You can answer if you understand.

5        A.    I -- I'm not aware.

6        Q.    Okay.

7        A.    I don't recall that being brought to

8    our attention.  I mean, I realize that there has

9    been -- you know, that -- like you said, the nine

10   hour, but I'm not aware of what you're -- if I

11   understood your question.

12       Q.    Okay.  Well, let's get back to, I

13   guess, a little more directly into AIP.  You've

14   made reference to your understanding about AIP and

15   what you were told with respect to AIP.  And I

16   guess let's talk a little bit about kind of when

17   you were told this or where or kind of the

18   circumstances surrounding that.

19           My understanding is there were a

20   number of meetings out at the plant with respect to

21   the transition?

22       A.    Yes.

23       Q.    Did you attend any of those meetings?

24       A.    Yes.

1       Q.     Do you remember which meetings you

2    attended?

3       A.     No, I cannot recall all of the

4    meetings that I attended.

5       Q.     And by "all," I'm guessing that that

6    means you went to certainly more than one?

7       A.     That is correct.

8       Q.     Okay.  Do you remember the

9    announcement that was made -- what, October, I

10   think, or so of 1998, kind of outside the hospital

11   area there in the production part of the facility?

12      A.     Is that the one that they had the --

13   the big press announcement that came out of

14   Detroit, yes.

15      Q.     Yeah, and Nasser was on the squawk box

16   thing and --

17      A.     Yes.  I -- I do recall that one.

18      Q.     Okay.  Did you go to that one?

19      A.     Yes, I did.

20      Q.     All right.  With respect to that

21   meeting, do you remember anything that was said at

22   that time?

23      A.     Just the fact that there was -- this

24   joint venture was going to take place.  I don't

19

1    even remember specifics --

2         Q.    Okay.

3         A.    -- other than the fact that there

4    was -- and I don't even remember who the gentleman

5    was from ZF.  But, of course, Nasser was there and

6    they made the joint announcement.

7         Q.    Okay.

8         A.    But specifics regarding, I -- I don't

9    recall.

10        Q.    Okay.  Was there anything that was

11   said at that meeting that you relied on to make

12   your decision to transition over to the joint

13   venture?

14        A.    Not that I can recall, no.

15        Q.    Do you remember the next meeting that

16   you had that provided you with information

17   regarding the move to the joint venture?

18        A.    As near as I can recall, it was the

19   joint the meeting -- the meeting that took place in

20   the cafeteria.

21        Q.    Does around May 27th of 1999 sound

22   right?

23        A.    That's -- yeah, yes --

24        Q.    And you --

```
 1          A.     -- which is --

 2          Q.     Yeah, you pointed to Exhibit 4 before,

 3    which is called the outline or whatever, I guess,

 4    agenda for that meeting.  That's, you think, the

 5    next meeting that you had regarding the --

 6          A.     The next meeting I can recall --

 7          Q.     Okay.

 8          A.     -- was this one, yes.

 9          Q.     And my understanding is there were two

10    meetings on that date, morning and afternoon

11    session?

12          A.     I don't recall whether there was.  I'm

13    assuming there was, but I don't recall whether that

14    was true or not.

15          Q.     Do you remember, then, did you go to a

16    morning meeting or an afternoon meeting?

17          A.     I don't recall.

18          Q.     What shift would you have been working

19    at that point?

20          A.     I was -- I was on days at that point

21    in time.

22          Q.     All right.  And "days" means 3:30 to

23    11 out there?

24          A.     Seven to --
```

```
1          Q.    Oh, all right.

2          A.    -- 3:30 time frame, roughly speaking.

3          Q.    All right.  Okay.  With respect to the

4    meeting on the 27th, do you remember being given

5    any handouts or anything like that at that point in

6    time?

7          A.    No.  As near as I can recall,

8    everything was presented in a slide presentation.

9          Q.    Okay.

10         A.    But as I recall, there was a request

11   made for copies, which is what -- this then

12   became --

13         Q.    Okay.

14         A.    -- available.

15         Q.    Let's take a look at Exhibit 4.  You

16   pointed to it and said "this."

17         A.    This package, which it was -- was, in

18   fact, as I can recall, a -- a hard copy of the

19   slides that were presented to us.

20         Q.    I have to confess.  I think you're the

21   first person that's told me that.

22              MR. SIMON:  Objection.  I don't know

23   that that's true.

24         Q.    You think you got a whole copy of
```

1   everything that was in Exhibit 4?  If you would,

2   take a look through there, just to make sure.

3        A.    I got a copy of -- of -- yes, of

4   everything that was -- I will be glad to look

5   through, but -- yes.

6              MR. SIMON:  I think, for the record,

7   we attached Exhibit 4 to our complaint.

8        A.    Yes.

9        Q.    Okay.

10       A.    Everything that's -- yes.

11       Q.    I don't remember anybody else telling

12   me they received that, but all right.

13             Do you remember when you would have

14   received that or who gave it to you or anything?

15       A.    It -- it was within, as I can recall,

16   within a day or two.

17       Q.    Okay.  All right.  Do you remember who

18   was at that meeting on May 27th?

19       A.    Of course, this in here makes

20   reference to people that did presentations.

21       Q.    I understand, but --

22       A.    But as far as remembering, Tony

23   DeShaw --

24       Q.    Okay.

1          A.    -- Karl Kehr, Dave Adams.  I mean, I

2    can remember people that were there that -- you

3    know, were at like at my level, but weren't part of

4    the presentation --

5          Q.    Okay.

6          A.    -- that type of thing.

7          Q.    In terms of those --

8          A.    Those are the ones -- I mean, I know

9    there's more, but I just --

10         Q.    Okay.

11         A.    I mean, I could refer to this and

12   refresh my memory, but -- you know, that's --

13         Q.    Yeah.  I know who was supposed to be

14   there.  I'm trying to just understand who you

15   remember.

16               In terms of your co-workers that were

17   there, do you remember who was there?

18         A.    Well, I can definitely remember Cindy

19   Kries being there because she's the one that did

20   the slide presentation.

21         Q.    Okay.

22         A.    I want to say that Pat McCaldon, I

23   believe was there in the same session.

24               MR. SIMON:  He just wants your

 1   recollection.

 2           A.     But that's --

 3                  MR. SIMON:  You don't have to guess.

 4           A.     That's -- that's the only ones I can

 5   remember.

 6           Q.     Okay.  Is there -- and this is

 7   probably a more difficult question.  In terms of

 8   details, what anybody said, for example,

 9   Mr. DeShaw.  Do you remember in particular anything

10   that he said to you or not to you, but said?

11           A.     Not specifically, no.

12           Q.     How about Mr. Kehr?

13           A.     No.  I cannot remember anything that

14   any one particular person said specifically.  I

15   cannot recall.

16           Q.     Is there anything in general you

17   recall about those -- these folks?

18           A.     Pretty much, in general, as I -- the

19   only thing I can recall is that those of us who

20   opted to make the transition, it would be from the

21   standpoint of our jobs, our aspects of our jobs,

22   our -- our -- everything about it would be -- how

23   do I put it?  Be like we were still with the same

24   company.  In other words, everything stays in

```
 1   place.

 2        Q.    I've heard, for example, folks

 3   yesterday used the term as basically the same or

 4   comparable.  Does that sound accurate to you?

 5             MR. SIMON:  Objection.  Go ahead.

 6        A.    I -- I don't know if -- if

 7   "comparable" would be a word I would use.  "The

 8   same," yes.

 9        Q.    And what did you understand would be

10   the same?

11        A.    Wages, which includes overtime, the

12   medical benefits.  Now, when I say same on the

13   medical benefits, it's not necessarily the same

14   company that -- that would represent -- you know,

15   as far as provide the health benefits, but the

16   benefits would still be the same.  Working hours.

17   I mean -- you know, I'm trying to recall.

18        Q.    When you say that things would be the

19   same, ZF Batavia doesn't have a retirement plan,

20   does it?

21        A.    It has a 401K plan.

22        Q.    But that's not the same, is it?

23        A.    It's still a retirement plan.

24        Q.    Okay.
```

26

1          A.    And we were told in the meeting that

2    between the GRP that Ford has and what we would

3    have from -- from the 401K, when it came time for

4    us to retire, it would be basically the same as if

5    we'd stayed with Ford for -- for that period of

6    time.

7          Q.    Okay.  But it would be a 401K, not a

8    defined pension plan -- defined benefit pension

9    plan?

10          A.    That's correct.

11          Q.    Okay.  And Batavia, ZF Batavia doesn't

12    have anything to do with the A Plan, right?

13          A.    That's -- we were told about the A

14    Plan, that it would be in effect for -- I forget

15    the -- some period of time.

16          Q.    Okay.  So --

17          A.    And then we would -- that, we would

18    lose.

19          Q.    Okay.  The personal days weren't the

20    same, either, though, were they?

21          A.    Mm-hmm.

22          Q.    How many personal days did you have at

23    Ford?

24          A.    Five.

```
 1          Q.    All right.  And those stayed the same?

 2          A.    Yes, sir.

 3          Q.    Because I've had other folks tell me

 4    they thought they had up to 30 days, I believe, and

 5    somebody else told me 22, which surprised me,

 6    but --

 7          A.    I'm not -- I mean --

 8                MR. SIMON:  Objection.  They didn't --

 9    no one said there were that many personal days, but

10    go ahead.

11          A.    I'm not aware of that.

12          Q.    Okay.

13          A.    My understanding was when I was

14    employed at Ford that I had five paid personal sick

15    days.

16          Q.    All right.  Do you remember anything

17    else or -- that was said or told to you or your

18    general impressions, let's say, at that May 27th

19    meeting?

20          A.    Not that I can recall, no.

21          Q.    No one gave you any specific dollar

22    amounts with respect to the annual incentive plan,

23    did they?

24          A.    Other than what was covered in the
```

1  slide presentation that showed where the targets --

2       Q.    And --

3       A.    -- would be.

4       Q.    Sure.  And those are shown as being

5  1999 objectives, correct?

6       A.    Doesn't state that.

7       Q.    Well, take a look at the -- in Exhibit

8  4, Bates document number 0008.  It's in the

9  upper -- yeah.  See 1999 objectives on that form?

10      A.    Yes.

11      Q.    And on page 9 as well, isn't it

12 designated as the 1999 objectives?

13      A.    Yes.  And this goes back to what I was

14 stating earlier, in that these items were given as

15 plant objectives and nowhere in here does it --

16 does it reference anything having to do with the --

17 the overtime or individual performance.

18      Q.    Okay.

19            MR. SIMON:  He was just asking about

20 the 1999, I'm sorry.

21            THE WITNESS:  Yes.

22      Q.    But you --

23      A.    This did say the 1999 objectives, but

24 this gave me a feeling that -- you know, this was a

1    target.  Didn't say 1999.  This was the target that

2    they're shooting for and -- you know.

3        Q.    Okay.  And the target that they were

4    shooting for -- and I think you told me this

5    already -- was a target that would change, correct?

6        A.    Well, I don't know that I was ever

7    told it could -- would change, but --

8        Q.    Well, you certainly understood that it

9    could change?

10       A.    Yes, because it had -- if things were

11   the same as with Ford, things did change.

12       Q.    Based upon your job positions, it

13   sounds like it changed a lot?

14       A.    My job position, to my understanding

15   when I was with Ford, my the -- the comparable

16   thing to AIP was not based upon performance.

17   That -- bonus or profit sharing is the term I

18   believe Ford uses, was not based upon my

19   performance --

20       Q.    Sure.

21       A.    -- nor plant performance.

22       Q.    Okay.  With respect to the May 27th

23   meeting, based on my understanding of your hire

24   date, you apparently had not decided to join the

1    joint venture as of May 27?

2        A.    I was considering, but had not made a

3    final decision, that's correct.

4        Q.    Okay.  And after you attended the

5    meeting on the 27th, based upon that meeting, did

6    you decide to join the joint venture?

7        A.    Not immediately, no.

8        Q.    Okay.

9        A.    I -- part of the reason I wanted a

10   copy of this and asked for a copy of this and there

11   was other people involved was so I could make --

12   you know, a better decision looking at this

13   information.

14       Q.    Did you ask any questions at the

15   meeting, do you remember?

16       A.    I don't recall.

17       Q.    Okay.  In terms of having not made the

18   decision as to May 27th, what issues were open

19   issues for you after you attended the meeting?

20       A.    I had no idea what my exact wages

21   would be.

22       Q.    Okay.

23       A.    I had no idea of -- even though I

24   was -- we were led to believe we would retain the

1    same position, I didn't know for a fact that that's

2    what I would -- I would, in fact, have.

3           Q.    Okay.  Anything else that you

4    considered to be an open issue?

5           A.    I wanted to see more clarification

6    than what we were given regarding -- you know,

7    things like medical benefits, dental benefits.  I

8    wanted to see that clarification.  Those are just

9    some examples, I mean.

10          Q.    And when you say "clarification," in

11   terms of just a better understanding as to what

12   your benefits were going to be or who the provider

13   was or --

14          A.    No.  I wanted to see something a

15   little bit more -- I mean, it's just like I would

16   go out and look for another job.  I wanted to see

17   something in writing as to what exactly was going

18   to be there for me.

19          Q.    Okay.

20          A.    I mean this -- this, what we saw made

21   me consider, but I wanted to see the final package

22   before I made my final decision.

23          Q.    Okay.  With respect to your job offer,

24   your offer was signed by somebody named Warren?

```
 1          A.     Warren Everett.

 2          Q.     Okay.  Who is Warren Everett?

 3          A.     He was the quality manager at Batavia

 4   at the time.

 5          Q.     Is he the one that presented you with

 6   the offer?

 7          A.     He was present, but it was more of --

 8   Greg Exner, E-X-N-E-R.

 9          Q.     In terms of meetings after May 27th,

10   did you attend any other meetings regarding the

11   transition?

12          A.     There was -- I -- I can't remember the

13   date, but there was a meeting that specifically was

14   set up for the quality department.  And I know it

15   was in -- it was in conference room A or B.  I

16   can't remember which one it was in, but I think it

17   was A.  I can't remember the date, but it was

18   specifically for the quality department.

19          Q.     Do you remember who was there?

20          A.     Warren Everett was there; Greg Exner

21   was there.  The current human resource manager and

22   I can't think of his name right now.

23          Q.     Sennish?

24          A.     No, before him.  He was -- he was --
```

```
 1          Q.    DeShaw?

 2          A.    No.  He was Ford.

 3          Q.    Mike Warden?

 4          A.    That's who.

 5          Q.    Okay.

 6          A.    Him name slipped my mind.

 7          Q.    Anybody else?

 8          A.    From a management side, no, that's

 9    all.

10          Q.    Okay.  Do you remember what employees

11    might have been there at that meeting?

12          A.    I know Larry Head was there, but

13    that's the only other person I -- there were more,

14    but that's the one I can recall.

15          Q.    Okay.  And what was said by Warren,

16    for example, at this meeting?

17          A.    I don't recall Warren having a whole

18    lot to say.  It was mostly Mike Warden.

19          Q.    Okay.  And so what did Mike talk

20    about?

21          A.    The one thing -- I can't recall a

22    whole lot, but the one thing I can recall was we

23    were told at that meeting that we would be able to

24    stay at ZF -- at Batavia as Ford employees as long
```

1   as we wanted.

2           I specifically asked the question, and

3   I very distinctly remember it.  I said, if I was 28

4   years old and hired in two weeks ago, are you

5   saying that I would be able to stay here at Batavia

6   and work as a Ford employee until I reach

7   retirement age of, say, 60 and the answer was yes.

8       Q.    And who answered that?

9       A.    Warden.

10      Q.    Okay.

11      A.    Mike Warden.

12      Q.    Do you remember anything else that was

13  said?

14      A.    Not right off the top of my head, I

15  don't.

16      Q.    I guess I'm curious as to the nature

17  of your question, in terms of why was it important

18  for you to stay as a Ford employee?

19      A.    Well, I -- I had had familiarity

20  with -- because of the position I was in at one

21  time with Flat Rock --

22      Q.    Okay.

23      A.    -- AAI assembly plant.  And I knew

24  that in talking to -- through some of my visits up

1   there, that there were -- when that first became a

2   joint venture with Mazda and Ford, that all the

3   employees had to become Mazda employees.

4          And then subsequently, at some later

5   time, they reverted back to Ford employees.  Some

6   of them, I guess, that had been Mazda employees

7   initially became Ford employees.  But the few

8   people I spoke to had been Ford, went to Mazda and

9   then came back to Ford.

10         So that's kind of what -- because of

11   the fact that this had been through the

12   announcement of a 49 percent Ford, 51 percent ZF,

13   that's what kind of prompted my question as to --

14   'cause we were told we could do that.  And so

15   having seen that history at AAI, that's what

16   prompted my question.

17      Q.    But I gather from that question, then,

18   that essentially meant you wanted to stay on as a

19   Ford employee?

20      A.    No, not necessarily.  I was open to --

21   because of the way it was -- the information we had

22   received, I saw that the CVT had, to my way of

23   thinking, a great potential.  Everything I had read

24   about it in periodicals, not just ZF's CVT, but the

1    concept of CVT, that potentially it was there that

2    it could be received in a similar fashion to what

3    the automatic transmission got with looking at the

4    standard transmission as its predecessor.  There

5    could be a lot of opportunity.

6              So I was probably leaning more towards

7    wanting to stay there for that -- that potential

8    and growth, not only of the facility, but also my

9    career because of what I saw the potential could

10   be.

11             And I wanted to understand what -- you

12   know, because of that movement that took place at

13   AAI, whether I was going to be exposed to the same

14   type of movement or not because if I was, then

15   there was other questions that, of course, I would

16   have probably asked.

17        Q.   All right.  Do you remember any other

18   discussion at this meeting?

19        A.   I can't recall specifics.

20        Q.   Do you remember any -- any general or

21   other comments that were made that you relied on in

22   order to make your decision to come over to ZF

23   Batavia?

24        A.   No, I don't recall it.

1          Q.      Maybe you told me.  But at this

2     meeting in relation to the meeting of May 27th and

3     prior to the time you joined the joint venture,

4     which was, I think, the 21st, was this meeting in

5     between those two dates?

6          A.      As I can recall, yes.

7          Q.      Okay.  Any other meetings that you

8     attended between the 27th and June 21st of that

9     year?

10          A.      I don't recall any, but I can't swear

11     for certain that there wasn't.

12          Q.      Okay.  Based on this second meeting,

13     had you made the decision to come over to the joint

14     venture?

15          A.      No, not at that point in time, I had

16     not.

17          Q.      What were the open issues at that

18     point in time?

19          A.      Again, still I wanted to see the

20     package, what I was going to get.

21          Q.      I guess I'm -- I don't understand that

22     fully because if you thought things were going to

23     be the same as they were at Ford, you knew what the

24     package was.

1          A.    I knew what the package was told to me

2    verbally, but I had not seen anything in writing

3    that documented what it was going to be.

4          Q.    Okay.

5          A.    And had been around long enough to

6    know it's best to have it in writing.

7          Q.    Okay.

8          A.    And that's what I was -- I wanted to

9    see.

10         Q.    Okay.  The -- basically I think what

11   you're telling me is you didn't -- were unwilling

12   to rely on what was told to you on the 27th.  You

13   were going to count on your arrangement being put

14   into writing?

15         A.    That's not totally true.

16         Q.    Okay.

17         A.    What was presented to me on the 27th,

18   I felt was accurate information.  It definitely,

19   between that and the announcement of the joint

20   venture and what I had read about CVT, I was very

21   interested.

22               But I'm not going to make any decision

23   because there's been times within my time with

24   working since I started with Ford where there were

1   verbal things presented to me and then they didn't

2   happen.  So I wanted to see in writing what I was

3   going to get.  I was definitely interested.

4           Q.    All right.  Did you have any

5   discussions with anybody between the meeting on the

6   27th and June 21st of 1999 related to your decision

7   to transition over to the joint venture?

8           A.    May 27th -- I understand the May 27th.

9   The June --

10          Q.    June 21st of 1999 is, I believe, when

11  you signed your hire letter with ZF Batavia.

12          A.    Okay.  I was presented and I don't --

13  I just know it was a one page.  It showed the

14  dollar amount and with that one page was --

15  attached to it was a copy of the tri-fold.

16          Q.    Okay.

17          A.    And my -- Greg Exner gave that to me.

18  He wanted me to sign.  And I said I wanted to take

19  it and review it with my wife.  So I didn't sign

20  the exact same day that he gave it to me, but

21  within a -- as I recall, it was within a day or two

22  is when I finally made the decision and signed it.

23          Q.    And you made reference to Exhibit 2,

24  the gray brochure.  Did you read that entire

1    document?

2         A.    Not in its entirety, no.

3         Q.    Well, I thought it was important to

4    you to have your understanding of the arrangement

5    in writing?

6         A.    That's true.

7         Q.    And then --

8         A.    And the parts -- the parts that

9    were -- that I felt were pertinent to me, I read.

10   Some of them were not pertinent to me; some of them

11   I may have missed.  But I did not read the entire

12   document, no.  I looked -- I looked at the things

13   that -- the medical, the dental, the wages, that

14   kind of thing is what I looked at.

15        Q.    How could you know a part was not

16   pertinent to you if you didn't read it?

17        A.    Sometimes you can start by perusing

18   and find out that it's not pertinent just because

19   it doesn't apply to you.

20        Q.    Okay.  Which parts didn't apply to

21   you?  Talking again about Exhibit 2.

22        A.    Some --

23        Q.    And let's talk about this kind of, if

24   we could, start with -- and I understand it's a

1    tri-fold.  So I'm going to call it page 1 of

2    Exhibit 2, which wouldn't necessarily be page 1 of

3    that tri-fold.

4          A.    And this is --

5          Q.    Page 2.  That used to be stapled

6    together.

7          A.    Yes.

8          Q.    All right.  On page 1, what's not

9    pertinent to you?

10         A.    Well, employees immediately eligible

11   to retire.

12         Q.    Okay.  So out of that section, what

13   didn't you read, the whole --

14         A.    I don't --

15         Q.    -- column or --

16               MR. SIMON:  Testify as to what you

17   recall.

18         A.    I don't recall exactly what I did or

19   didn't read on that section.

20         Q.    Okay.

21         A.    As in the same thing with section two.

22         Q.    Okay.

23         A.    You know, there's things I didn't -- I

24   mean, I'm not interested in maternity.  I'm not

1    interested.  So I didn't read everything, okay?

2    Pretty much the first -- if you look at the three

3    sections, the first two sections and the 401K, and

4    that's pretty much what I -- what -- I perused some

5    of it.  Some of it I read in great detail because

6    some of it at the time were not as critical to me

7    and would not have made or not made my decision.

8    The things that were critical that would make my

9    decision, that's what I read in great detail.

10           And those things are like -- you know,

11    the dental, the medical, the accident, the life

12    insurance.  Tuition reimbursement did not, okay?

13           Q.    Okay.

14           A.    Ford money market did not.  Disability

15    did.  Things like that.  That's what I -- so I

16    didn't read the entire document, no.

17           Q.    Okay.  Just so that I understand what

18    was critical to you, I think what you've told me is

19    what was critical was the dental, the medical --

20           A.    No, I -- please don't take what I gave

21    you as all-encompassing list.  If you want that,

22    then --

23           Q.    Let's go through the list.

24           A.    Okay.  Salary and --

43

```
 1          Q.    Wait a minute.  Salary was what,
 2     critical or not critical?
 3          A.    Critical.
 4          Q.    So you read all of that?
 5          A.    Yes.
 6          Q.    Okay.
 7          A.    Annual incentive plan.
 8          Q.    Critical or not?
 9          A.    Critical.  And I'm only reading the
10     critical ones to you right now.
11          Q.    Okay.  And I assume if you term them
12     as critical, that means you read that?
13          A.    Yes.
14          Q.    Okay.
15          A.    Merit increase program.
16          Q.    Okay.
17          A.    Benefits --
18          Q.    Okay.
19          A.    -- which includes the medical, the
20     dental, the medical-dental employee contribution
21     rates, flexible spending accounts, life insurance,
22     accident, death and dismemberment, disability,
23     vacation, holidays, leaves.  Pretty much that's it.
24     Oh, and the 401K savings plan.
```

44

1      Q.    All right.  When you say "leaves," for

2    example, does that include the subheadings, for

3    example, funeral?

4      A.    Funeral and personal or sick.

5      Q.    Didn't care about jury duty?

6      A.    No.

7      Q.    Maternity?

8      A.    No.

9      Q.    Military?

10      A.    No.

11      Q.    Family leave?

12      A.    I'm not going to say I didn't care.  I

13    just didn't read it because it was not -- I've

14    never used that.  I've never seen a personal

15    need -- I'm not criticizing people that would use

16    it.  I just haven't had a personal need to use it,

17    so --

18      Q.    Okay.  And what about the language

19    down in the bottom right-hand corner, see the kind

20    of two solid black lines?

21      A.    Mm-hmm.

22      Q.    Did you consider that language

23    critical?

24      A.    I don't recall reading it.

1         Q.    Well, again, I guess I go back to my

2    question, if you didn't at least, as you said

3    peruse it, how would you know whether or not it was

4    critical?

5              MR. SIMON:  Objection, argumentative.

6    Go ahead.

7         A.    I just didn't -- don't recall reading

8    it.

9         Q.    Does that mean that you didn't read it

10   or you just, as we sit here today, don't recall

11   that you read it?

12        A.    As best I can recall, I did not read

13   it.

14        Q.    Well, why don't you take a second

15   right now and read that for me to yourself and then

16   we'll talk about it.

17              Okay.  Having read that, does that

18   help you remember whether or not you read the

19   information back when you received the brochure?

20        A.    No.

21        Q.    Okay.  As you read that information,

22   as you sit here today, would you consider that

23   critical information?

24              MR. SIMON:  Objection.  Go ahead.

1      A.     I don't know if I understand your --

2   totally what you're trying to say or ask there.

3      Q.     Well, you've indicated that certain

4   information in this brochure is what you considered

5   critical.  And I believe that was your term,

6   correct?

7      A.     Yes.

8      Q.     With your definition of critical and

9   having read the information on page 2 at the bottom

10  right of Exhibit 2, would you consider the

11  information that you just read to be critical?

12         MR. SIMON:  Objection, irrelevant.

13     A.     I -- since -- since some -- some of

14  this refers to -- I mean, there -- it refers to the

15  medical and the dental and that, those things were

16  critical to me.  Whether that statement is or not,

17  I don't know.

18     Q.     Okay.  With respect to the discussions

19  that you had with your wife regarding your offer of

20  employment, do you remember what discussions you

21  had with her?

22     A.     We sat down and talked about the

23  things that are on this, looked at the wage offer

24  and that's pretty much what we talked about.

47

```
 1          Q.     Okay.  Did you show your wife Exhibit
 2     2?
 3          A.     Yes.
 4          Q.     Do you know, did she read it?
 5          A.     I do not know.
 6          Q.     At what point in time, then, did you
 7     decide to make the jump to ZF Batavia?
 8          A.     I can't give you a specific date.  I
 9     don't -- I don't know the exact date.  With --
10     probably within a day or so ahead of when I signed.
11          Q.     Okay.
12          A.     That's just my guess.  I don't know
13     that to be a exact fact.
14          Q.     Okay.  When you read Exhibit 2, did
15     you have questions about it?
16          A.     Not that I can recall, no.
17          Q.     Okay.  Then I would assume that you
18     didn't ask anything about anything that was
19     contained in Exhibit 2?
20          A.     Again, not that I can recall.
21          Q.     Okay.
22          A.     That goes back a few years and --
23          Q.     Sure.  With -- at some point in time,
24     you decided to accept the offer from Batavia,
```

48

1    correct?

2          A.    That's correct.

3          Q.    All right.  You signed, you recall, a

4    offer letter?

5          A.    If it's the letter I'm -- I recall

6    signing, but you have a copy of what you're --

7          Q.    Hang on.

8          A.    Yes.

9          Q.    I've got to get the court reporter to

10   mark that for us, then I'll give you a copy there.

11               MR. SIMON:  126.

12         A.    Yes, do recall signing that.

13         Q.    All right.  Mr. Stegmann, you have in

14   front of you number 126, which I think is a copy of

15   your signed offer letter?

16         A.    That is correct.

17         Q.    Have you had a chance to review that

18   document?

19         A.    Well, it's been handed to me just now,

20   so if you want me to review it, yes, I will.

21         Q.    Please do so.

22         A.    Okay.

23         Q.    Is that your signature down there at

24   the bottom left of that document?

49

```
 1          A.    Yes, it is.

 2          Q.    And did you read the document before

 3    you signed it?

 4          A.    Yes, I did.

 5          Q.    Did you read the entire document or

 6    just critical parts?

 7          A.    I read the --

 8                MR. SIMON:  Objection.  Go ahead.

 9          A.    I read the entire document.

10          Q.    Okay.  And with respect to the entire

11    document, did you have any questions regarding the

12    document?

13          A.    Not that I can recall.

14          Q.    And you hadn't mentioned previously

15    anything about a -- any discussions with anyone

16    regarding a transition bonus.  I see on document

17    126 that it has a transition bonus, correct?

18          A.    That is correct.

19          Q.    Didn't you wonder what that transition

20    bonus was for?

21          A.    At the time this was given to me

22    and -- and it says -- it says the bonus is designed

23    to address any monetary differences between Ford

24    benefits and ZF Batavia's plan.
```

1        Q.      Okay.  And you understood that that's

2    what the transition bonus was for?

3        A.      And as I can recall, I don't remember

4    exactly the time, but I asked and some of that was

5    to help off -- the way it was explained to me was

6    to help offset the fact that we're not getting the

7    A Plan, that that was going to go away and some of

8    the -- because the retirement, if I can recall, I

9    won't swear to that, but definitely the A Plan

10   was -- was mentioned.  There was more mentioned,

11   but I don't recall everything that was mentioned,

12   but that's what I was explained that bonus was an

13   offset for.

14       Q.      To make up for monetary differences

15   between your employment at Ford and your employment

16   at ZF Batavia?

17       A.      To make up for the differences on the

18   A Plan, which I could purchase a vehicle at a lower

19   cost than -- than I would as a ZF employee, yes.

20       Q.      Well, you told me that when you read

21   the letter and you read the entire letter, you had

22   no questions about it, right?

23       A.      At the time I received the letter,

24   yes.

1          Q.     And I asked you if you asked anybody

2     any questions about this letter and you told me,

3     no, that you didn't, right?

4          A.     I can't recall that I asked

5     specifically at the time I received the letter.

6     The one thing I do recall -- maybe I didn't recall

7     it -- you know, that I did ask about that and

8     that's what --

9          Q.     Okay.

10          A.     -- I was told.

11          Q.     Do you remember who you asked?

12          A.     I don't recall.

13          Q.     Okay.  Mr. Stegmann, if you would,

14     take a moment and take a look through Exhibit 127

15     for me.

16          A.     Okay.

17          Q.     Have you ever seen document 127

18     before?

19          A.     Yes.

20          Q.     And I see on page 2 of that document,

21     it appears to have your signature --

22          A.     That's correct.

23          Q.     -- in three places?

24          A.     That's correct.

```
 1          Q.    And, in fact, that is your signature?

 2          A.    Yes, it is.

 3          Q.    And at the time you signed this

 4   document, had you read the document?

 5          A.    I don't recall.

 6          Q.    Do you make it a habit to sign

 7   documents that you don't read?

 8                MR. SIMON:  Objection, argumentative.

 9   You can answer.

10          A.    Not normally, no.  But sometimes,

11   especially when I'm within the company, sometimes I

12   do.

13          Q.    But you don't know whether or not you

14   read this document --

15          A.    I don't recall.

16          Q.    -- before you signed it?  And you

17   would acknowledge that it was your application for

18   employment with ZF Batavia, correct?

19          A.    Yes.

20          Q.    Would you consider that a rather

21   important document to read?

22                MR. SIMON:  Objection, vague and

23   ambiguous regarding "important."  Go ahead.

24          A.    Well, let me put it to you this way.
```

1    If I'm going to accept employment, I have to fill

2    this out.  I have to sign it.  If I don't sign it,

3    I don't get employed, plain and simple.

4         Q.    But you didn't have to accept

5    employment with ZF Batavia, did you?

6         A.    That's correct, I did not.

7         Q.    Okay.  You could have stayed with Ford

8    Motor Company?

9         A.    That is also correct.

10         Q.    All right.  We've gotten kind of

11    afield here.  We were talking about -- gosh, I

12    think it was AIP in relation to issues that you

13    feel that ZF Batavia has not followed through on.

14    And I understand that with respect to AIP, that you

15    believe that individual performance should not

16    matter with respect to the allocation of your AIP.

17    Is that a reasonably accurate summary?

18         A.    No, I didn't say that.

19         Q.    Okay.

20         A.    I think what I said was it was never

21    presented to me that that would be a factor.

22         Q.    Okay.  Does that mean, then, you find

23    that an acceptable factor?

24         A.    Not under the auspices as it was

54

1   presented, no, because --

2        Q.    All right.  Certainly nobody ever told

3   you it wouldn't be considered, did they?

4        A.    No.

5        Q.    Okay.  Are there any other issues with

6   respect to AIP?

7        A.    Not that I can recall.

8        Q.    Okay.  Well, let's close that one and

9   talk about overtime.  What are the issues with

10  respect to overtime?

11       A.    We were told that the overtime would

12  be paid as it was with Ford and had been paid in

13  the 23 and a half years I had been with Ford Motor

14  Company and it would be continued into ZF.

15            And then some point in time -- and I

16  can't recall the exact point in time -- I was

17  informed by my supervisor that I was expected to

18  work nine hours a day and would not be paid any

19  overtime for that.

20       Q.    Who was the supervisor that told you

21  that, was that Exner?

22       A.    Greg Exner, yes.

23       Q.    Okay.  Now, who said that the overtime

24  would be paid as it was with Ford?

1          A.     That was, as I can recall, presented

2     at this meeting.

3               MR. SIMON:  Witness was pointing to

4     Exhibit 4.

5          A.     Meeting on May 27th.

6          Q.     May 27th, your Exhibit 4.

7          A.     I keep forgetting that she's got to --

8               MR. SIMON:  It's all right, Mr.

9     Stegmann.  You don't have to clarify.  It helps.

10         Q.     And as I understand it, as of May

11    27th, the end of that meeting, you weren't

12    satisfied with the explanations, at least as of

13    that date that you were given with respect to

14    salary and compensation; correct?

15         A.     That's correct.

16         Q.     And I think you told me that one of

17    the critical issues for you in Exhibit Number 2,

18    the gray brochure, was the salary, which included

19    overtime, correct?

20         A.     Yes.

21         Q.     And when I look at Exhibit 2 with

22    respect to salary, it says authorized overtime will

23    be paid.  Would you agree with that statement?

24         A.     Yes.

56

1        Q.    And it certainly doesn't say that it

2    would be paid as it was at Ford, does it?

3             MR. SIMON:  Objection.  Document

4    speaks for itself.  Go ahead.

5        A.    My assumption when I read this, my

6    understanding was when I read this, this supported

7    what I'd been told.  We'd be paid overtime, just

8    like we had been at Ford.

9        Q.    But the document doesn't say, "Just as

10    it is at Ford," does it?

11             MR. SIMON:  Objection.  Document

12    speaks for itself.  Go ahead and answer.

13        A.    I'm telling you what I personally

14    viewed this to be, that that's what that said, that

15    I would be paid for overtime that was authorized.

16    Now, if I work, and it has happened where I give --

17    you know, a half hour, an hour because something

18    took place that I needed to be there, it was my

19    decision, okay?  When management told me I needed

20    to be there, that was -- has always been, always

21    was authorized overtime.

22        Q.    Okay.  And I gathered yesterday from

23    one of the folks that we talked with that that kind

24    of being told that you were going to be there nine

1   hours was a taken as a bit of an affront, in terms

2   of the operating pattern or however you want to

3   describe that.

4            But what I didn't understand was that

5   the whole notion of casual time with respect to

6   Ford.  And by that, I guess what I'm trying to get

7   to here is, did you have an understanding, in terms

8   of a notion or concept of casual overtime at Ford?

9        A.    No.

10       Q.    Do you know what I mean by "casual

11  time"?

12       A.    Time you put in that you don't get

13  paid for.

14       Q.    All right.  And when you were at Ford,

15  did you work casual time?

16       A.    Strictly based upon my own decision to

17  do so, yes.

18       Q.    Okay.  And if you can -- and let's

19  talk about, for example, in 1999, but prior to you

20  joining the joint venture, how did casual time --

21  how was that reflected in your time sheet or your

22  working pattern?

23       A.    It was documented just -- that has not

24  changed, as far as my time sheet is concerned.

58

1    Whether it was Ford or ZF, I documented my starting

2    time.  I documented my quitting time.

3          Q.    Okay.  And when we talk about a start

4    time, is that kind of when you get into the plant

5    or is that some time period after you get into the

6    plant and change your shoes or clothes or whatever

7    you do to get ready for work or --

8          A.    I don't -- I don't change.  I mean,

9    case in point, this morning, I walked into the

10   plant.  I picked up my clipboard.  I went out and

11   there was no -- I mean, I didn't stop for coffee or

12   nothing.  I mean, it was --

13         Q.    Okay.

14         A.    And that's kind of the norm.  That's

15   just the way I was always trained and I've always

16   been that way.

17         Q.    Okay.  The -- so your time sheet

18   basically reflects pretty much when you get to the

19   plant and then when you leave?

20         A.    I don't know.  Roughly speaking, yes.

21   In other words, if my timecard says 4:30 in the

22   morning, which is what time I got there this

23   morning, I probably arrived at 4:25.

24         Q.    Okay.  Yeah, and I'm not mincing

1    minutes here.  But what I'm getting to is I've

2    heard the term before of hand off, that --

3         A.    I've not heard that term.

4         Q.    Okay.  And you're in quality --

5         A.    Yes.

6         Q.    -- or maintenance?

7         A.    Quality.

8         Q.    Quality?  And what I understood the

9    term "hand off" to mean, and it's maybe more for

10   production, is that at the end of your shift for

11   the guy coming on --

12        A.    Oh, the overlap.

13        Q.    -- okay?  You've got to say, Hey,

14   here's what's going on.  Here's what you've got --

15        A.    Now I know what you mean by "hand

16   off."  Yes, I'm -- I'm familiar with -- not

17   necessarily that term, but when I worked in

18   production, when I worked in maintenance, yes, we

19   had to -- where there was certain times that you --

20   you reviewed, okay, when you had a counterpart on

21   an off shift that you had to share information.

22   Somebody -- you know, I can go into specifics, but

23   I don't know it's germane.

24        Q.    Okay.

```
 1              MR. HUNTER:  Will you wait and make
 2     sure that Mr. Hunter finishes his question before
 3     you start answering, okay?
 4              THE WITNESS:  Okay.
 5          Q.    And what I understand is that that
 6     hand off or that transition period would certainly
 7     generally be after the scheduled shift, and that
 8     that's what I have been explained to me as being
 9     casual time.  You're not familiar with that at all?
10          A.    In my present position, that does not
11     exist.
12          Q.    Okay.  At any position that you held
13     at Ford, were you aware of that process?
14          A.    Not as casual time, no.
15          Q.    Okay.
16          A.    I mean, again, we're talking 15
17     minutes or less.  And, to me, that -- if you want
18     to call that casual time, then, yes, there was.
19     But it was always 15 minutes or less.    So, to me,
20     that -- you know, like I said, 4:30 versus 4:25 or
21     4:15 -- you know, I don't --
22          Q.    Okay.  Does your timecard reflect a
23     deduction for lunch?
24          A.    If I was to work -- I don't know if I
```

1    understand the question, but let me explain how I

2    document my time.

3              Q.    Okay.

4              A.    If I start at 4:30 and I'm going to

5    work nine hours, my timecard will reflect a 4:30

6    start and nine and a half hours later, reflects my

7    quit.

8              Q.    So that would be to 14:00?

9              A.    That's correct.  Does that --

10             Q.    All right.

11             A.    Does that answer your questions or --

12             Q.    I think -- well, we're getting closer.

13   All right.  So your timecard would reflect 04:30 to

14   14:00.  And on the salary time statement -- I

15   shouldn't call it a timecard.  On the salary time

16   statement, then, that would reflect a -- currently

17   a zero overtime amount; is that right?

18             A.    That is correct.

19             Q.    All right.  Now, when you first joined

20   the joint venture and if you had a timecard that

21   showed 4:30 to 14:00, what overtime would you have

22   put in for?

23             A.    One hour.

24             Q.    And the company, ZF Batavia, paid that

1     at that time?

2          A.     Yes, sir.

3          Q.     All right.  And then you told me that

4     at some point in time that changed when the company

5     made the announcement about the nine-hour workday?

6          A.     That's correct.

7          Q.     All right.  Prior to the announcement

8     of that change, do you believe you were paid what

9     you were entitled to be paid, in terms of overtime

10    compensation by ZF Batavia?

11         A.     The best I can recall, I was paid for

12    the overtime that I worked.

13         Q.     And I just want to make sure that no

14    part of the claim that you have made now against

15    the company would be for overtime prior to this

16    nine-hour change that we've been talking about?

17         A.     As I -- if I understand your question

18    correctly, yes --

19         Q.     Okay.

20         A.     -- that's correct.  In other words,

21    I'm not asking to get paid for an -- additionally

22    for time that I've already been paid for.

23         Q.     Okay.  I just -- I want to make sure I

24    understand because my next question is going to be

1    to you -- related to the interrogatories that you

2    filled out.  And there's a number in there, which I

3    understand, either in whole or in part, represents

4    overtime compensation.  And I just want to make

5    sure I understand essentially from when to when --

6    what time period that number covers.

7            You've indicated in the answers to

8    interrogatories that you're entitled to $18,570.

9    Does that sound right?

10            A.    Mm-hmm.

11            Q.    All right.  And as I understand it,

12    that number would represent unpaid overtime from

13    the time that the company announced the nine-hour

14    change until sometime in May, I think, when you

15    answered these interrogatories?

16            A.    That's correct.

17            Q.    Okay.  That number seems high, in

18    terms of it's only one hour a day.  Can you -- or

19    is that every day or tell me how you got there?

20            A.    There's quite a few days.

21            Q.    Okay.

22            A.    And then sometimes that also carried

23    over into the weekends also, not just through the

24    week.

64

```
 1        Q.    Okay.  I've heard from some

 2   individuals that they had -- they worked some

 3   scheduled shifts, for which they were paid nothing.

 4   I believe they were weekend shifts.  That did not

 5   occur with you?

 6        A.    I don't -- I can't swear to that

 7   without going back to look at records.  But as I

 8   can recall, no, it did not.

 9        Q.    Okay.  So, by and large, this really

10   is just the one hour a day times a -- apparently a

11   whole lot of days?

12        A.    As I can recall, yes.

13        Q.    Okay.  And you made a comment that --

14   to go back and check records.  Do you keep, for

15   example, copies of your salary time statements,

16   things like that?

17        A.    Yes, sir.

18        Q.    Okay.  Have all of those been turned

19   over to your attorney?

20        A.    I think I was lacking -- I think there

21   was one I -- I couldn't get, but yes.

22        Q.    Okay.  And so from those salaried time

23   sheets, I can, in a sense, work back to this

24   $18,575 number?
```

```
 1          A.    Yes.

 2          Q.    Okay.  Does that number include the

 3    AIP issue, dollar amount?

 4                MR. SIMON:  Objection.  Doesn't have

 5    the interrogatory in front of him.  Go ahead and

 6    answer, if you can.

 7          A.    Not that I can recall, no.

 8          Q.    Does it include anything other than

 9    the overtime loss that you were claiming?

10                MR. SIMON:  Same objection.

11          A.    Not that I can recall.

12          Q.    Okay.

13          A.    Again, I don't have that document in

14    front of me to read exactly what it says.

15          Q.    I mean, I can give it to you.  I've

16    read it and it's unclear to me.  I'm just trying to

17    understand what your number means.  Mr. Simon and I

18    have had this conversation repeatedly.  I just want

19    to understand the number.

20                MR. SIMON:  I don't know how it's not

21    clear.  That represents overtime lost.

22          Q.    All right.  Any other issues on

23    overtime?

24          A.    Not that I can recall at this time,
```

1    no.

2         Q.    Okay.  Bereavement, I think was the

3    next item that you had listed.  What are the issues

4    with respect to bereavement?

5         A.    Personally, I did not have any need --

6    I've had deaths, but I had -- the amount of days, I

7    have subsequently been told that that's been

8    reduced, as far as bereavement is concerned.

9         Q.    That doesn't sound like it's a real

10   critical issue for you?

11        A.    By itself, no.

12        Q.    Okay.  And you've suffered no loss

13   from that?

14        A.    Not that I can recall, no, because

15   I've had two deaths in my family since I came to ZF

16   and I've not suffered because the bereavement, as I

17   understand it to be, was still what it was with

18   Ford.  But if it has been reduced, then -- and I

19   have in-laws and a father that are still living

20   and -- you know, if something were to happen to

21   them, then I would -- I would suffer the impact on

22   that.  And they're all in their eighties.  God

23   hopes they live long, healthy lives.

24        Q.    You also mentioned for me the personal

67

1    time issue.

2          A.    Yes.

3          Q.    Okay.  We talked a little bit about

4    that, but --

5          A.    That was changed from five to three

6    and now it's back to five again.

7          Q.    During that period that it was changed

8    from five to three, did you suffer any loss or have

9    the need for the two days of personal time?

10         A.    Not that I'm aware of, no.

11         Q.    Do you currently know what the

12   personal time allotment is at Ford?

13         A.    No.

14         Q.    Do you know what the current

15   bereavement policy is at Ford?

16         A.    No.

17         Q.    Current overtime policy at Ford with

18   respect to nine hours or otherwise?

19         A.    My understanding is it hasn't changed,

20   but I don't know that to be a fact.  And when I say

21   "hasn't changed," it's -- I mean, it hasn't changed

22   from what it was when I was a Ford employee.  Now,

23   as far as dollar amounts, that may have changed and

24   I'm not aware of that.

```
1          Q.     Okay.  And we've been talking now

2     about a number of issues and I think I've covered

3     kind of the laundry list that you gave me up front.

4               But as we discuss this, is there

5     anything else that comes to mind with respect to

6     either something we've already talked about or an

7     issue that we haven't talked about?

8          A.     Not that I can recall off the top of

9     my head.

10          Q.     Are you satisfied, for example, with

11     the merit increases that you have received at ZF

12     Batavia?

13          A.     I do recall something now that you

14     mention it.  We were told and one of the factors

15     that helped me make my decision was that -- I think

16     the term would be used that we would be on the

17     ground floor for CVT.

18          Q.     Okay.

19          A.     And I have made a couple different

20     attempts to -- one specifically for a CVT position

21     and not had that opportunity.

22          Q.     If I can interrupt for a second.

23     Meaning you applied and were turned down or --

24          A.     I've applied and I've not -- to my
```

69

1    knowledge, I don't know if that position has been

2    filled yet or not, okay?

3         Q.    What position did you apply for?

4         A.    There's a quality engineering position

5    open in CVT.

6         Q.    All right.  And I kind of interrupted

7    you there, but --

8         A.    And there's been minor instances of --

9    of situations where I'm not involved with CVT, but

10    I don't know that that's --

11         Q.    You got to help me out.  I don't

12    understand.

13         A.    Well, case in point.  And this is not

14    part of the lawsuit.  It's just my personal, okay?

15    I requested to work during shutdown because of the

16    vacation time.  I wanted -- I wanted to take that

17    time at a different time.

18              I was told then I couldn't work, but

19    other employees who are -- never been transitional

20    employees got to work part or all of it.  And the

21    reason I was told was it wasn't meaningful work for

22    me.  And I'm a -- part of my job is I'm a test car

23    driver.

24              Well, one of the fellows that worked,

1    a large portion of what he did during that -- that

2    time he worked was drive test cars.

3         Q.    Okay.

4         A.    And it was CVT test cars.  So there

5    was an opportunity there that I could have been

6    more involved with learning about CVT, that I was

7    not given that opportunity.

8         Q.    All right.  Are you one of the guys

9    that put the bungee cord on the hood?

10        A.    (Witness nodded.)

11        Q.    I'll take that as a "yes"?

12        A.    That's correct.

13        Q.    Okay.

14        A.    I hate to --

15        Q.    All right.

16        A.    If you want to talk about that without

17   the stenographer, I'll be glad to talk to you.

18             MR. SIMON:  All right.  I think we're

19   into an area that's not relevant to the lawsuit.

20             THE WITNESS:  Yeah, I'm sorry.

21             MR. HUNTER:  That kills me.  I'm

22   sorry, Mr. Stegmann.

23        Q.    Any other issues, Mr. Stegmann?

24        A.    No.

1          Q.    Okay.  Other than the issues that you

2     raised today, it sounds, then, that you would agree

3     with me that ZF Batavia has lived up to the

4     expectations that you had when you joined the joint

5     venture?

6          A.    No.

7          Q.    Okay.  Well, what other issues are

8     there?

9          A.    Well, I mean, other than those

10    issues --

11         Q.    Okay.

12         A.    -- those issues are the ones that I

13    can recall that they have not, in my opinion, lived

14    up to.

15         Q.    Okay.  With respect to your timecards,

16    we talked about this a little bit ago.  You've

17    indicated that your loss is attributed to overtime

18    compensation.  Can I take from that, then, that you

19    have always received your base salary?

20         A.    Yes.

21         Q.    Okay.  And certainly nobody has ever

22    come up to you and said, Jeez, Mr. Stegmann, we've

23    got an issue with your salary time statements and

24    the card readers and we're going to deduct

1    something from your paycheck?

2         A.    The only thing that happened was there

3    was one day that I apparently took more than was

4    allotted for personal time.  And they brought it to

5    my attention, which I did not realize it happened.

6    They said, do you want to take -- I forget.

7    Vacation day or a dock in pay and I said go ahead

8    and dock me.

9         Q.    Okay.

10        A.    I'm only mentioning that -- it's not

11   an issue for me, but I'm mentioning it because of

12   your question, I mean.  But as far as docked for --

13   are you asking whether I've been docked because of

14   my card reader?

15        Q.    Yeah.

16        A.    No, never.

17        Q.    And certainly never been approached

18   about that or anything like that?

19        A.    Only that I was instructed that I

20   must, of course, ring in to get through the gate

21   and I must ring out when I go out.

22        Q.    Okay.

23        A.    And that was explained because it was

24   the free -- I forget the exact term, effectively

1   free trade zone that we're in and that's the

2   reason, although I don't understand why we as

3   salary have to do that and the hourly don't, but --

4       Q.   I've heard that issue.

5       A.   I'm abiding by those -- those

6   requirements simply because it's no big issue to

7   ring out when you go out the gate.

8       Q.   Okay.  Are you aware of anyone that

9   has ever had their ring reports or card reports

10  compared against their salaried time statement and

11  been challenged on those things?

12      A.   I'm personally not aware of anyone

13  that I know that has had that done.

14      Q.   I gather when you say "personally,"

15  where you may have heard something otherwise?

16      A.   I've heard talk that that's happened,

17  but I -- again, to use the legal -- I guess the

18  legal term, that's hearsay, you know, and I don't

19  know that to be a fact.

20      Q.   Okay.  What have you heard?

21      A.   I heard that there was at least one

22  instance where somebody -- they monitored his time

23  statement versus his ring in, ring out and he was

24  docked time.  And I don't even know how much he was

74

1    docked.

2        Q.    Do you remember the guy's name -- the

3    gentleman's name?

4        A.    No, just floor rumor, so to speak.

5            MR. HUNTER:  I think at this point, I

6    can turn this over to Mr. VanWay.

7            MR. VANWAY:  Take a quick break.

8        (Off the record:  9:45 a.m. - 10:14 a.m.)

9                    EXAMINATION

10    BY MR. VANWAY:

11        Q.    Mr. Stegmann, I know we met earlier

12    this morning.  My name's Jeff VanWay.  I represent

13    Ford in this case.  We've got a few questions for

14    you this morning.  And I'll try not to repeat the

15    questions Mr. Hunter has asked and try and move

16    through this as quickly as we can.

17            The entire time you were with Ford,

18    you were a salaried employee, right?

19        A.    That is correct.

20        Q.    Never in the UAW?

21        A.    That is also correct.

22        Q.    As a salaried employee with Ford, you

23    didn't have any sort of employment contract with

24    the company, did you?

1         A.    None that I can recall.

2         Q.    Okay.  You didn't have --

3         A.    I mean, I don't -- when you go back to

4    '76, we're talking quite a few years ago.  So if

5    there was one, I'm not aware of it.

6         Q.    Okay.  But you don't remember there

7    being any specific agreement that set forth what

8    your salary was going to be, for example?

9         A.    I don't recall.  I honestly can't say.

10         Q.    As you understood it, the company had

11    the discretion to change your salary according

12    to -- as they saw fit; is that a fair

13    characterization?

14         A.    It always went up, but I don't ever

15    recall anything saying that they could or would

16    lower it.  I don't know.

17         Q.    Okay.  And with regard to your

18    benefits while you were with Ford, those changed

19    from time to time, didn't they?

20         A.    Yes.

21         Q.    You didn't have any sort of agreement

22    with Ford that said they couldn't change your

23    benefits?

24         A.    By "benefits," explain what you -- I

1    guess when I said "yes," to that, when you said

2    "benefits," I assume you're referring to medical,

3    dental, those kind of benefits or are you referring

4    to other type of benefits?

5        Q.    Well, that's a fair point.  Why don't

6    we get an understanding as to what "benefits" means

7    to you?

8        A.    Yes.

9        Q.    What's "benefits" mean to you, sir?

10       A.    Benefits, to me, would be things like

11   eyeglass coverage -- and I'm referring to now while

12   I was at Ford --

13       Q.    Right.

14       A.    -- okay?  Eyeglass coverage, medical,

15   dental, under the medical, long and short term

16   health care, my retirement.  Those were, to me, and

17   I'm -- I don't mean that to be all encompassing,

18   but those are the things that come to mind --

19       Q.    Okay.

20       A.    -- first and foremost.  And those

21   things --

22       Q.    Was it your understanding that those

23   things were subject to change while you were with

24   Ford?

77

1        A.    Yes.

2        Q.    Okay.  What about things such as

3   profit sharing, is that -- you didn't mention

4   profit sharing, did you?

5        A.    That --

6        Q.    Is that a benefit as well?

7        A.    I -- I don't know if you could

8   consider it a -- I guess a benefit.  Depends upon

9   the term you want to use, but what is your

10  question?

11       Q.    Well, you received profit sharing

12  while you were with Ford, right?

13       A.    Yes.

14       Q.    And you didn't receive it every year,

15  though, did you?  Weren't there some years where

16  Ford didn't pay any profit sharing at all?

17       A.    I don't recall.  That may be true.  I

18  just don't recall.

19       Q.    Was it your understanding that the

20  company was obligated to pay you profit sharing

21  every year?

22       A.    No.

23       Q.    And that was up to the company's

24  discretion as to whether they paid profit sharing

78

1    or not, correct?

2         A.    Yes.

3         Q.    Okay.

4         A.    I believe the -- there was a

5    contractual thing with the UAW regarding profit

6    sharing, though.

7         Q.    Okay.

8         A.    And we would receive comparable to

9    whatever the UAW received.

10        Q.    But they had a contract and you didn't

11   with regard to profit sharing?

12        A.    Yes.  That was mentioned in their --

13   their agreement, their contractual agreement, yes.

14        Q.    You didn't mention vacation as a

15   benefit.  You received vacation time while you were

16   with Ford, didn't you?

17        A.    Yes.

18        Q.    And was it your understanding that

19   that was subject to change if the company, for

20   example, put in a new vacation policy, then your

21   vacation would change, wouldn't it?

22        A.    I just don't have -- I never thought

23   about that.  I'm not going to say either way.  I

24   just never thought about it.  It always increased.

```
 1    It never changed during the 23 and a half years I

 2    was there, as far as vacation.

 3            Sometimes we'd get additional days

 4    because of things that happened with the UAW and

 5    whatnot.  But as far as vacation, that -- that

 6    program, to my recollection, never changed.

 7            Q.    Now, you were with Ford a long time,

 8    all the way back to '76?

 9            A.    That's correct.

10            Q.    While you were with Ford, do you ever

11    remember there being a time where Ford canceled

12    some vacation days around, say, 1981, 1982 time

13    frame?  Do you recall that happening?

14            A.    No.

15            Q.    My understanding is that around that

16    time frame, '81, '82, the company was doing some

17    financial cutbacks and one of the things they did

18    was towards the end of the year, they canceled a

19    number of vacation days.  You don't remember that?

20            A.    I don't ever recall that happening.

21            Q.    Okay.  Overtime.  You received

22    overtime pay when you were with Ford?

23            A.    That's correct.

24            Q.    Did the company's overtime policy ever
```

 1    change while you were with Ford that you can

 2    recall?

 3         A.    Not that I can recall, never.

 4         Q.    Did the over --

 5         A.    The --

 6         Q.    Go ahead.

 7         A.    It changed from the standpoint that

 8    once I reached a certain amount, then I worked off

 9    of a flat rate versus time and a half and/or double

10    time, but -- but that's -- I mean, that wasn't a

11    change.  It just -- as I grew into that because of

12    my base pay.

13         Q.    Was there a time when the company

14    stopped paying overtime?

15         A.    Not that I'm aware of --

16         Q.    Go ahead.

17         A.    -- for authorized overtime.  In other

18    words, if I put in -- if I was to have put in

19    casual, then I didn't get paid for it, period,

20    okay?  But if they expected me to work and

21    scheduled me to work, then I always got paid, that

22    I can recall.

23         Q.    With regard to casual overtime, I know

24    you listed all the different jobs you held with

1    Ford, which were quite -- quite a few.  Some of

2    those jobs were production supervisor jobs, as I

3    recall.

4              As a production supervisor, weren't

5    you required to get to the plant a certain amount

6    of time before the actual start of your shift?

7         A.    Not required, no.  I did, but I was

8    not required.

9         Q.    Your boss never told you you've got to

10   be here 15 minutes beforehand to do a hand off or

11   to get the lineup or anything like that?

12        A.    No.  I did that, but I was never

13   informed that that was expected of me.

14        Q.    Okay.  Mr. Stegmann, you've got in

15   front of you what has been marked as Exhibit 128.

16   And it appears actually that there may be a couple

17   of different documents that were copied on one.  I

18   want to focus on the bottom part here where it says

19   "Employment Agreement" and then there are several

20   paragraphs under that.  And there appears to be

21   your signature?

22        A.    Mm-hmm.

23        Q.    Is that, in fact, your signature that

24   appears on the bottom left?

1          A.     Certainly appears to be, yes.

2          Q.     And I'll submit to you, Mr. Stegmann,

3     this is a document that was produced in this case

4     by Ford as a part of your salaried personnel file

5     from the time you worked with Ford.  Do you

6     remember signing this document while you worked at

7     Ford?

8          A.     No, I don't.

9          Q.     Okay.  Do you have any reason to

10     dispute that this is a document that you indeed did

11     sign while you worked for Ford?

12          A.     No.

13          Q.     Okay.

14          A.     Now, if there is --

15               MR. SIMON:  He's done with that

16     document.

17          A.     Okay.  If there's -- if this is -- in

18     other words, I signed this pursuant to this.

19          Q.     You're referring to the "Employment

20     Agreement" part?

21          A.     Whether in fact -- whether in fact

22     this is additional pages that were combined into

23     one, then I -- I can't say, you know.  You know

24     what I'm trying to say, in other words?

1        Q.    No, I understand.  Let me just make

2    sure that's clear on the record.  The part that

3    says "Employment Agreement," you definitely signed

4    that part?

5        A.    That is -- appears to be my signature,

6    yes.

7        Q.    Okay.  Great.  Now, Mr. Stegmann, I'll

8    have to apologize because I've sat through a number

9    of these depositions here of late and I may have

10   got some stuff confused.

11        But I want to go back to your

12   testimony about the meeting that you had that was

13   just for the folks in quality --

14        A.    Mm-hmm.

15        Q.    -- where you said Mike Warden was

16   present.

17        A.    Yes, sir.

18        Q.    And that was after the May 27th

19   meeting or it was before?

20        A.    As best I can recall, it was after.

21        Q.    Okay.  So it was between the May 27th

22   meeting and the time that you accepted employment

23   with ZF Batavia?

24        A.    That is correct.

1          Q.      And during that meeting, Mr. Warden

2     said that if you wanted to stay at Batavia as a

3     Ford employee, you could did that as long as you

4     wanted to?

5          A.      That is also correct.  Specifically --

6     and I'll repeat what I had said.  I asked the

7     question, if I was a 28-year-old man who had hired

8     in two weeks ago and I wanted to stay at Z -- at

9     Batavia, at that facility as a Ford employee until

10    the day I was eligible to retire, would I be able

11    to do that and he said yes.

12         Q.      I take it, then, that you didn't want

13    to stay at Batavia as a Ford employee?

14         A.      At that point in time, I had not made

15    a decision either way as to what I wanted to do, if

16    I understand --

17         Q.      Well, you eventually accepted

18    employment to stay at Batavia, but as a ZF Batavia

19    employee, not a Ford employee, correct?

20         A.      That's correct.

21         Q.      Were you ever made -- other than this

22    conversation with Mr. Warden, were you ever made an

23    offer to continue working at the Batavia plant as a

24    Ford employee?

1        A.     Other than this particular

2   conversation, no.

3        Q.     Why did you decide to leave Ford and

4   go to ZF Batavia?

5        A.     Because of the opportunity that I felt

6   like I explained in my previous testimony, the

7   opportunity of the CVT.  I felt that this could be

8   a move into the future and I felt there was a good

9   opportunity there and potentially an opportunity

10  for advancement.

11       Q.     If you had stayed at Batavia as a Ford

12  employee, would you still have had an opportunity

13  to work CVT?

14       A.     I don't know 'cause that question, I

15  didn't pose.  And other than that, that one

16  specific conversation, I don't know.

17       Q.     Okay.

18       A.     I can say this.  We still have Ford

19  employees at Batavia.

20       Q.     Salaried employees?

21       A.     Yes, sir.

22       Q.     And are those engineers?

23       A.     One works in maintenance; one's an

24  engineer and one is -- I don't know the exact term.

1       I think it's referred to as a business operations

2       manager.  Rob Kurtz is his name.  This is my

3       understanding these are Ford employees.  Mike

4       Conners, he's in maintenance.  George Barry, he's

5       an engineer.

6            Q.    But you decided that the opportunity

7       with -- to be a ZF Batavia employee was better than

8       the opportunity to stay as a Ford employee?

9            A.    If I had had the opportunity

10      potentially to stay as a Ford employee, I may or

11      may not have made that decision.  I don't know.  I

12      can't say for certain.

13           Q.    I'm getting confused.

14           A.    I was not given a choice.

15      Subsequently I was told that we either had to

16      switch to ZF or relocate to a different Ford

17      facility.

18           Q.    Okay.

19           A.    We could not stay there.

20           Q.    That's the piece I'm missing, then,

21      when you were told that.  It was obviously --

22           A.    After --

23           Q.    -- sometime after this meeting.

24           A.    After that meeting, but before I

1    signed my acceptance of the offer.  And I can't

2    give you an exact date because I just don't

3    remember.

4         Q.    Okay.  Do you remember who told you

5    that?

6         A.    No, I don't.

7         Q.    Was it Mr. Warden, again, do you know?

8         A.    I honestly don't remember.

9         Q.    Was it in writing or was it verbal?

10        A.    Verbal.

11        Q.    Was it in a one-on-one meeting?

12        A.    I want to say not, but I can't swear

13   to that.  I don't know.  I just don't remember.

14        Q.    Did you explore any opportunities at

15   other Ford locations?

16        A.    I was not -- I was instructed that I

17   was not allowed to do that.

18        Q.    And who instructed you as to that?

19        A.    Again, this came out of human

20   resources, but I can't remember who.  I think

21   Mr. Warden and we were told specifically that --

22   for instance, if I knew someone at Sharonville

23   where there might be a position open, I could not

24   directly contact him.

88

```
 1              I had to go through -- tell human
 2     resources what positions I would be interested in
 3     and they were -- would pursue within Ford Motor
 4     Company to find out and help me fill that position,
 5     if, in fact, I wanted to stay with Ford.  That's
 6     the way it was presented to us.
 7         Q.    I understand.  And did you do that?
 8     Did you contact human resources about other Ford --
 9         A.    No --
10         Q.    -- positions?
11         A.    -- I did not.
12         Q.    And why is that?
13         A.    Well --
14         Q.    Again, back to because you thought the
15     ZF Batavia opportunity was a better opportunity?
16         A.    It was the opportunity that I wanted
17     to take and I thought there was a potential --
18     greater potential for my growth --
19         Q.    Okay.
20         A.    -- by staying there.
21         Q.    Now, I believe you testified that
22     after the May 27th meeting, you still wanted to see
23     the package, you still wanted to see things in
24     writing?
```

1          A.     That's correct.

2          Q.     Within a day or two, though, you got

3     things in writing, right?  You got a copy of

4     Exhibit 4?

5          A.     It was the same thing as what was

6     presented at that -- at that meeting on May 27th.

7     It's a -- it's a -- basically they took the -- as I

8     understand it, they -- and, again, this is speaking

9     with Cindy Kries, who's the one who put on the

10    slide presentations.  They made copies of the

11    slides and that's what we received.  And that's

12    what Exhibit 4 is.

13         Q.     Correct.  And did you want something

14    more in writing, something additional than Exhibit

15    4?

16         A.     I wanted to see what was being offered

17    to me specifically.  In other words, I couldn't

18    make a decision based upon this package 'cause I

19    didn't know what exactly my wages were going to be

20    or anything else.  So I just used wages as one

21    example.

22         Q.     Sure.

23         A.     So I wanted to see that formal offer

24    in writing.

1          Q.     You knew generally, didn't you, that

2     your salary was going to be about the same as it

3     had been while you were at Ford?

4          A.     This is a very minor point, but in

5     reality when I first received my offer, my wages

6     went down $5 a year.  I mentioned it to Mr. Everett

7     and they corrected that error.  But the point I'm

8     making is -- in other words, it actually did drop

9     $5 a year.

10          Q.     But that got corrected?

11          A.     Yes, sir.

12          Q.     Okay.  You mentioned that one of the

13     things that was critical to your decision was

14     holidays.  I didn't -- I didn't see anything in

15     Exhibit 4 that said anything about holidays.

16              Where did you get your information?

17     Was it from Exhibit 2 as to what holidays were

18     going to be?

19          A.     Yes.

20          Q.     Okay.  And Exhibit 2, the only thing

21     it says about holidays is that they'll be

22     consistent with ZF Batavia hourly employees.

23              Now, at the time you accepted your

24     employment in June of '99, were there any ZF

1    Batavia hourly employees at that point?

2         A.    No.

3         Q.    So did you know what that meant?  Did

4    you know what the paid holidays for the ZF Batavia

5    hourly employees --

6         A.    Since that's a --

7         Q.    -- were going to be?

8         A.    Since that's a contractual item, no, I

9    did not.

10        Q.    Okay.  And I take it, then, you

11   understood that it was going to be whatever they

12   negotiated?

13        A.    Whatever the contract stated, then,

14   yes, that's what it would be.

15        Q.    And I take also you knew then that

16   that would be subject to change if there were

17   changes made in the contract that was negotiated by

18   these hourly employees?

19        A.    Yes.

20              MR. SIMON:  Objection.  Objection.

21   Calls for a legal conclusion.

22        Q.    Now, with regard to overtime, I

23   believe your testimony was that you got the

24   impression that it would be paid as it had been at

92

1    Ford.  Did someone specifically say that to you?

2         A.    I honestly don't recall.

3         Q.    Was --

4         A.    I don't recall it being spoken to me.

5         Q.    Okay.  Was there something in Exhibit

6    4 that you relied on for that assumption?

7         A.    Again, I -- I don't recall.

8         Q.    Well, if you look in Exhibit 4, the

9    only page I see that addresses overtime is Bates

10   stamped page 6.

11        A.    Yes.

12        Q.    And is that page 6 what you relied on

13   for your assumption that it was going to be paid

14   like it had been at Ford?

15        A.    That was part of it.  The other part

16   was -- is that, again, they didn't -- it wasn't as

17   specific, but that it was the benefits are the

18   same.  The -- and I don't mean the benefits under

19   the context of what we described earlier.  I mean

20   that -- you know, the wages are going to be

21   comparable; overtime is going to be comparable.

22   And this did reiterate that at that point in time.

23        Q.    And who is it that said overtime was

24   going to be comparable?

1          A.     I don't remember.  I honestly don't

2     remember.

3          Q.     Was it someone at this May 27th

4     meeting?

5          A.     Yes.

6          Q.     And did that person specifically talk

7     about overtime?

8          A.     Well, it's shown here as one of the

9     slides that was put up on the screen.

10          Q.     Right.  I mean, do you remember them

11     discussing anything other than what's shown on this

12     slide, page 6 of Exhibit 4?

13          A.     Other than the fact that it was

14     comparable to what Ford had at the time.

15          Q.     Okay.  At the time?

16          A.     Yes.

17          Q.     Were there any other discussions about

18     overtime at that meeting that you can recall?

19          A.     Not that I can recall.

20          Q.     Since ZF Batavia put the nine-hour

21     rule in effect, have you every day worked nine

22     hours?

23          A.     Excuse me.  Except in circumstances

24     where I was -- because of doctor's appointments or

1   things such as that, yes, I have.  I've tried to

2   schedule my doctor's appointments around that, but

3   sometimes that's not possible.  And so, depending

4   upon the circumstances, I work less than nine.

5        Q.    And, again, other than if it's a

6   doctor's appointment, are there any other

7   circumstances where you wouldn't work the full nine

8   hours?

9        A.    Not that I'm aware of, no.

10        Q.    When you have a doctor's appointment,

11   is that something you have to clear through your

12   supervisor?

13        A.    Make him aware that I -- I have a

14   doctor's appointment or I have a reason that I'm

15   not going to be working the nine hours, yes.

16        Q.    And how's that, the time that you miss

17   for a doctor's appointment, how is that accounted

18   for?  Is it deducted from your sick days?

19        A.    Well, it depends on the -- depends on

20   the circumstances.  If I had worked eight hours

21   instead of the ninth hour, then there's no

22   deduction and it just reflects eight hours.

23             If I, for instance, was to work six

24   hours, then I would document the starting time,

95

1    document the quitting time and show two hours as

2    personal business -- you know, illness, whatever

3    the case may be.

4         Q.    And would those two hours, then, be

5    deducted from your personal or sick day allotment,

6    if you know?

7         A.    I don't know.  I honestly don't know.

8         Q.    On those occasions, then, where you've

9    already worked eight hours, I think you said

10   there's no deduction made?

11        A.    That's correct.

12        Q.    Have you ever been disciplined or

13   reprimanded or anything like that for not working

14   the full nine hours?

15        A.    In writing, no; verbally, yes.

16        Q.    Tell me -- tell me about that.

17        A.    I have been told specifically that if

18   there's certain events that take place associated

19   with quality, that I've left too early.

20        Q.    Your boss has told you that?

21        A.    Yes.

22        Q.    Is that on occasions where you left

23   for a doctor's appointment?

24        A.    Sometimes, yes.  And that's --

1    sometimes I've left after nine hours and had to go

2    to a doctor's appointment because I scheduled it in

3    advance and scheduled it around that nine-hour

4    schedule.  And then comes time, something happens

5    towards the end of the day and -- because somebody

6    else, per se -- you know, I alerted people.  I let

7    them know what was going on, but because I didn't

8    stay and oversee all of that, then I got verbally

9    reprimanded.

10        Q.   By "verbally reprimanded," what do you

11    mean?  You were told that next time you need to

12    be --

13        A.   You shouldn't be leaving if you still

14    got -- if there's still things hanging.

15        Q.   Okay.  Didn't affect your pay in any

16    way?

17        A.   No, no, not directly.  Whether it

18    might have as far as any merit increases, I can't

19    say.

20        Q.   Well, has anyone told you that it

21    affected your merit increase?

22        A.   Merit increases are affected by your

23    performance review and performance reviews can be

24    affected by that.

1          Q.    I understand that they can be, but I'm

2    asking, were you ever told that, in fact, it did

3    affect your performance review --

4          A.    I don't recall.

5          Q.    -- affect your merit?

6          A.    I don't recall.

7          Q.    Okay.  Now, and this nine-hour rule, I

8    take it, is something that didn't exist at Ford?

9          A.    That is correct.

10          Q.    Had you known prior to the time that

11    you accepted employment with ZF Batavia, had you

12    known that there was going to be this nine-hour

13    rule put into effect, would you still have accepted

14    the job with ZF Batavia?

15          A.    I don't know that I can safely say --

16    and I don't know that that's necessarily -- I don't

17    mean to be confrontive or anything, but I don't

18    know that that's the point because I accepted it

19    based upon what I knew it to be.

20          Q.    No, I understand that.  I'm just

21    asking, to the extent that you know, was that a

22    critical part of your decision making?  In other

23    words --

24          A.    It was one of them.  It was not all of

```
 1    it.  And I don't -- I can't tell you what
 2    percentage 'cause I just haven't thought about what
 3    percentage that is.  But it did -- it did -- it was
 4    a factor.  The fact that there was -- I was going
 5    to get paid overtime.  My understanding was that
 6    that was what was going to happen.
 7            Q.    When you were with Ford, did you
 8    typically work more than eight hours?
 9            A.    Sometimes.  It depends on the
10    position.
11            Q.    Well -- right.
12            A.    You can see the number of positions I
13    was in.
14            Q.    Let's focus on the last year you were
15    with Ford, 1999.
16            A.    Yes.
17            Q.    Did you work overtime that year?
18            A.    As I can recall, yes.  But I can't --
19    again, I'd have to look at my records to be a
20    hundred percent sure.
21            Q.    Sure.  I understand that.
22            A.    But if you were to say in the past,
23    last two or three years within Ford, I think I can
24    unequivocally state there, yes, I did.
```

99

1          Q.    Do you have a sense for comparing the

2    amount of overtime you've worked since you've been

3    with ZF Batavia to the amount of overtime that you

4    worked, say, that last year you were with Ford,

5    have you worked more overtime with ZF Batavia or

6    less?

7          A.    I -- I honestly can't give you a true

8    answer.  I'd have to look at my records to say for

9    sure.

10         Q.    I mean, do you have a general sense,

11   are your days longer now than they used to be that

12   last year, 1999?

13         A.    Yes, especially with the nine-hour

14   rule because a lot of my overtime was more

15   sporadic.  It wasn't something that -- you know,

16   right now I am in more of an overtime situation.

17   When I say "right now," I mean since the past two

18   weeks, effectively.  But normally I was not always

19   in a nine-hour schedule.

20              I -- I personally would rather not

21   work overtime.  I personally would rather put in my

22   eight hours, do my job and do a job to the best of

23   my ability to where I can get my job done in eight

24   hours so I don't have to work overtime.  I got five

1    grandbabies.  I want to spend time with them.

2         Q.    I understand.  With respect to your

3    compensation, since the time you left Ford, it's

4    gone up every year at ZF Batavia, hasn't it?  Your

5    salary has gone up every year, hasn't it?

6         A.    I can't swear to that.  There may have

7    been one year where it didn't.

8         Q.    Today you make more than you did back

9    in 1999?

10        A.    That is correct.

11        Q.    The bereavement leave policy, what you

12   understood about bereavement leave when you

13   accepted employment with ZF Batavia, was that a

14   critical part of your decision making?

15        A.    Define "critical."

16        Q.    Well, it's a word you've used earlier.

17        A.    If it didn't -- if it -- if they had

18   said instead of five, you get three, is that what

19   you're saying to me?

20        Q.    That's a fine example of what you

21   said.

22        A.    Would I have turned the job down?

23        Q.    Yes, sir.

24        A.    No --

1          Q.    Okay.

2          A.    -- not for that purpose alone --

3          Q.    Okay.

4          A.    -- no.

5          Q.    What about with respect to personal

6    days, if they had told you with respect to personal

7    days that instead of five, you're only going to get

8    three for one year and then it --

9          A.    If they had said that --

10         Q.    -- went back to five?

11         A.    If they had said that, that by itself,

12   no.

13         Q.    Okay.

14         A.    But the point is, that's not what was

15   communicated.

16         Q.    I understand that.  I understand.

17   Now, is it your claim in this case, Mr. Stegmann,

18   that your benefits are required to always keep pace

19   with whatever Ford might do from this day forward?

20   Is that what your claim is, or is it that your

21   benefits are supposed to be what they were back in

22   1999?

23         A.    I don't know if I understand exactly

24   your question there.

1        Q.    Okay.  Well, let me try.

2        A.    Can you put it a little different way?

3        Q.    Sure, absolutely.  You have said that

4    your assumption was that things were going to be

5    essentially comparable to like they had been at

6    Ford when you made the change over to ZF Batavia.

7    Is that a fair paraphrase?

8        A.    Yes.

9        Q.    Okay.  I'm not sure what you mean by

10   that.  Do you mean that as of what things were like

11   in 1999, that's what they were going to be like

12   when you started over at ZF Batavia?  Is that what

13   your assumption was?

14       A.    Yes.

15       Q.    Okay.  Did you have any assumption as

16   to what things would be like down the road at ZF

17   Batavia, three years out, five years out, et

18   cetera?

19       A.    Specifically -- specifically when you

20   were referring to -- what are you referring to?

21       Q.    Benefits.  We'll start with benefits.

22   Did you have any understanding as to what the

23   benefits were going to be three years down the

24   road?

1        A.    Medical, dental, is that what you're

2    referring to when you say "benefits"?

3        Q.    Well --

4        A.    That's what we had originally

5    determined benefits to be.

6        Q.    That's -- that's what you had said

7    benefits --

8        A.    Yeah.

9        Q.    Let me focus it this way.  In terms of

10    the -- all the things listed on Exhibit 2, did you

11    have any -- what was your assumption, if you had

12    one, as to what those things would be like three

13    years down the road?

14        A.    My assumption would be that my salary

15    would go up, just because of merit increases and

16    whatnot, that I would continue to be paid overtime

17    for any authorized overtime.  And when I say

18    authorized, I mean where the company is requiring

19    me to be there, okay?

20        Q.    No, I understand.

21        A.    That -- I mean, some things could

22    change.

23        Q.    What did you believe could change?

24        A.    The medical part possibly could change

1    because of health care benefits.

2         Q.    Anything else that you believed could

3    change?

4         A.    No, except like we talked about with

5    the holidays.  We had mentioned -- you know, that

6    was a contractual thing, based upon the contract

7    with -- with the hourly people.

8         Q.    So you believed, then, that other than

9    the medical and holidays, everything else would be

10   exactly the same as it was when you made the

11   transition?

12        A.    You mean exactly today or exactly when

13   I made the transition?

14        Q.    Well --

15        A.    You mean it would never change?  Is

16   that what you're saying?

17        Q.    Let me back it up.  When you made the

18   transition, your understanding was it would be

19   exactly the same as it was when you left Ford,

20   correct?

21        A.    Yes.

22        Q.    Okay.  Did you have an understanding,

23   then, as to what it would be like three years down

24   the road?

 1          A.    No.

 2          Q.    Did you believe that it could change?

 3          A.    The medical, I believed could change.

 4          Q.    But other than that, you didn't

 5    believe anything else could change?

 6          A.    No.

 7          Q.    And on what did you base that belief

 8    that nothing else could change?

 9          A.    Based on what I had read, that I felt

10    this contract was stating.

11          Q.    Okay.  Based on the parts of Exhibit 2

12    that you read?

13          A.    Yes, except like I said previously

14    those holidays.

15          Q.    No, I understand.  And I've read

16    Exhibit 2 a number of --

17          A.    I don't want to say one thing now and

18    a different thing --

19          Q.    I understand.

20          A.    I want to make sure I'm saying the

21    same thing.

22          Q.    I understand and I appreciate that.

23    I've read Exhibit 2 a number of times.  Is there

24    anything that you recall in Exhibit 2 that said

1    things other than medical and holidays could not

2    change?  Is there something in Exhibit 2 that you

3    read that caused you to believe that all those

4    other things could not change?

5           MR. SIMON:  Objection.  The document

6    speaks for itself.  You can answer.

7           A.    I want to say no, but there's a caveat

8    that goes with that.  This was presented to me with

9    the written offer to me.  Those are two -- one and

10   the same documents.  This was a -- to me, was a --

11   to me, my perception, this was a contract,

12   therefore, except for the two items I mentioned

13   when I perused it, when I read it, I didn't feel

14   that anything else would change --

15          Q.    Okay.  And as you look --

16          A.    -- because I viewed this as a

17   contract.

18          Q.    I understand.  As you look at Exhibit

19   126, then, which is your offer letter --

20          A.    This one here?

21          Q.    Yes, sir.  You just referenced that in

22   kind of referring to Exhibit 2 and Exhibit 126

23   together.  Was there anything in Exhibit 126 that

24   you read that caused you to believe things could

 1    not change, again, other than the medical or the

 2    holidays?

 3         A.    No.

 4         Q.    Okay.  With respect to the CVT -- and

 5    you testified about your belief that there were

 6    going to be opportunities in CVT.  Did anyone ever

 7    communicate to you that you would get a specific

 8    opportunity in CVT?  In other words, did they

 9    promise you a certain job in CVT?

10         A.    No.

11         Q.    Did they ever tell you when it was

12    that you'd get an opportunity in CVT?

13         A.    No.

14         Q.    Give you a specific date?

15         A.    No.

16         Q.    It was just your understanding that

17    sometime in the future, you'd get an opportunity in

18    CVT?

19         A.    Yes.

20         Q.    And so far, that has yet to happen?

21         A.    That is correct.

22         Q.    Okay.  Now, with respect to the

23    different promises that you testified about earlier

24    that you believe ZF Batavia has not kept, is it

1    also your belief that Ford is somehow responsible

2    for those changes in AIP, overtime, bereavement,

3    personal and sick time?

4            A.    They have a partial ownership in it,

5    in my -- my opinion.  Ford has a 49 percent

6    interest in the company.  There is -- from what

7    I've been told, there's at least two members of

8    Ford that sit on the board of directors.

9                  And I believe some of the changes that

10   have taken place that myself and my -- other people

11   that are part of this lawsuit, some of these

12   changes were reviewed by the board of directors,

13   from my understanding and plus there's been times

14   where there's been mention of Ford helping with

15   financial help for the plant.   So I feel Ford has a

16   very active involvement still at Batavia.

17           Q.    Okay.  Let's break that up a little

18   bit.  First, with respect to the board of

19   directors, of the four changes that you've

20   testified about, AIP, overtime, bereavement,

21   personal and sick time, do you have any specific

22   knowledge as to any of those four being reviewed by

23   the board of directors?

24           A.    Not specific, no.

1     Q.    Other than what you've testified about

2   with regard to the board of directors, do you have

3   any knowledge that Ford was involved in the change

4   of the AIP?

5     A.    No, I have no specific knowledge.

6     Q.    Any specific knowledge that Ford was

7   involved in the -- in putting the -- strike that.

8           Any knowledge that Ford was involved

9   in the overtime policy change, the nine-hour rule?

10    A.    I have no specific knowledge.

11    Q.    Any specific knowledge that Ford was

12  involved in the change in the bereavement leave

13  policy?

14    A.    I have specific knowledge.

15    Q.    Any knowledge that Ford was involved

16  in the change in the personal and sick leave

17  policy?

18    A.    I have no specific knowledge.

19    Q.    Now, you also said that you had some

20  understanding that Ford has, at times, helped the

21  plant financially.  Tell me what you mean by that.

22    A.    Well, we've -- I've heard -- again,

23  this is hearsay, that as of the end of February,

24  the allotment for overtime for CVT was exceeded

1    already for the entire year and that Ford is

2    helping from a financial standpoint.  I don't

3    necessarily mean specifically overtime, but I'm

4    just saying there's other aspects that I have heard

5    that we are exceeding costs in the CVT area, the

6    budgeted costs that were planned for and that Ford

7    is helping to offset that.

8            Part of the reason I feel -- I put

9    some value in that is I was told up front -- and,

10   again, I can't give you specifics, but that ZF, the

11   parent company that has the 51 percent ownership,

12   extended way out financially to be able to -- to

13   buy the 51 percent of that -- that facility.

14           Again, I have no specific people to

15   tell you that told me that.  I don't remember, but

16   they did, in fact, extend way out.  Now, if you put

17   that and the fact that we're running over budget,

18   somebody's got to make up the difference.

19       Q.    And it's your understanding that Ford

20   made up some of that difference?

21       A.    That's correct.

22       Q.    And you base that on sort of plant

23   hearsay?

24       A.    Yes.

1      Q.    Okay.  And have you had any specific

2  conversations with Ford managers about that?

3      A.    No.

4      Q.    Or ZF managers about --

5      A.    No.

6      Q.    Other than that testimony that you

7  just gave about Ford's potential financial

8  involvement and the fact that Ford has a 49 percent

9  share and has representatives on the board of

10 directors, do you believe that Ford is in any other

11 way involved in any of these changes that you've

12 testified about?

13     A.    No, but adding to the financial

14 aspect --

15     Q.    Yes.

16     A.    -- of it, the hourly employees are

17 still, to my understanding, receive their paychecks

18 from Ford Motor Company and they work overtime.

19 So, therefore, somebody has to be paying that bill.

20          Now, I can't say how that's being

21 done.  I'm just saying you put all these little

22 factors together and that's what causes me to

23 believe not only does Ford have a financial aspect

24 into it, into the business.  But if I was in

1    business for myself and I was forking out money, I

2    want to have some say-so in what's going on.

3        Q.    That's how you would run it if you

4    were running it?

5        A.    Yep.

6        Q.    I understand.  Okay.  Have you ever

7    made any complaints to Ford about the things that

8    are at issue in this lawsuit?

9        A.    Personally?

10       Q.    Yes, sir.

11       A.    No.

12       Q.    You say "personally."  Is there

13   someone that you know has made complaints to Ford

14   about this, other than --

15       A.    Other than --

16       Q.    -- by filing the lawsuit?

17       A.    Other than the lawsuit, no.

18       Q.    Okay.  With regard to the transition

19   bonus -- well, strike that.  I think you addressed

20   that.

21           You know an employee by the name of

22   Eddie Adams out at Batavia?  My understanding is he

23   is a UAW committeeman or --

24       A.    Yes, yes, yes.

1          Q.    Have you had any conversations with

2     Mr. Adams about this lawsuit?

3          A.    No.

4          Q.    Or about any of the changes that are

5     at issue in this lawsuit?

6          A.    No.

7          Q.    Any conversations with Mr. Adams about

8     Ford's involvement or lack of involvement in the

9     Batavia plant?

10         A.    No.

11         Q.    Mr. Adams has been listed in this case

12    by your lawyers as a potential witness for the

13    plaintiffs.  Do you have any knowledge as to why

14    Mr. Adams might be a witness in this case?

15         A.    No.

16         Q.    You've testified for quite some time

17    this morning, Mr. Stegmann.  I appreciate that.

18    Other than what you've testified as to this

19    morning, do you have any other facts that you

20    believe support the claims you're making in this

21    case?

22         A.    Not that I can think of at this time,

23    no.

24              MR. VANWAY:  Okay.  I don't think I

1    have any further questions, Mr. Stegmann.  Thank

2    you, sir.

3                    MR. HUNTER:  I have nothing further.

4                    MR. SIMON:  Off the record.

5                    (Deposition concluded at 10:54 a.m.)

6

7

8

                          _____
9                            Edward L. Stegmann

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO          :

 4                           :   SS

 5    COUNTY OF HAMILTON     :

 6

 7          I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named EDWARD

11    L. STEGMANN was by me first duly sworn to testify

12    the truth, the whole truth, and nothing but the

13    truth; that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the 27th day of October 2003 was

17    submitted to counsel for deponent's signature.

18          I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

116

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3            IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    27th day of October 2003.

6

7

8
              Susan M. Barhorst, Notary Public
9             in and for the State of Ohio.
              My commission expires
10            February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24