1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF OHIO

 3               WESTERN DIVISION, CINCINNATI

 4
      EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
 5
            Plaintiffs,        : Judge Beckwith
 6
      V.                       : Magistrate Sherman
 7
      ZF BATAVIA, LLC, et al., :
 8
            Defendants.        :
 9    _____

10          Deposition of DENA M. STEVENS, taken on

11    Friday, August 22, 2003, commencing at 2:53 p.m.,

12    at the offices of Baker & Hostetler LLP, 312 Walnut

13    Street, Suite 3200, Cincinnati, Ohio, before

14    Susan M. Barhorst, Notary Public.

15

16

17

18

19

20

21                    GIGLIO REPORTING SERVICES
                          3 CYPRESS GARDEN
22                      CINCINNATI, OHIO 45220
                           513-861-2200
23

24
```

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3      Stephen A. Simon, Esq.
        22 West Ninth Street
 4      Cincinnati, Ohio 45202

 5
        On behalf of Defendant ZF Batavia, LLC:
 6
        John J. Hunter, Jr., Esq.
 7      Hunter & Schank Co., L.P.A.
        1700 Canton Ave.
 8      Toledo, Ohio 43624

 9   Also present:

10      Herb Huebner

11   On behalf of Defendant Ford Motor Company:

12      Jeffrey L. VanWay, Esq.
        Baker & Hostetler LLP
13      312 Walnut Street, Suite 3200
        Cincinnati, Ohio 45202
14

15   Cross-Examination

16      by Mr. Hunter                    4, 64

17      by Mr. VanWay                    52

18

19

20

21

22

23

24
```

3

| | STEVENS' DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 30 |
| 3 | | |
| 4 | 4 | 18 |
| 5 | | |
| 6 | 134 | 33 |
| 7 | 135 | 43 |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                    DENA M. STEVENS

 2   being first duly sworn, testified as follows:

 3                    CROSS-EXAMINATION

 4   BY MR. HUNTER:

 5        Q.    Would you please state your name for

 6   the record?

 7        A.    Dena M. Stevens.

 8        Q.    Ms. Stevens, your current address?

 9        A.    13706 St. Rt. 41, West Union, Ohio

10   45693.

11        Q.    Ms. Stevens, you've been here today at

12   least through part of Ms. Blanco's deposition.  I

13   don't remember if you were here for Mr. Stegmann.

14   But I think you understand generally the process

15   for today?

16        A.    Yes, I do.

17        Q.    I'm going to do my best to answer --

18   ask clear and concise questions.  If at any point

19   in time you can't hear me, you don't understand the

20   question, I mumble or for whatever reason, again,

21   you just can't -- feel -- don't feel you can fairly

22   answer the question, I want you to stop me and let

23   me know.

24        A.    Okay.
```

5

```
 1          Q.     Is there anything today, in terms of a

 2    personal issue or otherwise that would prevent you

 3    from being able to go forward with the deposition?

 4          A.     No.

 5          Q.     Have you ever been deposed before?

 6          A.     About 20-some years ago on a divorce.

 7          Q.     Okay.  Other than that, have you ever

 8    been deposed?

 9          A.     No.

10          Q.     You ever been involved in any

11    litigation of any type?

12          A.     Yes.

13          Q.     Other than a divorce?

14          A.     Yes.

15          Q.     What litigation would that be?

16          A.     I don't know if you would call it a

17    litigation.  Allegation, how about that?

18          Q.     Okay.  What did that relate to?

19          A.     Well, how about a dissolution?   Is

20    that --

21          Q.     Oh, yeah.

22          A.     That would be -- -

23          Q.     Yeah, okay.  So it was either a

24    divorce or dissolution?
```

```
 1          A.     Yeah.

 2          Q.     All right.  Other than a family law

 3   type issue, have you been involved in any

 4   litigation?

 5          A.     Yes.

 6          Q.     Okay.  What litigation would that be?

 7          A.     I brought suit and dropped it, how's

 8   that?

 9          Q.     Okay.  Can you give me a little more

10   detail, brought suit against who for what?

11          A.     Against a person for money.

12          Q.     Money that you lent them?

13          A.     No, that was -- that was owed me and

14   then I dropped it.

15          Q.     How long ago was that?

16          A.     Just recently.  It was due to divorce

17   and then I ended up dropping it.

18          Q.     All right.

19          A.     Again, it was due to divorce.

20                 MR. SIMON:  He doesn't want to know

21   any family law related --

22                 THE WITNESS:  Right, that's all

23   that --

24                 MR. SIMON:  All right, okay.
```

1          Q.     All right.  Other than family, marital

2     law, just not had any litigation experience?

3          A.     No.

4          Q.     Okay.  If I use the term "Ford

5     transitional," do you have an understanding as to

6     what I mean by that, in terms of Ford transitional

7     employees?

8          A.     Someone that was formerly a Ford

9     person that went to ZF.

10          Q.     Okay.  And do you consider yourself a

11     Ford transitional?

12          A.     Yes.

13          Q.     And prior to coming over to ZF, how

14     long had you been with Ford?

15          A.     20 years.

16          Q.     Do you recall what you hired into Ford

17     as?

18          A.     Accounting clerk.

19          Q.     Was that a salaried position?

20          A.     Yes.

21          Q.     After accounting clerk, what did you

22     do with Ford?

23          A.     I was in systems for 20 years.  Well,

24     19 something.

8

1      Q.      What do you mean by "systems"?

2      A.      Data processing, ITU -- you know, as

3  it evolved.

4      Q.      Were all of those positions salaried?

5      A.      Mm-hmm, yes.

6      Q.      Just prior to coming over to ZF

7  Batavia, what position did you hold?

8      A.      Technical support analyst.

9      Q.      In systems?

10     A.      Yes.

11     Q.      During your tenure with Ford in those

12  salaried positions, did you always receive overtime

13  compensation?

14     A.      Yes.

15     Q.      Were you ever subject to any

16  disciplinary action or anything like that --

17     A.      No.

18     Q.      -- during your tenure at Ford?  No?

19     A.      Na-huh.

20     Q.      Okay.  I heard a great deal of

21  testimony about certain representations or promises

22  that various Ford transitionals feel were made to

23  them prior to joining the joint venture.  Are you

24  aware of those issues?

```
 1          A.    Yes.

 2          Q.    Can you give me kind of a laundry list

 3   of your concerns?

 4          A.    Vacation purchase.

 5          Q.    Okay.

 6          A.    Sick, personal leave.

 7          Q.    Okay.

 8          A.    Bereavement, AIP and overtime.

 9          Q.    Are you one of those folks that has

10   five weeks vacation?

11          A.    Yes.

12          Q.    So you would have purchased --

13          A.    The first year I was able to purchase

14   an extra week, and then I was unable to.

15          Q.    Okay.  We've also talked about a

16   number of meetings that were held with the Ford

17   transitionals, in terms of informational meetings

18   regarding the joining of the joint venture.  Did

19   you attend any of those meetings?

20          A.    Yes, I did.

21          Q.    Which meetings, if you can tell me,

22   did you attend?

23          A.    Well, I can remember one in the

24   cafeteria.
```

1          Q.    Okay.

2          A.    Maybe another in the cafeteria.

3    That's all that I can recall.

4          Q.    Do you remember the date of the

5    meeting in the cafeteria?

6          A.    No, I don't remember the date.

7          Q.    Could it have been around May 27th of

8    1999?

9          A.    I would have to say so.

10         Q.    And my understanding is there were two

11   meetings on that date, one in the morning; one in

12   the afternoon.

13         A.    I attended the morning.

14         Q.    Now, prior to May 27th of 1999, had

15   you attended any meetings regarding your joining

16   the joint venture?

17         A.    With someone else?  Is that what

18   you're saying?

19         Q.    No.  Did you attend any other meetings

20   prior to May 27th regarding your joining the joint

21   venture?

22         A.    Just the one in the cafeteria.

23         Q.    Okay.  But that was on May 27th,

24   right?

1           MR. SIMON:  He's asking is there any

2    meeting that you can recall that you went to before

3    May 27.

4           A.    I just remember the ones in the

5    cafeteria that we had.  No, I don't.

6           Q.    I've heard about an announcement that

7    was made in October or so --

8           A.    The big giant plant, one with the big

9    video with Jacques Nasser, that was it.

10          Q.    Okay.  That was more, what I would

11    gather, like a press conference?

12          A.    Yeah --

13          Q.    Okay.

14          A.    -- the big announcement, yeah, the

15    shocker.

16          Q.    Okay.  Did you see --

17          A.    Yes, I did.

18          Q.    -- the announcement up there on the

19    screen?  When you made your decision to come over

20    to the joint venture, did you consider anything

21    that was said in that announcement in October of

22    1998?

23          A.    Did I consider it?  In what regards?

24          Q.    In regards to your decision to join

1    the joint venture.

2          A.    My decision was already made to join

3    the joint venture, to -- to when an offer was made,

4    I had already decided because what was presented in

5    this meeting in the cafeteria because it was going

6    to be like Ford.  I was losing nothing, only health

7    care benefits basically is what I had thought.

8          Q.    Okay.

9          A.    The overtime was going to be paid at

10   the same rate, they said.  We were going to get AIP

11   bonus based on the plant's performance.

12         Q.    All right.  Well, let's try it this

13   way.  In terms of the meeting on the 27th, do you

14   remember who spoke?

15         A.    Karl Kehr was there.  I remember Mark

16   Bugajski.  I remember some people from up north,

17   Ford.  I don't remember who they were.  I can't

18   name names.  I think Mike Warden was there.  That's

19   about all I can remember.  Some HR people.  I don't

20   know their names.

21         Q.    Did -- do you remember getting any

22   handouts at that meeting on the 27th?

23         A.    There were no handouts.  There were

24   slides.

1          Q.     Okay.  Do you remember subsequent to

2     the meeting getting any handouts?

3          A.     No.

4          Q.     No, okay.  Are there any specific

5     comments that you can attribute to Mr. Kehr or

6     Mr. Bugajski that stick out in your mind from that

7     May 27th meeting?

8          A.     Comments from him?

9          Q.     From them, by them, that they made.

10          A.     Other than this is a positive thing,

11     the big sales pitch that they would would be

12     selling the new company.  Yeah, join, join type of

13     stuff, nothing specific.

14          Q.     Do you remember any discussions at the

15     May 27th meeting regarding overtime or any

16     statements regarding overtime?

17          A.     The meeting in the cafeteria?

18          Q.     Mm-hmm.

19          A.     They had slides up there.

20          Q.     Okay.

21          A.     And those slides had up there the

22     overtime rates.  You would be paid these overtime

23     rates.  And they had salary bands.  They were going

24     from grade -- salary grades to salary bands.  I

14

1    remember that.

2         Q.    Okay.

3         A.    And they had retirement plan type of

4    stuff up there.

5         Q.    With respect to the rates, what was

6    your understanding as to those overtime rates, that

7    that's when you started, that's what the rate was

8    that you were going to be paid?

9         A.    Yes.

10         Q.    Do you remember any other statements

11    about overtime?

12         A.    That we would be paid at the same rate

13    as Ford was being paid at --

14         Q.    At that time?

15         A.    -- in regards to overtime.

16         Q.    But was that at that time or in the

17    future?

18         A.    I can't specifically say that, at that

19    time.  I just know they had a chart up there and

20    they're saying you will be paid at the same rate of

21    Ford's overtime.  They had blah, blah, blah, 42.50,

22    39.75 or whatever the heck it is, I don't know.

23    And will be continued to be paid at this rate.

24         Q.    So you would continue to be paid at

1   that rate that they put up on the slide?

2          A.     I can't say yes or no to that.

3          Q.     Do you remember anything else about

4   the statements about overtime?

5          A.     No.

6          Q.     Are there any specific statements that

7   you can remember with respect to vacation?

8          A.     That we could buy or sell vacation.

9          Q.     How much?

10         A.     And that I was allowed to keep my five

11  weeks if I had my 20 years in by such and such date

12  and I was so happy about that.

13         Q.     Do you remember any other statements

14  regarding vacation?

15         A.     Nope.

16         Q.     Do you remember any of the discussion

17  about AIP?

18         A.     That we would -- that it would be

19  based on plant performance.

20         Q.     Was there any indication as to what --

21  or how plant performance would be measured?

22         A.     By the deliverables.

23         Q.     Was it your understanding that those

24  measures or measurables could change over time?

1          A.     The deliverables?

2          Q.     Mm-hmm.

3          A.     I think deliverables could change.

4          Q.     The way you've said that leads me to

5     believe there's something you think can't change?

6          A.     Well, deliverables always change.

7          Q.     Okay.

8          A.     Not always.   I shouldn't say always

9     or never.  I should -- deliverables can change.

10          Q.     I guess I'm going to ask the same

11     question.

12          A.     Measurements change.

13          Q.     Okay.  It was safe to say, then, that

14     the AIP, the determination of AIP was subject to

15     change?

16          MR. SIMON:   Objection, vague and

17     ambiguous.  You can answer.

18          A.     They said we would be given an AIP

19     bonus based on the plant deliverables, whichever

20     way the deliverables or how they're measured.

21          Q.     Okay.  Any other --

22          A.     Deliverables can change.

23          Q.     Any other statements you can remember

24     with respect to AIP?

1          A.    No, no.

2          Q.    Do you remember any specific

3    statements as to sick and personal days?

4          A.    That we would have five.

5          Q.    When you were at Ford, how many sick

6    or personal days did you have?

7          A.    Five.

8          Q.    Did you understand that the number of

9    sick and personal days was subject to change?

10         A.    Not to my knowledge.

11         Q.    Does that mean you don't remember

12   anybody making any statements about that or --

13         A.    They just said that you would have

14   this many.

15         Q.    Did they say that you have this many

16   forever or that, again, it would be -- when you

17   start here, you're going to have five personal

18   days?

19         A.    They just said that you would have

20   this many.

21         Q.    Any other statements?

22         A.    I'd have to believe what they said.

23         Q.    Okay.  Any other statements that you

24   can recall with respect to personal days?

1          A.     No.

2          Q.     Bereavement, do you remember any

3     statements regarding bereavement?

4          A.     Three, three days bereavement.

5          Q.     Any other details with respect to

6     bereavement?

7          A.     Na-huh.

8          Q.     And as I asked before, did they make

9     any statement that you would have three bereavement

10    days forever?

11         A.     No.  They just said bereavement was

12    set at three days.

13         Q.      With respect to the vacation time, do

14    you remember, did they say that you could always

15    buy a week of vacation or just that, again, when

16    you started you could buy a week of vacation?

17         A.     They said I will have the option to

18    buy or sell.

19         Q.     Did they say that you would have the

20    option to buy or sell forever?

21         A.      I can't say that they said that or

22    not.  They said I will have the option.

23         Q.     Okay.  We've had a lot of discussion

24    with the various Ford transitional employees that

1    are plaintiffs in this instance about a concept

2    that I would refer to as casual time.  Are you

3    familiar with the concept of casual time?

4         A.    Yes.

5         Q.    What does that mean to you?  And I

6    guess I want to talk about it in the context of

7    your employment with Ford from those 20 years.

8    What is casual time?

9         A.    Just putting in free time to the

10   company in excess of eight hours.

11        Q.    Basically time at work for which you

12   are not paid --

13        A.    Right.

14        Q.    -- overtime compensation?

15        A.    Right.

16        Q.    I've heard varying positions with

17   respect to overtime -- or I'm sorry, casual time.

18   Some folks have said, yeah, 15 to 30 minutes

19   beginning of shift, end of shift; some folks have

20   said less.

21             Can you quantify for me what your

22   understanding was with respect to the amount of

23   casual time that was expected at Ford?

24        A.    My job at Ford wasn't required to be

1    there 30 minutes prior or after --

2         Q.    Okay.

3         A.    -- 'cause I was in the administration

4    building, so that really didn't apply to me very

5    much.

6         Q.    When you came over to Batavia -- I'm

7    sorry, ZF Batavia, did you have an understanding or

8    an expectation with respect to casual time?

9         A.    Are you saying that do I -- did I

10   expect them -- for me to work extra time for

11   nothing?

12        Q.    Mm-hmm.

13        A.    Nope.

14        Q.    But you knew casual time existed at

15   Ford, correct?

16        A.    As far as I know, it didn't exist at

17   Ford.

18        Q.    I'm sorry.  It did or it didn't?

19        A.    It did not.

20        Q.    I thought you told me that you knew

21   casual time existed, but just not in your

22   department?

23        A.    No.  What I'm trying to say, it did

24   not apply to me.  I didn't have to work casual.  No

1    one asked me to come in early.  They didn't ask

2    those other people to give casual time.  They said

3    it would be nice for them to come in early and to

4    stay late, just to make the transition -- or to

5    make the transition easier between jobs.  It wasn't

6    required of them.  I bet you if they put it down,

7    it probably would have gotten paid through Ford.

8            Q.    All right.  When you came over to

9    Batavia, what -- or ZF Batavia, what did you hire

10   on as?

11           A.    Something like an SAP launch

12   coordinator in the logistics area, something like

13   that.

14           Q.    That was not a production position,

15   was it?

16           A.    No.

17           Q.    I note on your hire letter, it was --

18   I saw a production control associate?

19           A.    They quickly changed that, like within

20   a couple weeks.

21           Q.    Okay.  Because I would assume that a

22   production control associate was somebody out on

23   the floor?

24           A.    No.

1          Q.    All right.  So within a couple weeks

2    of getting to Batavia, your job classification

3    changed?

4          A.    Within I -- within, I'd say, two

5    months.

6          Q.    Did that surprise you?

7          A.    Yes, it did.

8          Q.    Was that change a good change or a bad

9    change?

10          A.    Can't really say.  I don't know.

11          Q.    Did your compensation change at all?

12          A.    My work compensation?

13          Q.    The amount of money that you received

14    for your job.

15          A.    No.

16          Q.    At what point in time did you decide,

17    hey, I'm going to go over and take a job at the new

18    joint venture?

19          A.    When I got offered that position.  I

20    had to interview for that position.

21          Q.    Did the interview for the position,

22    who did that interview?

23          A.    Dave Longridge.

24          Q.    Anybody else?

1          A.     No.

2          Q.     Was the interview with Mr. Longridge

3     before or after the May 27th meeting in the

4     cafeteria?

5          A.     Before, I'd have to say.

6                 MR. SIMON:  If you don't know, don't

7     guess.  I mean, if you know, you know.

8          A.     I don't.  I can't say clearly.

9          Q.     Do you remember in the meeting -- is

10    it Longridge?

11         A.     Longridge.

12         Q.     I don't think I've heard that name

13    before.  Was he at ZF or Ford --

14         A.     No, he's Ford.  He's in Detroit

15    somewhere, I think.  Do you know, Herb?

16                MR. SIMON:  Herb is not answering

17    questions today.

18                THE WITNESS:  Okay.

19         Q.     With respect to Mr. Longridge, why did

20    he -- any idea why he interviewed you or --

21         A.     He was the materials manager at the

22    time.

23         Q.     At that time, all right.  Do you

24    remember the nature of the discussion that you had

1    with Mr. Longridge at the interview?

2         A.    Well, he was interviewing me for a SAP

3    launch coordinator of the material logistics area

4    because the technical support analyst job was being

5    replaced by contract people.  And they thought that

6    would be a very good fit for me, coming from

7    systems.

8         Q.    And with respect to your meeting with

9    Mr. Longridge, did you talk about salary or

10   compensation or other benefits?

11        A.    Not at that time.

12        Q.    Did he make a job offer to you at the

13   time of the interview?

14        A.    Not at that time.

15        Q.    And I think you told me, based on the

16   interview, you did decide to go with ZF Batavia?

17        A.    When they said that I had a job in

18   logistics or with him, and that it would be at the

19   same whatever -- rate, and that's when I said, oh,

20   yes.

21        Q.    You sound kind of in a sense anxious

22   or whatever to come over or was it to leave Ford

23   or -- I mean, you don't sound like there was a

24   great deal of hesitation on your part to make the

1  move.  Is that a fair assessment of your testimony

2  or --

3           MR. SIMON:  You can answer.

4       A.    At the time, I was married to Rick

5  Ervin.

6       Q.    Okay.

7           THE WITNESS:  And should I go there?

8           MR. SIMON:  Well, you have to answer

9  truthfully.  All they want to know was -- he asked

10  about the assessment of your testimony.  That's all

11  he's asking, so answer that question.

12      A.    And it was based on his decision also.

13  And, yes, he was made an offer and I was made an

14  offer.

15      Q.    All right.  I think -- so what you're

16  telling me is and I understand that you and

17  Mr. Ervin are now divorced, dissolution or

18  whatever.  You joined ZF Batavia, in part, because

19  your husband at that time joined ZF Batavia?

20      A.    Yes.

21      Q.    Was that the primary reason that you

22  joined over to ZF Batavia?

23      A.    No.

24      Q.    If you can tell me, what was the

1   primary reason you joined ZF Batavia?

2          A.    To have a job.

3          Q.    Well, you hadn't been told you were

4   going to be let go by Ford, were you?

5          A.    How would I have a guarantee that I'd

6   have a job?  What if I had to relocate to Nebraska

7   and my husband in -- in Batavia?

8          Q.    I think that comes back to, then, the

9   primary reason you came to Batavia was because your

10  husband had a job at ZF Batavia.  I'm not trying to

11  be difficult, but --

12         A.    Well, you'd like to work, stay at the

13  same place, yes.

14         Q.    Do you remember when Rick got the

15  offer from ZF Batavia?

16         A.    No.

17         Q.    Was it before the May 27th meeting, if

18  you know?

19         A.    I can't recall, but I know he had an

20  offer.

21         Q.    And you know he had an offer before

22  you signed on?

23         A.    I can't say that.

24         Q.    I thought you said -- actually I

1    thought you did already.

2            MR. SIMON:  Don't just -- don't guess.

3    If you know, you know.

4        A.    He had an offer --

5            MR. SIMON:  Hold on a second.  Hold on

6    a second.  If you know, you know, answer it.  If

7    you're guessing, say you're guessing.

8        A.    I wouldn't -- I would not take an

9    offer if I didn't know he had an offer --

10       Q.    Okay.

11       A.    -- okay?  I would not accept an offer

12   if I knew he didn't have an offer, okay?

13       Q.    Do you believe you would have accepted

14   the offer if he had -- strike that.

15            Was it a condition preceding to you

16   signing your offer that Rick signed his offer as

17   well?

18       A.    Condition to who?

19       Q.    A condition preceding, meaning if Rick

20   had only had an offer, but hadn't signed it yet,

21   would you have signed your offer?

22       A.    Yes.

23       Q.    And I think the expectation was then

24   that Rick certainly was going to sign his so that

1    you both ended up at the same plant?

2         A.    Mm-hmm.

3         Q.    To the extent you know, did you and

4    Rick talk about the fact that it was important for

5    both of you to work at the same plant?

6         A.    At that time?

7         Q.    Yes, ma'am.

8         A.    Yes.

9         Q.    And so the fact that you had accepted

10   an offer on June 4th of 1999 would have been very

11   important to Rick Ervin as of June of 1999,

12   correct?

13             MR. SIMON:  Objection, speculation.

14        Q.    That means you still have to answer,

15   Ms. Stevens.

16        A.    Yes.

17        Q.    All right.  So it would have been

18   important to him because you and he had discussed

19   it?

20        A.    Yeah.

21             MR. SIMON:  Let me make an objection

22   here.  I don't want to waive the marital

23   communication privilege because Mr. Ervin isn't

24   here to waive it.  So I am asserting the privilege

1    for the purpose of the deposition regarding

2    conversations you had with Mr. Ervin.

3            MR. HUNTER:  Well, I understand that

4    at this point, but, I mean, part of it has already

5    come in, so --

6            MR. SIMON:  Well, I think you asked if

7    they had conversations, but we're -- I'm asserting

8    the privilege regarding communications she had with

9    Rick while they were married and instruct her not

10   to answer those questions.

11       Q.    All right.  At some point in time you

12   received an offer from ZF Batavia, correct?

13       A.    Mm-hmm.

14       Q.    Do you remember physically how you got

15   that?  Was it mailed to you, somebody bring it down

16   to you?

17       A.    I don't remember.

18       Q.    Any recollection as to when you

19   received it?

20       A.    May.

21       Q.    After the May 27th meeting?

22       A.    I don't remember.

23       Q.    And I guess I should clarify.  Did you

24   go to any meetings after the May 27th meeting?  And

1    I say "any meetings."  Any meetings regarding your

2    transitioning over to ZF Batavia?

3         A.    I just remembered the one in the

4    cafeteria.  That's all I remember.

5         Q.    Okay.

6         A.    That's all I can remember.  I remember

7    a lot of bickering.  That's all I can remember with

8    all engineers and all --

9         Q.    A lot of bickering at the meeting?

10        A.    Yeah.

11        Q.    Do you remember what they were

12   bickering about?

13        A.    Benefits and this and that.  Thinking,

14   what are they bickering about?  We're not losing a

15   whole lot.

16        Q.    You're not losing a whole lot?

17        A.    Yeah, health care.  It's going to be

18   the same.

19        Q.    Do you remember, once you got the

20   offer from ZF Batavia, did you sign it right away?

21        A.    Pretty much.

22        Q.    Did you have any questions about the

23   offer that you received?

24        A.    Probably who I'd be working for, what

1    I'd be doing, those type of questions.

2          Q.    Did you have any questions about what

3    your compensation would be?

4          A.    They explained that in the meeting.

5          Q.    I think that means, no, you had no

6    questions?

7          A.    Right.

8          Q.    I mean, they didn't specifically know

9    in the meetings, say, Ms. Stevens, you're going to

10   be paid $4,600 a month or anything like that, did

11   they?

12         A.    Well, they handed me that paper when

13   they made me the offer.

14         Q.    Okay.  Prior to receiving the offer,

15   had you had any discussions with anyone about what

16   Dena Stevens' compensation would be at the joint

17   venture?

18         A.    Mean my salary and stuff?

19         Q.    Mm-hmm.

20         A.    I might have talked to someone about

21   you'll be making the same salary and you'll be

22   getting a -- whatever, a sign-on bonus.  And they

23   don't know what that is.  That's all I remember.

24         Q.    When you received the offer letter, do

1    you remember, did you receive anything else with

2    that?

3            A.     A tri-fold.

4            Q.     Okay.  And remembering now that you

5    received the tri-fold, again, any chance you

6    remember whether you received that in the mail or

7    otherwise?

8            A.     I received it with Dave Longridge.

9            Q.     From Dave Longridge?

10           A.     Yeah.

11           Q.     Okay.  Do you remember, did he come

12   out on the floor?

13           A.     No, we were in his office.

14           Q.     But this was not at the interview,

15   correct?

16           A.     Right.

17           Q.     So this was apparently a subsequent

18   meeting with Mr. Longridge?

19           A.     Yeah.

20           Q.     How long do you suppose that meeting

21   lasted?

22           A.     Half hour, maybe 20 minutes.

23           Q.     Do you remember what the nature of

24   your discussions were with Mr. Longridge in that

33

1    meeting?

2         A.    My salary, my job, the tri-fold.

3         Q.    Anything else?

4         A.    Not that I can recall.

5         Q.    Do you remember any specific --

6    specific comments that Mr. Longridge made regarding

7    any of those issues?

8         A.    No.

9         Q.    Ms. Stevens, we've handed you what's

10   been marked for identification purposes as Exhibit

11   134.  I would ask that you take a moment to go

12   through that.  You had a chance to review Exhibit

13   134?

14        A.    Yeah.

15        Q.    Have you seen that document before?

16        A.    Yes, I have.

17        Q.    Is that the hire letter that

18   Mr. Longridge gave to you?

19        A.    Yes, it is.

20        Q.    Is that your signature that appears

21   down there on the bottom left-hand side of that

22   document?

23        A.    Yes.

24        Q.    At the time that you signed that

34

1    document, did you have any questions regarding the

2    document?

3        A.    No.

4        Q.    I think you told me as well that you

5    reviewed the gray brochure, Exhibit Number 2, with

6    Mr. Longridge?

7        A.    Yes.  I remember him showing me this

8    brochure.

9        Q.    Did you read the brochure at that time

10    with Mr. Longridge?

11        A.    No, not the whole thing.

12        Q.    Well, what parts did you read?

13        A.    I don't remember.  I'm sure I looked

14    at salary and AIP and I probably looked at vacation

15    buy and sell.  And I didn't look at the tuition

16    because I already went through college.  I saw

17    United Health Care.  That's probably about all I

18    looked at.  AIP, I made sure that was in there.

19    Merit increase program, I made sure that was in

20    there.  Salary, yep.  Overtime, yep.  Looked at --

21    saw the retirement program was in there, probably

22    it.  Holidays.

23        Q.    Why wouldn't you read the entire

24    document?

1          A.      Probably at that time -- I don't know,

2     just didn't.

3          Q.      Did you not consider the document

4     important?

5          A.      I considered it important, but at that

6     time, probably not.   I -- well, I'll wait till I

7     get home to read it.

8          Q.      Okay.   Would it be safe to say, then,

9     that you didn't rely on the document in making

10    decisions to join the joint venture?

11         A.      No.   I would say this is a legal

12    document.   It is a document.

13         Q.      Okay.   But I guess what I asked you,

14    Ms. Stevens, was, if you didn't read the document,

15    how could you rely on the document?

16              MR. SIMON:   Objection.   That

17    mischaracterizes her testimony.   You can answer.

18         A.      I was just worried about the things

19    that were important to me at that time, which was

20    the vacation, the sick days, the AIP, the merit,

21    the retirement, the salary, the overtime.   I wanted

22    to make sure that was in there and that's what was

23    important to me at the time.

24         Q.      If you look at page 2 of that

1    document, you'll see down on the bottom right-hand

2    side some language sandwiched between two lines.

3    Do you see that section there?

4        A.    Yes.

5        Q.    Do you remember, did you read that

6    language at the time?

7        A.    No.

8        Q.    If you didn't read that language, how

9    do you know that it didn't apply to those things

10   that were important to you?

11           MR. SIMON:  Objection, argumentative.

12   You may answer.

13       A.    I didn't read it.

14       Q.    Pardon me?

15       A.    I don't remember reading it.

16       Q.    Could you take a minute while we sit

17   here today and read that language for me, please?

18       A.    Okay.

19       Q.    As we sit here today, if you had read

20   that language back in 1999, the time you read the

21   rest of the brochure, would that have caused you to

22   have any concerns about that brochure?

23           MR. SIMON:  Objection, speculation.

24   You can go ahead and answer.

```
 1          A.    I would -- I would ask if the summary

 2    plan benefit or descriptions mean the 401K and the

 3    dental and the life insurance and the medical

 4    'cause that's what it means to me.

 5          Q.    Okay.  And you would feel it is

 6    important to understand exactly what is meant by

 7    that language down there?

 8          A.    Right.  I would ask.

 9          Q.    All right.

10          A.    And would I receive a summary of those

11    plans.

12          Q.    With respect to your claims in this

13    case, I've received certain interrogatories that

14    set forth an amount claimed by you of $2,920 as

15    your loss with respect to, I believe, overtime?

16          A.    Casual, yeah, overtime.

17          Q.    Okay.  Well, and that's, I guess, is

18    my question.  Is what -- how did you calculate that

19    number?

20          A.    Through my time statement.

21          Q.    Does that number represent basically

22    the one hour of casual time that you now work for

23    ZF?

24          A.    Some days I put in nine, 10, sometimes
```

1    I came in on Sunday afternoons.  Sometimes I came

2    in late in the afternoon, like if I -- for

3    instance, I was on a training session at

4    Sharonville and I came in after that to get some

5    work done.  Worked late three or four hours that

6    night.

7        Q.    And you didn't get paid --

8        A.    Right.

9        Q.    -- by the company?

10        A.    Right.

11        Q.    And so --

12        A.    And I came in during the vacation

13   shutdown to check on stuff.

14        Q.    And so those hours are part of that

15   $2,920?

16        A.    Right.

17        Q.    Do you have any records of those

18   times?

19        A.    Yes.

20        Q.    Have you turned that over to your

21   attorney?

22        A.    Yes.

23        Q.    Is it something other than the

24   salaried time statements that you fill out for the

1    company?

2         A.    Just handwritten.

3         Q.    I honestly don't remember seeing those

4    from your attorney, but it's a note -- like a

5    notebook paper or something or --

6              MR. SIMON:  What are you referring to

7    when you say it's handwritten, is what he's asking.

8              THE WITNESS:  On those -- on those

9    questions.

10             MR. SIMON:  Oh, oh, oh, oh.  Well,

11   she's referring to information she gave directly to

12   me.

13             THE WITNESS:  Mm-hmm.  Asked --

14             MR. SIMON:  Hold on.  She's just given

15   me handwritten information she gave to me regarding

16   answers -- not information that was created

17   expressly to give to me, not documents that already

18   existed.

19        Q.    All right.  Are there any documents

20   that would identify those days or hours?

21        A.    My clock rings.  You can get them from

22   security.

23        Q.    So you're one of those folks we heard

24   about that occasionally might go to security to

1    find out what hours they worked by pulling the card

2    rings?

3         A.    You could do that, yeah.

4         Q.    Did you do that?

5         A.    Did I go to security, no.

6         Q.    Well, how did you -- I'm not trying to

7    be difficult here, but how did you figure out what

8    days you worked or didn't work over the last couple

9    years?

10        A.    I got time statements that I wrote

11   down my time that I was -- that I was there and

12   calculated from that.

13        Q.    Okay.  Including like those Sunday

14   afternoons for two or three hours, is that the

15   salary time statement that you've given to your

16   attorney?

17        A.    No, that's not.

18        Q.    Is there any document that reflects

19   that -- that afternoon, for example?

20        A.    Handwritten document in my desk.

21        Q.    Okay.  Are there other documents in

22   your desk that are relevant to the hours --

23        A.    No.

24        Q.    -- that you have worked?

```
 1          A.    Security would have that through my

 2    clock rings.

 3          Q.    I think you just told me you have a

 4    handwritten note in your desk at work?

 5          A.    Mm-hmm.

 6          Q.    Okay.  Is that note there today?

 7          A.    I just recently moved.  I have not a

 8    clue.  I would say not.

 9          Q.    Did you ever give a copy of that note

10    to Mr. Simon?

11          A.    No.

12          Q.    Do you have other notes in your desk

13    relative to hours worked that you have not given to

14    Mr. Simon?

15          A.    No.

16          Q.    You only had the one?

17          A.    Yes.

18          Q.    With respect to the -- the overtime,

19    what is your understanding as to what you thought

20    you were going to be paid in terms of an hourly

21    rate for overtime?

22          A.    The amount?

23          Q.    Mm-hmm.

24          A.    Whatever the flat rate would be, was
```

```
 1   or is.

 2        Q.    Okay.  And that was subject to

 3   whatever the company's discretion was?

 4             MR. SIMON:  Objection.  Calls for a

 5   legal conclusion.  You can answer.

 6        A.    What the Ford rate of overtime was at

 7   the meeting, that's what I thought.

 8        Q.    So it would always be the same rate as

 9   it was in 1999?

10        A.    Can't say for sure.

11        Q.    You hadn't --

12        A.    I can't say for sure.

13        Q.    You had no understanding, then, as to

14   what that rate would be?

15        A.    It just said authorized overtime will

16   be paid and they had a slide up and it said it

17   would be paid at the Ford rate.  It will be paid at

18   this Ford rate.

19        Q.    And from that statement, what did you

20   understand that to mean?

21        A.    It will be paid at this rate.

22        Q.    And it will be paid at that rate

23   forever?

24        A.    Forever, forever, ever and always.  At
```

1    this rate, it will be paid.

2           Q.    Ms. Stevens, I've handed you -- we've

3    marked for identification purposes as Exhibit

4    Number 135.  I would ask that you take a moment to

5    go through that document.

6           Q.    You've had a chance to review Exhibit

7    135?

8           A.    Mm-hmm.

9           Q.    You recognize that to be your answers

10   to certain interrogatories given to you by -- on

11   behalf of Ford Motor Company?

12          A.    I'm sorry.  Repeat that.

13          Q.    Sure.  You understand that those are

14   your answers to certain interrogatory questions

15   asked of you by Ford Motor Company?

16          A.    Yes.

17          Q.    And as we sit here today, does the

18   information contained within those answers to

19   interrogatories, is it still accurate and complete?

20          A.    Yes.

21          Q.    I direct your attention to page 6, the

22   third -- I'll call it indented paragraph.  Do you

23   see that section?

24          A.    Mm-hmm.

44

```
 1        Q.     Now, a minute ago, you told me that
 2   the 1999 rate was to be paid basically forever.  I
 3   note in your answer to that interrogatory -- again,
 4   third indented paragraph and it states, This
 5   estimate does not include the loss of pay
 6   attributable to ZF Batavia's failure to pay
 7   overtime rates to salaried employees consistent
 8   with Ford's rates as such rates have increased,
 9   contrary to the promises made to the plaintiffs in
10   1999.
11            I would find your interrogatory answer
12   inconsistent with the testimony that you have given
13   today.  Can you tell me what the answer is?
14            MR. SIMON:  Objection.  I don't know
15   what the question is.
16        Q.     Well, let me try it this way.  In the
17   deposition today, you testified under oath that you
18   were to be paid the 1999 rate forever and ever.
19            In your interrogatory answers, you
20   answered under oath that you have a claim for
21   damages against ZF Batavia and Ford for failure to
22   pay overtime rates on an increasing basis
23   consistent with Ford.
24            Those answers are, to my way of
```

1    thinking, inconsistent.  Whis answer is the true

2    and accurate answer?

3              MR. SIMON:  Objection.

4    Mischaracterizes your deposition testimony.  Go

5    ahead and answer.

6         A.    They said that we will paid at this

7    Ford rate.

8         Q.    And does that mean you're going to be

9    paid at the Ford rate forever, if you know?

10        A.    I would think so, yes.

11        Q.    And that would be the Ford rate as it

12   changes?

13        A.    I can't say yes or no.  I do not know.

14        Q.    Okay.  You fill out a salaried time

15   statement to report your time to ZF Batavia,

16   correct?

17        A.    Yes.

18        Q.    Has anyone from ZF Batavia ever come

19   up to you and said, Ms. Stevens, your salaried time

20   statement does not match with the card reader

21   reports and we have a problem here or anything

22   similar to that?

23        A.    No.

24        Q.    Have you ever had your base pay docked

1    because of an inconsistency between your salaried

2    time statement and the card readers, card swipe

3    reports?

4         A.    No.

5         Q.    Are you aware of anyone in the -- at

6    ZF Batavia that that has happened?

7         A.    I've just heard hearsay about Kevin

8    O'Hagan.

9         Q.    Can you tell me what you've heard?

10        A.    All I heard is that he had his pay

11   docked.  I don't know how much or what for, other

12   than he was late and he got docked and that was it.

13        Q.    Are you familiar -- have you heard of

14   a similar circumstance with respect to anybody

15   else --

16        A.    No.

17        Q.    -- at the facility?  We've spoken

18   about a number of issues where you feel that ZF

19   Batavia has not followed through on certain

20   commitments made to you as of the May 27th meeting.

21            Other than those items we've already

22   discussed, are there any other commitments,

23   promises, whatever you wish to call them, that you

24   feel ZF Batavia made to you, that it has not

1   followed through on?

2        A.    Okay.  We spoke about the vacation.

3        Q.    Yes, ma'am.

4        A.    Okay.

5        Q.    And as I understand, the vacation is

6   just the whole buy-sell issue?

7        A.    Right.

8        Q.    Okay.

9        A.    I'm unable to buy one.

10       Q.    Okay.

11       A.    Okay.  The bereavement issue is not an

12   issue with me.  I was able to take my three days

13   when I was able to.  The personal days, that was an

14   issue 'cause they reduced those.  I think we do

15   have those back now 'cause I have -- you know, I

16   have a need to take those.

17       Q.    If I can ask -- I don't want to throw

18   you off track.  For the time period that those

19   personal days were reduced from five to three, did

20   you have a need for those additional two personal

21   days?

22       A.    I'll have to say yes.

23       Q.    Okay.  And I didn't mean to interrupt,

24   but I wanted to clear that up as we spoke about it.

48

1    Okay.

2            A.    AIP.

3            Q.    And I think we've spoken about that

4    one.  Was that you?

5            A.    No.

6            Q.    Jeez, it's been a long day.  Let's

7    talk about AIP.  Tell me about the issues with

8    respect to AIP.

9            A.    Mine has been reduced.

10           Q.    Okay.  How was your AIP payment

11   reduced?

12           A.    It was told to me that mine was

13   reduced because I was a Ford transition employee.

14           Q.    And how much was that reduction?

15           A.    They didn't -- they didn't tell me.

16   They just said that yours was reduced because of

17   that reason.

18           Q.    And who told you that?

19           A.    Rod Baker.

20           Q.    And he was your supervisor at the

21   time?

22           A.    Mm-hmm.

23           Q.    And in terms of the AIP payment that

24   we're speaking of, what year would that have been

1    payable for?

2         A.    Okay.  That was not this March, last

3    March.

4         Q.    So the payment made in March of 2002,

5    which would have been for calendar year 2001?

6         A.    Right.

7         Q.    Now, you were --

8         A.    This year was for a whole different

9    reason mine -- why mine was cut.

10        Q.    I was just going to ask you about your

11   2003 payment.

12        A.    Right.

13        Q.    Why was this year's cut?

14        A.    Was because of my contribution to the

15   quality department.

16        Q.    All right.  Let's talk just for a

17   moment about the March 2002 payment.  Beyond what

18   you've already told me about that comment from Mr.

19   Baker, do you have any other information as to why

20   your payment was, as you put it, reduced?

21        A.    No.

22        Q.    At the time of the March 27th (sic)

23   meeting, certainly nobody told you, Ms. Stevens,

24   you're going to receive X number of dollars for an

1    AIP payment, did they?

2          A.    No.

3          Q.    Certainly nobody said that you would

4    receive a fixed percentage for an AIP payment, did

5    they?

6          A.    No.

7          Q.    Now, with respect to the payment to be

8    made in March of 2003, you've stated that that

9    payment as well was reduced?

10         A.    Yes.

11         Q.    How much was that payment reduced?

12         A.    I don't know what -- how much it was

13   reduced.  I just know what percentage that I got.

14   Something --

15         Q.    I think you told me your perception is

16   that it was reduced?

17         A.    Right.

18         Q.    Is that because somebody told you it

19   was reduced or how do you know it was reduced?

20         A.    I asked what the average was or what

21   everyone was getting and I asked why mine was at

22   that percent or whatever.

23         Q.    And who did you ask?

24         A.    Rod Baker.

1          Q.     And what was his answer?

2          A.     It was based on your contribution to

3     the quality department.

4          Q.     Did he feel that you had

5     underperformed, then, or --

6          A.     I suppose so.  I don't know if it was

7     up to him or upper management or what.  I can't

8     say.

9          Q.     Do you feel that the reduction this

10    year was in any way related to your position as a

11    Ford transitional employee?

12         A.     Can't say.

13         Q.     Any other issues on the AIP payment?

14         A.     No.

15         Q.     Maybe I better ask you, have we

16    covered everything, then, that was on your list?

17         A.     I think we have.  Laundry is never

18    done.

19         Q.     Other than those things that we have

20    already, then, talked about, is it your -- would it

21    be safe to say that ZF Batavia has lived up to

22    whatever other commitments were made to you in May

23    of 1999?

24         A.     Well, got my salary.

1          Q.     Okay.

2          A.     Overtime, vacation, no sick time and

3      personal, AIP.

4               MR. SIMON:  Note for the record the

5      witness made a hand gesture after going through

6      vacation, personal.

7          A.     Yes.

8          Q.     I think the answer to my question is

9      yes?

10         A.     Yes.

11              MR. HUNTER:  Okay.  At this point, I

12     think I will permit Mr. VanWay to ask his

13     questions.

14              MR. SIMON:  Are you okay to continue?

15              THE WITNESS:  That's fine.

16              MR. VANWAY:  Let's take five.

17          (Off the record:  3:50 p.m. - 4:04 p.m.)

18                        EXAMINATION

19     BY MR. VANWAY:

20         Q.     Ms. Stevens, I know we've been in the

21     same room for quite some time now.  My name's Jeff

22     VanWay.  I represent Ford in this case and I have

23     just a few questions for you this afternoon.  Try

24     not to keep you too much longer.

1                    In your answers to interrogatories,

2        you were asked about various policy changes that

3        are at issue in this case or benefit changes that

4        are at issue in this case.  And you listed the same

5        types of ones that you've testified about today and

6        you also stated in your answer that certain Ford

7        managers had authorized those changes.

8                    Can you tell me what Ford managers

9        authorized the changes to the policies and benefits

10       that you've testified about today?

11            A.    Ford managers that authorized the

12       changes?

13                  MR. SIMON:  If you know.

14            A.    No, I don't know.

15            Q.    Not aware of any Ford managers?

16            A.    No, I don't.

17            Q.    Are you aware of Ford being involved

18       with those changes at all?

19            A.    No.

20            Q.    Are you aware of anyone from Ford

21       approving those changes?

22            A.    No.

23            Q.    As far as you know, Ford had nothing

24       to do with those changes?

54

```
 1          A.    I don't have any proof of that.

 2          Q.    Okay.  And when I say "those changes,"

 3   you understand that I'm referring to the changes in

 4   vacation, sick and personal, bereavement, AIP and

 5   overtime?

 6          A.    Right.

 7          Q.    Ms. Stevens, you testified earlier

 8   about things you were told with regard to AIP.   In

 9   the meeting that you attended on May 27th, did

10   anyone say to you that all employees would get the

11   same AIP percentage or the same AIP amount?

12          A.    They said that we would be paid an AIP

13   bonus based on the plant deliverables.

14          Q.    Okay.  I think that's a no, but I want

15   to make sure.  No one said that everyone is going

16   to get the same.  That was never said, was it?

17          A.    I can't say that it was said or not

18   said.

19          Q.    Well, do you remember it being said?

20          A.    Just based on the plant deliverables.

21   That's all that I can remember.

22          Q.    Okay.  So you don't remember it being

23   said?

24          A.    No.
```

1        Q.     Do you remember anything being said

2    comparing your AIP to the AIP of new hires?

3        A.     No.

4        Q.     You testified that, I think, within

5    two months of the time you went to ZF Batavia that

6    your job changed?

7        A.     Yes.

8        Q.     Was it a job change or just a title

9    change?

10       A.     Job change.

11       Q.     Okay.  I take it from your testimony

12   today, that once you found out about the joint

13   venture, you never really seriously considered

14   staying with Ford, did you?

15       A.     Yes, I did.

16       Q.     At what point did you seriously

17   consider staying with Ford?  I mean, my

18   understanding from your testimony was you didn't

19   want to break up the family and so you were going

20   to stay at Batavia.

21       A.     I'd always wanted to stay a Ford

22   employee.

23       Q.     Well, let's take it this way, then.  I

24   believe you testified that your decision was

56

1    made -- it was a done deal in your mind after the

2    May 27th meeting; is that correct?

3        A.    After I was made an offer for a job

4    position.

5        Q.    Okay.  Well, I thought you said that

6    as of the May 27th meeting, you had made your

7    decision that you were going to accept --

8        A.    Right.

9        Q.    -- the offer?

10       A.    They had -- they had put the writing

11   on the wall.

12       Q.    Okay.  So as of May 27th, you weren't

13   seriously considering staying with Ford?

14       A.    Right.

15       Q.    Okay.  At the time you were made the

16   offer and you were in the office with

17   Mr. Longridge, did you sign the offer letter at

18   that time?

19       A.    Yes.

20       Q.    Now, I know you were employed at Ford

21   for a long time.

22       A.    Yes.

23       Q.    20 years, I think you told me?

24       A.    Mm-hmm.

```
 1          Q.    Salary the whole time, right?

 2          A.    Yes.

 3          Q.    Never in the union?

 4          A.    No.

 5          Q.    Okay.  Did you have any sort of

 6     employment contract with Ford while you worked for

 7     Ford?

 8          A.    Not that I can recall.

 9          Q.    Okay.  And you understood that when

10     you were with Ford, your salary and benefits were

11     subject to change at the company's discretion?

12                MR. SIMON:  Objection.  Calls for a

13     legal conclusion.

14          A.    Like health care would change, I would

15     figure.

16          Q.    What about your salary, was it your

17     understanding that your salary could change

18     according to what the company determined was best?

19                MR. SIMON:  Same objection.  Would

20     hope that I would get merit increases.

21          Q.    But my questions is, you -- I

22     understand.  Your salary did change while you were

23     with Ford, right?

24          A.    Yes.
```

1          Q.    And when it changed, you didn't have

2     any input into that change, did you?

3          A.    No.

4          Q.    Okay.  And your benefits changed when

5     you were with Ford, didn't they?

6          A.    Health care benefits and that type of

7     benefits?

8          Q.    Well, what are benefits to you?  When

9     you hear the word "benefits," what does that mean?

10         A.    Health care, dental, my contributory

11    benefits, my life insurance benefits, that type of

12    benefits.

13         Q.    Okay.  Did those types of benefits

14    change from time to time while you were at Ford?

15         A.    Yes.

16         Q.    And you didn't have any input into

17    those changes, did you?

18         A.    No.

19         Q.    Company made the change and told you

20    here it is, right?

21         A.    Mm-hmm.

22         Q.    Now, while you were with Ford, the

23    overtime rate changed from time to time as well,

24    didn't it?

59

1          A.    Well, yes, I would have to think so.

2     I wasn't paid at the flat rate all the time.

3          Q.    Okay.  And the company would tell you

4     what the rate was, correct?

5          A.    Yes.

6          Q.    They didn't ask if it was okay with

7     you, did they?

8          A.    No.

9          Q.    And they made the decision and you had

10    to follow it, correct?

11         A.    Yes.

12         Q.    Okay.  Were you employed with Ford

13    back in the early eighties?  I guess you would have

14    been.

15         A.    '79 I was hired in.

16         Q.    Do you recall the time back in --

17    around '81, '82, that the company was doing some

18    belt tightening, if you will, and they canceled

19    some vacation days?  Do you remember that

20    happening?

21         A.    Yes, I do.

22         Q.    When that happened, did they go to

23    employees and ask them if it was all right if they

24    canceled the vacation days?

1          A.    They did not ask us.

2          Q.    They just did it, right?

3          A.    Right.

4          Q.    Okay.  Do you remember there being a

5     period of time when they stopped paying overtime

6     and went to comp instead for salaried exempt

7     employees?

8          A.    I was never denied overtime pay.

9          Q.    Okay.  But do you remember that

10    occurring, even though it may not have happened to

11    you --

12         A.    I remember --

13         Q.    -- in terms of them going to --

14         A.    -- talk about --

15         Q.    -- comp time?

16         A.    -- about it, that's it.  I don't

17    remember it ever happening.

18         Q.    Okay.

19               MR. SIMON:  Wait for him to finish --

20               THE WITNESS:  Okay.

21               MR. SIMON:  -- his question before you

22    start answering.

23               THE WITNESS:  Okay.

24               MR. SIMON:  Thanks.

```
 1          Q.     I take it at the time you were sitting

 2    through these May -- this May 27th meeting, you

 3    believed what was being said, correct?

 4          A.     Yes.

 5          Q.     You believed what was being shown up

 6    on the slides?

 7          A.     Certainly.

 8          Q.     You had no reason to believe that

 9    those individuals were being untruthful with you,

10    correct?

11          A.     Right.

12          Q.     Okay.  Since the time you left Ford

13    and went to ZF Batavia, your salary has gone up

14    every year, hasn't it?

15          A.     Yes.

16          Q.     And your W-2 wages have gone up as

17    well, correct --

18          A.     Yes.

19          Q.     -- compared to what they were with

20    Ford?

21          A.     Yes.

22          Q.     Do you know an employee by the name of

23    Eddie Adams?

24          A.     No.
```

1          Q.     My understanding is he's a -- either a

2     committeeman or he's some type -- holds some type

3     of position with the UAW out at Batavia.  Does that

4     help you recognize --

5          A.     Maybe he --

6          Q.     -- who Eddie Adams is?

7          A.     Now, maybe, yes, yeah.

8          Q.     Do you recall having any conversations

9     with Eddie Adams about this lawsuit or the issues

10    in this lawsuit?

11         A.     No.

12         Q.     Mr. Adams has been listed by your

13    attorneys as a possible witness in this case.  Do

14    you have any knowledge as to why Mr. Adams might be

15    a witness in this case?

16         A.     No.

17         Q.     Your lawsuit here is not only against

18    ZF Batavia, it's also against Ford.  Why did you

19    file a lawsuit against Ford?

20              MR. SIMON:  Objection.  Calls for a

21    legal conclusion.  Obviously her attorney prepared

22    the complaint.  Try to answer the question.

23         Q.     What's your understanding as to why

24    you have filed claims against Ford in this case?

1              MR. SIMON:  Objection, to the extent

2    you're asking for attorney-client communication.

3    But without divulging those communications, Ms.

4    Stevens, you can try to answer.

5         A.    Because it's a joint venture and Ford

6    has 49 percent.

7         Q.    Okay.  Any other reasons that you've

8    filed these claims against Ford, other than the

9    fact that Ford's the minority shareholder in the

10   joint venture?

11             MR. SIMON:  Same objection.

12        A.    That's all I have to say.

13        Q.    Does that mean there aren't any other

14   reasons, other than those that might be attorney-

15   client privileged?

16        A.    That's it, yes.

17        Q.    Okay.  You've testified for awhile

18   this afternoon.  Other than what you've already

19   said, are there any other facts that you're aware

20   of that support any of your claims in this case

21   against either Ford or ZF Batavia?

22        A.    No.

23             MR. VANWAY:  I don't think I have

24   anything further, Ms. Stevens.  Thank you.

64

```
 1                    THE WITNESS:  You're welcome.

 2                    MR. SIMON:  Off the record.

 3                    MR. HUNTER:  I have a couple of

 4    follow-up questions.

 5                    MR. SIMON:  I'm sorry.

 6                    MR. HUNTER:  It's been a long day.

 7                         EXAMINATION

 8    BY MR. HUNTER:

 9         Q.    Ms. Stevens, in preparation for

10    today's deposition, did you look at any documents?

11         A.    Yeah.

12         Q.    What documents did you review?

13         A.    This document.

14         Q.    Exhibit Number 2?

15         A.    Yes.

16         Q.    Okay.  Any other documents?

17         A.    Four.

18         Q.    And with respect to your deposition

19    today, did you have any discussions with anyone

20    else about your deposition today?

21         A.    No.

22         Q.    You rode over with Ms. Blanco,

23    correct?

24         A.    Right.
```

1          Q.    Didn't discuss with her at all about

2     the deposition today?

3          A.    No.

4                MR. HUNTER:  Okay.  I have nothing

5     further.

6                MR. SIMON:  Off the record at this

7     point.

8                (Deposition concluded at 4:15 p.m.)

9

10

11

12

                  _____

13                     Dena M. Stevens

14

15

16

17

18

19

20

21

22

23

24

```
 1                C E R T I F I C A T E

 2

 3   STATE OF OHIO          :

 4                          :    SS

 5   COUNTY OF HAMILTON     :

 6

 7          I, Susan M. Barhorst, a Notary Public in

 8   and for the State of Ohio, duly commissioned and

 9   qualified, do hereby certify that prior to the

10   giving of this deposition the within-named DENA M.

11   STEVENS was by me first duly sworn to testify the

12   truth, the whole truth, and nothing but the truth;

13   that the foregoing pages constitute a true,

14   correct, and complete transcript of the testimony

15   of said deponent, which was recorded in stenotypy

16   by me, and on the 27th day of October 2003 was

17   submitted to counsel for deponent's signature.

18          I further certify the within deposition was

19   duly taken before me at the time and place stated,

20   pursuant to the Federal Rules of Civil Procedure;

21   that I am not counsel, attorney, relative or

22   employee of any of the parties hereto, or their

23   counsel, or financially or in any way interested in

24   the within action, and that I was at the time of
```

67

1   taking said deposition a Notary Public in and for

2   the State of Ohio.

3       IN WITNESS WHEREOF, I have hereunto set my

4   hand and notarial seal at Cincinnati, Ohio, this

5   27th day of October 2003.

6

7

8

9           Susan M. Barhorst, Notary Public
            in and for the State of Ohio.
10         My commission expires
           February 18, 2004
11

12

13

14

15

16

17

18

19

20

21

22

23

24