1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF OHIO

 3                WESTERN DIVISION, CINCINNATI

 4

 5    EVERETT W. WHISMAN, et al.: Case No. C-1-02-406

 6         Plaintiffs,        : Judge Beckwith

 7    v.                      : Magistrate Sherman

 8    ZF BATAVIA, LLC, et al.,  :

 9         Defendants.         :

10    _____

11         Deposition of MICHAEL STEWARD, taken on

12    Tuesday, August 12, 2003, commencing at 11:18 a.m.,

13    at the offices of Baker & Hostetler LLP, 312 Walnut

14    Street, Suite 3200, Cincinnati, Ohio, before

15    Susan M. Barhorst, Notary Public.

16

17

18

19

20

21                GIGLIO REPORTING SERVICES
22                  3 CYPRESS GARDEN
                  CINCINNATI, OHIO 45220
23                   513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     Jim Crump

 7   On behalf of Defendant ZF Batavia, LLC:

 8     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 9     1700 Canton Ave.
       Toledo, Ohio 43624
10
     Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16
     Cross-Examination
17
       by Mr. Hunter                 4, 140
18
       by Mr. VanWay                 83
19

20

21

22

23

24
```

3

| | STEWARD DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 19 |
| 3 | | |
| 4 | 4 | 68 |
| 5 | | |
| 6 | 108 | 45 |
| 7 | 109 | 79 |
| 8 | 110 | 120 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                      MICHAEL STEWARD

 2   being first duly sworn, testified as follows:

 3                      CROSS-EXAMINATION

 4   BY MR. HUNTER:

 5           Q.    Sir, will you please state your name

 6   for the record?

 7           A.    Michael Steward.

 8           Q.    And your current address?

 9           A.    7386 Starkey-Clevenger,

10   C-L-E-V-E-N-G-E-R, Road.  That's Blanchester, Ohio.

11           Q.    Mr. Steward, my name is John Hunter.

12   I represent ZF Batavia.  I don't think we've ever

13   met before today, have we?

14           A.    No.

15           Q.    Have you ever been deposed before?

16           A.    No.

17           Q.    All right.  You sat through a little

18   bit of Mr. Vories' deposition, but let me give you

19   a couple ground rules with respect to the

20   deposition.  The format is just basically a

21   question and answer format.  I'm going to ask you

22   questions regarding litigation that has been filed

23   by yourself and others.

24                 If at any point in time you can't hear
```

1    me, I mumble, I speak too quickly or if for

2    whatever reason you just don't feel you can fairly

3    answer my question, I want you to stop me and let

4    me know, okay?

5        A.    Yes.

6        Q.    Is there anything today that would

7    prevent you from being able to go forward with your

8    deposition, in terms of a personal issue, a health

9    issue or anything like that?

10        A.    No.

11        Q.    Okay.  You've heard me use in

12    Mr. Vories' deposition the term "Ford

13    transitional"?

14        A.    Yes.

15        Q.    You understand by that term, I mean an

16    employee of Ford Motor Company that transitioned

17    over to ZF Batavia, the joint venture in 1999?

18        A.    Yes.

19        Q.    Okay.  Are you a Ford transitional

20    employee?

21        A.    Yes.

22        Q.    Okay.  When did you start with Ford

23    Motor?

24        A.    Actually I started in 1977, worked

1    till mid '79, then came back in '83, August 8, '83.

2         Q.    Okay.  And when you hired on with

3    Ford, what was your position?

4         A.    Production supervisor.

5         Q.    And prior to Ford, where had you been

6    employed?

7         A.    I was basically in college, been out

8    for a couple years.  I've worked for 84 Lumber

9    Company.  I did some different jobs, sales,

10   marketing.

11        Q.    Okay.  And in the period of '79 to

12   '83, was that a layoff from Ford?

13        A.    No, actually -- no, actually was I

14   quit to go to a company downtown, Gidding Jennings.

15        Q.    I'm sorry.  Which company?

16        A.    Gidding Jennings.

17        Q.    Okay.  And why did you quit Ford?

18        A.    I felt that -- I was working a lot of

19   overtime at the time.  I was young.  I had a

20   college degree.  I felt like there might be a

21   another opportunity to do something a little

22   different in a different field.  I didn't want to

23   work in a factory at the time because I was young.

24   I was 25, 26 years old.

7

```
 1          Q.    Okay.  And then why did you come back
 2    to Ford?
 3          A.    Well, I had had some discussions with
 4    the superintendent I had worked with prior to
 5    leaving and the opportunities were going to be good
 6    for me to come back.  It was a stable economy at
 7    the time and it was something that I felt like it
 8    was an opportunity to get back into Ford Motor
 9    Company, which was a very good company.
10          Q.    And who was the superintendent you had
11    these discussions with?
12          A.    At that time, it was Floyd Mason, who
13    has since retired.
14          Q.    Did you sign an application, then, to
15    come back --
16          A.    Yes.
17          Q.    -- to be employed by Ford?
18          A.    Yes.
19          Q.    And when you hired back in with Ford,
20    what did you hire back in as?
21          A.    Supervisor.
22          Q.    At the time of the joint venture, what
23    was your position at Ford?
24          A.    Superintendent.
```

8

```
 1          Q.    And would that have been a management-

 2    level position --

 3          A.    Yes.

 4          Q.    -- within Ford?

 5          A.    Yes.

 6          Q.    And as a superintendent for Ford, were

 7    you paid overtime?

 8          A.    Yes.

 9          Q.    And what was the basis for payment of

10    overtime at Ford?

11          A.    I don't know -- understand what you're

12    asking me.

13          Q.    How did Ford -- as a superintendent,

14    how were you paid overtime, in terms of how was it

15    calculated?  How was it figured?  How was it paid?

16          A.    Oh, the policy was the same for all

17    grade levels up to grade 10.  So as a -- generally

18    salary -- general salary roll, whatever the first-

19    line supervisors had for the next level, which was

20    an MPS level to a superintendent level, everything

21    through a grade 10 was paid basically the same.

22          Q.    And how was that paid?  You say it was

23    paid the same.  But I mean, what was --

24          A.    Well, it was an hourly rate.
```

9

1          Q.     Okay.  And how much was the hourly

2    rate?

3          A.     I don't recall exactly.  35, $40 -- 35

4    I think for Saturdays and daily overtime.  $40 or

5    something like that for Sundays.

6          Q.     Okay.  Did the rate change from time

7    to time?

8          A.     Yes.

9          Q.     Okay.  The --

10         A.     I'm not exactly -- I don't -- I don't

11   recall exactly what the numbers were.

12         Q.     Okay.  The -- in terms of the -- the

13   overtime policy, were you paid from minute one or

14   was -- are you familiar with the notion of casual

15   overtime or how did that work?

16         A.     Yeah.  You were supposed to give them

17   up to an hour casual time.  Anything over an hour,

18   you were paid.  Basically if -- if you put in an

19   hour, you were paid the hour.

20         Q.     And, again, I've heard some folks tell

21   me that, again, at 59 minutes, you weren't going to

22   get paid.  You hit the hour, you would get paid?

23         A.     That's correct.

24         Q.     Okay.

1        A.    But for the most part, you didn't put

2    in just one hour.  It was usually historically more

3    than just an hour.

4        Q.    Okay.  Well, some folks have said that

5    casual time could be somewhere between 15 minutes

6    to 30 minutes or perhaps more at the beginning of

7    shift and end of the shift, kind of a routine and

8    kind of the concept of passing off to the following

9    shift?

10        A.    Correct.

11        Q.    That sounds accurate to you?

12        A.    I think the Ford policy is 40 minutes

13    of casual time per day.

14        Q.    Do you have anything in writing with

15    respect to that?

16        A.    I'm pretty sure that if you looked

17    into the policies of Ford Motor Company, that you

18    would find that 40 minutes of daily overtime -- I

19    mean, 40 minutes of daily is -- was pretty much

20    what you were required to do.

21        Q.    Okay.

22        A.    But for the most part, everybody at

23    least worked an hour of casual time.  And then once

24    they got over the 40 -- hour, they got paid for it.

1          Q.    All right.  So under the Ford system,

2    okay, and let's talk at least 1999 when you were a

3    superintendent at Ford.  If you worked an hour and

4    15 minutes of overtime at Ford, what would you be

5    paid for?

6          A.    An hour.

7          Q.    An hour?  What happened to the 15

8    minutes?

9          A.    You basically just dedicated that

10   amount of time to the company.

11         Q.    Okay.

12         A.    You just gave it up.

13         Q.    Okay.

14         A.    You didn't even think about it.

15         Q.    If you worked an hour and a half, how

16   much would you paid for?

17         A.    The hour.

18         Q.    Okay.  And the half hour again was

19   kind of --

20         A.    Well, it was -- well, let me step back

21   and say it another way.  At one time, you could get

22   the hour, hour and a half.  As a superintendent,

23   I -- I did not do that personally.

24         Q.    Okay.

1          A.     There were people that got paid for

2    the half an hour.

3          Q.     Okay.

4          A.     And that did change, I think, later

5    on, but I -- I can't recall exactly when it did

6    change.  But at one time, you got paid for the half

7    an hour.

8          Q.     Okay.  All right.  And when you came

9    over to Batavia, did you come over as a

10   superintendent?

11         A.     Yes.

12         Q.     Do you remember, did you get a bump in

13   pay or anything?

14         A.     Yes.

15                MR. SIMON:  Just for clarification,

16   are you talking about the Batavia plant or ZF

17   Batavia?

18                MR. HUNTER:  Let me clarify.

19                MR. SIMON:  I didn't --

20                MR. HUNTER:  I said that poorly.  I

21   think the witness understood.  But when I said

22   "Batavia," I meant ZF Batavia.

23                THE WITNESS:  When I came from Ford in

24   a transition --

1            MR. HUNTER:  Mm-hmm.

2            THE WITNESS:  -- no, I don't believe I

3    got an increase in pay.  I might have, but I don't

4    recall it being -- if it was -- if I got an

5    increase, it wasn't much.

6    BY MR. HUNTER:

7        Q.    Okay.  But you came over as a

8    production superintendent?

9        A.    Yes.

10       Q.    Okay.

11       A.    Although I think the title changed and

12   was more of a business manager than I was a

13   superintendent.

14       Q.    Okay.

15       A.    But when I came from Sharonville to

16   Batavia in the Ford world, it was a promotional

17   opportunity.  I thought that's what you were

18   talking about --

19       Q.    Okay.

20       A.    -- when you first asked me that.

21       Q.    Okay.  No, poor question on my part.

22   I meant the transition to ZF Batavia from Ford

23   Motor Company.

24       A.    Okay.

14

1      Q.    All right.  Did you attend any of the

2  organizational meetings?

3      A.    Yes.

4      Q.    All right.  Which ones did you attend,

5  if you recall?

6      A.    I don't know exactly recall.  I think

7  both of the informational meetings that were held

8  up front in the cafeteria.

9      Q.    Do you remember the dates for those

10  meetings?

11      A.    No, not offhand.

12      Q.    We've heard about when the JV was

13  announced that outside the hospital area in the

14  plant, that there was a screen and that Nasser came

15  on and -- and announced the JV.  Do you remember

16  any of that?

17      A.    Yes.

18      Q.    Were you present for that?

19      A.    Yes.

20      Q.    Would that, then, be in addition to

21  the two meetings in the cafeteria?

22      A.    Yes.

23      Q.    The Nasser announcement, do you

24  remember any details with respect to what was said

1    at that time?

2        A.    Specific details -- they -- no.  Other

3    than just it was just a general statement -- a

4    general announcement that Ford and ZF had come to

5    an agreement to build CVT transmissions,

6    opportunity for Ford in the future.

7        Q.    Anything else about that announcement

8    or that meeting or whatever you want to call that?

9        A.    No.

10       Q.    Was there any discussion about what

11   was going to happen to Ford employees at that point

12   in time?

13       A.    Not that I recall.

14       Q.    Okay.

15       A.    It was just a general announcement of

16   a business announcement, a joint venture being

17   established.  The opportunity for a Continuous

18   Variable Transmission being built at Batavia, CVT

19   transmissions being the future for opportunities in

20   business.

21       Q.    Okay.  Would you say it was kind of

22   like a PR type thing?

23       A.    Yes.

24       Q.    All right.  That was, as I recall,

16

1    late 1998?

2         A.    I don't recall exactly when it was.

3         Q.    Okay.  The first group meeting that

4    you attended at -- at the Batavia plant, was that

5    the meeting in May, approximately May 27th?

6         A.    I believe so.

7         Q.    Okay.  Did you go -- do you remember

8    there was a morning session and an afternoon

9    session?

10        A.    I went to the morning session.

11        Q.    Okay.  Do you remember, did they hand

12   anything out at that time?

13        A.    I don't recall.

14        Q.    Do you recall, in terms of Ford

15   transitionals, who else might have been there?

16        A.    Just pretty much all the Ford

17   employees were invited to come to the meeting.  As

18   far as whether who was with me was basically my

19   peers and some of the others guys that were on day

20   shift at the time.

21        Q.    Okay.  Do you remember specifically

22   who?

23        A.    Rick Ervin, Mike Steward, Dennis

24   Baker.  Some of the -- some of the other guys

1    that -- group leaders like John Mosely, Bill

2    DeVito.

3        Q.    Do you remember who spoke at that

4    meeting?

5        A.    There were several people that spoke.

6    Karl Kehr, Tony DeShaw, guy by the name of Charlie.

7    I can't remember his last name.

8        Q.    Charlie Corbett?

9        A.    Yes.

10        Q.    Okay.  How about Dave Adams?

11        A.    I don't recall whether Dave actually

12    spoke at that one or not.

13        Q.    Anybody else that comes to mind?

14        A.    No.

15        Q.    Do you remember the topics that were

16    discussed by any of those individuals?

17        A.    Well, they basically -- the topics

18    that I remember were discussed were the -- what the

19    joint venture was about, how was it going to affect

20    the people in the plant, the opportunities for the

21    plant itself, that -- that the plant had been given

22    new life, that there were going to be opportunities

23    for new business, up to a million transmissions a

24    year to be produced in the building, that if we

 1    decided to make the transition, that Ford -- we'd

 2    basically be mirrored, as far as our benefits, our

 3    wages, our overtime packages would be mirrored with

 4    Ford and it would continue to grow as Ford did.

 5        Q.    Okay.  Do you remember specifically,

 6    did somebody use the term "mirrored" or what was

 7    the term, if you recall, that was used?

 8        A.    I can't recall offhand.

 9        Q.    Okay.  Do you remember who made the

10    statements about Ford?

11        A.    I believe it was -- I think it was

12    also Tony DeShaw and Karl Kehr.

13        Q.    But you can't remember any specific

14    statements?

15        A.    Well, no, not specifics, other than

16    saying they -- you know, that if the joint

17    venture -- if you join with ZF, you'll basically be

18    treated -- it would basically be -- not mirrored,

19    but it would be the same as if you were working for

20    Ford.

21             The retirement package would be

22    supplemented.  If you got vested with Ford and ZF

23    both, you would have the same investment -- or same

24    type of retirement program that you would have as

1    if you stayed with Ford.

2          Q.    Okay.  So the retirement package would

3    be the same --

4          A.    Yes.

5          Q.    -- or basically the same as --

6          A.    Well, your retirement package with --

7    you know, your overtime, your vacations, your

8    employment, as far as your AIPs, you'd be available

9    for AIPs, that your pay would stay the same.  And

10   the merit raises would be opportunities for you to

11   have as if you were with Ford Motor Company.

12         Q.    Now, when you talk about AIP, I mean,

13   that couldn't stay the same because Ford didn't

14   have AIP?

15         A.    They had a profit sharing --

16         Q.    Okay.

17         A.    -- which they basically explained as

18   an AIP, an Annual Incentive Plan, was going to be

19   ZF's answer to the profit sharing.

20         Q.    Okay.  I think you told me you don't

21   recall getting the -- what we've called the gray

22   brochure, Exhibit Number 2 at this first meeting?

23         A.    Right.

24         Q.    Okay.  Do you remember anything else

1    about this first meeting?

2        A.    No.

3        Q.    Did you decide to join Batavia at that

4    point?

5        A.    No.

6        Q.    Why not?

7        A.    I was interviewing for several

8    superintendent jobs within Ford Motor Company.  And

9    at that particular time, there was discussions

10   about four people being moved to different areas in

11   different plants and I was listening to the

12   different opportunities that -- that were coming to

13   me.  I was keeping an open mind about what I wanted

14   to do.

15       Q.    Okay.  After that meeting, I think you

16   told me you attended a second meeting?

17       A.    I believe there was a second, smaller

18   meeting that -- you know, talked about -- continued

19   talking about the -- how ZF employees and Ford

20   transition employees -- you know, the need for

21   senior people -- or not senior people, but

22   experienced people to be having the opportunity to

23   go to ZF and the discussions about what the

24   benefits would be, the -- the opportunities would

1    be, things like that.

2         Q.    Do you remember who was at this second

3    meeting?

4         A.    Pretty sure Tony DeShaw and Karl Kehr.

5    And seems like there was another guy and I can't

6    remember his name.

7         Q.    Okay.  Now, Mr. Vories had

8    indicated -- and I'm not sure what meeting he was

9    at, but he referred to it as the first meeting,

10   that there were a lot of issues that he felt

11   weren't or couldn't be answered by Mr. Kehr or Mr.

12   DeShaw at that first meeting.  Did you leave that

13   meeting with that impression?

14        A.    Yes.  And I believe the second meeting

15   was a follow-up with Ford salaried personnel that

16   came in to answer some of the issues and questions.

17   Seems like Izu or somebody like that was one of the

18   guy's name.  I can't remember his name offhand.

19        Q.    What do you think it was?

20        A.    I -- I don't know.

21        Q.    Don't remember?

22        A.    No, no, I don't recall.

23        Q.    Well, from your point of view, then,

24   what were the open questions or issues that needed

1    to be answered from that first meeting?

2         A.    One, I wanted to understand a little

3    bit more about what ZF was --

4         Q.    Okay.

5         A.    -- and who they were.

6         Q.    Okay.

7         A.    What effect did -- what was the joint

8    venture going to mean to the Ford Motor Company?

9         Q.    Okay.

10        A.    What was the CVT transmission?  What

11   was it?  What was it going to go into?  What kind

12   of products was Ford looking at?  Down the future,

13   what was the opportunities going to be for me?  How

14   was it -- pay scales, how was the benefit packages?

15   How were the conditions of employment going to

16   change for me personally --

17        Q.    Okay.

18        A.    -- or if they were at all?

19        Q.    Okay.  And these were all open issues

20   going into this second meeting?

21        A.    Yes.

22        Q.    Okay.  And Tony DeShaw, Karl Kehr and

23   maybe somebody from Ford --

24        A.    Yeah.

```
 1          Q.      -- you think was at that --
 2          A.      There was two guys from Ford that were
 3   there.
 4          Q.      I'm talking the second meeting now.
 5          A.      Second, yes.  There were several --
 6   several of the Ford salaried personnel, there was
 7   some people there.
 8          Q.      But you just don't remember who it
 9   was?
10          A.      No.
11          Q.      At the second meeting, do you remember
12   what Mr. DeShaw or Mr. Kehr indicated?
13          A.       No, not offhand, other than basically
14   that the joint venture, the terms and conditions of
15   employment basically were going to stay -- I want
16   to say everything was going to be mirrored with
17   Ford was the impression that I took from there.
18   That if you were with ZF employees, that if you
19   made the transition, you would be treated as if you
20   were Ford because Ford was still going to be
21   actively involved in what was going on in that
22   business because of the 49 percent that they had --
23   had bought into.
24          Q.      But nobody used the term "mirror" or
```

1    "mirrored," did they?

2        A.    I don't think they used the verbiage

3    "mirror," but, I mean, it was -- you would be

4    treated as if you were a Ford employee and that you

5    would be given the same benefits, same salary

6    packages as if you were a Ford employee.

7        Q.    And who made that statement?

8        A.    Salaried personnel from Ford.

9        Q.    Okay.  Now, at this second meeting,

10   did you receive Exhibit 2 at that point in time?

11       A.    Yes, yes.

12       Q.    Did you review that document at that

13   point?

14       A.    Yes.

15       Q.    Okay.  And as you were there at the

16   meeting, you reviewed the document?

17       A.    I looked at it while I was there, but

18   I read it more of when I got -- I went into more

19   detail after I got out of the meeting.

20       Q.    Okay.

21       A.    I just casually glanced at it during

22   the meeting and when I got home, I sat down and

23   looked at it.

24       Q.    Okay.  I've heard from various

1    individuals that there were also discussions

2    with -- kind of amongst the Ford transitionals

3    about what the future was going to hold and kind of

4    what the deal was.  Did you have some more

5    discussions with other Ford transitionals?

6          A.    Yes.

7          Q.    Can you tell me who, for example?

8          A.    Rick Williams, Jerry Priest.  They

9    were also --

10          Q.    Okay.

11          A.    -- at the meeting that we attended.

12          Q.    Do you remember the nature of your

13    discussions with Rick?

14          A.    I went into great details with Rick.

15    I wanted to have some more details.  What are the

16    opportunities going to be?  How he felt, as far as

17    making the transition 'cause he was one of the very

18    first people to make the transition.

19              You know, how did -- he felt that it

20    was going to affect his family in the future.  What

21    was going to be the -- the opportunities going down

22    the road with CVT?  What was going to be the life

23    of the CD4E?  What did he know about the business

24    as a whole?  The same way with Jerry Priest.  And I

1    asked them why they made the transition.

2         Q.    Their personal opinion was important

3    to you?

4         A.    Yes.

5         Q.    Okay.  Now, these meetings with Rick

6    and Jerry in relation to the first meeting and the

7    second meeting, can you timeline those for me?

8         A.    Oh, there was just ongoing meetings

9    with them.  I mean, you know, just general

10   conversation out on the floor.

11        Q.    Okay.

12        A.    There wasn't -- there wasn't specific

13   meetings where I had set an appointment to go in

14   and sit down and discuss these things.  It was

15   basically just out on the floor, Hey, what do you

16   think about this?  What's your feelings towards it?

17        Q.    Okay.

18        A.    Why did you do this?

19        Q.    Okay.

20        A.    If I make the transition -- you know,

21   how will I fit into the big picture?

22        Q.    Did you discuss with Rick your

23   retirement in particular to any degree of detail?

24        A.    I asked him about the formulas that

1    were going to be used and how the benefit package

2    or the retirement package was going to be generated

3    or -- you know, what was the expected outcome of it

4    if I had 10 years with them because I was expecting

5    to work at least another 10 to 12 years.

6        Q.    Okay.

7        A.    And -- you know, in that -- he had a

8    formula set up on his computer that basically will

9    tell you, okay.  Here's how much you would receive.

10   This is how much you would -- if you stayed at

11   Ford, based on if the -- if you were in the

12   contributory retirement, what you expected the

13   retirement to be, yes.

14       Q.    Okay.  Do you remember when you did

15   those calculations with Rick?

16       A.    No, I don't recall.

17       Q.    Okay.  Can you relate it all to,

18   again, the first or second meeting?

19       A.    Oh, I think it was after that.

20       Q.    Okay.  And you say "after that," after

21   in the sense, them -- after both of those meetings?

22       A.    Yes.

23       Q.    Okay.

24       A.    It was probably in the summer.

1        Q.    Okay.  And I don't know that I asked

2     it, but for clarification, the second meeting, was

3     that about a week after those May 27th meetings?

4        A.    You know what?  I don't recall offhand

5     exactly when they were.

6        Q.    Okay.

7        A.    They were follow-up meetings is --

8     from my recall, is that after the first meeting

9     that we had, there was a lot of issues and a lot of

10    questions.  So then there was a follow-up meeting

11    later on.

12       Q.    Okay.

13       A.    And it seems like it was several weeks

14    later.  I -- I don't recall exactly.

15       Q.    Do you remember the nature of your

16    discussions with Mr. Priest?

17       A.    Same as they were with Mr. Williams.

18       Q.    Okay.  And would those have been the

19    same as -- as with other Ford transitionals?

20       A.    Sure.

21       Q.    Okay.  And I understand that probably

22    none of the other Ford transitionals had -- had

23    done the calculation on the retirement as Mr.

24    Williams did, but other than that, they would have

29

```
 1   been the same general conversations you had with

 2   other Ford transitionals?

 3        A.    I believe so.

 4        Q.    Okay.  Do you remember kind of at what

 5   point in time you decided to make the jump?

 6        A.    It was probably more towards

 7   September.

 8        Q.    Okay.  A lot of folks had offers made

 9   to them in late May or early June, as I recall.

10        A.    Yes.

11        Q.    Did you have an offer made to you

12   during that time period?

13        A.    No.

14        Q.    But apparently you hadn't made up your

15   mind during that time period as well?

16        A.    Correct.

17        Q.    Is there some -- some event or

18   something that happened that -- that helped you

19   make that decision?

20        A.    Well, there were several things that

21   helped me make that decision.  And one was the fact

22   that Jacque Nasser was running Ford Motor Company

23   at that particular time.  And the general feeling

24   was that Jacque was trying to drive the price of
```

1    stock up for shareholder returns.  And by doing

2    that, you had to have your price earnings ratios in

3    line with what Wall Street was asking.

4            So the health of Ford Motor Company as

5    Jacque Nasser felt was to get Ford to where they

6    wanted to be for the return on investments for

7    their investors was that you had to reduce the PE

8    ratios.  And to do that, you had to reduce

9    capitalization.

10            And I felt that in the long run, that

11    ZF would be the -- the supplier of transmissions

12    for Ford Motor Company, in my mind.  And it also --

13    because of going back and reviewing information

14    about ZF, they were a major player in the supply

15    base for automotive and also power train throughout

16    the world.

17        Q.    Okay.

18        A.    So the opportunities at ZF was -- I

19    saw ZF as being the transmission producer

20    throughout the world.

21        Q.    Okay.

22        A.    And so then I looked at CVT

23    transmissions, Continuous Variable Transmission,

24    and I thought that was the wave of the future

1    because under the laws and regulations or the CAFE

2    regulations, Ford was looking at how to reduce or

3    increase gas mileages.

4            So the CVT was going to be a major

5    transmission for that.  And looking at the amount

6    of investments of both ZF and Ford was going to

7    make for the future, it looked like a great

8    opportunity.

9        Q.    Okay.  And this research that you did,

10   for example, on ZF, that was research apparently

11   you did on your own?

12       A.    Yes.

13       Q.    Okay.  And how did you become familiar

14   with the CVT?

15       A.    Just by auto magazines --

16       Q.    Okay.

17       A.    -- having discussions with Rick

18   Williams.

19       Q.    Okay.  Was there anything else that

20   helped you, again, decide to make that jump other

21   than the opportunities and the CVT and the CAFE

22   issues?

23       A.    Well, and by looking at this, I felt

24   like this was a written agreement, that -- that I

1  felt like -- you know, that I had an agreement.  I

2  was going to have an agreement with Ford -- I mean

3  with ZF, that I was going to be compensated the

4  same as I would have been with Ford.  My benefits

5  would have -- were going to be the same as what

6  they currently were with Ford and I would be

7  making -- I'd be moving into an opportunity where

8  CVT -- I could be promotionally, the opportunities

9  down the road.

10            MR. SIMON:  And just for the record,

11  when he said "this," the witness was pointing to

12  Exhibit 2.

13       Q.    When you referenced Exhibit 2, you

14  said you -- earlier you indicated you just got home

15  and read that in more detail, right?

16       A.    Yes.

17       Q.    And I gather from your testimony here

18  today, that you spent a fair amount of time in

19  reviewing this and apparently a lot of other things

20  with respect to ZF and CVT, correct?

21       A.    Yes.

22       Q.    And you would acknowledge, wouldn't

23  you, that this document, Exhibit 2, specifically

24  says that it's not an employment contract, wouldn't

1    you?

2          A.    I don't agree with that.

3          Q.    Well, let's take a look at Exhibit

4    2 --

5          A.    Okay.

6          Q.    -- page 2.  Well, what is -- on the

7    way the exhibit's copied, page 2 over in the

8    right-hand column --

9          A.    Okay.

10          Q.    -- okay?  And there's two little black

11    lines down towards the bottom.  Do you see those

12    black lines?

13          A.    There are several black lines.  You

14    talking about right here?

15          Q.    Yeah, all right.  There we go.  And I

16    guess I would direct your attention to the last

17    sentence in that little section, okay, that says,

18    Plan provisions and eligibility do not constitute

19    an employment contract with any individual.

20          A.    Okay.

21          Q.    You saw that language back in 1999,

22    correct?

23          A.    I saw the language.

24          Q.    And despite that, your testimony is

1    you still thought you had an employment contract?

2          A.    Yes.

3          Q.    Okay.  And why did you think that?

4          A.    Because I felt like this is basically

5    boilerplate type of agreement that was given the

6    same way with the applications that is something

7    that's generally put out on almost all contracts.

8                But I felt that, based on what we had

9    been put down in writing and what we were given, as

10   far as the compensation, benefits and the dental,

11   that this was what we were going to be -- the

12   agreement that I was going into and this is what I

13   felt as -- as from my employment part of what I was

14   going to contribute to ZF, this is what I would

15   receive as compensation.

16         Q.    But, again, you've testified you

17   thought it was an employment agreement, right?

18         A.    Yes, I did think it was an agreement.

19         Q.    And you saw that it said that it

20   specifically wasn't an employment agreement?

21               MR. SIMON:  Objection.  The document

22   speaks for itself.  I mean -- go ahead and answer.

23         Q.    You saw that language?

24         A.    I read -- I read the document, yes.

```
 1          Q.    Okay.  And you saw the language where
 2    it says that it does not constitute an employment
 3    contract with any individual?
 4               MR. SIMON:  Mr. Hunter, let's read the
 5    whole sentence if you're going to refer him back to
 6    that.  I think --
 7               MR. HUNTER:  Is that an objection
 8    or --
 9               MR. SIMON:  Yeah, because -- yes, it
10    is an objection.
11               MR. HUNTER:  Okay.
12               MR. SIMON:  The document --
13               MR. HUNTER:  The objection is noted
14    for the record.
15               MR. SIMON:  Okay.  Now, my -- just for
16    the record, my objection is you're
17    mischaracterizing the evidence.  You're
18    mischaracterizing this document that we keep
19    talking about in all these depositions.
20               If you're going to refer him to a line
21    in the document, please quote the sentence
22    accurately.  Go ahead and ask your question.
23          Q.    Mr. Steward, you see the language that
24    says, Plan provisions and eligibility do not
```

1   constitute an employment contract with any

2   individual, correct?

3        A.    I read that, yes.

4        Q.    All right.  And is your testimony that

5   you simply discounted that because you viewed that

6   as boilerplate?

7        A.    Yes.

8        Q.    All right.  Simply didn't believe what

9   it said?

10       A.    I believed that what was written over

11  here was an agreement.

12       Q.    Okay.

13       A.    What was written in the other parts of

14  this document was an agreement that I was going to

15  live up to --

16       Q.    Okay.

17       A.    -- and ZF was -- abide by.

18       Q.    Okay.  And, again, the language that I

19  just read to you, you simply didn't believe?

20       A.    I felt like it was just basically a

21  boilerplate document, as far as the lines that were

22  put in there.  And I didn't think, as far as the

23  other things that were put in the writing, were

24  parts that I considered being terms or conditions

1    of employment.

2        Q.    So you believed those sections of the

3    agreement and simply chose not to believe that

4    section that I just read to you?

5            MR. SIMON:  Objection, argumentative.

6    You can answer.

7        A.    Did I not believe it?

8        Q.    Mm-hmm.

9        A.    Is that what you're asking me?  I

10    guess I'm not understanding exactly what you're

11    asking me.

12        Q.    Okay.  I've read to you certain

13    language in the document about the fact that the

14    document does not constitute an employment

15    contract.  Do you remember me reading that to you?

16        A.    Yes.

17        Q.    Okay.  Did you believe or not believe

18    that language that was contained therein?

19        A.    I believed that the other parts of the

20    document, such as the competitive compensation, the

21    benefits, the dental, the benefits as far as

22    accidental, tuition, vacations, was what I was

23    accepting as far as -- as far as what I felt was

24    going to be the agreement with ZF and Mike Steward.

1          Q.     Okay.  And what about this language,

2     again, that I read now a couple times?

3          A.     And I understand what you're asking

4     me, but I'm just saying is that this is what I

5     believed to be true.

6          Q.     Okay.  And what about this language,

7     you didn't believe that to be true?

8          A.     I believed -- believed that it was

9     boilerplate that was probably put into every one of

10    the -- well, it is on every one of the offers.

11         Q.     Okay.  And what did you believe with

12    respect to that language?

13         A.     I believed --

14              MR. SIMON:  Objection, asked and

15    answered.  Go ahead.

16         A.     Okay.  I believed that this was the

17    agreement that I was signing up to.  I felt that

18    this was put in for protection of ZF basically, but

19    this was what was being offered to me.

20         Q.     Okay.  Now, you'll see in that same

21    section and the sentence before where it says,

22    Plans described here are subject to change.  You

23    saw that language back in 1999, correct?

24         A.     Yes.

1          Q.     Okay.

2          A.     But what I consider plans is health

3     care, savings plans, 401K, okay?  Not competitive

4     salaries, not AIPs, not merit.

5          Q.     And why did you not consider those to

6     be subject to change?

7          A.     Because competitive compensations are

8     based upon how -- you went into the agreement with

9     the company.  The annual incentive plan is

10    basically set up on a formula and the same way with

11    merit raises.

12              Formulas are set up so that it takes

13    the subjectivity out of who gives what to who.  As

14    far as the plans, as far as the dental, accidental

15    death, 401Ks -- you know, I can see where they

16    might change 'cause they have with Ford Motor

17    Company.

18         Q.     They were always subject to change at

19    Ford, correct?

20         A.     They had changed, yes.

21         Q.     Okay.  Your salary never changed with

22    Ford?

23         A.     It got more.

24         Q.     So it changed?

1          A.     I got increases on a yearly basis.

2          Q.     So it changed?

3          A.     Yes --

4          Q.     The --

5          A.     -- positively.

6          Q.     Sure, okay.  And with respect to

7     profit sharing, that changed at Ford, right?

8          A.     Based on the formulas of profitability

9     of Ford Motor Company as a whole, yes.

10         Q.     And --

11         A.     But the formula as to how I was paid

12     did not change.

13         Q.     Okay.  But the profit sharing changed?

14         A.     The amount of monies that were paid to

15     individuals were subject to change, but not the

16     formulas of what level you were at or what grade

17     level you were on.  They were all the same.  Just

18     like --

19         Q.     Okay.

20         A.     -- I believe ZF has got the same

21     formula set up and that's what -- it should be --

22     it's not -- it takes the subjectivity out of it.

23         Q.     Okay.

24         A.     It basically says that, Hey, here's

1    what you're going into.  Here's the percentages

2    based on your level of employment where you're at,

3    as far as -- you know, salary grade levels.

4         Q.    Well, you talk about subjectivity and

5    I look at the language in the gray brochure.  And

6    all it says is, The merit program is established

7    and the amount will be announced annually.  That's

8    what the document says, right?

9         A.    Yes.

10        Q.    I don't see any objective standards in

11   there whatsoever.  Do you?

12        A.    As far as in the past what Ford Motor

13   Company has said, here's -- or even Zed-F, here's

14   the percentage that should be given.  And that's

15   what you -- based on the profitability of the

16   company.

17        Q.    Okay.  Well, let's talk about that for

18   a second because what we're talking about right now

19   is the gray brochure that you had in 1999, correct?

20        A.    Yes.

21        Q.    And all the gray brochure says is the

22   merit increase -- is that a merit program is

23   established and the amount will be announced

24   annually, period.  That's all it says, agreed?

42

```
 1          A.    Yes.

 2          Q.    It doesn't say anything about

 3    objectivity, does it?

 4                MR. SIMON:  Objection.

 5          Q.    Does it?

 6                MR. SIMON:  Objection.  The document

 7    speaks for itself.  Go ahead and answer.

 8          Q.    Doesn't say anything about

 9    subjectivity, does it?

10                MR. SIMON:  Same objection.

11          A.    The document itself says -- no.

12          Q.    Doesn't say that you're going to get X

13    percentage on any given year, does it?

14                MR. SIMON:  Same objection.

15          A.    No.

16          Q.    It doesn't say that you're going to

17    get a fixed dollar amount on any given year, does

18    it?

19                MR. SIMON:  Mr. Hunter, can I have a

20    continuing objection --

21                MR. HUNTER:  Please.

22                MR. SIMON:  -- to this line of

23    questioning?

24          A.    No, it does not say that.
```

1          Q.     All right.

2          A.     The document does not say that.

3          Q.     And nobody at any of the meetings

4     said, You're going to have a fixed dollar amount,

5     did they?

6          A.     No.  They said there would be

7     percentages.  There would be a plan put into

8     position that -- be adhered to and be administrated

9     by the management team here at ZF Batavia.

10         Q.     And that's all they said as to that

11    issue, correct?

12         A.     Yes.

13         Q.     Okay.

14         A.     But there would be guidelines that

15    went along -- they said there would be guidelines

16    set up and -- and -- in the plan on what

17    percentages would be based upon what level you were

18    at.

19         Q.     And the company would at some point in

20    time determine what those percentages and

21    guidelines would be --

22         A.     Yes.

23         Q.     -- in its discretion?

24         A.     Yes.

1        Q.    Now, we've talked about -- tried to

2    talk about when you made the decision to come over

3    to Batavia, and I think what you told me, you had

4    continued to do your homework with respect to CVT

5    and ZF.  Is there a point in time that Mike Steward

6    said, Okay.  I'm going to make the move?

7        A.    It was around September.

8        Q.    Okay.  What happened between now --

9    let's say the last formal meeting, okay, which I

10   think we've been calling the second meeting in

11   September to cause you to change your mind or make

12   up your mind maybe is a better way to --

13       A.    Well, I think we stated that earlier.

14   You know, I did come research on ZF.  I did some

15   research about what Ford was doing.

16       Q.    Okay.

17       A.    I did some research about the CVT.

18       Q.    Anything else?

19       A.    No.

20       Q.    Okay.  You were then presented

21   apparently an offer in about August?

22       A.    I believe that's about correct.

23       Q.    August, September, perhaps?

24       A.    Yeah, as far as I remember, yes.

1          Q.    Okay.  And I'm not trying to trick

2     you.  Let's mark the next exhibit and do it that

3     way.

4              Mr. Steward, we've handed you what

5     we've marked for identification purposes as Exhibit

6     108.  If you would, please, take a moment to go

7     through that.

8          A.    Okay.

9          Q.    Is that the offer that you were

10    presented by ZF Batavia?

11         A.    Yes.

12         Q.    Do you remember who gave that to you,

13    because I note for the record that it is unsigned?

14         A.    Rick Williams.

15         Q.    Okay.  Now, I see a date on there that

16    you accepted this on September 30th of 1999?

17         A.    Yes.

18         Q.    Do you remember, did you sign it the

19    day you received it or did you take it home to

20    think about it, if you recall?

21         A.    I don't recall.

22         Q.    Do you remember, did Rick come out to

23    the floor?

24         A.    Yes.

1        Q.    Did you get -- Okay.  Rick came out to

2    the floor where you were out working?

3        A.    Yes.

4        Q.    Was anybody else with Rick?

5        A.    No.

6        Q.    Did you know that Rick was going to

7    come out --

8        A.    Yes.

9        Q.    -- and present an offer?

10        A.    Yes.

11        Q.    How did you know that?

12        A.    We had discussions.  He asked me if I

13    was -- had made up my mind and I told him yes.

14        Q.    Okay.  Did you speak with him about

15    what the compensation would be with respect to

16    coming over?

17        A.    Compensation?  I don't understand what

18    you're asking me, as far as --

19        Q.    Anything to do with what you would be

20    paid or receive to come over to Batavia.

21        A.    Yes.

22        Q.    Do you remember the nature of those

23    discussions?

24        A.    Well, I asked him how would my salary

47

1    be affected and he said it wouldn't.  I'd be

2    maintaining the same salary that I had right --

3    currently.

4         Q.    Okay.

5         A.    And my overtime would stay the same,

6    that my vacation would be the same, that the AIPs

7    and the merits would be the same as if we were with

8    Ford, only based upon the profitability of ZF

9    versus what we had with Ford.

10         Q.    Okay.  Now, I guess what I'm talking

11    about is, for example, I see in here transition

12    bonus of $30,500.

13         A.    Mm-hmm.

14         Q.    Did you discuss that with Rick?

15         A.    Yes.

16         Q.    Okay.  And why were you paid a

17    transition bonus?

18         A.    To offset what we were losing for the

19    lease car, for what I was giving up for my lease

20    car for the A Plan.

21         Q.    Okay.  Did that transition bonus cover

22    anything else?

23         A.    Not that I was aware of, no.

24         Q.    Well, you see in the second bullet

1    point where it talks about the transition payment?

2    The last sentence says, "This bonus is designed to

3    address any monetary differences between Ford

4    benefits and ZF Batavia's new plan."

5         A.    Right.

6         Q.    You saw that language?

7         A.    Yes.

8         Q.    It certainly doesn't say lease car or

9    A Plan, does it?

10         A.    It talks about the differences between

11   the Ford benefits and the ZF plan.

12         Q.    Okay.  And what did that mean to you?

13              MR. SIMON:  Objection --

14         A.    Just what I told you.

15              MR. SIMON:  -- asked and answered.  Go

16   ahead.

17         A.    Just what I told you.

18         Q.    Okay.  So you took "monetary

19   differences between Ford benefits and ZF Batavia's

20   new plan" to mean only the lease car and the A

21   Plan?

22         A.    Yes.

23         Q.    Okay.  Have you received that bonus?

24         A.    Yes.

1          Q.     Okay.  What is your current position

2     with the company?

3          A.     Lean process manager.

4          Q.     Is that a promotion from

5     superintendent or --

6          A.     I'm still on the MR roles, but what I

7     was -- after superintendent, we went to one shift

8     and basically what happened is the CD4E

9     transmission, there was a different -- right before

10    the Escape came on board, there was a -- production

11    went down.

12         Q.     Okay.

13         A.     So when it went down, I went into --

14    as a Ford production system/Batavia Customer

15    Satisfaction System, BCSS coordinator.

16         Q.     Okay.

17         A.     And that was based on a Ford

18    production system that was being implemented

19    throughout Ford Motor Company and the management

20    team had decided that -- that they wanted to follow

21    suit.

22         Q.     Okay.  And apparently you came back

23    from customer satisfaction to LPM --

24         A.     Yeah.

1          Q.     -- the current LPM position?

2          A.     Yeah, yeah.

3          Q.     You obviously heard Mr. Vories talk

4    about the commitments that have not been followed

5    through by ZF Batavia, and he made various

6    statements about those commitments.

7               Do you have an opinion as to any

8    commitments or representations, whatever you want

9    to call them, that ZF Batavia has not followed

10   through on?

11         A.     Well, I think the biggest ones are --

12   one was the overtime payments.

13         Q.     Okay.

14         A.     Second was the -- what I considered

15   the AIP is not -- when we say subjectivity, being

16   put in the AIPs, the AIPs were supposed to be based

17   on the formula -- based on the formula that I was

18   supposed to receive if the company made a profit,

19   which was stated that we made a five percent over

20   the year improvement, then my -- my profit sharing,

21   compared to what I had, was substantially lower.

22         Q.     Okay.  All right.  So for you the

23   issues --

24         A.     And the opportunities to go into CVT.

```
 1          Q.     Okay.  Have you been denied that

 2     opportunity or it's just not there yet?

 3          A.     No, it's been denied.

 4          Q.     Okay.  And when was it denied?

 5          A.     I wouldn't say it's actually formally

 6     been denied, but I was -- when I had discussions

 7     with Ray Pablice about getting into the CVT

 8     organization, he said at that time -- particular

 9     time there weren't any openings available.

10               What I tried to explain to him is that

11     with the PCSS production system, new programs

12     coming on, that would be right in line with what we

13     were trying to get accomplished and what he was

14     trying to get accomplished.  And he said he didn't

15     have the head count at that particular time.

16          Q.     Was there a head count available to

17     rate at that point in time, do you know?

18          A.     I don't know whether there was or not.

19     I just have to take him for face value for what he

20     said.  And I asked him after that about six months

21     later and the same answer came up.

22          Q.     Have you had any economic losses

23     because of the fact that you're not currently in

24     CVT?
```

1       A.    I've had current -- I've had economic

2   losses based on the overtime that I would have

3   received on the floor.

4       Q.    Okay.  And how much have you lost?

5       A.    I don't know right offhand.

6       Q.    And just so that I understand, what

7   you're saying is you think you would have worked

8   even more overtime had you been in CVT?

9       A.    No.  What I'm saying is -- based on

10  the CVT?  Wait a minute.  Let's step back.

11      Q.    Sure.

12      A.    Ask me again.

13      Q.    Okay.

14      A.    I'm not sure exactly I understand what

15  you're asking me.

16      Q.    Okay.  And I want -- please -- you

17  know, stop me if that's an issue.

18      A.    Okay.

19      Q.    Trying to understand, have you lost

20  any money or what I refer to as economic loss

21  because you're not over in CVT?

22      A.    No --

23      Q.    Okay.

24      A.    -- other than maybe a promotional

1    opportunity where there would be monies involved.

2         Q.    Can you identify the promotion that

3    you would have had over there?

4         A.    Well, basically a business manager,

5    back to the business manager level.

6         Q.    When we talk about the fact that you

7    went and became involved in the customer

8    satisfaction program and you're currently an LPM,

9    your salary, however, has continued to go up every

10   year that you've been with Batavia, right?

11        A.    Yes.

12        Q.    Now, you started to make the comment

13   before that I think the biggest issue was the

14   overtime payments, in terms of what Batavia -- ZF

15   Batavia has not followed through on, correct?

16        A.    No.  It's not the biggest issue.

17   There's several issues.

18        Q.    Okay.  Well, let's talk about those

19   issues.  As I understand it currently, you said

20   overtime payments was first mentioned, AIP and then

21   CVT opportunities, which I think --

22        A.    Yes.

23        Q.    -- we've talked about CVT?

24        A.    Yes.

54

```
1          Q.     All right.  Let's talk about overtime.

2          A.     Okay.

3          Q.     What's the issue with respect to

4    overtime?

5          A.     Well, under the Ford guidelines, the

6    promises that were made -- that we'd be paid

7    overtime as if we were in salary ranks of Ford

8    Motor Company and that's been taken away.

9          Q.     Okay.  And what's the difference

10   and/or what's been taken away?

11         A.     Well, as an LPM, you don't get paid

12   overtime unless you're working on the floor in

13   production areas, unless you're covering a group

14   leader or a supervisor.  And under the Ford

15   guidelines, we did get paid.

16         Q.     Did Ford have LPMs?

17         A.     They have manufacturing planning

18   specialists.

19         Q.     So they didn't have the LPM position?

20         A.     Correct.  Well, it's not identified,

21   as -- as far as the verbiage.  The verbiage is

22   different, but the levels are the same.  The job

23   responsibilities are the same.

24         Q.     Well, when you were at Ford and
```

1    particularly when you were at Batavia or

2    Sharonville, wherever, did Ford during your tenure,

3    use lean processing methodologies with respect to

4    its production philosophies?

5        A.    Yes.

6        Q.    Universally use those?

7        A.    In the last six, seven years, yes.

8        Q.    And so they had lean process managers?

9        A.    They called them manufacturing

10   planning specialists --

11       Q.    Okay.

12       A.    -- or a Ford production coordinator

13   who had -- who was responsible for coordinating the

14   activities throughout the plant, through the LPM

15   and superintendents.

16       Q.    So if -- if someone had said that Ford

17   operated the Batavia facility on a mass production

18   basis, you would simply say that's inaccurate?

19       A.    Restate that so I understand what

20   you're saying.

21       Q.    Well, I've had the Batavia philosophy

22   described to me as one of mass production, in a

23   sense, and opposite to lean process methodologies.

24   Would you say that that is inaccurate?

1          A.     I still don't understand what you're

2     asking me.  If you're asking me if Ford Motor

3     Company has mass productivity -- what's your

4     definition of "mass"?  When you're making large

5     amounts of transmissions per year, it's mass.

6          Q.     Okay.

7          A.     Lean has nothing to do with the amount

8     of transmissions that you produce.

9          Q.     I agree.  It's a different methodology

10    in terms of minimalization of inventory, scrap --

11         A.     Of waste.

12         Q.     All of those issues, the seven signs

13    of waste, all of that, correct?

14         A.     Exactly.

15         Q.     Were those philosophies part of the

16    philosophies over at Ford when Ford was running the

17    Batavia facility?

18         A.     Yes.

19                (Off-the-record discussion.)

20         Q.     All right.  So with respect to

21    overtime, then, you felt that as an LPM at Ford, or

22    at least the equivalent position because that

23    position didn't exist, you would have been paid

24    overtime?

```
 1          A.    Yes.

 2          Q.    Okay.  And in terms of that overtime,

 3   how did -- we've talked about the casual time.  So

 4   you --

 5          A.    Yes.

 6          Q.    -- still would have had casual time as

 7   an LPM?

 8          A.    Yes.

 9          Q.    All right.  Would the amount of casual

10   time been different than what you've already

11   described to me?

12          A.    As an LPM or versus an MPS?  In the

13   Ford world, would it -- what are you asking me?

14          Q.    Yeah, I guess because the positions

15   just aren't necessarily equivalent.  In terms of an

16   LPM at ZF Batavia --

17          A.    Yes.

18          Q.    -- what do you think you would have

19   been paid if that position existed at Ford?  I

20   don't know how else to say that, but --

21          A.    The same I would have been if I had

22   been a manufacturing planning specialist.

23          Q.    And so you would have had casual time?

24          A.    Yes.
```

1          Q.     And how much casual time would you

2     have had?

3          A.     40 minutes a day.

4          Q.     Okay.  You've given a number to your

5     attorney, in terms of a loss -- an economic loss.

6     That number was $19,780.  What does that number

7     represent?

8          A.     What that represents -- it's actually

9     more than that on this one.

10               MR. SIMON:  I assume, Mr. Hunter,

11     you're referring to his interrogatory answer?

12               MR. HUNTER:  Mm-hmm.

13               MR. SIMON:  I've got a different one

14     on my page.

15          Q.     Oh, jeez, I'm looking at the wrong

16     number.  I am.  Sorry about that.  I'm sorry.

17     $23,675.

18          A.     That money represents the amount of

19     time that I put in, casual time, anywhere from 10

20     to 11, 12 hours and not paid for.  It's my job --

21     if I was doing something at work --

22          Q.     Okay.

23          A.     -- that required me to be there, I was

24     not paid or wasn't given the compensation in the

1    first several years that we made the transition.

2    Now, since I been back out on the floor as an LPM,

3    I've covered production supervisors and I been paid

4    for it, the overtime.

5            But from 2000 until 2002, the amount

6    of what I consider 10-hour rule, that represents

7    that hour that we didn't get paid 'cause I didn't

8    get paid overtime at that particular time.  But if

9    I was paid, it was very little.

10       Q.    Okay.  I was going to say, were you

11   paid no overtime in 2000?

12       A.    Very little.

13       Q.    How about 2001?

14       A.    Same way.  Very little overtime, even

15   though I put at least 10 hours a day in.

16       Q.    When you do your time sheets -- and

17   let's talk about 2000 where you were paid.  I think

18   your comment was very little overtime.  What -- how

19   do you do your time sheets?

20       A.    I just put down the amount of time

21   that I'm in the building.

22       Q.    All right.  So your time sheet, if it

23   reflected that -- well, if it reflected a start

24   time of, let's say -- I don't know, 7:00.  That's

1   the time you arrived at the plant?

2        A.    No.  It's usually I got there a little

3   bit before that, quarter till.

4        Q.    All right.  So I guess I'm going to

5   ask the question again.  What is reflected on your

6   time sheet?  I think you said when you get to the

7   plant and now I think what you're telling me is --

8        A.    It's normally whatever time -- 7:00

9   is -- seven -- you know, it differs.  It changes

10  based on what I'm particularly doing at that

11  particular time.  If I get to the office and check

12  my computer, it's usually -- it says -- 7:00 is

13  what time I get there, that's normally what time I

14  put down.

15       Q.    Okay.  And so -- and the end time --

16  or term I guess would be more appropriate, actual

17  quitting time that's shown on your salary time

18  statements, is that when you leave the building or

19  is that something else?

20       A.    Something else.  It's usually

21  whenever -- depending on what time we get out of

22  the meetings or -- we usually have a 4:15

23  meeting --

24       Q.    Okay.

```
 1        A.      -- or right before the 4:15 meeting,

 2   we have a -- we download with the group leaders.  I

 3   usually sit through that.  And it depends on --

 4   when I leave the building, it's usually 10 or 15

 5   minutes later than what I put on my time sheet.

 6        Q.      And what are you doing in that last 10

 7   or 15 minutes?

 8        A.      Usually leaving.  I mean, it's on the

 9   way out the door, but I mean -- where our offices

10   are in the building, it's -- it's 10 to 15 minutes

11   to the parking lot.

12        Q.      Okay.  And do your timecards reflect

13   any deductions for lunch or anything like that?

14        A.      No.

15        Q.      Okay.  And so what's the average

16   lunchtime?

17        A.      15 minutes.

18        Q.      Okay.  And what was that at Ford?

19        A.      Basically the same.  I mean, we get --

20   it's 30 minutes is what you -- 30 minutes for

21   lunch.

22        Q.      Okay.

23        A.      But based on the job that I had and my

24   responsibilities, I usually never took that long.
```

```
 1          Q.    Okay.

 2          A.    So sometimes you get lunch; sometimes

 3    you don't.  Sometimes the bear gets you and

 4    sometimes you get the bear, you know?  But very

 5    seldom it was ever 30 minutes.

 6          Q.    Okay.

 7          A.    And even the same way today.  Well,

 8    except for today, maybe.

 9                MR. VANWAY:  We're taking the full 30.

10          Q.    All right.

11          A.    You know, day-to-day activities on the

12    floor -- I mean, you pretty much got to -- if you

13    get a chance to go get something to eat, you grab

14    it or you might even get a snack and -- depending

15    on what's going on.

16          Q.    Okay.  And is that any different than

17    what it was at Ford?

18          A.    No --

19          Q.    All right.

20          A.    -- not for me.

21          Q.    All right.  And just so that I'm

22    clear, you are currently being paid overtime at ZF

23    Batavia, correct?

24          A.    I'm being paid overtime if I cover a
```

1     production supervisor.

2          Q.     Okay.  Well, is there, then, still

3     overtime that you feel you're entitled to now that

4     is not being paid?

5          A.     I feel that if I put nine -- the 10

6     hour rule is -- is something that under the Ford

7     rule, I would have been paid.  I'd have been

8     compensated for.

9          Q.     Okay.  Can you define for me in a

10    couple sentences, what is the 10-hour rule?

11         A.     We're expected to put at least 10

12    hours a day in.  That was a directive that came out

13    for salaried personnel.

14         Q.     At Ford or Z --

15         A.     At ZF.

16         Q.     Okay.  You're expected to put in a 10

17    hour -- I remember a memo that talked about

18    expected to put in a nine-hour day, but I don't

19    remember a 10-hour day.

20         A.     In a management role position, you're

21    expected to put 10 hours a day.

22         Q.     Did that come out in writing or --

23         A.     No, I don't think it came out in

24    writing, but -- I mean, it was an expectation that

1    was sent down by the management team.

2        Q.    Do you remember specifically who said

3    that?

4        A.    Well, Len Sennish.  I believe in his

5    organization, it's a 12-hour day.

6        Q.    I think Mr. Ervin feels the same way.

7            And at the -- if you put in a 10-hour

8    day, what are you paid for?

9        A.    Eight hours.

10       Q.    Okay.  And just so that I'm clear, the

11   LPM position that you currently hold is a

12   management role position?

13       A.    Yes.

14       Q.    Okay.  Any other issues with overtime?

15       A.    No.  I can't think of -- nothing I can

16   think of at this time.

17           MR. HUNTER:  Okay.  Well, let's take

18   our lunch break.

19       (Off the record:  12:17 p.m. - 12:52 p.m.)

20           MR. HUNTER:  I want the record to

21   reflect that Mr. Crump has joined the deposition

22   this afternoon.

23   BY MR. HUNTER:

24       Q.    Mr. Steward, I think we had pretty

1    much beat to death the overtime issue.  Is there

2    anything else comes to mind with respect to that?

3           A.    Well, the five days of the personal

4    days went to three.

5           Q.    Okay.  Hang on.

6           A.    That's --

7           Q.    Any overtime issues, though?

8           A.    No.

9           Q.    Okay.  Now let's talk about other

10   issues with respect to things that Batavia hasn't

11   followed through on.

12          A.    Okay.  One, we talked about the

13   personal days went from five to three --

14          Q.    Okay.

15          A.    -- and the bereavement went to three

16   days.

17          Q.    Okay.  Anything else?

18          A.    We talked about the promotional

19   opportunities in CVT, but other than that, no.

20          Q.    And the personal days, my recollection

21   is that was a -- lack of a better way to put it, a

22   temporary change that lasted, I think, for about a

23   year?

24          A.    I think it lasted about a day -- I

66

1    mean, about a year, but I don't think it was

2    intended to be temporary.  That's not the way the

3    memos came out.  It was just basically that this

4    was going to be a change in the policy.

5        Q.    Okay.  And there was a subsequent

6    change that came out and said --

7        A.    We're going back to five days.

8        Q.    Okay.  And I guess I don't understand

9    your comment about how you didn't think it was

10   temporary or I don't understand what you mean by

11   that.

12       A.    Well, the memo didn't say it was going

13   to be temporary.

14       Q.    Okay.

15       A.    So I would not think that if a memo

16   came out of salaried personnel saying that personal

17   days from five to three, I wouldn't think that as

18   being a temporary situation.

19       Q.    Okay.  But, in fact, it ultimately

20   turned out to be that way?

21       A.    Yes.

22       Q.    Did you, for that period where it was

23   reduced from five to three, did you use all of your

24   personal days?

1          A.     I believe so.

2          Q.     Okay.  Did you have need for

3     additional personal days?

4          A.     I'm not sure.  I don't recall.  I

5     don't know if I did or not.

6          Q.     So you don't know if you were affected

7     by that change?

8          A.     I was affected by the fact that it was

9     changed, the policy was changed.  That was the only

10     way I was -- as far as taking additional two days,

11     having personal -- I don't know.

12          Q.     Okay.  What about the bereavement?

13          A.     I wasn't affected by the bereavement.

14          Q.     Okay.  You'd mentioned in the kind of

15     laundry list of items AIP.  And I don't think we

16     spent much time talking about AIP.  What's your

17     understanding or issue with respect to AIP?

18          A.     Well, I have several issues.

19          Q.     Okay.

20          A.     One is that I felt there was a formula

21     that was supposed to be used to determine -- based

22     on the profitability of the company and supposedly

23     year over year -- there was a five percent

24     year-over-year improvement in the plant.  Return on

1    sales was around five percent improvement.

2            And based on that, then, we met our

3    objectives based on what was said to be the goals

4    of the AIP.  And AIP should have been reflected in

5    that.

6            I felt that there was some comments

7    made by Dick Newark that said that the Ford

8    transition people are going to get less of an AIP

9    because they were making too much money and --

10        Q.    Okay.  Obviously if Dick Newark made

11    such a comment, it was well after the

12    organizational meetings that we talked about

13    earlier?

14        A.    Yes.

15        Q.    Okay.  When you talk about this

16    formula for AIP and the five -- the year-over-year

17    and the five-percent improvement, is that anywhere

18    contained within the gray brochure?

19        A.    No, but it was based in here.

20        Q.    All right.  Well, then, you've got in

21    front of you Exhibit 4?

22        A.    Yes.

23        Q.    All right.  Exhibit 4 was never a

24    handout, was it?

69

1          A.    I think these were very -- these were
2     part of the overheads that were shown to us.
3          Q.    Okay.
4          A.    Now, we were given handouts from the
5     management team saying what the objectives were for
6     your -- for the AIP objectives.
7          Q.    Okay.  But, again, that was after the
8     organizational meetings, correct?
9          A.    Correct.
10         Q.    And, in fact, I think that would have
11    been after you had signed on?
12         A.    Correct.  Well, except for this part
13    right here.  It looks like page 7.
14         Q.    All right.  You're talking about page
15    7 of Exhibit 4?
16         A.    Yes, the annual incentive plan --
17         Q.    Okay.
18         A.    -- Ford transition, MR bands based on
19    what percentage the target would be, what the
20    maximum would be.
21         Q.    Okay.  And, in fact, the discussion
22    document, whatever you want to call it, regarding
23    AIP continues on for other pages, correct?
24         A.    Yes.

1        Q.     I think in Exhibit 4 after that kind

2   of bar graph, what would be, I believe, pages 8 and

3   9, starts, ZF Batavia 1999 objectives.  Those two

4   pages would relate to the AIP as well?

5        A.     Yes.

6        Q.     Okay.  Did you receive an AIP payment

7   in 2001 for year 2000?

8        A.     Yes.

9        Q.     Okay.  Was there any time you didn't

10  receive an AIP payment?

11       A.     No.

12       Q.     Okay.

13       A.     But the percentages of what I felt was

14  supposed to be given was lower than what the

15  expected -- based on the management teams

16  receiving -- from what we were told is that the

17  management team -- when I say "management team,"

18  I'm talking about the SER roles, the managers and

19  directors received full compensation, where ours

20  was put on a prorated basis.

21       Q.     You got to help me there with that --

22       A.     All right.

23       Q.     -- because when you said "management

24  team," I assumed you meant TMT, but apparently

1    that's not the case.

2        A.    No, that's the same, yeah.  TMT and

3    management, the role -- when I say SCR roles, that

4    could be directors --

5        Q.    Right.

6        A.    -- or managers.

7        Q.    Okay.  Which is basically the TMT

8    team?

9        A.    Yes.

10        Q.    All right.  And so -- and I know you

11    already said it, but you lost me.  The difference

12    or the issue is what now?

13        A.    The issues that I felt were the

14    percentages of what we received versus what the

15    targets were were lower.  And in discussions with

16    Dick Newark, they were based on, one, some people

17    didn't get them because of overtime.  Some people's

18    merit raises or AIPs were lower because of how much

19    money they were, quote, "making" versus being a

20    transition person versus a new hire from ZF.

21        Q.    And is this for every year or is this

22    for one particular year or --

23        A.    First two years.  Well, the first year

24    in particular because we were just paid for 2002.

72

```
 1          Q.    Okay.

 2          A.    So it would have been -- actually been

 3     for 2001.

 4          Q.    Which was paid in 2002?

 5          A.    2001.  It was paid in 2002.

 6          Q.    Right.

 7          A.    2000 was paid in 2001.

 8          Q.    Right.

 9          A.    So it was for 2002, 2001 time frame.

10          Q.    And in terms of reductions or

11     adjustments for either overtime or what people were

12     paid, what -- what adjustments were made?

13          A.    I'm not clear what you're asking me.

14          Q.    You said that Mr. Newark indicated

15     that there were adjustments or changes based --

16          A.    There were AIPs.  People did not get

17     AIPs because of the amount of overtime that they're

18     working.

19          Q.    Okay.  Did that affect you?

20          A.    No.

21          Q.    Who did it affect?

22          A.    Well, let me say it this way.  I don't

23     know if it affected me because I didn't -- as far

24     as the overtime, the actual working of overtime and
```

1    the compensation based on the job that I had, it

2    was some over -- casual overtime, but as far as

3    what I put down on my time sheet, no, it did not

4    affect me.

5         Q.    Okay.  Whose AIP payment was affected

6    by --

7         A.    First-line supervisors in the

8    maintenance organization, material control

9    organization, people who historically in the plant

10   work a lot of overtime.

11        Q.    Do you know any specific individuals

12   or no?

13        A.    I don't know offhand.  I kind of

14   figure that's a private discussion and if somebody

15   wants to tell you, they'll tell you.  And if they

16   don't, I don't go and ask them about their -- how

17   much money they get paid or how much that they make

18   or if they got their bonuses or even how much they

19   got.

20        Q.    Okay.  The number that we talked about

21   before, I think it was about 22.  Since your AIP

22   was paid appropriately, there would be no -- no

23   portion of that number reflects an issue with

24   respect to AIP?

1          A.    Yes, there would be a reflection of it

2     of what I felt that I -- the target number was

3     versus what I should have -- what I actually got.

4          Q.    So --

5          A.    If you go back -- if you go back to

6     this Exhibit Number 4, theoretically in 2002, the

7     target should have been for an MR level $10,050.

8          Q.    Okay.

9          A.    And my merit -- I mean, my AIP was

10    somewhere around 2,000 to $3,000.

11         Q.    And I guess I want to be clear.  I

12    think you said 2000.  That would have been actually

13    1999, that it was paid in 2000?

14         A.    No, it would have been 2001 when it

15    would have been paid.

16         Q.    All right.  So we're talking about --

17    what I don't understand --

18         A.    2002.

19         Q.    We talked a little bit before about

20    Exhibit 4 on pages 8 and 9.  I see ZF Batavia 1999

21    objectives.  It doesn't say 2000 objectives, does

22    it?

23         A.    No.

24         Q.    Are you saying, then, that the targets

1    and the objectives weren't subject to change?

2         MR. SIMON:  Mike, make sure you listen

3    to his question while you're flipping through that.

4    If you want to flip through that to review at all,

5    you can do that, then answer his question.

6         A.   Okay.  The objectives were not subject

7    to change.  As far as delivery cost initiatives,

8    they did not change.  Safety, quality, the

9    percentages did not change.

10        Q.   Could they have changed?

11        A.   Could they have changed?  I don't

12   know.  I'm not aware if they did.  As far as

13   safety, quality, delivery and costs, no, they have

14   not changed.

15        Q.   But they certainly could have if the

16   company elected to change those?

17        A.   The objectives are basically the

18   guiding principles and it's also the -- the way the

19   business is defined, as -- as being -- of what the

20   objectives would be for the plant and the building.

21             I mean, as part of the -- what do I

22   want to say?  -- guiding principles and the plant

23   statement, I guess is the best way to say this,

24   it's not exactly what I want to say, but that's

1    where it was defined as -- as how we're going to

2    run the business.

3          Q.    Okay.  So --

4          A.    Guiding principles, the statement of

5    the intent of ZF Batavia.

6          Q.    All right.  And so your position is

7    that your AIP payment that was made in March of

8    2000 --

9          A.    And 1 --

10          Q.    2001 --

11          A.    -- and 2002.

12          Q.    -- was insufficient?

13          A.    Yes.

14          Q.    Okay.  And 2002 was insufficient?

15          A.    Yes.

16          Q.    All right.  Any other issues with the

17    AIP?

18          A.    No.

19          Q.    Okay.  As we sit here today, can you

20    tell me how much you think --

21          A.    There is.  Wait a minute.  Let me step

22    back a second.  The problem with the AIP was

23    discussions that were had, and it comes from

24    basically Mr. Newark, that the Ford transition

77

1  people made too much money, that the merit

2  raises -- merit and AIPs would be -- would be

3  different and would be lowered because of the --

4  basically because we made too much money, is what

5  he would say.

6          And he basically, from what I -- the

7  impression that I got was Mr. Newark was pretty

8  much calling the shots on who got what, as far as

9  the AIPs, rather than going by any formulas or --

10  or how they were -- you know, approved was really

11  upon Mr. Newark.

12     Q.    You were aware that the company had an

13  AIP formula, correct?

14     A.    Yes.

15     Q.    And is it your -- what you're telling

16  me is that apparently Dick Newark  --

17     A.    Disregarded it.

18     Q.    -- disregarded that?

19     A.    Yes.

20     Q.    Why didn't you go to Dave Adams or

21  Karl Kehr or Len Sennish and say, Hey, guys, Dick's

22  not following company policy?

23     A.    There was discussions on that.

24     Q.    Who did you discuss it with?

```
 1          A.    I -- well, I had a discussion with Len

 2    and -- you know, basically Len's position was that

 3    Dick's the production manager, production director

 4    and it's his business.

 5          Q.    Did you take it any further?

 6          A.    No.

 7          Q.    All right.  Anything else on AIP?

 8          A.    No.

 9          Q.    You would certainly acknowledge that

10    with respect to AIP, there was no specific dollar

11    amount that was guaranteed to you?

12          A.    I would agree to that, yes.

13          Q.    And certainly no specific percentage

14    that was ever guaranteed to you?

15          A.    Well, I don't think anything is

16    guaranteed, but I think that we had an agreement

17    that AIPs would be based upon a percentage and

18    based upon when we go back to this right here, that

19    there would be a system in place, that you just

20    arbitrarily couldn't pull a number from a hat.

21              Since because I like you better than I

22    like Jim or I like you or whoever, I can give you

23    whatever I want.  There should be guidelines put

24    into place and there should be plans that are
```

1    regulated based upon how you run your business.

2        Q.    Okay.  All right.  Mr. Steward,

3    handing you what we've marked for identification

4    purposes as Exhibit 109.  Have you ever seen that

5    document before?

6        A.    Yes.

7        Q.    And I direct your attention to the

8    second page.  It appears to have your signature

9    there three times on that page?

10       A.    Yes.

11       Q.    Is that, in fact, your signature?

12       A.    Yes.

13       Q.    Did you read the document before you

14   signed it?

15       A.    Yes.

16       Q.    Do you feel you understood the

17   document at the time that you signed it?

18       A.    Yes.

19       Q.    And we're done with that one.  With

20   respect to merit increases, you have always

21   received merit increases at ZF Batavia?

22       A.    Yes.

23       Q.    And I don't know if we talked about

24   it, but I guess I want to clarify it.  Do you have

1    any issue with your merit increases other than what

2    you relayed about apparently some comments from Mr.

3    Newark?

4          A.    I think the concern I had with merit

5    raises is that -- just what we said about the

6    comment from Mr. Newark is -- is really a major

7    concern to me.  As far as an issue with the merit

8    system, I think it can be -- you know, probably be

9    handled in a -- by more of an appropriate -- coming

10   from salaried personnel, based on putting controls

11   in place to where -- that somebody just couldn't

12   arbitrarily come up and say, I give you this much

13   money based on I like you or I don't like you.

14         Q.    Do you think it's appropriate to base

15   merit increases based upon individual merit?

16         A.    I think it should be based upon your

17   performance from the prior year.

18         Q.    For the individual?

19         A.    Yes.

20         Q.    Okay.  So if I understand your

21   question -- your comment, I think what you're

22   telling me is it is appropriate to base upon --

23   base a merit increase upon individual performance,

24   but certainly not a personal like or dislike or

1    something like that?

2        A.    Yes.

3        Q.    Okay.  And do you feel that your merit

4    increases have been affected based upon some

5    personal animus from Mr. Newark or somebody else?

6        A.    Yes.  I think the Ford transition

7    employees -- the comment's been made many, many,

8    many times that we make too much money, and that

9    the merit raises and the AIPs would be

10   proportionately different because of the amount of

11   monies we make versus what the ZF new hires coming

12   in at.

13           And that is not a totally true

14   statement because the new business managers coming

15   in are coming in at a much higher level of pay than

16   what the current business managers are making with

17   Ford transition people.

18       Q.    Okay.  The -- if you're working the

19   same job as somebody else and there is an AIP

20   payment for that position, do you think it's

21   appropriate or within the company's discretion to

22   pay the same actual dollars, in terms of an AIP

23   payment for the same work?

24       A.    I think that what you have to look at

1    is -- is the objectives of each individual, what

2    they were given from the prior -- in your

3    performance reviews and what the -- what your boss

4    set your expectations for the coming-up year.  And

5    if you meet those or exceed those, then your merit

6    raise should be based on -- or AIP and your merit

7    raises should be based upon the targets that were

8    set forth in the formulas.

9         Q.    Now wait a minute.  I thought I told

10   me before AIP shouldn't be performance based, in

11   terms of individuals?

12        A.    It's based on the company.  I'm saying

13   that based upon the performance expectations that

14   you were given and objectives that you were given

15   and if you reach your objectives, based on the

16   company's goals and also your personal goals, then

17   you should either get the target number or exceed

18   that target number.

19        Q.    And if you don't?

20        A.    Then it should be proportionate upon

21   how you're rated by your supervisor.

22        Q.    So there is a personal component to

23   AIP?

24        A.    There is a -- as far as the objectives

 1    that are set forth that you're given on a yearly

 2    basis, based on your personnel files, it could be

 3    different.

 4         Q.    Okay.

 5         A.    But as far as the percentage and the

 6    formulas, the way they're set up, no.  They're not

 7    different.

 8         Q.    With respect to your salary, certainly

 9    you've always received your salary while you were

10    at Batavia?

11         A.    Yes.

12         Q.    Never been docked to the best of your

13    knowledge?

14         A.    No.

15         Q.    Anybody ever come to you and said,

16    Hey, Mike, there's a problem with your time sheets

17    or anything related to your time sheets?

18         A.    No.

19              MR. HUNTER:  Well, I will turn the

20    floor over to Mr. VanWay.  And I see the hour is

21    getting a little bit late here.

22              (1:15 p.m.)

23                           EXAMINATION

24    BY MR. VANWAY:

```
 1        Q.    Mr. Steward, good afternoon.  I'm Jeff

 2   VanWay.  I represent Ford in this case.  I have

 3   some questions for you.  I don't think I have as

 4   many as Mr. Hunter did.  I think he's covered a lot

 5   of the areas that I would have covered, so I'll try

 6   not to repeat those areas.

 7            The transition bonus that you received

 8   when you went over to ZF Batavia, that was larger

 9   than the transition bonus that most other

10   transitional employees received, wasn't it?

11        A.    I don't -- I don't know.

12        Q.    Were you given -- were you ever told

13   that yours was larger than others?

14        A.    No.  I -- bonuses, salaries,

15   transition monies, I always felt that is a private

16   situation for each individual and I didn't think

17   it's any of my business to be asking people what

18   they made or what they didn't make.

19        Q.    Okay.  But -- well, I understand that,

20   but I thought you just testified earlier that they

21   were hiring new people in at higher rates than what

22   you were making?

23        A.    Currently they are.

24        Q.    And I guess how do you know that if
```

1    you --

2         A.    Just scuttlebutt, just hearsay.

3         Q.    Okay.  So you don't know that?

4         A.    No.

5         Q.    It's just kind of plant rumor?

6         A.    Yes.

7         Q.    Now, you understood when you accepted

8    employment with ZF Batavia that you were going to

9    be working for the joint venture, right?

10        A.    Correct.

11        Q.    You wouldn't be working for Ford

12   anymore?

13        A.    Correct, but Ford would have an

14   influence on what was going on in the building.

15        Q.    Right.  They were a 49 percent

16   shareholder, right?

17        A.    Yes.

18        Q.    And that's what you expected the

19   influence to be, right --

20        A.    Yes.

21        Q.    -- through their 49 percent?

22        A.    Yes.

23        Q.    Okay.  And you understood that it was

24   going to be the joint venture that would set the

1    terms and conditions of your employment, right?

2         A.    Yes.

3         Q.    Now, at the time you had conversations

4    with Rick Williams and Jerry Priest and talked to

5    them about how they felt about making the

6    transition, et cetera, they'd already signed on

7    with ZF Batavia at that time, hadn't they?

8         A.    Yes.

9         Q.    You testified that one of the factors

10   in making your decision was that Jacque Nasser was

11   running Ford.  Am I right in taking that to mean

12   that you thought it was kind of a good time to get

13   out Ford  --

14        A.    No.

15        Q.    -- to get out of Ford because of the

16   cost cutting?

17        A.    No, that's not what I said.

18        Q.    Okay.  And that's what I'm trying to

19   understand.

20        A.    Okay.  What I was saying is that I

21   felt that with the transition -- let me step back.

22   What I meant by that is that Jacque Nasser was

23   running the company, was trying to improve return

24   on investments for stockholders.

1              I felt that in the future, that

2    transmission business potentially could have been

3    joint ventured with ZF or some other company

4    because, as Jacque was trying to improve the

5    price-earnings ratio, to do that you have to reduce

6    the capitalization.

7              Take a plant like Batavia.  There's

8    probably $100 million of capitalization in that

9    plant.  To satisfy what Wall Street was looking

10   for, to drive the -- the investor-shareholder

11   improvements and -- and make more profitability for

12   Ford Motor Company, I felt that in the future, Ford

13   would become more of a service-oriented type

14   business and that manufacturing, such as Vistion,

15   now most of those plants have been spun off.

16             I thought the transmission business

17   potentially could have been spun off the same way

18   as it had been at Batavia.  And so there -- I

19   looked at it as saying this could be the ground

20   floor of a good opportunity to get in with ZF, as

21   well as -- you know, what was going on in the -- in

22   the business.

23        Q.    Okay.  So you thought there might be

24   in the future either other joint ventures or just

88

1    the transmission business itself was --

2        A.    Yes.

3        Q.    -- outsourced?

4        A.    Yes.

5        Q.    Okay.

6        A.    I figured -- quite honestly, I thought

7    Sharonville would be in full going with ZF, and as

8    far as Batavia, Sharonville would both come under

9    the ZF eventually.

10        Q.    You testified that you were in the

11    process of exploring opportunities at other Ford

12    locations.

13        A.    Yes.

14        Q.    Did you get any offers from any

15    other --

16        A.    Yes.

17        Q.    Where did you get an offer?

18        A.    Kansas City.

19        Q.    Anywhere else?

20        A.    VanDyke.

21        Q.    Is VanDyke and --

22        A.    Transmission.

23        Q.    -- Kansas City the same thing?

24        A.    No.  Kansas City is an assembly plant;

89

1    VanDyke is a transmission business.

2         Q.    Okay.  So you got two offers?

3         A.    Yes.

4         Q.    Did you interview over at Sharonville

5    at all?

6         A.    No.

7         Q.    Did you express an interest in going

8    to --

9         A.    Yes.

10        Q.    -- Sharonville?  Then --

11        A.    Well, yes, I did because I came from

12   Sharonville.  I had been promoted from

13   Sharonville --

14        Q.    Right.

15        A.    -- and I was told that I couldn't go

16   back.

17        Q.    And who told you that?

18        A.    Mike Warden --

19        Q.    Okay.

20        A.    -- and also salary personnel from

21   Sharonville.

22        Q.    And do you know at the time they told

23   you that, were there openings at Sharonville?

24        A.    Yes, there was.

90

1  Q. Were there openings for which you were

2 qualified?

3  A. Yes, there was.

4  Q. And did you explain that to

5 Mr. Warden?

6  A. Yes, I did.

7  Q. And what did he say?

8  A. Sharonville can do whatever they want.

9  Q. So --

10  A. And at that particular time, it was in

11 the six-month grace period that we weren't allowed

12 to move out of the building.

13  Q. Okay.  So was it your understanding

14 that you weren't allowed to go to Sharonville

15 because of this six-month --

16  A. Yes.

17  Q. -- freeze, if you will?

18  A. Yes, yes.

19  Q. He didn't say there were any other

20 reasons --

21  A. No.

22  Q. -- you couldn't go to Sharonville?

23 After the six-month freeze was up, did you express

24 an interest in going to Sharonville?

91

1      A.    Yes.

2      Q.    And who did you talk to about that?

3      A.    Make Warden and also Pat Popalow at

4    Sharonville.

5      Q.    Okay.  And what did they say?

6      A.    That the job -- said basically been

7    filled.

8      Q.    Okay.  And do you know at the time

9    they told you that, had the jobs been filled?

10      A.    Yes.

11      Q.    Okay.  Now, Exhibit 2, which I know

12    you testified quite a bit about, you took this to

13    be a summary of the benefits at ZF Batavia, right?

14      A.    I guess when you say "benefits" --

15      Q.    Well, let me ask you it this way.  You

16    didn't understand that this was a detailed list of

17    each and every provision that applied to each and

18    every benefit, did you?

19      A.    I didn't think -- I didn't take it as

20    being a detailed explanation, but I felt that this

21    was an agreement that I was getting into, that this

22    is the outline of how it was going to be handled,

23    yes.

24      Q.    Okay.  So it was an outline of the

1    benefits at Batavia, at least the benefits set

2    forth --

3        A.    I felt that this was the agreement

4    that I was signing up for.

5        Q.    Okay.  But, I mean, you -- you thought

6    there was more to some of these than just what you

7    saw, right?

8        A.    Not really, no.

9        Q.    No?  I mean, you would agree with me

10   that some of the benefits here are not spelled out

11   in great detail?

12       A.    No, I wouldn't agree with that.  I

13   mean, they're pretty basic, as far as what the

14   expectations of life insurance, accidental health

15   insurance, disability, vacation, savings plan,

16   dental and health care benefits, of what it was

17   going to cost me.  I thought it was pretty well

18   spelled out.

19       Q.    Okay.  Well, let's look, for example,

20   under leaves in the far-right column here.  It says

21   family leave.

22       A.    Okay.

23       Q.    It says there, the serious health

24   condition of either the employee or certain family

1    members may allow the employee to a family leave.

2    It doesn't spell out who those other certain family

3    members are?

4        A.    I think that's family -- FMLA pretty

5    much comes under government regulations.

6        Q.    Okay.  Did you think that it was going

7    to be whatever the FMLA said or that it was going

8    to be whatever the company's FMLA policy said?

9        A.    Well, I thought it was FMLA, the act

10   of 1993 that was put into place by the government.

11       Q.    Okay.  So you didn't think that

12   there'd be an FMLA policy?

13       A.    No.  I thought it would come under the

14   guidelines of government regulations.

15       Q.    Now, with respect to vacation, was it

16   your understanding that you'd be able to schedule a

17   vacation anytime you wanted to?

18       A.    No.

19       Q.    There's nothing here under vacation

20   that talks about how you schedule vacation, is --

21       A.    Well, past practice has always been

22   that -- you know, you sit down the first part of

23   the year and you do it a year in advance so that

24   there's no conflicts and it can be scheduled so

94

1    that the appropriate coverage can be handled.

2        Q.    So you had an expectation, then, that

3    past practice would be incorporated into the

4    benefits described here in Exhibit 2?

5        A.    No, just on the vacation time.

6        Q.    Just on vacation?  Well, what about

7    personal or sick days, it doesn't appear that

8    there's a detailed procedure as to how you go about

9    scheduling a personal or sick day.  What was your

10   understanding as to how that was going to operate?

11       A.    I figured it was coming under the --

12   how your -- your -- the guy that you have to -- or

13   guy or lady, whoever you're working for, would

14   basically help you understand what you needed to

15   do, how to schedule it.

16       Q.    Okay.  So there was something that was

17   unanswered by this that --

18       A.    Well, no.  In the past -- no.  In the

19   past practice with Ford, if you were sick, you were

20   sick.  If you had something coming up, you would

21   schedule it in advance.  I mean, as far as being --

22   I mean, as far as you get up to five days of being

23   used for sick or personal, for house closings, I

24   mean, that could be scheduled.  I mean, I don't see

1    what you're asking me, as far as the policy.

2         Q.    Well, I think you've answered it.  I

3    mean, I think what you said was that with respect

4    to personal and sick, also you kind of had this

5    understanding based on past practice as to how this

6    would work.  Is that your understanding or --

7         A.    Well, what I'm saying is that this

8    tells me right here by looking at this document

9    that my sick days or five days of personal or sick

10   days -- up to five days could be used for being

11   sick or for such things as closing the house cares.

12   I mean, it pretty well tells you what it's allowed

13   to be used for, as long as it's approved by your

14   supervisor.

15        Q.    Do you know, is that -- do you have to

16   ask in advance?

17        A.    No, not necessarily.  How do you know

18   you're going to be sick?

19        Q.    Are there any instances you have to

20   ask in advance?

21        A.    No.

22        Q.    If, for example --

23        A.    I mean --

24        Q.    -- you were going to use it for a

1    house closing, would you --

2         A.    When you say by approving in

3    advance -- I mean, if you know that you're going to

4    close on the house -- I mean, I'm sure that you'd

5    sit down with your supervisor and say, Look, I'm

6    going to be off this particular day.  Is there

7    going to be an issue at Ford or should I have it

8    rescheduled?

9         Q.    And that's the way things had worked

10   at Ford?

11        A.    Yes.

12        Q.    And you expected them to continue to

13   work --

14        A.    Yes.

15        Q.    -- that way?  Under salary at the top

16   left-hand column of this same page, it says, Base

17   salary starting at your current Ford salary.  I'll

18   submit to you there's nothing in the document that

19   says what your salary would be in future years.

20   You'd agree with me, wouldn't you, that there's

21   nothing in the document that says what your salary

22   would be in future years?

23        A.    Yes.

24        Q.    The only commitment here was that your

1    starting salary would be at your current Ford

2    salary?

3         A.    Yes.

4         Q.    Now, I believe that you testified that

5    it was your understanding that some of the things

6    listed in Exhibit 2 were subject to change and some

7    were not; is that correct?

8         A.    It's correct to say that -- that in

9    the summary plan, 401Ks, accidental, health, life

10   insurance benefits at Ford Motor Company has

11   historically changed or could change.  But usually

12   there's discussions on why they need to be changed.

13   There's up-front discussions on why -- where we're

14   headed with the company, but they have changed over

15   the 20 years that I been with Ford Motor Company.

16        Q.    Okay.  And you took your understanding

17   as to what was subject to change and what wasn't

18   based on what had happened while you had been with

19   Ford?

20        A.    Yes.

21        Q.    Okay.  And things like health

22   insurance, you recognized that was subject to

23   change?

24        A.    Yes.

98

1          Q.     And, in fact, if ZF Batavia had

2     decided after a year that we're not going to offer

3     health insurance to salaried employees anymore, is

4     that a change you believe that they could have

5     made?

6          A.     No.

7          Q.     It would not be within their rights --

8          A.     No.

9          Q.     -- to make that --

10         A.     No, no.

11         Q.     They were limited as to what changes

12    in health insurance they could make?

13         A.     I think what they would be limited in

14    is -- is what was identified here as being

15    opportunity -- I mean, here's what our benefit

16    package is going to look like.  As far as

17    out-of-pocket monies, it change -- it could change,

18    yes.  As far as eliminating it altogether, no.

19              I felt that this was an agreement that

20    our compensation, our benefits, whether it was

21    dental, whether it was medical, whether it's the

22    401K -- 401K could potentially change, but not be

23    eliminated, no.

24         Q.     Is there anything in this document

99

1    that says medical, dental, 401K cannot be

2    eliminated?

3         A.    There's nothing in the document that

4    says that, no.  But past practice is -- I mean,

5    that's terms of employment or conditions of

6    employment.

7         Q.    So because Ford had never eliminated

8    those things, you assumed that ZF Batavia couldn't

9    eliminate them?

10        A.    Exactly.

11        Q.    Okay.  401K, if ZF Batavia decided

12   we're not going to do a 401K match, do you believe

13   that that's something that's within their rights to

14   do?

15        A.    No.

16        Q.    And that's because -- and during the

17   time you were with Ford, Ford had never eliminated

18   the 401K --

19        A.    Yes.

20        Q.    -- match?  What if after you left

21   Ford, Ford decided to eliminate the 401K match,

22   would that, then, give ZF Batavia the right to

23   eliminate the 401K?

24        A.    No.

1          Q.    No?  Because what Ford was going -- or

2     what ZF Batavia could do is not tied to what Ford

3     did, right?

4                MR. SIMON:  Objection, vague and

5     ambiguous.

6          A.    Yes.

7                MR. SIMON:  Go ahead and answer.

8          A.    Well, what I was going to say is that

9     I don't think that any company has the right to

10    change or just arbitrarily come up and cancel or

11    stop something when you have an agreement.  And I

12    felt that this was -- this piece of paper right

13    here, this document is an agreement of what the

14    expectations were for work done and this is what

15    your compensation would be.

16         Q.    Okay.  While you were with Ford, is it

17    your understanding that Ford had the ability to

18    change your 401K, for example?

19         A.    As far as contributions, yes, they did

20    change.

21         Q.    Did they have the ability to get rid

22    of the 401K while you were there?

23         A.    No.

24         Q.    Is that because you had some sort of

1   written agreement with Ford?

2       A.   There wasn't any written agreement,

3   but I just felt that was part of the way Ford did

4   their business and I don't think any company

5   throughout the country should be given the

6   opportunity to just arbitrarily come in and cancel.

7       Q.   Okay.  And I want to make sure I

8   understand you because you said you don't believe

9   they should be given the opportunity and I'm asking

10   you is it -- did you believe Ford had the right to

11   say no more 401K?

12       A.   No.

13       Q.   Okay.  And that's --

14       A.   Personal opinion.

15       Q.   Just personal opinion, okay.  Now, you

16   testified that while you were with Ford, the amount

17   of profit sharing changed, but the formula always

18   stayed the same?

19       A.   Correct.

20       Q.   Was it your understanding that Ford

21   had the ability to change the formula or that it

22   was locked in and they had to stick with that

23   formula?

24       A.   I'm not sure if it was locked in or

1    not, but there was always high-level discussions on

2    what -- if something like that would come down,

3    could change.  I hadn't seen a change in 20 years

4    that I been with Ford.

5        Q.    "High-level discussions" --

6        A.    Senior --

7        Q.    -- what do you mean by --

8        A.    -- management, the vice president

9    levels and above.

10        Q.    Okay.  Would you be involved in those

11    discussions?

12        A.    No.

13        Q.    Okay.  These would be discussions

14    where they'd determine what was going to happen?

15        A.    Yeah --

16        Q.    And then it would be --

17        A.    -- for the health of the company.

18        Q.    Okay.  And then it would be

19    communicated to you?

20        A.    Yes.

21        Q.    And it would be at that point

22    nonnegotiable, wouldn't it?

23        A.    Yes.

24        Q.    I noticed in your offer letter, which

1   is Exhibit 108, the start date appears to be

2   scratched out.  There's a new one written in.

3         A.    Yes.

4         Q.    Who made that change, do you know?

5         A.    Salary personnel.

6         Q.    Was that your decision to change the

7   start date --

8         A.    Yes.

9         Q.    -- or not?  Why did you change the

10  start date?

11        A.    Mainly because the profit sharing was

12  coming out that year for Ford and I wanted to get

13  the last that I could, the last -- I wanted to make

14  the transition right at the end of the year.

15        Q.    Okay.  So you were allowed to

16  change --

17        A.    Yes.

18        Q.    -- the start date?

19        A.    Yes.

20        Q.    It wasn't -- in other words, I guess

21  this offer letter wasn't presented to you as a take

22  it or leave it.  You had some flexibility to change

23  certain things?

24        A.    Exactly.

1          Q.     Okay.  And I believe you testified,

2     but I just want to make sure that before you had

3     actually received the offer letter, you'd already

4     made up your mind that you were going to accept the

5     offer?

6          A.     I had made up my mind to make the

7     transition, yes.

8          Q.     Well, and you had told Rick Williams,

9     yeah, I'm going to take the offer and then he

10    called you up there --

11         A.     The question I was asked of me is that

12    when I -- when Rick Williams came and gave this to

13    me, had I made up my mind, yes, I had.

14         Q.     Okay.  And --

15         A.     But I had had prior discussions with

16    him about what the package was going to look like.

17         Q.     Sure.

18         A.     I already knew that -- that there were

19    going to be certain things in the package -- in the

20    offer that I was going to be given.

21         Q.     But my question is simply before you

22    ever saw the offer letter, you had already decided

23    that you were going to take it, you were going to

24    go to ZF Batavia, right?

1     A.   No, no, because it wasn't completely

2    spelled out, as far as exactly what I was going to

3    get.  He had told me that there were going to be

4    certain things that I was going to get, as far as

5    the monies, as far as the opportunities for

6    promotional opportunities.  This was all spelled

7    out.

8         So when he came to me and he had some

9    discussions and said, Look, I understand that we're

10    coming up on a time where we need to make a

11    decision.  What do you want to do?  We got into

12    discussions and he brought the letter out and he

13    said, This is what the letter is going to be, said,

14    Are you willing to make the decision, yes.  And I

15    said, yes, I'm willing at this time to make that

16    decision.

17     Q.   And then did you sign it right then?

18     A.   Yes.

19     Q.   Okay.  Because I must have

20    misunderstood because I thought you said that

21    before Rick brought the offer letter out to you on

22    the floor, that you had already told him that you

23    had made up your mind?

24     A.   We'd already been through this.  This

1    was -- I'd already seen this letter.  When Rick

2    came out with this letter out on the floor is when

3    I -- I already understood what I was going to get

4    because he had written it down on this, on my

5    tri-fold.  He gave me a tri-fold and he gave me

6    what the bonuses were going to be, what this

7    transition money was going to be, both these two

8    areas right here were written down on this

9    particular document that I was given.

10             And by the time I got to this, yes, I

11   had made up my mind --

12        Q.    Okay.

13        A.    -- based on the information that was

14   put into here.

15        Q.    Okay.

16        A.    And that's Exhibit 2.

17        Q.    The tri-fold that Rick Williams wrote

18   those things on, do you still have that?

19        A.    Yes.

20        Q.    Has that -- do you know, has that been

21   produced in this case?  Have you given that to your

22   lawyers to --

23        A.    No.

24        Q.    -- to produce in this case?

1          A.     No, it wasn't asked.

2               MR. SIMON:  We'll certainly produce

3     any documents that Mr. Steward has at his house

4     that relates to the case.

5               MR. VANWAY:  Thank you.

6               MR. SIMON:  I started to interrupt a

7     second ago.  You were both talking over each other

8     a little bit.  So make sure, Mike, that you wait

9     for him to finish his question.

10               THE WITNESS:  Okay.

11               MR. SIMON:  I'm sure Mr. VanWay will

12     do the same.

13               MR. VANWAY:  I will.  I apologize, Mr.

14     Steward.  I try not to do that.

15     BY MR. VANWAY:

16          Q.     You testified, Mr. Steward, about CVT

17     opportunities and that I guess Mr. Pablice has told

18     you that you can't be placed in CVT because of head

19     count restrictions?

20          A.     Yes.

21          Q.     Prior to the time that you accepted

22     employment with ZF Batavia, did anyone ever

23     communicate to you that you would be placed in CVT

24     without regard to any head count restrictions?

```
 1        A.    No.

 2        Q.    Did anyone ever tell you that -- what

 3   specific job you would get in CVT?

 4        A.    No.

 5        Q.    You testified that you may have lost a

 6   promotional opportunity to a business manager

 7   level.  Was there a specific business manager job

 8   available in CVT?

 9        A.    Just currently there has been, yes.

10        Q.    There are currently jobs available?

11   And have you applied for those jobs?

12        A.    I wasn't asked to apply.  I wasn't

13   given an opportunity --

14        Q.    Well, have you on your own --

15        A.    -- to enter discussions that -- the

16   interview process -- Ray personally came out and

17   talked to several people and asked them if they

18   were interested in the businesses or going over to

19   CVT.

20        Q.    He didn't --

21        A.    No.

22        Q.    -- ask you --

23        A.    He didn't ask me, no.

24        Q.    Did you go to him, then, and say, Ray,
```

1    what about me, I'm interested?

2          A.    No, I did not.

3          Q.    Or anyone else other than Ray?

4          A.    I said something to Dick about it.

5          Q.    Dick Newark?

6          A.    Yeah.   I said, Dick, how come I'm not

7    being considered for this opportunity?  And he

8    said, Well, right now, with the things going on in

9    CD4E, we need to make sure that we keep some

10   experienced people over in CD4E and keep the

11   business running.

12         Q.    Did you respond when he said that?

13         A.    I said, I'd like to have an

14   opportunity in the future.  He said, Oh, okay.

15   When something else comes up, we'll give you a --

16   we'll give you a call.

17         Q.    Okay.  Now, I asked you some of this

18   earlier, but I'm not sure that I understand all of

19   your testimony or my question may not have been

20   clear.

21              If Ford has made any changes since

22   1999, since the time you left the company, would

23   you expect those changes to apply to you?

24         A.    I'm not sure they made any changes.

1          Q.    I understand.  I'm asking if they had,

2    would you expect that those changes would apply to

3    you?

4          A.    I would expect -- I don't know.  I

5    don't have an answer to that.

6          Q.    Well --

7          A.    I don't know if it would -- just

8    because Ford arbitrarily changes, I don't know

9    if -- if that means ZF would change --

10         Q.    Okay.  And you do understand --

11         A.    -- if that's what you're asking me.

12         Q.    Well, I want to know what your

13   understanding is.  Is it your understanding that,

14   based on Exhibit 2 or the other documents that

15   you've referred to as an agreement, is it your

16   understanding that, based on those documents, when

17   Ford makes a change, that change should affect you?

18              MR. SIMON:  Objection as to the

19   hypothetical, not relevant.  Go ahead and answer.

20         A.    Would it affect me, no.  But it has --

21   yes, I was because -- say the overtime, the amount

22   of overtime payments, if it's changed at Ford, then

23   the agreement we originally went into and my

24   understanding is that we would basically have the

1    same kind of compensation that Ford would have.

2            Q.    Okay.  So if the overtime changed for

3    the better --

4            A.    Yeah.

5            Q.    What if it changed for the worse,

6    should that affect you as well?

7            A.    No.

8            Q.    No?

9            A.    No.

10            Q.    Why not?

11            A.    I don't think anybody should lose

12    money.

13            Q.    Oh, okay.  So you should only get the

14    benefit of changes.  You shouldn't suffer any

15    changes that would cause you to lose money; is that

16    right?

17                    MR. SIMON:  Objection, argumentative.

18            A.    No.

19            Q.    That seems to be what your testimony

20    is.  If there are changes that would cause you to

21    lose money, it's your understanding that those

22    changes don't apply to you, then?

23                    MR. SIMON:  Same objection.

24            A.    I don't think anybody should lose

1    money.

2         Q.    Okay.  So if, for example, Ford

3    eliminated the 401K match, that shouldn't apply to

4    you?

5         A.    Correct.

6         Q.    Because Ford's a separate company and

7    you don't work for them anymore?

8         A.    Right.

9         Q.    When you -- in your interrogatory

10   response where you listed a specific number, I

11   think 23,000 and some change as your overtime loss,

12   did you subtract out the 40 minutes a day casual

13   time if you would have worked at Ford?

14        A.    Yes.

15        Q.    Okay.  And is it your claim in this

16   case that you're not required or should not be

17   required to follow ZF Batavia's policies?

18        A.    I think I should be required --

19   restate that.

20        Q.    Sure.

21        A.    Let me make sure I understand what

22   you're saying.

23        Q.    Since ZF Batavia has come into

24   existence, it's my understanding that they've put

1    in various policies and procedures that apply to

2    employees in the workforce such as yourself?

3         A.    Yes.

4         Q.    Is it your claim that you shouldn't be

5    required to follow those policies?

6              MR. SIMON:  Objection to the word

7    "should."  Vague and ambiguous.  Go ahead.

8         Q.    Do you believe that you're required to

9    follow those policies?

10        A.    Yes.

11        Q.    All of them?

12        A.    Yes.

13        Q.    You testified that you're only paid

14   for eight hours.

15        A.    Right.

16        Q.    Required to work a 10-hour day, only

17   paid for eight hours.  In fact, you're paid salary,

18   aren't you?

19        A.    Yes.

20        Q.    You're not paid by the hour?

21        A.    Correct.

22        Q.    Now, when you accepted employment with

23   ZF Batavia, you understood that there was going to

24   be a change in the personal days from what you had

1    received prior at Ford, didn't you?

2        A.    Yes.

3        Q.    You don't dispute, do you, that ZF

4    Batavia had the right to change those days from

5    something different than what Ford had?

6        A.    I felt that I knew going in that

7    that's what the agreement was going to be.

8        Q.    You don't --

9        A.    This is -- what I went into was -- and

10   this is what I signed up to be, what this exhibit

11   is.  This is what my understanding was, that this

12   is what the vacation -- I mean, personal days were

13   going to be and I agreed to that.

14       Q.    Okay.  And so you don't dispute, then,

15   that ZF Batavia had the right to do something

16   different than what Ford had done with respect to

17   personal days?

18       A.    When I -- when this agreement was

19   spelled out, this is what I agreed to.

20       Q.    I understand.

21       A.    Okay.  It has nothing to do with Ford.

22   Things changed between Ford and what ZF is.  This

23   is what I accepted when I -- my terms and

24   conditions of employment.  This is what I knew I

1    was getting into.  This is what I accepted.

2        Q.    Right.

3            MR. SIMON:  Just for the record, the

4    witness has been pointing to Exhibit 2.

5        Q.    Right.  And I believe when you pointed

6    to Exhibit 2, you said it has nothing to do with

7    Ford?

8        A.    What I said is that this -- what Ford

9    personal days compared to what this is, this is

10   what I accepted.

11       Q.    Okay.  Now, with respect to the

12   objectives on the AIP, do you still have Exhibit 4

13   in front of you or can you get Exhibit 4 in front

14   of you, please?

15           You'll have to help me a little bit on

16   this, if you would.  If you turn to Bates stamp

17   page 08 where it lists the 1999 ZF Batavia

18   objectives.  Under quality, the first objective

19   there, achieve warranty costs per unit objective of

20   $1.66 and $3.32 at one and three months in service

21   respectfully.  That was a specific objective for

22   1999, right?

23       A.    Yes.

24       Q.    Do you know, was that objective met?

1          A.    I believe so.

2          Q.    And I assume that that objective

3    wouldn't carry over to future years since it had

4    already been met, right?

5          A.    As far as the goal or the objective.

6          Q.    Right.

7          A.    The quality objectives have always

8    stayed the same, safety, quality, productivity,

9    delivery and costs have been the same.

10          Q.    Well, one and three months in service,

11    wouldn't that mean one month after ZF Batavia came

12    into existence?

13          A.    No, it's one year after model.

14          Q.    One year after model?

15          A.    No, it's one month --

16          Q.    One month after model?

17          A.    -- and three months after model

18    launch.

19          Q.    Okay.  So it's your understanding,

20    then, that $1.66 and $3.32, that's a continuing

21    objective?

22          A.    Yes.

23          Q.    Okay.  Assembly plant pool objective

24    of 250/million.  What does that mean?

1          A.    Parts per million.

2          Q.    And that was the objective in '99?

3          A.    Yes.

4          Q.    Is it still the objective?

5          A.    It's -- you go over your improvements

6     and each year you're expected to have an

7     improvement, so each one of them have been lowered

8     over the last several years.

9          Q.    Oh, okay.  So the objective changes

10    from --

11         A.    Yeah.

12         Q.    -- year to year?

13         A.    Yes, yes.

14         Q.    Implement internal TPM process by end

15    of third quarter.  That's already happened, hasn't

16    it?

17         A.    Yes.

18         Q.    So that's not an objective that still

19    applies, does it?

20         A.    No.

21         Q.    Okay.  And there weren't any slides

22    put up at the May '99 meeting about any future

23    objectives, were there?

24         A.    No, other than, again, safety,

1    quality, delivery and costs.

2         Q.    Other than pages 8 and 9?

3         A.    Yes.

4         Q.    Was it your understanding, then, that

5    as you met some of these objectives, like some of

6    the quality objectives that we just spoke about,

7    that there would be new objectives that would come

8    in and take the place of the ones that you had

9    already met?

10         A.    Historically at Ford, yes.  There's

11    always been year-over-year improvements and

12    expectations changed.

13         Q.    Now, I believe it was your testimony

14    that with regard to the AIP, Dick Newark was

15    responsible for that.  He disregarded the formula?

16         A.    That was my understanding, yes.

17         Q.    And you spoke to Len Sennish about it

18    and Len Sennish said basically that's Dick Newark's

19    call?

20         A.    Yes.

21         Q.    Are you aware of anyone from Ford

22    being involved in the decision to deviate from the

23    AIP formula?

24         A.    No.

1          Q.     Are you aware of anyone from Ford

2     approving that decision?

3          A.     No.

4          Q.     And it's your understanding, then,

5     that if an individual employee doesn't meet his or

6     her objectives, it's possible that that employee

7     might not receive an AIP at all?

8          A.     Yes.

9          Q.     Even though other employees may

10    receive AIPs, if they met their objectives?

11         A.     If they met their objectives, yes.

12         Q.     Okay.  With respect to merit increase,

13    what is your claim there?  What is it you believe

14    you should have received that you didn't?

15         A.     The merit raise?

16         Q.     Yes, sir.

17         A.     I felt that the -- the amount of

18    monies that we had on the merit raises -- well,

19    based on the formula, could have been more monies

20    based on my performance from the past year.

21         Q.     Which year are we talking about?

22         A.     2002.

23         Q.     Okay.  How much did you receive in

24    2002?

```
 1          A.    Well, actually in 2001, I think I
 2    received $2,000.  I think it was approximately
 3    $2,000 for 2001 and 2002 both.
 4          Q.    Okay.  And how much do you believe you
 5    should have received for those years?
 6          A.    My understanding -- cost of living is
 7    around three percent.
 8          Q.    Is it your understanding that the
 9    merit increases were going to match whatever the
10    cost of living increases --
11          A.    Historically they have not matched,
12    but they've been close to cost of living with Ford
13    Motor Company.  And I felt that they would probably
14    be close to the same thing.
15          Q.    At any of these employee meetings, did
16    anyone communicate to you that the merit increases
17    were going to keep up with whatever increases --
18          A.    No.
19          Q.    -- there were in the cost of living?
20          A.    No.
21          Q.    Bear with me, Mr. Steward.  I think I
22    only have one exhibit for you.
23                Mr. Steward, you've been handed what
24    has been marked as Exhibit 110.  And I will submit
```

1    to you, sir, that that's a document that Ford

2    produced in this case.  It came from your personnel

3    file at Ford.

4            Do you have any reason to dispute that

5    that's indeed what this document is?

6        A.    No.

7        Q.    In the lower left-hand side, is that

8    your signature that appears there?

9        A.    Yes.

10        Q.    You agree with me that you signed this

11    document while you were employed by Ford Motor

12    Company?

13        A.    Yes.

14        Q.    In the 20-some years that you were

15    with Ford, was there ever a time that Ford didn't

16    give merit increases?

17        A.    There was a time when -- yes.  I

18    don't -- I -- I can't remember.  I don't know if

19    there was or not.  I don't -- I don't recall ever

20    not getting a merit raise.

21        Q.    Okay.  Was it your understanding that

22    while you were with Ford, if the company hit some

23    lean years, that they had the right to say, Sorry.

24    No merit increases this year?

```
 1          A.     There was no really set -- profit

 2    sharing was always said that it could be a

 3    difference.

 4          Q.     And did that, in fact, happen with

 5    profit sharing, that there were years you didn't

 6    receive --

 7          A.     I think in the mid -- in the mid

 8    eighties, I think so.

 9          Q.     Okay.  Was it your understanding that

10    you were entitled to receive a merit increase every

11    year, though?

12          A.     Yes.

13          Q.     Without regard to the performance of

14    the company?

15          A.     Yes.

16          Q.     So long as you were doing a good

17    job --

18          A.     Yes.

19          Q.     -- you would get a merit increase?

20          A.     Yes.

21          Q.     Even if the company wasn't making

22    money?

23          A.     Yes.

24          Q.     Anyone from Ford ever tell you that's
```

123

1    how it was going --

2         A.    No.

3              MR. SIMON:  Make sure he finishes his

4    question before you answer, make sure you

5    understood his question.

6              THE WITNESS:  Okay.

7              MR. SIMON:  Don't talk over him.

8         Q.    While you were with Ford, did they

9    change the profit sharing to a performance bonus

10   system while you were there?

11        A.    I don't understand your question.

12        Q.    Okay.  Let me try again.  My

13   understanding is that for at least most or perhaps

14   all of the time you were with Ford, that they had

15   profit sharing, which was primarily based on the

16   performance of the company?

17        A.    Correct.

18        Q.    Did they, at any time while you were

19   there, change the profit sharing over to a

20   performance bonus system that was more based on

21   individual performance, as opposed to company-wide

22   performance?

23        A.    No, not that I'm aware of.

24        Q.    Okay.  And the profit sharing, was it

1    specifically company-wide, Ford world-wide

2    performance or was it just the individual location

3    where you were at?

4        A.    My understanding was it was North

5    American.

6        Q.    Okay.  So it didn't matter -- if you

7    were at Batavia, it didn't matter how Batavia was

8    doing.  It was Ford North America?

9        A.    Yes.

10        Q.    And I believe you already testified

11    that while you were with Ford, benefits such as

12    health insurance changed?

13        A.    Yes.

14        Q.    The amount you paid went up, didn't

15    it?

16        A.    Yes.

17        Q.    Do you recall Ford ever canceling any

18    vacation days while you worked for the company?

19        A.    No.

20        Q.    Do you recall them changing the way

21    that they paid overtime, other than increasing the

22    rate while you were with the company?

23        A.    No.

24        Q.    Do you recall them putting in comp

125

1   time rather than overtime for certain salaried

2   employees?

3          A.     No.

4          Q.     Do you ever recall them changing the

5   rate from time and a half or a flat rate to

6   straight time?

7          A.     Yes.

8          Q.     Do you remember when that change took

9   place?

10          A.     No.

11          Q.     Did that result in less dollars in

12   your pocket for working overtime?

13          A.     I don't believe so, no.

14          Q.     Is what they did, they went to a flat

15   rate as opposed to time and a half?

16          A.     Correct.

17          Q.     And you don't dispute that Ford had

18   the right to do that, do you?

19          A.     No.

20          Q.     Now, you've testified about several

21   representations, promises, whatever you want to

22   call them that you believe were made to you and

23   have not been kept in this case.  And I think I've

24   captured them all.  I just want to make sure, okay?

126

1              What I have in my notes that you

2      testified to are overtime, AIP, CVT opportunities,

3      personal days, bereavement leave and merit

4      increases.

5          A.    Yes.

6          Q.    Did I miss any?  Are there any other

7      promises or representations that you believe were

8      made that haven't been fulfilled?

9          A.    No.

10         Q.    Would you agree with me that with

11     respect to each of those that I just listed, that

12     it's ZF Batavia that's made the changes?

13         A.    I would agree that ZF's made the

14     changes, yes.

15         Q.    Are you aware of anyone from Ford

16     being involved in any of those changes?

17         A.    I believe Ford is actively involved

18     with all the changes going on.

19         Q.    And is that because Ford's a 49

20     percent shareholder in the --

21         A.    Yes.

22         Q.    -- joint venture?

23         A.    I sat in meetings where the executive

24     vice president Roman Kreyger has given direction to

1    the plant and coaching sessions, been part of a

2    board meeting where we've given -- we've outlined

3    what we planned on doing for the next six or eight

4    months.

5            And in each one of those, there's been

6    discussions and coaching and I think they've been

7    actively involved with the board of directors in

8    setting the -- the policies and where the direction

9    of the company is going.

10           And I think they're very much active

11   in -- in how we're doing our business on a

12   day-to-day business.  I think George Lindstrom

13   is -- is actively involved with how the plant is

14   being ran, especially if it affects the UAW part of

15   the business.

16       Q.    Who is George Lindstrom?

17       A.    He's the head of salaried personnel

18   for power train, I believe.

19       Q.    Do you have any knowledge that he's

20   involved with salaried employees at the Batavia

21   plant?

22       A.    I think he's like a human resource

23   manager for power train.

24       Q.    For Ford?

128

1        A.    Yes.

2        Q.    Right.  And I believe your testimony

3    was that, at least with respect to UAW-represented

4    employees, you believe he's actively involved?

5        A.    But he was also part of discussions

6    where one of the employees, a Ford person didn't

7    get his overtime and I believe Mr. Lindstrom was

8    instrumental in getting this man paid.

9        Q.    Who was that, do you know?

10       A.    Bernie Blankenship.

11       Q.    And he was a Ford employee?

12       A.    Yes.

13       Q.    At the time that there was a dispute

14   over his overtime --

15       A.    Yes.

16       Q.    -- he was a Ford employee?

17       A.    Yes.

18       Q.    Are you aware of Mr. Lindstrom being

19   involved in any issues like that with respect to ZF

20   Batavia employees?

21       A.    No.

22       Q.    Not Ford employees, but Batavia

23   employees?

24       A.    No.  I think he's -- I think he's

1      active in what's going on -- I think he's close

2      enough to the building that he knows what's going

3      on through the building.

4              Q.      And why do you say that?

5              A.      'Cause he's been in the plant several

6      times.  He comes into the board of directors

7      meetings, as well as the other three members of the

8      board members.  Always discussions out on the

9      floor.  There's tours that go on.  Presentations

10     were made with BCSS.  I sat through meetings at the

11     time with Roman Kreyger, who is now the executive

12     vice president of power train and quality.

13             Q.      Mr. Kreyger, does he work for Ford or

14     for ZF Batavia?

15             A.      Ford.

16             Q.      And is he on the board of directors?

17             A.      Currently, no.  But he was when the

18     joint venture was first -- he's been promoted to

19     executive vice president at this time.

20     Mr. Shoopick took his place.

21             Q.      These meetings that you sat in with

22     Mr. Kreyger, was that while he was on the board of

23     directors?

24             A.      Yes.

1          Q.    And the meetings that you attended,

2    were they board of directors meetings?

3          A.    One of them was, yes.

4          Q.    How many meetings are we talking

5    about?

6          A.    Well, three that I know of, as far

7    as -- one board of directors meeting and two

8    meetings with the BCSS team room where the -- the

9    managers and also the people that were involved

10   with the BCSS, which was the Ford production

11   system.  And he was giving direction on how he

12   wanted the plant to be ran and what his expectation

13   was for his next visit.

14         Q.    And at the time of that meeting, was

15   he still on the board of directors?

16         A.    Yes.

17         Q.    Have you been in any meetings with Mr.

18   Kreyger where he wasn't a part of the board of

19   directors?

20         A.    No.

21         Q.    And you say he gave direction as to

22   how he wanted the plant to run.  What specifically

23   did he say?

24         A.    Quality initiatives.  He wanted Ford

1    production system implemented.  He wanted hourly

2    involvement with decisions being made, the teams to

3    be more developed out on the floor.

4            And I think to answer Mr. Hunter's

5    question about mass manufacturing versus lean

6    manufacturing and Ford being very active in both

7    arenas, as far as when you talk about mass

8    productivity, you're talking about large amounts.

9    And what I consider large amounts anywhere from

10   300,000 to a million transmissions a year is -- is

11   mass manufacturing.

12           But FPS, Ford Production System

13   initiatives started back in 19 -- I think '98 and

14   it's being pushed throughout Ford Motor Company, as

15   well as through Batavia.  Batavia wasn't going to

16   accept BCS -- or FPS at one time.  And it was

17   pretty much told by Mr. Kreyger that, yes, you will

18   be doing FPS.

19       Q.    Again, he was on the board --

20       A.    Yes.

21       Q.    -- when he said that?

22       A.    Yes.

23       Q.    Other than Ford being involved through

24   Mr. Kreyger or other members of the board of

 1    directors, are you aware of Ford being involved in

 2    any of the changes that are at issue in this

 3    lawsuit?

 4          A.    No.

 5          Q.    With respect to these conversations

 6    that you had with Mr. Priest and Mr. Williams, did

 7    I leave anybody out?  Did you have discussions with

 8    anyone other that Mr. Priest and Mr. Williams,

 9    other than at the employee meetings?

10          A.    No.

11          Q.    Okay.  Did you believe what Mr. Priest

12    and Mr. Williams told you about how things would be

13    at ZF Batavia?

14          A.    Yes.

15          Q.    Have any reason to believe they were

16    being untruthful with you?

17          A.    No.

18          Q.    Have any reason to believe that at the

19    time of those conversations with you, that they

20    knew down the road ZF Batavia was going to make

21    certain policy changes?

22          A.    No.

23          Q.    Okay.  With respect to the employee

24    meetings that you sat through, as you sat there,

1    did you believe what was being told to you?

2         A.    Yes.

3         Q.    Did you have any reason to believe

4    that any of those individuals were being

5    untruthful?

6         A.    No.

7         Q.    Did you have any reason to believe

8    that those individuals knew that sometime down the

9    road ZF Batavia was going to make certain changes

10   to policies, procedures?

11        A.    No.

12        Q.    Now, who do you currently report to,

13   Mr. Steward?

14        A.    Dan Sullivan.

15        Q.    Is he a ZF Batavia employee?

16        A.    Yes.

17        Q.    What's his position?

18        A.    Business manager.

19        Q.    And if I understood your testimony

20   earlier, you were a business manager at some point

21   at ZF Batavia?

22        A.    I was a superintendent at one time.

23        Q.    Okay.

24        A.    And once that -- I went into BCSS,

1    they've -- they've changed the -- actually all the

2    jobs pretty much changed in the last two or three

3    years.  I mean, we went from superintendents, two

4    superintendents on days and afternoons to area

5    managers to business managers and we were -- the

6    titles have changed in the last two or three years.

7        Q.    When your title changed, was that a

8    demotion?

9        A.    No.

10       Q.    You didn't lose any pay?

11       A.    Well, I didn't lose any money.

12   Title-wise, I guess you could say it was a

13   demotion, but I didn't lose any money.

14       Q.    Okay.  And, in fact, you've received

15   increases in pay every year you've been at ZF

16   Batavia; is that right?

17       A.    Yes.

18       Q.    And your gross annual wages since

19   you've been with ZF Batavia are more than the years

20   you were with Ford, aren't they?

21       A.    They're more than I was at Ford, yes.

22   But at -- they're probably less than what they

23   would be if I was back with Ford at this particular

24   time.  And it was based on management role levels

1    and the band levels.

2        Q.    And by that, you mean if you'd went to

3    another Ford plant somewhere else?

4        A.    Yes.

5        Q.    Do you know what your gross annual

6    wages would be today if you accepted either of --

7        A.    No.

8        Q.    -- of those other two opportunities

9    you had with Ford?

10        A.    No.

11        Q.    So you're speculating?

12        A.    Speculating, yes.

13        Q.    Your profit sharing at Ford, if the

14    numbers I've reviewed are accurate, it looks like

15    the last full year you worked at Ford in 1998, your

16    profit sharing was a just a little bit less than

17    $7,800.  Does that sound about right?

18            MR. SIMON:  Mr. VanWay, just note my

19    same objection to this document that I made in the

20    earlier deposition.

21        Q.    Does that sound about right?

22        A.    '98?

23        Q.    $7,800 in '98.

24        A.    Yes.

1          Q.     And at ZF Batavia, at least --

2          A.     '99, I also got a profit sharing check

3     from Ford Motor Company.

4          Q.     Right.  Around $11,600?

5          A.     Yes.

6          Q.     Now, at ZF Batavia, the first AIP you

7     ever received from ZF Batavia was over $15,000,

8     wasn't it?

9          A.     No, that was Ford.

10         Q.     You sure that was Ford?

11         A.     Yes, I am.  I was a ZF employee at the

12    time that I received the check.

13         Q.     Well, didn't you receive two --

14         A.     That was for the year '90 -- I'm

15    sorry.

16         Q.     Didn't you receive two bonuses in

17    2000?  While you were at ZF Batavia didn't you

18    receive two different ones?

19         A.     I received the transition monies at

20    the first of the year and then I had a profit

21    sharing check for Ford.

22         Q.     Well, I don't know if we need to mark

23    this, but maybe you can clear up the confusion for

24    me.  I'm going to hand you what has been produced

1    in this case by ZF Batavia as Bates stamp number

2    4151.  Doesn't that appear to show that you got a

3    bonus in 2000 that was part ZF and part kind of a

4    Ford true-up bonus?

5         A.    Well, let me -- well, are you saying a

6    merit raise --

7         Q.    Well, let me --

8         A.    -- or an AIP?

9         Q.    -- ask you, did you receive the bonus

10   that's reflected in that document?

11        A.    Yes.

12        Q.    Okay.  And you would agree with me

13   that that was a bonus that was part ZF Batavia and

14   part Ford?

15        A.    Yes.

16        Q.    Okay.  Now let me take that one back

17   from you, if I can.  Let me show you Bates stamp

18   number 4150, which shows you received a bonus in

19   2000 of $15,310.

20        A.    Correct.

21        Q.    Now, that was just from ZF Batavia,

22   wasn't it?

23        A.    No, that was from Ford Motor Company.

24        Q.    Ford paid that bonus?

```
 1          A.    Yes.

 2          Q.    Did you receive a W-2 from Ford in the

 3   year 2000?

 4          A.    Yes.

 5          Q.    And did it reflect that $15,000 bonus?

 6          A.    Yes, it did.

 7          Q.    Have you produced that W-2 in this

 8   case?

 9          A.    I'm not sure I have or not.

10          MR. VANWAY:  Mr. Simon, I don't

11   believe that Mr. Steward's --

12          MR. SIMON:  His W-2 --

13          MR. VANWAY:  -- W-2s for that year

14   have been produced.

15          MR. SIMON:  Well, you had asked me for

16   a W-2 of other plaintiffs.  And as for Mr. Steward,

17   is there one we just didn't produce or --

18          MR. VANWAY:  It may be.  I'll

19   double-check here before we convene for the day,

20   but I don't believe I have it.  I'll take that one

21   back from Mr. Steward.  Thank you.

22          THE WITNESS:  If you happen to look on

23   that piece of paper, the exhibit, it says a grade

24   nine superintendent.  And that's under the Ford
```

```
 1   rules.  That's what I was at Ford.  See where it
 2   says grade level?
 3              MR. VANWAY:  Bonus eligible --
 4              THE WITNESS:  Grade level --
 5              MR. VANWAY:  -- grade level nine?
 6              THE WITNESS:  -- nine.  I was a grade
 7   nine superintendent.
 8   BY MR. VANWAY:
 9       Q.    Okay.  But it's your understanding
10   that this is -- you actually got a check from Ford
11   for that?
12       A.    Yes, I did.
13       Q.    Okay.  Do you know Eddie Adams?
14       A.    Yes.
15       Q.    Have you had any conversations with
16   Eddie Adams about this lawsuit?
17       A.    No.
18       Q.    Or about issues in this lawsuit?
19       A.    No.
20       Q.    Do you know if Eddie Adams has any
21   information that's relevant to this case at all?
22       A.    I don't know.
23              MR. VANWAY:  I don't think I have any
24   further questions.  Subject to taking a quick time
```

1    out to check on the W-2s, I don't think I have

2    anything else, Mr. Steward.  Thank you.

3                (2:03 p.m.)

4                MR. HUNTER:  I do have a couple

5    follow-up questions.

6                            EXAMINATION

7    BY MR. HUNTER:

8        Q.    I just want to clarify your

9    understanding with respect to -- I think your

10   testimony was that the -- the benefits and

11   compensation would be the same as they were at

12   Ford.  Is that fair, Mr. Steward?

13       A.    I think what I -- no, it's not fair.

14       Q.    Okay.

15       A.    I think what I -- repeat the question

16   again.

17       Q.    Let me ask it this way.  What was your

18   understanding, whether based on Exhibit 2 or your

19   meetings --

20       A.    Yeah.

21       Q.    -- as to what the benefits and

22   compensation at ZF Batavia would look like going

23   forward?

24                MR. SIMON:  Objection, asked and

1   answered.  Go ahead.

2        A.    Okay.  What I was under the impression

3   was is that we would be treated as if we were Ford

4   employees.  But we were also -- but I was given

5   this Exhibit Number 4 or number two, rather, that

6   these -- what was spelled out as in this is what I

7   would be receiving and this is what I agreed to.

8        Q.    Okay.  And so if --

9        A.    I did not expect to be treated --

10  getting the same benefits that I had at Ford

11  because by reading this and understanding this, I

12  knew that there were some changes in it.

13            MR. SIMON:  Again, the witness is

14  referring to Exhibit 2.

15            THE WITNESS:  Exhibit 2.

16       Q.    And so you'd mentioned, for example,

17  you felt the overtime rate at Batavia -- ZF Batavia

18  should have been increased when Ford's overtime

19  rate was increased?

20       A.    Yes.

21       Q.    And you believe that because of

22  something in the gray brochure or because of

23  general statements?

24       A.    General statements.

```
 1          Q.    And those general statements --

 2          A.    We'd be treated as if we were still

 3    Ford employees.

 4          Q.    Okay.  And yet I think what you told

 5    Mr. VanWay was -- but if Ford paid less in terms of

 6    overtime, you shouldn't be paid less.  Isn't that

 7    what you told him?

 8          A.    What I said -- yes, that's what I

 9    said.

10          Q.    I guess I'm going to ask -- I don't

11    understand how that's consistent, then, with being

12    treated as if you were still a Ford employee?

13          A.    Well, because I don't think there's

14    ever been a situation where Ford's taken money away

15    from anybody, as far as the overtime rates.  It's

16    always increased.  Same way with the merit raises.

17    Same way with the salary.  In the past 20 years

18    that I was with Ford Motor Company, salaries was

19    never affected, as far as monies being taken away.

20          Q.    But I think you acknowledged that

21    overtime had been modified and changed from a

22    higher rate to a flat rate?

23          A.    I -- yes.

24          Q.    And so if you're treated the same
```

1    way --

2         A.    Well, wait a minute.  Let's step back

3    a second.

4         Q.    Okay.

5         A.    I didn't mean to interrupt you.  But

6    when you say "a flat rate," it depends on your

7    rate, how much money you were making.  A flat rate

8    at the time that we were given a flat rate was more

9    than what we were currently making at time and a

10   half.

11        Q.    Okay.  But as the years progressed,

12   the flat rate changed or didn't change?

13        A.    Changed.

14        Q.    Okay.  And if it changes to the

15   negative in the future, your position is as a

16   ZFBA -- ZF Batavia employee, you should not bear

17   that negative impact from Ford?

18             MR. SIMON:  Objection just to the

19   hypothetical.  Go ahead and answer.

20        A.    No.

21        Q.    And, again, I'm not trying to beat

22   this again, but why not?

23             MR. SIMON:  Objection, asked and

24   answered.

```
 1         A.    Because I don't think anybody should
 2    have money taken away from them.  I don't think
 3    that the past practice has been where you take
 4    money away.  It's always been an increase rather
 5    than a decrease.
 6         Q.    Okay.  But, again, I'm asking you --
 7         A.    It's a personal opinion that I think
 8    that we should -- the money shouldn't be taken
 9    away.
10         Q.    Okay.  And it's not -- and it's your
11    personal opinion, not based upon anything that's in
12    the gray brochure or anything that was told to you
13    in any of these meetings?
14         A.    Correct.
15              MR. HUNTER:  Okay.  I have nothing
16    further.
17              MR. VANWAY:  I just want to check --
18    can we go off the record?
19              MR. SIMON:  Yeah.
20              (Deposition concluded at 2:07 p.m.)
21
22         _____
                    Michael Steward
23
24
```

```
1                    C E R T I F I C A T E

2

3    STATE OF OHIO           :

4                            :   SS

5    COUNTY OF HAMILTON      :

6

7            I, Susan M. Barhorst, a Notary Public in

8    and for the State of Ohio, duly commissioned and

9    qualified, do hereby certify that prior to the

10   giving of this deposition the within-named MICHAEL

11   STEWARD was by me first duly sworn to testify the

12   truth, the whole truth, and nothing but the truth;

13   that the foregoing pages constitute a true,

14   correct, and complete transcript of the testimony

15   of said deponent, which was recorded in stenotypy

16   by me, and on the 12th day of September 2003 was

17   submitted to counsel for deponent's signature.

18           I further certify the within deposition was

19   duly taken before me at the time and place stated,

20   pursuant to the Federal Rules of Civil Procedure;

21   that I am not counsel, attorney, relative or

22   employee of any of the parties hereto, or their

23   counsel, or financially or in any way interested in

24   the within action, and that I was at the time of
```

1   taking said deposition a Notary Public in and for

2   the State of Ohio.

3        IN WITNESS WHEREOF, I have hereunto set my

4   hand and notarial seal at Cincinnati, Ohio, this

5   12th day of September 2003.

6

7

8
             Susan M. Barhorst, Notary Public
9            in and for the State of Ohio.
             My commission expires
10           February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24