1

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION, CINCINNATI

4
    EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
5
            Plaintiffs,       : Judge Beckwith
6
    V.                        : Magistrate Sherman
7
    ZF BATAVIA, LLC, et al.,  :
8
            Defendants.       :
9   _____

10        Deposition of GARY VORIES, taken on

11   Tuesday, August 12, 2003, commencing at 8:22 a.m.,

12   at the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20

21
                   GIGLIO REPORTING SERVICES
22                   3 CYPRESS GARDEN
                   CINCINNATI, OHIO 45220
23                    513-861-2200

24

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     Michael Steward

 7   On behalf of Defendant ZF Batavia, LLC:

 8     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 9     1700 Canton Ave.
       Toledo, Ohio 43624
10
     Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16
     Cross-Examination
17
       by Mr. Hunter                  4, 133
18
       by Mr. VanWay                  99
19

20

21

22

23

24
```

3

| | VORIES DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 2 | 7 |
| 3 | | |
| 4 | 4 | 102 |
| 5 | | |
| 6 | 105 | 56 |
| 7 | 106 | 121 |
| 8 | 107 | 121 |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                     GARY VORIES
 2   being first duly sworn, testified as follows:
 3                     CROSS-EXAMINATION
 4   BY MR. HUNTER:
 5       Q.    Mr. Vories, my name is John Hunter.  I
 6   think we've met before, certainly at other
 7   depositions and other matters.  I know you've sat
 8   through a number of the depositions, so I think you
 9   understand basically the ground rules, but let me
10   cover a couple real quickly here.
11            If at any time you can't hear me, you
12   don't understand what I've said or for whatever
13   reason, you feel you just can't fairly answer my
14   question, please let me know and I'll fix whatever
15   the deficiency is, okay?
16       A.    Okay.
17       Q.    If at any time today, if you need to
18   take a break, just let me know.  The only thing
19   that I would ask is that if there's a question on
20   the floor, that you answer the question before we
21   go to the break, all right?
22       A.    That's fair.
23       Q.    Is there anything today that would
24   prevent you from being able to go forward with your
```

1    deposition, in terms of a medical or a personal

2    issue or otherwise?

3         A.    No.

4         Q.    Okay.  Mr. Vories, what's your current

5    address?

6         A.    It's 3 Oakwood Lane, Alexandria,

7    Kentucky 41001.

8         Q.    And if I use the term "Ford

9    transitional employee," you know that I mean a --

10   an employee of ZF Batavia that came over from Ford

11   Motor Company generally during 1999, at the time of

12   the joint venture that created ZF Batavia?

13        A.    Yes.

14        Q.    Okay.  And are you a transitional

15   employee?

16        A.    Yes, I am.

17        Q.    And how long were you with Ford prior

18   to joining the JV?

19        A.    I started at Ford in August of '93.

20        Q.    And what did you start at Ford as?

21        A.    I was a maintenance supervisor, which

22   I still am today.

23        Q.    Prior to coming to Ford Motor Company,

24   where were you employed?

1       A.    I was at General Electric in Evendale.

2   I was a maintenance manager of their engine

3   assembly unit.

4       Q.    And what caused you to leave GE?

5       A.    Well, when I was there, they had about

6   25,000 people.  And after about seven layoffs, an

7   individual that was two levels higher than I was

8   had my job.  So it was a layoff situation.

9       Q.    Okay.  How long had you been with GE?

10       A.    I was there approximately seven years.

11       Q.    And prior to that?

12       A.    I worked with Cinco Products in

13   Newtown.  They manufacture staples and nails and

14   nailing units and also got in the medical business,

15   suturing business at the time I was there.  I was

16   there about 13 years.

17       Q.    Okay.  Have you ever testified before

18   in a matter?

19       A.    No.

20       Q.    Ever been involved in any litigation

21   of any type?

22       A.    No.

23       Q.    From the testimony that you've heard,

24   obviously you're aware that there are issues

1    relating to certain representations or promises, I

2    think is the term that's been used, that were made

3    to the Ford transitional employees.

4              If you could, could you tell me kind

5    of your thoughts with respect to the promises that

6    were made, kind of a list, if you will?

7         A.    Well, basically -- and I'll forget the

8    listings of them, but I believe the whole thing

9    deals with the written agreement given to us in the

10   brochure, to transitional employees that was

11   jointly put together by Ford and Zed-F.  And it

12   just hasn't been kept on those issues that were in

13   that brochure what was discussed with us at -- at

14   different meetings.

15        Q.    Okay.  And when you say "the

16   brochure," you're talking about Exhibit 2?  I think

17   we've called it the gray brochure or a tri-fold

18   brochure?

19        A.    That's correct.

20        Q.    Okay.

21              MR. SIMON:  Off the record for just

22   one second.

23              (Off-the-record discussion.)

24        Q.    All right.  We've made reference,

1    Mr. Vories, to, again, the gray brochure and that's

2    Exhibit 2, which you have a copy of now?

3            A.    Yes.

4            Q.    Okay.  You made comment that that was

5    a -- I think you used a written agreement or

6    contract, something like that?

7            A.    Yes.

8            Q.    In -- in your opinion, what makes that

9    a written agreement or a contract?

10           A.    Well, at the time that this meeting

11   was held and it was explained to us in a couple

12   different meetings that this basically was going to

13   be what the conditions of employment were going to

14   be, if we decided to leave Ford and go over to

15   Zed-F as a transition employee.

16           Q.    Okay.  Nobody certainly used the term

17   that it was a written contract, did they?

18           A.    Basically that's the way it was

19   interpreted by the -- most of the -- I'd say

20   probably all of the Ford employees that were at

21   that meeting.

22           Q.    Now, how do you know that?

23           A.    It was discussed between different

24   people out on the floor.  Very important decision

9

1    to make.

2         Q.    You discussed it with all the Ford

3    employees?

4         A.    Most of them.  I wouldn't say

5    everyone, but most of them.

6         Q.    Okay.  Who did you discuss it with?

7         A.    All the people who are in the suit,

8    for one.

9         Q.    Okay.  Well, who is that?  Let's run

10   down that list.

11        A.    I believe you've got a list of that.

12        Q.    Okay.

13        A.    I'd probably forget them if I tried to

14   remember all of them.

15        Q.    Okay.  Well, who else did you discuss

16   it with?

17        A.    There was people who went to

18   Sharonville, those people.

19        Q.    Okay.  And what are -- what are their

20   names?

21        A.    I couldn't remember all of them off

22   the top of my head, but we had meetings to discuss

23   it out on the floor among ourselves.

24        Q.    And what was the nature of those

1    discussions?

2        A.    On what they thought of the brochure

3    and what it meant to them --

4        Q.    Okay.

5        A.    -- and how were they interpreting it

6    as something just to look at or something that was

7    basically a promise being given by the people of

8    Ford and Zed-F who put it together.

9        Q.    Okay.  Now, a minute ago, you said it

10   was a contract.  Now you use the term "promise."

11   What's the difference in your mind?

12       A.    I have no difference.

13       Q.    Okay.  Well, you saw in the document,

14   okay, where it says that the document does not

15   constitute an employment contract with any

16   individual, right?

17       A.    You talking this little section right

18   here?

19             MR. SIMON:  He's pointing to Exhibit

20   2.

21       Q.    You have Exhibit 2.  Do you remember

22   from Exhibit 2 any language that says the document

23   does not constitute an employment contract?

24       A.    I remember a little section here at

 1    the bottom, if that's what you're alluding to.  You

 2    want to explain exactly what you're trying to --

 3         Q.    I'm just asking, sir, do you remember

 4    that language from the document?

 5              MR. SIMON:  Just to clarify, John.

 6    Does he remember it at the time in '99 or does he

 7    remember it now?

 8              MR. HUNTER:  At any time.

 9         A.    I remember this point being brought up

10    on benefits.

11         Q.    Okay.  Well, let's talk about that.

12    You're pointing to Exhibit Number 2, what, in a

13    sense, let's call it the second page, okay?  And

14    when you point to the document, why don't you read

15    whatever it is you're pointing to, so I know right

16    where you're at?

17         A.    This is where it says the brochure

18    only, the key figures of Zed-F benefit plan, that

19    paragraph.

20         Q.    Okay.  And what does that mean to you?

21         A.    That means at that -- that basically

22    it's talking about the things, such as benefits,

23    which is your hospitalization, that type of thing.

24         Q.    But what does that mean?  You read to

1    me language that says, This brochure includes only

2    the key features, which means apparently there's

3    other terms and conditions.

4         A.    The way I interpret it and the way

5    that it was explained in the meetings, that these

6    were basically the main issues that we needed to

7    consider to make a choice to go with Zed-F.

8         Q.    Okay.  Now, what I had asked you

9    before is, did you read the provision that says,

10   Plan provisions and eligibility do not constitute

11   an employment contract with any individual.  Do you

12   do you remember reading that?

13        A.    I read it.

14        Q.    Okay.  Did you understand it?

15        A.    I understood it.

16        Q.    Okay.  And what did you understand it

17   to mean?

18        A.    I understood that to mean that it was

19   not a -- a -- in reference to terms of employment,

20   which I consider to be salary, AIP plan, merit

21   increase, that was in term with the medical part of

22   it, such as your benefits.

23        Q.    I don't understand.  It says that it

24   doesn't constitute an employment contract, right?

```
 1            MR. SIMON:  Objection.  The document
 2    speaks for itself.  Go ahead and answer.
 3        A.    Yeah, basically that's the way that I
 4    interpreted it.
 5        Q.    That it wasn't an employment contract?
 6        A.    That it is a -- basically agreement
 7    for us to consider for employment and that it was a
 8    key issue of making our decision.  And the way I
 9    considered it, that these items were going to be
10    followed and maintained and kept if we accepted the
11    transition to Zed-F.
12        Q.    Okay.  Did you think that these
13    things, as you put it, were written in stone, would
14    never change?
15        A.    That's the way I figured.
16        Q.    Okay.  And so did you see the language
17    in here that says, Plans described herein are
18    subject to change?
19            MR. SIMON:  Objection, asked and
20    answered.  Go ahead.
21        A.    Yeah, the plans, that's where it says
22    benefit plans.
23        Q.    Well, all right.  Let's stop for a
24    minute, Mr. Vories.  It doesn't say benefits plans
```

14

1    described here are subject to change, does it?

2         A.    It says summary plan --

3              MR. SIMON:   Objection.   The document

4    speaks for itself.   Go ahead.

5         A.    It says, Summary plan descriptions.

6    "Summary plan descriptions" in my interpretation is

7    benefit plan.

8         Q.    Okay.   Well, let's talk about what the

9    document says, because as you attorney has pointed

10   out, the document speaks for itself.

11             Do you see the sentence that starts

12   with "Plans"?

13        A.    Mm-hmm.

14        Q.    It doesn't say "benefit plans" there,

15   does it?

16        A.    It says, Summary description plans.

17        Q.    Oh, sir, I beg to differ here.   Do you

18   see the paragraph on page 2?

19        A.    I'm looking right at that paragraph.

20        Q.    See the sentence that starts with just

21   the word, "Plans," the big capital "P" there?

22        A.    Maybe you better read it for me.

23        Q.    Well, no, you need to read it because

24   I've read it for you a couple times, so let's --

1    let's get you to the same place.  That's what I'm

2    trying to do.

3           A.     That's what I'm doing.

4                  MR. SIMON:  Can you see it?

5           Q.     Do you see the sentence in that

6    little -- in that little section that says "Plans"?

7                  MR. SIMON:  He just wants you to read

8    that sentence out --

9           A.     Right.

10                 MR. SIMON:  -- loud, I guess.

11          Q.     Can you read that out loud?

12          A.     Can you read it out loud for me?

13          Q.     Sure.  "Plans described here are

14   subject to change," correct?

15          A.     Correct.

16          Q.     It doesn't say benefit plans, does it?

17                 MR. SIMON:  Objection.  The document

18   speaks for itself.  Go ahead.

19          A.     Right above that --

20          Q.     Sir --

21          A.     -- it says, Summary description plans.

22          Q.     Right.

23          A.     That's what I interpret that as --

24          Q.     Okay.

```
 1          A.     -- plans.  It's in the next sentence

 2    after talking about summary description plans.

 3          Q.     But you would agree with me, the

 4    sentence that starts with "Plans" certainly doesn't

 5    say "benefit plans," does it?

 6          A.     It doesn't say --

 7                 MR. SIMON:  Same objection.

 8          A.     It doesn't say anything more than

 9    that.

10          Q.     It certainly does not.

11          A.     And it doesn't say it isn't.

12          Q.     No, it doesn't.

13          A.     It doesn't explain itself.

14          Q.     Okay.  So you're saying it's unclear?

15          A.     I'd say that probably wasn't clear,

16    but the way I interpreted it, and that's the way

17    I'm interpreting it, is it's a summary description

18    plan.

19          Q.     And what's a summary description plan?

20          A.     That's benefits, in my opinion.

21          Q.     Okay.  And what's a benefit?

22          A.     Health -- or your health insurance,

23    your visual, your dental, your -- probably your

24    retirement, which was a separate issue on this.
```

1    It's listed in here in detail, those items.

2         Q.    Probably, but you don't know?

3         A.    It was listed.

4         Q.    No, you said that -- I asked you what

5    was a benefit and you said probably retirement.  So

6    is retirement a benefit or not?

7         A.    I would assume it would probably be

8    one.  I'm not sure --

9         Q.    Okay.

10         A.    -- but in my opinion, it probably is.

11         Q.    Okay.  And so when you talk about the

12    other items that are listed in here, if they're not

13    a benefit, what are they?

14         A.    Terms of employment is the way I've

15    always looked at them, which is your wages --

16         Q.    Okay.

17         A.    -- your AIP, your merit review.

18         Q.    Okay.  Anything else?

19         A.    That would be what I'd see as top two

20    or three listed on here.  I may have forgot

21    something, but as far as --

22         Q.    And what's --

23         A.    -- I can see, that's it.

24         Q.    And what's the 401K savings plan,

1   then?

2       A.    I would say that would probably fall

3   into a benefit.

4       Q.    Okay.  All right.  And so let's talk a

5   little bit -- you made reference to meetings and

6   the gray brochure.  All right.  When did you first

7   receive the gray brochure?

8       A.    I remember getting it, I believe, in

9   the second follow-up meeting --

10      Q.    Okay.

11      A.    -- questions meeting.  We had our

12  original presentation, and then I remember that --

13  when we had follow-up question meeting, it was made

14  available at that time.  And I also had it on my

15  offer sheet attached to it.

16      Q.    Was it stapled or clipped?

17      A.    I believe it was stapled.

18      Q.    Do you have your original offer letter

19  anywhere?

20      A.    I don't have a copy on me.

21      Q.    Do you have in your possession your

22  original offer letter?

23      A.    I don't believe so.

24      Q.    Okay.

1        A.    I'd have to try and look to find it.

2        Q.    All right.  Now, you said there was an

3   original meeting.  When was the original meeting?

4        A.    Sometime in '99.

5        Q.    You have no recollection when?

6        A.    No.

7        Q.    Okay.  Who was at the meeting?

8        A.    There was representatives from both

9   Ford and Zed-F.

10        Q.    And when you say "Ford and Zed-F," do

11   you mean ZF Lemforder or ZF Batavia?

12              MR. SIMON:  Okay.  Go ahead and answer

13   his question.  I'm just moving stuff around here.

14              THE WITNESS:  Okay.

15              MR. SIMON:  Go ahead.

16              THE WITNESS:  All right.

17        Q.    Who was present?

18        A.    Ed Adams -- or Dave Adams for one.

19        Q.    And who was he a representative of?

20        A.    I would hope it would have been with

21   Zed-F.

22        Q.    Well, what was your understanding?

23        A.    He was with Zed-F.

24        Q.    Okay.

20

1          A.    They're the main company.  I have no
2     recollections of what it was, other than he was
3     with Zed-F.
4          Q.    Okay.  So you don't know who he
5     represented at that time?
6          A.    He was at Zed-F.  Is that good enough
7     answer?
8          Q.    Just want to know what you know.
9          A.    That's what --
10         Q.    Who else --
11         A.    -- I'm telling you, Zed-F.
12         Q.    All right.  Who else was there?
13         A.    Okay.  Karl Kehr, which I think he
14    might have been Ford/Zed-F at the time.
15         Q.    You don't know?
16         A.    I didn't get in on his employment
17    negotiations at the time when he went, so I don't
18    know if he was Zed-F or Ford at the time.  I would
19    say probably was Ford.
20         Q.    Okay.
21         A.    And there was a -- Tony DeShaw, he was
22    also present.
23         Q.    Who is he employed by?
24         A.    He was Zed-F.

1          Q.    Okay.

2          A.    And I think they did the main talking.

3     Karl Kehr did most of the talking, if I remember

4     right.  Dave Adams said a few words.  Tony DeShaw

5     got into benefits and those are the three main ones

6     that I remember.

7          Q.    Okay.  What employees were there?

8          A.    All the Ford salaried employees.

9          Q.    Every Ford salaried employee?

10         A.    At the plant at that time.

11         Q.    So the plant was shut down?

12         A.    Basically they had two meetings, one

13    for day shift, one for afternoon.

14         Q.    Okay.  Well, wait a minute.  We're

15    talking about a meeting that you referred to as an

16    original meeting.  You don't remember when it was.

17    And I'm talking only about a meeting where Gary

18    Vories was present, okay?  Let's make sure we're

19    talking about the same thing.  Now, did you go to

20    two original meetings or just one?

21         A.    I went to one.

22         Q.    Okay.  So I don't want to hear about

23    the other one yet.  Let's talk about that later, in

24    terms of what you apparently heard, but where Gary

1    Vories present.  So were you present at the meeting

2    for Dave Adams, Karl Kehr and Tony DeShaw?

3           A.     You want to specify your question to

4    me a little better?

5           Q.     Okay.  You made reference to an

6    original meeting.  You've told me it was sometime

7    in 1999.  You've told me David Adams, Karl Kehr and

8    Tony DeShaw were there.

9           A.     Mm-hmm.

10          Q.     All right.  Were you there?

11          A.     You'll have to determine what meeting

12   you're talking.

13          Q.     You were talking about it, Mr. Vories.

14   You told me who was there.  Were you present or

15   not?

16          A.     I was present at one meeting.

17          Q.     Okay.  Well, let's try it this way.

18              MR. SIMON:  I think he got confused.

19   Can I -- he was asking you about a meeting --

20              MR. HUNTER:  Steve if there's an

21   objection, please place the objection.  Otherwise,

22   I'm going to ask --

23              MR. SIMON:  Well, I --

24              MR. HUNTER:  -- that we limit it to an

1    objection.

2              MR. SIMON:  You can answer.  I was

3    just was trying to help because it seemed like you

4    weren't getting anywhere, but go ahead.  Your

5    deposition.  Go ahead.

6         Q.    What meeting were you present at?

7         A.    I was at the afternoon meeting.

8         Q.    All right.  What afternoon was that?

9         A.    I do not remember the exact date or

10   time.

11        Q.    And who was present at this meeting,

12   afternoon meeting that you were at?

13        A.    The same people I've already

14   mentioned.

15        Q.    Anybody else?

16        A.    I do not remember the other people

17   that were there.  Those were the main ones.

18        Q.    All right.  And what Ford employees

19   were there?

20        A.    The Ford transitional employees had

21   the opportunity of making the decision on what they

22   wanted to do.  So there were Ford employees,

23   salaried employees.

24        Q.    Okay.  Which Ford employees were

24

```
 1    there?
 2          A.    Ford salaried employees.
 3          Q.    What are their names?
 4          A.    I do not remember all their names.
 5          Q.    Tell me the ones you do.
 6          A.    I was there.  Gary Vories.
 7          Q.    Yeah.
 8          A.    I do not remember all of them.  I was
 9    there.
10          Q.    Any others you remember?
11          A.    No, just myself.
12          Q.    What did Mr. Kehr say at this meeting?
13          A.    He basically covered the details in
14    the brochure that were salaried, AIP, merit
15    increase, basically those items.
16          Q.    He spoke to every one of those?
17          A.    Basically, yeah --
18          Q.    Okay.
19          A.    -- he covered most of those, all of
20    those.
21          Q.    Specifically, what did he say?
22          A.    He basically followed this as a
23    guideline, that's in here and that's what he
24    basically said.
```

1          Q.     Okay.  Mr. Vories, I don't know what

2     he basically said and you can put Exhibit 2 aside

3     for a minute, okay?  I need to know what you

4     remember what he said.

5          A.     Basically he said we would get our

6     same salary --

7          Q.     Okay.

8          A.     -- maybe some people might even get an

9     increase, but we would get our -- basically our

10    same salary.

11         Q.     Okay.

12         A.     He mentioned overtime.

13         Q.     What specifically did he say?

14         A.     He basically said that overtime would

15    remain the same, the program, the overtime policy,

16    the pay rate would maintain the same as Ford.  And

17    he also covered the AIP program, saying it was

18    based on how the company met its goals and the

19    profits of the company.  And if one was paid,

20    everyone would get a -- an AIP bonus.

21         Q.     Okay.  What else did he say?

22         A.     I believe that was basically it, other

23    than comments that he thought it was a -- you know,

24    a good opportunity, a chance to get in on the

1    ground floor with CVT, the new product.

2         Q.    Okay.  Anything else that you can

3    remember?

4         A.    No, that was basically his comment.

5         Q.    At the meeting, did you have a copy of

6    the gray brochure, Exhibit Number 2?

7         A.    No, I don't think it was at that first

8    meeting.  I believe it was at the follow-up meeting

9    after a lot of questions were asked, but they -- to

10    the best of my memory, that they had these

11    available.

12        Q.    Do you remember anything else that

13    Mr. Kehr said?

14        A.    No.

15        Q.    What did Mr. Adams say?

16        A.    He gave a -- just a small speech on a

17    little bit about the -- what Zed-F was and the

18    various companies -- you know, operations that they

19    had, various plants and what type of business they

20    were in.  And also talked a little bit about the

21    new product and what it looked like for the future.

22        Q.    And anything else?

23        A.    No, he -- he didn't spend a lot of

24    time.  From what I remember, it was just a short

1    introduction of who he was and a short speech on,

2    again, the background on Zed-F.

3        Q.    And how about Mr. DeShaw?

4        A.    He basically got into the benefits --

5    benefit section of what the health insurance would

6    be and -- and he spent a little bit of time -- a

7    little more time, I guess, getting into how we were

8    going to convert our Ford shares over to the 401

9    program and there was going to be a follow-up

10   meeting on that with people from Fidelity.

11       Q.    Anything else?

12       A.    No.  I think that was pretty much what

13   the meeting covered.

14       Q.    All right.  Now, I gather from your

15   comments, there must have been a second meeting?

16       A.    There was a follow-up meeting

17   basically on questions that got brought up that

18   they couldn't possibly -- you know, that they said

19   they couldn't answer at that meeting and --

20       Q.    Okay.  Well, let's -- questions they

21   couldn't answer at this meeting we just talked

22   about?

23       A.    Correct.

24       Q.    What questions couldn't they answer at

1    this meeting?

2           A.     Are there openings at Sharonville?

3           Q.     Okay.

4           A.     Would there be any opportunities

5    anywhere else at Ford for people who may not want

6    to go with Zed-F?  And also the possibility of

7    staying there as a Ford employee for the future.

8           Q.     Okay.  Anything else?

9           A.     And I think there was questions again

10   about the -- you know, certain questions such as

11   vacation.  You know, if I'm a Ford employee and

12   this year I get my fifth year -- you know, week of

13   vacation, would I be able to get that fifth week if

14   I go with Zed-F and those type of general

15   questions, just different concerns people have

16   that --

17          Q.     And they were --

18          A.     -- in regards to either benefits or

19   possible opportunities, other opportunities.

20          Q.     And they weren't able to answer the

21   vacation question?

22          A.     No, I think they were to check on it

23   and got back to us at the follow-up meeting.

24          Q.     Any other questions that you can

29

1    recall that weren't answered?

2         A.    No.  I think those were the main --

3    the main ones.  I'm sure there probably were some

4    others, but I could -- can't remember them all.

5         Q.    Did you ask any questions?

6         A.    Yeah, there were several.  I asked the

7    question about the possibility of Sharonville, of

8    which -- you know, there was several other people

9    that had follow-up questions at that time.

10        Q.    Specifically what was the question you

11   asked about Sharonville?

12        A.    If there was any opportunity to be

13   able to go over to Sharonville.

14        Q.    Okay.  And who answered that question

15   for you?

16        A.    I believe it was Kehr at the time

17   'cause he was covering most of the -- you know,

18   most of the meeting.

19        Q.    And what was his answer?

20        A.    I think at that time, the best that I

21   can remember, that it was still unsure whether

22   there'd be any opportunities to go to Sharonville

23   or not at the time.  It was something that they

24   were still working on, whether that would be

1  available or not.

2       Q.    Did you ask any other questions?

3       A.    No.  I think that was the main

4  question I had at the time.

5       Q.    All right.  Now, we kind of went --

6  backtracked there, so when was this next follow-up

7  meeting?

8       A.    I'd say approximately within a --

9  maybe a week of the first meeting.

10      Q.    Do you remember the date of that?

11      A.    No.  I just know it was in the

12  summertime.

13      Q.    And you attended the follow-up

14  meeting?

15      A.    Yes.

16      Q.    And who was there?

17      A.    There was, I believe, Mike Warden and

18  I think Tony DeShaw was the two people I remember

19  for sure.

20      Q.    Is Mike Warden -- who did he

21  represent?

22      A.    He was a Ford employee, still a Ford

23  employee, as far as I know.  He was the human

24  resources person --

```
 1          Q.     Did you have --

 2          A.     -- at that time.

 3          Q.     And how about DeShaw?

 4          A.     He was a benefits man.

 5          Q.     Was he a ZF guy?

 6          A.     He was a ZF person, I'm almost sure.

 7   I can't say 100 percent, but I -- I don't believe

 8   he was Ford.

 9          Q.     And who was there, in terms of

10   employees?

11          A.     It was an open meeting for salaried

12   employees that still had questions or -- or wanted

13   to hear what was -- what was found out on some of

14   the questions that were asked or get some

15   clarification on some other issues, if they forgot

16   to ask a question the first time around.  So it was

17   a group of salaried Ford employees.

18          Q.     Do you remember who was there?

19          A.     I don't remember -- you know, basic

20   names, but -- you know, the same Ford people who

21   had to make a decision on whether to go with the

22   company or not.  I don't believe there was as many

23   people at the second meeting as was at the first.

24          Q.     Do you remember specifically anybody
```

1    that was there?

2         A.    Most of the -- well, my shift --

3    afternoon shift, there was probably John Wissy.

4    He's at Sharonville now.  He was one of the

5    maintenance supervisors at the time.  And trying to

6    think of production people.  Probably Richard Carr.

7    He's one of the -- one of the production

8    supervisors.  Norm Kauffee, he's a production

9    supervisor on afternoons.

10             And trying to remember who was all

11    still there at that time production-wise.  And

12    maintenance-wise, I probably -- Wayne Whisman was

13    probably -- well, I don't know.  I don't think

14    Wayne was there.

15         Q.    Okay.  If you don't know --

16             MR. SIMON:  Don't guess.  Don't guess,

17    Gary.

18         A.    I don't think -- I don't think Wayne

19    was there.

20         Q.    All right.

21         A.    I don't think Wayne was there.

22         Q.    Who else was there, if you recall?

23         A.    Other than that, I don't know.  I'm

24    just trying to think of anybody that would have

1    been there for sure, but I -- I can't remember

2    back -- that was four years ago and different

3    people on shifts have changed so much.

4          Q.    And what did Mr. DeShaw say at the

5    meeting?

6          A.    He spent most of the time, I think,

7    on, again, telling us when this meeting was going

8    to be with Fidelity on the 40K -- 401K.  And the

9    decision had been made that you would not be able

10   to keep your Ford shares.  He would have to convert

11   them over to mutual funds of your choice.

12         Q.    Okay.

13         A.    Fidelity was going to be there, I

14   think, within the next -- if I remember, the next

15   week to have meetings with the salaried employees

16   that -- you know, were interested in finding out

17   how that was going to shake out or what would be

18   available and the timing.

19         Q.    Mr. DeShaw say anything else?

20         A.    I think he came back and there was a

21   few other questions.  I don't remember off the top

22   of my head specifically.  But, you know, there was

23   some questions about the -- the hospitalization.

24   And if I remember right, it was going to be with a

 1    different company under Zed-F than it would be with

 2    Ford.  That was basically it.

 3         Q.    And what about Mr. Warden, what did he

 4    have to say?

 5         A.    I just remember generally that the

 6    questions concerning going to Sharonville, that it

 7    was pretty well decided that there wouldn't be any

 8    available -- you know, any available openings at

 9    Sharonville for people to be considered for.

10         Q.    Okay.

11         A.    And that you had a couple

12    possibilities that Ford would try and line up, if

13    you weren't interested in going with Zed-F at that

14    time, if your decision was to stay with Ford, there

15    wouldn't probably be any openings at Sharonville

16    for people to go to.  And that you had two

17    opportunities for interviews somewhere with Ford,

18    wherever that would be.  They'd help try and line

19    two interviews up.

20              And the answer basically for Ford

21    people being able to stay, within six months, there

22    wouldn't be any more Ford people at that time.  So

23    if -- if anyone was thinking that they could stay

24    for any period of time until something opened up a

1   year and a half down the road or something like

2   this, that wasn't going to be available.

3          Q.    Okay.  What else did Mr. Warden say?

4          A.    I think those were the basic key

5   issues that people had concerns at that time trying

6   to make a decision on whether to stay with Ford or

7   go with Zed-F.

8          Q.    Nothing else that you can remember

9   from either Mr. Warden or Mr. DeShaw?

10         A.    No.

11         Q.    And they were the only ones at the

12  meeting?

13         A.    They were the only two that I

14  remember.  There could have been some other people

15  there.

16         Q.    I think you told me before at the --

17  I'll call it the original meeting with Adams, Kehr

18  and DeShaw, you didn't at that point have the gray

19  brochure.  Did you get the gray brochure at this

20  meeting?

21         A.    I believe I did.  Best of my memory, I

22  thought they were -- the brochures were available

23  to try and give a little clearer breakdown of some

24  of the points that were covered.

1          Q.     Did you ask any questions at this

2     meeting, the second meeting?

3          A.     I don't remember asking any.

4          Q.     Did you review the gray brochure at

5     that time?

6          A.     I remember they give it to us and we

7     were able to look it over and -- you know, take it

8     with us.  It was our copy.  There were copies

9     there, best as I can remember.

10         Q.     What I had asked was, did you look

11    at --

12         A.     Sure.

13         Q.     -- that gray brochure at that meeting?

14         A.     Sure.

15         Q.     Okay.  And when you read the gray

16    brochure and you saw the language about subject to

17    change and you saw the language that it wasn't an

18    employment contract, did you think that it was

19    different, in terms of what Mr. Kehr had told you

20    or Mr. Adams had told you at the original meeting?

21              MR. SIMON:  Objection.  The brochure

22    speaks for itself.  I think you mischaracterized

23    what it said.  You can go ahead and answer the

24    question.

1         A.    Okay.  Well, basically I think I

2    answered that earlier.  There wasn't any other

3    further discussion on that.  When I read it, it

4    basically -- what we -- what we had discussed

5    earlier, which was the way I looked at it.

6         Q.    So you thought it was consistent with

7    what Mr. Adams and Mr. Kehr had told you earlier?

8         A.    Well, my opinion is that when they

9    covered it, that it was still in my mind that there

10   was conditions of employment and also benefits.

11   That's the way I continually kept it in my mind.

12        Q.    What I asked you is, particularly the

13   language on the second page we talked about before,

14   do you feel that language is consistent with what

15   was represented to you by Mr. Adams and Mr. Kehr?

16        A.    I can't answer that.  I don't know.

17        Q.    You don't know if it was consistent --

18        A.    I don't --

19        Q.    -- or not?

20        A.    I can't say if it was or wasn't.

21        Q.    Okay.  All right.  So you've got your

22   second meeting and you've got your brochure.  You

23   didn't ask any questions.  When did you next

24   discuss with a representative of ZF or -- ZF

1    Batavia or Ford any issues related to the decision

2    to leave Ford Motor Company?

3        A.    I had a couple different discussions.

4    Hassan Saleh was basically the -- I don't know what

5    word you'd want to use, but if it was recruiter or

6    whatever, on the floor at that time, and he talked

7    to most of the salary people who were production

8    supervisors, salary -- maintenance supervisors,

9    people actually on the floor, floor- level

10    supervision.

11        So I had a couple different

12    discussions with him, not in a formal office thing

13    'cause he was always out on the floor and naturally

14    we were on the floor.  And several different times

15    I met with him and -- you know, just for a minute

16    here, a couple minutes here standing in the aisle

17    way discussing -- you know, what had gone on, what

18    the situation was and what he thought.

19        And I do remember one situation where

20    I asked him about the -- what he thought of the --

21    the people at Zed-F and the situation and was it

22    good or bad.  And this was after the follow-up

23    meeting.  We had this brochure and had different

24    things we could look at and discuss.  And just

1    basically his response was, Do you think I'm going

2    to give up 26 years of Ford if I didn't think it

3    was a good deal to go with Zed-F?

4              And then when we asked him different

5    questions concerning the salary and the -- and the

6    AIP program and things such as this, and the

7    benefits, he made the statement that -- you know,

8    they put it in writing.  You think they're not

9    going to live up to it, that type of thing.  The

10   words, I wouldn't give up 26 years to -- to go with

11   someone I didn't feel was going to basically keep

12   their word and what concerns we had.  Well, if they

13   put it in writing, they're going to live up to it.

14        Q.    Okay.  You can't give me a date

15   obviously on the second meeting, certainly after

16   the first meeting and before you signed your

17   employment letter, right?

18        A.    That's correct.

19        Q.    Had you made up your mind to join ZF

20   at the time of the second meeting?

21        A.    No.  Still hadn't made my mind up till

22   I -- actually went to the day that they asked us to

23   come up to meet with them and -- and sign the

24   required -- you know, paperwork for benefits and

1    that type of thing.

2            So you had a certain date, but they

3    wanted you to come up and they called and -- you

4    know, would say, Gary, you're supposed to be up to

5    see Mike Warden -- you know, this afternoon or

6    Tuesday afternoon, 4:00, if you're interested.  If

7    you're not -- you know, that's up to you.  But

8    you're supposed to be up there at 4:00.

9        Q.    And what issues were open in your

10   mind, in terms of not making the decision to join

11   ZF Batavia?

12       A.    Well, I think my own personal

13   situation was I was -- you know, I was getting

14   fairly close to retirement.  I still had some years

15   left, but I was concerned about retirement and

16   which way to go, to stay with Ford or -- you know,

17   to go with Zed-F.  And there is a section that they

18   did clarify in the brochure here that really made a

19   difference for me after it came out was on the

20   retirement, that if you had 10 years in and were 55

21   years old, then basically you would get the same

22   dollar amount retirement as what Ford -- you would

23   have got under Ford.

24           In other words, they count the years

41

1     that you had with Zed-F towards your Ford

2     retirement and that was the one big key issue in

3     my -- my mind that made the difference.

4             So I was still kind of debating in my

5     head back and forth of which way to go.  Up until

6     that was clarified and that was clarified after the

7     first meeting -- in between the first meeting and

8     the second meeting 'cause that was one question

9     that got asked several times by a lot of the people

10    at the first meeting, about the retirement

11    situation.  How was this going to affect their

12    retirement?  Would it still be the same or not be

13    the same or would years count that you were with

14    Zed-F if you went -- you know.  So that was a big

15    issue to a lot of salary people.

16        Q.    Well, now, I guess I'm confused

17    because retirement, you really haven't mentioned up

18    until about now.

19        A.    Yeah.

20        Q.    And so you're telling me that was a

21    big issue.  You didn't ask any questions about it

22    at the first meeting.  You didn't ask any questions

23    about it --

24        A.    I didn't personally ask them, no.  But

1    they were asked.

2         Q.    But you haven't mentioned it till yet.

3    So I guess I'm confused, Mr. Vories.  So when did

4    retirement become an issue for you?

5         A.    It was an issue all the way along.

6         Q.    Okay.  And --

7         A.    But I specifically did not ask

8    questions.  There was questions asked, same

9    questions I would have asked in the meeting.

10        Q.    All right.  And so you then said that

11   the retirement issue was clarified.  When was it

12   clarified and by whom?

13        A.    I don't know by whom, but when -- or

14   who made the decision, but in the first meeting,

15   there was questions about retirement, how was

16   this -- was going to affect retirement for people,

17   even different situations than I was, that maybe

18   had 28 years.  Two more years they could retire

19   from Ford, and were there going to be any

20   consideration or any specific agreements made to

21   cover that type of thing.  And then in my case --

22        Q.    All right.  Wait a minute.  So

23   somebody asked a question or there was a discussion

24   or --

1      A.     There were several people that asked

2  questions about retirement.  That was one of the

3  issues.

4      Q.     Do you remember who those people were?

5      A.     No, not off the top of my head, but

6  there was -- probably everybody in the -- there had

7  some type of concern about retirement.  But the

8  specific people, I don't have off the top of my

9  head.

10     Q.     And what was the -- do you remember

11  specifically what any of the questions were?

12     A.     Yeah.  I've got 28 years in with Ford

13  here.  If I go with Zed-F, will there be any

14  consideration and still be able to get my 30-year

15  retirement?  Is there going to be any grace period

16  of so many years or anything like this agreed to?

17     Q.     Okay.  And what -- who answered that

18  question?

19     A.     Well, Karl Kehr couldn't answer it.

20     Q.     Okay.

21     A.     He said that's one of the issues

22  that -- you know, were brought up and we'd still

23  have to work on to finalize.  We don't have a final

24  answer at the first meeting, but it is important to

```
 1    everyone and we're working on those issues and

 2    we'll try and have that cleared up as soon as

 3    possible and so forth.

 4         Q.    So --

 5         A.    So by the time they had the second

 6    meeting, then, it basically -- whoever got together

 7    at the upper levels at Ford and Zed-F had decided

 8    what -- what issues would be acceptable to agree on

 9    for retirement.

10         Q.    Now, how do you know that?

11         A.    Well, I don't think they just made a

12    decision on retirement without consulting one

13    another, if Ford gave the okay to say, we'll let

14    you count your years for Zed-F towards Ford's

15    retirement.

16         Q.    So you're just guessing.  You don't

17    have any personal knowledge that that occurred,

18    right?

19         A.    No.

20         Q.    Okay.  Well, but what I guess I

21    struggle with is, you explained to me what was

22    discussed at the second meeting and you didn't say

23    anything about retirement or answer any questions

24    about retirement at the second meeting.  So you're
```

1    now telling me that that was discussed at the

2    second meeting?

3         A.    That's correct.

4         Q.    Okay.  Well, then, who discussed it?

5         A.    Who discussed it?

6         Q.    Mm-hmm.

7         A.    People in the meeting and at the

8    second meeting -- who did I say was there was Mike

9    Warden.

10         Q.    Well, all I'm asking, Mr. Vories, is

11    who discussed it at the second meeting?  Who gave

12    you the answer about the retirement?

13         A.    As far as I remember, it was Mike

14    Warden.

15         Q.    And -- all right.  So you're changing

16    what you told me before about -- you indicated

17    previously you'd only discussed the move to

18    Sharonville and the ability or inability to stay on

19    as a Ford employee.  So now you're telling me you

20    also discussed retirement?

21              MR. SIMON:  I think he did testify

22    what he did recall, so go ahead and answer.

23         A.    That's correct.

24         Q.    Okay.  And what did he say about

1    retirement?

2         A.    He basically said what was in the

3    brochure here.  Now, he did say -- because if you

4    read it here, if I can do that?

5         Q.    No.  Let's stick with what you

6    remember.  I can read the brochure.

7         A.    Well, I don't remember, then --

8         Q.    Okay.

9         A.    -- all the details.

10        Q.    I didn't ask for all the details.  All

11   I want is what you can remember.

12        A.    Okay.  I don't remember.

13        Q.    What can you remember?

14        A.    I don't remember.

15        Q.    You don't remember anything?

16        A.    No.

17        Q.    Okay.

18        A.    All I know is it was discussed, all

19   the details and exactly, I do not remember.

20        Q.    So you don't remember the discussion

21   or just it was somehow related to the gray

22   brochure?

23        A.    Don't remember all the details.

24        Q.    Okay.  And you don't remember -- I

47

```
 1    don't think you've told me any details.

 2         A.    I don't remember any of the details --

 3         Q.    Okay.

 4         A.    -- that were discussed specifically in

 5    that meeting.

 6         Q.    Do you remember any details that you

 7    relied on to make your decision to transition?

 8         A.    I remember in my specific

 9    consideration, my own personal situation, that they

10    said that if you had five years in or were vested

11    with Ford, that you could use -- the remaining

12    years would be credited -- that you worked for

13    Zed-F would be credited toward your Ford

14    retirement.

15              So, in my case, that meant I could get

16    55 -- I was 55 and had 10 years in, I could get the

17    equivalent amount of dollars that I would get with

18    Ford, I'd get when I retired at Zed-F.

19         Q.    Okay.  And you used the term "they

20    said."  Who is "they"?

21         A.    I don't remember.

22         Q.    So you don't know if it was a

23    representative of Ford or representative of --

24         A.    I just remember --
```

```
 1        Q.    -- ZF Batavia?

 2        A.    -- it was discussed in that meeting

 3   and all the exact details.  But I remember that

 4   part of it.

 5        Q.    Okay.  Now, you had told me that --

 6   well, let's clarify.  Again, at what point in time

 7   did you decide, then, to make the transition to ZF

 8   Batavia?

 9            MR. SIMON:  Objection, asked and

10   answered.  Go ahead.

11        A.    Repeat the question again.

12        Q.    At what point in time did you make the

13   decision to transition to ZF Batavia?

14            MR. SIMON:  Same objection.

15        A.    At the point sometime after the second

16   meeting and when I went and saw Mike Warden.

17        Q.    Okay.  So you hadn't decided as of the

18   second meeting to -- to make the transition?

19        A.    No.

20        Q.    Now, you relayed to me before that you

21   had had a number of conversations, shorter,

22   informal or otherwise on the floor and whatnot with

23   Mr. Saleh?

24        A.    Right.
```

1          Q.     Were those discussions before or after

2     the second meeting?

3          A.     They were before and after.

4          Q.     All right.  Do you remember

5     specifically any of the discussions prior to the

6     second meeting with Mr. Saleh?

7          A.     Not specific meetings, just other

8     general questions of what he thought what our

9     position was going to be, what did the future look

10    like, what did he really know about Zed-F, those

11    type of things.

12         Q.     Okay.  And do you remember any of the

13    specific discussions with Mr. Saleh after the

14    second meeting?

15         A.     I think after the second meeting,

16    there was more -- you know, specifics toward

17    we'll -- you know, again, the retirement, the

18    wages, the AIP, those type of questions, more

19    detailed concerns about the -- excuse me.  -- the

20    information listed in the brochure that we had

21    gotten.

22         Q.     Well, what -- when you say the

23    "concerns," what were the concerns?

24         A.     Well, I think everybody was just

1    concerned, you're going to a new company.  What do

2    you know about these people?  How do you feel about

3    it?  You've dealt with them, you've discussed

4    things with them.

5              We've had one meeting, then a follow-

6    up meeting.  We do not know the people that --

7    that's basically going to be running the company.

8    We saw Dave Adams for a few minutes at the one

9    meeting.  You know, what's your general feel?  Is

10   it going to basically be similar to Ford, different

11   than Ford, basically the same?  And that was

12   basically what our questions were.

13        Q.    So you felt those questions hadn't

14   been answered at the prior two meetings, the formal

15   meeting?

16        A.    I don't think you get a feel at the

17   meetings, in a group situation.  It was more of a

18   one-on-one type thing.

19        Q.    Okay.

20        A.    In other words, my concerns were

21   maintenance, my position in maintenance and how was

22   maintenance going to be run and the general

23   questions in addition to that.

24        Q.    And so you spoke to Mr. Saleh about

51

```
 1    these concerns.  Did you speak to Mr. Williams?
 2    Rick Williams, to clarify.
 3           A.    Rick Williams?
 4           Q.    Mm-hmm.
 5           A.    No.
 6           Q.    Well, what about Mr. Priest, Jerry
 7    Priest?
 8           A.    No.
 9           Q.    I think you did mention you'd spoken
10    in general with other Ford transitionals?
11           A.    Right.
12           Q.    Who else?
13           A.    Different maintenance people,
14    supervisors, production people.
15           Q.    Okay.  And any specifics you can
16    recall?
17           A.    No, but a lot of people just had the
18    same concerns of going from Ford to a new company
19    and a lot of them were basically -- have the same
20    concerns on, is it the right way to go?  Do we feel
21    comfortable?  What's the future going to be?  Are
22    the things that are being told going to happen, not
23    happen?  How do you feel?  That type of thing.
24           Q.    Okay.  Same general discussions, in a
```

1    sense, amongst all the Ford transitionals, whether

2    it was you and Mr. Whisman or Mr. Saleh or whoever,

3    just the same general, what do you know about ZF

4    and that type of discussion?

5        A.    Yes, that's part of it.

6        Q.    Okay.  So you've had the two meetings;

7    you've had the gray brochure; you've had your

8    conversations with Mr. Saleh and the other Ford

9    transitionals.  And it sounds like you got summoned

10   up to or somehow went up to Mr. Warden's office?

11       A.    That's how they basically were

12   handling the -- I don't know how they handled the

13   people up in the office area.  But on the floor

14   area on the different shifts, they just gave you a

15   time to come up there to -- to make your final

16   decision, ask any final questions, sign your

17   paperwork, whatever.  Make your decision.

18       Q.    Now, as -- as -- and maybe I've asked

19   this before, but I guess I'm going to ask it again.

20   As you went up to the office that day, I mean, did

21   you have a predetermined day or was it like you got

22   a call that said come on up in 10 minutes, Gary, or

23   how was that handled?

24       A.    I believe that when we got in that

1    day, it was -- we were told that we were supposed

2    to go up there at a certain time.

3        Q.    Okay.

4        A.    But I work afternoons.  I got there,

5    say, at 3:00 and I was told -- you know, be up

6    there at five or be up there at whatever.

7        Q.    When you found out that it was kind of

8    your day to decide, had you already decided, then,

9    at that point?

10        A.    Oh, sure.  I was thinking it over.

11    You know, every day you were trying to make your

12    mind up.  So by that time, based on the discussions

13    I had with Hassan and what information I had, I

14    pretty well made my mind up that, yeah.  I was

15    going to go ahead and transfer over.

16        Q.    Okay.  And I guess we'll nail it down

17    here.  You had pretty much made up your mind or you

18    had --

19        A.    Well, there was still a couple

20    questions that I asked Mike Warden when I went up

21    there.

22        Q.    Okay.

23        A.    And it was the same questions that I

24    mentioned earlier about the offer, the availability

1    of anything being available at Sharonville and --

2        Q.   Well, let's hold that thought for a

3    second.  I guess I'm confused because if you had

4    "pretty much" decided -- I think was the term you

5    used -- to come over to ZF, why would it matter

6    what --

7        A.   Well, 'cause things were changing.

8    One day you'd hear one thing and the next day it

9    was another.  Next day, yeah, there's going to be

10   some probably within the next month or within the

11   next six months, there's going to be some openings

12   at Sharonville or, no, there isn't any openings or,

13   no, you're not going to be able to go to

14   Sharonville or -- so it seemed liked every day or

15   two, there was a lot of different discussion,

16   rumors going around the plant floor, well, this is

17   now the story.  Yeah, there is going to be some

18   possible openings at Sharonville.  No, there isn't,

19   so --

20       Q.   But if you're coming on to ZF Batavia,

21   what did it matter?

22       A.   Well, I was 100 -- well, I shouldn't

23   say 100 percent sure.  But I wanted to go up and

24   make sure that I didn't say, Hey, I'm going to do

1    this and then, yeah, there was still some other

2    options that were available that weren't available

3    yesterday.

4            So that was basically the reason, just

5    to make sure before I signed that I had all the

6    information I needed to -- to make the final

7    decision, that something didn't come up that I

8    wasn't aware of it.

9        Q.    Okay.  And I interrupted you before.

10   You had mentioned the Sharonville openings.  What

11   other discussions did you discuss with Mr. Warden

12   at this time?

13       A.    And I think it was the other one

14   about -- about the staying as Ford because that was

15   also a rumor going around that, yeah, you could

16   possibly stay with Ford now and it's been decided

17   you could stay there now for a year -- or no.  So

18   that was the other -- the other option.

19       Q.    Okay.  Any other questions that you

20   remember with Mr. Warden?

21       A.    No, I think that was the two --

22       Q.    Anything else that you --

23       A.    -- two main ones.

24       Q.    I'm sorry.  Anything else that you

1   discussed with him at that time?

2          A.    No.

3          Q.    And so he had a offer letter for you?

4          A.    Right.

5          Q.    Mr. Vories, we've handed you what

6   we've marked for identification purposes as Exhibit

7   105.  I would ask if you would take a moment to go

8   through that.

9          A.    Okay.  Yeah, this is --

10         Q.    You've seen that document?

11         A.    I seen -- right.

12         Q.    Okay.  Do you remember, did you sign

13  that document at that meeting we've discussed at

14  Mr. Warden's office?

15         A.    I would believe -- I can't say a

16  hundred percent I'm sure, but I'm pretty positive I

17  signed it at his office because we also were -- we

18  not only met in his office, but then went into a

19  conference room because there were several other

20  employees there, four or five, I think, at the

21  time.

22         Q.    Well, all right.  I'm confused.

23         A.    In other words, they call you --

24         Q.    Did they call it a group offer or --

```
 1          A.     No.  They called you into his

 2     office --

 3          Q.     Okay.

 4          A.     -- and then from there, you went over

 5     to the conference room.  Best of my memory, I think

 6     we signed this in his office, but I can't say I'm

 7     100 percent sure because then we went in and signed

 8     a bunch of other papers in the conference room.

 9          Q.     Okay.  But I guess, more to my point

10     is, you went up there and you signed it that day?

11          A.     Right.

12          Q.     Okay.  Did you read it before you

13     signed it?

14          A.     Yes.

15          Q.     Do you remember, was there a summary

16     attached or any other document attached to this?

17          A.     I believe this, the gray tri-fold was

18     attached to it.

19          Q.     Okay.  You see in there at the second

20     bullet point, the transition bonus payment?

21          A.     Yes.

22          Q.     And in all of the discussions that

23     we've had so far, you hadn't mentioned the

24     transition bonus.  Did that come as a surprise to
```

58

1    you?

2        A.    No, because at the time, Ford was in a

3    pretty good streak of profit sharing payments at

4    that time and that was basically -- how would you

5    say it?  A -- something to help cover the profit

6    sharing that we may not get if we -- if we left and

7    went to Zed-F.

8        Q.    Well, now, how do you know that

9    because, again, you hadn't indicated that anybody

10   ever discussed the transition payment with you?

11       A.    I didn't say that.

12       Q.    You didn't say what, sir?

13       A.    I didn't say that nobody had ever

14   discussed that with me before.

15       Q.    Well, I asked you about the two

16   meetings and your --

17       A.    You asked me --

18       Q.    -- discussions with Mr. Saleh and you

19   never mentioned the transition bonus.

20       A.    I couldn't remember every issue that

21   was discussed at those meetings.

22       Q.    Okay.  So now you're changing your

23   testimony and telling me --

24       A.    No --

```
 1          Q.      -- that --

 2          A.      -- I'm not.

 3                  MR. SIMON:  Hold on.

 4          A.      I'm not changing my testimony.

 5                  MR. SIMON:  Hold on a second.  He

 6    testified to everything he could recall and now

 7    he's answering.  Go ahead and answer the question.

 8          Q.      Okay.  So let's talk about the

 9    transition bonus.

10          A.      Okay.

11          Q.      What was it for?

12          A.      It was basically -- what it states

13    here, it is paid over three equal -- of that amount

14    shown for salaried employees, the sign-on bonus is

15    what they were calling it.

16          Q.      Well, all right.  Now, Mr. Vories, you

17    started reading the paragraph and then you stopped.

18    Let's go down to the second bullet point, the last

19    sentence here.  It says, This bonus is designed to

20    address any monetary differences between Ford

21    benefits and Batavia -- ZF Batavia's new plan.  Do

22    you see that?

23          A.      Yeah.

24          Q.      Okay.  What was your understanding as
```

1   to what the transition bonus was for?

2       A.    Basically to make the difference up

3   between the profit sharing that was being paid by

4   Ford and what was not guaranteed with Zed-F --

5       Q.    Okay.  What --

6       A.    -- because they didn't know if

7   anything would be paid at Zed-F that first year,

8   second year or third year.

9       Q.    Didn't know if anything would be paid

10  in terms of --

11      A.    Their AIP program.

12      Q.    And who told you that?

13      A.    That was basically what the discussion

14  was.  I don't remember exactly who told me about

15  it, but that was the way it was interpreted.

16      Q.    Okay.  That was the way the discussion

17  was.  Which discussion?

18      A.    Different discussions on the floor

19  with Hassan Saleh, that there would be a bonus paid

20  to make up the difference that possibly you

21  wouldn't get for profit sharing.

22      Q.    Okay.  So it wasn't discussed at the

23  two formal group meetings?

24      A.    If it was, I'm not sure.  It could

1    have been.  I don't remember all the exact details

2    of all these meetings four years ago, to the best

3    of my memory.

4        Q.    And you've received that $8,333.33

5    payment for the last three years, correct?

6        A.    First three years, yeah.

7        Q.    Okay.  And, in fact, the suit wasn't

8    filed until after you received your third payment,

9    was it?

10       A.    I don't remember the timing.  I do

11   remember the last profit sharing check I got from

12   Ford was like $13,000.

13       Q.    And what's the significance of that?

14       A.    Well, if you're trying to say that

15   it's because we didn't put a suit in after this was

16   done, it's not true.

17       Q.    So you filed suit before you got your

18   $8,300 payment?

19       A.    No, I didn't say that.

20       Q.    Okay.  What did you --

21       A.    I just said -- I just said -- I'll

22   repeat what I said.  I do remember the last profit

23   sharing check I got with Ford was like $12,000.

24       Q.    Okay.  And how is that significant?

1        A.    That's all I said --

2        Q.    I don't understand the significance of

3    your statement.

4        A.    -- because you were saying that you

5    couldn't understand how we could get this bonus and

6    what it was for and I was explaining it was

7    replacing the profit sharing program payments that

8    we had got recently from Ford.  That was the way it

9    was interpreted.

10        Q.    Okay.  And certainly that's not what

11    the letter says, though, is it?

12            MR. SIMON:  Objection.

13        A.    It doesn't say it is or it isn't.

14            MR. SIMON:  I'm sorry.  Objection.

15    The document speaks for itself.  You can go ahead

16    and answer.

17        A.    Okay.  It doesn't say.  Ford benefits

18    and Zed-F's new plan.  Profit sharing is a Ford

19    benefit.

20        Q.    Okay.

21        A.    So, yes, I guess it does say that.

22        Q.    Okay.  And that's the way you

23    interpreted that?

24        A.    That's the way I interpret.

1          Q.    Okay.  Now let's talk a little bit

2     about -- in general terms, we kind of have talked

3     about the gray brochure and -- and your thoughts

4     with respect to that and other discussions you've

5     had.

6               What items or issues or benefits or

7     conditions of employment, whatever you want to call

8     them, has ZF Batavia failed to deliver?

9          A.    I think their overtime is one of them.

10     It's not -- starting with that, overtime.

11          Q.    Okay.  What's the issue with the

12     overtime?

13          A.    I don't think they've maintained the

14     policy that they said that they were going to.

15          Q.    Okay.  You've got to help me with a

16     little detail there.

17          A.    Okay.

18          Q.    What specifically has Batavia not done

19     that you believe it was going to?

20          A.    Okay.  One, they haven't paid us

21     overtime.

22          Q.    You've received no overtime

23     compensation?

24          A.    For three weekends in 2001, we worked

64

1    and were not paid.

2        Q.    When you say "we," who is "we"?

3        A.    Maintenance supervision.

4        Q.    Who specifically?

5        A.    I don't know who else worked or who

6    didn't work, but I know there was more than myself.

7    I don't get into people's pay, so I don't know.

8        Q.    So when you use the term "we," you

9    didn't know who you were talking about?  That's an

10   assumption, again, on your part?

11            MR. SIMON:  Objection, argumentative.

12   Go ahead.

13       A.    There was, I think, four or five

14   people who worked that weekend that did not get

15   paid.

16       Q.    And what weekend would that have been?

17       A.    It was back in April of -- I believe

18   April, May of 2001.  I don't remember the exact

19   weekend.  It's in the documents.

20       Q.    It's in which document, sir?

21       A.    Probably in the documents that you

22   have and Steve have.

23       Q.    Documents that you gave to your

24   attorney?

1          A.    Right.

2          Q.    Okay.  And when you say you worked

3     those three weekends, did you work both Saturday

4     and Sunday?

5          A.    I believe I worked Saturday, I

6     believe.  Maybe Saturday two weeks and a Sunday one

7     week.  So there was --

8          Q.    So two Saturdays and one Sunday?

9          A.    Best I can remember.

10         Q.    Did you work eights or twelves or do

11    you know?

12         A.    I believe it was -- it was either

13    eight or nine.  I'm not sure.  One or the other.  I

14    don't remember.

15         Q.    For all three shifts?

16         A.    Yeah.

17         Q.    Okay.  Certainly you received your

18    salary during that time period, correct, your base

19    salary?

20         A.    On overtime?  Clarify your question.

21         Q.    For those -- for that time period,

22    let's say all of April of 2001.  You did during

23    that time period receive your salary, correct?

24         A.    I received my base salary, yeah.

1          Q.     All right.  What other or what else

2     has Batavia not done with respect to overtime?

3          A.     Well, I also think that they haven't

4     maintained the rates.  They started off at the same

5     rate that Ford was and said basically they would

6     stay -- the overtime rate would stay the same as

7     what Ford would.  You know, went up, it would go

8     up.  And I think if it -- I think there was one

9     year in there, maybe they -- they didn't adjust it.

10          Q.     Which year is that?

11          A.     I would say maybe 2000, but I'm not

12     100 percent sure.

13          Q.     And how much should the rate have

14     been?

15          A.     I don't know.  We didn't know until

16     recently they hadn't raised it.

17          Q.     When recently did you find out that

18     it --

19          A.     Like in the last year, but they just

20     adjusted it again recently.

21          Q.     And who said that the rate would go up

22     if Ford's rate went up?

23          A.     When they covered it in the meetings

24     and gave their explanation you would be paid

67

1    overtime, it would be the same rate as Ford's.  It

2    would basically stay -- you know, would stay the

3    same as what Ford has, so you wouldn't be losing

4    any overtime.  It's the same basic overtime policy

5    that Ford used.

6         Q.    Same basic policy?

7         A.    Yeah, be the same.  Be the same.

8         Q.    Wait a minute.  You said the first

9    time the same basic policy, correct?

10        A.    Yeah --

11        Q.    Okay.

12        A.    -- would be the same.

13        Q.    And who made the comment that it would

14   be the same basic policy?

15        A.    I believe Karl Kehr.  He was the one

16   giving the -- the presentation on that.

17        Q.    You believe or you know?

18        A.    To the best of my memory, yes, he did

19   say that.

20        Q.    Okay.  And I'd asked you earlier about

21   any other comments from Mr. Kehr and you didn't

22   mention that.  Are you now telling me you remember

23   that now?

24        A.    I remember the overtime, that's

68

1    correct.

2        Q.    You remember that Mr. Kehr at the

3    first meeting said it would be the same basic

4    policy as at Ford?

5        A.    And they even had a brochure -- or a

6    slide that they showed, showing it would be the

7    same.

8        Q.    Did the slide say that it would be the

9    same or did the slide show the rates?

10       A.    Showed the rate and the comment was

11   made would be the same.

12       Q.    Do you know if at that time, the rate

13   was the same as what was paid at Ford?

14       A.    Yes, it was.

15       Q.    And did they say the rate would stay

16   the same forever or that the rate would be the same

17   as it was at Ford at that time?

18       A.    That it would -- it would mirror

19   Ford's -- the same as what Ford was for the

20   overtime.

21       Q.    All right.  Well, let's wait a minute

22   now.  Are you saying they used the term "mirrored"

23   or it was the same basic policy?

24       A.    It would stay the same as Ford's.

1        Q.    And that's a quote you would attribute

2    to Mr. Kehr?

3        A.    That's correct.

4        Q.    But you would certainly agree that's

5    not what the slide said, correct?

6        A.    The slide showed the number.

7        Q.    Right.

8        A.    That's all it had was a number.

9        Q.    As we sit here right now and talk

10   about this issue, do you remember any other

11   comments from Mr. Kehr about this issue?

12       A.    Not off the top of my head.  But as we

13   discuss, I remember.  So as we're going, I might

14   recall some more.

15       Q.    Okay.  What else has Batavia failed to

16   do with respect to overtime?

17       A.    Well, I think the other big issue was

18   and they paid it the same initially the first year

19   up till November of -- I guess it was 2000.  It was

20   on the casual time difference and that --

21       Q.    Okay.

22       A.    -- Ford's casual time.  If you got up

23   to the ninth hour -- in other words, if you came in

24   a half hour prior to the start of your shift and 20

1    minutes -- stayed over 20 minutes, that was casual

2    time.  If you came in 30 minutes early and then

3    stayed 30 minutes over, when it got to the ninth

4    hour, you were paid that ninth hour for your first

5    hour of overtime.

6            Zed-F changed that in -- I believe --

7    I don't know the exact date, but I believe it was

8    November of 2000.  Probably November 2000, two and

9    a half years ago, somewhere in there, to where you

10   had to work 10 hours to get paid the one, the one

11   hour overtime.  So there's been a change in the

12   casual overtime or the way the overtime is paid.

13       Q.    Okay.  Anything else with respect to

14   overtime?

15       A.    I think those are the main -- main

16   ones that I can remember.

17       Q.    Now, I recall in certain answers to

18   interrogatories that you had included a figure of

19   $22,500 as a damage claim?

20       A.    Yes.

21       Q.    Does that number sound familiar?

22       A.    (Witness nodded.)

23       Q.    And is that a number you provided to

24   your attorney?

1          A.    Yes.

2          Q.    And what does that number represent?

3          A.    That basically goes back to two and a

4    half years on casual time of the change -- when the

5    change was made from paying the ninth hour to going

6    to the tenth hour before you got paid.  So it's an

7    hour a day.

8          Q.    An hour a day for every day Gary

9    Vories has worked since approximately --

10         A.    Well, pretty much.  I -- I wouldn't

11   say exactly, but as best as I can figure.

12         Q.    But did that mean -- did you take a

13   set number of days and just multiply that times an

14   hour or I'm just trying to understand the --

15         A.    Just ballparked it, yeah, as best I

16   could.

17         Q.    Okay.  Does that include the three

18   shifts in April of 2001?

19         A.    Three shifts?

20         Q.    You remember you'd mentioned three

21   shifts where you didn't paid in April of '01?  I

22   think that's the right date.

23         A.    No, because -- that weekend, you mean?

24         Q.    I thought it was three weekends, but

1     maybe I'm mistaken.

2          A.    Well, that's what you're saying, the

3     weekends, not the regular days.

4          Q.    Yeah.

5          A.    On the weekends, you'd get paid.  In

6     other words, if I work nine hours on a weekend or a

7     holiday, I get paid that.

8          Q.    Okay.

9          A.    Weekdays is the only difference where

10    you have the tenth hour before you get paid the one

11    hour.

12         Q.    I think we've got a bit of a

13    disconnect there.  You had mentioned earlier -- I

14    think it was your first point on overtime that ZF

15    Batavia didn't pay you or four or five other people

16    for three weekends in April and May of 2001?

17         A.    That's correct.

18         Q.    Okay.

19         A.    That's for the whole hours we worked.

20         Q.    Understood.

21         A.    Right.

22         Q.    My question is, are those three

23    week -- I think it was three days.  There was three

24    weekends included in the 22,5 number?

1          A.    No, I don't believe so.

2          Q.    All right.  So I would need to add

3     that to your claim?

4          A.    I believe so.  I -- I can't say for

5     sure because I'd have to look at what I turned in.

6          Q.    All right.  If you know, is there any

7     other component of that 22,5 other than --

8          A.    No.

9          Q.    -- the overtime and maybe those

10    weekends?

11         A.    I believe that was just for the

12    overtime, and then there was also a calculation

13    of -- now, I can't remember if that was added in or

14    not, to be honest with you.  I'd have to look at my

15    information.  That was a -- there was also a

16    calculation of the difference in the rate between

17    what they were paid and what Ford was paying at

18    that time.  And I think that was a ballpark figure.

19    I don't remember exactly how -- how we got it.

20         Q.    But I think you're telling me you're

21    not sure if that is or isn't in there?

22         A.    It's in there, but I don't know if it

23    was included in that total amount or not.

24         Q.    Okay.

1         A.    In other words, what I'm saying is

2    if -- if we figured that the overtime rate for

3    overtime should have been another 70 cents per

4    hour, whether that was included in that number or

5    separated out --

6         Q.    Okay.

7         A.    -- I'm not sure.

8         Q.    All right.  Any other issues with

9    respect to overtime?

10        A.    No, as far as I can remember at this

11   point, unless something comes up during the

12   discussion here that I remember something else.

13             MR. HUNTER:  Okay.  We've been at this

14   for about an hour and a half.  Let's take a break.

15        (Off the record:  9:34 a.m. - 9:47 a.m.)

16        Q.    All right.  I think, Mr. Vories, we

17   had exhausted overtime, but I didn't know if during

18   the break something else had come to mind with

19   respect to that?

20        A.    The only thing that we were

21   discussing --

22             MR. SIMON:  Well, don't say anything

23   we were discussing.  Hold on a second.  Don't

24   discuss anything we're discussing.  I don't ask --

1            THE WITNESS:  Okay.

2            MR. SIMON:  -- witnesses what they

3    discuss.

4            THE WITNESS:  Okay.

5            MR. SIMON:  Go ahead.  And if there's

6    anything else on overtime you want to explain, you

7    can do that.

8        A.    Okay.  The overtime part where you

9    were -- the total.  And I think I'm answering as

10    best as I can.  I'm not sure if -- if the hour

11    difference was put in there for that total.  It may

12    have been.  You know, the 22,000, I think you were

13    saying what all that included.

14        Q.    Mm-hmm.

15        A.    That may've included everything.  I'm

16    not sure.  I don't have it in front of me, but

17    it's -- it's possible.  I don't know.  I can't

18    remember.

19        Q.    Oh, okay.

20        A.    When all the totals were added up, so

21    that may be the whole total.  I'm not --

22        Q.    Is that a number that you came up with

23    or that somebody else came up with for you or --

24        A.    No, I -- I came up with.

```
 1          Q.     Okay.

 2          A.     But when I turned it all in, I don't

 3     remember if I separated it out and then two or

 4     three different things and I added up the total to

 5     get that or -- you know, that's possible.

 6          Q.     Okay.  And when you -- you had

 7     apparently, I don't know, some worksheet or

 8     something that you gave to Mr. Simon?

 9          A.     I had all my copies of my time sheets.

10          Q.     Okay.  And you gave to Mr. Simon all

11     those time sheets?

12          A.     That's correct.

13          Q.     And I think he's given those to me?

14          A.     Okay.

15          MR. SIMON:  I gave you everything that

16     was given to me, in terms of time sheets and that

17     sort of thing.

18          MR. HUNTER:  I guess my only

19     consternation is just really trying to understand

20     what those numbers represent because so far nobody

21     has really been able to tell me exactly what's in

22     those numbers.  You know, I've been getting best

23     guesses, but I just -- honestly, Steve, I don't

24     feel like I know.
```

1              MR. SIMON:  Really?  I can further

2    explain, if you like, after the deposition.

3         Q.    All right.  We're done with overtime,

4    right?

5         A.    If you are, I am.

6         Q.    Okay.  I just didn't know if there was

7    any other issues with you with respect to overtime.

8         A.    Not right now --

9         Q.    Okay.

10         A.    -- unless something would come up

11    later in our discussion, but I think that's it.

12         Q.    Okay.  What other representations,

13    promises, whatever you want to call them, has ZF

14    Batavia failed to deliver on?

15         A.    I believe the -- the AIP bonus.  In

16    the brochure, agreement we -- we got, it basically

17    stated that it was going to be based on the goals

18    that that company meets and the profit margin on

19    the -- whether one would be paid.

20              And at no time during discussions and

21    meetings we were -- was it included into that, that

22    overtime would be part of it or personal

23    performance would be part of it.

24         Q.    Okay.  Now, when you say that overtime

1    is not to be a part of it, certainly you would

2    acknowledge that overtime affects the profitability

3    of the company, doesn't it?

4         A.    That part of it, but your individual

5    amounts of overtime you earn would not be part of

6    it.

7         Q.    Okay.  But, again, overtime affects

8    the profitability overall?

9         A.    That's part of costs.

10         Q.    Okay.  And you're saying that

11    individual performance is an unfair measure for

12    annual incentive?

13         A.    Well, the annual incentive or our

14    merit review, that's your performance review.

15         Q.    Okay.

16         A.    I think that is -- that is the time

17    that your performance is evaluated.  At no time was

18    it stipulated or mentioned that a performance

19    review would be a part of a AIP calculation.

20         Q.    Well, I guess I'm just talking in

21    general fairness terms.  Mr. DeVito talked about

22    that yesterday.  In terms of -- are you telling me

23    that it's unfair to consider individual performance

24    with respect to AIP?

1          A.    I'm saying that what was told us, that

2    it would not be, that it would be based on the

3    goals of the company and the profits that the

4    company got.  And then in the next item that's

5    listed in the brochure is your merit review where

6    it does get into your individual performance.

7          Q.    But I guess my question still stands,

8    Mr. Vories.  Are you telling me that it was unfair?

9          A.    I don't believe it's part of the AIP

10   bonus.  I don't think that would be fair if it was

11   not told to you that that was going to be used.

12         Q.    It wasn't told to you that it wouldn't

13   be used, was it?

14         A.    No.

15         Q.    Okay.  All right.  Now, with respect

16   to AIP, in particular you've discussed the -- your

17   opinion that -- that overtime, individual overtime

18   had a basis in that.  How did that affect Gary

19   Vories?

20         A.    Well, in the AIP that was paid in 2002

21   for 2001, I personally did not get a AIP bonus.  I

22   was told at the time I was -- had the meeting to

23   determine whether I was going to get one with my

24   boss, who is Milt Gross, that the reason I didn't

1    get it was because I had worked too much overtime.

2         Q.    Mr. Gross told you that?

3         A.    That's correct.

4         Q.    Do you have an opinion as to what your

5    bonus would or should have been?

6         A.    I don't know exactly what it would be.

7    I know in previous years, it would have been -- I

8    know seven or $8,000, somewhere in that ballpark.

9         Q.    When you say "in previous years," you

10   talking 2001 and 2000?

11        A.    Yeah, somewhere in that -- the year

12   before that, the year after.  The one we just got

13   in 2003, which was for 2002, I don't know what

14   the -- what the equivalent would have been.

15        Q.    Okay.  Do you have any other issues

16   with respect to AIP and ZF Batavia?

17        A.    Well, I think on that same issue,

18   that -- you know, when we were told that we didn't

19   receive an AIP bonus for that year because we had

20   worked too much overtime, that during that year we

21   were on a critical -- what they call critical plant

22   status where you were required to work overtime.

23   You didn't have the option of -- you know, not

24   being able to work 'cause there was real emphasis

1    on production that particular summer of that year

2    and there was a lot of overtime worked.

3            And also we were told later that --

4    that the reason -- part of the reason we didn't get

5    a bonus was because maintenance's budget -- didn't

6    have the money in the budget to pay it, the

7    overtime.

8            So that ended up being a problem, too,

9    because when you tied -- it's kind of two different

10   subjects.  But once you -- one, you didn't have the

11   overtime to get paid for the weekend and then the

12   other one you worked too much.

13           So but on the specific AIP bonus, I

14   think being told that the overtime was used and you

15   worked too much overtime, that was the main reason

16   on the AIP bonus.

17           MR. SIMON:  Off the record.

18       (Off the record:  9:56 a.m. - 9:57 a.m.)

19           MR. HUNTER:  Okay.  We're back on the

20   record.  The record should reflect that Mr. Steward

21   has joined the deposition this morning.

22       Q.   Mr. Vories, we were talking about the

23   AIP issues and I think we concluded that one.

24       A.   Just one other point I would like to

1    make is that -- getting back to the budget is --

2    because we had worked too much overtime and we were

3    over budget, the people -- my -- my feeling is --

4    personal feeling is that people who were

5    responsible for maintaining that budget, who are

6    people above me, they do the budget.  They're

7    responsible for trying to keep within that budget,

8    they got paid a bonus, which doesn't seem to make a

9    lot of sense to me.  The year that we didn't get a

10   bonus, they got one.

11           At my position, I don't get much

12   choice of saying whether I get to work or I don't

13   unless they tell me I have to work Saturday or

14   Sunday or a weekend.  I have to work.  That's part

15   of my responsibility for employment.  But I see it

16   as part of their -- their responsibility as a

17   manager if there's supposed to be budgeting and

18   maintaining their budgets, that they should be able

19   to do that.  If they didn't do that, then they

20   should be affected bonus-wise, just like I was.

21       Q.    Are you telling me that, in a sense,

22   you'd have been happier if nobody had gotten a

23   bonus that year?

24       A.    I would have been happier if the

1    people who were responsible didn't get a bonus, if

2    that's -- that's my point.

3         Q.    Okay.  So you don't have a problem

4    if -- if some people had gotten a bonus, just in a

5    sense, the folks above you?

6         A.    People responsible.

7         Q.    And so that, again, it would have been

8    appropriate for some people to get a bonus, but not

9    others?

10         A.    Yes.  There was people who were going

11    to be adversely affected on their bonuses, that

12    should have been the people responsible for the

13    budget.

14         Q.    Okay.  And under your understanding,

15    that would have been appropriate, in terms of the

16    AIP plan?

17         A.    If that's the way it was determined,

18    they say they did it, I would say yes.

19         Q.    Okay.  Any other issues, in terms of

20    commitments made by ZF Batavia that have not been

21    followed through on?

22         A.    I think personal days went from five

23    to three.

24         Q.    Okay.

1          A.     And the funeral -- bereavement, that

2    was reduced from three down to one for nonclose

3    family members, immediate family.

4          Q.     Did you use -- were you negatively

5    impacted by the reduction in personal days?

6          A.     I'd say I was.  Well, I'd say I was

7    because of the availability of them not being

8    there.

9          Q.     Did you --

10         A.     I think I did use the three days that

11   I had.  If I'd had a couple more -- I think during

12   that period, one week I had the flu real bad.  That

13   particular winter, I was off, I think, a whole

14   week.  So I end up using -- you know, the personal

15   days and some vacation time to cover it.

16         Q.     Do you remember what time period that

17   was?

18         A.     I know it was in January.

19         Q.     Of '01?

20         A.     I'm guessing '01.  I'm not -- trying

21   to think back.  I would say probably '01.  Trying

22   to think how many years back I was sick.

23         Q.     And on the bereavement days, have you

24   been negatively impacted by that?

1          A.    No.

2          Q.    Now, we discussed the meetings before.

3    You originally told me about a few items, then you

4    recollected about the retirement issue.  To my

5    recollection of your testimony, you never mentioned

6    the personal days or the bereavement days at any of

7    the -- coming up at any of the meetings.

8             Are you telling me now that those

9    issues came up at any of those meetings?

10         A.    I don't believe they came up because

11   I think they were changed later because of the

12   brochure.  I believe it was five days.

13         Q.    Okay.  So there was no discussion at

14   any of the -- either of the formal meetings?  I

15   guess there are two that you've related about

16   bereavement or personal days?

17         A.    Not that I remember.

18         Q.    Okay.  Any other issues where ZF

19   Batavia has failed to follow through?

20         A.    I believe that we were given the

21   impression that there would be more people possibly

22   going into CVT.  Ford transitional people would

23   have a real good opportunity of getting in on the

24   ground floor of the CVT.  And I don't think it's

1    necessarily happened.  I think a lot of people that

2    are in CVT now are a lot of -- you know, new hires.

3    They're not transitional people.

4           Q.    Is it your desire to go into CVT?

5           A.    I'd like to have the opportunity.

6           Q.    Have you ever inquired of the company

7    about moving over to CVT?

8           A.    Just in general discussions, but

9    nothing specifically.

10          Q.    General discussions with?

11          A.    Just like with Hassan and what the

12   possibility would be of going over there sometime.

13          Q.    Has Hassan told you that that's not

14   possible?

15          A.    He's basically just said that -- you

16   know, it's a possibility and be kept in mind.  But

17   with us running the CVT, they -- you know, I'm sure

18   decided to keep the people with experience over on

19   the CD -- CD4E side.  That's probably what's

20   happened.

21          Q.    Well, in part, my understanding is we

22   still from time to time struggle with production at

23   CD4E, correct?

24          A.    That type of business, every day is a

1    struggle.

2         Q.    Agreed.  And so do you think it's

3    inappropriate to keep the experienced people over

4    on the current product?

5         A.    I think it's important to really try

6    and keep both of them going to keep our business

7    alive.  We got to have the CVT going to keep money

8    going now and the -- the CD4E.  CVT for the future,

9    we have to have that or not going to be good if we

10   don't.

11        Q.    Sure.  But, again, I think you would

12   agree it's absolutely critical to perform on CD4E.

13   And that's a current immediate need.  It's not --

14        A.    That's correct.

15        Q.    Anything else that ZF Batavia has

16   failed to deliver on, in your opinion?

17        A.    Not off the top of my head that I can

18   think of right now, unless I think of something

19   else during discussions.

20        Q.    With respect to these issues, did you

21   ever go to Mr. Kehr or Mr. Adams and try and

22   discuss these issues?

23        A.    No.

24        Q.    Did you ever go to Mr. Saleh?

88

```
 1        A.     The person probably that was -- that

 2   we went to or at least attempted to discuss some of

 3   these issues with in group meetings was Len Sennish

 4   in our face-to-face meetings.

 5        Q.     Okay.  And what was the nature of your

 6   discussions with Mr. Sennish?

 7        A.     Well, at one time, there was a letter

 8   that was sent to Mr. Sennish and he opened it up

 9   and started reading it about concerns about how do

10   you think you're going to be able to keep the

11   business running if you're -- if you're not meeting

12   these commitments.  And they were spelled out, some

13   of the things that people -- you know, the overtime

14   or not paying overtime, AIP and the whole different

15   issues that we've already discussed.

16           And his basic response was that -- you

17   know, he didn't think whoever that person was --

18   see how I can word this.  Basically was much of a

19   person to send him something in writing and not

20   talk to him face to face and he wasn't even going

21   to continue the lead meeting.  And his basic

22   opinion was if you didn't like it, hit Route 32 and

23   sue me.

24        Q.     Okay.  Did he use those words or --
```

```
 1          A.     Yes, he did.

 2          Q.     -- or is that kind of a summary?

 3          A.     That was basically his words that he

 4   used was hit 32 or sue me.

 5          Q.     Okay.  Do you remember when that

 6   meeting was?

 7          A.     I don't remember the specific date.

 8          Q.     Do you remember who was in attendance

 9   at that face to face?

10          A.     No.  I know it's -- you know, it's an

11   afternoon -- Wednesday meeting that we have every

12   Wednesday and there's production, maintenance,

13   floor supervision that go to that meeting in the

14   afternoon.

15          Q.     The -- when we talked about your claim

16   for damages, which was a -- $22,000 and some

17   change, there is no component of that that relates

18   to your base salary, is there?

19          A.     No --

20          Q.     You've always --

21          A.     -- not that I'm aware of.

22          Q.     You've always received your base

23   salary?

24          A.     Yes.
```

1    Q.    When you report your time for the

2    company, and I'm talking about ZF Batavia, have you

3    been consistent in terms of the way you report that

4    since you started there at the company?

5    A.    Yes.

6    Q.    Okay.  And generally, how do you do

7    that?

8    A.    Basically you have two time sheets you

9    fill out and you put in what time you -- what time

10   you actually start and what time you leave, show

11   your hours.  And if you have any overtime, you

12   indicate the hours of overtime for that day.  And

13   then if you have a personal day, there's a column.

14   You fill that in for personal or vacation, so --

15   Q.    Okay.  Now, in terms of casual time,

16   which you've acknowledged exists, how do you report

17   that on your timecard?

18   A.    What I do is I show that I started --

19   and I don't -- I actually come through -- I

20   personally come through the door normally at 10

21   after two, somewhere -- give or take a minute at 10

22   after two.  I come through the door.  I'm usually

23   out at the floor at the outpost where I work by

24   quarter after two.

1          Q.     Okay.

2          A.     I show my starting time as 2:30, which

3     is a half hour before my shift actually starts at

4     three.  And then I work -- majority of the time, I

5     work till 1:00, which is a total of 10 and a half

6     hours, including -- you know, a lunch -- a lunch

7     half hour, which equivalents to, under the new

8     overtime policy, of one hour overtime.

9          Q.     Okay.  Let's see.  I want to

10    understand something here.  Your scheduled shift,

11    in a sense, would begin at three, correct?

12         A.     That's correct.

13         Q.     And then -- so you arrive at the plant

14    2:10.  You tell me you're on the floor at 2:15?

15         A.     Right.

16         Q.     And so you, in a sense, hit the time

17    clock, as it were, then, at 2:30?

18         A.     That's when I show my actual starting

19    time.

20         Q.     Okay.  And so is that 15 minutes

21    between -- or I don't know.  15 to 20 minutes

22    between either 2:10 or 2:15 to 2:30.  Is that

23    casual time?

24         A.     Right.

1      Q.    Okay.  Now, what's the half hour

2   between 2:30 and three?

3      A.    Well, actually 2:30 and three would be

4   your casual time because you're supposed to be

5   there a half hour ahead and a half hour after.

6      Q.    Okay.

7      A.    So my 15 minutes, that's basically my

8   time.  I don't show that --

9      Q.    Okay.

10     A.    -- even though I'm there and I'm on

11  the job, I'm showing that I'm there at 2:30.  So we

12  have to give -- you know, the one hour casual time,

13  so that's the half hour before and a half hour

14  after.  So the half hour at 2:30 till one, that

15  includes the hour.

16     Q.    Okay.

17     A.    Ends up being 10 and a half hours

18  total with lunch in there.

19     Q.    Okay.  Is there a deduction on your

20  time sheet for the half hour for lunch or is it

21  just part of the overall --

22     A.    That's just part of the overall --

23     Q.    Okay.  And are you a -- kind of a

24  creature of a habit?  I mean, lunch is a half hour

1    every day or it just --

2         A.    Yeah.  I stay at the plant -- normally

3    in production, you don't get it.  About the time

4    you sit down and try to eat something, somebody is

5    calling your name.  So in and around a half hour

6    there.

7         Q.    Do you have an understanding as to

8    whether or not ZF Batavia pays for lunch?

9         A.    No.

10        Q.    You don't have an understanding there?

11        A.    No.  Your lunchtime is -- I show the

12   total time that I'm there, but they don't pay you

13   for lunch.

14        Q.    Okay.

15        A.    That's why my total time each day is

16   10 and a half hours.

17        Q.    All right.  And so if it's 10 and a

18   half hours --

19        A.    My total --

20        Q.    I think you told me if it was a 10 and

21   a half hour time entry, that you would be paid,

22   then, for nine hours for that day?

23        A.    Right, because that half-hour lunch is

24   included in there.  You don't get paid for that.

```
 1          Q.     Okay.  And so if you acknowledge the
 2    hour of casual time and the half hour for lunch,
 3    are you being paid, then, what you're supposed to
 4    be being paid --
 5          A.     Right.
 6          Q.     -- per your understanding?
 7          A.     Right.
 8          Q.     So you're being paid appropriately?
 9          A.     Right --
10          Q.     Okay.
11          A.     -- under the new policy --
12          Q.     Well --
13          A.     -- where you're putting in -- under
14    the Ford policy, I'd get paid 10 hours.  When I was
15    with Ford, if you worked 10 and a half hours, that
16    included lunch, you'd get paid 10 hours.  Once you
17    got to the ninth hour, you'd get that ninth hour.
18    If you worked the next hour, you'd get the tenth
19    hour.  Under Zed-F's overtime policy, you don't get
20    that ninth hour till you've worked 10 hours.
21          Q.     If I recall, though, correctly, I can
22    recall a couple of Ford transitionals telling me
23    that, for example, Mr. Ervin, even.  And I don't
24    recall if you sat through his deposition --
```

1        A.      Na-huh.

2        Q.      -- that the casual time could be 15

3    minutes to 30 minutes prior to the shift at Ford.

4    Is that a fair statement?

5            MR. SIMON:  I just object to the

6    extent you're asking him about Mr. Ervin's

7    testimony.  He wasn't here for that.  The record

8    will speak for itself what Mr. Ervin said, but you

9    can go ahead and answer his question.

10       Q.      Well, let me clarify the question,

11   then.  Is it accurate to your way of thinking that

12   casual time at Ford would have been 15 to 30

13   minutes at the end and beginning of each shift?

14       A.      Casual time could have been, yeah, 15

15   minutes or it could have been 20 minutes, could

16   have been whatever, whatever it took you.  But once

17   you got an hour in, then they paid you.

18       Q.      Okay.

19       A.      That was the example I gave -- you

20   know.  20 minutes for the start of the shift, 20

21   minutes after the start of the shift, that was

22   casual.  When you got to that hour mark, then they

23   paid the money for the first hour of overtime.

24       Q.      And I think I remember testimony where

1    somebody said, Well, you know, if you hit 59, you

2    weren't there.  You didn't get the hour?

3          A.    That's correct.

4          Q.    Okay.  So if you worked a minute less

5    here each day, you would not be entitled to the

6    overtime?

7          A.    You'd have to give me an example.

8          Q.    I'm just asking because you -- you've

9    basically said, I'm working a half hour before, a

10   half hour after and a half hour out of there for

11   lunch.  And so I'm not trying to pick nits, but if

12   I understand what other folks have told me, if, in

13   fact, it was 29 minutes before and 30 minutes

14   after, you would not be entitled to that hour of

15   compensation, correct?

16              MR. SIMON:  I just object.  He didn't

17   say he worked the hours as you've described them,

18   but go ahead and answer.

19         A.    I don't know.  I'd have to -- I'd have

20   to see the example.  I don't do that, so it

21   wouldn't make any difference.

22         Q.    Okay.  Well, then --

23         A.    I'm there plenty early.

24         Q.    Okay.  Well, let's -- what you've told

1    me and I think your timecards would bear it out, is

2    generally, as you've told me, have a start time of

3    about 2:30 on there?

4         A.    Start time of 2:30, yeah.

5         Q.    Okay.  And in the example that you

6    used, you said if basically -- my timecard reflects

7    10 and a half hours --

8         A.    Right.

9         Q.    -- okay?  For that 10 and a half

10   hours, you've got a half hour before the shift?

11        A.    Right.

12        Q.    Half hour after the shift?

13        A.    Right.

14        Q.    And a half hour after?

15        A.    Right.

16        Q.    Or I'm sorry, for lunch?

17        A.    Right.

18        Q.    Okay.  Under the new system, if the

19   one hour of casual time was 59 minutes --

20        A.    Right.

21        Q.    -- you would not be paid for that

22   first hour, correct?

23        A.    You wouldn't be paid -- according to

24   how many hours you work.  You're only working nine.

```
 1        Q.    I'm talking -- let's call it, again --

 2        A.    You couldn't do that if you're working

 3   10.

 4        Q.    It's the 59 minute issue --

 5        A.    Mm-hmm.

 6        Q.    -- okay?  If you've only got 29

 7   minutes casual time before the shift, 30 minutes

 8   after and a half hour for lunch --

 9        A.    Right.

10        Q.    -- okay?  What would you be paid for

11   under the Ford system?

12        A.    If you didn't have your hour of casual

13   time, you wouldn't get paid starting until you had

14   an hour in.

15        Q.    Okay.  So we're talking now about a

16   difference of a minute here, basically --

17        A.    Mm-hmm.

18        Q.    -- right?

19        A.    Right, but --

20              MR. SIMON:  I'm just going to add,

21   when you say he worked 10 hours, not the nine, but

22   I -- you heard him say it, so --

23              MR. HUNTER:  All right.

24              MR. SIMON:  The reason I interjected,
```

99

1    I wasn't sure you understood -- understood his

2    answer, but apparently you did, but go ahead.

3             MR. HUNTER:  And it's kind of running

4    passed here.  Let's -- I'll turn the floor over to

5    Mr. VanWay, try and keep on schedule here.

6             (10:17 a.m.)

7             MR. VANWAY:  Mr. Vories, are you good

8    to keep going or do you need a break?

9             THE WITNESS:  No, I'm okay.

10                         EXAMINATION

11   BY MR. VANWAY:

12        Q.   Well, Mr. Vories, I know we've met

13   before.  As you know, I'm Jeff VanWay.  I represent

14   Ford in this case.  I have a few questions for you

15   today regarding the claims that you've brought

16   against Ford.

17             You testified earlier today about

18   Exhibit 2 and about the paragraph at the end of --

19   of Exhibit 2 and -- and your understanding

20   regarding that paragraph.  I believe that what you

21   said was it was not entirely clear to you at the

22   time you read that as to what it meant.  Is that

23   right?  Did I capture your testimony accurately?

24        A.   That when I first -- when I was first

```
1    given -- when I first got it and read it over, it
2    wasn't -- you know, clear in my head exactly what
3    it meant.  But as I studied it and the meetings
4    that were held at that time when we got it, the
5    follow-up meeting, that the way I interpreted it
6    was that the benefit summary plans, which are your
7    benefits, such as your health insurance, that type
8    of thing is what they were talking -- your actual
9    compensation or what I call employment conditions,
10   such as salary, annual incentive and merit program,
11   that type of thing were separate than the summary
12   plan benefits.
13        Q.    When did you come to that
14   understanding?
15        A.    When I had the discussions and it was
16   explained to me in the second meeting when we got
17   it and a quick review was done of this.
18        Q.    And in the second meeting, did you or
19   anyone else in that meeting ask a question about
20   what does this language mean, subject to change?
21        A.    No, but I think, like I say, that was
22   my own personal interpretation of --
23        Q.    Did someone say something in that
24   meeting that led you to that interpretation?
```

1    A.    No, but the only thing that was said

2    in that meeting, that they were talking about the

3    benefits, such as the 401K being changed, that it

4    was going to be different, there was going to be a

5    different, I believe, health insurance company,

6    those type of things were going to be different on

7    the benefit side.

8    Q.    Different than what they were at Ford?

9    A.    Right.

10   Q.    Okay.  Vacation was going to be

11   different, too, wasn't it?

12   A.    Vacation was basically going to be the

13   same, except for the person for the fifth week.

14   Q.    There would be some difference --

15   A.    Right.

16   Q.    -- for some people, right?

17   A.    Right.

18   Q.    So did you understand, then, that that

19   language applied to vacation as well since vacation

20   was going to be different than what it had been at

21   Ford?

22   A.    Vacation's the --

23   Q.    So vacation wouldn't be one of those

24   conditions of employment?

```
1           A.    No.

2           Q.    That would be more of a benefit --

3           A.    Right.

4           Q.    -- that you thought was subject to

5     change?

6           A.    Right.

7           Q.    Okay.  Personal days, those were going

8     to be different than how they had been at Ford

9     also, right?

10          A.    Right, because I believe if I remember

11    at Ford, it was -- you know, more days than the

12    five.

13          Q.    Okay.  So, again, you understood the

14    subject to change language applied to personal days

15    as well?

16          A.    Right.

17          Q.    Okay.  Now, you testified earlier

18    about an employee meeting where there were slides

19    shown.  And I'll ask you, do you have Exhibit 4

20    that you can show him, Steve?

21                MR. SIMON:  Yes.

22          Q.    Exhibit 4, is that a copy of the

23    slides that were shown at the meeting?

24          A.    As best as I can remember, yeah.
```

1          Q.     Okay.  And as you look at -- if you

2     would, look at Bates stamp page 2, which is the

3     third page in, towards -- back towards the front.

4     It says agenda at the top.  I think you're there,

5     right there.  You went to the p.m. meeting, right?

6          A.     Right.

7          Q.     Okay.  If you look at what's on Bates

8     stamped page 2, does that -- that agenda, as far as

9     you can remember, is that an accurate

10    description --

11         A.     Mm-hmm.

12         Q.     -- of what was discussed at the

13    meeting?

14         A.     Right.

15         Q.     Okay.  And as you look at each topic,

16    it has an individual's name.  At the end of that,

17    for example, Welcome, Introductions, Karl Kehr, et

18    cetera.  As you look at this, is that correct in

19    terms of who addressed each topic at the meeting,

20    as far as you can recall?

21         A.     Yeah, as best as I can remember.

22         Q.     Okay.  Now, you testified regarding

23    your conversations with Hassan.  You understood,

24    didn't you, that Hassan wasn't responsible for

1    putting together Exhibit 2?

2         A.    I wouldn't think he would've been

3    involved with that, no.

4         Q.    Okay.  I mean, as far as you knew, he

5    only -- the only things he knew about the benefits

6    listed in here are the same things you knew because

7    he'd attended the same meetings that you had,

8    right?

9         A.    That's correct.

10        Q.    I believe you also said that your

11   questions to Hassan were more in the line of, can I

12   trust these folks from ZF?

13        A.    Right, and that was part of it and

14   also -- you know, what -- what they have given to

15   us here in writing, they feel like these were going

16   to be upheld or -- you know, any reason to not

17   believe what we were told or generally again --

18        Q.    And it was important to you to be able

19   to trust ZF, right?

20        A.    Definitely.

21        Q.    Because it was your understanding that

22   it was going to be up to ZF to fulfill the promises

23   that you've characterized being made here in

24   Exhibit 2, right?

1          A.    Well, I wouldn't necessarily say that

2    a hundred percent because I think at the -- you

3    know, at the time it was announced, there was going

4    to be a board of three Ford people and three Zed-F

5    people on the joint venture.

6          Q.    Right.

7          A.    And that they were going to be

8    responsible for basically the operation of the

9    company and hopefully overseeing that these things

10   were done.

11         Q.    Okay.  So --

12         A.    So the combination of the two.

13         Q.    You understood, then, that the board

14   of directors was going to be responsible for

15   fulfilling whatever was represented here in Exhibit

16   2?

17         A.    I would say that they were the people

18   responsible for the operation, yeah.

19         Q.    Okay.

20         A.    I'd say they were overseeing to make

21   sure these things were done.

22         Q.    And there is, in fact, a board of

23   directors at ZF Batavia, isn't there?

24         A.    Right.

1        Q.      Three Ford representatives and three

2    ZF representatives?

3        A.      There was originally.  I don't know

4    what the -- what the number is now --

5        Q.      Okay.

6        A.      -- but that's what we were told, that

7    there was going to be Ford involvement also -- you

8    know, at the start of the joint venture and that's

9    the way it was going to be put together --

10       Q.      Okay.

11       A.      -- three and three.

12       Q.      And when you asked Hassan whether or

13   not essentially you could trust the folks from ZF,

14   was it your belief that Hassan could speak for the

15   people from ZF?

16       A.      Well, he had had dealings with them.

17   I guess -- I know I felt that at least he had some

18   better insight than what we would have because we'd

19   only seen a few people and heard Dave Adams -- you

20   know, give his speech a little bit during the

21   meeting.  But he had been in meetings with the

22   different Zed-F people who were going to be taking

23   over.

24       Q.      Now, you testified about the

1    retirement issue, the specific issue that affected

2    you and that that was a very important issue.  I

3    take it that if that hadn't been clarified to your

4    satisfaction, you would not have accepted the offer

5    with ZF Batavia?

6        A.    I probably wouldn't have, no.

7        Q.    You testified some about questions

8    that were asked about the ability to transfer to

9    Sharonville.  And I wasn't clear from your

10   testimony.  You seem to kind of separate into two

11   categories in your testimony those things you

12   called conditions of employment and those things

13   that you called benefits.

14       The ability to transfer to

15   Sharonville, which category did that fit into, a

16   condition of employment or a benefit?

17       A.    I would say that would be, in my

18   opinion, be a condition of -- of employment, having

19   that opportunity to -- to transfer.

20       Q.    Okay.  And I believe you said that the

21   answer on whether or not you could transfer to

22   Sharonville just kept changing all the time?

23       A.    Yeah, and the rumor mill also held --

24       Q.    Okay.

1      A.      -- you know, originally, yeah, there'd

2    be a possibility of people being able to go there

3    and, no, it wasn't going to happen.  And, okay,

4    maybe somewhere down the road within six months,

5    there would be additional openings, you know.

6      Q.      Fair statement, then, that whether or

7    not you could transfer to Sharonville seemed to be

8    subject to change because it kept changing all the

9    time?

10      A.      Right, because the last word we got --

11    the last official word was that there would be

12    no -- no opportunities at Sharonville, that there

13    would be an opportunity -- possibility for other

14    interviews within the Ford organization, but it

15    wouldn't be at Sharonville.

16      Q.      Now, you testified about your profit

17    sharing.  I believe what you said was that, as best

18    as you could recall, your last profit sharing check

19    from Ford was around $13,000?

20      A.      Mm-hmm, somewhere in that ballpark.

21      Q.      Now, the records that I've reviewed,

22    Mr. Vories, show that the last profit sharing check

23    you received from Ford in 1999 was a little over

24    $9,500.  Does that sound --

1        A.    Might have --

2        Q.    -- right?

3        A.    -- been.  That probably was a partial

4   because we only had part of the year, maybe.

5        Q.    Okay.  So '98, then, would have been

6   the last full year's profit sharing --

7        A.    Probably --

8        Q.    -- received?

9        A.    -- yeah.

10       Q.    And the same records that I've

11  reviewed show that your profit sharing in 1998 from

12  Ford was just a little over $7,000.  Does that

13  sound right?

14       A.    That might be true.

15       Q.    Okay.  So --

16             MR. SIMON:  Mr. VanWay, are you

17  reading off a document that's been produced in this

18  case?

19             MR. VANWAY:  Certainly not.  This is

20  work product.

21             MR. SIMON:  Okay.

22       A.    Well, maybe --

23             MR. SIMON:  Let me just offer an

24  objection that you've been asking these witnesses

1    about documents that reflect their performance

2    bonus at Ford and we haven't been produced the

3    documents.

4              MR. VANWAY:  I guess in response to

5    that, I don't believe there's been a request to

6    produce the document.  If you'd like to make such a

7    request, certainly we'd consider that.

8              MR. SIMON:  We don't have to argue

9    about this on the record, but there is a Rule 26

10   disclosure that they're mandatory.  And it sounds

11   like Ford's position -- that those documents

12   support your claims, but I haven't seen them.

13        Q.    Mr. Vories, at the time there were

14   these discussions about overtime in the employee

15   meetings, there wasn't any discussion, was there,

16   about adjusting the rate in the future?

17        A.    Could you ask it again?

18        Q.    Sure.  During these meetings, did

19   anyone represent to you that there were going to be

20   future changes in the overtime rates?

21        A.    It was basically stated that they

22   would maintain the same as what Ford was going to

23   be.

24        Q.    Maintain the same as what Ford was

1    right then?

2           A.    Or going to be in the future.

3           Q.    Well, which one did they say?

4           A.    They would maintain -- be basic -- be

5    the same as what Ford was on the overtime -- or the

6    overtime would be paid at a rate equivalent of what

7    Ford was paying then and in the future.  It would

8    follow that.

9           Q.    Okay.  So your understanding was that

10   this was a representation as to what was going to

11   happen in the future if Ford changed their overtime

12   rates?

13          A.    Right.

14          Q.    And who said that?

15          A.    It was asked as a question on whether

16   it was going to continue to change or stay the same

17   down the road or what it -- because everybody knew

18   that Ford adjusted their rates once a year or at

19   least looked at it.  The question was asked and the

20   answer was that would be a consideration of trying

21   to stay at that same level that Ford had on their

22   overtime.

23          Q.    And who said that?

24          A.    I believe it was Karl Kehr when it was

1   asked.  I can't say for sure.

2       Q.   And he said that they'd give

3   consideration to doing that?

4       A.   Yeah.

5       Q.   As of November 2000, which I believe

6   is when you testified ZF Batavia changed its policy

7   with regard to casual time?

8       A.   Mm-hmm.

9       Q.   Do you know what Ford's policy

10   regarding casual time was as of November 2000?

11       A.   My interpretation of the years I was

12   with Ford, just from my personal experience of

13   working overtime and a lot of it while I was there

14   and a lot since I been with Zed-F, that if you had

15   casual time prior to the shift, after the shift

16   less than an hour, you did not get paid that hour

17   of overtime.  In other words, once you got to the

18   ninth hour or 60 minutes in, then you got paid that

19   first hour of overtime.

20       Q.   Okay.  And that was your understanding

21   as of the time you left Ford?

22       A.   Correct.

23       Q.   Do you know as of November 2000

24   whether Ford's policy had changed or not?

1         A.     Far as I know, it was the same, but I

2    can't say.

3         Q.     I mean, have you spoken to anybody to

4    ascertain whether or not Ford's policy changed?

5         A.     No.

6         Q.     At the -- at the employee meetings,

7    did anyone speak to personal days?

8         A.     I don't remember, but I know it was a

9    difference in -- you know, from what Ford had

10   offered at the time.  But I don't remember any

11   specific questions being asked.

12        Q.     What about bereavement leave, do you

13   remember anyone speaking specifically to

14   bereavement leave at any of these meetings?

15        A.     No.

16        Q.     You testified that you were given the

17   impression that there would possibly be more

18   opportunities available in CVT.  Who gave you that

19   impression?

20        A.     That was Karl Kehr during his

21   presentation and also Dave Adams.

22        Q.     What did Mr. Kehr say that gave you

23   that impression?

24        A.     I think when he was, again, giving his

1   opinion on where we were heading and what the Zed-F

2   move was going to mean to the plant, and overall

3   down the road, that the people who were going to be

4   able to transfer over, that there would be

5   opportunity to go to CVT because that was the

6   business of the future.  And Dave Adams also

7   emphasized that they needed experienced people to

8   help with that.

9         Q.    Did either Mr. Kehr or Mr. Adams say

10   when that opportunity would materialize?

11         A.    They didn't say.  There wasn't no time

12   period, but there was -- there was a -- I think

13   just a general understanding or interpretation that

14   that meant -- you know, hopefully as soon as

15   possible.

16         Q.    You didn't understand that to mean at

17   day one, you'd be working on CVT, did you?

18         A.    No, because at that time, CVT wasn't

19   really set up and it was only -- mainly engineering

20   group.  It wasn't even on the floor yet.  No

21   equipment had been installed or anything.

22         Q.    So it was your understanding that at

23   some unknown date in the future, you'd get the

24   opportunity to work --

1        A.      Right.

2        Q.      -- in CVT?  While you were at Ford

3    the -- I guess six, six and a half years or so that

4    you were there, did your job assignment ever

5    change?

6        A.      Basically had the same job, different

7    shifts.

8        Q.      Different shifts?  Well, what about

9    different departments?  Were you ever assigned to

10   work in different departments?

11       A.      No.  Pretty well been in the same

12   area.  I mean, I had different areas that I

13   covered, but the same side of the plant.  I guess

14   we call it east side, west side.  I been on the

15   east side basically the whole time I been there,

16   but I -- I covered or been responsible for

17   providing maintenance to different departments

18   within that east side.

19       Q.      So at times, then, which departments

20   that you were responsible to provide maintenance to

21   changed?

22       A.      Well, they changed and what areas I

23   covered changed --

24       Q.      Okay.

```
 1          A.     -- combination of the two.

 2          Q.     Sure.  And the decision as to whether

 3     the departments or the areas that you covered were

 4     going to change, that was a decision made by

 5     someone at Ford while you were there, right?

 6          A.     Yeah, your job assignment.

 7          Q.     I mean, your boss told you where to go

 8     and you went there?

 9          A.     Yeah, your job assignment, yeah.

10          Q.     Okay.  You testified about complaints

11     that you've made to -- well, about conversations

12     with Len Sennish and the letter that Mr. Sennish

13     was sent.  Have you personally ever complained to

14     anyone at Ford about your complaints in this

15     lawsuit?

16          A.     I personally haven't, no.

17          Q.     Why not?

18          A.     Well, at this point in time, I figured

19     that the people at the plant that were available --

20     you know, were for Zed-F and that they were the

21     available people basically running the plant.  So

22     that's where we would go first.

23          Q.     Okay.  Now, in the years that you were

24     at Ford, the things that you've classified as sort
```

1    of conditions of employment, your compensation,

2    bonus, merit, et cetera, you understood that at

3    Ford, at least, those things were subject to

4    change, didn't you?

5         A.    Well, I'll answer it this way.  Yeah,

6    while I was at Ford, I understand different things

7    could be changed, okay?  But the difference I think

8    in this situation is that when we went from one

9    company to another as a transition employee and

10   what discussions we had and what we got in writing,

11   that for people to be able to change something

12   without at least consulting with us or -- or

13   discussing it with us or doing whatever they want

14   is not right.  But your initial question with Ford,

15   yeah, during that time --

16        Q.    So if I understand your claim in this

17   case, it's that at least before making these

18   changes, ZF should have told you what they were

19   going to do?

20        A.    Well, they should have -- I think at

21   least tried to live up to what was in their

22   agreement.

23        Q.    Should have tried to or they should

24   have definitely?

    1          A.    Well, they should have --

    2          Q.    Okay.

    3          A.    Should have, yeah.

    4          Q.    Now, while you were at Ford, you

    5    didn't have any sort of written agreement that said

    6    the company couldn't change your terms and

    7    conditions of employment, did you?

    8          A.    When I was at Ford, that was not an

    9    issue.  At the time I was at Ford --

   10          Q.    No, I understand.  I'm simply asking

   11    whether you had such an agreement at Ford?

   12          A.    No.  Not similar to the agreement

   13    we've got here.

   14          Q.    And I want to know whether you had any

   15    agreement with Ford that said Ford couldn't change

   16    your terms and conditions of employment?

   17          A.    No, not that I'm aware of.

   18          Q.    And, in fact, while you were at Ford,

   19    terms and conditions of your employment did change

   20    from time to time, didn't they?

   21          A.    I don't remember a whole lot changing.

   22    There might have been some things, but I don't

   23    remember.

   24          Q.    Did you ever get a raise while you

1    were there?

2            A.    Yeah.

3            Q.    And the raise was determined by the

4    company, in terms of telling you how much it was

5    going to be, right?

6            A.    Yes, that was their merit review

7    policy.

8            Q.    Did your -- any of your benefits ever

9    change while you worked at Ford?

10           A.    I would say maybe vision or -- I was

11   just trying to think of something back that

12   changed.  I think most of them pretty well stayed

13   the same or --

14           Q.    Health -- I'm sorry.  I didn't mean to

15   cut you off.

16           A.    Yeah, like the vision, I think, may

17   have changed.

18           Q.    Health insurance premiums ever

19   increase while you were at Ford?

20           A.    I think they did go up a little, yeah.

21           Q.    And I take it that when the health

22   insurance premiums came up, the company just told

23   you they were going up, right?

24           A.    Yeah.

120

 1          Q.      They didn't ask you if it would be
 2      okay with you --
 3          A.      No.
 4          Q.      -- if they went up, right?
 5          A.      But that's a benefit.  I didn't see
 6      that being -- that's -- they can do that.  That's a
 7      benefit.
 8          Q.      Okay.  Now, and your profit sharing
 9      bonus, that -- the amount that you received varied
10      from year to year, didn't it?
11          A.      Mm-hmm, based on a written program,
12      yeah, on a percentage that was announced.  So,
13      yeah, it could vary.  And it did, I think, you
14      know.
15          Q.      Were there ever any years at Ford that
16      you didn't receive a profit sharing?
17          A.      Not that I can remember.  I think the
18      first year -- I started in August, so I wasn't
19      eligible.  I don't know if they got anything that
20      year or not.  I think every year that I was there,
21      they -- they did have some type of profit sharing.
22          Q.      While you were with Ford, did they
23      change the profit sharing to be a performance bonus
24      plan?  Do you recall that happening?

1        A.    No.

2        Q.    Mr. Vories, you've been handed what's

3   been marked as Exhibit 106, which I'll submit to

4   you -- which is a document that Ford produced in

5   this case that came from your personnel file.  And

6   I'll ask you first, do you remember signing this

7   document before?

8        A.    No.

9        Q.    Is that your signature that appears at

10  the bottom left?

11       A.    Yeah, looks like my signature.

12       Q.    Do you have any reason to dispute that

13  this is a document you signed while you worked for

14  Ford?

15       A.    No.  I'm sure I signed it.

16       Q.    Okay.  Mr. Vories, Exhibit 107 appears

17  to be an application for employment that you

18  completed when you applied to work at Ford.  Is

19  that what that is?

20       A.    Yes.

21       Q.    Okay.  And this is your handwriting on

22  this document?

23       A.    Right.

24       Q.    On the second page, is that your

1   signature?

2          A.     Right.

3          Q.     I'm done with those.  You're free to

4   put those away.  Now, Mr. Vories, you testified to

5   various promises, representations, whatever you

6   want to call them, that you believe were made to

7   you that hadn't been kept by ZF Batavia.  I tried

8   to keep pretty good notes.  I just want to make

9   sure I've captured them all.

10              First of all, I believe you said

11  overtime, AIP, personal days, bereavement and

12  opportunities at CVT?

13         A.     That's correct.

14         Q.     Is that all?  Are there any others

15  that you believe ZF Batavia haven't fulfilled?

16         A.     Not that I can think of at this point.

17         Q.     Now, scratch that.  With respect to

18  overtime, AIP, personal days and bereavement, the

19  changes that have been made to those various

20  policies or benefits, are you aware of anyone from

21  Ford being involved in any of those changes?

22         A.     Repeat that again --

23         Q.     Sure.

24         A.     -- just to be sure.

1          Q.     With respect to the various changes

2    that you have said have been made and are at issue

3    in this case, I believe you said overtime, AIP,

4    personal days and bereavement.

5               As you sit here today, do you have any

6    reason to believe that Ford was involved in making

7    those changes?

8          A.    I can't say that I 100 percent am sure

9    that Ford was involved with it.  But, again, with

10   Ford being part of the board and the board of

11   directors and the operations of the joint

12   venture -- you know, I would hope that someone from

13   Ford would have been aware of the changes that they

14   were making -- you know, prior to them making

15   them --

16         Q.    Other than --

17         A.    -- in other words.

18         Q.    I'm sorry.  I didn't mean to cut you

19   off.  Were you finished?

20         A.    (Witness nodded.)

21         Q.    Other than possibly being involved

22   through membership on the board of directors, are

23   you aware of any other way that Ford was involved

24   with any of these changes?

1          A.     No.

2          Q.     With respect to CVT opportunities, are

3     you aware of anyone at Ford that's involved in the

4     decision as to whether or not to assign you to CVT?

5          A.     No.

6          Q.     When Hassan spoke to you about ZF and

7     essentially told you -- you know, I think you can

8     trust these guys, they put it in writing.  You

9     believed him at the time, didn't you?

10         A.     Definitely.

11         Q.     And do you have any reason to believe

12    that Hassan was not being truthful with you?

13         A.     No.

14         Q.     Or that Hassan knew some year or two

15    or more down the road that ZF was going to make

16    changes to certain of its policies?

17         A.     Well, I hope not.

18         Q.     As far as you know, he didn't know

19    that was going to happen, right?

20         A.     I don't believe so --

21         Q.     Okay.

22         A.     -- but I can't -- I can't say a

23    hundred percent.  But I'd have to say what

24    discussions I had with him, I'm not aware of

125

1    anything.

2        Q.    How about Mr. Kehr, do you have any

3    reason to believe that Mr. Kehr knew that there

4    were going to be changes a year, two years or more

5    down the road?

6        A.    Well, I listened to Mr. Kehr's

7    deposition and I can't say that I would agree with

8    that a hundred percent.

9        Q.    Okay.  Prior to --

10       A.    I can't say I have any proof that he

11   does or he doesn't.

12       Q.    Okay.

13       A.    That's just my personal opinion.

14       Q.    And prior to listening to Mr. Kehr's

15   deposition, did you have any reason to believe that

16   Mr. Kehr knew that a year, two years, three years

17   down the road from these employee meetings, that ZF

18   Batavia was going to make the specific policy

19   changes that are at issue in this case?

20       A.    I can't say that.

21       Q.    Same question for Mr. Adams.

22       A.    No, not off the top -- off the top of

23   my head, I can't say that's the case.  I just -- I

24   feel that they had involvement with hopefully

1    putting this together.  Mr. Kehr said he did and

2    was closely related on the conditions that were

3    discussed, promised, agreed, whatever you want

4    to -- term you want to use.  What he knew beyond

5    that, I don't know.

6         Q.    Okay.  You understood, didn't you,

7    that when you went up to Mike Warden's office,

8    signed the offer letter, that you were accepting

9    employment with ZF Batavia?

10         A.    Right.

11         Q.    And that you would be working for ZF

12    Batavia in the future and not for Ford?

13         A.    Right.

14         Q.    Mr. Vories, do you know who Eddie

15    Adams is?

16         A.    Yes, I do.

17         Q.    Who is Eddie Adams?

18         A.    He's -- I don't know if I got his

19    title right, but I think a skilled trades -- he's

20    not the committeeman, but the head guy for the

21    skilled trades, hourly people, union.

22         Q.    He's associated with the UAW?

23         A.    Right.

24         Q.    Is he also an employee at the plant?

1          A.     Right.

2          Q.     Do you know, is he a Ford employee or

3     a ZF Batavia employee?

4          A.     He's ZF.  Or, no, he isn't.  Excuse

5     me.  He's Ford.  I'm wrong.  He's Ford.

6          Q.     So he was an hourly employee before

7     the joint venture, then?

8          A.     Right --

9          Q.     Okay.

10         A.     -- he still is.

11         Q.     Have you had any conversations with

12    Mr. Adams about this lawsuit?

13         A.     Have I, personally?

14         Q.     Yes.

15         A.     No.

16         Q.     Are you aware of any conversations

17    that any of the plaintiffs in this case have had

18    with Mr. Adams about this lawsuit or the claims

19    that are at issue in this lawsuit?

20              MR. SIMON:  Objection.  Instruct not

21    to answer to the extent that, to answer that

22    question, he has to disclose any conversation where

23    I was present or any conversation where -- when

24    other plaintiffs have been present and they've been

 1     investigating the case on my instruction.

 2          A.    No.  As far as I know, I don't know of

 3     anybody that's had conversations, but I wasn't

 4     there or around any, that I'm with aware of.

 5          Q.    Has Mr. Adams ever told you that he

 6     met with your lawyers?

 7          A.    No, I haven't talked with him.  The

 8     only thing I've talked to Mr. Adams about in the

 9     last years have been union issues.

10          Q.    As you sit here today, are you aware

11     of any specific knowledge that Mr. Adams has that's

12     relevant to this case?

13          A.    The only thing I heard is a rumor and

14     this was way back when, that there was a meeting

15     that he attended with Ford, along with Zed-F

16     management and Ford at some meeting up in Detroit.

17     And all the details of what was discussed, I don't

18     know.  But there was some type of meeting that they

19     went to and some comments made during that meeting

20     that --

21          Q.    What were those comments?

22          A.    -- that may or may not -- the only

23     thing I heard, it had something to do with -- you

24     know, Ford in the plant, trying to get the

1    production running correctly or to the right

2    levels.

3        Q.    Comments about Ford trying to get

4    production running?

5        A.    About Ford making comments about the

6    operation of the plant in regards to getting the

7    numbers that they needed.

8        Q.    Do you know specifically what the

9    comments were?

10        A.    No.

11        Q.    Do you know when this meeting was?

12        A.    No, I don't know the exact time.  I

13    know it was back a couple years.

14        Q.    Was it after the joint venture?

15        A.    Yep.

16        Q.    It was before the lawsuit, which I

17    believe was filed in the summer --

18        A.    I believe so --

19        Q.    -- of '02?

20        A.    -- but I'm not 100 percent sure.  And

21    it was just rumors that were flying around on the

22    floor because of anything that's union or

23    management gets out on the floor of any type of

24    meeting sometimes is rumor mill.  That's the only

130

1      thing that I've heard.

2          Q.    In the time that you've known

3      Mr. Adams, has he ever been a salaried employee?

4          A.    No, that I'm aware of.  Not since I've

5      been there.

6          Q.    Do you know, is he involved at all in

7      decisions that affect salaried employees?

8          A.    Not that I'm aware of.

9          Q.    These meetings that were -- you

10     testified about, employee meetings where

11     transitional employees attended, did hourly

12     employees attend those meetings as well?

13         A.    Not these specific meetings that

14     were -- this agenda was covered in.  Now, we did

15     have a major plant meeting out in the open area in

16     front of the cafeteria.

17         Q.    When the JV was first announced?

18         A.    Right.

19         Q.    Okay.  Setting aside that meeting,

20     these other meetings where there were salaried

21     employees only, I take it Eddie Adams never

22     attended any of those meetings that you're aware

23     of?

24         A.    Not that I'm aware of.

1       Q.    Who do you currently report to, Mr.

2  Vories, at the plant?

3       A.    My boss is Kevin Bryan, right now on

4  afternoons.  He's the MPS.

5       Q.    Is he a ZF employee?

6       A.    Yes.

7       Q.    Do you know who his boss is?

8       A.    Milt Gross.

9       Q.    Milt Gross is also a ZF employee?

10       A.    He's a transitional employee, I

11  believe.  I might be wrong there, too.

12       Q.    Same as yourself, as far as you know?

13       A.    I believe so.  I'm not sure because he

14  transferred in from another plant.  So he might

15  have come in later, but he's Zed-F.  He's not Ford.

16       Q.    When you accepted the offer with ZF

17  Batavia, did you get a raise over what you'd been

18  making at Ford?

19       A.    I think I got basically the same

20  amount.

21       Q.    The documents I reviewed showed that

22  your starting ZF salary was about $7,000 more than

23  your last Ford salary.  Is that not right, as far

24  as you can recollect?

1          A.    If it -- somebody got that money, I

2    got to find out who.

3          Q.    You know what?  I'm sorry.  You're

4    correct.  Looks like it was about $60 more.

5          A.    There you go.

6          Q.    I looked at the wrong person.

7          A.    Be looking for it.

8          Q.    But since you've been at ZF Batavia,

9    your gross annual wages have been more than what

10   they were at Ford, haven't they?

11         A.    Yeah, my wages have gone up a little

12   bit, yeah.

13         Q.    You also worked more overtime than you

14   did while you were at Ford?

15         A.    I'd say it stays about the same, quite

16   a bit of overtime.

17         Q.    Setting aside the one year that you

18   didn't receive an AIP bonus, I take it you've

19   received an AIP every other year?

20         A.    Yes.  Or I guess I should -- I want to

21   make that clear, too, because I wouldn't say every

22   year, but every year that the AIP was paid, except

23   for the one year I got something.  I can't remember

24   if the AIP was paid every year or not.

```
 1          Q.    Okay.  And your claim in this case
 2   with regard to the AIP is just for that one
 3   specific year that you weren't paid anything --
 4          A.    That's correct.
 5          Q.    -- when other people were?
 6          A.    That's correct.
 7                MR. VANWAY:  Okay, gotcha.
 8   Mr. Vories, I don't think I have any -- any other
 9   questions right now.  Thank you.
10                (10:53 a.m.)
11                MR. HUNTER:  Just a couple of
12   questions.
13                          EXAMINATION
14   BY MR. HUNTER:
15          Q.    With respect to your timecards,
16   Mr. Vories, we talked about that at length.  Do you
17   recall?
18          A.    Mm-hmm.
19          Q.    Did -- have you ever been approached
20   by anybody at ZF Batavia regarding your timecard or
21   any inaccuracies or inconsistencies on that
22   timecard?
23          A.    Yeah, just recently they didn't pay me
24   for an hour, two hours.
```

```
 1          Q.    Well, okay.  They didn't pay you.  Was

 2   that because there was a mistake made?

 3          A.    By them?

 4          Q.    Yes.

 5          A.    Yeah.

 6          Q.    Okay.  And I think you threatened to

 7   call your attorney if that wasn't correct the same

 8   day that mistake was made?

 9          A.    Basically what I said is I needed it

10   by Friday.

11          Q.    And if you didn't get it by Friday,

12   what was going to happen?

13          A.    I didn't say anything was going to

14   happen, other than I need it by Friday.

15          Q.    And it was clearly just a clerical

16   error by Batavia?

17          A.    I don't know what the reason was.

18          Q.    I think you made the comment it was a

19   mistake.  The company made a mistake, correct?

20          A.    Somebody made a mistake that checks my

21   timecard, yeah.

22          Q.    Okay.  And, in fact, you have been now

23   compensated for that time, correct?

24          A.    No.
```

1          Q.     Still haven't been?

2          A.     It won't be till the next check, if I

3    interpreted Herb's memo right.

4          Q.     All right.  And the next check comes

5    out -- is it Friday?  I don't remember what today's

6    date is --

7          A.     Yeah.

8          Q.     -- but your understanding is that the

9    company is going to correct that mistake, correct?

10         A.     Correct.

11         Q.     And that was a -- I think, again, a

12   calculation with respect to overtime?

13         A.     Right.

14         Q.     Other than that, have there been any

15   issues with respect to your time reporting or

16   otherwise?

17         A.     No, they didn't pay me shift

18   differential not too long ago.

19         Q.     Okay.

20         A.     They corrected that.

21         Q.     Okay.

22         A.     And other than that, off the top of my

23   head, I'm not aware of anything.

24                MR. HUNTER:  Okay.  I have nothing

1   further.

2              MR. SIMON:  Okay.  We're done.  Off

3   the record.

4              (Deposition concluded at 10:55 a.m.)

5

6

7          _____

                    Gary Vories

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                  C E R T I F I C A T E

 2

 3    STATE OF OHIO           :

 4                            :   SS

 5    COUNTY OF HAMILTON      :

 6

 7            I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named GARY

11    VORIES was by me first duly sworn to testify the

12    truth, the whole truth, and nothing but the truth;

13    that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the 20th day of October 2003 was

17    submitted to counsel for deponent's signature.

18            I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

138

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3           IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    day of October 2003.

6

7

8
            Susan M. Barhorst, Notary Public
9           in and for the State of Ohio.
            My commission expires
10          February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24