1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF OHIO

 3                WESTERN DIVISION, CINCINNATI

 4

 5   EVERETT W. WHISMAN, et al.: Case No. C-1-02-406

 6        Plaintiffs,        : Judge Beckwith

 7   v.                      : Magistrate Sherman

 8   ZF BATAVIA, LLC, et al.,  :

 9        Defendants.         :

10   _____

11        Deposition of MICHAEL WARDEN, taken on

12   Tuesday, August 5, 2003, commencing at 8:10 a.m.,

13   at the offices of Baker & Hostetler LLP, 312 Walnut

14   Street, Suite 3200, Cincinnati, Ohio, before

15   Susan M. Barhorst, Notary Public.

16

17

18

19

20

21                  GIGLIO REPORTING SERVICES
22                     3 CYPRESS GARDEN
                     CINCINNATI, OHIO 45220
23                       513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     Stephen A. Simon, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     E. Wayne Whisman

 7   On behalf of Defendant ZF Batavia, LLC:

 8     John J. Hunter, Jr., Esq.
       Hunter & Schank Co., L.P.A.
 9     1700 Canton Ave.
       Toledo, Ohio 43624
10
     Also present:
11
       Herb Huebner
12
     On behalf of Defendant Ford Motor Company:
13
       Jeffrey L. VanWay, Esq.
14     Baker & Hostetler LLP
       312 Walnut Street, Suite 3200
15     Cincinnati, Ohio 45202

16
     Cross-Examination
17
       by Mr. Simon
18

19

20

21

22

23

24
```

3

| | WARDEN DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | | |
| | 2 | 24 |
| 3 | 3 | 44 |
| | 4 | 145 |
| 4 | | |
| | 6 | 147 |
| 5 | | |
| | 11 | 88 |
| 6 | 12 | 107 |
| | 13 | 109 |
| 7 | 14 | 107 |
| 8 | 65 | 48 |
| | 66 | 59 |
| 9 | 67 | 82 |
| | 68 | 83 |
| 10 | 69 | 86 |
| 11 | 70 | 94 |
| | 71 | 94 |
| 12 | 72 | 98 |
| | 73 | 100 |
| 13 | 74 | 104 |
| 14 | 75 | 106 |
| | 76 | 131 |
| 15 | 77 | 133 |
| | 78 | 148 |
| 16 | 79 | 148 |
| 17 | 80 | 156 |
| | 81 | 156 |
| 18 | 82 | 157 |
| | 83 | 162 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

```
 1                        MICHAEL WARDEN
 2   being first duly sworn, testified as follows:
 3                        CROSS-EXAMINATION
 4   BY MR. SIMON:
 5           Q.    Morning, Mr. Warden.
 6           A.    Good morning.
 7           Q.    My name is Steve Simon.  I'm one of
 8   the attorneys for the plaintiffs in this action.
 9   We met each other at a previous deposition.
10                 Were you listening, Mr. Warden, when
11   people gave the ground rules for these depositions?
12           A.    Yes, I was.
13           Q.    Okay.  So you understand that if I ask
14   a question, you don't understand it, you need to
15   ask me to rephrase it, re-ask it, so forth.
16   Otherwise I'm going to assume you understood the
17   question.  You understand that?
18           A.    Yes.
19           Q.    All right.  I assume you've had your
20   deposition taken before?
21           A.    I have.
22           Q.    How many times have you had your
23   deposition taken?
24           A.    At least twice that I can recall.
```

1          Q.     When were those times?

2          A.     One was approximately five years ago,

3     another --

4          Q.     What was that?

5          A.     -- another 10 years ago.

6          Q.     Were they both when you were working

7     for Ford?

8          A.     Yes.

9          Q.     Were they lawsuits?

10         A.     Yes, they were.

11         Q.     What was the last one?

12         A.     The last one was a harassment --

13    alleged harassment charge.

14         Q.     Okay.  Where was that case filed, do

15    you know?

16         A.     Lorain, Ohio, I believe.

17         Q.     What was the name of the plaintiff?

18         A.     I don't recall.

19         Q.     You said it was five years ago?

20         A.     Approximately.

21         Q.     Okay.  You still work for Ford; that's

22    correct?

23         A.     Yes, I do.

24         Q.     When did you first begin working for

6

1    Ford?

2        A.    August 9th, 1978.

3        Q.    Okay.  And just generally, I don't

4    need every detail, but what was your educational

5    and work background before you joined Ford?

6        A.    Before that, I have a Master's in

7    Business Administration with a concentration in

8    Human Resources from the University of Pittsburgh.

9    I was a Navy officer.  I have a Bachelor's in Labor

10   Relations from Penn State University.

11       Q.    When did you get that degree?

12       A.    1971.

13       Q.    Okay.  Where did you work between 1971

14   and 1978?

15       A.    When I was in the Navy.

16       Q.    You were in the Navy those years?

17       A.    Yeah, and at the University of

18   Pittsburgh for 11 months.

19       Q.    Okay.  And what position did you hire

20   in at Ford?

21       A.    Labor relations representative C.

22       Q.    What did that mean?

23       A.    I was a labor relations representative

24   in a plant in Brownstown, Michigan.

7

1          Q.     Okay.  How long were you -- how long

2      were you in Brownstown?

3          A.     About a year.

4          Q.     Let me actually jump ahead.  When did

5      you first move to Batavia?

6          A.     Early 1998.

7          Q.     What was your position when you came

8      in 1998?

9          A.     Human resources manager.

10         Q.     And I think it might be easier to work

11     backwards.  Where were you immediately before 1998?

12         A.     Human resources manager at Lorain

13     assembly plant.

14         Q.     How long were you in that position?

15         A.     Three years.

16         Q.     Were you in Lorain prior to becoming

17     HR manager?

18         A.     No, I was not.

19         Q.     Where did you come from before you --

20         A.     HR manager at Cleveland casting plant,

21     Brook Park, Ohio.

22         Q.     How long were you there?

23         A.     Approximately two years.

24         Q.     Okay.  How many different plants have

1    you worked at between -- other than Batavia and

2    Lorain and then you said you worked at Cleveland

3    casting, then you started in Brownstown, Michigan,

4    how many others are there?

5         A.    I -- I've worked in -- in total,

6    including my present assignment, I've worked in six

7    plants and at least four staffs.

8         Q.    At least four what?

9         A.    Staffs.

10        Q.    What do you mean?

11        A.    I worked at employee relations staff

12   in Dearborn; I worked at finance staff in Dearborn;

13   I worked for the Ford parts and service division

14   staff in Dearborn; I worked for the sales operation

15   staff in Detroit.

16        Q.    So why is it that you came to Batavia

17   in early '98?

18        A.    I was asked to transfer to -- to

19   Batavia from Lorain.  Lorain had just -- we had

20   just discontinued the Thunderbird-Cougar line there

21   and Lorain was to become a -- a junior, sister

22   plant to the Ohio assembly plant and I was asked

23   to -- consider coming to Batavia and accepted that

24   assignment.

9

```
1          Q.    Who asked you to come to Batavia?

2          A.    I believe it was Jim Quinlan, who was

3    a manufacturing human resources director.

4          Q.    Does he work in Dearborn?

5          A.    He did at that time, yes.  He's

6    retired now.

7          Q.    Did it have anything to do with your

8    performance that you were asked to leave Lorain to

9    go to Batavia?

10         A.    I guess I need to understand that

11   question better.

12         Q.    Well, you explained that things were

13   changing at Lorain.  To your understanding, is that

14   why you moved to Batavia or did they have certain

15   problems with -- did they have problems with your

16   job performance and --

17         A.    There were no problems with my job

18   performance.

19         Q.    Was it a -- and I'm sorry.  Lorain,

20   your title was HR manager.  So was this a lateral

21   move to Batavia?

22         A.    Yes, it was.

23         Q.    Did you receive any increased benefits

24   or compensation?
```

1          A.     No.

2          Q.     All right.

3          A.     Let me clarify that.  Not -- I

4    received no increased compensation or benefits as a

5    result of the -- the transfer.  However, I was

6    eligible for merit increases and that sort of

7    thing.  I don't -- I don't recall the timing of the

8    merit increase for that year.

9          Q.     Okay.  So -- okay.  When you came in

10   1998 to the Batavia plant, did you have any idea

11   that they were going to change ownership of the

12   plant to the joint venture?

13         A.     No, I did not.

14         Q.     When did you first learn of the plans

15   of the joint venture?

16         A.     There was an announcement that was

17   done with television feed to Batavia and an

18   announcement by Jacque Nasser and the -- his

19   counterpart for Zed-F.  And -- and that was the

20   first announcement in the plant.  I learned of the

21   joint venture approximately a week earlier than

22   that.

23         Q.     Who told you about it a week earlier?

24         A.     I believe it was Tim Hartman and

1   George Lindstrom in Dearborn.

2        Q.    What's Tim Hartman's title?

3        A.    Tim, at that time, was a -- I believe

4   he was a director for human resources for power

5   train operations.

6        Q.    And he worked in Dearborn?

7        A.    Yes.

8        Q.    And Mr. Lindstrom?

9        A.    Mr. Lindstrom was a senior human

10  resources associate, reported to Mr. Hartman, had

11  special responsibilities for labor relations at

12  power train operations.

13       Q.    And did they tell you about this when

14  you were in Dearborn?

15       A.    Yes.

16       Q.    What -- tell me how the conversation

17  went or more contacts about how you learned of the

18  joint venture.

19       A.    Well, I believe the day before I went

20  to Dearborn, I received a phone call asking that

21  the plant manager, Alain Claus, and I drive -- go

22  to Dearborn, that there was some information about

23  the plant that had to be shared with us.  And we

24  met with Mr. Hartman and Mr. Lindstrom in

1    Mr. Hartman's office.

2        Q.    The plant manager's name at the time

3    was Claus?

4        A.    Alain Claus.

5        Q.    The two of you drove up to Dearborn,

6    didn't know what the news was going to be and found

7    out when you got there?

8        A.    I believe that's correct, yes.  It

9    could have been that some information about what

10   the -- what -- what was going to be shared with us

11   was conveyed to me on the telephone.  I don't

12   recall.

13       Q.    And so this was -- I'm sorry.  I

14   forget the time frame.  But the TV feed that you

15   talked about, was that October or so of '98?

16       A.    Approximately.

17       Q.    Okay.  How long had you actually been

18   at the plant at that time?  You said you came in

19   early '98.

20       A.    About 10 months, I -- I think.  I

21   don't recall exactly my transfer date to Batavia.

22       Q.    Okay.  Well, what was your thought

23   when you learned about the joint venture?  Any

24   concerns about your future?

1          A.     Yes, I had concerns about my future.

2          Q.     I assume because you had just come to

3     this plant and then they're saying there was going

4     to be a change in ownership, were you wondering if

5     you were going to have a position there?

6          A.     Well, my thoughts for myself were

7     if -- if there were to be a joint venture with Ford

8     employees, then would I remain there or would I

9     transfer or what -- what would happen with me and

10    my family because we had just bought a house and so

11    forth.  So I didn't know what my future would be at

12    that point.

13         Q.     Okay.  What else were you told?  What

14    were you told about the joint venture?  What kind

15    of details were you given?

16         A.     I was -- I was -- most of the

17    discussion had to do with labor relations issues at

18    that time and with some responsibilities that my

19    department would have with respect to due diligence

20    that Zed-F would be performing in preparation for

21    finalizing the joint venture agreement.

22              So we talked about -- we talked mostly

23    about hourly employees and -- and our relationship

24    with the UAW and how that would -- that was

1    envisioned as being for the future and also some

2    specific responsibilities that my department would

3    have with respect to due diligence.

4             There was -- there was some discussion

5    about salaried employees that was preliminary

6    and -- and it had to do with a goal at that point

7    that the -- that employees, both hourly and salary,

8    could remain Ford employees.

9         Q.    Just to summarize what were you told

10   at this meeting in Dearborn was that the goal was

11   for salaried employees at the Batavia plant, for

12   them to remain Ford employees?

13        A.    The discussion at that point was --

14   was that employees could remain Ford employees,

15   both hourly and salary.  And that did change over

16   time before the joint venture agreement was

17   finalized.

18        Q.    Anything else discussed about the

19   workforce during that meeting in Dearborn?

20        A.    Not -- not -- that I recall.

21        Q.    And, again, the people in the meeting

22   would have been Mr. Clause, yourself, perhaps

23   Mr. Lindstrom and Mr. Hartman?

24        A.    Yes.

1          Q.     Anybody else you remember?

2          A.     Not that I remember being in the

3     meeting.

4          Q.     And then did you get -- find out any

5     other information between that time and then when

6     there was the TV feed a week later?

7          A.     Not anything different.

8          Q.     And then the TV feed, that was -- this

9     was Mr. Nasser again appearing by TV feed, right?

10          A.     Yes.

11          Q.     And some other people, Ford officials?

12          A.     There was a Zed-F -- and I can't

13     remember the head of Zed-F also was on the TV feed,

14     but I don't recall his name.

15          Q.     Okay.  And was the same thing

16     communicated on the TV feed that the goal was for

17     the people in the plant to remain Ford employees?

18          A.     My recollection is that -- that there

19     was a very brief statement from Mr. Nasser that the

20     employees could remain Ford employees.  Prior to

21     that meeting -- prior to that, however, there was a

22     meeting the morning of the announcement that

23     indicated that management employees would need to

24     all be eventually ZF Batavia employees.  However,

1   they would have the opportunity to remain Ford

2   employees and go to other locations.

3        Q.    But that -- that part of it didn't

4   work itself into Mr. Nasser's statement, I guess?

5        A.    No, I -- it was not part of the

6   statement on the feed.

7        Q.    Who would management include?  Would

8   that include all salaried?

9        A.    That would be the department managers

10  and there also was a -- I guess an objective or a

11  goal that the -- that the higher level, middle

12  management people, the superintendent level people,

13  also -- also eventually all be ZF Batavia

14  employees --

15       Q.    Would that be --

16       A.    -- at that time.

17       Q.    Well, I guess, is that like a

18  superintendent may be one or two steps above group

19  leader?

20       A.    A superintendent would -- would

21  supervise group leaders and have an MPS who handled

22  administrative kind of work and -- and filled in

23  for the superintendent as well.

24       Q.    The superintendent level would have to

```
 1    join ZF Batavia.  That's what you understood the

 2    morning of the announcement?

 3         A.    Eventually, yes.  And -- and you have

 4    to understand that this, again, is prior to the

 5    finalization of the joint venture agreement.  So --

 6    so negotiations between Zed-F and Ford are

 7    continuing at that time and decisions are not

 8    finalized.

 9         Q.    Would Ford retain a copy of this TV

10    feed?

11         A.    I do not know the answer to that

12    question.  I was not part of putting together the

13    TV feed.

14         Q.    Is that customary for a statement like

15    that, that -- by the way, the statement went to

16    everybody in the plant and press that was there in

17    Dearborn, I assume, or --

18         A.    I believe there were press in

19    Dearborn, yes.

20         Q.    Any other audience besides the press

21    in Dearborn and the people in the plant?

22         A.    I don't know.

23         Q.    But for these -- you've been at Ford a

24    long time.  They've done these kind of big
```

1    announcements, whether by TV feed or otherwise,

2    you've seen this before for whatever reason?

3        A.    Yes.

4        Q.    Do they typically make a tape of these

5    and retain them?

6        A.    I -- some -- some, to my knowledge,

7    tapes are -- are made and -- and retained.  I have

8    no idea whether this one was.

9        Q.    Okay.  Well, let's do it this way.

10   Take me through, then, from that announcement --

11   and this is, you say, around October '98, right?

12       A.    Yes.

13       Q.    Take me through, then, that period of

14   time through the period of time which is, I think,

15   roughly May 1999 when salaried employees -- certain

16   salaried employees were offered jobs at ZF Batavia.

17   Explain how we got from the -- the announcement to

18   the jobs being offered to join ZF Batavia and

19   explain what your role is.

20       A.    At -- well, my role was to be the --

21   to continue as the human resources manager for the

22   Batavia plant.  At -- at that time, all employees

23   at the Batavia plant were Ford employees, as was I,

24   as was my staff.  And I worked with the -- I worked

19

1    with the management of the joint venture company

2    and with Ford management on behalf of the Ford

3    employees at ZF Batavia.

4              I also was involved in negotiations

5    with the UAW for the working agreements that would

6    apply to employees -- to hourly employees at ZF

7    Batavia.  I also worked with the UAW and negotiated

8    for the UAW nursing unit at the plant and worked

9    with Ford staff to develop a transition process for

10   employees who desired to leave Batavia.

11        Q.    You say you worked with the management

12   of the joint venture?

13        A.    Yes.

14        Q.    Who are you referring to there?

15        A.    Karl Kehr was the chief financial

16   officer and -- and I don't recall when Dave Adams

17   actually reported to the plant, but he was the

18   chief executive officer.

19        Q.    Wasn't Karl Kehr a Ford employee at

20   that time?

21        A.    Ford, yes, he was --

22        Q.    Okay.

23        A.    -- and eventually became the -- the

24   chief financial officer of ZF Batavia.  He was --

1    he was a Ford employee, as were all employees at

2    that time because there was no ZF Batavia payroll

3    or personnel policies or -- or anything to support

4    ZF Batavia employees at -- initially.

5        Q.    Okay.  How did it -- at what point did

6    it -- so you were a part of a lot of internal

7    discussions with Mr. Kehr and other people in

8    management at Ford in the plant at the time about

9    developing a package of compensation and benefits

10   for the Ford salaried employees to consider in

11   joining ZF Batavia?

12       A.    I was in -- in several conversations,

13   yes.

14       Q.    How did it go from the public

15   announcement where people were told that they would

16   be able to stay with Ford as a Ford employee at the

17   plant to the situation that ultimately involved

18   where people -- where people were given a choice?

19       A.    Yeah, at some point between that

20   announcement and the finalization of the -- of the

21   negotiated agreements between Zed-F and Ford to

22   form the joint venture, a decision was made that --

23   that eventually through a transition process, Ford

24   employees, all -- all Ford salaried employees

1    would -- would either be -- be offered and given

2    the opportunity to accept or reject a -- a position

3    at ZF Batavia as a ZF Batavia employee, or a

4    transfer to another location and remain a Ford

5    employee.

6            So each -- each individual could

7    remain a Ford employee, if they -- if they chose to

8    do so, or they could -- they could elect to

9    terminate their Ford employment and become ZF

10   Batavia employees if --

11       Q.    Did someone ever explain it --

12       A.    -- if made an offer.

13       Q.    I'm sorry.  I didn't mean to interrupt

14   you.  Was there anything else you wanted to say?

15       A.    No.

16       Q.    Okay.  Did anyone explain to you the

17   rationale for the change from the initial statement

18   that people remain Ford employees into -- they

19   had -- they were given a choice to join ZF Batavia

20   or staying with Ford or go somewhere else?  Did

21   anyone ever explain the rationale for that?

22       A.    I don't recall who explained it, but

23   the rationale that was provided to me was that

24   because ZF Batavia was going to be a stand-alone

1    company, a joint venture that was 51 percent owned

2    by Zed-F, that the -- so that the company could

3    compete in the international marketplace, they

4    wanted to have the salaried employees, that is the

5    management and professional employees in the plant

6    become employees of ZF Batavia and not -- and not

7    be Ford employees.

8            And there was some rationale that --

9    that would -- if the employees in the plant were

10   Ford employees, that would impede the

11   competitiveness of the plant in -- in being able to

12   sell transmissions to other -- other companies and

13   that sort of thing.  And, in addition, the -- it

14   was desirable for the people in the plant who were

15   in management and professional capacities to have

16   their decision making be focused on the well-being

17   of ZF Batavia and not slanted by decisions for a

18   main customer, like Ford Motor.

19       Q.    As it turns out, the only customer of

20   ZF Batavia is Ford Motor Company, right?

21       A.    I have heard that; however, I don't

22   know.

23       Q.    Has anyone ever told you that ZF

24   Batavia has another customer besides Ford?

1        A.    At this -- at this point, I know of no

2    other customers besides Ford.  At the time,

3    however, I am aware that ZF Batavia was working

4    hard to market to at least Volkswagen and Fiat and

5    I don't -- I left the plant before any of -- any of

6    that was concluded, so I don't know what the

7    conclusion of -- of those negotiations or sales to

8    those companies was.

9        Q.    Were you told during this period that

10   you were ultimately going to leave the plant?

11       A.    Yes.

12       Q.    When were you told that?

13       A.    Sometime between October and May, I --

14   but I don't recall exactly --

15       Q.    Okay.

16       A.    -- when that was.

17       Q.    And you ultimately left the plant

18   when, in early 2000?

19       A.    I reported to my present position --

20   was assigned there March 1st of 2000.

21       Q.    Okay.  Let's see.  Were you -- you

22   said you were part of discussions in putting

23   together a package of compensation benefits for the

24   salaried employees at the plant to consider in

1    joining ZF Batavia?

2         A.    Yes, I was.

3         Q.    And you worked with -- Karl Kehr was

4    someone that you worked with on that?

5         A.    Actually Karl Kehr led that effort and

6    the involvement I had was to attend a meeting with

7    Ernst and Young where there were -- where a

8    compensation philosophy was developed.

9         Q.    Okay.  Was that held in -- those

10   meetings held in New York?

11        A.    The meeting I attended was in Batavia.

12        Q.    Oh, okay.  Let me ask you it this way.

13   Do you have the -- all the exhibits?

14             MR. VANWAY:  Yeah.

15             MR. SIMON:  Makes it easier.

16        Q.    Pull out Exhibit 2.  You have in front

17   of you a copy of an exhibit that's marked as

18   Exhibit 2 we've used in previous depositions.

19   There may be a number of exhibits that have been

20   used in previous depositions, Mr. Warden, that I'll

21   show you today.

22             Have you seen Exhibit 2 before today?

23        A.    Yes, I have.

24        Q.    I'm not talking about the copy that

1    says "Exhibit" on it, but when was the first time

2    you saw this document?

3         A.    Well, the first time I saw this

4    document, it was -- this is a photocopy of a

5    tri-fold, glossy summary of ZF Batavia compensation

6    and benefits for Ford employees who elected to

7    become ZF Batavia employees.  And I first saw this

8    after it was developed -- completely developed by

9    Karl Kehr and -- I believe Karl Kehr and also Tony

10   DeShaw, who was the benefits manager who worked for

11   Karl Kehr.  And I'm talking about the completed

12   document, that's when I first saw it.

13        Q.    Well, do you know how this document --

14   so it's your understanding that Karl Kehr and Tony

15   DeShaw put this document together?

16        A.    Yes.

17        Q.    Tony DeShaw, was he a Ford employee?

18        A.    No.

19        Q.    Where did he come from?

20        A.    He was a -- I believe he was a

21   contract employee who was -- who reported to Karl

22   Kehr for the express purpose of managing benefits.

23        Q.    Was he in the plant when you arrived

24   in 1998?

1          A.    No, he was not.

2          Q.    Did he arrive sometime after the joint

3    venture was announced?

4          A.    Yes.

5          Q.    We've referred to this as the glossy

6    brochure.  I think we've called it the tri-fold

7    brochure, the tri-fold summary, gray brochure, so

8    if I call it any of those, I'm referring to Exhibit

9    2.

10              What's your understanding -- and you

11    understand and you agree that on the beginning, the

12    first page of Exhibit 2 on the left-hand column, it

13    has some provisions regarding Ford's general

14    retirement plan benefits, right?

15          A.    On this copy, it is on the left-hand

16    side --

17          Q.    Right, right.

18          A.    -- of the -- the front page.  However,

19    on the tri-fold it was not.

20          Q.    I understand.  The second page of the

21    copy you have in front of you, Exhibit 2, has

22    provisions about salary, annual incentive plan,

23    merit increase, so forth, right, among others?

24          A.    Yes, it has a number of subcategories.

1          Q.    What's your understanding of how --

2    and I don't necessarily mean this exact document,

3    but how this package was put together?

4          A.    My understanding is that Karl Kehr and

5    Tony DeShaw utilized information regarding Ford

6    compensation and benefits and information from a

7    study done by Ernst and Young to develop a

8    competitive, transitional compensation and benefits

9    program, which could be offered to -- to Ford

10   salaried employees at the time within the plant as

11   the initial compensation and benefits for them, if

12   they chose to join the joint venture, and -- and it

13   was a summary of those benefits.

14         Q.    You said you were part of a Ernst and

15   Young meeting in Batavia.  Was that a series of

16   meetings held at the plant?

17         A.    My recollection is that it was a

18   one-day meeting at the plant.  Could have been two,

19   but I -- I recall it as one.

20         Q.    And then it's your understanding that

21   following this meeting, Karl Kehr and Tony DeShaw,

22   perhaps others, worked on developing this package

23   of compensation and benefits to offer to the

24   salaried employees?

1          A.     Correct.

2          Q.     And you were -- you were participating

3    in other meetings where this was discussed?

4          A.     On occasion, there were -- there were

5    meetings to discuss these things.

6          Q.     Was there somebody -- were you dealing

7    mostly with the UAW at that point or salaried?

8          A.     He was dealing with both.  However,

9    there were -- there was an awful lot of UAW

10   business to do at that point.  And -- and I was

11   working very closely with the union bargaining

12   committee and the company bargaining committee and

13   also with the -- with the HR staff people for labor

14   relations issues.

15              At the same time, I was -- I was

16   working with other HR staff people for transition

17   processes for salaried employees.

18         Q.     Were you the top person in HR at that

19   time?

20         A.     At the plant, yes.

21         Q.     Okay.  Were there people subordinate

22   to you who you directed to handle a lot of the

23   issues with the salaried employees?

24         A.     Yes, I had a staff.

1        Q.    Who would have been the people you

2    would have looked to to handle the salaried

3    employee issues regarding the transition?

4        A.    There were -- and I -- I have to be --

5    timing is a -- is a little difficult because I did

6    have transfers out of my department.  So there was

7    a -- an individual -- there was an individual that

8    reported to me who was a management-role person

9    who -- who transferred out of -- actually he -- he

10   decided to quit Ford Motor Company during that

11   process.  And I don't recall the exact timing.  And

12   there were three other people who worked with

13   salary personnel matters.  Dyvetta O'Neal was one,

14   Ann Jones was another and Peggy Jameson worked some

15   on salary matters, but mostly on -- on hourly

16   matters.

17       Q.    Is Ann Jones still with the company?

18       A.    Ann -- Ann Jones retired from Ford

19   Motor Company.

20       Q.    The person that quit, I think I know

21   the name.  Who's the HR person you said had quit

22   and left Ford?

23       A.    I can remember the first name.

24       Q.    What was --

1          A.     His first name is Mark.

2          Q.     Okay.  We might come back to that.

3     All right.  Now, I imagine when I asked you about

4     concerns you might have had when you learned about

5     the joint venture, I assume you were hearing

6     concerns starting October '98, concerns that the

7     salaried workforce had about their future at the

8     plant?

9          A.     Yes.

10          Q.     What kind of concerns were you

11     hearing?

12          A.     Well, because the -- the joint venture

13     was a -- an announcement that the two -- two

14     companies were -- were planning to enter this joint

15     venture, employees were concerned -- and I, because

16     of the -- this case, I'm going to speak in terms of

17     salaried employees.

18              Salaried employees were concerned

19     about their -- their future, what -- would they be

20     able to remain Ford employees, for example.  Would

21     they be able to remain Ford employees at ZF Batavia

22     and for how long?  Would they -- would their --

23     would they -- would something happen to them, like

24     they read in papers about other companies who

1    formed joint ventures or -- or had buyouts and --

2    and they're simply forced to join the -- the

3    successor company and take whatever compensation

4    and benefits are -- are applicable to them or be

5    laid off or what would happen?

6              There was no -- it wasn't defined and

7    it wasn't defined because it was a brand new

8    announcement.  And so all of that -- all of those

9    things had to be defined.  And a lot of our

10   salaried employees wanted to stay in Cincinnati.

11   And they were very much interested in -- in

12   assignments in Cincinnati and they -- they -- a

13   number of people did not want to leave Cincinnati.

14        Q.   A lot wanted to -- if given the choice

15   between staying in the plant and ZF -- become ZF

16   Batavia employees, a lot of them preferred to

17   transfer to the Ford plant in Sharonville?

18        A.   Many people were interested in

19   assignments at Sharonville, yes.

20        Q.   Okay.

21        A.   A number of them.  I don't know how

22   many.

23        Q.   But at one point, Ford actually put a

24   freeze on people moving over to Sharonville during

1    this period, right?

2        A.    That's -- well, Ford put a freeze on

3    people leaving the Batavia plant.  It was not

4    specific to Sharonville, that I recall.  It was --

5    it was that -- because of the transitional issues

6    and the need for the plant to continue operations,

7    that there had to be a metering process for

8    employees to leave the plant.  And, yes, there was

9    a six-month freeze.

10        Q.    Do you remember when that began?

11        A.    I -- my recollection is that the

12    overall freeze ended in April and -- and starting

13    in April, people were -- then had the opportunity

14    to move to other locations on a metered basis

15    because the operations there had to continue.

16        Q.    Starting in April, were people

17    permitted to go to Sharonville?

18        A.    Yes, as far as I recall.  If it

19    wasn't -- there was no guarantee of any specific

20    location.

21        Q.    Is your recollection -- so in April,

22    the freeze ended; that's your recollection?

23        A.    Yes.

24        Q.    And would it sound right to you -- I'm

1    just recalling what some of the offer letters said

2    to some of the salaried employees at -- in May

3    1999, people were given offer letters to join ZF

4    Batavia; does that sound right?

5         A.    Yes.

6         Q.    So around the time that they were

7    getting these offers, as far as you understood,

8    there were openings at Sharonville?

9         A.    I don't recall if there were any

10   openings in Sharonville at the time or not.

11        Q.    Do you remember -- do you know who all

12   my -- who the 15 people are in this lawsuit?

13        A.    No.

14        Q.    All right.  Let me -- let me

15   familiarize you with the names.  I just want to ask

16   you if you had conversations with any of these

17   people, so I'll give you the names.  Ron Pearce,

18   Wayne Whisman, who is to my left.  Rick Ervin, Mike

19   Steward, Gary Vories, Pam Blanco, Jim Crump, Lee

20   Stegmann, Ted Edrington, Dennis Baker, Don

21   Williams, Dena Stevens, Teri Parker, Bill DeVito,

22   Randy Newsome.  Do you know who those people are?

23        A.    Yes.

24        Q.    All 15?

1          A.    My recollection is that all are --

2    were, at the time, Ford salaried employees.

3          Q.    Okay.  All right.  Do you remember

4    talking to any one of those individuals or more of

5    those individuals about their decision to join ZF

6    Batavia?

7          A.    I would expect that at some -- at some

8    point, I had had contact with most, if not all in

9    some conversations.

10          Q.    Can you specifically recall any of

11    them, as you sit here today?

12          A.    No.

13          Q.    What, just generally speaking, would

14    have -- what would have the conversation been?  And

15    this would be early 1999, I take it.

16          A.    Well, early -- early on after the --

17    and I don't -- I'm not going to say whether it was

18    early 1999 or late 1998, but early after the

19    announcement, Alain Claus and I had meetings with

20    salaried employees periodically to update the

21    salaried employees on our understandings of -- of

22    what was happening with the -- with the development

23    of a joint venture company.

24          Q.    Question and answer sessions?

1       A.    There were questions and answers

2   involved in it, yes.

3       Q.    And you said you had contact with

4   most, if not all of the 15 people I named.  That

5   may have also included one or more meetings?

6       A.    Could have, but I don't recall any

7   specific ones.

8       Q.    Do you remember, was it possible that

9   some of those 15 might have asked you, Mike, are

10  there openings in Sharonville?

11      A.    It's possible.

12      Q.    Do you remember Gary Vories asking

13  you?

14      A.    No, I don't.

15      Q.    If Gary recalled that you said, no,

16  there's no openings in Sharonville, would you have

17  any reason to doubt it?

18      A.    No, I wouldn't because at any -- at

19  any point in there, there could be or may not be

20  openings in any Ford plant to include Sharonville.

21      Q.    Okay.  Were you part of discussions

22  regarding which salaried employees at Ford would be

23  given offers to join ZF Batavia?

24      A.    Yes.

1     Q.    Who did you talk to about those issues

2    and how was that ultimately determined?

3     A.    At some point early on in the -- in

4    the process, the management committee at ZF

5    Batavia, which included the -- since it was before

6    there was a developed compensation and benefits

7    process or even a payroll process for ZF Batavia,

8    it -- it included the -- the Ford managers that

9    were there, led by Karl Kehr, to discuss the

10    salaried employees in the -- in the plant, the Ford

11    salaried employees in the plant and the -- whether

12    or not ZF Batavia would make offers to those

13    employees as -- as an initial waive of offers for

14    employment at ZF Batavia.

15     Q.    Okay.  Was it ultimately determined

16    that you wanted the best of the bunch to stay at

17    the plant?

18     A.    It was -- it was determined that

19    the -- the discussions revolved around how would

20    these employees fare, both in terms of being able

21    to achieve the ZF Batavia production, quality, cost

22    objectives and to work in a stand-alone,

23    profit-centered company, small company, as opposed

24    to a cost center within a large company, like Ford

1    Motor Company.  And -- and there were -- there were

2    discussions about the individuals' performance

3    and -- and adaptability to that kind of

4    environment.

5        Q.    In other words, performance had to be

6    one of the main factors, right?

7        A.    Yes.

8        Q.    So as far as you knew, the people that

9    were offered jobs to join ZF Batavia were good

10    performers?

11        A.    Were acceptable performers, yes.

12        Q.    And it was critical, as you understood

13    it, that you -- the plant to succeed under this

14    joint venture needed a critical mass of salaried

15    employees to stay in the plant, otherwise the plant

16    would discontinue, right, in the short term?

17        A.    Well, that's -- that's a little bit of

18    a complicated question.  My understanding was this.

19    That the production operations at ZF Batavia needed

20    to continue and produce high quality transmissions,

21    the CD4E, and eventually after development, the

22    CVT.

23        So -- and it had to be competitive in

24    the marketplace and -- and that was both as for

1  Ford as its customer and as it was marketing its

2  products to other automotive companies.  Therefore,

3  experienced people who knew how to produce good

4  transmissions and to supervise UAW hourly employees

5  and to manage the production and maintenance

6  operations in that organization were important for

7  the organization to do well.  Survival is a

8  different question.  I -- I don't know the answer

9  to that.

10       Q.    Well, you're not -- if -- do you know

11  how many Ford transitional employees ultimately

12  came over to join ZF Batavia?

13       A.    Maybe I can back into a number.  I

14  believe we made offers to approximately 70 percent

15  eventually of the employees at -- at Batavia,

16  approximately.  About half of those, I think,

17  accepted eventually.

18       Q.    70 percent would have been how many

19  people?

20       A.    Somewhere around a hundred, I think,

21  but I'm not real sure of that number.

22       Q.    Okay.  All right.  About 50 accepted?

23       A.    Approximately --

24       Q.    Okay.

1          A.     -- in that, in that range.

2          Q.     All right.  If those 50 had not

3     accepted, that said, Well, we're going to stick

4     with Ford or leave Ford.  We're not staying in the

5     Batavia plant.  I mean, realistically could ZF

6     Batavia have continued?

7               MR. VANWAY:  Object to form.

8               THE WITNESS:  Should I answer?

9               MR. VANWAY:  You can answer to the

10    extent that you know.

11         A.     I -- I don't know the answer as to

12    whether or not it could have continued.

13         Q.     Okay.  I mean, was there any

14    contingency plans discussed that if -- look, if

15    these people, these salaried employees don't join

16    the company, then we're going to hire some people

17    off the street, so to speak, who are going to fill

18    their positions and continue to make the CD4E?

19         A.     Well, we did hire people from -- from

20    off the street as ZF Batavia employees.

21         Q.     Right.

22         A.     And -- and we had plans to hire ZF

23    Batavia employees for those -- those individuals

24    who didn't accept Ford assignments.  And so -- so,

1    yes, there were plans to do that.

2         Q.    But you have no opinion on whether if

3    this roughly 50 people had said, no, we're not

4    coming, do you -- based on your conversations with

5    people involved in this -- in the formation of the

6    joint venture, do you have any reason to believe

7    that the plant -- the management could have hired

8    that many people off the street and plugged them

9    into the manufacturing facility so that it could

10   continue in 1999?

11        A.    My personal opinion is that it would

12   have been very difficult for -- for the plant to

13   operate in an efficient way.

14        Q.    And from your point of view, it was

15   really important that the package of compensation,

16   benefits that were offered to salaried employees

17   was competitive enough that it would be attractive

18   enough to them to stay in the plant, right?

19        A.    Yes.

20        Q.    Especially -- okay.  The CVT

21   obviously -- strike that.

22              The people who joined the plant had,

23   in your understanding, years of experience on

24   producing the CD4E transmission?

1        A.    Yes, I -- a range of experience.

2        Q.    All right.  And the plant at that time

3    in '99 was to -- obviously CD4E would continue

4    during at least a two- or three-year period after

5    which the plant would start transitioning towards

6    production of the CVT?

7        A.    While I'm not certain of the time

8    frames, that's the general -- that was my general

9    understanding.

10        Q.    All right.  And it was your

11    understanding that it was critical to have the Ford

12    transitional people stay there for the CD4E

13    production, right?

14        A.    Important, yes --

15        Q.    And at the time --

16        A.    -- for them to do so.

17        Q.    Okay.  And at the time in 1999, you

18    understood from your conversations with other

19    people in ZF Batavia management, Ford management,

20    that the plan was to hire in the new -- the ZFB --

21    the ZF Batavia new hires were to come in and fill

22    positions in the CVT, right?

23        A.    That was not my understanding, no.

24        Q.    What was your understanding?

1          A.     My understanding was that -- was that

2    the plant production and new departments actually,

3    since -- since Ford did not have a purchasing

4    activity, did not have a treasury activity, did not

5    have a sales activity and so forth at the plant,

6    that new -- new employees needed to be hired

7    throughout the organization, both to fill new

8    functions and to continue the -- the operation of

9    the plant in a manufacturing organization.  There

10   was no distinction between CD4E and CVT, although

11   at that time, CD4E was the only product being

12   produced.

13         Q.     You've heard of this May 27th, 1999

14   meeting that's been discussed at this deposition.

15   There's a packet of material that we've produced

16   regarding that meeting.  Are you aware of that?

17         A.     Yes.

18         Q.     Were you at that meeting?

19         A.     I was.

20         Q.     But you weren't one of the speakers;

21   is that right?

22         A.     No, I was not.

23         Q.     Okay.  How is it that that meeting

24   came to be?

1    A.    That meeting was a follow-up meeting

2    to other meetings that -- that were specific to

3    Ford employees and -- and -- and decisions for Ford

4    employees.  The purpose of the May 27th meeting was

5    to outline the compensation and -- and benefits

6    process and some of the objectives of the -- of the

7    ZF Batavia company, with respect to people who

8    would elect to join that new company.

9    Q.    Okay.  Was Exhibit 2 the tri-fold

10    brochure, was that handed out at the May 27th

11    meeting?

12    A.    The tri-fold brochure was available at

13    that time, as I recall.  I do not recall whether or

14    not it was handed out at the meeting.

15    Q.    Exhibit 2, the tri-fold brochure was

16    available May 27th to salaried employees who wanted

17    to review it?

18    A.    Yes.  Let me back up.  I -- I guess

19    I'm not certain of that.  I'd have to review when

20    we made offers to salaried employees, the date of

21    those offers, before I could be certain that the

22    tri-fold was available at that time.

23    Q.    The date that you made offers to the

24    Ford transitional employees, you're certain that

1    Exhibit 2 was available at that time?

2         A.    Yes.

3         Q.    This is perhaps a bad example.  Do you

4    have Exhibit 3?  Try to keep that.  Exhibit 3,

5    is -- is that an offer letter to Mr. Whisman?

6         A.    Yes, it is.

7         Q.    Do you see -- this is a bad example, I

8    suppose.  But do you see where it has the date, May

9    27th, 1999 and it's crossed out?

10        A.    I do.

11        Q.    And then it has November 30th.  Is it

12   your recollection that Mr. Whisman was offered a

13   job later than a lot of the other Ford transitional

14   employees?  Or strike that.

15             Is it your understanding Mr. Whisman

16   decided to join the ZF Batavia organization

17   sometime after a lot of the other people did?

18        A.    Yes.

19        Q.    Okay.  If I showed you other documents

20   that had May 17, 19 -- well, strike that, too.

21             Does May 17th, 1999 sound about right

22   when a lot of people were given their offers?

23        A.    Yes, it does.

24        Q.    And were they given them -- even

1    though they were given individually, was

2    essentially a form letter created on or about May

3    17th and then they were distributed out to the

4    employees?

5        A.    That's correct.

6        Q.    Who created the form -- Exhibit 3 is

7    essentially a form letter, right?

8        A.    Yes.

9        Q.    Who created the form letter?

10       A.    I drafted the form letter --

11       Q.    Okay.

12       A.    -- with some help with others.

13       Q.    Okay.  Who did you help with?

14       A.    I believe Dyvetta O'Neal helped me

15   with that.

16       Q.    Who did?

17       A.    Dyvetta O'Neal.

18       Q.    I mean, did she help you like fill in

19   the different figures, like how much they're going

20   to pay per month, that sort of thing?

21       A.    And the verbiage, as I recall.

22       Q.    Well, you see in the first full

23   paragraph where it mentions joining the ZF Batavia

24   team and it says in parenthesis "(summary

1    attached)"?

2         A.    Yes.

3         Q.    Was Exhibit 2 the summary that was

4    attached, to your understanding?

5         A.    Yes, it was.

6         Q.    Okay.  This might be confusing to

7    someone who's reading the transcript later.  Your

8    testimony is that the tri-fold, glossy brochure

9    that is Exhibit 2 was attached to the form offer

10   letter example, which is Exhibit 3?

11        A.    Yes.  The process was to attach the

12   glossy to the -- to the letter with a paperclip.

13        Q.    All right.  Not a staple?

14        A.    I do not recall stapling anything.

15        Q.    Well, you said "paperclip," so I

16   thought perhaps that was significant.  Well, let's

17   talk about the nuts and bolts.  You tell me what

18   the procedure was after the letter was created, who

19   gave it to the individual salaried employees, that

20   sort of thing.

21        A.    The letter was provided to the manager

22   who was doing the -- who -- for whom the

23   position -- under whom the position would report

24   and that manager or his representative was to

47

1    present it to the salaried employee.

2         Q.    Like in Mr. Whisman's Exhibit 3, we

3    see Hassan Saleh at the -- his signature at the

4    bottom?

5         A.    Yes.

6         Q.    I may have misstated what you just

7    said, but correct me if I'm wrong.  Was your

8    procedure then that Hassan Saleh would be the one

9    who would give it to Mr. Whisman?

10        A.    For this letter, which -- which was

11    November 30th, 1999 --

12        Q.    Yeah.

13        A.    -- that is correct.

14        Q.    If we look at the other letters and we

15    look at the person whose name is signed there, is

16    that the person, then, who you would have expected

17    to give the document to the salaried employee?

18        A.    Yes, or his representative if he

19    wasn't there.

20        Q.    Whose representative?

21        A.    The manager's representative.

22              MR. SIMON:  Oh, I see.  Okay.  All

23    right.  You can -- Jeff, however you want to do

24    this.  If you want to put exhibits back in the

1   folder --

2            MR. VANWAY:  Okay.

3            MR. SIMON:  We probably -- we may come

4   back to exhibits.

5            MR. VANWAY:  Okay.  I'll hold on to

6   it.  You all right?  You need a smoke?

7            THE WITNESS:  No, I'm fine.

8            MR. SIMON:  You had heard the ground

9   rules before, so you understand if you need a break

10  at any time, Mr. Warden, you're -- just say so.

11           MR. WHISMAN:  Thanks for reminding me.

12  Excuse me.

13           MR. SIMON:  Mr. Whisman will step out

14  for a second.  Let's see.  I think there's no time

15  like the present.  Let's jump into some documents.

16  BY MR. SIMON:

17       Q.    Take a look at Exhibit 65.  For some

18  reason, I'm missing a copy, so you have to -- have

19  you seen this document before, Mr. Warden?

20       A.    No, I haven't.

21       Q.    All right.  And it says -- you agree

22  it says at the top "Appendix A Design Team

23  Members," right?

24       A.    Yes.

1        Q.     I don't recall -- I know it says

2     "Appendix A."  I don't -- this was a document that

3     was produced to us by ZF Batavia.  I don't recall

4     if it was actually attached to another set of

5     documents, but I'm just presenting this one

6     document to you.

7              Was there a thing called the "Design

8     Team" during the transition period?

9        A.     I don't recall a -- an organization

10     called the "Design Team," no.

11        Q.     All right.  You see that you're listed

12     as one of them, right?

13        A.     Yes.

14        Q.     Okay.  Is it fair to say these were

15     the people who were involved in putting together,

16     among other things, a package of compensation,

17     benefits for the salaried employees in the plant in

18     '99?

19        A.     This appears to me to be a listing of

20     the -- of the people who attended the meeting that

21     I attended at Batavia where Ernst and Young worked

22     with the management at Batavia at the time to

23     develop compensation and benefits philosophy for ZF

24     Batavia.

1        Q.     Where it says "ZF Batavia Management,"

2    are those -- other than Dave -- well, let's --

3    sorry.

4              Mark -- I've heard his pronunciation

5    before.  I'll probably say it wrong, but is that

6    Bugajaski?

7        A.     Mark Bugasjaski.

8              MR. HUEBNER:  Bugasjaski.

9        Q.     Bugasjaski, thank you.  Is he -- and

10   he's currently -- is he at Batavia?

11       A.     I believe he is.

12       Q.     Okay.

13       A.     I have not worked at ZF Batavia for

14   several years.

15       Q.     I understand.  Had he previously been

16   with Ford?

17       A.     Yes.

18       Q.     And Mr. Claus had also been with Ford?

19       A.     Yes.

20       Q.     Mr. Corbett is still at Ford?

21       A.     Yes.

22       Q.     Kurt Gogolin, who is that?

23       A.     Kurt Gogolin was a -- a Zed-F employee

24   and I believe he had responsibility for purchasing.

1          Q.    Dave Longridge?

2          A.    Dave Longridge is a Ford employee.

3          Q.    Still is?

4          A.    As far as I know, yes.

5          Q.    And John Zielke, he was -- he's Ford,

6     right?

7          A.    Yes.

8          Q.    Is he retired?

9          A.    I do not know.

10         Q.    Okay.  All right.  We can put that one

11    aside.  Mr. Warden, the next set of documents I'm

12    going to show you are a -- a lot of e-mails during

13    this period of time.  And for the most part, I'm

14    going to show them to you chronologically.  So

15    perhaps it might refresh your recollection about

16    these events.

17              Have you reviewed documents in

18    preparation for this deposition?

19         A.    Yes.

20         Q.    What documents did you review?

21         A.    My file that my attorney had.

22         Q.    Is that -- maybe Mr. VanWay can pipe

23    in.  When you say your file, are you talking about

24    a set of documents that were from -- produced to us

1       in this case that were from Mike Warden's file?

2           A.    Yes.

3           Q.    Any other documents?

4           A.    I did take a look at some recent Ford

5       benefits and compensation documents that are

6       recent.

7           Q.    Did you review Ford's overtime policy

8       for salaried employees?

9           A.    I did.

10          Q.    Okay.  Let's take that one while we're

11      there.  What is Ford's current policy for salaried

12      employees, their payment of overtime?

13          A.    Payment of overtime for salaried

14      employees varies.  For exempt employees, the -- the

15      process today is that employees may be paid for

16      authorized, scheduled overtime, to the extent that

17      it's authorized by their management.  And there is

18      also an expectation of casual time, which is

19      unpaid, to do necessary administrative tasks and

20      that policy is changing because of a recent

21      announcement of a 10 percent reduction in salary

22      costs at Ford Motor Company.  And I'm aware that

23      there are -- there's a proposal to change the

24      overtime policy as part of that and -- and to

53

1    change the rates of the overtime and who is -- who

2    may work overtime.

3            Typically under the present policy,

4    exempt employees may -- may work as many hours that

5    they find necessary to complete their assignments

6    without compensation.

7        Q.    What's the status of this proposal to

8    change the overtime policy?

9        A.    My understanding is that it's to be

10   reviewed in late August and would be effective in

11   September, if approved.

12       Q.    Okay.  Is there a possibility that's

13   not going to be approved in your mind?

14       A.    There's a possibility it would not be

15   approved.  However, there is a -- there is a 10

16   percent reduction in salaried costs that has been

17   announced.  So the -- the way the company is trying

18   to do that is steps short of layoffs and reduction

19   of salaried people --

20       Q.    Okay.  Well --

21       A.    -- although that could be -- could

22   also occur.

23       Q.    Okay.  If I wanted to know about this

24   proposal, I suppose the best way to understand it

54

1    in full is to read -- are there some documents that

2    reflect this proposal?

3         A.    Yes.

4         Q.    And ultimately there's going to be

5    some document, if it's effective, in September of

6    this year, there will be some written policy,

7    right?

8         A.    Correct.  The proposal that I'm

9    referring to is -- is a policy change proposal.

10        Q.    Okay.  Well, notwithstanding this

11   proposal, the current policy is that exempt

12   salaried employees, if overtime is scheduled and

13   authorized, they'll be paid overtime at some rate,

14   right?

15        A.    If it's scheduled and authorized and

16   worked --

17        Q.    Okay.

18        A.    -- as scheduled.

19        Q.    And what's the -- is there a certain

20   dollar rate for overtime that's worked during the

21   week?

22        A.    There is.

23        Q.    What is that?

24        A.    I don't recall the exact rate.

```
 1          Q.     And there's a different rate if you

 2    work on Sundays or holidays?

 3          A.     Yes, there is.

 4          Q.     And since '99, that's changed over the

 5    years?

 6          A.     I believe it has, yes.

 7          Q.     It's gone up?

 8          A.     I believe so, yes.

 9          Q.     Has it gone up every year since 1999,

10    as far as you understand?

11          A.     I don't know.

12          Q.     Is that what usually has happened

13    since you been at Ford, that that overtime rate

14    inches up every year?

15          A.     No.

16          Q.     No?  Some years it doesn't?

17          A.     No.  And, in fact, in some years, it

18    has gone down.  In my 25 years with the company,

19    that -- the overtime policy has -- has changed

20    and -- and -- on a number of occasions.

21          Q.     Do you remember the last year that the

22    overtime rate went down for exempt salaried

23    employees?

24          A.     Well, I can recall that when I first
```

1    worked for the company, it was -- it was always for

2    exempt salaried employees, a time and a half kind

3    of rate with no cap for daily overtime or Saturday

4    overtime and double time for holidays and -- and

5    Sundays.  And then it was reduced to a flat rate

6    amount.

7              So there was a cap and there were

8    times when -- there was a time early on when casual

9    time was by written policy, was said to be capped

10   at an hour, but that cap at some point was -- was

11   taken out of the policy.  There are -- there have

12   been a number of changes over the years.

13        Q.    All right.  What's the -- is the

14   current policy regarding casual time that you're

15   expected to generally work a half hour casual time

16   and about a half hour casual time after your shift?

17   Have you heard that?

18        A.    That's a -- that is a -- kind of a

19   standard practice.

20        Q.    Okay.

21        A.    But to my knowledge, there's no

22   requirement that it be limited to that amount.

23        Q.    Has the standard practice been that if

24   your casual time -- if you work at least one hour

1   over your eight-hour shift and you're an exempt

2   salaried employee and it's authorized, that you get

3   paid that hour if you work a full hour?

4        A.    If you're authorized and scheduled for

5   that -- that full hour, then you can be paid at an

6   overtime rate for -- for that hour.  However, it

7   must be authorized and -- and scheduled and there's

8   an expectation that salaried employees will --

9   exempt salaried employees will -- will need some

10  casual time.

11       Q.    Okay.  Is it fair to say it's not the

12  policy at Ford that you only get paid overtime

13  beyond your eight hours if you work at least two

14  hours overtime that would include casual time?

15       A.    I know of no written policy that says

16  that.

17       Q.    All right.  Just to -- switching gears

18  just slightly.  We had talked about the gray

19  brochure, Exhibit 2.  And you had said that it had

20  been -- it is your understanding that it had been

21  paper clipped to the offer letters that were sent

22  out to the various salaried employees in '99,

23  right?

24       A.    Correct.

1          Q.     So if someone in this case testifies

2     that when they received their offer letter, Exhibit

3     2 was -- the glossy brochure was attached, you

4     would have no reason to disagree with that

5     testimony?

6          A.     Unless I personally handed the offer

7     letter to the person, I would not know if it was

8     actually attached or not.

9          Q.     All right.  But it was your

10    expectation it was going to be attached?

11         A.     Yes.

12         Q.     Okay.  So if someone said it was

13    attached, you wouldn't disagree with that?

14         A.     Right.  I could not disagree with

15    that.

16              MR. SIMON:  Okay.  All right.  Let's

17    just -- we're about to go through a lot of

18    documents.  Do you want to take a break?

19              MR. WARDEN:  Why don't we take a quick

20    break?

21              MR. SIMON:  Sure.

22         (Off the record:  9:22 a.m. - 9:36 a.m.)

23              MR. VANWAY:  Steve, before you get

24    started, we -- you asked Mr. Warden some questions

1    about the overtime proposal or the change.  And I

2    know we have -- we have a protective order in this

3    case.  And I just wanted to put on the record that

4    it's our position that his testimony and any

5    questions and answers regarding that proposal which

6    has not yet been disclosed to the general workforce

7    would be covered by the protective order.

8            By virtue of Mr. Warden's position in

9    HR, he knows some things that haven't been

10   discussed yet.  So I just wanted to make that

11   clear.

12   BY MR. SIMON:

13       Q.    Okay.  All right.  Let's see.  As I

14   said before we took a break, Mr. Warden, I'm just

15   going to show you a series of e-mails.  I'm going

16   to try to move this expeditiously as possible, but

17   take as much time as you need to read these

18   e-mails.  This is 66.

19       A.    Okay.  I've read it, reviewed it.

20       Q.    All right.  Would you agree with me

21   that part of Exhibit 66, which is, for the record,

22   is Bates stamped by Ford 1287 to 1288.  Are these

23   set of documents e-mail from you to certain people

24   in the Ford organization sent on October 16th,

```
 1   1998?

 2         A.    Yes.

 3         Q.    And it like looks you sent it to

 4   Mr. Hartman?

 5         A.    Yes.

 6         Q.    And I guess you cc'd Mr. Claus and you

 7   sent it to -- is that Mr. -- is that Jeff

 8   Faistenhammer?

 9         A.    Yes, it is.

10         Q.    I don't know that we've identified

11   him.  Who's -- what's his -- what was his title?

12         A.    Jeff Faistenhammer was a manager or

13   director in power train operations with, I believe

14   at the time, specific responsibilities that were in

15   the hourly labor relations arena.  I believe that's

16   correct.

17         Q.    Okay.  Well, I was just going to find

18   out who a few other people are up here.  You'll see

19   that your e-mail, looks like it was forwarded by

20   Mr. Hartman and some other people at Ford?

21         A.    Yes.

22         Q.    So it was forwarded to Mr. Quinlan,

23   who you've identified.  Mr. Solberg, who's that?

24         A.    Jim Solberg was an operational manager
```

1 in power train operations, may have been vice

2 president for power train operations or a director.

3   Q. Mr. Cirbes?

4   A. Mr. Cirbes is a -- an employee

5 relations -- human resources staff person,

6 presently is the vice president for employee

7 relations for human resources.

8   Q. Which one -- was Mr. Hartman your boss

9 at the time?

10   A. Mr. Hartman was my -- Mr. Hartman

11 and -- and Mr. Faistenhammer were functional

12 directors for HR in power train operations for

13 salaried personnel matters and human resources

14 managers -- matters.  My direct boss was Alain

15 Claus.

16   Q. People who you reported to in HR at

17 Ford were Hartman and Faistenhammer?

18   A. Functionally they -- they coordinated

19 our efforts in -- in the field for HR matters.

20   Q. Okay.  What were you -- were you

21 subordinate to them?

22   A. Not as -- not as a direct report.

23   Q. Okay.

24   A. I -- I directly reported to Alain

62

1   Claus.

2        Q.    Okay.  All right.  You had a chance to

3   read your e-mail that you had sent.  And would you

4   agree that your e-mail kind of captures a lot of

5   the concern and anxiety among salaried employees at

6   the time about the future of the plant?

7        A.    Yes, I -- I believe it does at that

8   time, which was immediately after the announcement.

9        Q.    Okay.  And it's -- there's a line in

10  the second full paragraph where your e-mail begins.

11  It says, "Misunderstandings and false rumors had

12  been rampant throughout the Plant, including such

13  things as," and then you list what those rumors had

14  been, right?

15       A.    Yes, the types of rumors that I had

16  been made aware of.

17       Q.    And one of those rumors was that Ford

18  employees will work only on CD4E and will be

19  ineligible to work in CVT.  You had heard that

20  rumor?

21       A.    I heard -- I had heard that from --

22  and -- and mostly I had heard that from hourly

23  employees.

24       Q.    But some salary as well?

1          A.     Yes.

2          Q.     These captured the concerns of the

3     salaried employees, does it not?  I -- I say that

4     because your e-mail begins with talking about

5     informational meetings with salaried employees.  So

6     is that fair to say that this e-mail captures the

7     concern of salaried employees?

8          A.     This e-mail spoke to both salaried

9     employees' and hourly employees' --

10         Q.     Okay.

11         A.     -- concerns.

12         Q.     You say at the beginning of the e-mail

13    that you and Alan -- and Mr. Claus had conducted

14    informational meetings with salaried employees

15    department by department and an additional meeting

16    for all MR employees; that was accurate?

17         A.     Yes.

18         Q.     Okay.  And the rumor about the -- not

19    working on the CVT, I guess from your e-mail you

20    tried to address that with the salaried employees,

21    that they would have a chance to work on CVT?

22         A.     Yes.  The things that we addressed

23    were that -- that employees working the JV would be

24    working in the operations of the JV.  No

1    distinction between CD4E and CVT.

2         Q.    But maybe -- you might know.  These

3    words didn't come out of your mouth, but had you

4    been part of meetings with salaried employees where

5    people from management told the salaried employees

6    this is an opportunity to get onto the CVT on the

7    ground floor?

8         A.    I -- I did not attend any meetings

9    where -- that I recall where that specifically was

10   said.  However, the -- the CD4E was due to be -- be

11   phased out and -- and eventually it was envisioned

12   that the plant would be doing CVT production and

13   the employees that worked in the plant would be

14   working on CVT when that occurred.

15        Q.    It was understood at that time in '98

16   and '99 that CVT was the future of the plant?

17        A.    Yes.

18        Q.    And it still is?

19             MR. VANWAY:  Objection.  Answer to the

20   extent you know.

21        A.    I don't know what has happened since I

22   left the plant.

23        Q.    Well, have you communicated from time

24   to time with people who are still at the plant in

1    Batavia?

2          A.    Yes.

3          Q.    I mean, having -- not directly having

4    to do with this case as well, right?

5          A.    On occasion, yes.

6          Q.    All right.  Who do you still talk to?

7          A.    Hassan Saleh is a friend of mine.

8          Q.    Anybody else in particular?

9          A.    Other than as -- as with respect to

10   this case, not that I can recall.

11         Q.    All right.

12         A.    Not that currently work at Batavia, at

13   least.

14         Q.    Well, have you talked to Mr. Saleh

15   about this case outside the presence of your

16   lawyers?

17         A.    No, other than -- other than the fact

18   that the case is -- exists.

19         Q.    Other than a conversation with

20   Mr. Saleh about the lawsuit, have you talked to

21   Mr. Saleh about -- strike that.

22               Has Mr. Saleh communicated to you,

23   perhaps before this lawsuit was filed, concerns

24   that the salaried employees had that ZF Batavia was

1    taking away benefits that they had promised in '99?

2         A.    Not that I recall, no.

3         Q.    I mean, did he communicate any kind of

4    discontent among the salaried workforce,

5    specifically the Ford transitional employees before

6    this lawsuit was filed?

7         A.    Yes.

8         Q.    What did he tell you?  When did he

9    tell you?

10        A.    Well, he indicated to -- to me that

11   salaried employees were -- were disappointed in --

12   some salaried employees were disappointed in the

13   way that the JV was developing, words to that

14   effect.

15        Q.    Was this last year, 2001?  Do you

16   recall?

17        A.    I don't recall.

18        Q.    But you understood -- you recall it

19   being before this lawsuit was filed, which I'll

20   tell you was filed in June of last year?

21        A.    I -- I don't know, then, the dates of

22   it.

23        Q.    You believe your conversation with

24   Mr. Saleh took place before you heard about the

1    lawsuit?

2          A.    As far as I know, yes.

3          Q.    Did he name names, as far as salaried

4    employees that were upset?

5          A.    Not that I recall.

6          Q.    What did he mean or what do you mean

7    when you say that they were upset about the

8    direction of the JV?

9          A.    That the -- they felt the management

10   of the JV was not to their liking.

11         Q.    He must have provided more details

12   than that.

13         A.    That the assignments, the way the

14   organization was developing was perhaps not as it

15   would have been, had the plant remained a Ford

16   plant --

17         Q.    Were there complaints --

18         A.    -- essentially.

19         Q.    Were there complaints about individual

20   managers in ZF Batavia, like Len Sennish?

21         A.    I heard of complaints about Len

22   Sennish, yes.

23         Q.    That he was -- complaints that he was

24   a bit heavy-handed with the salaried employees?

1          A.     I have heard that, yes.

2          Q.     Okay.  Complaints made by Dick Newark?

3          A.     Not that I recall specifically.

4          Q.     Any examples, Mr. Warden, of where

5     people -- that had been forwarded to you by

6     Mr. Saleh or perhaps others about Mr. Sennish being

7     a bit heavy-handed with the salaried employees?

8          A.     Examples?  Not that I recall.

9          Q.     Generally you had heard that

10    description or something like that attributed to

11    Mr. Sennish?

12         A.     Yes.

13         Q.     Was that a concern to you?

14         A.     Well, the -- as a concern, I would be

15    concerned if -- if employees were dissatisfied with

16    their -- with their management or with their HR

17    manager, regardless of who it might be.

18         Q.     I realize you were in Batavia a short

19    time, but did you kind of -- did you continue to

20    have an interest even -- after you left in 2000,

21    did you have an interest in seeing that the

22    transition worked out the best possible at ZF

23    Batavia?

24         A.     Yes.

```
 1        Q.    And you also -- you were part of

 2   numerous meetings with salaried employees and

 3   perhaps individual meetings that salaried employees

 4   that joined ZF Batavia -- I mean, was it important

 5   to you that what had been promised to them would

 6   actually occur at the plant after you left?

 7              MR. VANWAY:  Objection.  Form,

 8   foundation.

 9        A.    Would you restate the question,

10   please?

11        Q.    Yeah, sure.  During your conversation

12   with salaried employees as part of group

13   meetings -- I mean, there were a lot of statements

14   made about here's how your employment is going to

15   be at ZF Batavia, right?

16        A.    There were discussions about what the

17   initial compensation and benefits would be at -- at

18   ZF Batavia, yes.

19        Q.    Okay.  And those -- and there was a

20   package of compensation and benefits that were put

21   together that is summarized in Exhibit 2, which is

22   the gray, tri-fold brochure, right?

23        A.    Exhibit 2 is the summary that I'm

24   familiar with, yes.
```

```
 1          Q.     Okay.  And you know that in this

 2    summary brochure, it said that authorized overtime

 3    will be paid, right?

 4          A.     Let me refer to it --

 5          Q.     Sure.

 6          A.     -- what it says.

 7          Q.     Upper left-hand corner, third line.

 8          A.     Third line?

 9          Q.     Under where it says "salary."

10          A.     It says "authorized overtime will be

11    paid."

12          Q.     And that's consistent with what you

13    recall people being told during these informational

14    meetings, right?

15          A.     As far as I recall, authorized,

16    scheduled and worked overtime was to be paid

17    initially.

18          Q.     That's how it was at Ford at the plant

19    in '99 before the transition, right?

20          A.     Yes.

21          Q.     And people were told in the meetings

22    that you attended, the salaried employees were told

23    you're going to be paid overtime like you were at

24    Ford?
```

1          A.     That was the impression that was

2     given.  However, there were no guarantees that

3     there would never be any changes to any

4     authorized -- to any compensation or benefit plans,

5     just as there's no guarantees at Ford that there

6     would be no changes to compensation and benefit

7     plans.

8          Q.     So you're saying like at the May 27th,

9     1999 meeting, Mr. Kehr, he spoke at the meeting,

10    right?

11         A.     Yes.

12         Q.     He never made -- he never said

13    authorized overtime will be guaranteed while you're

14    an employee at ZF Batavia, right?

15         A.     No.  Had he said that, I would have --

16    I would have intervened.

17         Q.     I mean, did he -- but -- so it's

18    significant to you that he never used those words,

19    this is guaranteed.  This is always going to be

20    forever, right?

21         A.     Please -- I didn't understand the

22    question.

23         Q.     People were given the impression, you

24    said, that the authorized scheduled, worked

1    overtime would be paid, just as they were at Ford,

2    right?  That was the impression given?

3         A.    Under the terms of this summary, yes.

4         Q.    And that's what was also told at the

5    May 27th meeting, among others?

6         A.    Under the terms -- under the terms of

7    the benefits plans and compensation plans, yes.

8         Q.    Okay.  And -- I mean, Mr. Kehr never

9    said like during the May 27th meeting, Hey, you all

10   understand here that this is subject to change

11   whenever we want?  This is just what it's going to

12   be initially, but if we want to change this next

13   year, we're going to do that.  Did Mr. Kehr say

14   anything like that at the May 27th meeting?

15        A.    I don't know if he did or not.

16   However, had there been a statement guaranteeing

17   this overtime, as an attendee of the meeting and

18   knowing what I know about company's rights and

19   practices with respect to compensation and

20   benefits, I would have corrected that.

21        Q.    Okay.  You personally didn't draft

22   Exhibit 2, right?

23        A.    I -- I did review Exhibit 2 before it

24   was finalized.

1          Q.      Okay.  There's a paragraph in the

2     lower right that begins, "This brochure includes

3     only the key features of the ZF Batavia benefits

4     plans."  Do you see that paragraph I'm referring

5     to?

6          A.      Yes.

7          Q.      Do you know, did you author that

8     paragraph?

9          A.      I had input to that -- that paragraph,

10    yes, and I did -- and I did make a recommendation

11    in that paragraph.

12         Q.      Okay.  Who else was involved in

13    authoring that paragraph or contributing to that

14    paragraph?

15         A.      The person who reviewed the draft with

16    me was Tony DeShaw.

17         Q.      Did Tony DeShaw write it?

18         A.      I don't know.

19         Q.      So you and Tony DeShaw reviewed this

20    language that we're referring to?

21         A.      I -- I reviewed -- I reviewed the

22    document at his request.

23         Q.      Okay.  And what recommendation did you

24    make for any language in this document, not just

1    the language in the last paragraph in the lower

2    right-hand column, but any of it that you recall?

3         A.    The recommendations that I made had to

4    do with how wording was so that it would be

5    understandable.  When I reviewed it, there were

6    some -- and I don't recall the exact specifics in

7    the plan descriptions that are here.

8              But -- but there were some things that

9    when I reviewed it, I didn't understand.  So I

10   asked questions about what does that mean, and then

11   recommended some minor wording changes that I -- I

12   believed would help to clarify what it meant.

13        Q.    As you sit here today, can you recall

14   any specific language in here that you know is your

15   contribution?

16        A.    One specific statement that was my

17   contribution was that I recommended that a

18   statement be placed in the brochure that said the

19   plans are subject to change.

20        Q.    All right.  And you see where it says

21   "ZF Batavia benefits plans" in the same paragraph?

22   Right -- let me just -- it says in the first

23   sentence, "This brochure includes one of the key

24   features of the ZF Batavia benefits plans as

1    applicable to active Ford employees."

2          A.    Yes, I see that.

3          Q.    Okay.

4          A.    That's the first two lines.

5          Q.    And then it refers to -- in the second

6    sentence, it refers to summary plan descriptions.

7    Do you see that there?

8          A.    Yes.

9          Q.    So certain of these benefits --

10   there's benefit plans that are reflected in actual

11   plan documents and summary plan descriptions,

12   right?

13         A.    Yes, that's what it says.

14         Q.    Like 401K has a benefit -- has plan

15   documents, right?

16         A.    Yes.

17         Q.    401K has a summary plan description?

18         A.    Yes.  I presume that ZF Batavia's

19   does.

20         Q.    I mean, that's standard among -- in

21   HR --

22         A.    In my experience, yes.

23         Q.    -- to have -- in fact, it's required

24   by law, right?

```
 1            A.    As far as I know.

 2            Q.    Same thing, if you look at the left-

 3    hand column, you have some medical benefits listed

 4    there or described, right?

 5            A.    In the left-hand column,

 6    medical-dental employee contribution rates, is that

 7    what --

 8            Q.    Yes, yes.

 9            A.    -- you're referring to?

10            Q.    Yes --

11            A.    Yes.

12            Q.    -- indeed.  And those also are reduced

13    to summary plan descriptions?

14            A.    As far as I know, they are.

15            Q.    All right.  Certain -- all right.  So

16    when you're referring to benefit plans in that

17    first sentence, and then later referring to plans

18    described are subject to change, you were referring

19    to those items here that can be reduced to a

20    summary plan description or a plan document, right?

21            A.    No.

22            Q.    Why not?

23            A.    "Plans described here are subject to

24    change" applies to the entire document.
```

77

1          Q.     Okay.  It's your testimony that a

2     merit increase program is a plan?

3          A.     Yes.

4          Q.     Is a merit increase program reduced to

5     a summary plan description?

6          A.     It has the -- the merit increase

7     programs have a longer description than -- than a

8     simple summary, so yes.

9          Q.     But merit increase is reduced to a

10    summary plan?  I'm sorry.  That was your testimony?

11         A.     It's -- a merit increase plan has

12    longer verbiage in the entire plan than it -- than

13    these simple highlights that are -- that are

14    included in a summary like this.

15         Q.     Okay.  All right.  Things like merit

16    increase program, unlike the health benefits, they

17    don't have that same kind of summary plan

18    description, right?

19         A.     I think you'd have to ask your

20    question differently because --

21         Q.     You're familiar with the law ERISA,

22    right?

23         A.     To some extent.

24         Q.     I mean, I understand you're not a

1     lawyer.  But working in HR all these years, you've

2     had to, perhaps unfortunately, gained some

3     familiarity with that law?

4          A.     Deal -- deal with ERISA to some

5     extent, yes.

6          Q.     Okay.  And you know that those plans

7     subject to ERISA have to have these summary plan

8     descriptions?

9          A.     Yes.

10         Q.     And we could -- I don't even think I

11    have them here, but I mean they -- these plans even

12    say "summary plan description" on those documents,

13    right?

14         A.     I don't know.

15         Q.     Well, all right.  The merit increase

16    program is different than something like the

17    medical health benefits that has the summary plan

18    description, right?

19         A.     A merit increase plan has to do

20    with -- with salaries.  What was the other example

21    you gave?

22         Q.     Medical benefits.

23         A.     Medical benefits have to do with --

24    with the terms and conditions for payment by the

1    insurance company or the -- or the company for

2    medical services.  They're two different plans.

3         Q.    Okay.  That's all right.  Any other --

4    any other particular language in Exhibit 2 that you

5    recall was your contribution?

6         A.    Not specifically.  I don't recall.

7         Q.    Okay.  Generally your goal in

8    reviewing that with Mr. DeShaw was to make the

9    brochure more readable?

10        A.    I -- when I reviewed it, I had two --

11   two things that I was concerned about.  One was

12   that it be understandable; the other was that it

13   specifically state that the -- that compensation

14   and benefit plans -- that benefit plans, which I --

15   I include compensation as a benefit of employees,

16   would not -- it would not leave the impression in

17   the document that those were static.  Because of my

18   experience with Ford Motor Company, I know that

19   they are not.

20        Q.    Okay.  You don't remember Karl Kehr

21   saying in that May 27th meeting plans that I'm

22   describing here today are subject to change, do

23   you?

24        A.    I don't recall.

1          Q.     I mean, you don't recall him saying

2     anything along those lines, this is subject to

3     change, it can change whenever we want, anything

4     like that?

5          A.     I don't remember specific words that

6     Karl Kehr used in a presentation, no.

7          Q.     Or any other kind of disclaimer.  You

8     don't recall him or any of the other speakers

9     making that at that meeting?

10          A.     Again, I don't recall the specific

11     words of any specific speaker at that meeting.

12     So --

13          Q.     Okay.

14          A.     -- no, I do not.

15          Q.     I meant someone said that Karl Kehr

16     and any of the other speakers at the May 27th

17     meeting, they never said anything that these

18     benefits were subject to change.  If someone said

19     that, you couldn't actually contradict it?

20          A.     No.

21          Q.     You agree, right?

22          A.     I agree.

23          Q.     Okay.  I actually have one more

24     question about Exhibit 66, the e-mail in front of

1   you.  Let's see.  Let me just find the line here.

2   All right.

3              Well, on the second page of the

4   e-mail, do you see where you have like some bullet

5   points or they're dashes.  It says, "Salaried

6   employees may not transfer out of Batavia for the

7   next 6 months."  Do you see that line there?

8        A.    Which -- which of the sub-bullets is

9   it?

10       Q.    It's -- well, it's -- of the -- we'll

11   call it the dashes.  It's the one, two, three,

12   four -- sixth dash, begins "Salaried employees may

13   not transfer out of."

14       A.    Yes.

15       Q.    Okay.  And that is, in fact, what you

16   were communicating to the employees at that time?

17       A.    Yes.

18       Q.    All right.  Which is what you

19   testified earlier, you thought it was about a

20   six-month freeze?

21       A.    Yes.

22       Q.    All right.  We're done with Exhibit

23   66.  Hand that to Mr. VanWay, if you like.  Let's

24   see.  Need the court reporter to have the originals

1    here.  That's important.  All right.  This is

2    Exhibit 67.  Tell me when you're done reading.

3           A.    Oh, I have read it.

4           Q.    My question, this again, this e-mail

5    apparently is from Cindy Kreis to all the salaried

6    employees at the Batavia plant on November 16th,

7    '98; is that right?

8           A.    Yes.

9           Q.    And what was Cindy's -- Kreis'

10   position at the time, as you recall?

11          A.    Cindy worked in my department and

12   Cindy had responsibility for communications in the

13   plant --

14          Q.    All right.

15          A.    -- among other duties.

16          Q.    Again, this e-mail confirms what we

17   discussed just a moment ago that the salaried

18   employees were told that there was a six-month

19   freeze to being transferred out of the Batavia

20   plant within Ford from October '98 to April '99,

21   correct?

22          A.    Yes, a six-month moratorium on

23   salary --

24          Q.    Okay.

1          A.     -- transfers.

2          Q.     All right.  You can put that one

3     aside.  This is 68.  Have you had a chance to

4     review that?

5          A.     Yes.

6          Q.     And this is an e-mail that you sent on

7     November 19th, 1998 to Mr. Faistenhammer and other

8     people in the Ford organization?

9          A.     Yes.

10         Q.     Okay.  If I understand right, and I

11    think we have some of these documents, you had a

12    question and answer session with the salaried

13    employees; is that right, before this date?

14         A.     I -- we had a -- we had a number of

15    question and answer sessions and I believe that

16    there were some before that date, yes.

17         Q.     Okay.  And there were concerns that

18    people weren't getting the answers to their

19    questions in writing.  Is that the concern you were

20    hearing from salaried employees?

21         A.     That was one of the concerns

22    expressed, yes.

23         Q.     Okay.  And what you understood they

24    wanted in writing, they wanted to know specifically

1    what was going to happen if they joined ZF Batavia,

2    what was going to become of them, right?

3         A.    Among other things, that was -- that

4    was one of the things that the employees were

5    concerned about.

6         Q.    All right.  So you certainly

7    understood when -- during your conversations and

8    meetings with management about putting together a

9    package of compensation and benefits for the ZF

10   Batavia prospective employees from Ford, that this

11   all needed to be put in writing to satisfy them,

12   right?

13        A.    That was the -- that was the request

14   from the employees.

15        Q.    All right.  Right.  For instance,

16   Exhibit 2, which I said we'll come back to from

17   time to time, the tri-fold, gray brochure, you

18   understood certainly, based on the concerns you

19   heard from salaried employees, that it was

20   important that you explain what their package of

21   compensation and benefits at ZF Batavia would be by

22   putting them in writing?

23        A.    Yes.  I -- I felt it was important

24   that when we made offers to salaried employees,

1    that they -- that they have some reference as to

2    what their initial compensation and benefits would

3    be.  The -- but this -- at the time of this e-mail,

4    their -- we knew -- we didn't know anything about

5    what the --

6           Q.    Right.

7           A.    -- compensation and benefits would be.

8    That was -- that was part of the reasons, as I

9    testified before, for the level of concern that

10   I -- I believed was in the plant at the time.

11          Q.    Okay.

12          A.    And it was very difficult to get some

13   salaried employees to understand that it takes time

14   to develop such -- such a process.

15          Q.    Looking at your last sentence,

16   Mr. Warden, you write in parenthesis, "(I don't

17   like to think about the consequences....the

18   reference to the hourly employees' status is

19   clear)."  What did you mean by that, if you recall?

20          A.    Well, I -- I did not know who

21   submitted this, these questions.  And -- and I did

22   have some concern that if -- if the uncertainty

23   continued, that there could be a salary-organizing

24   drive among those employees who would be eligible

1    to be union employees.

2         Q.    Okay.  You thought that this might

3    lead to your having to deal with another union at

4    the plant other than the UAW, right?

5         A.    I didn't think in those terms, no.

6         Q.    Well, you thought they might organize

7    as a union?

8         A.    There might -- yeah, there could be a

9    union-organizing drive.

10         Q.    Okay.  Put that one aside.

11    Mr. Warden, this is a handwritten note from the

12    same date.  If it helps you to look at the previous

13    e-mail, go ahead.  Might cover some of the same

14    material.

15               (Exhibit 69.)

16         A.    Okay.  I've read it.

17         Q.    Just one moment here.  What's this?

18    Are these your handwritten notes?

19         A.    No.

20         Q.    Any idea who --

21         A.    No.

22         Q.    Any idea whether these notes are

23    referring to a meeting that you attended?

24         A.    I don't know.

1          Q.    Do you know what these notes mean at

2     all?

3          A.    Only if I speculated.  I do not know

4     what the person who wrote these notes meant by the

5     notes.

6          Q.    Well, let's speculate a little bit.

7     Who do you think may have written this handwritten

8     note, based on what you see here?

9          A.    I have no idea who wrote this.

10         Q.    Okay.  It has something to do with

11    communicating with the salaried employees at the

12    plant, right?

13         A.    I -- I don't know if this has anything

14    to do with communicating with salaried employees.

15         Q.    Okay.  Do you see where it says in the

16    middle of the page "sign any agreement"?

17         A.    Yes.

18         Q.    Do you, based on because you were

19    there at the time, even though you're not sure who

20    wrote this note, do you have any idea what that

21    might be referring to?

22         A.    I don't know if I was there at the

23    time.

24         Q.    Oh, I just mean you were at the plant

1    at the time.

2          A.    I was at the plant at the time.

3          Q.    Yeah, but you don't know what that

4    line means?

5          A.    No.

6          Q.    Move on to the next one.  This one was

7    already made an Exhibit 11 at an earlier

8    deposition.  Sorry I broke with tradition there.

9                MR. VANWAY:  Killing more trees.

10         A.    Okay.

11         Q.    This is a memo dated December 1st,

12   1998 that was distributed to all the Batavia

13   salaried employees, right?

14         A.    Yes.

15         Q.    And did you author this?

16         A.    I authored the -- the language and I

17   believe I had it reviewed as well.

18         Q.    Who would have reviewed it?

19         A.    I would have sent it to a person named

20   Ed Thompson at power train operations.

21         Q.    What was Mr. Thompson's position?

22         A.    Mr. Thompson was a salaried -- was a

23   human resources associate in power train

24   operations.  I believe that I -- that I did send

1    this to power train operations before it was

2    published.

3        Q.    Okay.

4        A.    Not certain of that, but I believe I

5    did.

6        Q.    Was that the procedure for any formal

7    written communication you sent to salaried

8    employees, that you had to send it to Mr. Thompson?

9        A.    No.

10       Q.    Why did you send Mr. Thompson, you

11   believe, this document?

12       A.    Because I would have been concerned

13   about -- to make sure that what I was saying here

14   was -- was accurate as to what people knew, what

15   people knew at the time.

16       Q.    The people knew at the time that you

17   sent this?

18       A.    Yes.

19       Q.    Well, is all the information here

20   accurate?

21       A.    It's -- it's accurate for December

22   1st, 1998.

23       Q.    Okay.  Did concerns, things that are

24   said here, did they change after December 1st,

1    1998?  I just say that because you qualified your

2    answer by saying it was accurate December 1st --

3         A.    Yeah.

4         Q.    -- 1998?

5         A.    Yeah, some things did change.  I don't

6    know if they're referred to in this -- in this

7    letter specifically.  But what we knew in December

8    of 1998 was different as time went on and -- and

9    the benefits and compensation plans were -- were

10   developed and finalized and up until the time that

11   the joint venture agreement was signed by the two

12   parties.

13        Q.    The document references Sharonville,

14   which we've talked about.  The people who were not

15   offered jobs that were at the Batavia plant who

16   were salaried, they weren't offered positions to

17   continue with the joint venture, did some of them

18   go to Sharonville?

19        A.    They may have, yes.

20        Q.    Okay.  And some of those people may

21   have been people who were designated as not being

22   very good performers?

23        A.    I don't know the answer to that.  I'd

24   have to -- I'd have to see the individual's

1    records.

2        Q.    Okay.  Certain people who were not

3    offered jobs to go to the ZF -- to join ZF Batavia

4    in '99 were people who it was determined were not

5    good performers?

6        A.    I can't say that specifically.

7        Q.    Okay.  Well, can you say it generally?

8        A.    Well, the -- the people that were made

9    offers originally were people who were interested

10    in -- in being considered for the joint venture

11    first.  So there were -- there were good -- better

12    performers and lesser performers in that -- in that

13    group.

14        There also were better performers and

15    lesser performers in those who said, I don't even

16    want to be considered.  Don't make me an offer.

17        Q.    Okay.

18        A.    So -- so it's very difficult for me to

19    say, unless I could see a specific individual's

20    record, whether or not they were a better performer

21    or a lesser performer.

22        Q.    When you had talked to Mr. Saleh, you

23    said about concerns among the salaried workforce,

24    were some of the concerns that things that were

1  stated in the glossy, gray, tri-fold brochure that

2  is Exhibit 2, that some of those things were being

3  taken away from the salaried employees in 2001 and

4  2002?

5      A.     Not that I recall.

6      Q.     You don't recall him -- there were any

7  concerns about the overtime policy?

8      A.     I -- I'm aware that there are -- that

9  there are concerns about the overtime policy

10  through this -- through these proceedings.

11      Q.     Okay.  Mr. Saleh hasn't communicated

12  that to you?

13      A.     I don't believe he did, no.

14      Q.     Did he communicate any concerns about

15  personal days being taken away?

16      A.     No.  I -- I don't believe he mentioned

17  any specific benefits or compensation.

18      Q.     Did he mention concern with the Ford

19  transitionals, that they weren't being involved in

20  the CVT?

21      A.     There were concerns about -- that he

22  expressed to me about the development of the CVT,

23  that the -- that there were issues with the

24  transmission.

93

1        Q.    Did Mr. Saleh or someone else at the

2    plant communicate to you that the Ford transitional

3    employees were concerned that certain people in

4    upper management had a negative view of Ford

5    employees?

6        A.    Whether Mr. Saleh told me that

7    specifically, I don't recall.  But I -- I did hear

8    that, yes.

9        Q.    Was that a concern to you?

10       A.    It's a concern to me if employees

11   are -- are dissatisfied with their -- with their

12   employment, yes, in general.

13       Q.    I mean, was it a concern to you

14   specifically that you were part of the group that

15   told Ford transitionals about what their future

16   would be like at ZF Batavia, and then people are

17   reporting back to you through whatever channels

18   that the people at ZF Batavia have a bias against

19   Ford employees?  Was that a specific concern?

20       A.    Please -- please ask that question

21   again --

22       Q.    That's fair.

23       A.    -- maybe in parts.

24       Q.    Yeah, that's fair.  I mean, in the

94

1    meetings that you attended in '98, '99, no one ever

2    said that -- no one ever made statements that

3    reflected a bias against Ford employees, did they?

4         A.    No.

5         Q.    And so you can understand why we'd be

6    concerned with someone after they joined the joint

7    venture, that there's a perceived bias against Ford

8    employees, right?

9         A.    If they had that perception, yes.

10         Q.    Okay.  Do you understand that

11    perception to be true?

12         A.    I -- I do not because I don't know

13    the -- what actually is happening in the joint

14    venture at this time, other than from these

15    proceedings.  So I -- I have no firsthand knowledge

16    of that.

17         Q.    Okay.  You don't have to actually read

18    this entire set of documents, but I will -- you may

19    if you wish.  This is 70 and 71.  This is 70.

20    That's 70.  This is 71.  Take as much time as you

21    need to familiarize yourself with the document.

22    I'm just going to ask you just generally where

23    these documents came from.

24         A.    Okay.  I'm familiar with this

1    document --

2         Q.    Okay.

3         A.    -- without reading it at the moment.

4    That's -- meaning 70.  71 I believe I have seen

5    before, yes.

6         Q.    Okay.  Well, maybe I should -- let's

7    see.  Which -- I'm not sure which one came first

8    here, which was the document, Deposition 71.

9    That's the one that says "Questions Submitted For

10   Salaried Employee Information Meeting."  And for

11   the record, 71 is a multi-page affair, starting

12   with Ford Bates stamp 1377 through 1394.

13   Deposition Exhibit 70 is Ford's 1368 through 1376.

14             Where did the questions come from in

15   Deposition Exhibit 71, to your understanding?

16        A.    In 71, the -- the questions were

17   submitted to -- actually Cindy Kreis collected

18   questions from employees so that we could

19   understand what the concerns and -- and issues of

20   employees might be and try to answer them to the

21   best of our ability.

22        Q.    And so it's your understanding that

23   starting with -- let's see.  -- Bates stamp

24   document 1391 of Exhibit 71, that that's where the

1   answers begin to these questions?

2       A.    Draft answers.

3       Q.    Draft answers?

4       A.    And as far as I know, they do relate

5   to these questions, yes.

6       Q.    And would've Exhibit 71 been

7   distributed to salaried employees?

8       A.    It may have been.

9       Q.    Is there anything that would help you

10  to know one way or the other?

11      A.    There was a -- there were -- was one

12  set of questions and I don't know if it was 71 that

13  I wrote draft answers to, submitted them to power

14  train operations HR for review and finalization

15  previous to a meeting that was to be held at

16  Batavia by Ford HR employees to speak specifically

17  about Ford salaried employee concerns --

18      Q.    Okay.

19      A.    -- and this may have been those

20  questions, but I'm not certain of that.

21      Q.    All right.  Certainly Exhibit 70,

22  which is -- it's titled, "You Ask & We Answer."

23  This is something that was distributed to the

24  salaried employees?

97

1          A.    I believe it would have been, yes.

2          Q.    And so all that information in Exhibit

3    70 is certainly is -- was accurate at the time?

4          A.    To the best of my knowledge, at -- at

5    the time, this -- the answers in this Exhibit 70

6    would have been correct for the period of time that

7    it was -- that it was published, December 3rd,

8    1998.

9          Q.    Okay.  And certainly you did your best

10   to give the salaried employees only the most

11   truthful information, right?

12         A.    As I knew it, yes.

13         Q.    And you certainly understood they were

14   entitled to truthful, accurate information about

15   their decision to join ZF Batavia?

16         A.    Yes.

17         Q.    I mean, there's nothing that you

18   certainly would have intentionally not told them,

19   right?

20         A.    No, there is not.

21         Q.    Okay.  Exhibit 71, I don't think I

22   asked.  But that's, to your understanding, the

23   answers to the questions that we briefly

24   referenced, those -- you certainly would have

1   expected those answers to be accurate at the time

2   they were written?

3        A.    At the time I wrote them, they were my

4   understanding.  I -- I -- but my draft was reviewed

5   at power train operations HR and I don't recall

6   whether or not it was changed.

7        Q.    Okay.  Did Deposition Exhibit 70, the

8   other one, is that also one that you would have

9   written, sent to power train for review and then

10  was produced as the newsletter?

11       A.    Yes.

12       Q.    I don't know if it's clear from here.

13  Do you know if Deposition Exhibit 70 is the final

14  draft exhibit -- what's the exhibit?  -- of Exhibit

15  71?

16       A.    I do not.

17       Q.    Let's see.  This is Exhibit 72.

18       A.    Are we finished with these?

19       Q.    Yes, yes.  Please hand those to your

20  attorney or give them to the court reporter, even

21  better.  Off the record for a second.

22       (Off the record:  10:28 a.m. - 10:29 a.m.)

23       (Rick Ervin entered the room.)

24       Q.    All right.  Have you had a chance to

99

```
 1   read Deposition Exhibit 72?

 2        A.    I'm reading it now.

 3        Q.    Sure.  Take your time.

 4        A.    Yes, I've read it.

 5        Q.    All right.  This document reflects, I

 6   guess, a proposed memo that was to be sent to the

 7   salaried employees at the Batavia plant regarding

 8   the status of the transition, right?

 9        A.    That's how I read it, yeah.

10        Q.    And apparently -- does it refresh your

11   recollection at all where it says that Dave Adams

12   is requesting this timing so that the letter

13   precedes his planned discussions next week with

14   salaried employees in Batavia?  Do you see that

15   line there?

16        A.    Yes.

17        Q.    Do you recall such a meeting that

18   Mr. Adams had at the plant?

19        A.    Yes, I recall that there was such a

20   meeting.

21        Q.    And was that sometime in December, I

22   guess?

23        A.    Yes.  It was scheduled for the

24   following week after this memo.
```

 1          Q.     Do you remember who attended that

 2     meeting?  Was this all salaried employees in the

 3     plant had this meeting with Mr. Adams, do you

 4     recall?

 5          A.     I -- I do not recall.

 6          Q.     Okay.

 7          A.     And I do not believe that I was at

 8     that meeting.

 9          Q.     Okay.  The memo comes from

10     Mr. Faistenhammer, but you've reviewed it.  Does it

11     appear to have all the accurate information?

12          A.     As far as I knew the information at

13     that time, yes.

14          Q.     Okay.  This is 73.

15          A.     This?

16          Q.     Yeah.

17          A.     Is there a second page?

18          Q.     I don't have one.  I'm not sure the

19     next sequential document that was produced is the

20     second page.  I assume it doesn't because I would

21     have otherwise brought it.

22                 In any event, this e-mail that is

23     Exhibit 73 is at least part of an e-mail that you

24     sent on February 4th, 1999, right?

1          A.    Yes.

2          Q.    You were again explaining the

3    situation regarding the salaried employees at

4    Batavia, right?

5          A.    As I understood it, yes.

6          Q.    And then from -- I realize it looks

7    like part of the e-mail is missing, but as far as

8    what you wrote there, that appears to be accurate,

9    what was going on at the time?

10         A.    Yes, as far as I understood it.

11         Q.    All right.  And it's true that the

12   salaried employees did not have a high trust level,

13   that any offers from the JV will be competitive

14   with Ford compensation and benefits.  That was

15   true, right?

16         A.    Yes.  It's -- as I testified

17   previously, there had not at that point been a

18   finalized compensation and benefits program

19   developed and put into place.  So, yes, there

20   continued to be concerns from salaried employees as

21   to what would be contained in that.

22         Q.    All right.  And you also mention in

23   this last full paragraph there, you write, "A visit

24   by senior HR people to talk with them would help,"

1   right?

2         A.     Yes.

3         Q.     And you were talking about Ford HR

4   people, right?

5         A.     Yes.

6         Q.     Why was that?

7         A.     Because the -- all employees were Ford

8   employees at that time.  I say that because I -- I

9   don't recall that at that time we had -- we would

10  have hired any JV employees, don't believe we had

11  because we didn't have a way to pay them.  So I'm

12  pretty confident that that's true.

13        The -- and employees -- a number of

14  employees didn't want to stay in the JV, but they

15  wanted to remain Ford salaried employees.  And so

16  they were concerned about the process for

17  transfers.  And they were -- they were still

18  concerned at this point about the freeze.  They --

19  and then how metering to other locations would

20  occur, those kinds of concerns.

21        Q.     All right.  And you actually hadn't

22  been in the plant very long at that time, right?

23        A.     Not very long, no.

24        Q.     And you thought that these salaried

1   employees who had been with Ford at least some

2   period of time wanted to hear from other Ford HR

3   people who they -- who they knew better?

4         A.    Yes.  Well, I -- the problem was that

5   the HR people in the plant, the Ford HR people in

6   the plant, we had responsibility for Ford HR in the

7   plant.  We did not -- we did not have firsthand

8   knowledge of where other openings might occur, what

9   a -- an agreed process would be for transferring

10  people out of the plant and those kinds of things

11  because they had to come from the power train

12  operations organization and perhaps the

13  manufacturing HR organization so that it could be

14  accomplished in -- in a way that would be

15  beneficial for the Batavia Ford employees.

16        Q.    All right.  Now, people -- you

17  understood that at this time in February '99, that

18  Ford was going to be a -- was going to be a

19  minority owner of the joint venture, right?

20        A.    I believe that I knew that at that

21  time, yes.

22        Q.    49 percent for Ford and 51 percent for

23  ZF --

24        A.    Yes.

1          Q.    -- right?  And you believe that it

2    was -- one reason it was important to have Ford

3    people come down to talk to the people was to

4    reassure them that Ford was going to continue to be

5    interested in the plant and for Ford generally to

6    give the salaried employees some reassurances about

7    what would happen when they were joining this new

8    joint venture?

9          A.    The purpose of this memo was to

10    request that Ford HR people come to Batavia to help

11    the Ford salaried employees to understand the

12    processes that were being developed that would be

13    applicable to Ford salaried employees.  Whether --

14    and -- and that that did include that they would --

15    that they would have the option of remaining Ford

16    salaried employees and not accepting an offer

17    from -- from the JV, if one was forthcoming --

18    forthcoming.

19          Q.    Okay.  I think we're done with that

20    one.  This is 74.

21          A.    This is the same memo, correct?

22          Q.    Whoops, it may be.  One second.  It

23    very well may be.  Let's -- let me take that one

24    back for a minute and we'll redesignate 74.

1                All right.  We are actually moving

2      forward chronologically.  Mr. Warden, this is

3      Exhibit 74.  This is an e-mail that's 74.  We're

4      withdrawing the designation 74 and the other

5      document.  This document is Bates stamped Ford 734

6      will be Deposition Exhibit 74, I think.

7           A.     Okay.  I've read it.

8           Q.     One second here.  Is this an e-mail

9      that you sent to Mr. Quinlan an March 2nd, '99?

10          A.     Mr. Quinlan and Mr. Hartman.

11          Q.     Okay.  Is the information that you

12     reported there accurate --

13          A.     Yes.

14          Q.     -- as you understood it at the time?

15          A.     Yes, accurate as I understood it at

16     the time.

17          Q.     So it's safe to say as late as March

18     2nd, 1999, there still was lots of uncertainty,

19     fear among the salaried workforce at the plant what

20     was going to happen to them?

21          A.     In my view, there was.

22          Q.     Take as much time as you need to

23     review these, Mr. Warden.  These are a series of

24     e-mail on March 3rd, 1999.  See if your name is on

1   here.

2              (Exhibit 75.)

3        A.    I've read it.

4        Q.    Mr. Warden, you didn't draft these

5   e-mails, but maybe you can help me.  The e-mail on

6   the bottom from Richard Bair, do you see that?

7        A.    Yes.

8        Q.    Who is Richard Bair?

9        A.    He was the operations manager for

10  transmission operations in power train.

11       Q.    Was he located in Batavia or not

12  Batavia?

13       A.    He -- he was located in Dearborn.

14       Q.    Okay.  And is Mr. Bair reporting the

15  situation at the Batavia plant?

16       A.    I am not familiar with this.  I --

17  it -- it would appear from my reading of it that he

18  was reporting some information that he heard from

19  salaried people at Batavia during a visit at

20  Batavia.  That would be my take on what I just

21  read.

22       Q.    And the comments that he lists in his

23  e-mail, are those some of same comments you had

24  heard, perhaps not specifically, but generally?

1          A.    A general flavor of the -- of the

2    kinds of comments that I had heard.

3               MR. SIMON:  Okay.  Done with that one.

4    Actually probably you want to take a quick break?

5               THE WITNESS:  Yeah.

6         (Off the record:  10:45 a.m. - 10:58 a.m.)

7         (Rick Ervin entered the room.)

8          Q.    All right.  13 and 14, these are just

9    two e-mails a day apart or a series of e-mail.  If

10   you want to read them both first, then I'll ask you

11   questions, that's fine.  Take your time.

12         A.    Okay.

13              MR. HUNTER:  Steve, while Mike is

14   looking at that, I would point out that Exhibit 12

15   is actually an exhibit used before with a second

16   page on it.  It was missing the other page --

17              MR. SIMON:  Ah-huh.

18              MR. HUNTER:  -- so --

19              MR. SIMON:  Good detective work there.

20              MR. HUNTER:  -- for what it's worth.

21              MR. SIMON:  Well, let's go back and --

22   off the record for a second.

23         (Off the record:  11:00 a.m. - 11:01 a.m.)

24         A.    Okay.  Do you want me to read 12 as

1    well?

2         Q.    Well, just for the record, that

3    Exhibit 12 is the first page of an e-mail that you

4    saw before.  And you recall we had a discussion,

5    where's the second page.  In fact, the second page

6    is in front of you.  That's Exhibit 12.  So, for

7    the record, we'll leave Deposition Exhibit 3 to

8    still be Bates stamped 738, even though --

9              MR. VANWAY:   73.

10        Q.    Deposition Exhibit 73 will be Bates

11   stamped 738 alone.  And, for the record, the more

12   complete document is Exhibit 12, which has both

13   pages.  I think I'd asked you before about Exhibit

14   12, which is your e-mail on February 4th, 1999,

15   about whether that was accurate, whether those were

16   concerns that you were hearing about from the

17   salaried employees.

18              And now that you've had an opportunity

19   to see the last paragraph or so in that e-mail on

20   the second page, is your testimony the same?

21        A.    Yes.  It's -- it's accurate as to my

22   understanding of the condition at the time.

23        Q.    Okay.  And your paragraph on the

24   second page of Exhibit 12, that's -- that reflects

1    accurately what you believe the scheduling was

2    going to be with Ford employees coming down to the

3    plant and so forth?

4         A.    At the time, yes.

5         Q.    Okay.  All right.  I'm done with

6    Exhibit 12, I think.  Exhibit 13 is one you just

7    had a moment to review.  Do you see the line in

8    there where you write that employees have no

9    confidence in Mr. Claus, Dave Adams or me?

10        A.    Why don't you help me?  At the end,

11   yes.

12        Q.    What did you mean by that?

13        A.    What I meant was that because of

14   the -- because at this time, March 2nd of 1999, six

15   months approximately after the JV announcement,

16   there still was no definite process for -- for

17   offers, okay?  As I testified previously, the

18   benefits and compensation was not developed for

19   offers to Ford employees to join the JV, as I

20   recall.

21             Secondly, there was concern about

22   the -- about the transfer freeze, which was a

23   six-month freeze.  And, thirdly, there continued to

24   be some concern about whether or not employees

1   would be permitted to go to other locations and --

2   I believe as I -- as I mentioned before, a lot of

3   employees continued to want to stay in the

4   Cincinnati area and Sharonville was a preferred

5   location if they were to remain Ford employees.

6        Q.    Okay.  And you thought that it was

7   important that Ford employees outside the plant

8   communicate these things to the salaried employees?

9        A.    Yes, because -- and the reason that I

10  said about the confidence in Alain Claus and Dave

11  Adams and me is because we were inside the plant

12  and we were communicating things that we knew at

13  the time and some of the things were changing.

14       Q.    Okay.  Coming back to Sharonville,

15  which you see comes up from time to time in these

16  e-mails, ultimately what was decided was that if

17  you weren't given an offer to join the ZF -- the

18  joint venture or you were offered and declined, you

19  were given an opportunity to interview with Ford to

20  join some other plant?

21       A.    Correct.

22       Q.    And it's my understanding you were

23  given a maximum of two interviews for opportunities

24  within Ford?

1          A.     I don't recall specifically, but there

2     was -- there were opportunities for interviews

3     within Ford.

4          Q.     Okay.  If someone said that they were

5     told that you only get two interviews, you would

6     dispute that?

7          A.     I wouldn't dispute that they were told

8     that.  I don't believe that that's completely

9     accurate.

10          Q.     What do you think is accurate?

11          A.     I -- I believe that people had the

12     opportunity to interview until a placement was

13     worked out.

14          Q.     So it's not -- if someone said it was

15     their understanding that they had a couple shots at

16     transferring to another Ford plant if they didn't

17     join the joint venture, if those didn't work out,

18     they were out of the organization, you would say

19     that that's -- that was not your understanding?

20          A.     There was no plan to terminate any

21     Ford salaried employees unless they had an offer of

22     employment elsewhere in Ford.  An interview and an

23     offer are two different things, okay?

24               An interview is -- is to explore --

1    you know, qualifications and opportunities, whereas

2    an offer of employment is here's an offer to come

3    to this location --

4          Q.    All right.

5          A.    -- of this other location.

6          Q.    Okay.  So it's your understanding that

7    the transitional -- excuse me.  -- salaried

8    employees in Batavia, '99, didn't join the joint

9    venture because they weren't offered or they

10   declined an offer, they ultimately, it was your

11   understanding, would be able to stay within the

12   Ford organization?

13         A.    Yes, unless they chose not to,

14   which -- which means that they -- they declined

15   offers of employment in other locations.

16         Q.    Okay.  Had you ever heard that people

17   were given options to transfer -- or excuse me.

18   -- given options to interview at other locations,

19   but even after the freeze was lifted, they couldn't

20   interview at Sharonville?

21         A.    No.

22         Q.    You don't believe that is correct?

23         A.    No, I don't.  If there was an opening

24   at Sharonville and -- and we had people who

1    qualified for the opening, then I believe that

2    after the freeze was lifted, they -- they had the

3    opportunity to be considered in Sharonville.

4         Q.    Okay.  If someone testified that, in

5    this case, that they were told, I got two

6    interviews with Ford.  If those don't work out, I'm

7    out.  And, oh, by the way, you can't interview with

8    Sharonville, you would be surprised by that

9    testimony?

10        A.    I would be surprised by that

11   testimony, yes.

12        Q.    Would you have any idea where someone

13   might have been given that understanding?

14        A.    No.

15        Q.    Staying with Exhibit 13, in the middle

16   paragraph, it says, "I would expect serious

17   reactions to transfers to Sharonville from other

18   locations, which could include legal action and/or

19   union activity among eligible employees.  This is

20   particularly risky given the protections for

21   unionized hourly and salaried employees not

22   afforded to nonunion salaried employees."  Have I

23   read that accurately?

24        A.    Yes.

1          Q.     What were you referring to there?

2          A.     What I was referring to was a strong

3     desire by Batavia Ford employees to be considered

4     for all Sharonville openings, if there were

5     openings.  And -- and it goes back to the fact that

6     many of our Batavia employees wanted to stay in the

7     Cincinnati area as Ford employees.

8          Q.     Okay.  What did the reference of union

9     activity -- the same thing we were talking about

10    before the break -- that you thought the salaried

11    employees might engage in some sort of union

12    campaign?

13         A.     My -- my thought process was the same,

14    that because the protections afforded to the UAW

15    employees were different than those to nonunion

16    employees, that -- that there could be an

17    organizing drive among eligible -- employees

18    eligible to organize.

19         Q.     Among the salaried workforce?

20         A.     Yes.

21         Q.     And what did you mean?  What kind of

22    legal action did you contemplate?

23         A.     Well, I contemplated that -- that an

24    employee might initiate a lawsuit against Ford --

1    Ford Motor for not transferring them to

2    Sharonville.

3        Q.    Okay.  All right.  And to avoid that

4    kind of lawsuit, you thought it was important to

5    reassure the employees in the plant at the time

6    that they would not be forced out of the Batavia

7    plant?

8        A.    No.  I -- I believed that it was

9    important that Ford salaried employees have a

10   definition as to what their -- what the company

11   would do with respect to transfers.

12       Q.    You thought it was important the

13   company have some sort of uniform policy regarding

14   the transfers?

15       A.    Correct.

16       Q.    Was there a uniform policy ultimately

17   followed?

18       A.    Yes.

19       Q.    Wasn't there some handpicking of

20   people from the Batavia plant to go to Sharonville?

21       A.    "Handpicking" is -- is not a term that

22   I would use.  There were employees who were

23   considered for openings at Sharonville and

24   ultimately transferred to Sharonville because of

1    the -- their selection for the opening, based on

2    their qualifications and -- and competitiveness for

3    the opening.

4         Q.    But you had some concerns that you

5    wanted to make sure there was an orderly process

6    where if Sharonville had an opening, that they

7    communicated that to the Batavia plant and that

8    Batavia plant management could sort out who was

9    available, that sort of thing?

10         A.    Yes, and it was not limited to

11   Sharonville.

12         Q.    Okay.  And sometimes that uniform

13   policy wasn't followed regarding people going to

14   Sharonville?

15         A.    Ford's -- Ford's policy on transfers

16   was followed.  My recommendation that all

17   Sharonville openings be filled by Batavia employees

18   was not put into place as part of the -- part of

19   the process.

20         Q.    Why not?  Did anyone tell you?

21         A.    Not that I recall.

22         Q.    Well, why did you recommend that?  I

23   don't mean -- for the reasons you describe here?

24         A.    I saw -- I saw my -- my role as

1    partially to assist in the -- in the transition of

2    Ford salaried employees who wished to remain Ford

3    salaried employees back into the Ford system in an

4    expeditious way.

5          Q.    Okay.  Give Exhibit 13 back to

6    Mr. VanWay.  Now get to Exhibit 14, which you had

7    an opportunity to review a moment ago.  And, again,

8    this e-mail reflects the e-mail on March 3rd, 1999

9    that you had sent to Mr. Quinlan, as well as below

10   that is an e-mail you had originally sent December

11   20th, 1998, right?

12         A.    Which exhibit are you looking at?

13         Q.    Exhibit 14.  Oh, I'm sorry.  We're

14   done with Exhibit 13.  We're going to go back to

15   Exhibit 14, which was an exhibit at an earlier

16   deposition.

17         A.    Okay.  Let me -- let me take a look.

18         Q.    Yeah, I was just pointing out there's

19   two e-mails.  One, March 3rd at the top, '99.

20   Second one is also from you.

21         A.    Okay.  This is -- this is a -- an

22   e-mail that I sent to Jeff Faistenhammer with a cc

23   to George Lindstrom on December 20th, 1998, and

24   then also forwarded to Jim Quinlan on March 3rd,

1    1999.

2        Q.    Okay.  And what you -- you see where

3    it says there, "There also was a strong fear that

4    any offers given to employees here from the JV will

5    result in significant loss of retirement benefits

6    and/or salaries."  Do you see that there?

7        A.    Please point it out to me.

8        Q.    It's the first full paragraph under --

9    where your e-mail starts in the middle.  It

10    starts -- see where it says, "Essentially these

11    concerns were resolved"?

12        A.    "There also was a strong fear that any

13    offers given to employees here from the JV will

14    result in a significant loss of retirement benefits

15    and/or salaries."

16        Q.    There you go.  That last sentence, do

17    you -- that's accurate, right?

18        A.    Accurate on 12/20/98.

19        Q.    Okay.  And then you write below that,

20    "We explained" and in parenthesis, (I believe the

21    employees accepted, but this is not true.  But if

22    it were even attempted, no one would likely -- be

23    likely to accept an offer from JV.  And then

24    replacements for all salaried employees would need

1   to be hired and trained.  This could not be done in

2   one year while maintaining production.  Have I read

3   that accurately?

4          A.    That's what I wrote.

5          Q.    And that was accurate at the time?

6          A.    That was my understanding at the time,

7   yes.

8          Q.    Okay.  And so just to kind of

9   summarize, you tell me if I'm right here, is that

10  the salaried employees were concerned that if

11  they'd go with the JV, they're going to get

12  something less than what they had before?

13         A.    There was -- there was a concern among

14  salaried employees that -- that the offers that the

15  JV would make them would -- and I think -- I think

16  it was referenced in an earlier exhibit -- would be

17  token offers, that there really wasn't any desire

18  from the JV for them to join the JV.

19         Q.    All right.

20         A.    And -- and I did not believe that to

21  be true at the time.  I still don't believe it to

22  be true.

23         Q.    Would you agree with what I said,

24  though, they were concerned that what they were

1  going to be offered was something less than what

2  they had at Ford, in terms of compensation,

3  benefits?

4         A.    I would say that there was that

5  concern among some employees and that there also

6  was acknowledgment that there would not necessarily

7  be an exact duplicate of Ford compensation and

8  benefits.

9         Q.    All right.  But it would be -- it

10  wouldn't be something that was significantly less

11  than what they had at Ford, in terms of

12  compensation and benefits?

13         A.    For the -- that's correct.

14         Q.    Okay.  And it was important to you, as

15  you explain in this e-mail, that you had to tell

16  these employees, look, the compensation, benefits

17  you were offered would not be significantly less

18  than what you have at Ford?

19         A.    That they would be competitive to --

20  to be real offers that the JV would want them to

21  accept.

22         Q.    Okay.  And you had also explained here

23  that you understood that if they weren't

24  competitive, then people weren't going to accept

1    them and they weren't going to join the JV, right?

2         A.    Yes.

3         Q.    And if they didn't -- if these

4    salaried employees didn't join the JV, I understand

5    your second -- your last sentence to be correct,

6    that there was no way that the joint venture could

7    hire people off the street in that year to maintain

8    production if those people didn't accept?

9         A.    Yes.  I believed it would be very

10   difficult for the -- for the plant to maintain its

11   production while replacing the entire salaried

12   workforce in one year.

13        Q.    So to avoid that very difficult

14   situation, replacing the entire salaried workforce

15   in that year, you conveyed here that it's very

16   important that they are given a packet of

17   compensation and benefits with the joint venture

18   that is competitive?

19        A.    Correct.

20        Q.    And by "competitive," we also mean

21   something that's not going to be significantly less

22   than what they enjoyed at Ford?

23        A.    Correct.

24        Q.    You also understood that this -- from

1    talking about this before, that that needed to be

2    communicated in writing?

3         A.    I -- I believed it needed to be

4    reduced to writing.   I -- I don't believe that I

5    referred to that in this -- in this e-mail.   Maybe

6    I did.

7         Q.    In earlier e-mails, we've talked about

8    the salaried employees wanted -- they wanted to

9    understand what was going on.   They wanted it in

10   writing, right?

11        A.    Yes.

12        Q.    And so you certainly understood in

13   conveying this competitive package of compensation

14   and benefits to salaried employees had to be in

15   writing?

16        A.    I believed that it needed to be

17   reduced to writing so that the employees could

18   review it.

19        Q.    All right.   And then one of the -- and

20   one of the ways you reduced it to writing was the

21   gray, tri-fold brochure that is Exhibit 2?

22        A.    That's what the JV decided to use,

23   yes.

24        Q.    Okay.   Maybe you will agree with this

1   kind of characterization.  Basically you had a lot

2   of skeptical, suspicious employees who were at Ford

3   who needed a lot of reassurance about what their

4   compensation and benefits were going to be at ZF

5   Batavia if they joined; is that fair?

6          A.     What their offer would be with ZF

7   Batavia, that's correct.

8          Q.     I mean, they needed reassurance and

9   they needed it in writing?

10         A.     They -- yes, they needed to be able to

11  understand what -- if they were given an offer for

12  a -- for employment at ZF Batavia and to leave Ford

13  employment, then they needed an offer that -- that

14  they could -- that they could review and understand

15  what the contents of the offer was.

16         Q.     When you were -- getting back to

17  Exhibit 14, when you were having these

18  conversations with salaried employees and you were

19  explaining to them that, look, it's going to be a

20  competitive offer because otherwise you wouldn't

21  join it.  I mean, did you say during those

22  conversations -- you know, what we offer you is

23  just going to be an initial package that is subject

24  to change?  I mean, did you ever say anything like

124

1    that at all?

2         A.    I -- I did say that and I can recall

3    specifically saying in -- in at least one of the

4    informational meetings and probably more, and I

5    also advised Alain Claus to say the same thing, was

6    that no compensation and benefit program is -- is

7    guaranteed for the future.  They're subject to

8    change by any employer.  And I -- and I

9    specifically stated that that was true of Ford

10   Motor and other employers.

11        Q.    What meeting specifically, Mr. Warden,

12   did you say this?

13        A.    One of the informational meetings that

14   we had with the employees.  And I recall that it --

15   also covered in that meeting was an explanation

16   from Alain Claus as to how a CVT works, in general,

17   versus a geared transmission.  It was one of the

18   very earliest meetings that we had, informational

19   meetings with salaried employees.

20        Q.    So probably would have been before

21   this 12/29 e-mail?

22        A.    Probably was.

23        Q.    So this is a meeting -- all right.

24   Mr. Claus is there; you're there.  What salaried

1    employees are there at this meeting that you're

2    describing?

3        A.    All salaried employees were invited to

4    our informational meetings.  I don't recall who --

5    specifically who attended, but there was always

6    quite good attendance.

7        Q.    Okay.  Are we talking about dozens of

8    people, hundreds of people?

9        A.    Yes, dozens.

10        Q.    Do you remember --

11        A.    Twenties of people, I would say and

12    more.

13        Q.    Do you -- I mean, you don't

14    specifically recall if Mr. Whisman or Mr. Ervin

15    were there, do you?

16        A.    I do not.

17        Q.    I mean, you don't recall any

18    particular salaried employee being there, do you?

19        A.    I do recall at least one, yes.

20        Q.    Who's that?

21        A.    An employee by the name of Grimmer

22    because he asked a lot of questions.

23        Q.    I think I've seen his name.  Is that

24    Jim Grimmer?

1          A.      Yes.

2          Q.      Do you know if he's still with the

3   organization?

4          A.      I do not know.

5          Q.      Did Mr. Grimmer -- I think I've seen

6   G-R-I-M-M-E, is that him?

7          A.      Grimme, yes.  Yes, that's correct.  It

8   is Grimme.

9          Q.      I mean, when you said this thing that,

10  look, these are -- nothing is guaranteed, do you

11  remember Mr. Grimme responding?

12         A.      Well, I -- I recall him being at the

13  meetings.  I don't remember him responding to

14  those -- that specific statement.

15         Q.      All right.  I mean, I guess what I'm

16  wondering is if you're -- you have this group

17  that's very suspicious and then you're telling

18  them, Hey, none of this is guaranteed.  I mean, did

19  you get any negative reaction from any of the

20  salaried employees when you told them that or if

21  Mr. Claus told him that?

22         A.      The atmosphere sometimes was negative

23  in the meetings, okay?  So -- and -- and my belief

24  is that the atmosphere was -- was negative because

1    of the uncertainty among the employees as to -- as

2    to what the processes would be with respect to

3    offers for them to join the JV and/or transfers to

4    other locations.

5              And so because we had no specifics to

6    provide at those early dates, there was -- there

7    was negativity in the room.  You -- okay?  And --

8    and so there would be comments and questions that

9    had a negative slant to them.

10        Q.    And so people may have -- are you

11   saying people may have reacted negatively to your

12   statement that this package isn't guaranteed in the

13   future?

14        A.    They may have.

15        Q.    You don't specifically recall any --

16        A.    Specifically I don't -- I don't recall

17   a specific question or comment that was negative

18   about that.

19        Q.    Now, was the May -- moving forward,

20   that's kind of '98, we figure.  Moving forward to

21   May 27, '99 -- I think I have the right date of

22   this larger meeting where Mr. Kehr was there.  I

23   mean, do you remember, was that meeting also fairly

24   negative among the salaried employees or was that

1    less so?

2         A.    I didn't -- I didn't see it as a

3    negative atmosphere in the meeting, no.

4         Q.    And you had said you had told

5    Mr. Claus that he should say in a meeting, he

6    should point out that --

7         A.    That he should be careful not to --

8    not to give the impression of guarantees that

9    things would not change.  And he was astute about

10   that as well because he had experienced changes in

11   Ford compensation and benefits over his career,

12   which was at least as long as mine.

13        Q.    Did you tell Mr. Kehr that he should

14   be careful when he was speaking at the May 27th

15   meeting?

16        A.    Karl Kehr was aware that -- that --

17   there -- that compensation and benefit plans are

18   subject to change.  I don't recall specifically

19   telling him to -- or recommending to him at least

20   that he -- that he do that, no.

21        Q.    Okay.  I think we're done with 14.  Do

22   you know anything about a Julie Howard?  Do you

23   know who that is?

24        A.    I recall Julie Howard, yes.  I recall

1   her.  I met her a couple times.

2        Q.    Was she -- she was a -- I think she

3   was like a CVT director or something.  Does that

4   sound --

5        A.    I don't know what her title was.

6        Q.    It's my understanding that she was a

7   Ford transitional employee, meaning she was a Ford

8   employee who became a ZF Batavia employee at the

9   Batavia plant, and then transferred back to Ford;

10   is that your understanding?

11        A.    I -- I know that Julie Howard was a

12   Ford employee.  She came to ZF Batavia.  She was --

13   she was an engineering manager type employee.  I

14   don't know what her specific title was.  I -- I

15   recall that -- that there was an offer that was

16   being developed for her.  I don't know if -- I

17   don't know specifically if it was ever presented or

18   if she accepted such an offer.

19        Q.    Okay.  All right.  Were you aware at

20   the time of the transition in '98, '99, that Ford

21   employees -- salaried employees made well above the

22   market rates for that kind of market?

23        A.    I -- I was aware that they made above

24   the market rate for the Cincinnati area, yes.

```
 1          Q.     Okay.  Was that -- you were in

 2     meetings, I guess, with Karl Kehr and Dave Adams,

 3     Mr. Claus, other people from upper management in

 4     the plant at the time, right, where you discussed,

 5     I think, salaried employees and the package of

 6     compensation, benefits.  I mean, just generally,

 7     that's true, right?

 8          A.     Yes.

 9          Q.     And certainly Mr. Adams and Mr. Kehr

10     were aware of this fact that Ford employees --

11     salaried employees made more than the average for

12     Cincinnati area?

13          A.     I know Karl Kehr was.  I -- I don't

14     know about Dave Adams specifically.

15          Q.     Okay.  Were there any concerns or

16     comments raised at one of these meetings that you

17     attended or overheard or perhaps somebody told you

18     secondhand that there was kind of a goal of

19     bringing those salaries more in line with what the

20     market rate is over a period of time, once they

21     joined the joint venture?

22          A.     Once who joined the joint venture?

23          Q.     Once the Ford transitionals joined the

24     joint venture, that over a period of time, their
```

1    salaries would be more in line with the market rate

2    for Cincinnati?

3         A.    No, I don't recall.

4         Q.    Was there any concern that people who

5    they'd hire off the street who they call the ZF

6    Batavia new hires would be making less than what

7    the Ford transitional employees would be making?

8         A.    I -- I don't know that there was a

9    concern about that.  The system that was designed

10    ended up with a recognition that the ranges for new

11    hire employees would be at lower levels than the

12    ranges for transitional employees.

13         Q.    Was there any concern about going

14    forward that -- a concern that you heard that going

15    forward, you're going to have two tiers, people who

16    are Ford transitional who were making this and the

17    ZF Batavia new hires were making a different amount

18    of money?

19         A.    There was recognition of that fact.

20    I -- I don't know of concerns about that fact.  It

21    was -- it was how it was designed.

22         Q.    Okay.  Okay.  This is Deposition

23    Exhibit 76.  This is -- is a memo dated March 15th,

24    1999.  Take as long as you need to review this

```
 1   brief memo, Mr. Warden.

 2        A.    Okay.  I've read it.

 3        Q.    All right.  Is this -- did you draft

 4   this memo?

 5        A.    No.

 6        Q.    Do you know if this memo was

 7   distributed to salaried employees?

 8        A.    No, I don't.

 9        Q.    Is this information accurate,

10   specifically all employees electing to remain with

11   Ford will be given a one-time offer of employment

12   at another Ford location?  Do you know if that was

13   what happened?

14        A.    I -- I believe that that is not what

15   happened.

16        Q.    You believe -- what's your

17   understanding?

18        A.    My understanding is that there were

19   employees who had multiple offers.

20        Q.    Your understanding was they get as

21   many offers as they cared to entertain and --

22        A.    No.

23        Q.    Well, was there --

24        A.    I'm sorry to interrupt.
```

1          Q.    No, go ahead.  How many offers could

2    they have?

3          A.    This, as I read this, this is a

4    statement of the -- the general Ford process, okay?

5          Q.    Mm-hmm.

6          A.    Ford policy with respect to -- in a

7    reduction in force, the rights that it -- that Ford

8    affords to employees, the -- to have the ability to

9    transfer, okay?  In -- at ZF Batavia, at least

10   while I was there, we did not require that

11   employees be terminated if they were given a

12   one-time offer of employment at another Ford

13   location and turned it down.  There was no such

14   case that I recall at -- at ZF Batavia.

15         Q.    So I guess -- but how many could they

16   get?

17         A.    I don't recall that there was a

18   number.  There may have been, but I don't recall.

19         Q.    Okay.  We're done with that document.

20   This is 77.

21         A.    Okay.  I've read it.

22         Q.    Who was Greg Battle, do you know?

23         A.    Greg Battle was a -- I think he was an

24   MPS in the production organization at Z -- at

1   Batavia, was a Ford employee.

2        Q.    Okay.  And this is -- ultimately this

3   is -- this is an e-mail chain that you forwarded

4   to, I guess, Mr. Kehr on May 19th, 1999?

5        A.    Yes.

6        Q.    All right.  And I guess it had been

7   forwarded -- I guess it's from -- it was from

8   Mr. Battle to, I guess, Glen Marinetti and Jerry

9   Priest; is that right?

10       A.    That's how it reads, yes.

11       Q.    And then on to you, which you

12   forwarded to Mr. Kehr?

13       A.    Correct.

14       Q.    All right.  Do you know what

15   Mr. Battle was talking about?  Was that a -- when

16   he writes, I polled the group leaders concerning

17   the benefits, I mean, the things that follow that,

18   does that mean anything to you?

19       A.    Well, as I read this, it -- it appears

20   that there were questions that people had about

21   what the compensation and benefits would be at ZF

22   Batavia if they were given an offer.  That's what I

23   believe this refers to.

24       Q.    Are these concerns of salary people or

 1    the union workers, because it says in Mr. Battle's

 2    subject line, "U Concerns"?

 3         A.    Well, group leaders are salaried

 4    employees, so I presume it means group leaders.

 5         Q.    What about "U Concerns," does that

 6    mean anything to you?

 7         A.    U Concerns?

 8         Q.    See where it says, From Greg Battle,

 9    subject line?

10         A.    Oh, "U" is unclassified.

11         Q.    Okay.

12         A.    So it's not confidential is -- he

13    didn't --

14         Q.    Oh.

15         A.    He didn't make this confidential

16    e-mail.

17         Q.    All right.  And it says you forwarded

18    this to Mr. Kehr.  I don't know if you specifically

19    recall.  Do you know if you tried to address these

20    concerns that Mr. Battle had ultimately forwarded

21    to you?

22         A.    I don't recall that I talked with Greg

23    Battle about these concerns myself, no.

24         Q.    Do you know --

1          A.     I don't believe I did.

2          Q.     Where it says -- references authorized

3     overtime, do you see that in caps down near the

4     middle?  It says "authorized OT."  What does that

5     mean?

6          A.     Yes.

7          Q.     I mean, do you know what they were

8     specifically referring to?

9          A.     I don't know, but this appears to be

10    questions regarding the summary of -- of benefits

11    from Exhibit 2.

12         Q.     So you believe that -- okay.  So you

13    believe that Exhibit 2 had been distributed before

14    May 18th, 1999?

15         A.     With this level of detail, I would

16    expect that that's a reasonable expectation, yes.

17         Q.     Okay.  We're done with that one.  Is

18    it your understanding that at the -- during the

19    transition, if there were employees who were at

20    Ford and eligible for retirement, they could go

21    ahead and retire from Ford and join the joint

22    venture?

23         A.     Some employees could and did, yes.

24         Q.     Okay.  And was there a discussion

1    about whether that option could be available to

2    employees who might be eligible for retirement two

3    or three years down the road after joining the

4    joint venture?

5        A.    Yes.  I believe it was for up to three

6    years, I think is -- and that was a later

7    development.

8        Q.    It was your understanding -- you're

9    saying at some point during the discussion about

10   the joint venture, the transition, it was decided

11   that if someone was eligible for retirement under

12   the Ford plan, within three years of joining the

13   joint venture, they could go ahead, retire from

14   Ford and continue working at ZF Batavia?

15       A.    My recollection is that it applied to

16   people who would -- who -- who were offered such an

17   opportunity and who would attain eligibility for

18   retirement under -- under the Ford GRP within what

19   we expected to be the transition period, which was

20   two to three years.

21           So I -- I do not recall that there was

22   an open-ended -- and, in fact, I specifically

23   recall that it was not an open-ended offer.

24       Q.    Okay.  Does -- I think we need a

1    second copy of Exhibit 2.  Do you have one there?

2    Exhibit 2, on the -- what's on the left-hand side

3    of the first page?  Other page.  Even though you've

4    acknowledged that what's on the first page

5    technically wasn't part of the first page of the

6    tri-fold brochure, but putting that aside, Exhibit

7    2, first page, left side, does that refer to this

8    conversation -- this issue we're talking about with

9    being able to retire and being able to join the

10   joint venture?

11          A.    No.

12          Q.    It doesn't?

13          A.    No.  This was -- this was information

14   for any employee who joined the joint venture and

15   qualified for Ford general retirement plan benefits

16   as described herein.

17          Q.    What I understood you to say is

18   that -- strike that.

19               It says there on the left-hand column,

20   it says -- see where it says "Ford General

21   Retirement Plan Benefits"?

22          A.    Yes.

23          Q.    It says, Employees immediately

24   eligible to retire" -- Employees who are eligible

1    to retire immediately from the Ford General

2    Retirement Plan, GRP, and receive an offer of

3    immediate employment by ZF Batavia may elect to

4    begin GRP benefit payments and also accept

5    employment with ZF Batavia.  That's -- have I read

6    that right?

7         A.    Yes.

8         Q.    Okay.  So that's -- that is accurate

9    and some people did go ahead and retire and then

10   join ZF Batavia, correct?

11        A.    Correct.

12        Q.    And what I think you were saying a

13   moment ago is what was decided ultimately was

14   during the transition period, which was two to

15   three years after '99, if anyone who had joined the

16   joint venture was eligible to retire under the Ford

17   plan, they could go ahead and do so and continue to

18   work at ZF Batavia?

19        A.    If they were -- if they were offered

20   such employment and -- this is my recollection five

21   years later --

22        Q.    Yes.

23        A.    -- okay?  And they became eligible to

24   retire within the transition period, then they

1    could be given and accept offers as ZF Batavia new

2    hires, so not subject to these benefits and

3    compensation anymore at ZF Batavia.

4         Q.    Okay.  Does that at all contradict

5    what's in that second line, right below where I

6    read where it says, Otherwise an employee may not

7    in the future begin benefit payment from the GRP

8    until they have separated employment from ZF

9    Batavia.  What you described, is that kind of an

10   exception to what's there or --

11        A.    It's different than that.

12        Q.    Okay.

13        A.    This says, "Employees immediately

14   eligible to retire."  So -- so that's employees who

15   retired right at that time, and then they -- they

16   were offered -- they -- some were offered

17   employment as -- as ZF Batavia new hires.

18        Q.    Okay.  Well, it says, "Otherwise

19   employed may not in the future begin benefit

20   payments from the GRP until they have separated

21   employment from ZF Batavia."  Is it your

22   understanding that there were people in the future

23   who did begin benefit payments under the Ford plan

24   and they continue to work at ZF Batavia?

1          A.     Not as transitional employees.

2          Q.     Okay.  They had to be hired as ZF

3     Batavia new hires?

4          A.     Yes.

5          Q.     But they could continue --

6          A.     At least that's my recollection and

7     understanding.

8          Q.     Oh, okay.  I see.  All right.  Well,

9     is it your understanding that this sentence in the

10    brochure when it says, "until they have separated

11    employment from ZF Batavia," perhaps did that mean

12    that you just had to merely go through the process

13    of becoming a new hire at ZF Batavia after you

14    retired from Ford and then you would basically

15    continue doing the same job?  Is that what, kind

16    of, you had anticipated?

17         A.     Yes.  You could do the same job or you

18    could be offered a different job.

19         Q.     Okay.  But you didn't have to like

20    leave the company for six months or something?

21         A.     No.

22                MR. VANWAY:  Which company?

23                MR. SIMON:  ZF Batavia.

24                MR. VANWAY:  You're asking him what ZF

1   Batavia's rule was?  I'm not clear on your

2   question.

3        Q.    I have a question about that sentence,

4   this paragraph that we've been talking about.  I'm

5   just trying to understand what you thought this

6   meant.

7        A.    Well, with respect to the question

8   that you asked, my understanding was that ZF

9   Batavia was willing to rehire some people, okay,

10  after they retired from Ford Motor.  And in those

11  cases, the people would be -- their compensation

12  and benefits would be essentially the new hire

13  compensation and benefits.

14       Q.    Okay.

15       A.    Okay.

16       Q.    But they could -- the critical part

17  for them, they could actually begin receiving their

18  retirement benefits under the Ford plan?

19       A.    Correct, that was my understanding.

20       Q.    And that would be a period of -- so

21  that's how you -- is that how you read, then, this

22  sentence, this paragraph --

23       A.    Yes.

24       Q.    -- Exhibit 2?

1      A.    I think we're talking about two -- two

2   separate things, though, okay?  I was talking about

3   the transition period --

4      Q.    Mm-hmm.

5      A.    -- all right?  And if an employee

6   retired under the general retirement plan, then

7   they were no longer Ford transitional employees.

8   And that was my understanding with respect to this

9   document, with respect to anyone who retired from

10  Ford Motor Company through the GRP, if ZF Batavia

11  offered and they accepted a -- an offer of -- of

12  employment thereafter.

13     Q.    Okay.  Was there any reason that you

14  wanted to have -- you talked about they had to

15  retire during the transition period.  I mean, is

16  there any reason that someone suggested that they

17  couldn't retire if they were just outside the

18  transition period and continue to work at ZF

19  Batavia?

20     A.    Well, it was ZF Batavia's request that

21  we consider that, so that more employees might

22  be -- who the -- who the joint venture wanted to

23  employ as joint venture employees might be willing

24  to -- to remain with the joint venture.

1          Q.     Okay.  Do you know how many employees

2     retired during the transition period at ZF Batavia,

3     retired from Ford and then continued to work as ZF

4     Batavia new hires?

5          A.     My recollection is there were about 10

6     that were eligible, somewhere around there.  And I

7     do not recall how many actually were re-employed.

8               MR. SIMON:  I only have a few more

9     documents.  They're thick documents, but I only

10    have a few documents, so we're actually much closer

11    than I -- might otherwise appear.

12               THE WITNESS:  And how about if we take

13    about five minutes?

14               MR. SIMON:  Sure, sure.

15          (Off the record:  11:49 a.m. - 12:02 p.m.)

16               MR. SIMON:  Back on the record.

17               THE WITNESS:  Okay.  Earlier I -- I,

18    in responding to one of your questions, I said that

19    an employee who left Ford employment through

20    retirement would be rehired as a -- as a -- could

21    be rehired as a ZF employee.  That's inaccurate.

22    That's inaccurate for ZF -- for transitional

23    employees or for new hire employees.

24               When an employee retired from Ford, if

1    they were given an offer and accepted it, they

2    would be hired as ZF Batavia employees because they

3    never had ZF Batavia employment in the first place.

4    So rehire would not make sense.

5        Q.    All right.  So the people who -- you

6    believe there were 10 people, you said, who were

7    eligible to retire from Ford after the joint

8    venture had started.  Are you saying those people

9    had remained Ford employees the whole time or were

10   they transitional employees?

11       A.    I think I said that I -- my

12   recollection was there were about 10 employees who

13   could get to retirement with Ford during the

14   transitional period, which was envisioned to be two

15   to three years.  And that if they retired from Ford

16   and were made an offer to -- to go to work for the

17   JV, then they -- if they accepted such an offer,

18   the correct -- the correct statement would be that

19   they would be hired by the JV as new employees.

20       Q.    Okay.  I'm switching gears entirely.

21   I'll just show you my copy.  This is Exhibit 4 of

22   the meeting that was held on May 27th, 1999.

23   You've seen Exhibit 4 before?

24       A.    Yes.

1          Q.    My question is, were the pages that

2     are reflected beyond the cover page there, were

3     those part of a slide show or some sort of a

4     PowerPoint presentation that you recall?

5          A.    My recollection is that there were --

6     there were slides --

7          Q.    Okay.

8          A.    -- that were -- well, I'm certain that

9     there were slides that were used in the

10    presentation.

11         Q.    And it's --

12         A.    And -- and I do not know if these are

13    all of them or --

14         Q.    Sure.

15         A.    -- all of them were shown.

16         Q.    Was a hard copy made of those

17    materials and distributed to employees who wanted

18    them?

19         A.    I don't recall specifically whether --

20    whether or not it was.

21         Q.    And we've had in this case -- I think

22    we had a number of -- we produced a number of those

23    materials and they came from my clients.  So, I

24    mean, do you have any reason -- do you know my --

1   why -- if someone said that they received a copy --

2   a hard copy of those materials in the May 27th

3   meeting -- I mean, would you have a reason to

4   disbelieve them?

5       A.    I would not dispute that.

6       Q.    I mean, did you ever put out an

7   instruction to Mr. Kehr or others, these are not to

8   be printed out in hard copy, distributed or

9   anything like that at all?

10      A.    I don't -- I don't believe that I ever

11   put out any instruction about it.

12      Q.    Okay.  To the best of your

13   understanding, what was conveyed at the May 27th

14   meeting was accurate information about the

15   compensation and benefits package that was being

16   offered to the transitionals, right?

17      A.    As far as I understand it, yes.

18      Q.    And I know you haven't read every page

19   there.  Well, as you recall, the information that

20   was put on the slide show was accurate, too, right?

21      A.    As far as I knew, yes.

22      Q.    Okay.  I can take that back from you.

23   This is Exhibit 6.  The question just is, is that a

24   memo that you authored or you participated in the

1    authorship of?

2          A.    I've read it.

3          Q.    Okay.  Did you author that document?

4          A.    No.

5          Q.    Do you know where it came from?

6          A.    Well, I know who Quentin Walker is, so

7    it -- Quentin Walker was a -- an HR associate at

8    power train operations.

9          Q.    Was that memo distributed to the

10   salaried employees?

11         A.    I don't know.

12         Q.    Okay.  You read it.  Did it appear --

13   the information appear to be accurate there that

14   you read through?

15         A.    It matches with my understanding of

16   the -- of some of the process that was happening

17   later in the transition period while I was there.

18         Q.    All right.  Hand you what's been

19   marked as Exhibit 78 and I'm also going to hand you

20   79 at the same time because I think they might be

21   related.  This is 79.  I'm not going to ask you

22   about every page in it, Mr. Warden, but familiarize

23   yourself with it.  And just for the record, while

24   you're looking it over then -- I've already marked

```
 1    it.  Exhibit 78 says "ZF Batavia Rewards Philosophy
 2    and New Rewards Programs."  It's Bates stamped
 3    2964.  Deposition 79 has "Table of Contents" on the
 4    top and it's Bates stamped marked number 2858
 5    through 2870.  And Exhibit 78 is 2964 through 2977.
 6              And my question to you generally about
 7    both of these sets of documents, I'm just -- are
 8    these -- were these documents created out of this
 9    meeting or meetings you attended with Ernst and
10    Young?
11         A.    I don't know for certain that that's
12    the case, one way or the other.
13         Q.    Okay.  I guess --
14         A.    I -- 79 appears that it was.
15         Q.    All right.  Okay.  And 79, it says on
16    the second page -- go to the second page for a
17    second.  It says the design team met on February
18    11th and 12th in Batavia, Ohio.  And I think I --
19         A.    Second page?  Okay.
20         Q.    And we've -- we have established that
21    you were a part of that design team, right?
22         A.    I was part of the meetings that Ernst
23    and Young had at Batavia, which I recall as being
24    one or two days.
```

1      Q.    So as far as you understand, you were

2  at these meetings on February 11th and 12th?

3      A.    Yes, if that's those meetings.

4      Q.    Let's see.  Turn to 2861.  I just want

5  to ask you about specific things in here.  See at

6  the very bottom of 2861 where it says, "Careful

7  consideration must be given to avoid creating two

8  classes of employees"?

9      A.    Yes, I see that statement.

10     Q.    All right.  Do you remember, was this

11  something that was raised during these meetings,

12  that concern?

13     A.    There were a number of concerns raised

14  because of the difficulties we were -- that -- that

15  everyone was envisioning with respect to Ford

16  transitional employees versus new hire employees

17  versus Zed-F transferring employees from Zed-F

18  versus the hourly employees as UAW employees

19  continuing to be subject to the UAW-Ford

20  agreements.  So that -- that certainly could have

21  and probably was one of the -- one of the

22  considerations.

23     Q.    Okay.  Well, just generally then,

24  Exhibit 79 -- I mean, as far as you understand it,

1   is this a fair reflection of things, issues that

2   were discussed during these February meetings with

3   Ernst and Young?

4        A.    I have no reason to believe that it is

5   not.

6        Q.    Okay.  You can put that one aside.

7   Stick with Exhibit 78, then, for a second.  Exhibit

8   78, you weren't sure if this was in relation to a

9   Ernst and Young meeting.  Do you -- and in fact, it

10   actually was at least two months after that

11   February meeting, right?

12        A.    Yes.

13        Q.    Was this, if you know, was this set of

14   documents created as a result of your meetings with

15   Ernst and Young, which ultimately resulted in

16   putting together a package of compensation

17   benefits?

18        A.    I don't know.  I -- I -- what I do

19   know is that I did not create this document.

20        Q.    Any idea who did?

21        A.    No.

22        Q.    Turn to 2966, which is page 3 of that

23   same document.

24        A.    This one?

1          Q.     Yeah, just turn down that one.

2          A.     Okay.

3          Q.     Do you remember any kind of meeting

4    that you had with design plan or other people in

5    management at ZF Batavia or Ford where they

6    discussed some of these issues about ZF Batavia's

7    awards philosophy regarding base pay, annual

8    incentive plan, merit increase program, et cetera?

9          A.     There were a number of meetings where

10   those things were discussed that I was a part of.

11         Q.     All right.  This, in fact -- if this

12   is correct, this was -- this says April 9th, 1999

13   at the top.  And you would agree with me that

14   within a very short period of time after that, the

15   final touches were put on the package of

16   compensation and benefits and offers were sent out?

17         A.     Yes.

18         Q.     Okay.  See where it says "Merit

19   Increase"?  We're still back on page 3, sorry.

20         A.     Okay.

21         Q.     See where it says "Merit Increase

22   Program"?  You tell me if I read this correct.  It

23   says, "Merit increases will be continued, but each

24   year the amount will decrease by a fixed amount.

1    Over time, merit increases for transitional

2    employees will align with those of new hires and be

3    at a level in line with the annual inflation rate."

4    Have I read that correctly?

5         A.    Yes.

6         Q.    Do you remember anyone ever expressing

7    the same kind of sentiment in one of these meetings

8    or any conversations you had with management during

9    this time?

10        A.    I don't recall specific references to

11   that.

12        Q.    Was that, in fact, as you understood

13   it, the plan going forward regarding merit

14   increases?

15        A.    I had no understanding about that.  I

16   can understand why it would be.

17        Q.    Okay.

18        A.    Because the initial -- the initial

19   merit increases as they were envisioned by the

20   joint venture, by ZF Batavia, were -- were to be

21   higher for Ford -- Ford transitional employees

22   than -- than we would expect from -- for the new

23   hires.

24              I can understand why such a philosophy

1    would be developed, so that eventually the level of

2    increases might be the same.

3         Q.    I may have lost you there.  At the --

4    in 1999, the last -- I'm sorry.  Stay on page 3

5    there.  In 2000, are you saying there would have

6    been some difference in the merit increase

7    comparing a Ford transitional employee who had

8    joined the joint venture versus a new hire from ZF

9    Batavia?

10         A.    There certainly could have been, yes.

11         Q.    Why would that have been built-in to

12    the system, that there would be a difference?

13         A.    Because the Ford salaried employees

14    had a higher salary to begin with.

15         Q.    I understand.

16         A.    And so on a percentage basis, they'd

17    be receiving higher dollar amount increases.

18         Q.    Okay.  So you can understand why the

19    company would want to have going forward each year,

20    a lower percentage of merit increase for the Ford

21    transitional employees as compared to the ZF

22    Batavia new hires?

23         A.    I could understand why going forward

24    it would make sense for -- for there to be a more

1    level philosophy, as far as the dollar amounts of

2    merit increases.  It's much the same as the

3    philosophy at Ford Motor, which -- which where

4    we -- we tend to look at merit increases in dollar

5    amounts, as opposed to percentage amounts.

6         Q.    I mean, ultimately, you understood

7    that the trend here would be to align the salaries

8    of new hires with Ford transitions?

9              MR. VANWAY:  Objection to form.  I

10   believe he testified he was familiar with this

11   document.

12        Q.    That's what I'm saying.  You've

13   explained, Mr. Warden, why they would want to do

14   with the merit increases what's described here on

15   page 3 of this document.  And what I'm saying is

16   you understood, too, that it would make sense as a

17   trend going forward to have the Ford transitional

18   salaried employees -- their annual salaries align

19   with those new hires?

20        A.    No, that's not what this says.

21        Q.    But didn't you understand that to be

22   the plan?

23        A.    No.

24        Q.    Why not?

1        A.    What -- what this says is that the

2    increases over time would -- would start aligning

3    with the amounts provided for new hires.

4        Q.    So the actual --

5        A.    So that doesn't necessarily -- well,

6    it -- it doesn't mean that the salaries would be

7    the same.

8        Q.    I think we're done with 78.  You can

9    give that to the court reporter.

10        A.    Are we finished with 79, too?

11        Q.    Yeah.  That's 80.  This is 80.  80,

12    for the record while you're just reviewing is Bates

13    stamped 2673 to 2684.  And my question to you as

14    you flip through it is, have you ever seen this

15    document before?

16        A.    I don't believe I have, no.

17        Q.    Okay.  Do you have any idea who

18    created it or where it same from?

19        A.    No, I don't.

20        Q.    You can throw that on the pile.  81.

21    81 for the record is Bates stamped 2631 through

22    2633.  Same question, Mr. Warden, did you author

23    this?  Do you know who did?

24        A.    I didn't author it.  I don't know who

1    did.

2         Q.    Does it reflect -- fairly reflect

3    deadlines that were imposed on a -- handling all

4    these different issues with the transitional

5    employees and putting together a package of

6    compensation, benefits?

7         A.    I -- I'm not familiar with this

8    document, so I can't say one way or the other.

9         Q.    One second here.  Okay.  This is 82.

10   It's -- on the front is a fax cover page from -- to

11   Mr. Kehr to Ernst and Young.  It's Bates stamped

12   the Plaintiffs' Bates stamp 652 to 662.  Have you

13   ever seen these documents before?

14        A.    I don't recall seeing this document

15   before.

16        Q.    On the second page, it says,

17   "Incentive Plan Talking Points March 16, 1999."  Do

18   you have any idea what that's referring to?

19        A.    No.  The idea I would have is that it

20   would be speaking to the annual incentive plan.

21        Q.    That second page, it's actually page 2

22   of the document where it says "Base Pay," are you

23   on that?

24        A.    Yes.

1          Q.     See where it says "Transition Plan" in

2     the middle?  It says, "ZF Batavia is willing to pay

3     Ford employees at comparable to current levels

4     throughout the transition."  Have I read that

5     correctly?

6          A.     That's what it says.

7          Q.     That, and the fact is in April 1999,

8     that was a true statement, correct?

9          A.     Yes.

10          Q.     That was the intent, to pay Ford

11     employees at comparable to current levels

12     throughout the transition?

13          A.     I don't know what the intent of this

14     document was.  I -- I agree with you as to what it

15     says.

16          Q.     I'm asking since you were involved in

17     these discussions, was it -- the intent of those

18     who were in management at Ford and at ZF Batavia

19     who were involved in these discussions regarding

20     the Ford transitionals, that it was the intent to

21     pay Ford transitional employees at comparable to

22     current levels throughout the transition period?

23          A.     The intent -- this document says, "ZF

24     Batavia is willing to pay Ford employees at

1    comparable to current levels throughout the

2    transition."  It does not say Ford transitional

3    employees.

4        Q.    All right.

5        A.    My understanding, however, of initial

6    offers for Ford employees, if they wish to

7    discontinue their Ford employment and -- and be

8    hired by ZF Batavia, was that the offer would be at

9    a competitive level.

10        Q.    Okay.  See where it says, then, "It is

11    OK if a two-tier base pay structure is in place

12    short-term (next three years)"?

13        A.    Yes --

14        Q.    Have I --

15        A.    -- I see that.

16        Q.    -- read that correctly?  Next three

17    years -- I actually didn't write this document, but

18    three years going forward from 1999 was roughly the

19    transition period in your mind?

20        A.    In my mind, yes.

21        Q.    Okay.  And others expressed a similar

22    time frame?

23        A.    Yes.

24        Q.    Okay.  And you understood that there

1    would be a two-tier base pay structure in that you

2    have the Ford transitional salaried that made --

3    were in a certain band, and then the ZF Batavia new

4    hires would be in another band, right?

5         A.    Yes.

6         Q.    It would be a two-tier base pay

7    structure?

8         A.    Correct.

9         Q.    And it was -- this document reflects

10    what was accurately the sentiment of those in

11    management in Ford and ZF Batavia at the time, that

12    that was okay to have that two-tier base pay

13    structure for those two -- two groups for the next

14    three years?

15         A.    Well, it was -- that was ZF Batavia's

16    plan to -- to have a two-tier structure because of

17    the desire to make offers -- competitive offers to

18    employees who were then Ford employees to

19    discontinue their employment with Ford and become

20    employees of ZF Batavia.

21         Q.    Okay.

22         A.    That was the -- that was the reason

23    for the two-tier system.

24         Q.    Right.  And I just want to say how I

1    read this is, what this means is that two-tier base

2    pay structure with Ford transitionals having one

3    band -- salary band and ZF new hires having another

4    band.  That two-tier base pay structure was fine

5    for three years, but after that, that would be

6    changed.  Is that how you understood it?

7            A.    No.

8            Q.    Is that how you read this document?

9                  MR. VANWAY:  Are you referring just to

10   page 2 or --

11                 MR. SIMON:  Yes.

12                 MR. VANWAY:  -- the entirety of the

13   document including page 2?

14                 MR. SIMON:  I'm referring to page 2.

15   I was referring just to that sentence.

16           A.    The sentence says, "It is OK if a

17   two-tier base pay structure is in place in the

18   short-term (next three years)."  That's what it

19   says and that's my only understanding of that --

20           Q.    Okay.

21           A.    -- of that statement because I did not

22   author this or -- and I don't believe I've seen it

23   before.

24           Q.    Okay.  We are done with that document.

1    All right.  This tentatively could be the last

2    document.

3             A.    Good.

4             Q.    Exhibit 83.  I think this document has

5    been -- it's about salary banding.  -- at another

6    deposition, but I don't believe it was ever marked.

7    At the top on the cover page, "ZF Batavia L.L.C.

8    offers you this Salaried Employee Benefit Program."

9    It's Ford Bates stamped 1336 through 1339.  Have

10   you ever seen Exhibit 83 before, Mr. Warden?

11            A.    Yes, I have.

12            Q.    Okay.  And was this set of documents

13   the benefits summary that was given to ZF Batavia

14   new hires?

15            A.    Yes.

16            Q.    Okay.  It was not given to ZF

17   Batavia -- excuse me.  It was not given to Ford

18   transitionals; that's correct?

19            A.    It was not given to Ford transitionals

20   unless it was in -- in conjunction with retiring

21   from Ford Motor Company and then being hired by ZF

22   Batavia.

23            Q.    Okay.  Only in that situation, based

24   on your understanding, would a Ford transitional

1    employee consider and gone to ZF Batavia would he

2    or she have been given Exhibit 83, right?

3         A.    As part of an -- as part of an offer

4    of employment, that's correct.

5         Q.    Okay.

6         A.    This was not kept secret from anyone.

7         Q.    Right.

8         A.    Okay.

9         Q.    The Ford transitional employees should

10   have gotten Exhibit 2, which is the tri-fold, gray

11   brochure, right?

12        A.    Yes.

13        Q.    And the people who you hired in off

14   the street, so to speak, the new hires, they would

15   get Exhibit 83?

16        A.    Yes, as a general course of business

17   as part of their offer.

18        Q.    Okay.  I said "the last document."  We

19   knew that wasn't going to be.  I apologize.  I

20   don't think I've shown you Exhibit 11.

21        A.    Yes, you have.

22        Q.    I have shown you Exhibit 11?

23              MR. SIMON:  Off the record.

24        (Off the record:  12:29 p.m. - 12:38 p.m.)

```
 1              MR. SIMON:  We're back on the record.
 2    Just a few more wrap-up questions, Mr. Warden.
 3         Q.    Any other conversations that you
 4    remember with any of my 15 clients who I named
 5    earlier, any other conversations that you recall,
 6    either before they made their decision to join ZF
 7    Batavia or after they made their decision?  Did you
 8    have any conversation with them that somehow
 9    related back to the decision, anything like that at
10    all that you haven't testified to?
11         A.    I -- I don't recall any specific
12    discussions with the clients that you -- that you
13    showed me earlier.
14         Q.    Okay.  Any other meeting that you
15    haven't testified about or conversation you haven't
16    testified about generally regarding salaried
17    employees and what they were told in '98, '99?
18         A.    None that I recall.
19         Q.    Do you have an employment agreement
20    with Ford?
21         A.    I -- I applied for work with Ford
22    Motor and -- and I believe that I signed employment
23    papers that included an employment agreement.
24         Q.    Okay.
```

1          A.     But that's been 25 years ago and --

2     and knowing the processes now, I believe they were

3     the same then.

4          Q.     All right.  Are you at will?

5          A.     Yes.

6               MR. SIMON:  Okay.  I have no more

7     questions.

8               MR. VANWAY:  Okay.  He does not waive

9     signature.

10               MR. SIMON:  We're off the record.

11     Thank You.  We're done.  Thank you, sir.

12               THE WITNESS:  You're welcome.

13          (Deposition concluded at 12:41 p.m.)

14

15

16               _____

                           Michael Warden
17

18

19

20

21

22

23

24

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO          :

 4                           :   SS

 5    COUNTY OF HAMILTON     :

 6

 7          I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named MICHAEL

11    WARDEN was by me first duly sworn to testify the

12    truth, the whole truth, and nothing but the truth;

13    that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the 2nd day of September 2003 was

17    submitted to counsel for deponent's signature.

18          I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

167

1    taking said deposition a Notary Public in and for

2    the State of Ohio.

3         IN WITNESS WHEREOF, I have hereunto set my

4    hand and notarial seal at Cincinnati, Ohio, this

5    2nd day of September 2003.

6

7

8
              Susan M. Barhorst, Notary Public
9              in and for the State of Ohio.
              My commission expires
10             February 18, 2004

11

12

13

14

15

16

17

18

19

20

21

22

23

24