1

```
1                    IN THE UNITED STATES DISTRICT COURT

2                     FOR THE SOUTHERN DISTRICT OF OHIO

3                         WESTERN DIVISION, CINCINNATI

4
   EVERETT W. WHISMAN, et al.: Case No. C-1-02-406
5
           Plaintiffs,          : Judge Beckwith
6
   v.                           : Magistrate Sherman
7
   ZF BATAVIA, LLC, et al.,     :
8
           Defendants.          :
9   _____

10         Deposition of EVERETT W. WHISMAN, taken on

11   Monday, August 4, 2003, commencing at 9:12 a.m., at

12   the offices of Baker & Hostetler LLP, 312 Walnut

13   Street, Suite 3200, Cincinnati, Ohio, before

14   Susan M. Barhorst, Notary Public.

15

16

17

18

19

20

21                        GIGLIO REPORTING SERVICES
22                          3 CYPRESS GARDEN
                          CINCINNATI, OHIO 45220
23                            513-861-2200

24
```

2

```
 1   APPEARANCES:

 2   On behalf of Plaintiffs:

 3     David Cook, Esq.
       22 West Ninth Street
 4     Cincinnati, Ohio 45202

 5   Also present:

 6     Dennis Baker
       Pam Blanco
 7
     On behalf of Defendant ZF Batavia, LLC:
 8
       John J. Hunter, Jr., Esq.
 9     Hunter & Schank Co., L.P.A.
       1700 Canton Ave.
10     Toledo, Ohio 43624

11   Also present:

12     Herb Huebner

13   On behalf of Defendant Ford Motor Company:

14     Jeffrey L. VanWay, Esq.
       Baker & Hostetler LLP
15     312 Walnut Street, Suite 3200
       Cincinnati, Ohio 45202
16
     Also present:
17
       Michael Warden
18
     Cross-Examination
19
       by Mr. Hunter                    4, 185
20
       by Mr. VanWay                  116, 188
21

22

23

24
```

3

| | WHISMAN DEPOSITION EXHIBITS | MARKED/IDENTIFIED |
|---|---|---|
| 1 | | |
| 2 | 3 | 32 |
| 3 | 16 | 185 |
| 4 | 28 | 160 |
| 5 | 44 | 39 |
| | 45 | 81 |
| 6 | 46 | 82 |
| 7 | 47 | 82 |
| | 48 | 82 |
| 8 | 49 | 82 |
| 9 | 50 | 82 |
| | 51 | 109 |
| 10 | 52 | 112 |
| 11 | 53 | 112 |
| | 54 | 127 |
| 12 | 55 | 131 |
| 13 | 56 | 133 |
| | 57 | 135 |
| 14 | 58 | 171 |
| 15 | 59 | 172 |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

4

```
 1                         EVERETT W. WHISMAN

 2    being first duly sworn, testified as follows:

 3                         CROSS-EXAMINATION

 4    BY MR. HUNTER:

 5          Q.    Sir, will you please state your name

 6    for the record?

 7          A.    Everett Wayne Whisman.

 8          Q.    And, Mr. Whisman, what's your current

 9    address?

10          A.    11046 Liming-VanThompson Road,

11    Hamersville, H-A-M-E-R-S-V-I-L-L-E, Ohio, 45130.

12          Q.    Now, Mr. Whisman, I believe last week

13    you sat through a fair number of depositions in

14    this case, so you understand the process?

15          A.    Yes.

16          Q.    If at any time you can't hear me,

17    don't understand me or if for whatever reason you

18    don't feel you can fairly answer my question, I

19    really do want you to let me know that you've got

20    that problem and we will -- we'll either respeak

21    the question, do it more loudly or in a manner that

22    you understand and can fairly answer the question,

23    okay?

24          A.    Okay.
```

5

```
 1          Q.     Is there anything today that would
 2   prevent you from being able to go forward with your
 3   deposition?  Any medical issues, personal issues or
 4   otherwise?
 5          A.     No.
 6          Q.     Okay.  Obviously, Mr. Whisman, you are
 7   part of the litigation here.  And, as I understand
 8   it, part of the issue is that you believe certain
 9   representations or promises were made to you as a
10   Ford transitional employee; is that a fair
11   statement?
12          A.     That's correct.
13          Q.     Can you tell me what those promises
14   were?
15          A.     That if I hired on with ZF and left
16   employment with Ford, that the only change in my
17   benefits would be what they stated as to the
18   absent, paid absent days.  Vacation would be
19   basically the same.  We would be treated basically
20   like Ford employees, like we never left Ford and
21   we'd be considered transitional Ford employees.
22          Q.     Okay.  Anything else?
23          A.     No.
24          Q.     Okay.  Now, you got to help me a
```

6

1    little bit here.  When you say that your paid

2    absences would be the same, what does that mean?

3         A.    We had so many like sick days.  I

4    think --

5         Q.    Okay.

6         A.    -- with Ford, you had up to 30 days a

7    year.  When we came over, they said that would be

8    reduced to five.  And the bereavement and things of

9    that sort would be the same -- be the same as if we

10   were with Ford.  The pay structure would be the

11   same.

12        Q.    Okay.  Well, hang on.  Let's stick

13   with sick days.  When you say "sick days," are you

14   talking like short-term disability --

15        A.    Right.

16        Q.    -- are you talking personal days or --

17        A.    Just like if I called in sick today,

18   okay --

19        Q.    Okay.

20        A.    -- and I was off, you had up to 30 of

21   those days during the year as a Ford employee.

22        Q.    And those days were all paid?

23        A.    Yes.

24        Q.    All right.  Now, you also mentioned

7

```
 1    bereavement, which I would assume is different than
 2    sick days?
 3          A.    Yes.
 4          Q.    Okay.  Tell me what that difference
 5    is.
 6          A.    That's for death in the family --
 7          Q.    Okay.
 8          A.    -- for family members.
 9          Q.    And what were you promised?
10          A.    I was told it would be just like it
11    was with Ford.
12          Q.    Okay.  I don't know what that means.
13          A.    Be three to -- five days to three.
14    You would get three days and if it was out of town,
15    you could get up to five.  And then if it was -- I
16    had got up at Ford as much as, I think, 10 or 12
17    days when my father died --
18          Q.    Okay.
19          A.    -- paid.
20          Q.    Okay.  All right.  I think you also
21    said that your vacation was "basically the same,"
22    was the phrase you used?
23          A.    Right.
24          Q.    What did that mean?
```

1          A.     Well, like when you were a Ford

2     employee, once you got 10 years, you would have

3     four weeks vacation.  And that's what I brought

4     over and that's what I was allowed to have.  I had

5     the four weeks, except with Ford, we were allowed

6     to buy a week.  And -- and that was committed to

7     me.  I would be able to buy a week's vacation and

8     I'm no longer allowed to do that.

9          Q.     Anything else with respect to

10    vacation?

11         A.     No.

12         Q.     Now, you also said you would basically

13    be like a Ford employee or treated like a Ford

14    employee?

15         A.     Right.  We were --

16         Q.     I'm sorry.  What does that mean?

17         A.     We would go up with Ford or down with

18    Ford, as far as overtime rates.  You know, like we

19    have an overtime hourly rate.

20         Q.     Okay.  So when you say "up with Ford,"

21    that meant --

22         A.     Well, if -- if -- we were led to

23    understand if -- if we became ZF employees, we

24    would -- we would have the same benefits as we did

1   with Ford, that those wouldn't be taken away.

2   Whatever those benefits were, they would remain the

3   same things.

4           And it was things like hourly overtime

5   rate for a week and weekends.  That got adjusted as

6   we went a long with Ford, those things would remain

7   the same as a transitional Ford employee.

8           Q.    Okay.  So you said basically like Ford

9   and you said "up with Ford," "down with Ford."

10  What does "down with Ford" mean?

11          A.    Well, companies have good times and

12  bad times --

13          Q.    Okay.

14          A.    -- and we would understand, like if

15  our retirement stuff with Ford changed for better

16  or worse, we went along with the Ford people.

17  Whatever there's went to, that's what we would go,

18  for better or worse as a Ford transitional person.

19          Q.    Okay.  So I would gather what that --

20  from your comment, that basically the Ford programs

21  had changed from time to time, whether it was up or

22  down, depending upon Ford's economic circumstance?

23          A.    I think all companies do.  I believe

24  all companies do.  Ford's no different.

1          Q.     Okay.  You also made the comment, you

2     would be a transitional Ford employee?

3          A.     Yeah, we were termed transitional Ford

4     employees.  That's what we were termed.  That was

5     the title that was given us when we came over.

6     Now, that's the language we were -- that was used

7     to us when they were throwing the pitch to us to

8     come over to ZF Batavia.

9          Q.     I don't know what that means.  I mean,

10    that is certainly descriptive, perhaps, of a group.

11    But what did that mean to you, in terms of benefits

12    or whatever?

13         A.     Well, that meant that we -- we were

14    led to believe that we were different than regular

15    new hire ZF people.  So we were termed -- since we

16    were ex-Ford people, that we were transitional Ford

17    people, whereas the people that hired in off the

18    street were ZF Batavia people.

19              So when we were talked to by the

20    representatives that talked to us, we -- the

21    terminology was Ford transitional employees because

22    we had left Ford to go to ZF.

23         Q.     Okay.  But I guess what did that get

24    for you, aside from a nice title, perhaps?  Was

1    there something that was attendant to that title?

2        A.    Sure.  The promises that was made to

3    us that we would be like all other Ford employees.

4        Q.    Okay.  What else do you feel was

5    represented to you, in terms of the -- making the

6    jump from Ford to ZF Batavia?

7        A.    That we would be on the ground floor

8    to CVT.  It was an opportunity for us as a new

9    company that we would be on the ground floor of

10    CVT.  There would be promotional opportunities and

11    we would grow with the company.

12        Q.    Okay.  What else?

13        A.    The benefits and the things that we

14    had with Ford and the fact that we were getting in

15    on the ground floor to CVT were the big ones.

16    Those were the issues that we all heard and that's

17    what we believed.  To me, that was the most

18    important thing there.

19        The benefit package we had with Ford

20    would basically stay the same and the -- the part

21    where we could get on the CVT ground floor, those

22    were the big things to me.  I can't speak for the

23    other individuals, but those were the big things to

24    me.

1         Q.     Anything else you feel that was

2    represented to you?

3         A.     No.

4         Q.     Let's talk a little bit about your

5    history with Ford.  Do you remember when you hired

6    on there?

7         A.     I believe it was June 4th, 1989.

8         Q.     Do you remember what you hired on as?

9         A.     As a maintenance supervisor.

10        Q.     How long did you hold that position

11   with Ford?

12        A.     I still do.  I -- I held it at the

13   time I was there and I still hold that position.

14        Q.     Prior to coming to Ford, where did you

15   work?

16        A.     I worked at Duro Bag Corporation in

17   Kentucky.

18        Q.     And how long did you work there?

19        A.     Approximately a little over a year.

20        Q.     Why did you leave Duroby?

21        A.     To come to Ford, better employment.

22        Q.     Okay.  Better wages, better benefits?

23        A.     Better everything.  Better wages,

24   yeah.  It was just better everything.

```
 1          Q.    Okay.

 2          A.    Closer drive to where I live.

 3          Q.    Okay.  And how about prior to Duroby?

 4          A.    I sold cars for a short period of

 5   time.

 6                MR. COOK:  It's Duro Bag, right?

 7                THE WITNESS:  Duro, D-U-R-O, Duro Bag.

 8                MR. HUNTER:  Duro Bag, oh.

 9                MR. COOK:  Around here it's pretty

10   famous.  They make all Kroger's bags.

11                THE WITNESS:  Frisch's, Kroger's,

12   right.

13   BY MR. HUNTER:

14          Q.    So you sold cars?

15          A.    Mm-hmm.

16          Q.    Where did you sell cars at?

17          A.    Jeff Wyler.

18          Q.    And so we're talking now roughly

19   sometime around 1987?

20          A.    Yes.

21          Q.    Okay.

22          A.    Yes.

23          Q.    And how long did you do that?

24          A.    Maybe 10 months, nine months
```

1   approximately.

2          Q.     Okay.  So where were you at prior to

3   that?

4          A.     General Electric.

5          Q.     And what did you do for GE?

6          A.     I worked for -- I was a production

7   supervisor for General Electric.

8          Q.     And how long were you at GE?

9          A.     Almost 20 years.

10         Q.     Why did you leave GE?

11         A.     It was sort of a mutual thing.  It was

12  a mutual thing between the company and I and

13  dealing with the union, I thought I had enough of

14  dealing with the union and -- and thought I wanted

15  to get into something else.  It -- the money wasn't

16  there, so I attempted to get back into

17  manufacturing, went back to Duro Bag and then from

18  there I came to Ford.

19         Q.     When you say it was "a mutual thing,"

20  from the company's perspective, what was the issue,

21  if you know?

22         A.     Committeeman -- I had an issue with a

23  committeeman, where a comitteeman had -- had put

24  his hands on me and hit me and the company -- it

15

1    was a political thing where they thought the thing

2    to do was sweep it under the rug and I didn't feel

3    like that was the right thing to do.  So we

4    couldn't agree on that, so we parted company.

5         Q.    Was GE your first job, then, if you

6    were in there 20 years or --

7         A.    Yes.  I hired in there I think

8    10/23/1967.

9         Q.    Okay.  Have you ever been terminated

10   from a job?

11        A.    I don't know if you would call it a

12   termination at GE.  I more or less walked out, but

13   it was a -- you know, they might say it was.  I say

14   it wasn't.  You know, I more or less just walked is

15   actually what it was.

16            And then later on I was offered to

17   come back and work with the Air Force, which I

18   declined to do after I came to Ford and I decided

19   to stay with Ford.

20        Q.    Okay.  Have you ever filed suit

21   against anybody in the past?

22        A.    No.

23        Q.    Been involved in any type of

24   litigation whatsoever?

1          A.    No.  You mean as a -- as a plaintiff

2    you mean or --

3          Q.    As a plaintiff -- when I talk about

4    filed suit, been involved in litigation basically

5    on either side.  That would mean plaintiff or

6    defendant where somebody had sued you --

7          A.    No.

8          Q.    -- for example?

9          A.    No.

10         Q.    Okay.  Do you remember how you were --

11   first became aware of the joint venture between ZF

12   and Ford?

13         A.    Yeah, they had a meeting and I

14   can't -- I don't remember the exact day, but they

15   told us -- they had all the screen -- the movie

16   screen, the stage set up in the front of our

17   manufacturing area and they called a meeting for

18   everybody in the plant.

19              We all attended and they had several

20   people from division down and from ZF. And they

21   announced that ZF was buying 51 percent of the

22   company and would be a new joint venture between

23   Ford and ZF.

24         Q.    Had you ever heard of ZF --

1          A.     No --

2          Q.     -- prior to this?

3          A.     -- never.

4          Q.     Did you personally go to that meeting?

5          A.     Yes, I did.

6          Q.     And was that the one where Jacques

7     Nasser was on the TV screen --

8          A.     Yes --

9          Q.     -- and --

10         A.     -- yes, it was.

11         Q.     Safe to say that no terms of

12    employment were discussed at that meeting?

13         A.     I think -- I believe there was a

14    comment made you'll be able to stay with this

15    company as a Ford employee.

16         Q.     Who said that?

17         A.     I'm -- I'm not sure who said it.  I'm

18    not -- there was several people speaking and I'm

19    not sure who made that comment.

20         Q.     Do you remember when this was

21    approximately?

22         A.     Had to be in the '98 time period,

23    maybe.  '98, '99.  Might have been sooner than

24    that, but I doubt it.  I'm not real sure.

1          Q.    You do not know who made that comment?

2          A.    No, I don't.

3          Q.    Do you remember if it was Nasser that

4     was on the television screen or --

5          A.    I -- I really don't know because there

6     was people from the international union there, Gary

7     Mason was talking and -- you know, there was so

8     many people talking, I -- I really couldn't say who

9     made that statement.

10          Q.    Okay.  When was the next time you

11     spoke to a representative of Ford, ZF or ZF Batavia

12     about making the change in employment?

13          A.    I was approached by Jerry Priest and I

14     can't -- I can't say the exact date.  It was

15     probably early '99.

16          Q.    Okay.

17          A.    And I was presented an offer sheet by

18     Mr. Zielke and he informed me that I was being

19     officially offered a chance to go with the new

20     joint venture and he presented me with that offer

21     sheet.

22          Q.    Would that have been perhaps around in

23     May?

24          A.    That's possible.  I'm -- I'm not sure

1   of the exact date, but that's possible.

2       Q.    Now, did Mr. Zielke sign that offer if

3   you remember or --

4       A.    Don't believe he did.

5       Q.    Okay.

6       A.    I just think it was like a formal

7   thing, congratulations.  You've been offered

8   employment with ZF Batavia and he handed me the

9   offer sheet.

10      Q.    Okay.  The -- so between the press

11  release sort of with Jacques Nasser and sometime

12  early '99 you didn't hear from anybody, in terms of

13  what was going to happen at the Batavia plant?

14      A.    No.

15      Q.    Okay.  So you're approached by Jerry?

16      A.    Yes.

17      Q.    What did Jerry say to you at that

18  time?

19      A.    He was more or less telling me what

20  the expectations was with the company and they

21  needed the Ford expertise because ZF had never mass

22  produced transmissions and they needed certain

23  people and their expertise to get the new company

24  off the ground.  And there would be opportunities.

1              And I think the word that Jerry told

2    me was -- the phrase that he used was -- is they

3    don't expect us to jump up and reach the sky.  All

4    they expect us to do is stand on our tip toes and

5    reach.  And what they're asking is not totally

6    impossible and I just listened to him.  You know,

7    basically I can't tell you word for word what he

8    said, you know.  But he showed an interest in me

9    going with the new company.  He asked me if I was

10   interested.

11        Q.    And this was at or about the time you

12   got your hire letter?

13        A.    I think it was before that.

14        Q.    Okay.  So it wasn't Jerry coming up

15   with the hire letter?

16        A.    No, it was not.

17        Q.    Okay.

18        A.    No, it was not.

19        Q.    Do you know who Jerry worked for at

20   the time you had this discussion?

21        A.    No, I don't.

22        Q.    Do you remember anything else?

23        A.    Not direct -- not with the Jerry

24   Priest conversation, I don't.

1          Q.    Okay.  When was the next time you

2     spoke with somebody about your employment at

3     Batavia or your expectations, perhaps I should say?

4          A.    Probably a couple months later with

5     Hassan Saleh.

6          Q.    Okay.  Can you tell me about that

7     discussion?

8          A.    He had heard that -- that I -- the way

9     I took it, he had heard that I wasn't interested in

10     going with the new joint venture and he was -- I

11     took it that he was kind of upset with me because

12     he said he couldn't understand why I wouldn't be

13     interested in trying to make a new company run

14     because I have a son and a daughter-in-law that

15     works there and he doesn't understand being his

16     father and her father-in-law why I wouldn't want to

17     use my expertise to make the business run for their

18     benefit and --

19          Q.    Okay.

20          A.    And I indicated to him the only

21     problem I had was was I was afraid they would

22     change what I had with Ford and his comment was,

23     They're not going to do that.  They promised us

24     they wouldn't do that and Ford was going to look

1    over us and that wouldn't be an issue.

2        Q.    Who did Hassan work for at that time,

3    if you know?

4        A.    I'm not real sure who the managers

5    reported to.  He was a manager then.  So was Jerry

6    Priest and I'm not sure who they reported to.

7        Q.    Were they working for Batavia, though?

8    Were they working for Ford?  Were they working for

9    ZF or do you know?

10       A.    It was right on the border.  I'm not

11   sure if they had went with ZF yet or not.  I can't

12   really say if they went with ZF yet or not.

13       Q.    Okay.  Do you remember any other

14   comments made to you by Mr. Saleh?

15       A.    Not at that time, I don't.

16       Q.    You don't know his title and you don't

17   know who he was working for?

18       A.    He was a manager.  I believe he was a

19   production manager at the time.

20       Q.    Okay.  Any other comments made to you

21   by Mr. Saleh?

22       A.    Not at that time.

23       Q.    Would that discussion have been around

24   the time period that you received your offer letter

23

1    or subsequent to that?

2         A.    I'm not sure.  It could have been

3    before or after.  It was right around that time,

4    but I can't be sure if it was before or after.

5         Q.    Do you remember what you said to

6    Mr. Saleh?

7         A.    I -- I showed a concern that -- that I

8    was -- had my 10 years in with Ford, which is a

9    magical number for us, to get your 10 years in.

10   And being a new company, I wasn't sure that we'd be

11   able to retain the same benefits we had with Ford.

12   And he assured me that you would --

13        Q.    Okay.

14        A.    -- that those wouldn't change.

15        Q.    Okay.  Anything else you told him at

16   that time?

17        A.    Not at that time, no.

18        Q.    Did you tell him you were going to

19   take the job, you weren't going to take the job?

20        A.    I -- I told him I wasn't interested.

21        Q.    Okay.  When, then, was the next time

22   you spoke to anybody about your possible

23   employment --

24        A.    I had some -- I'm sorry.

```
 1          Q.     -- at Batavia?

 2          A.     I left -- at that time -- see, I'm not

 3   sure of the exact month I left and went to

 4   Sharonville, went to the Sharonville plant.

 5          Q.     Okay.  Because from your point of

 6   view, you had rejected the offer --

 7          A.     Yeah, I left.

 8          Q.     -- and it was a closed issue?

 9          A.     Exactly.

10          Q.     Okay.

11          A.     Exactly.

12                 (Dennis Baker entered the room.)

13          Q.     Okay.  We were at -- you had left

14   Batavia and gone to Sharonville?

15          A.     That's correct.

16          Q.     When next did you discuss with someone

17   the possibility of going back to Batavia?

18          A.     I had some -- I had phone

19   conversations with Mike Conners, an engineer, and

20   Jim Crump, who I believe at the time -- Jim was

21   either a maintenance foreman or an MTS.  I'm not

22   sure what.  Foreman, supervisor.

23          Q.     Okay.

24          A.     And I had been in the gear department
```

1     when I left Sharonville and they indicated to me

2     that they had hired a new hire back there that

3     wasn't doing such a good job.  And gears was out of

4     control and -- and we can sure use you back over

5     here at Sharonville.  And that was sort of a

6     friendly conversation.

7              I mean, that wasn't they were making

8     me an offer.  They just indicated that a lot of

9     guys had worked for me long term were unhappy and

10    sort of like I abandoned them.

11         Q.    Okay.

12         A.    And we could sure use your expertise

13    back in the gear department.

14         Q.    Okay.

15         A.    And I think at that time, I told Mike

16    Conners maybe -- you know, I would consider coming

17    back 'cause my wife's health.  You know, my wife is

18    pretty bad off and I was making a long drive to

19    Sharonville and I was thinking about retiring real

20    soon and I thought, Well, maybe if they assure me

21    the benefits are there and nothing will change,

22    maybe I'll go back.

23              So they indicated one of them was

24    going to talk to Hassan, you know.  They did so and

1    I think my son talked to Hassan, too, because he

2    wanted me to come back to Batavia and that.  At

3    that time, I was told -- by then, Hassan said to

4    come in and see him.  I'm not sure if I -- if I

5    called Hassan and talked to him or not.  I may

6    have.  I'm not real sure.

7         Q.    Okay.  When you say those two, that

8    would be Conners and Crump?

9         A.    Mike Conners and Jim Crump.

10         Q.    Said they talked to Hassan?

11         A.    One of them did.  I'm not sure which

12   one 'cause some -- and my son did also, so then I

13   got hooked up with Hassan in a discussion about

14   coming back to Batavia.

15         Q.    Okay.  When did you next speak with

16   somebody about the issue?

17         A.    I'm not sure that I did until I came

18   back into the plant and talked to Hassan about it,

19   I believe.

20         Q.    Okay.  When did you come to the plant

21   and talk to Hassan?

22         A.    It was late 1999.

23         Q.    Okay.  And tell me about the

24   discussion with Hassan.

1          A.     We went over the benefit things again

2     and I want -- I want him to reassure me that

3     there -- that if I came back, there wouldn't be a

4     change, that everything would remain the same, the

5     promises that were made, the vacation, the benefits

6     and et cetera would be the same.  And I wouldn't

7     come back and there wouldn't be a change in that.

8     And I emphasized the overtime pay.  Yes, you'll get

9     overtime pay, just like you did with Ford.  He said

10    basically everything is going to be like you were

11    with Ford.  We're transitional people and we'd be

12    different than the ZF new hires.

13         Q.     Well, what did he tell you about the

14    overtime pay?

15         A.     He just said you'll get paid as you

16    did before.  There will be no change in that.

17         Q.     Okay.  So what happened next?

18         A.     We talked about it and I agreed -- I

19    agreed with him that I would come back.  So I think

20    I worked there for a few weeks as a Ford employee,

21    and then they said by December 15th, you have to go

22    up and sign the papers to join ZF and that's what I

23    did.

24         Q.     Let's back up.  I think we covered a

28

```
 1    lot of things there.

 2            A.    Okay.

 3            Q.    All right.  So sometime late in '99,

 4    you met with Hassan at the plant?

 5            A.    Mm-hmm.

 6            Q.    You had a conversation with him, which

 7    I think you related to me?

 8            A.    Yes.

 9            Q.    How is it that you physically got back

10    in the plant?  I mean, did you have to go up to HR

11    or how did that --

12            A.    No.

13            Q.    -- physically happen?

14            A.    I just walked in.

15            Q.    Okay.

16            A.    I just came into the plant.  And like

17    I say, they assigned me back out to the gear

18    department.

19            Q.    Okay.  But who was that that assigned

20    you out there?

21            A.    Hassan.

22            Q.    Okay.  Did Hassan take care of

23    whatever paperwork was required?

24            A.    No.  There was no paperwork done until
```

1     I went up and did the actual signing the papers to

2     become a ZF employee.

3          Q.     Okay.  So you had accepted the job

4     based upon your discussion with Hassan?

5          A.     Yes.

6          Q.     And apparently nothing else?

7          A.     Exactly.

8          Q.     Okay.

9          A.     Well, I wouldn't say nothing else.  I

10    talked to some of the other transitional employees

11    and they'd been told the same thing and with --

12    after talking to them, after talking to Hassan,

13    then I decided to -- to go ahead and go back.

14         Q.     Well, what other employees did you

15    talk to?

16         A.     Most everyone.  I talked to most of

17    the maintenance supervisors about the promises they

18    were made and they were assured that this promise

19    would be kept and -- and -- 'cause I reiterated

20    with them after I talked to Hassan and they all

21    felt comfortable making the move and, therefore, I

22    did, too.

23         Q.     Okay.  Let's talk -- who specifically

24    did you speak with?

```
 1          A.    I talked to Ed Erras.

 2          Q.    Okay.

 3          A.    Ron Pearce.

 4          Q.    Okay.

 5          A.    Jerry Priest.

 6          Q.    Okay.

 7          A.    And I can't remember all the others,

 8   but those -- those are a few.

 9          Q.    Let's talk about Ed Erras.  What did

10   he tell you?

11          A.    Ed Erras?

12          Q.    Mm-hmm.

13          A.    He said the promises were made to him

14   and he felt comfortable with it, they would agree

15   to -- they would stand by the agreement.

16          Q.    Okay.

17          A.    And after talking -- I talked to Mike

18   Shore some, too, and --

19          Q.    I'm sorry?

20          A.    Mike Shore, I talked to Mike Shore,

21   too.  And they felt like it was a golden

22   opportunity to get on the ground floor of CVT

23   and -- and we wouldn't take a whack on our benefits

24   and our overtime and stuff like that.  And they
```

```
 1   felt comfortable with the agreement.  And,
 2   therefore, I thought if all them feel comfortable
 3   with it -- you know, it must be okay.
 4        Q.    So you relied on what they were
 5   telling you?
 6        A.    Yeah, somewhat.  That's not what made
 7   my decision.  The discussion I had with Hassan is
 8   what made my decision to come back.
 9        Q.    I thought it was in part related to
10   your wife's health issues --
11        A.    It was.
12        Q.    -- as well?
13        A.    It was.  That's true.
14        Q.    So what did Ed Erras tell you?
15        A.    We talked about bereavement, overtime
16   pay, retirement benefits, 401K and things like
17   that.  And we thought it was okay, you know.  And
18   he felt comfortable with it and -- and I did, too,
19   at the time.
20        Q.    Was there any other statements or
21   anything else then you relied on to make your
22   decision?
23        A.    No.
24        Q.    At some point in time, you did sign an
```

```
 1    offer letter, didn't you?

 2          A.    I believe I did.

 3          Q.    I'm sorry?

 4          A.    I believe I did.

 5          Q.    Okay.  This exhibit has been used

 6    before and I apologize.  I've got number three

 7    here.  Dave, if you've got one and can share it.

 8                Okay.  Mr. Whisman, your counsel is

 9    kind enough to be showing you the -- plaintiff's --

10    or I'm sorry.  The deposition Exhibit Number 3.

11    Can you take a minute to take a look at that

12    document?

13          A.    Yes.

14          Q.    Okay.  Have you ever seen Exhibit

15    Number 3 before?

16          A.    Yes, I have.

17          Q.    Can you tell me what that document is?

18          A.    That was the one where they explained

19    what my signing bonus would be and the -- the date

20    of my actual hiring on with ZF Batavia and what my

21    title would be and my salary.

22          Q.    Okay.  Did you ever discuss the terms

23    of this letter with anyone?

24          A.    Hassan.
```

1          Q.     Okay.  In all of our discussions so

2     far, you never mentioned that you discussed this

3     with Hassan.  At what point in time did you discuss

4     this letter with Hassan?

5          A.     When I went to his office for a -- I

6     believe for the formal meeting and when he threw

7     the pitch to me --

8          Q.     Okay.

9          A.     -- after coming back from Sharonville.

10          Q.     Well, did he have this letter with him

11     at that time?

12          A.     I'm not real sure.  I'm not real sure.

13     I believe this letter was with Ann Jones.  I

14     believe I talked to Hassan and when I went up with

15     Ann Jones, I believe -- personnel to sign on with

16     them, I believe she had the letter at that time

17     there.

18          Q.     Okay.  Because that's -- when I had

19     mentioned before --

20          A.     Right.

21          Q.     -- about how did you get back in the

22     plant --

23          A.     Right.

24          Q.     -- somehow I didn't think they just

34

```
 1   send you out there.

 2        A.    Right.

 3        Q.    Okay.  So you think you might have

 4   gone up and spoke with Ms. Jones?

 5        A.    I know I did.

 6        Q.    All right.

 7        A.    And I believe, if I'm not mistaken,

 8   this document was there, but that was after I was

 9   back in the plant for a couple weeks.

10        Q.    Okay.  All right.  So, again, you've

11   seen this document before.  Do you think you ever

12   spoke with Mr. Saleh about this document or not?

13        A.    I can't say if I did or not.

14        Q.    Okay.  With respect to the transition

15   bonus of $25,000, do you see that --

16        A.    Yes, I do.

17        Q.    -- in the second bullet point?

18        A.    Yes, I do.

19        Q.    Did you receive that bonus?

20        A.    Yes, I did.

21        Q.    Okay.  Do you see in the bottom

22   left-hand corner -- I should have done this before.

23   It's very hard to read.  But from what you can see

24   on Exhibit 3, does that appear to be your signature
```

1   down there on the left-hand side.

2       A.   Yes, it does.

3       Q.   And do you see the language at the

4   second bullet, the last sentence, it says, This

5   bonus is designed to address any monetary

6   differences between Ford benefits and ZF Batavia's

7   new plan?

8       A.   Yes, I do.

9       Q.   Okay.  Did you read that?

10      A.   Yes, I did.

11      Q.   Okay.  What does that mean to you?

12      A.   Well, I asked that question with Ann

13   Jones, I believe, and she stated that that was to

14   make up for the difference in the personal days

15   that we got from ZF versus Batavia when we went

16   from 30 to 35.  And it was the difference in what

17   they gave us compared to what we had before.

18      Q.   So you were -- your testimony is you

19   were paid $25,000 only for the personal days?

20      A.   No.  Just for the benefits like the

21   personal days, and that was it over the years to

22   make up the difference from what we were getting

23   less by signing on with ZF.

24      Q.   It doesn't say that, but --

```
 1          A.    I know that.

 2          Q.    Okay.

 3          A.    Yeah, I see that.

 4          Q.    Okay.  Do you remember, was there

 5    something attached to this document?

 6          A.    I don't believe there was.

 7          Q.    And I said "this document," Exhibit 3.

 8          A.    I don't believe there was.

 9          Q.    Okay.  You see that it talks about

10    summary attached up there in the second paragraph?

11          A.    Mm-hmm, yes.

12          Q.    Did you ask Miss Jones for a copy of

13    any attachment?

14          A.    No.  She showed me the copy.

15          Q.    I'm sorry?

16          A.    The tri-fold.  She showed me a

17    tri-fold.  It was in the papers when we were

18    signing papers.

19          Q.    Okay.  I think the attachment we've

20    referred to is the gray brochure, perhaps?

21          A.    Right, right.

22          Q.    Okay.  You would acknowledge, wouldn't

23    you, that it doesn't make any representations that

24    you're going to be treated as a Ford transitional,
```

1    correct, Exhibit 3?

2         A.    Well, I think -- let me read this

3    again here.  The second paragraph where it says,

4    Former Ford employees -- you know, that's where I

5    question it.  It wasn't like a ZF employee.  So I

6    made -- I made the comment, So we're not treated

7    like all new hire ZF people?

8         Q.    Mm-hmm.

9         A.    And Ann said, No.  He said that's why

10   they're in there, Former Ford employee because you

11   won't be like ZF new hires.

12        Q.    Okay.

13        A.    You know, and that's where the

14   difference was made between the two, Ford

15   employees --

16        Q.    But it certainly --

17        A.    -- versus ZF.

18        Q.    Sure.  But it certainly doesn't say

19   what -- what that difference will be, does it?

20        A.    No, it doesn't.

21        Q.    And you'd already accepted your job

22   prior to signing this document --

23        A.    Yes, I had.

24        Q.    -- based upon a discussion with

38

```
 1    Mr. Saleh?

 2          A.    Yes.

 3          Q.    Do you remember what your overtime

 4    rate was at the time you accepted your position?

 5          A.    No, I don't.

 6          Q.    Do you remember what the overtime rate

 7    was at ZF Batavia when you came on board?

 8          A.    No, I do not.  We were supposed to

 9    take the same overtime rate we had with Ford, but I

10    couldn't tell you what that was.

11          Q.    And in terms of that same overtime

12    rate that's based upon your discussion with

13    Mr. Saleh, Mr. Erras, Mr. Priest and all those

14    individuals --

15          A.    Yes.

16          Q.    -- you've identified otherwise?

17          A.    Yes.

18          Q.    Did you ever ask anybody from human

19    resources at ZF Batavia, Mr. Kehr, Mr. Adams,

20    anybody about what you would be provided --

21          A.    No.

22          Q.    -- at Batavia?  You never went to any

23    of the employee meetings --

24          A.    No, I did not.
```

39

```
 1        Q.      -- did you?

 2        A.      No, I did not.

 3        Q.      And prior to -- apparently your

 4    sitting in Annie Jones' office, you had not seen

 5    then the gray brochure?

 6        A.      No.

 7                MR. HUNTER:  Exhibit -- are we up to

 8    30?  Off the record.

 9        (Off the record:  9:47 a.m. - 9:48 a.m.)

10        Q.      Mr. Whisman, I've handed you what

11    we've marked --

12                MR. COOK:  Excuse me.

13        Q.      Mr. Whisman, I hand you what we've

14    marked as Exhibit 44.  Have you seen that document

15    before?

16        A.      Yes, I have.

17        Q.      All right.  Can you tell me what that

18    document is?

19        A.      That's what I -- Ann -- I think -- I

20    believe Ann had me fill this out at -- when we did

21    the formal sign over.

22        Q.      Okay.

23        A.      She had -- she went with -- she had me

24    fill this out then.  I believe that's when I filled
```

1    it out.

2         Q.    Okay.  That's your handwriting

3    throughout the document?

4         A.    Yes, it is.

5         Q.    And your signature three places on the

6    second page?

7         A.    Yes, it is.

8         Q.    Did you read that document before you

9    signed it?

10        A.    I believe I did.

11        Q.    Okay.  Do you feel you understood the

12    document?

13        A.    No, not as I see it now I didn't, I

14    don't think.

15        Q.    Well, maybe not as you see it now, but

16    at the time you signed it, did you feel you

17    understood it?

18        A.    Yeah, I thought so.

19        Q.    Okay.  And you'd read it?

20        A.    Yes.

21        Q.    Do you remember what your starting

22    salary was?

23        A.    No, I really don't.

24        Q.    Does 65,400 sound right?

1          A.    That's probably close.  If that's not

2    it, that's probably close.

3          Q.    If you take a look back at Exhibit

4    3 --

5          A.    Okay.

6          Q.    -- and you --

7          A.    Yeah.

8          Q.    -- take a look at 5,450 a month --

9          A.    Yeah.

10         Q.    -- and trust my math, which may be

11    dangerous, but I believe that's 64 -- 65,4?

12         A.    That sounds right.

13         Q.    Is that what you were making at Ford?

14         A.    Yes.

15         Q.    All right.  Do you remember when you

16    next -- when did you next receive a pay raise?

17         A.    I believe it was a year after I went

18    over.  I went over December 15th of 1999.

19         Q.    Okay.  So would it have been, for

20    example -- well, when was it that you think you got

21    the next pay raise?

22         A.    Approximately a year later, a year

23    after I went over, I believe.

24         Q.    If I told you I thought you got a pay

1    bump in March of 2000, would that sound incorrect?

2         A.    That could be.

3         Q.    If I told you that you got a pay bonus

4    of 66,708 in March of 2000, would that sound

5    incorrect?

6         A.    It could be.  I -- I -- it wouldn't be

7    unheard of.

8         Q.    Okay.  Well, if you had stayed at

9    Ford, what would your pay increase have been or

10   when would you have next gotten a pay increase at

11   Ford?

12        A.    We got a pay increase every year.

13        Q.    Okay.

14        A.    So I'm -- I'm not sure when my last

15   one was with Ford, but it would have been a year

16   later.

17        Q.    Okay.  Was that something that you had

18   expected to stay the same or --

19        A.    Well, I thought it would be in the

20   same range percent-wise as it was with Ford.

21        Q.    Okay.  Why did you think that?

22        A.    Because we were told that.

23        Q.    You were told your salary would stay

24   the same?

43

1          A.     We -- we were told that we would be

2     treated like we never left Ford.

3          Q.     Okay.

4          A.     That's what we were told.

5          Q.     Okay.  And so what would your pay

6     increase at Ford have been?

7          A.     I don't know, five percent.  Now, I'm

8     just guessing.  I can't say for sure.  In the five

9     percent range, six percent range.

10         Q.     Sure, because it depended on

11    economics, in terms of how Ford was doing at any

12    given point in time, didn't it?

13         A.     I'm sure that played a role.

14         Q.     Well --

15         A.     It was mostly based --

16         Q.     But there was no set number?

17         A.     No, I don't believe so.

18         Q.     Okay.  Do you have any idea how your

19    bump in March of '01 compared to what everybody

20    received at Ford?

21         A.     No, I do not.

22         Q.     And when we talk about everybody at

23    Ford, Ford has -- I don't even know how many

24    employees.  Is it employees with Ford around the

1    world or what are we talking about?

2        A.    I'm talking me as a Ford employee.

3        Q.    Okay.

4        A.    The way I was with Ford before I came

5    to ZF.  I don't know about all the other employees

6    at Ford.  I can only talk about the 10 years I was

7    with Ford.

8        Q.    Okay.  Did you also receive an AIP

9    bonus?

10        A.    The first year, I may have.  I believe

11    I did the first year.

12        Q.    Do you remember how much that bonus

13    was?

14        A.    No, I do not.

15        Q.    How much would your bonus have been

16    had you stayed at Ford?

17        A.    I'm not sure.  I got in double figures

18    with Ford, I know.  But I can't tell you the exact

19    amount I received from Ford.  I'm not saying I got

20    that much every year.  We didn't.  The

21    performance -- it definitely was based on Ford's

22    performance and their profits.

23        Q.    No recollection as to what you

24    received as a performance -- or I'm sorry.  -- as

1    an AIP bonus?

2            A.    At Ford?

3            Q.    At Batavia, first year.

4            A.    No, I don't.  The first year, I don't.

5            Q.    Any idea what Ford employees received?

6            A.    No, I do not.

7            Q.    And you would acknowledge that that

8    AIP payment changed from time to time?

9            A.    Absolutely.

10           Q.    Okay.  Do you remember your next pay

11   increase?

12           A.    No, I don't.  I got a pay increase

13   like in March of each year.

14           Q.    Okay.

15           A.    March time period.

16                 MR. COOK:  Could you help me?  Are you

17   now referring to Ford or ZF?

18                 MR. HUNTER:  He works for ZF.  His

19   next pay increase would have been after the March

20   2000 --

21                 MR. COOK:  But you were switching back

22   and forth as to what was happening at Ford and

23   what.  So I -- just in terms of clarification.

24                 MR. HUNTER:  Sure.

```
 1                 MR. COOK:  Thank you.

 2          Q.    Okay.  I think we've agreed you had a

 3    pay bump in March of 2000?

 4          A.    Mm-hmm.

 5          Q.    Next pay bump would have been when, if

 6    you know?

 7          A.    Should be in March for next year.

 8          Q.    Okay.  Do you remember how much that

 9    pay bump was?

10          A.    No.  It wasn't very much, but I don't

11    remember how much it was.

12          Q.    Okay.  Do you remember, how did it

13    compare with Ford?

14          A.    It seems like it was less, but I can't

15    swear to that.

16          Q.    You just don't know?

17          A.    No, I don't.  No, I don't.

18          Q.    Okay.  How about March of '02, did you

19    receive another pay bump?

20          A.    Yes.

21          Q.    How much was that?

22          A.    I'm not sure what the percentage

23    was --

24          Q.    Okay.
```

47

```
1          A.    -- for sure.

2          Q.    And how does it compare with what an

3    employee at Ford would have received?

4          A.    I have no idea.

5          Q.    And how about March of '03?

6          A.    Yes.

7          Q.    Okay.  Do you remember how much that

8    pay bump was?

9          A.    Probably two percent.  I'd say in the

10   two percent neighborhood.

11         Q.    Do you know what your current salary

12   is?

13         A.    It's in the seventies, I believe.

14         Q.    About 78,150?

15         A.    Could be, yeah.

16         Q.    And you started at 65,400, correct?

17         A.    That's correct.

18         Q.    So since 1999, and you came on very

19   late in 1999, your pay has increased almost $13,000

20   in terms of base pay, hasn't it?

21         A.    Yeah.

22         Q.    How does that compare with somebody at

23   Ford?

24         A.    I'm not real sure.
```

1          Q.    Do you remember when you next received

2    an AIP bonus going from March 2000 forward?

3          A.    I don't believe I got one in 2000.  I

4    believe it was 2002.  I got one this year.  Last

5    year I didn't.

6          Q.    Okay.  And how does that compare with

7    Ford?

8          A.    I'm not sure that I never got a bonus

9    with Ford, a profit sharing with Ford.  I'm not

10   sure that there was a time I didn't get a profit

11   sharing with Ford.

12         Q.    Okay.  But for March of 2001, how did

13   that AIP payment relate, in terms of what Ford

14   employees received?

15         A.    I -- I couldn't tell you.

16         Q.    Now, you made a comment that you

17   didn't receive an AIP bonus?

18         A.    This year I did.  Last year I didn't.

19         Q.    Okay.  And if we say that you didn't

20   receive one last year, that would be March of 2002?

21         A.    I believe so, yes.

22         Q.    And that would have been an AIP

23   payment then for actually calendar year 2001?

24         A.    I believe so.

49

1          Q.     Do you know why you didn't receive an

2     AIP bonus?

3          A.     Yes.  Milt Gross told me that I had

4     worked too much overtime and it was a performance

5     issue.

6          Q.     Okay.

7          A.     And I informed him that my performance

8     review was excellent.  He said, Not the one you got

9     there, but the one you're getting from 50,000 feet

10    above.  And I said, Who's that?  And he said, I'm

11    not at liberty to tell you that.

12         Q.     What else did you discuss with Mr.

13    Gross?

14         A.     I asked him if he thought that was

15    fair and he said, No.  But he said it's -- I was

16    told to do that.

17         Q.     Did you discuss anything else with him

18    at that time?

19         A.     No, it was pointless.  I said, I

20    understand and I left.

21         Q.     Did you go talk to somebody in human

22    resources?

23         A.     No.

24         Q.     Did you go talk to Mr. Kehr?

1          A.    No.

2          Q.    Mr. Adams?

3          A.    No.

4          Q.    Anybody else about the issue?

5          A.    No.

6          Q.    Wouldn't it be safe to say you

7    probably talked to some of the other plaintiffs in

8    this case about the issue?

9          A.    Yes.

10         Q.    Okay.  So who did you talk to?

11         A.    Ron Pearce, Ted Edrington.

12         Q.    Okay.

13         A.    I don't know.  I don't know if it was

14   anybody else or not.  There could have been more,

15   but I'm not sure.  But I know I talked to those two

16   about it.

17         Q.    Okay.  Why didn't you go talk to

18   somebody in human resources or somebody 50,000 feet

19   up?

20         A.    'Cause it's pointless.

21         Q.    When have you ever discussed such an

22   issue with them in the past?

23         A.    I discussed issues like that with

24   Mr. Sennish at face to face.

1          Q.    Okay.  Well, let's talk about

2     Mr. Sennish for just a second.  Do you remember

3     your first conversation with him?

4                MR. COOK:  You mean first ever?

5                MR. HUNTER:  Mm-hmm.

6          A.    Probably the first time I ever met him

7     was at one of the face-to-face meetings that we had

8     every Wednesday.

9          Q.    Okay.  And that was a weekly

10    meeting --

11         A.    Mm-hmm.

12         Q.    -- related to production and

13    production type issues?

14         A.    Mm-hmm.

15         Q.    All right.  In terms of a pointless

16    discussion with Mr. Sennish, let's talk about your

17    first pointless discussion with Mr. Sennish.

18         A.    I don't know if I ever had a

19    one-on-one discussion with him.

20         Q.    Okay.

21         A.    It was more or less when I was in a

22    group atmosphere.

23         Q.    Okay.  And where do you feel, again,

24    that it was pointless or from what source do you

1    feel it was pointless to raise issues with

2    Mr. Sennish?

3         A.    I -- I would -- I heard several

4    individuals in those meetings asking him questions

5    about their benefits and stuff and he more or

6    less -- he didn't more or less tell them.  He just

7    told them, If you don't like it, quit.  If you

8    don't like the way I do things, quit.

9         Q.    Do you remember the nature of the

10   questions that were raised?

11        A.    Well, I remember Rick Senior asked him

12   about the hour casual time and he was trying to

13   clarify the issue and he told Rick Senior if he

14   didn't like it, quit.

15        Q.    And when we talk about Rick Senior

16   here, that's Rick Ervin, Senior?

17        A.    No, Rick Senior.

18        Q.    Rick Senior?

19        A.    His last name is Senior, Rick Senior.

20        Q.    All right.  You sat through

21   Mr. Sennish's deposition, didn't you?

22        A.    Yes, I did.

23        Q.    Do you remember Mr. Sennish's

24   testimony regarding the discussion about quitting

```
 1   and leaving Batavia?

 2        A.    Yes, I do.

 3        Q.    Do you feel that his testimony was

 4   accurate?

 5        A.    Absolutely not.

 6        Q.    Okay.  So I gather you don't have a

 7   lot of confidence in Mr. Sennish?

 8        A.    No, no, I do not.

 9        Q.    Okay.  And I'm not trying to put you

10   on the spot.

11        A.    I understand.

12        Q.    So why not go see Mr. Adams or

13   Mr. Kehr?

14        A.    Because to talk to other people at the

15   plant, they said it would be pointless to do that

16   'cause you're going to get the same thing from

17   them.

18        Q.    Okay.

19        A.    And from what I had seen from them at

20   face to face, in fact, I -- I agreed with them.

21        Q.    Okay.  All right.  And I apologize.

22   We kind of went off on a tangent there.

23        A.    That's okay.

24        Q.    You indicated you spoke to Mr. Pearce
```

54

1    and Mr. Edrington regarding your AIP payment.  Do

2    you remember what you told them?

3         A.    It wasn't what I told them.  I asked

4    them if they were told the same thing as me, that

5    they were penalized for working too much overtime

6    and they said yes.  And -- And I asked them, Did

7    you explain to him that you were forced to work

8    overtime, and they said yes.  And they said it

9    didn't matter.

10              We realize you were forced, but you're

11   still not getting a bonus.  I think Ted got a

12   reduced bonus and I think -- I don't think Ron --

13   Ron got one at all.

14        Q.    Did you do anything further at that

15   point about the bonus issue?

16        A.    No.  There -- there was people that

17   had asked Mr. Sennish about it face to face is why

18   I didn't go any farther and I heard his comments

19   back to them and I thought it pointless to say

20   anything to anybody.

21        Q.    Do you remember what his comments were

22   back to them?

23        A.    They didn't like it, quit.  Basically

24   if you don't like it, quit.

```
 1          Q.     Okay.  Any other comments at all?

 2          A.     No.

 3          Q.     Any discussion about the fact that --

 4          A.     Well, they asked him how he -- one

 5   person asked him about his bonus or something.  He

 6   said that you got to understand I -- I get my bonus

 7   and they give me a bonus to make me equal with my

 8   Ford counterpart.  That was his comment at the face

 9   to face.

10          Q.     Okay.  Any discussion about the amount

11   of overtime that was being worked?

12          A.     With who?

13          Q.     At this face-to-face meeting where --

14   we've been talking about.

15          A.     You mean where we --

16          MR. COOK:  I'm not sure that he's

17   describing a single face-to-face meeting.

18          A.     Now, these are numerous face to face.

19   This is not one face to face.  I'm talking about --

20   you know, like we had the meeting every Wednesday

21   and things were brought up in different meetings.

22          Q.     Okay.  So the overtime issue, in terms

23   of AIP, occurred at more than one meeting?

24          A.     Probably, I'd say probably.
```

1          Q.     What other measurables were used to

2     determine the AIP bonuses for 2000?

3          A.     I was just told performance issue and

4     you work too much overtime.  Those two issues and

5     that was it.

6          Q.     You're not familiar, then, with the

7     other measurables the plant used, in terms of

8     determining eligibility for AIP and the -- and the

9     bonus pool?

10         A.     No.

11         Q.     Do you know how that compared with

12    Ford?

13         A.     No, I do not.  The only -- the only

14    measurables I saw was really put out for the

15    production people on costs, quality, deliverables,

16    which don't pertain to maintenance.  You know,

17    we're separate from production.  And we're not

18    really responsible or held accountable for quality

19    in a sense like they are.

20         Q.     And I didn't tell you, Mr. Whisman, if

21    you need to take a break at any time point --

22         A.     That's okay.

23         Q.     -- just let me know.

24         A.     That's fine.

1        Q.     Let's talk a little bit about

2    overtime.  When you were at Ford, how was overtime

3    paid?

4        A.     We were paid for all scheduled

5    overtime and we were expected to be there 15, 20

6    minutes, up to a half an hour at the beginning of

7    the shift or whatever it took to line the person up

8    that followed us.  And then we were there 10 or 15

9    minutes after the other shift or whatever it took

10   to make sure he was comfortable with the lineup

11   before I left.

12       Q.     Okay.  And when you say, "paid for all

13   scheduled overtime," what is scheduled overtime?

14       A.     Scheduled overtime basically to us is

15   whatever your boss signed your timecard for.  You

16   know, he would look at it.  He would determine if

17   he considered that scheduled overtime.

18              Like for maintenance, we cover

19   production people.  You know, basically that's what

20   we do.  We function and cover production areas.  So

21   if production people are scheduled on Saturday and

22   Sunday, then we're scheduled.

23       Q.     Okay.  And is your schedule --

24   basically what we're talking about is a shift or

58

```
1    perhaps a shift plus four hours or two hours or

2    something like that?

3         A.    Yes.

4         Q.    And so if a shift started at 3:30 and

5    ended at 11:30, for example, scheduled overtime for

6    a shift -- or scheduled -- I said that poorly.

7              If you were scheduled from 3:30 to

8    12:30 --

9         A.    In the evening?  We talking about 3:30

10   in the evening?

11        Q.    Mm-hmm.  3:30 to 12:30 midnight, plus

12   a half hour, how would you report that on your

13   timecard?

14        A.    I think it comes out to eight and a

15   half hours.  We -- we don't get a paid lunch, so we

16   would -- we would show eight hours.  For eight and

17   a half hours, we would show eight hours of pay.

18        Q.    And this is -- we're talking at Ford?

19        A.    Right.

20        Q.    Okay.  All right.  And so given my

21   example, kind of as poorly worded as it was, and

22   again, we're assuming that production was going to

23   run 3:30 to 12:30, what time would you show up at

24   the plant?
```

```
 1          A.    I was told at Ford that I was to be
 2    there a half an hour, 20 minutes prior to the start
 3    of the shift.
 4          Q.    Okay.  That's what you were told, I
 5    guess.  Is that what you did?
 6          A.    Absolutely.
 7          Q.    Okay.
 8          A.    Yeah, absolutely.
 9          Q.    The way you said that, I thought --
10          A.    Yeah, that's -- that's what they --
11    that was their expectation and that's what I did.
12          Q.    Okay.  And so for a 3:30 production
13    start, you would show up three to 3:15, something
14    like that?
15          A.    Well, actually I would start at three.
16    Production would start --
17          Q.    Okay.
18          A.    -- at 3:30.  My shift would start at
19    three.
20          Q.    Three --
21          A.    And I would get there basically 3:30,
22    sometimes 20 till three.
23          Q.    2:30, 20 till three?
24          A.    2:30 till 20 till three.  I'm sorry.
```

60

```
 1          Q.     All right.

 2          A.     Right.

 3          Q.     And your timecard, then, would have

 4     what as a start time on it?

 5          A.     It varied.  Sometimes it got to the

 6     point where we would just show like 3:00 when we're

 7     actually there at three.  The main thing was we

 8     were scheduled eight hours overtime and that's what

 9     we put on it.

10                 If we stayed like nine hours -- if we

11     work like -- if we started at like 20 till three

12     and got off at 11:30 at night, we would display

13     eight hours.  But once we got to the hour, we would

14     put nine hours on our card for overtime --

15          Q.     You got to help me here.

16          A.     Okay.

17          Q.     Okay.  When you say you got --

18          A.     Nine and a half actually, when it got

19     to nine and a half.  Because, see, if we start at

20     three and work till 11:30, that's eight and a half

21     hours.

22          Q.     Okay.

23          A.     And we don't get -- that half hour is

24     lunch, okay?
```

61

```
 1          Q.     Okay.  So let's stop right there.

 2          A.     Okay.

 3          Q.     So you've got that eight and a half

 4    hours.  What does the timecard say?

 5          A.     I believe it said exactly what we

 6    worked on our card.  Like if we got there at 20

 7    till three, I believe we put 20 till three on our

 8    card.

 9          Q.     All right.  So you'd be from 2:40 and

10    what would be the end time, then?

11          A.     Well, normally we get off at 11:30.

12    Most of the time, that's when I left, at 11:30 --

13          Q.     Okay.

14          A.     -- unless there was something that

15    would keep me there for longer, unforeseen.

16          Q.     And then how many hours is that, in

17    terms of --

18          A.     How much?  Eight.

19          Q.     -- overtime or otherwise?  Why is that

20    eight hours of overtime?

21          A.     Because 3:00 to 11:30 is eight and a

22    half, which a half hour of that is our lunch.  So

23    we don't get paid for that.

24          Q.     So that's eight hours straight time,
```

```
 1   then --

 2          A.    Right.

 3          Q.    -- not overtime?

 4          A.    Right, right.

 5          Q.    You said "overtime."

 6          A.    Are we talking about during the week

 7   or are we talking about weekends?

 8          Q.    We're talking about weekends.

 9          A.    Okay.

10          Q.    I understand that difference --

11          A.    Okay.

12          Q.    -- okay, because --

13          A.    Okay.

14          Q.    All right.  So that would have been

15   reported as eight compensable hours?

16          A.    Right.

17          Q.    From 2:40 to 11:30?

18          A.    Right.

19          Q.    Now, let's say that it's a Saturday --

20          A.    Okay.

21          Q.    -- okay?  Now we're talking overtime,

22   correct?

23          A.    Okay, correct.

24          Q.    And so from 2:40 to 11:30 on a
```

63

```
 1    weekend --

 2         A.    Okay.

 3         Q.    -- not a Sunday.  I guess I better say

 4    Saturday.

 5         A.    Okay, okay.

 6         Q.    How is that -- what is that, in terms

 7    of compensable overtime hours?

 8         A.    Eight hours.

 9               MR. VANWAY:  Just so I'm clear, all of

10    this testimony is about when you were at Ford,

11    right?

12               THE WITNESS:  That's the way I

13    understand.

14               MR. HUNTER:  Yeah, absolutely.

15               THE WITNESS:  That's what I

16    understand.

17               MR. VANWAY:  Thank you.

18    BY MR. HUNTER:

19         Q.    Okay.  Now, let's say the 2:40 -- from

20    the 2:40 to 11:30 was on a Sunday.  How many hours

21    of compensable overtime?

22         A.    Eight.

23         Q.    And what about a holiday?

24         A.    Same.
```

1          Q.     Would the rates have varied because it

2     was a holiday or double time or Sunday time?

3          A.     Yeah, your -- your hourly rate for

4     Sunday and holidays, I believe, are the same.  And

5     then your overtime rate for week -- weekdays and

6     Saturday is the same.  So there's two different

7     overtime rates.

8          Q.     Was this written down anywhere at

9     Ford?

10         A.     They had an overtime policy, but I

11    don't think I ever saw it.  When I hired in, my

12    general foreman, Carl Thomas, explained those rules

13    to me.

14         Q.     Do you know what the rules are at

15    other Ford plants?

16         A.     No, I don't.

17         Q.     And so this basically would have been

18    just over at Sharonville, as far as you know?

19         A.     No, this was at Batavia.  This wasn't

20    Sharonville.

21         Q.     I'm sorry.

22         A.     Yeah.

23         Q.     I meant Batavia.

24         A.     Right.

1        Q.    Now, you went over to Sharonville for

2    awhile, though, from sometime in mid '99 --

3        A.    Right.

4        Q.    -- through late '99?

5        A.    Right.

6        Q.    How was the overtime policy at

7    Sharonville?

8        A.    It was the same way basically there.

9    Once you got to the hour -- like during the week,

10    if you stayed -- if you worked 45 minutes casual

11    time, you didn't put that on your card or 55

12    minutes, but once it got to the hour, you put the

13    hour on your card and it was paid for.  I'm not

14    sure if that happened.

15            That instance happened to me at

16    Sharonville, but that's supposedly the way it was

17    there.  That's the way it was at Batavia.

18        Q.    So, by and large, if I understand your

19    testimony, if you got over an hour, your

20    recollection is that then you started putting on

21    overtime?

22        A.    Right.  I think we had an instance

23    where Mike Conners put like 20 minutes on his card

24    one time and Carl Thomas cursed him, said, Don't

66

1    ever do that again.  If you put -- if you put a

2    half an hour -- if you're here four -- 40 minutes

3    or 45 minutes, Carl Thomas told him that's fine.

4    You don't put it on your card.

5              Now, once you get to that hour, put

6    the hour on it, I don't have a problem with it.

7    But if you put 20 minutes or 25 minutes or half an

8    hour on your card, I got a real problem with that,

9    he said.  But once you get to the hour, put the

10   hour on your card.

11        Q.    And was that -- would that be a ninth

12   hour?

13        A.    Yes.

14        Q.    Okay.  And was that hour, then, paid?

15        A.    Yes.

16        Q.    What happened if you were there nine

17   and a half hours?

18        A.    If you were actually there nine and a

19   half, that's when you would get the hour because

20   that half -- that half hour would be the lunch.

21   But if you were there an hour above the nine and a

22   half, that's when I put the hour on my card.

23        Q.    Okay.  Well, let me back up because I

24   want to be very careful with this issue.  I think

```
 1    you've told me basically up to about 45, 55 minutes

 2    is what you would call casual time?

 3         A.    Exactly.

 4         Q.    Okay.  You hit the hour.  That hour

 5    then becomes paid --

 6         A.    Right.

 7         Q.    -- okay?  Let's say that -- that we

 8    hit an hour and 15 minutes --

 9         A.    Mm-hmm.

10         Q.    -- okay?  What's paid --

11         A.    The hour.

12         Q.    -- at Ford?

13         A.    The hour, not the 15 minutes.

14         Q.    Okay.  Because that extra 15 minutes

15    is, again, casual time?

16         A.    Exactly.

17         Q.    All right.  Now, that's all been Ford?

18         A.    Right.

19         Q.    Let's make the jump now to Batavia, ZF

20    Batavia.

21         A.    Right.

22         Q.    How does time -- how does Wayne

23    Whisman report time at ZF Batavia?

24         A.    Example --
```

```
 1          Q.    Okay.

 2          A.    Okay.  I start at three.  I get there

 3   at 2:30 --

 4          Q.    Mm-hmm.

 5          A.    -- okay?  If I work from 2:30 till

 6   11:30, I get no overtime pay.  That's casual.  If I

 7   work till 12:00, I get no overtime pay.  That's

 8   casual, that whole hour.

 9          Q.    Okay.

10          A.    If I work beyond the nine hours, you

11   get no overtime pay for the minutes up to 60

12   minutes.  When you get to the tenth hour -- when

13   you work a full 10 hours and you get one over --

14   one hour overtime pay -- in other words, you have

15   to work 10 hours to get one hour overtime pay.  You

16   have to work 13 hours to get four hours overtime

17   pay.

18          Q.    And how do you report your time at

19   Batavia, in terms of your -- what I'll call casual

20   time, kind of preproduction or premaintenance, I

21   guess, since you're not production?  And that,

22   again, casual time or transition over at the end of

23   your shift, how do you report that on your

24   timecard?
```

1          A.     All right.  I reflect the time I get

2     to work to the time I leave.  Say, for instance, if

3     I get there 20 till three, I show my starting time

4     at 14:40, which would be 20 till three.  And if I

5     leave at midnight, I show it 00:00, which is 12 and

6     I don't put any overtime on my card.

7          Q.     So you report the casual time on your

8     card?

9          A.     Yes.

10         Q.     Okay.

11         A.     I -- I show my actual starting time

12    and my actual quitting time on my card.  And

13    sometimes that's hard to do because -- you know,

14    you'll forget to put your time on there that day.

15         Q.     Sure.

16         A.     For awhile, I went back to security

17    and had them run me a sheet.  So I put the actual

18    time on there minute for minute.

19         Q.     Okay.  Now, how do you treat lunch,

20    for example, on your time card?

21         A.     I -- I don't show lunch, period.  I

22    just show starting and quitting and that's it.  We

23    don't reflect a lunch hour on our card.

24         Q.     Ford didn't pay you lunchtime, did

1    they?

2         A.    No.  It was the same way at Ford.

3         Q.    Okay.  So your timecard includes your

4    lunch break, correct?

5         A.    Yes, yes.  For instance 2:30 to 12:00,

6    you just put 2:30 to 12:00 and half an hour in

7    there was lunch or 45 minutes or whatever you get

8    for lunch.

9         Q.    Well, how long do you get for lunch?

10        A.    Nobody has ever said.  I assume a half

11   an hour.

12        Q.    Okay.  I think I heard you say before

13   "45 minutes"?

14        A.    Well, there's some salary people I

15   think get 45 minutes.

16        Q.    How long do you take for lunch?

17        A.    It varies.  Sometimes I don't take

18   lunch at all.

19        Q.    Okay.

20        A.    Sometimes I don't get a chance to.

21        Q.    And it's not reflected on the timecard

22   anywhere?

23        A.    Oh, no.

24        Q.    How is that treated at Ford?

```
 1          A.    Same way.  You know, you -- it depends

 2    on your job.  You know, sometimes you got time for

 3    lunch.  Sometimes you -- that was just part of the

 4    job.

 5          Q.    How was it reflected on the Ford

 6    timecards?

 7          A.    Same way as I do at ZF.

 8          Q.    When you calculate your casual time

 9    and your lunchtime, do you reflect deductions for

10    that on your timecard when you put in for the total

11    hours for compensation?

12          A.    You mean when I'm putting overtime pay

13    on my card?

14          Q.    Mm-hmm.

15          A.    Absolutely.

16          Q.    Okay.  So how much do you take off

17    each day for lunch or casual time?

18          A.    It varies.  Sometimes I've worked an

19    hour and a half just casual time alone, plus a half

20    hour lunch.  That's two and a half hours.

21          Q.    Okay.

22          A.    Sometimes it's been a half an hour.

23    Sometimes it's been 20 minutes.

24          Q.    So if we reviewed the timecards, they
```

72

```
 1    would show these deductions for lunch or casual

 2    time?

 3         A.    I don't know what you mean by

 4    "deductions."

 5         Q.    If --

 6         A.    See, all I show on my card is starting

 7    and quitting, that's all.

 8         Q.    Okay.

 9         A.    I don't indicate anything for lunch.

10    All it shows is starting and quitting.

11         Q.    Okay.

12         A.    2:30 to midnight, that's it.  There's

13    nothing else on there.  But we keep in mind during

14    that period with a half an hour lunch.

15         Q.    Okay.  So you take a half hour off

16    kind of in your head?

17         A.    Sure.

18         Q.    Okay.  That's all I'm trying to get

19    to.

20         A.    Yes, absolutely, yeah.

21         Q.    All right.  So you deduct a half hour

22    in your head?

23         A.    Right.

24         Q.    And how much do you deduct for casual
```

73

1    time?

2         A.    Up to an hour.  We can do a half an

3    hour, 20 minutes, up to an hour.  But with this

4    present system we got now, I don't put any overtime

5    on my card unless I get two hours casual time.

6         Q.    Okay.

7         A.    And one of those hours becomes

8    overtime.

9         Q.    Is that consistent for what you did at

10   Ford?

11        A.    No.

12        Q.    And obviously you believe that Batavia

13   is not doing something it's supposed to with

14   respect to your payment of overtime?

15        A.    Yes, I do.

16        Q.    Okay.  And that difference would be

17   what?

18        A.    The hour that we're forced to work

19   each day or hour and 50 minutes that we're forced

20   to work each day.

21        Q.    How many hours or minutes, however you

22   can break it down, have you worked that you have

23   not been paid for because of this overtime

24   calculation?

74

1          A.    I couldn't even venture a guess.  I'd

2     have to see the actual time cards before I could

3     say.

4          Q.    I think in certain interrogatories you

5     answered, there was a loss indicated of $9,495.  Is

6     that that overtime number?

7          A.    That was part of it, yes.

8          Q.    All right.  So that's not necessarily

9     the overtime issue?

10         A.    May not be all of it.

11         Q.    Okay.  All right.  Any other issues

12    with overtime?

13         A.    No.

14         Q.    We heard testimony last week or at

15    some point in time about individuals that worked

16    overtime aside from the casual time and the

17    incremental hours that worked scheduled overtime

18    and weren't paid.  Are you familiar with that

19    issue?

20         A.    Yes.

21         Q.    Okay.  What can you tell me about

22    that?

23         A.    I worked Saturdays and Sundays and I

24    was told I would not be paid.

```
 1          Q.     All right.  These were scheduled --

 2          A.     Absolutely.

 3          Q.     -- shifts?

 4          A.     Absolutely.

 5          Q.     Okay.  And you worked how many

 6   Saturdays or Sundays?

 7          A.     I can only guess.  I'd say five to

 8   eight total of the two, not each.  Not each -- five

 9   or eight Saturdays.  Total of five to eight days.

10          Q.     Okay.  So five to eight shifts?

11          A.     Right.

12          Q.     Okay.  And you were paid nothing for

13   those shifts?

14          A.     Nothing.

15          Q.     Who told you to do that?

16          A.     Milt Gross and Hassan Saleh held a

17   meeting with the maintenance people and the

18   engineers.

19          Q.     Do you remember when these shifts

20   were?

21          A.     The dates?  Well, that was -- that was

22   May time period, I think, of last year maybe.  May

23   time period of last year, I believe, in the May

24   time period.  And at that meeting, I asked them if
```

1   that included my holidays and they said, yes, it

2   does.

3               And I said, So I have to work holidays

4   and I don't get -- so you're taking my holidays?

5   And their comment was, no, you will get your

6   holiday pay, but you will work.  And I won't get

7   overtime pay.  And they said absolutely not.  So my

8   comment was, There's all the holidays I had with

9   Ford when I came over and you just took them all.

10  And the comment was yes.

11          Q.    Okay.  Now, if it was five to eight

12  shifts and it was approximately May, I would

13  understand that that would include the Memorial

14  Day, then, potentially?  That's the holiday I can

15  think of in May.

16          A.    It may have been.

17          Q.    You're just not sure?

18          A.    If there was a holiday in there, I'm

19  sure I worked it.  I'm sure I worked it.

20          Q.    All right.  When they came and told

21  you this, Milt and Hassan, again, why not go to

22  Sennish, Adams, Kehr, anybody and say --

23          A.    Because I asked at the meeting who --

24  who approved this plan and their comment was Dave

```
1   Adams, Len Sennish and Dick Newark.

2       Q.    Okay.

3       A.    And I asked the question, What if I

4   don't work it?  And they said you will be

5   terminated.

6       Q.    Do you remember any discussion about

7   overtime budgets and things like that?

8       A.    He said the overtime budget was

9   getting low.

10      Q.    Okay.  Anything else?

11      A.    Well, we asked the question, does

12  production foremans get paid?  And they said

13  absolutely.  And we said, so we're going to be

14  working in here Saturday and Sunday, covering their

15  departments and they get paid, we don't?  They said

16  absolutely.

17      Q.    Okay.  To this date, have you ever

18  been paid for those shifts?

19      A.    No.

20      Q.    It's somewhere between five and eight

21  shifts?

22      A.    But back to your question, that was

23  brought up to Dick Newark if he was going to pay it

24  and he said, No.
```

1          Q.     Okay.

2          A.     He said, At this time, we don't have

3     any plans to pay that overtime.  Gary Vories

4     brought that up to him at the face to face.

5          Q.     Okay.  And this was apparently at the

6     time you were still having face-to-face meetings --

7          A.     Mm-hmm.

8          Q.     -- and Dick was participating?

9          A.     Yeah.

10          Q.     To your knowledge, how many other

11     folks in maintenance -- well, in any department

12     worked and didn't get paid?

13          A.     I can't really answer that.  I

14     wouldn't -- I would say all of them didn't get paid

15     at a time or never.  I don't think -- I think I

16     might have been the only one that worked every

17     single day.

18          Q.     Okay.

19          A.     But I know there was a portion of that

20     period that all the maintenance foremans lost some

21     pay.  How much, I don't know.

22          Q.     And you'll have to help me.  Who are

23     the other maintenance foremans that would not have

24     been paid for that weekend --

1          A.     Ted -- I'm sorry.

2          Q.     -- or those weekends?

3          A.     Ted Edrington.

4          Q.     Okay.

5          A.     Ed Erras.

6          Q.     Okay.

7          A.     Ron Pearce.

8          Q.     Okay.

9          A.     Probably Ed Orff, Dave Osborne,

10     probably Kevin Bran, Rick Senior, and there's new

11     maintenance foremans there that I don't know.  I'm

12     not acquainted with.  New foremans that hired in

13     with ZF that I'm not acquainted with, but probably

14     worked through those periods, too.

15          Q.     Are there any other time periods where

16     you were not paid overtime for working scheduled

17     overtime?

18          A.     No, I don't think so.  They came back

19     later -- I think it was after this litigation was

20     filed and said they found money or something and

21     they were going to pay it.  I'm not sure of the

22     time period on that.  I'm not real sure.  But they

23     made it clear that it was only temporarily that

24     they were going to pay it.

1          Q.     But, in fact, it's all been paid now?

2          A.     Since that time it has, yes.

3          Q.     Okay.  Any other issues with respect

4     to overtime or what you're being paid by ZF

5     Batavia?

6          A.     No.

7          Q.     In terms of your pay with ZF Batavia,

8     we talked a little bit before about your salary.

9     Throughout this time period, you did receive your

10    normal salary?

11         A.     Yes.

12         Q.     What we're talking about basically,

13    you were not paid for overtime shifts?

14         A.     Correct.

15         Q.     In fact, you've always received your

16    salary?

17         A.     Yes.

18         Q.     Certainly never had any deductions or

19    anything like that from your salary?

20         A.     Don't believe so, no.

21         Q.     Batavia didn't threaten to reduce your

22    salary or something like that?

23         A.     No.

24         Q.     That's going to be 45.  If I get these

1    in order, I'm good.  Mr. Whisman --

2        A.    Yes.

3        Q.    -- I've handed you what we've marked

4    for identification purposes as plaintiffs' -- or

5    I'm sorry.  -- Deposition Exhibit 45.  Can you take

6    a look at that?

7        A.    Mm-hmm.

8        Q.    Have you ever seen that document

9    before?

10        A.    Yeah, it's my -- it's my timecard, a

11    copy of it.

12        Q.    It's one of your timecards -- -

13        A.    Mm-hmm.

14        Q.    -- correct?

15        A.    Mm-hmm.

16        Q.    Is that reporting there generally

17    consistent with the discussion we had a little bit

18    ago about how you report your time?

19        A.    I think so.

20        Q.    See any errors or mistakes with

21    respect to that timecard?

22        A.    No, nothing jumps out at me.

23            MR. HUNTER:  All right.  Let's take a

24    break here, one second.

82

1          (Off the record:  10:28 a.m. - 10:54 a.m.)

2          Q.    Mr. Whisman, you have in front of you

3     a series of Exhibits, 45, 46, 47, 48, 49 and 50.

4     Can you take a minute to review those, please?

5          A.    Mm-hmm.  Okay.

6          Q.    Okay.  You've had a chance to review

7     those Exhibits 45 --

8          A.    Mm-hmm.

9          Q.    -- through 50?

10         A.    Mm-hmm.

11         Q.    Have you ever seen those documents

12    before?

13         A.    Some of these don't -- don't look like

14    my handwriting.

15         Q.    Oh, okay.  Which ones don't look like

16    your handwriting?

17         A.    That.  See, I fill them out

18    completely.

19         Q.    We need an exhibit number.

20         A.    Exhibit 46.  I'm not -- I'm not saying

21    it's not.  I didn't sign it.  It doesn't appear

22    that it is.  It could be.  It looks too neat for

23    me --

24         Q.    Okay.

```
 1          A.     -- but it could be.

 2          Q.     All right.  How about the rest of

 3     them?

 4          A.     This one --

 5          Q.     All right.

 6          A.     -- is different.

 7          Q.     47.

 8          A.     And I'll say 48 definitely is not my

 9     handwriting.

10          Q.     Okay.

11          A.     49 is -- is possibly that it might not

12     be, too.

13          Q.     Okay.  Do you recognize the

14     supervisor's signature on, for example, 48?

15          A.     48?

16          Q.     Mm-hmm.

17          A.     Yes, it looks like Milt Gross.

18          Q.     Okay.  He would have been your

19     supervisor January 3rd, 2000?

20          A.     He's not my immediate supervisor.  Ron

21     Pearce -- see, there's an MPS.  That's my immediate

22     supervisor and then Milt is the maintenance

23     manager.

24          Q.     Okay.  Do you have any reason to
```

84

```
 1   believe that this isn't the timecard for your time

 2   worked during that time period?

 3              MR. COOK:  Objection.

 4       A.     You're talking about --

 5              MR. COOK:  You may answer.

 6       A.     You're talking about 48?

 7       Q.     Mm-hmm.

 8       A.     Well, that's definitely not my

 9   handwriting.

10       Q.     Okay.

11       A.     That timecard is definitely not my

12   handwriting.

13       Q.     Okay.

14       A.     I don't know whose that is, but that's

15   not my handwriting.

16              MR. COOK:  We'll note for the record,

17   Mr. Hunter, that there's nothing on here other than

18   his name typed at the top to indicate that it's

19   his.

20              MR. HUNTER:  Understood.

21       Q.     Okay.  But you see on the top where it

22   says, "First Name E," --

23       A.     Mm-hmm.

24       Q.     -- "Last Name Whisman"?
```

85

```
 1          A.     Right.

 2          Q.     Is that your Social Security number?

 3          A.     Yes, it is.

 4          Q.     And you see the 12/31/99 pay ending

 5   date?

 6          A.     Yeah, mm-hmm.

 7          Q.     Okay.  Do you see the location and

 8   department?

 9          A.     Yes.

10          Q.     Is that your location and department?

11          A.     1398, I don't -- I don't know if --

12   that 001921 --

13          Q.     Mm-hmm.

14          A.     -- it's not the same as Exhibit 49.

15          Q.     Okay.

16          A.     That department number is different.

17   On Exhibit 49, it's 002021.  And on Exhibit 48,

18   it's 001921.  So those department numbers are

19   different.  I don't know who put those on there.

20          Q.     Okay.  Do you have any reason to

21   believe the hours reflected on there seem

22   inappropriate?

23          A.     That's in 1999, I -- I can only assume

24   if they're on that card, they're appropriate.
```

86

```
1          Q.     Okay.  Let's talk -- all right.  So

2     48, you don't recognize a great deal on that one.

3     Let's talk about 46.

4          A.     Okay.

5          Q.     Whose handwriting is that?

6          A.     I'm not sure.

7          Q.     Okay.  You don't think that's your

8     timecard?  I mean, your handwriting?

9          A.     Well, if I look at four -- if I look

10    at Exhibit 45 and 46, compare those two, they don't

11    look the same.

12         Q.     Okay.  What I asked you, is 46 your

13    handwriting?

14         A.     It doesn't look like it.

15         Q.     How did you get paid, for example, in

16    June of 2000?

17         A.     I don't understand.  What do you mean,

18    how did I get paid?

19         Q.     Did you fill out a time sheet or --

20         A.     Mm-hmm.

21         Q.     Okay.  Did it look like this, this --

22         A.     Yes.

23         Q.     -- salary time statement?

24         A.     Yes, it does.
```

1          Q.    Did you always fill those out or would

2    somebody fill them out for you?

3          A.    No, I assume -- I always filled them

4    out.

5          Q.    See at the top where it's called a

6    prefilled in whatever, you might term that with the

7    location, the department, the name --

8          A.    Mm-hmm, yes.

9          Q.    -- the file number?

10         A.    Right.

11         Q.    Okay.  Does that appear at all to

12   relate to you?

13         A.    Yes, it does.

14         Q.    Okay.  Do you always sign your salary

15   time statement?

16         A.    On -- we fill out two copies.

17         Q.    Okay.

18         A.    On the second copy, I believe one of

19   them we do and one of them we don't.

20         Q.    Let's talk about Exhibit 45, then.

21         A.    Okay.

22         Q.    Appears to have your signature down

23   there?

24         A.    Yes, it does.

88

1        Q.    Okay.  Is that your handwriting on

2    that sheet?

3        A.    Yes, it is.

4        Q.    Okay.  We've had a fairly lengthy

5    discussion about overtime and how -- how you're

6    paid and how that's reported.  Can you take me

7    through Exhibit 45 and -- and let's apply it to

8    something concrete here, okay?

9        A.    Okay.

10       Q.    So I look at that and this would be --

11   it appears starting with Saturday, December 1st?

12       A.    That's correct.

13       Q.    And that would have been December 1st

14   2001, correct?

15       A.    Correct.

16       Q.    Now, it says actual start time 14:30?

17       A.    Yes.

18       Q.    So that would mean the actual start

19   time for you was 2:30 in the afternoon, correct?

20       A.    Correct.

21       Q.    And when we talk about "actual start

22   time," what does that mean?  Is that when you get

23   to the plant?  Is that when you start casual time?

24   Is that -- what is that?

```
 1          A.    I generally look at my watch when I

 2    come through the gate and generally it's what I put

 3    on my card.

 4          Q.    So the --

 5          A.    The arrival time.

 6          Q.    So right when you get to the plant?

 7          A.    Mm-hmm.

 8          Q.    Okay.  And I see an actual quitting

 9    time --

10          A.    Mm-hmm.

11          Q.    -- of 23:40?

12          A.    Correct.

13          Q.    Which, if I'm not mistaken, would be

14    about 11:40 at night?

15          A.    That's correct.

16          Q.    Okay.  Now, these are actual start and

17    actual quitting times?

18          A.    That is correct.

19          Q.    What would be the scheduled shift

20    related to these times on Saturday, the 1st?

21          A.    Starting time three, the regular shift

22    would be three --

23          Q.    Okay.

24          A.    -- till 11:30.
```

1          Q.     And then see the fifth column over, it

2     says overtime eight?

3          A.     Yes.

4          Q.     So you put in for eight hours of

5     overtime pay?

6          A.     Correct.

7          Q.     And that's because this was a

8     Saturday?

9          A.     Correct.

10          Q.     Okay.  Where is the casual time

11     reflected in --

12          A.     Saturday there is none.  Len Sennish

13     said you'll be paid punch to punch on Saturday.

14     Saturdays, holidays and Sundays will be paid punch

15     to punch.

16          Q.     Well, how is that done at Ford?

17          A.     Depends on if you get up to the hour.

18     At Ford, you would be paid -- once you got to the

19     hour, you would get nine hours.

20          Q.     Okay.  But Ford is not punch to punch,

21     is it?

22          A.     No.  What he meant -- what I took him

23     to mean when he said that, we had to give the hour

24     during the week, but he said on holidays, Saturdays

1    and Sundays, you don't have to give the hour.  We

2    will pay you from the time you're here to the time

3    you leave, minus minutes.

4          Q.    What do you --

5          A.    You know, less than an hour.

6          Q.    Okay.

7          A.    It was understood less than an hour.

8    Once you get to the hour, it was understood on the

9    weekends you'll be paid that on the weekends and on

10   holidays.

11         Q.    Okay.  Now, I see, for example, on

12   Sunday December 2nd, it appears that your actual

13   start time was 3:00?

14         A.    Mm-hmm.

15         Q.    And quitting time was basically 11:30?

16         A.    Mm-hmm.

17         Q.    The overtime hours are eight?

18         A.    Mm-hmm.

19         Q.    Okay.  Is that punch to punch or

20   how -- I don't understand that difference.

21         A.    No, this is -- this is not exactly

22   15:00 to 23:30.  On the weekends, you get your

23   eight hours' pay.  So a lot of times, if I'm late

24   in the shift and I don't -- you know, I know I was

1    there at least three to 11:30.

2          But if you went to the Honeywell, you

3    would probably see I was actually there before

4    15:00.  But since you get paid punch to punch on a

5    weekend and you're not working the nine hours, you

6    work eight and a half, if I wasn't sure of the

7    time, I'd just put three to 11:30 'cause I knew I

8    was there that amount of time.

9        Q.    Okay.  Why wouldn't you put in for

10    eight and a half hours of overtime if it's punch to

11    punch?

12        A.    Because he told us he wouldn't pay

13    less than a -- he said -- that's what I said.  He

14    would pay up to the nine -- like when you get nine

15    hours, but he wouldn't pay in the minutes,

16    increments of minutes or half an hour.  He won't

17    pay anything less than an hour increments of

18    overtime.

19        Q.    Okay.  And then I see what I would

20    believe to be Monday, December 3rd --

21        A.    Mm-hmm.

22        Q.    -- the one-third shift?

23        A.    Mm-hmm.

24        Q.    You put a start time of 2:30?

93

```
 1          A.     Mm-hmm.

 2          Q.     And you worked till 12:30?

 3          A.     Mm-hmm.

 4          Q.     Okay.  And that's an hour of overtime?

 5          A.     That's correct.

 6          Q.     Okay.  And how many hours would you

 7    have been at the facility at that point?  From 2:30

 8    to 12:30 --

 9          A.     I assume what I put on my card.

10          Q.     Okay.  And so 2:30 to 12:30 is 10

11    hours, correct?

12          A.     It's actually nine and a half, taking

13    a half-hour lunch off.  So you got to take that

14    half-hour lunch.  That would make it nine and a

15    half actually.

16          Q.     Okay.  Well, how do I get to the hour

17    of overtime?  I'm confused.

18          A.     Okay.  4:30 to 11:30, okay, you're

19    actually there nine hours.  2:30 to 11:30, you're

20    actually there nine hours.

21          Q.     That's -- that's -- if my math is any

22    good, yeah.  2:30 to 11:30 is nine hours?

23          A.     Right.  Then till 12:30 would be one

24    more hour --
```

94

```
1          Q.    Okay.

2          A.    -- okay?

3          Q.    All right.  So you're there

4    physically.  Well, what you referred to as start

5    time to quitting time is basically 10 hours on

6    December 3rd on Exhibit 45?

7          A.    Correct.

8          Q.    You --

9          A.    Correct, minus a half hour for

10   lunch --

11         Q.    Okay.

12         A.    -- okay?

13         Q.    Minus a half hour for lunch?

14         A.    Mm-hmm.

15         Q.    Okay.  Minus 15 to 30 minutes casual

16   time before, correct?

17         A.    No, this -- this is 12/15/2001, the

18   date on this.  This is before they -- that he made

19   this new overtime policy, I believe.  Now, May 2001

20   is before he made this overtime policy.

21         Q.    You would agree with me, this doesn't

22   reflect any casual time?

23         A.    No, it doesn't.  It doesn't.

24         Q.    At the beginning of the shift nor at
```

1    the end of the shift -- -

2         A.    No.

3         Q.    -- correct?

4         A.    No, it don't.

5         Q.    And why does it not reflect any casual

6    time?

7         A.    Because that's all I worked that day

8    and I guess evidently -- it must have been a

9    scheduled hour because my boss signed it.  If it

10   wasn't legit, he would not have signed his

11   signature on it.  He would not approved it.  So it

12   must have been a scheduled hour.  They must have

13   scheduled that because of production or what have

14   you.

15        Q.    Well, I thought you told me before,

16   you always took into consideration the casual time,

17   beginning, end of the shift.  And, again, lunch

18   would vary --

19        A.    Oh, yeah.

20        Q.    -- depending upon the needs of the

21   day?

22        A.    Mm-hmm.

23        Q.    But, again, we don't see that, for

24   example, on the December 3rd time entries, correct?

```
 1          A.    Well, if you look at 2:30, okay?

 2          Q.    Mm-hmm.

 3          A.    Like I say, 2:30 to 11:30 is nine

 4    hours --

 5          Q.    Yes, sir, understood.

 6          A.    -- okay?  One more hour to 12:30 is 10

 7    hours.  So if you only put one hour of overtime on

 8    there, there is casual time there.

 9          Q.    Okay.  There's some --

10          A.    Yeah.

11          Q.    -- but there's also lunch?  And all

12    I'm suggesting is, if my math is any good, if it's

13    a half hour for lunch, then there's, at best, 15

14    minutes, perhaps, on either side?

15          A.    Could be.

16          Q.    Okay.

17          A.    Could be.

18          Q.    And if I took a look at the Honeywell

19    reader, you obviously don't have any idea at this

20    point what time you've got there, do you?

21          A.    Probably not, no.  No, I know I don't.

22    I wouldn't have any way of knowing.  Couldn't

23    remember that far.

24          Q.    Do you generally swipe the card reader
```

1    when you go in and out of the plant?

2         A.    Unless you forget, you do.

3         Q.    Okay.

4         A.    And that's for lunch, too.

5         Q.    Do you generally go out of the plant

6    for lunch?

7         A.    Sometimes, not all the time, but

8    sometimes --

9         Q.    Sure.

10         A.    -- I do.

11         Q.    Okay.  And that would generally be

12    reflected in the Honeywell reader?

13         A.    Should.

14         Q.    Okay.  Can you tell me, as we sit here

15    today looking at Exhibit 45, whether or not the

16    other entries include casual time or lunch?

17         A.    They would appear to.  If it's 15:00

18    to 12:00 and you're not charging time, there's

19    casual in that.  It would appear to be, yeah.

20         Q.    Okay.  Are there any of the overtime

21    cards that appear to you to bear either your

22    handwriting or your signature?

23         A.    No, just the one.  Just the one.  I

24    just see my signature on the one, Exhibit 45.

1      Q.    I think you told me before that if you

2    forgot to mark your time or whatever, you'd go

3    back, have somebody run you a Honeywell?

4      A.    I had -- I had security to do that.

5    Like if I've lost my time sheet before and couldn't

6    find it.  And then actually I tried to get them to

7    do it every pay period --

8      Q.    Okay.

9      A.    -- so I would not have the exact time

10   on it.

11     Q.    Okay.

12     A.    And then they indicated that somebody

13   was unhappy that they were doing that.

14     Q.    Okay.  So generally you would consider

15   the Honeywell reader to be pretty accurate?  You

16   would base your pay upon it?

17     A.    I wouldn't bet on that because

18   sometimes when you punch in and out -- when I go

19   out and I punch out, the gate's free.  The gate's

20   free.  So whoever punches in, I don't think it's

21   going to record it.  They're going to come right on

22   in on -- in the gate on the other punch out.

23     Q.    So you rely on it for your paycheck

24   and you go back and I think you suggested you might

99

1    even do that every week?

2        A.    I do it for -- for a short period of

3    time.

4        Q.    Okay.

5        A.    Only if I was behind a day or two on

6    the timecard.

7        Q.    In terms of your records, things that

8    you have, I think you told me before you really

9    don't know at this point how much you believe

10   you're entitled to be paid, in terms of overtime

11   hours?

12       A.    Not -- not actually without looking at

13   every -- every document.

14       Q.    Do you have documents that you have

15   that would enable you to do that calculation?

16       A.    Probably -- probably not.

17       Q.    I think we talked before that in your

18   answers to certain interrogatories you had set

19   forth a number of about $9,400 in terms of your

20   damages?

21       A.    Mm-hmm.

22       Q.    Can you tell me how you calculated

23   that number?

24       A.    Just overtime, like where I wasn't

```
 1   paid by overtime, AIP bonus, which I wasn't paid,

 2   bereavement days that were taken away, personal

 3   days that were taken away.

 4        Q.   Okay.  Well, anyhow, let's --

 5        A.   Yeah.

 6        Q.   -- try and break this thing down, all

 7   right?  In terms of your AIP bonus that you weren't

 8   paid, how much was that bonus?

 9        A.   I have no idea.  They wouldn't tell

10   me.

11        Q.   How did you calculate that --

12        A.   I just kind of looked --

13        Q.   -- into your damages?

14        A.   I just kind of looked at a percentage

15   of what I thought the percentage would be on my

16   salary.

17        Q.   Okay.  So what do you think that

18   number was?  I mean, if you don't know, you don't

19   know, but --

20        A.   I think I guessed like five to $6,000.

21        Q.   Okay.  And the only year you didn't

22   receive an AIP bonus was -- I want to state this

23   correctly -- for -- paid in 2002, payable for 2001?

24        A.   Correct.  I believe that's correct.
```

1          Q.    Okay.  What other numbers went into

2     your calculation of damages?

3          A.    I really don't know.  Could I see a

4     copy of the interrogatory there?

5          Q.    Let me see if I have one I haven't

6     written on.

7          A.    Okay.

8                MR. COOK:  I have one.

9                THE WITNESS:  You got one?

10         A.    It would be the overtime that I wasn't

11    paid.

12         Q.    Okay.  But, again, you -- I think you

13    told me and I'm not  --

14         A.    I'm not sure.

15         Q.    -- beating you on this --

16         A.    I'm not sure.

17         Q.    -- but you don't know how much that

18    is?

19         A.    No

20         Q.    Okay.

21         A.    Not an exact number.

22         Q.    Five to eight shifts roughly?

23         A.    Mm-hmm --

24         Q.    Okay.

1          A.     -- probably.

2          Q.     Okay.  What else?

3          A.     The AIP bonus.

4          Q.     Right.

5          A.     The bereavement days that were taken

6     away.

7          Q.     All right.  Well, all right.  Let's

8     talk about the bereavement days.  What bereavement

9     days did you miss?

10         A.     My mother-in-law passed away.

11         Q.     When was that, sir, just roughly?  I

12     mean, I'm talking what year?

13         A.     2002, I think 2003.  Or I'm sorry.

14     2001, I think.

15         Q.     2001?

16         A.     Yeah.

17         Q.     All right.  How many days bereavement

18     leave were you granted by Batavia?

19         A.     One.

20         Q.     And how many do you think you should

21     have had?

22         A.     Should have had five.  Matter of fact,

23     I called in and talked to Ann Jones before I took

24     the bereavement.  She assured me it was.  She said

1  you're Ford transitional and you get just like you

2  were still with Ford.

3           And then when I came back, they said,

4  what are you going to use for the time you were off

5  and I said bereavement.  And Milt Gross said, no,

6  Len Sennish changed that to one day.

7      Q.    Did your mother-in-law live out of

8  town or --

9      A.    We had to go to Tennessee for that.

10 She lives close to me, but most of the stuff was in

11 Tennessee.  I actually just took three is what I

12 did, but I had up to five, but only took three.

13     Q.    Okay.  So we're talking about, then --

14     A.    Two days --

15     Q.    -- two days' pay?

16     A.    -- actually.

17     Q.    Did you use vacation days, then --

18     A.    I had to --

19     Q.    -- for the rest?

20     A.    -- use vacation.  Well, first of all,

21 they told me I didn't have any vacation left.  And

22 then I had to call Hassan at home and he came in

23 and went to Len Sennish and said, Yes, he does have

24 a week.  That's the agreement we made.

```
 1                And reluctantly Len Sennish gave me

 2     that fourth week back.  He was trying to take the

 3     fourth week.

 4          Q.    Okay.  So I've got the AIP, five to

 5     6,000, five to eight shifts of overtime, two

 6     bereavement days.  What else makes up that --

 7          A.    And the personal days.

 8          Q.    Personal days, okay.  Explain that one

 9     for me.

10          A.    We had five and I believe they cut it

11     to three, maybe two.  It was either -- maybe two.

12     They may have cut that to two.

13          Q.    Did you use all of your personal days?

14          A.    The two.

15          Q.    Okay.  Did you need additional

16     personal days?

17          A.    Absolutely.

18          Q.    Okay.  What years did you need

19     additional personal days?

20          A.    It would be basically every year

21     because my wife has arthritis so bad that I needed

22     those personal days for her for doctor's

23     appointments, surgeries and such.

24          Q.    Now, I'm -- and you worked there, so
```

1    correct me if I'm wrong.  I thought the personal

2    days only changed for about one year.

3         A.    We got the personal days back now.  We

4    just got them back, I think, on this year.

5         Q.    Okay.  Does it sound correct to you if

6    I said that I think the personal days were cut from

7    five to three --

8         A.    I think --

9         Q.    -- but only for a year?

10        A.    I think it was.  I think it was just

11   for a year.

12        Q.    All right.  And your testimony would

13   be -- so then you're owed two days for the personal

14   days?

15        A.    If we had five and they cut them to

16   two, it would be three.  I'm not sure if they cut

17   them to two or three.

18        Q.    Okay.  So you don't --

19        A.    I'm not real sure.  They cut them from

20   two to three.

21        Q.    Okay.  Any other components that make

22   up your damage claim?

23        A.    No, that's it.

24        Q.    Okay.  And I guess I would want the

1    record to reflect that currently Mr. Whisman is

2    reviewing currently his objections and answers to

3    Ford Motor Company's first set of interrogatories.

4              Is there an issue or I guess -- you've

5    got those back in front of you.  If you want to

6    read from that, you can.  But, I guess,

7    Mr. Whisman, I'd really like to -- you know, what

8    you know today.

9         A.    Okay, that's fine.

10        Q.    I'm not trying to trick you.

11        A.    No, that's all right.

12        Q.    Okay.

13        A.    That's fine.  That's fine.

14        Q.    Any other components of that damage

15   claim?

16        A.    I believe that's it.

17        Q.    What is your understanding of --

18   "your," and I'm talking about Wayne Whisman, your

19   vacation rights?

20        A.    The same rights I had with Ford.

21        Q.    And what would that be?

22        A.    In 10 years, I receive four weeks and

23   that's -- that's what I brought over with me was

24   four weeks when I went with ZF.

1          Q.     Okay.

2          A.     And then I had a right to buy,

3    purchase a week, which now I'm not allowed to do.

4          Q.     Okay.  Was the purchase automatic at

5    Ford?

6          A.     It had to be approved by your

7    supervisor, but I never was told, no, that I

8    couldn't purchase that week.

9          Q.     Did you purchase that week every year?

10         A.     I think I did.

11                MR. HUNTER:  I haven't forgot about

12   you, Jeff.

13         Q.     You're familiar with the hire letters

14   that were given to yourself?  I think we talked

15   about that earlier, the one signed by Mr. Saleh?

16         A.     Mm-hmm.

17         Q.     Okay.  Those documents were provided

18   to myself and to Mr. VanWay on behalf of Ford, the

19   hire letters for all the Ford transitional

20   employees.  Are you familiar with that?

21         A.     Yes, I am.

22         Q.     Where did you obtain copies of

23   everybody's hire letter?

24         A.     Those were on the P drive.  They --

1    they were made public knowledge of which we

2    complained or Joe Phelps complained at face to face

3    that those letters were on the P drive and everyone

4    had access to those and --

5         Q.    Okay.  Let's -- Let's -- hang on a

6    second.  What's the P drive?

7         A.    I have no idea what the P drive is.

8    I've never been on it.

9         Q.    Okay.

10         A.    I couldn't tell you.

11         Q.    All right.  So you don't have access

12    to that?

13         A.    I do, everybody in there, but I just

14    don't know how to get on it because I'm not

15    computer orientated.  I'm really not -- I really

16    don't mess with the computer that much, except for

17    what it takes me to do my job with and that's it.

18              I have certain programs I use and

19    that's it.  Other than that, I don't get into the

20    computer and look for stuff.  I knew about it

21    because Joe Phelps brought it up.  I believe it was

22    to Len Sennish at the face to face.  I'm not sure

23    if Len was there or not.

24              But I was on three separate face to

1    face.  He had a major concern that those were on

2    the P drive.  And everyone's salary and bonuses

3    were public to anybody that wanted to get in there.

4    And they elected not to take them off for a long

5    period of time.

6        Q.    Who physically printed those

7    documents?

8        A.    I have no idea.

9        Q.    Did Mr. Phelps assist you in getting

10   those documents?

11       A.    Yes, he did.

12       Q.    Mr. Whisman, you've been handed what

13   we've marked as Exhibit 51.  Have you seen that

14   document before?

15       A.    Yes, I have.

16       Q.    Can you tell me what that document is?

17       A.    I believe that's a affidavit that I

18   signed with Steve Simon indicating a letter that

19   was put out about the lawsuit.

20       Q.    Okay.  And is that your signature

21   there on the second page of document 51?

22       A.    Yes, it is.

23       Q.    To your knowledge, is that affidavit

24   accurate?

```
 1          A.    Yes, it is.

 2          Q.    Can you take a look at paragraph two

 3    for me?

 4          A.    Mm-hmm.

 5          Q.    You indicate in that affidavit, I was

 6    approached by other ZFB employees about the

 7    memorandum.  And I'm assuming that's the

 8    Mr. Huebner memorandum, correct?

 9          A.    Mm-hmm.

10          Q.    What other employees approached you?

11          A.    I'm not sure.  There was -- there was

12    a number of employees that approached me.

13          Q.    You can't recall any of their names?

14          A.    No, I can't.

15          Q.    Do you recall any of their concerns?

16          A.    They were thinking about joining the

17    lawsuit and when they saw this, it -- they were

18    reluctant to do so.

19          Q.    Did they indicate why?

20          A.    For they were -- they feared that they

21    would be held liable if they did.  They were afraid

22    that someone would hold it against them.

23          Q.    But you don't recall anybody?

24          A.    No.
```

```
1         Q.    With respect to paragraph three, and
2    if you take a look at actually the second page.
3         A.    Mm-hmm.
4         Q.    See the sentence there at the top?
5         A.    Mm-hmm.
6         Q.    You tried to explain that the
7    memorandum was inaccurate and misleading.
8         A.    Yes.
9         Q.    What was inaccurate about the
10   memorandum?
11            MR. COOK:  Objection.  May he see the
12   memorandum in question?  Paragraph three is
13   referring to another memorandum.
14            THE WITNESS:  Okay, all right.
15            MR. HUNTER:  I may not have copies of
16   that.  Dave, you're going to have to share that
17   one.
18            MR. VANWAY:  John, I'll get it later,
19   if that's all right.
20            MR. COOK:  I also want to object on
21   the relevance grounds issue raised here is moot.
22            THE WITNESS:  Okay.
23   BY MR. HUNTER:
24        Q.    Okay.  You've had a chance to review
```

1     the memorandum, which is the subject of that

2     affidavit?

3                    (Exhibit 52.)

4          A.     Mm-hmm.

5          Q.     Can you tell me what was misleading or

6     inaccurate about that memorandum?

7          A.     They had a concern about the

8     competency of our attorneys because they couldn't

9     meet deadlines and they were under the impression

10    that they had to go back to the court and ask for

11    additional deadlines.  So they had a concern about

12    attorneys that were handling our case.

13         Q.     Okay.  That's the employee concerns.

14    Your affidavit says, The memorandum from

15    Mr. Huebner is inaccurate and misleading.  What was

16    inaccurate or misleading about Mr. Huebner's

17    affidavit?

18         A.     The part about the attorneys not being

19    able to meet deadlines.

20         Q.     How was that inaccurate?

21         A.     Because it wasn't true.  Evidently it

22    wasn't true because they were to follow-up later as

23    to an apology or something to it, I believe.

24                    MR. HUNTER:  Can you mark this as 53,

1     please?

2          A.     To my knowledge, our attorneys hadn't

3     missed deadlines.

4          Q.     Well, does the memorandum say they

5     missed deadlines?

6          A.     It says they weren't able to meet

7     deadlines, I believe it said --

8          Q.     Okay.

9          A.     -- unless I read it wrong, set forth

10    by the court.  Cannot meet certain deadlines set

11    forth by the court.

12         Q.     Okay.

13         A.     That was a concern of some of those

14    people.

15         Q.     Okay.  And you believe that that was

16    inaccurate?

17         A.     I do.

18         Q.     Okay.

19         A.     I think I talked to Steve about it and

20    he thought it might be inaccurate also.

21         Q.     So you felt your attorneys were able

22    to meet all the deadlines?

23         A.     I felt so.

24         Q.     Sir, we've handed you Exhibit 53.

1    Have you ever seen that document before?

2          A.    No, I haven't.

3          Q.    Take a second to read that, if you

4    would, please.

5                MR. COOK:  I'm going to interpose an

6    objection to the entire line of questioning as

7    irrelevant to any issue related to the merits of

8    the litigation.  It's a procedural issue.  It's

9    been resolved by the court.

10         A.    I've never seen that.

11         Q.    Okay.  You've had a chance to review

12   Exhibit 53?

13         A.    Mm-hmm.

14         Q.    Do you see the statements in that

15   document about -- well, what is that document?

16         A.    It appears to me it's a document that

17   Steve had addressed to you and Mr. VanWay,

18   requested more time.

19         Q.    Because your attorneys were unable to

20   meet certain deadlines.

21               MR. COOK:  Objection.  Go ahead.

22         A.    Not deadlines.  I see there was --

23   they wanted an extension on one thing --

24         Q.    Okay.

```
1          A.    -- okay?  And I'm not sure if there

2     was a holiday in there because he asked for that

3     extension or not.  I don't know what the reason was

4     for asking for an extension, but I had never seen

5     this document before.

6          Q.    But clearly your attorneys asked for

7     an extension?

8          A.    Yes, yes.

9          MR. COOK:  I think the record will

10    reflect that the date the deadline was due was the

11    day after Thanksgiving.

12         Q.    Having seen that document, do you

13    still believe the Huebner memorandum was

14    inaccurate?

15         A.    Yes, I do.

16         Q.    And how so?

17         A.    Because I think Steve told me they

18    all -- I think Steve told me the only deadline that

19    they missed was because of the holiday.  That's why

20    I mentioned the holiday.  And I'm assuming that's

21    what this is.

22         MR. COOK:  Objection.  Excuse me.

23         A.    I just looked at this and -- and when

24    I read it, when other people approached me, they
```

1    saw it as a concern to them and I saw it as

2    inaccurate because it became a concern to them.

3              MR. HUNTER:  Okay.  Well, let's do

4    this, Jeff.  It's 11:30.  I think I better give you

5    a little opportunity to ask a few questions.

6              MR. VANWAY:  Can we take about a

7    two-minute restroom break?

8              MR. COOK:  Does that complete your

9    examination, Mr. Hunter?

10             MR. HUNTER:  No, but it's -- given the

11   time because I understand we have somebody coming

12   in or did we call them?  What have we done?  Oh,

13   Dennis is next.  All right.  You can sit through.

14   No, I am not concluding but I want to give Jeff

15   some time this morning.

16             MR. COOK:  Take a break?

17             MR. VANWAY:  Yeah, quick.

18        (Off the record:  11:30 a.m. - 11:36 a.m.)

19                       EXAMINATION

20   BY MR. VANWAY:

21        Q.    Mr. Whisman, good morning.  I'm Jeff

22   VanWay.  As you know, I represent Ford in this

23   case.  I have some questions for you this morning.

24   I don't believe I have as many as Mr. Hunter did

1   and I will try not to repeat his questions, but

2   bear with me if I do.  It's not intentional, okay?

3          A.    Okay.

4          Q.    Do you still have Exhibit 51 in front

5   of you, which is where Mr. Hunter left off, I

6   believe?

7          A.    Yes.

8          Q.    Just real quickly, if you could turn

9   to the second page of that, paragraph four --

10         A.    Okay.

11         Q.    -- where it states that certain

12  employees said they were concerned about

13  retaliation by ZFB.

14         A.    Mm-hmm.

15         Q.    Did anyone express concern about

16  retaliation by Ford?

17         A.    I don't believe so.

18         Q.    Do you believe that you've been

19  retaliated against by ZFB since you filed this

20  lawsuit?

21         A.    No, I do not.

22         Q.    Do you believe you've been retaliated

23  against by Ford since you filed the lawsuit?

24         A.    No, I do not.

```
 1          Q.     In fact, no one at Ford's got the
 2   ability to retaliate against you because you don't
 3   work there anymore; is that correct?
 4          A.     I don't think that's true.
 5          Q.     Who do you believe has the ability to
 6   retaliate against you?
 7          A.     Well, Ford's 49 percent owner.  I
 8   believe they have an influence in the plant.
 9          Q.     Okay.  They're 49 percent owner of the
10   joint venture?
11          A.     Of the joint venture.
12          Q.     All right.  And they have members of
13   the board of directors?
14          A.     Correct.
15          Q.     And you believe that through their 49
16   percent ownership there, they're asserting some
17   interest in the plant?
18          A.     Correct.
19          Q.     Okay.  Now, Mr. Whisman, when you were
20   employed at Ford, take you back to that time frame
21   for awhile, you understood while you were employed
22   there that there were basically two groups of
23   employees, hourly and salary, right?
24          A.     Correct.
```

```
 1          Q.    Okay.  Hourly were represented by the

 2   UAW?

 3          A.    Correct.

 4          Q.    They had a contract --

 5          A.    Correct.

 6          Q.    -- a labor agreement?  And their terms

 7   and conditions, their compensation and benefits

 8   were as negotiated in the contract, correct?

 9          A.    Correct.

10          Q.    Okay.  Salaried employees, on the

11   other hand, their compensation and benefits were as

12   the company set, correct?

13          A.    I don't know how they ever set them.

14   I don't know how they ever came by that.

15          Q.    Is it your understanding that while

16   you were with Ford, you had a contract that said

17   what your compensation and benefits were going to

18   be?

19          A.    Yes, I did.

20          Q.    And do you know where that contract

21   is?  I haven't seen it produced in this case.

22          A.    I haven't seen it, either, but I was

23   told that when I was hired in.  I was told this is

24   what you'll have and -- and I always did with Ford.
```

1          Q.     Do you remember who told you that?

2          A.     The person that hired me in, Carl

3     Thomas and John Burnside.

4          Q.     Okay.  So they told you what your

5     compensation --

6          A.     I can't --

7          Q.     -- and benefits --

8          A.     Right.

9          Q.     -- would be?

10         A.     Right.  And I can't think of the

11    girl's name in personnel, the salary personnel

12    lady.  I can't think of her name.  Dyvetta, I

13    believe.  She actually explained all my medical,

14    retirement benefits, overtime and all that stuff to

15    me.

16         Q.     Okay.  And was it your understanding

17    then that those benefits would never change?

18         A.     No, it was not.

19         Q.     Well, what was your understanding,

20    then?

21         A.     That's what I would have if I hired in

22    there.  And I had those with Ford.  Ford -- Ford,

23    to my knowledge, never changed those.

24         Q.     The entire time you worked at Ford,

1   your benefits never changed?

2        A.    No, they never -- I don't remember

3   them ever taking anything away.

4        Q.    Did they ever change?

5        A.    Well, your raises were different and

6   your -- and your profit sharing was different from

7   time to time.

8        Q.    Is it your testimony that things were

9   subject to change, your benefits and compensation

10  were subject to change or not?

11       A.    I think a lot of things are, compared

12  to the economy and such, you know.  But like the

13  stuff that they give you, like their vacation, your

14  terms of vacation, your terms of overtime and stuff

15  like that, those, to me, were never subject to

16  being changed.  That was an agreement when I hired

17  in with them.

18       Q.    Okay.  Vacation, overtime.  Anything

19  else that you believe --

20       A.    All -- all the benefits --

21       Q.    -- were not?

22       A.    -- retirement, anything that goes

23  under the benefit category, to me, was this is what

24  you'll have and that's what I had with them.

```
1          Q.     Profit sharing?  Did you have profit

2     sharing when you started in?

3          A.     Yeah.

4          Q.     Medical, did you have medical

5     insurance --

6          A.     Yes.

7          Q.     -- when you started?

8          A.     Yes.

9          Q.     Did that ever change while you were

10    there?

11         A.     The co-pay may have.  I'm not real

12    sure about that --

13         Q.     Did it go up?

14         A.     -- on my prescriptions.  I think it

15    went up and it went down, I believe.

16         Q.     Was it your understanding that the

17    medical was subject to change?

18         A.     Mm-hmm.  They made that clear to us.

19         Q.     So would I be correct in understanding

20    your testimony that your belief when you hired in

21    at ZF Batavia was just as it was when you were

22    hired at Ford, that your benefits wouldn't change?

23         A.     Exactly.

24         Q.     Okay.  Were there ever any years that
```

1    you were employed at Ford that you didn't receive a

2    merit increase?

3         A.    No, I don't believe there was.

4         Q.    Now, your performance bonus, I believe

5    you testified varied from year to year in the

6    amount?

7         A.    Mm-hmm.

8         Q.    Did you have a guarantee that you

9    would receive a performance bonus while you were

10   employed at Ford?

11        A.    No.  It was just in writing somewhere.

12   I remember seeing it, that we would -- we would

13   share in a profit sharing, based on their profits,

14   but when we -- they made a profit, we would get

15   profit sharing.

16        Q.    Okay.  And so if there weren't

17   profits, then your expectation was you wouldn't

18   receive profit sharing?

19        A.    Correct.

20        Q.    And so, for example, such has been the

21   case in the past two years with the down economy

22   that has severely affected the auto industry, my

23   understanding is that Ford has not shown a profit.

24   Your understanding is, then, that those are years

124

1    you wouldn't have received profit sharing because

2    Ford wasn't showing a profit?

3         A.    I wouldn't have had a problem with

4    that.

5         Q.    Okay.  Were you still employed -- at

6    some point in '99 was when you changed from Ford to

7    ZF, correct?

8         A.    Yes.

9         Q.    Okay.  While you were still employed

10   with Ford in 1999, do you recall Ford changing from

11   a profit sharing plan to a performance bonus plan?

12        A.    No, I don't.  I'm not saying it didn't

13   happen.  I don't recall it.

14        Q.    Okay.  If that happened, is that

15   something that would have violated your contract

16   with Ford, do you believe?

17        A.    No.

18        Q.    You believe Ford had the ability to

19   change the types of bonus plans that it offered?

20        A.    As long as you got your compensation,

21   as long as you got compensated according to their

22   rules.

23        Q.    I'm not sure I follow you.  As long as

24   you get that compensation --

125

```
 1        A.    It was still based on profit and
 2   measurables and their profit sharing always was, to
 3   my knowledge.
 4        Q.    My understanding is that the change
 5   from profit sharing to performance was much more
 6   geared towards looking at individual performance
 7   once they went to the performance bonus.
 8        A.    That could be.
 9        Q.    Are you aware of that?
10        A.    No, I wasn't, but that could be.  I'm
11   not saying it's not true, but that could be.
12        Q.    When you were with Ford, it was profit
13   sharing, which was primarily tied to the company's
14   profits?
15        A.    Exactly.
16        Q.    Okay.  Is it your belief, then, that
17   if Ford changed from a plan that was primarily
18   geared towards profit to one that was primarily
19   geared towards performance, is it your belief that
20   that would be a breach of your contract with Ford?
21        A.    No, not unless they told me that we're
22   doing this because you work too much overtime.  If
23   it was based into their profits, I don't have a
24   problem with that.
```

1        Q.    Well, what if it was based on your

2    performance?

3        A.    I don't have any problem with that,

4    either.  I don't have a problem with that, either.

5        Q.    During the time that you were employed

6    by the company, did the company ever change the

7    health insurance carrier?  I'm sorry.  During the

8    time you were employed by Ford, did they ever

9    change the health insurance carrier?

10        A.    They could have.  I'm not sure.  They

11    could have and probably did.

12        Q.    Okay.  And you would agree with me,

13    wouldn't you, that that was within the company's

14    discretion as to who the health insurance carrier

15    was going to be?

16        A.    Yeah, because that's what we were told

17    when we hired in.

18        Q.    And they changed the co-pays, I

19    believe, you said?

20        A.    Yes.

21        Q.    Did they ever change your premiums,

22    the amount you paid out of pocket for your health

23    insurance?

24        A.    They could have.  I don't recall, but

1    they could have.

2           Q.    And you would agree with me that that

3    was within Ford's discretion to do that as well?

4           A.    Yeah.

5           Q.    Okay.  Do you recall any other types

6    of benefit changes that Ford made while you were

7    employed with Ford?

8           A.    No, I don't.

9           Q.    We'll mark this as 54.  Mr. Whisman,

10   I've handed you what the court reporter has marked

11   as Exhibit 54.  Can you tell me what that document

12   is?

13          A.    Let me read through this.

14          Q.    Sure.

15          A.    Yes, I see that.  I've seen this

16   before.

17          Q.    Is this the document that you referred

18   to earlier as a contract between you and Ford?

19          A.    No, I didn't necessarily say a

20   contract.  I said that we had an agreement with

21   them, okay?  But, yeah, I signed this.  Yeah, I

22   remember this.

23          Q.    Okay.  But you're not necessarily

24   saying this was a contract?

1          A.     I took it for what it said, that my

2    salary, my overtime would be paid, my benefit

3    package would be there, yes.  I understood that to

4    be an agreement between us.

5          Q.     Okay.  You would agree with me,

6    wouldn't you, that the document doesn't say that

7    your benefits or compensation won't ever change?

8          A.     No, I don't think it says that they

9    will, either.

10          Q.     Correct.  Doesn't say one way or the

11    other --

12          A.     Right --

13          Q.     -- correct?

14          A.     -- it doesn't say one way or another.

15          Q.     Mr. Whisman are you familiar with the

16    term "at-will employment"?  Have you ever heard

17    that term before?

18          A.     Yeah, I've heard it from Len Sennish

19    quite a bit.

20          Q.     Okay.  Is it your understanding that

21    when you were employed at Ford, that you could be

22    terminated at any time for any reason?

23          A.     No, I did not.  I didn't understand

24    that.

1        Q.      Okay.  Did you think that the company

2    had to have just cause to terminate?

3        A.      Absolutely.

4        Q.      Did you believe that, absent just

5    cause, you had employment for life at Ford?

6        A.      Absolutely.

7        Q.      Do you recall, was there any sort of

8    document from Ford that communicated that to you?

9        A.      No, only what I was told when I hired

10   in.

11       Q.      And that, again, would be what was

12   reflected in the offer letter?

13       A.      That and what I was told.

14       Q.      What were you told about your term of

15   employment?

16       A.      As long as your performance is

17   acceptable and you do a good job here, you take

18   care of your job, basically you'll have a job

19   forever.

20       Q.      Who told you that, do you remember?

21       A.      Carl Thomas, Joe Nygro.

22       Q.      Was that during the interview process?

23       A.      They told me how stable it was during

24   the interview process and you won't have any

```
 1   problem being employed here.  And they give me

 2   the -- the history of how many people had been

 3   terminated and what for.  And they convinced me

 4   that they were very fair.

 5             And the examples they gave me, those

 6   people were justly terminated.  And not one time

 7   did I hear anywhere where anybody was unjustly

 8   terminated.  And I thought, Well, they seem to be

 9   very fair people.  And they were.  They were with

10   me.

11        Q.    Was this -- I'm sorry.  This

12   conversation that you're talking about, was this

13   before or after you accepted employment?

14        A.    During my interview process.

15        Q.    Okay.  And this is Carl Thomas?

16        A.    Mm-hmm.

17        Q.    And as far as you can recall,

18   Mr. Thomas didn't ever put anything like that in

19   writing --

20        A.    No.

21        Q.    -- to you, did he?

22        A.    No, no.

23             MR. COOK:  Go off the record for a

24   second.
```

```
 1          (Off the record:  11:49 a.m. - 11:50 a.m.)

 2          Q.    Mr. Whisman, you've been handed what

 3     the court reporter has marked as Exhibit 55, which

 4     appears to be an application for salaried

 5     employment with Ford that you completed.  Do you

 6     agree with me, is that what this document is?

 7          A.    It would appear to be, yes.

 8          Q.    This is your handwriting on this

 9     document, correct?

10          A.    The signature is.  I think it's

11     obvious the rest of it's not my handwriting.

12          Q.    I'm sorry.  The rest of -- only the

13     signature is your handwriting?

14          A.    It would appear to be.  If you look at

15     my signature at the bottom and then look at the

16     handwriting, it doesn't appear to be the same.

17          Q.    Did you have someone fill this out for

18     you?

19          A.    My wife could have done that.

20          Q.    Okay.  But the signature is definitely

21     yours?

22          A.    Yeah, I'm a pretty sloppy writer.  She

23     could have done that.  The signature is mine, yes.

24          Q.    Okay.  I'd like to direct your
```

1    attention, Mr. Whisman, to the second page of the

2    document to the paragraph that appears right above

3    your signature.  If you could take a moment and

4    review that paragraph, please.

5        A.    Okay.  I've read that.

6        Q.    Okay.  If you look in that, just that

7    paragraph, about the middle of the paragraph where

8    it says, "I understand that my employment is not to

9    be for any definite term and it may be terminated

10   at any time."  Do you see where I'm at?

11       A.    Mm-hmm, yes.

12       Q.    I take it that's -- what's written

13   there is different than what your understanding was

14   as to your employment at Ford?

15       A.    No, not really 'cause I think that

16   issue was brought up and they said termination with

17   just cause.  It doesn't say in here without any

18   specific reason we can terminate you without any

19   reason or just cause or notification.  And I

20   understood that.  I understood that if you don't do

21   your job, you're subject to being terminated --

22       Q.    Okay.

23       A.    -- absolutely.

24       Q.    Do you see the -- I think it's that

```
 1   same sentence towards the end, where it says, "The
 2   only way that any differing commitment regarding my
 3   employment may be made is by written agreement,
 4   signed by the vice president of the Company in
 5   charge of employee relations."
 6         A.    I see that.
 7         Q.    Did you ever have a written agreement
 8   signed by the vice president of the company in
 9   charge of --
10         A.    No --
11         Q.    -- employee relations?
12         A.    -- I don't believe I did, no.
13         Q.    Okay.  If you would, Mr. Whisman, just
14   let me get my question out.
15         A.    I'm sorry.
16         Q.    My question was, did you ever have a
17   written agreement signed by the vice president of
18   the company in charge of employee relations?
19         A.    No, I did not.
20         Q.    Okay.  Mr. Whisman, you've been handed
21   what's been marked as Exhibit 56 and I will tell
22   you that obviously that parts of this document are
23   hard to read.  We have a bad copy.  Tried to get a
24   better copy, but this is the best I've got so far.
```

1    But it does appear that at the bottom of that

2    document, that that's your signature; is that

3    right?

4          A.    Yes, it is.

5          Q.    Okay.  And if you look here,

6    Mr. Whisman, at the third paragraph and it looks

7    like the second-to-the-last line of the third

8    paragraph, can you make that out?  It appears to me

9    to say, My compensation to such adjustments as my

10   employer may from time to time determine.  Do you

11   agree with me that that's what that says?

12         A.    I have a hard time reading it.  If you

13   say that, I take your word for it.

14               MR. COOK:  Where are you, Jeff?

15               THE WITNESS:  Right here.

16               MR. VANWAY:  Third paragraph, the

17   second-to-last line, starting towards the end of

18   that line.

19               MR. COOK:  Well, I'm not going to

20   doubt you, but I can't read that.

21               MR. VANWAY:  No, no, I agree.  Let's

22   do this.

23   BY MR. VANWAY:

24         Q.    I have a better copy, Mr. Whisman,

1    that was signed by someone else.  But just so that

2    we're clear on what it says.

3         A.    Okay.

4         Q.    Now, Mr. Whisman, I've handed you

5    what's been marked as Exhibit 57.  I ask, if you

6    would, kind of put 56 and 57 side by side there.

7         A.    Okay.

8         Q.    And I'll submit to you that I have

9    reviewed both of these.  They appear to be the same

10   document, only one was signed by you, that being

11   Exhibit 56.  And Exhibit 57 was signed by

12   Mr. Williams, who's also a plaintiff in this case.

13   And I think that Exhibit 57 is easier to read.

14        A.    Yes, it is.

15        Q.    If you look to the third paragraph,

16   then -- actually, why don't I just read this whole

17   paragraph here?  It says, I understand my

18   employment is not for any definite term.  It may be

19   terminated at any time without advance notice by

20   either myself or my employer, that my employment is

21   subject to such rules, regulations and personnel

22   practices, policies and changes therein as my

23   employer may from time to time adopt and that my

24   employment shall be subject to such layoffs and my

1    compensation to such adjustments as my employer may

2    from time to time determine.

3              And that, reading from Exhibit 57

4    there, does that help in the reading of the

5    sentence in Exhibit 56 that I referred to earlier?

6         A.    Yes, it does.

7         Q.    Okay.  And that paragraph that I just

8    read, is that consistent with your understanding as

9    to the nature of your employment while you were

10   with Ford?

11        A.    Yes.

12        Q.    Mr. Whisman, are you aware of any

13   changes that Ford has made to salaried compensation

14   and benefits since the time you left the company

15   and went to work for ZF Batavia?

16        A.    No, but I was led to believe that

17   there would be a equal number of Ford -- Ford

18   members compared to ZF board members for the joint

19   venture.  And when I talked to Mr. Saleh and -- and

20   the group and Jerry Priest about coming over here,

21   that we would be looked over by the Ford people.

22              So I took it that any changes that

23   would have been made at ZF, Ford knew about it and

24   okayed the changes.  And that was under the

1    impression I had when I came over, that any -- any

2    changes for a transitional Ford employee would be

3    reviewed by the board before there would be any

4    changes in their benefits.  That's what I

5    understood.

6        Q.    Okay.  And I asked a poor question

7    because that's not where I intended to go.

8        A.    Okay, I'm sorry.

9        Q.    What I intend to ask about is,

10   employees who are still salaried employees with

11   Ford, not transitional employees --

12       A.    Oh, okay.

13       Q.    -- but employees who either left

14   Batavia and went somewhere else or that were always

15   employed by Ford, are you aware of any changes that

16   Ford has made with respect to those types of

17   employees, their compensation and benefits since

18   the '99 time frame?

19       A.    No, I'm not.

20       Q.    Are you aware, for example, that Ford

21   no longer uses the 401K match for --

22       A.    No, I'm not.

23       Q.    -- salaried employees?

24       A.    No, I'm not.

```
 1          Q.     Do you receive a company match at ZF

 2     Batavia?

 3          A.     Yes.

 4          Q.     How much is it?

 5          A.     I'm not sure what it is.  They reduced

 6     the amount you could --

 7          Q.     Are you aware that Ford has stopped

 8     paying performance bonuses to salaried employees?

 9          A.     No, I --

10          MR. COOK:  I'm going to interpose an

11     objection.  You're saying these things, but we have

12     no way of knowing that they're, in fact, correct.

13     And so his statement to you that he doesn't know

14     says absolutely nothing.

15          If you want to pursue this, Jeff, go

16     ahead.  But he said -- you asked him if he knew

17     about 401K match and he said no and you say it

18     changed.  That means nothing.

19          MR. VANWAY:  I understand your

20     objection.  I'm asking him if he's aware of these

21     things.

22     BY MR. VANWAY:

23          Q.     I'm sorry we got interrupted.  Are you

24     aware that Ford no longer pays performance bonuses
```

1    to salaried employees?

2         A.    No, I'm not.

3         Q.    Okay.  Other than the one year that

4    you testified about earlier when you didn't receive

5    an AIP bonus, you've always received a bonus at ZF

6    Batavia, correct?

7         A.    Except for the one year.

8         Q.    Are you aware that Ford recently

9    announced it would be cutting salary-related costs

10   by 10 percent?

11        A.    No, I'm not.

12        Q.    Are you aware that Ford is

13   contemplating reductions in overtime for salaried

14   employees?

15        A.    No, I'm not.

16        Q.    Now, your performance bonus the first

17   year at ZF Batavia, according to the records I've

18   reviewed, was $12,600.  Does that sound correct?

19        A.    That's probably about right.  I don't

20   remember, but I take your word for it.

21        Q.    And the last bonus that you received

22   from Ford while you were still employed with Ford,

23   I believe the records show was approximately

24   $8,600.  Does that sound correct?

    1          A.    From Ford?

    2          Q.    Yes.

    3          A.    That's -- yeah, that sounds right.

    4          Q.    Now, you testified earlier today about

    5    promises that you believe Mr. Saleh made to you.

    6          A.    Mm-hmm.

    7          Q.    And first, I believe you said that

    8    Mr. Saleh discussed the job with you at ZF Batavia

    9    in approximately May or so of '99?

   10          A.    Could be.  I'm -- I'm not sure of the

   11    time period, but it was before I came back --

   12          Q.    Okay.

   13          A.    -- he discussed it with me.

   14          Q.    Well, he discussed it with you twice,

   15    didn't he?  The --

   16          A.    I believe he did, yes.

   17          Q.    The first time, you rejected the

   18    offer, correct?

   19          A.    Right.

   20          Q.    Okay.  And so I take it --

   21          A.    I didn't reject his offer.

   22          Q.    Well, whose offer did you reject?

   23          A.    Mr. Zielke presented the -- the

   24    employment offers.  And at that time, I decided I

1    wasn't interested in going.  The initial -- the

2    initial one I got was -- the one they offered that

3    you got in writing was presented by Mr. Zielke.

4            Q.    Okay.  And that's the one you

5    rejected?

6            A.    Right.  And I indicated to him I

7    wasn't interested.

8            Q.    Okay.  Before you decided that you

9    weren't interested, though, you talked to Mr. Saleh

10   about what things would be like if you stayed,

11   correct?

12           A.    Mm-hmm, correct.

13           Q.    And I believe you testified that Mr.

14   Saleh made certain assurances to you about how

15   things would be?

16           A.    Yes.

17           Q.    But you evidently weren't convinced by

18   those assurances and decided to go ahead and not

19   accept the offer, correct?

20           A.    Exactly.

21           Q.    Okay.  Are you aware of who it was at

22   Ford at the time you were at Ford Batavia that had

23   the responsibility for determining what the

24   benefits were going to be?

```
 1          A.    No, I don't.

 2          Q.    Would that typically have been someone

 3     in human resources?  Is that your understanding?

 4          A.    Yeah.  Ed Smith was in human resources

 5     then.  He was the manager of human resources, so I

 6     assume it would be him.  I'm not sure.

 7          Q.    Mr. Saleh wasn't in human resources?

 8          A.    No, he wasn't.

 9          Q.    He didn't have any responsibility for

10     determining what benefits would be, did he?

11          A.    No.

12          Q.    Then by the time that you accepted the

13     offer, I guess after you came back to Batavia after

14     you'd been at Sharonville, that was late in '99,

15     correct?

16          A.    Yes, it was.

17          Q.    And by then, Mr. Saleh, he was a ZF

18     Batavia employee by then, wasn't he?

19          A.    At that time, I believe he was.

20          Q.    As was Ms. Jones, wasn't she?

21          A.    I believe so.  I'm not sure about Ann

22     Jones.

23          Q.    Now, we looked earlier today, I

24     believe, at Exhibit 44.  Do you still have that one
```

```
 1   in front of you?

 2        A.   Yes.

 3        Q.   Okay.  And Exhibit 44 is your

 4   application for employment with ZF Batavia,

 5   correct?

 6        A.   Wait a minute.  Wait a minute.  I've

 7   got the wrong one.

 8        Q.   You got the right one in front of you?

 9             MR. VANWAY:  Mr. Cook, do you have

10   another copy of Exhibit 44 for the witness?

11             MR. COOK:  Let me see.  Yep, I do.

12   You can look at mine.

13             THE WITNESS:  Yeah, here's one.

14             MR. VANWAY:  Okay.

15             THE WITNESS:  It's on the bottom.  I'm

16   sorry.

17   BY MR. VANWAY:

18        Q.   That's your application with ZF,

19   correct?

20        A.   Correct.

21        Q.   If you would, turn to the second page

22   of that document, Mr. Whisman, and your signature

23   appears on there three times.  I want to focus on

24   the area where it first appears.  And there are
```

```
 1   three paragraphs right above that.  Do you see

 2   where I'm at?

 3        A.    Where my first signature is?

 4        Q.    Yes.

 5        A.    Where you at in relation to that first

 6   signature?

 7        Q.    I want to direct your attention --

 8        A.    Okay.

 9        Q.    -- to the middle paragraph.

10        A.    Okay.

11        Q.    Okay.  And that paragraph appears to

12   have similar language as to what you read earlier

13   from the Ford application.  And specifically it

14   says, any differing commitment regarding my

15   employment -- I'm sorry.

16             The only way any differing commitment

17   regarding my employment may be made is by a written

18   agreement signed by the director of human resources

19   of the company.  Do you see where I'm at?

20        A.    I see that.

21        Q.    Okay.  Who's the director of human

22   resources at ZF Batavia?  Is it Mr. Sennish?

23        A.    I believe it is.

24        Q.    Do you have any written agreement with
```

1    Mr. Sennish?

2        A.    No, I don't.

3        Q.    Now, back to your conversations with

4    Mr. Saleh where you asked him about whether

5    benefits would change.  Is that what you asked him?

6        A.    I asked him the same things he had

7    told me prior were still in effect, if I would

8    still be like any other Ford person and he said,

9    Yes, they are.  And I said, They're not going to

10   change stuff on me.  He said, They can't do that.

11   He said, They made us an agreement.  They're not

12   going to change anything on you.

13       Q.    And by "they," who are you referring

14   to, ZF Batavia?

15       A.    ZF.

16       Q.    Okay.  And was it your understanding,

17   then, that your benefits would never change, that

18   they would always remain exactly the same as they

19   were at the time you hired with ZF Batavia?

20       A.    They would change if Ford's changed.

21   If Ford's changed, ours would change --

22       Q.    Okay.

23       A.    -- for Ford transitionals.

24       Q.    So if, for example, Ford eliminated a

```
 1    401K match, for example, then you would expect your

 2    401K --

 3          A.    Absolutely.

 4          Q.    -- match to be eliminated as well?

 5          A.    Absolutely.

 6          Q.    Did anyone make any -- well, did

 7    Mr. Saleh make any promises to you to the effect

 8    that your benefits would be greater than those of

 9    ZF new hires?

10          A.    He just said the transitional people

11    were separate from new hires.  New hires hired in

12    probably wouldn't make as much money as us.  But

13    benefits would be different, but ours would remain

14    like Ford.

15          Q.    Did he tell you, for example, that

16    your AIP bonuses would be greater than those of new

17    hires?

18          A.    No, he didn't.

19          Q.    Did he say anything one way or the

20    other as to comparing your bonus to the bonus of

21    new hires?

22          A.    No.

23          Q.    Did anyone from ZF make that type of

24    assurance to you?
```

```
 1          A.    No.

 2          Q.    Anyone from Ford make that type of

 3     assurance --

 4          A.    No.

 5          Q.    -- to you?  Now, you understood that

 6     by accepting the job with ZF, that you were going

 7     to be employed by ZF Batavia and not Ford, correct?

 8          A.    Correct.

 9          Q.    Okay.  You understood that ZF would be

10     responsible for your wages and benefits from that

11     point forward, correct?

12          A.    Correct.

13          Q.    And that you would be subject to ZF's

14     policies and procedures?

15          A.    Correct.

16          Q.    And your understanding was that --

17     well, strike that.

18               The benefits that you and Mr. Saleh

19     discussed, was it your understanding that those

20     were to be provided by ZF or Ford?

21          A.    By ZF.

22          Q.    Ford wasn't going to have any

23     responsibility for providing those benefits as far

24     as you knew, correct?
```

```
 1         A.    Well, I think we were under the
 2   understanding that Ford was going to share in the
 3   cost.
 4         Q.    Who told you that?
 5         A.    The CD4E, for instance.  They -- they
 6   share in the cost of the CD4E.  I think what we
 7   were told in one of the prior depositions that --
 8   that Ford is footing the bill for the CD4E.
 9         Q.    Okay.  But what about specifically
10   employee costs --
11         A.    We --
12         Q.    -- and more specifically, salaried
13   employee costs, did anyone tell you that Ford was
14   going to share the costs of paying for ZF salaried
15   employees?
16         A.    No, they didn't.
17         Q.    Or paying for benefits for ZF salaried
18   employees?
19         A.    No, no, they didn't.
20         Q.    And I believe you testified -- you
21   understood that there were going to be some
22   differences between the benefits that you had
23   received at Ford and the benefits that you were
24   going to receive at ZF Batavia?
```

```
 1          A.     The ones they told us about.

 2          Q.     And that was just the personal days?

 3          A.     Right.

 4          Q.     You didn't believe that there would be

 5     any other differences?

 6          A.     No, did not.

 7          Q.     And so you believe, then, that the

 8     transition bonus that you received, which was

 9     $25,000, was designed only to offset the difference

10     in the personal day amount?

11          A.     That and to -- to take our name from

12     Ford to ZF because we -- it was just a matter of

13     changing companies.  It was a -- you know, that was

14     all.  I mean, it wasn't to say we're going to

15     change this benefit and this is going to make up

16     for the difference in that benefit.  That's not the

17     way I understood it.

18          Q.     Okay.  I'm not sure I follow your

19     testimony about it also being part of the change of

20     the name from Ford to ZF.

21          A.     Well, when you got -- some employees

22     have 30-some years with Ford, you know.  And

23     they're saying -- you know, we know that you feel

24     unsafe about going with ZF, but we'll make you
```

1   these promises and plus we'll give you a bonus to

2   go.

3           So they did everything they could do

4   to get people to go -- long-term employees from

5   Ford.  That's a big jump to switch to another

6   company.  So I certainly took it that that bonus

7   was to help you make that decision to go.

8           Q.    Now, the -- at least towards the end

9   of your employment with Ford at Batavia, the

10  Batavia plant had not been successful, had it?

11          A.    I -- I heard rumors to that effect.

12  I -- I don't see their numbers -- you know.

13          Q.    There were rumors, in fact, weren't

14  there, that the plant was going to be shut down?

15          A.    Oh, sure.  There's always rumors of

16  that.

17          Q.    And it was your understanding that ZF

18  Batavia was going to come in and try and succeed in

19  this plant where Ford had failed or had been

20  unsuccessful; is that correct?

21          A.    I don't know that I saw it that way.

22  I just thought of this as a business venture and --

23  you know, Ford was buying into new technology.

24  That's how I saw it.  But I did hear rumors that

1    the plant wasn't doing well, you know.  Strictly

2    rumors.  I couldn't say.

3        Q.    Your starting salary at ZF was

4    slightly higher than it was at Ford, wasn't it?

5        A.    I think it was the same.  You mean

6    when I left Ford?

7        Q.    Yes.

8        A.    It was the same.  I believe it was the

9    same, unless I'm mistaken.  I could -- I believe it

10   was the same.

11       Q.    And I don't mean to quibble over

12   details.  I believe the records show it may have

13   been $10 --

14       A.    Oh --

15       Q.    -- higher.

16       A.    -- that could be.

17       Q.    Do you know?

18       A.    Oh, that could be.  That's possible.

19             MR. COOK:  You meant slight.

20             MR. VANWAY:  Very slight, I

21   understand.

22             THE WITNESS:  I mean, I got a raise

23   and didn't know about it?

24   BY MR. VANWAY:

1          Q.    Now, I know you have testified today

2     about certain changes that ZF has made that you

3     believe are in violation of what you were promised

4     when you accepted the job with ZF.  Did I

5     characterize that correctly?

6          A.    Yes.

7          Q.    Okay.  I'm not sure I have a complete

8     list, and I don't mean to duplicate what you've

9     already said.  But can you tell me specifically

10    what changes it is that you believe ZF made?  It

11    appears you're referring to a document.  What

12    document are you referring to?

13         A.    That's the interrogatory.

14         Q.    Is it possible for you to answer my

15    question without referring to the interrogatories?

16         A.    Yeah, I think so.

17         Q.    What changes would those be?

18         A.    Bereavement days, personal days,

19    overtime pay, the casual overtime policy.  That's

20    all I can remember at this time.

21         Q.    Okay.  Let's start with --

22         A.    Did I have AIP bonus on there?

23         Q.    You didn't.  AIP bonus.

24         A.    AIP bonus.

1      Q.    And you're referring to the one year

2  you didn't get it?

3      A.    Right.

4      Q.    Do you know who made the change in

5  bereavement days?

6      A.    I was told Len Sennish and I don't

7  have any proof of that.

8      Q.    Who told you it was Len Sennish?

9      A.    I believe it was brought up to face to

10  face on different occasions when people questioned

11  him on it and I think he more or less said that he

12  was part of that decision and he made that

13  decision.

14      Q.    Did anyone tell you that Ford had made

15  that decision to --

16      A.    No.

17      Q.    -- change?

18      A.    No.

19      Q.    Are you aware of any evidence that

20  shows that Ford made that decision?

21      A.    No.

22      Q.    Are you aware of any evidence that

23  Ford approved that decision?

24      A.    We were told that Ford would

1   approve -- would be involved in any changes made to

2   us by -- when we came over, that's what we were led

3   to believe.  But did I see anything in writing with

4   Ford, no.

5          Q.    That's what Mr. Saleh told you --

6          A.    Right.

7          Q.    -- told you before you accepted the

8   job?

9          A.    Right.

10         Q.    But no one specifically told you that

11  Ford approved the change in bereavement?

12         A.    Did anybody specifically tell me that?

13         Q.    Yes, sir.

14         A.    I think Mr. Saleh told me at one time

15  that the changes that had been had to -- Ford had

16  to know about it and Ford had to approve them.  I

17  believe he made that comment.

18         Q.    Okay.  And do you know the basis of

19  Mr. Saleh's knowledge there?  In other words, do

20  you know, was he speculating as to, oh, I think

21  Ford has to know this or did he say, I know Ford

22  knows about this because of these reasons?

23         A.    I think he just gave his opinion.

24         Q.    Okay.  And you have no knowledge one

155

```
 1    way or the other, do you --

 2          A.    No.

 3          Q.    -- as to whether Ford approved --

 4          A.    No, I'm sorry.  No, I don't.

 5          Q.    -- the changes in personal days?

 6    You're talking about -- there was initially a

 7    change that you were aware of, right?  Changing

 8    from some 30 days that you had at Ford to five days

 9    at ZF?

10          A.    Yes.

11          Q.    That's not the change that's at issue

12    in this lawsuit, right?

13          A.    No.

14          Q.    The change is from five to three?

15          A.    Correct.

16          Q.    Which was for a one-year period?

17          A.    Right.

18          Q.    Okay.  Do you know who made that

19    change in policy?

20          A.    I assume Len Sennish.  I can't say for

21    sure.  I can only assume.

22          Q.    Are you aware of whether anyone from

23    Ford was involved in that policy --

24          A.    I'm not --
```

```
 1          Q.    -- change?

 2          A.    -- aware of that.

 3          Q.    Or approved of that policy change?

 4          A.    I'm not aware of that.

 5          Q.    Okay.  The change in overtime pay,

 6   first, I think you're referring to two different

 7   things on overtime.  You said overtime pay and then

 8   you said casual overtime policy.  By "overtime

 9   pay," are you talking about that five to eight

10   shifts where you didn't get paid?

11          A.    Correct.

12          Q.    Okay.  And that was Milt Gross and

13   Mr. Saleh that told you that?

14          A.    Correct.

15          Q.    Are you aware of anyone from Ford

16   being involved in that change?

17          A.    No, I do not.

18          Q.    Are you aware of anyone from Ford

19   approving of that change?

20          A.    No, I do not.

21          Q.    The casual overtime policy change, are

22   you aware of anyone from Ford being involved in

23   that change?

24          A.    No, I do not.
```

1          Q.     Anyone from Ford approving that

2     change?

3          A.     Not that I'm aware of.

4          Q.     The AIP bonus that you did not receive

5     for that one year, are you aware of anyone from

6     Ford being involved in that change?

7          A.     No, I'm not.

8          Q.     Or anyone from Ford approving that

9     change?

10          A.     No, I'm not.

11          Q.     And if I understood your testimony

12     correctly, the -- the only person that made

13     promises to you were Mr. Saleh?

14          A.     And Jerry Priest.

15          Q.     And Jerry Priest?

16          A.     Right.  Jerry Priest did it informally

17     in the aisle, was telling me what was promised and

18     he felt comfortable that those promises would be

19     kept.

20          Q.     Okay.  And what was Jerry Priest's

21     position?

22          A.     He's a manager, a production manager,

23     I believe.

24          Q.     Was he higher on the totem pole than

1    you were?

2          A.    Oh, yeah.

3          Q.    Okay.

4          A.    Most people are.

5          Q.    Is he with ZF Batavia now?

6          A.    Yes, he is.

7          Q.    When he had that conversation with

8    you, was that before you left and went to

9    Sharonville or was that after you came --

10         A.    Before.

11         Q.    -- back?  Okay.  Do you have any

12   reason to believe that when Mr. Priest made those

13   statements to you, that he wasn't telling the

14   truth?

15         A.    No.  At that time, you mean --

16         Q.    Yeah.

17         A.    -- did I believe him?

18         Q.    Yeah.

19         A.    Oh, absolutely I believed him, yeah.

20   I had confidence in Jerry.

21         Q.    Do you have any reason to believe that

22   Mr. Priest was lying to you?

23         A.    No.

24         Q.    Or that he knew that ZF was, down the

```
 1   road, going to make changes?
 2        A.   At that time, I don't know if he did.
 3        Q.   Okay.  With respect to Mr. Saleh, at
 4   the first time in May or thereabouts when he had
 5   conversations with you about what the benefits
 6   would be and what things would be like if you
 7   stayed -- or rather if you came to ZF Batavia, do
 8   you have any reason to believe that Mr. Saleh
 9   wasn't being honest with you at that time?
10        A.   I can't really say.  I don't know.
11        Q.   Any reason --
12        A.   What they were thinking -- I'm sorry.
13   I don't know.
14        Q.   No, I understand.
15        A.   What they were thinking when they said
16   that, I don't know.
17        Q.   Okay.
18        A.   I can't really say if they were being
19   honest or not.
20        Q.   Sure.  Do you have any reason to
21   believe that Mr. Saleh, at the time he made those
22   statements knew that, down the road, ZF Batavia was
23   going to make changes in your benefits?
24        A.   No, I don't think he knew that.
```

1          Q.     Okay.  And then later when you had

2     more conversations with Mr. Saleh after you

3     returned from Sharonville and around December of

4     '99, do you have any reason to believe at the time

5     Mr. Saleh had those conversations with you, that he

6     didn't -- that he knew that, down the road, ZF

7     Batavia was going to change your benefits?

8          A.     I don't know if he did or not.  I

9     honestly don't know if he did or not.

10          Q.     Okay.  If you could, Mr. Whisman, turn

11     to Exhibit 28.  I don't -- I don't believe that's

12     one that was marked today.

13          A.     I don't think I have 28.

14          Q.     I have an extra copy

15               MR. COOK:  28?

16               MR. VANWAY:  Yeah, I have an extra

17     copy here, if you'd like.

18               MR. COOK:  It's here in the group.

19               THE WITNESS:  I don't think I have 28.

20               MR. COOK:  It's here in this group.

21     BY MR. VANWAY:

22          Q.     Mr. Whisman, feel free to take your

23     time and review Exhibit 28 as thoroughly as you

24     believe you need to.  I will tell you I don't -- I

1    don't have very many questions on Exhibit 28.

2            But my understanding is that that is

3    the ZF Batavia overtime policy for salaried exempt

4    employees.  Is that your understanding as well?

5            A.    Yes, I've read it.

6            Q.    Okay.  Is that -- as far as you know,

7    is that the current ZF Batavia overtime policy?

8            A.    Current -- if I look at the date, it's

9    11/15/2000.  I think -- I don't think I saw this

10   when I came over December 15th of 1999.

11           Q.    No, I understand.

12           A.    The current policy --

13           Q.    Is this what's in effect today as far

14   as you know?

15           A.    The current policy, yes.

16           Q.    Okay.  If you could get Exhibit 45 out

17   as well and kind of put those two side by side for

18   just a moment.  Exhibit 45 was one of your pay

19   records, I believe.

20           A.    Okay.

21           Q.    Now, correct me if I'm wrong, but I

22   believe your testimony earlier today was that at

23   the time of Exhibit 45, at the time you filled that

24   document out, that ZF had not made the changes in

1    the overtime policy that are at issue in this

2    lawsuit.

3            Now that you've had a chance to look

4    at Exhibit 28, does that change your testimony as

5    to whether or not the changes in the policy had

6    been made as of the time you filled out Exhibit 45?

7            A.     It would appear.

8            Q.     Okay.  So as far as you know, the

9    changes in the policy which are in dispute in this

10    lawsuit were in effect at the time you filled out

11    this Exhibit 45?

12            A.     Mm-hmm.

13            MR. COOK:  I'm sorry, what was that?

14    Did you say "yes"?

15            THE WITNESS:  Yes, yes.

16            Q.     Could you turn to Exhibit 28 and point

17    out to me, please, the change or changes in the

18    policy that you believe are a violation of what you

19    were promised?

20            A.     In eight, general rules 8, 8.1,

21    manager should schedule overtime in advance.  Hours

22    worked without prior authorization will not be

23    paid.

24            Q.     That's a change?

1          A.     Yeah, because I -- I was scheduled and

2     it was prior authorized that I worked and I wasn't

3     paid on the second sheet.

4          Q.     Let me back up for that one for just a

5     minute.  You're referring to the five to eight

6     shifts that you weren't paid?

7          A.     Correct.

8          Q.     Okay.  And let me focus my question a

9     little bit better.  I'm asking with respect to this

10    Exhibit 28, this policy, what's different about

11    what's written in this policy than what you were

12    led to believe the overtime policy was going to be

13    or what it had been at Ford?

14         A.     Well, I don't see anything in this

15    policy that says we'll be paid overtime pay.  Is

16    there something here that says we will be paid

17    overtime pay in this policy?  I don't see it.

18         Q.     Well, I'm not --

19         A.     Does this --

20         Q.     -- sure I'm following you.

21         A.     Does it say we'll be compensated for

22    overtime pay in this policy?  If it does, I don't

23    see it.

24         Q.     Okay.  Let me direct you to section

```
 1    7.1 --

 2         A.    Okay.

 3         Q.    -- where it appears to say that

 4    employees will receive overtime compensation for

 5    hours worked in excess of nine.  Was that the same

 6    as it was at Ford or is that a change?

 7         A.    That's a change.

 8         Q.    And what was the policy at Ford?

 9         A.    Well, I can tell you the practice

10    was --

11         Q.    Okay.

12         A.    -- okay, which I assume was a policy.

13         Q.    Sure.

14         A.    That if you worked up to 45 minutes

15    casual, you didn't put it on your card.  If you

16    worked up to 50 minutes casual, you didn't put it

17    on your card, to 55.  But once you got to the hour,

18    you put the hour on your card and it was approved.

19    Anything less than an hour was casual overtime.

20         Q.    Okay.  So if you worked an hour of

21    casual overtime, you'd be paid for it at Ford?

22         A.    Right.  It would be considered casual

23    as of the ninth hour.  When you got the ninth hour

24    in, it was no longer casual.  Anything less than
```

1    nine, anything less than that extra hour was

2    considered casual time.

3        Q.    Oh, okay.  Well, let me -- well, so

4    you would submit, then, that 7.1 -- section 7.1 is

5    a change from the Ford policy?

6        A.    Yes, I would.

7        Q.    Okay.  Anything else in this policy

8    that you believe is a change from the policy or the

9    practice when you were with Ford?

10            MR. COOK:  Please review it very

11   carefully.

12       A.    Okay.

13       Q.    Any other changes, Mr. Whisman, other

14   than section 7.1?

15       A.    In one, when a manager determines a

16   need to schedule exempt salaried employees to work

17   beyond the normal work week, additional

18   compensation will be paid for such hours, that

19   didn't happen.

20       Q.    No, I understand that.

21       A.    That was a change.

22       Q.    Well, your testimony is it wasn't

23   followed, right?

24       A.    Correct.

1          Q.     That section wasn't followed?

2          A.     Correct.

3          Q.     My question is just specifically, what

4     in this document, in this Exhibit 28 in the writing

5     is different than what the practice was at Ford?

6     Do you understand what I'm saying?

7          A.     Right.

8          Q.     I want to make a distinction as to

9     whether ZF followed this policy or not.

10          A.     The casual time.

11          Q.     Okay.  7.1?

12          A.     Right.

13          Q.     Anything else?

14          A.     I don't -- nothing jumps out at me at

15     this time.

16          Q.     Okay.  Now, you testified earlier

17     about weekend or holiday overtime and I believe

18     your testimony was that you were paid punch to

19     punch --

20          A.     Mm-hmm.

21          Q.     -- including for what would be

22     casual -- normally be casual time, correct?

23          A.     Yeah.

24          Q.     Okay.   At Ford --

1          A.    There was no casual time included in

2     overtime on weekends.

3          Q.    Okay.  At Ford, if you worked overtime

4     on the weekends, were you paid for your casual

5     time?

6          A.    On the weekends, we were, yes.

7          Q.    And on holidays?

8          A.    Yes.

9          Q.    So were you paid punch to punch at

10    Ford as well?

11         A.    As long as it was in hour increments.

12         Q.    Okay.  And is that the same policy

13    that ZF Batavia has?

14         A.    Yes.

15         Q.    Now, I believe that you testified that

16    at ZF Batavia, your time starts when you enter the

17    gate; is that correct?

18         A.    That's what punch to punch means.

19         Q.    Okay.

20         A.    That's the only thing we punch.

21         Q.    Okay.  Now, at Ford, wasn't it true

22    that your time didn't start until you actually got

23    to the job?  In other words, your time didn't start

24    just when you walked through the gate?

1          A.      It probably varied from person to

2     person.

3          Q.      What was your experience?  When did

4     your time start, when you walked through the gate

5     or when you got to the job?

6          A.      Basically when I got in the building.

7          Q.      Would that be the same as when you

8     walked through the gate?

9          A.      Probably.

10         Q.      So it's the same as it is --

11         A.      Right.

12         Q.      -- today?

13         A.      Right.

14         Q.      Okay.  If you could turn back to

15    Exhibit 45 for just a moment.  The first entry

16    there for December 1st, which appears to be a

17    Saturday, if I'm doing the math right, it looks

18    like you worked nine hours and 10 minutes that day?

19         A.      That's correct.

20         Q.      Okay.  But you only put down eight

21    hours for overtime?

22         A.      That's correct.

23         Q.      Why only eight hours?

24         A.      'Cause the half hour was lunch.  The

1    rest of it was casual.  I didn't -- they don't pay

2    less than an hour, okay?  So if you look at that

3    and you take the half hour off, you're less than an

4    hour.

5         Q.    Okay.  And so you have to get all the

6    way up to 60 minutes --

7         A.    Right.

8         Q.    -- to get paid for it?

9         A.    Right.

10        Q.    Okay.

11        A.    So I didn't put that time on there.

12        Q.    Okay.  Is there anything on Exhibit 45

13   as you look at all the different entries in the

14   overtime that you'd recorded that you had worked,

15   is there anything different than if you'd been

16   working at Ford?  In other words, you've got eight

17   hours overtime for December 1st.  If you'd been at

18   Ford and worked those same hours, would you have

19   been paid eight hours overtime, more or less?

20        A.    I'd been paid the same.

21        Q.    Okay.  What about December 2nd, would

22   that have been the same?

23        A.    Would have been the same.

24        Q.    December 3rd?

1          A.    It would have been the same.

2          Q.    Well, rather than going day by day,

3    can you just look at the rest of these days and

4    tell me if any of these are different than how it

5    would have been if you had been working at Ford on

6    these hours?

7          A.    Basically these would have been the

8    same thing.

9          Q.    Okay.

10         A.    I would have the same entries in here

11   that I would have at Ford.

12         Q.    Okay.  So if you'd worked these same

13   hours when you were with Ford, you wouldn't have

14   gotten any additional pay?

15         A.    No, I don't think so.

16         Q.    Now, since you've been employed by ZF

17   Batavia, the overtime rate that you're paid, it's

18   increased, hasn't it?

19         A.    Mm-hmm, I think once at ZF.

20         Q.    Is it --

21         A.    It hasn't been increased each year,

22   but I -- you know, I can't tell you what years they

23   were.

24         Q.    Well, is the overtime rate, as far as

1   you know, currently $39.81 for daily and Saturday

2   overtime?  Does that sound right?

3        A.    That could be.  I'd have to look and

4   see.  I'm not real sure.

5        Q.    Well, I'm not -- I'm not trying to

6   trick you.  Let me introduce the document here.

7             Okay.  Mr. Whisman, Exhibit 58 is a

8   two-page document which was produced to me by your

9   lawyers in this case.  And the first page appears

10  to set forth the current overtime rates out at ZF

11  Batavia.  Do you agree with me that the first page

12  of this document contains those current rates?

13       A.    If that's what they say.  I don't see

14  a date on this.

15       Q.    Okay.

16       A.    I was looking for a date.

17       Q.    It looks like it says effective 4/1/03

18  there towards the top.

19       A.    I'd say it's current, yes.

20       Q.    And you would agree with me, wouldn't

21  you, that $39.81, that overtime rate, that's more

22  than what the overtime rate was when you first

23  started with ZF Batavia?

24       A.    Yes.

1          Q.    And, in fact, if you flip to the

2     second page here, it appears that it shows the

3     overtime rates for ZF Batavia back in April of

4     2000.  Do you agree with me that that's what that

5     document is?

6          A.    Yes.

7          Q.    And it looks like the overtime rate

8     then was 36.54 at that time.  Okay.

9          A.    Are you finished with that document?

10         Q.    Yes, sir.  Now, Mr. Whisman, Exhibit

11    59 is a document that I also received from your

12    attorneys in this case.  And can you tell me what

13    that document is?

14              MR. COOK:  Did I get one?

15              MR. VANWAY:  I'm sorry.  Didn't I hand

16    you one?  I really didn't want you to see this one,

17    David.

18    BY MR. VANWAY:

19         Q.    Can you tell me what this document is,

20    Mr. Whisman?

21         A.    That's what I was trying to figure out

22    here.  It appears that this is their policy for

23    overtime and scheduling overtime.

24         Q.    Whose policy?

```
 1          A.     ZF's, it would appear.

 2          Q.     Okay.  Do you know if it's ZF's or if

 3     it's Ford's policy?

 4          A.     ZF's, I assume.

 5          Q.     Are you familiar with the HR online

 6     system?

 7          A.     Vaguely.  I don't -- I don't --

 8          Q.     Wasn't that a --

 9          A.     I don't get on that.  I think I got on

10     it once when they took the bereavement.  That's the

11     only time I've ever been on it.

12          Q.     Wasn't the HR online system a Ford

13     system that contained Ford policies?

14          A.     It may have, but I was never on it.

15          Q.     Well, if you look to the last page of

16     this document, Mr. Whisman, at the very bottom

17     there, three bullet points.  And it gives lists of

18     contacts if questions about this policy.  And the

19     first one says Southeast Michigan Ford and that

20     location.

21              The next one also -- next bullet point

22     also contains a reference to Ford.  Does that

23     change your testimony as to whether this is a Ford

24     policy or a ZF policy?
```

1          A.    It would appear that it's Ford.

2          Q.    And at the bottom of this page, all of

3    these pages, there's a date of 5/22/02, which I

4    would assume is the date that this document was

5    printed?

6          A.    I see that.

7          Q.    Do you know who printed this document?

8          A.    No, I do not.

9          Q.    Mr. Whisman, are you familiar with the

10   salary bands that are used at the ZF Batavia plant?

11         A.    Not really.

12         Q.    Are you aware at all that there are

13   different bands for ZF new hires, as opposed to for

14   transitional employees?

15         A.    No, I'm not aware of that.

16         Q.    Okay.

17         A.    The only thing I know about the salary

18   band is what I've heard the group talk about.

19         Q.    Okay.

20         A.    I'm not aware of it.

21         Q.    Okay.  Fair enough.  Do you know who

22   the policy committee is at ZF Batavia?

23         A.    No, not actually, I don't.

24         Q.    Do you know if there are any Ford

1    representatives on the policy committee?

2        A.    No, I don't.

3        Q.    Who do you currently report to at

4    Ford?

5        A.    Ron Pearce is my immediate supervisor.

6    Milt Gross is the manager.

7        Q.    And both of those individuals are

8    ZF --

9        A.    Yes.

10       Q.    -- employees, correct?  Who does your

11   performance evaluation?

12       A.    I'm not real sure.

13       Q.    Have you had a performance evaluation

14   since you've --

15       A.    Yes, I have.  Ron Pearce did one, but

16   Milt Gross told me I was getting one from 50,000

17   feet above and he wouldn't tell me who it was.  He

18   said he wasn't allowed to tell me.

19       Q.    Okay.  The performance reviews that

20   you've seen, which I take it would be other than

21   the 50,000 --

22       A.    Yeah.

23       Q.    -- above performance reviews that

24   you've testified about, who filled out the most

1  recent one, the one you would have received, I

2  suppose, in 2003?

3        A.    Ron Pearce, I believe --

4        Q.    Okay.

5        A.    -- with Milt -- I'm sure Milt reviewed

6  it, Milt Gross.

7        Q.    Mr. Whisman, there were -- just last

8  week your attorneys faxed to me some additional

9  documents.  And I don't intend to mark these as an

10  exhibit.  I just want to ask you a question about

11  one of these documents.  I apologize.  I don't have

12  copies for everyone.  It's Bates stamped as P01012.

13  It says at the top -- it's on ZF Batavia letterhead

14  and it says acknowledgment forms for policies.  And

15  I ask you, Mr. Whisman, have you seen that document

16  before?

17        A.    Yes, I have.

18        Q.    What is that document?

19        A.    Let me read that again.  I want to

20  make sure this is the one I thought I saw.  No,

21  this is not the policy that I was thinking about.

22        Q.    Have you ever seen that document

23  before?

24        A.    No, I haven't --

1          Q.    Okay.

2          A.    -- not to my knowledge.

3          Q.    Okay.

4          A.    I won't say that I have, but not to my

5     knowledge.

6          Q.    Fair enough.  Now, you would agree

7     with me, Mr. Whisman, wouldn't you, that since you

8     left Ford and went to ZF Batavia, your annual wages

9     have been higher than they were at Ford?

10         A.    Yes.

11         Q.    And, in fact, the last full year that

12    you were employed with Ford, which would have been

13    1998, I believe that the documents you've produced

14    in this case, your W-2's showed that you made

15    $79,400 at Ford.  Does that sound about right for

16    1998?

17         A.    Could be.  I'm not sure, but I'd say

18    it probably is.

19         Q.    And the documents that you produced

20    show that last year for 2002, from ZF you received

21    $121,700 in compensation.  Does that sound

22    accurate?

23         A.    Yes.  That would be including the

24    signing bonus in that.

```
1          Q.    In 2002?

2          A.    I believe it would, yeah.

3          Q.    You received a signing bonus in 2002?

4          A.    We got that in three-year increments.

5          Q.    Oh, okay.  So you received --

6          A.    I came over --

7          Q.    -- your transition bonus?

8          A.    Transition bonus, that would be

9    included in that.

10         Q.    Okay.  Which was 25,000 split in

11   three --

12         A.    In three increments.

13         Q.    Okay.  So if you subtract out the

14   8,300, then -- well, I guess the math would speak

15   for itself.

16         A.    Yeah.

17         Q.    The 11 or 12,000 or so?

18         A.    Correct.

19         Q.    At the time you were employed with

20   Ford, did your job assignments ever change?

21         A.    Yeah.  You were given more

22   responsibility, taking on new departments.  As a

23   maintenance supervisor, your responsibilities were

24   basically the same.
```

```
 1          Q.    And you would agree with me, wouldn't
 2    you, that Ford had the discretion to change your
 3    job assignment as it saw fit?
 4          A.    As long as it's in the maintenance
 5    realm -- you know, 'cause that's where I had hired
 6    in, as a maintenance supervisor.
 7          Q.    Okay.  So as long as it was in
 8    maintenance --
 9          A.    Right.
10          Q.    -- Ford could give you whatever
11    assignment they felt was proper?
12          A.    Yeah, they had that right.
13          Q.    I believe you testified that at the
14    video conference announcing the JV, you were
15    originally told that you could stay at Batavia as a
16    Ford employee?
17          A.    As long as we wanted.
18          Q.    Okay.  But later someone communicated
19    something different to you, correct?
20          A.    Yes.
21          Q.    Okay.  And told you that you either
22    had to sign up with ZF or go somewhere else with
23    Ford?
24          A.    In Lima.
```

180

```
 1          Q.     Okay.  You've testified that Miss
 2   Jones showed you the -- what we've called the gray
 3   brochure --
 4          A.     I believe she did.
 5          Q.     -- at the time she handed you your
 6   offer letter?
 7          A.     I believe she did.
 8          Q.     Did you read the gray brochure at that
 9   time?
10          A.     She more or less read through it for
11   me.
12          Q.     Did she give you a copy of it?
13          A.     I don't believe so.
14          Q.     I just want to make sure I understand
15   your claims completely here, Mr. Whisman.  With
16   regard to merit increases, are you claiming in this
17   case that your merit increases have not kept up
18   with what they would have been, had you stayed at
19   Ford?
20          A.     No.
21          Q.     With respect to any of these changes
22   that you testified ZF Batavia has made regarding
23   overtime, bereavement, et cetera, all of those
24   changes that you testified about, have you ever
```

1    complained to anyone at Ford about those changes?

2         A.    No, I have not.

3         Q.    Why not?

4         A.    I have no one to complain to.  I

5    called Ford about my retirement and I'm still

6    waiting a year later to see what it is.  So I don't

7    know why I would --

8         Q.    Okay.  And who did you call about your

9    retirement??

10        A.    I called the -- the retirement number.

11   I don't know right off what that is.

12        Q.    The NESC, I think it is?

13        A.    I believe it is, yeah.

14        Q.    And your understanding is that that's

15   a group that deals solely with retirement issues?

16        A.    Correct.

17        Q.    But you haven't, for example, called

18   any HR representative in Dearborn or anywhere else

19   from Ford to complain about changes that ZF has

20   made to your benefits?

21        A.    No, I haven't.

22        Q.    And it was your understanding when you

23   accepted employment with ZF Batavia that your Ford

24   retirement would still be administered by Ford?

1          A.     Correct.

2          Q.     Okay.  But that the rest of your

3     benefits would be administered by ZF?

4          A.     Correct.

5          Q.     And the five to eight days that you

6     were not paid for in, I believe, it was 2002 --

7          A.     Mm-hmm.

8          Q.     -- on an overtime basis, were there

9     new hires -- ZF new hires that also were not paid

10    at that time?

11         A.     I'm not sure.

12         Q.     And with respect to those five to

13    eight days, did anyone ever tell you that Ford was

14    involved in the decision not to pay you for those

15    five to eight days?

16         A.     I don't believe so.

17         Q.     Or that Ford approved of the decision?

18         A.     I don't believe so.

19         Q.     And just so I understand your

20    testimony, you testified earlier that you believe

21    Ford still has an interest because they're 49

22    percent owner in the joint venture; is that

23    correct?

24         A.     Yeah.

1       Q.      Okay.  Other than because they are a

2   49 percent owner in the joint venture, do you

3   believe they have any other interest in the Batavia

4   plant?

5       A.      Yeah, because our -- one of our

6   meetings up in the mezzanine, I think I heard Dave

7   Adams say that we can't make a decision until Ford

8   says yes or no.

9       Q.      What was he referring to --

10      A.      I have --

11      Q.      -- do you know?

12      A.      -- no clue.  He was giving a speech

13  before when they first took the company over in the

14  mezzanine and he made that comment.  We can't make

15  a decision until Ford says yes.  That was before we

16  came over.  And that would lead me to believe that

17  Ford's part of the decision making.

18      Q.      And that was before the joint venture

19  was formalized?

20      A.      That was after he was here and it was

21  formalized, but I think it's before all the people

22  had left Ford and went with ZF.

23      Q.      And do you have any idea what he was

24  talking about?

1          A.     I think he was trying to give us a

2    pitch about Ford influence, that we would not be

3    completely broken away from Ford if we decided to

4    go with ZF.

5          Q.     And Mr. Adams, at that time, was

6    employed by ZF, wasn't he?

7          A.     Yes.

8          Q.     Since that time, has anyone -- well,

9    has Mr. Adams communicated anything to you about we

10   can't make a decision unless Ford says it's okay?

11         A.     No.

12         Q.     Has anyone from ZF Batavia management

13   communicated that to you?

14         A.     No.

15         Q.     And after employees accepted offers,

16   there was a transition period, wasn't there, before

17   Ford would release certain employees -- well,

18   before Ford would release certain employees to the

19   joint venture; is that right?

20         A.     Now, where we were froze in the plant

21   before we could relocate, is that what you're

22   saying?

23         Q.     Yes.

24         A.     Yes, there was.

1            MR. VANWAY:  Okay.  Mr. Whisman, I

2    don't believe I have any further questions, but

3    I'll turn things back over to Mr. Hunter while I

4    review my notes.  And then if I got any more, I'm

5    sure I won't have very many, okay?

6            THE WITNESS:  Okay.

7            MR. HUNTER:  I don't have much.

8                    EXAMINATION

9    BY MR. HUNTER:

10       Q.    Would you pull Exhibit 16?

11            MR. COOK:  Are you going to do it from

12    down there?

13            MR. HUNTER:  I'm pretty loud.  It's

14    going to look like this.  It's the --

15            MR. COOK:  Go ahead.

16       Q.    Okay.  Does Mr. Whisman have that in

17    front of him?

18       A.    Yes.

19            MR. COOK:  Yes, he does.

20       Q.    Okay.  Mr. Whisman, if you could take

21    a quick look for me at Exhibit 16.

22       A.    Okay.

23       Q.    Okay.  Have you ever seen Exhibit 16

24    before?

```
 1           A.    Yes, I have.

 2           Q.    When did you see that document?

 3           A.    I'm not sure when it was, some time

 4      ago.

 5           Q.    Do you see that the document shows

 6      that it was sent on August 29th, 2001 at the

 7      top-left corner?

 8           A.    Yes.

 9           Q.    Would it have been approximately in

10      that time period?

11           A.    Could be.  Yeah, it could be.

12           Q.    And you're familiar with the Honeywell

13      reader system, correct --

14           A.    Yes.

15           Q.    -- if I use that term?

16           A.    Yes.

17           Q.    And with respect to that system, you

18      certainly have never been approached by anybody

19      from Batavia indicating there's any irregularities

20      between the system, the Honeywell system and your

21      timecards, have you?

22           A.    I've been told that there is.

23           Q.    I'm sorry.  Has anyone from ZF Batavia

24      ever approached you and said, Mr. Whisman, there's
```

1    a discrepancy between your timecards and the

2    Honeywell readers?

3          A.    No, no, there hasn't.

4          Q.    Certainly you've never had any

5    payments adjusted, in terms of salary, overtime or

6    otherwise as a result of the Honeywell reader

7    system, correct?

8          A.    Correct.

9          Q.    Are you aware of anyone that has ever

10   had a pay adjustment due to the Honeywell reader

11   system and a comparison of the timecards with the

12   Honeywell system?

13         A.    I heard there was.

14         Q.    Are you personally aware of --

15         A.    No.

16         Q.    -- any such situation?

17         A.    No.

18         Q.    What have you heard?

19         A.    That Kevin O'Hagan was docked.

20         Q.    And what was docked?

21         A.    He was docked a full hour when he was

22   tardy by like six or seven minutes.

23         Q.    But you have no personal knowledge of

24   that, correct?

```
 1          A.     He told me that.

 2          Q.     Okay.  You aren't aware of any

 3    documents, haven't seen anything to that effect,

 4    have you?

 5          A.     No, I have not.

 6          Q.     At what pay period was he supposedly

 7    docked?

 8          A.     I'm not certain.

 9          Q.     Do you know the year?

10          A.     I think it was two years ago in the

11    February time period.  I can't be accurate on that,

12    but it was somewhere in there.

13          Q.     You're not aware of any other

14    circumstance where somebody's been docked?

15          A.     No.

16                 MR. HUNTER:  I have nothing further at

17    this point.

18                 MR. VANWAY:  I just need a minute to

19    confer with my client and then I think I'll be

20    finished.

21          (Off the record:  12:49 p.m. - 12:54 p.m.)

22                              EXAMINATION

23    BY MR. VANWAY:

24          Q.     Mr. Whisman, promise, just a few more
```

1    questions.  When you were at Ford, bereavement

2    days, weren't they lumped together with personal

3    days?

4         A.    No, I -- I don't believe so.

5         Q.    It was separate?  Your understanding

6    was they were separate?

7         A.    I believe they were, yeah.

8         Q.    You had a separate allotment for

9    bereavement and a separate allotment for personal?

10        A.    I believe they were, yeah.

11        Q.    You testified earlier this morning

12   about conversations you had with Mr. Conners and

13   Mr. Crump when you returned to the Batavia plant

14   after you'd been at Sharonville.  Do you remember

15   that testimony?

16        A.    (Witness nodded.)

17        Q.    At the time you had those

18   conversations, Mr. Conners and Mr. Crump, they were

19   already employed by ZF Batavia, right?

20        A.    Well, Mr. Conners is still employed

21   with Ford.

22        Q.    Okay.  He is to this day or --

23        A.    To this day.

24        Q.    Who is Mr. Conners?

1          A.     Mike Conners is an engineer.  He's on

2     division payroll.

3          Q.     Okay.  So he's one of the resident

4     engineers that we've heard testimony about?

5          A.     Correct.

6          Q.     Okay.  Mr. Crump was a ZF employee by

7     then, right?

8          A.     Correct.

9          Q.     Did Mr. Conners have any supervisory

10    responsibilities over you?

11         A.     No.

12         Q.     Is he in a management position, as far

13    as you know?

14         A.     I'm not real sure.  I think Mike might

15    have been an MPS for awhile and then he was an

16    engineer for awhile.  I'm not real sure what he was

17    at the time.

18         Q.     Okay.  A resident engineer is not a

19    management position to your understanding, correct?

20         A.     That's true, but Mike at one time was

21    a supervisor.

22         Q.     No, I understand.  I understand.

23         A.     But was I working directly for Mike,

24    no.

```
 1          Q.    Okay.  Mr. Whisman, in your

 2    interrogatories and interrogatory responses, if you

 3    could turn to page 7 of those.  In the

 4    second-to-the-last paragraph, it says, Plaintiff

 5    asserts that each of the policies described herein

 6    was authorized by ZF Batavia and Ford management.

 7    Do you see where I'm at?

 8          A.    Yes.

 9          Q.    Okay.  And I know you've already

10    testified with regard to the different policies

11    and -- and Ford's involvement or lack of

12    involvement.

13          Do you have any evidence, Mr. Whisman,

14    that you're aware of that Ford authorized any of

15    these changes that you reference in your

16    interrogatory response?

17          A.    No, I don't.

18          Q.    Finally, Mr. Whisman, I know you've

19    testified at length today.  Are you aware of any

20    other facts that support your claims in this case

21    other than what you've testified to today?

22          A.    No, except on -- when I testified to

23    the benefits that I lost, I said that's all.  There

24    could be more that I don't remember at this time.
```

```
 1          Q.    I'm not sure I'm following you.

 2          A.    When I testified earlier about the

 3    benefits when I listed them one by one -- you know,

 4    what I was and I think he -- Mr. Hunter said, is

 5    that all and I said, yes.  But there could be

 6    others that I don't remember --

 7          Q.    Okay.

 8          A.    -- you know.  That's just to the best

 9    of my knowledge and that'd be all I can remember at

10    this time.

11          Q.    And as you reviewed pages 6 and 7 of

12    your interrogatories, which I believe list in

13    detail those benefits.  If you could take a moment

14    and look at that and let me know if there are any

15    other benefits that come to mind other than those

16    listed on pages 6 and 7.

17          A.    This could -- these could possibly get

18    into other issues, like retirement and things like

19    that.  But at this time, I don't remember any

20    specifics.

21          Q.    Okay.  Your retirement hasn't been

22    changed that you're aware of, has it?

23          A.    No, not at this time.

24                MR. VANWAY:  Okay.  I don't have
```

193

1    anything further for Mr. Whisman.  Thank you, sir.

2                    MR. HUNTER:  No, nothing further.

3                    MR. VANWAY:  Okay.  Then we're done.

4                    MR. COOK:  We will read and sign.

5                    (Deposition concluded at 12:58 p.m.)

6

7

8

9
                     _____
10                            Everett W. Whisman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

194

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OHIO        :

 4                         :   SS

 5    COUNTY OF HAMILTON   :

 6

 7          I, Susan M. Barhorst, a Notary Public in

 8    and for the State of Ohio, duly commissioned and

 9    qualified, do hereby certify that prior to the

10    giving of this deposition the within-named EVERETT

11    WAYNE WHISMAN was by me first duly sworn to testify

12    the truth, the whole truth, and nothing but the

13    truth; that the foregoing pages constitute a true,

14    correct, and complete transcript of the testimony

15    of said deponent, which was recorded in stenotypy

16    by me, and on the        day of October 2003 was

17    submitted to counsel for deponent's signature.

18          I further certify the within deposition was

19    duly taken before me at the time and place stated,

20    pursuant to the Federal Rules of Civil Procedure;

21    that I am not counsel, attorney, relative or

22    employee of any of the parties hereto, or their

23    counsel, or financially or in any way interested in

24    the within action, and that I was at the time of
```

195

1   taking said deposition a Notary Public in and for

2   the State of Ohio.

3          IN WITNESS WHEREOF, I have hereunto set my

4   hand and notarial seal at Cincinnati, Ohio, this

5   day of October 2003.

6

7

8

9

10

               Susan M. Barhorst, Notary Public
11             in and for the State of Ohio.
               My commission expires
12             February 18, 2004

13

14

15

16

17

18

19

20

21

22

23

24