1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF OHIO

 3                WESTERN DIVISION, CINCINNATI

 4

 5   EVERETT W. WHISMAN, et al.: Case No. C-1-02-406

 6        Plaintiffs,          : Judge Beckwith

 7   v.                        : Magistrate Sherman

 8   ZF BATAVIA, LLC, et al.,  :

 9        Defendants.          :

10   _____

11        Deposition of E. DONALD WILLIAMS, taken on

12   Monday, August 11, 2003, commencing at 8:13 a.m.,

13   at the offices of Baker & Hostetler LLP, 312 Walnut

14   Street, Suite 3200, Cincinnati, Ohio, before

15   Susan M. Barhorst, Notary Public.

16

17

18

19

20

21              GIGLIO REPORTING SERVICES
22               3 CYPRESS GARDEN
                CINCINNATI, OHIO 45220
23                 513-861-2200

24
```

2

```
1   APPEARANCES:

2   On behalf of Plaintiffs:

3     Stephen A. Simon, Esq.
      22 West Ninth Street
4     Cincinnati, Ohio 45202

5   Also present:

6     Ron Pearce

7   On behalf of Defendant ZF Batavia, LLC:

8     John J. Hunter, Jr., Esq.
      Hunter & Schank Co., L.P.A.
9     1700 Canton Ave.
      Toledo, Ohio 43624
10
    Also present:
11
      Herb Huebner
12
    On behalf of Defendant Ford Motor Company:
13
      Jeffrey L. VanWay, Esq.
14    Baker & Hostetler LLP
      312 Walnut Street, Suite 3200
15    Cincinnati, Ohio 45202

16
    Cross-Examination
17
      by Mr. Hunter              4, 140
18
      by Mr. VanWay              88
19

20

21

22

23

24
```

3

```
 1    WILLIAMS' DEPOSITION EXHIBITS   MARKED/IDENTIFIED

 2

 3         4                          101

 4

 5         10                         51

 6

 7         57                         89

 8

 9         90                         70

10         91                         79

11         92                         137

12         93                         137

13         94                         138

14

15

16

17

18

19

20

21

22

23

24
```

4

```
 1                    E. DONALD WILLIAMS
 2   being first duly sworn, testified as follows:
 3                    CROSS-EXAMINATION
 4   BY MR. HUNTER:
 5        Q.    Sir, will you please state your name
 6   for the record?
 7        A.    E. Donald Williams.
 8        Q.    Mr. Williams, what's your current
 9   address?
10        A.    7915 Milford Road, Camp Dennison,
11   45111.
12        Q.    Mr. Williams, you obviously know me.
13   I'm John Hunter.  I represent ZF Batavia.  We're
14   going to take your deposition today.  It's a series
15   of questions and hopefully answers regarding the
16   litigation that you've brought against ZF Batavia.
17             With respect to the deposition today,
18   is there anything that would prevent you from being
19   able to go forward with respect to the deposition,
20   whether it's a personal problem, a health problem
21   or otherwise?
22        A.    Not that I know of.  I may have to
23   take some breaks from time to time.
24        Q.    Okay.  That's -- that's not a problem.
```

```
 1        A.     I'm on a water pill for my high blood
 2   pressure.
 3        Q.     Okay.
 4        A.     So we'll see.  I'll let you know.
 5        Q.     Not a problem.  If you need a break,
 6   please let me know.  The only thing I would ask is
 7   if you haven't answered a question, that before you
 8   take a break, you answer the question --
 9        A.     Okay.
10        Q.     -- that's before you.
11        A.     We'll do.
12        Q.     If at any time you can't understand
13   me, you don't hear me, if for whatever reason you
14   just don't feel that you can fairly answer the
15   question, please stop me and I'll see what I can do
16   to correct the question.
17               I do have a tendency to speak rather
18   quickly.  Occasionally I'll mumble and occasionally
19   I just go off on a tangent.  So, again, feel free
20   to reel me back in if at any time you can't answer
21   my question, okay?
22        A.     (Witness nodded.)
23        Q.     And you've got to answer --
24        A.     Okay.
```

6

1          Q.     -- audibly every question --

2          A.     Okay.

3          Q.     -- for the court reporter.  Thanks.

4     You are -- if I use the term "Ford transitional

5     employee," you know what I mean by that?

6          A.     Yes.

7          Q.     Okay.  And you are a Ford transitional

8     employee?

9          A.     Yes.

10         Q.     At the time you came over to ZF

11    Batavia, do you recall how many years of service

12    you had at Ford?

13         A.     I believe that was 1976 through 19 --

14    I signed on in 1999.

15         Q.     Okay.  Was there any interruption

16    through those years of service, whether through

17    layoff or otherwise?

18         A.     No.

19         Q.     If my math is any good, approximately

20    23 years service?

21         A.     Yeah, right.

22         Q.     Okay.  With respect to that 23 years

23    service, when you came over to ZF Batavia, what

24    happened with your retirement plan, your

7

1    participation in the Ford general retirement plan?

2        A.    As I understood it, I -- it was -- I

3    would get that 23/30ths and I would be eligible for

4    any benefits that -- that the Ford people got, that

5    I would not lose those years.  It was

6    grandfathered.

7        Q.    Okay.  Was it frozen, though,

8    basically at that point?  I mean, you didn't

9    continue to accrue service, did you?

10       A.    There's been a lot of question around

11   that.  And to be quite honest, we were told that we

12   would always have access to that system and we

13   don't.

14       Q.    Okay.

15       A.    So honestly to answer that question, I

16   don't know where it stands right now.

17       Q.    Okay.  Well, I guess just so that I

18   understand, what is your -- what is Don Williams'

19   understanding, whether right, wrong or

20   indifferent --

21       A.    I understand --

22       Q.    -- what do you think?

23       A.    I understood that I wasn't going to

24   lose anything --

1          Q.    Okay.

2          A.    -- in the transition process.

3          Q.    Okay.  To this date, though, I guess

4     what you're telling me is you don't know whether or

5     not you lost anything?

6          A.    I -- I can't answer that --

7          Q.    Okay.

8          A.    -- because I twice tried to get into

9     the system.  They took off -- they -- they took our

10    access IDs away from us, so we no longer have

11    access to that system, so --

12         Q.    Okay.  Is that through NESC or

13    something like that?

14         A.    John, I don't know.

15         Q.    Okay.  All right.  We got a little

16    bit, again, off on tangent there, talked about the

17    retirement.  When you started with Ford back in

18    1976, what did you sign on as?

19         A.    I hired in as the plant security

20    person.

21         Q.    Okay.  And how long did you hold that

22    position?

23         A.    Less than a year.

24         Q.    Okay.  What did you move to next?

9

1         A.    I went to supervisor, production

2    supervisor.

3         Q.    And was that the title over at Ford?

4         A.    Yes.

5         Q.    Okay.  From production supervisor,

6    what did you move to next?

7         A.    Maintenance supervisor.

8         Q.    Okay.  Do you remember how long you

9    were production supervisor?

10        A.    Would have been '70 -- let's see.  '77

11   through -- the terminology changed at Batavia.

12   I -- and it changed so many times, but I went into

13   maintenance, if I recall correctly, around 1986.

14        Q.    Okay.  And after maintenance?

15        A.    They had a lot of problems in

16   production and they asked the maintenance

17   superintendent, could they borrow me back.  I was

18   in maintenance probably about a year, maybe, and a

19   half.

20              They had some significant problems in

21   production and they asked the maintenance

22   superintendent could they borrow me back to help

23   them out.  And I did that, and then ended up

24   staying in production.

1          Q.     Okay.  Back as a production

2     supervisor?

3          A.     I believe it was a -- what was the

4     terminology?  Yes, as a production supervisor, but

5     the terminology changed.

6          Q.     Might have been different, okay.  And

7     I didn't ask.  When you started in '77, were you

8     over at Sharonville or where were you?

9          A.     I started at Sharonville --

10          Q.     Okay.

11          A.     -- in '76 and I moved to Fairfax in

12     '77.

13          Q.     When did you leave Fairfax?

14          A.     '79.

15          Q.     For Sharonville, then?

16          A.     For Batavia.

17          Q.     Okay.  So you were one of the first

18     ones in the building at Batavia?

19          A.     Before the walls were up and the floor

20     was concrete.

21          Q.     Okay.  And I assume, then, the balance

22     of your service is over here at Batavia?

23          A.     Yes.

24          Q.     Okay.  When you went back to

1   production in roughly, as I understand it, '87, was

2   that a salaried position?

3          A.    Yes.

4          Q.    Okay.  And is that the position you --

5   I don't want to say left, but held at the time you

6   moved over to Batavia in 1999, the production

7   supervisor?

8          A.    Yes.

9          Q.    Okay.  Is that currently the position

10  you hold with Batavia?

11         A.    Group leader, yes.

12         Q.    Is that the same as a production

13  supervisor or --

14         A.    Yes.

15         Q.    Okay.  When you signed on with

16  Batavia, the hire letter -- and I'll show you that

17  here in a second -- indicated manufacturing

18  production specialist.  Is that the same as a group

19  leader or --

20         A.    Yes.  No, no, no, no.  When -- when --

21  when I signed on with ZF Batavia, it was as a

22  manufacturing planning specialist, correct,

23  correct.

24         Q.    Okay.  And so you're now a group

1   leader.  Would you consider that a step down from a

2   manufacturing production specialist or is it the

3   same or --

4       A.    They did away with the MPS's.  They

5   did -- that's why I was trying to recall the names,

6   the acronyms and the things that we had.  Yes, I

7   signed on as an MPS, but then it was -- I can't

8   recall the date after Dick Newark came on.

9       Q.    Okay.

10      A.    He did away with the MPS's, and then I

11   went to a position that was I believe at the time

12   called area manager.

13      Q.    Okay.  And that was for a short while?

14      A.    Seem to recall -- I think that was

15   probably maybe six, seven months.

16      Q.    Okay.  Is a group leader -- can you

17   kind of take me through your day?  Let's -- Friday,

18   if you worked the shift --

19      A.    Usually go in and --

20      Q.    About what time do you usually go in?

21      A.    It varies.  Sometimes two hours before

22   the shift; sometimes an hour before the shift;

23   sometimes a half an hour before the shift.  It all

24   depends on kind of like where you were the previous

1    day or where afternoon shift was the night before.

2    But we'd gather float counts.

3         Q.    Okay.

4         A.    The first thing I would do in the

5    morning is go in and count departmental floats on

6    floats, just to kind of try to find out where I am.

7         Q.    And when you say where you are, in

8    terms of number of parts you need to --

9         A.    Number of parts.

10        Q.    -- do production?

11        A.    Number of parts, number of parts ahead

12   of assembly, the number -- the float, are there any

13   people that's going to be off that day, check the

14   calendars for any call-ins, maybe check security

15   for any call-ins, touch bases with the team leaders

16   to find out -- and maintenance on what equipment

17   is -- is available to run, manpower available to

18   run it.

19        Q.    How do you figure out manpower?  Do

20   your team leaders gather up names and report that

21   to you or does Don Williams do that or how do you

22   physically or practically get --

23        A.    It's both ways.  As far as how much

24   manpower is needed for the department?

1        Q.    Basically who's in and who's available

2    to work for you that day.

3        A.    Both.  I do it and the team leader

4    does it.

5        Q.    Okay.  What do you do with respect to

6    that?

7        A.    With the manpower?

8        Q.    Mm-hmm.

9        A.    Check to see who's there, who's not

10   there, visually observe to see who's available --

11       Q.    Okay.

12       A.    -- and then discuss with -- because

13   actually the team -- the group leader gives

14   guidance.  He or she is there as a -- as a guidance

15   individual.  But the team leaders through their

16   matrix is supposed to run the departments.

17       Q.    Okay.

18       A.    So really the group leaders are

19   advisors and at one time we were called advisors.

20       Q.    Okay.  How many team leaders report to

21   you?

22       A.    Depends on the employees.

23       Q.    Okay.

24       A.    In a specific department, you could

```
 1   have two team leaders; you could have one team

 2   leader.  There was -- in clutch, the -- I currently

 3   went to afternoon shift several weeks ago, I think

 4   the first or second week of June.  There was a team

 5   leader in -- two team leaders in 851 and there was

 6   one team leader in 850.  No.  There was one in 51,

 7   53 and 55 and two in 52.  So there would be five.

 8          Q.    Okay.

 9          A.    Just depends on the amount of

10   individuals.

11          Q.    Sure.  How many departments do you

12   currently manage right now?  Or what departments,

13   if you want to just give me the numbers?

14          A.    851, two, three and five as of

15   yesterday.  And today, as of today, I understand

16   that I'm in 871 and three, which I came from in

17   about the first week of June.

18          Q.    Okay.

19          A.    And I understand I'll be there for a

20   week, and then I'll go to 811, 821, 822.

21          Q.    Okay.  But still on afternoons?

22          A.    No.  I understand -- no, no, back on

23   days.

24          Q.    Back on days, all right.
```

```
 1          A.    Kind of getting jerked around.

 2          Q.    Who do you report to directly, Don?

 3          A.    Well, let's see.  I was reporting to

 4   Eric Spencer when I was on days in June.

 5          Q.    Let's stick as of -- let's try like

 6   Friday, okay?  We'll stick with that department.

 7          A.    Friday I was reporting to -- I never

 8   did understand who I was reporting to.  I never was

 9   told who I was reporting to.  It was either -- it

10   was either Chuck Hugan --

11          Q.    Okay.

12          A.    -- or Dennis Baker.

13          Q.    Okay.  I assume somebody comes out and

14   makes sure that you're hitting the part counts.  At

15   some point in time, somebody inquires, correct?

16          A.    That would be the 10:30 meeting --

17          Q.    Okay.

18          A.    When I was on afternoon shift, that

19   was the 10:30 meeting.

20          Q.    All right.  And I interrupted you with

21   a little bit of detail.  We were talking about an

22   average day.  And, again, I -- because it seems to

23   change greatly, let's talk about maybe Friday,

24   okay?  You came in, you had checked the floats and
```

17

1    a number of other things.  What happens or what do

2    you do as you go through your shift?

3          A.    As I go through the shift, I check

4    with the team leaders to make sure that everything

5    is still okay.  I'll visually make -- try to get

6    into the different departments that I run and try

7    to make sure -- I try to watch to make sure that

8    the parts are flowing in the line.  I'll go to

9    assembly several times to make sure that there's

10   not any problems with any of our quality.

11         Q.    Okay.

12         A.    And I try to observe, as best I can,

13   that the flow is not interrupted.

14         Q.    Okay.  Now, do you, as a group leader,

15   have a office?

16         A.    Team room.

17         Q.    Okay.  I gather from what you're

18   telling me you don't spend much time in there?

19         A.    In the team room?

20         Q.    Yeah.

21         A.    It depends.  See, my -- my computer is

22   in -- is in -- is still in gears, so it's -- it's

23   about a -- two blocks away.

24         Q.    Okay.

1    A.    So I have to go down to there to -- to

2  read e-mail and to send e-mail and to do any of

3  that.  And the team room -- so there's a distance.

4  So I have to go back and forth.  So I -- I try to

5  at least open my e-mail somewhere around six, 7:00

6  maybe.

7    Q.    Okay.

8    A.    And I will run the time sheets for the

9  previous day when I come in and post those in the

10  team room and -- so that if there's any

11  corrections, we can go back.  If there's any

12  mistakes, we can go back and make the necessary

13  corrections.

14    Q.    Okay.

15    A.    If anybody says they need to go home

16  or has to leave, we try -- I try to coordinate with

17  the team leaders how we're going to replace them

18  or --

19    Q.    You mean if they leave a shift early,

20  for example?

21    A.    Emergency phone call --

22    Q.    Oh, okay.

23    A.    -- kid's sick, parakeet died,

24  whatever.  You get some --

1          Q.    Okay.  I presume that's not a daily

2     occurrence where the parakeet dies or anything

3     else?

4          A.    You'd be surprised, dog sick.

5          Q.    All right.

6          A.    It happens a lot.

7          Q.    All right.  Again, trying to stick

8     with a constant here.  For example, the departments

9     that you were in on Friday, there would have been

10    a -- a scheduled shift, correct?

11         A.    Yes.

12         Q.    Okay.  And if you recall, for example,

13    is Friday a day where you would have come in a half

14    hour early or an hour early or -- if you know.

15         A.    John, I'd have to -- I'd have to

16    check.  I can't tell you what time I got there

17    Friday.

18         Q.    Okay.

19         A.    I know on afternoon shift, a lot of

20    times I was -- I was -- I cut the clock pretty

21    close on afternoon shift.  I was there temporarily

22    to help them out.  They asked me to go over to help

23    them and I said I would.  They promised me that it

24    would be for -- for three weeks and that -- that

1    that wasn't so.  But I stayed and -- and I tried to

2    help them as best as I could.  I get -- I put my

3    best foot forward, as always.  And to be -- to tell

4    you what time I got there Friday, I have no idea.

5            Q.    Okay.

6            A.    I mean, I --

7            Q.    All right.  And I'm not necessarily

8    interested in exactly what time you got there

9    Friday.  If there's a scheduled shift, is it fair

10   to say you're expected or you expect to arrive

11   sometime prior to the start of the scheduled shift?

12           A.    Some individuals, John, need to be

13   there two hours before.

14           Q.    Okay.

15           A.    When you've -- when you've been around

16   and you know when you can just look and see what's

17   going on by just a matter of an observation, enough

18   to count your float and be in your department.

19   There's been times that I been there probably, like

20   I said, a couple hours before and there's times I

21   probably walk in 10 minutes before.

22           Q.    Okay.

23           A.    Quickly enough to make the -- quickly

24   enough to make the -- to make the rounds and count

1    the float and make sure assembly is okay, make sure

2    everybody's there, machines and equipment are

3    running.  And, like I say, some guys need an hour,

4    two hours; other people probably need 15 minutes.

5         Q.    Okay.  Let's talk about the end of the

6    shift, then.  What do you do at the end of your day

7    or afternoon, as the case apparently is right now?

8         A.    The end of the day, I go around and

9    collect from the team leaders.  The team leaders

10   are responsible for gathering the downtime.  Team

11   leaders are responsible for reporting the hours.

12   They have a -- a cover sheet that they put that

13   information on.  And basically I take that

14   information and just capture it on hours for

15   afternoon shift.

16          I just capture the hours, staple the

17   team leaders' downtime and their information and

18   how many parts they made.  I attach that to the

19   sheet, lay it on the superintendent's desk and head

20   for the hills.

21        Q.    Okay.  Do you generally stay the

22   entire time of the scheduled shift or do you leave

23   sometimes before the shift ends or --

24        A.    I'm usually there until the normal

1   assigned shift is over.  If on an afternoon shift

2   that's scheduled from 3:30 to midnight, I would be

3   there till midnight.

4          Q.    Okay.

5          A.    One occasion I think I stayed till two

6   or 3:00 in the morning, but when I went to

7   afternoons, very seldom was I there till 12:00.

8   Normally I -- I was heading out of the building.

9          Q.    Because I understand that there's a

10  lot of departments that work a lot of overtime.

11  Who supervises your team leaders if you are not in

12  the facility?

13         A.    If I'm not in the facility, they --

14  sometimes they would call me on the radio or what

15  they do is they have Nextels and in a lot of cases,

16  they just get the person that they need to come

17  over.  They'll call the maintenance supervisors.

18  They write up their own tickets.

19              That's a part of their -- that's a

20  part of the team matrix, for the team to generate

21  their -- their downtime tickets, to -- their PM

22  tickets, to notify -- and then what they do then,

23  in turn, is just notify the supervisor that they're

24  down.

1          So on many occasions, there's people

2     in the building with -- with team leader

3     supervision.  Not group leader supervision, but

4     team leader supervision.

5          Q.    How do you determine, then, when Don

6     Williams goes home, based just on a scheduled

7     shift?

8          A.    Just -- yeah, based on the scheduled

9     shifts.  Now, if -- if for some reason that there's

10     a crisis, a problem or whatever, I wouldn't walk

11     out under those conditions.

12          Q.    Sure.

13          A.    But if there's floats in the

14     departments, the people are lined up and they know

15     what they're going to do, all the equipment's up,

16     then I go.

17          Q.    Okay.  We've heard a lot of talk about

18     representations or the term "promises" had been

19     made for individuals when they came over from Ford

20     Motor Company to ZF Batavia.  Can you tell me, in

21     terms of Don Williams' opinion, what

22     representations or promises were made that have not

23     been followed through on by ZF Batavia?

24          A.    Starting -- I believe that was -- was

1   that '98 when we had the meetings?  That was -- it

2   was a -- it was a -- it was a shock when we found

3   out that there had been some reorganization, I

4   guess, in the Ford structure and how they were

5   going to do their business.

6           And there was a lot of hesitation

7   and -- and reservations.  There was a lot of people

8   that said they weren't going to make the plunge.

9   And I was one that felt as though after 22 or 23

10  years, whether I was going to jump ship or not.

11          And there was some meetings that were

12  held in the cafeteria, but prior -- prior to those

13  meetings, as I recall it, there was -- my -- I was

14  directly reporting to Rick Williams at the time and

15  he was acting, I guess, as -- as a -- well, we were

16  still all Ford, but evidently he had been or had

17  already accepted an offer to go over with the joint

18  venture.

19          And I specifically recall on several

20  occasions, he asking -- you know, what are you

21  going to do because Rick thought a lot of -- he

22  felt that I performed my job very well and he

23  was -- he was wanting me to come over and he had

24  accepted a position, as I understand it, as

```
 1   production manager.

 2            The people that were in the cafeteria

 3   at the time was -- was -- Karl Kehr did a lot of

 4   the -- a lot of talking.  Dave Adams had us all

 5   together upstairs in the conference room when he

 6   introduced himself as the president of the newly

 7   formed joint venture and --

 8        Q.    Not to interrupt, but I sometimes

 9   can't help myself.  But let's back up a second.

10   Now, the meeting with Dave was a meeting with maybe

11   six or seven of the -- what I'll call Ford

12   transitionals?

13        A.    You mean with Dave?

14        Q.    Yeah.

15        A.    All the salary people.

16        Q.    Okay.  Was that in the cafeteria?

17        A.    No, no.  That was -- that was upstairs

18   in the conference room.

19        Q.    Okay.  And if I told you that the

20   meeting in the cafeteria -- if I got the right

21   ones -- those were held on May 27th.  Does that

22   sound about right?

23        A.    That sounds about right, late May.

24        Q.    All right.  In relation to the
```

26

1    meetings in the cafeteria, the -- the meeting up in

2    the conference room, was that before or after the

3    cafeteria meeting?

4        A.    John, I want to say it was before.  I

5    think that was -- Dave was introducing himself as

6    the president of the newly formed joint venture.

7        Q.    Okay.

8        A.    And I very specifically saying -- I

9    specifically remember him saying in that -- in that

10   meeting that the CVT was the future --

11       Q.    Okay.

12       A.    -- of the automotive transmission

13   industry and that we would have a opportunity to

14   get in on the ground floor of a -- of a -- of a new

15   product, a newly developed product.  And that's --

16   that's -- I remember -- I specifically remember him

17   saying a newly developed product.

18       Q.    Okay.  Anything else you remember

19   from -- and let's stick with that meeting for right

20   now.  Any other phrases, comments, anything else

21   from Dave at that point?

22       A.    He said details would -- would be

23   worked out and we would -- basically what he did

24   was give us his background and gave us ZF's

1    background.

2          Q.    Okay.

3          A.    And said it was -- it was their

4    attempt to get as many people to come over to the

5    new company as possible, so that there wouldn't be

6    a -- any interruptions in the -- in the business.

7          Q.    Okay.  Anybody else speak of any

8    substance at that meeting?

9          A.    Not as I recall.

10         Q.    Okay.  Now -- and I want to talk about

11   those meetings.  Let's talk a little bit again

12   about what you recall, again, whether it's promises

13   or representations or whatever you want to call it,

14   that you feel were made to you or other

15   transitionals that hasn't been followed through on.

16               We talked a little bit about the

17   meetings, okay?  But let's talk specifically about

18   issues or items or however you want to phrase that.

19         A.    Well, in the very beginning when they

20   announced it, they had us all together in the open

21   area outside the hospital.  And at that meeting,

22   there was a lot of union officials and I believe,

23   if my memory is correct, there was a -- it was a

24   video.  It was a conference and Detroit was -- the

1    CEO, Nasser, I believe it was, was there.  And we

2    were told at that time nothing would change.

3    Everything would be the same for hourly and

4    salaried people.

5            So at the very first meeting when we

6    were told by the higher ups nothing would change,

7    and that was -- that was union and salary.  So we

8    went away still in shock, I guess, about the joint

9    venture from that very first meeting, but with a

10   good feeling that this announcement was made to the

11   world and we were told then that nothing would

12   change.  Everything would be the same.

13       Q.    Okay.  What's the next -- well, let's

14   try and get back to the issues and then I want to

15   try and tie them to a meeting or discussion.

16           Again, what do you feel hasn't been

17   followed through on?

18       A.    The promises, the agreement?

19       Q.    Whatever you want to call them.

20       A.    The -- the AIP.

21       Q.    Okay.

22       A.    We were told very specifically -- and

23   that's one of the things in the cafeteria that they

24   knew because none of the -- I wouldn't have gone

1    over.  I mean, we were getting some pretty good --

2    we were getting some pretty good bonuses at Ford.

3    So they knew they had to give us something.  So

4    they called them AIPs.  And we were told at that

5    time that that would be distributed based upon the

6    plant's performance and productivity, quality,

7    schedule and cost.  Not individual, but on the

8    plant's performance.

9         Not on how much money you made that --

10    the previous year, but on money that was allocated

11    this year for next year and if the plant's ability

12    to attain those numbers were favorable, then the

13    AIP would be distributed based upon those

14    calculations.

15         And come to find out, I was penalized

16    for whatever reason because I had a transition

17    bonus that was paid one-third, one-third,

18    one-third.  So I had received that money the prior

19    year.  I had received my overtime money the prior

20    year and I had received the bonus money the prior

21    year, some of which was Ford for the first year and

22    there was a -- and there was a percentage of it

23    that was also ZF that they -- that was distributed.

24         So the next year, then, I was reduced

1    because of the -- of my gross salary the year

2    before.  So the -- the agreement was already, in my

3    opinion, broken because somewhere I didn't get from

4    my previous year what they told me they were going

5    to give me.

6        Q.    Okay.

7        A.    I either lost it in my one -- I either

8    didn't get my one-third that was Ford transition

9    bonus or they took away my overtime or they took

10   away my -- the other bonus.  So that was gone.

11   That -- that was violated very quickly.  The next

12   area, it really --

13       Q.    All right.  Before we go to the next

14   area, let me ask you -- I'm going to tie some

15   things down here, okay?  With respect to the AIP,

16   you received a pretty substantial AIP payment in

17   March of 2000, as I recall.

18       A.    I'd have to see it.

19           MR. SIMON:  Just make an objection,

20   make it a continuing objection, if you like,

21   Mr. Hunter, that we had asked for the AIP bonuses

22   for all 15 of our clients and we didn't get them.

23           MR. HUNTER:  Well, I --

24           MR. SIMON:  And you're asking the

1    clients questions about what they remember getting,

2    so I object to that.

3            MR. HUNTER:  I must respectfully

4    disagree.  For example, if you look at document 276

5    in the Bates stamped documents that have been

6    provided to you for months now, you will see the

7    2000 AIP payment in there for Mr. Williams.

8            If you review the other documents that

9    have been provided with respect to the other

10    individuals, the AIP payments for 2000 were

11    reflected in all those personnel files and have

12    been that way for several months now.

13           MR. SIMON:  2000, 2001 and 2002?

14           MR. HUNTER:  I'm asking about 2000,

15    Mr. Simon.

16           MR. SIMON:  Well, I'm not sure we've

17    got all three years of bonuses and that's my

18    objection.

19    BY MR. HUNTER:

20        Q.    Mr. Williams, you received $7,350 in

21    March of 2000, didn't you?

22        A.    I'd have to see it.

23        Q.    You don't remember?

24        A.    Do I remember the number?

1          Q.    Mm-hmm.

2          A.    No, I don't.

3          Q.    Well, how much were you supposed to

4    receive?

5          A.    I'd have to look at the numbers, John.

6          Q.    No, no, no.  How much were you

7    supposed to receive?  Not what you received.  If

8    you don't know that, that's okay.  What were you

9    supposed to receive?

10         A.    Was that the first bonus?  See, I

11   don't --

12         Q.    Yes, sir.

13         A.    There was -- there was -- I'm confused

14   about your question because there was a bonus that

15   the first year we went over and I can't recall

16   without seeing that, just exactly -- if you have

17   them all, lay them out there so I can see and then

18   I can better answer your question.

19              I mean, just to wave a piece of paper

20   at me is -- is kind of -- and ask me a question.

21   I'm trying to be specific.  I'm trying to give you

22   the most honest answers and accurate that I can.

23   But if -- if I see them, I can tell you, the first

24   payment that we got was a Ford and a ZF bonus when

1    we went over our first year.  Some of that was

2    Ford; some of that was ZF.

3              So for you to wave something at me

4    and -- let's see.  When I signed on, I signed on in

5    December of '99.  When was that paid?

6        Q.    March of 2000.  I would represent --

7        A.    Then that --

8        Q.    -- I would represent to you --

9        A.    Then that would have been -- then that

10    would have been the first bonus we received --

11        Q.    Right.

12        A.    -- which would have been a combination

13    number of Ford and ZF, correct?

14        Q.    I get to ask today, okay?  I don't

15    know the source of that payment, okay?  My opinion

16    would be --

17        A.    Well, don't hide anything.  Just put

18    it out there --

19        Q.    My opinion would be, Don --

20        A.    -- and we'll get to the bottom of it.

21        Q.    -- was that was a Batavia payment,

22    okay?  I mean, you've said something nobody else

23    has said, in terms of Ford or ZF Batavia.

24        A.    No, that was not a Batavia --

34

1          Q.    Okay.

2          A.    Ford --

3          Q.    You received a true-up payment, okay?

4     You received a bonus payment and you received a

5     merit increase about March of 2000.  But let's

6     stick with the AIP for right now.

7          A.    Okay.

8          Q.    You don't know how much you were paid

9     in March.  Do you know how much you were supposed

10    to be paid in March of 2000?

11         A.    There was a letter that came out, as I

12    recall it, that said this was what ZF's going to

13    do; this is what Ford's going to do, going back

14    three years.

15         Q.    Mm-hmm.

16         A.    That payment -- it was that payment

17    that was -- if we're talking about the same

18    payment -- it was that payment that was correct.

19    That would have been the first year I went over.

20    The next year is when it changed.

21         Q.    Okay.  Let's talk about the next year.

22    All I'm trying to do, Don, is understand what

23    payment you felt you didn't receive, okay, and then

24    when.  I'm not trying to trick you or anything else

1    here.

2            You made the comment that you didn't

3    get the AIP you were supposed to because it was

4    reduced for your gross salary.

5            A.    Mm-hmm.

6            Q.    Okay.  How much did you not receive?

7            A.    They cut it in half.

8            Q.    Okay.  Well, what's the dollar amount?

9            A.    It's right around $4,000.

10           Q.    And when should you have received

11   that?

12           A.    I'm certain it was the second, so that

13   would have been the AIP that was paid in 2001.

14           Q.    All right.  And why do you think that

15   was reduced?

16           A.    I have no idea.

17           Q.    Okay.

18           A.    I have no idea why it was changed.

19           Q.    And who told you how much that payment

20   was going to be?

21           A.    It was -- it was -- it was announced

22   that it was somewhere around -- I believe it was

23   seven percent.  But how it was announced

24   specifically, I don't know whether it was an e-mail

1    posted.  Some -- it was -- it was announced.

2         Q.    Okay.  And this is, again, roughly

3    March of 2001?

4         A.    Roughly.

5         Q.    Okay.

6         A.    I'd have to look at the -- I'd have to

7    look at the -- to better really understand -- I

8    understand it, but I just want to make sure that

9    I'm -- I'm right in what I'm saying, just bringing

10   it out of -- bringing it out of my head --

11        Q.    Okay.

12        A.    -- my memory.

13        Q.    Certainly you're not telling me that

14   anybody represented to you prior to your signing on

15   with ZF Batavia a fixed dollar amount for your AIP

16   payment, are you?

17        A.    It was based upon the -- on the

18   schedule, delivery, cost of the Batavia plant.

19        Q.    Basically the plant performance?

20        A.    Plant performance.

21        Q.    Okay.  All right.

22        A.    Not individual performance.  Not

23   individually where -- because you went over a

24   certain amount of money gross.  And I understand

1    that what they did was they just looked at some

2    guys and said this guy made over -- over this

3    amount, he gets cut.  This person made over this

4    amount, he gets cut.  They made over this amount,

5    he gets cuts.

6           It was given willy-nilly and there was

7    some people that got more and there was some that

8    got none and I was given half.  Never was given an

9    explanation for why I got half.

10      Q.   Will you explain to me why you think

11   you got what you referred to as half, what you base

12   your opinion on, then?

13      A.   Only what I heard, that --

14      Q.   Okay.

15      A.   -- the fellows that they thought made

16   too much money, they -- they reduced it.  They

17   said, Well, he got his in overtime --

18      Q.   Okay.

19      A.   -- but that wasn't true because there

20   was -- one-third of that money was -- was my

21   transition bonus.  Another part of that money

22   was -- was the AIP from the year before.

23      Q.   Okay.

24      A.   Because they said -- I understand that

1    the scuttlebug (sic) was, well, if you worked a lot

2    of overtime.

3        Q.    Okay.  Any other AIP payments -- and

4    let's stick with the AIP -- that you feel that

5    you're entitled to?

6        A.    No, because the next year it was done

7    in accordance with -- well, let me say this.  Let

8    me say this.  I didn't know that the ZF hirees were

9    going to have a greater amount of transition

10   percentage -- excuse me.  Let me stop there.  Not

11   transition.  I didn't know that the ZF new hires

12   were going to get a greater percentage of the pie.

13       Q.    Okay.

14       A.    That was never -- that was never told.

15   As I -- as the AIP payments were -- came -- were

16   then paid, the transition people got less money,

17   percentage.

18       Q.    I was going to say, they got less

19   percentage or less real dollars?

20       A.    They got less percentage.

21       Q.    Same dollars?

22       A.    You can play with the numbers all you

23   want.  When you tell me that you're going to pay me

24   a transition -- when you're going to pay me a bonus

1    and then you come back and tell me, Well, you know,

2    because you're transition, we're going to give you

3    less, that isn't what you told me in the beginning.

4         You told me in the beginning I was

5    going to get an AIP bonus.  And I certainly

6    expected that to be even.  I expected that to be

7    based upon the plant's performance.  It -- it was

8    going to be eight percent, whether you were a

9    transition employee or whether you were a -- a new

10   hire, I expected that to be the same.

11        Q.    Okay.  All right.  We've talked a lot

12   about AIP.  Anything else with respect to AIP that

13   you feel you're entitled to?

14        A.    No.  The percentage difference between

15   the ZF and what I got and the year that I was cut

16   in half.

17        Q.    Okay.  What other promises or

18   representations do you feel were made to you that

19   haven't been followed through on?

20        A.    Overtime.

21        Q.    Okay.  Well, let's talk about that.

22   What's the issue with overtime?

23        A.    The issue with the overtime is I

24   expected it to be paid and I was told -- and they

40

1    even had to go back and read me on this issue

2    because when we brought up overtime in the

3    cafeteria meeting, the first cafeteria meeting,

4    everybody's eyebrows raised because they didn't

5    have any intention of paying overtime.

6              And they said, We can't give you guys

7    an answer.  We need to go back and re-meet (sic) on

8    that.  So they went back and they came back some

9    time later and said, okay, we're going to pay

10   overtime, just like you're getting your overtime

11   pay right now.

12             You won't lose anything because -- I

13   mean, most of the floor people, again, that

14   historically knew how the business ran and worked

15   overtime, no way they would have transitioned.  No

16   way I would have transitioned with -- with losing

17   that.  So they came back and said you will not lose

18   anything.

19        Q.    All right.  Let's try and nail that

20   down, okay?  When was the first time you remember

21   discussing overtime -- the overtime policy at

22   Batavia with anybody?  And when I say "Batavia," I

23   mean --

24        A.    Didn't have to be --

 1          Q.    -- ZF Batavia.

 2          A.    Didn't have to be discussed until --

 3    until they came out and said that they were going

 4    to stop paying overtime.  There was no reason to

 5    discuss it.  Everything was the same.

 6          Q.    Okay.  All right.  So that's the

 7    first -- sounds like it's the first time and this

 8    was at one of the cafeteria meetings?

 9                MR. SIMON:  I think you confused him

10    about when --

11                MR. HUNTER:  I know I'm confused.  All

12    right.  Let's try this time --

13                MR. SIMON:  I think he's trying to

14    focus on the transition period in '99, when did the

15    topic of overtime first come up when they were --

16                THE WITNESS:  At that transition

17    meeting?

18                MR. HUNTER:  I don't know.  That's

19    what I'm trying to nail down.

20                THE WITNESS:  The question came up in

21    that meeting in the cafeteria --

22                MR. HUNTER:  There we are.

23                THE WITNESS:  -- what about overtime?

24                MR. HUNTER:  Okay.

```
 1              THE WITNESS:  And they -- there was a
 2    big blank look of, what do you mean overtime?  So
 3    we're -- we're paid overtime.
 4    BY MR. HUNTER:
 5         Q.   Hang on a second.  This is a May
 6    meeting in the cafeteria at ZF Batavia, right?
 7         A.   Yes.
 8         Q.   Okay.  Now, you were there?
 9         A.   Yes.
10         Q.   Okay.  And somebody in the crowd asked
11    a question about the payment of overtime --
12         A.   Yes.
13         Q.   -- compensation?  All right.  Do you
14    remember who asked that question?
15         A.   I -- I can't, no.
16         Q.   Okay.  Who answered it?
17         A.   They looked at each other like -- like
18    they were aliens.  We were aliens.  Karl Kehr was
19    doing a lot of the -- a lot of talking.
20         Q.   Okay.
21         A.   I know Dave Adams was there.  There
22    was a fellow --
23         Q.   Hang on.  Does that mean Dave wasn't
24    talking about the issue or Dave was just there?
```

1   What are you telling me?

2        A.   I specifically remember he -- he did

3   limited talking.  I specifically remember Dave

4   getting in -- I guess one of the superintendents --

5   I believe it was Rick Williams brought up a leased

6   car.  And I specifically remember Karl looking at

7   Dave and Dave answered that question and said,

8   We're working with a local dealer to replace leased

9   cars.  That was the answer that they gave to the

10  superintendents.

11       Q.   Okay.

12       A.   I -- I specifically remember Dave

13  saying that.  But they looked at each other, just

14  like -- they didn't have an answer for us.  They

15  did not have an answer for the overtime, too, for

16  that question.

17       Q.   What did they say?  We don't have an

18  answer?

19       A.   We don't have an answer for it.  We'll

20  have to get back to -- to you.

21       Q.   Okay.  Did the overtime issue come up

22  again at that meeting?

23       A.   No, there was no need for it to, as I

24  recall it.

44

```
 1        Q.    Okay.  Do you remember, was this --
 2   there were -- well, do you recall there were two
 3   meetings on that date in the cafeteria?
 4        A.    One was for the off-shift people and
 5   the other one was for the day-shift people.
 6        Q.    Okay.  Which meeting did you go to?
 7        A.    The day shift meeting.
 8        Q.    Trying to remember what -- do you
 9   remember what time that was?
10        A.    Oh, Lord, no.
11        Q.    Okay.  Hang on.  Okay.  Before you had
12   your conversation with your counsel, I had asked
13   you a question about what time the meeting was that
14   you went to.
15             MR. SIMON:  I thought he answered the
16   question.  I'm sorry.
17        A.    I don't know.
18        Q.    Okay.
19        A.    I don't know what time that meeting --
20   I don't know what time it was held.
21        Q.    If I told you there was one meeting at
22   8:30 a.m. and another meeting scheduled for two,
23   which meeting -- if that helps at all.
24        A.    John, I -- I can't -- I don't know.
```

1       Q.    Okay.  Do you remember who -- who else

2    might have spoken at those meetings?

3       A.    No, it was -- there was a lot of

4    people that was --

5       Q.    Okay.

6       A.    A lot -- a lot of questions.

7       Q.    Okay.  So you went to the meeting on

8    the 27th.  The question was asked about overtime

9    and simply couldn't be answered, from your

10   understanding?

11          MR. SIMON:  Objection.  I don't know

12   that he was talking about the 27th meeting, but go

13   ahead.

14      Q.    Were you talking about the May 27th

15   meeting, if you know, Don?

16      A.    I don't know, John.  The first

17   meeting -- the first meeting that I went to, the

18   overtime question came up.  They couldn't answer

19   it.

20      Q.    Okay.

21      A.    We had another meeting sometime after

22   that.  If that was May the 27th, it could have

23   been.

24      Q.    Okay.

1          A.     But as far as -- as -- you said the

2     date and it could have been.  But I do know the

3     first meeting that I attended -- and I don't recall

4     missing a meeting, so it could have been that date.

5     It could not have been.  And then there was another

6     meeting when they came back and said they would pay

7     it, so --

8          Q.     Okay.  The first meeting where that

9     question was asked, was that in the cafeteria there

10    at the plant?

11         A.     Mm-hmm.

12         Q.     And that was kind of like a -- a

13    meeting for the Ford transitional folks?

14         A.     Mm-hmm, yes.

15         Q.     Okay.  I think you told me Karl was

16    there; Dave was there.  How about Tony DeShaw?

17         A.     As I recall, he was there.

18         Q.     How about representatives from Ford?

19         A.     I know they were at a meeting.  I

20    don't know whether it was the first one or the

21    second meeting.  It seems like it was the second

22    meeting, but --

23         Q.     Okay.

24         A.     There was representatives from Ford.

47

1      Well, Karl was a representative from Ford.  He

2      certainly wasn't ZF at the time.

3            Q.    Okay.  Let's talk now about the second

4      meeting.  Did they come -- when I say "they" -- I

5      shouldn't say "they."  But did somebody come back

6      to you with an answer on the overtime issue?

7            A.    In that second meeting, they said we

8      will pay overtime.

9            Q.    Okay.  Do you remember who said that?

10           A.    No, I don't.

11           Q.    Okay.  Who was at the second meeting,

12     was it -- well, who was at the second meeting?

13           A.    John, I can't say for sure.  I want to

14     say it was -- I want to say it was a combination of

15     Ford.  I want to say there was some benefit reps

16     from -- from Fidelity.  I want to say there was

17     some -- but to -- but to name the individuals,

18     there was -- we had representatives, but I can't be

19     positive --

20           Q.    Okay.

21           A.    -- with the names.

22           Q.    Okay.  All right.  Now, we've talked

23     about, then, the overtime issue.  In terms of --

24     and apparently your expectation, how has that

1  expectation not been met?

2      A.    With the -- they did deduct -- they

3  just deduct an hour away from -- from your day.

4  And if you -- and in increments, you had to work a

5  whole hour.  If there was a half hour -- so if I --

6  if I stayed over an hour and a half, I -- I didn't

7  get any pay.  And that was -- that was a biggy, as

8  far as I was concerned.

9      Q.    Okay.  Do you know what the term

10  "casual time" means?

11      A.    Mm-hmm.

12      Q.    Okay.  What -- to Don Williams, what

13  is casual time?

14      A.    To me, casual time is going in the

15  office and turning in your paperwork and the -- the

16  few minutes that it takes you to start your day

17  out, but normally that -- at the end of the shift,

18  may be giving your end-of-the-shift lineup to the

19  next guy.  That's casual.

20      Q.    And certainly you had casual time at

21  Ford, didn't you?

22      A.    There was casual time.  There was --

23  there was maybe 15 minutes before and after,

24  something like that.  But -- but there was a lot of

1    times we dropped our paperwork and you had a number

2    to run to.  And if you ran to your budget, why you

3    didn't even have to -- you didn't even have to hang

4    around.  You gave your paperwork to the general

5    foreman as you went by and you were out there.  You

6    were out of there by -- right on the money.

7         Q.    Okay.  So -- and when you say run

8    through a number, you get a set number of parts and

9    you're out of the plant?

10        A.    I didn't say that.

11        Q.    Okay.

12        A.    No.  That's an open -- that's a open

13   statement.  What I said was, when we achieve our

14   goals, if you achieved it, then there was -- there

15   was really no reason to go through a lot of what we

16   called the terror chair.  So you didn't have to sit

17   there and be terrorized.

18              You gave your -- you just passed your

19   numbers to the -- to the -- maybe the afternoon

20   shift guy or to your general foreman and he --

21   because you knew everything was going to be fine.

22   So you didn't even have to go up to the squirm

23   chair.

24        Q.    To the what?

1          A.     Squirm chair, when you go to the

2   superintendent because you ran horrible and he beat

3   you up from everything you do from a mock 10

4   through the final sell count.  That was the squirm

5   or the terror chair.

6          Q.     Okay.

7          A.     So if you ran horribly and you

8   couldn't give an explanation for it, why you might

9   be in the squirm chair for 45 minutes.  And if you

10  were in the squirm chair for 45 minutes, you

11  didn't -- you didn't get paid for that.

12         Q.     Okay.  Any other issues with respect

13  to the overtime?

14         A.     Not as I -- not -- no.

15         Q.     Okay.  And if I recall, you answered

16  certain interrogatories in this case and asserted a

17  loss of $27,000.

18         A.     Mm-hmm.

19         Q.     Does that sound familiar?

20         A.     Mm-hmm.

21         Q.     Okay.  Does that relate to overtime or

22  what is that number?

23         A.     That relates to the dollar amount that

24  I lost because of the policy change.

1          Q.    When did the policy change?

2          A.    I'm not sure of the date.  I know when

3    I -- I know when I figured that loss, I had the

4    date and I figured it from --

5                MR. HUNTER:  Steve, you can pull

6    number 10 -- or actually let's go off the record

7    for a second.

8          (Off the record:  9:08 a.m. - 9:09 a.m.)

9          Q.    Mr. Williams, your attorney was kind

10   enough to hand you Exhibit 10.  I would ask you to

11   take a couple minutes to read that document.

12         A.    Okay.

13         Q.    Okay.  You had mentioned the change in

14   policy with respect to overtime, but couldn't

15   remember the date.  Does Exhibit 10 help you with

16   that date?

17         A.    Mm-hmm.

18         Q.    Okay.  And would it be safe to say,

19   then, in approximately March of 2002 is the policy

20   change date you reference?

21               MR. SIMON:  Objection.  We've answered

22   this question in the interrogatory, but go ahead.

23         A.    Yes.

24         Q.    All right.  And so your $27,000 would

1   represent uncompensated overtime from March

2   approximately of 2002 until today or what time

3   period?

4           MR. SIMON:  John, may I have a

5   continuing objection?  These questions have been

6   asked and answered in the interrogatory, but you

7   can ask him.  I mean, there in the interrogatory

8   answer may explain where the numbers came from.

9   I'm not saying you're not entitled to ask him, but

10  my objection is that he has answered the

11  interrogatory.

12          MR. HUNTER:  Yeah, the interrogatory

13  reflects it's an estimate.  I'm just trying to

14  understand --

15          MR. SIMON:  Yeah.

16          MR. HUNTER:  -- the time, the place.

17  Just want to know what the claim is.

18          MR. SIMON:  That information also is

19  given in the interrogatory answer, but he can

20  answer.

21      A.    That was an estimate from that time --

22  from this time through the current -- I believe it

23  was maybe two or three months ago, when -- I'm

24  thinking.

1         Q.    Certainly whatever date you supplied

2    the answers?

3         A.    Right.

4         Q.    Again, it's not a trick question.  I'm

5    just trying to understand what that number

6    represents.

7         A.    That's -- that's it.

8         Q.    Okay.  So March, again, of '02

9    through -- these were submitted back sometime in

10   May.

11        A.    Okay.

12        Q.    All right.  The AIP payment you

13   mentioned before, the $4,000, is that a component

14   of that 27,000?

15        A.    No.

16        Q.    Okay.  So that four would be on top of

17   the 27?

18        A.    Yes.

19        Q.    Okay.  And, again, I'm not trying to

20   ask this 47 times.  So the 27 is truly just unpaid

21   overtime compensation?

22        A.    It's an estimate of that, yes.

23        Q.    Okay.  Any other issues with the

24   overtime, then?

1          A.     Well, the other issue that comes about

2    with the overtime is, if you wanted to pay me -- if

3    I'm going to be paid as a nonexempt employee --

4    there's two more issues with it.

5          Q.     Okay.

6          A.     Let me first start with managerial

7    role and -- because that was a biggy.  We were told

8    the overtime was going to be the same, that MR

9    role -- and at Ford, the MR roles were paid

10   overtime up through and including a grade -- I know

11   12 and sometimes a 13.

12          Well -- and we were told nothing is

13   going to change.  MR role -- and I was just told

14   again last week by Eric Spencer, we don't pay MR

15   overtime.  Dick Newark said, Len Sennish said, we

16   don't pay MR role overtime.

17          Well, then, the agreement is not true

18   because the agreement was we were going to be paid

19   overtime up through the MR role, just like it was

20   at Ford.  And now we found out and this was -- this

21   had -- this had a substantial impact on whether I

22   was going to take another job or not because

23   they -- they said we can't pay you in this job

24   overtime because you'll be in MR role.

1          So that had a substantial impact on

2     what my decision was.  So two things with the

3     overtime.  ZF changed the policy to where they quit

4     paying the MR role people overtime as Ford did.

5          And then the second part of that is,

6     if you're going to treat me as a nonexempt

7     employee, then -- and -- and that wasn't figured in

8     these dollars amount, then -- then I should be paid

9     for every tenth.  So that figure would even be

10    higher.

11         Q.    Okay.  How is it that you're paid as a

12    nonexempt employee?

13         A.    By ringing in and ringing out and --

14    and being threatened to be docked.  And, in fact, I

15    think I was docked because when you didn't pay me

16    for the half hour or the hour that I was there

17    because I hadn't done the first nine, then, in

18    essence, in my opinion, I was docked.

19         Q.    Have you ever received less than your

20    full salary?

21         A.    Yes.

22         Q.    When?

23         A.    I was -- that would have been last

24    year and it was due to the policy change on the

```
 1  sick days.

 2          Q.    And how much less did you receive?

 3          A.    A day's pay.

 4          Q.    Did you work that day?

 5          A.    No.

 6          Q.    And you were docked a day?

 7          A.    Mm-hmm.

 8          Q.    In the information that you supplied,

 9  in terms of the answers to interrogatories, is that

10  reflected anywhere in those answers?

11          A.    It could be -- it could be under the

12  sick and personal.

13          Q.    Do you remember what day you were

14  docked for?

15          A.    Unfortunately, John, I had it in the

16  computer and I understand now, the hard drive,

17  they're trying to retrieve that information because

18  I recall Teri, the girl in timekeeping, sent me an

19  e-mail and said that I was into the fourth day and

20  I replied that -- so I had it under the send it

21  columns on my e-mail, if they're successful in

22  getting all that information back, I can tell you

23  exactly.  But without that, I -- I'd only be

24  guessing.  It was fourth quarter, maybe.
```

57

```
 1          Q.     Fourth quarter of '02 or '01?

 2          A.     '02.

 3          Q.     After the lawsuit was filed?

 4          A.     I'd have to look.

 5          Q.     Okay.

 6          A.     I'd have to look.

 7          Q.     When you say it's on the computer,

 8     that's at your computer at work?

 9          A.     Or even -- I even have a check, so I

10     could even look at my check and tell you and say --

11     and tell you.

12          Q.     Okay.  Did you ever give a copy of

13     that check to your attorney?

14          A.     Can't be sure.

15          Q.     Other than that date, do you claim

16     that you've been docked your salary any other date?

17          A.     I'd have to go back and look, John.

18     But I'd say I was docked every time that I was in

19     that building.  When the policy changed, I was

20     docked every day.

21          Q.     Your salary was reduced every day?

22          A.     Yes, it would have been.

23          Q.     Your salary?

24          A.     Not -- not my -- not my monthly
```

58

1    salary, but my overtime.  I was docked on the back

2    end.

3           Q.    Okay.  Does Batavia pay for lunch for

4    salaried folks such as yourself?

5           A.    Do they pay for lunch?

6           Q.    Mm-hmm.

7           A.    Can't say that they do.

8           Q.    Does your time sheet reflect the time

9    you take for lunch?

10          A.    I don't know that it does.

11          Q.    Do you ever in the middle of the day

12   go out of the plant for lunch?

13          A.    Sometimes.

14          Q.    That's not reflected on your time

15   sheet, either, is it?

16          A.    What do you mean by it's not reflected

17   on my time sheet?

18          Q.    Do you reduce your hours for that?

19          A.    Do I charge them for lunch?

20          Q.    Mm-hmm.

21          A.    Is that what you're saying?  No.

22          Q.    Okay.  So your time sheet is adjusted

23   for when you go in and out of the plant?

24          A.    I would have to say it is.

1          Q.     Okay.  How do you show that on your

2     time sheet?

3          A.     How do I show lunch on my time sheet?

4          Q.     The time that you're out of the plant.

5          A.     It varies.  If I came in late,

6     normally I would put down the time that I started.

7     If -- if I'm out and it's a long lunch, normally I

8     would tell my supervisor I'll be gone for this

9     amount of time and I'll be back.  But normally

10    somebody knows if I'm out of the building for an

11    extended period of time, somebody would know.

12         Q.     Okay.  But how is it reflected on your

13    time sheet?

14         A.     In most instances, I pull it out of

15    there.  In most instances, I wouldn't -- I wouldn't

16    want to charge them for --

17         Q.     Most instances or all instances?

18                MR. SIMON:  Just clarifying, are you

19    talking about lunches outside the plant or lunches

20    inside the plant?

21                MR. HUNTER:  Either.

22         A.     I don't know that I've charged them

23    for -- for being out of the building.  If I was out

24    of the building for an extended period of time, I

1  don't know -- I don't know that I charged them for

2  that.

3        Q.    Well, what's an extended period?

4        A.    I'd say anything over 45, 50 minutes.

5        Q.    Okay.  So anything under 45 minutes --

6        A.    They're salaried -- salaried

7  individuals sit in the cafeteria hour, hour and a

8  half.  I never do that.

9        Q.    Okay.  Now we're talking about --

10        A.    I've never done that.

11        Q.    -- you, Mr. Williams -- -

12        A.    Right.

13        Q.    -- as you.

14        A.    Right.

15        Q.    So you feel up to 45 minutes does not

16  need to be reflected in your timecard?

17        A.    45 minutes, 50 minutes.  I say that's

18  reasonable.  Sometimes you have to -- you have to

19  run out and get a sandwich, 45, 50 minutes.

20        Q.    And, again, clearly your timecards

21  would not reflect if you're out of the plant for

22  something less than 45 minutes, correct?

23        A.    John, you'd have to -- be specific.

24  You'd have to show me something to -- to let me

1    recall my memory and see exactly what we're talking

2    about here.  There's times when I'm out of the

3    building for an extended period of lunch that I

4    would go and my boss would know that I was out.

5          Q.    But not reflected on your timecard?

6          A.    It could not be.  There's -- there's

7    a -- there was -- you'd have to be specific.

8          Q.    Okay.  And with relation to your start

9    time and the time reflected on your timecard, if --

10   if I took a look at the Honeywell readers as to

11   when you swiped into the building, safe to say your

12   time sheet is pretty close to when you swiped into

13   the building, correct?

14         A.    I try to be.

15         Q.    So that you don't account for any

16   casual time for ZF Batavia?

17         A.    That I don't?  Yes, I did.

18         Q.    Well, you just told me your swipe time

19   was pretty much what was reflected on the time

20   sheet.  How is that casual time?

21         A.    If I came in at 20 minutes to seven

22   and my shift started at seven, that was casual

23   time.

24         Q.    Well, if it's not on your time sheet,

1    how is that accounted for if you're to be paid for

2    every increment on your time sheet?

3         A.    How would I be paid for it?

4         Q.    No, sir.  How is that casual time?  If

5    the minute you walk in the plant it's on your time

6    sheet, where's the casual time?

7         A.    If I walked in prior to the start of

8    the shift.  If I walked in at -- if I walked in --

9    there would be none.  If I was going to be paid for

10   every minute, there wouldn't be casual time.

11        Q.    Right.  And you understood when you

12   worked at Ford there was casual time, correct?

13        A.    There was some casual time at Ford.

14   There was, like I said, squirm chairs.  If some

15   guys didn't make it, they stayed there.  If other

16   guys did, they were gone.

17        Q.    Okay.  But there was casual time at

18   Ford, correct?  And your time sheets that are

19   submitted to ZF Batavia do not reflect any casual

20   time, do they?

21        A.    Sometimes they do; sometimes they

22   don't.

23        Q.    Give me a date when it reflects --

24        A.    I don't know.

1          Q.     -- casual time.

2          A.     I would have to look at them and see.

3          Q.     Okay.

4          A.     You're talking about time sheets from

5     the -- from the time when the Honeywell system was

6     instituted and you expect me to recall every day

7     without being specific what was there.  That's

8     impossible.

9               MR. HUNTER:  What other issues --

10     well, do you want to take a break?

11               THE WITNESS:  That's fine.

12               MR. HUNTER:  We've been at this for

13     about an hour and a half.

14               MR. SIMON:  Sure.  Let's take a break.

15          (Off the record:  9:22 a.m. - 9:35 a.m.)

16               MR. HUNTER:  Mr. Williams, your

17     attorney has indicated that you would like to

18     clarify something.

19               MR. SIMON:  It's just with respect to

20     the overtime policy, that -- you had asked about

21     his calculation of $27,000 and which is explained

22     in the interrogatory answer.  And you had tied it

23     to Exhibit 10, which is a March 28, 2002 memo and

24     Mr. Williams wanted to clarify something.

```
 1                THE WITNESS:  Yes, that that was
 2    actually -- my calculations were actually before
 3    2002 because there was another announcement that we
 4    wouldn't receive the overtime pay as it had been,
 5    the policy change.  So it was actually before the
 6    2002 letter came out.
 7    BY MR. HUNTER:
 8         Q.    You don't know when, though?
 9         A.    I believe it was in the third quarter,
10    second or third quarter of '01, I believe.
11         Q.    Okay.  And so your $27,000 loss is
12    from second, third quarter of '01 through -- I
13    think we said May, roughly?
14                MR. HUNTER:  Mr. Simon, if you
15    could --
16                MR. SIMON:  I'm just trying to
17    clarify.  I think he's guessing about when the memo
18    came out.  We answered it.  It's his memory --
19    whatever Mr. Williams' memory is, the record
20    reflects when the memo came out.
21                THE WITNESS:  Yeah.
22                MR. SIMON:  It isn't -- you know,
23    2002.  He was confused on Exhibit 10.
24                THE WITNESS:  Right.
```

1          MR. SIMON:  So whatever his answer is,

2     it's already reflected on the record when the memo

3     came out.

4          THE WITNESS:  Yes.

5          MR. SIMON:  I was just trying to help.

6     The 2002 memo does address overtime, but that's not

7     the issue.

8          THE WITNESS:  I took, John -- on my

9     estimate, what I took was what I had in front of me

10    at that particular time and --

11    BY MR. HUNTER:

12    Q.    You had documents in front of you, you

13    mean or --

14    A.    What I looked at was when that policy

15    change came and when I started doing different

16    and -- and the -- it says November the 15th, 2000

17    and I will -- I will stand that -- that I started

18    from then, due to a -- either an oral communication

19    or a written communication that I had.

20    Q.    Okay.  So you changed the way you did

21    your time sheets or -- I guess -- I don't know.

22    Trying to understand, what did Don Williams do

23    differently?

24    A.    Changed the way I reported it --

1          Q.    Okay.

2          A.    -- so that the time, as I recall it,

3    was still -- there might have been an hour and a

4    half on the timecard, but I just didn't put down --

5    I just didn't -- the time entering and leaving, say

6    would maybe be 6:30 to 5:30 --

7          Q.    Okay.

8          A.    -- and no overtime.  Or maybe one hour

9    of overtime when there would have been two or two

10   and a half hours of overtime.

11         Q.    And there's a change as of -- as I

12   understand your attorney, in November of 2000 in

13   the way you report your time on your time sheets.

14   Is that what you're telling me or just the way you

15   were paid?

16         A.    The way -- just didn't put the

17   overtime down.

18         Q.    Okay.

19         A.    Didn't put the overtime down.

20         Q.    Okay.

21         A.    Didn't put the overtime down.  So if I

22   was there nine and a half hours, I didn't put any

23   overtime down.

24         Q.    But you would have put the same start

1    and finish time; you just didn't mark the overtime

2    hours?

3           A.    Didn't mark the overtime.

4           Q.    Gotcha, I think.  Okay.

5                 MR. SIMON:  This will be less

6    confusing.  Mr. Williams had said about the AIP

7    bonus was cut in half, I think he said 2001 bonus.

8    I was -- perhaps the record's clear, but he was

9    referring to the 2001 bonus paid in 2002.  Maybe

10   you understood that.

11          Q.    Okay.  Anything else we need to fix?

12          A.    I don't think so.  That's best as I

13   can --

14                MR. SIMON:  Those are just the two

15   issues that I noticed needed clarified.

16                MR. HUNTER:  Okay.

17                MR. SIMON:  So perhaps the AIP one

18   doesn't even need clarified.

19          Q.    Is there anything else with respect to

20   the payment of overtime that you feel is not what

21   was represented to you, other than what we've

22   already talked about?

23          A.    If I recall it, I'll --

24          Q.    Okay.

1      A.      -- I'll come back to it.

2      Q.      And we've talked about AIP; we've

3    talked about overtime.  What else do you feel you

4    were entitled to that you haven't received from ZF

5    Batavia?

6      A.      John, I was put into a position of --

7    of area manager without compensation back when Dick

8    Newark came in and he changed things.  So, in my

9    opinion -- and those numbers aren't here, but I

10    should have been -- I should have been compensated

11    at that level that the job dictated.

12      Q.      You're telling me you received a

13    promotion without a bump in pay or you got paid

14    nothing?  I don't think I understand.

15      A.      It was -- it was a no-monetary gain

16    promotion.

17      Q.      Okay.  Why didn't you decline?

18      A.      At the -- at the time, it wasn't -- it

19    wasn't a do you want it or not.  It's this is

20    what -- this is what we need you to do.

21      Q.      Okay.  It's safe to say that your

22    salary has been increased every year since you

23    started with Batavia, correct?

24      A.      Correct.

69

1          Q.    And you received an AIP bonus, maybe

2    not to your liking, but an AIP bonus every year,

3    correct?

4          A.    Correct.

5          Q.    And so you're saying as well you

6    should have gotten additional compensation, at

7    least for some period of time based upon your

8    responsibilities as an area manager?

9          A.    Correct.

10          Q.    At what meeting or why did you believe

11    that that would be the policy at Batavia when you

12    signed on?

13          A.    Again, I was told that everything

14    would be the same.  And even coming over from Ford,

15    if you went up to another level, you -- you got

16    that other level of pay.

17          Q.    Every time?

18          A.    There wasn't a time that I didn't.

19          Q.    But you're certainly aware of others

20    that may have had increased responsibilities

21    without increased pay?

22          A.    Responsibilities and going up another

23    level are two different things.  So, yes, there's

24    times when you can be performing your same job and

1    just get some additional -- some additional

2    responsibility.  But when you go up another level,

3    that's -- that's different.

4         Q.    You're not currently an area manager,

5    are you?

6         A.    No.

7         Q.    Okay.  You've got in front of you,

8    Don, Exhibit Number -- well, yeah, Exhibit Number

9    90.  Have you had a chance to review that?

10        A.    I'm familiar with it.

11        Q.    Have you had a chance to review it,

12   though?  If you need time, take time.

13             MR. SIMON:  Off the record.

14        (Off the record:  9:44 a.m. - 9:45 a.m.)

15             MR. HUNTER:  Okay.  We're back on the

16   record.  I guess the record should reflect that Mr.

17   Pearce has joined the deposition this morning.

18        Q.    Mr. Williams, I've asked you to take a

19   minute to review Exhibit 90.  Have you had a chance

20   to review that?

21        A.    Mm-hmm.

22        Q.    Okay.  On the bottom left-hand corner,

23   that appears to be your signature down there --

24        A.    Yes --

1          Q.      -- on the left?

2          A.      -- that's correct.

3          Q.      Okay.  Do you remember who gave you

4    this document?

5          A.      Glen Marinetti.

6          Q.      Okay.  Did you read the document when

7    you received it?

8          A.      Yes, I did.

9          Q.      Do you remember any discussion you had

10   with Mr. Marinetti at the time that he gave it to

11   you?

12         A.      In particular, he walked into the

13   office -- he called me and asked me where I was

14   and -- and I told him that I was in the -- in the

15   area of department 832.  There's a conference room

16   upstairs in the -- in his own office.  He said,

17   Hang around.  I'll be down.  And he came down and

18   he basically put it in front of me and I read that

19   and -- and did the accept and signed it.

20         Q.      Okay.  Did you have any discussion

21   with him at that point in time about the letter or

22   your expectations?

23         A.      He just welcomed -- he said -- you

24   know, he welcomed me aboard and -- and, really,

1    that was the extent of --

2         Q.    Okay.  Did he give you any other

3    documents at that time?

4         A.    I was given the -- the offer from ZF

5    Batavia for the transition employee.

6         Q.    Okay.  You've nodded to the

7    document -- Mr. Simon's pulled out Exhibit 2.

8         A.    Mm-hmm.

9         Q.    He gave you that when you were out on

10   the floor?

11        A.    Mm-hmm.

12        Q.    Okay.  Is that the first time you had

13   seen that document?

14        A.    It seems like there was a -- given to

15   me personally was when I -- when I did this, but it

16   seems like -- it seems like I had seen it, but --

17   and I couldn't recall whether it was -- whether it

18   was -- where I had seen it.  But it seems like I

19   had seen it, but really not given to me personally

20   and --

21        Q.    Okay.  And, again, the discussion with

22   Marinetti was basically welcome aboard?

23        A.    Mm-hmm.

24        Q.    Okay.  That exchange took roughly how

1   long?

2          A.    He read -- we read this together.

3   Welcome aboard.  Gave me the brochure.  I looked at

4   it and -- maybe five minutes.

5          Q.    Okay.  Given the fact that this was a

6   change in employment after 20-plus years, would it

7   be safe to say that you had made up your mind to

8   make the jump prior to him coming out on the floor?

9          A.    We were told certain things, and based

10  upon what we were told, along with -- with this

11  document, yes.  And looking over that folder, it's

12  safe to say that I made up my mind then.

13          If I would have been -- based upon

14  what I was told and not seeing anything in

15  writing -- so to answer your question, I can't say

16  that my mind was already made up.

17          Q.    So in five minutes out on the floor,

18  you decided to leave 22-plus years at Ford?

19          A.    Once I put together, yes, what they've

20  told me is they're going to do now because I've got

21  some documents in front of me that I can believe

22  in, they've put some things in writing.  To me,

23  that solidified it.

24          Q.    But you --

1        A.    If -- if he would have brought

2    documents out that would have been different than

3    verbal communications that we would have had and it

4    would have not substantiated that, no, I

5    wouldn't -- I wouldn't have signed.

6        Q.    Can you tell me what in the gray

7    brochure stuck out in your mind then?

8        A.    What stuck out?

9        Q.    Mm-hmm.

10        A.    As far as I was concerned, the salary,

11    the vacation, the AIP.  I mean, I -- I looked at

12    that rather -- I felt like comprehensibly.  I

13    looked at the -- the -- the 401K plan that -- that

14    I had been verbally communicated to that that was

15    going to be because it was a -- it was a different

16    plan than a -- than a defined retirement plan.  And

17    I wanted to make certain that, yes, there was some

18    certain information in there that -- that was

19    around that.

20        Q.    Okay.  And you saw on the gray,

21    tri-fold brochure, Exhibit Number 2 that it said

22    that it was subject to change?

23        A.    The plan -- the agreement, as I

24    understood it, I -- I determined that, John, as a

1    condition of employment.  And I -- I felt like that

2    they would live up to that agreement on those

3    conditions.

4         Q.    That they would change?

5         A.    So when I saw that --

6              MR. SIMON:  I just object.  If you

7    want to show him the line you're talking about, you

8    can do that.  I just object to --

9         A.    I felt -- I felt like the plans as

10   referred to in that document was the vision, the

11   dental plan, because those normally change.  But

12   the other information -- the -- the retirement

13   was -- there was a specific rider on that that said

14   it would be guaranteed just like the Ford employee.

15   So I felt like that -- that I trusted that -- that

16   document.

17        Q.    In five minutes on the floor?

18        A.    John, I trusted that document, that

19   what it said there --

20        Q.    Okay.

21        A.    -- was I was willing to live up to

22   coming in every day and doing every day what they

23   expected me to do and I expected that to be what

24   they were going to do.

1          Q.     Okay.  You've made a comment that the

2     plans were going to change.  I don't understand

3     what you mean by that.

4          A.     Vision plan, dental plan, 401K plan.

5     And that document specifically said plan on 401.

6     If specifically said benefits for the vision and

7     the medical and -- so it specifically referred to

8     that.  I looked at that document.

9          Q.     Okay.  What wasn't going to change,

10     according to that document?

11          A.     What wasn't referred to as a plan, in

12     my opinion.

13          Q.     In preparing for today's deposition,

14     did you review that document?

15          A.     I've looked at that document a hundred

16     times.

17          Q.     In preparing for today's deposition,

18     did you look at that document?

19          A.     I looked at it as recently as --

20               MR. SIMON:  He just wants to know if

21     you looked at it, Don.

22               THE WITNESS:  Yes.

23          Q.     Okay.  And so which items in there say

24     they aren't going to change?

77

1          A.    I believe this -- I believe this

2    document says salary won't change.  I believe this

3    document says the AIP wouldn't change.  I believe

4    the merit increase program -- I believe this

5    document says it doesn't change.  I believe -- I

6    believe that maybe -- let me restate it.

7          The only thing that I believe this

8    document says can change is the medical, the

9    dental, the life insurance and the 401.  Those are

10   plans and in -- and in --

11         Q.    They're plans?  I guess -- what makes

12   them a plan?

13         A.    Because this specifically says

14   benefits plan.  The brochure says benefits plan.

15   And I look over here and I see benefits.  Salary,

16   to me, isn't a benefit.  That's a condition of my

17   employment.  So when this plan says key features of

18   the ZF Batavia plans, I interpret that as being

19   medical, dental, flexible spending account, life

20   insurance, accidental death, the other and the

21   401K.  Those are the plans.

22         Q.    Well, annual incentive says plan.

23         MR. SIMON:  I just object to the

24   extent you're asking him to draw a legal conclusion

1   about a plan.

2              MR. HUNTER:  I haven't asked for a

3   legal conclusion.  I asked for Don Williams'

4   interpretation.

5              THE WITNESS:  Well, I --

6              MR. SIMON:  I'm making an objection.

7   The witness can answer.

8         Q.   So if the plans can change, why can't

9   the annual incentive plan change?

10        A.   That's a condition of employment.

11        Q.   So it's --

12        A.   That's very specifically a condition

13   of employment and that was told that it was going

14   to be a condition of employment because if that had

15   never been set forth as a -- as a condition,

16   wouldn't have accepted.

17        Q.   Okay.  So when was this condition set

18   forth?

19        A.   When was it set forth?

20        Q.   Mm-hmm.  You just said it was "a

21   condition of employment."

22        A.   When I signed that document.

23        Q.   And when you say "that document,"

24   you're talking about Exhibit Number 90 --

```
1           A.     Exhibit Number 90.

2           Q.     -- that you reviewed for five minutes

3    out on the floor with Mr. Marinetti, correct?

4           A.     Correct.

5           Q.     Take a look at Exhibit 91 for me, if

6    you would, please.

7           A.     Okay.

8           Q.     Okay.  On Exhibit 91, do you see the

9    second page of that document?

10          A.     Mm-hmm.

11          Q.     Is that your signature that appears

12   there in three different places on that document?

13          A.     Yes, it is.

14          Q.     Okay.  I want to go back if we can for

15   a second to Exhibit Number 2.  You would

16   acknowledge that the medical, the dental, the life

17   insurance, the accidental death and dismemberment,

18   I think you said were all subject to change?

19          A.     I interpreted that, yes.

20          Q.     And that's because those are plans?

21          A.     I -- that's -- yes.

22          Q.     What about the 401K savings plan?

23          A.     I -- I thought I acknowledged that --

24          Q.     Okay.
```

1          A.     -- in my original answer.

2          Q.     And the annual incentive plan, in your

3     opinion, is not subject to change?

4                MR. SIMON:  Objection, asked and

5     answered.  You can answer again.

6          A.     That was condition of employment,

7     based upon me coming over.  And I was verbally told

8     that it would be based upon and it's, here again,

9     that we would be awarded on ZF Batavia's success.

10    ZF Batavia's success, as determined by product,

11    time and delivery, yes.

12         Q.     Okay.

13         A.     So I understand when I say, "yes," I'm

14    saying, no, that it wouldn't change, that they

15    would live up to that agreement as a condition of

16    employment.

17         Q.     You got to help me, Don.  What's a

18    condition of employment?

19         A.     To me, the condition of employment is

20    here's what we're going to -- here's your salary

21    and here's all those things that surround that.

22    And those are -- are things that are not going to

23    change and the other things, the plans -- some of

24    the plans may change.

```
 1          Q.    Okay.  Who told you the annual

 2   incentive plan wouldn't change?

 3          A.    The way that it's -- the way that it's

 4   dictated, we were told that -- that you'll have an

 5   annual incentive plan.

 6          Q.    Okay.

 7          A.    Now, it was based upon ZF Batavia's

 8   success, ZF Batavia's success.  And that's the way

 9   it's written here.

10          Q.    Okay.  But who said it wouldn't

11   change?

12          A.    When we initially -- in the cafeteria,

13   we were initially told you're going to come over,

14   nothing is going to change.  The AIP was, in fact,

15   a part of -- it was a replacement.  It was a

16   terminology that replaced Ford's -- I can't think

17   of the name of their -- their bonus.  It wasn't

18   really a bonus.

19          Q.    Profit sharing?

20          A.    Profit sharing plan, yes.  Profit

21   sharing.  We were told that there's going to be

22   a -- a board that was going to be put together of

23   three Ford and three ZF.  And they were going to --

24   so I felt comfortable.  That was a part of that
```

1  decision, too, because I felt comfortable that I

2  was going to have, if you will, a -- a family that

3  was still going to watch out for my best interest.

4          So that helped me make that decision

5  of it won't change.  I understood the parameters

6  around the plan as written here, that it would

7  be -- you'd be rewarded on ZF Batavia's success.

8  Those parameters -- I expected those parameters not

9  to change.

10         Q.    Okay.  But who at the meeting said

11  they wouldn't change?  Was that your expectation or

12  was there a representation made to you?

13         A.    When I was told that it's not going to

14  change, it's going to be the same, that's what -- I

15  expected it to be the same.

16         Q.    Okay.  Who said that?

17         A.    I remember Hassan specifically saying

18  they're going to put it in writing.  It's not going

19  to change.

20         Q.    Let's stick with Hassan for a minute.

21  Did Hassan speak at that meeting?

22         A.    No, no.  That wasn't that -- this

23  wasn't -- this was sometime after the meeting when

24  there was still some questions whether people were

1    going to go, whether they were going to go over or

2    not.  And you would see somebody that was

3    representing Ford and ZF to -- to entice the people

4    to sign over, just to make sure that, yeah,

5    everything is going to be the same.  We're not

6    going to lose anything.  That was -- that was a

7    huge step.

8         Q.    So Hassan told you that everything

9    wasn't going to be -- or that things would be the

10   same.  That's what you're telling me, correct?

11        A.    He was an individual, yes.

12        Q.    Okay.  This is not, then, at a meeting

13   that was organized by either ZF, ZF Batavia or

14   Ford?

15        A.    No.  It was outside of that cafeteria,

16   if that's what you're saying.

17        Q.    Okay.

18        A.    That was outside of that cafeteria

19   setting.

20        Q.    Let's talk about a formal meeting that

21   you went to where these representations may or may

22   not have been apparently made.  Let's stick with

23   the cafeteria meeting, for example, okay?

24             Did somebody at the cafeteria meeting

84

1    say annual incentive plan wouldn't change?

2         A.    They said here's what we're going to

3    offer and nobody indicated at the time that they

4    were going to change.  Nobody indicated at the time

5    you may or may not have AIP.  Nobody indicated at

6    the time that you're going to be paid less than

7    your ZF people that hired on.  Nobody indicated at

8    the time that the panel, the board of directors

9    that was going to set up wasn't going to happen.

10   Nobody indicated at the time that you're going to

11   be given some time and then taken away.  Nobody

12   indicated any of those things.

13           The indications that came out of those

14   meetings were this is what you're going to have as

15   a transition employee and we're going to look out

16   after you because we're going to establish this

17   panel and you're going to be protected.

18        Q.    All right.  Let's try and move on now.

19   You've told me about AIP, overtime.  What else has

20   not been as was represented to you?

21        A.    They changed the amount of sick days.

22        Q.    Okay.  What else?

23        A.    Merit increase.

24        Q.    Okay.  What was represented to you

1    regarding the merit increase?

2         A.    That there would be a merit program,

3    but I had no idea that it was going to be different

4    than -- than -- in other words, I'm saying I was

5    penalized for being a transition employee and I

6    never was indicated that -- that I would be

7    penalized for that.

8         Q.    Okay.  Let's back up a second to the

9    question I asked.  What was represented to you?

10        A.    That I would have a merit program.

11        Q.    Okay.  Anything else with respect to

12   the merit program?

13        A.    No, not that I can recall.

14        Q.    Okay.  What else has ZF Batavia not

15   followed through on?

16        A.    If I -- I've omitted anything

17   verbally, it would be indicated in the -- in the

18   interrogatory answers.

19             MR. SIMON:  Mr. Hunter, I know you're

20   not trying to short Mr. Williams.  He had said two

21   other things in passing of two things that they had

22   promised that hadn't happened.  I know you're

23   trying to be thorough, so I just want to --

24             MR. HUNTER:  Give me a hint.  What am

1    I missing?

2              MR. SIMON:  He had mentioned CVT, the

3    ground floor CVT.  This was way before we took our

4    break and just now he mentioned the panel.

5              MR. HUNTER:  Okay.  But we've kind of

6    talked about that.

7              MR. SIMON:  Okay.  I didn't hear you

8    list the CVT when you listed them a second ago.

9    BY MR. HUNTER:

10        Q.    All right.  Anything else?

11        A.    Not that I recall.

12        Q.    Okay.  Don, you had made mention of

13    your transition bonus before.  You received

14    $17,000?

15        A.    Yes.

16        Q.    Okay.  And do you believe you're

17    entitled to any additional transition bonus or you

18    got the 17 that was told to you?

19        A.    I -- I lost -- I think I lost it.

20        Q.    And that goes to the AIP discussion we

21    had?

22        A.    That goes back to the AIP.

23        Q.    Okay.  Well, you were to receive three

24    payments of -- where was it?  5,666.66 --

```
1          A.    Yes.

2          Q.    -- you received those three payments,

3    correct?

4          A.    Yes.

5          Q.    Did you also receive the one-time

6    signing bonus?

7          A.    Yes.

8          Q.    What was the $17,000 paid to you for?

9          A.    I understood it to be some specifics

10   and A Plan loss, defined retirement program and

11   maybe some of the other little perks we got at Ford

12   that -- that were different.  But specifically, I

13   believed it to be defined loss of -- the defined

14   retirement plan and the A Plan.

15         Q.    To make up for those differences, in

16   terms of benefits, whether it's the retirement

17   benefit or the A Plan?

18         A.    A Plan and the defined retirement

19   plan.

20              MR. HUNTER:  Okay.  Tell you what.  As

21   it is after 10:00, I'll let Mr. VanWay have a

22   couple minutes here.  I'm not finished, but I know

23   that Mr. Pearce is scheduled for 11.  See if we can

24   keep on track.
```

```
 1              (10:07 a.m.)

 2              MR. SIMON:  Just "a couple minutes"

 3     for Mr. VanWay sounds promising.

 4              MR. VANWAY:  He said that, I didn't.

 5                        EXAMINATION

 6     BY MR. VANWAY:

 7         Q.    Good morning.

 8         A.    Morning.

 9         Q.    Mr. Williams, you and I have not met

10     before.  I'm Jeff VanWay.  I represent Ford in this

11     case and I've got some questions for you this

12     morning as well.  I'll try not to duplicate the

13     questions that Mr. Hunter has already asked you.

14     If I do, I apologize.  It's not intentional.  We've

15     got somewhat different interests in this case.

16         A.    I beg to differ.  We met at -- we met

17     at --

18              MR. SIMON:  Karl Kehr's --

19         Q.    Oh, okay.  You're right.  I apologize.

20     I have lost track, I'm sorry, of everyone that I've

21     met in this case.

22         A.    See, I've got a -- I'm over 50, so I

23     can --

24         Q.    I don't have an excuse.
```

```
 1          A.    You don't have an excuse.

 2          Q.    Fair enough.  Mr. Williams, I'd like

 3   to show you what's previously been marked in this

 4   case as Exhibit 57.  I'll submit to you that's from

 5   your personnel file at Ford Motor Company.  If you

 6   look at the bottom of that document, does that

 7   appear to be your signature, Mr. Williams?

 8          A.    That appears to be my signature.

 9          Q.    Do you have any reason to dispute that

10   this is a document you signed while you worked for

11   Ford?

12          A.    I -- restate the question.  I was

13   reading.

14          Q.    Sure.  Do you remember signing this

15   when you worked for Ford?

16          A.    No.

17          Q.    Do you have any reason to believe that

18   you didn't sign this while you worked for Ford?

19          A.    That looks like my chicken scratching,

20   so I would say I signed this document.

21          Q.    Okay.  And if you look, Mr. Williams,

22   at the third paragraph of that document where it

23   starts, "I understand that my employment," would

24   you take just a moment and read that paragraph to
```

1    yourself and let me know when you've done so?

2         MR. SIMON:  Can you read it?

3         THE WITNESS:  Yeah, I can.

4         MR. SIMON:  Well, read it out loud, if

5    you --

6         THE WITNESS:  Okay.

7    Q.    Okay.  Now, that, as I read it, Mr.

8    Williams, that paragraph appears to say that your

9    compensation at Ford was subject to such

10   adjustments as Ford may from time to time

11   determine.  You agree with me that that's what the

12   document says, right?

13   A.    That's what the document says.

14   Q.    And that's how you understood things

15   to operate while you were employed with Ford; is

16   that correct, that your compensation changed from

17   time to time as Ford determined?

18   A.    It went up, yes.

19   Q.    Okay.  Did your benefits change from

20   time to time while you worked at Ford?

21   A.    When you're speaking of "benefits,"

22   you want to be more specific?

23   Q.    Well, your health insurance premiums

24   changed?

1          A.     Health insurance changed, yeah.

2          Q.     The -- Ford changed its overtime

3     policy from time to time, didn't it?

4          A.     Once the -- no.

5          Q.     Wasn't there a period of time,

6     Mr. Williams, in fact, in the early eighties where

7     the company stopped paying for overtime?  Do you

8     remember that?

9          A.     No.

10         Q.     May have went to comp time --

11         A.     No.

12         Q.     -- for salaried employees?  You don't

13    recall that?

14         A.     My -- my pay was never changed for the

15    overtime.  When I went in there, I got --

16    excluding -- I started as a guard, now.  When I

17    started as a guard, as a plant security person, we

18    got -- there was a specific amount because we got

19    five percent operational pay because it was

20    seven-day operation.

21              So that was different, but that plan

22    as it existed then, it never changed while I was

23    there.  And then once I came on board in

24    supervision, it never changed.

1       Q.   Let me ask this, then, Mr. Williams.

2  Would you agree with me that while you were

3  employed by Ford, had they wanted to change the

4  overtime policy, that was something that was within

5  their discretion to do so?  Do you agree with that

6  statement?

7       A.   I would agree with that statement.

8       Q.   They didn't, for example, have to come

9  to you and get your approval before making a change

10  to the overtime policy?

11       A.   I would agree with that.

12       Q.   And, in fact, if they decided they

13  weren't going to pay overtime to salaried employees

14  anymore, they wouldn't have had to get your

15  approval to put in that sort of change, would they?

16       A.   I agree with that.

17       Q.   Are you familiar with the term

18  "at-will employee"?

19       A.   Recently, yes.

20       Q.   Okay.  What's your understanding of

21  that term?

22       A.   To me, that's a -- that's a

23  broad-based term that says I don't like your tie,

24  you're out.

93

1       Q.    Did you understand that to be the way

2    things were when you were a salaried employee at

3    Ford --

4       A.    No.

5       Q.    -- that Ford could terminate you

6    without cause if they wanted to?

7       A.    No.

8       Q.    You didn't understand that?

9       A.    No.

10       Q.    You thought they had to have cause?

11       A.    Yes.

12       Q.    Did you ever receive a document from

13    Ford that said they had to have cause to terminate?

14       A.    Did I ever receive --

15       Q.    Yes, sir.

16       A.    -- a document?

17       Q.    Yes, sir.

18       A.    No.

19       Q.    That's just your understanding of how

20    things operated?

21       A.    Well, I understood that there was --

22    never in -- in my years at Ford, did I know they

23    just brought somebody in and said, you're out of

24    here.  It was always -- they had a -- they had

94

1    plan.  They had clear-cut goals and objectives and

2    they sat down with you on a timely basis, went over

3    your plans and objectives with you and quarterly

4    your -- your supervisor would go in with you, they

5    would go over where you were, where you were weak

6    at.  And if you were weak, they would try to come

7    up with somebody to put with you to make sure you

8    got where you needed to be and it was a defined

9    process.  Very much different, in my opinion, as --

10   very much in contradiction to at will.

11        Q.    Okay.  Well, let me ask you this.  Do

12   you dispute that had Ford wanted to terminate you

13   for any reason, that they could have done so?  Do

14   you dispute that?

15        A.    No.

16        Q.    Okay.  And when you went to ZF

17   Batavia, you understood you were going to be an

18   at-will employee there as well, didn't you?

19        A.    No.

20        Q.    You didn't understand that ZF Batavia

21   could terminate you for any reason?

22        A.    No.

23        Q.    How is it that ZF Batavia can

24   terminate you?  Can they terminate you at all?

1          A.    Yes, but their policy as -- as -- from

2    what I signed on my ZF application and what it is

3    now, that policy is very much different.

4          Q.    From time to time you signed --

5          A.    If I would --

6          Q.    -- the application, things have

7    changed?

8          A.    If I would have signed -- if I would

9    have seen ZF's policy the way it is written now

10   versus -- and it was changed some -- a year

11   afterwards, if that would have been presented in

12   front of me at will as strongly as it's worded now,

13   I wouldn't have signed it.

14         Q.    Okay.  So if at the time you applied

15   with ZF Batavia they had told you that your

16   employment was going to be at will, you wouldn't

17   have accepted employment then?

18         A.    The way it's worded now, no.

19         Q.    Do you still have Exhibit 91 in front

20   of you?

21         A.    Yes.

22         Q.    Will you take a look at the second

23   page of that document?

24         A.    Yes.

1        Q.    First section where your signature

2   appears --

3        A.    Yes.

4        Q.    -- the middle paragraph there.

5        A.    Yes.

6        Q.    Can you take just a moment and review

7   that paragraph?  Let me know when you've done so.

8        A.    I -- I've reviewed.

9        Q.    Okay.  Do you see in the second

10  sentence there where it says, "I understand that my

11  employment is not to be for any definite term and

12  it may be terminated at any time by either myself

13  or my employer"?

14       A.    Yes.

15       Q.    Okay.  Is that your understanding of

16  how things were when you hired on at ZF Batavia?

17       A.    This -- this, in my opinion, would

18  be -- I understood that -- that, yes, there's a --

19  there's a -- there could be a separation.

20       Q.    Okay.

21       A.    But I didn't understand that it's like

22  it is now.

23       Q.    Well, how is it now?

24       A.    Didn't need a reason.  You're black,

1    get out.  You're bald, get out.  It's very

2    strongly -- if you had that document in front of

3    you, you would see what I was saying.  You would

4    see what I was talking about.  It's very much

5    different than this agreement that I signed with

6    Ford and/or ZF when I originally signed it.

7         Q.    The same paragraph that we were just

8    looking at, Mr. Williams, if you continue --

9         A.    "Regardless of my personnel policies

10   or practices adopted by the Company"?

11        Q.    Right.  And into the next sentence, it

12   says, the only way any differing commitment

13   regarding my employment may be made is by a written

14   agreement signed by the director of human resources

15   of the company.  Do you see that sentence?

16        A.    Mm-hmm.

17        Q.    Do you have a written employment

18   agreement that's signed by the director of human

19   resources of ZF Batavia?

20        A.    No, I don't.

21        Q.    Now, we talked a little bit earlier

22   about changes that took place while you were at

23   Ford.  You said that you always got a raise; is

24   that right?  Your compensation always went up when

98

1     you were at Ford?

2          A.     Mm-hmm.

3          Q.     Did you get a raise every --

4          A.     I can't say that I did.

5          Q.     Some years that you may not have

6     gotten a raise?

7          A.     Could have been possible.

8          Q.     And you understood it was up to the

9     company how much of a raise you were going to get?

10         A.     It wasn't always up to the company.

11    It was up to the individual.

12         Q.     So you could go in and tell your boss

13    how much of a raise you were going to get; is

14    that --

15         A.     No, but Ford's policy could have been

16    10 percent and your boss could have said three

17    percent.

18         Q.     Okay.  But you understood that it was

19    up to the company as to whether you were going to

20    get 10 percent, three percent, zero percent, right?

21         A.     As I recall, it was up to my

22    supervisor.  I don't know that there was ever a

23    time that -- that there wasn't any given -- that

24    there wasn't any given out, as I recall it.

99

```
 1          Q.     Okay.  Did it vary from year to year?
 2   Some years you received more; some years you
 3   received less?
 4          A.     The years that -- I'd have to go back
 5   and look at that form to see.  I don't recall it --
 6   I don't recall it being any less.
 7          Q.     Is it your understanding that you got
 8   the same raise every single year that you worked
 9   for Ford for 22, 23 years?
10          A.     I think the percentage -- I think the
11   percentage for merit -- I don't recall it
12   decreasing.
13          Q.     What percentage did you get?
14          A.     Seems like five was probably the
15   lowest and -- I'd have to look at the documents.
16          Q.     You said five was probably the lowest.
17   That leads me to believe that some years it may
18   have been more than five?
19          A.     Mm-hmm.
20          Q.     Okay.  So you didn't get the same
21   increase every single year, right?
22          A.     I thought I answered that.
23          Q.     Well, you did, but then I think you
24   changed by some -- you confused me by something you
```

1    said later.  You said the lowest you ever got was

2    five, and then I believe you said that there may

3    have been years when you got more than five, which

4    is fine.  I just want to know, did you get the same

5    amount every -- the same percentage every single

6    year you were with Ford?

7        A.    No.  I think -- I think it progressed,

8    but I'd have to -- I'd have look at it to see --

9        Q.    Okay.

10       A.    -- how --

11       Q.    That's fine.

12       A.    I can't recall.

13       Q.    Do you recall in the early eighties,

14   say the '82, '83 time frame, some lean years for

15   Ford and no merit increases at all were awarded?

16   Do you recall that time frame?

17       A.    21 years ago.  You know, I don't.

18       Q.    Now, you testified earlier that you

19   used to get a profit sharing bonus at Ford?

20       A.    Mm-hmm.

21       Q.    And the amount of your profit sharing

22   bonus varied, depending on how the company was

23   doing, right?

24       A.    That was -- that was predetermined.

1    It was -- it was a set amount as predetermined and

2    the only way that it -- that it varied was -- was

3    based upon a certain -- they had a formula and you

4    always knew what that formula was even before

5    profit sharing days came out, so --

6        Q.    But the amount that you, as an

7    individual, received wasn't the same every year,

8    was it?

9        A.    No.

10       Q.    And the percentage that you received

11   every year was not the same, was it?

12       A.    No.

13       Q.    Okay.  And, in fact, there was some

14   years where there wasn't a profit sharing at all

15   paid; is that right?

16       A.    No.

17       Q.    No?  Do you have Exhibit 4?

18       A.    As I recall, no.

19            MR. SIMON:  Let me find it.

20            MR. VANWAY:  If Mr. Simon could

21   provide you with Exhibit 4, I would appreciate

22   that.

23            MR. SIMON:  Let's see.  Which ones are

24   we done with?  Are we done with 90?

```
1              THE WITNESS:  We done with 57 and --

2              MR. VANWAY:  Yes.

3              THE WITNESS:  -- 90, 91?

4              MR. VANWAY:  We are, at least for

5    right now.

6    BY MR. VANWAY:

7         Q.   Exhibit 4, actually if you could turn

8    just to the first page first, and then I'm going to

9    direct you to page 18 in just a moment.

10             MR. SIMON:  Okay.

11        Q.   Exhibit 4, as I understand it, are

12   some slides that may have been put up at the May

13   27th, '99 meeting.  Is that your understanding of

14   Exhibit 4 as well?

15        A.   Mm-hmm.

16        Q.   Now, then, if you flip to page 18,

17   which is a chart that shows Ford historical profit

18   sharing.  And you see there for the years '91, '92

19   and '93, it shows a zero percent?

20        A.   I don't recall it, but if it's here, I

21   don't -- I don't recall.

22        Q.   Okay.  And I believe you already

23   testified that from time to time, your health

24   insurance changed?
```

1        A.     Mm-hmm.

2        Q.     But the amount you paid personally out

3  of your pocket changed, right, from time to time?

4        A.     Mm-hmm.

5        MR. SIMON:  He's done asking about

6  that.

7        Q.     Do you also --

8        A.     Are you finished with this?

9        Q.     I am for the moment.  Do you recall in

10  the early eighties, around 1982, again, some lean

11  times for Ford, that they canceled a number of

12  vacation days for employees, six, I believe?  Do

13  you recall that happening?  You need to answer out

14  loud so she's can get that.

15        A.     No, no.

16        Q.     Do you recall that prior -- just

17  shortly prior to the time that you accepted

18  employment with ZF Batavia, that Ford switched from

19  a profit sharing to a performance bonus system?  Do

20  you recall that happening?

21        A.     That would have been when?

22        Q.     It would have been in 1999.

23        A.     You're saying they stopped -- you're

24  saying they stopped the profit sharing?

```
 1          Q.    I'm asking if you remember a time in

 2     1999 where Ford discontinued the profit sharing

 3     plan and instead put in a performance bonus system.

 4     Do you recall that happening?

 5          A.    No.

 6          Q.    Okay.  Now, you testified as to a

 7     number of promises that you believe were made to

 8     you prior to the time you accepted employment with

 9     ZF Batavia.  I think I've got them all, but I want

10     to go through them to some extent.

11               The first, I believe you said, was

12     kind of a general promise that nothing will change?

13          A.    (Witness nodded.)

14          Q.    Did someone actually say that, nothing

15     will change?

16          A.    Mm-hmm.

17          Q.    And who actually said that?

18          A.    That was in the meeting that was held

19     out on the floor in front of the plant hospital.

20          Q.    Is that at the time the joint venture

21     was first being announced?

22          A.    When it was -- when it was first

23     announced.

24          Q.    And that was the video conference with
```

```
 1    Jacque Nasser?

 2         A.    Yes.

 3         Q.    Okay.  But later you understood that

 4    things were going to change, right?

 5         A.    After -- that came about after -- if

 6    I'm correct, after I had signed, then it said there

 7    were going to be some -- some things started to

 8    change.

 9         Q.    Well, even before that.  If you go

10    back to the video conference, didn't Mr. Nasser or

11    somebody else in that video conference say that

12    everyone would be able to remain a Ford employee

13    and stay at the Batavia plant?  Do you remember

14    that being said?

15         A.    Yes.

16         Q.    But later --

17         A.    I don't recall whether it was Nasser

18    that said that.

19         Q.    But someone -- someone at that time

20    said that?

21         A.    Someone at that time.  As I recall, he

22    just announced a joint venture on the global

23    teleconference thing and it seems like it was

24    somebody else -- it seemed like it was another
```

1    representative of Ford and ZF that said that --

2    that assured us we would remain Ford employees.

3         Q.    Okay.  But, of course, by the time you

4    accepted employment with ZF Batavia, you knew that

5    that wasn't going to be the way it was, right?  You

6    knew that you were going to have to be a ZF Batavia

7    employee if you were going to work in the Batavia

8    plant, right?

9         A.    Yes.

10        Q.    Okay.  Now, you also testified about

11   the AIP.  I believe you said that the only change

12   that's taken place that's affected you is one year

13   you got 4,000 and -- or you got 4,000 less than you

14   think you should have, right?

15        A.    As I recall it, yes.

16        Q.    Okay.  Now, did anyone prior to the

17   time you accepted employment with ZF Batavia, did

18   anyone ever communicate to you a specific dollar

19   amount as to how much your AIP was going to be?

20        A.    No.

21        Q.    Did they ever communicate to you a

22   specific percentage as to what your AIP was going

23   to be?

24        A.    No.

1        Q.    Did they ever tell you your AIP will

2    never fluctuate, it will be the same every year

3    while you're with ZF Batavia?

4        A.    They told me your AIP is based upon

5    the overall performance of the plant.

6        Q.    Okay.  I'm asking a specific

7    question --

8        A.    And I --

9        Q.    -- Mr. Williams.

10       A.    -- I understand that.

11       Q.    And the specific question is, did

12   anyone tell you that your AIP will never fluctuate

13   while you're with ZF Batavia?

14       A.    No.

15       Q.    Okay.  Did anyone in any of the

16   communications with you prior to the time that you

17   accepted employment with ZF Batavia tell you that

18   you, as an individual, would receive a larger AIP

19   bonus than the new ZF new hires would receive?

20       A.    They didn't tell me I wouldn't.

21       Q.    I understand.  I'm asking if they ever

22   told you you would?

23       A.    No.

24       Q.    In fact, they didn't tell you one

1   thing one way or the other with respect to

2   comparing your pay and benefits to ZF new hires,

3   did they?

4        A.    If there were nothing to hide, why

5   wouldn't it be disclosed?

6        Q.    I'm asking you, did they tell you one

7   way or the other?  Did they tell you how your pay

8   was going to compare to ZF new hires?

9        A.    No.

10       Q.    They tell you how your benefits were

11  going to compare with ZF new hires?

12       A.    No.

13       Q.    Who is it that changed your AIP, do

14  you know?

15       A.    I can only suppose.  I don't know.  It

16  was either Dick Newark or above.

17       Q.    Do you have any reason to believe that

18  anyone from Ford was involved in you not getting as

19  large an AIP as you believed you should receive?

20       A.    Well, I believe that if -- I was told

21  in the very beginning that there was going to be a

22  council.  There was going to be a board of

23  directors.  There was going to three Ford and there

24  was going to be three ZF and there was going to be

1    the president that was going to sit on that board.

2              And the promises that were made at

3    that time was surrounding that -- that board of

4    directors.  There were going to be three Ford

5    people on there.  I felt very comfortable in that

6    they were going to do what they said they were

7    going to do.

8         Q.    I understand.  My question is much

9    more specific.  It's with respect to your AIP.  As

10   you sit here today, do you have any reason to

11   believe that anyone from Ford was involved in the

12   decision to give you less of an AIP than you

13   believe you should have received?

14        A.    Yes, yes --

15        Q.    Who from --

16        A.    -- yes.

17        Q.    -- Ford, if you recall?

18        A.    Yes, because if the board -- if the

19   board would have been -- if that board would have

20   been formed, I don't believe that I would have been

21   gotten -- I would receive less.

22        Q.    Okay.  But my question is much simpler

23   than that, okay?  I don't want to know -- we'll

24   talk about the board, okay?  What I want to know,

1    as you sit here today, do you have any reason to

2    believe that anyone from Ford either made the

3    decision or was involved in the decision to give

4    you less of an AIP than you believe you should have

5    received?  Do you have any reason to believe that

6    anyone from Ford was a part of that decision?

7         A.    Yes.

8         Q.    Who from Ford was part of that

9    decision?

10        A.    The ones that didn't get on the board,

11   like I was told that they were going to be there.

12        Q.    If they had been on the board --

13        A.    To name names --

14        MR. SIMON:  Mr. VanWay, I understand

15   maybe he's not giving the answer that you're

16   looking for, but if you can just let him finish his

17   answer.

18        MR. VANWAY:  That's fine.  It's not

19   that I'm not getting the answer I'm looking for.

20   It's that he's not answering my question.

21        MR. SIMON:  I think he's trying.

22        THE WITNESS:  I'm answering him.

23        MR. SIMON:  He's trying to.

24   BY MR. VANWAY:

1          Q.     Let me back up, okay?  I understand

2     that one of your allegations is that there should

3     have been a board, that you were promised that

4     there'd be a board and that there isn't a board --

5          A.     Absolutely.

6          Q.     -- fair?  Okay.  So since there's not

7     a board as you believe there should be, then no one

8     that is on that board that doesn't exist could have

9     been involved in this decision, right?  That didn't

10    make much sense, did it?

11         The reason I'm confused, Mr. Williams,

12    is I believe what you're saying is that if there

13    had been a board, then you think that you would

14    have gotten the AIP the way that you think you

15    should have received it, right?  Your AIP would be

16    correct if there'd been this board; is that a fair

17    statement?

18         A.     Yes --

19         Q.     Okay.

20         A.     -- because I'm also going back to it

21    was cost plus and anything -- that our salaries

22    were going to be supplemented by this -- this cost

23    plus and that it technically wasn't going to cost

24    ZF anything, that Ford was going to pay that.  So

1    why -- why wouldn't they?  You know, when they

2    were -- when they were looking after me on the

3    board when it's going to be the cost plus and Ford

4    is going to pay this, maybe it was a bad

5    assumption.  Now I understand it must have been a

6    bad assumption on my part to say that, yes, that's

7    the way it would be.

8         Q.    Well, there is a board of directors at

9    ZF Batavia, correct?  ZF Batavia has a board of

10   directors, correct?

11        A.    Yes.

12        Q.    And that board consists of three

13   individuals from ZF and three individuals from

14   Ford; is that correct?

15        A.    I've asked who those individuals were

16   and couldn't get names, but I understand that -- I

17   understand that there is some type of a board.

18        Q.    Okay.  With three representatives from

19   both of the parent companies who got together and

20   formed the JV.  Is that your understanding, three

21   from ZF, three from Ford?

22        A.    That's -- that was my understanding.

23        Q.    And Mr. Adams in some way, shape or

24   form is associated with the board of directors,

```
 1   isn't he, Dave Adams?

 2        A.    I don't -- I can't -- I don't know the

 3   makeup but --

 4        Q.    Do you know whether he's on the board?

 5        A.    I think there was some -- I think

 6   there was some discussion as to how -- what his

 7   role would be, but I don't understand exactly what

 8   that would be.  I imagine he's on it.

 9        Q.    Okay.  What's different about the

10   board of directors of ZF Batavia than the board

11   that you believed was going to exist?

12        A.    I thought there would be -- I was led

13   to believe that there would be a panel and I -- and

14   I thought it was going to be on site.  I didn't

15   know they were going to be scattered around the

16   world, but that would -- that would run that

17   company, that would run ZF Batavia.  And my

18   understanding was that it -- that it would be

19   comprised of different members of both companies.

20        Q.    Okay.  But there is a board that runs

21   ZF Batavia, right?  I mean, the board of directors

22   run ZF Batavia, don't they?

23        A.    Well, I don't know that there's -- I

24   don't know that there's -- those Ford people that's
```

1    there, I don't know that they ever were.  And if

2    they were, then that's who didn't give me my --

3    that's who didn't give me the correct merit that I

4    should have got.

5         Q.    The board of directors?

6         A.    Yeah.

7         Q.    Okay.  So it's a board of directors.

8    Are we talking merit or we talking AIP?

9         A.    Well, you asked me AIP.

10        Q.    I asked you AIP.

11        A.    You asked me AIP?

12        Q.    Yeah.  The board of directors is

13   responsible for you not getting the proper AIP?

14   I'm asking.

15        A.    I can only assume that.  I can only

16   assume that they didn't.  Somewhere in there, it

17   changed.  I just thought it would be fair and

18   equitable and it looks like it wasn't fair and

19   equitable.

20             So I can only assume that -- that

21   that's where it came from.  I don't know that's

22   where came from.

23        Q.    Okay.  I think you've answered my

24   question.  Thank you.

1           Now, while you were at Ford, you

2    certainly knew that things were subject to change,

3    right, in terms of benefits?  You knew those were

4    subject to change, didn't you?

5           A.    Mm-hmm.

6           Q.    You knew that overtime was subject to

7    change, right?

8           A.    I never knew 'cause mine never

9    changed.

10          Q.    Okay.  But I believe you testified

11   earlier that you understood that the company had

12   the ability to do that --

13          A.    They could --

14          Q.    -- if they --

15          A.    -- have the ability to do that.

16          Q.    Okay.  Did you also understand, then,

17   as you went to ZF Batavia that they also had the

18   ability to change their policies if they wanted to?

19          A.    No.  ZF Batavia said everything --

20   what you have now is going to stay intact.  I

21   believed that it would stay in tact.  I believed

22   that.  I believed that as a transition employee,

23   that they were telling me sorts of things that may

24   not apply to a nontransition employee, yes.  So the

1    answer is, no, I didn't believe that it could

2    change.

3         Q.    Okay.  And you believed that they were

4    telling you that things would never change as long

5    as you were at ZF Batavia, correct?

6         A.    I believe that for my transition, as

7    being a transition employee, I believe that what I

8    took in there is what I would have.

9         Q.    For the rest of your tenure at ZF

10   Batavia?

11        A.    I believe that.

12        Q.    But no one actually told you that it

13   would be for the rest of your tenure, did they?

14        A.    No one told me it wasn't going to be

15   for the rest of my tenure.

16        Q.    I understand that.  You didn't answer

17   my question.

18        A.    Oh, I thought I did.

19        Q.    Did anyone --

20        A.    I answered it.  I didn't give you the

21   answer you wanted.

22        Q.    Well, no, actually you didn't answer

23   it, so let's try again.

24             MR. SIMON:  I think he -- I think he

1    did answer, but you can answer -- ask it again so

2    it's clear on the record.  Go ahead and ask the

3    question.

4        Q.   Did anyone either from Ford or ZF

5    Batavia as you're making this decision-making

6    process to come over to ZF Batavia, did anyone tell

7    you things will never change as long as you're with

8    ZF Batavia?

9        A.   I remember meeting with Hassan where

10   Hassan said they're putting it in writing.  It's

11   not going to change.  You're not going to lose

12   anything.  Everything is going to be the same.

13       Q.   Did he say it will never change?

14       A.   He said it's not going to change.

15   You're not going to lose anything.

16       Q.   When was this conversation with

17   Hassan?

18       A.   It was prior to -- I can't tell you

19   the exact date.  It was prior to my coming over.

20       Q.   Okay.

21       A.   Rick Williams was another individual

22   that said it -- you know, it looks like the only --

23   the only difference here is going to be going from

24   the nondefined retirement plan -- to a defined to a

1    nondefined.

2            There was a big discussion around the

3    retirement plan.  Rick Williams was another

4    individual that was -- the only thing that's going

5    to be any different here is our -- is our

6    retirement plan.  Everything is the same.

7        Q.    Now, when you were with Ford, if you

8    had questions regarding benefits, would you direct

9    those to the HR people, right?

10        A.    Yes.

11        Q.    You understood that the HR people were

12    responsible for benefits, right?

13        A.    Yes.

14        Q.    Okay.  Hassan, he wasn't responsible

15    for benefits, was he?

16        A.    I believe he was acting as a

17    representative at that time.  He was a agent that

18    was acting in Ford's behalf, soliciting me for

19    hire.

20        Q.    You say he was an agent.  What does

21    that mean?

22        A.    That means he was employed by Ford

23    Motor Company.

24        Q.    Okay.

1        A.    So he was out actively pursuing people

2    on the floor to change companies.  And, in my

3    opinion, he was a agent for Ford Motor Company that

4    was trying to get me to -- to do something.

5        Q.    I understand your testimony.  My

6    question was very simple.  Did you understand that

7    he had responsibility for the benefit plans at Ford

8    Motor Company?

9        A.    At that particular time, yes, I

10   understood that, and Rick Williams.  I understood

11   that, and Karl Kehr.

12       Q.    Anyone else?

13       A.    Those individuals.

14       Q.    Okay.  Since you've left Ford, have

15   you had any questions about your retirement?

16       A.    Yes.

17       Q.    Have you attempted to contact the NESC

18   about those questions?

19       A.    No.  I tried to get into the computer

20   on -- on one occasion, I believe it was, and then

21   found my number had been deleted out of the system

22   and I couldn't get into there because we were told

23   you'll always have access to that.  You'll always

24   be able to get into that.  And, no, have I picked

1   up the phone and called, no.

2        Q.    Have you picked up the phone and

3   called anyone from Ford?

4        A.    No.

5        Q.    Have you spoken to Hassan about it?

6        A.    About my retirement?

7        Q.    Yeah --

8        A.    No.

9        Q.    -- to see if he could get you the

10  access.

11       A.    No.

12       Q.    Have you spoken to Rick Williams about

13  it?

14       A.    No.

15       Q.    Karl Kehr?

16       A.    No.

17       Q.    At the time you spoke to Hassan and he

18  told you that things were not going to change, that

19  they were putting it in writing, did you believe

20  Hassan?

21       A.    Sure, I believed it.

22       Q.    Did you have any reason to believe

23  that Hassan knew that down the road, ZF Batavia was

24  going to make changes to overtime policies, AIP

1    policies, et cetera?

2         A.    Did I -- did I have any reason to

3    believe?

4         Q.    Reason to believe that at that time,

5    Hassan knew that those changes were coming down the

6    road?

7         A.    I can't tell you what Hassan knew at

8    that time.  The only thing I can tell you is what

9    he conveyed to me.

10        Q.    I'm asking you, at the time that he

11   told you that, did you think that he knew things

12   were going to change down the road?

13        A.    I don't know what he thought down the

14   road.

15        Q.    Okay.

16        A.    I mean, that's -- I can't tell you

17   what he thought.

18        Q.    So if Hassan, for example, were to

19   testify that whatever he communicated to you was

20   truthful information as far as he knew, you'd have

21   no reason to dispute that?

22        A.    No.

23        Q.    Same for Rick Williams?

24        A.    True.

122

1          Q.    Same for Karl Kehr?

2          A.    True.

3          Q.    Now, the overtime change that you

4    testified to previously, do you know who made that

5    change?

6          A.    No, I don't.

7          Q.    Is it Len Sennish, do you know?

8          A.    I have -- I have no idea.  Could have

9    been Len; could have been Dick; could have been

10   Dave.  I have no idea who actually --

11         Q.    Do you have any reason to believe that

12   it was anyone from Ford that actually made that

13   change?

14         A.    You won't like this answer, but I

15   don't know -- I don't understand.  I don't know

16   that it was not anyone from Ford that -- that made

17   that.

18         Q.    Okay.  That's one answer.  But the

19   question is, do you know whether anyone from Ford

20   was involved?

21         A.    I believe they were.

22         Q.    Okay.  Who from Ford was involved?

23         A.    Who was ever on the board.

24         Q.    Who's on the current board of

1    directors?

2         A.    Who was on the board at the time.

3         Q.    Okay.  So whoever was on the board of

4    directors at that time were the people that were --

5    that made the overtime change?

6         A.    In my book, yes.

7         Q.    Do you know whether changes like that,

8    overtime changes go up that high to the board of

9    directors?  Do you have any idea?

10        A.    No, I don't.

11        Q.    Now, you testified earlier about

12   another promise that wasn't kept was you said you

13   don't think you were paid properly for the area

14   manager job.  At the time you were making your

15   decision to accept employment with ZF Batavia, did

16   anyone communicate to you anything at all about an

17   area manager job?

18        A.    No.

19        Q.    That's something that happened after

20   you became employed with ZF Batavia?

21        A.    Yes.

22        Q.    You're not in this claim -- in this

23   case, are you making a claim against Ford for you

24   not properly being paid for the area manager job at

1    ZF Batavia?

2         A.    Once again, I go back to that board of

3    directors and if that would have been running, my

4    interest -- then I think they would have looked out

5    for me in that specific case, that I would have

6    been compensated.

7         Q.    Okay.  So the ZF Batavia board of

8    directors, whoever those individuals might have

9    been at the time that you didn't get paid for the

10   area manager job, those people might be

11   responsible?

12        A.    They could be.

13        Q.    Okay.  And your claim with regard to

14   the board, basically the board is not what you

15   expected it to be; is that right?

16        A.    That's a fair statement.

17        Q.    Okay.  Do you know, did Ford have area

18   managers at the time you were working at Batavia?

19        A.    At that time, they still could have

20   been called superintendents, but there was a lot of

21   name changing going on, so they could have -- they

22   could have gone in area managers as a name change,

23   but the title and job responsibilities were the

24   same.

125

1          Q.     Now, you testified earlier about

2     Exhibit 2 and about the language in there that says

3     subject to change and you testified about --

4          A.     Exhibit 2 is?

5          Q.     I'm sorry.  The gray brochure.

6                 MR. SIMON:  Tri-fold, gray brochure.

7          Q.     And there's language in there that

8     says benefit plans are subject to change and you've

9     already testified as to your interpretation of what

10    that term meant.

11                Before you accepted employment with ZF

12    Batavia, did you discuss your interpretation with

13    anybody, your interpretation of subject to change?

14         A.     No.

15         Q.     And it was your understanding that at

16    ZF Batavia, what you've described as the terms and

17    conditions of your employment, that those could not

18    change; is that right?

19         A.     As a transitional employee, right.

20         Q.     Okay.  And that's different than the

21    way things were when you were with Ford, right?

22         A.     What's different?

23         Q.     At Ford, you understood that the terms

24    and conditions of your employment could change,

1    didn't you?

2         A.    Yes.

3         Q.    Okay.  And so you had this different

4    expectation when you went over to ZF Batavia?

5         A.    Yes.

6         Q.    Okay.  And you had this different

7    expectation because people in meetings communicated

8    to you that things would be the same?

9         A.    Mm-hmm.

10        Q.    Okay.  Now, is there a merit increase

11   program at ZF Batavia?

12        A.    Yes.

13        Q.    And as I understand it, one of the

14   promises that you believe was made was that there

15   would be a merit increase program?

16        A.    Yes.

17        Q.    Okay.  And, in fact, there is a merit

18   increase program?

19        A.    Yes.

20        Q.    And you weren't told anything about

21   merit increases, were you?

22        A.    I wasn't told that wasn't going to be

23   fair and equitable, no.

24        Q.    Okay.  Were you told how much of a

1    merit you were going to get?

2        A.    No.

3        Q.    Were you told that your merit would be

4    greater or less than the merit increases received

5    by new hires?

6        A.    No.

7        Q.    You also testified about CVT.  What is

8    your claim here that there is a promise about CVT

9    that was made and wasn't kept?  Well, let me start

10   with what was the promise about CVT?

11       A.    The promise -- the promise was that

12   we've got a developed product and that you'll be in

13   on the ground floor of the new products.

14       Q.    Did anyone say when you would get in

15   on the ground floor?

16       A.    No.

17       Q.    Your understanding was that at some

18   point while you're employed with ZF Batavia you

19   would get to work on CVT?

20       A.    Well, I understand that -- I don't

21   think the ground floor would be after the product

22   is launched.  I don't think the ground floor is two

23   years later after the product is in production.

24       Q.    Well, when were you told that you'd

1    get to work on CVT?

2         A.    Promising future on a developed

3    product with the CVT on the ground floor of this

4    new program.  And ground floor -- and one of the

5    reasons why it was -- greatly influenced my

6    decision was being in on the ground floor.

7         Q.    Would ground floor be as soon as the

8    plant became ZF Batavia?

9         A.    I think ground floor would be as soon

10   as that product started to go in and you start

11   setting in installations and you start getting in

12   equipment and you start doing some run offs.  To

13   me, that's ground floor.

14        Q.    Has that happened yet?

15        A.    No.

16        Q.    And by "that," I mean, has the ground

17   floor been established as you've described it?

18        A.    Well, they're looking for -- I think

19   by September, they're looking for some production

20   runs.

21        Q.    I'm not clear.  And I just don't know

22   your business as well as you do, okay?  Has the

23   ground -- is the ground floor in existence?

24        A.    The ground floor has come and gone.

1          Q.    When did the ground floor first come?

2          A.    I would say the ground floor first

3     came about a year ago.

4          Q.    Okay.  And what position were you in

5     when the ground floor came?

6          A.    Supervisor.

7          Q.    Who was your -- who did you report to?

8          A.    Could have been Rick Ervin, could have

9     been Eric Spencer.  Let's see.  One of those guys.

10          Q.    Did you go to either of those

11     gentlemen and tell them, I want to transfer over to

12     work on CVT?

13          A.    No.

14          Q.    Did you bid on any jobs or apply for

15     any jobs working in CVT?

16          A.    Most of them down there didn't bid or

17     apply.

18          Q.    I'm asking if you did.

19          A.    They didn't.

20          Q.    I'm asking if you did.  I'm not asking

21     what they did.

22          A.    No.  Again, I'll ask the question, why

23     wouldn't it be fair and equitable and why wouldn't

24     I be treated like the others?

1    Q.    I appreciate the question, but today I

2    get to ask.

3    A.    I understand --

4    Q.    You don't.

5    A.    -- that.

6    Q.    You understood when you accepted

7    employment as an MPS with ZF Batavia that you're

8    going to be working CD4E, correct?

9    A.    At that particular time.

10    Q.    This board that you thought was going

11    to exist that was going to run ZF Batavia, other

12    than the understanding that it would be three from

13    Ford and three from ZF, did you have any

14    understanding as to who the specific individuals

15    would be?

16    A.    No.  They said they would be named.

17    Q.    Were you told that you'd have any

18    input in the naming of those individuals?

19    A.    No.

20    Q.    And you understood that once you

21    accepted employment with ZF Batavia, that you were

22    going to be working for ZF Batavia and not Ford,

23    right?

24    A.    I understood that they would be --

1   that ZF Batavia might -- my check would come from

2   ZF Batavia.  But I also had this greater feeling

3   that with Ford being a 49 percent partner, that my

4   best interest would still be first and foremost, if

5   you will.

6         I kind of -- it was kind of like to

7   me -- and I think they even made an analogy one

8   time.  It's like my parent dropping me off at my

9   grandparents.  I would still be looked out under --

10   under that umbrella of family.

11       Q.   Okay.  Your understanding as you went

12   into it was that Ford was going to be a 49 percent

13   shareholder?

14       A.   Mm-hmm.

15       Q.   And you understood, then, that ZF was

16   going to have 51 percent, that they'd have more

17   control than Ford.  You understood that, right?

18       A.   No, I didn't.  No, I didn't.  I

19   thought that -- if you want to look at it from the

20   business picture and -- and the 49 and the 51, yes.

21   But as the day-to-day operations unfolded and there

22   was a time when Sharonville had 70,000 units, that

23   they had to be -- that were recalled and ZF said

24   we -- we don't have time to fool -- we don't have

1    any capacity, we don't have any time.  Ford said

2    you will do this.  You will bring those

3    transmissions in.

4         Matter of fact, they're on trucks on

5    their way.  You will -- you will find a way to do

6    that.  And the trucks were there and they started

7    repairing -- the people coming from Sharonville and

8    they started repairing those transmissions.  So I

9    understood Ford to have a big input in the

10   day-to-day operations.

11        Q.    This situation that you've described

12   with Sharonville sending transmissions over, when

13   did that happen?

14        A.    I want to say December of 2000.

15        Q.    Okay.  Sometime after you had gone to

16   work for ZF Batavia?

17        A.    Mm-hmm.

18        Q.    Okay.  So that situation obviously

19   couldn't have influenced your decision to come to

20   work for ZF Batavia because it hadn't happened at

21   the time you accepted --

22        A.    No, not to come to work for, but while

23   you're working there and you see decisions like

24   that happen --

1    Q.    Sure.

2    A.    -- things like that come about, then

3    you understand, okay?  They still have a -- Ford

4    still has a big say in day-to-day operations.

5    Q.    You understand that Ford, as the

6    customer, has a lot of say in what ZF Batavia is

7    doing; fair statement?

8    A.    Fair statement.

9    Q.    Okay.  I want to back up a little bit.

10    A.    But not running the business.  Not to

11    run the business.

12    Q.    Well, who's running the business?

13    A.    I believe it's Ford.

14    Q.    Then why -- what do you base that on,

15    other than this example where Ford sent some

16    transmissions over?

17    A.    They're -- trying to get my thoughts

18    together here.  ZF said that they weren't going to

19    have any Ford people in the CVT.  Ford said there

20    would be.  ZF says there are not going to be any

21    time clocks.  Ford says there will be.  Right now,

22    that's all I can recall.

23    Q.    Okay.

24    A.    If there's anything else, I'll add it.

1          Q.     Let's talk about those two.  You said

2     that ZF had said there weren't going to be any Ford

3     employees in the CVT, but in fact there are.

4          A.     Mm-hmm.

5          Q.     Are you talking about hourly

6     employees?

7          A.     Mm-hmm.

8          Q.     And those are hourly employees that

9     work for Ford, right?

10          A.     Mm-hmm.

11          Q.     Okay.  So your understanding is that

12     Ford is still able to direct where those hourly

13     employees work at?

14          A.     Mm-hmm.

15          Q.     You said that ZF said there'd be no

16     time clocks.  Are you, again, talking about for

17     hourly employees?

18          A.     Mm-hmm.

19          Q.     I know you've indicated if you think

20     of anything else you'll let me know.  You'll do

21     that?

22          A.     Mm-hmm.

23          Q.     Okay.  Thank you.  I want to make

24     sure, Mr. Williams, that I just got my

1   understanding correct.  I know I asked specifically

2   about changes in overtime; changes in AIP and

3   whether Ford was responsible and your answer was

4   essentially, well, through the board of directors,

5   they're responsible.  And that may very well be

6   your answer for -- for all of those promises.  I

7   just want to make sure, okay?

8               With respect to the change in sick

9   days, is it your understanding or is it your

10  testimony that Ford may have been involved in that

11  through the board of directors?

12      A.    (Witness nodded.)

13      Q.    I just need you to --

14      A.    Yes.

15      Q.    Thank you.  Other than through the

16  board of directors, do you have any other reason to

17  believe that Ford may have been involved in that

18  change?

19      A.    No.

20      Q.    Okay.  The merit increase, the promise

21  that you believe wasn't kept with regard to the

22  merit increase, again, do you believe that Ford's

23  involvement was through the board of directors?

24      A.    Could have been --

1          Q.     Okay.

2          A.     -- yes.

3          Q.     Other than through the board of

4    directors, do you have any other reason to believe

5    that Ford was involved in that change?

6          A.     Not at this time.

7          Q.     The CVT, your not getting to work in

8    CVT or not getting in on the ground floor of CVT,

9    do you believe Ford is responsible for that?

10          A.     Could have been.

11          Q.     Again, through the board of directors?

12          A.     Mm-hmm, mm-hmm.

13          Q.     You think that someone on the board of

14    directors decided that Rick Williams would not work

15    in CVT?

16          A.     Rick Williams?

17          Q.     I'm sorry.  I'm sorry.  Don -- Don

18    Williams.  I apologize.  I'm getting my plaintiffs

19    and all my names confused.  Let me re-ask it.

20              Is it your testimony that you believe

21    someone on the board of directors said that you

22    specifically wouldn't get to work on the CVT?

23          A.     I don't know how that came about.

24          Q.     Okay.  Mr. Williams, there was some

1    confusion, I thought, earlier in the deposition

2    about your 2000 AIP.  So I'm going to see if I can

3    clear that up now.  We'll mark both of those.

4            Okay.  Mr. Williams, you have in front

5    of you Exhibits 92 and 93.  Exhibit 92, as I look

6    at it, appears to be notification to you as to how

7    much bonus you received in 2000, which appeared to

8    be a combination of your ZF Batavia bonus and a

9    true-up for your Ford bonus.

10           A.    Right.

11           Q.    Do you agree with me that's what that

12    is?

13           A.    Yes.

14           Q.    Okay.  Then Exhibit 93, which shows

15    that you received -- well, first of all, it shows

16    you received a bonus in the amount $7,718.  Do you

17    agree with me that that's what Exhibit 93 shows?

18           A.    I agree and then I need a break.

19           MR. VANWAY:  Okay, sure, absolutely.

20     (Off the record:  10:55 a.m. - 11:07 a.m.)

21    BY MR. VANWAY:

22           Q.    Okay.  Mr. Williams, we're back on the

23    record.  I've placed in front of you what I've

24    marked as Exhibit 94.

```
 1              MR. SIMON:  Are you done with 92 and

 2     93?

 3              MR. VANWAY:  I am.

 4              MR. SIMON:  Exhibit --

 5       A.    Refresh me.  Before I left, we said

 6     that this was compensation -- dual compensation for

 7     months and service, I guess, prior to changing

 8     over -- 90 -- the AIP in '90 --

 9       Q.    Well, let's make sure we're clear --

10       A.    Okay.

11       Q.    -- because I had a different

12     understanding.  My understanding was that Exhibit

13     92 reflected part ZF Batavia bonus and part -- sort

14     of a true-up for what the Ford bonus would have

15     been?

16       A.    Yes.

17       Q.    Okay.  Then Exhibit 93, that was all

18     ZF Batavia, right?

19       A.    Yes.

20       Q.    That $7,718 is a bonus that you

21     received just from ZF Batavia?

22       A.    Yes.

23       Q.    Now, Exhibit 94, which I've placed in

24     front of you, are documents which you've produced
```

1    in this case.  I believe those are W-2s for your

2    last few years at Ford, and then your employment at

3    ZF Batavia.  Do you agree with me that's what those

4    documents are?

5         A.    That's what they appear to be.

6         Q.    And your last salary when your worked

7    at Ford -- it's not reflected in the documents, but

8    my understanding is that your last salary when you

9    left Ford was around 66,000 a year.  Does that

10   sound about right?

11        A.    It could have -- it very well could

12   have been.

13        Q.    Okay.

14        A.    I don't see it here in front of me and

15   I don't recall -- so you're talking about when I

16   left in '99?

17        Q.    Right.  I'm not asking what your W-2

18   wages were for that year.  Those would be --

19        A.    You're asking what my salary was?

20        Q.    Just your salary.  Do you remember

21   what your salary was when you left --

22        A.    No.

23        Q.    -- Ford?

24        A.    No, I don't.

1          Q.     What's your current salary at ZF

2     Batavia?

3          A.     I believe it's 80 -- it's right around

4     3,500.  It's 34 something.  So it's right around

5     82,000, I think, a year --

6          Q.     Okay.

7          A.     -- base.

8          Q.     You don't dispute that your salary is

9     greater at ZF Batavia than it was when you left

10    Ford?

11         A.     No.

12                MR. VANWAY:  Okay.  That's all the

13    questions I had, Mr. Williams.  Thank you.

14                (11:09 a.m.)

15                            EXAMINATION

16    BY MR. HUNTER:

17         Q.     Mr. Williams, just a few things.  When

18    Mr. VanWay asked you about your merit increases at

19    Ford, you seemed to be making a distinction between

20    your supervisor making the distinction -- the

21    increase and the company making the increase when

22    you were at Ford.  Do you remember that testimony?

23         A.     Mm-hmm.

24         Q.     Okay.  Can you explain that a little

1  better for me, in terms of what you meant by that?

2       A.    Just that the company -- the overall

3  could have been -- there was a budget amount -- a

4  budgeted amount and it could have been 10 percent.

5  And, if for some reason, you might have got five --

6  or it was kind of like the supervisor, your direct

7  supervisor had the leeway and I understand that

8  with ZF, in some cases where the direct supervisor

9  sent it up, somewhere or another it got changed.

10  So that's probably what I was referring to.

11       Q.    Okay.

12       A.    It became less after -- after I had

13  gone to ZF, it became less.  Once a direct

14  supervisor sent up, say, a five; it came back maybe

15  a two.

16       Q.    But at Ford, you understood there was,

17  in a sense, a pool and that that individual

18  increase was up to your individual supervisor?

19       A.    Mm-hmm.

20       Q.    And he could pick whatever number he

21  wanted, as long as it was in accord with that pool?

22       A.    Mm-hmm.

23       Q.    You mentioned that the ground floor

24  for CVT has kind of come and gone.

142

1          A.    Yes.

2          Q.    Is that true for the CFT26?

3          A.    The CFT26, to my knowledge, has kind

4     of been shelved.  So they're opening up CFT23 and

5     the CFT30, is the best -- and I just try to follow

6     that somewhat on my own because I'm not involved in

7     that area.

8                But the CFT26 may or may not come to

9     fruition.  I don't know.  I wasn't -- I wasn't

10    privy and I wasn't privileged enough to be in those

11    meetings.

12         Q.    Okay.

13         A.    'Cause I can't really answer that

14    question for the 26.  It kind of looks like it

15    might be -- may be dead, I don't know.  And I'm

16    just going on what I've heard.

17         Q.    Okay.  And with respect to the CFT26,

18    that certainly isn't anywhere near preproduction or

19    certainly installation, is it?

20         A.    To answer your question, when I was

21    told I was going to be in on the ground floor of

22    the CVT, it wasn't specified as to 23, 26 or 30.

23    As a matter of fact, I believe it was only the 23

24    and the 30 at that time.  The 26 didn't even exist.

1    And I believe it came about because there were some

2    engineering problems with the 23 or design -- the

3    way they were going to hook it up to the

4    horsepower.  So at the time it was just 23 and 30.

5        Q.    CFT26 hasn't yet hit preproduction or

6    installation, has it?

7        A.    John, I can't answer that question.  I

8    don't know.

9        Q.    You don't know if the CFT is in

10    preproduction or installation, CFT26?

11        A.    The 26?

12        Q.    Yeah.

13        A.    No, I don't know.  I'm not -- I

14    haven't -- I'm not privy to that end of the

15    building.  I'm with the CD4E and when I made that

16    statement, I made that statement because I missed

17    the ground floor of the CVT program.  It wasn't

18    specified.  When those comments were made, there

19    was no specifications as to what model.

20        Q.    Absolutely.  So you could be put in on

21    the ground floor of the CFT26, couldn't you?

22        A.    That could be.

23        Q.    Okay.  We talked before about

24    timekeeping for the employees that you manage.  And

144

1    my understanding is that you're the one that would

2    open and close DROTs, Daily Reports of Time, for

3    those people you manage, correct?

4            A.    Correct.

5            Q.    And you understand it's your

6    responsibility with respect to that reporting of

7    time, correct?

8            A.    I believe so.

9            Q.    And what is your understanding of your

10   responsibility with respect to that time?

11           A.    Of paying the people --

12           Q.    Mm-hmm.

13           A.    -- that they submit to me their sheets

14   of what they work.  And then I, in turn, I pay

15   them.  And they've got a responsibility that -- to

16   mark down what they work.  And I put that

17   responsibility back on the employee.  And they

18   fully understand if they misreport that and it's

19   brought to management's attention or my attention,

20   then they understand what would happen.

21           Q.    Then you understand that it's your

22   responsibility to make sure that that time is

23   accurate, correct?

24           A.    To the best of my ability.

```
 1          Q.    And because you told me before you go

 2    out there on the floor and make sure that the

 3    people are there.  And that is one of the things

 4    that you take seriously is to make sure that your

 5    people are at work and working, correct?

 6          A.    To the best of my ability.

 7          Q.    Okay.  Was there anything that impairs

 8    your ability to keep track of your people?

 9          A.    Sometimes I'm not in the building.

10          Q.    Okay.  With respect to making sure

11    that your people are out there on the floor and

12    being productive, the company provides you with

13    tools to be able to do that, doesn't it?

14          A.    Sometimes they do.

15          Q.    You're aware of, for example, MMS

16    information systems, the machine counts?

17          A.    Yes.

18          Q.    Do you utilize those from time to time

19    to manage your people?

20          A.    There's a lot of times when they

21    aren't -- it doesn't work, they're unavailable.

22    Some of the counters don't work.  Some of the times

23    they do.  Some of the times they won't.  Some of

24    the times you'll see three, four, 500 pieces in an
```

1    hour.  So what I had found -- and there's some that

2    work and some that don't.

3         Q.    Okay.  But apparently, then, from what

4    you're telling me, you do look at those on a

5    regular basis because you realize some days they

6    work, some days they don't, some days the counts

7    are off?

8         A.    I haven't really looked at those,

9    John, and -- because the system has been down a

10   lot.  I haven't hardly looked at those in -- in

11   probably a month and a half or so.

12        Q.    Okay.  But prior to a month and a half

13   ago, then you reviewed those kind of regularly?

14        A.    I looked at -- no, I looked at the SAP

15   counts.  I looked at the SAP counts, John, because

16   the machine counts and the SAP counts are very much

17   different.

18             So what I try to do is -- what I try

19   to do is I try to take a look at the float counts

20   in the morning, what assembly ran, what we made.

21   What was -- and like I used what was left there,

22   kind of like a put and take.  And then reviewed

23   those with the SAP, trying to make sure that they

24   were close.

```
 1              But they all depend on what number you

 2     looked at, as to whether or not -- I've approached

 3     guys before and made an idiot out of myself because

 4     I went to an individual and said, What about that

 5     number?  And he -- they said, Well, there's the

 6     machine count.  Machine count would be totally

 7     different.  And then when I looked at the parts at

 8     the end of the line or maybe parts backed off

 9     'cause the next operations didn't count, then I

10     come over, Well, this guy is right.  So you just --

11     it just depends.

12          Q.    And when you talk about the SAP count,

13     you mean the S-A-P count, correct?

14          A.    Yes.

15          Q.    Does SAP give you a per hour breakdown

16     of production for a given machine?

17          A.    If it's -- it gives you a breakdown of

18     the sell count.  So if you're looking at the sell

19     count and you have to -- and it all depends on what

20     line it is.

21          Q.    Okay.  But certainly the more detailed

22     information is available, I believe, on MMS?

23          A.    Yes and no.  It all depends on -- if I

24     went to -- down in gears, if I went to the O15
```

```
 1    line -- and I don't know that any of that counts.

 2    The bore doesn't count.  The bushing bore doesn't

 3    count.  The hone doesn't count.

 4            So what you have to do is you try

 5    to -- it just all depends.  But, no, to answer your

 6    question, MMS, does it give you more detail, no.

 7        Q.    Okay.  Well, with respect -- and let's

 8    take an example, last week, okay?  Did you review

 9    machine counts or anything last week --

10        A.    No, I didn't.

11        Q.    -- with respect to the information

12    system available to you?

13            MR. SIMON:  Let me just slide in an

14    object.  I don't know how this relates to our

15    claims.  If this is related to Mr. Williams'

16    performance at his job, I don't -- I don't think

17    that's relevant.  Go ahead and answer.

18        A.    Last week what?

19        Q.    Did you review any of the machine

20    counts?

21        A.    I looked at SAP counts.

22        Q.    Okay.

23        A.    Because I don't understand -- I've

24    never been -- I've never been taught how to use
```

1   the -- they've got a new system and I don't -- to

2   be frank with you, I don't know how -- I don't know

3   how to use that new system.  Nobody showed me that

4   new system.

5         Q.    Did you ever go and say to somebody,

6   Hey, I needed to be trained on the system?

7         A.    There was some times that there was

8   supposed to be somebody to come around and train

9   and that never did happen.  I was in gears.  That

10  never happened.  I think Spencer had some -- some

11  people was supposed to come around.  That never

12  happened.

13        Q.    Well, when was the last time you made

14  an adjustment to an employee's check because of an

15  issue over machine counts or anything like that?

16        A.    Over machine counts?

17        Q.    Mm-hmm.

18        A.    I don't know that I've ever made over

19  a machine.

20        Q.    Okay.  Why would you adjust an

21  employee's or a number of employees' time sheets?

22        A.    If they for some reason -- sometimes

23  they'll say, Hey, I didn't stay.  They'll come back

24  and change it.  Other times is if I have observed

1    somebody that was gone and then I would change it.

2        Q.    Okay.  When was the last time you made

3    such an adjustment?

4            MR. SIMON:  I'll just make another

5    objection.  There's been another -- I know there's

6    another lawsuit that Mr. Williams had testified

7    where a supervisor was discharged regarding his

8    handling of employees.  And I don't know if that's

9    where you're going, Mr. Hunter.  Maybe make a

10    problem for relevancy because I think you're

11    harassing the witness asking how he performs his

12    job.

13            If somebody there has a problem with

14    how he performs his job, they should have that

15    discussion with Mr. Williams out at the plant.  But

16    unless you can make another -- a proper ground for

17    relevancy in this case, it sounds like you're kind

18    of reviewing his performance in a deposition, which

19    I don't think is appropriate.

20            MR. HUNTER:  I would indicate that it

21    was indicated previously that he wasn't paid for --

22    he's now indicated that he doesn't have the

23    training for his current job.  I'm just trying to

24    work through the issues with respect to the current

1    job because he's saying his merit increase was

2    performance based individually and it shouldn't

3    have been.  I'm entitled to ask in a discovery

4    deposition matters related to his job.

5              MR. SIMON:  Well, I think you're going

6    beyond them, the claims in this lawsuit when you're

7    asking these kind of details about performing his

8    job.  That's not what he said on merit increase.

9              The claim in the lawsuit is that he,

10   as a Ford transitional employee, has been treated

11   differently.  This seems far outside the scope.

12             MR. HUNTER:  Okay.  Are you

13   instructing him not to answer?

14             MR. SIMON:  I'm not instructing him

15   not to answer, but at some point -- I mean, we have

16   to conclude his deposition or ask questions

17   pertinent to the claims.

18   BY MR. HUNTER:

19        Q.    Okay.  Mr. Williams, when was the last

20   time you made an adjustment to an employee's

21   timecard?

22        A.    I adjusted -- and it was based upon

23   some calls that the employee said, I changed my

24   mind.  I'm not going to work.  Last week sometime.

1    Prior to that --

2         Q.    Well, let's talk about last week.

3    What timecards did you change?

4         A.    Let's see.  There was a couple that I

5    decreased.  I think one of the departments in

6    question -- I think it was -- I'd have to go back

7    and look.  I took away pay -- I took away pay for

8    four or five on a -- because they said they were

9    not staying and I had already -- and I had already

10   paid that day and I had to change the next day.

11        And there was another couple that came

12   in and said, You underpaid me.  And I went back and

13   I put in -- because they claimed they had worked 12

14   hours.  So I went back and made an additional, I

15   think, two hour -- gave -- took away some others,

16   John.  But I'd have to -- I'd have to look at it.

17   I'd have to look at it and see.  Off the top of my

18   head, I don't really know.

19        Q.    And does that relate to the daily

20   posting, I think you mentioned awhile ago, in terms

21   of you post the daily time that's going to be

22   reported for those employees?

23        A.    Yes.

24        Q.    So these four or five that you

153

1    decreased last week came to you and said we worked

2    less hours?

3        A.    They called me over the Nextel and

4    they said, We're not going to work, pay us.  And I

5    said, I've already closed the DROTs.  I think I

6    closed the DROT at 11:30 and they said at quarter

7    of 12 or something they weren't going to work.

8            So -- and that happens frequently.

9    I'm not going to say "frequently."  But there's

10   times when they come and say, I'm not going to

11   work.  Change my time.

12           MR. HUNTER:  Okay.  I don't think I

13   have anything further at this point.

14           MR. SIMON:  I have no questions.  We

15   will not waive signature.  Actually, hold on one

16   second before we adjourn.  Off the record for a

17   second.

18       (Deposition concluded at 11:23 a.m.)

19

20

21                    _____
                              E. Donald Williams

22

23

24

154

```
 1              C E R T I F I C A T E

 2

 3   STATE OF OHIO         :

 4                         :   SS

 5   COUNTY OF HAMILTON    :

 6

 7        I, Susan M. Barhorst, a Notary Public in

 8   and for the State of Ohio, duly commissioned and

 9   qualified, do hereby certify that prior to the

10   giving of this deposition the within-named E.

11   DONALD WILLIAMS was by me first duly sworn to

12   testify the truth, the whole truth, and nothing but

13   the truth; that the foregoing pages constitute a

14   true, correct, and complete transcript of the

15   testimony of said deponent, which was recorded in

16   stenotypy by me, and on the 8th day of September

17   2003 was submitted to counsel for deponent's

18   signature.

19        I further certify the within deposition was

20   duly taken before me at the time and place stated,

21   pursuant to the Federal Rules of Civil Procedure;

22   that I am not counsel, attorney, relative or

23   employee of any of the parties hereto, or their

24   counsel, or financially or in any way interested in
```

1    the within action, and that I was at the time of

2    taking said deposition a Notary Public in and for

3    the State of Ohio.

4           IN WITNESS WHEREOF, I have hereunto set my

5    hand and notarial seal at Cincinnati, Ohio, this

6    8th day of September 2003.

7

8

9
              Susan M. Barhorst, Notary Public
10            in and for the State of Ohio.
              My commission expires
11            February 18, 2004

12

13

14

15

16

17

18

19

20

21

22

23

24