UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, CINCINNATI


EVERETT W. WHISMAN, et al.,          :

      Plaintiffs                       :

      -v-                              : Case No. C-1-02-406
                                       : (Judge Beckwith)
                                       : (Magistrate Sherman)

ZF BATAVIA, LLC, et al.,             :

      Defendants                       :


- 0 -


      The deposition of **HASSAN SALEH,** taken before
Susan K. Lee, CVR-CM, Court Reporter and Notary Public
in and for the State of Ohio, at the Holiday Inn
Eastgate, 4501 Eastgate Boulevard, Cincinnati, Ohio, on
the 24th day of July, 2003, beginning at the hour of
9:00 a.m. and ending at 12:27 p.m. of the same date.

- 0 -


**RIVERSIDE REPORTING**
**Certified Court Reporters**
**P.O. Box 949**
**Covington, Kentucky  41012**
**KY(859)291-6110   OH(513)574-7017**

APPEARANCES:


FOR THE PLAINTIFFS:        DAVID M. COOK, Esq.
                           STEPHEN A. SIMON, Esq.
                           Attorneys at Law
                           22 West Ninth Street
                           Cincinnati, Ohio 45202



FOR THE DEFENDANTS:        JOHN J. HUNTER, JR., Esq.
                           Attorney at Law
                           One Canton Square
                           1700 Canton Avenue
                           Toledo, Ohio  43264

                           JEFFREY L. VANWAY, Esq.
                           Attorney at Law
                           312 Walnut Street
                           Suite 3200
                           Cincinnati, Ohio  45202-4074



ALSO PRESENT:              MR. GARY VORIES
                           MR. EVERETT W. WHISMAN
                           MR. HERBERT HUEBNER

                           - 0 -


                    STIPULATIONS:

         It is stipulated by and between counsel
for the respective parties that the deposition of
**HASSAN SALEH,** a witness herein, may be taken at this
time pursuant to the Federal Rules of Civil Procedure
and Notice; that the deposition may be taken via
Stenomask by the Notary Public/Court Reporter, and
transcribed by her out of the presence of witness; that
the deposition was submitted to counsel for the witness
for reading and signature.

                           - 0 -

**INDEX OF EXAMINATION:**

By Mr. Simon......................................4

**INDEX OF EXHIBITS:**

17  organization chart...........................42

18  organization chart...........................43

1    **HASSAN SALEH**, called as a witness, being first duly

2    sworn, testified as follows:

3                    MR. SIMON:  Good morning, sir.

4                    THE WITNESS:  Good morning.

5                    MR. SIMON:  My name is Steve Simon.

6            I'm one of the attorneys for the plaintiffs in

7            this lawsuit that we've brought against Ford

8            Motor Company and ZF Batavia.  And next to me

9            is David Cook.  He is also one of the attorneys

10           for the plaintiffs in this lawsuit.  And I

11           think you know Wayne Whisman and Gary Vories,

12           who are two of the 15 plaintiffs in this

13           lawsuit.

14    BY MR. SIMON:

15           Q      Mr. Saleh, could you spell your last

16    name?

17           A      It's S-A-L-E-H.

18           Q      Okay.  And, sir, have you ever had your

19    deposition taken before?

20           A      Yes.

21           Q      When was the last time you had your

22    deposition taken?

23           A      It's been a long time.  It's probably

24    more than ten years ago.

25           Q      What was the reason that you were

1    deposed?

2         A        I witnessed -- I witnessed a car

3    accident.

4         Q        Was the lawsuit pending in a court in

5    Cincinnati?

6         A        No.  It was in Detroit.

7         Q        Okay.  Do you remember any of the names

8    of the parties involved?

9         A        No, I don't.

10        Q        Have you ever testified in a deposition

11   other than in that case you've just described?

12        A        No, I did not.

13        Q        Have you testified in labor

14   arbitrations?

15        A        No, I did not.

16        Q        Other than this testimony in a

17   deposition regarding the car accident, have you ever

18   given sworn testimony in any other matter or

19   proceeding?

20        A        I was asked to be on a jury one time

21   and --

22        Q        Did you serve?

23        A        No, I did not.  I was disqualified

24   before the case started.

25        Q        Okay.  Any other times besides the

1    deposition where you've given sworn testimony?

2    A        No.

3              MR. SIMON:  Let me just explain how

4         this works since this will be your first time

5         in a deposition, which is what we're doing now.

6              I'm going to be asking you questions.

7         You're going to be answering them under oath.

8         And the court reporter to your left is going to

9         be taking those down, your answers, and it will

10        eventually be transcribed and there will be a

11        transcript that will be produced.  It's really

12        important because of the fact that there is a

13        transcript produced that if you can when you

14        answer my questions, answer yes or no and make

15        an audible response because if you make kind of

16        an mm-hmm, the court reporter can't take that

17        down.  So will you try to answer yes or no

18        where you can?

19             THE WITNESS:  Sure.

20             MR. SIMON:  Also, it's really important

21        that if you didn't hear my question or you

22        didn't understand my question, that you ask me

23        to rephrase the question or simply re-ask the

24        question.  And the reason is if you answer my

25        question, it's just going to reflect in the

```
 1              transcript my question, your answer, and
 2              someone reviewing the transcript will assume
 3              that you understood the question.  So if you
 4              don't understand one of my questions, you'll
 5              ask me to rephrase or re-ask?
 6                   THE WITNESS:  Sure, I will.
 7                   MR. SIMON:  Okay.  And this is a rather
 8              informal proceeding, too, Mr. Saleh.  If you
 9              would to at any time take a break, as long as
10              there isn't a question pending, just tell your
11              lawyer and we can take a break at any time.
12              Sounds good?
13                   THE WITNESS:  I will do that.
14    BY MR. SIMON:
15         Q      Sir, where do you currently work?
16         A      ZF Batavia, LLC.
17         Q      When did you start working for ZF
18    Batavia?
19         A      August 1st, 1999.
20         Q      Had you worked in the plant, in the
21    Batavia plant, prior to it becoming ZF Batavia?
22         A      Yes, sir, I did.
23         Q      And how long did you work in the plant?
24         A      Approximately three years.
25         Q      Were you a Ford employee at the time?
```

```
1            A       Yes, sir, I was.

2            Q       Were you transferred from another Ford

3      facility?

4            A       Yes, I did.

5            Q       Was that in 1996 then?

6            A       That is correct.

7            Q       All right.  What was your title in 1996

8      when you started at the Batavia plant?

9            A       I was a production superintendent.

10           Q       And what facility had you come from?

11           A       Livonia Transmission up in Detroit.

12     It's in Plymouth actually.

13           Q       When did you first start at Ford?

14           A       1973.

15           Q       Were you continuously employed by Ford

16     from 1973 to 1999, August 1st?

17           A       Yes, sir.

18           Q       I imagine you worked at a number of

19     Ford facilities during that time?

20           A       That is correct.

21           Q       And just how long were you at the

22     Livonia plant?

23           A       The bulk of the time, almost 26 years.

24           Q       You said that you were a production

25     superintendent when you started in 1996.  When you
```

1    ultimately went to ZF Batavia on August 1st, 1999, were

2    you still production superintendent?

3        A        When I transferred over to ZF, I was

4    the maintenance superintendent at the time.

5        Q        So I understand, were you production

6    superintendent at Ford in 1999 and then when you

7    transferred to ZF Batavia, you became maintenance

8    superintendent?

9        A        I -- you asked me -- the initial

10   question you asked me was when I came to Batavia, what

11   did I start at.  Throughout the time when I was in

12   Batavia I got promoted and became the maintenance

13   superintendent at a latter date, so --

14       Q        Do you remember when you first became

15   maintenance superintendent while you were employed at

16   Ford?

17       A        Probably in 1998, early.

18       Q        So in any case, you had been

19   maintenance superintendent for perhaps a year and then

20   August 1st, 1999 you switched over to ZF Batavia?

21       A        Probably a year and a half as --

22       Q        Okay.  And you left your employment

23   with Ford and became employed with ZF Batavia on August

24   1st, 1999?

25       A        That is correct.

1          Q        And what was your position when you

2     started at ZF Batavia?

3          A        I was the maintenance manager.

4          Q        And is that your title currently?

5          A        Up till yesterday.

6          Q        What happened yesterday?

7          A        I am supposed to be the technical

8     service manager of the plant, a slight change in my

9     responsibilities.

10          Q        Is that a promotion?

11          A        You could call it that if you want.

12          Q        Is there more pay?

13          A        That wasn't discussed yet.  The meeting

14     yesterday finished at quarter to 7:00 in the evening,

15     so --

16          Q        Who told you about this promotion?

17          A        The company CEO.

18          Q        Is that Mr. Adams?

19          A        No.  Well, maybe I gave the wrong

20     title.  Dr. Reckmann is the individual in charge of

21     operations in the plant.

22          Q        Is he COO maybe?

23          A        COO.  I'm sorry.  I said, I think, the

24     wrong title.

25          Q        Did he tell you why he was giving you

1    this promotion yesterday?

2         A         The company is looking for a way to --

3    to centralize some of the -- the operations to reduce

4    the manpower requirement and that's been in

5    conversation for at least six months, looking for ways

6    to -- to stream the operation to reduce the number of

7    required salaried people around the operation, trying

8    to be more efficient.

9         Q         Are you responsible for more employees

10   with this new position, do you understand?

11        A         Yes.

12        Q         How many people were you responsible

13   over as maintenance manager?

14        A         My work chart shows 27 people reporting

15   to me up till yesterday and it will increase by six in

16   the -- in the new position.

17        Q         Are you now over some people who

18   technically aren't in the maintenance department?

19        A         In the new position I will be.

20        Q         Okay.  And just so I understand, who

21   are those people?

22        A         Technical management, power house,

23   waste treatment, the washer people, decontamination

24   piece of the business.

25        Q         When you say you're over 33 people,

1    does that include hourly or are you just talking about

2    people who are going to be your direct reports?

3          A      My direct reports, salaried people.

4          Q      Okay.  And you would be surprised if

5    this didn't result in some increase in pay, given the

6    increase in responsibility?

7          A      Not necessarily.  I -- you know,

8    responsibilities in the plant usually change sometimes

9    and --

10          Q      Typically when there's an increase in

11    responsibility, it's your understanding that the

12    company is going to give that person more pay, right?

13          A      Sometimes and sometimes not.  We've --

14    we've changed responsibilities and roles and -- I

15    wasn't anticipating.  I'm not anticipating extra pay,

16    if that's what you're asking me.

17          Q      Have you ever had an occasion since

18    1999 where you were given more responsibility and

19    didn't receive extra pay?

20          A      Yeah.  A lot of times I had more

21    assignments and more -- that happens almost every day.

22          Q      When you came to the plant in 1996, was

23    Wayne Whisman there?

24          A      Yes.

25          Q      Gary Vories?

1          A        Yes.

2          Q        Do you know who all the people are in

3    this case?  Do you know who the 15 are?  I mean, do you

4    know which --

5          A        No, I do not.

6          Q        All right.  Well, let me tell you.

7    Maybe we'll go through and I'll tell you who all they

8    are and then we'll talk about them individually.

9    There's Mr. Whisman, Pam Blanco, Bill DeVito, Ted

10   Edrington, Ron Pearce, Gary Vories, Don Williams, Jim

11   Crump, Randy Newsome, Lee Stegman, Dena Stevens, Teri

12   Parker, Dennis Baker, Rick Ervin and Michael Steward.

13   Now, you know who all those people are, right?

14         A        Yes, I do.

15         Q        And have you worked with each of those

16   people many years?

17         A        A couple of them didn't -- didn't work

18   with me directly.  Lee Stegman, for instance, I -- you

19   know, I barely know the individual.

20         Q        But Wayne Whisman you've know since at

21   least 1996?

22         A        That is correct.

23         Q        And Pam Blanco?

24         A        That is correct.

25         Q        Bill DeVito?

```
 1              A       That is correct.

 2              Q       Ten Edrington?

 3              A       That is correct.

 4              Q       Ron Pearce?

 5              A       Yes.

 6              Q       Don Williams?

 7              A       Yes.

 8              Q       Jim Crump?

 9              A       Yes.

10              Q       Randy Newsome?

11              A       Yes.

12              Q       Dena Stevens?

13              A       Not at the beginning.  I probably got

14      to know her somewhere in the latter -- in the latter

15      years.

16              Q       Did you know her before you became a ZF

17      Batavia on August 1st --

18              A       No.

19              Q       What about Teri Parker?

20              A       I know Teri.

21              Q       And Dennis Baker?

22              A       I know Dennis.

23              Q       Rick Irvin and Mike Steward?

24              A       I know both of them.

25              Q       And quite a few of them you've worked
```

```
1    with pretty closely over the years, right?

2           A        In the latter part, that is correct.

3           Q        All right.

4           A        When I was in production, I did not

5    work with Gary Vories and Jim Crump and Mr. Whisman.  I

6    just worked with the production organization, so my

7    relationship with them was limited at that time.  When

8    I became the maintenance -- the individual in charge of

9    the maintenance organization, I -- so there are two

10   different groups that you're referring to.

11          Q        I understand.  You said you'd become

12   maintenance superintendent perhaps a year and a half

13   before you went to ZF Batavia?

14          A        That's approximate, not exact.

15          Q        I understand.

16          A        I don't remember the exact dates.

17          Q        Generally speaking then, for that year

18   and a half before you went over to ZF Batavia you had

19   worked closely with Wayne Whisman and Gary Vories?

20          A        That is correct.

21          Q        And everyone else that I've talked

22   about, with the exception of perhaps Lee Stegman and

23   Dena Stevens?

24          A        That is correct.

25          Q        Okay.  And you found all these people
```

1     to be good workers?

2          A       For the most part.

3          Q       Any glaring exceptions?

4          A       Some of the people that you're asking

5     me about, I never was part of evaluating their

6     performance or had anything to do with them.  For

7     instance, Mike Steward never worked for me or Dena

8     Stevens never worked for me, so I cannot really answer

9     truly to whether she was -- she was a good performer or

10    not.

11         Q       Okay.  We'll pick on the two people

12    here.  You found Wayne Whisman and Gary Vories to be

13    good workers?

14         A       They did a good job when they worked

15    for me.

16         Q       You found them to be honest?

17         A       Yes.

18         Q       In fact, all the people I've mentioned,

19    it's been your experience that they've been honest?

20         A       To the best of my knowledge, yes.

21         Q       Okay.  Let's move to 1999.

22         A       Okay.

23         Q       In fact, it might be a little bit

24    before 1999.  But you found out in late '98 or early

25    1999 that the Batavia plant was changing ownership from

1    Ford to a joint venture, ZF Batavia; is that right?

2         A      That is correct.

3         Q      Do you remember when you first found

4    out about the change in ownership?

5         A      It was in the summertime, 1998, if I

6    recall.  Somewhere around there.

7         Q      Do you remember how you found out?

8         A      Same way as everybody in the plant.

9    There was an announcement.  We were told there were

10   people coming down to talk to us and that's how we

11   found out.

12        Q      And then there was a video

13   teleconference with, I think, Jack Nasser; is that

14   right?

15        A      That is correct.

16        Q      What was your initial reaction?

17        A      Surprise.

18        Q      Concern?

19        A      Obviously.

20        Q      I mean, were you concerned for your

21   future, whether you would continue in the plant?

22        A      Absolutely.

23        Q      At some point after that announcement

24   did someone approach you from management and tell you

25   that they wanted you to stay in the plant and that they

1    wanted you to join ZF Batavia?

2          A      Yes.

3          Q      Who was that?

4          A      There were several names.  I mean, are

5    you looking for someone in particular or are you --

6          Q      Who you remember.  If you say you can't

7    remember everybody --

8          A      Alain Claus, my boss, for instance,

9    thought it would be a good thing if I could do that.

10         Q      Did you say Alan Claus?

11         A      Alain Claus, the plant manager at the

12   time.

13         Q      How does he spell his first name; do

14   you know?

15         A      If I'm not making a mistake, it's

16   E-L-A-I-N.

17         Q      I think I've seen his name in a

18   document.  I must have misunderstood his name was Alan.

19   But Mr. Claus, he was the plant manager and he was your

20   boss at the time?

21         A      Not my immediate boss.  He was the

22   plant manager.

23         Q      Who was your immediate boss?

24         A      A gentleman by the name of John Zielke.

25         Q      Did either of those two gentlemen join

1     ZF Batavia?

2          A        No.

3          Q        Do you know why?

4          A        When I talked to Alain Claus -- he is

5     from France -- his retirement would have been seriously

6     adversely affected by the transfer.  And if I recall

7     right, the company never made an offer to John Zielke

8     to join.

9          Q        Was there anybody else that you

10    remember off the top of your head besides Mr. Claus or

11    Mr. Zielke who told you that they wanted you to join

12    the new company?

13         A        Those were mainly my immediate -- Glen

14    Marinetti thought it might be a good move if I did

15    that.

16         Q        And Mr. Marinetti ultimately did -- he

17    ultimately did join ZF Batavia, correct?

18         A        No, he -- no, did not.

19         Q        Mr. Marinetti did not?

20         A        No, he did not.

21         Q        What was his position with Ford at the

22    time?

23         A        He was a production manager at the

24    time.

25         Q        Do you know why Mr. Marinetti didn't

1    joint ZF Batavia?

2        A       Well, I mean, when the company started,

3    there were some people already in the background slated

4    for certain jobs and the company made offers to who

5    they felt would be appropriate to make offers to.  I

6    don't know exactly whether he was actually made an

7    offer to or not.

8        Q       Okay.  So as it turns out, at least

9    three individuals who told you it would be a good idea

10   to join ZF Batavia, ultimately they didn't join ZF

11   Batavia?

12       A       Yes.

13       Q       Did you know that at the time when you

14   joined, on August 1st, 1999, that these three

15   individuals were not going to join the company?

16       A       Yes.

17       Q       Did that cause you any concern?

18       A       Somewhat.

19       Q       How so?

20       A       When -- when you're taking a step of

21   the magnitude of the step I took, obviously you have

22   concerns and you have fear.  You have your retirement

23   and you have your livelihood and you have 26 years

24   invested in a company, so you -- you look very

25   seriously at your decision and, I mean, these are just

1    natural human feelings, I guess.

2            Q        Okay.  Have you retired from Ford?

3            A        No, I have not.

4            Q        Although you'd be eligible to at this

5    point, correct?

6            A        I am eligible today to retire, yes.

7            Q        Okay.  You were talking about the

8    magnitude of the decision that you made.  Obviously the

9    people that we've discussed in the case, my clients,

10   they also had to make that same sort of decision to

11   join ZF Batavia, right?

12           A        I understand that.

13           Q        Mr. Saleh, at what point did somebody

14   from either Ford or ZF Batavia tell you that they

15   wanted you to talk to some of these individuals, or my

16   clients, and talk to them about joining ZF Batavia?

17           A        I presented a lot of the offers to

18   employees prior to me joining the company.  The offers

19   that were presented by me, they were not my choice.

20   They were not something I recommended.  They were

21   presented to me by Mr. Zielke, which was my immediate

22   boss, and he asked me to give them to the employees and

23   ask them if they would consider joining the company.

24   And if they chose to do so or not, to sign the paper,

25   return it to him by a given date.  And that I did.

1              There's one exception, to the time when

2      initially Mr. Whisman did not wish to join the company.

3      And if I -- if I can recall right, I can't remember

4      exactly the time frame in which he indicated he would

5      like to come back and join the company.  He was working

6      at Sharonville at the time, and I asked some of the

7      management people -- I don't remember exactly the

8      mechanics of what transpired, but I went back and had

9      the form and he signed on.

10             Q      So Mr. Whisman --

11             A      Some of the people did not go through

12     me in the lawsuit.  As a matter of fact, a good

13     percentage of them, I did not give them the letter, nor

14     did I have anything to do with them joining the

15     company.

16             Q      Okay.  But Mr. Whisman is one where he

17     went to Sharonville, which was unusual, right, for

18     somebody to leave the plant and go to Sharonville

19     during that time?

20             A      That was unusual.

21             Q      Because they put a freeze on people

22     leaving the plant to go to Sharonville for a period in

23     1999; is that what you recall?

24             A      In the initial contract we were told

25     that there was a freeze, but as the company started

1    forming, the freeze was lifted and we were able to --

2    if the person -- the company, Ford Motor Company,

3    director -- direction, at least when you talked to the

4    HR group, was they were going to try to accommodate the

5    employees as best as they can, move them to the areas

6    where they would be -- it would be desired by them or

7    would be more beneficial to them than just sticking

8    them all over the country.  And there at the time if

9    there was an opening somewhere like at Sharonville or

10   somebody wants to go somewhere else, it was, you know,

11   this opportunity is here, you can move to there.  So --

12           Q       It's your recollection, though, that

13   you had presented offers to a number of salaried

14   employees who joined ZF Batavia, at the time that you

15   made those offers, you recall at that time that you

16   were still a Ford employee, right?

17           A       Yes, sir.

18           Q       Okay.  Staying with Mr. Whisman for a

19   second, he, I think you said, was the one exception,

20   where it sounds like after he went to Sharonville, you

21   said that you specifically told upper management that

22   Mr. Whisman was somebody that you wanted on your team

23   in Batavia to join ZF Batavia; is that fair?

24           MR. HUNTER:  I'm going to object to

25           that.  He didn't say upper management and a

1           good portion of what you said, so --

2                 MR. SIMON:  Well, he -- he can explain

3           if I'm wrong.

4                 MR. HUNTER:  Okay.  But let's make the

5           question fair.  I mean, that was really out

6           there.  That's not what he said at all.

7                 MR. SIMON:  I didn't think so.

8    BY MR. SIMON:

9           Q      What did you tell management, if

10   anything, about Mr. Whisman?

11          A      Well, Mr. Whisman seeked employment

12   back with us and there were some conversations in the

13   background to why he had the desire to come back to --

14   to Batavia.  There was the need for supervisors in the

15   maintenance organization and also Mr. Whisman, if I

16   recall, in a conversation with -- his son approached me

17   and talked to me about the matter.  Mr. Whisman's wife

18   was ill.  He lived nearby the plant compared to

19   Sharonville and he had some personal needs to take care

20   of his family.  So many different factors played in the

21   -- in the decision to offer Mr. Whisman back the

22   opportunity to come back to the plant and --

23          Q      Did you say his son approached you?

24          A      Yes.

25          Q      Do you know what his son's name is?

```
1              A        Chad.

2              Q        He actually visited you at the plant?

3              A        He's an employee at -- he's an

4       employee.  He's a Ford employee at the plant today.

5              Q        All right.  So you're saying your

6       understanding was there were some personal reasons that

7       Mr. Whisman wanted to come back to the Batavia plant?

8              A        Yes, sir.

9              Q        But from your perspective after working

10      with Mr. Whisman, you thought he was somebody who could

11      do a good job to fill a need that you identified in the

12      maintenance supervisory area, right?

13             A        Yes.

14             Q        And you wanted him as part of your

15      team, right?

16             A        I hired him.

17             Q        So you agree, right?

18             A        Yes.

19             Q        And you told upper management that you

20      wanted him as part of your team?

21             A        I discussed the matter in HR and asked

22      for approval and I was told I could hire.

23             Q        I think that's pretty close to what I

24      said earlier, but that's okay.

25             A        I followed the due process to hire Mr.
```

1      Whisman.

2             Q       Sure.  And I'm not accusing you of

3      doing anything else but that.

4             A       All right.

5             Q       In this case, Mr. Saleh, we've had

6      written questions go back and forth among the parties

7      and they call those interrogatories.  And Ford has

8      asked us to identify certain conversations that my

9      clients had with people employed by Ford and ZF when

10     they were recruited in 1999, and a number of my clients

11     had identified you as somebody they had talked to

12     during that period when they were trying to make the

13     decision to join the company.

14             And given your answer, I just want to

15     confirm that you agree with their recollection.  Don

16     Williams, according to his answer, believes that he

17     talked to you at least on one occasion about joining

18     the plant.  Is that your recollection with Don?

19             A       That is correct.

20             Q       And even though their interrogatory

21     answers weren't identical, but basically the same

22     testimony was given in interrogatory answers regarding

23     these people.  I just want to see if you remember this.

24             Do you remember talking to Gary Vories

25     individually about joining the plant?

1          A          I'm going to have to say I don't

2     remember exactly any specifics of any conversation that

3     took place with many of the people that I indicated.

4     There are a couple, like Don Williams, for instance,

5     that talked to me.  And Teri Parker I talked to.  I

6     talked to Teri Parker.  But the rest of the

7     organization, most of the people that you referred to

8     in the -- in your earlier statement, they attended the

9     meetings with Ford Motor Company and ZF and they asked

10    questions.  There were a lot of questions asked and

11    answered and they made their decisions, to the best of

12    my knowledge, based on the meetings and the

13    conversations, not based on what I presented.  I wasn't

14    the guy who made the decision on who to make the offer

15    to.  That was a different level of decision.

16         Q          I understand what you're saying.  They

17    had other information besides talking to you about

18    whether they could join.

19         A          Right.

20         Q          But I'm just trying to just confirm

21    here that you did talk to them.  And you can just tell

22    me whatever you remember of the conversation.  So just

23    because we have so many people, I just want to try to

24    check them off.

25                     So Don Williams is somebody you recall

1     talking to?

2          A          Sure.

3          Q          And obviously Mr. Whisman?

4          A          Mr. Whisman approached me in the -- at

5     a latter date seeking employment, if that's what you're

6     asking me.  But we never had conversation about what

7     would be or would not be.  And he -- he asked me -- I

8     can't remember exactly what he asked me, but he asked

9     me how did it affect his -- he had a concern pertaining

10    to medical and what it -- what it did to his

11    retirement, if I can recall the conversation.  I tried

12    to clarify that to him and I don't know if there -- I

13    don't remember any other conversation that took place

14    between me and him.

15         Q          Do you remember ever initiating a

16    conversation with Mr. Whisman, walking up to his area

17    and talking to him about why he might join ZF Batavia?

18    Do you remember anything like that?

19         A          I might have done that.  I can't

20    remember exactly the conversation.

21         Q          I mean, if somebody like Mr. Whisman

22    said that he recalled some conversations you didn't, is

23    it your testimony that Wayne is wrong or maybe you just

24    don't remember since --

25         A          I said I don't remember doing that, but

```
 1        I'm not denying that it could have happened.  There was

 2        a lot going on at the time.

 3             Q     Sure.  I was just trying to understand

 4        the nature of your recollection.  Mr. Pearce, do you

 5        remember talking to Ron Pearce?

 6             A     Yes.

 7             Q     Do you remember if you had approached

 8        him and talked to him about why he might come to ZF

 9        Batavia; was that the nature of the conversation?

10             A     At the time Mr. Pearce was somewhat in

11        a distressful situation for whatever reason, and I

12        don't know exactly what was -- what was the reason, and

13        he was seeking different employment in a different

14        organization from the maintenance organization.  He was

15        looking for a job either in engineering or some sort of

16        a support function.

17             Q     At Ford?

18             A     Yes.

19             Q     At a different plant?

20             A     No, at the same plant.

21             Q     Okay.

22             A     And if I remember right, I think I had

23        a conversation with him, telling him that if he worked

24        for me and stayed in ZF, I would treat him fairly.

25             Q     Do you remember his reaction when you
```

1    told him that?

2           A       He was very uncertain, unsure at the

3    beginning for -- for three or four weeks.  And I always

4    kidded him, telling him that there's a lot of fun in

5    taking risks in life, and he eventually said he would

6    -- he would stay and work with us.

7           Q       Okay.  So to be fair, it sounds like

8    you were able to give him at least some reassurances

9    that while it was a risky move to come over, that at

10   the very least he could expect that you would treat him

11   fairly?  Is that --

12          A       Absolutely.

13          Q       Do you remember talking to Bill DeVito?

14          A       Bill did not work for me.  Bill DeVito,

15   a couple instances, talked to me and asked me if I

16   thought it was a good idea to join ZF.

17          Q       He approached you, you recall?

18          A       Yes.

19          Q       And when he asked you that, what did

20   you tell him?

21          A       I said it was a good idea to join ZF

22   Batavia.

23          Q       Did you explain why it was a good idea?

24          A       Same reason I thought it was, a lot of

25   opportunity, it's new technology, there's the chance to

1    be creative, I guess.

2         Q       With the opportunity, did you explain

3    that there would be an opportunity to kind of get on

4    the ground floor with the new CVT technology?

5         A       That's one of the basic premises, yes.

6    We were supposed to be part of a new technology that

7    was introduced to the market and it was a leading-edge

8    technology, so, you know, basically my decision was

9    because I wanted to be part of that and obviously that

10   would have been probably part of the conversation.

11        Q       So you probably, with Bill DeVito and

12   some other people, told them, look, one of the benefits

13   here to coming over to ZF Batavia is you'll get in on

14   the ground floor with the new technology and there will

15   be some real opportunities; is that fair?

16        A       That -- that conversation probably

17   drove a lot of the people that were technical and

18   wanted to see the new technology, yeah.

19        Q       Okay.  Do you remember talking to Randy

20   Newsome?

21        A       Yes.

22        Q       Did you approach him, do you recall?

23        A       I had several conversations with Mr.

24   Newsome and told him I would like him to stay in my

25   organization and help, yes.

1          Q        And you told him some of the same

2     things that we've been talking about here?

3          A        Basically.

4          Q        Did you talk about some of the

5     compensation, the package that ZF Batavia had put

6     together for these people?

7          A        In the early stage there was not a real

8     package as per se.  There was papers that were passed

9     to -- to everybody in the plant pretty much.  I think

10    they were trying to -- I don't know the name of the

11    gentlemen that came to the plant from Ford Motor

12    Company, and there were representatives from both Ford

13    and ZF when the papers were passed on to the employees

14    at the time.  There was no real benefit package that

15    was given to us.

16         Q        Okay.  We have some of those documents

17    here.  I'll probably have you look at some of those

18    before we let you go today.

19                  You said you talked to Teri Parker.

20    And, again, it was you approached her and had the same

21    kind of conversations with her that you had with the

22    other people, I imagine?

23         A        That is correct.

24         Q        You did single out Teri Parker.  Was

25    there any specific reason why you wanted Teri Parker to

1      join?

2           A      Teri was a very multi-skilled

3      individual.  She had -- she was an expert in the TWOS

4      system, that's where we pay the people.  She worked as

5      an expediter in helping us bring in parts for the

6      equipment in the plant.  She was able to do the

7      overtime, which was very complex work in the plant.  So

8      she was very valuable as far as the organization, the

9      maintenance organization was concerned.  And I had the

10     fear if she left me, I would have to really work hard

11     to find somebody to do all of these things.

12          Q      So you gave her a good pitch to come

13     over to the company?

14          A      I did.

15          Q      Dennis Baker, do you recall talking to

16     Dennis?  And Dennis has said that he talked to other

17     people as well in his interrogatory answer, like Glen

18     Marinetti, but I believe he identified you.  Do you

19     recall talking to Dennis on one occasion?

20          A      Dennis looked up to me as a -- as an

21     individual and he always asked me if it was a smart

22     thing to do.  And, again, the same conversation as, you

23     know, there's a slight risk because we're an

24     independent small company, so we have to go there.  If

25     we go there, we have to do a good job, otherwise we can

1    run it out of business.  But then, you know, there are

2    opportunities and a lot of room to grow and the

3    technology is something that I'm willing to take a

4    chance to be part of, I guess.

5            Q        I guess I'll give you a chance to kind

6    of toot your own horn, Mr. Saleh, but Mr. Baker wasn't

7    the only person that probably looked up to you; is that

8    fair?

9            A        You can -- you can say that.

10           Q        Some of these other people, Wayne

11   Whisman, Gary Vories, from your understanding, they all

12   in 1999 had those feelings towards you?

13           A        Some probably.  Some didn't.

14           Q        They respected you as a manager?

15           A        I would have to say some did and some

16   didn't.

17           Q        Did you talk to Pam Blanco?

18           A        I did.

19           Q        Do you recall approaching Pam about

20   joining the company?

21           A        I did.

22           Q        And you gave her kind of the same pitch

23   that you had given the other people, I suppose?

24           A        It was not exactly the same type of

25   pitch.  With Pam, Pam first didn't want to join and she

1     changed her mind and changed her mind again.  And Pam

2     did not work in my organization directly, so, you know,

3     I told Pam several times that it was a good -- it's a

4     good thing to do, but Pam wasn't sure.  She flip-

5     flopped several times and eventually joined.

6               Q       And when you're having these

7     conversations that you've described with these people,

8     as far as you recall, you were still a Ford employee,

9     right?

10              A       Most of them.

11              Q       And so as you saw it, they kind of

12    looked to you as somebody they had worked for at least

13    a year and a half, perhaps more, at Ford, they

14    respected you and that's why they were listening to you

15    give this pitch; is that fair?

16              MR. VANWAY:  Objection.  Are you asking

17              him to speculate as to what was in the minds of

18              these individuals?

19              MR. SIMON:  No, no.  I'm not asking him

20              to speculate at all.  Just his understanding of

21              the relationship with these people that he had

22              worked with.

23              THE WITNESS:  Again, I was in a

24              supervisory position working for Ford Motor

25              Company.  You have employees that like you,

1    employees don't like you.  You have people that
2    think you're good to them, people think you're
3    not good to them, so, you know -- and, again,
4    I'd answer that the individuals like Dennis
5    Baker thought I was -- I was good because he
6    worked with me and he always looked up to me,
7    so he asked me and I said I think it's a good
8    opportunity for us to join ZF.
9         And some of those employees that you
10   asked me about, again, I answered them to the
11   best of my knowledge.  Some of them looked up
12   to me, some of them didn't and some of them
13   liked me, some of them didn't.
14        The decisions to make an offer to them,
15   again, I reiterate that, didn't always come out
16   of me.  As a matter of fact, the only
17   individual that I made the offer to, because at
18   first he refused and later -- later on seeked
19   back into the plant, was Mr. Whisman.  The rest
20   of the offers were not made by me and it wasn't
21   my solicitation.  There was a piece of paper
22   that was given -- I was given a package and
23   said those people, please make offers to them
24   and collect the information back.  And that was
25   my role in it.

1    BY MR. SIMON:

2          Q        And the people that told you to give

3    them offers would have been Mr. Claus, Mr. Zielke or

4    Mr. Marinetti?

5          A        Mr. Zielke is the gentleman who gave me

6    the envelopes and said provide those offers to the

7    people.

8          Q        Just to make sure there isn't an

9    exception here, Teri Parker, was she one of them that

10   Mr. Zielke told you to or is she somebody that you

11   sought out yourself?

12         A        At the time she was not working in my

13   organization.  She'd just recently transferred into

14   accounting.  And I did talk to her on several different

15   occasions, tried to convince her that I would like her

16   to stay and help.

17         Q        So she wasn't on the list of people

18   that Mr. Zielke had told you to --

19         A        To give an offer to her, no.

20         Q        But you believe all the others that

21   we've discussed were part of these names that Mr.

22   Zielke gave to you?

23         A        On the list you -- you indicated

24   earlier?

25         Q        Yes.

1      A      No.  A lot of them did not work for me.

2      Q      Well, just so the record is --

3      A      Mike Steward, for instance, did not

4   work for me, so I had nothing to do with --

5      Q      I'll just go back through just to make

6   sure --

7      A      Dennis Baker, I didn't have anything to

8   do with his offer.  I mean, I can -- anybody who wasn't

9   directly in the maintenance organization at the time, I

10  had nothing to do with.

11     Q      Let's see if we can identify who those

12  people were just so the record is clear.  And Mr.

13  Zielke gave you a list of names or gave you some

14  envelopes and said make offers to them?

15     A      That is correct.

16     Q      And that would have included Don

17  Williams?

18     A      I had nothing to do with Don Williams.

19     Q      It would have included Gary Vories?

20     A      Yes.

21     Q      Jim Crump?

22     A      Yes.

23     Q      Would it have included Mr. Whisman

24  ultimately or not?

25     A      Yes.

```
1           Q        Ted Edrington?

2           A        Yes.

3           Q        Ron Pearce?

4           A        Yes.

5           Q        Bill DeVito?

6           A        No.

7           Q        Randy Newsome?

8           A        Yes.

9           Q        And Pam Blanco?

10          A        I don't remember Pam.  Pam wasn't

11    working for me at the time.  She was in -- she was in

12    production and she did not want to work -- she did not

13    work in the maintenance organization, so it would have

14    not been me who handed her that paper.  And when she

15    first rejected the offer, I -- I knew none of it.  I

16    did not know she rejected the offer at the beginning.

17    She did not work in my organization and I did not serve

18    her the paper at the -- at the beginning.

19          Q        Okay.  We keep talking about these

20    papers, so let's make sure we're talking about the same

21    thing.  This has already been previously marked as

22    Plaintiffs' Exhibit 3 for Mr. Kehr's deposition, so

23    we'll stay with that.  That's your copy, Mr. Saleh, if

24    you can just review that.

25          A        This is the paper that I was referring
```

1    to in previous conversations as the offer that was

2    given to us to --

3            Q      And so that's Plaintiffs' Exhibit 3.

4    It's dated -- well, let's look at the signature first.

5    That is your signature, right?

6            A      That is correct.

7            Q      And you see that that's Mr. Whisman's

8    name at the top, right?

9            A      That is correct.

10           Q      Now, Mr. Whisman we've identified as

11   someone who came over to the company in a little

12   different route than the others.

13           A      That is correct.

14           Q      And does that explain why his offer

15   date is crossed out and November 30th is put there?

16           A      That is correct.

17           Q      Was May 17 -- well, as you sit there

18   today, you don't recall what dates you gave the offer

19   letters to the other people, do you?

20           A      No, I don't remember.

21           Q      All right.

22           A      But this paper is accurate and this is

23   the paper that was served to everyone else in the -- in

24   the company, the people that I indicated I served this

25   piece of paper to.

 1          Q       And you didn't draft this document, did
 2     you?
 3          A       I had nothing to do with the drafting
 4     of this document.
 5          Q       Did anyone tell you who did?
 6          A       I don't know.
 7          Q       No one ever told you?
 8          A       No.
 9          Q       Mr. Whisman is a bad one here because
10     you've identified him as being exceptional in how he
11     came over to the company in terms of when he did in
12     1999, but turning to like somebody else that you had
13     identified, such as Mr. Vories, for instance, when you
14     were told -- actually, let me not use Mr. Vories.
15             Let me use Mr. Pearce.  You said that
16     you had talked to Mr. Pearce.  We talked about the
17     conversations that you had with Mr. Pearce.  Would
18     those conversations with Mr. Pearce have taken place
19     before you were given this offer letter from Mr. Zielke
20     to give to Ron or would have those conversations with
21     Mr. Pearce taken place afterwards?
22          A       I can't remember the exact dates and
23     time, but there was conversations -- remember, some of
24     the names you -- you -- you're asking me about are
25     individuals that worked in my organization.  There was

1      interactions with them at different levels and

2      conversations that took place at different times, so I

3      -- I cannot separate the time, whether it was prior to

4      the letter, after the letter or the offer.  I mean, I

5      don't know these things.  I can't remember these

6      things.

7             Q      Okay.  But you didn't talk to these

8      individuals about coming over to ZF Batavia until

9      somebody at ZF Batavia told you or somebody at Ford

10     told you that these are the people we want to join the

11     company; is that fair?

12            A      That is correct.

13            Q      Mr. Zielke was a Ford employee, right?

14            A      He still is.

15            Q      There was actually no one at ZF Batavia

16     who told you to talk to these individuals about joining

17     the company?

18            A      That is correct.

19            Q      Okay.  I'm going to hand you a couple

20     of organization charts that were produced in this case,

21     Mr. Saleh, and just see if you can help me to

22     understand them a bit.  The first organization chart,

23     which actually shows less positions, that's Exhibit 17

24     that you have.  And a larger organization chart is

25     Plaintiffs' Exhibit 18 --

1                MR. COOK:  Deposition exhibit.

2                MR. SIMON:  Deposition exhibit.  I'm

3        not sure what I said there.  We're just

4        continuing on where we left off from the last

5        time.

6                MR. HUNTER:  Okay.  Understood.

7   BY MR. SIMON:

8        Q       Just take a second to review that, Mr.

9   Saleh.  Just for the record, Plaintiffs' 17 is Bates

10  stamped by Ford EWW10821.  Plaintiffs' 18 is Bates

11  stamped 0819.  Mr. Saleh, just take a moment to review

12  those.  I just want to see where you fit into the

13  organization.  And I'm not sure what time period these

14  charts refer to, but maybe you can help me there.

15  Well, actually one of them has a time frame on it.

16               Looking at the organization chart, this

17  one, Plaintiffs' 17, I see your name there listed as

18  maintenance manager.

19       A       That is correct.

20       Q       And you've testified that that was your

21  position since 1999 until yesterday, right?

22       A       That is correct.

23       Q       As we look at that -- let's see,

24  looking then at Plaintiffs' 18, is your name or

25  position anywhere on Plaintiffs' 18?  That's the chart

1    that says organizational structure and it has April

2    through December 1999.

3         A      It's on the second column, yes, at the

4    very bottom almost, one up from the bottom.

5         Q      I see it there, okay.  Plaintiffs' 18

6    has your name listed and then above you is Mr. Clark

7    and another position and then there's production

8    operations manager and then manufacturing quality

9    manager.  Were all those people who were above you or

10   were they your peers at that time?

11        A      They were my peers, according to the --

12   the chart.

13        Q      Yes, I understand.

14        A      I mean, it's the same as the other

15   chart.

16        Q      It is the same?

17        A      Basically, yeah.  You know, maybe a

18   couple names changed but --

19        Q      Sure.  So when you joined in 1999, did

20   you report to the director of manufacturing?

21        A      That is correct.

22        Q      And when you joined on August 1st,

23   1999, who was the director of manufacturing?

24        A      At the time we did not have a director

25   of manufacturing.  It was Mr. Adams I reported to.

1    That was -- that is the president of the company today.

2         Q       So has there ever been a director of

3    manufacturing?

4         A       Yes.

5         Q       And who is it now?

6         A       Dick Newark.

7         Q       When did he join the plant?

8         A       I can't remember the exact date, but in

9    -- in late 1999 or early 2000 probably.

10        Q       So Mr. Adams, as CEO, acted as the

11   director of manufacturing until Mr. Newark came on

12   board; is that fair?

13        A       That is correct.  Don't hold me to the

14   dates.  I can't remember exactly.

15        Q       I understand.  All right.  Have you at

16   all, in your mind, been demoted between August 1st,

17   1999 and yesterday?

18        A       Demoted?

19        Q       Yes.

20        A       I have never been demoted, to the best

21   of my knowledge.

22        Q       Have you ever had responsibilities

23   taken away from you since you joined the company?

24        A       Yes.

25        Q       When was that?

1        A        When I started, I was -- I was in -- I

2   was in maintenance.  I was the maintenance manager.  I

3   was moved from the maintenance manager position into

4   the production manager position for about three months.

5   And after that position I was sent to the CVT side to

6   help install the equipment in CVT for approximately six

7   or seven months and then was brought back to the

8   maintenance organization because there were problems on

9   the CD4E side and remained in the maintenance manager

10  position till yesterday.

11       Q        Do you think that ZF Batavia has

12  treated you fairly since you joined the company?

13       A        The word fairly encompasses a lot of

14  things.  I mean, what -- what is your -- what is your

15  question exact?  I got paid what I was promised and I'm

16  still employed there and I haven't been mistreated in

17  this sense.

18       Q        Are there certain promises that were

19  made to you in '99 that they haven't delivered on that

20  cause you some concern?

21       A        I was never given anything in writing

22  that the company didn't deliver, but there were

23  conversations with some people that I might have not

24  received.

25       Q        I don't mean to put you in a difficult

1    position.  Anything in particular that you were told

2    verbally in '99 that ultimately hasn't transpired since

3    you joined the company?

4         A       I would have to say yes.

5         Q       Is there an example?

6         A       In conversation with the president, he

7    said -- when I came from Ford Motor Company to -- to

8    ZF, I had a leased car from Ford Motor Company and I

9    was told I will be compensated for that, and that never

10   transpired.

11        Q       Mr. Adams had told you that?

12        A       Yes.

13        Q       And I imagine you brought -- and when

14   that didn't transpire, did you raise the issue with Mr.

15   Adams?

16        A       No, I did not.

17        Q       Was that because you didn't think it

18   would do any good?

19        A       On a personal level I consider myself

20   to be a well-paid individual for the type of work I do,

21   so I -- I didn't think it was necessary.

22        Q       Are there any other promises that were

23   made that are either perhaps --

24        A       The only other promise that was made to

25   me is when I left Ford Motor Company, I was a grade ten

1    and that gave us -- we had fairly good health coverage

2    and when I joined ZF Batavia, that cut down my coverage

3    considerably for the number of days I could be on

4    medical, and we were told there would be some

5    consideration to fix that, and that didn't transpire.

6         Q       Is that something you would have talked

7    about with Mr. Sennish?

8         A       The president is the gentleman who made

9    the promise to us.

10        Q       Okay.  When that didn't transpire, did

11   you remind Mr. Adams about that or did you talk to Len

12   Sennish?

13        A       I did not.

14        Q       In your mind, are there some promises

15   that were given these other salaried employees who are

16   my clients -- Wayne Whisman, Gary Vories and the rest,

17   did you witness or observe that they were given

18   promises in '99 that haven't transpired?

19        A       I don't know that they were given any

20   promise.  I mean, if you can be specific, I'll try and

21   answer if I know, but I don't know of promises that

22   were made that weren't kept.  I mean, you know, ask me

23   a specific question and if I know, I promise you I'll

24   answer.

25        Q       That's all we can ask.  Let me show you

1   a document that was Exhibit 2 to Mr. Kehr's deposition.

2   Take a moment to review that.  The print is a little

3   smaller, Mr. Saleh.  Take as long as you need to review

4   that and I'll ask you some questions, Mr. Saleh.

5        A       I've read this many times before, if

6   that's what you --

7        Q       Okay.

8        A       I mean, you want to ask me about it,

9   you can ask me about it.  This is the one that was

10  given to the Ford transitional employee and not the one

11  that was provided to the ZF employee.

12       Q       Okay.

13       A       It was a three-pieces folded piece of

14  paper.

15       Q       Tri-fold?

16       A       Tri-fold.  Folded three times.

17       Q       And when did you first see this

18  document?  And I don't mean a date, but just when in

19  the process that we've talked about did you first see

20  this document?

21       A       As the company started maturing, there

22  were two -- two pieces of paper that were introduced at

23  a latter date and that was after this that we actually

24  saw this piece of paper.

25       Q       Turning back to Exhibit 3 with Mr.

1    Whisman's name on it, you see that second paragraph

2    where it says "Your starting salary with ZF Batavia..."

3    -- it continues and then it says "Former Ford employees

4    joining the ZF Batavia team..." and it says summary

5    attached.  Do you see that?

6         A       Mm-hmm.

7         Q       Do you think that Exhibit 2, the tri-

8    fold brochure that you've identified, was the summary

9    that was attached to Mr. Whisman's letter?

10        A       We did not have this with this when we

11   turned -- when we gave them the offer.

12        Q       Do you know what was attached?

13        A       I can't -- I can't remember.  There was

14   like a -- like a letter, if I can recall right.  I

15   don't know exactly what was --

16             MR. SIMON:  Mr. Hunter, do you know

17        what document Mr. Saleh is talking about?  I

18        mean, is ZF or Ford taking a position on what

19        was the summary attached?  I mean, Mr. Saleh is

20        the one who signed it so he's obviously the

21        logical person for me to ask, and he seems

22        unsure or at least he said that he doesn't

23        think it's Exhibit 2.

24             MR. HUNTER:  Yeah.  I can't tell you

25        what was attached.  I'm not convinced that

1          anything was actually attached to them.  I

2          would represent that in the personnel files,

3          for example, the copies that were kept by the

4          company, there's nothing attached to them.

5                    THE WITNESS:  When I passed out the

6          paper, there was no attachment to it that I can

7          recall.

8    BY MR. SIMON:

9          Q     Well, I thought you said just a second

10   ago --

11         A     There was a letter that was sent to us

12   in the package, in the envelope, please take those

13   offers to the employees and do this and this.  And it

14   was something that was given to me as -- as an

15   attachment and the rest of it, I don't recall there was

16   anything attached to this.

17         Q     Okay.

18                    MR. COOK:  This is Deposition Exhibit

19         3; is that what you mean?

20                    THE WITNESS: Yes.

21                    MR. COOK:  I can't ask questions.

22   BY MR. SIMON:

23         Q     I understand what you're saying.  The

24   letter to Mr. Whisman, you don't recall if there was

25   anything actually attached to his letter that you

1    signed, right?  Or you're unsure?

2         A     I am unsure.  Originally -- when we did

3    the initial passing these letters to everyone, Exhibit

4    3 as we referred to it, there were no -- nothing

5    attached to them that I remember.

6         Q     When Mr. Whisman or others signed the

7    document, were you -- either for Mr. Whisman or any of

8    the other people we've talked about, were you present

9    when they signed it?

10        A     No.  With Mr. Whisman I can't remember.

11   I can't tell.  With the rest of them, they were

12   supposed to sign the paper and take it back to labor

13   relations and I pretty much found out whether they were

14   going -- they were actually joining or not was from

15   taking it back to salaried personnel.  They didn't

16   return -- some of them might have returned it back to

17   my organization, but the majority of them took them

18   back to HR.

19        Q     When you say returned to your

20   organization, they may have left it on your --

21        A     Either gave it to me or they might have

22   given it to their immediate supervisor.

23        Q     Okay.  And given your testimony, I just

24   want to get some more details here.  When you gave

25   Exhibit 3 to Mr. Whisman or gave the same letter in

1    substance to Mr. Vories, would you have given it to him

2    in his work area or did you call him into a conference

3    room and talk about it and then give it to him?  What

4    was generally your practice there?

5           A       At the beginning you asked me a

6    question, if these people were my direct report.  If

7    you look at an old chart, they are not directly direct

8    report to me.  They -- I am the manager of the

9    maintenance organization and we have a structure and

10   they report to somebody who might second-tier report to

11   me.

12          So typical procedure would say I give

13   this piece of paper -- if Mr. Whisman worked for Ron

14   Pearce, I might have given it to Ron Pearce to give

15   him.  Mr. Whisman, his paper was somewhat treated

16   differently because he didn't go through the normal

17   process.  But what I would have done obviously at that

18   time is, you know, each MPS or their immediate boss

19   would probably have taken these papers from me and

20   passed them out to them.  That's typically the

21   procedure, so --

22          Q       For somebody like Teri Parker who

23   you've testified that you talked to, when you talked to

24   somebody like Teri Parker, you didn't have her letter

25   in your hand, right?

1           A        No.  Just conversation.  She had the

2      letter passed to her from her organization.  So it

3      wasn't me.  I had nothing to do with her letter.

4           Q        Okay.  I think you may have answered

5      this.  But do you remember actually reviewing this

6      letter, which is Exhibit 3, with Mr. Whisman or similar

7      letters for any of the other individuals?

8           A        If I did, the only individual might

9      have been Teri Parker.

10          Q        Okay.

11          A        If I recall right, she -- she refused

12     at first and I went back and got it back and tried to

13     talk to her, trying to convince her to -- to rejoin.

14          Q        Since you, other than Teri Parker,

15     didn't review the letter with these people, I suppose

16     it's possible that when they received the letter

17     through the bureaucratic channels, that there may have

18     been a summary attached, as far as you know?

19          A        I did not see a summary and when --

20     when I signed, I didn't have a piece of paper given to

21     me.

22          Q        Okay.  Somebody else could have

23     attached a summary after you released the letters?

24          A        Again, I have never seen it, so --

25          Q        Okay.  Moving to Plaintiffs' Exhibit 2

1    then, the tri-fold brochure, did you ever present

2    Plaintiffs' Exhibit 2, the tri-fold brochure -- did you

3    either present it to any of these people, did you ever

4    go over the contents of the brochure with any of these

5    people?

6         A       I don't recall ever doing that, no.

7         Q       The actual contents of it, though, you

8    see on the first page it talks about the retirement

9    benefits on the left-hand side generally?

10        A       That's true.  Mm-hmm.

11        Q       And then we open it up and it has at

12   the very top -- it's a little hard to see with the

13   staple -- it says competitive compensation.  Do you see

14   that?

15        A       Mm-hmm.

16        Q       It mentions salary and then it goes on,

17   annual incentive plan.  Do you see all that?

18        A       That is correct.

19        Q       It also mentions a number of benefits

20   that are listed there, such as we have the 401(k)

21   savings plan on the far right.  Do you see that?

22        A       Mm-hmm.

23        Q       Are these all -- is that a yes, Mr.

24   Saleh?

25        A       Yes, sir.  Yes.  I'm sorry.

1          Q        Thank you.  Even though you, given your

2     testimony, may not have physically gone over this

3     document with any of these people, did you discuss

4     generally the package of compensation and benefits with

5     them before they made the decision to come over?

6          A        No, sir.  That was done by someone

7     else, not me.

8          Q        When you talked to these people, you

9     talked about the opportunities they might have at ZF

10    Batavia, right?

11         A        That is correct.

12         Q        You talked about the new technology,

13    that sort of thing?

14         A        That is correct.

15         Q        And didn't you tell them that as far as

16    the benefits and compensation go, it's generally going

17    to be like what it was like at Ford?

18         A        We were told that in a meeting, that

19    our compensation would be similar to -- we were

20    summoned to a couple of meetings and there was a lot of

21    talk and a lot of questions asked and a lot of things

22    answered.  And there were two meetings, maybe three.  I

23    can't remember.  I attended only one of those meetings

24    and didn't attend the others.  But those questions were

25    raised by many people and I don't remember or I don't

1      -- I wasn't part of the answer.  But there were -- we

2      knew exactly how our retirement was going to be

3      affected from the meetings.  We knew what the policy

4      was going to be like.  And we roughly had an idea what

5      the work environment was going to be.

6          Q       This meeting that you attended, was

7      this one that -- there was a meeting that took place on

8      May 27th where most of the salaried employees attended,

9      based on the testimony in the case.

10         A       Right.

11         Q       A large meeting where Mr. Kehr was

12     there, representatives from -- I think Lee Mezza was

13     there, Charlie Corbet.  Is this the meeting that you

14     attended?

15         A       That's -- that's one of the meetings.

16         Q       Well, you said you attended one

17     meeting.  Were there other meetings?

18         A       There were -- there were originally,

19     when we -- we were Ford employees after the initial

20     announcement.  The company came down and they had

21     several meetings with us in which they talked about

22     general -- what are we -- you know, what we can expect.

23     If you accept an offer with ZF and you stay here, what

24     to expect, how the transition will take place.  And if

25     you don't, then, you know, we'll try to place you as

1     best as we can in a compatible position and these are

2     the rules and regulations.  And that's basically what

3     transpired.  There was two or three meetings that took

4     place like so.  And there was the major meeting that

5     you're referring to in which ZF and Ford were

6     represented in there and there was the roll-out of the

7     -- what to expect and not to expect.

8          Q      And I think before you gave that

9     detail, you had started to say that you were told at

10    this meeting that the package of compensation and

11    benefits would be very similar to Ford's current

12    package, right?

13         A      That most of it would be similar to

14    Ford, yes, some changes will take place.  Like we knew

15    going in that we weren't going to have the A plan, for

16    instance.  That would have been a change.

17         Q      Just looking at -- what you were told

18    in that meeting, does it pretty closely track what's in

19    Exhibit 2 in the brochure?

20         A      I would have to say so.

21         Q      Like it says authorized overtime will

22    be paid.  Do you see that there in the upper left-hand

23    column?

24         A      Yes.

25         Q      And they were told that at the meeting,

1    right?

2           A       Yes, sir.

3           Q       And did you remind people like Teri

4    Parker and other people who you spoke with, did you

5    remind them that overtime will be paid just as it was

6    at Ford?

7           A       I'm not sure I have ever used the word

8    authorized.  The words if you're forced to work

9    overtime, I will pay you.  That was -- that was

10   probably what -- what I would have said.  If I schedule

11   you to work overtime, I will pay you.

12          Q       Okay.  And stopping there for just a

13   second, Ford had a -- obviously that had been the

14   policy of Ford is to pay their salaried employees

15   overtime?

16          A       Except for the casual time and the

17   exempt people.

18          Q       Well, were they exempt?

19          A       The employees working in my

20   organization?

21          Q       Yeah.  I mean, the non-hourlies, like

22   Wayne Whisman, did you consider him to be exempt from

23   overtime?

24          A       No.

25                  MR. HUNTER:  Well, objection to the

1           extent that you're asking for the exemption

2           status under FLSA.  It's Mr. Saleh's opinion as

3           to what he thought.  I have no objection to

4           that.  But he obviously can't render --

5                     MR. SIMON:  He used the word --

6                     MR. HUNTER:  Understood.  Just so

7           that's clear.

8      BY MR. SIMON:

9           Q       You said exempt.  What did you mean by

10     that?

11          A       In Ford Motor Company when you reach a

12     certain level of pay, you become an exempt employee.

13     You -- you're expected to do your job as part of the

14     management group and you're not compensated for working

15     overtime.  You work the number of hours you need to

16     work to get the job done.

17                  And we have, you know, the categories

18     -- the category, as an employee of Ford Motor Company,

19     if I was a maintenance supervisor, I was expected to

20     put approximately 45 minutes of casual time.  And if

21     you were required or told you had to work the hours,

22     you were paid for them.

23          Q       At Ford the policy was that casual time

24     was 45 minutes a day?

25          A       It varied from -- from a half an hour

1    to 45 minutes.  At times it was an hour.  It would

2    depend on -- it depended on the individual and the

3    expectation of the job.  I mean, if the job required

4    you to be there and get a lineup from somebody and line

5    somebody up at the end, we pretty much expected people

6    to do the 45 minutes.

7         Q    Okay.  Generally, as you recall --

8         A    I don't remember ever seeing it written

9    in stone in Ford Motor Company, but that was the

10   general understanding of us as an organization and we

11   held people to that extent.

12        Q    But your general understanding was if

13   you worked a full hour beyond your eight hours, that

14   that was typically compensated?

15        A    If you were required to work the hour,

16   yes.

17        Q    Okay.  Is that the current policy at ZF

18   Batavia?

19        A    If I schedule an individual to work

20   beyond an hour, which I call that the lineup piece of

21   it, if you may, the casual time, if you work -- if I

22   request that you work more than -- than that hour, I

23   will pay you for it, yes.  That's the policy I have

24   today.

25        Q    Well, isn't the policy at ZF Batavia

1    that you have to work at least 10 hours in an eight-

2    hour day before you get compensated for overtime?

3            A       If you work more than the hour required

4    for what's -- what's considered casual time in my

5    organization, I pay you for it.

6            Q       But isn't it true that if somebody

7    works nine and a half hours today at ZF Batavia --

8            A       Mm-hmm.  Mm-hmm.

9            Q       -- isn't it true that that hour and a

10   half is not compensated, assuming that it was --

11           A       The half an hour is compensated.  The

12   original hour that is considered to be casual is not

13   paid for.  But if you present me with a time card with

14   just a half an hour overtime on it and you say you

15   started at 3:30 and you quit at -- I mean, if you

16   started at 7:00 or 9:00 and quit at 5:30, I am not

17   going to compensate you for -- for that half an hour,

18   if that's what you're asking.

19           Q       All right.  I just want to understand.

20   At Ford if you worked an hour and a half beyond your

21   eight hours and it was required by the supervisor, you

22   were paid an hour and a half overtime, right?  We're

23   talking about the salaried people.

24           A       I would have to say no to that.  In my

25   practice years and in my management at Ford Motor

1      Company, that if you did an hour, you did not get paid

2      for it.  It was -- it was casual time.  I mean, I was

3      expected to get on my job a half an hour early and if

4      it took a half an hour at the end of the shift to go

5      and turn in my papers and change my shoes and tell my

6      boss I did this and that and the other and walk out, I

7      didn't get paid for that.

8             Q       I thought you said that casual time

9      was a total of maybe a half hour to 45 minutes, maximum

10     an hour, at Ford.

11            A       That's what I said, to the best of my

12     knowledge.  I have never seen it cast in stone, but

13     that's basically the unwritten rule that we in Ford

14     Motor Company played with.

15            Q       The half hour, 45 minutes being the

16     total casual time, including the time before and the

17     time after your shift?

18            A       That is correct.

19            Q       So the policy was -- let's say, take

20     the lower one, a half hour of casual time --

21            A       Okay.  Right.

22            Q       So if the person worked an hour, they

23     had worked an hour extra beyond eight hours, they had

24     worked a half hour beyond the casual time --

25            A       Right.  So they get the half an hour

1    overtime.  That's how it's supposed to work or that's

2    how we interpret our responsibility toward the company

3    to be.

4         Q    Okay.  So --

5         A    Now, one thing I'd like to say and I

6    want to go on record as saying, I don't know what other

7    managers in Ford Motor Company did, but at least the

8    environment in which I grew in, that was the common

9    practice.

10        Q    Right.  And a lot of the people who

11   joined ZF Batavia who are in this lawsuit, a lot of

12   them worked in that same environment for you at Ford in

13   1998 and 1999.

14        A    At least where I worked, I thought that

15   was what's appropriate to do.

16        Q    All right.  Let's just take -- let's

17   make sure we're talking about the same thing.  It's

18   just an issue in the case.  That's why I'm asking you

19   about it.

20             If somebody works a total of 10 hours,

21   and that's two hours beyond eight hours, okay, and

22   assuming that it's authorized overtime, compelled

23   overtime, what have you --

24        A    Mm-hmm.

25        Q    -- if they work 10 hours at ZF Batavia

1    today, how much overtime do they get paid?

2            A       One hour.

3            Q       And what about at Ford under your

4    system?

5            A       It should have been one hour when I

6    worked for Ford Motor Company at the time too.

7            Q       Do you know how much your casual time

8    was under your policy when you were at Ford, what you

9    enforced?  Did you enforce an hour of casual time?

10           A       If I tell an individual you have to

11   work 10 hours for me, he worked 10 hours and got paid

12   two hours of overtime.  If he started a half an hour

13   earlier than the 10 hours and a half an hour after

14   those 10 hours to do his start-up and end of the day, I

15   didn't count that as 11 hours.  It was 10 hours.

16           Q       And if you work 10 hours at ZF Batavia,

17   typically then you'll be paid for one hour extra

18   overtime?

19           A       If I told you to work 10 hours, I don't

20   tell you to work the casual time.  I do not schedule

21   casual time.

22           Q       Right.  But if you work the 10 at ZF

23   Batavia, do you get paid for one or two hours?

24                   MR. HUNTER:  Steve, if I can interject

25                   --

```
 1                    MR. SIMON:  Well, I --

 2                    MR. HUNTER:  -- I think there's some

 3             confusion here about casual time in terms of

 4             does your 10 hours count casual time?  Are you

 5             saying 10 hours plus?  Because I think there's

 6             a real disconnect here.

 7                    MR. SIMON:  Well --

 8                    THE WITNESS:  If I have a department

 9             running 10 hours and I tell a supervisor to

10             come in and supervise this department for 10

11             hours, I pay the supervisor two hours of

12             overtime.  He's also expected by me to arrive

13             on the job a half an hour early and get a

14             lineup and stay the extra 15 or 20 minutes to

15             do the closure with the new group leader that's

16             coming in if a group leader is going to come in

17             to take over from that.

18                    So the unwritten rule that was at Ford

19             Motor Company, as far as I grew up and

20             understood, is if the department is working 10

21             and I was there the 10 hours in that

22             department, I got paid the two hours of

23             overtime, I came in on my own half an hour to

24             get lined up or to get the start-up procedure

25             from the individual who was before me there or
```

```
 1                  to initiate the department and at the end of
 2                  the shift I went up and did a closure with my
 3                  boss or -- that's how it worked.
 4       BY MR. SIMON:
 5                  Q       Is the overtime policy on this issue
 6       about casual time, is it any different at ZF Batavia
 7       today than it was at Ford when you were there?
 8                  A       I think I've seen a policy at ZF.  I
 9       haven't seen the policy at Ford.
10                  Q       Focusing then on your practice when you
11       were at Ford --
12                  A       Right.
13                  Q       -- is your practice at Ford the same as
14       the current ZF Batavia policy on this issue?
15                  A       Real close, yes.
16                  Q       Were there any differences that you
17       know of?
18                  A       I have not seen the policy at Ford,
19       again, but I've seen the policy at ZF.  And the policy
20       at ZF said you put an hour of casual time in and -- and
21       you get paid beyond that.
22                  Q       And you're saying that was your
23       practice when you were at Ford?
24                  A       The casual overtime policy -- I mean,
25       my understanding of the casual overtime at Ford Motor
```

1    Company, depending on your job and your environment,

2    was anywhere from a half an hour, minimum of a half an

3    hour to as much as an hour.

4         Q         Is there any difference between your

5    practice at Ford on this issue of casual time and ZF

6    Batavia's current policy?

7         A         I don't think I -- I conduct it any

8    differently myself, no.

9         Q         And you're currently conducting your

10   overtime policy in a consistent manner with ZF

11   Batavia's written policy?

12        A         To the best of my knowledge, yes.  I

13   have people working for me and they -- they do that.  I

14   only sign one time card in my organization or maybe

15   two.  And to the best of my knowledge, it is enforced.

16        Q         Okay.  And I think you had said when

17   you had talked to some of these individuals, Wayne

18   Whisman, others, you had mentioned overtime as a

19   benefit that they would get at ZF Batavia, right?

20        A         I did not.  In the meeting that we

21   attended we were told that scheduled overtime will be

22   compensated.

23        Q         And you understood that scheduled

24   overtime would be compensated in the same way that it

25   had been done at Ford?

1          A       Yes.

2          Q       Okay.  Let me stay on this topic for a

3     second.  We might take a break in a moment.

4                  If, for example, someone like Mr.

5     Vories has to work 12 hours because he has to come in

6     four hours early to cover a person on vacation, does he

7     get paid that four hours overtime at ZF Batavia?

8          A       The policy is clear at ZF Batavia.  You

9     have to work the additional -- you have to arrive a

10    half an hour early and leave a half an hour late.

11         Q       But this is, I guess, a different

12    situation where you come in four hours early because

13    you have to cover for a person.  In that situation do

14    you get the four hours overtime?

15         A       Again, the policy said if you are doing

16    the work, you are physically -- here -- here is where

17    there may be some -- some confusion and that you might

18    not understand that I'm trying to tell you.

19                 If I walked into the plant on casual

20    time, it starts when I start walking into the plant.

21    It's covered under me changing my shoes, walking up to

22    my department, reading a few pieces of e-mail and

23    getting lined up.  And when I was a Ford Motor Company

24    employee, I did not put that on my time card and I

25    didn't get compensated for it.  And the same rule

1      applies at ZF today.

2                    If you're asking me if I got -- if I

3      pay the person from the minute they walk into the plant

4      to the minute they walk out -- if I schedule the

5      individual for 12 hours, I pay them for the 12 hours,

6      he's expected to walk into the plant on his own time,

7      change his shoes, put his clothes on, read his e-mail,

8      talk to his associate to get acquainted with what he

9      needs to do.  That's what we refer to as casual time.

10     He's not in the capacity serving as you're responsible

11     for this department this minute.

12              Q       Okay.  I understand.

13              A       The time he's responsible for that job,

14     I pay him the overtime.  That's the policy.

15              Q       All right.  So the policy is if someone

16     works 12 hours and they're covering for another person

17     for four of those hours, they also work casual time

18     which they don't put down, they should get paid an

19     additional four hours?

20              A       That is correct.

21              Q       That's the policy at ZF Batavia and

22     that was your policy at Ford?

23              A       That's how I understood the policy at

24     Ford Motor Company.  I was never given a piece of paper

25     and say sign on the dotted line, this is what Ford

1     Motor Company's policy is.  It was the common practice

2     a good employee would do this and we held people to a

3     certain standard in the manufacturing organization.

4                    MR. SIMON:  All right.  Why don't we

5              take just a short break.

6                        (RECESS)

7                    MR. SIMON:  We're back on the record,

8              Mr. Saleh.  We took a small break.  Do you

9              understand you're still under oath, sir?

10                   THE WITNESS:  Yes, sir.

11    BY MR. SIMON:

12         Q      Let's take a look at Plaintiffs'

13    Exhibit 2 some more.  This the tri-fold brochure.  And

14    it's your understanding that Plaintiffs' Exhibit 2 at

15    some point was given to the salaried employees that

16    transitioned to ZF Batavia?

17         A      That is correct.

18         Q      And you understood this brochure, this

19    summary, to contain a set of promises from ZF Batavia

20    of what the transitional employees could expect at ZF

21    Batavia?

22         A      That was the policy at the time.  I

23    don't know about promises were made.  You know, this

24    was the policy that was this is what we're going to do

25    and --

1          Q          Well, this is what when someone came

2     over to ZF Batavia that they could expect that this

3     would be their package of compensation and benefits,

4     which is Exhibit 2?

5          A          We understood it as this is our intent

6     today.  And, again, I'd like to go back on record one

7     more time to say this piece of paper itself wasn't --

8     wasn't around and I'm not -- I do not deny that it

9     might have been part of something that looked

10    differently or there were -- you know, some of these

11    rules and regulations that you see on it, if you want

12    to call them rules and regulations, are -- some of

13    those things on it right now, they might have been on

14    different documents, on a different piece of paper.

15         Q          Well, let's turn to the second page of

16    this, which has the three columns.

17         A          Okay.

18         Q          Starting in the upper left it has a

19    section called salary.  It says there that broad

20    banding replaces salary grades, right?

21         A          Yes.

22         Q          And that has been the policy at ZF

23    Batavia, which I guess was a change from Ford, that

24    there would be broad banding instead of salary grades?

25         A          That is a change.

1         Q         And that has happened?

2         A         That is correct.

3         Q         All right.  And so someone reading this

4    also was advised that authorized overtime will be paid,

5    right?

6         A         That is correct.

7         Q         And has that happened at ZF Batavia

8    since 1999?

9         A         To the best of my knowledge, in my

10   organization -- and I can answer regarding my

11   organization -- I paid the employees and anytime I --

12   you keep calling it authorized overtime.  I refer to it

13   as scheduled overtime.  I paid my employees for

14   scheduled overtime, to the best of my knowledge, from

15   day one till today, except for approximate -- either

16   two or three weeks, I can't swear that it was three and

17   I can't swear it was only two.  I don't know.  It was

18   probably in two pay periods there was a weekend that I

19   told people they had to work and did not pay them

20   overtime.  And typically our overtime -- our weekends

21   are overtime.

22              So to the best of my knowledge today, I

23   paid people according to policy and paid them overtime

24   for required overtime and under the same rules and

25   regulations that I -- I had back in the days of Ford

1    Motor Company or today in ZF -- in the ZF organization.

2         Q         This period that you're talking about,

3    does May 2002 sound right?

4         A         Around that time frame.

5         Q         Do you recall a meeting of the

6    maintenance department, I think you or Milt Gross were

7    there and Mr. Whisman and others, where you announced

8    that you're going to work this weekend and the next

9    weekend without being paid?

10        A         Mr. Gross was the individual who held

11   the meeting.  I don't recall myself being in the

12   meeting.  But Mr. Gross does represent my organization

13   and he did have -- he did have that meeting.  I don't

14   know exactly what was transpired, but that was the --

15   the direction that Mr. Gross was given by me.

16        Q         Okay.  Who told you that they -- did

17   somebody tell you that maintenance wouldn't be paid

18   overtime for these particular weekends?

19        A         Yes.

20        Q         Who was that?

21        A         My boss.

22        Q         Which is Mr. Newark?

23        A         Yes, sir.

24        Q         What did Mr. Newark tell you was the

25   reason for this?

1          A        We -- as a company, we can't afford to

2     pay the overtime we're paying and we're going to

3     require the people to get the job done for their -- you

4     know, particularly on the weekend without paid -- paid

5     overtime.

6          Q        And that was a change in policy as far

7     as you knew at that point?

8          A        Yes, sir.

9          Q        Did he say anything else that you

10    recall?

11         A        We talk every day.  I mean, what do you

12    mean?

13         Q        Well, he said that the problem was that

14    they're having problems with budget paying the salaried

15    people overtime and that to handle that problem they

16    were going to have salaried people work on weekends

17    without being paid; is that essentially what he told

18    you?

19         A        That is -- that is correct.  We had so

20    many hours of overtime we could use and when we run

21    out, we're not going to pay overtime was basically the

22    general idea, the approach.

23         Q        And that's what you told Mr. Gross to

24    tell the maintenance department?

25         A        Yes, sir.

1          Q        Essentially that at that point there

2     was going to be a new policy that because of budgetary

3     problems weekend overtime would be mandatory and

4     unpaid?

5          A        We had so many hours of overtime we

6     could use in the year and when you run out, you are not

7     going to use any more hours of overtime.  The people

8     are going to have to work and get the job done with

9     their base pay.

10         Q        Okay.  And at that point -- and, again,

11    you think May 2002 may be correct?

12         A        That's around -- around the time when

13    it did take place, yes.

14         Q        And when you told Milt Gross to tell

15    the maintenance department about this policy, at that

16    point you already had used up everything in your budget

17    to pay overtime, so --

18         A        That is not correct.  We did not use

19    the entire amount of money that was left in the -- in

20    the pot, not just yet.

21         Q        What kind of numbers are we talking

22    about?  How much was left in the budget?

23         A        Again, this is -- this is not cast in

24    stone.  If I can recall right, it was anywhere between

25    $80,000 and maybe $100,000 left in the pot.

1           Q       If you had $80,000 to $100,000 left in

2      the pot, why did you in May 2002 instruct the

3      supervisors to work overtime on the weekend without

4      being paid, as opposed to letting that $80,000 to

5      $100,000 run out?

6           A       The fear on my part was if we asked

7      people to work during holidays and you're going to take

8      somebody away from their Mother's Day brunch, I guess,

9      we need to -- to pay for that -- for that holiday, not

10     a regular weekend or -- or an hour or two hours of

11     overtime Monday through Friday.  That was -- that was

12     the conversation I had with my boss at the time when we

13     got close to running out of funds for overtime.

14          Q       How long did that $80,000 to $100,000

15     -- how long -- if you had continued to pay the people

16     the time they worked on the weekends, how long would it

17     have taken for the $100,000 to run out?

18          A       Not long.  It couldn't -- it couldn't

19     have lasted a month.

20          Q       Okay.  And then is there a point later

21     in the year in 2002 where you would get a new budget

22     that you could draw from?

23          A       No, sir.

24          Q       So once you ran out of that $100,000 --

25     which might have run out in a matter of weeks, is that

1    fair?

2           A       Right.

3           Q       -- then for the rest of 2002 you would

4    have had no money in the budget to pay that overtime,

5    weekend, right?

6           A       That is correct.

7           Q       And that's what ultimately was conveyed

8    by you to Mr. Gross, which was conveyed to the

9    maintenance supervisors?

10          A       That is correct.

11          Q       That for the rest of the year you were

12   going to have to work some weekend overtime, not get

13   paid, except for certain days we'll draw on the $80,000

14   to $100,000 so we can make sure you're paid for certain

15   holidays and things like that; is that fair?

16          A       Yes.

17          Q       Okay.  Do you remember any other

18   meeting besides the one that we talked about with Milt

19   Gross where maybe you did attend the meeting with the

20   supervisors in that same time period?

21          A       Well, I've attended many meetings, but

22   I don't know that this individual meeting I necessarily

23   was in it.  But, I mean, I was there, attended some of

24   the meetings.  And that meeting in particular, I don't

25   remember being in it.

1          Q          Do you remember any meeting where this

2     subject was discussed in that time period in 2002?

3          A          I was asked --

4          Q          Where you were present?

5          A          I was asked many times in different

6     areas what the intent and what was the direction and

7     why we're doing this and I probably answered the same

8     way I'm answering you today.

9          Q          And that may have been --

10          A          So I don't deny me being part of this.

11     I'm telling you it's --

12          Q          I understand that.  I'm just trying to

13     place you at certain meetings if you recall.  Would you

14     have been at a group-wide meeting talking about this?

15     Or you just don't recall?

16          A          I have been in group-wide meetings, but

17     I don't remember it was an overtime meeting.  I don't

18     know that I was in that one in particular.  Again, I

19     probably answered those questions to people when they

20     asked me.  I don't deny it took place.

21          Q          Sure.  That's all right.

22          A          I just don't remember being in the

23     overtime meeting.

24          Q          That's okay.  I just was wondering

25     because someone might testify that you were at a group-

1    wide meeting talking about this --

2          A       And that's -- that could be.  That

3    could be.

4          Q       Okay.  Are people paid for weekend

5    overtime today?

6          A       Yes, sir.

7          Q       What changed, if anything, from the

8    time of this May 2002 meeting until today that they're

9    now paid weekend overtime?

10          A       Immediately after the first two

11    weekends in which we told people they had to work and

12    we didn't pay the overtime, there was a concerted

13    effort on -- on our part to try and rectify and fix the

14    situation.  And what I understood at the time from the

15    accounting fraternity, that we went back to that

16    organizations where there was overtime authorized --

17    and because of the nature of the business, the

18    maintenance organization worked weekends to fix the

19    equipment they cannot fix Monday through Friday, and we

20    have a higher requirement of overtime.  They -- the way

21    I understood what transpired is we drew some of the

22    funds from the -- from the other organizations that

23    didn't have the same demand and we -- we -- the way we

24    approached it is we controlled the number of people

25    that came in on the weekend to reduce our requirement

1     as far as the payroll is concerned.

2                   So the way we started doing it is we

3     would bring a lesser number of people on the weekend to

4     do the work than we were doing in the past and control

5     -- control the budget so that people that were, again,

6     told they had to work, they were paid.

7          Q     And you had conveyed to Mr. Gross that

8     it wasn't just weekend overtime, it was all overtime,

9     even during the week, that would be --

10         A     All overtime.  So we had an overtime

11    budget and when we run out of overtime, any overtime

12    worked would -- would not be paid for.  You -- you

13    revert back to your base pay.

14         Q     And the issue of the weekends came up

15    because it was further explained to them that you are

16    going to work on the weekends and you're not going to

17    get paid?

18         A     For the two, maybe three -- two, I

19    think it's two, but it could be three weekends we had

20    people working, we did not pay overtime.

21         Q     And one of the ways that you remedied

22    this problem, you said, is that you took monies from

23    other departments at ZF Batavia allotted for overtime

24    budget and you moved it over to maintenance?

25         A     What I was explained to by the

1    accounting fraternity.

2            Q        Were there other departments in that

3    time of May 2002 who were told, like in production,

4    well, you've got the same problem here, overtime budget

5    is about to run out and you're going to be in the same

6    situation as maintenance?

7            A        We -- in several meetings -- the

8    material handling organization was close to being in

9    the same category as maintenance because of the nature

10   of their requirements as far as overtime is concerned.

11   And then a little distance was the production

12   organization and they were -- they were being warned to

13   control it and reduce their number of people so they

14   don't run into the same situation as the maintenance

15   organization has.

16           Q        When the maintenance supervisors

17   learned about the situation with overtime, that it

18   wouldn't be paid, I think you said people had come up

19   to you and asked you questions and you answered.

20           A        The same way I answered you today.

21           Q        Mr. Whisman may have been one of them?

22           A        Probably.

23           Q        You understood that there were a lot of

24   complaints in maintenance that they were going to have

25   to work overtime and not be paid?

1          A          I'm aware of that.

2          Q          Okay.  There was a lot of dissension?

3          A          I understand that, too.

4          Q          And did you have any concerns that

5    someone in that group might bring a lawsuit over this?

6          A          That was a possibility, obviously the

7    employees' right.

8          Q          And were you aware that a lawsuit then

9    was filed, I believe, in June of that year, which is

10    this lawsuit?

11          A          I did not know exactly about the time

12    that the lawsuit was filed.  I -- I heard of the

13    lawsuit at a latter date.

14          Q          Have you ever reviewed a copy of the

15    complaint in the lawsuit, which is --

16          A          No, sir, I've never really seen it.

17          Q          Did you review any documents in

18    preparation for the deposition today?

19          A          Did I review any documents in

20    preparation?  No.  I was just informed by our HR group

21    that I was deposed today.  That was about a week ago.

22    And just -- just a piece of e-mail, if that's what you

23    --

24          Q          And I don't want to get into this, but

25    you had an opportunity to meet with Mr. Hunter before

1     the deposition?

2          A     I did have an opportunity to meet with

3     Mr. Hunter and he went over some of the -- the

4     questions that may be asked of me, and that's -- that's

5     the only thing that I --

6          Q     You didn't review any documents during

7     that time?

8          A     I reviewed this document, and it would

9     be Exhibit 3.  He asked me if I have seen this and I

10    said yes.  He asked me if I understood what was in it

11    and I said --

12         Q     Well, hold on.  I didn't want to go

13    there.  I don't want to get into communications you had

14    with Mr. Hunter.  I just was trying to see what

15    documents you had looked at.  But that's all you looked

16    at?

17         A     That's the only document I looked at.

18    This one here.  He -- he showed me these two documents

19    is all he showed me.

20         Q     Okay.  That's it.  That's fine.

21    Nothing was disclosed there.

22         A     I'm sorry.

23         Q     I'm just trying to understand the

24    timing of it.  May 2002 there's the new policy, you're

25    going to work overtime and not be paid.  There's

1    grumblings, there's dissension and then a lawsuit is

2    filed in June 2002.  And then what you've told me is

3    ultimately ZF Batavia worked it out so that the

4    maintenance supervisors would be paid overtime, right?

5         A       That is correct.

6         Q       Did you ever draw a connection between

7    the two, the filing of the lawsuit and the reversal in

8    the change of policy on overtime?

9         A       I am not aware of that.  I don't know.

10   I cannot -- I really cannot.  If you're asking me if I

11   know that the overtime issue initiated the lawsuit, I

12   would -- I would have to answer no.

13        Q       And I don't mean to put you in a

14   difficult spot, but did anyone tell you that the

15   lawsuit had something to do with the change in policy

16   or did anyone give you any indication that because of

17   the lawsuit they were going to reverse course on the

18   overtime policy?

19        A       No, sir.

20        Q       No indication whatsoever?

21        A       If -- if there was -- if that was in

22   the background, I'm not aware of it.

23        Q       Okay.  Turning back to the brochure --

24   and we're going to come back to that a number of times.

25   You'll want to keep that one out.

1          A       Okay.  I'll keep it open.

2          Q       Keep it open, yeah.  The other ones you

3    can probably put aside.  And, again, this is Exhibit 2.

4    This is the summary, tri-fold brochure.  Where it said

5    authorized overtime will be paid, I guess for at least

6    a period of several weekends and several weeks or more

7    that promise was not honored; is that fair?

8               MR. VANWAY:  Objection.

9          Mischaracterizes the witness' testimony.  I

10         think he said that these were not promises.

11              MR. SIMON:  If we could keep the

12         speaking objections to a minimum.  If you want

13         to make an objection --

14              MR. VANWAY:  Let's keep the

15         mischaracterization of the testimony to a

16         minimum as well.

17              MR. SIMON:  Well, I'm allowed to ask

18         him questions.  It's cross examination.  He's

19         certainly free to correct me or answer how he

20         wishes.  You can object to the form.  Let the

21         witness answer.  I don't want a situation where

22         the lawyer testifies.  You made the objection.

23              Mr. Saleh, do you remember the

24         question?

25              MR. HUNTER:  I was going to say, can we

1          go back to the question?

2                    MR. SIMON:  Do you remember it, sir?

3                    THE WITNESS:  If I understood you

4          right, you asked me if I did that for several

5          weeks.  And what I said, two, no more than

6          three weeks and that's all I said.  I did

7          require people to work overtime, didn't pay

8          them, and after that --

9    BY MR. SIMON:

10         Q     And to be fair, it wasn't your

11   decision, sir; you were told that from the top, right?

12         A     That is correct.

13         Q     And the fact that overtime wasn't paid

14   for the period, that was one instance of a failure to

15   honor a promise that the transitionals had been told

16   about in 1999; is that fair?

17                   MR. HUNTER:  Objection to the form of

18         the question.

19                   MR. SIMON:  Go ahead.

20                   THE WITNESS:  I -- I've never promised

21         anybody anything.  I -- I deviated away from

22         the policy, if that's what you're asking.

23   BY MR. SIMON:

24         Q     You didn't think that was -- did you

25   think that the failure to pay the salaried people that

1  overtime for that period was a failure by ZF Batavia to

2  honor a promise that they had made in 1999?

3      A      Again, I don't know that ZF Batavia

4  made promises.  ZF Batavia is a business and --

5      Q      Is it your --

6      A      -- the policy was such that if I forced

7  people to work overtime, I paid them, and for two

8  weekends I did not.

9      Q      Mr. Saleh, do you think that any of

10  these statements on the summary brochure contain

11  promises?

12      A      It's a -- you might call it a contract,

13  you might call it a guideline or -- now, you've got to

14  understand something.  I worked at Ford Motor Company,

15  where Ford Motor Company, for example, paid me -- for

16  every share of stock I bought from them, they gave me

17  50 percent and when the company got into trouble

18  financially, I didn't get anything.  They just said

19  hey, I'm sorry, I can't pay you the 50 percent on your

20  stock.  Is that a breach of their promise to me?  I

21  don't know.  I mean, I don't consider that a breach of

22  a promise.  I -- the compensation the company pays me,

23  if the company gets in trouble and can't pay it, I

24  guess, that's -- I don't know what you call that.

25      Q      Okay.  Do you see where it says annual

1    incentive plan?

2          A       Yes, sir.

3          Q       And it says "Reward program based on ZF

4    Batavia's success determined by product quality, timing

5    and delivery of new and existing products and

6    profitability."  That's what it says there?

7          A       Mm-hmm.  Yes, sir.

8          Q       And have the Ford transitional

9    employees been paid an annual incentive plan bonus

10   consistent with what is written on the summary?

11         A       To the best of my knowledge, yes.

12         Q       Well, wasn't there a period last year

13   where AIP bonuses for the year 2001 that were handed

14   out in 2002 were reduced for certain salaried employees

15   because their departments had what some believed to be

16   excessive overtime?

17         A       I can assure you, on my side anyway,

18   and I can answer to my -- my piece of it, I am not

19   privy to everybody's, but I do see the numbers for my

20   organization.

21               When they came through me and I was

22   told to go through the paper and do what I thought was

23   appropriate as far as rating, my recommendation was

24   purely based on their performance and nothing else,

25   both ZF and Ford employees.  Now, whether they got paid

1    that amount or not, I don't know.

2        Q        Why would someone -- are you saying

3    there's someone who you might have designated as

4    receiving X numbers of dollars as AIP bonus for the

5    performance that you thought was excellent or adequate

6    and that a decision was made elsewhere in the company

7    that they wouldn't receive that bonus, even though they

8    worked in your department?

9        A        I was handed a piece of paper with AIP

10    on it for individuals with recommendation.  And because

11    I give my organization guidelines to follow and measure

12    their performance to a certain standard, I measured

13    their performance for the AIP and I made the

14    recommendations and turned it into my boss.  Beyond

15    that point, I don't know what happened.  I did not -- I

16    did not see what they actually received in a bonus.

17        Q        Did you ever hear from anyone,

18    including the salaried employees themselves, that their

19    AIP bonus was cut because someone told them that their

20    department had too much overtime?

21        A        I heard hearsay rumors, yes.

22        Q        Did Mr. Whisman tell you that?

23        A        Several people said that to me, not

24    just Mr. Whisman.  If Mr. Whisman said it to me, I

25    wouldn't deny he said it to me.

1          Q        And what they told you was -- and I

2     understand you might not remember specific

3     conversations, but they told you "Hey, my AIP bonus was

4     cut because somebody told me I worked too much overtime

5     or my department worked too much overtime"?

6          A        There were -- there were some people

7     that complained, "Hey, you told me I had to work

8     overtime.  Why am I penalized for it?"  And I -- I

9     really -- you know, it's -- I don't get to see their

10    checks.  It's not company policy to -- I mean, I don't

11    have access to their AIP amount.

12         Q        What did you tell them when they told

13    you this happened?

14         A        I was -- I couldn't answer the

15    question.  I mean, obviously I didn't know whether it

16    was really true, the extent of what their -- what their

17    results were and I don't know.

18         Q        Well, did you investigate to find out

19    if what they said was true?

20         A        I didn't think it was my place to do

21    that.  If -- if they had a -- if they had a question or

22    an issue, they could go to HR and complain about it.

23    My piece of that was done based on what I always have

24    done historically.

25         Q        Did it bother you that you had made

1    recommendations for certain people's AIP bonuses and

2    that they were apparently, from what you've heard, cut

3    because somebody had worked overtime?

4         A       It would obviously bother me if

5    somebody changes the values that I put on a piece of

6    paper, but I don't know that it did take place.  I

7    mean, I heard a lot of rumors, a lot of people talked

8    about it, a lot of people complained about it, but I

9    did not see the AIP finalized piece of paper and what

10   the individuals got paid.  That's in my organization

11   only, what I'm saying is true.

12        Q       I mean, did you think it was fair that

13   their bonuses would be cut because they worked too much

14   overtime?  Did you personally think it was fair?

15        A       Personal opinion, if I force somebody

16   to work overtime, I shouldn't hold that against them,

17   if it's my -- my -- if you're asking me my personal

18   opinion.

19        Q       Did you think that that occurring --

20   and I understand you're saying you don't firsthand know

21   that it happened, but if somebody's AIP bonus was cut

22   because they worked too much overtime, do you think

23   that's at least inconsistent with what's in the

24   statement in the brochure about AIP?

25        A       I never interpreted it to be if I tell

1    you to work overtime, I'm going to cut your AIP.  I --

2    I did not interpret this piece of paper to be as such.

3        Q    Okay.  And you understood that in 1999

4    when people came over to ZF Batavia, one of the

5    benefits that was described either by you personally or

6    at a meeting you attended, the company had described an

7    annual incentive plan?

8        A    Yes, sir.

9        Q    It was one of the benefits of joining

10   the company?

11       A    Yes, sir.

12       Q    It was for you as well?

13       A    Yes, sir.

14       Q    Okay.  Where it says merit increase

15   program, it says "A merit program is established and

16   the amount will be announced annually."  That's right,

17   correct?

18       A    That is correct.

19       Q    Has anyone ever told you that merit

20   increases were going to be reduced for ZF transitional

21   -- excuse me, for Ford transitional employees so that

22   their salaries would be more in line with ZF new hires?

23       A    Specify your question a little bit more

24   for me, a little closer to at the beginning, in the

25   middle, at the end.  When -- what are you -- what are

1      you asking me about what --

2          Q      Well, we'll start from the beginning

3      when you first joined ZF Batavia and then we move into

4      2000, were your people given merit increases?

5          A      Yes, sir.

6          Q      And did that happen in subsequent

7      years, 2001, 2002?

8          A      Every year.

9          Q      Starting with 2000, did anybody

10     indicate to you from ZF Batavia or Ford that they

11     wanted to make sure the merit increases went down over

12     the years so that the Ford transitional employees'

13     salaries were consistent with ZF new hires?  In 2000

14     did that happen?

15         A      Yes.

16         Q      Who told you that?

17         A      The piece of paper I received from the

18     company to -- to do the merits for my employees showed

19     on it a column that would say there is a different

20     merit recommendation that was for the Ford employees --

21     for the Ford transitional employees versus the ZF

22     employees.

23         Q      And this was regarding merit increases?

24         A      That was regarding merit increases.

25     Did I abide by it or did I pay the merit based on what

1    was recommended to me?  The answer to that is no, in my

2    organization at least.  My understanding was I -- I did

3    the paper, I did it based on their -- on everyone's

4    performance, and returned it again through the proper

5    channels, but I did it based on performance, not what

6    was recommended on the paper to me.

7         Q    Now, where did the paper come from?

8         A         Through the HR channels, with

9    guidelines on how to apply merit increases for

10   employees.

11             MR. SIMON:  Mr. Hunter, have we

12             received that document?  I don't think we have.

13             MR. HUNTER:  I'm not familiar with such

14             a document.

15   BY MR. SIMON:

16        Q    Well, since we don't have it in front

17   of us, let me just go over some of those details.  It

18   was from HR.  Was it in a memo form?

19        A         Well, there was a piece of paper that

20   explains the rules and regulations of the company and,

21   you know, merit should be decided based on these rules

22   and regulations.  And this piece of paper had the names

23   of the employees reporting directly to me, their

24   salary, and there was a recommended merit increase for

25   the salaried individuals and a column that my

```
 1    organization would decide on -- we have a pot of money,
 2    a certain amount.  We divide that by percentages or a
 3    dollar value for the employees.  And the approach I did
 4    was I looked at their performance and divvied the merit
 5    increase accordingly.
 6              Q      But there was something in the document
 7    that indicated that if you were a Ford transitional,
 8    the approach was different than if you were a ZF new
 9    hire in terms of the merit increases?
10              A      The recommendation in the document was
11    as such.
12              Q      And did it specifically say that Ford
13    transitional, the merit increases should be lower?
14              A      Yes.
15              Q      And did it explain the rationale for
16    that?
17              A      If you recall in the conversation
18    earlier, in this package there was something called a
19    broad band way of paying people, and what we were told
20    is we want to bring the people into that band.
21              Q      Well, let's just use some numbers.  You
22    said bring them into that band.  Let's say someone was
23    making $50,000 and they were a Ford transitional.  What
24    would the recommendation have been then on this piece
25    of paper you've described?
```

```
 1              A       It's a certain percentage of their pay.

 2              Q       Okay.  But you're saying they would try

 3      to get them into a lower band or to put them at a

 4      different position in the current band?

 5              A       A Ford transitional employee has a

 6      higher cap as far as their allowable salary to be than

 7      a ZF employee.  And the only thing I -- you know, I

 8      know of is the recommendation in the paper was such,

 9      but it was not dictated to us to do anything on the

10      paper.

11              Q       But it was recommended?

12              A       It was recommended but left up to me to

13      put the final number on it.  And I put the final number

14      on it, to the best of my knowledge, and returned it.

15      Now, whether what I put on the paper went through or

16      not is something I cannot -- again, I'm not a

17      policymaker.  I just follow the policy rules and

18      regulations.  The policy never said to pay a

19      transitional employee less than a -- than a ZF

20      employee, but the paper did have on it a recommendation

21      for a Ford employee that appeared, when you looked at

22      it, to have a lesser value than a ZF employee.

23              Q       Okay.  And you were kind of surprised

24      to see that document?

25              A       I was surprised to see that document,
```

 1    yes.

 2              Q        I mean, in your mind if you had known

 3    that that was going to be the policy, if you had known

 4    that in 1999, you may have questioned your own decision

 5    to come to the company?

 6              A        I don't fall under the same category as

 7    the individuals in -- in the situation you're asking

 8    about.  My contract is different and, to the best of my

 9    knowledge, the company did not mistreat me in any shape

10    or form as far as -- I don't know of any inappropriate

11    anything towards me, so --

12              Q        I understand.  But after you saw this

13    document, you wondered whether the Ford transitional

14    people below you who came over -- you wondered whether

15    if they had known that this was going to be the policy,

16    whether they would have joined in 1999; is that fair?

17              A        Again, as far as I'm concerned, some of

18    the people in my organization got higher raises than

19    the ZF employees if their performance was as such.

20              Q        Despite this recommendation?

21              A        Despite the recommendation.  The

22    recommendation was never given to me as a policy.

23              Q        Did you ever tell Pam Blanco about this

24    document?

25              A        Did I ever tell her about this

1    document?

2              Q        Yeah.

3              A        She asked me if -- if I've seen that

4    and I said yes.

5              Q        Did you have some conversation with Pam

6    where you said, you know, "If you had known about this

7    document in '99, you may not have joined the company"?

8              A        Pam asked me if I've seen the document.

9    I said yes.  She asked me if I knew about that document

10   in 1999 and I said no.

11             Q        When was this conversation?

12             A        I don't know.  Maybe three, four, five

13   months ago, six months ago.  I can't remember exactly.

14             Q        Well, during the conversation she

15   related that she may not have joined the company if she

16   had known about that?

17             A        Yes.

18             Q        And you told her in so many words that

19   that made sense?

20             A        Again, I don't know what her merit was.

21   I know what was made as a recommendation by my

22   organization based on her performance.  She's got an

23   immediate boss who wrote her performance and whatever

24   her rating was, she had a merit increase.  Whether that

25   merit increase was what was recommended and received or

1    what was recommended by me, I do not know.  I do not

2    know what was Ms. Blanco's recommended final merit and

3    if it's in line with what I turned in.  I turned it in

4    based on her performance by her immediate boss.

5              She asked me if I saw a document that

6    shows that the recommended value for the Ford

7    transitional employees was one and a half percent less,

8    and I said I have seen a document like this.  She asked

9    me if I knew when I was asking her to join the company

10   that was the intent, and I said no.  That was the

11   intent of the conversation between me and her.  She

12   asked me if I was under the same umbrella, and I said

13   that's -- that's personal and I don't fall under the

14   same contract she's under or the same rules she's

15   under.

16        Q     Did you tell Pam that either this

17   document or maybe a different document that you had

18   seen after '99 made you question whether you had made

19   the right decision to join the company?

20        A     If I did about myself having questions

21   about me joining the company or not, I -- I don't

22   remember that.  I'm not denying I might at some point

23   in time have been, you know, questioning my wisdom in

24   making the transition.  That comes up almost every day

25   in my life.  I don't know whether I did make the right

1    decision or not, but --

2            Q       And what makes you think you didn't?

3            A       I didn't say I didn't.  I said you

4    can't help but wonder, leaving a company like Ford

5    Motor Company and coming to ZF, whether it was the

6    right thing to do or not.  I mean, there are emotions

7    and you go up and down in your -- in your thoughts.

8            Q       Okay.  Since 1999 have you see any

9    other document, other than the one you've described,

10   that gave you pause about whether either your decision

11   to join the company was a good one or whether, had the

12   other Ford transitionals seen the document, you

13   wondered whether they would have joined?  Is there any

14   other document out there that you've seen like that?

15   You've described this one.  I wondered if there's

16   others.

17           A       I -- I can't remember.  I honestly

18   can't remember anything that was directed in a policy

19   form or a document that would say we should mistreat

20   the Ford transitional employees.  Again, I'm not a

21   policy maker.  I'm on the receiving end.

22           Q       Have you seen any other documents that

23   would show that ZF Batavia wants to have a different

24   policy in terms of merit increases or perhaps some

25   other benefit or term of compensation such that the

1    transitional benefit or compensation is different than

2    the new hire?  You've described one such document.  Are

3    there other documents you've seen like that?  Did you

4    understand my question?

5         A    I'd like you to clarify it just a

6    little bit.

7         Q    Sure.

8         A    I understood, but I'm not totally sure

9    100 percent exactly what you're asking me between the

10   new and the transitional.  Are you referring to --

11        Q    I'm referring to -- you have the Ford

12   transitionals, those are people that were with Ford and

13   joined ZF Batavia in 1999.

14        A    That is correct.

15        Q    And then 2000 forward people have

16   joined the company and I'm calling them ZF new hires.

17        A    Okay.

18        Q    All right.  You've said that this

19   document that had to do with merit increases, on your

20   review of the document, it had a different

21   recommendation for a merit increase depending on

22   whether somebody was a Ford transitional or --

23        A    It absolutely was not a recommendation.

24   It was a cap I called it, if you'll recall in the

25   earlier conversation.  As a Ford transitional employee,

```
 1    you have a different cap.  And if you look at the --
 2    the structure of the wages at the ZF LLC company, it
 3    would say, for instance, an MR role might end up at
 4    $100,000 as just an example, and the Ford transitional
 5    employee will be higher than that.  Their -- their
 6    maximum cap could be higher than that.  A person who
 7    transitioned from Ford to ZF could be paid more than
 8    $100,000 if they were management role people.  That's
 9    what the intent of the paper was, the cap, the upper
10    limit of your GSR would be higher for management and
11    for GSR people.
12         Q       What was the one and a half percent
13    that you referenced?
14         A       That was part of the yearly merit
15    increase that the company recommended for people.  Some
16    people got three, some people two, some people four.
17         Q       I guess I'm lost a little bit.  We
18    don't have the documents.  I thought the paper showed
19    that the merit increase should be lower for the Ford
20    transitionals than the ZF new hires.  That was the
21    recommendation?
22         A       That was the recommendation.  I have so
23    much money in that pot to divvy to people and they
24    recommended that I give a Ford transitional employee
25    one and a half percent less than -- than the ZF
```

1    employee.  But that -- that was not a policy.  That was

2    a recommendation.

3            Q       I got you.

4            A       And as long as I followed the general

5    rules of how much you can maximum pay someone and what

6    the minimum is, I could give the individual the money,

7    as long as I don't exceed the initial cap set by ZF and

8    Ford at the time for a ZF transitional employee versus

9    a ZF employee.

10           Q       Okay.  Did you ever see any other

11   document that differentiated between this is what the

12   merit increase is going to be, this is what the AIP

13   bonus is going to be for Ford transitionals versus ZF

14   new hires?  Did you ever see that distinction made on

15   any other document?

16           A       I've seen a piece of paper that was

17   part of minutes from a meeting that took place

18   somewhere in the company to talk about the strategy to

19   why we do this.

20           Q       You saw a document that explained the

21   strategy you said?

22           A       The intent of -- of bringing the Ford

23   transitional employees' wages more in line with a

24   general ZF employee.

25           Q       Do you know what meeting that was?  You

1    said minutes of a meeting.

2            A       I -- I can't remember.  It's probably a

3    couple years ago.  I can't -- I mean, I can't recall

4    what's in it.  I just remember seeing something.

5            Q       Do you remember if it explained what

6    the strategy was?

7            A       To have the employees making roughly

8    the same amount of money was the intent of it.

9            Q       Had you ever heard in 1999 at one of

10   the meetings you attended or any private conversations

11   that that was ZF Batavia's intent, to have the Ford

12   transitionals ultimately make the same amount of money

13   as ZF new hires?

14           A       No, sir, I did not.

15           Q       So when you heard this in 2000, that

16   was news to you?

17           A       That is correct.

18           Q       Do you think that contradicts what the

19   Ford transitionals had been told in 1999?

20           A       Yes.

21           Q       Let me just show you Exhibit 4.  This

22   was from an earlier deposition.  There you go.  Exhibit

23   4 is probably a 20-pages-long document.  It says

24   Meeting Held May 27, 1999.  You can take as much time

25   as you need to familiarize yourself with this, Mr.

1    Saleh.  My question to you is whether you think you

2    attended these meetings.

3            A       This is the piece of paper that I said

4    the only thing that I've seen prior to turning those

5    papers, the Exhibit 3, to the employees, that's the

6    only piece of paper I have seen that talked about -- I

7    said I didn't see this exhibit, I don't know, Exhibit

8    2.

9            Q       The summary, yes.

10           A       And this was a piece of paper that was

11   shared with us in the meeting that I attended.

12           Q       So you attended a meeting on May 27th?

13   I understand there was one in the morning and one in

14   the afternoon.

15           A       There were several meetings.

16           Q       And you attended one of them at least?

17           A       Yes.

18           Q       And was Exhibit 4 in some form or

19   another handed out?  Was there hard paper distributed

20   at the meeting that you recall?

21           A       There were people that asked for it,

22   yes.  They said they would give it to us and eventually

23   it was brought back and given to us, yes.

24           Q       Including yourself?

25           A       I think I own one.

1      Q      Were these documents -- I understand if
2  you don't specifically recall, but you see there's
3  charts and that sort of thing in this document.
4      A      I'm well aware of what's in it.
5      Q      Were they put on slides?
6      A      Yes, they were.
7      Q      Let's turn to what's number six there,
8  one page back from where you are.  Do you specifically
9  recall the overtime being discussed at the meeting?
10      A      Yes, sir.
11      Q      Do you remember Tony Deshaw?
12      A      Yes, sir.
13      Q      Had you known him prior to 1999?
14      A      Just -- not -- not personally.
15      Q      Had he worked for Ford?
16      A      I --
17      Q      You're not sure?
18      A      I'm not sure.
19      Q      Okay.  Do you recall him talking about
20  the overtime?
21      A      Yes, I do.  I remember one of the
22  gentlemen talking about it.  I don't remember the exact
23  name you're talking -- that you're referring to, you're
24  referencing in your conversation.  But I remember at
25  the meeting there were representatives of Ford Motor

1    Company or at least they identified themselves as such.

2    And we had people from ZF side in the meeting.  And

3    these papers were on slides when the presentation was

4    made.

5         Q        Had you heard conversations, discussion

6    in the plant before this May 27th meeting, that the

7    salaried people really wanted to hear from some Ford

8    people before they made the decision to come over?

9         A        That did happen, yes.

10        Q        Many different conversations you heard

11   that sentiment?

12        A        Yes.

13        Q        Okay.  It was important to you as well?

14        A        Absolutely.

15        Q        This overtime policy that we're looking

16   at which is Bates stamped 6 of this exhibit, Depo

17   Exhibit 4, this fairly sets forth the rates that then

18   the ZF Batavia salaried employees were paid for

19   overtime as far as you know?

20        A        Yes.

21        Q        And I guess it's gone up a little bit

22   over the years?

23        A        Yes.

24        Q        Were the rates that are set forth on

25   this document Bates stamped 6, was that, as far as you

1    recall, consistent with Ford's?

2          A       Yes, sir.

3          Q       Did someone say during the meeting

4    that, look, guys, women, it's going to be just like --

5    it's going to be like it was at Ford.  These are the

6    rates you're going to be paid, overtime is going to be

7    paid?

8          A       That's the impression we got out of the

9    meeting with, yes.

10         Q       Okay.  To your knowledge, has Ford's

11   overtime rate for salaried people gone up, to your

12   knowledge?

13         A       I have not -- I'm not privy to anything

14   Ford Motor Company does anymore, so --

15         Q       All right.  But it was your

16   understanding at the meeting that the overtime rates

17   would go up in a consistent way that Ford's would go up

18   for the salaried employees?

19         A       History would say that, yes.

20         Q       That was your expectation?

21         A       Yes.

22         Q       Okay.  I think that's all we have with

23   4.  You can put that one aside unless I think of

24   another question, Mr. Saleh.

25                 This is Plaintiffs' Exhibit 9.  And,

1      again, these were exhibits at other depositions.

2                     MR. COOK:  Deposition Exhibit 9.

3                     MR. SIMON:  Deposition Exhibit 9.  I

4             think, Mr. Hunter, we're hoping that when you

5             take depositions, can we just continue the same

6             numerical sequence?

7                     MR. HUNTER:  That's the expectation,

8             yes.

9                     MR. SIMON:  Okay.  Excellent.

10     BY MR. SIMON:

11            Q      Have you seen Deposition Exhibit 9

12     before, Mr. Saleh?

13            A      No, I have not.

14            Q      You see it has 2000 AIP Award at the

15     top?

16            A      Yes, sir.

17            Q      And you see that it has the different

18     percentages for Ford transitional and then it says ZF

19     underneath each, for each of the three positions, AC,

20     GSR, MR?

21            A      Yes, sir.

22            Q      And you see that the percentage of the

23     award is lower for each category for the Ford

24     transitional as opposed to the ZF?

25            A      That is correct.

1          Q        Has anyone ever told you that the AIP

2     bonus percentages are lower for Ford transitional as

3     compared to ZF new hires?

4          A        No, sir.

5          Q        This is news to you?

6          A        This piece of paper is news to me, yes.

7          Q        That policy, as it's reflected in

8     Exhibit 9, that is news to you?

9          A        I can't see where it says on it it's a

10    policy.  I don't know that this is a policy.

11         Q        No one has ever told you before today

12    that when they compute AIP award bonuses, that there's

13    a different percentage depending on whether you're a ZF

14    new hire or Ford transitional?

15         A        I was not told that, no, sir.

16         Q        Are you surprised to hear that?

17         A        As far as my piece of it is concerned,

18    I'm surprised.  That's the first I've ever seen this.

19         Q        Okay.  This is Deposition Exhibit 16.

20    Have you ever seen Deposition Exhibit 16 before, Mr.

21    Saleh?

22         A        Yes, sir, I have.

23         Q        And does this reflect a notice, I

24    guess, in August of 2001 regarding a new policy for

25    salaried employees coming in and out of the plant?

1        A        Yes, sir.

2        Q        Is it your understanding that following

3    this notice, the policy is with salaried employees that

4    they have to swipe in and swipe out with a card, using

5    an electronic card system, when they're leaving and

6    exiting the plant?

7        A        Yes, I'm aware of that.  The same rules

8    apply to me.

9        Q        Okay.  Now, is it my understanding that

10    hourly employees don't have to use these cards when

11    they exit the plant?

12        A        That is correct.  They have -- they

13    have an hourly contract.

14        Q        Has anyone ever explained why there was

15    this -- other than what's in this document, has anyone

16    ever explained to you why this policy was instituted?

17        A        We were told the plant is going to be

18    -- going to apply for the foreign trade zone -- as a

19    foreign trade zone to gain the ease of delivery of

20    equipment and for -- for certain tax benefits, and part

21    of the requirement is the company had to account for

22    who is on the premises or not.

23        Q        Had someone told you that they also --

24    as part of the foreign trade zone rules, that they had

25    to make sure that someone -- they knew when someone

1    checked out as well?

2         A      I can't remember what the check-out

3    piece of it is.  I know we were told we are required to

4    check out, but I don't remember the reason why.

5         Q      Is it your understanding that human

6    resources uses these readouts of when someone checked

7    in and checked out, that they cross-check those against

8    time cards to see if the person is in the plant?

9         A      I think you ought to direct that

10   question at HR.

11        Q      Okay.  Have you ever expressed a

12   concern that you have these salaried employees who

13   they're keeping close tabs on actually what minute they

14   check in and check out of the plant?

15        A      I am not aware of any and no one ever

16   told me that my employees are doing that, so --

17        Q      You've never expressed a concern about

18   this policy?

19        A      For punching in and out?

20        Q      Yes.

21        A      I -- I didn't think it was a problem.

22   I had that prior to ZF.  When I had to go into the

23   plant, I had to use a card to go in.  When I worked at

24   the other plants, I had to use the card to open the

25   gate and -- open the gate and close the gate when I got

1    out.  I didn't think it was a big deal and I don't know

2    that it's a big deal, as far as I'm concerned, today.

3        Q      All right.  And I told you that we were

4    going to keep going back to Plaintiffs' Exhibit 2, so

5    --

6        A      Okay.  It's right here, still open.

7        Q      You can put the other documents to the

8    side.  Plaintiffs' Exhibit 2, this is obviously a copy

9    of a tri-fold brochure.  Do you remember how it was

10   folded when it was given to you, if at all?

11       A      It was one, two, three folds.  It was

12   like -- you can -- you can -- right here --

13       Q      Well, where it says Plaintiffs' Exhibit

14   2, you understood that the ZF logo, that was obviously

15   the first page?

16       A      That is correct.  I can't remember

17   whether it was inside or on the outside.  I can't

18   remember.

19       Q      Okay.  But as we look at the second

20   page, perhaps where it says salary on the left, that

21   may have been part of the first page that you opened

22   up?

23       A      Okay.

24       Q      But you're not sure?

25       A      I can't remember exactly.

```
 1            Q       Was it actually one piece of paper, the
 2    brochure?  Do you remember if it was more than one
 3    page?
 4            A       It was one piece of paper.
 5            Q       Folded up, a tri-fold?
 6            A       Right.
 7            Q       All right.  I just wanted to nail down
 8    that detail with you.  Looking at some of the other
 9    terms of compensation and benefits set forth here, do
10    you see where -- let me see if I can find it.  Do you
11    see where it says "Leaves" in the second column at the
12    very bottom, where it says "Personal or sick"?
13            A       Yes, sir.
14            Q       It says "Up to five days may be used
15    for sick"?
16            A       Yes, sir.
17            Q       Was that policy changed for a short
18    time regarding the maximum number of personal or sick
19    days you could receive?
20            A       As far as I remember, yes.
21            Q       Also the funeral leave, was that also
22    changed to be something less than three days of leave?
23            A       Yes, sir.
24            Q       Was that last year, as you recall, that
25    that policy was changed?
```

1          A          If I remember right, yes.

2          Q          Did you express a concern that that

3    change in policy was inconsistent with what was on this

4    brochure?

5          A          I don't understand exactly what you're

6    asking me.  Did I have a personal concern with that or

7    did I -- did I --

8          Q          Did you tell somebody that, hey, wait a

9    minute, the brochure that people were given in 1999

10    says three days for funeral leave?

11          A          I never had that conversation with

12    anybody.  Nonetheless, I had my personal, you know,

13    concern over the fact that I didn't have the same

14    number of days for a death in my wife's family.  That

15    was the thing I was concerned with, my personal.  But

16    never really went to anybody and said "Hey, look, this

17    is what you committed to me.  What are -- you know, why

18    are you..." -- I've never done that or questioned it.

19          Q          With the funeral leave the change in

20    policy apparently affected you because you had to

21    attend a funeral, I understand?

22          A          No.  It was just a concern.

23          Q          Oh, I see, a concern.  All right.  Did

24    anyone else in the company, any other salaried people,

25    come up to you and say "Hey, wait a second, Hassan.

1    They told us three days funeral leave, five days

2    personal or sick in 1999 and then they changed it"?

3           A       Many people complained about that, yes.

4           Q       Did you think it was a valid complaint?

5           A       I think, yes, it is a valid complaint,

6    my opinion.  This is my personal opinion.  I don't know

7    how does that reflect on the policy of a company or the

8    needs of a company.  But if you're asking me about my

9    personal opinion, I have my own standard in life and I

10   like certain things and dislike certain things and I

11   would like to have more days if I had a funeral on my

12   wife's part, but that's my personal preference, I

13   guess.

14          Q       Is it your recollection that those

15   changes had been made prior to this lawsuit being

16   filed, do you remember?

17          A       I don't know exactly when the lawsuit

18   was -- I said that earlier.  I don't really know when

19   the lawsuit was -- was filed and I don't know whether

20   this was prior or after.  I have -- I guess you can --

21   you know, you ought to be asking somebody else in HR

22   about these things.

23          Q       I understand.  You ultimately did find

24   out about the lawsuit last year at some point, right?

25          A       Yes.  That is correct.

1           Q       And you knew at that time that they had

2      had the period of time where overtime wasn't paid,

3      right?

4           A       I was part of the policy enforcement of

5      the -- so, I mean --

6           Q       You were aware of that?

7           A       Yes.

8           Q       And you were also aware apparently of

9      this document regarding the merit increases, right?

10          A       Yes, sir.

11          Q       And you were aware that they had

12     limited the amount of funeral leave, right?

13          A       Yes, sir.

14          Q       And you were aware that they had

15     limited the amount of sick or personal leave?

16          A       Yes, sir.

17          Q       And you understood that the lawsuit on

18     some level had something to do with those changes?

19          A       I heard there were things in the

20     lawsuit that would address most of these issues.

21     That's what I heard, but, I mean, I don't know exactly

22     what the lawsuit is all about, so, I mean, I --

23          Q       Well, I just mean in that vein you

24     weren't surprised by the lawsuit?

25          A       No.

1           Q        You agree with me?

2           A        I -- I wasn't surprised by the lawsuit,

3      if that's what you're asking me.

4           Q        Had you been aware that people had

5      complained to HR about these issues, specifically Len

6      Sennish?

7           A        I'm trying to remember.  But at one

8      time -- only one time Mr. Sennish talked to me and said

9      one employee had concern.  I can't remember about which

10     -- which piece of that.  But, I mean, I -- I was never

11     aware or there was never any -- anything sent to me

12     saying "What are you guys doing?"  Typically that stuff

13     is not handled through your immediate supervisor.  You

14     raise your concerns to the HR organization.  And if

15     that stuff took place, I am not aware of it.

16          Q        Okay.  When you were at Ford, were you

17     aware of a Ford supervisor manual?

18          A        Yes, sir.

19          Q        Would that document have set forth what

20     Ford's policy was regarding casual time and overtime?

21          A        I can't -- I can't remember.

22          Q        But the manual did exist at that time?

23          A        Yeah.  In the manufacturing

24     organization we never really -- I mean, I've never

25     really had it in my hand and sat down and read it, not

1    that I ever remember, sitting down and going through

2    the supervisor's manual.

3              Ford had a way of -- of putting certain

4    things in front of us that was important to the

5    business.  I used to sign a C3 letter it was called by

6    the company at the time -- I don't know what they do

7    nowadays -- that said what are -- what are the things

8    they can do ethically and not ethically.  But I've

9    never really seen the policy -- I said that earlier and

10   I'll repeat it again -- as far as the casual overtime

11   piece of it.  I have never seen a policy or read a

12   policy or signed my name to a policy.

13        Q      Given all that, you believe when you

14   were at Ford, there was a document called supervisor's

15   manual?

16        A      I've seen a supervisor's manual, yes.

17        Q      Okay.

18              MR. SIMON:  Jeff, we might be

19              requesting a copy of that.  I'll put that in a

20              letter.

21   BY MR. SIMON:

22        Q      The casual time, just to return to that

23   for a moment, when someone is coming in and they're

24   getting ready to start their shift, they may, in fact,

25   be doing more than just putting on their shoes.  They

1    may be answering e-mails related to their job or doing

2    other things that are related to their job, right?

3             A       It could be anything.

4             Q       But they could be performing their job

5    during the casual time?  It's just considered casual

6    time because of the nature of --

7             A       I perform my job during casual time.  I

8    did when I was GSR, too, a certain piece of it.  I said

9    that, I thought, from the beginning, that if I have a

10   department that's got to start in production at 7:00,

11   the least I was expected to do and we expected our

12   peers to do was walk in, do your counts, know your

13   department setup, what is it going to take to start it

14   up properly, and that was considered part of prepping

15   to start doing your job and doing your job effectively.

16   And that's what we call casual time.  Is that part of

17   the contribution towards being successful on getting

18   the job done?  Yes.  We call it casual.

19            Q       When there was the change in the

20   overtime policy in May of last year, do you ever recall

21   being in a meeting where somebody said if you don't

22   work the overtime on the weekend, you're going to be

23   fired?

24            A       I never said that to anybody or

25   directed anyone in my organization to say that.  If I

1    recall, the answer -- the question that was asked to me

2    by my -- by the gentleman who runs the organization for

3    me, Mr. Gross, he asked me what do we do if somebody

4    said I don't want to work, and the reply was you're

5    being ordered to work, you have to work.  But I've

6    never threatened to fire anybody.

7         Q     You used the word organization a number

8    of times during the deposition.  When you say

9    organization, you're still talking about -- even if

10   it's within ZF Batavia, that's just what you call

11   departments?

12        A     Right.  You ask me questions a lot of

13   times and the gentlemen that -- the gentlemen and

14   ladies that you referred to in the lawsuit work in

15   different areas and different organizations.  And when

16   you ask me questions, I can answer what -- what

17   transpired in my department and what happens in my

18   department.  And a lot of times a lot of the questions

19   you're asking me are vague in the sense I don't know

20   what happened in production.  I don't know how it was

21   handled.  I have no -- no way of knowing.  I'm not in

22   HR and I'm not privy to these -- to these records, but

23   I hear say and the things I know of, I -- I can answer

24   to.

25        Q     I was asking a more mundane question.

1    When you say organization, you're not referring to some

2    organization outside the company, correct?

3        A        No.   My organization is a department in

4    ZF Batavia LLC and it's the maintenance organization

5    that I -- I answer questions to that organization.

6                MR. SIMON:   Okay.   Let's go off the

7            record for just a second.

8                    (OFF THE RECORD)

9                MR. SIMON:   We can go back on the

10           record.

11   BY MR. SIMON:

12       Q        Have you ever had any conversations

13   with people in upper management, which I'll say is Dick

14   Newark or anybody at Mr. Newark's level or above, about

15   any of these issues we've talked about:   the annual

16   incentive plan, the overtime, the merit increase, sick

17   leave, bereavement leave, all those kind of things?

18   Have you ever had any conversations with anybody above

19   you or in HR and said "What are you doing here?   What's

20   going on?   Why are we making these changes?" anything

21   like that at all?

22       A        I voiced my opinion, for instance,

23   about the -- you know, the bereavement to my boss and

24   said "Now, most of us in this company here are from

25   other states and if my -- you know, my wife's

1    grandmother or father dies, I would like to believe

2    that I should be able to have two or three days to

3    spend with her during that time."  Those are, again, my

4    personal opinion and I did voice my opinion, no

5    different than any other employee would.

6         Q       Anything else besides the bereavement

7    leave that you voiced your opinion on?  Again, the

8    annual incentive plan, the merit increase, authorized

9    overtime, personal days, all these things relating to

10   Ford transitional employees?  Have you ever voiced

11   concern?

12        A       I voiced concern about the overtime

13   because I had the fear that it might upset the

14   employees and create an environment which might

15   adversely affect our ability to run the company.

16   Obviously I did voice my opinion about that.  And the

17   rest of it, I -- I wasn't aware that -- I was told what

18   to do with my merit and there were guidelines that were

19   part of the policy given to us, and my recommendations

20   were within those guidelines, so --

21        Q       When you had talked to people in 1999,

22   did you ever tell them that, look, you're leaving Ford,

23   you're joining a new company, but Ford is going to look

24   out for you?

25        A       My understanding, that Ford was going

1    to be a half-owner of the company, 49 percent of the

2    company.  Some of the things that we were told is, you

3    know, we'll know about the company, we'll understand

4    where the company is and, you know, our retirement

5    would be protected and I'll have access to the company

6    as far as like where I stand on things like that.  That

7    stuff has been taken away since, but --

8        Q       What's been taken away, your access?

9        A       I don't have any access to my -- I

10   don't know where my retirement stands today, for

11   instance.  That's -- that's the company's policy,

12   change in policy at Ford Motor Company to protect their

13   security.  They don't want non-employees to have access

14   to their -- to their systems.

15       Q       That has to be a big concern to you.

16       A       Well, I know we were informed that they

17   are doing this for their company's survival, I guess,

18   and security in the Internet days, and we were booted

19   out as far as our access to that, to the company and to

20   company information and stuff of that nature.

21       Q       So you had told people, explained to

22   them that, look, Ford is going to be a 49 percent

23   owner.  You'll still have access to certain things at

24   Ford, I guess, such as access to information with Ford

25   retirement.  Did you tell them anything else, that Ford

1    is going to be looking out for you or anything else

2    like that?

3         A       No.  The concern was, you know, how do

4    we know the state of the affairs of the company, how

5    are we going to be told about the things that are

6    important to us, what's going to happen to my

7    retirement and how am I going to be communicated to

8    that entire time under this circumstance, now that I

9    signed on the dotted line.  And we were told we will

10   have access to all of that and we can find out about

11   that information, but it's -- it's extremely difficult

12   today and it was a change in the company policy to

13   protect, I guess, ourselves from whatever it is that

14   you can do through e-mails and access to their

15   databases and information.

16        Q       When were you told that you were going

17   to have restricted access to this information about

18   your retirement?  How recently was that?

19        A       About a year ago Ford started putting

20   out e-mails to all of us saying that, you know, we're

21   eventually going to kick you out of the system, you're

22   not going to have access to anything on the inside.

23   You'll have -- it used to be a PROFS ID and now it's an

24   Outlook ID.  You will have something living in the

25   background called you and that's all.  You have to be

1    -- you have to be sponsored by a Ford employee in order

2    for you to get anything from the -- from the system.

3    Somebody would have to find out for you and tell you.

4    And besides that, we have no -- that was taken away

5    from us.

6              That's the only thing I remember the

7    company committing to, they will provide us information

8    about the company, because eventually if the company

9    runs out of business, ZF will run out of business,

10   therefore, it was a concern to us.  And we asked for

11   that, and that policy has changed, as far as I

12   understand.

13        Q    Right now at ZF Batavia CVT is in the

14   pre-production phase; is that right?

15        A    Well, close to production, yes.

16        Q    Okay.  And CVT was the exciting

17   technology that this plant was beginning that was

18   certainly something that was an attraction to the

19   people like yourself leaving Ford and joining the new

20   joint venture, right?

21        A    That is correct.

22        Q    Are you part of the CVT pre-production

23   team?

24        A    No, sir, I'm not.  As of yesterday, I

25   was given more responsibility in the CVT area.  In my

1     new assignment I would have.

2          Q     So yesterday was the first time that

3     you were told that you were going to be given

4     involvement in the CVT?

5          A     That is true.

6          Q     All right.  How many salaried people

7     are working on the CVT currently, roughly?

8          A     I don't know.  I, honest to God, don't

9     know, but there's quite a few.

10          Q     I mean, more than seven?

11          A     A lot more than seven.

12          Q     Do you know how many Ford transitional

13     employees are working on the CVT?

14          A     I would have to think, but Rick

15     Williams would be one, John Detloff would be one, Greg

16     Exner partial.  Those are the three names I can

17     remember right now.

18          Q     Was there an occasion in the plant in

19     the last few weeks where somebody from Ford visited the

20     plant and observed the CVT pre-production and wondered

21     where all the experienced guys were?

22          A     I mean, there's probably a lot of

23     incidents in which Ford Motor Company visited the

24     plant.  I recall -- in the last few weeks I have never

25     known anybody from Ford Motor Company came here, but in

1    the past there were incidents in which, you know, Ford

2    was asking "Who are the people doing this?" and "Where

3    is the experienced people?"  I mean, why are we doing

4    certain things.  And obviously Ford is in the business

5    to -- they audit us all the time and they ask all kinds

6    of questions.

7         Q    Does Ford play a role in most of the

8    significant decision making that occurs in the plant,

9    based on your experience?

10        A    We were supposed -- we're supposed --

11   the bigger owner of the company is ZF, and ZF makes

12   most of the calls, but Ford Motor Company lends its

13   expertise in a lot of different ways and they are part

14   of the major decisions made in the company, definitely.

15        Q    Is there an attitude in the plant that

16   if Ford doesn't want this to happen, it's not going to

17   happen?

18             MR. HUNTER:  Objection to the form.  If

19        you know.

20             THE WITNESS:  I don't know.

21   BY MR. SIMON:

22        Q    Wasn't Gerry Priest recently moved from

23   his position to work on the CVT?

24        A    As a part-time assignment, yes.

25        Q    Wasn't that triggered by a visit by

1    somebody from Ford?

2         A       The way it was rolled out to me is we

3    need some of the senior employees, people with

4    experience behind them, launched products before, to go

5    help us in CVT.  And Gerry Priest was one of the

6    employees that was taken there.  And part of extending

7    my role into CVT was part of that same roll-out.

8         Q       And Gerry Priest is a Ford transitional

9    employee, right?

10        A       Gerry Priest is a retired individual.

11    He retired from Ford approximately, what, maybe three,

12    four months ago.

13        Q       Well, he was with Ford in 1999, right?

14        A       That is correct.  He was a transitional

15    employee.  He recently retired, if that's what you're

16    asking me.

17        Q       Right.  That is what I was asking.

18    Well, do you think there's been a move lately with

19    Gerry Priest and you to move more Ford transitional

20    people into the CVT?

21        A       Out of the CVT?

22        Q       Into the CVT.

23        A       Into the CVT, yes.

24        Q       Do you think that the CVT, from your

25    perspective, has kind of lacked a lot of the Ford

1    transitional employees?

2        A       In the initial phase we didn't have any

3    transitional employees in there, if that's what you're

4    asking me.

5        Q       And when did the initial phase end?

6        A       Probably about a year, year and a half

7    ago.  Year and a half, maybe even two years.  Rick

8    Williams has been there for almost two years, him and

9    John Detloff.

10       Q       So maybe in the last one and a half or

11   two years there's been some Ford transitionals added to

12   the CVT, and that would include Rick Williams, I think

13   you said his name was Ron Detloff --

14       A       John Detloff.

15       Q       And then you said Greg Exner works part

16   time --

17       A       Partially, mm-hmm.

18       Q       -- on the CVT?

19       A       He's -- he's on both sides and his

20   involvement would be with the customer; hence, since we

21   don't really have a customer, his involvement is very

22   little.

23       Q       Well, in the last year and a half to

24   two years have you been surprised how few people on the

25   CVT are Ford transitional employees?

```
 1          A       The CD4E has been demanding and, you

 2    know, good thing for us is Ford Motor Company decided

 3    to extend the life of CD4E, so we kept more of the CD4E

 4    with the Ford transitional, if you may, on the CD4E

 5    side.  We didn't send them to the CVT.  At least in my

 6    organization I didn't send them to the CVT side because

 7    I needed them on the CD4E side.

 8                  Now, if you're asking me if someone

 9    else stopped them from going or stood in the way, I

10    can't answer for that.  I didn't stand in the way of my

11    people going to -- to CVT.  My department, I did not do

12    that.

13          Q       Would you agree that Ford transitional

14    people were told in 1999 that you're going to be able

15    to get in on the ground floor of the CVT --

16          A       Yes, sir.

17          Q       -- and ultimately that hasn't happened

18    for most people, except for a handful of the Ford

19    transitionals?

20          A       You could say that.

21          Q       And have a number of people expressed

22    concerns about that to you?

23          A       To me?

24          Q       Yeah.

25          A       I'm trying to remember in my
```

1    organization if anybody said they would like to go work

2    in CVT.  Probably Ron Pearce is the one that's most

3    vocal and said "Let me go work on CVT."  And I always

4    replied to Ron that his -- his expertise and the need

5    for him on the CD4E in the capacity he's helping me

6    with, there is no one more suited for the job.  And Ron

7    was always understanding or I thought he was

8    understanding.  He understood that if he had left and

9    went to CVT, he could -- he could hurt the business

10    we're in today.

11        Q       You're saying he would hurt the

12    business if he left the CD4E; is that what you said?

13        A       Yes.  He was kept on the CD4E side

14    because of his knowledge and expertise, not because --

15    I mean, I did not stop him from going to CVT.  Would he

16    have applied for a job in CVT and interviewed and been

17    selected, I wouldn't stand in the way.  I -- I always

18    lobbied him to stay on my side and help me.

19        Q       Back in '99 were you ever told, did you

20    hear someone say that "We want to get the best of the

21    salaried employees to join ZF Batavia"?

22        A       Yes, sir.

23        Q       And did you think that you did?

24        A       Mr. Zielke, my boss, for instance, in

25    the maintenance organization, he thought he made the --

1  the offers to the better employees to stay behind.

2  That was the pretense, that was the understanding.

3       Q     And the group of people that we've been

4  talking about, some of whom you work with more closely

5  than others, you agree that they were at least one of

6  the better people that were at the Ford plant that

7  joined ZF Batavia?

8       A     That is correct.

9       Q     Okay.  Have you ever heard in upper-

10  management levels, perhaps Mr. Adams or Mr. Newark make

11  comments that kind of reflect that they have a certain

12  disdain for Ford employees or the way the Ford

13  employees do their jobs?

14       A     Yes.

15       Q     I mean, has Mr. Newark, perhaps Mr.

16  Adams said that he wanted to get the Ford taint off the

17  plant floor?

18       A     I can't remember those words.  I mean,

19  I never really heard those words.  I never --

20       Q     I understand.  Well, you had agreed

21  with me initially.  Is there anything in particular

22  that Mr. Adams has said that makes you think that he

23  has a bias against the Ford employees?

24       A     Mr. Adams in several meetings indicated

25  that we were set in certain ways in the way we approach

1    and do our jobs and he thought it would be in the best

2    interests of the company to hire, if you may -- forgive

3    me for lack of better words -- new blood that would

4    have different ideas and different approach to getting

5    the job done.

6         Q     And as you recall -- I'm sure you don't

7    remember a specific date, but did he say this in a

8    meeting pretty close to early 2000 or after you had

9    joined?  Was it soon after you had joined ZF Batavia

10   that Mr. Adams had said this?

11        A     In the immediate probably year, yes.

12        Q     Anything else Mr. Adams has said along

13   those lines that leads you to believe that he doesn't

14   like the way that Ford employees do their jobs?

15        A     Now, if you look at Mr. Adams'

16   organization --

17             MR. VANWAY:  Excuse me.

18             MR. SIMON:  Well, he was in the middle

19        of answering.  Can we just let him finish the

20        answer?

21             MR. VANWAY:  I'm sorry.  I'm just not

22        clear on Ford employees, if that means Ford

23        transitional employees or --

24             MR. SIMON:  We haven't differentiated.

25             THE WITNESS:  I've been answering Ford

```
 1              transitional employees, sir.  I don't say

 2              anything pertaining to your organization.

 3              Particularly I don't know anything about your

 4              organization, so I've been answering to a Ford

 5              transitional employee.  That's what I've been

 6              saying in my answers.

 7                    MR. SIMON:  All right.

 8     BY MR. SIMON:

 9         Q      Mr. Adams had said that he thinks the

10     Ford transitional employees are set in their ways and

11     he wanted to get new blood --

12         A      That's what I thought I said in my

13     statement.

14         Q      Okay.  And I think you were starting to

15     say something else that Mr. Adams had said, other

16     occasions where he had said that.  And I don't think

17     this is --

18         A      That's along the same theme.  I mean,

19     Mr. Adams is surrounded by ex-Ford employees in his

20     organization and, you know, everybody in his -- just

21     about, came from a previous assignment in Ford Motor

22     Company somewhere.  But his belief that -- or at least

23     that's what he shared with us, his thoughts that we as

24     manufacturing people who transitioned from Ford to ZF,

25     we lack the vision and the ability to -- to change and
```

1    drive the business to where the company would like the

2    business to be.

3          Q      And has Mr. Newark said similar things?

4          A      At different times he did.

5          Q      Any particular thing that Mr. Newark

6    said that perhaps bothered you when he was talking

7    about Ford transitional employees?

8          A      I didn't say what the remarks were --

9    bothered me.  I -- I'm the type of individual that I'm

10   willing to try anything and if you believe that if you

11   hired non-transitional employees, they would do a good

12   job for you, you might as well go ahead and do what

13   you've got to do.  If you think that's the best

14   interests of your company, you can go ahead and do

15   whatever it is you feel is appropriate.

16         Q      And a lot of those new hires that the

17   company hired work on the CVT?

18         A      Yes, sir, they do.

19         Q      Has Len Sennish ever said anything

20   about Ford transitional employees along those lines?

21         A      I don't remember being in the presence

22   of Mr. Sennish and him personally saying things like

23   that.

24         Q      I apologize for asking about this

25   quote, but did Mr. Newark ever tell you that he wanted

1    to fuck with the Ford transitionals so they can win

2    their lawsuit and then their ass will be out of the

3    building?

4         A       There was a lot of conversations.  I

5    don't remember exactly the exact words that Mr. Newark

6    might have said.  I just don't know that he used these

7    words.  I -- I don't remember him ever saying he wants

8    them to win the lawsuit or he wants them -- he's --

9    he's intentionally doing this so they can win the

10   lawsuit.  I don't remember exactly a conversation to

11   that.

12        Q       Maybe he said something like "Well, if

13   they win the lawsuit, we can get them out of the

14   plant," something like that?

15        A       In a conversation one time he said if

16   -- if they win the lawsuit, they might all leave, they

17   might not.

18        Q       Did he say it in such a way that he

19   thought it would be a good thing that this group of

20   people left the plant?

21        A       I don't know what his feelings are.  I

22   had a concern and the conversation probably stemmed --

23   and a lot of different times and meetings where I

24   brought up the issue that if the lawsuit is really true

25   and the people they are saying are in it and that many

1    people leave the maintenance organization, it could

2    create a severe drain on the talent and the ability to

3    continue running the plant if we drain the maintenance

4    organization to that magnitude.  If the individuals in

5    the lawsuit decide to leave, it could create a problem

6    for us as a company.

7                    And whether that made some people

8    happy, sad or indifferent, I don't know, but my concern

9    was it could create a problem for me and I would have a

10   difficult time conducting the day-to-day maintenance

11   business at ZF if the individuals decided to leave.

12          Q       Is there an employee named Rick Bauer

13   (phonetic) at Ford?

14          A       I don't know who Rick Bauer is.

15          Q       Was there a situation where you demoted

16   Mr. Crump in the last year or recommended that he be

17   demoted?

18          A       Jim Crump?

19          Q       Yeah.

20          A       Demoted him?

21          Q       Yes.

22          A       Mr. Crump was disciplined by me, and

23   that was in accordance with company rules and

24   regulations.  But Mr. Crump is not demoted.  Mr. Crump

25   is still in the same position he was hired in when he

1     left Ford and transitioned to ZF.

2              Q       He was disciplined in the past year?

3              A       Somewhere in there, yes.

4              Q       Was the discipline reversed by

5     management?

6              A       No, sir.

7                      MR. HUNTER:  Off the record a second.

8                      (OFF THE RECORD)

9                      MR. SIMON:  Back on the record.

10    BY MR. SIMON:

11             Q       This is Deposition Exhibit 10.  It's a

12    memo dated March 28th, 2002.  It has Mr. Len Sennish's

13    name at the bottom.  Have you ever seen this document

14    before, Mr. Saleh?

15             A       I'm trying to remember.

16             Q       Take your time and look at it.

17             A       I remember seeing this piece of paper.

18             Q       Did you think that this reflected any

19    change in the overtime policy?

20             A       That was the first time I had seen an

21    actual value for -- for what -- what is referenced as

22    casual overtime.  I have never seen, like I said, when

23    I worked for Ford, something similar to this that would

24    say you have to work that casual overtime.

25             Q       And what this document said, as you

1    understand it, is that you're going to work one hour

2    extra each day that would be considered casual time?

3        A       Right.

4        Q       Whereas at Ford, I suppose, you may

5    have worked that extra hour -- could you have been paid

6    for that hour is that was casual time at Ford?

7        A       If it was casual time, no.

8        Q       But at Ford they were never told this

9    is how much time you're going to work every day that's

10   casual time; is that fair?

11       A       That is correct.

12       Q       Okay.

13       A       To the best of my knowledge.

14       Q       As you enforced the overtime policy

15   when you were manager?

16       A       As I put on my time card and I applied

17   that rule at Ford Motor Company, I wasn't aware of

18   this.

19       Q       When we were talking about AIP bonuses

20   and we were talking about those being reduced because

21   of overtime or at least people told you that, did you

22   receive a bonus in 2002?

23       A       Yes, sir, I did.

24       Q       Was it at all reduced because of

25   overtime?

1          A       I am not eligible for overtime.  I

2     don't get overtime.  I work whatever is required from

3     me.

4          Q       But was your bonus reduced because

5     people in your department had worked a lot of overtime?

6          A       If it was, I wasn't told so.

7          Q       Okay.  When you saw what your bonus

8     was, it wasn't your thought that, hey, it's been

9     reduced?

10          A       Again, I don't know -- the allotted

11     money to the people in my class in the company is

12     something I'm not privy to, I don't get to see.  And

13     you showed me a piece of paper earlier that said

14     because I'm a transitional employee, the recommendation

15     for me is lesser than the ZF.  I wasn't aware of that

16     and I'm not part of that.  You know, that decision is

17     made at a higher level than me.  But as far as I know,

18     I was compensated for what I thought I was doing and I

19     thought it was based on my performance.  And the way I

20     did mine toward my employees was the same way.

21          Q       Staying with Plaintiffs' Exhibit 10 for

22     a second, do you understand the policy to be as it's

23     set forth here, that salaried employees every day are

24     going to work one extra hour every day and that will be

25     considered casual time?

1          A        It sounds like it when you -- when you

2     read this paper.  That's -- that's my interpretation of

3     it.

4                    MR. SIMON:  Okay.  Let's go off the

5               record for a second.

6                    (OFF THE RECORD)

7                    MR. SIMON:  I think I'm done with my

8               questioning of Mr. Saleh.  I just wanted to put

9               on the record that -- and we're going to follow

10              this up by letter as well, that given Mr.

11              Saleh's testimony about the summary attached in

12              the letter, if ZF or Ford has that or believes

13              they have that document, to produce it.  The

14              second one is the document that Mr. Saleh

15              testified that he received, I believe, from HR

16              that had the recommendation about merit

17              increases.  The third one is then from Ford, a

18              supervisor's manual that might have --

19              something called supervisor's manual or

20              something that would indicate their policy on

21              overtime for salaried employees.

22                   Otherwise, we have no more questions,

23              Mr. Saleh.  Thank you very much for your time

24              today, sir.

25                   THE WITNESS:  I -- I have a request.  I

```
 1          would like to have a copy of my deposition,

 2          even if it means me paying for it.  I'd like to

 3          have --

 4               MR. SIMON:  You're going to get a

 5          chance, I think, to review it.  Are you waiving

 6          signature?

 7               MR. HUNTER:  No.  We always read.

 8               THE WITNESS:  I'd like to read it and

 9          if I made a -- if I made a mistake or

10          something, I would like to have an opportunity

11          to -- to read it and make sure at least what I

12          said is accurate to the best of my knowledge.

13               MR. SIMON:  Is there anything as we're

14          sitting here at this time and looking back

15          during the deposition that you think you did

16          misspeak?

17               THE WITNESS:  The only thing I'm

18          concerned about is in your questioning to me a

19          lot of times I wasn't really totally sure

20          whether you were asking me whether it pertains

21          to my department or it pertained to the plant

22          and to the company as a company.

23               And so a lot of the questions I was

24          trying to explain to you that I -- I have the

25          maintenance piece of it and that the people in
```

1    the lawsuit are from several different

2    organizations in the company and they might

3    have been treated a certain way based on

4    whomever they work for or whatever things may

5    be.  But most of the times when I answered, I

6    answered pertaining to the maintenance

7    organization and not for everyone.

8        MR. SIMON:  I think you were clear in

9    your answers.

10        THE WITNESS:  So, I mean, I -- there

11    are some people that I have no idea what they

12    went through, what they had or -- I'm not in

13    the position to know that or let to know that.

14        MR. SIMON:  And I think you said that

15    at the appropriate times.  Anything else you

16    wanted to add, Mr. Saleh?

17        THE WITNESS:  No.  I'd just like to

18    have a copy, like I said, to review.

19        MR. SIMON:  And you will receive one.

20    Thank you very much.

- 0 -

(AND FURTHER THE DEPONENT SAITH NAUGHT)

- 0 -

_____
Hassan Saleh

146

C-E-R-T-I-F-I-C-A-T-I-O-N

STATE OF OHIO,

COUNTY OF HAMILTON, To-wit;

I, Susan K. Lee, CVR-CM, Court Reporter and Notary Public in and for the State of Ohio, do hereby certify;

That on the 24th day of July, 2003, there appeared before me pursuant to Notice and agreement of counsel, **HASSAN SALEH**, as a witness in the previously entitled cause;

That the said witness was sworn by me and examined to tell the truth, the whole truth, and nothing but the truth in said cause;

That the deposition was taken by me via Stenomask and electronic recording and the foregoing 145 pages contain a true, full and correct transcription of all the testimony of said witness;

That the deposition was submitted to counsel for the witness for reading and signature;

That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of August, 2003.


_____
Susan K. Lee, CVR-CM
My commission expires:
August 30, 2004