UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, CINCINNATI


EVERETT W. WHISMAN, et al.,            :

       Plaintiffs                      :

       -v-                             : Case No. C-1-02-406
                                       : (Judge Beckwith)
                                       : (Magistrate Sherman)

ZF BATAVIA, LLC, et al.,                :

       Defendants                      :


- 0 -


      The deposition of **HERBERT HUEBNER,** taken before
Susan K. Lee, CVR-CM, Court Reporter and Notary Public
in and for the State of Ohio, at the Holiday Inn
Eastgate, 4501 Eastgate Boulevard, Cincinnati, Ohio, on
the 2nd day of October, 2003, beginning at the hour of
10:52 a.m. and ending at 2:27 p.m. of the same date.

- 0 -


**RIVERSIDE REPORTING**
**Certified Court Reporters**
**P.O. Box 949**
**Covington, Kentucky  41012**
**KY(859)291-6110   OH(513)574-7017**

APPEARANCES:


FOR THE PLAINTIFFS:          STEPHEN A. SIMON, Esq.
                             Attorney at Law
                             22 West Ninth Street
                             Cincinnati, Ohio 45202



FOR THE DEFENDANTS:          JOHN J. HUNTER, JR., Esq.
                             Attorney at Law
                             One Canton Square
                             1700 Canton Avenue
                             Toledo, Ohio  43264

                             JEFFREY L. VANWAY, Esq.
                             Attorney at Law
                             312 Walnut Street
                             Suite 3200
                             Cincinnati, Ohio  45202-4074



ALSO PRESENT:                MR. EVERETT W. WHISMAN

                     - 0 -


                  STIPULATIONS:

          It is stipulated by and between counsel
for the respective parties that the deposition of
**HERBERT HUEBNER**, a witness herein, may be taken at this
time pursuant to the Federal Rules of Civil Procedure
and Notice; that the deposition may be taken via
Stenomask by the Notary Public/Court Reporter, and
transcribed by her out of the presence of witness; that
the deposition was submitted to counsel for the witness
for reading and signature.

                     - 0 -

**INDEX OF EXAMINATION:**

By Mr. Simon......................................4

**INDEX OF EXHIBITS:**

136  1/10/03 memo regarding personal/sick days.....9

137  1999 merit planning and AIP documents........31

138  e-mails, 8/27/01 and 8/28/01 with notice
     attached....................................50

139  e-mails, 1/22/02 and 2/01/02................66

140  annual incentive plan objective measurement
     and weighted average distribution chart,
     2001 results................................68

141  AIP calculation for 2000....................82

142  AIP calculation for 2001....................82

143  2001 final AIP objective measurement chart...98

1    **HERBERT HUEBNER**, called as a witness, being first duly

2    sworn, testified as follows:

3                    MR. SIMON:  I hesitate to say this, Mr.

4            Huebner.  I am Steve Simon.  We've been sitting

5            in the same room many times over in the past

6            several months in depositions and you've

7            certainly heard the same speech by me and Mr.

8            Hunter and Mr. VanWay as well about what the

9            process of a deposition is, right?

10                   THE WITNESS:  Yes.

11                   MR. SIMON:  And you fully understand

12           it?

13                   THE WITNESS:  Yes.

14                   MR. SIMON:  All right.  Then you will

15           not get that speech.

16   BY MR. SIMON:

17           Q       What is your current title, sir?

18           A       I'm the manager of benefits,

19   compensation and salaried relations at ZF Batavia.

20           Q       And how long have you held that

21   position?

22           A       Since I think it was December of 2001

23   that I added the salaried relations part.  I was hired

24   as the manager of benefits and compensation and then my

25   job was modified to include the employee relations work

```
 1    related to salaried employees at a later date.

 2            Q       When were you first hired?

 3            A       August 1st of 2000.

 4            Q       Where had you worked before that?

 5            A       Immediately before that I worked for

 6    Deaconess Association in Cincinnati, Ohio.  It's a

 7    health care company.

 8            Q       How long did you work for them?

 9            A       I worked with them for several years.

10    It was -- I believe it was May of '97 until August of

11    2000.

12            Q       How long have you been experienced in

13    the HR position?

14            A       I began working in HR when I finished

15    my master's degree and that was August of 1973.

16            Q       So you're in your 30th year?

17            A       Yeah.

18            Q       Are you part of ZF Batavia's policy

19    committee?

20            A       Yes.

21            Q       Let me read off a list of people and

22    you tell me if they're still on the committee.  Mr.

23    Sennish?

24            A       Yes.

25            Q       Mr. Kehr?
```

1          A       Yes.

2          Q       Mr. Newark?

3          A       No.

4          Q       Mr. Greiner?

5          A       Yes.

6          Q       That's Mark Greiner?

7          A       That's correct.

8          Q       Ann Appleton?

9          A       Yes.

10         Q       Anybody else?

11         A       Dr. Ludger Reckmann.

12         Q       All right.  Did Lou Reckmann take Dick

13    Newark's spot?

14         A       Yes.

15         Q       Mr. Newark was on the policy committee

16    for a period of time?

17         A       That's correct.

18         Q       And when did he serve?

19         A       Well, you know, I believe he was on the

20    policy committee when -- when I got there and then that

21    switch occurred shortly after Lou got there, right

22    almost simultaneously when Lou got there that we put

23    Lou in and that was January of 2001.  Wait a minute.

24    2002 approximately, yeah.

25         Q       Let's go back to the exhibits.  Do you

```
 1      have Exhibit 30?

 2              A       Okay.

 3              Q       Exhibit 30 is an e-mail from you to an

 4      employee named Joe Phelps?

 5              A       Mm-hmm.

 6              Q       Do you see in there where you tell Joe

 7      who is on the policy committee?

 8              A       Yeah.

 9              Q       Was that information accurate?

10              A       Yeah.

11              Q       All right.  So --

12              A       Yeah.  And --

13              Q       I'm just trying to determine when Mr.

14      Reckmann joined the --

15              A       Well, it was very -- you know, it was

16      in that time frame.  I don't remember exactly when Lou

17      started attending meetings, but it was right in that

18      time frame.

19              Q       Sometime after February 19th?

20              A       Yeah.

21              Q       Maybe within a couple months or

22      something --

23              A       Yeah.

24              Q       -- Dick Newark left the committee and

25      Reckmann joined it?
```

1          A          Right.  Right.

2          Q          What does the policy committee --

3     what's their task?  What's their purpose?

4          A          Well, the company is a new company and

5     so it's to develop and maintain the policies for

6     salaried employees.  I think there's some talk about

7     possibly, you know, involving other types of policies

8     as well, but the main focus has been policies related

9     to human resources for salaried employees.

10          Q          Let's see.  There was a change

11     regarding your sick/personal leave policy for salaried

12     employees a year or so ago, right?

13          A          Yes.

14          Q          And from what I understand, the policy

15     had been that salaried employees were entitled to five

16     days for sick or personal leave, that was changed to

17     three days for a period in 2002, and then recently, I

18     think, in January of this year it went back to five

19     days.

20          A          That's correct.

21          Q          And what was the basis for the change

22     initially and the return to five days this year?

23          A          Well, in the period of time when the

24     policy went from five to three there was concern that

25     people were using sick time, personal time for reasons

1    other than what was intended by the policy.  In

2    addition, it was a time when, you know, we're in a new

3    product launch, the existing product had a very -- was

4    put into a very popular model, so there was a lot of

5    demand.  There was really a need to have people on

6    board as much as possible, so people felt that they

7    should reduce the number of sick and personal time,

8    sick/personal days.

9          Q       Why did it return back to five then?

10         A       Well, I think people felt that, you

11   know, there was some unhappiness among employees, that

12   there were some instances where -- that had been

13   brought to various people's attention that there was

14   some reasonable need for it, so it was decided to be

15   reinstated back to five.

16         Q       I'll hand you a document that we'll

17   mark as Exhibit 136.  Take as long as you need to

18   review this, Mr. Huebner.  I know you've seen it

19   before.  This is a memo of January 10th, 2003 from you

20   to salaried employees explaining that the sick and

21   personal leave policy is changing back to five days,

22   right?

23         A       Right.

24         Q       And you agree with me that in between

25   the time when the change first happened back to three

1 days to the time where you sent this memo a lawsuit was

2 filed in June of last year?

3   A  That's correct.

4   Q  Any connection?

5   A  I guess to the extent that it -- it's

6 one measure of employee dissatisfaction.  You know, I

7 think that I had some employees come to me and other

8 directors or managers had people come to them and

9 express concerns about it and so it was decided to

10 bring it -- bring it back to five.

11   Q  When you made the change in last year,

12 2002, in sick and personal leave to three days, there

13 were instantaneous complaints, right?

14   A  There were some, yeah.  Yes.

15   Q  From quite a few people, to be fair?

16   A  Well, you know, that's kind of a

17 subjective thing.  I had myself, there were only about

18 two or three people that came to me, but on the other

19 hand there were some people that expressed concern to

20 other -- you know, other managers.

21   Q  Len Sennish had told you that other

22 people had come to him about it?

23   A  I don't recall that he said something,

24 but I wouldn't be surprised.

25   Q  Do people come to Len Sennish with

1    problems they have about their employment?

2         A         From time to time.  Len is a person who

3    goes out on the floor quite a bit or had been and so he

4    -- you know, he runs into a lot of people during the

5    day and so people talk to him.

6         Q         Do you see him as a hands-on HR

7    director?

8         A         He's very active in the business, yeah.

9    Yes.

10         Q         I mean, he knows what's going on on the

11    plant floor generally?

12         A         Yes.

13         Q         Is it your understanding that there was

14    a period of weekends in April and May of 2002 that a

15    group of salaried maintenance employees worked weekends

16    and were not paid overtime for that work?

17         A         Yes.

18         Q         And were you aware of that at the time,

19    in April/May of 2002?

20         A         I -- you know, I'm fuzzy about maybe

21    the timing exactly, but, you know, I was very aware

22    that there was -- that people were exceeding the

23    overtime budget, you know, the various departments, and

24    that that was something that -- that was decided upon

25    that -- that if people exceeded their overtime budget,

```
 1    that they were going to have to, you know, stay within
 2    their budget, which meant either, you know, not paying
 3    people for overtime or else working less overtime, one
 4    or the other.  But the managers were supposed to adhere
 5    to that.
 6            Q       All right.  And I'm not going to go
 7    through anything close to all the documents we've
 8    already made as exhibits, Mr. Huebner, but I think
 9    there's already an exhibit that a memo was sent out by
10    Mr. Sennish in the spring of 2002 that explained this
11    problem with the overtime budget; that sounds right?
12            A       Yes.
13            Q       It's your understanding back then that
14    that's going to be handled one of two ways, either
15    people will work less overtime, right?
16            A       Mm-hmm.
17            Q       That's a yes?
18            A       Yes.  I'm sorry.
19            Q       Or the other possibility is that people
20    are going to have to work overtime and not get paid?
21            A       Yes.
22            Q       So it certainly wouldn't be a surprise
23    to you if a group of people in maintenance during that
24    same period worked overtime and were not paid?
25            A       Yes.
```

1          Q        Did anyone tell you that at the time?

2          A        I -- I remember one -- one specific

3     instance and certainly I'm -- you know, I'm generally

4     aware that that happened.  I remember we had one

5     individual at the time who was working in maintenance

6     who was unhappy working with the -- with the

7     organization and, you know, as I recall, he quit and he

8     mentioned to me that he was -- you know, one of the

9     things he was unhappy with was the fact that he didn't

10    get paid for certain -- certain overtime.

11         Q        Who was that?

12         A        You know, I really don't remember his

13    name, but, you know, it was a guy who quit about that

14    time.

15         Q        You were here when Mr. Sennish

16    testified in this case?

17         A        Mm-hmm.

18         Q        Do you recall Mr. Sennish's deposition

19    testimony that he was not aware that there were people

20    in maintenance who worked overtime without being paid?

21    Do you recall that testimony?

22         A        I don't recall it exactly, but --

23         Q        Well, if I represent to you that's what

24    he testified, would that be a surprise to you that Mr.

25    Sennish wouldn't have been aware of the fact that

1    maintenance people were working overtime and not being

2    paid?

3        A    It's certainly possible that he wasn't

4    aware that that happened, and I -- I would characterize

5    that by saying that the fact that people were told to

6    manage the -- the overtime was, you know, clear to him

7    and everybody.  On the other hand, is he going to know

8    exactly what people are doing in all facets of

9    manufacturing all of the time?  You know, the answer is

10    no, he's not necessarily going to know that precisely.

11    So, you know, I can't say whether he did or didn't know

12    it at the time.

13        Q    You didn't tell Mr. Sennish about this

14    one maintenance employee whose name you can't remember

15    that had come to you that had said "I worked a period

16    of time and didn't get paid overtime"?  You didn't

17    report that to Mr. Sennish?

18        A    I don't remember whether I did or not.

19    We may have discussed it because it seems to me this

20    guy, when he was leaving, said "Well, gee, am I going

21    to get, you know, paid that overtime?"  And my response

22    to him was "Well, no.  Nobody has been paid for that

23    overtime and so, no, we're not going to pay you."

24        Q    You were aware that there were other

25    people in addition to him that were not being paid for

1    overtime?

2            A        Yeah.

3            Q        In maintenance?

4            A        Yeah.

5            Q        In other areas of the plant, too?

6            A        That's -- that was my general

7    awareness, that it was maintenance that was

8    overshooting the budget.

9                     Now, there was also -- subsequent to

10   that I was aware that the material folks, the planning

11   people were close to the budget, but I don't know if

12   anybody ever didn't get paid for overtime or not.  I

13   wasn't aware of that.

14           Q        You can tell me if I'm wrong.  It

15   sounds like you didn't tell Mr. Sennish about the group

16   of maintenance employees who didn't get paid overtime

17   because you figured it wasn't really newsworthy?

18           A        Well, I guess I'm not aware of the time

19   and, you know, when it was and I don't know that we --

20   we're not directly -- whether someone gets paid

21   overtime or doesn't get overtime isn't a matter of

22   daily record to us.  I mean, we're doing our thing and

23   the time sheets come in, they're managed by the

24   managers and they get run through payroll and then

25   they're paid, so that there's likely to be some delay

1    in terms of, you know, cause and effect there.  And it
2    was likely to be coming -- come up on an exceptional
3    basis.
4           Q    Now, there's periods of time other than
5    this period of time we're talking about in 2002 where
6    somebody might not be paid overtime even though they
7    put it down because the supervisor decided that wasn't
8    authorized?
9           A    That's correct.
10          Q    That sort of thing happens often
11   enough, right?
12          A    I mean, managers have to manage and,
13   you know, if -- if they make that decision, they make
14   that decision.   And I don't know how often that
15   happens, but I'm sure it happens.
16          Q    But that kind of situation was
17   different than what you had heard in the spring of
18   2002, fair?  And the distinction being, Mr. Huebner,
19   that you understood in the spring of 2002 that people
20   were working authorized overtime that they were
21   required to work and they weren't going to get paid
22   because there wasn't money in the budget; that was your
23   understanding at the time?
24               MR. HUNTER:  Objection.  Compound
25          question.  But you can answer, Herb.

```
 1                   THE WITNESS:  Well, let's put it this
 2              way:  I mean, I don't know that I think quite
 3              that compartmentally.  I mean, people are here
 4              to manage the business and they're looking at
 5              okay, well, was this an appropriate overtime
 6              situation to whether it would be paid or not
 7              or, you know, is it -- is it authorized in
 8              terms of okay, do we have a budget for it.  And
 9              this was the case where the -- the budget
10              wasn't there.
11    BY MR. SIMON:
12         Q      If you were told today that "By the
13    way, Mr. Huebner, we had about ten maintenance
14    employees, salaried, in here over the weekend and we're
15    not paying any of them because we're not going to," I
16    mean, would that be unusual?
17         A      Well, yeah.  I'd ask, you know, why is
18    that and what are the circumstances, sure.
19         Q      I'm just trying to understand.  From
20    your perspective in spring of 2002 finding out that a
21    group of people hadn't been paid overtime wasn't
22    surprising to you because you knew that there was a
23    lack of money in the budget, right?
24         A      Yeah.
25         Q      And from your working with Mr. Sennish,
```

1    you assumed that he also had that understanding?

2         A    I -- I guess I would have, you know,

3    assumed that, you know, he would have become aware

4    because of his regular interaction with people, but,

5    you know, whether he did or he didn't, you know, I

6    don't know.

7         Q    We'll nail this down and move on.  When

8    you found out that a group of maintenance employees

9    weren't paid overtime, it wasn't a surprise to you

10   because you knew of the problems in budget, right?

11        A    Yes.

12        Q    And it's fair to say Mr. Sennish, if he

13   had found out a group of maintenance employees weren't

14   being paid authorized overtime in that period, he also

15   wouldn't have been surprised?

16        A    I wouldn't think so.

17        Q    Is the current policy at ZF Batavia to

18   pay let's take salaried group leaders overtime where

19   that work is authorized?

20        A    Yes.

21        Q    All right.  And so as you sit here

22   today, you're aware that of the people that didn't get

23   paid in 2002, those included people like Wayne Whisman,

24   group leaders, right?

25        A    Yes.

1          Q       And you're aware that the work that Mr.

2     Whisman and others did in the maintenance department,

3     that that overtime they worked was authorized?

4          A       Well, it was -- they were -- well,

5     first of all, I mean, I'm not exactly aware of the

6     precise circumstances, okay, that they were supposed to

7     be fixing this machine or whatever it might be.  I

8     mean, you know, I never got into the detail of that.

9     But it was -- and actually I don't know that I'm aware

10    of how it was communicated to them that there -- you

11    know, that there was a budgetary issue with respect to

12    the overtime.  And as I recall, there was some mention

13    to people that there -- there would not be overtime

14    paid if they exceeded the budget.  I mean, you know, as

15    I recall now.  And so it -- it seems to me that it

16    wasn't authorized in the sense of we're not going to

17    pay you overtime because we don't have the money.  On

18    the other hand, there was an expectation that people

19    would be working.

20         Q       Well, when I say authorized, they

21    weren't coming in on the weekends just for the heck of

22    it.  They came in on the weekends because, as you

23    understand, their supervisors told them to?

24         A       There was work to do, yes.

25         Q       And the general policy is when you come

1    in because there's work to do, their supervisor says

2    you have to come in on the weekend, that salaried

3    people get paid overtime, right?

4         A      Well, I mean, there's an authorization

5    process.  People are supposed to plan out the overtime

6    in advance and then -- and then a supervisor approves

7    it based upon what was -- what was approved.  And so --

8         Q      As far as you know -- I don't mean to

9    interrupt you, but as far as you knew, that process was

10   followed with respect to Mr. Whisman and others in

11   spring of 2002?

12        A      I guess.  I don't know.  Where we are

13   today, I don't know exactly what happened.

14        Q      Do you have any facts to believe that

15   that process regarding authorization wasn't followed?

16   Do you have any facts?

17        A      There's a double negative in there.

18   Let me just think that through.

19        Q      I'll re-ask the question.  Do you have

20   any reason to believe that the overtime authorization

21   process wasn't followed in this period of spring of

22   2002 that we've been discussing?

23        A      My recollection by looking at the

24   records was is that there were some -- there was

25   records related to that, you know, in the file so, you

1    know, I'm assuming that there were discussions relating

2    to what was and wasn't authorized and what was and

3    wasn't going to be paid.

4         Q        But as far as you know, the work itself

5    was authorized, correct, Mr. Huebner?

6         A        Well, we keep on talking about the word

7    authorized and I think the -- was the work there

8    necessary to be done?  Yes.  Was the pay of overtime

9    then that was concomitant -- you know, that related to

10   that, was that approved?  And my understanding is is

11   that they told people ahead of time that they didn't

12   have -- they didn't have the money to pay the overtime.

13   I don't think it was done after the fact.

14        Q        So the current policy at ZF Batavia is

15   if someone tells Wayne Whisman "You're going to work

16   this weekend.  You're required to work this weekend.

17   Work needs to be done.  But just so you know, we're not

18   paying you," in your mind that would be consistent with

19   current policy at ZF Batavia?

20        A        Well, managers have to manage and I

21   think that would be a little bit -- even, you know, the

22   practices, it would be a little bit out of the ordinary

23   because basically what people did following this couple

24   week period was to work so that the budgets and the

25   authorization -- you know, to get a better

1    synchronization between the work that needed to be done

2    and the available budget for overtime and, you know,

3    the management of that.

4              But there was no question.  I mean,

5    that's the whole thing.  This -- this occurred because

6    people had set up a financial plan, you know, as you do

7    for anything in a business and that was going awry.

8         Q     I don't know if you answered my

9    question.  So the current policy is at ZF Batavia if

10   the manager tells a group leader, salaried, "You're

11   going to work on the weekend and just so you

12   understand, you're not going to get paid for it," that

13   would be consistent with the current ZF Batavia policy?

14        A     Because he's explaining that the pay of

15   it isn't going to be authorized, yeah.  But on the

16   other hand --

17        Q     Do you -- I'm sorry.  You were going to

18   say something else?

19        A     Well, I mean, it's -- and, again, it's

20   hypothetical situation, you know, that typically --

21   well, I guess I don't know if this could -- you know, I

22   think it wouldn't happen too often without us being

23   aware of it, but, you know, it hasn't happened very

24   much lately.

25        Q     So it's hypothetical, but this, what

1    I've described, did happen last year, right?

2            A        That's correct.

3            Q        Do you have Exhibit 2?

4            A        You had it right with Kevin.  It was in

5    front of Kevin.

6                     MR. HUNTER:  Did Kevin take it?

7                     THE WITNESS:  I don't think so.

8    BY MR. SIMON:

9            Q        Well, while Mr. Hunter is looking for

10   it, Mr. Huebner, Exhibit 2, you couldn't be more

11   familiar with a document than Exhibit 2; is that fair

12   to say?

13           A        Well, I'm familiar with Exhibit 2.

14           Q        I was kidding.  We've talked about that

15   many times --

16           A        Yes.

17           Q        -- in depositions you've attended.  And

18   for the record, you've sat in on, what, 20 depositions

19   in this case, right?

20           A        Well, there have been quite a few, yes.

21           Q        On the second page of Exhibit 2 up in

22   the upper left do you see where it says authorized

23   overtime will be paid?

24           A        Yes.

25           Q        And it's your understanding that this

1    tri-fold brochure that's Exhibit 2, that this was

2    distributed to Ford transitional employees in 1999,

3    right?

4           A      Yes.

5           Q      All right.  So where it says authorized

6    overtime will be paid, is that the current policy at ZF

7    Batavia?

8           A      Yes.

9           Q      So how is that consistent with what you

10   just said?  How is that consistent with telling a group

11   leader that they have to come in on the weekends, work

12   overtime and not be paid?

13          A      Well, in -- in terms of it's

14   authorized, you know, that's -- that's the word and

15   it's the interpretation of that.  And I think that it's

16   a situation where I think the reality of it is is that

17   in general -- now, again, we have the exception in 2002

18   -- is that people have been able to match up their

19   available budgetary dollars with the amount of overtime

20   they assign, but on the other hand, they're supposed to

21   be doing that matching so that we -- we stay within the

22   budget.

23                 So the -- the process, the way it

24   should work is that the manager is, you know, sitting

25   down with the employees and planning out what needs to

1    be done during the pay period and planning out what

2    overtime is going to be worked and then he's got to

3    make sure that's consistent with his budget.

4         Q       And in your mind the statement

5    authorized overtime will be paid, that statement is

6    consistent with a supervisor telling a salaried

7    employee to come in on the weekend and work overtime

8    and not be paid; is that right?

9         A       Because, again, you know, situations

10    could occur, and we're talking, you know, in many cases

11    hypothetically, but, I mean, if the individual doesn't

12    have the budget and yet the work has got to be done,

13    with salaried employees I wouldn't -- you know, it's --

14    it's not inconceivable that a person could be asked to

15    work and not get paid overtime.

16        Q       You didn't quite answer my question yes

17    or no.  Is the statement authorized overtime will be

18    paid consistent with the practice of having someone

19    come in and work on the weekend that's required and not

20    be paid, yes or no?

21        A       Yes.

22        Q       Is there a reason that the maintenance

23    employees haven't been paid that overtime that they

24    worked last year?

25        A       Is there a reason that they haven't

```
 1    been paid?  Well, they didn't have the budget at the
 2    time, so they didn't pay it.
 3          Q       Is there the budget now to pay it?
 4          A       I don't know.
 5          Q       Have you asked anybody?
 6          A       No.
 7          Q       There's no question in your mind that
 8    management at ZF Batavia are well aware of the fact
 9    that many of these employees worked this period in 2002
10    and were not paid overtime, correct?  It's not a secret
11    at this point, is it?
12          A       At this point in time it's not a secret
13    I don't think.  Well, at least, you know, say, you
14    know, most managers would be aware -- need to be aware
15    of this, I mean, within the chain of command, let's put
16    it that way.
17          Q       Everyone on the current policy
18    committee is aware of this, right?
19          A       I would -- probably.  I guess, you
20    know, let me just think through who they are, you know.
21    Whether Ann is aware of it or not, you know, I'm not
22    sure, but I would think all the other ones are.
23          Q       And the people on the policy committee,
24    some work in human resources, some don't, right?
25          A       That's correct.
```

1        Q      All of them that serve on the policy

2    committee, they have to have some minimum level of

3    knowledge regarding the pay practices, the personnel

4    policies at ZF Batavia; is that right?

5        A      Yes.

6        Q      So certainly when any one of the

7    members of this policy committee are talking about the

8    pay practices at ZF Batavia, that's someone who

9    certainly has a basic knowledge of the practice?

10       A      Well, if they don't, they would ask

11   questions about it because not everybody's level of

12   expertise is the same and, quite honestly, they may not

13   be familiar with what's going on in a particular area.

14   So some people are more well versed on what's going in

15   the administration area, some are more well versed

16   what's going on in the factory and stuff.  So, you

17   know, I mean -- I mean, if a question comes up, we have

18   to dig into it.

19       Q      If someone comes up to you and asks

20   about overtime policy, you're a good person to ask,

21   right?

22       A      Yeah.

23       Q      And if you give an answer, they can --

24   and I understand people probably come up to you a lot

25   of times where you say "I'm going to have to get back

1    to you and find out."

2          A       Sure.

3          Q       But those times where you say "Here's

4    the answer," they certainly can rely on your answer?

5          A       Generally speaking.

6          Q       And that's true of really anyone who

7    would be serving on the policy committee, if you go up

8    to them and say "Ann Appleton, what's the policy

9    regarding overtime?" she gives an answer, you can

10   certainly rely on the fact that she's knowledgeable of

11   what she's talking about?

12         A       I would say that, depending on the

13   depth of the question, there are certain policy

14   committee members who would probably either defer to

15   somebody in HR or get back to the person.  I don't

16   think they'd be giving flat answers out.  You know,

17   like Ann, if somebody asked her a personnel question,

18   my guess is that she would refer them to me.

19         Q       But, I mean, if somebody asked Karl

20   Kehr a question and he gave an answer, one can rely on

21   the fact that the answer he's giving is accurate, given

22   that he serves on policy committee certainly?

23         A       Yes.  But like anybody else, he'd -- it

24   wouldn't take too long for him probably to need to get

25   into and re-read the policy or, you know, check out the

1    circumstances or what have you.

2              Q        Unless his giving an answer didn't

3    require doing that, right?

4              A        Yeah.  It depends.

5              Q        I mean, if last year somebody came up

6    to Dick Newark and said "What's the policy on sick

7    days?  How many do I have?" Mr. Newark obviously could

8    have said "Well, the policy has been changed.  You now

9    have three days," right?

10             A        After it had been changed, yeah, he

11   would have known.

12             Q        Let's move to AIP.  We've heard lots of

13   testimony about the AIP.  Let me give you a general

14   understanding and you tell me if I'm right.  When you

15   started in 2000, they had already -- the company had

16   already distributed AIP bonuses for the previous year?

17             A        That's correct.

18             Q        Are you knowledgeable about how they

19   did it?

20             A        Yes.

21             Q        And did they do it by assigning a fixed

22   percentage to people, depending on what salary band

23   they were and then using that percentage as a part of

24   their base salary and give them an AIP bonus?

25             A        Whereas that's a general categorization

1    of how it -- how it worked, the -- I would -- excuse

2    me.  When I started, I was oriented by Tony Deshaw, my

3    predecessor, and one of the questions I asked Tony was

4    was there a discretionary component in the AIP and --

5    or did everybody just get, you know, the straight

6    percentage that the numerical formula would indicate.

7    And he -- he told me that the bonus for -- and that

8    would have -- let me just make sure -- yeah, that would

9    have been the payment, the AIP payment for '99 that was

10   paid in 2000, there was a discretionary component that

11   -- that he provided the formula information to the

12   managers and they were free to change that and, in

13   fact, they did.

14              Now, could I say who may or may not

15   have gotten more or less?  I'd have to look at the --

16   at the facts, but that's what I remember Tony telling

17   me.

18       Q     Before I show you this document, let me

19   see if this general statement is true.  For the 1999

20   and 2000 bonus which would be distributed in 2000 and

21   2001 respectively the AIP bonus was not dependent on

22   individual performance?

23       A     No.  I just said that the 1999 was not

24   dependent on individual performance.  Was not.

25       Q     And 2000?

 1          A          And 2000 was pretty much a straight --
 2     straight payment.
 3          Q          And then the 2001 AIP there was a
 4     change where individual performance was factored in,
 5     correct?
 6          A          That's correct.
 7          Q          And then the 2002 AIP bonus that was
 8     paid this year, that also factored in individual
 9     performance?
10          A          That's correct.
11          Q          All right.  Let me show you a document
12     we've marked as Exhibit 137.  You might have to share
13     with Mr. Hunter.  Sorry about that.  For the record,
14     Exhibit 137 is marked Bates stamp P00634 through 639.
15     Take a second to familiarize yourself with it.  I'm
16     just going to ask you a few questions about particular
17     things, Mr. Huebner.
18          A          Okay.
19          Q          Have you ever seen these documents
20     before?
21          A          Yes.
22          Q          Do you know who authored them or where
23     they came from?
24          A          It's been a while because I believe
25     this is the -- the information from the payment of the

1    -- yeah, this is from 2000, payable in 2001.  And yeah,

2    this -- the second bullet would indicate that this is

3    -- this is a discussion that related to -- or the

4    overheads related to a discussion relating to the 2000

5    -- wait a minute, though.

6                        MR. HUNTER:  Take your time.

7                        THE WITNESS:  Okay.  Yeah.  No, that

8              would have been for the 2001 payout.  Now, I'm

9              sorry, but I'm getting a little bit goofed up.

10             Let me -- let me just look at it a little bit

11             more.  And the reason why I'm getting goofed up

12             is that they used some overheads and then we

13             modified them again the next year and that's

14             why I'm stumbling a little bit.  I'm just

15             trying to make sure.

16                   Okay.  Okay.  No.  This bullet here.

17             Yeah, this is the one that they used to explain

18             the 1999 AIP because that talks about the 54

19             transitional employees would be prorated by

20             Ford and ZF for payouts.

21                        MR. SIMON:  All right.

22                        THE WITNESS:  And to answer your

23             question, I believe there was a cooperative

24             effort between Ann Appleton and my predecessor,

25             Tony Deshaw, to put that together.

1      BY MR. SIMON:

2              Q        To put these documents together?

3              A        That's correct.

4              Q        And I think you started to say they

5      were used as overheads for a meeting of some type?

6              A        Yes.

7              Q        For the policy committee to discuss

8      perhaps?

9              A        My understanding was is that it was

10     broader than that.  I think they used it to explain to

11     line managers.

12             Q        And would line managers include group

13     leaders?

14             A        I wasn't there, so I don't know who --

15     who attended.  The following year, I think, we had

16     people at one level above that, so it would have been

17     the area managers and, you know, people up higher.

18             Q        Turning, if you could, to I think

19     what's the third or fourth page that's marked 637 in

20     the corner --

21             A        Okay.

22             Q        -- this page at the top says 1999 AIP

23     Award Targets.

24             A        Mm-hmm.

25             Q        And, again, this is part of Exhibit

1    137.  What does the information on that page show?

2         A        Well, it shows the percentage that was

3    going to be paid by broad band.  And the broad bands

4    are the way the employees are organized in terms of

5    their -- their level of responsibility and their pay

6    ranges.  And so this shows that for the various broad

7    bands, and if we pick one, GSR is where the bulk of the

8    salaried employees are, that -- that the Ford

9    transitionals would receive 6.9 percent and the ZF --

10   at the time they called them ZF new hires would get 9.5

11   percent.  And so those are the -- the targets for the

12   -- for the bonuses and the actual payout would depend

13   on how they -- you know, how it would perform, you

14   know.  So if the company performed at a certain level,

15   you could get, you know, 50 percent of that or 75 or

16   100 or whatever the -- but that was the -- the base

17   targets that were used at the time.

18        Q      Do you know if the salaried employees

19   received -- for example, the GSR Ford transitionals,

20   did they receive 6.9 percent as a bonus?

21        A      I can't say for sure.  I mean, I have a

22   vague recollection that they may have gotten just

23   slightly -- slightly more of that.

24              And, of course, 1999 was a rather

25   complex payout year because the employees had worked

1     part of the year for Ford and got from Ford whatever

2     they got for that time frame, you know, not in AIP but

3     in the Ford program, and then they got the ZF Batavia

4     AIP award for that prorated part of that year.

5              And they did something in addition

6     called a true-up.  And whereas I -- you know, without

7     work in front of me, I can't describe it exactly, but

8     basically the general concept was is that the process

9     of assimilating into the ZF Batavia workforce took a

10    period of time, so it could be that you could have

11    started as a Ford transition on, say, July 1 of 1999 or

12    it could have been December 1 of 1999 and that timing

13    alone, your total payout out of -- let's say the total

14    income from various types of bonuses for two people

15    with equal rates of pay might have been different

16    because if one of them started in July, then their --

17    their payout would have been different than if they

18    started in November.  And so recognizing that, the

19    management folks at ZF Batavia on their own decided to

20    make it kind of a level playing field, as it were, and

21    I believe that the Ford payout in that year was a

22    little bit higher than ZF's and so they paid a little

23    bit more just, you know, to eliminate that timing

24    variance.

25         Q        Just so I understand, where it says on

1      that document Ford/ZF Transitionals, that refers to a

2      group of people that we've been talking about in this

3      lawsuit as Ford transitionals; is that correct?

4              A       That's correct.

5              Q       And ZF refers to what we're calling ZF

6      Batavia new hires?

7              A       Yes.

8              Q       What explanation is there for the

9      difference of 6.9 percent versus 9.5 percent, looking

10     at the GSR level?

11             A       Okay.  The intent of the way the AIP

12     was set up was that the cash awards were to be

13     comparable between the Ford transitionals and the ZFs,

14     and the -- the broad bands, there's two sets of, you

15     know, broad bands, one for Ford transitionals, one for

16     ZF'ers and, of course, then the pay opportunities were

17     a little bit higher for the ZF transitionals and so in

18     order to --

19             Q       You said ZF transitional.  You're

20     talking about Ford transitional?

21             A       I'm sorry.  I'm seeing this here and

22     it's throwing me off.  Yeah, the Ford transitionals;

23     you're correct.

24                     So anyway, the -- in order to on a

25     general basis get a rough equivalent in dollars between

1    the Ford transitionals and the ZF new hires, there was

2    this difference in the -- in the percentages.  Can I

3    call time briefly?

4               MR. SIMON:  Off the record.

5                  (OFF THE RECORD)

6               MR. SIMON:  Back on the record.

7    BY MR. SIMON:

8         Q       I think your testimony is that

9    generally speaking in 1999 the Ford transitional

10    employees in GSR generally had a higher base salary

11    than an equivalent GSR who was a ZF Batavia new hire;

12    is that right?

13         A       That was part of the -- the thought

14    process at the time and certainly the thinking in terms

15    of the planning was is that the -- again, going back to

16    the broad bands, is that the -- the planned target

17    areas or the range of distribution in which Ford

18    transitional salaries could fall versus the range of

19    distribution that the ZF new hires could fall was

20    different in that the Ford had a higher -- Ford

21    transitionals had a higher broad band and so that was

22    the thinking that -- you know, that was used at that

23    time is to say okay, you know, it's likely that their

24    pay is going to be higher and so to get -- to get at

25    that issue of having level dollars, that's how they're

1    going to do it.

2          Q        To simplify, was it the thought that

3    you might have a GSR who's a Ford transitional who,

4    let's say, makes -- let's say that person makes $60,000

5    in base and you have a ZF Batavia new hire who's in an

6    equivalent position, a GSR, who makes $50,000.  The

7    reason there's a different percentage is so that the

8    lump sum AIP will be roughly equal; is that --

9          A        Yes, that's the idea.

10          Q        Now, it's true, however, that there

11    were ZF Batavia new hires who made more than some Ford

12    transitionals in equivalent positions?

13          A        Yes.

14          Q        That was true in '99.  It was also true

15    in 2000?

16          A        You know, I guess I can't call up

17    anybody to mind, but that certainly -- well, let's put

18    it this way:  It's certainly within the realm of

19    possibility and it's probable that that was the case,

20    but I'd have to look at the list to say that for sure.

21          Q        You were obviously not in on AIP paid

22    out in 2000.  That's before you joined.  So then if we

23    look forward to the 2000 AIP paid out on 2001, for that

24    AIP you were intricately involved --

25          A        Yes.

1          Q        -- in the calculation?  And you were

2     aware during that period that there may be, or maybe

3     you were even aware of certain ones -- you were aware

4     in 2000 when you were figuring out the calculation for

5     the AIP to distribute in 2001 that there were Ford

6     transitional employees who made less base salary than

7     ZF Batavia new hires in equivalent positions?

8          A        I guess I didn't -- at the time when I

9     was working on it I didn't particularly focus on that,

10    but --

11         Q        I just want to know if you were aware

12    of it.

13         A        You know, it -- it -- well, you know, I

14    guess in general the transitional employees were --

15    were paid better.  I guess what I'm struggling for is

16    to come up with names off the top of my head where that

17    might have been not the case.  You know, a lot of the

18    new hires were shorter service, but there were some --

19    you know, I'm sure there are new hires that were

20    brought in that had more -- you know, had a lot of

21    experience that might have -- might have been -- had

22    higher pay than certain other -- but, you know,

23    obviously that's not just a single, you know, criteria,

24    whether you were a Ford or a ZF new hire.  There's the

25    whole experience, educational, you know, thing.  But

1    yeah, it's possible.

2         Q        I understand you can't come up with

3    individual names, but when you were working on the 2000

4    AIP bonus calculation, you were aware that there were

5    some ZFB new hires that had higher base income than the

6    corresponding employee who was a Ford transitional?

7    You were aware of that?  Yes?

8         A        I just wasn't focusing on that, so I

9    can't say absolutely yes or no, they're weren't.

10        Q        As you sit here today, you know that

11   there are?

12        A        You know, without looking at the list

13   of people, I can't say that, you know.  I mean, that's

14   the whole thing.  I mean, I don't commit this stuff to

15   memory.  I deal with -- deal with reports.

16        Q        I understand.  It's the practice that a

17   salaried person who joined ZF Batavia since 1999,

18   they're allowed to negotiate their salary?

19        A        Well, I mean, anytime, you know, when

20   you come in, you know, you come in with a certain

21   salary and people have to make it attractive to you,

22   sure.

23        Q        So you might have someone who had 20

24   years of experience at a different plant who comes in

25   and is actually brought in at a salary higher --

```
 1          A       Let's put it this way --

 2          Q       Well, let me finish the question --

 3          A       Oh, okay.

 4          Q       -- if I could.

 5          A       Sure.

 6          Q       Someone can come in who has a certain

 7     amount of experience at a different plant, they come in

 8     and their starting salary is actually higher than

 9     somebody who is a Ford transitional in an equivalent

10     position?  That occurs, correct?

11          A       Yeah.  And I think what -- you know,

12     now that we've talked a little bit, in my head I can

13     come up with some -- some MR level people that are paid

14     more than MR -- you know, an MR ZF Batavia person paid

15     more than a MR Ford transitional.  So, yeah.

16          Q       That may not have been clear on the

17     record.  As you sit here thinking about it, you know

18     that there are some ZF Batavia new hires who make more

19     in base salary than a Ford transitional in an

20     equivalent position?

21          A       Yes.

22          Q       And based on that understanding of how

23     it is today, you certainly wouldn't be surprised if

24     there were such employees in that circumstance that

25     I've described in '99 and 2000 when these bonuses were
```

1      paid, right?

2           A        There were probably some.

3           Q        So in those instances someone who was

4      Ford transitional would have actually received a

5      smaller bonus than a corresponding person who is a ZF

6      Batavia new hire based on the application of this

7      formula?

8           A        Somebody who is in that situation, what

9      you're saying is that they were paid less than the ZF

10     new hire.  Yes.

11          Q        I had said before -- we were talking

12     about somebody who made $50,000 as a ZF Batavia new

13     hire versus somebody making $60,000 as a Ford

14     transitional.  It's possible just using those numbers

15     that a ZF Batavia new hire may have made $60,000, a

16     Ford transitional person at the same level made

17     $50,000, and actually the percentage for the AIP bonus

18     was lower for the Ford transitional person?

19          A        That they would have gotten, yes.

20          Q        Okay.  I think, Mr. Huebner, we'll talk

21     in a little more detail about the AIP at the end of the

22     deposition, for what it's worth.

23          A        Okay.

24          Q        I just want to get a general

25     understanding.  The 2001 AIP bonus which was paid out

1    in 2002, individual performance was a factor in the

2    calculation?

3         A     Yes.

4         Q     And as a component of that, the AIP

5    bonus was affected by how much overtime a salaried

6    person had worked?

7         A     Yes.

8         Q     And generally speaking, if you worked a

9    certain amount of overtime, your AIP bonus was either

10   reduced or eliminated entirely?

11        A     Yes.

12        Q     And that was something that was new for

13   the 2001 AIP bonus that hadn't happened with the 2000

14   and 1999 bonus?

15        A     Yes.

16        Q     And is it my understanding that that

17   change in the AIP came from the top, Mr. Adams?

18        A     It was a -- I mean, it came from some

19   discussion that the accounting people -- you know,

20   let's say Mark Bugajski, being the controller, were

21   making people aware that by their figures, you know, we

22   were spending an excessive amount of money in overtime

23   and that for that particular year, and I don't remember

24   the exact figures, but we've blown the budget quite a

25   bit.  And so I'm sure he made that known to everybody

1    in the TMT as time was going on.  I mean, I don't

2    attend the TMT meetings, but I suspect that's what they

3    talk a lot about is how we're doing against budget and

4    so all of the TMT members would have been aware that,

5    you know, that's -- that's a problem.  And so the -- my

6    understanding is is that Dave Adams did want that lack

7    of achievement on the overtime front reflected in the

8    AIP.

9            Q       All right.  As I said, I think we're

10   going to return to the subject of AIP, just to give you

11   a roadmap, if you will.

12           A       Okay.

13           Q       But let's turn to a different subject.

14   Do you have Exhibit 16?  These two exhibits you can put

15   aside.

16           A       Okay.  And I keep the green tags with

17   green tags?

18           Q       Yes.

19           A       Okay.

20           Q       All right.  Exhibit 16 you've seen

21   before today, Mr. Huebner, correct?

22           A       Yes, sir.  Yes.

23           Q       And Exhibit 16 is a copy of a notice

24   sent out, I think, under Mr. Sennish's signature, if

25   you will?

1           A       That's correct.

2           Q       And this was an announcement of a new

3    policy regarding salaried employees, that from that

4    point forward they would need to engage an electronic

5    reader as they enter the plant and as they exit it.

6           A       Yes.

7           Q       Do you recall, just generally speaking,

8    my asking Mr. Sennish about this at his deposition?

9           A       Yeah, I remember it came up.

10          Q       And it's a fact that the foreign trade

11   zone did not require that salaried employees engage the

12   reader when they exit; is that right?

13              MR. HUNTER:  Objection to the extent

14              that you're requesting a legal conclusion from

15              Mr. Huebner.  He does not have a legal

16              background.

17              THE WITNESS:  Okay.  I don't know that

18              -- at the time that this was written I didn't

19              get involved in the foreign trade zone rules.

20              I was just involved in looking at it from more

21              of an HR perspective, so I have not read the --

22              the statute.  I think I've looked at -- at one

23              point in time, you know, I might have looked at

24              a summary or something from one of the other

25              people, but I don't know exactly.

1              MR. SIMON:  And I understand you're not

2          a lawyer.  I wasn't really looking for a legal

3          conclusion on that.

4              THE WITNESS:  Yeah.

5    BY MR. SIMON:

6          Q      I imagine that the subject of this new

7    policy was discussed in your policy committee meeting?

8          A      No, it wasn't.  At least, you know, is

9    your question:  Was it before it was issued discussed?

10   And my recollection is that it wasn't.

11         Q      Okay.  You had worked on issues

12   regarding this notice before it was sent out, right?

13         A      Yes.

14         Q      And obviously you worked with Mr.

15   Sennish on that?

16         A      That's correct.

17         Q      Was this a secret plan the two of you

18   had or did you involve anybody else from management?

19         A      Mr. Sennish -- and I don't know if

20   anybody else in our department had much involvement in

21   -- in the foreign trade zone thing, but there were

22   groups of people working on the foreign trade zone

23   issue, signs posted, things of that ilk.  You know,

24   today when you walk in, there's a big blue sign about

25   foreign trade zone.  So that had been -- people had

1    been working on that sort of thing.  It just wasn't one

2    of the things I was working on.  And as I recall, Len

3    sent me an e-mail and said "I'd like to send this out.

4    Give me your thoughts," that sort of thing.  And so

5    that's when I became aware of -- of this memo or the

6    concept, I mean.

7         Q       I understand it wasn't formally raised

8    at a policy committee meeting, but, I mean, did other

9    members of management like Mr. Kehr, Mr. Newark, were

10   they aware that this notice was going to be sent out?

11        A       I assume so, but I don't remember

12   talking about it with anybody in terms of, you know,

13   somebody like Karl Kehr or Dave Adams.  I mean,

14   basically I talked about it when Len said "Okay.  Pick

15   a couple people and find out -- you know, do some

16   testing on them to see what their opinion is."  So, you

17   know, I just went to a few folks in management, you

18   know, I said "Okay.  We're going to hand this out.

19   What do you think?"

20             So -- but, I mean, the assumption is --

21   I mean, Len is my superior, so I'm assuming that he's

22   talking about this sort of thing with other -- other

23   members of management at that level.

24        Q       Did he go to Dick Newark about it; do

25   you recall?

1          A       You know, I don't know that or I don't

2     remember it anyway, you know, in terms of who he may or

3     may not have spoken with.  I mean, this is a -- I mean,

4     it's the kind of thing that, like I say, the foreign

5     trade zone work had -- it seems to me that there was a

6     committee of people that were working on the various

7     items on it.  I mean, I would have thought that he

8     would have talked to Dick about it because, you know,

9     Dick has a lot of people.

10          Q       It would be your expectation that Dick

11     Newark would want to know that this was going to

12     happen?

13          A       Yeah.

14          Q       As I understand it, there was some

15     concern that salaried people aren't going to appreciate

16     that they have to do it, swipe in and swipe out, number

17     one, and number two, that they were going to have the

18     requirement to swipe out and the union hourly employees

19     would not have that requirement, right?

20          A       There was -- you have to try and

21     separate before and after.  I mean, beforehand -- I

22     mean, just reading it, you know, just having some HR

23     experience, I looked at it and I thought well, there's

24     going to be a certain group of people that don't care

25     and that there are going to some people who -- who

1    might take exception to -- you know, to having to swipe

2    in and out.  But --

3         Q         I thought -- and I don't think I

4    brought this with me today, but I thought there was an

5    e-mail back and forth between you and Mr. Sennish where

6    somebody was concerned that if you put it out, you post

7    this notice somewhere where the hourly people see it,

8    they might actually kind of, for lack of a better word,

9    harass the salaried employees.

10        A         That was -- yeah, that was probably

11   discussed because the -- as you've pointed out, there

12   -- there was not an attempt at that time to have the

13   hourly employees do that.  It's a collective bargain,

14   you know, facility and so if they were going to do

15   this, it would have to be subject to at least some

16   collective bargaining considerations.  And I think

17   Len's feeling was that -- my recollection of it anyway

18   was that they were going to be accounted for in other

19   ways anyway so that we would meet the spirit of the

20   needs here.

21              And I think the needs, the way it was

22   explained to me is that we need to have a good handle

23   on who's coming and going in the building, you know,

24   from a security standpoint because it's -- in a sense

25   it's a big -- my understanding of it is it's sort of

1     like it's a big warehouse and so you have to secure the

2     area.

3          Q          Was it your understanding that a

4     motivation for requiring salaried employees to swipe in

5     and swipe out was to hold salaried people accountable

6     for being in the plant when they say they're in the

7     plant?

8          A          That was one of the things that -- you

9     know, that came up in the discussions because, I mean,

10     Len wanted to make sure that, you know, people were

11     aware that -- that, you know, we reserve the right to

12     take a look at these things if we needed to, you know,

13     verify whether people were here or not.

14               There was a lot of, at that time,

15     concerns that employees of all levels, salaried and

16     hourly, there was -- there were some people that were

17     thought either not to be working when they said they

18     were working and things of that ilk.  So in order to

19     have -- to make people aware that, you know, those

20     could be used, that kind of wording was put in here.

21          Q          I'll hand you a two-page document, Mr.

22     Huebner, that we'll mark as Exhibit 138.

23          A          Okay.

24          Q          Exhibit 138 is two documents, an e-mail

25     that is -- a series of e-mails that's Bates stamped

1    2399, and 2400 is the second page and that's the

2    notice.  I'm not sure, Mr. Huebner, have you seen these

3    -- I'll represent to you that the e-mail, one of them

4    is from you.  Have you seen this before?

5            A        Yes.

6            Q        And as you read this, is this notice

7    that's attached on 2400, is that what you attached to

8    your e-mail do you believe?

9            A        Well, I'd have to compare them.

10           Q        That's all right.  That's okay.

11           A        Yeah.  Because there's one of the

12   underlined parts in there.

13           Q        Looking at --

14                    MR. HUNTER:  Steve, they are different,

15           for what it's worth.

16                    THE WITNESS:  Yeah.

17   BY MR. SIMON:

18           Q        What are the differences that you've

19   identified, Mr. Huebner?  And we're comparing page two

20   of Exhibit 138 with Exhibit 16.

21           A        Well, there's one section that's

22   underlined that stands out here, to enter as well as

23   exit.  That's about the fifth line down.  So that's

24   underlined.  And --

25           Q        We don't have to go through that

1    exercise.  That's fine.  I just was trying to establish

2    that it was just a draft.

3              Did you actually draft the notice first

4    and then give it to Mr. Sennish to edit; is that how it

5    worked?

6         A     No, no.  This one here, Len prepared

7    the notice and then asked me my opinions.  And so I --

8    I did some rearranging in terms of just, okay,

9    communication value, you know, what are you trying to

10   say here and that sort of thing.

11        Q     The two sentences that read "Please be

12   advised that salaried time sheets will be audited

13   against Honeywell system readouts," and the sentence

14   that immediately follows that, do you know who wrote

15   those two sentences?

16        A     Okay.  Which paragraph?  That's the

17   third -- oh, "Please be advised..." -- okay, that one

18   there and then the which one, the one following that?

19        Q     Mm-hmm.

20        A     Okay.

21        Q     Do you recall if those were sentences

22   that you added or that you revised?  Do you recall?

23        A     I don't remember precisely about

24   modification.  This was -- my recollection was is that

25   that's part of Len's original memo and whether or not I

1 might have modified that a little bit, that -- that may

2 have happened.

3   Q Reading your memo that's on the first

4 page there that you sent on August 27th, which I'll

5 represent was two days before the notice was sent out,

6 I guess, apparently you had done some research about

7 how this practice might be impacted by the FLSA; is

8 that fair?

9   A Yeah.  Part of this was that Len gave

10 me the memo and said what do you think and then, second

11 of all, he said well, ask a couple of people, you know,

12 how they'll react, do some sensitizing or customer

13 listening or whatever you want.

14    And so one of the people that I gave it

15 to was another coworker in my department, Blandina

16 Jabbari, and she just said well, you know -- kind of

17 vaguely saying well, gee, aren't there some, you know,

18 things that you have to be careful of with respect to

19 salaried employees and timekeeping and things of that

20 sort, so that then I went to several documents -- I

21 don't remember them all, but I remember going to the

22 Society of Human Resource Management web site and

23 pulling out some stuff that they had and looking at

24 that, and that's where the information on this memo

25 came from.

1          Q        In those two sentences that we were

2     discussing on the notice itself, since the issuance of

3     this notice has ZF Batavia made any pay adjustments

4     based on discrepancies between salaried time sheets and

5     Honeywell system readouts?

6          A        I don't recall any.  The -- there could

7     have been some times.  I mean, you know, it's hard when

8     you work in an environment like we do where there's

9     things going on with hourly and salaried people, you

10     know, all together and stuff, you hear about things.

11     But I'm not aware of -- if it has happened, it's

12     certainly a rarity.  And I think the -- the use of

13     these Honeywell things is more broader than that, I

14     mean, as the, you know, disciplinary situation, you

15     know.  Somebody might, you know, take a look and say

16     well, okay, were they -- were they here, were they

17     supposed to be here or whatever.  I mean, that -- there

18     has been some looking at it, but it's not something

19     that's regularly looked at or certainly not compared to

20     time sheets, you know.

21          Q        On occasion there's been employees who,

22     people in management or otherwise, have compared

23     Honeywell system readouts against time sheets?

24          A        There has been some when -- it seems to

25     me that there has been a supervisor or two that have --

1      and, quite honestly, now when I'm saying this, most of

2      this is coming from hearsay from somebody else.  They

3      don't come to me and say "Can I get a reading printed

4      out from the Honeywell reader?"  They go to, you know,

5      Marty Robbins and they request it from Marty.  So I --

6      you know, I know that Marty has said to me that there

7      have been, you know, some supervisors who have

8      requested -- you know, taken a look at the readouts to

9      kind of have a check and balance against the -- the

10     time sheets.

11          Q      Did Mr. Robbins give you any indication

12     how many times that's happened where a supervisor has

13     come to him and said "I'd like to look at the

14     readouts"?

15          A      It's -- it's not a frequent thing, but

16     it happens from time to time.  My understanding, from

17     what Marty says, is that more readily what happens is

18     that somebody will get all wrapped up in their work,

19     somebody who, you know, has been doing -- you know, is

20     eligible for getting overtime pay and they'll get all

21     wrapped up in their work and they'll lose their

22     overtime planning sheet or whatever and they'll come

23     and ask him, you know, on their own, you know, "Let me

24     -- let me see my readings just to verify," that sort of

25     thing rather than -- more so than management, you know,

 1   people, but there have been some.

 2           Q       There have -- we'll be talking to Mr.

 3   Robbins tomorrow.

 4           A       Yeah.

 5           Q       But Mr. Robbins gave you an indication

 6   that at least in some instances supervisors have come

 7   to him --

 8           A       Mm-hmm.

 9           Q       -- and said "I want readouts for

10   another employee, my subordinate..." --

11           A       Yeah.

12           Q       -- "...and I want to check his or her

13   readouts", right?

14           A       Yeah.

15           Q       It's happened more than once?

16           A       Yes.

17           Q       And do you know -- based on someone

18   looking at those readouts, do you know if perhaps

19   during those instances pay adjustments were made?

20           A       I can't bring any to mind that I'm --

21   I'm aware of.

22           Q       Okay.  In your e-mail you kind of laid

23   out the lay of the land for Mr. Sennish regarding the

24   FLSA and so forth.  In your e-mail you write "Len, I

25   modified your memo to put the foreign trade zone on the

```
 1      top and modified the timesheet/readout paragraph to

 2      retain the 'notice' quality, but to make it look like

 3      we're looking for major issues rather than to get on

 4      your case if you're 10 minutes late one morning."

 5                A       Mm-hmm.

 6                Q       Is what you said there accurate?  Was

 7      that a concern of yours?

 8                A       Well, it was something that, you know,

 9      with salaried employees, you know, there's got to be

10      some flexibility and I thought that if we tried to make

11      a communication that said well, look, this is -- you

12      know, we're not denying that it could be used if we've

13      got a concern about when you're here and when you're

14      not here, but on the other hand, it's not like it's our

15      daily practice to sit up there as judge and say oh, I'm

16      going to flip through the Honeywell readouts.

17                      I mean, you know, Len never gave me

18      that impression that that's what this was all about and

19      it's not happened that way, that people sit up there

20      and use this as a regular tool.

21                Q       I understand.  It was never your

22      intention to deduct somebody -- excuse me, to make a

23      pay adjustment if they were ten minutes late; you

24      didn't want to give people that indication, right?

25                A       Yeah.
```

1          Q       Obviously a more serious situation is

2     if you learn that someone isn't coming -- they say

3     they're coming in to work at 9:00, they're really

4     getting in at 11:00 on a Monday, for example; that

5     would be a more serious concern?

6          A       Well, that -- that kind of thing, yeah,

7     where are you.  Yeah.

8          Q       And so if we look at the time sheets

9     and look at the readouts and you say you're coming in

10    on a Monday at 9:00 and it says you're really coming in

11    at 11:00 a.m., there may be some pay adjustments?

12         A       Well, not in that sense.  I mean, it's

13    a matter of okay, you know, what's the story here, you

14    know.  You're supposed to be here at a certain time,

15    you weren't.  And so I think it depends on what the

16    circumstances are.  I mean, if -- you know, we don't

17    dock people because of, you know, not putting in the

18    full eight hours, but on the other hand, you know, if

19    somebody is not representing their overtime in an

20    honest and fair manner, I mean, we've got a right to

21    question that.

22         Q       Let's say that's what you found out.

23    Let's say you do an investigation, somebody comes in

24    two hours late on a Monday and you find out, you check

25    against the readouts, this person, in fact -- a

 1    salaried person, in fact, came in two hours late, you

 2    find out that it's just fraud, that they're lying about

 3    when they come in, I imagine this is a situation where

 4    there may be a pay adjustment; fair enough?

 5            A      Well, there -- there -- again, it's --

 6    you know, you're bringing up a hypothetical thing and I

 7    think that discipline is perhaps a better realm of, you

 8    know, coming in.  I think that if people were saying

 9    that they were here on Saturday, for example, and they

10    weren't here on Saturday or whatever it might be, that

11    that would -- that would come up and so -- but there --

12            And, again, there are other reasons to

13    have this sort of thing.  You know, not being in the

14    authorized place, you know, that sort of thing that,

15    okay, what are you doing swiping in on that door or

16    something like that if somebody is in where they

17    shouldn't be or whatever.  And there's a lot of

18    potential reasons for having that.

19            Q      And, again, to be fair, when you sent

20    out this notice that you reviewed with Mr. Sennish, you

21    didn't want to give the impression that pay adjustments

22    were a possibility if you're ten minutes late, right?

23            A      Yeah.

24            Q      We've talked just now about a more

25    serious situation where there's a two-hour discrepancy

1     and there's no good reason for it.  That's certainly a

2     more serious situation, right?

3          A     Yeah.

4          Q     And you've talked about whether

5     discipline may have been a consequence, right?

6          A     Well, if -- if somebody who, you know

7     -- you know, I guess it's not a simple matter.  I mean,

8     if somebody, you know, put down -- you know, there's a

9     two-hour discrepancy, there would be a lot of

10    questions, you know.  And that -- well, first of all,

11    the -- the manager would have to somehow notice that

12    this was -- that there was some sort of -- you know,

13    he'd have to have some sort of reason.

14               So, for example, gee, let's say that

15    somebody works for Dick Newark, and Dick Newark needed

16    a report at a certain time and Dick Newark came and

17    said to this guy, hey, this was supposed to be here and

18    I went over there and you weren't there.  Where the

19    heck were you?  You know, I mean, it's these kinds of

20    circumstances that people say, well, you know, yeah,

21    where was he?  And then if the -- you know, if the time

22    sheets don't -- you know, don't add up, the -- the --

23         Q     Can I interrupt you for just -- go

24    ahead.  I'm sorry.

25         A     Yeah.  I mean, you have to take a look

1    at this as a -- as a system, I guess, and that is is

2    that most employees are very honest about what they do.

3    From time to time there are people who -- who aren't

4    honest about various parts of their employment and so

5    in the process of investigating and disciplining

6    people, this is something that could have been used as

7    a tool.  And so I think that's the context in which Len

8    was thinking about, okay, just make you aware that, you

9    know, if we need to, we'll use it.  And I think his

10   thinking is from situations that had occurred I'm sure

11   in the -- in the hourly group from time to time, where,

12   you know, we only had one swipe, but there are times

13   when people's swipes weren't jibing with when they were

14   supposed to be at work.  So, you know, he just wanted

15   to make sure people were aware of it.

16           Q       Right.  What he wanted to make people

17   aware of was that in the situation we've described, a

18   person comes in on a Monday two hours late, you find

19   that out after checking the readouts, there may be

20   discipline such as something put in your file, right?

21   That might be a result?

22           A       Could be.

23           Q       It could even be more serious like a

24   suspension?  I'm saying it's a possibility.

25           A       I mean, it depends on the context.  I

1    mean, you know, I just can't say how we would

2    discipline somebody in any given situation unless I

3    knew the facts and what was going on.

4         Q     Sure.  I'm just trying to understand

5    the possibilities.  One of the possibilities may have

6    been a pay adjustment?

7              MR. HUNTER:  Objection.  That has been

8         asked now probably three or four times.

9              MR. SIMON:  My question has not been

10         answered.  I'd appreciate it if you could

11         answer that.

12              THE WITNESS:  Well --

13   BY MR. SIMON:

14        Q     Yes or no, Mr. Huebner.  You said that

15   might happen as a possibility.  If someone comes in on

16   a Monday, is two hours late, you investigate it,

17   there's not a good reason.  As I understand this memo,

18   a pay adjustment was a possibility; is that fair?

19        A     Not in base pay, but in overtime it

20   could have been adjusted because, okay, if, you know,

21   you're saying that you worked two hours of overtime and

22   you didn't, why should we pay you for the two hours

23   that you didn't -- didn't pay.

24        Q     Now, does this sentence anywhere say

25   that we're going to make a pay adjustment only to your

```
 1    overtime?  Does it say that?
 2                    MR. HUNTER:  Objection.  The document
 3            speaks for itself.  You're asking what the
 4            document says?
 5                    MR. SIMON:  Yeah.
 6                    MR. HUNTER:  The document says what it
 7            says.
 8                    THE WITNESS:  No, it doesn't say
 9            anything about overtime.
10    BY MR. SIMON:
11            Q       I mean, you went over this notice very
12    carefully with Mr. Sennish before it was sent out,
13    right?
14            A       I mean, I worked on it, yes.
15            Q       Did you -- in your mind were you
16    communicating to the salaried workforce that only their
17    overtime pay would be adjusted if their readouts didn't
18    match up with their time sheets?  Is that what you were
19    trying to communicate?
20            A       Well, that's the result that would --
21    would occur.  I think what's -- what was in people's
22    minds is the -- you know, at this time there was a lot
23    of concern about overtime, so, I mean, that's what --
24    you know, what the thinking would be.  I mean, you know
25    --
```

1          Q       You're saying that concerns about

2     overtime motivated this notice?

3          A       No.  But, I mean, in terms of -- you

4     know, as far as I know, Len came up with this related

5     to the foreign trade zone.  I mean, that's the way he

6     told me.  But, I mean, this -- this part here, you

7     know, pay adjustments, I think that the kind of

8     thinking or talking at the time was related to concerns

9     about overtime.  I mean, there weren't, you know,

10    people concerned about, you know, people working their

11    normal time.

12               I think, you know, you have to think of

13    the context of this was that it was pretty unusual --

14    you have to remember that we were making the

15    transmission for the Escapes and this is a very busy

16    place and people were working lots of hours and so the

17    issues that were coming up related to overtime.  It

18    wasn't so much, you know, was the person physically

19    there or whatever.

20         Q       When you told me that Mr. Robbins had

21    told you that supervisors had come up to him and asked

22    him for readouts, I mean, he didn't tell you they were

23    just checking to see if they had worked the overtime

24    that they purported, did he?

25         A       I don't know that Marty knew exactly,

```
 1         but I'm assuming that it was about overtime because
 2         that's typically what the -- you know, what the
 3         questions come about.
 4              Q       Well, you said there was -- you were
 5         talking about hypotheticals, but you said that a
 6         situation that might come up is Dick Newark needs a
 7         report by a certain point and he goes and he goes to
 8         that person for the report and he's not there.
 9              A       Yeah.  Where are you?
10              Q       Yeah, where are you.  And that could
11         happen on a Monday or a Tuesday or Wednesday or
12         Thursday, right?
13              A       Exactly.
14              Q       So definitely one of the motivations
15         for this notice was you were concerned about where
16         salaried employees were Monday through Sunday?
17              A       Well, hypothetically, yes.
18              Q       And it could be in the middle of their
19         shift, it could be during overtime, right?
20              A       Yeah, it could be.
21              MR. SIMON:  We're at a good stopping
22              point.  Five minutes, if that's all right.
23              MR. HUNTER:  Yeah.
24                   (RECESS)
25              MR. SIMON:  We're back on the record.
```

1     BY MR. SIMON:

2          Q     Mr. Huebner, I told you we were going

3     to come back to the AIP, so --

4          A     Okay.

5          Q     -- the moment has arrived.  Exhibit

6     139.  I'm afraid you're going to have to share again

7     with Mr. Hunter.

8          A     Okay.

9          Q     It appears that that's an e-mail

10    exchange capturing a couple of e-mails that you wrote,

11    Mr. Huebner.

12         A     Mm-hmm.

13         Q     And it looks like we're missing a page.

14    Is that your understanding?  It ends at kind of an odd

15    note.

16         A     This -- I mean, not that I've never

17    hung a single bullet out all alone, but I would have

18    typically put an A and a B usually.

19         Q     Right.  But minus that perhaps defect,

20    does this series of e-mails kind of describe, at least

21    in some detail, your thought process regarding

22    calculating the AIP for 2001, factoring in this time,

23    though, the amount of overtime a salaried employee

24    worked?

25         A     It's certainly representative of my

1    train of thought.  It became -- you know, people

2    mentioned to me in various meetings and what have you

3    that overtime for the prior year was a serious problem.

4    And if you think about how people think, human

5    resources people usually focus on people one at a time

6    and the accounting people focus in aggregate numbers.

7    And so I think the accounting people were saying we

8    really have a lot of overtime exposure, and my role was

9    to provide some further understanding about how that

10   was spread out by people.

11        Q       Near the bottom of your e-mail you

12   write "Did the employee who worked a lot of overtime

13   fail to manage his work, or was he being a good guy and

14   taking more overtime than other people?"

15        A       Yes.

16        Q       As it ultimately turned out in the 2000

17   bonus, could someone have worked significant amounts of

18   overtime, but still received an AIP bonus that wasn't

19   reduced because of the fact that he was judged or she

20   was judged to have been a good employee?

21        A       The rule that was followed was that the

22   director level personnel, the TMT members, in general

23   were to take overtime into account, but on the other

24   hand, if there was someone whose output and

25   contribution was such that they felt that they still

1    deserved AIP because of the merit of their output, the

2    quality of their output, that they could get AIP in

3    spite of the fact it would have otherwise been reduced

4    or eliminated because of the overtime consideration.

5         Q      All right.  Turn that one over.  This

6    is Exhibit 140.  Have you seen Exhibit 140 before?

7         A      Yes, sir.

8         Q      What does this represent?

9         A      This is the chart that indicates how

10   the organization did against certain important

11   measurables for the company, and in doing so, it shows

12   what the target achievement was, what the actual

13   achievement was, and some sort of measurement in terms

14   of, okay, how does that equate to the plan that was set

15   out for the board of directors for this -- for the

16   payment of bonus.

17        Q      And then in the corner it says total

18   percent 82.29%, right?

19        A      Yes.

20        Q      That's the total for what you call the

21   measurables, right, safety, quality, delivery,

22   financial?

23        A      That's correct.

24        Q      Explain to someone who doesn't know.

25   What does the 82.29% mean?

1          A       Well, if we take one or two examples we

2     can -- you know, I can then build from the one or two

3     examples to the total.

4                 So if you take a measurement that we

5     did very well on, OSHA incidents, for example, the

6     third one, you'll see that the -- the measurement was

7     3.8 and that the expectation was is that we would come

8     in at 5.  And by looking at that, 3.8 is good and,

9     quite honestly, it's above where the target was set for

10    150%, so on that particular measure the chart is saying

11    that, hey, on that measurement we did well and so we

12    did 150% of -- of what we -- I mean, you know, doing

13    what was expected would show 100% and we did much

14    better.  So taking those, and there are ratings in

15    here, that's the last couple of columns on the right,

16    and then adding them up comes to, okay, how did we do

17    in general versus, you know, what we thought we were

18    going to do and so we came up to 82.29.

19                Then at the bottom the -- this gets to

20    the part where it's difficult for people to understand,

21    but the -- how do I best put this?  If -- if we flat

22    made expectation on every measurable, then we would be

23    then at 100%.  And the way this system is designed,

24    that the payout then is if you hit 100%, then you're

25    entitled to 75% of the maximum, and so doing it that

1    way allows you then in a good year to -- you know, it's

2    the way you -- in a good year you're going to get close

3    to the maximum.  In a normal year you're going to hit

4    around 75% of the maximum, okay?

5              And so other bonus systems turn the --

6    they all have some sort of concept like that.  They

7    sometimes express it in a different way for

8    understanding.  Quite honestly, most of them are

9    somewhat confusing unless you're really good at math.

10    Q      Okay.  One of your tasks, though, in

11    your position in 2001 was to figure out, to understand

12    this stuff?

13    A      Yeah.  I mean, the -- the controller

14    works with higher-level management than I in terms of

15    coming up with the goals and the weightings and so

16    although I'm involved in this in terms of working with

17    the controller on this chart, he -- Mark Bugajski, the

18    controller, really is the lead individual on this.

19    Q      And you weren't necessarily a decision-

20    maker in terms of what bonuses people are going to get.

21    You were told to put the numbers together to -- well,

22    how would you explain your role in AIP?

23    A      My role in AIP is a coordinative one.

24    I'm looked at, first of all, to make sure the process

25    is moving along as it should and I prepare several

1    steps in this process.  I prepare the -- I work with

2    the controller, but basically what he does is --

3    sometimes he's given me the raw numbers and I put them

4    in here, but most of the time he takes the raw numbers

5    from the various sources and puts them together

6    because, quite honestly, he's got much more -- most of

7    that at hand much more readily than I.

8            But there are several -- several

9    things.  We mentioned before the maximums that the

10   bonus will pay by band.  One of the processes that was

11   decided upon in the company at its inception was that a

12   part of the -- the pay that might normally be paid in

13   merit form was going to be deferred till the payment of

14   bonus and in that way over a period of time the amount

15   of pay that you came to get was more variable and it

16   related upon incenting people to have focus on

17   achieving the important measurables that -- that they

18   were working towards.  And so one of the things in my

19   job is to take the amount -- you know, take whatever

20   amount is decided upon, and it's been one percent

21   that's been -- of what the potential merit pool could

22   have been by other measures.  We take one percent of

23   that and then we apply it to the bonus.  And that's a

24   fairly complex formula that was derived by Karl Kehr,

25   but basically it has to do with, okay, there were so

1    many people here at the end of the year that generated

2    the pot of money.  It had a certain proportion of

3    administrative band GSRs, MRs and that sort of thing,

4    and so we will spread those dollars across the -- the

5    pay that we have for people this year.  And it comes

6    out that, okay, rather than the maximum being 6.9, it's

7    now 7.1 or .2, something like that.  So the idea being

8    that on a gradual basis we are taking the company's

9    resources that are available and making the pay

10   totality more variable based on objectives.  So that's

11   going on.

12            In addition to that then, what I do is

13   I compute the -- you know, prepare the tables so that

14   we have lists -- we make lists of the employees, what

15   their rate of pay is and, you know, identify what the

16   achievement here is and then provide for each director.

17   And this is done at the director level, so for

18   manufacturing, for example, Dick Newark gets it, you

19   know, Len Sennish gets it for HR.  We give people a

20   list of everybody and say, okay, well, they make so

21   much money and the -- the award percentage for their

22   given category if they're Ford transition and an MR

23   level, then they're going to get X percent as the base

24   amount or the -- the -- you know, I forget the term I

25   used, but, you know, the raw mathematical score that

1    comes out is generated.  Then there's a blank in the

2    form.  And so we give that out to the director-level

3    people and say, okay, at the bottom here is your total.

4    It's your responsibility then to distribute the AIP

5    based on, you know, your assessment of their -- their

6    performance.  And so then they take the money and

7    spread it around.  So, for example, it may be that

8    somebody gets the exact formula amount and it may be

9    that they don't.  They may get more than that or less

10   than that.  The application of that varies between

11   departments.  But that's -- that's kind of the process

12   we go through.

13              Then I get the input back from the

14   directors, put it in a general spreadsheet and then I

15   sit down with Len Sennish and Karl Kehr and see if they

16   have any, you know, issues or concern with it.  And in

17   general there's, you know, great deference given to the

18   judgment of the line managers, but on the other hand,

19   if there is something that doesn't look right to

20   anybody, you know, we'll bring it out and discuss it.

21              And sometimes there are unusual

22   circumstances.  I'm reminded by one of these sheets,

23   there was a guy on military leave one time, so how do

24   we do that, stuff like that.

25              Q     That last part where the directors then

1    are given a form and they have to decide how to

2    distribute the AIP among their people, that part was

3    new in 2001; that had not been done in 2000, 1999,

4    correct?

5          A        No.  In 1999 the sheets were given out

6    to the line managers by my predecessor and people made

7    the awards.  At least that's the way it was explained

8    to me by Tony.  In 2000 it was decided that -- and,

9    again, you have to think of the context at the time.

10   In 2000 you had -- there was some concern about the

11   original performance review form that we used and also

12   there was a huge influx of people, so we had a rather

13   large influx of line managers and a large influx of,

14   you know, professionals come in, engineers, group

15   leaders, people like that.  And so the thought was is

16   that given that was a time when a lot of people were

17   getting to know one another and their behavior and

18   everything like that, it was probably better to pay it

19   out on a level basis and that decision was made.

20              Then the following year -- you know,

21   because knowing from Tony that the original one was

22   discretionary and from, I suspect, conversations with

23   Karl as well, you know, then I brought it up again,

24   okay, how are we going to do it, you know, this year.

25   And, you know, then the discussion was is that we were

1    going to revert back to that discretionary basis of

2    making the awards.

3         Q       Well, in 1999 it was a flat percentage

4    that was used for employees for their bonus depending

5    on what grade level they were in and whether they were

6    ZF Batavia new hire or Ford transitional?

7         A       The ultimate award?

8         Q       Mm-hmm.

9         A       No.  What I -- I mentioned in our

10   earlier conversations was that I was told by Tony that

11   there was some discretion used in the amount of award

12   given to some of the -- some of the people.

13        Q       So it was based on individual

14   performance?

15        A       Yes.

16        Q       In '99?

17        A       Yes.

18        Q       And then -- I'm sorry -- the 2000 AIP

19   bonus, was individual performance factored in?

20        A       No.

21        Q       All right.  And you described the

22   process for the AIP 2001 bonus.  The directors would

23   make their recommendations for AIP bonus and then you

24   and some other people in HR, I'm not sure who else,

25   would review it and may make adjustments?

1          A        No.  Basically when the AIP came up, we

2     would aggregate it and I would sit with Karl and Len

3     and we would discuss -- you know, I mean, it's a big

4     list of department by department what the line manager

5     had wanted to award.  And so, like I said before, there

6     was great deference given to the directors and what

7     their judgment was.  And that if, for example, somebody

8     took exception to something -- and it didn't happen a

9     lot, but, I mean, you know, it did happen -- then one

10    of us would go back to whomever and say, well, gee,

11    this was a concern brought up.  What's the story?  And

12    then either they'd make a further adjustment based on,

13    you know, the facts or else they'd leave it the way it

14    is and say, well, this is what my reasoning was and

15    people would agree.

16               I mean, you know, it's -- it was

17    intended to be, you know, just another set of eyes, you

18    know, looking at it, but for the most part the director

19    was responsible for making those decisions.

20          Q        Just very briefly, if we focus on merit

21    increases, was it the same process, that directors

22    would make a recommendation and then another group of

23    people, perhaps including yourself, would review it and

24    if there was a problem, you would go to the director

25    and say how did you come up with this?

         1          A        For merit the cascade of information

         2    went further down in the organization.  Typically it

         3    went to anybody -- you know, a list would go to anybody

         4    who managed salaried employees and then they would, you

         5    know, do the performance review and come up with a

         6    merit recommendation and then that would have to go to

         7    the director, who would then aggregate and then -- and

         8    then say, well, gee, this makes sense or this doesn't

         9    make sense.

        10          Let me give you the classic example.

        11    Someone who is a line manager that manages six people

        12    sees a fairly wide range of performance and has a

        13    pretty good gauge about what good and okay is and that

        14    sort of thing.  Somebody who is a manager who manages

        15    one person has a much more limited scope and could --

        16    may have less of an accurate idea of what, you know,

        17    the performance is relative to -- relative to others.

        18          So the -- having the fact that the line

        19    manager makes the recommendation and then the director

        20    makes the final, you know, approval and changes if

        21    there need to be is the way that -- that it works.  And

        22    it's to get the -- the broader, mile-high view of the

        23    director involved in the decision-making.

        24          Q        And who is at the mile high on the

        25    merit increase?  Would that include you and Mr. Sennish

1    and Mr. Kehr?

2        A        The -- once the director has filled out

3    the sheets, then we get them and Len and Karl and I

4    then, you know, look at what they've said and the same

5    thing goes on, that we'll go back and talk to the line

6    manager if there is something that seems out of -- out

7    of the ordinary.

8        Q        And basically -- I understand the

9    difference, but basically that part of it where you go

10   back to the director, that's how the AIP works as well,

11   if you have a concern about the level of bonus that he

12   or she wants to give out, right?

13       A        Yeah.

14       Q        So if an hourly employee is told in

15   2002 --

16       A        Well --

17       Q        I'm sorry.  Salaried.

18       A        Okay.

19       Q        Thank you.  If a salaried employee is

20   told in 2002 "You're not getting a 2001 bonus.  One of

21   the reasons is because you worked too much overtime,"

22   that actually would be a fair description and

23   explanation of why that person didn't get a bonus,

24   right?  That happened?

25       A        Yeah.

1          Q          And if the person said "Well, I had a

2     good evaluation.  What's the problem?" and if you said

3     "Well, 50,000 feet or a mile high someone else reviewed

4     it and decided there's a problem here and you shouldn't

5     get the bonus," that also happened?

6          A          Was -- were there people who made

7     recommendations or the immediate manager made a

8     recommendation and then the director didn't agree with

9     it?  Yeah, that did happen.

10          Q          Okay.  Staying with Exhibit 140, I'll

11     say generally speaking, 82.29 percent, did that reflect

12     a good year?

13          A          This was '02.  Well, I -- I mentioned

14     that 100 would be hitting, you know, kind of where we

15     had hoped to be and so it was -- it was not where we

16     would have wanted to be.  All right?

17                     And the second thing is is that if you

18     look at the percent score, you will see that we did

19     real good in some areas.  Despite it being a very

20     industrial place, it's a safe plant.  You know, I mean,

21     people care about safety.  And on the other hand,

22     performance to schedule was rather poor and -- in that

23     particular year.

24                     As a matter of fact, no missed

25     vehicles, what that means is that you've got a bunch of

1      people working in Kansas City and they're ready to go

2      and they don't have a transmission to stick in the car

3      and -- because of you here, you know, ZF Batavia.  And

4      that's a hugely expensive and very -- you know, it's a

5      very large no-no and we happened to have one of those.

6      So, you know, it's -- you know, so it's hard to

7      globalize.  We did good on some things and poorly on

8      others.

9              Q      Obviously you understood that the

10     performance might be so bad in the plant that there

11     would be no AIP; is that right?

12             A      You mean is that a possibility?

13             Q      Yes.

14             A      Yes.

15             Q      But obviously the performance was at

16     least at an adequate level enough to warrant issuing

17     AIP bonuses?

18             A      Yes.

19             Q      For each of the years that you've been

20     there?

21             A      Yes.

22             Q      And is it fair to say that one of the

23     motivations for having the 2001 bonus for the AIP

24     factoring in individual performance, the reason that it

25     was done that way is that Mr. Adams had said that he

1    wanted the operations to feel some pain and that he

2    wanted to make sure that manufacturing pukes that were

3    taking their share of the pie through overtime payments

4    during the year were going to have a lower bonus?  Is

5    all that true?

6         A       That's a large question, but let me

7    break it down to the pieces.  My understanding through

8    that -- you're referring to a memo from Mr. Bugajski to

9    me and others, I guess.  And, first of all, yes, you

10   know, Dave wanted people, because our -- you know, our

11   productivity was poor and our overtime was way beyond

12   budget, he wanted to have that reflected in the payout

13   and that's -- you know, that's clear.

14             The use of the word pukes is

15   unfortunate.  It was, you know, as I recall, Mr.

16   Bugajski's words and not -- not Mr. Adams.  And so I

17   wanted to just make that clear to you, that my

18   understanding was that those were Mr. Bugajski's words.

19   The -- that use of terminology was just something that

20   was tossed around for a couple of weeks just as kind of

21   a joking kind of thing, so it's unfortunate but, you

22   know --

23             Let me stop there to say (A) yes, Dave

24   wanted to make sure that people were made aware that we

25   had some problems that year in those areas, and (B) I

1     don't believe that Dave used the word pukes.  It was

2     Mark.

3          Q     Okay.  Let's go through some of these

4     reports that have been sent to me this week or last

5     week by e-mail.  Let's do them together.  It will be

6     141 and 142.  141 will be the report for 2000 AIP.  142

7     will be the report for 2002.

8          A     Okay.  Go ahead.

9          Q     All right.  One second here.  What I'm

10    trying to do is get the three years of AIP that I have

11    reports, Mr. Huebner, and kind of just make sure

12    they're all saying kind of the same thing or they

13    should be read the same way.

14                Just to add to your pile there, is

15    Exhibit 37 available?  All right.  So you've got the

16    three laid out before you.  Let me actually start with

17    it chronologically.  We'll start with the 2000 one,

18    which is Exhibit 141.

19          A     Okay.

20          Q     Now, this document was prepared and e-

21    mailed to me and I actually scratched on the top

22    9/26/03; that's when it was e-mailed.

23          A     Okay.

24          Q     That's my handwriting in the corner.

25    This report, as you understand it, shows the AIP

1    bonuses that people actually received in 2001 for the

2    2000 AIP, right?

3           A       That's correct.

4           Q       This is everybody?

5           A       Yeah, that looks -- it looks complete.

6           Q       Okay.  It lists what category they work

7    in, but the 2000 AIP appears to be alphabetical

8    according to the individual's name, right?

9           A       The 2000 one is in pay band order and

10   then within pay band order the sort is whether you are

11   a regular ZFBA or new hire, as we've been talking

12   about, or a Ford transitional, and within that then by

13   alphabet.

14          Q       All right.  We'll look at the first

15   name on here, John Anderson.  Do you see that?

16          A       Yes, sir.

17          Q       Band code A.  So is that AC?

18          A       Yeah.  Yes, AC.  And we use, you know,

19   slightly different abbreviations in the computer from

20   time to time, but yeah, he's an administrative band

21   employee.  He's a guard.

22          Q       And the 3.4 percent is the percentage

23   multiplier because that person is in band AC and

24   because Mr. Anderson was a ZF Batavia new hire; is that

25   right?

1          A        That's correct.  An A without any

2     modification would have been a ZF new hire.

3          Q        And obviously 3.4 percent of $21,300,

4     that's where we get the 12-month AIP figure of $724.20?

5          A        That's correct.

6          Q        And is it prorated because he was only

7     there nine and a half months?

8          A        That's correct.

9          Q        And then the final column, even though

10     it's a little fuzzy on this copy, the final column on

11     the right that says actual prorated payout --

12          A        That's right.

13          Q        -- that column reflects the AIP bonus

14     that that individual received in 2001?

15          A        That's correct.

16          Q        As we look down to Lazarus Chapman, do

17     you see that?

18          A        Yes.

19          Q        That person, based on the 3.0 percent

20     figure we see, that's because Lazarus Chapman was a

21     Ford transitional employee, correct?

22          A        That's correct.

23          Q        And I guess -- let's see if we can do

24     this.  Lazarus Chapman has a base salary of $37,961.52,

25     correct?

1        A        That's correct.

2        Q        And Michael Piccirillo, do you see that

3    name above there?

4        A        Yeah.

5        Q        $41,700, right?

6        A        Right.

7        Q        Because Mr. Piccirillo was a ZF Batavia

8    new hire, his multiplier was 3.4 percent?

9        A        That's correct.

10        Q        So he actually -- that's an instance

11    where someone who is in the same pay band as a Ford

12    transitional who was a ZF Batavia new hire, he made

13    more than the Ford transitional, yet his multiplier was

14    higher?

15        A        Yeah.  Yeah.  And this is -- this

16    particular situation is is that Mr. Piccirillo is one

17    of two senior guards, so they make a little bit more

18    than the rest of the guards.  And you'll note Mr.

19    Howard, who is a Ford transitional, is at the same pay

20    there as Mr. -- Jeff Howard and Mike Piccirillo.  And I

21    just happen to know that because they work in HR, but

22    they're -- they're the two senior guards and so their

23    pay shows the same.  And you're correct, the Ford

24    transition multiplier is -- is lower for the -- than

25    the new hire.

1          Q        That may be my only questions about the

2     2000.

3          A        Okay.

4          Q        Just to stay in order, even though it's

5     part of the exhibit binder, Exhibit 37 --

6          A        Oh, yeah.

7          Q        It's the green one.

8          A        Yeah, it's the green one.  All right.

9          Q        Exhibit 37 is the 2001 AIP

10    determination.

11         A        Yes.

12         Q        Actually you may have to help me along

13    here, Mr. Huebner.  I think at a certain page it begins

14    with the individual employees.  The first page

15    obviously is not it.  It may be -- I think it's that

16    second page that has Cynthia Clousson at the top.

17         A        Yes.

18         Q        So that shows what Cynthia's payout was

19    for 2002, right?

20         A        That's correct.

21         Q        Okay.  Now, this one is different than

22    the one we just looked at in that it has a column where

23    the amount of overtime the employee worked is

24    reflected.

25         A        That's correct.

```
 1              Q        As you look at Ms. Clousson's, for

 2      example, is it right to assume that she made 1.2

 3      percent -- I didn't say that right.  1.2 percent of her

 4      compensation, I guess, as a percent of her base was

 5      overtime pay, right?

 6              A        Yes.

 7              Q        Which isn't that much; is that fair?

 8              A        Yeah, it's a modest amount of overtime.

 9      That's right.

10              Q        She, it appears -- and if you look in

11      the column on the right where it says OT based

12      adjustment, it appears to reflect that she lost $835

13      from her AIP bonus because of her overtime; is that

14      right?

15              A        No.  No.  Let me explain how to read

16      this chart.  And Cindy is perhaps a bad example, but

17      we'll use it as long as you picked it out.

18                       Cindy was -- had a -- you know, a

19      potential bonus of $835, as noted in the portion payout

20      2001 column.  Her overtime based adjustment is zero,

21      which means that we -- we made no adjustment related to

22      overtime to her available bonus, and so the amount

23      available for payout was $835.  The decision was made

24      to -- not to pay Cindy anything and -- and so --

25              Q        For reasons having nothing to do with
```

1    overtime?

2          A      Yes.

3          Q      Based on her job performance?

4          A      Yes.

5          Q      Let's turn to what's marked -- well,

6    it's the quality department, which is several pages in.

7          A      Okay.  There's a page in the lower --

8    page number in the lower right.  You've got -- oh,

9    shoot.  No, never mind.  They go over -- that's fine.

10         Q      If you see the Bates stamp number on

11   the far right --

12         A      Yeah.

13         Q      -- it's 3362.

14         A      That's good.  Okay.

15         Q      Just so the record is clear, we're

16   looking at Exhibit 37, a document made an exhibit at an

17   earlier deposition.  All right.  Now, you see that this

18   lists employees of the quality department, right?

19         A      Yes.

20         Q      Let's look at one of the plaintiffs in

21   this action.  Do you see Mr. Stegmann's name at the

22   bottom?

23         A      Yes.

24         Q      As we look over and look at the numbers

25   in the different columns there, is it fair to say that

1    his AIP bonus was reduced at least $1325 because of the

2    overtime he worked?

3           A      That's correct.

4           Q      How do you further explain how it was

5    reduced from $3092 to zero?

6           A      Mr. Newark must have not been happy

7    with his performance.

8           Q      Looking right above Mr. Stegmann is Mr.

9    Phelps.  Do you see in the far right-hand column

10   there's some handwriting --

11         A      Oh, I'm sorry.  I'm sorry.  I misspoke.

12   Not Newark, but quality would be Rick -- Rick Williams.

13         Q      Okay.  Right above where Mr. Stegmann's

14   zero is on the right-hand column, if you look up to Mr.

15   Phelps --

16         A      Yes.

17         Q      -- there's a $2000, then it says plus

18   SAP and I can't read the rest.

19         A      2000.

20         Q      Do you know what that refers to, that

21   handwriting?

22         A      Yes.  In that year there were two

23   projects that went very well that people worked as a

24   team, and Dave Adams felt that they should be

25   recognized monetarily within this system for -- for

1     having done well.  And so this relates to -- the words

2     SAP is the brand name of our software, and that was the

3     year that a team of people went out and rolled out the

4     SAP factory -- whatever they call it, the factory

5     control module or whatever, the software that's used in

6     managing the flow of -- of product through the plant

7     and the roll-up of accounting and things of that sort.

8     So it's really the manufacturing data system and it was

9     implemented at -- during that year and it was felt that

10    people in that group did, you know, a very good job and

11    Dave wanted to recognize that.  And so you'll see that

12    notation throughout several different departments from

13    accounting to quality to manufacturing.

14         Q      Turn back to Mr. Stegmann, let's

15    compare him to Craig Stevens, which is several names

16    up.  Do you see Mr. Stevens' entry there?

17         A      Yes, sir.

18         Q      It says Mr. Stevens worked -- the

19    percentage of his OT relative to base is 36.2 percent.

20    Mr. Stegmann's was 36.6 percent.  Mr. Stegmann, his AIP

21    bonus was reduced by $1325.  Mr. Stevens' was reduced

22    $701.  Are those differences the reflection of their

23    total base pay or was a determination made that even

24    though their overtime rates are roughly the same, that

25    Mr. Stevens was not reduced as much as Mr. Stegmann?

1        A       The calculation that was followed in --

2    in most of the organization other than Mr. Newark's was

3    there was a table that Mr. Bugajski calculated and so

4    depending on the overtime as a percentage of base, then

5    a certain percentage of your -- the proportion payout

6    was -- you know, was reduced by a certain proportion.

7    So seeing as how that then is a function of pay, it's

8    pay related in this case.

9        Q       All right.  So the relationship between

10   overtime and AIP bonus for that year, there was a

11   strict formula that was used.  If your percentage of

12   overtime relative to base was at a certain level, it

13   was reduced accordingly based on the formula?

14       A       That reduction that you see in the

15   overtime-based adjustment is -- is correct, except for

16   in Mr. Newark's area of responsibility.  In his area of

17   responsibility -- as this process was being unfolded,

18   the -- or the process went kind of like this:  A group

19   of people, and, you know, I can recall there was, you

20   know, Len Sennish and Mark Bugajski, myself, there had

21   been a lot of discussion about, you know, Dave Adams'

22   and other people's concerns about the overtime and, you

23   know, Dick Newark had heard that there was a lot of

24   concerns about it, that it was to affect the AIP, and

25   yet he wasn't at the particular meetings that we were

     1     beginning to discuss this and so the decision was made

     2     that, okay, Herb, you're going to get to Dick Newark,

     3     you know, his people laid out in terms of, okay, well,

     4     how much overtime they made and that sort of thing and

     5     see how he reacts to it and see how he comes up with a

     6     way of dealing with this, given some general guidelines

     7     from Mark Bugajski about, okay, we're so much over so,

     8     you know, the answer ought to come out in general about

     9     here.  Now, I don't -- you know, obviously that's

    10     pretty technical.  I'd have to look at the notes to see

    11     exactly how that worked, but basically that's what

    12     happened.

    13            So Dick went and -- you know, so he

    14     didn't have -- well, I guess, I don't think he had this

    15     thing with the OT-based adjustment in there yet.  He

    16     had an earlier spreadsheet without that column in

    17     there.  And he went through and made some adjustments

    18     in pay based on the amount of overtime that people had

    19     been -- or adjustments in the AIP.

    20            And then -- and then he gave them back

    21     to me and then I -- what I did was I -- you know, he

    22     had them in -- I don't know whether he had them color-

    23     coded or what, but I remember having to, you know,

    24     translate that into spreadsheet-readable format.  And I

    25     did that and then I fed that back to -- it seems to me

```
 1      that Karl Kehr at that point in time was on a trip and
 2      so -- Karl might have been back at that time, but I
 3      know that he wasn't at one of the earlier meetings when
 4      we were talking about, okay, the impact of overtime.  I
 5      remember having to kind of fill him in about what had
 6      gone on.  But anyway, then I fed back to people, you
 7      know, Mark and Len and probably Karl, okay, this is how
 8      Dick's spreadsheet comes out.
 9                      And the answer was is that by his own
10      devices Dick had come up with a result that in
11      aggregate was very similar to what Mark had done by
12      formula and was -- the amount of reduction was a few
13      thousand dollars -- the amount of reduction was a few
14      thousand dollars more than Mark Bugajski had said, you
15      know, that was kind of his -- his thought about, okay,
16      this is where we need to get approximately.  And so the
17      decision was made then to let Dick's assessment stand
18      because the result was fairly similar to what the other
19      individuals came out by formula in that there were some
20      people who, despite a huge amount of overtime, Dick did
21      award them some bonus and there were some people who
22      may not have had much overtime that, you know, in
23      effect, didn't get bonus because of performance
24      reasons.  And so there -- the overall outcome seemed to
25      be similar to what some of the other managers had done.
```

1             The directors did not use completely
2      uniform methods in arriving at -- at their process.
3      Some of them strictly come up with the numbers
4      themselves, other ones involve their direct reports in
5      coming up with the numbers.
6             Q       So everyone except for Dick Newark,
7      people who worked under Dick Newark, were their bonuses
8      determined -- the amount of overtime reduction they had
9      for 2001, was that based on a formula?
10            A       Yes.
11            Q       It didn't matter if the person was a
12     good guy who worked a lot of overtime or not; that was
13     based on a formula?
14            A       Well, let's clarify this by talking
15     about what -- how this chart works because I think that
16     will help you understand.
17            The -- the third from the end column is
18     the overtime-based adjustment, and so you have that
19     number.  And then you go to the next one and that's the
20     available, which is the proportion payout minus the
21     overtime adjustment comes to the amount of available.
22     All right.  In that column then is the amount available
23     and you'll see -- just happen to come up on people that
24     -- if you look at Brian Connolly, this shows a $1518
25     overtime adjustment, comes to an available payout of

```
 1      $1518, but Brian was actually awarded $2000 because

 2      evidently in their evaluation he was a good performer

 3      and they felt that they ought to give him a little

 4      more.

 5                   So does that help you understand that

 6      process?  Am I going too fast?

 7           Q      No, no, no.  I understand.  If it

 8      hadn't been for the overtime reduction, he would have

 9      received $3036?

10           A      Yes.  And based on this, he probably

11      would have gotten a little more than that if Rick had

12      the -- you know, if that worked out in aggregate.

13           Q      But you started to say something else

14      with Dick Newark.  You said other directors did their

15      own thing.  Other directors besides Dick Newark

16      followed the formula regarding the OT reduction?

17           A      That's correct.

18           Q      Okay.  I think we're done with 2001.

19      Let's just look at 2002 briefly, which is Exhibit 142.

20           A      Yes, sir.

21           Q      2002's AIP, there is no column for

22      overtime reduction, right?

23           A      That's correct.

24           Q      That wasn't followed for that year?

25           A      That's correct.  In a preliminary
```

1    meeting, I don't remember exactly who, probably Len

2    Sennish and Karl Kehr and myself, in setting this up, I

3    raised the question, I said well, where are we on

4    overtime?  Are we going to be doing that again or not?

5    And my recollection was that it was Karl that said that

6    people had been managing overtime in a better manner in

7    that year and he didn't feel it was necessary.

8         Q        Now, the directors who manage

9    departments where there was a lot of overtime, were

10   they reduced?  Excuse me, was their AIP reduced for AIP

11   2001?

12        A        It depends on what level in the

13   organization.  And, again, we're referring back to the

14   other exhibit, which I'm digging out.  But you have

15   varying levels of management, so you have a -- you may

16   have a business manager, let's say, in production who

17   has several group leaders working to him -- working for

18   him and then, you know, above him is going to be the

19   director of the department and so there are people at

20   varying levels.  And so the -- the people at the -- I

21   guess if you go through and look at this, you will see

22   that through a certain level, and what's the sort order

23   on this?  Okay, this one here is by department sort

24   order.  But the MR level employees are all on this

25   sheet and so if they were eligible to receive overtime,

1    and some of them were, some of them weren't, or

2    received it, then they were included within this --

3    this concept.

4                 On the other hand, going up, the

5    evaluation schema was different, in that there are two

6    other groups of people.  There's the -- I'll do it in

7    high to low order.  There's the TMT members, the

8    directors, and then there are the SCR level employees

9    who are not TMT directors, and the -- in 2002 there's a

10   sheet in here about what the directors got, and you'll

11   see that at the director level -- well, maybe that

12   isn't as part of this, but it seems to me that, if I

13   remember -- I'm looking for a particular form and it's

14   usually sideways, so hang on just a second.  No, this

15   exhibit doesn't have it, but I suspect we produced

16   somehow the -- but the -- the rule is is that the

17   officers and the direct reports, which we would

18   consider the TMT members, have to have their bonus

19   approved by the -- by the board of directors.  And that

20   amount relates to -- they have -- they have a different

21   -- a little bit more direct.  Instead of having a band

22   modifier, basically they have a -- a maximum that's

23   individual based upon, you know, the scope of their

24   job.  And so then the -- then the percentage is applied

25   to that, you know, the payout percentage is applied

1    directly to that -- to that maximum.

2              And so -- so to answer your question,

3    the TMT director that might have had an excessive

4    amount of overtime in -- in that year of payout of

5    2000/2001, I'd have to take a look at that to see if

6    there was any variation.  Do you have those figures

7    there?

8         Q        I have something for you.  This is

9    Exhibit 143.

10        A        Oh, okay.  This is 2001, okay.  And so

11   you can see that if you look at -- let's go down to

12   Bugajski, Newark, Sennish, people like that, that the

13   -- the officers have a completely different scheme in

14   terms of how the math is done, so, you know, we can

15   skip over that.  But looking at the -- at the senior

16   managers, you can see that 61.72 percent was applied to

17   whatever their maximum is and that generated an actual

18   bonus.  And so, as you can see, that I -- I don't

19   believe in that year there was any variation from what

20   the formula generated for those -- for those guys.

21             Then there is a second group of people

22   who are the SCR level employees.  These are senior

23   managers but not TMT members, okay?  And not all but a

24   decent chunk of those guys are Ford transitionals.  And

25   -- and their individual performance was considered in

1     the determination of their bonus and I really, without

2     looking at the list, couldn't tell you whether -- in

3     fact, even looking at the list I can't tell you whether

4     overtime was a factor because it wasn't a direct -- a

5     direct relationship.  It would have reflected more on

6     their overall performance.

7              Q       I think you said for Exhibit 143 -- I

8     don't know if you were referring to the officers or

9     just the people listed as other senior management, but

10    was it your testimony that all of the people listed on

11    Exhibit 143, their bonuses were strictly according to a

12    formula, there was no variance based on individual

13    performance; is that right?

14             A       The answer to that is yes.

15             Q       And the answer was that there wasn't a

16    variance; that's correct?

17             A       Okay.  Let me restate that.  Yeah.

18    What you said was is that everybody was paid according

19    to formula and there wasn't a variance related to

20    performance or overtime.  And the answer was yes.

21             Q       And the formula, did the formula factor

22    in excessive amounts of overtime in certain

23    departments?

24             A       Well, this -- the -- and, again, I made

25    the distinction that the -- the officer one is a

1    completely different -- well, it's -- it's quite a bit

2    different than the -- the senior managers.

3          Q      Well, the question was:  For either

4    group, the officers or the senior management, would the

5    amount of overtime worked by salaried personnel, would

6    that be factored into the formula that you've referred

7    to for either group?

8          A      Not directly.  Only in the sense that

9    the -- I forget which exhibit it is here, is that

10   exhibit -- this exhibit that -- here, I'll find it.

11   Exhibit 140 governs everything, okay?  I mean,

12   everybody that gets AIP, officers, SCR, everybody, this

13   is the root.  And to the extent that our productivity

14   was at the 25 percent level and that our cost per unit

15   was at the 50 percent level and that productivity and

16   cost per unit are very closely intertwined, it affected

17   everybody.  But there was no direct adjustment,

18   compared to many of the other employees.

19         Q      Exhibit 142, just very briefly, this

20   report which we started to talk about, it has AIP

21   percent payout per chart and we see a bunch of

22   percentages there, starting with Mr. Kendall at the top

23   who has 9.2 percent --

24         A      Yeah.  Mm-hmm.

25         Q      -- again, those percentages relate to

1    the pay band designation as well as if the person is ZF

2    Batavia new hire or Ford transitional?

3            A       That's correct.

4            Q       And that also was true of Exhibit 37,

5    which was 2001?  It's true of all the reports, that

6    there is a grade code and then there is an AIP percent

7    payout?

8            A       That's correct.  That's correct.

9            Q       That's true of all the reports we've

10   just looked at?

11           A       Yes.

12           Q       Okay.  You can put those aside.  I

13   think we're done with those.

14           A       Okay.

15           Q       Are you aware that the Ford

16   transitional employees, the salaried employees,

17   received a transition bonus paid out over the course of

18   several years?

19           A       Yes, sir.

20           Q       And do you know on what basis the

21   transition bonus was awarded for those employees and

22   for what reason?

23           A       Well, only in a general sense because I

24   wasn't there, you know.  But I think it was to help

25   make up for the fact that they may not have certain

1    things in their reward system that -- you know, with ZF

2    Batavia that they had with Ford.  But --

3         Q    Anything specific?

4         A    No.  No.  I mean, you know --

5         Q    Who --

6         A    Go ahead.

7         Q    I'm sorry.  You said you weren't there

8    in '99, which is true.  Who told you that was the

9    reason for the transition bonus?

10        A    Well, I would imagine it would have

11   come up with my orientation with Tony Deshaw because

12   one of the things that Tony passed over was that hey,

13   you know, don't forget to pay them the money every

14   year, what they're due, and, you know, here's the list

15   and all that sort of thing.  So he gave me a general --

16   general idea.  But --

17        Q    Did he tell you that it was due to, in

18   part, the loss of the A plan?

19        A    Well, I can just remember, you know,

20   just him giving me a general, you know, over -- you

21   know, thing that there were differences in the -- you

22   know, in the system and -- and there were a couple of

23   things that were done to try and help make up for the

24   fact that there was a difference in the two different

25   pay and benefit systems.  So, you know, I remember we

1    talked about this Ford transition bonus, which is a

2    very finite period of time, three -- you know, three

3    installments, as opposed to the defined contribution

4    piece of the 401(k), which is an ongoing kind of

5    payment which actually goes up every year.

6        Q    You heard in some testimony perhaps at

7    Mr. Sennish's deposition about an employee named Bernie

8    Blankenship.

9        A    Yeah.  Mm-hmm.

10        Q    And Mr. Blankenship apparently had gone

11    to HR and said that he was denied some overtime.

12        A    Mm-hmm.

13        Q    Were you involved in that?

14        A    Only very peripherally.  You know,

15    Bernie pretty well took his concern directly to Len.  I

16    mean, Bernie is a very friendly, talkative guy so, you

17    know, I may have had a conversation with him about it

18    and heard from Len afterwards what happened, but I

19    don't -- I don't remember being involved as it was

20    going on.

21        Q    You were also here during Mr. Saleh's

22    testimony, right?

23        A    Mm-hmm.

24        Q    He had testified about documents he had

25    seen that had reflected whether -- a document he had

1    had from human resources that showed that for Ford

2    transitional employees the AIP bonus or perhaps the

3    merit increase should be different based on the fact

4    they were Ford transitional.  Are you aware of any such

5    documents?

6         A      The -- I'm aware of the testimony that

7    Hassan, you know, made, and then there was a subsequent

8    request in the discovery for those documents.  And so

9    in trying to determine, you know, what's there, the

10   conclusion that I came up with was is that in AIP there

11   are plenty of documents that indicate that there is a

12   difference for Ford transitionals and -- and ZF new

13   hires and I think we've covered that ground pretty

14   thoroughly.

15              With respect to merit, I was unaware of

16   any and so I went to Hassan and I said "Hassan, they're

17   asking for this document.  You testified about it.  You

18   know, explain it to me."

19              MR. HUNTER:  Hang on.  We're getting

20         into work that was done at my request.

21              THE WITNESS:  Oh, okay.

22              MR. HUNTER:  To help move things along

23         here, I'm willing to waive privilege on a

24         limited basis, that he can answer this

25         question, but it's not an overall waiver of

```
 1                  privilege, Mr. Simon.  If we can move forward
 2                  with that understanding, I think I'll let Mr.
 3                  Huebner finish the question.
 4                       MR. SIMON:  You can finish the
 5                  question.
 6                       THE WITNESS:  Okay.  So I asked Hassan,
 7                  you know, what were you thinking of when you
 8                  made that testimony, and Hassan told me that he
 9                  was thinking about AIP and not merit and that
10                  was his answer and so he was not able to come
11                  up with a document and, you know, neither was I
12                  because the -- you know, my understanding of --
13                  and obviously I'm in the middle of it, is that
14                  the merit system, you know, is not presented
15                  with a distinction between Ford transitionals
16                  and -- and new hires.
17       BY MR. SIMON:
18            Q     Are you aware of any plan or intent to
19       have the Ford transitional employees have their
20       salaries in line with the ZF Batavia new hires?
21            A     A couple of things.  I know that -- and
22       I think we've provided this in discovery, but what I've
23       run across in the early planning, that there was
24       discussion of, okay, you've got this group of people
25       from Ford and you're going to hire a bunch of people
```

1    coming in.  How are you going to handle it?  And there

2    was discussion, you know, at the very early stages of

3    the formation.  So I'm aware of that.

4              Then when I came here as an HR

5    professional, I come in and say, oh, this is very

6    complicated and so I suspect I talked about it with

7    Tony and I -- but I very clearly talked about it with

8    Karl.  And I said "Well, gee, Karl, you know, pretty

9    complicated.  Has this got some sort of a phase-in or a

10   sunset or something like that, that you've got these

11   separate systems?"  And he said no, that, you know, his

12   intent was is that we would continue to have a higher

13   pay range for the Ford transitionals than the -- than

14   the ZF new hires and that we would have those -- you

15   know, those two systems because then the Ford

16   transitionals, as any -- you know, as a whole had more

17   room, you know, within their salary range.  And we've

18   kept that up.

19        Q     All right.  We won't make these

20   exhibits.  I don't have a copy for Mr. VanWay to even

21   see from there, but I'll just describe it.  This is

22   document 5419, and actually let me give you --

23              MR. VANWAY:  Oh, that's all I needed,

24        Steve.

25              MR. SIMON:  You've got it, right?

1               MR. HUNTER:  Just for clarity, these

2          are not going to be made exhibits?

3               MR. SIMON:  I don't believe so.  I have

4          an extra 5419.  I actually need 5420 back,

5          John, if I could take yours back.  There we go.

6          Broke from tradition here.  No, we're not going

7          to make them exhibits.

8    BY MR. SIMON:

9          Q       This e-mail and this portion of

10   something from June 2002, some sort of policy committee

11   meeting, references FMLA review.  And without

12   disclosing any attorney/client communications, as Mr.

13   Hunter's name is referenced, I'm wondering what sort of

14   FMLA review there was at that time.

15              MR. HUNTER:  Steve, it's the Fair Labor

16         Standards, not --

17              MR. SIMON:  I'm sorry.  Pardon me.

18              MR. HUNTER:  Okay.

19   BY MR. SIMON:

20         Q       One says FLSA and the other has FMLA.

21   I think -- let's do it this way.  The same with 5419,

22   Mr. Huebner.  Do you see where it references at the

23   bottom of that e-mail -- this is from you to Mr.

24   Sennish, right, on June 2nd?

25         A       Yes.

1        Q        "John has not gotten back to me on

2    overtime policy."

3        A        Mm-hmm.

4        Q        And then we look over at 5420 and it

5    says "Awaiting Fair Labor Standards Act review by John

6    Hunter, Jr."

7        A        Mm-hmm.

8        Q        Again, without disclosing any

9    attorney/client communication, was there some

10    communication you were having amongst the policy

11    committee about the Fair Labor Standards Act?

12        A        Well, basically if you look under the

13    -- this document here, the overhead, we were talking

14    about the excused absence policy, and the excused

15    absence policy is the one that talks about the

16    sick/personal time, all right, the three and the five-

17    day thing.  All right?  And so we were working on -- we

18    had already made the announcement to employees that we

19    were going to go back to five days and I had been busy,

20    so we didn't actually get to change the -- the wording

21    of the policy for, you know, some time afterwards and

22    so this is -- this is the discussion that we had about

23    making that change back in 2002 on the -- on the

24    actual, you know, policy form.  And so the Fair Labor

25    Standards Act part of it was just something that we

1    felt we had to have looked at because we were, you

2    know, getting involved in, you know, making sure that

3    -- you know, whatever the rules were and everything

4    like that were okay, so we had John review them.

5           But I don't know that there was a whole

6    lot of discussion at the policy level about -- about

7    the Act itself.

8         Q     Okay.  We're done with those two.

9    Again, we won't make this an exhibit.  We'll try to

10   make this less confusing.  You can share this with Mr.

11   Hunter.  This is 5436 and 5437.  Those are Bates

12   stamped by ZF Batavia, two documents that are

13   handwritten notes.  It says "Policy Committee Agenda

14   Topics."  Are those your handwritten notes?

15        A     It's not my handwriting, no.

16        Q     This refers to a committee meeting on

17   it looks like November 1st, 2001.

18        A     That's correct.

19        Q     And you would have attended unless you

20   were ill or something else, right?

21        A     That's correct.

22        Q     Turning to the second page of that, in

23   the middle it says "Vacation/Buy or Sell," do you see

24   that?

25        A     Right.

1          Q          "Do we limit to four or five weeks," do
2     you see that?

3          A          Mm-hmm.

4          Q          What's the current policy regarding
5     buying or selling vacation for an employee that has,
6     let's say for example, four weeks of vacation?

7          A          Okay.  Basically the rule is is that
8     the vacation buy or sell, a person can't buy more
9     vacation such that the total vacation of company and
10    purchased would exceed four weeks.  And the thinking
11    behind that was is that this is a period of (A) again,
12    high customer demand and CVT launch, and so it was felt
13    that we had to have people on board working. And, you
14    know, with 18 paid holidays in some years -- that
15    varies by the calendar, but people do have quite a --
16    quite a bit of time off.

17         Q          So was the discussion at the time -- in
18    2001 was it the case that it had -- because it says "Do
19    we limit to four or five weeks," what I'm wondering is:
20    Was it limited to four weeks at that time, five weeks
21    at that time?  Was there a change in policy?

22         A          Let me think this through.  My
23    recollection is is that the limitation of four weeks
24    was done on -- you know, effective for 2002 and it was
25    decided again that 2003 the same rule would apply.

1          Q       So from 2001 to 2002 it went from five

2    weeks of vacation you could buy or sell to four weeks?

3          A       Oh, no, no, no, no, no.  No.

4          Q       There are some employees who have five

5    weeks of vacation?

6          A       That's correct.  Let me just give you a

7    real quick rundown.  There are some employees that have

8    five weeks of vacation.  Those are limited to Ford

9    transition employees who were at that point when they

10   made the transition eligible for five weeks.  Okay?

11   Then there are other employees who have from, you know,

12   entry people up to four weeks of vacation.

13                And, again, like I say, the rule is

14   that was implemented in -- and my recollection is

15   1/1/02 and again done for 2003 is is that you can --

16   the general rule about buying or selling is that you

17   can only buy or sell one week, okay, and, two, that if

18   the sum of the company vacation that you would have

19   according to policy, if you take that and if you wanted

20   to purchase another week, if you add those two

21   together, that sum can't equal -- can't exceed four

22   weeks.

23                So, for example, to turn it another

24   way, if you have three weeks of vacation, you can buy

25   another week.  If you have four weeks of vacation or

1    five weeks of vacation, you can't buy another week.

2              Q         And the buying and selling, has that

3    policy ever changed since you've been there?

4              A         Yes.  1/1/02.  I --

5              Q         That's what you were saying.  Okay.

6              A         Yes.

7              Q         I understand.

8              A         Yeah.  Because previous to that you

9    could -- if you had five weeks, you could buy a sixth

10   and if you had four weeks, you could buy a fifth.  And

11   the difficulty with that, you know, was that line

12   managers were calling me up and, you know, saying, you

13   know, do we really want to do this because I'm having

14   trouble figuring out how I'm going to get the work in

15   my department done.

16             Q         Okay.  Again, that will not be an

17   exhibit.  Then there's a large stack I need to show you

18   here but very few questions about it.

19             A         Okay.

20             Q         This is the summary plan description

21   that I was given of ZF Batavia's investment plan.

22   There's a date noted at the bottom.  If you could share

23   that.

24             A         Okay.

25             Q         10/16/01, do you see that date at the

1    bottom there?

2           A       Yes, sir.

3           Q       Is that when this became effective?

4    And perhaps there were some changes before.

5           A       Yeah.  The effective date -- you know,

6    this is probably the date that it was printed or

7    something like that.  I'm sure the effective -- you

8    know, this is -- the effective date of any changes or

9    anything are typically stated within the body of the --

10   of the document.

11          Q       Turning to page five of the document,

12   which is Bates stamped 5349, at the top it says (A)

13   Compensation, and it lists -- it says "In addition,

14   compensation excludes..." and it says "...overtime pay,

15   bonuses, et cetera," right?

16          A       Mm-hmm.

17          Q       And then addendum B, it says effective

18   January 1st, 2000 and it goes on to say in paragraph

19   sub-two -- are you with me?

20          A       Mm-hmm.

21          Q       "For purposes of matching

22   contributions, compensation shall mean regular

23   earnings, medical reimbursement, all overtime pay,

24   shift differential and car allowance."

25          A       Right.

```
1            Q       I think we had some testimony about
2      this from Mr. Sennish.  If someone -- is it true what
3      it says there in addendum B, paragraph A, sub-two, that
4      if your overtime -- you've got $20,000 worth of
5      overtime, that's added to your total compensation and
6      the matching contribution by the company is figured
7      accordingly?
8            A       Okay.  This is a time-sensitive
9      question that you're asking, so I will respond to you
10     by which year we're talking about.  It's somewhat
11     complicated.
12                  In -- within about -- well, shortly
13     after I was hired, I noted that there was a difference
14     between what the plan document said in terms of
15     eligible compensation on the 401(k) plan and the actual
16     practice.  This caused us to do some auditing and
17     eventually a filing with the federal government for a
18     voluntary correction.
19                  What was done then is that for 1999 the
20     voluntary correction is is that we're doing what the
21     plan document says, and that is basically on most forms
22     of compensation, with a very limited number of
23     exclusions -- car allowance and medical reimbursement,
24     I think -- all compensation, you know, is considered
25     eligible for 401(k).  That's for the year 1999.
```

1                    For the year 2000 the amendment was

2        made in the appropriate time frame such that we were

3        able to make the definition of compensation roughly

4        equate to the method that was used in -- in the

5        operations of the payroll system, and therefore, for

6        certain categories of the 401(k) we defined it as a

7        certain amount and based upon what was actually done on

8        the payroll because -- how's the easiest way to explain

9        it?  The setup of the payroll system, it's a third-

10       party situation.  We don't have all of the computer

11       hardware and software resident.  It's -- it's a

12       purchased system.  And the payroll person is in control

13       of most of those automatic features of the plan but not

14       all of them.  For certain things you have to go to the

15       vendor, ADP, and say I want you to change this or make

16       this rule.  Okay?  So that for the year 2000 there were

17       some situations where with some people for a given

18       category of employer contribution or employee

19       contribution, overtime might have been handled in one

20       of two different ways.  So the result was is that we

21       tried to define the 401(k) plan as best we could to the

22       method that had been used in payroll and then to the

23       points where there was complete ambiguity we resolved

24       it in the favor of the employee.

25                    All of this has been explained in

1    rather copious detail to the -- to the IRS in the

2    voluntary compliance.  Coincidentally the communication

3    of the resolution of this is being communicated to the

4    employees who were affected.  In other words, those

5    employees who were participants in 1999 and 2000 and

6    there was some mistake made in their 401(k), that's

7    being communicated to them by the end of the week.  And

8    we don't have the full approval of the IRS yet to make

9    the correction, but we're far enough along that it's

10   within the realm of acceptable practice to make the

11   contribution.

12              So -- you have a puzzled look on your

13   face.  It's a very complicated situation.  To -- to go

14   back, what I will say is is that for the year 2001 and

15   beyond 401(k) eligible compensation for all categories

16   is base pay.  For the year 1999 for all categories

17   except for Ford defined contribution, that's always

18   been very well defined and, you know, Ford transition

19   have this extra piece of 401(k) and that piece has

20   always been very well defined in both the document and

21   the payroll, so that's always been on base pay.  But

22   for 1999 everything besides that is -- is based on all

23   compensation with the exception of car allowance, and

24   that's very limited, and this medical allowance, which

25   is a fairly minor amount of money.

1          Q        What about 2000?  Same thing?

2          A        2000 is listed in item B and if you

3    want, I'll go through and read them to you, but you can

4    read them yourself, too.  But for the deferral

5    contribution, which means the employee pre-tax

6    contribution, that's regular earnings.  For matching

7    contribution compensation is regular earnings including

8    adjustments, plus medical reimbursement, plus all

9    overtime pay and adjustments, shift diff and car

10   allowance.  So that's for the match.

11              So if I put in, you know, six percent

12   and, you know, the match is supposed to be three

13   percent, unfortunately they're on different bases.  And

14   you think, well, that's not logical and from, you know,

15   a high level view that isn't logical.  But from the way

16   the payroll is set up, they use -- they don't take your

17   contribution and then, you know, figure out the match

18   using a connected formula so a mistake -- they were

19   done independent mathematical calculations, so a

20   mistake was made on one and not the other.

21              And so rather than going back and

22   trying to figure out what is rather complex mathematics

23   when you get down to the details, we just said that

24   we're going to define for this particular year as the

25   way the payroll actually did it and so that's defined.

118

1    And this has been -- you know, we've run this through

2    the IRS and we've got a letter of determination.

3              Then for the -- some of the other ones

4    then there are some differences.

5         Q      Right.  Let me stop you, Mr. Huebner.

6    I got what you -- '99 you explained that the

7    contribution would be based on all compensation except

8    for the minor things you've mentioned.  For

9    contributions made in 2000 we should follow addendum B

10   here.

11        A      Exactly.

12        Q      2001 and beyond, contributions are to

13   be based --

14        A      On regular pay.

15        Q      -- on base pay.

16        A      Base pay.

17        Q      Okay.

18        A      Good.  Thank you.  It's hard to

19   explain.

20        Q      That's all right.  And we won't make

21   that an exhibit.  Let's see.  There's been some

22   documents that have been produced in this case since

23   the last deposition that have reflected that Ford is

24   reevaluating its overtime policy for salaried

25   employees.  Are you aware of this development?

1        A        Yes, I've heard that Ford is, in fact,

2    doing that.

3        Q        All right.  Is the fact that Ford is

4    considering or has already made effective changes

5    regarding salaried employees, the way they're paid

6    overtime, does ZF Batavia have plans to do the same

7    thing?

8        A        Not at -- well, let's put it this way:

9    We're an independent company.  We could make such

10    adjustments if we chose.  At this very moment I am not

11    working on anything to change that, and on the other

12    hand, it could change at some point in time.  We'll

13    just have to see.

14        Q        Has somebody told you -- again,

15    excluding any attorney/client conversations, has anyone

16    told you that "Mr. Huebner, Herb, this is something

17    that we may look at in the very near future or in the

18    future," words to that effect?

19        A        I had a conversation very recently with

20    Karl Kehr and with Len Sennish, and you'll appreciate

21    that in general this is a confidential kind of

22    conversation.  Mr. Kehr's view at this time is that we

23    are in different circumstances for Ford, the parent,

24    and that some of the work that we've done to manage

25    overtime better in terms of scheduling and other things

1  has -- has been good and so at this time he doesn't

2  feel an immediate need to -- to make those changes

3  similar to Ford.

4           It was further discussed that given the

5  climate in the industry, there's tremendous change,

6  that this could change in the future and so I -- you

7  know, what I took away from that is that at very high

8  levels, probably at the board of directors's level, you

9  know, this could be something that they would look at

10  from time to time.  But there is no interest at the

11  precise moment to make any change.

12       Q       Are there any other changes in the

13  works or on the horizon that would affect my clients'

14  employment at ZF Batavia?

15       A       That's a pretty broad question.  I

16  mean, I think I've just said that the industry is in a

17  tremendous state of flux and I don't think people can

18  -- there's a lot of speculation on the floor.  You

19  know, you hear rumors of rumors.  That's -- you know,

20  when you sit in my office, you don't hear the real

21  rumor.  You hear a rumor of a rumor.  But my advice to

22  people has been to be calm and let -- you know, let the

23  world, you know, move and then we'll see what happens.

24  Because we are right now making 45 CVT transmissions a

25  day.  If those things sell like hot cakes, we're going

1    to be busier than the devil and rich as kings and if

2    they fall on their fanny, we're going to have a

3    problem, and I don't know of anybody that can predict

4    what's going to happen.  So I'm not in a policy-making

5    -- you know, and quite honestly I don't get financial

6    statements and that sort of thing, so I don't know at

7    that level what's being contemplated.

8                    But, you know, there's -- in terms of

9    -- you know, I'm trying to think of like benefit

10   changes or anything like that.  I don't know what your

11   question is.  But, you know, things that would affect

12   them is kind of broad.  You know, do you have any

13   suggestions for me?

14           Q       Well, I mean, are there any major

15   changes that are contemplated in the next, let's say,

16   couple of weeks that might affect the terms of their

17   employment or who's operating the facility, these sort

18   of things?

19           A       I have no knowledge of anything that's

20   going to happen in the next couple of weeks.

21           Q       Have you heard rumors of rumors that

22   something is going to happen in the next couple of

23   weeks?

24                   MR. HUNTER:  Objection to the extent

25                   that it calls for hearsay.

1                    THE WITNESS:  Yeah.  And believe me,

2              you know, we've said it's rumors, you know, but

3              there's all kinds of rumors about things, that

4              we could get -- you know, we could get bought

5              out somehow.  That's not unusual in the

6              company, you know, we're at.  So I don't know

7              of anything -- I mean, that was told -- some of

8              the most recent rumors I got from one of the

9              plaintiffs, quite honestly, so --

10     BY MR. SIMON:

11              Q       The rumors in the plant are that

12     there's going to be some change in ownership; those are

13     the rumors of the rumors that you're hearing?  You're

14     hearing those frequently at this moment?

15              A       No.  I'm not hearing any rumors

16     frequently, but, again, that's where I sit.  I mean, I

17     don't -- you know, we're busy in our department and I

18     don't have a lot of time to shoot the breeze.

19              Q       Is it your testimony that there is a

20     buzz going around the plant right now that there's

21     going to be a change in the ownership of the plant?

22              A       That's one of the things that's -- you

23     know, that's going around, yeah.

24              Q       And just to the extent that it would

25     affect the terms and conditions of employment of my

```
 1    clients --

 2            A        That's correct.

 3            Q        -- and then potentially affect claims

 4    in the lawsuit, are you aware of any prospective

 5    changes?

 6            A        No.

 7            Q        Even through hearsay?

 8            A        Am I aware of any change in ownership

 9    that's been determined or whatever from somebody in an

10    official capacity?  No.  You know, have I heard rumors

11    from, you know, just average employees that they think

12    that something might be happening?  Yes.

13            Q        But as you understand, those rumors are

14    not factually based at this point?

15            A        I don't know whether they are or they

16    aren't.  I mean, you know, you've heard the story of

17    the Ford transitional folks repeated, you know, time

18    and time again, that when that sort of thing happens,

19    almost everybody uses the same word, it's shock.  You

20    know, they maintain confidentiality and whatever

21    happens happens and boom, everybody finds out at once.

22    So we'll find out.

23                     MR. SIMON:  Let's take a break.  Off

24            the record.

25                          (RECESS)
```

1                    MR. SIMON:  Back on the record.

2     BY MR. SIMON:

3          Q      Mr. Huebner, you've testified for a

4     while today.  Is there anything that you said in your

5     deposition up to this point that after further

6     reflection, you realize you misspoke?

7          A      Nothing comes to mind.

8          Q      All right.  And we had talked about Mr.

9     Saleh's deposition and the discussion you and he had

10    about merit increase and AIP, and basically your

11    understanding, you said that he said that he misspoke

12    when he was referring to merit and not AIP.  You've

13    attended the depositions of other defendant witnesses,

14    Mr. Kehr, Mr. Newark, Mr. Sennish, Mr. Warden from

15    Ford.  Was anything said in those depositions where you

16    thought "I know that's wrong.  They made a mistake.

17    That's factually incorrect"?

18                    MR. HUNTER:  I'm going to object.  I

19                 mean, Mr. Kehr's deposition was I don't even

20                 remember how long ago.  We've sat through 20

21                 depositions.  That is really an unfair question

22                 to ask Mr. Huebner months later about that kind

23                 of testimony.

24                    MR. SIMON:  Sure.  I'm not asking about

25                 any of the plaintiffs' depositions.

1    BY MR. SIMON:

2         Q       But at any recent -- with Mr. Kehr, I

3    know Mr. Kehr's was a while ago, earlier in time.  In

4    Mr. Newark's, Mr. Sennish's, Mr. Warden's, was anything

5    said that you thought wow, he said that wrong and

6    that's just not true?  Did anything jump out at you?

7         A       Nothing that jumps out at me.  I'll

8    tell you that that thought crossed my mind once or

9    twice, but in terms of what it is, at the moment I

10   can't think of it and it wasn't anything earth-shaking,

11   you know.  You know, just it stems from sometimes I'm

12   the technical guy and some manager says something that

13   might not have been, you know, fully technically

14   accurate.  But, you know, I don't --

15        Q       Sure.  I'll give you the chance to say

16   nice things about people you work for.  Mr. Sennish,

17   he's your boss, right?

18        A       Yes.

19        Q       And you find him to generally be very

20   knowledgeable about the personnel policies with respect

21   to the salaried employees at the plant?

22        A       Yes, sir.

23        Q       And Mr. Newark isn't -- for example,

24   he's not in HR, but you find him to be fairly

25   knowledgeable with respect to salaried policies?

```
1              A       In general, yes.  I mean, he's -- he is
2       a line manager and so HR is not his -- you know, his
3       immediate area of responsibility, so as a -- as a line
4       manager, he's, you know, maybe not as technically
5       strong as somebody that works in HR, but he's -- you
6       know, he's been on the policy committee so he's, you
7       know, had a chance to be involved in it.
8                       MR. SIMON:  I have no more questions.
9                       THE WITNESS:  Okay.
10                      MR. SIMON:  Thank you.
```

                            - 0 -

                (AND FURTHER THE DEPONENT SAITH NAUGHT)

                            - 0 -


                _____
                      Herbert Huebner

C-E-R-T-I-F-I-C-A-T-I-O-N


STATE OF OHIO,

COUNTY OF HAMILTON, To-wit;


   I, Susan K. Lee, CVR-CM, Court Reporter and Notary Public in and for the State of Ohio, do hereby certify;

   That on the 2nd day of October, 2003, there appeared before me pursuant to Notice and agreement of counsel, **HERBERT HUEBNER**, as a witness in the previously entitled cause;

   That the said witness was sworn by me and examined to tell the truth, the whole truth, and nothing but the truth in said cause;

   That the deposition was taken by me via Stenomask and electronic recording and the foregoing 126 pages contain a true, full and correct transcription of all the testimony of said witness;

   That the deposition was submitted to counsel for the witness for reading and signature;

   That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

   IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of October, 2003.


         _____
         Susan K. Lee, CVR-CM
         My commission expires:
         August 30, 2004