```
              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF OHIO
               WESTERN DIVISION, CINCINNATI


EVERETT W. WHISMAN, et al.,      :

     Plaintiffs                  :

     -v-                         : Case No. C-1-02-406
                                 : (Judge Beckwith)
                                 : (Magistrate Sherman)

ZF BATAVIA, LLC, et al.,         :

     Defendants                  :
```

- 0 -

    The deposition of **KEVIN O'HAGAN**, taken before Susan K. Lee, CVR-CM, Court Reporter and Notary Public in and for the State of Ohio, at the Holiday Inn Eastgate, 4501 Eastgate Boulevard, Cincinnati, Ohio, on the 2nd day of October, 2003, beginning at the hour of 10:38 a.m. and ending at 10:50 a.m. of the same date.

- 0 -

**RIVERSIDE REPORTING**
**Certified Court Reporters**
**P.O. Box 949**
**Covington, Kentucky  41012**
**KY(859)291-6110   OH(513)574-7017**

APPEARANCES:

FOR THE PLAINTIFFS:    STEPHEN A. SIMON, Esq.
                       Attorney at Law
                       22 West Ninth Street
                       Cincinnati, Ohio 45202


FOR THE DEFENDANTS:    JOHN J. HUNTER, JR., Esq.
                       Attorney at Law
                       One Canton Square
                       1700 Canton Avenue
                       Toledo, Ohio  43264

                       JEFFREY L. VANWAY, Esq.
                       Attorney at Law
                       312 Walnut Street
                       Suite 3200
                       Cincinnati, Ohio  45202-4074


ALSO PRESENT:          MR. EVERETT W. WHISMAN
                       MR. HERBERT HUEBNER

- 0 -


STIPULATIONS:

It is stipulated by and between counsel for the respective parties that the deposition of **KEVIN O'HAGAN**, a witness herein, may be taken at this time pursuant to the Federal Rules of Civil Procedure and Notice; that the deposition may be taken via Stenomask by the Notary Public/Court Reporter, and transcribed by her out of the presence of witness; that the deposition was submitted to counsel for the witness for reading and signature.

- 0 -

```
 1    KEVIN O'HAGAN, called as a witness, being first duly
 2    sworn, testified as follows:
 3              MR. SIMON:  Mr. O'Hagan, good morning.
 4              THE WITNESS:  Good morning.
 5              MR. SIMON:  We met a moment ago.  My
 6         name is Steve Simon and I'm one of the
 7         attorneys who is representing the plaintiffs in
 8         this lawsuit.  This lawsuit, I'm sure you're
 9         aware of it generally, is a group of employees
10         at the Batavia plant who used to work at Ford,
11         they're Ford transitional employees, and
12         there's 15 of them and they've sued ZF Batavia
13         and Ford Motor Company.
14              We actually have a very specific
15         purpose for calling you here, so I'm going to
16         just get right to it.
17    BY MR. SIMON:
18         Q    A little bit of background.  You've
19    never worked for Ford Motor Company, correct?
20         A    I did once back in 1974.
21         Q    Okay.  When did you leave Ford?
22         A    The end of 1974.
23         Q    You joined the Batavia plant as a ZF
24    Batavia employee?
25         A    Correct.
```

```
1       Q       When was that?
2       A       May of 2000.
3       Q       And what was your position at the time?
4       A       Maintenance supervisor.
5       Q       Is that still your title?
6       A       Correct.
7       Q       Have you always been salaried?
8       A       Yes.
9       Q       Has your overtime been paid?
10      A       Yes, but with one exception.
11      Q       What's the one exception?
12      A       And that was where I had lost an hour
13   of pay due to a coming in -- on my -- on my sheet it
14   was ten minutes past the start of the shift.
15      Q       I didn't hear what you said.
16      A       It was ten minutes past the start of
17   the shift as it was notated on my pay sheet.
18      Q       When did this happen?
19      A       Winter of 2000.  I don't remember the
20   exact month.
21      Q       Do you think it was winter of 2001?
22      A       I'm sorry.  Winter of 2001, correct.
23      Q       This is the reason we've called you
24   here.  So what happened that day?
25      A       Ed Erras, who was my supervisor at the
```

```
 1     time, had called -- called me to the back because there
 2     was a discrepancy with my pay sheet and I had on there
 3     that I had started the shift at 4:40 in the morning.
 4     Normally start at 4:30.  So what he said is they were
 5     going to deduct an hour of the overtime from my pay
 6     that day.
 7           Q     What day of the week was that day that
 8     you worked?
 9           A     I -- I don't remember.
10           Q     You don't remember if it was a weekday
11     or weekend?
12           A     I believe it was a weekday.  Weekday.
13           Q     Okay.  So you were talking with Mr.
14     Erras?
15           A     Right.  And as I said, he just wound up
16     -- they wound up deducting it off of my pay.  I
17     couldn't remember the reason why I was -- I was late
18     because normally I'm there at 4:30.
19           Q     How many hours had you worked that day?
20           A     I would have normally worked my eight-
21     hour shift plus two hours of overtime.  I came in, like
22     I say, two hours early.
23           Q     Your shift starts at 6:30?
24           A     Correct.
25           Q     How soon after this day that you worked
```

1    did you have this conversation with Ed Erras?  Was it a
2    couple of days later?
3         A    It was at the end of that pay period
4    when I turned my sheet in.  Our pay sheets are turned
5    in at the end of the pay period -- of each pay period.
6    And he notified me either that day or the next day.
7         Q    Was your time sheet -- did your time
8    sheet say you had been there at 4:30 or did your time
9    sheet say you had been there at 4:40?
10        A    4:40.
11        Q    And that is the time that you showed up
12   that day?
13        A    Well, what happened was -- and I
14   remembered it two weeks later when I couldn't get in
15   the building -- I was there at 4:30, but I could not
16   get in the door on the west side of the plant.  It was
17   frozen shut.  So I had to get back in my car, drive
18   clear around to the east side and go in that door
19   there.  And then when I -- I clock in, I normally put
20   the time I get to my outpost, so, you know, it was
21   around 4:40.  That's why I put that on the pay sheet.
22        Q    How much time in between going through
23   the gate and getting to your outpost?
24        A    It's probably five minutes.
25        Q    So really you were through the gate

```
 1      probably at 4:35?
 2           A      Roughly.
 3           Q      Yet they deducted an hour of overtime?
 4           A      Correct.
 5           Q      Did you ask them why they were taking
 6      an hour off?
 7           A      Well, because the -- you're supposed to
 8      be on the job ready to start at that -- at 30 minutes
 9      prior to the start of the shift, as it was explained to
10      me.
11           Q      All right.  But you were there well
12      before the 30 minutes?
13           A      Yes.
14           Q      Again, where did they come up with an
15      hour?
16           A      Well, again, as it was explained to me,
17      and I could not remember why I didn't get in on time,
18      but we're supposed to be there 30 minutes prior to the
19      start of the shift.  That's when the shift starts for
20      the salaried people.
21           Q      So you were required to be there at
22      6:00 a.m.?
23           A      Well, no.  At that time I was working a
24      two early, so I was required to be there at -- so my
25      shift would start at 5:00, so I was required to be
```

```
 1    there at 4:30 if, in fact, I wanted to be paid for the
 2    two hours.
 3           Q      Did anybody explain to you -- why
 4    didn't you lose ten minutes of overtime?  Why did you
 5    lose an hour?  Did they tell you why you lost an hour?
 6           A      The way the -- again, the way it was
 7    explained to me as I hired on, they don't do 30-minute
 8    increments of overtime.  It's an hour.  So anything
 9    less than one hour, you know, you would not be paid
10    for.
11           Q      And was anybody else in this meeting
12    with Ed Erras besides yourself?
13           A      Larry Jarman may have been there.
14    Larry was the superintendent at the time,
15    superintendent over maintenance.
16           Q      Anyone else that you recall?
17           A      No.
18           Q      Were you upset during the meeting?  Did
19    you kind of complain this isn't fair or anything like
20    that?
21           A      I voiced my opinion, but, again, I
22    couldn't remember.  I'm normally there other times at
23    4:30, so I figured there must have been a reason.  And
24    like I say, two weeks later when I couldn't get in the
25    door, I remembered what that reason was.
```

```
 1          Q      Let me, if I could, show you Exhibit
 2    16.
 3          A      I'm familiar with reading it.  I've --
 4    you know, I've read this before.
 5          Q      You've seen it before today?
 6          A      Yes.
 7          Q      Do you see where it says -- backing up
 8    a second, the practice now at the plant is that when
 9    you go into the plant, you have a card --
10          A      Correct.
11          Q      -- that you have to swipe to engage the
12    reader?
13          A      Correct.
14          Q      And you do that when you leave as well?
15          A      Correct.
16          Q      And actually that's what you did that
17    -- you did that the day that we're talking about in the
18    winter of 2001?
19          A      This -- this memo came out after the
20    event that I was involved in occurred.  Like I said,
21    that was in the winter -- the winter of 2000/2001.
22    Larry, I remember -- and the reason I remember this is
23    Larry Jarman had just come on board with the company
24    and Larry came on board in like January or February and
25    he was only there a short period of time before he was
```

```
 1     moved over to another role.  And at that point in time
 2     we had -- where I came in up front there was an old
 3     system that had been installed under Ford that was
 4     being utilized, so to actually enter through the front
 5     of the building, I had to -- I was given that card.  It
 6     wasn't under the current Honeywell system that we have.
 7            Q     Okay.  Do you remember your reaction
 8     when you read Exhibit 16 when it was distributed in
 9     August?
10            A     Having been involved in the airline
11     business and foreign trade zones before, I knew it
12     wasn't a requirement that, you know, you needed to have
13     salaried employees clock in and out.  I did know that.
14     But, you know, at that point it doesn't matter to me.
15     I come out of the airline business and we swiped in and
16     out every time we went through a gate, so it was no --
17     no issue to me at that point.
18            Q     Do you see in that paragraph where it
19     says "Please be advised..."?  Do you see that
20     sentence?
21            A     Yeah.
22            Q     "Please be advised that salaried time
23     sheets will be audited against the Honeywell system
24     readouts.  Your manager will be asked to clarify
25     notable differences between them and pay adjustments
```

```
 1     are a possibility if no justification is forthcoming."
 2     Do you see that sentence there?
 3          A     Yes.
 4          Q     And was it your understanding that
 5     there may be pay adjustments if your time sheets and
 6     your readouts don't align?
 7          A     Yes.
 8          Q     I mean, from your perspective what
 9     happened before this in the winter of 2001 --
10          A     Right.
11          Q     -- did that kind of make you think
12     well, this could happen again?
13          A     Certainly.
14          Q     At the time you were working two hours
15     of overtime every day?
16          A     Right.
17          Q     In the winter of 2001?
18          A     Correct.
19          Q     And how long had you been doing that?
20          A     A while.  Same thing I'm doing this
21     year.  It went on for quite a while.
22          Q     Currently you're working two hours of
23     overtime?
24          A     Yes.  Every other week we -- we come in
25     -- one of us comes in early, one of the supervisors.
```

                                                                12

```
1            Q      So the week that you're working
2     overtime you understand that if you put down 4:30 on
3     your time sheet, you understand that someone might
4     check the Honeywell system readout and see that you
5     actually came in at 4:40?
6            A      Yes.
7            Q      All right.  And so you understand that
8     you might lose overtime if you don't, right?
9            A      Yes.
10           Q      And on the weeks that you're not
11    working overtime, where you just come in at your
12    regular time and work eight hours, you understand that
13    if the time sheet and the Honeywell readout don't
14    align, you might lose pay in that situation as well?
15           A      Yes, the way it reads here.
16    Absolutely.
17                  MR. SIMON:  Okay.  Off the record.
18                     (OFF THE RECORD)
19                  MR. SIMON:  No more questions for Mr.
20          O'Hagan.  Thank you very much, sir.
21                  THE WITNESS:  Thank you.
                            - 0 -

               (AND FURTHER THE DEPONENT SAITH NAUGHT)


                            - 0 -
```

13

```
                              _____
                                   Kevin O'Hagan
```

Case 1:02-cv-00406-SSB-TSB   Document 74-2   Filed 12/17/2003   Page 13 of 14

C-E-R-T-I-F-I-C-A-T-I-O-N

STATE OF OHIO,

COUNTY OF HAMILTON, To-wit;

      I, Susan K. Lee, CVR-CM, Court Reporter and Notary Public in and for the State of Ohio, do hereby certify;

      That on the 2nd day of October, 2003, there appeared before me pursuant to Notice and agreement of counsel, **KEVIN O'HAGAN**, as a witness in the previously entitled cause;

      That the said witness was sworn by me and examined to tell the truth, the whole truth, and nothing but the truth in said cause;

      That the deposition was taken by me via Stenomask and electronic recording and the foregoing 13 pages contain a true, full and correct transcription of all the testimony of said witness;

      That the deposition was submitted to counsel for the witness for reading and signature;

      That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

      IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of October, 2003.

                                _____
                                Susan K. Lee, CVR-CM
                                My commission expires:
                                August 30, 2004