IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Everett W. Whisman, *et al.*,        )
                                     )
                    Plaintiffs,      )   Case No. 1:02-CV-406
                                     )
        vs.                          )
                                     )
Ford Motor Company, *et al.*,        )
                                     )
                    Defendants.      )


<u>Memorandum and Order</u>


        Seven of the current Plaintiffs initiated this action
by filing a complaint in June 2002.  They amended their complaint
twice, and in the third version of the complaint were joined by
eight additional Plaintiffs.  Plaintiffs were all salaried
employees at the Batavia, Ohio, Ford transmission plant in 1999
when Ford sold the plant to ZF Batavia, LLC, a limited liability
corporation in which Ford owned a minority interest.  Plaintiffs'
claims relate to events surrounding the sale of the plant and to
the conditions of their employment by ZF Batavia after the sale.
This matter is now before the Court upon motions for summary
judgment by both Defendants, Ford and ZF Batavia, and motions to
strike certain evidence submitted by the parties in support of
their arguments in favor of and in opposition to those motions.[1]

---

[1]An additional motion by Defendants for leave to file a
supplemental brief in support of their motions for summary judgment
(Doc. 95) is hereby **GRANTED**.  The sole purpose of the motion was to
alert the Court to a recent Ohio Supreme Court decision that may

A.  <u>Background</u>

When Ford sold the Batavia plant to ZF Batavia, it
presented Plaintiffs and other salaried employees with the option
of leaving its employ to become employees of ZF Batavia or
remaining Ford employees if employment at another Ford plant was
available.  Plaintiffs were given until December 31, 1999, to
decide upon one of those two options.

At a May 27, 1999, meeting, Ford and ZF Batavia
representatives met with interested salaried employees in the
plant cafeteria to present details about employment at ZF
Batavia.  Plaintiffs, and others attending the meeting, were told
or given the impression that ZF Batavia would continue to pay
overtime to salaried employees in generally the same fashion as
Ford had.  Employees attending the meeting were advised that ZF
Batavia would pay annual incentives based upon plant
profitability and productivity.  Attendees were advised that
staying with ZF Batavia was an opportunity to get in on the
"ground floor" for producing Ford's new CVT transmission.  Those
statements and assurances are the basis for most of Plaintiffs'

---

bear upon this Court's decision in this matter.  Plaintiffs have
submitted their memorandum in opposition in which they assert that
the Ohio Supreme Court's decision has no bearing.  They are,
therefore, not prejudiced in any fashion by the Court's  granting
Defendants' motion for leave to file the supplemental brief in the
context of this Memorandum and Order addressing the merits of the
underlying motions.

claims in this action.  Plaintiffs do not allege that they were promised employment for any definite period of time or offered any assurances that their employment could not or would not be terminated except for cause.

Plaintiffs all accepted employment with ZF Batavia. They are, and at all times have been, at-will employees.  They claim, however, that ZF Batavia has not honored the assurances it made at the May 27, 1999, meeting.  Specifically, they allege that overtime policies have changed such that they are required to work additional hours without receiving the compensation to which they would have been entitled while working for Ford.  They also allege that bonuses have been significantly smaller than they received while working for Ford.  They assert claims of breach of contract on the basis of Defendants' alleged failure to pay overtime for "casual" hours worked and to award bonuses under the Annual Incentive Plan based on objective factors.  On essentially the same bases, Plaintiffs assert a claim for promissory estoppel and a claim of fraudulent misrepresentation. Plaintiffs seek punitive damages with respect to the alleged fraud.

In addition to those claims under Ohio common law, Plaintiffs assert claims under the Fair Labor Standards Act ("FLSA") and Ohio Revised Code ("O.R.C.") § 4111.01, *et seq.* They allege that in August of 2001 Defendant ZF Batavia began

requiring them to clock in and out of the plant.  While they
concede that the practice has not affected their compensation or
employment in any fashion, they contend that it qualifies them as
non-exempt employees for purposes of the cited statutes and that,
accordingly, they are entitled to overtime compensation, as
provided by law, for any time they have worked beyond forty hours
per week.

Defendants deny liability with respect to all of
Plaintiffs' claims.  They contend that, as at-will employees,
Plaintiffs cannot successfully prosecute the claims they assert
under Ohio common law.  Defendants further contend that
Plaintiffs are not entitled to the protections of the statutes
they cite because they are exempt employees for purposes of those
statutes.  On those bases, both Defendants seek summary judgment.
Their motions (Doc. 42 by Ford and Doc. 65 by ZF Batavia) are
fully briefed.

B.  The Summary Judgment Standard

Summary judgment is proper "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The evidence presented on a motion for summary judgment
is construed in the light most favorable to the non-moving party,

4

who is given the benefit of all favorable inferences that can be drawn therefrom.  United States v. Diebold, Inc., 369 U.S. 654 (1962).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).

The Court will not grant summary judgment unless it is clear that a trial is unnecessary.  The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id.

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial."  First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. Id.; Anderson, 477 U.S. at 250. Rule 56(e) requires the non-moving

party to go beyond the pleadings and designate "specific facts
showing that there is a genuine issue for trial."  Id.

Further, there is no express or implied requirement in
Rule 56 that the moving party support its motion with affidavits
or similar materials negating the opponent's claim.  Id.  Rule
56(a) and (b) provide that parties may move for summary judgment
"with or without supporting affidavits."  Accordingly, where the
non-moving party will bear the burden of proof at trial on a
dispositive issue, summary judgment may be appropriate based
solely on the pleadings, depositions, answers to interrogatories,
and admissions on file.

C.  Analysis

    1.  The Common Law Claims

        a.  Breach of contract and promissory estoppel

As the Court has noted, Defendants moved for leave to
supplement their memoranda in support of their motions for
summary judgment by advising the Court of the recent decision of
the Ohio Supreme Court in Lake Land Employment Group of Akron,
LLC v. Columber, 101 Ohio St.3d 242 (2004).  In Lake Land, the
Ohio Supreme Court considered whether continued employment
constitutes consideration for a promise not to compete after
termination of employment by a current employee.  The Court
stated as follows:

It follows that either an employer or an employee in an at-will relationship may propose to change the terms of their employment relationship at any time.  If, for instance, an employer notifies an employee that the employee's compensation will be reduced, the employee's remedy, if dissatisfied, is to quit.  Similarly, if the employee proposes to the employer that he deserves a raise and will no longer work at his current rate, the employer may either negotiate an increase or accept the loss of his employee.  In either event the employee is entitled to be paid only for services already rendered pursuant to terms to which they have both already agreed.  Thus, mutual promises to employ and to be employed on an ongoing at-will basis, according to agreed terms, are supported by consideration: the promise of one serves as consideration for the promise of the other.

Id. at 247.

Defendants contend that the Lake Land decision requires that the Court enter judgment in their favor with respect to Plaintiffs' breach of contract and promissory estoppel claims, inasmuch as it establishes that an Ohio employer may change the terms of at-will employment at any time without breaching a contract or otherwise giving rise to liability.  Plaintiffs counter that Lake Land pertains only to covenants not to compete. See id. at syllabus.

The Lake Land court stated, broadly, that its decision "does no more than recognize that consideration exists where an at-will employer and an at-will employee continue their employment relationship, rather than terminate it, after the employer imposes a new requirement for employment. . . ."  Id. at

8

248.  That language is sufficiently encompassing to encompass the changes Defendant ZF Batavia made to Plaintiffs' employment in the years following their decisions to become ZF Batavia's employees.  Plaintiffs are correct in their observation that the Lake Land decision is limited to a discrete type of change to employment requirements.  It is not a break from Ohio law as regards changes in the benefits, compensation, or other terms of employment of at-will employees in Ohio, however.

Where parties to an employment arrangement do not agree in advance to the duration of the employment or to specific causes that will be the exclusive justifications for termination, employment is at-will and subject to termination at any time by either party.  See Mers v. Dispatch Printing Co., 19 Ohio St.3d 100 (1985); Henkel v. Educational Research Council, 45 Ohio St.2d 249, syllabus (1976).  The terms and conditions of at-will employment are subject to change at any time without consideration other than continued employment.  See, e.g., Johnson v. Norman Malone & Assocs., Inc., No. 14142, 1989 WL 154763 (Ct. App. Summit Cty. Dec. 20, 1989).  It stands to reason that an employer who may legally terminate an employee on any given day without reason may also take the lesser step of altering the terms and conditions of the employee's employment prospectively without incurring liability for breach of contract or promissory estoppel.

Plaintiffs do not dispute that Defendant ZF Batavia was legally entitled to terminate their employment one day after they had agreed to transfer into its employ.  The conclusion that ZF Batavia could also alter the annual incentive plan and overtime compensation plan for salaried employees without incurring contract or quasi-contract liability is inescapable.  For that reason, Defendants' motions for summary judgment with respect to Plaintiffs' claims for breach of contract and promissory estoppel are well-taken.

b.  Fraudulent misrepresentation

Plaintiffs allege that Defendants fraudulently induced them to transfer to ZF Batavia's employ by representing that certain conditions would apply to their employment.  The elements of a claim of fraud in the inducement are no different from the elements of a claim of fraud.  See Spencer v. Huff, No. 97CA2543, 1998 WL 391948 at *3 (Ct. App. Scioto Cty. July 2, 1999); Binsack v. Hipp, No. H-97-029, 1998 WL 334223 at *5 (Ct. App. Huron Cty. June 5, 1998).  In order to prove a claim of fraud, a plaintiff must establish each of the following:

(1)  a representation or, where there is a duty to disclose, concealment of a fact,

(2)  which is material to the transaction at hand,

(3)  made falsely, with knowledge of its falsity, or with such utter disregard and recklessness

10

as to whether it is true or false that
knowledge may be inferred,

(4)  with the intent of misleading another into
relying upon it,

(5)  justifiable reliance upon the representation
or concealment, and

(6)  a resulting injury proximately caused by the
reliance.

See Cohen v. Lamko, 10 Ohio St.3d 167, 169 (1984).

Defendants argue for summary judgment with respect to
Plaintiffs' fraud claim.  They contend that Plaintiffs cannot
satisfy the third element of the claim because they cannot
identify evidence that tends to show that Defendants did not
intend to the honor the representations upon which Plaintiffs
base their claims when those representations were made.

"[F]raud may not be predicated upon promises or
representations relating to future conduct unless it is proven
that, at the time of the promise, the person making the promise
had no intention of carrying it out."  Freeman v. Westland
Builders, Inc., 2 Ohio App.3d 212, 217 (Cuyahoga Cty. 1981).  A
statement concerning future events may be actionable as fraud if
the speaker knew that the statement was an inaccurate prediction
when made.  See Hofstetter v. Fletcher, 905 F.2d 897, 907 (6th
Cir. 1988).  In this case, the statements upon which Plaintiffs
rely were made prior to their deciding to transfer to ZF
Batavia's employ and relate to their potential employment by ZF

11

Batavia.  Accordingly, they are statements concerning future
events, actionable only if the speaker or speakers knew them to
be inaccurate predictions or inaccurate statements of intentions
when made.  <u>See</u> <u>Hofstetter</u>, <u>supra</u>; <u>Freeman</u>, <u>supra</u>.

The Court has carefully read Plaintiffs' memorandum in
opposition to Defendants' motions for summary judgment and has
identified four alleged misrepresentations or omissions that are
the bases of Plaintiffs' fraudulent misrepresentation claim.
Those four are (i) that employment with ZF Batavia would be "just
like" employment at Ford; (ii) that ZF Batavia's overtime policy
would be a continuation of Ford's policy; (iii) that individual
performance would not be considered a factor in the payment of
bonuses under the Annual Incentive Plan ("AIP"); and (iv) that
employees who transitioned from Ford to ZF Batavia could "get in
on the ground floor" of the new CVT transmission.

The Court's first task is to determine whether
Plaintiffs have identified evidence that tends to show that an
actionable representation or omission was made.  As regards the
first alleged representation, they have not.

Plaintiffs cite to the transcripts of the deposition
testimony of Plaintiffs Dena Stevens and Michael Steward for the
proposition that Plaintiffs were told, prior to accepting
employment from ZF Batavia, that their employment would be "like
at Ford."  Stevens deposition, p. 12.  When testifying to that

12

effect, however, Ms. Stevens was not quoting any speaker at the May 27, 1999, meeting and did not attribute the statement to anyone. Indeed, she did not testify that the statement was made. Michael Steward also testified that he believed, after hearing from Ford and ZF Batavia executives, that his employment would mirror his previous employment at Ford, but he conceded that he did not remember any specific statement to that effect. See Michael Steward, p. 18. Plaintiffs have failed, therefore, to identify evidence of any such representation on the part of Defendants. They cannot prove fraudulent misrepresentation, accordingly, on the basis of the alleged representation that employment with ZF Batavia would be "just like" employment with Ford.

As evidence that the second alleged misrepresentation, that ZF Batavia's salaried worker overtime policy would be a continuation of Ford's policy, was made, Plaintiffs cite to the deposition testimony of Plaintiff Dennis Baker, ZF Batavia Chief Financial Officer Karl Kehr, and Ford Human Relations Manager Michael Warden. Mr. Baker's testimony about what he "was told" begins at page 13 of the transcript of his deposition. He does not specify who told him the things he alleges, under what circumstances, or in what words. Seven pages later, after covering a number of other topics, Mr. Baker testifies as follows:

Q: Okay.  Anything else, in terms of what you were told that was not followed through on?

A: At this time, I can't recollect anything.

Q: Not to give too many hints, any issues about overtime or anything like that?

A: That they would be the same, that the overtime policy would be the same.

Q: What does that mean, I guess in terms of it would be the same?

A: That the way overtime was -- the way overtime was done with Ford would be the same way it's done with ZF."

Baker depo., p.20.

      Regarding representations about overtime policy made at the May 27, 1999, meeting with salaried employees, ZF Batavia's Chief Financial Officer, Karl Kehr, testified as follows at his deposition:

Q: Are you saying what was being communicated at this May 27th meeting was that if you -- to these Ford salaried employees at this time that, if you join ZF Batavia, we're going to follow Ford's overtime policy if you join ZF Batavia; is that what was said at this meeting?

A: I can't recall exactly what was said.  Like I said, this page deals with the compensation amounts for approved overtime and I think what we put in the brochure, you know, authorized overtime will be paid.  And I'm not sure what was communicated to the employees, but practically speaking we were continuing to operate the factory fundamentally, you know, subject to the existing Ford policies and procedures, you know, absent any -- any new guidelines.  That was fundamentally the way we were

operating the factory at this time.

Q: Even though you can't recall specifically, was it generally the thrust of the presentation on this overtime issue that we're going to follow Ford's overtime policy and we're going to follow these rates that are on page six?

A: I'd say that's a fair characterization.

&ast; &ast; &ast;

Q: And earlier when you were talking about Ford's policy, do you understand Ford's policy at time

[sic] that they didn't pay for casual time?  They didn't pay overtime for casual time?

A: I think -- I don't know.  I don't recall actually reading that in detail.  I did work for Ford for 15 years and, you know, depending upon where you are, in what areas and whatnot, I don't recall getting paid overtime for, you know, like I say, a long, long time and I work, you know, 60, 65-hour weeks.

Q: But in this presentation the people speaking, some from Ford Motor Company, some from ZF Batavia, they were advising this group of employees who were considering going to ZF Batavia that they in fact would be paid overtime for their work generally speaking in the same way that they were being paid overtime under Ford, right?

A: Yeah. Yeah, I don't think that's an unfair characterization.  It would have been a continuation of Ford's -- the Ford policy regarding overtime at this point in time, yes.

Kehr depo., pp.96-99.

Ford Human Relations Manager Michael Warden testified, with regard to the same issue, as follows:

Q: Okay.  And you know that in this summary brochure, it said that authorized overtime will be paid,

15

right?

\* \* \*

A: It says "authorized overtime will be paid."

Q: And that's consistent with what you recall people being told during these informational meetings, right?

A: As far as I recall, authorized, scheduled and worked overtime was to be paid initially.

Q: That's how it was at Ford at the plant in '99 before the transition, right?

A: Yes.

Q: And people were told in the meetings that you attended, the salaried employees were told you're going to be paid overtime like you were at Ford?

A: That was the impression that was given.  However, there were no guarantees that there would never be any changes to any authorized -- to any compensation or benefit plan, just as there's no guarantees at Ford that there would be no changes to compensation and benefit plans.

Warden depo., pp.70-71.

        The cited testimony lends very scant support to Plaintiffs' allegation that Defendants represented that they would be paid overtime exactly as they were at Ford. Plaintiffs' specific complaint regarding the actual payment of overtime by ZF Batavia is that they were not compensated for one "casual" hour per shift, as they had been at Ford.  In other words, overtime at ZF Batavia began one hour later than it had at Ford.  While the above-quoted testimony lends ample support

16

to the allegation that salaried Ford employees at the Batavia
plant were told that ZF Batavia's overtime policy would
generally resemble Ford's policy, nothing in the cited testimony
suggests that Defendants advised Plaintiffs that every aspect of
the policy would be identical to Ford's.

Plaintiff Baker did not attribute his understanding of
the overtime policy to any particular speaker.  He has not, in
the cited portions of his deposition, even affirmatively stated
that a representative of either of the Defendants was responsible
for that understanding.  His testimony is, therefore, no evidence
of fraudulent misrepresentation on the parts of Ford and ZF
Batavia.

Karl Kehr and Michael Warden affirm that the message
communicated to Plaintiffs and other salaried employees
considering the transition in 1999 was that the overtime policy
at ZF Batavia would be similar to that at Ford.  Neither has
testified, however, that potential transitional salaried
employees were assured that they would be compensated for one
"casual" hour per shift or that, more generally, every detail of
the overtime policy would be as it was while Ford operated the
plant.  The Court concludes that Plaintiffs have failed to
identify an actionable representation by Defendants that overtime
policy under ZF Batavia would be exactly as it had been under

17

Ford or that ZF Batavia would compensate Plaintiffs for one "casual" hour per shift as Ford had.

The third alleged fraudulent misrepresentation is that Plaintiffs would receive annual bonuses under the AIP without reference to individual performance. The AIP is described in the brochure distributed at the time of the May 27, 1999, meeting as a "[r]eward program based on ZF Batavia's success determined by product quality, timing and delivery of new and existing products and profitability." The brochure did not indicate how the incentive money would be distributed on an individual basis. Plaintiffs have alleged, however, that they were advised by Defendants that payments under the AIP would vary only according to job classification and not according to individual performance.

The Court has carefully considered the evidence cited by Plaintiffs in support of their allegation that Defendants falsely represented that individual performance would not be a factor in the distribution of payments under the AIP. None of that evidence supports the allegation. Michael Steward, whose deposition testimony is cited, could not recall any specific statements. See Steward depo., p. 18. Donald Williams, in the portion of the transcript of his deposition that is cited by Plaintiffs, testified, in so many words, that Ford had not considered individual performance. See Williams depo., pp.100-

18

01.  He did not testify that anyone from ZF Batavia or Ford had represented to him that individual performance would not be considered.  The documents cited by Plaintiffs are equally unsupportive.

The Court recognizes that Plaintiffs have attempted to argue that they may base a fraud claim upon Defendants' omission, from their statements to Plaintiffs at the time of the transition, that individual performance would be considered in the distribution of payments under the AIP.  Plaintiffs have not identified legal support for that theory.  The case law strictly limits claims of fraud and misrepresentation based upon statements about future events to statements made while the speaker had no intention of doing what is said.  See Martin v. Ohio State University Foundation, 139 Ohio App.3d 89, 98 (Franklin Cty. 2000).  That limitation cannot be stretched to include omissions.  Accordingly, absent some evidence that Defendants advised Plaintiffs that individual performance would not be considered, Plaintiffs cannot prove fraud in relation to the AIP.

The fourth alleged fraudulent misrepresentation was that Plaintiffs would be able to "get in on the ground floor" of the new CVT transmission program if they agreed to become ZF Batavia employees.  For the proposition that such a statement was made, Plaintiffs cite to the transcripts of three of their

depositions, as well as the transcript of the deposition of Gerry Priest, a retired transitional employee who is not a plaintiff in this action.

When asked if "people used the phrase you can get in on the ground floor on this new technology," Gerry Priest responded, "Sure."  Priest depo., p.48.  Plaintiff Pamela Blanco testified "we were supposed to go to CVT, ground floor."  Blanco depo., p.63.  Plaintiff Rick Ervin, page 73 of whose deposition transcript was cited, did not identify any representation made by Ford or ZF Batavia.  Plaintiff Charles Pearce testified that Hassan Saleh, a ZF Batavia employee who extended ZF Batavia's offer to him discussed "[t]hat we were in the ground floor of the CVT, in the joint venture" and "that we had . . . great opportunities with the joint venture, being on the ground floor of CVT."  Pearce depo., pp.23, 46.  None of the transitional employees has testified, in testimony cited by Plaintiffs, that Ford or ZF Batavia represented that all of the Plaintiffs would work on the CVT transmission or that any individual employee would do so.  Plaintiff Blanco did not identify an actionable representation but, rather, her impression.  Gerry Priest testified only as to what unidentified "people" said.  He did not attribute their comments to Ford or ZF Batavia.  To the extent that Plaintiff Pearce's discussions with Hassan Saleh constitute representations by Mr. Saleh, they were not representations that

20

any particular employee, as opposed to the joint venture itself, would benefit from the CVT transmission.  He testified that the CVT line would present opportunities, but he did not testify that Mr. Saleh assured him that he would be placed on the CVT line. In sum, none of the evidence supports Plaintiffs' allegation that Defendants fraudulently misrepresented that Plaintiffs would work on the CVT transmission.  The Court concludes that Plaintiffs have failed to identify a single actionable representation.

Even were Plaintiffs able to identify an actionable representation, however, their fraudulent misrepresentation claim would fail for want of evidence that Defendants made any representation without the intention of doing what was said. Plaintiffs' memorandum in opposition to the Defendants' motions for summary judgment is long on strenuous argument that Defendants secretly intended to do something very different in their treatment of Plaintiffs than they represented to Plaintiffs.  They have cited evidence to that effect, but the evidence does not support the argument.

For example, Plaintiffs cite to the deposition testimony of ZF Batavia President David Adams for the proposition that ZF Batavia did not intend to follow the overtime policy it represented to the transitional employees.  Mr. Adams testified, however, that ZF Batavia would develop an overtime policy with reference to Ford's.  See Adams depo., p.128.  He did not testify

21

that ZF Batavia had represented to its employees that every aspect of the policy would be identical to Ford's while intending to deviate from Ford's.  As the Court has noted, Plaintiffs have not identified evidence of any representation by Ford or ZF Batavia that the overtime policy at ZF Batavia would mirror Ford's in every respect.  Accordingly, Mr. Adams' testimony that ZF Batavia's overtime policy would borrow from Ford's and suggestion that it would not be identical are no evidence of fraud.

Likewise, Plaintiffs have cited to the deposition testimony of ZF Batavia Chief Financial Officer Karl Kehr for the proposition that Defendants did not believe themselves to be required to abide by the representations made to transitional employees.  The transcript of Mr. Kehr's deposition testimony reveals, however, that he testified that the brochure provided to Ford employees about potential employment at ZF Batavia represented what the employees could reasonably expect to receive from ZF Batavia but that those features were subject to change.  See Kehr depo., pp.65-66.  That testimony does not support the allegation that ZF Batavia had no intention of honoring the assurances made in the brochure.

The same is true of the cited testimony of David Adams at page 60 of the transcript of his deposition.  Mr. Adams testified that he understood in 1999 that AIP payments would be

22

awarded "at least one or two years out going forward" on the basis, at least in part, of individual performance.  He further testified, however, that that intention was not, in his understanding, inconsistent with the representation in the brochure that AIP payments would be "tied to profitability, which is tied to the overall result of the company."  Adams depo., p.60.  The Court agrees and finds no evidence in the cited portion of the deposition that Defendants did not intend to honor the representations made to Plaintiffs and others in 1999.

Plaintiffs have also cited to page 41 of the transcript of Michael Warden's deposition as evidence that Defendants did not intend to honor their representations to Plaintiffs when they made them.  There, Mr. Warden testified that it was important to the success of the existing transmission line, the CD4E, for Ford transitional hires to stay at the Batavia plant.  That statement does not constitute evidence that representations about opportunities in the CVT line were false when made.  Mr. Warden did not testify that ZF Batavia intended to place all transitional employees in the CD4E line or to prevent all of them from working on the CVT transmission.  Indeed, when asked whether the plan was to place new hires in the CVT line, Mr. Warden testified that that was not his understanding.  See Warden depo., p.41.  His cited testimony does not support Plaintiffs'

allegation that Defendants made representations to Plaintiffs in 1999 with no intention of doing what was said.

The Court has also considered the documents Plaintiffs have cited in support of their allegation that Defendants had concocted a secret plan prior to offering transitional employment to Plaintiffs to limit Plaintiffs' salaries, pay lower AIP bonuses to Plaintiffs, and to give them lower merit increases in salary.  The Court first observes that a plan to do any of those things would not have contradicted any of the representations of which Plaintiffs have introduced evidence.  Accordingly, the existence of such a plan would not constitute evidence that any representation was made while the speaker did not intend to honor it.  In any event, the documents simply do not support Plaintiffs' allegations concerning a secret plan.

The only document cited by Plaintiffs that lends any support to the allegation that a plan existed is a document dated April 9, 1999, and entitled "ZF Batavia Rewards Philosophy and New Rewards Programs."  That document demonstrates, at most, that individual performance was to be a factor in the payment of AIP bonuses and that, over time, merit increases in salary for transitional employees would align with those for new hires and, eventually, with inflation.  Plaintiffs have not identified evidence of representations by Defendants to the contrary, however.  Accordingly, whether the "plan" documented in the April

24

9, 1999, document represented the actual intentions of ZF Batavia
and whether it was secret, it does not suggest that Defendants
misrepresented their intentions to Plaintiffs in 1999.  It is no
evidence of fraud on Defendants' parts.

Plaintiffs are not helped by their citation to <u>Miles v.
Perpetual Savings & Loan Co.</u>, 58 Ohio St.2d 97 (1979).
Plaintiffs contend that that decision stands for the proposition
that Defendants were under a duty to disclose every intention
they had with respect to Plaintiffs in 1999 and that they
committed fraud by failing to inform Plaintiffs of such things as
their intentions with respect to future merit increases in
salary.  They grossly misconstrue the <u>Miles</u> decision, which
stands for nothing more, in the present context, than that a
party commits fraud by failing to disclose material facts when it
has a duty to do so.  It does not support Plaintiffs' implied
contention that a potential employer has a duty to disclose every
thought it has regarding the future of the potential employment
arrangement.  Plaintiffs have identified no other support for
that contention.  The Court concludes that Defendants are
entitled to summary judgment with respect to Plaintiffs'
fraudulent misrepresentation claim.

Defendants are also, therefore, entitled to summary
judgment with respect to Plaintiffs' claim for punitive damages
in relation to the fraudulent misrepresentation claim.  Unable to

establish a claim for fraudulent misrepresentation, Plaintiffs
cannot prove that the fraud was aggravated or egregious.

    2.  The FLSA claim and the related Ohio law claim

    Plaintiffs assert just one claim under federal law in
this action, a claim that Defendant ZF Batavia violated the FLSA
and O.R.C. § 4111.01, *et seq.*, by misclassifying Plaintiffs as
exempt employees and, consequently, failing to pay them overtime
in accordance with the requirements of the statutes.  In general,
the statutes upon which Plaintiffs rely require the payment of
overtime "at a rate not less than one and one-half times the
regular rate" when an employee works beyond forty hours in a work
week.  29 U.S.C. § 207(a)(1).  Ohio law requires the same and
also imports the exemptions made applicable under the FLSA.  See
O.R.C. § 4111.03.  Accordingly, Plaintiffs' claims under the two
statutes stand or fall together.

    The FLSA exemptions from the requirements of §207(a)(1)
are set out in 29 U.S.C. § 213:

    (a)  The provisions of . . . section 207 of this
        title shall not apply with respect to --

        (1)  any employee employed in a bone fide
            executive, administrative, or professional
            capacity . . . (as such terms are defined and
            delimited from time to time by the Secretary
            [of Labor], . . ., except that an employee
            of a retail or service establishment shall
            not be excluded from the definition of
            employee employed in a bona fide executive or
            administrative capacity because of the number

of hours in his workweek which he devotes to
activities not directly or closely related to
the performance of executive or
administrative activities, if less than 40
per centum of the hours worked in his
workweek are devoted to such activities).

Accordingly, the overtime compensation requirement of
29 U.S.C. § 207(a)(1) does not apply to a bona fide executive
employee, as that term is defined in regulations promulgated by
the Secretary of Labor, as long as that employee devotes more
than sixty per cent of his working hours to activities directly
or closely related to the performance of his executive
activities.  The pertinent regulations, promulgated by the
Secretary of Labor, are collected in chapter 29 of the Code of
Federal Regulations.

The term "bona fide executive employee" is defined at
29 C.F.R. § 541.1:

The term "employee employed in a bona fide
executive . . . capacity" in section 13(a) of
the act [29 U.S.C. §213(a)] shall mean an
employee:

(a)   Whose primary duty consists of the
management of the enterprise in which he
is employed or of a customarily
recognized department or subdivision
thereof; and

(b)   Who customarily and regularly directs
the work of two or more other employees
thereof; and

(c)   Who has the authority to hire or fire
other employees or whose suggestions and
recommendations as to the hiring or
firing and as to the advancement and
promotion or any other changes of status

27

of other employees will be given
particular weight; and

(d)  Who customarily and regularly exercises
discretionary powers; and

(e)  Who does not devote more than 20
percent, or, in the case of an employee
of a retail or service establishment who
does not devote as much as 40 percent,
of his hours of work in the workweek to
activities which are not directly and
closely related to the performance of
the work described in paragraphs (a)
through (d) of this section:  Provided,
That this paragraph shall not apply in
the case of an employee who is in sole
charge of an independent establishment
or a physically separated branch
establishment, or who owns at least a
20-percent interest in the enterprise in
which he is employed; and

(f)  Who is compensated for his services on a
salary basis at a rate of not less that
$155 per week . . ., exclusive of board,
lodging, or other facilities:  Provided,
That an employee who is compensated on a
salary basis at a rate of not less than
$250 per week . . . , exclusive of
board, lodging, or other facilities, and
whose primary duty consists of the
management of the enterprise in which
the employee is employed or of a
customarily recognized department or
subdivision thereof, and includes the
customary and regular direction of the
work of two or more other employees
therein, shall be deemed to meet all the
requirements of this section.

Plaintiffs do not dispute that they were exempt

employees while employed by Ford or that they maintained that

exempt status when they transitioned to ZF Batavia.  Rather, they

claim that their status changed in the Summer of 2001 when they

were required to begin recording their time as they entered and left the plant.

In August 2001, ZF Batavia Human Resources Director Len Sennish sent a notice to all salaried employees and contract employees with "salaried responsibilities."  That notice advised the employees that the Batavia plant had been designated as a foreign trade zone and that applicable regulations required that the facility be secure and that records of ingress and egress be maintained.  The notice further advised employees as follows:

> Please be advised that salaried timesheets will be
> audited against Honeywell system readouts.  Your
> manager will be asked to clarify notable differences
> between them, and pay adjustments are a possibility if
> no justification is forthcoming.  For example, a
> clarification will be necessary if the time sheet shows
> a person reporting for work and the readout indicates
> your badge had not activated the system that day, or
> vice versa.  The same would be true if the amount of
> overtime listed on the timesheet does not reasonably
> balance to the readout.
>
> There are no employees as identified above exempted
> from this procedural requirement.

Defendant ZF Batavia has introduced evidence that demonstrates that no salaried employee has had his or her pay docked as a result of the badge requirement imposed in 2001. Plaintiffs have failed to identify a shred of evidence to the contrary.  Defendant has also introduced evidence that demonstrates that it does not routinely, or even frequently, compare salaried employees' timesheets to the Honeywell readouts. Again, Plaintiffs offer only evidence that an employee without

ultimate payroll authority reviews approximately twelve reports per year.  Finally, Defendant ZF Batavia has observed that evidence submitted by Plaintiffs as an attachment to their memorandum in opposition to ZF Batavia's motion for summary judgment supports ZF Batavia's contention that it desired to preserve Plaintiffs' exempt status under the FSLA and that it was aware that it could not dock exempt employees' pay and preserve that status.

In the face of the evidence supporting Defendant ZF Batavia's contention that Plaintiffs were not subject to docking or routine comparison of their timesheets to badge readouts, Plaintiffs argue, under the authority of Auer v. Robbins, 519 U.S. 452 (1997), that ZF Batavia altered their exempt status when it began requiring them to use the badge reader and issued the August 2001 notice.  In Auer, the Supreme Court considered a policy, broadly applicable to salaried employees, that set forth potential discipline for various infractions.  One available disciplinary measure was a pay deduction, and such a deduction had been imposed upon one salaried employee on one occasion.  The Court stated as follows:

> The Secretary of Labor, in an *amicus* brief filed at the
> request of the Court, interprets the salary-basis test
> to deny exempt status when employees are covered by a
> policy that permits disciplinary or other deductions in
> pay "as a practical matter."  That standard is met, the
> Secretary says, if there is either an actual practice
> of making such deductions or an employment policy that
> creates a "significant likelihood" of such deductions.
> The Secretary's approach rejects a wooden requirement
> of actual deductions, but in their absence it requires

a clear and particularized policy--one which "effectively communicates" that deductions will be made in specified circumstances.  This avoids the imposition of massive and unanticipated overtime liability (including the possibility of substantial liquidated damages, see, *e.g., Kinney v. District of Columbia, supra*, [994 F.2d 6] at 12 [(D.C. Cir. 1993)]) in situations in which a vague or broadly worded policy is nominally applicable to a whole range of personnel but is not "significantly likely" to be invoked against salaried employees.

Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless "'plainly erroneous or inconsistent with the regulation.'"  *Robinson v. Methow Valley Citizens Council*, 490 U.S. 332, 359, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989)(quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).  That deferential standard is easily met here.  The critical phrase "subject to" comfortably bears the meaning the Secretary assigns.

* * *

If the statement of available penalties applied solely to petitioners, matters would be different; but since it applies both to petitioners and to employees who are unquestionably not paid on a salary basis, the expressed availability of disciplinary deductions may have reference only to the latter.  No clear inference can be drawn as to the likelihood of a sanction's being applied to employees such as petitioners.  Nor, under the Secretary's approach, is such a likelihood established by the one-time deduction in a [salaried employee's] pay, under unusual circumstances.

Auer,519 U.S. at 461-62.

        In 1999, the Court of Appeals applied the rationale of

Auer to conclude that salaried employees who could not

demonstrate "an actual practice" of applying deductions under a

broadly applicable policy remained exempt for FSLA purposes.

Aiken v. Memphis, 190 F.3d 753, 762 (6th Cir. 1999), cert.

denied, 528 U.S. 1157 (2000).  The Court finds Aiken and Auer to
be persuasive authority in Defendant ZF Batavia's favor in this
action.

       While the Court is aware that the policy suggested by
the August 2001 notice was applicable only to salaried employees,
the Court is also persuaded that that fact does not exclude it
from the class of broadly applicable policies at issue in Auer,
supra, and Aiken, supra.  Evidence of record demonstrates that ZF
Batavia had salaried employees in August 2001 who were not exempt
for FSLA purposes.  Moreover, the notice was explicitly directed
to contract salaried employees as well as regular salaried
employees.  It was not limited, therefore, to salaried exempt
employees.

       While the mechanism for tracking Plaintiffs' time and
that of other exempt employees was in place beginning in or
around September of 2001, that fact alone does not give rise to a
significant likelihood that Plaintiffs' pay would actually be
docked.  It certainly does not constitute evidence of a actual
practice of docking salaried employees' pay.  Considered in the
light of the uncontroverted evidence that Defendant ZF Batavia
wished to avoid the potentially massive liability that could
attach in the event that Plaintiffs' exempt status were
compromised, the evidence that no deductions occurred, and the
evidence that Defendants did not routinely monitor the time
records of salaried employees, the existence of the mechanism for
making deductions and the notice advising Plaintiffs and other

salaried employees that time could be monitored and pay
deductions made do not constitute evidence of a significant
likelihood of deductions.  See Auer, 519 U.S. at 461.

The Court is not persuaded by Plaintiffs' citation to
the transcript of the deposition testimony of Dick Newark, ZF
Batavia's plant manager.  Mr. Newark testified that his
understanding was that a salaried employee could lose pay for
working less than his timesheets suggested he had worked.  See
Newark depo., p.85.  The Court first notes that Mr. Newark did
not distinguish between exempt and non-exempt salaried employees,
both of which worked in the plant.  More importantly, however,
uncontroverted evidence of record demonstrates that Mr. Newark's
understanding was incorrect.

At his deposition, Len Sennish, the Human Resources
Director at ZF Batavia, testified that exempt employees' pay
would not be docked unless in accordance with the FSLA.  See
Sennish depo., p.102.  To the extent that Mr. Newark's broad
testimony might suggest that the pay of exempt employees would
have been docked by ZF Batavia, even if that docking would
compromise their exempt status, Mr. Sennish's testimony clarifies
the policy at ZF Batavia.  Mr. Newark's suggestion, which did not
distinguish between exempt and non-exempt salaried employees,
does not constitute evidence of a policy to dock the pay of
Plaintiffs and other salaried exempt employees when their
timesheets differed from the Honeywell records.  The Court
concludes that Plaintiffs cannot establish that Defendants

33

violated either the FSLA or parallel Ohio law with respect to the payment of overtime to Plaintiffs, because they were, as a matter of law, exempt employees.  Defendants are, therefore, entitled to summary judgment with respect to Plaintiffs' statutory claims.

D.  <u>Conclusion</u>

For those reasons, the motions for summary judgment of Defendant Ford Motor Company (Doc. 42) and ZF Batavia (Doc. 65) are hereby **GRANTED**.  Defendant Ford Motor Company's motion to strike deposition exhibits (Doc. 82) is hereby **DENIED** as **MOOT.** The Court has considered the exhibits but has concluded that they do not lend evidentiary support to Plaintiffs' claims to the extent, if any, that they are admissible.  Plaintiffs' motion to strike certain evidence (Doc. 89) is also hereby **DENIED** as **MOOT**, inasmuch as the Court has not considered the evidence in question.  This action is **CLOSED**.

**IT IS SO ORDERED**.

_____/s/_____
Sandra S. Beckwith
United States District Judge