NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

**FILED**

INFORMATION COPY
MANDATE NOT YET ISSUED
DIS. CT. # 02-406

No. 04-3877

OCT 2 6 2005

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LEONARD GREEN, Clerk

FILED
JAMES BONINI
CLERK
05 OCT 26 PM 1:05

EVERETT W. WHISMAN, et al.,

    Plaintiffs-Appellants,

v.

FORD MOTOR COMPANY; ZF BATAVIA,
LLC,

    Defendants-Appellees.

On Appeal from the United
States District Court for the
Southern District of Ohio

_____/

BEFORE:    RYAN, MOORE, and COOK, Circuit Judges.

    RYAN, Circuit Judge.    The district court granted summary judgment in favor of the defendants, Ford Motor Company and ZF Batavia, LLC, in this action alleging violations of the overtime provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, and Chapter 4111 of the Ohio Revised Code (ORC). The plaintiffs appeal the summary judgment and also appeal the dismissal of their state law claims for fraudulent misrepresentation, breach of contract, and promissory estoppel. For the following reasons, we will affirm.

I.

    Ford Motor Company formerly owned and operated an automatic transmission plant in Batavia, Ohio. The plant had been underperforming for some time and was scheduled to be shut down in 2004 or 2005. In 1999, Ford sold most of its ownership interest in the Batavia plant to ZF Batavia, LLC (ZFB), a joint venture formed by Ford and ZF

(No. 04-3877)                    - 2 -

Friedrichshafen AG (ZF).  ZF had experience with new technology for producing a transmission known as the CVT transmission.  The joint venture was formed because Ford and ZF hoped to utilize ZF's CVT technology and Ford's experience in the mass production of transmissions to produce the CVT transmission.  Under the terms of the joint venture agreement, ZF held a majority ownership interest in ZFB with 51 percent of the shares, while Ford retained a minority ownership interest with 49 percent of the shares.

Before Ford transferred the plant operations to ZFB, Ford gave its salaried employees the option of ending their employment with Ford and becoming employees of ZFB or remaining Ford employees, provided employment at another Ford plant was available.  On May 27, 1999, representatives from Ford and ZFB met with the salaried employees to discuss the joint venture and to provide information regarding ZFB's benefits and compensation plans.  During the meeting, the Ford salaried employees were presented with a compensation package that was, with certain exceptions, virtually identical to their compensation package at Ford, should they elect to join ZFB.  The plaintiffs allege that, during this meeting and other less formal gatherings, Ford and ZFB representatives assured them that their "overtime would remain the same" under ZFB.

As an inducement to the salaried employees to resign from Ford and join ZFB, Ford drafted a brochure summarizing the benefits and compensation that ZFB would offer to its salaried employees.  The brochure stated, among other things, that "[a]uthorized overtime will be paid," and noted that its Annual Incentive Plan would be "based on [ZFB's] success determined by product quality, timing and delivery of new and existing products and profitability."  The brochure contained a disclaimer stating that the plans described in the

(No. 04-3877)                                    - 3 -

document were "subject to change." The plaintiffs comprise a group of 15 former salaried employees of Ford who eventually accepted employment at ZFB.

Within weeks of the May 27, 1999, meeting, many of the plaintiffs signed their offer letters to join ZFB and, by the end of the year, all of them had resigned from Ford and accepted employment with ZFB. As part of the transition to ZFB, the plaintiffs were required to complete applications for employment. In the applications, the plaintiffs acknowledged that they would be employed on an at-will basis.

The salaried employees at the Batavia plant were eligible to receive overtime pay under both Ford and ZFB. Beginning in November 2000, however, ZFB implemented an overtime policy that differed from Ford's policy. Prior to and for some time after ZFB began operating the plant, salaried employees, particularly the supervisors who worked on the plant floor, were required to arrive at the plant early and to remain at work late to help accommodate the shift change. This overtime work was known as "casual time." Under Ford's overtime policy, a salaried employee at the plant who worked at least one full hour of overtime beyond his eight-hour shift would receive an hour's pay at the salaried overtime rate, and thus, would receive overtime compensation for casual time. Under ZFB's new policy, a salaried employee received no overtime compensation if he worked less than two full hours beyond his eight-hour shift, and even if he did work two full hours, he would not be paid overtime for the first hour. The plaintiffs allege this new policy violated their statutory overtime compensation rights.

The plaintiffs also allege that ZFB reneged on its promises concerning its Annual Incentive Plan. Although Ford's brochure did not describe how the salaried employees' incentive money would be distributed on an individual basis under ZFB, the plaintiffs allege

(No. 04-3877)                                    - 4 -

that they were informed that payments under the Annual Incentive Plan would vary only according to job classification, not individual job performance. Beginning in 2002, however, ZFB took into account individual performance in distributing annual bonuses. Meanwhile, and significantly, the plaintiffs continued to work for ZFB, despite the changes to their overtime compensation and annual incentive bonuses.

In 2001, ZFB was awarded status as a Foreign Trade Zone, a status which gave it certain economic advantages with respect to the importation of goods. Leonard Sennish, ZFB's Director of Human Resources, testified that regulations governing foreign trade zones required that documentation be maintained regarding the ingress of individuals into the Batavia plant. Accordingly, on August 29, 2001, Sennish issued a memorandum to all salaried employees, announcing that they would be required to swipe their electronic identification badges through a card reader to record their ingress into and egress from the plant (the Sennish memo). The Sennish memo was specifically addressed to "All ZFB[] Salaried, Ford Salaried and Contract Employees with Salaried Responsibilities" and was not sent to the hundreds of hourly employees at the plant. To ensure compliance with the new policy, the memorandum warned that the salaried employees' time sheets would be audited against the card reader reports, and that any unexplained discrepancies could lead to possible "pay adjustments." Despite this threat, there is no evidence in the record that any salaried employee's base pay has ever been docked as a result of the policy.

On June 6, 2002, seven of the plaintiffs in this appeal brought suit against Ford and ZFB, asserting statutory overtime compensation claims under federal and Ohio law, in addition to state law claims for fraudulent misrepresentation, breach of contract, and promissory estoppel. Thereafter, Ford filed a motion to dismiss under Federal Rule of Civil

(No. 04-3877)                          - 5 -

Procedure 12(b)(6), and its motion was denied.  The plaintiffs later amended their

complaint to add additional plaintiffs, and the parties then engaged in extensive discovery.

After the close of discovery, Ford and ZFB both filed motions for summary judgment. After

the plaintiffs filed their responses to the motions for summary judgment, Ford moved to

strike certain deposition exhibits that were filed with the plaintiffs' response to Ford's

motion. The plaintiffs, in turn, filed a motion to strike certain affidavits submitted with ZFB's

reply brief in support of its motion for summary judgment.  On June 1, 2004, the district

court granted the defendants' motions for summary judgment, while denying, as moot, both

the plaintiffs' and the defendants' motions to strike.  The plaintiffs appealed.

II.

Both the FLSA and the ORC provide that employees may not be required to work

more than 40 hours per week without overtime compensation at a rate not less than one

and one-half times their regular pay.  29 U.S.C. § 207(a)(1); Ohio Rev. Code Ann. §

4111.03(A).  The FLSA provides certain exemptions from its overtime requirement, all of

which have been adopted by the State of Ohio in the enforcement of its overtime laws.

Ohio Rev. Code Ann. § 4111.03(A). Because the success of the plaintiffs' overtime claims

turns on whether the plaintiffs are exempt from such requirements, the merits of the federal

and state overtime claims are indistinguishable and therefore will be examined together.

The FLSA does not require employers to pay overtime compensation to "any

employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1).  The

regulations implementing the FLSA provide that, to fall within this exemption, the employee

must be "compensated on a salary basis." 29 C.F.R. § 541.1(f) (2002). An employee is

"compensated on a salary basis" "if under his employment agreement he regularly receives

(No. 04-3877)                                    - 6 -

each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a) (2002). This is known as the "salary-basis test."

In Auer v. Robbins, 519 U.S. 452 (1997), the Supreme Court resolved a split among the circuits over the meaning of the phrase "subject to" as used in the salary-basis test. Prior to Auer, the circuits differed as to "whether, under that test, an employee's pay is 'subject to' disciplinary or other deductions whenever there exists a theoretical possibility of such deductions, or rather only when there is something more to suggest that the employee is actually vulnerable to having his pay reduced." Id. at 459. In resolving the split, the Court deferred to the Secretary of Labor's interpretation of the salary-basis test as set forth in the Secretary's amicus brief. According to the Secretary's interpretation, employees are subject to a reduction in pay when they "are covered by a policy that permits disciplinary or other deductions in pay 'as a practical matter.'" Id. at 461. "That standard is met . . . if there is either an actual practice of making such deductions or an employment policy that creates a 'significant likelihood' of such deductions." Id. (emphasis added). While this standard does not require a showing of actual deductions, "in their absence it requires a clear and particularized policy—one which 'effectively communicates' that deductions will be made in specified circumstances." Id.

The plaintiffs in Auer, several sergeants and a lieutenant employed by the St. Louis Police Department, were nominally covered by a police manual that listed 58 possible rule violations as well as a range of penalties attached to each violation. The manual nominally covered all department employees and several of the specified penalties permitted

(No. 04-3877)                                    - 7 -

deductions in pay.  The Court concluded that, under these circumstances, the plaintiffs

were not "'subject to' disciplinary deductions within the meaning of the salary-basis test."

Id. at 462.

> This is so because the manual does not "effectively communicate" that pay
> deductions are an anticipated form of punishment for employees in
> petitioners' category, since it is perfectly possible to give full effect to every
> aspect of the manual without drawing any inference of that sort.  If the
> statement of available penalties applied solely to petitioners, matters would
> be different; but since it applies both to petitioners and to employees who are
> unquestionably not paid on a salary basis, the expressed availability of
> disciplinary deductions may have reference only to the latter.  No clear
> inference can be drawn as to the likelihood of a sanction's being applied to
> employees such as petitioners. Nor, under the Secretary's approach, is such
> a likelihood established by the one-time deduction in a sergeant's pay, under
> unusual circumstances.

Id. (emphasis omitted).

In this case, the plaintiffs contend that they were not exempt from the overtime

requirements of either the FLSA or the ORC because their pay was "subject to reduction

because of variations in the quality or quantity of the work performed."  29 C.F.R. §

541.118(a) (2002).  The plaintiffs introduced evidence tending to show that there was a

significant likelihood that they would receive such deductions in pay.  In his August 2001

memorandum, ZFB's Human Resources Director, Leonard Sennish, warned that salaried

employees' time sheets would be audited against the card reader reports, and that any

unexplained discrepancies could lead to possible "pay adjustments."  The plaintiffs note

that the Sennish memo was not distributed to all the employees at the plant, but only to the

salaried employees. As such, the plaintiffs argue that they were not just nominally covered

by ZFB's policy, but were specifically targeted by the memorandum.  Although there is no

evidence in the record of an actual practice of pay deductions under this policy, the

(No. 04-3877)                              - 8 -

plaintiffs claim that, once the Sennish memo was circulated, there was a significant likelihood that their compensation would be reduced and therefore their compensation does not meet the "salary-basis test." We disagree.

We first note that some circuits have interpreted <u>Auer</u> to mean that, in order to establish a significant likelihood of pay deductions, an employer's disciplinary policy must effectively communicate that if a specific infraction is committed, then the salaried employee's pay <u>will be</u> docked. <u>Stanley v. City of Tracy</u>, 120 F.3d 179, 184 (9th Cir. 1997); <u>Ahern v. County of Nassau</u>, 118 F.3d 118, 121-22 (2d Cir. 1997). These circuits have gleaned from <u>Auer</u>'s language that a significant likelihood exists only where there is "a clear and particularized policy—one which 'effectively communicates' that deductions <u>will be</u> made in specified circumstances." <u>Auer</u>, 519 U.S. at 461 (emphasis added). Were this the law in this circuit, the plaintiffs' overtime claims would necessarily fail because the Sennish memo merely declares that "pay adjustments are a possibility." This circuit, however, appears to have implicitly rejected this reading of <u>Auer</u>. See <u>Takacs v. Hahn Auto. Corp.</u>, 246 F.3d 776, 781 (6th Cir. 2001).

Unlike the employment manual in <u>Auer</u>, the disciplinary policy in <u>Takacs</u> was clearly applicable to salaried employees like the plaintiffs, because the memo "explicitly states that [the salaried employees], not simply all employees, are subject to pay deductions due to disciplinary infractions." <u>Takacs</u>, 246 F.3d at 781. But the fact that the ZFB policy was clearly applicable to the salaried employees is not itself dispositive of whether there was a significant likelihood of pay deductions, since a lack of clarity in the policy is merely "one example of what would suffice to show that a policy did not effectively communicate that deductions would be made." <u>Ahern</u>, 118 F.3d at 122 n.6. Moreover, the Sennish memo

(No. 04-3877)                              - 9 -

was also distributed to Ford and contract employees at the plant who were not exempt under the FLSA, so that the threat of pay deductions did not "appl[y] solely to [the salaried employees], . . . but . . . applie[d] both to [the salaried employees] and to employees who are unquestionably not paid on a salary basis." Auer, 519 U.S. at 462.

Although the Sennish memo explicitly targeted ZFB's salaried employees, other considerations warrant the conclusion that the plaintiffs were not subject to pay reductions "'as a practical matter.'" Id. at 461. The pretrial record is devoid of any evidence that ZFB routinely monitored the plaintiffs' card reader reports so as to carry out its threat of possible "pay adjustments." Jeffrey Howard, a security guard employed by ZFB, testified that, on average, he was requested to pull a salaried employee's card reader report about once a month. Sennish testified that readouts were requested only when there was a specific concern regarding the attendance of a particular employee. Combined with the fact that no salaried employee's salary was ever docked, there is no evidence that ZFB implemented or enforced the disciplinary policy described in the Sennish memo.

There is also evidence that ZFB would not have docked any salaried employee's pay if it would have resulted in a violation of the FLSA. Shortly before the Sennish memo was circulated, Herbert Huebner, ZFB's Manager of Benefits and Compensation, sent an electronic mail message to Sennish concerning the memo, warning him that it would be impermissible under the FLSA to dock a salaried employee's base pay for missing less than a day's work. During his deposition, Sennish testified that he would not have made an adjustment to a salaried employee's pay if it was impermissible under the FLSA.

Finally, "[ZFB's] nonenforcement of its disciplinary policy and the fact that no [salaried employee] has ever suffered a reduction in pay under the policy, provide even

stronger evidence that [ZFB's] disciplinary policy is not one under which there is a 'significant likelihood' of deductions." Balgowan v. New Jersey, 115 F.3d 214, 219 (3d Cir. 1997). Even under Auer, a "one-time deduction in [an employee's] pay, under unusual circumstances," was not sufficient to establish a significant likelihood that pay deductions would actually be imposed. Auer, 519 U.S. at 462. Based on the record before us, we conclude there was no more than a theoretical possibility that the salaried employees at ZFB would have been docked pay as a result of the Sennish memo. Consequently, the plaintiffs were paid on a salary basis under ZFB and were therefore exempt from the overtime requirements of both the FLSA and the ORC.

### III.

The plaintiffs also contend that the district court erred in dismissing their claims of fraudulent misrepresentation. The plaintiffs argue that the defendants falsely represented that their overtime compensation under ZFB would be paid as it was paid under Ford, and that under ZFB's Annual Incentive Plan, bonus eligibility would not be determined according to individual job performance. The plaintiffs claim that they presented evidence showing that at the time the defendants made such representations they had no intention of honoring them.

To establish a claim for fraud under Ohio law, the plaintiffs must establish the following elements:

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

    (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

    (d) with the intent of misleading another into relying upon it,

    (e) justifiable reliance upon the representation or concealment, and

    (f) a resulting injury proximately caused by the reliance.

Cohen v. Lamko, Inc., 462 N.E.2d 407, 409 (Ohio 1984).  It is a familiar canon of contract law—and one adopted by the Ohio courts—that "[g]enerally, fraud [may not be] predicated on a representation concerning a future event, as such representation is more in the nature of a promise or contract or constitutes mere predictions or opinions about what the future may bring."  Yo-Can, Inc. v. The Yogurt Exchange, Inc., 778 N.E.2d 80, 89 (Ohio Ct. App. 2002).   "However, a promise made with a present intention not to perform is a misrepresentation of an existing fact even if the promised performance is to occur in the future."  Id.

    The plaintiffs have not demonstrated that the representations concerning their future benefits and compensation were false when they were made in that there was no intention to honor them.   While plaintiffs submitted a plethora of evidence showing that representatives of Ford and ZFB assured them that their overtime compensation under ZFB would be paid as it was under Ford, and that the Annual Incentive Plan would be based on certain objective factors, there is no evidence that the defendants promised that the plaintiffs' benefits and compensation were guaranteed for the indefinite future and would never be subject to change.  Nor is there any evidence indicating that the plaintiffs were actually told that individual performance would never be considered by ZFB in distributing annual bonuses.  When the plaintiffs first began working for ZFB, they were

(No. 04-3877)                                    - 12 -

paid overtime compensation just as they had been paid at Ford, and were given annual

bonuses based on the criteria that the defendants had identified before hiring them.  ZFB

did not change its overtime policy until late 2000, over a year after the plaintiffs left Ford

and began working for ZFB, and individual performance was not factored into the plaintiffs'

bonuses until 2002.  Thus, the defendants initially honored the alleged promises they made

to the plaintiffs.  There is no evidence that the plaintiffs were promised that their benefits

and compensation would <u>never change</u>, or that when the promises concerning their

compensation were made, there was <u>then</u> no intention to keep them.  Therefore, the ZFB

was free to change the employees' benefits and compensation package after the plaintiffs

were employed by ZFB.

     Under Ohio law, "an action for fraud and deceit is maintainable not only as a result

of affirmative misrepresentations, but also for negative ones, such as the failure of a party

to a transaction to fully disclose facts of a material nature where there exists a duty to

speak."  <u>Miles v. Perpetual Sav. & Loan Co.</u>, 388 N.E.2d 1367, 1369 (Ohio 1979).

> [A] party is under a duty to speak, and therefore liable for non-disclosure, if
> the party fails to exercise reasonable care to disclose a material fact which
> may justifiably induce another party to act or refrain from acting, and the non-
> disclosing party knows that the failure to disclose such information to the
> other party will render a prior statement or representation untrue or
> misleading.

<u>Id.</u>

     The plaintiffs contend that, prior to offering them transitional employment, the

defendants concocted a secret plan to align the salaries of the Ford transitional employees

with those of other new hires, to pay lower Annual Incentive Plan bonuses to the plaintiffs,

and to give them lower merit increases compared to ZFB's new hires.  The plaintiffs argue

(No. 04-3877)                                    - 13 -

that the defendants had a duty to disclose their secret plan and, by failing to do so, are

liable for fraudulent concealment.  There is no evidence in the record that either Ford or

ZFB promised the plaintiffs that their salaries would remain higher than those of ZFB's

other new hires, or that they would receive a specific percentage or dollar amount for their

bonuses.  Neither is there any evidence that the plaintiffs were told that their future merit

increases would be higher or the same as those given to ZFB's new hires.  Thus, even if

the defendants truly conceived a plan to implement these initiatives—and there is no

evidence they did—the failure to disclose it to the plaintiffs was not fraudulent because the

non-disclosure did not "render a prior statement or representation untrue or misleading."

Id.  Consequently, the district court properly concluded "that a plan to do any of those

things would not have contradicted any of the representations of which Plaintiffs have

introduced evidence."

                                            IV.

        The plaintiffs also allege that the defendants breached their employment

agreements by prospectively altering the terms of their employment.  Specifically, the

plaintiffs contend the defendants committed a breach by:  (1) not paying them overtime

compensation that would have been paid when Ford operated the Batavia plant; and (2)

by awarding bonuses under the Annual Incentive Plan based, in part, on individual

performance.  Alternatively, the plaintiffs contend that the defendants are liable under a

theory of promissory estoppel for failing to adhere to their pre-hire promises.

        The plaintiffs do not dispute that their employment relationship with ZFB is governed

by Ohio's employment at-will doctrine.  Under that doctrine, "[u]nless otherwise agreed,

either party to an oral employment-at-will agreement may terminate the employment

relationship for any reason which is not contrary to law." Mers v. Dispatch Printing Co., 483 N.E.2d 150, 153 (Ohio 1985). The district court concluded that, given the plaintiffs at-will status, ZFB retained the right to change the prospective terms of their employment, stating, "[i]t stands to reason that an employer who may legally terminate an employee on any given day without reason may also take the lesser step of altering the terms and conditions of the employee's employment prospectively without incurring liability for breach of contract or promissory estoppel."

The plaintiffs' contention that altering the terms of their employment was tantamount to a breach of their employment agreements is at odds with the Supreme Court of Ohio's recent decision in Lake Land Employment Group of Akron v. Columber, 804 N.E.2d 27 (Ohio 2004). In Lake Land, the defendant, a former employee of the plaintiff, argued that the non-compete agreement he had signed during the course of his employment was unenforceable because it was not supported by consideration. In evaluating the plaintiff's claim, the court noted that, in general, "an employer or an employee in an at-will relationship may propose to change the terms of their employment relationship at any time." Id. at 32. The court reasoned that if an employer changes the terms of the employee's work agreement, "the employee's remedy, if dissatisfied, is to quit." Id. Conversely, "if the employee proposes to the employer that he deserves a raise and will no longer work at his current rate, the employer may either negotiate an increase or accept the loss of his employee." Id. From these observations, the court reasoned that "mutual promises to employ and to be employed on an ongoing at-will basis, according to agreed terms, are supported by consideration: the promise of one serves as consideration for the promise of the other." Id. Applying these principles, the Lake Land court held that an

(No. 04-3877)                          - 15 -

employer's offer of continued employment, given in exchange for an employee's assent to a non-compete agreement, constitutes consideration to support the agreement. Id.

The plaintiffs argue that Lake Land is limited to those situations in which an employee is asked to alter the terms of his at-will employment agreement by signing a non-compete agreement. We are not persuaded that the general principle invoked in Lake Land—that continued employment constitutes consideration for a change in the terms of the employee's employment agreement—should not be applicable here. The articulation of this principle in Lake Land was not a novel development in Ohio law. In Nichols v. Waterfield Fin. Corp., 577 N.E.2d 422, 423 (Ohio Ct. App. 1989), a case which did not involve a non-compete agreement, the court reasoned that "if consideration were required to modify [an] at-will employment contract, . . . continued employment [would be] sufficient consideration to modify the contract."

When ZFB changed the compensation terms of the plaintiffs' at-will employment, the plaintiffs' proper remedy was not to sue for breach of contract; it was to attempt to negotiate a more favorable benefits and compensation package, or quit. Because the plaintiffs did not quit, but continued to work for ZFB, even after ZFB altered its overtime and annual incentive policies, the modification to the plaintiffs' employment agreements was supported by consideration. Consequently, the plaintiffs have no basis on which to sue for breach of contract.

**V.**

Finally, we turn to the plaintiffs' claims of promissory estoppel. Although the State of Ohio adheres to the employment at-will doctrine, the Supreme Court of Ohio has recognized a "limit on an employer's right to discharge [an employee] . . . where

(No. 04-3877)                         - 16 -

representations or promises have been made to the employee which fall within the doctrine of promissory estoppel." Mers, 483 N.E.2d at 154. "The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." Id. at 155.

As the language of Mers indicates, the Supreme Court of Ohio has recognized the doctrine of promissory estoppel only as a limit on an employer's right to discharge an employee; it has not addressed whether promissory estoppel may be used to proscribe an employer's right to change the prospective terms of an employee's employment relationship at any time. "'Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 517 (6th Cir. 2001) (quoting Puckett v. Tennessee Eastman Co., 889 F.2d 1481, 1485 (6th Cir. 1989)). "This rule applies regardless of whether the appellate court decision is published or unpublished." Id.

In Johnson v. Norman Malone & Assocs., Inc., No. 14142, 1989 WL 154763, at *3 (Ohio Ct. App. Dec. 20 1989) (unpublished disposition), the court considered whether an employer could be held liable under a theory of promissory estoppel for changing an employee's eligibility for the employer's incentive bonus and stock purchase plans. The court assumed that promissory estoppel was potentially applicable under the circumstances, but concluded that, even if the employer had made specific promises regarding these benefits, "[the employee's] decision to continue to work for [her employer]

(No. 04-3877)                                    - 17 -

after she became aware of the evanescence of the bonus and stock option plans altered the terms of her employment with [her employer]." Id. "Accordingly, the promises lost meaning when [the employee] became aware of their lack of bases, but continued to work for [her employer] under the new terms of employment." Id.

Applying the principles of promissory estoppel to this case, we conclude that the plaintiffs' promissory estoppel claims must fail. The plaintiffs, as we have explained, have failed to produce any evidence that either Ford or ZFB promised them that individual performance would not be considered in the distribution of their annual bonuses. Further, even acknowledging the evidence indicating that the plaintiffs were promised that overtime compensation would be paid as it had been under Ford, "the promises lost meaning when [the plaintiffs] became aware of their lack of bases, but continued to work for [ZFB] under the new terms of employment." Id. Accordingly, the district court did not err in granting summary judgment for the defendants with respect to the plaintiffs' claims of promissory estoppel.

**VI.**

For the foregoing reasons, the district court's grant of summary judgment is **AFFIRMED**.

(No. 04-3877)                    - 18 -

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.** I respectfully dissent from Part II of the majority's opinion because I believe that plaintiffs have created a genuine issue of material fact about whether ZFB violated the overtime-compensation requirements of the Fair Labor Standards Act ("FLSA") and the Ohio Revised Code ("ORC"). In *Auer*, the Supreme Court deferred to the Secretary of Labor's test for determining whether employees are exempt under the FLSA, adopting the view that exempt status is denied "when employees are covered by a policy that permits disciplinary or other deductions in pay 'as a practical matter.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Plaintiffs have produced evidence that they were covered by such a policy, thereby entitling them to the overtime-compensation protections of the FLSA and ORC. The August 2001 Sennish memo to all ZFB salaried, Ford salaried, and contract employees with salaried responsibilities advised that "pay adjustments are a possibility" if management finds notable differences between salaried time sheets and the entrance and exit times recorded by the electronic employee badge system installed at the facility entrances. J.A. at 249 (Sennish Memo to Salaried Employees, Aug. 29, 2001). In addition, ZFB plant manager Dick Newark testified that under this policy, a salaried employee would lose an hour of pay if his or her electronic card readout indicated that the employee was at work for an hour less than indicated on his or her time sheet. Newark stated:

> [T]he intent behind what we were trying to do was to incent people to be very disciplined on using their badge swipes for security purposes. And so the threat was, well, you don't do that right and we're going to — we're going to take your pay away and assume that, you know, you didn't clock in the door or didn't activate the door correctly.

(No. 04-3877)                                    - 19 -

J.A. at 516 (Newark Dep. July 24, 2003, at 86).  Newark also agreed that a few employees may have lost pay under this policy.  This testimony, along with the text of the August 2001 memo, suggests that ZFB instituted "a clear and particularized policy" that effectively communicated that pay deductions would be permitted in specific circumstances.  *Auer*, 519 U.S. at 461.  Because plaintiffs have raised a genuine issue about whether they faced "a 'significant likelihood'" of experiencing those pay deductions, *id.*, I would reverse the district court's grant of summary judgment to defendants on plaintiffs' overtime-compensation claims.